## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| J.B., a minor child, by and through his next friend, ADDIE WARD, on behalf of himself and all other similarly situated; | ) ) ) | |
| | ) | **Case No: 2:06-CV-755-CSC** |
| Plaintiff, | ) | **CLASS ACTION** |
| | ) | |
| vs. | ) | |
| | ) | |
| WALTER WOOD, in his individual capacity, | ) ) | |
| | ) | |
| Defendant. | ) | |

### BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The Defendant opposes the certification of a class of plaintiffs in this case. The Plaintiffs have not provided the Court with sufficient evidence to satisfy the rigorous analysis requirement of Fed.R.Civ.P. 23. *See, General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364 (U.S.,1982) (stating that a "class action, may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied"). The Defendant opposes class certification because the Plaintiffs failed to meet their burden of proof to supply the Court with sufficient information to rigorously analyze any of the requirements of commonality, typicality, or adequacy of representation. Likewise, the Plaintiffs failed to supply information to satisfy their burden of proof regarding predominance, and superiority. In this brief the Defendant will discuss the stringent requirements of Rule 23 and the inadequacies of the Plaintiffs' case in support of certification.

## PROCEDURAL BACKGROUND

Plaintiffs JB by and through Addie Ward filed this lawsuit in the United States District Court for the Middle District of Alabama on August 23, 2006. They now seek to be certified to represent a class. JB seeks damages allegedly due the class for violations of a state statute which they allege required the Defendant J. Walter Wood, Jr. to place JB in DYS within 7 days of his commitment, and for alleged violation of JB's constitutional right to rehabilitative treatment.

On or about March 5, 2007, the Plaintiffs filed a Motion for Class Certification and a supporting Brief. The case is now before this Court on the Plaintiffs' motion for class certification. The Plaintiffs seek certification of a class of individuals pursuant to Fed.R.Civ.P. 23(b)(3).

## UNDISPUTED FACTS

JB is a 17 year old Caucasian juvenile delinquent who seeks to be certified as a class representative. JB is currently committed to the custody of the Department of Youth Services and has been committed previously. He was first committed to state custody in May 2005 for burglary in the 1st degree. (Exhibit 1). He went to a program in Mobile called "The Bridge", from which he ran away. (Exhibit 2 - JB depo. p. 7, lines 4-9). He was subsequently sent to DYS Autauga campus. He was again committed to state custody for possession of drugs in April 2006. (Exhibit 2 - JB depo. p. 9, lines 9-7; Exhibit 3). He is currently again in state custody for theft of property and possession of a pistol. (Exhibit 2 - JB depo. p. 7, lines 20-22; Exhibit 4). JB has a pending claim against him for conspiracy to commit robbery and for which he asserts a 5th Amendment right against self incrimination. (Exhibit 2 - JB depo. p. 10, line 6 - p. 11, line 18). The

pending charge for conspiracy to commit robbery, the charge for theft of property, and the charge for possession of a pistol all occurred during the pendency of this lawsuit.

J. B. testified that he has been a frequent user of marijuana since he was nine years old. (Exhibit 2 - JB depo. P. 15, line 22 - p. 17, line 19). The only thing that may have convinced him to stop using drugs is having been locked up. (Exhibit 2 - JB depo. p. 19, line 8- p. 21, line 1). JB is apparently not a highly motivated individual. Throughout his DYS file are references to his unwillingness to put forth a full effort in his undertakings. (Exhibit 5). He is affiliated with gangs and considers himself "Crip to the heart" or "Crip for life." (Exhibit 6; Exhibit 2 - JB depo. p. 22, line1-6; Exhibit 7 - Ward depo. p. 28, lines 3-9). JB admitted to DYS staff that he used hallucinogenic drugs including mushrooms and pills (Exhibit 8), but now denies using hallucinogens (Exhibit 2 - JB depo. p. 25, lines 11-18).

JB has little understanding of what this lawsuit is about or what it means to be a class representative. (Exhibit 2 - JB depo. p. 28, lines 6- p. 29, line 2; Exhibit 2 - JB depo. p. 31, lines 11-20). He has communicated with putative class counsel approximately three times. (Exhibit 2 - JB depo. p. 30, line 5 - p. 31, line 2). He doesn't know his lawyers' phone numbers or where to find them. (Exhibit 2 - JB depo. p. 31, lines 3-10). JB plans to get a job in construction when he gets out of state custody. (Exhibit 2 - JB depo. p. 34, lines 7-19).

Plaintiff Addie Ward is a 78 year old retiree. She is JB's great grandmother and JB has lived with her, off and on, since approximately 1996. (Exhibit 7 - Ward depo. p. 9, lines 10-11; p. 12, lines 10-13). She does not have custody of JB ( Exhibit 7 - Ward depo. P. 44, line 18- p. 46, line 11). She currently lives alone and her sources of income

3

include only state retirement and social security.  (Exhibit 7 - Ward depo. p. 41, lines17-23).  On the day of her deposition her attorney originally stated that her deposition could only last one hour because she had an appointment for treatment at the cancer clinic.[1]

Addie Ward's grandson–Kenneth Turner–is JB's father.  Kenneth Turner has legal custody of JB  (Exhibit 7 - Ward depo. p. 35, lines 7-12; 44, line 18 - p. 46 line 10).  Turner has been in and out of jail including for DUI.  JB's mother is in prison in Louisiana.  (Exhibit 7 - Ward depo. p. 46, line17- p. 47, line 23).

The Mission of DYS is to enhance public safety by holding juvenile offenders accountable through the use of institutional, educational, and community services that balance the rights and needs of victims, communities, courts, and offenders.  Essentially, the juvenile courts in the 67 Alabama counties commit delinquent youth, and in certain cases children in need of supervision (CHINS) to DYS custody, *see* Ala.. Code 12-15-71 (c), and (e), 1975, as amended, and DYS staffs each juvenile according to his or her characteristics.(Exhibit 9).

When a juvenile is committed to DYS custody, the Screening and Placement Committee reviews the juvenile's characteristics and determines where the juvenile would most appropriately be staffed.  The Screening and Placement Committee currently has available for placement 6 operated DYS facilities and 26 contract facilities.  The DYS operated facilities for staffing are:

Autauga Campus                              Mobile Group Home,

Chalkville Campus,

---

[1] Though the undersigned offered to accommodate her she changed her appointment and went forward with the deposition.

Mt. Meigs Campus,

Thomasville Campus,

Vacca Campus.

The contract facilities are:

Alabama Youth Homes, Inc.,
    (locations in Wetumpka,
    Westover, and Oneonta)

Big Brothers Home Away From
    Home,

J & M Manor,

Laurel Oaks Behavioral Health
    Center,

Lee County Youth Development
    Center, (S.T.A.R.S. program
    and BEAMS program)

Southern Oaks Center,

The Bridge, (GEMS Program),

The Bridge, (REACH Program),

The Bridge, (STEPS Program),

The Bridge, (Camp Cobia),

The Bridge, (About Face),

The Bridge, (Camp 180),

Three Springs, (Madison),

Three Springs (Tuskegee),

Three Springs, (Choices, Male),

West Alabama Youth Services,
    (W.A.Y.S.),

West Alabama Youth Services,
    (Chances)

New Life Center for Change,

Restoration Resources, Inc.,

Group Homes for Children,

Troy University, Troy Group Home,

Montgomery Group Home,

University of North Alabama, North
    Alabama Group Home.

The selection of the above referenced placement options is based on a cycle of approximately three years. Estimated staffing needs must be projected, proposals must be

prepared, and contracts solicited.  DYS adheres to the standards of the American

Correctional Association with regard to staffing ratios, and facility standards.

Obviously, with 29 current placement options, staffing is a complex undertaking.  A

complicating factor is that the various types of commitments (discussed below) occasionally

experience unpredictable spikes from the various courts in the 67 Alabama counties.  Those

spikes tend to be sporadic and unpredictable.  Capacity at each placement option is limited

based on facility capacity and ACA standards.  When a particular facility is full, and no

alternate appropriate placement is available, placement is delayed until a bed becomes

available pursuant to the provisions of § 12-15-71(j), Code of Alabama, 1975, as amended.

(See Applicable Law, below).

Obviously, with 29 current placement options, staffing is a complex undertaking.  A

The Plaintiffs claim they are entitled to money damages for the violation of the above

referenced state statutes.  Alternatively, the Plaintiffs claim they are entitled to money

damages for violation of the Plaintiff's alleged constitutional right to rehabilitative

treatment.[2]

"RIGHT TO TREATMENT."  When dealing with treatment of juvenile delinquents

in the custody of DYS, it is important to distinguish between the various kinds of

"treatment," and the semantic distinctions involved in the various usages of the terms

involved.  The terms rehabilitation, treatment, mental health treatment, treatment of mental

illness, and rehabilitative treatment are often used interchangeably in casual discussion,

however the law regarding these issues is distinct and requires precise understanding of the

---

[2]  The Defendant denies the Plaintiffs are entitled to damages and denies a cause of action exists
under either claim.  However, because this is a brief on class certification the Defendant will not
address the merits of the claims herein.

subject under scrutiny. In addition, there are cases discussing "treatment as a juvenile," which have nothing to do with the issues in this case because they deal mostly with transfer of defendants from the juvenile system to the adult system. The Defendant in this case will focus on "treatment" in conformity with the provisions of the Eighth Amendment. Essentially, the Defendants submit that under the law in this circuit, there is no constitutional right to treatment and the constitutional standard for treatment is found under the Cruel and Unusual clause of the Eighth Amendment. *See Morales v. Turman*, 562 F.2d 993 (11th Cir. 1977).

Plaintiff and putative class representative JB is not an individual with a serious mental illness and he is not seeking to be a representative of a class of seriously mentally ill, or emotionally disturbed, juveniles in DYS custody. He is a delinquent adjudicated for burglary, drug offenses, theft of property and possession of a firearm. Yet he is seeking to be a representative of EVERY juvenile committed to DYS custody who has been required to wait in detention for placement in a DYS facility. As discussed herein, the class is overly broad and includes subclasses with claims that differ significantly in substance. For example, a juvenile delinquent with a history of criminal conduct such as JB has a significantly different substantive claim to "treatment" from a seriously mentally ill or emotionally disturbed juvenile who is ungovernable.

## APPLICABLE LAW

§ 12-15-71(j), Code of Alabama 1975, as amended, states:

> whenever a court commits a child to a state or local agency or orders a
> state or local agency to provide services or treatment for a child, that
> agency shall accept the child for commitment, order services, or
> treatment within seven days of the court's order. However, if
> compliance with the court's order within seven days would place an

7

<u>agency in violation of either a state statute or standard, then
compliance is not required.</u>  (Emphasis added).

§ 12-15-61( c ), Code of Alabama 1975, as amended, states that "the Department of Youth

Services shall accept all children committed to it within seven days of notice of disposition."

The constitutional right to treatment on which this case is based has not been firmly

established.  *See, e.g. Morales v. Turman*, 562 F.2d 993, 998 (5th Cir. 1977)[3] (stating that the

"right to treatment is doubtful" and that "the eighth amendment prohibition of cruel and

unusual punishment as the constitutional standard for the conditions of imprisonment can

adequately remedy the conditions in [juvenile] institutions").  Generally, there is therefore no

constitutional right to treatment of juvenile delinquents in DYS custody similar to the right to

treatment of mentally ill or mentally retarded juveniles.

Rule 23, Fed.R.Civ.P., governs the certification of class actions.  The Court must first

perform a rigorous analysis of the four prerequisites before certifying a class action.  Rule

23(a) states:

> Prerequisites to a Class Action.  One or more members of a
> class may sue or be sued as representative parties on behalf of
> all only if (1) the class is so numerous that joinder of all
> members is impracticable, (2) there are questions of law or fact
> common to the class, (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of
> the class, and (4) the representative parties will fairly and
> adequately protect the interests of the class.

The prerequisites stated in Rule 23(a) are commonly referred to as numerosity,

commonality, typicality, and adequate representation. The Plaintiffs have the burden of proof

with regard to each issue.  *See, Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 350 F.3d

---

[3] In *Bonner v. Prichard*, 661 F.2d 1206 (1981), the newly created Eleventh Circuit adopted as
binding precedent Fifth Circuit decisions rendered prior to October 1981.

1181, 1192 (11ᵗʰ Cir., 2003).  Each is discussed below in the section titled Argument.

If the plaintiffs satisfy the Court as to the prerequisites of Rule 23(a), only then does the Court go on to determine whether the action can be maintained under the provisions of Rule 23(b)(1)(A), Rule 23(b)(1)(B), Rule 23(b)(2), or Rule 23(b)(3).[4]

Rule 23(b) states as follows:

> **(b) Class Actions Maintainable.**  An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
>
> . . .
>
> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; ©) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

## ARGUMENT

Numerosity.  The numerosity requirement hinges on whether joinder of all members is impracticable.  While there is no minimum number necessary in all cases to meet the numerosity requirement, the Plaintiffs must submit evidence of factors regarding each subclass sufficient to satisfy the Court that the impracticability threshold has been met.  *See, e.g.* Rule 23( c)((4); *Johnson v. American Credit Co. of Georgia*, 581 F.2d 526 (5th

---

[4]  The plaintiffs in this case only seek to have a class certified pursuant to Rule 23(b)(3).

9

Cir.1978); *LaBauve v. Olin Corp.*, 231 F.R.D. 632 (S.D.Ala.2005); *Pickett v. IBP, Inc.*, 197 F.R.D. 510 (M.D.Ala.2000); *Woodward v. Nor-Am Chem. Co.*).  In this case, while it is true that the entire group of juveniles committed to state custody and not placed within seven days exceeds 600 people, it does not necessarily follow that each subclass satisfies the Numerosity requirement.  The Plaintiffs have glossed over the numerosity requirement, assuming that the number of juveniles when lumped together in one group satisfies the Numerosity requirement, without submitting one whit of evidence that they can be so treated.

The purported class in this case includes no subclasses but delineates one lead plaintiff as representative of one class comprising all persons committed to state custody who remained in detention for seven days or longer.[5]  A closer examination however reveals that the committed juveniles include several subclasses.  For example, the alleged class includes individuals who are males and females.

The Prison Litigation Reform Act applies to certain claims and not to others.   This issue is particularly troublesome with regard to JB because he filed the first complaint in this lawsuit while still in DYS custody.  His having re-filed the complaint *after* being released from DYS custody may not solve the problem–particularly in light of the fact that his two cases have now been consolidated.  Moreover, during the pendency of the case, JB was again placed in state custody.  This legal complication is most likely unique to his case and is an example of the type of conflict that requires subclasses.[6]

_____

[5]  The Plaintiff characterizes the claim as though the issue were placement within seven days of commitment, while the statute under the Plaintiff wants to travel requires placement "within seven days of notice of disposition."

[6] It is also the kind of conflict that destroys commonality.  (See below).

10

The Plaintiffs made no attempt to delineate between juveniles of various groups staffed for the various facilities described above. SJOs and juveniles committed for alcohol abuse, for example, are purported to be thrown into one pot. However, such differences present serious intraclass conflicts which require subclasses to be defined. The Plaintiffs have offered no definitions of subsidiary classes they might present. If they had done so, they would have been required to submit that each subclass meets the Numerosity requirement. They have supplied the court with no information whatsoever.

In addition to the differences between juveniles staffed at various facilities, there are several categories of commitments. The Plaintiffs have made no attempt to delineate between juveniles of various types of commitments. The following paragraphs, derived from the attached affidavit of Pat Pendergast, will discuss these categories of commitments.[7]

The first category is known as HIT (high intensity treatment). HIT commitments are generally not committed to DYS custody but are adjudicated and placed on probation, with a condition of probation being that they complete a HIT program. Obvious differences exist between juveniles committed to state custody and a juvenile on probation who must complete a HIT program or be subsequently committed to DYS custody. The defense that HIT juveniles are not in DYS custody is a defense to the claims not applicable to others in the purported class.

A second category is known as SJO (serious juvenile offenders). Pursuant to the

---

[7] The DYS Screening and Placement committee simplifies classifications and classifies all students as either (a) SJO, (b) Regular Commitment, (c) Sex Offender, (d) Community/Residential, (e) Pure Hit, (f) Special Needs, or (g) any combination of two or more of the above. Screening and Placement's classification is based on the type of commitment order, risk assessment scores, reports from probation officers, psychologists and others familiar with the child. (Exhibit 9).

provisions of § 12-15-71.1, Code of Alabama 1975, as amended, serious juvenile offenders are committed for serious crimes and are required to be incarcerated for a minimum period of one year. Their claim of a need for placement within the shortest period of time is therefore different from other groups and unique in character, and their claim to a higher priority with regard to the limited resources of the agency–compared to the claims of other groups–is more tentative. Likewise, their claim to monetary damages–as compared to the claim of other groups–is different in character.

A third category is dependent children who are also adjudicated delinquent. Pursuant to § 12-15-71, Code of Alabama 1975, as amended, such children may be placed in residential facilities but they have unique characteristics that separate them from generic delinquents and from other groups.

A fourth category is known as CHINS (children in need of supervision). Pursuant to the provisions of § 12-15-71, Code of Alabama 1975, as amended, a CHINS must be treated different from delinquents. However, only if a CHINS is also delinquent, he/she may be placed in a facility with delinquent children, and only if the court also finds the child is not amenable to treatment or rehabilitation under a prior disposition or if the child is adjudicated a CHINS for a second time.

A fifth unique category is status offenders under a valid court order. Such status offenders include truants, children committed for contempt of court, violation of probation (VOP), possession of alcohol by a minor, and children under 16 committed for traffic offenses. This group may overlap with, but is distinct from, CHINS. They are obviously distinct from, and have claims different in character from, for example, delinquent children or SJOs.

12

A sixth category is delinquent children.  A delinquent child is a child committed for an act designated a violation, misdemeanor, or felony offense under the law of Alabama or another state if the act occurred in another state or under federal law or a violation of a municipal ordinance except violations of municipal curfew ordinances.

A seventh category is determinate sentence commitments.  The concept of determinate sentence commitments was judicially created in *Ex parte R.E.C.*, 678 So.2d 1041 (Ala. 1995).  A juvenile judge may require a juvenile to stay in custody for a specific length of time if the commitment order cites specific findings of fact and a reasoned analysis as to how the determinate period is calculated to benefit the juvenile or to further his or her rehabilitation; and provided, further, that the judge plainly states his/her intent to incorporate its order into DYS's service plan.

An eighth category is criminal sex offenders.  Pursuant to the Community Notification Act,  § 12-20-20, *et seq.*, Code of Alabama, 1975, as amended, juvenile criminal sex offenders are juveniles who are adjudicated for any of the following offenses:

> a. Rape in the first or second degree, as proscribed by Section 13A-6-61 or 13A-6-62; provided that a sentencing court may exempt from this article a juvenile or youthful offender criminal sex offender for a criminal sex offense as defined in Section 13A-6-62(a)(1).
>
> b. Sodomy in the first or second degree, as proscribed by Section 13A-6-63 or 13A-6-64.
>
> c. Sexual torture, as proscribed by Section 13A-6-65.1.
>
> d. Sexual abuse in the first or second degree as proscribed by Section 13A- 6-66 or 13A-6-67.
>
> e. Enticing a child to enter a vehicle, room, house, office, or other place for immoral purposes, as proscribed by Section 13A-6-69.

f. Promoting prostitution in the first or second degree, as proscribed by Section 13A-12-111 or 13A-12-112.

g. Violation of the Alabama Child Pornography Act, as proscribed by Section 13A-12-191, 13A-12-192, 13A-12-196, or 13A-12-197.

h. Kidnaping of a minor, except by a parent, in the first or second degree, as proscribed by Section 13A-6-43 or 13A-6-44.

I. Incest, as proscribed by Section 13A-13-3, when the offender is an adult and the victim is a minor.[8]

j. Soliciting a child by computer for the purposes of committing a sexual act and transmitting obscene material to a child by computer, as proscribed by Sections 13A-6-110 and 13A-6-111.

k. Any solicitation, attempt, or conspiracy to commit any of the offenses listed in paragraphs a. to j., inclusive.

--Any crime committed in any state or a federal, military, Indian, or a foreign country jurisdiction which, if it had been committed in this state under the current provisions of law, would constitute an offense listed in paragraphs a. to k., inclusive.

--The foregoing notwithstanding, any crime committed in any jurisdiction which, irrespective of the specific description or statutory elements thereof, is in any way characterized or known as rape, sodomy, sexual assault, sexual battery, sexual abuse, sexual torture, solicitation of a child, enticing or luring a child, child pornography, lewd and lascivious conduct, taking indecent liberties with a child, or molestation of a child.

All juvenile criminal sex offenders must receive a risk assessment prior to release to the public. DYS, in cooperation with the University of Alabama and Auburn University, has developed the Accountability Based Sex Offender Program (known as ABSOP), for holding juvenile criminal sex offenders accountable and providing treatment and rehabilitation of

---

[8] Incest is included herein merely because the statute lists it. By definition, a juvenile in DYS custody cannot be an adult and therefore cannot be a juvenile sex offender based on conviction of incest.

14

criminal juvenile sex offenders. The ABSOP program is located at Mt. Meigs campus. Approximately 50% of the physical bed space at Mt. Meigs is occupied by the ABSOP program. Obviously this group's claim on the limited resources of the agency is different from the claims of other groups.

A ninth category of juvenile commitments are "Multiple needs" children. Multi-needs children include children at imminent risk of out-of-home placement or a placement in a more restrictive environment as a result of the conditions of emotional disturbance, behavior disorder, mental retardation, mental illness, dependency, chemical dependency, educational deficit, lack of supervision, delinquency, or physical illness or disability, or any combination thereof, and whose needs require the services of two or more of the following entities: DYS, public school system (services for exceptional needs), Department of Human Resources, Department of Public Health, juvenile court probation services, or Department of Mental Health and Mental Retardation. These children present the various juvenile courts with perhaps the most challenging set of placement decisions.

Each of the above categories are distinct subclasses who present serious intraclass conflicts which require subclasses to be defined. These groups of juveniles compete for limited state resources with regard to placement in the various facilities. The groups and subgroups have different and competing claims on limited state resources. Yet the Plaintiffs have offered no definitions of subsidiary classes they might present.

Furthermore, in this case there is no avoiding multiplicity of actions. The real relief sought by the putative members of the class--money--can only be obtained in individual actions following inquiries into the individual situations of the juveniles and the facilities to which they were staffed. Every class member will necessarily have to submit evidence, and

the court will have to make findings of fact, to sustain their characteristics and therefore their claims for money. For these reasons, the court should decline to certify the class as defined and should refuse to certify smaller classes. *Paciello v. Unum Life Ins. Co. of America*, 188 F.R.D. 201, 205 (S.D.N.Y. 1999).

<u>Commonality</u>. The commonality requirement "is aimed at determining whether there is a need for combined treatment and a benefit to be derived therefrom." *Jenkins v. Raymark Industries Inc.*, 782 F.2d 468, 472 (5th Cir.1986) (citations omitted).

As alluded to above, the plaintiffs' identification of the common issues in this case is grossly oversimplified. The Plaintiffs argue that because the case involves a common legal theory[9] there is necessarily a predominance of questions of law or fact common to the class. (Exhibit 10 - Plaintiff's Brief in Support of Motion for Class Certification (Doc. 20 p. 5)). Based on that faulty logic, every group of employees having a claim against a common employer, for example based on 42 U.S.C. 1983, necessarily compromises a single class under Rule 23 simply because the plaintiffs may ask the court to declare that the provisions of 42 U.S.C. 1983 apply to the case. Obviously, if the law applies to one employee' s claim, then it applies to all, however not every case brought under 42 U.S.C. 1983 necessarily has common questions of law or fact. The claims in this case will be determined based on whether each plaintiff can present evidence of his unique claim, not whether DYS is required to follow the law or whether the Fourteenth Amend applies (as opposed to the Eighth

---

[9] The alleged theory has four components including: (1) that the plaintiff was not placed within seven days of commitment to DYS, (2) the plaintiff was not placed within a reasonable time subsequent to commitment, (3) state law requires the placement within seven days of commitment (sic.), and (4) the unreasonable delay in placement of each committed youth is unconstitutional. (Exhibit 10 - Plaintiff's Brief in Support of Motion for Class Certification (Doc. 20 p. 5)).

Amendment).

As discussed above under the section titled Numerosity, there are significant conflicts between the claims of the subclasses. If the Plaintiffs are successful, the result of this case will be a pool of money which must be distributed among the class members, some of whom have claims antagonistic to one another.[10] Class counsel will then be required to allocate the money to the different kinds of plaintiffs, making decisions that necessarily favor some claimants over others. These subclass conflicts destroy the Plaintiffs' commonality, making the claims insufficiently cohesive to warrant adjudication by class representation.[11]

Typicality. The typicality requirement focuses on the interests of the class representatives. *Mack v. General Motors Acceptance Corporation*, 169 F.R.D. 671, 675 (M.D.Ala. 1996). The typicality requirement limits the class claims to those fairly encompassed by the named plaintiff's claims. *General Tel. Co. v. EEOC*, 446 U.S. 318, 330, 100 S. Ct. 1698, 1706, 64 L. Ed.2d 319 (1980).

A "defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class . . . [and] the adequacy of the named plaintiff's representation." *J. H. Cohn & Co. v. American Appraisal Assoc., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980); *Shelley v. AmSouth Bank*, 2000 WL 1121778, 4 (S.D.Ala., 2000). The rationale underlying this rule is that representation will be inadequate if the named plaintiff is preoccupied with her own separate defense or that she will not have the incentive to present

---

[10] For example a juvenile committed to state custody with a determinate sentence to serve until he is 21 years old and a juvenile committed for CHINS and ordered to attend drug treatment would have fundamentally different legal claims. As a result, they will have competing claims to a pool of money to be distributed as damages to the class.

[11] This issue also destroys typicality.

pertinent facts when the defense is not applicable to her but applicable only to a small portion of the class. *Id.*  As discussed above, the purported class representatives' claims are subject to different defenses, thus destroying typicality.  Most glaring is the PLRA defense that applies to JB's claim and the complexities of that claim resulting from his having been in state custody when the first complaint in this lawsuit was filed, the lawsuits having been consolidated, and JB's having been returned to state custody during its pendency.  In addition, the various groups of juveniles, for example CHINS, sex offenders, SJOs, determinate sentence commitments, etc., have significantly differing and competing arguments for "treatment".

Adequate Representation.  Putative class counsel did not address the adequacy of representation issue as it relates to the characteristics of the proposed class representatives. The adequacy of representation inquiry involves questions whether class counsel are qualified, experienced, and generally able to conduct the proposed litigation, but contrary to the Plaintiffs' argument also focuses on whether the plaintiffs have interests antagonistic to those of the rest of the class, and whether they will vigorously prosecute the litigation on behalf of the class.  *Ex Parte Government Employees Insurance Company*, 729 S.2d 299, 307 (Ala. 1999), citing *Griffin v. Carlin,* 755 F.2nd 1516 (11th Cir. 1985).  The Plaintiffs did not address whether the JB has a conflict with members of the class, whether he possesses certain qualifications, or whether the attorney for the class and the class representative are too closely related.  The Plaintiffs' glossing of the concept is a serious deficiency because adequacy of representation presents a due process issue with regard to whether the interests of the class are represented and therefore whether they can be bound by the holding of the case.  The Plaintiffs' brief on certification gives the impression that putative class counsel

18

intends to submit themselves as virtual class representatives and that the named plaintiffs are merely lending their names to the suit controlled entirely by class counsel. This is likewise a troubling issue with regard to JB's adequacy as a representative. *See* <u>Wright, Miller & Kane</u>, 7A Fed. Pract. & Proc. Civ. 3d § 1766, pp 310-11.

Courts consider such characteristics as (1) the representative's role as fiduciary for the class; (2) his interest in vigorously pursuing the case; (3) his general knowledge about the case; (4) his honesty and credibility; and (5) his lack of relation to class counsel. *See e.g., Sheffield v. Homeside Lending, Inc.*, 281 B.R. 24 (Bankr.S.D.Ala.2000). The Eleventh Circuit has not established a standard of characteristics for an adequate representative for general application, however the general principle is that adequacy of representation is primarily based on "the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the ... class" and "whether plaintiffs have interests antagonistic to those of the rest of the class." *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718, 726 (11th Cir.1987). Moreover, meeting these requirements might still be insufficient if the "named plaintiffs ... do not possess the personal characteristics and integrity necessary to fulfill the fiduciary role of class representative." *Id.*

Proposed class representative abdicated his role in this lawsuit to counsel. During JB's deposition the following discussion took place:

> Q: Tell me what your understanding about this case is?
> A: "I really don't know, I guess you'll have to ask my lawyer."
> Q: Okay. Do you have any understanding at all?
> A: All I know is that they held me at Air Base too long and my grandmother and my lawyer had asked for a lawsuit.

(Exhibit 2 - JB depo. p. 28, lines 6-9). This goes to the heart of the adequate representative analysis. *See e.g. Darvin v. International Harvester Co.*, 610 F.Supp. 255, 257 (S.D.N.Y.

19

1985), *Massengill v. Board of Education,* 88 F.R.D. 181 (N.D. Ill. 1980), cited with approval in *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 727 (11th Cir. 1987). Moreover, JB has communicated with putative class counsel only approximately three times. (Exhibit 2 - JB depo. p. 30, line 5 - p. 31, line 2). He doesn't know his lawyers' phone numbers or where to find them. (Exhibit 2 - JB depo. p. 31, lines 3-10). It is quite unlikely that JB will even be available throughout this lawsuit. JB plans to get a job in construction when he gets out of state custody. (Exhibit 2 - JB depo. p. 34, lines 7-19).

JB's testimony makes clear that his great grandmother Addie Ward and putative class counsel were the motivating forces behind this lawsuit. Addie Ward is 78 years old and she does not have legal or physical custody of J.B and she is not his legal guardian.[12] JB's father Kenneth Turner has legal custody and is his guardian. He is not a party to this suit.

Ms. Ward may not have standing to file suit on behalf JB under 17(b) Fed.R.Civ.P.[13] *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). In *Elk Grove*, the Supreme Court recognized that the father's parental authority was derived from state law. In Alabama, 'next friend' standing is not granted automatically to whomever seeks to pursue an action on behalf of another. Prerequisites for 'next friend' standing include providing an adequate explanation--such as disability due to age--why the real party in interest cannot appear on his own behalf to prosecute the action. The Defendant does not dispute this issue. But the 'next friend' must also be truly dedicated to the best

---

[12] She testified that the she has physical custody but apparently that testimony was based on the fact that JB has lived with her off and on for several years because she clarified that there is no court order awarding her custody. (Exhibit 7 - Ward depo. p. 44, line 18- p. 46, line 11).

[13] The Defendant does not argue that Ms. Ward will be a class representative but that she must have standing to be JB's representative because he lacks capacity due to his age.

interests of the person on whose behalf he seeks to litigate. Moreover, it has been further suggested that a 'next friend' must have some significant relationship with the real party in interest. The burden is on the 'next friend' clearly to establish the propriety of his status and thereby justify the jurisdiction of the court. *Ex parte Ray-El*, 911 So.2d 1100, 1102-3, (Ala.Crim.App., 2004). The Defendant does not dispute whether Ms. Ward has a significant relationship or the desire to act in JB's best interest, but whether she has the *ability* to truly prosecute the action on behalf of JB or a class of juveniles. She is 78, has cancer, and has little income.

Proposed class representative JB testified that his motive in this case is "to see that people get shipped off to their programs sooner than what they do." (Exhibit 2 - JB depo. p. 32 lines 1-8). However this is an action for money damages. Aside from the logical *non sequitur* of claiming money damages yet wanting only quicker placement for juveniles, JB has either distinguished his interests as antagonistic of the claims of the putative class members seeking monetary damages or demonstrated that he has no understanding of the case–either of which are fatal to his ability to adequately represent the purported class.

JB has not shown himself to posses the personal characteristics of a responsible individual who will protect the interests of the class. During the pendency of this lawsuit JB has already committed acts that caused him to be recommitted to state custody. Moreover, a new criminal charge is currently pending against JB over which class counsel advised JB to take the 5th Amendment. JB refused to testify regarding that pending charge pursuant to that advice.[14]

_____

[14] Putative class counsel also represents JB in the pending criminal charges. Not only does the existence of pending charges over which JB claims a 5th Amendment privilege separate JB as an

The underlying legal issue in this case is whether juvenile delinquents have a constitutional right to rehabilitative treatment similar to the constitutional right to treatment of individuals committed to state custody for mental health reasons.  There is no doubt that one purpose of commitments to DYS is punishment because of his theft and firearms violations.  Punishment is the means to accountability.  JB and Addie Ward claim that JB should have been placed in treatment instead of being required to wait in detention until a bed became available; however JB has attended two previous treatment programs but he testified that the only thing that may have convinced him to stop using drugs is having been locked up.  (Exhibit 2 - JB depo. p. 19, line 8- p. 21, line 1).   His testimony is antagonistic to the claims of the class that they need treatment–not punishment–for their rehabilitation.  His serious criminal conduct separates him from any juveniles who could have a legitimate shot at a right to treatment.

Class representative must have a strong incentive to vigorously prosecute the action, and this is shown if he has a substantial monetary investment.  JB has absolutely no monetary investment in this case whatsoever.

Rule 23(b)(3).  Plaintiffs seek certification pursuant to Rule 23(b)(3). Additional requirements exist under Rule 23(b)(3)[15]. The Plaintiffs have the burden of proving those

---

inadequate representative of the class, but putative class counsel's instruction to JB not to answer questions relevant to class certification based on the 5th Amendment brings up a serious question of putative class representatives' adequacy to represent the class.

[15]  Rule 23(b) provides for a class certification if:

> **(3)** the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:  (A) the interest of members of the class in individually

additional requirements.

PREDOMINANCE.  The Court must determine whether there are individualized issues of fact and how they relate to the common issues.  The individualized fact issues have been introduced herein. The Plaintiffs offered no information to assist the Court on the true substance of the analysis.

SUPERIORITY.  Then the Court must examine how the class action process compares to the available alternatives: either individual suits or joinder; consolidation, intervention, or other nonrepresentational forms of aggregate litigation; test cases; more narrowly defined class actions, and agency enforcement.  *See Manual for Complex Litigation*, § 21.142.  The Plaintiff has submitted no information nor purported analysis regarding this question.  The Defendant submits that the class action process is not superior. The Defendant will show that the various groups of juveniles committed to state custody have different claims to treatment.  The individual characteristics of each plaintiff will bear heavily on the merits of each claim and there is no way to avoid the problem–particularly in light of the fact that the Plaintiff has not acknowledged subclasses.  On the other hand, a ruling that there either is a right to rehabilitative treatment on behalf of the Plaintiff individually, or a ruling that there is no right to rehabilitative treatment under the law in this circuit, will result in the answer to a question that has long been in dispute.  There is simply no need for class certification.

---

controlling the prosecution or defense of separate actions;  (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;  ©) the desirability or undesirability of  concentrating the litigation of the claims in the particular forum;  (D) the difficulties likely to be encountered in the management of a class action.

MANAGEABILITY.  The Defendant submits that if a class could be certified and subdivided appropriately, the analysis of the proof whether each individual fits in a particular class, or in no class, would be incredibly voluminous and fact-intensive inquiries.  Many juveniles have complex backgrounds and sufficient data and expert analysis is simply missing because there has never been a suggestion that the individual needs "treatment."  Others have significant information available but analysis of that information requires extensive fact-finding.  The Plaintiffs have submitted absolutely no information regarding this issue.

## CONCLUSION

The Defendant submits that the Plaintiffs have failed to sustain their burden of proof under Rule 23.  The Defendant submits that the proposed class cannot be certified under the provisions of Rule 23(b)(3).

Respectfully submitted,


TROY KING
ATTORNEY GENERAL

**s/ T. Dudley Perry, Jr.**
T. Dudley Perry, Jr.
Bar Number: PER-034
Deputy Attorney General
Post Office Box 66
Mt. Meigs, AL 36057
Telephone: (334) 215-3803
Fax: (334) 215-3872
E-Mail: dudley.perry@dys.alabama.gov

## CERTIFICATE OF SERVICE

I hearby certify that on the 3rd day of April, 2007, I electronically filed the foregoing **BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION,** with the Clerk of the Court Using the CM/ECF system which will send notification of such filing to the following:

Michael J. Crow, Esq.
**BEASLEY, ALLEN, CROW**
**METHVIN,**
**PORTIS & MILES, P.C.**
Post Office Box 4160
Montgomery, AL 36103-4160

Robert D. Drummond, Jr., Esq.
**ATTORNEY AT LAW**
 323 De LaMare
Fairhope, AL 36532

                                             **s/T. Dudley Perry, Jr.**
                                             T. Dudley Perry, Jr.
                                             Bar Number: PER-034
                                             Deputy Attorney General
                                             Attorney For Defendant
                                             J. Walter Wood, Jr.

# EXHIBIT
# 1

Alabama Department of Youth Services

Date/Time Printed: 03/05/2007  09:50:35 AM



Alabama Department of Youth Services
# Main Juvenile Information

## Case No.: AUTA-8215 Name: Jonathan C Bishop

**Alias:**
CHASE

**Gender:**
Male

**Date of Birth:**
09/13/89

**S.S.N:**
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

**Age:**
16 *(Current)*
15 *(At Commitment )*

**Commitment Information:**

**Probation Officer:**
Ray Williams

**Commitment Type:**
Regular DYS

**Office#:**
334-261-4100

**Committing County:**
Montgomery

**Beeper #:**

**Main Committing Offense:**
BURGLARY

**DYS Returnee?**
No

**Other Commiting Offenses:**

**HIT Returnee?**
No

**Main Offense Category:**
Offenses against property

**# Past Offenses:**
4

**Date/Risk Information:**

**Commitment Date By Court:**
05/18/2005

**Date Notification Order Received by DYS:**
05/24/2005

**Risk Score:**
11

**Needs Score:**

**Screening and Placement Staffing Date:**

**Multiple Needs?**

**Initial Date of Entry into DYS:**
06/28/2005

**Drug & Alcohol Score:**

**Service Plan Staffing Date:**

**Medical Risk?**
No

**Anticipated Entry/ Return Date:**

**Suicide Risk?**
No

**Psych. Evaluation/Iintake Date:**

**Security Risk?**
No

**Anticipated Release Date:**
10/04/2005

**Substance Abuse?**
Yes

**Placement:**
Released from DYS Custody
Placed on Aftercare

**Gang Affiliation?**
Yes

**Occult Involvement?**
No

**Actual Entry Date Into Facility:**
08/16/2005

**Weapon Involvement?**
Yes

**Status:**
RELEASED

**Case Manager:**
Phyllis Taylor

**Other Custody:**

**Release Type:**

EXHIBIT

41

# EXHIBIT
# 2

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF ALABAMA
2                   NORTHERN DIVISION

3    J. B., a minor
     child, by and
4    through his next
     friend, ADDIE
5    WARD, on behalf
     of himself and
6    all other
     similarly                  CASE NO.
7    situated;                  2:06-CV-908-MHT
     Plaintiff,                 CLASS ACTION
8
     vs.
9
     J. WALTER WOOD,
10   in his individual
     capacity,
11   Defendant.

12          *      *      *      *      *      *

13          **D E P O S I T I O N   O F   J.  B.**

14   taken  pursuant  to  notice  and

15   stipulation  on  behalf  of  the

16   Defendant,  in  the  Central  Office,

17   Mt.  Meigs  Complex,  1000  Industrial

18   School  Road,  Mt.  Meigs,  Alabama,

19   before  Mishan  Williamson,  Certified

20   Shorthand  Reporter  and  Notary  Public

21   in  and  for  the  State  of  Alabama  at

22   Large,  on  March  26,  2007,  commencing

23   at  approximately  10:04  a.m.

EXHIBIT

2

```
 1                        A P P E A R A N C E S

 2

 3        FOR THE PLAINTIFF:

 4                    MICHAEL J. CROW, ESQ.

 5                    Beasley, Allen, Crow,

 6                    Methvin, Portis & Miles

 7                    218 Commerce Street

 8                    Montgomery, Alabama 36104

 9

10                    ROBERT D. DRUMMOND, ESQ.

11                    Attorney at Law

12                    6767 Taylor Circle

13                    Montgomery, Alabama 36117

14

15        FOR THE DEFENDANT J. WALTER WOOD:

16                    T. DUDLEY PERRY, JR., ESQ.

17                    Alabama Department of Youth

18                    Services

19                    Montgomery, Alabama

20

21        ALSO PRESENT:

22                    ADDIE WARD

23                    PHYLLIS CARNEY
```

```
 1        start today and work backward?
 2   A.   It would be easier to work from the
 3        past to now.
 4   Q.   Okay.  What was the -- when were you
 5        first committed to state custody?
 6   A.   In '05 for burglary and theft.  And
 7        then I had ran.  And they put me back
 8        in state custody after I ran.  And
 9        then in '06, for violation of
10        aftercare.
11               THE REPORTER:  Violation of
12                    what?
13               THE WITNESS:  Violation of
14                    aftercare.
15               MR. DRUMMOND:  Speak a little
16                    slower so she can hear
17                    you and write.
18               THE WITNESS:  Yes, sir.
19   A.   And I ran from Mobile again, and they
20        brought me back to Mt. Meigs.  And
21        this time, for possession of small
22        pistol and theft of property.
23   Q.   So how many times is that?
```

```
1          my dad came and got me from

2          Birmingham.

3    Q.    How did you get to Birmingham?

4    A.    The person I ran with mother came and

5          got us.

6                   MR. DRUMMOND:  Don't ask that.

7                   MR. PERRY:   I wonder how that

8                        worked out for her.

9    Q.    All right.  Then in '06, you were

10         committed for aftercare violation?

11   A.    Yes, sir.

12   Q.    That was a drug offense?

13   A.    Yes, sir.

14   Q.    Did you test positive, or did they

15         catch you with drugs on you?

16   A.    My grandmother found the marijuana in

17         my room.

18   Q.    Okay.  Now, weren't you sent to jail

19         at one time?

20   A.    To the county jail in October of 2006.

21   Q.    All right.  That was for firing a

22         pistol at Waffle house?

23   A.    Yes, sir.  I was with another --
```

```
 1        another person and we went into the

 2        woods behind Holiday Inn and shot the

 3        gun.  And then they asked some people

 4        to say that we shot in the parking

 5        lot.

 6   Q.   Now, before that -- a couple of weeks

 7        before that, you had been detained.

 8             (Off-the-record discussion.)

 9             MR. DRUMMOND:  Dudley, this

10                  case is still pending.  I

11                  just want to make sure

12                  there's not a pending

13                  case still out there.  It

14                  would be inappropriate

15                  for him to answer your

16                  questions, one that

17                  obviously he's been

18                  adjudicated on.

19                  So, anyway -- go

20                  ahead, if that comes up,

21                  then I'm going to object.

22             MR. PERRY:  Well, I guess what

23                  you're telling me is,
```

```
 1                     there's 5th Amendment

 2                     privilege issue.

 3          MR. DRUMMOND:  Well, let's see

 4                     if we get to -- it may

 5                     not even come up.

 6   Q.   Okay.  J. B., are there pending cases

 7        hanging out there now?

 8   A.   The case in the county for conspiracy

 9        to commit robbery.

10   Q.   Well, tell me what that's about.

11                     MR. DRUMMOND:  I object to

12                     that.  Dudley, do you

13                     really need to ask that?

14                     I'm going to

15                     instruct him to the 5th

16                     -- if you ask him

17                     anything about what it's

18                     about.

19   Q.   All right.  That is not the

20        shoplifting at Parisian?

21   A.   No, sir.

22   Q.   All right.  The shoplifting at

23        Parisian's was a couple of weeks
```

```
 1        were smoking and I wanted try it.  So

 2        I asked them to try it and I tried it.

 3        They let me try it.

 4   Q.   Who were these people you were hanging

 5        around with?

 6   A.   I can't remember their names now.

 7        They were people I used to hang around

 8        with when I was 9.

 9   Q.   Were they gang members?

10   A.   No; not at the time.

11   Q.   Where did they go to school?

12   A.   Brewbaker.

13   Q.   When did you first use alcohol?

14   A.   When I was about 10 or 11.

15   Q.   And how frequently have you used

16        marijuana?

17   A.   Every day.

18               MR. CROW:  You talking about

19                    when he was 9, or when he

20                    was 16?  What time period

21                    are you talking about?

22   Q.   From the time you were 9 until the

23        time you were 16, did you use
```

| | | |
|---|---|---|
| 1 | | marijuana pretty much every day? |
| 2 | A. | Yes, sir. |
| 3 | Q. | And how about alcohol? |
| 4 | A. | It was every now and again. |
| 5 | Q. | Did the frequency of your alcohol use, |
| 6 | | from the time you first used it until |
| 7 | | the last time you were committed to |
| 8 | | state custody, change or was it pretty |
| 9 | | much just the same? |
| 10 | A. | I'd say about the same -- about the |
| 11 | | same. |
| 12 | Q. | And did your frequency of marijuana |
| 13 | | use change? |
| 14 | A. | Yes, sir. |
| 15 | Q. | Pretty much daily the whole time or |
| 16 | | were there times where you used it |
| 17 | | less frequently? |
| 18 | A. | Daily, the whole time. But it was |
| 19 | | like -- sometimes, it changed. It got |
| 20 | | where I smoked more. |
| 21 | Q. | Okay. I saw somewhere a note that |
| 22 | | said you used smoked as much as an |
| 23 | | ounce or half an ounce in a day; is |

1          that right?

2     A.   Yes, sir.

3     Q.   How many marijuana cigarettes is in an

4          ounce?

5     A.   Over 10.

6     Q.   And you would smoke as many as 10 in

7          one day?

8     A.   Yes, sir.

9     Q.   You were selling drugs during this

10         time; is that right?

11    A.   Yes, sir.

12    Q.   Is that where you got your drugs?

13    A.   Yes, sir.

14    Q.   And after the treatment programs that

15         you've been through -- I want to make

16         sure I understand this -- your use did

17         not -- your frequency did not really

18         change?

19    A.   No, sir.

20    Q.   Let me ask you this:  Is there any

21         reason that anybody should expect that

22         when you leave here this time that

23         your frequency of use when you get out

| | | |
|---|---|---|
| 1 | | Kent, but you can bet -- |
| 2 | | let's go off the record. |
| 3 | | (Off-the-record discussion.) |
| 4 | Q. | (By Mr. Perry:) So what you're saying |
| 5 | | is that you have already abstained |
| 6 | | from marijuana use; is that right? |
| 7 | A. | Yes, sir. |
| 8 | Q. | Any other reason -- well, first of |
| 9 | | all, why -- what made you say no? |
| 10 | A. | Cause I finally realized that it cost |
| 11 | | my -- it cost my freedom several |
| 12 | | times. |
| 13 | Q. | Because you've been locked up as a |
| 14 | | result? |
| 15 | A. | Yes, sir. |
| 16 | Q. | Several times? |
| 17 | A. | Yes, sir. |
| 18 | Q. | During the treatment programs that you |
| 19 | | have attended, am I correct if I |
| 20 | | assume that one of the topics that |
| 21 | | y'all have discussed is the fact that |
| 22 | | as a result of your drug use, you've |
| 23 | | lost your freedom? |

```
 1   A.    Yes, sir.

 2   Q.    And you understand that, don't you?

 3   A.    Yes, sir.

 4   Q.    And that's true, isn't it?

 5   A.    Yes, sir.

 6   Q.    So would it being fair to say that in

 7         your case -- your specific case,

 8         having been locked up may be the only

 9         thing that helps you decide not to use

10         drugs anymore?

11               MR. DRUMMOND:  Object to the

12                     form.

13   A.    Could you rephrase the question?

14   Q.    Would it be fair to say -- would it be

15         true to say that, where you are

16         concerned, in your case, the thing

17         that may have gotten through to you,

18         the thing that may have made a

19         difference for you -- time will

20         tell -- is the fact that you've been

21         locked up?

22               MR. DRUMMOND:  Object to the

23                     form.
```

```
 1   A.     I guess so.
 2   Q.     J. B., have you -- several of the
 3          notes that I see in your file make
 4          reference to your unwillingness to put
 5          forth a full effort.  Have you seen
 6          those notes?  Are you aware --
 7   A.     No, sir.
 8   Q.     What are you working on today, these
 9          days, here at Meigs?
10   A.     I go to trade every day.
11   Q.     Anything else?
12   A.     And I just started CAPS.  Today will
13          be my first -- well, today was my
14          first day at CAPS.
15   Q.     All right.  You've been through CAPS
16          before, haven't you?
17   A.     Yes, sir.
18   Q.     Okay.  Describe CAPS.
19   A.     CAPS is a program that -- where you
20          have group, and they go on different
21          topics about drug use and drug abuse;
22          that's all that.
23   Q.     When you -- well, let me back up.
```

```
 1          There's a note that says that -- that

 2          says that you had said that you're a

 3          Crip to the heart?

 4    A.    I said Crip for life.

 5    Q.    Crip for life.  Is that true?

 6    A.    Yes, sir.

 7    Q.    So when you leave here, will you be or

 8          will you not be a Crip?

 9                    MR. DRUMMOND:  Object to the

10                        form.

11    A.    It's -- it's hard to say.  Yeah, I'm

12          going to be a Crip.  But I ain't going

13          to be affiliated because everybody

14          that I hang around is not -- is not

15          gang affiliated.

16    Q.    Okay.  What does it mean to be a Crip

17          or not to be a Crip?

18    A.    For -- well --

19                    MR. DRUMMOND:  Dudley, I know

20                        this is a pretty wide

21                        field, but with all due

22                        respect, this is sort of

23                        -- I can't find any
```

```
1                      read, Page 22, Line 11.)

2    Q.    All right.  Let's try it another way,

3          J. B.  Will you, when you get out --

4          do you expect to hang around others

5          who are affiliated with the Crips?

6    A.    No, sir.

7    Q.    Why not?

8    A.    Cause it's just -- I just made it in

9          my mind that gang-banging got me in

10         trouble, just like drugs.

11   Q.    When did you first use mushrooms?

12   A.    I never used mushrooms.

13   Q.    Do you recall telling someone that you

14         had hallucinated while you were on

15         mushrooms?

16   A.    No, sir.

17   Q.    You never told anyone that?

18   A.    No, sir.

19   Q.    Who is Gwendolyn Reynolds?

20   A.    My case manager.

21   Q.    Have you talked with Gwendolyn

22         Reynolds, off and on, over the years

23         about your drug use?
```

| | |
|---|---|
| 1 | my lawyer. |
| 2 | Q. All right. |
| 3 | MR. DRUMMOND: He may not |
| 4 | understand the word |
| 5 | "plaintiff." |
| 6 | Q. Tell me what your understanding about |
| 7 | this case is? |
| 8 | A. I really don't know. I guess you'll |
| 9 | have to ask my lawyer. |
| 10 | Q. Okay. Do you have any understanding |
| 11 | at all? |
| 12 | A. All I know is that they held me at |
| 13 | Air Base too long and my grandmother |
| 14 | and my lawyer had asked for a lawsuit. |
| 15 | Q. All right. Do you know that you are |
| 16 | or may be asked to be a class |
| 17 | representative? |
| 18 | A. Yes, sir. |
| 19 | Q. What is your understanding of what |
| 20 | that means? |
| 21 | A. That everybody -- well, whoever |
| 22 | participates in it and who is got the |
| 23 | same -- same problem as I do on the |

1       court case and they attend, I

2       represent for all of them.

3   Q.  All right.  I'm going to -- you were

4       here when I questioned your great

5       grandmother about her discussions with

6       Mr. Drummond and Mr. Crow, and I'm

7       going to do the same with you.  Be

8       careful that -- your lawyers will go

9       nuts if you start talking about what

10      y'all have talked about, and they

11      should.  I don't want to ask you what

12      y'all have discussed.  Okay.

13              About this case, this

14      lawsuit we're here today about, about

15      being at Air Base Boulevard, how many

16      times have you talked to your lawyer?

17              MR. DRUMMOND:  Object to the

18                  form.  You can't ask him

19                  what we've talked about.

20                  He can't answer that

21                  unless you rephrase it.

22  Q.  Do Mr. Drummond and Mr. Crow represent

23      you in connection with any other

*J. B. -- March 26, 2007*

| | | |
|---|---|---|
| 1 | | cases? |
| 2 | A. | Yes, sir. |
| 3 | Q. | Juvenile delinquency cases? |
| 4 | A. | Yes, sir. |
| 5 | Q. | Okay; exclude that.  How many times |
| 6 | | have you met and talked with your |
| 7 | | lawyers? |
| 8 | A. | I really don't remember. |
| 9 | Q. | More than once? |
| 10 | A. | Yes, sir. |
| 11 | Q. | More than twice? |
| 12 | A. | I'd say about three times. |
| 13 | Q. | Okay.  Would I be correct in assuming |
| 14 | | that one time, at least, was before |
| 15 | | this lawsuit was filed? |
| 16 | A. | I believe so.  I'm not sure. |
| 17 | Q. | Would I be correct in assuming that |
| 18 | | one time was this morning before this |
| 19 | | deposition? |
| 20 | A. | Yes, sir. |
| 21 | Q. | When would the other time have been? |
| 22 | A. | When I was released from jail. |
| 23 | Q. | All right.  That would have been |

```
 1            September of '06?
 2    A.      '05.
 3    Q.      Do you know their phone number?
 4    A.      No, sir.
 5    Q.      Do you know their address?
 6    A.      No, sir.
 7    Q.      Do you know where their office is?
 8    A.      I know it's located in Mobile.
 9    Q.      What about Mr. Crow?
10    A.      No, sir.
11    Q.      What do you think will be required if
12            you are to become a class
13            representative?  What will be asked of
14            you, if anything?
15    A.      I don't know, sir.
16    Q.      Why does it matter -- or does it
17            matter whether or not this case
18            becomes a class or whether you become
19            a class representative?
20    A.      I don't know, sir.
21    Q.      What do you hope to happen as a result
22            of this lawsuit?
23    A.      Rephrase that, sir.
```

1   Q.   Is there anything that you would like

2        to happen -- anything you want to see

3        change or happen as a result of this

4        lawsuit?

5   A.   That people get shipped off to their

6        programs sooner than what they do.

7   Q.   Anything else?

8   A.   I can't think of anything.

9   Q.   The burglary commitment, the

10       commitments that had to do with

11       firearms, do you think that you should

12       have been punished for those things?

13  A.   Yes, sir.

14  Q.   What about your drug use?

15  A.   I believe that -- they sentenced me to

16       drug treatment, and I believe that was

17       exactly what I needed.

18  Q.   I believe we've also talked about the

19       fact that your loss of freedom --

20  A.   Yes, sir.

21  Q.   -- is the thing that hopefully will

22       help you choose not to use drugs in

23       the future; that's true, isn't it?

1  Q.    And you have your GED; correct?

2  A.    Yes, sir.

3  Q.    What trade are you working on?

4  A.    Electrical and horticulture.

5  Q.    How are you doing?

6  A.    All right.

7  Q.    What are you -- are you going to get a

8        job?

9  A.    I don't -- I don't know if I'm going

10       to have my certificate in the trades

11       when I get out.

12 Q.    So --

13 A.    I'm going to get a job when I get out,

14       though.

15 Q.    What are you going to do?

16 A.    I'm going to look for a job for

17       whoever will hire me.  And when I turn

18       18, my daddy said I can have a job

19       with him working construction.

20 Q.    Your daddy is where now?

21 A.    My dad, he lives in Montgomery.

22 Q.    And he's working near here now; right?

23 A.    I guess so.

```
 1                     E X A M I N A T I O N

 2         BY MR. DRUMMOND:

 3    Q.   Ms. Ward, Mr. Perry asked you, your

 4         son holds legal custody from a prior

 5         court order; correct?

 6    A.   And my grandson, J. B.'s father.

 7    Q.   Who has physical custody of J. B.?

 8    A.   I do.

 9    Q.   I'm sorry?

10    A.   I do.

11                     MR. DRUMMOND:  Thank you.

12

13                     E X A M I N A T I O N

14         BY MR. PERRY:

15    Q.   That's pursuant to the same court

16         order?

17    A.   Yes.

18    Q.   So there's a court document that says

19         you have physical custody?

20    A.   No.  No.  Not the original order.

21         Back in '97, maybe, that was the

22         original order was just -- his father

23         had physical and legal custody.  But
```

1          they are -- since he's been going out

2          to Air Base, they have put me down as

3          physical custody.

4    Q.    They did that at Air Base?

5    A.    Yes, sir.

6    Q.    Was that in connection with an

7          allegation of some sexual misconduct

8          or not?

9    A.    I don't know what you mean.

10   Q.    Do you recall some involvement with

11         DHR over allegations of sexual

12         misconduct?

13   A.    Yes.  Yes.

14   Q.    What's your recollection of that?

15         What happened?

16   A.    I never did know the specifics.

17   Q.    Okay.  Did anything happen as a result

18         of those allegations?

19   A.    No.

20   Q.    Okay.  So the change in physical

21         custody was not related to those

22         allegations?

23   A.    Not that I know of.

1    Q.    And do I correctly understand that

2          there is no court document that gives

3          you physical custody?  There's no

4          order?

5    A.    No.

6    Q.    There is -- there is -- the clerks or

7          the people out at the Air Base have

8          written you down as having --

9          acknowledged that he lives with you

10         and has physical custody?

11   A.    Yes.  Uh-huh.

12               MR. DRUMMOND:  Object to the

13                    form.

14   Q.    When did that change take place; if

15         you remember?

16   A.    I don't remember.

17   Q.    Now, Kenneth, I believe has been

18         incarnated at different times; am I

19         right or wrong?

20   A.    Yes.  You're right.

21   Q.    Was the change in physical custody in

22         connection with that?

23   A.    Oh, no.  Huh-uh.  That was before he

```
 1        even got custody of his children.  He

 2        hasn't been incarcerated since he got

 3        custody of his children.

 4   Q.   Great.  Okay.  And that was -- was

 5        that in the '90s?  I think you may

 6        have just told me.  I think I wrote

 7        that down.  When did he get physical

 8        and legal custody?

 9   A.   Let's see.  Let me think a minute.  It

10        was around '97.

11   Q.   Okay.  Does -- to your knowledge, does

12        Kenneth use drugs or alcohol?

13   A.   Alcohol.

14   Q.   To your knowledge, has he ever

15        attended treatment for alcohol abuse?

16   A.   He has -- well, that's what he was

17        incarcerated for, was for DUI's.  But

18        he's never been diagnosed as an

19        alcoholic.

20   Q.   Where is J. B.'s mother?

21   A.   She's in prison in Louisiana.

22   Q.   How long has she been there?

23   A.   She's been in Louisiana over a year.
```

# EXHIBIT
# 3

| State of Alabama<br>Montgomery County<br><br>Form JU-      Rev. 4/88 | ORDER OF COMMITMENT<br>TO<br>THE DEPARTMENT OF YOUTH SERVICES | Case Number<br><br>JU – 2003 – 1408.a |
|---|---|---|

IN THE JUVENILE COURT OF _____**MONTGOMERY**_____ COUNTY, ALABAMA

IN THE INTEREST OF _Jonathan Chase Bishop_ DOB: 9/13/1989 A JUVENILE

This cause coming on to be heard and said juvenile and _Father-Guardian, Atty Clay Benson,_ _DA Tim Tyler_____ being present, the Court explained the nature of the proceeding and the rights of the child to those present. The Court finds that said juvenile is a child under 18 years and that this Court has jurisdiction in this cause. The juvenile admits/denies the allegations of the petition(s) and the Court has considered the evidence presented. The Court finds that said juvenile has committed the offense(s) of: _Violation of Aftercare_____ and is in need of care or rehabilitation treatment.

It is therefore ORDERED, ADJUDGED and DECREED as follows:

1. Child is delinquent.
2. Custody is removed from the custodian and placed with Alabama Department of Youth Services (DYS) for a period of time to be determined by DYS
3. DYS is authorized to exercise the powers listed in Section 44-1-33, Code of Alabama 1975, as amended.
4. DYS is authorized to place child in greater or lesser restrictive environment according to its rehabilitation program.
5. DYS is authorized and directed to obtain such physical testing and to obtain the results thereof as it deems advisable.
6. DYS is authorized and directed to implement procedures of identifying, evaluating and determining the eligibility of students in need of special education and related services as specified in Administrative Policy Manual (Bulletin No. 36).
7. Restitution in the amount of $ _____ shall be paid by child after released into aftercare and before discharge unless same is earned under commitment
8. Pending transfer to DYS, child is directed to be detained at __MCYF__
9. Other: _Committed for inpatient Drug Treatment_

DONE this the __4th__ day of __April__, 2006

_____
Judge/Referee

Court costs: _____ Remitted     _____ Taxed ($ _____)

Filed: _____     _____
                                    Clerk

The Court having further considered this cause, it is Ordered that this Order of Commitment be suspended conditioned upon the juvenile's compliance with the rules of probation attached hereto

DONE this the _____ day of _____, _____.

_____
Judge/Referee

The Findings and Recommendations of the Re[...]
having been read and approved, are h[...]
confirmed as the decree of this court
Done this _____ day of _____

EXHIBIT
3

93

# EXHIBIT
# 4

| State of Alabama<br>Montgomery County<br><br>Form JU-    Rev. 4/88 | **ORDER OF COMMITMENT**<br>**TO**<br>**THE DEPARTMENT OF YOUTH SERVICES** | Case Number<br><br>JU – 2003 1408  07<br>                          08 |
|---|---|---|

IN THE JUVENILE COURT OF _____ **MONTGOMERY** _____ COUNTY, ALABAMA

IN THE INTEREST OF _____ Jonathan Bishop _____ A JUVENILE

This cause coming on to be heard and said juvenile and _Did Larv Craw  Atty M/Hon Wasny  mother_ _& Child_ _____ being present, the Court explained the nature of the proceeding and the rights of the child to those present. The Court finds that said juvenile is a child under 18 years and that this Court has jurisdiction in this cause. The juvenile admits/denies the allegations of the petition(s) and the Court has considered the evidence presented. The Court finds that said juvenile has committed the offense(s) of: _ToP 3rd  RSP 3rd  & Possession of Small Pistol_ _____ and is in need of care or rehabilitation treatment.

It is therefore ORDERED, ADJUDGED and DECREED as follows:

1. Child is delinquent.
2. Custody is removed from the custodian and placed with Alabama Department of Youth Services (DYS) for a period of time to be determined by DYS
3. DYS is authorized to exercise the powers listed in Section 44-1-33, Code of Alabama 1975, as amended.
4. DYS is authorized to place child in greater or lesser restrictive environment according to its rehabilitation program.
5. DYS is authorized and directed to obtain such physical testing and to obtain the results thereof as it deems advisable.
6. DYS is authorized and directed to implement procedures of identifying, evaluating and determining the eligibility of students in need of special education and related services as specified in Administrative Policy Manual (Bulletin No. 36).
7. Restitution in the amount of $ _____ shall be paid by child after released into aftercare and before discharge unless same is earned under commitment
8. Pending transfer to DYS, child is directed to be detained at _____
9. Other: _VDCHduwal  Rehab / Drug Treatmt / Counsel  At DYS_ _Htc  Gl rue_ _____

DONE this the _31_ day of _Jun_ _2007_

_____
Judge/Referee

Court costs: _____ Remitted    _____ Taxed ($ _____ )

Filed: _____

_____
Clerk

The Court having further considered this cause, it is Ordered that this Order of Commitment be suspended conditioned upon the juvenile's compliance with the rules of probation attached hereto

DONE this the _____ day of _____, _____

_____
Judge/Referee

**EXHIBIT**
4

The Findings and Recommendations of the Re[...]
having been read and approved, are he[...]
confirmed as the decree of this court
Done this _____ day of _____, _____

63

# EXHIBIT
# 5

**Alabama Department of Youth Services**                 Date/Time Printed: 03/05/2007  10:03:07 AM

Alabama Department of Youth Services

# Service Plan Progress Summary

**Name:** Jonathan C Bishop
**Age:** 16  **Race:** White  **Gender:** Male
**Date of Birth:** 09/13/89 12:00:00 AM
**Committing County:** Montgomery
**Probation Officer:** Ray Williams

**Committing Offense(s):** BURGLARY
**Commitment Type:** Regular DYS
**Case Manager:** Phyllis Taylor
**Interval:**   Release
**Date:**

I.    **SHORT TERM GOALS:**

**A. Jonathan will be encouraged to utilize his sports abilities to complete all the physical components of the program.**

1. Intervention: Jonathan will be encouraged to utilize his sports abilities to complete all the physical components of the program to include:
    1. Physical Training
    2. Project Adventure
    3. The Alpine Tower
   (Responsible Person/Unit: Jonathan C Bishop; Actual Start Date: 6/29/2005; Completion Date: 08/15/2005)
   Progress:
   Recorded 06/30/2005:
   Jonathan entered this facility on 06/28/2005, was placed on Level I, and was cleared by the doctor the next evening to participate in all activities of the program.  He began participating in the physical components for Level I on 06/29/2005 starting with AM Physical Training.

   Recorded 07/04/2005:
   Jonathan has used his sports abilities to complete all the physical components assigned to Level I.  Tomorrow morning, he will begin working on the physical components for Level II.

   Recorded 07/20/2005:
   No progress

   Recorded 07/27/2005:
   Jonathan does not put forth 100% effort in everything.  This is causing him to remain on Level II.

   Recorded 07/27/2005:
   Jonathan does not put forth 100% effort in everything.  This is causing him to remain on Level II.

   Recorded 08/04/2005:
   Jonathan has used his sports abilities to complete all the physical components assigned to Level II.  He is currently working on the physical components for Level III.

   Recorded 08/08/2005:
   Jonathan has used his sports abilities to complete all the physical components assigned to Level III.  He is currently working on the physical components for Level IV, including the Alpine Tower.

   Recorded 08/12/2005:
   Jonathan is using  his sports abilities to complete all the physical components assigned to Leve  IV, including The Alpine Tower.  All components will be completed on 08/15/2005.  This portion of his service plan will be closed at that time.

**B. Jonathan will have the opportunity to attend weekly drug education classes to include relapse prevention and risk management  so that he will have a working knowledge of Twelve Step Programs and to prepare him for his in-patient drug treatment.**

1. Intervention: Jonathan will have the opportunity to attend weekly drug education classes  to be conducted by Mr. Richard Baity II, M. Ed., CADP from Harbor Lights and/or COSA (Counc  on Substance Abuse) to include relapse prevention and risk management  so that he will have a working knowledge of Twelve Step Programs and to prepare him for his in-patient drug treatment.
   Jonathan will be expected to write three essays:
    1. "How using drugs has affected my life."
    2. "How I feel in-patient drug treatment will help me."
    3. "What I have learned from drug group."
   NOTE:  THIS PORTION OF JONATHAN'S SERVICE PLAN WILL NOT BE CLOSED UNTIL  SUCCESSFULLY COMPLETES IN-PATIENT DRUG TREATMENT.



**EXHIBIT**
5

5

## Academic Vocational Review

Student _Jonathan Bishop_ Date _09/14/06_

Case Manager_Ms Reynolds_ Teacher _Mr Ellis_

### Strengths

☐ Usually completes assignments
☒ Completes some assignments
☐ Usually works to his ability
☒ Sometimes works to his ability
☐ Accepts corrections positively
☒ Willing to accept supervision _Sometime_
☐ Can work independently
☐ Stays on task
☒ Remains in assigned area

### Deficiencies

☐ Doesn't complete assignments

☐ Rarely works to his ability

☐ Doesn't accept corrections
☐ Doesn't accept supervision
☐ Requires close supervision
☐ Strays from assigned tasks
☐ Wanders about easily

Subject Area _Carpentry_

Grade:
☐ A
☐ B
☐ C
☒ D   _65_
☐ F

Conduct:
☐ Excellent
☐ Good
☒ Average
☐ Needs improvement
☐ Unsatisfactory

☐ Incomplete-Student has not completed enough assignments to receive a grade.

Comments _Bishop attends trade every day in the morning. He does only the minimum tasks necessary to earn his day. He has displayed some negative behaviors such as use of profanity, disrespectful behavior and dress code violations. Most of the time he is like his peers, being an average student. He needs to increase his desire to perform in the classroom_   _(17)_

# EXHIBIT
# 6

**Alabama Department of Youth Services**                    Date/Time Printed: 03/05/2007 10:19:21 AM

Jonathan has completed his 24 hours of mandatory isolation on the unit. He met with this worker and the unit was explained, as well as his hearing to discuss placement. An unremarkable intake interview was completed. a brief history of his AWOL was discussed. Jonathan was allowed to talk with his father on the phone and information was relayed to the father. Jonathan was teary in session which, he reports, is due to his feeling bad about his responsibility for running away.

Recorded 07/26/2006:
Jonathan was seen at a due process hearing on 7/24/06. The committee decided to check on Jonathan's progress in 30 days during which time he should be evaluated for CAP and remain at the ITU.

Recorded 07/28/2006:
Jonathan took his GED pre test yesterday. He reports that he feels positive about the results. Jonathan talks very "street" saying dis for this and dem and dat for them and that. This worker corrects the student and asks that he speaks correct English.

Recorded 08/08/2006:
Jonathan reports that he is "CRIP to the heart. His gang behavior has led to burglary. The negative aspects of gang membership are discussed. Jonathan is discouraged from any gang behavior on this unit and on the street. He as read "Letters to Incarcerated Youth" 1 and 2, written by deceased CRIP founder Tookie Williams. He has not shown any obvious gang behavior on this unit.

Recorded 08/14/2006:
Mr. Robinson, of the Montgomery Co aftercare office called today and inquired about Jonathan. Jonathan has not been a problem on the ITU and shows maturity and insight. His major problem is his gang involvement, in which he is discouraged from participating. Jonathan is scheduled to transfer to the CAP dorm tomorrow.

## H. Education
**To give the client an opportunity to participate in classes and to further his education during his stay in the program.**
1. Intervention: 1. Client will be referred to the Educational Department.
   2. Client will be tested in the most appropriate classes.
   3. Client will complete all classroom assignments.
   4. Client will display appropriate behavior in the classroom.
   5. Client's educational progress will be monitored through daily reports prepared by the teacher and given to the counselor and/or Program Manager.
   6. Client will discuss in a paragraph the monthly growth he has experienced in school/education.
   (Responsible Person/Unit: Jonathan Bishop; Actual Start Date: 6/7/2006; Tentative Completion Date: 09/29/2006)
Progress:
Recorded 07/19/2006:
Weeks 1-4 June: 06/07/2006- Crewman has some good reports from the education department and preparing to take his GED test.

Recorded 07/19/2006:
Jonathan reports that he passed his pre-GED test, and was scheduled to take the GED in August. This worker has spoken with STEP teacher, Ms Jones who reports that Jonathan has studied hard, and should pass the test. She plans to fax test results to this facility this afternoon. It may be possible for Jonathan to take the test on this campus in August.

Recorded 07/24/2006:
Jonathan will take the GED on 7/27/06. He is currently working toward that goal.

Recorded 08/10/2006:
In session, plans on release and positive outlets in the community are discussed as well as self respect.

Recorded 09/14/2006:
Jonathan passed his GED exam; therefore, he was placed in Mr. Ellis' carpentry trade. He has average grade and conduct, in his trade class. Please see the Academics section of this progress report for further information.

## I. Vocational Preparation
**To give the client an opportunity to prepare for numerous vocational opportunities and to develop or sharpen skills that could increase his possibility of obtaining employment.**
1. Intervention: 1. Client will participate in all groups related to Vocational Preparation.
   2. Client will learn about college campuses to obtain some options for a career.

**EXHIBIT**

6

32

# EXHIBIT
# 7

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

J. B., a minor
child, by and
through his next
friend, ADDIE
WARD, on behalf
of himself and
all other
similarly                CASE NO.
situated;,               2:06-CV-908-MHT
Plaintiff,               CLASS ACTION

vs.

J. WALTER WOOD,
in his individual
capacity,
Defendant.

*       *       *       *       *       *

**DEPOSITION OF ADDIE WARD,**

taken pursuant to notice and

stipulation on behalf of the

Defendant, in the Central Office,

Mt. Meigs Complex, 1000 Industrial

School Road, Mt. Meigs, Alabama,

before Mishan Williamson, Certified

Shorthand Reporter and Notary Public

in and for the State of Alabama at

Large, on March 26, 2007, commencing

at approximately 9:00 a.m.

EXHIBIT
7

```
1                    A P P E A R A N C E S

2

3       FOR THE PLAINTIFF:

4                MICHAEL J. CROW, ESQ.

5                Beasley, Allen, Crow,

6                Methvin, Portis & Miles

7                218 Commerce Street

8                Montgomery, Alabama 36104

9

10               ROBERT D. DRUMMOND, ESQ.

11               Attorney at Law

12               6767 Taylor Circle

13               Montgomery, Alabama 36117

14

15      FOR THE DEFENDANT J. WALTER WOOD:

16               T. DUDLEY PERRY, JR., ESQ.

17               Alabama Department of Youth

18               Services

19               Montgomery, Alabama

20

21      ALSO PRESENT:

22               J. B.

23               PHYLLIS CARNEY
```

*ADDIE WARD -- March 26, 2007*

```
 1   A.    Oh, gosh, he was -- that was about

 2         five years -- about 2000, I would say.

 3   Q.    Okay.  Let's do this, how many

 4         children do you have?

 5   A.    Three.

 6   Q.    And their names are?  Kenneth Turner?

 7   A.    Yeah.  He's my grandson.

 8         Kenneth Turner is my grandson.  His

 9         mother is dead.

10   Q.    So you're J. B.'s great grandmother?

11   A.    Yes.

12   Q.    Okay.  And your sons are?

13   A.    Charles Churchwell, Jerry Churchwell,

14         and Annette Stewart.

15   Q.    Annette Stewart?

16   A.    Uh-huh.  S-T-E-W-A-R-T.

17   Q.    Does she live in Montgomery?

18   A.    Yes.

19   Q.    Does she work at Gold's Gym?

20   A.    No.  She works at Jackson Hospital.

21   Q.    All right.  Now, J. B.'s grandfather?

22   A.    Is dead.

23   Q.    And who was he?
```

1   A.    Just Kenneth Turner.

2   Q.    Okay.

3   A.    And Kenneth has two children, J. B.

4        and Brittany.  And Brittany is

5        handicapped.  She lives out at Father

6        Walters.

7   Q.    At where?

8   A.    Father Walters Handicap -- Home for

9        Handicap Children.

10  Q.    Okay.  Now, how long has J. B. lived

11        with you?

12  A.    He's lived off and on with me since he

13        was seven years old.

14            THE WITNESS:  What year is

15               that?

16            J. B. :  '96.

17  A.    '97, I think -- yeah; '96 or '97.

18  Q.    In '96 or'97, when he first came to

19        live you?

20  A.    His father and mother separated and so

21        Ken got custody.  They were already

22        separated, but Ken got custody of the

23        two children.  And they all three came

*ADDIE WARD -- March 26, 2007*

```
 1   A.    Let's see -- I don't remember the

 2         date.

 3   Q.    Are you aware of J. B.'s

 4         identification with gangs?

 5   A.    Yes.

 6   Q.    I believe, specifically, he talks

 7         about the Crips.  Have you ever heard

 8         of that?

 9   A.    Yes.

10   Q.    Let's get back to the spring of '06.

11         Tell me about the time when you called

12         the police during, I think, April; do

13         you recall that?  I think you may have

14         found marijuana --

15   A.    Yes.

16   Q.    -- in his room?

17   A.    Yes.

18   Q.    Tell me what happened.

19   A.    Well, I think he was at one of the --

20         I'm not sure where he was.  But while

21         he wasn't at home, but I found

22         marijuana in his room, and I carried

23         it down to the Air Base because I
```

1    Q.    He's right.  So I'm talking about,

2          Ms. Ward, this lawsuit that we're here

3          today, not J. B.'s previous legal

4          issues or problems.  I'm sure that you

5          were involved in that -- oh, wait.

6          Let me get off on a tangent here.

7                    Are you J. B.'s legal

8          guardian?

9    A.    No.

10   Q.    Kenneth is --

11   A.    Kenneth.

12   Q.    -- correct?

13   A.    Uh-huh.

14   Q.    Okay.  But it is you that the lawyers

15         communicate with about this case?

16   A.    Uh-huh.

17   Q.    Now -- so you talked on phone, what,

18         last Sunday, or was it this Sunday?

19   A.    Huh?

20   Q.    About this lawsuit with -- I think you

21         spoke with --

22                    MR. CROW:  I'm going to object

23                    "about this lawsuit."  I

*ADDIE WARD -- March 26, 2007*

```
 1   A.    Because I feel like he has no place

 2         else to go; that nobody will love him

 3         like I do.

 4   Q.    Have you ever heard the term

 5         "enabler"?

 6   A.    Yes.

 7   Q.    What's your understanding of that, the

 8         concept of that word?

 9   A.    Well, maybe not being as strict with

10         somebody as you should be.  And I

11         don't know exactly -- being a crutch.

12   Q.    That's my understanding, too.  All

13         right.  Are you employed?

14   A.    No.

15   Q.    I apologize for asking you go this,

16         but how old are you?

17   A.    78.

18   Q.    What are your sources of income?

19   A.    State retirement and Social Security.

20   Q.    Where did you retire from?

21   A.    The state.

22   Q.    Which agency?

23   A.    The Department of Education -- I mean,
```

1                          **EXAMINATION**

2       **BY MR. DRUMMOND**:

3    Q.   Ms. Ward, Mr. Perry asked you, your

4         son holds legal custody from a prior

5         court order; correct?

6    A.   And my grandson, J. B.'s father.

7    Q.   Who has physical custody of J. B.?

8    A.   I do.

9    Q.   I'm sorry?

10   A.   I do.

11            MR. DRUMMOND:   Thank you.

12

13                         **EXAMINATION**

14      **BY MR. PERRY**:

15   Q.   That's pursuant to the same court

16        order?

17   A.   Yes.

18   Q.   So there's a court document that says

19        you have physical custody?

20   A.   No.  No.  Not the original order.

21        Back in '97, maybe, that was the

22        original order was just -- his father

23        had physical and legal custody.  But

ADDIE WARD -- *March 26, 2007*

```
1              they are -- since he's been going out
2              to Air Base, they have put me down as
3              physical custody.
4      Q.      They did that at Air Base?
5      A.      Yes, sir.
6      Q.      Was that in connection with an
7              allegation of some sexual misconduct
8              or not?
9      A.      I don't know what you mean.
10     Q.      Do you recall some involvement with
11             DHR over allegations of sexual
12             misconduct?
13     A.      Yes.  Yes.
14     Q.      What's your recollection of that?
15             What happened?
16     A.      I never did know the specifics.
17     Q.      Okay.  Did anything happen as a result
18             of those allegations?
19     A.      No.
20     Q.      Okay.  So the change in physical
21             custody was not related to those
22             allegations?
23     A.      Not that I know of.
```

*ADDIE WARD -- March 26, 2007*

```
 1   Q.    And do I correctly understand that
 2         there is no court document that gives
 3         you physical custody?  There's no
 4         order?
 5   A.    No.
 6   Q.    There is -- there is -- the clerks or
 7         the people out at the Air Base have
 8         written you down as having --
 9         acknowledged that he lives with you
10         and has physical custody?
11   A.    Yes.  Uh-huh.
12                MR. DRUMMOND:  Object to the
13                     form.
14   Q.    When did that change take place; if
15         you remember?
16   A.    I don't remember.
17   Q.    Now, Kenneth, I believe has been
18         incarnated at different times; am I
19         right or wrong?
20   A.    Yes.  You're right.
21   Q.    Was the change in physical custody in
22         connection with that?
23   A.    Oh, no.  Huh-uh.  That was before he
```

ADDIE WARD -- *March 26, 2007*

| | | |
|---|---|---|
| 1 | | even got custody of his children.  He |
| 2 | | hasn't been incarcerated since he got |
| 3 | | custody of his children. |
| 4 | Q. | Great.  Okay.  And that was -- was |
| 5 | | that in the '90s?  I think you may |
| 6 | | have just told me.  I think I wrote |
| 7 | | that down.  When did he get physical |
| 8 | | and legal custody? |
| 9 | A. | Let's see.  Let me think a minute.  It |
| 10 | | was around '97. |
| 11 | Q. | Okay.  Does -- to your knowledge, does |
| 12 | | Kenneth use drugs or alcohol? |
| 13 | A. | Alcohol. |
| 14 | Q. | To your knowledge, has he ever |
| 15 | | attended treatment for alcohol abuse? |
| 16 | A. | He has -- well, that's what he was |
| 17 | | incarcerated for, was for DUI's.  But |
| 18 | | he's never been diagnosed as an |
| 19 | | alcoholic. |
| 20 | Q. | Where is J. B.'s mother? |
| 21 | A. | She's in prison in Louisiana. |
| 22 | Q. | How long has she been there? |
| 23 | A. | She's been in Louisiana over a year. |

# EXHIBIT
# 8

**Alabama Department of Youth Services**                    Date/Time Printed: 03/05/2007  10:10:36 AM

Alabama Department of Youth Services
# Service Plan

**Name:** Jonathan  Bishop                          **Service Plan Date:** 07/19/2006
**Facility/Living Unit:** Development & Education      **Case Manager:** Gwendolyn Reynolds
Center
Projected Completion Date: 08/30/2006                **Completion Date:**

1.    **PROBLEM:**  Drug/alcohol education/intervention
        Jonathan admitted to experimenting with alcohol, marijuana, mushrooms, and pills.  He stated
that he started using drugs and alcohol at age twelve.  He can benefit from learning about the dangers
of alcohol and drug use and how to increase his awareness to maintain sobriety.

2.    **OBJECTIVE/SHORT TERM GOAL:**
        Alcohol & Drug Education
        To give the client an opportunity to increase his awareness by learning more about alcohol and
other drug use and acquire the skills to maintain sobriety.

3.    **INTERVENTION NARRATIVE:**

a.    1. Client will participate in all groups related to A&D Education.
        2. Client will list and explain the six classifications of drugs.
        3. Client will be given "Tips for Teens" pamphlets on Alcohol, Cocaine, Marijuana, Tobacco,
Inhalants, and Hallucinogens.  Client will create a pamphlet on his DOC.
        4. Client will watch a treatment film about the dangers of methamphetamine use and will
write a four-page essay based on what was learned from the film.
        5. Client will learn about the seven principal neurotransmitters in the brain and how they are
affected by alcohol and other drug use.
        6. Client will write a story using self as the main character about marijuana refusal skills.
        7. Client will create a poster on the dangers of alcohol and other drug use.
        8. Client will watch "Radio Flyer" and discuss in a three-page paper how alcoholism
damages the family.
        9. Client will create a family tree indicating any history of alcoholism or addiction in his family
and discuss with his counselor.
        10. Client will make a list of consequences he has faced due to his alcohol and other drug
use.
        11. Client will write an essay on how his DOC has affected his physical health, his behavior,
his personality, his schoolwork, his family, his life, etc.
        12. Client will watch the video "The Truth About Drinking" and write a letter to his family as in
the video.
        13. Client will learn material on the disease concept and will explain the three characteristics
that make addiction a disease.
        14. Client will list and explain how substance use, abuse, and dependence affect different
areas and functions of the brain.
        15. Client will write an essay on how substance use affects athletic ability.
        16. Client will write a song about the dangers or consequences of A&D use.
        17. Client will write a front page newspaper article about a wreck and death he could have
been involved with.
        **(Responsible Person/Unit: Jonathan  Bishop; Actual Start Date: 5/10/2006; Completion Date:  07/19/2006)**



EXHIBIT

___8___

24

# EXHIBIT
# 9

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| J.B., a minor child, by and through his | ) | |
| next friend, ADDIE WARD, on behalf of | ) | |
| himself and all other similarly situated; | ) | |
| | ) | Case No: 2:06-CV-755-CSC |
| Plaintiff, | ) | CLASS ACTION |
| | ) | |
| vs. | ) | |
| | ) | |
| WALTER WOOD, in his individual | ) | |
| capacity, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT OF PATRICK PENDERGAST

STATE OF ALABAMA

COUNTY OF MONTGOMERY

BEFORE ME, the undersigned authority, a Notary Public in and for said County and State, personally appeared Patrick Pendergast, who being known to me and being by me first duly sworn, deposes and says as follows:

I am Pat Pendergast, and I am over the age of twenty one (21). This affidavit has been prepared by DYS Legal Counsel and is given by me based upon my personal knowledge. I am the Screening and Placement Coordinator for the Alabama Department of Youth Services (DYS). I have been employed with DYS for approximately 31 years. As Screening and Placement Coordinator I participate in the Screening and Placement Committee. The Screening and Placement Committee classifies and places (or "staffs") all children committed to DYS custody. Classification decisions



are made by the Committee based on court orders, risk assessment scores, and reports from probation officers, psychologists and others familiar with the child being staffed.

The Mission Statement of DYS states that it is the mission of DYS to enhance public safety by holding juvenile offenders accountable through the use of institutional, educational, and community services that balance the rights and needs of victims, communities, courts, and offenders. Delinquent children from the 67 Alabama counties are committed to DYS, and in certain cases children in need of supervision (CHINS), and the Committee staffs each child according to his or her characteristics.

When a child is committed to DYS custody, the Screening and Placement Committee meets and reviews the child's characteristics to determine where the child would most appropriately be staffed. The Screening and Placement Committee currently has available for placement 6 operated DYS facilities and 26 contract placements. The DYS operated facilities staffing are:

| | |
|---|---|
| Autauga Campus | Mt. Meigs Campus, |
| Chalkville Campus, | Thomasville Campus, |
| Mobile Group Home, | Vacca Campus. |

The contract facilities are:

| | |
|---|---|
| Alabama Youth Homes, Inc., (locations in Wetumpka, Westover, and Oneonta) | J & M Manor, |
| | Laurel Oaks Behavioral Health Center, |
| Big Brothers Home Away From Home, | Lee County Youth Development Center, (S.T.A.R.S. program and BEAMS program) |

Southern Oaks Center,

The Bridge, (GEMS Program),

The Bridge, (REACH Program),

The Bridge, (STEPS Program),

The Bridge, (Camp Cobia),

The Bridge, (About Face),

The Bridge, (Camp 180),

Three Springs, (Madison),

Three Springs (Tuskegee),

Three Springs, (Choices, Male),

West Alabama Youth Services, (W.A.Y.S.),

West Alabama Youth Services, (Chances)

New Life Center for Change,

Restoration Resources, Inc.,

Group Homes for Children,

Troy University, Troy Group Home,

Montgomery Group Home,

University of North Alabama, North Alabama Group Home.

These contract facilities are created through the State of Alabama's contract process which I understand is based on a cycle of approximately three years. Estimated staffing needs are projected by DYS staff, proposals are prepared, and contracts are solicited. DYS adheres to the standards of the American Correctional Association with regard to staffing ratios, and facility standards.

Staffing is thus a complex process. It is not unusual for the Committee to experience fluctuations in commitments within the various categories of children as a result of unpredictable spikes in specific types of commitments from the courts of the 67 Alabama counties. Those spikes tend to be sporadic and unpredictable. Capacity at each facility is limited by factors including facility capacity, contract amounts, and ACA standards including staffing ratios. When a particular facility has no beds are available due to lack of capacity, and if no alternate appropriate placement is available, placement is delayed until a bed becomes available. Sometimes these children are

required by the various courts to wait in detention until a bed is available.

The Screening and Placement Committee classifies students to determine their staffing needs. They are classified as either (a) SJO, (b) Regular Commitment, ( c ) Sex Offender, (d) Community/Residential, (e) Pure Hit, (f) Special Needs, or (g) any combination of two or more of the above. Classification is based on the type of commitment order, risk assessment scores, reports from probation officers, psychologists and others familiar with the child. Commitment orders from the 67 counties vary widely. The following is an attempt to categorize the types of commitment orders.

HIT (high intensity treatment). HIT commitments are generally not committed to state custody but are adjudicated and placed on probation, with a condition of probation being that they complete a HIT program.

SJO (serious juvenile offenders). Serious juvenile offenders are committed for serious crimes and are required to be incarcerated for a minimum period of one year in a secure facility. They are staffed at Mt. Meigs Campus.

Dependent Children Adjudicated Delinquent. Dependent Children Adjudicated Delinquent may be committed to DYS. They are usually placed in residential facilities.

CHINS (children in need of supervision). CHINS are a unique category and are different from most delinquents. CHINS who are also delinquent may be staffed in a facility with delinquent children if the court also finds the child is not amenable to treatment or rehabilitation under a prior disposition or if the child is adjudicated a CHINS for a second time.

Status Offenders Under A Valid Court Order. Status offenders include truants, children committed for contempt of court, violation of probation (VOP), possession of alcohol by a minor, and children under 16 committed for traffic offenses. This group may overlap with, but is distinct

from, CHINS. They have different characteristics, and different needs, from most other children in DYS custody.

     <u>Delinquent Children.</u>  A delinquent child is a child committed for an act designated a violation, misdemeanor, or felony offense under the law of Alabama or another state if the act occurred in another state or under federal law or a violation of a municipal ordinance except violations of municipal curfew ordinances.

     <u>Determinate Sentence Commitments.</u>  Judge sometimes order a child to remain in DYS custody for a specific time. The characteristics of these children vary widely. In my experience for example I have observed that some determinate sentence commitments are violent and some are not. As a result of the differences in characteristics of these children, their needs vary widely.

     <u>Criminal Sex Offenders.</u>  Juvenile criminal sex offenders are adjudicated for the following offenses:

          Rape in the first or second degree, as proscribed by Section 13A-6-61 or 13A-6-62; provided that a sentencing court may exempt from this article a juvenile or youthful offender criminal sex offender for a criminal sex offense as defined in Section 13A-6-62(a)(1).

          Sodomy in the first or second degree, as proscribed by Section 13A-6-63 or 13A-6-64.

          Sexual torture, as proscribed by Section 13A-6-65.1.

          Sexual abuse in the first or second degree as proscribed by Section 13A-6-66 or 13A-6-67.

          Enticing a child to enter a vehicle, room, house, office, or other place for immoral purposes, as proscribed by Section 13A-6-69.

          Promoting prostitution in the first or second degree, as proscribed by Section 13A-12-111 or 13A-12-112.

          Violation of the Alabama Child Pornography Act, as proscribed by

Section 13A-12-191, 13A-12-192, 13A-12-196, or 13A-12-197.

Kidnaping of a minor, except by a parent, in the first or second degree, as proscribed by Section 13A-6-43 or 13A-6-44.

Soliciting a child by computer for the purposes of committing a sexual act and transmitting obscene material to a child by computer, as proscribed by Sections 13A-6-110 and 13A-6-111.

Any solicitation, attempt, or conspiracy to commit any of the offenses listed in paragraphs a. to j., inclusive.

Any crime committed in any state or a federal, military, Indian, or a foreign country jurisdiction which, if it had been committed in this state under the current provisions of law, would constitute an offense listed in paragraphs a. to k., inclusive.

The foregoing notwithstanding, any crime committed in any jurisdiction which, irrespective of the specific description or statutory elements thereof, is in any way characterized or known as rape, sodomy, sexual assault, sexual battery, sexual abuse, sexual torture, solicitation of a child, enticing or luring a child, child pornography, lewd and lascivious conduct, taking indecent liberties with a child, or molestation of a child.

Juvenile criminal sex offenders receive a risk assessment prior to release to the public. DYS, in cooperation with the University of Alabama and Auburn University, has developed the Accountability Based Sex Offender Program (known as ABSOP), for holding juvenile criminal sex offenders accountable and providing treatment and rehabilitation of criminal juvenile sex offenders. The ABSOP program is located at Mt. Meigs campus. Approximately 50% of the physical bed space at Mt. Meigs is occupied by the ABSOP program. All juvenile criminal sex offenders are staffed at Mt. Meigs in the ABSOP program.

Multiple Needs. Multi-needs children include children at imminent risk of out-of-home placement or a placement in a more restrictive environment as a result of the conditions of emotional disturbance, behavior disorder, mental retardation, mental illness, dependency, chemical dependency, educational deficit, lack of supervision, delinquency, or physical illness or disability, or any

combination thereof, and whose needs require the services of two or more of the following entities: DYS, public school system (services for exceptional needs), Department of Human Resources, Department of Public Health, juvenile court probation services, or Department of Mental Health and Mental Retardation. These children present the various juvenile courts with perhaps the most challenging set of placement decisions. They are seldom staffed in DYS operated facilities or DYS contract facilities.

Each of the above categories of children compete for DYS placement resources. They have different and competing claims on DYS resources.

DATED THIS April 3, 2007.

Patrick Pendergast

SWORN TO AND SUBSCRIBED BEFORE ME, this April 3, 2007.

NOTARY PUBLIC
MY COMMISSION EXPIRES: 3/2010

# EXHIBIT 10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

J.B., a minor child, by and through       *
his next friend, ADDIE WARD, on           *
Behalf of himself and all others          *
similarly situated;                       *
                                          *
            Plaintiff,                     *
vs.                                       *       CIVIL ACTION NO.
                                          *       2:06cv755-MHT
                                          *
WALTER WOOD, in his individual            *
capacity,                                 *
                                          *
            Defendant.                     *

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION
## FOR CLASS CERTIFICATION

Plaintiff J.B. states the following in support of his motion for class certification.

### INTRODUCTION

This case involves the failure of defendant to provide timely placement, treatment and services to juveniles committed to the Alabama Department of Youth Services. The case is based upon two distinct and separate legal theories, neither dependent on the other. The first is the defendant's conduct in relation to the unreasonable delay in placement, treatment and services subsequent to a juvenile's commitment to the Alabama Department of Youth Services, the same being a violation of due process rights under the Fourteenth Amendment to the Constitution of the United States. The second is the defendant's failure to comply with state law regarding the placement of committed juveniles.



EXHIBIT

_10_

neither exact class size nor identification is necessary for class certification. In Evans v. United States Pipe and Foundry, 696 F. 2d 925, 930 (11th Cir. 1983), the Eleventh Circuit held that "a plaintiff need not show the precise number of members in the class."

The evidence submitted by the Plaintiff clearly meets, and exceeds, the numerosity test.

## B. COMMONALITY

Rule 23(a)(2) Fed. R. Civ. P. requires that there be either questions of law or fact common to the class. The commonality requirement is "not high." Morris v. Transouth Fin. Corp., 175 F.R.D. 694, 697 (M.D. Ala. 1997). The rule is satisfied, therefore, even if there are factual discrepancies, and even if there are individual differences in damages. Id. at 697.

The legal theory in this case is that: (1) plaintiff was not placed within seven days of commitment to the Alabama Department of Youth Services; (2) plaintiff was not placed within a reasonable time subsequent to commitment to Department of Youth Services; (3) state law requires the placement of juveniles within seven days of commitment; (4) the unreasonable delay in placement of committed youth is unconstitutional. Each one of these questions is common to the class, satisfying the requirements of Fed. R. Civ. P. 23(a)(2)

## C. TYPICALITY

Rule 23(a)(3) Fed. R. Civ. P. requires the "the claims or defenses of the representative parties be typical of the claims or defenses of the class." While the second and third prerequisites, commonality and typicality, tend to merge,