IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| J.B., a minor child, by and through his next friend, Addie Ward, on behalf of himself and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | 2:06cv755-MHT |
| WALTER WOOD, in his individual capacity, | ) ) ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| J.B., a minor child, by and through his next friend, Addie Ward, on behalf of himself and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | 2:06cv908-MHT |
| WALTER WOOD, in his individual capacity, | ) ) ) ) | |
| Defendant. | ) | |

## **BRIEF IN SUPPORT OF SUMMARY JUDGMENT**

In support of the Defendant J. Walter Wood, Jr.'s motion for summary judgment, the undersigned submits the following brief and evidentiary material:

### UNDISPUTED FACTS

The plaintiff in this case, J.B., is a 17 year old juvenile delinquent.  He is currently committed to the custody of the Department of Youth Services and has been committed previously.  He was first committed to state custody in May 2005 for burglary in the 1st degree. (Exhibit 1).  He went to a program in Mobile called "The Bridge", and ran away.  (Exhibit 2 - J.B. depo. P. 7, lines 4-9).  He was subsequently apprehended and sent to DYS Autauga campus and completed the program.  Later he was again committed to state custody for possession of drugs in April 2006. (Exhibit 2 - J.B. depo. P. 9, lines 9-7).  He is yet again committed to state custody for theft of property and possession of a pistol.  (Exhibit 2 - J.B. depo. P. 7, lines 20-22).  J.B. also has a pending un-

1

adjudicated charge against him for conspiracy to commit
robbery and he asserts a 5th Amendment right against
self incrimination regarding that charge.  (Exhibit 2 -
J.B. Depo. P. 10, line 6 - p. 11, line 18).  J.B.'s
current criminal charges for conspiracy to commit
robbery, and his previous charges for theft of
property, and possession of a pistol all occurred after
this lawsuit was filed, yet J.B. sues Mr. Wood
individually for damages for waiting in detention
pending DYS placement.

J. Walter Wood, Jr. is the Executive Director of
the Alabama Department of Youth Services ("DYS").  He
is sued not in his official capacity, but individually
only.  The Plaintiffs seek monetary damages from Mr.
Wood for allegedly violating J.B.'s Constitutional
"right to treatment" for juvenile delinquency while in
the custody of DYS.  The crux of this claim is that Mr.
Wood should be ordered to pay monetary damages because
he purportedly deliberately and intentionally caused
J.B. to wait in detention without treatment before he
was placed in a DYS facility.  There is no evidence

2

that Mr. Wood deliberately or intentionally caused J.B. to wait in detention with or without treatment.

Mr. Wood was appointed by the Alabama Youth Services Board to the position of Executive Director on July 19, 1999.  He has worked in juvenile justice and juvenile corrections in programs and administration for over thirty four years.

Mr. Wood's function as Executive Director of the Alabama Department of Youth Services is to carry out the policy and procedure of the Alabama Youth Services Board.  He is responsible for the operation of the department within the budget allocation for the Department.

As explained in the attached affidavits of J. Walter Wood, Jr.(Exhibit 3) and Screening & Placement Coordinator Patrick Pendergast (Exhibit 4), Mr. Wood does not personally place students in DYS facilities. Placement is a detailed process carried out by DYS's Screening & Placement Division.  There are occasions when particular juveniles have been required to wait in

detention[1] for placement.  J.B. was such a case.

The ability of the Screening & Placement Division to intake juveniles and place them in facilities is determined by the number of beds available compared to the number of commitments.  Thus, intake is a matter ultimately controlled by the committing Courts.[2]  The following paragraphs, taken from the attached affidavits of Wood(Exhibit 3) and Pendergast (Exhibit 4), outline the factors in the equation that must be taken into consideration.

First, the number of beds available is a complicated factor.  One size does not fit all.  There are currently 26 contract placements and 6 DYS operated placement options available for the Screening and

---

[1] Whether a juvenile is required to wait in detention is a matter determined by the committing Court.  Some juveniles are allowed by the committing juvenile court to go home and are not required to wait in detention after adjudication pending placement while others are refused permission to return home and must wait in detention.  That determination is within the discretion of the committing court.

[2] This is true because actual commitments fluctuate depending on factors within the 67 counties, whereas the more static number of beds available within the DYS system is established in advance of commitments as discussed below.

Placement Committee. (Exhibit 4).[3]  That number
fluctuates over time.  These options are comprised of a
combination of institutional, residential, and
community based facilities, some of which are
Department of Youth Services facilities, some of which
are private vendor facilities, and some of which are
quasi-governmental. Two of the contract and quasi-
governmental facilities are located within one of the
DYS institutional facilities.

Second, contracts are procured through a process
largely determined by state law.  The DYS RFP process
cycles over three years.  At the beginning of each
three year cycle the DYS RFP committee makes its best

---

[3] The number of available beds is a more complex factor than
meets the eye.  For example two of the contract placements
(namely Alabama Youth Homes and Lee County Youth Development
Center) operate a number of different programs.  Alabama Youth
Homes, Inc., operates three different facilities, separate
localities in Oneonta, Wetumpka and Westover.   In addition, at
Oneonta AYH operates separate programs for boys and for girls.
Thus, the Oneonta facility for AYH is essentially two separate
facilities. These four programs are each distinctly different
programs for juveniles with different characteristics–all under
one contract placement option.  Likewise, Lee County Youth
Development Center operates two separate programs: STARS and
BEAMS.  These are two separate facilities for two separate groups
of juveniles. (See Exhibit 4).  These facts should give the
reader an insight into the complex nature of DYS intake.

guess as to the number of beds needed and the types of beds needed over the next three years. (See Exhibit 3). Obviously the committee is not omniscient and actual future commitments do not necessarily match perfectly the committee's predictions.

Each of the current placement options provides a number of beds for placement of juveniles with particular characteristics.  The Screening & Placement Committee gathers the needs assessments of each committed juvenile and makes placement decisions based on needs. The committee classifies juveniles into definable groups to help simplify the process.  They are classified as either (a) SJO (or serious juvenile offender), (b) regular commitment, ( c ) sex offender, (d) community/residential, (e) pure HIT (or high intensity treatment), (f) special needs, or (g) any combination of two or more of the above.  (See Exhibit 4).  Placement decisions are judgment calls made by the Screening & Placement Committee with the purpose in mind of matching the needs of the particular juvenile to the characteristics of the placement options

6

available.   Intake occurs when a bed is available.

The number of beds within each placement option is usually static, being determined on a three year contract cycle.  However commitments within each classification are not static. They fluctuate. Commitments within each classification are a function of adjudications by the juvenile judges in the 67 Alabama counties and are completely beyond the control of the Department (and certainly beyond the control of the Defendant J. Walter Wood, Jr. in his individual capacity).

When commitments within a particular classification spike and current commitments exceed anticipated needs within a particular classification, as happens from time to time, temporary reallocation of resources is possible within the limitations of the rules and laws for state contracts and the availability of additional permanent merit system staff.  Such reallocation is the sole means of adjusting to the vicissitudes in commitments by the juvenile courts in the 67 counties to DYS custody of particular classifications of

7

juveniles.  This is true because the process of developing new placement options must be done on a three year cycle and cannot be done quickly and because placement in DYS operated facilities is dependent on the total number of staff available to adequately supervise the youths.  Obviously the reallocation of limited governmental resources is a discretionary function that requires judgment at the highest levels.

As described above, the Screening & Placement Division has occasionally experienced temporary increases in commitments within particular placement options.  Those fluctuations are not predictable.  As a result, there are occasions when beds are not available for the placement of juveniles with particular needs while facilities in other categories are under staffed with juveniles.  When a spike occurs and the limited flexibility to reallocate resources within the budget of the Department is insufficient to absorb the increased commitments, a temporary wait list develops.

For many years, intake has been closely monitored by DYS staff.  The RFP process attempts to predict

8

needs and when actual commitments exceed anticipated needs, the Executive Director has reallocated DYS resources whenever possible to eliminate or minimize, within applicable categories of placement options, the wait lists when they have occurred.

<u>ARGUMENT</u>

SUMMARY OF ARGUMENT, Plaintiffs' Section 1983 deliberate indifference claim fails because there is no material issue of fact whether J. Walter Wood, Jr. acted with deliberate indifference to cause J.B. to be in detention with or without "treatment." There is not, as the Plaintiff would have the Court believe, a constitutional right to treatment, similar to the right to mental health treatment, for juvenile delinquents. Without a constitutional right, there is no Section 1983 claim. In the alternative, Defendant submits that the Eighth Amendment provides the requisite framework for analysis of this lawsuit, and that Mr. Wood would be immune from suit for damages under the Fourteenth Amendment.

The state law claim for negligence against  J.

9

Walter Wood, Jr., in his individual capacity, also fails
to present a material issue of fact because there is no
evidence the Mr. Wood personally breached a duty to the
Plaintiff or proximately caused the Plaintiff to wait in
detention with or without "treatment," and because Mr.
Wood is immune from suit.  The wantonness claim fails
too because there is no material issue of fact whether
Mr. Wood was conscious of his conduct and conscious from
his knowledge of existing conditions that injury would
likely or probably result from his conduct, and that
with reckless indifference to consequences, he
consciously and intentionally did some wrongful act or
omitted some known duty which produced the injury.
Moreover, Mr. Wood would be immune from this claim for
wantonness.

SUMMARY JUDGMENT STANDARD.  Rule 56(c) of the
Federal Rules of Civil Procedure provides that summary
judgment is appropriate where "there is no genuine
issue as to any material fact and ... the moving party
is entitled to a judgment as a matter of law." Once the
party seeking summary judgment has informed the court

of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115-17 (11th Cir.1993) (discussing how the responsibilities on the movant and the non-movant vary depending on whether the legal issues, as to which the facts in question pertain, are ones on which the movant or non-movant bears the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

COUNT 1 (42 USC § 1983).  The Defendant is entitled to summary judgment for the claim under Count 1.  There is no evidence that Mr. Wood violated a constitutional right.  In addition, the evidence shows that the Plaintiff was not required to wait in detention as a result of any action or non-action by J.

11

Walter Wood, Jr.

The Eighth Amendment Provides the Governing
Standard: The complaint purports to state a cause of
action under the Fourteenth Amendment.  However, as set
forth in the following paragraphs, the Eighth Amendment
–not the Fourteenth– provides the governing standard
for this claim.

The first step in analyzing the Plaintiff's § 1983
claim is to identify the specific constitutional
provision under which the claim arises.  *See*, *Graham v.
Connor*, 490 U.S. 386, 393-94 (1989).  In this case the
alleged right arises under the "cruel and unusual
punishment" provision of the Eighth Amendment because
it pertains to the conditions of Plaintiff's
confinement.  Specifically, the complaint alleges that
the Plaintiff was unjustifiably restrained "with
deliberate indifference to [his] rehabilitative and
treatment rights", and/or he was held in detention and
not placed in a DYS facility within a reasonable time.
(Complaint, paragraph 17).

In this regard, the Eighth Amendment "prohibits the

12

unnecessary and wanton infliction of pain, or the
infliction of pain totally without penological
justification." *Ort v. White*, 813 F.2d 318, 321 (11th
Cir. 1987).  Graham requires analysis of the
Plaintiff's § 1983 claims under the specific provisions
of the Eighth Amendment and prohibits analysis under
the more general Fourteenth Amendment provisions.  See
also *Brown v. Smith*, 813 F.2d 1187, 1188 (11th Cir.
1987) (citing *Whitley v.Albers*, 475 U.S. 312 (1986)).

The law in this Circuit is that the Eighth
Amendment analysis does not change due to the fact that
J.B. is a juvenile confined in a juvenile correctional
facility.  E.g., *Morales v. Turman*, 562 F.2d 993, 999
n. 1 (5th Cir. 1977) (stating "[t]he eighth amendment
applies to juvenile detention centers as well as to
adult prisons");  *D.R. by Robinson v. Phyfer*, 906
F.Supp. 637, 644 (M.D.Ala. 1995); *Hill v. Dekalb
Regional Youth Detention Center*, 40 F.3d 1176,
1195-1197 (11th Cir. 1994); see also, *Edwards v.
Gilbert*, 867 F.2d 1271 (11th Cir. 1989) (applying
deliberate indifference standard without

13

differentiation between Eighth and Fourteenth Amendment claims in juvenile setting).

   Systemic Conditions verses Individual Claims. Simply put, the Plaintiffs are impermissibly attempting to place all blame for the juvenile justice system on Mr Wood.  The substance of the complaint–that J.B. had to wait in detention for a DYS bed– involves overall, or systemic, conditions within the juvenile justice system.  Plaintiffs however allege that Mr. Wood simply deliberately and intentionally caused him (and a class of similar individuals) to be held in detention for an unreasonable length of time without "treatment."  Thus, the Plaintiffs do not allege that J.B. has been subjected to a unique type of punishment or condition to which other inmates have not been subjected. In fact he alleges the opposite–that an entire class of Plaintiffs suffered the exact same type of punishment or condition as he.  It is therefore clear that the case alleges general or systemic conditions.

   Because this case actually focuses on the general or systemic conditions allegedly giving rise to

14

classwide constitutional deprivations, it is significantly distinguishable from cases in which prison officials have been found individually liable for constitutional violations. Such cases usually involve prison officials or supervisors who individually inflicted, or stood by while subordinates intentionally inflicted excessive force, denied medical benefits, or otherwise deprived plaintiffs of their constitutional rights in a one on one situation. In addition to the obvious difference in the level of personal culpability in such situations as compared to this case, there is a substantive distinction between the two types of claims. As the following paragraphs describe, that substantive difference reveals that the Plaintiffs have chosen a vehicle for this claim they cannot ride. Because this is a monetary damages lawsuit, the Plaintiffs can only focus on the individual culpability of the defendant J. Walter Wood, Jr. in his individual capacity, and not on the characteristics of the entire system which gives rise to the wait list conditions when they occur.

15

In *Wilson v. Seiter*, 501 U.S. 298, 309, 111 S. Ct. 2321, 115 L. Ed.2d 271 (1991), Justice White, concurring in the judgment, discussed the distinction between cases challenging specific acts or omissions directed at individual prisoners on one hand versus challenges to general conditions of confinement on the other, and observed that "intent simply is not very meaningful when considering a challenge to an institution, such as a prison system."  However Justice White noted that prison officials will be able to defeat § 1983 actions, such as this one challenging prison conditions by, for example, showing insufficient funding prevented the official from meeting standards of decency.  Justice White's conclusion was based on his observation that systemic problems are the result of actions or inactions by numerous officials over a long period of time as opposed to acts or omissions directed at specific prisoners. The true essence of the Plaintiff's allegations in this case is that the actions or inactions by the entire Alabama Juvenile Justice system over time has resulted in alleged

16

classwide constitutional deprivations[4].

The solution to the problem of systemic inadequacies is found in the difference between damage claims, brought in an official's individual capacity, and injunctive claims, which name defendants in their official capacities, and are "in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114, (1985). Because significant personal culpability is necessary to sustain <u>individual</u> liability under 42 U.S.C. § 1983, damage claims against a specific individual do not focus on the combined acts or omissions of persons other than the defendant. Only injunctive relief claims may focus on the combined acts or omissions of the state's agents, without searching for a particular bad actor whose individual conduct caused the constitutional deprivation. However, this is an individual liability case and must focus only on

---

[4] As discussed below, the Defendant submits that no constitutional deprivation results from a juvenile delinquent being placed by a juvenile judge in detention—with or without "treatment."

the individual bad acts of the Defendant J. Walter
Wood, Jr., not an injunctive relief case which could
focus on the overall combination of activities by
agency employees over time.  Significantly, in this
case there are no claims for injunctive relief.  Yet
because the problem is systemic and not the result of
one man's actions or non-actions, the Plaintiffs could
only hope to prevail if they could have this Court
focus on the alleged systemic problem and award
monetary damages against J. Walter Wood, Jr.  This he
cannot do.

A high degree of personal culpability is required
to impose liability under 42 U.S.C. 1983.  *See Hill v.*
*Dekalb Reg'l Youth Detention Center.*, 40 F.3d 1176,
1192 (11th Cir. 1994).  The Eleventh Circuit discussed
this issue in *Williams v. Bennett*, 689 F.2d 1370, 1382,
(11th Cir. 1982), stating:

> it would be unfair to penalize with
> personal monetary liability an
> individual Board of Corrections member
> whose vigorous efforts to hire
> sufficient prison guards, or to assign
> available guards so as adequately to
> staff the dormitories, were overruled

18

> by the contrary views of a majority of
> the Board. On the other hand, it would
> be highly relevant to the establishing
> of personal liability to introduce
> evidence that an individual defendant,
> having jurisdiction over an adequate
> number of guards and over Williams'
> dormitory at the time of the stabbing
> announced: "I'm not going to station a
> guard in that dorm. Those prisoners
> deserve what they can do to one
> another." Such matters remain to be
> litigated.

Similarly, it would be highly unfair to punish with

individual liability a DYS employee for the systemic

condition about which the Plaintiffs complain without

evidence that the employee's personal conduct actually

caused the deprivation.  As set forth in the Facts

section above, it is clear that J. Walter Wood, Jr. is

not personally at fault for the spikes in commitments

of juvenile delinquents from the 67 counties to the

Alabama Department of Youth Services and the resulting

occasional delays in placement.

    Constitutional Right to Treatment for Juvenile

Delinquents.  This damages lawsuit against Mr. Wood

individually is based on an alleged constitutional

right that does not exist.  The following paragraphs

will discuss the constitutional right to treatment for
juvenile delinquents.

When analyzing treatment issues of juvenile
delinquents it is first necessary to distinguish
juvenile delinquency treatment case from cases
addressing mental health treatment or mental illness
treatment.  The Plaintiff J.B. is a juvenile
delinquent.  He was committed to the custody of the
Department of Youth Services after adjudication for
serious criminal conduct.  He is not seriously mentally
ill and has no serious medical needs[5] requiring
immediate treatment.  The "treatment" issue in this
case is based on the objective of rehabilitation.[6]  It

---

[5] J.B.'s committing judge noted that he was committed on one
occasion for drug treatment, however there is no constitutional
right to drug rehabilitation.  See, e.g., *Bulger v. United States
Bureau of Prisons*, 65 F .3d 48, 50 (5th Cir.1995); *Abdul-Akbar v.
Department of Corrections*, 910 F.Supp. 986, 1002 (D.Del.1995).
Drug addiction therapy can fall in the category of necessary
medical treatment, but only under limited circumstances not
present here.

[6] Two theories have been argued by various plaintiffs in an
attempt to establish a right to treatment for juvenile
delinquents.  First is the argument is *parens patriae*. It is
argued that the nature and duration of the commitment should bear
a relationship to the purposes for which the juvenile was
committed, and since juveniles are committed for
"rehabilitation", the argument goes that confinement should not
be without treatment.  The second argument is the "*quid pro quo*"

is important to keep in mind the purposes for which
J.B. was committed: he was committed by the juvenile
court to be held accountable for his actions, to
protect the public, and in an attempt to rehabilitate
him and return him to society with the tools to
function as a non-delinquent juvenile.  While it is
true that DYS attempts to rehabilitate delinquent
juveniles, there is frequently--as in this case--a
strong penological aspect for juvenile commitments to
DYS.  This is supported by the fact that the committing
judges, including J.B.'s committing judge, have
knowledge when juveniles are in detention for more than
25 days but require them to remain in detention pending
placement in a DYS facility.

    Neither the US Supreme Court, the Eleventh Circuit,
nor the Alabama Supreme Court has addressed whether a
right to treatment exists for juvenile delinquent
offenders.  Accordingly no such right can be said to

---

argument.  It is argued that juvenile offenders have fewer
constitutional protections than adults during adjudication and
should therefore receive treatment.  Neither argument has been
adopted by the Eleventh Circuit, the Alabama Supreme Court, nor
the United States Supreme Court.

exist for purposes of holding Mr. Wood personally liable.[7]

Eighth Amendment Analysis.    As discussed above, the Eleventh Circuit has held that the Eighth Amendment is the applicable standard for claims for conditions of confinement in juvenile facilities.  Moreover, J. Walter Wood, Jr. could only be liable for a constitutional violation that "shocks the conscience". Mere negligence is insufficient to state a cause of action.  The evidence is woefully insufficient to create a fact issue whether Mr. Wood deliberately punished J.B. by causing him to remain in detention in violation of a constitutional right to treatment.

Deliberate Indifference.    As stated above, only actions by prison officials with a culpable state of mind will support an Eighth Amendment claim. The requisite state of mind for a prison official is deliberate indifference to a substantial risk of

---

[7]    If a cause of action existed under the Due Process clause of the Fourteenth Amendment, which it does not as discussed above, Mr. Wood would be immune from liability.

serious harm to an inmate. *Farmer v. Brennan*, 511 U.S. 825, 828, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Supreme Court has made clear that the elements of an Eighth Amendment claim include both an "objective" and "subjective" component. See *Hudson v. McMillian*, 503 U.S. 1, 20, 112 S.Ct. 995 (1992), citing *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 2324, 115 L.Ed.2d 271 (1991). In other words, to establish the defendant acted with deliberate indifference, first, the plaintiff must prove an objectively serious need[8], and second, the plaintiff must prove that the prison official acted with deliberate indifference to that need." *Brown v. Johnson*, 387 F.3d 1344, 1351 (11th Cir.2004). The subjective component requires showing the official acted with a specific "intent to punish." *Salas v. Tillman*, 162 Fed. Appx. 918, 921, 2006 WL 122426, 3 (11th Cir. 2006), citing *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir.2000). Clearly J. Walter

---

[8] As discussed above, the constitution does not require "treatment" for juvenile delinquency. Accordingly, the Plaintiff's claim fails to satisfy the "objectively serious" element under the Eighth Amendment.

Wood, Jr. has not acted with an intent to punish.

"To establish the second element, deliberate indifference to the serious medical need, the prisoner must prove three facts: (1) subjective knowledge of a risk of serious harm [to the Plaintiff]; (2) disregard of that risk; and (3) conduct that is more than mere negligence." *Brown v. Johnson*, 387 F.3d at 1351.  The Plaintiffs  must show that Mr. Wood reacted to the alleged constitutional deprivation (if it existed) in an "objectively unreasonable manner." See  *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1982-83, 128 L.Ed.2d 811 (1994).  The Plaintiffs in this case cannot satisfy the deliberate indifference standard.  There is no evidence that Mr. Wood was specifically familiar with J.B. so under no circumstances could he have perceived a serious risk of harm to him or have disregarded that risk.  Moreover, his actions in relation to the overall systemic conditions about which the Plaintiffs complain can only reasonably be perceived as having been taken in good faith.

The deliberate indifference standard is quite

deferential to the judgments of prison administrators because it subjects prison officials to liability only when they are subjectively aware of the risk to the inmate, and they fail to take reasonable measures to abate the risk. *Farmer*, 511 U.S. at 847, 114 S.Ct. 1970. J.B. can submit no evidence that Mr. Wood acted with deliberate indifference to the substantial risk of serious harm to J.B. "[D]eliberate indifference describes a state of mind more blameworthy than negligence". *Farmer v. Brennan*, 511 U.S. at 835, 114 S.Ct. 1970.

   <u>Vicarious Liability</u>. A § 1983 claim cannot be based on vicarious liability. *Brown v. Smith*, 813 F.2d 1187 (11th Cir. 1987), citing *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1504 (11th Cir.1985) (en banc), cert. denied, 476 U.S. 1115, 106 S.Ct. 1970, 90 L.Ed.2d 654 (1986). There are no facts on which to place sole blame for the alleged constitutional violation (if it existed) on Mr. Wood. Accordingly, he is entitled to summary judgment.

   Because the Eighth Amendment provides the proper

framework for analysis of this claim, summary judgment is due to be granted.  However, for the sake of thoroughness, the following paragraphs will analyze this claim as though it could be considered under the Fourteenth Amendment.

Substantive Due Process vs. Procedural Due Process. The Complaint states that the action is premised on two distinct and separate legal theories.  The first is an alleged due process violation for "unreasonable delay in placement."  The second is violation of a state statute regarding placement within seven days of notice of commitment.  (Complaint, unnumbered paragraph on page 1).  The two theories will be dispensed with below.

Assuming for the sake of argument the claim could be analyzed under the Fourteenth Amendment and not under the Eighth as discussed above, what specifically is the claim: substantive or procedural due process? The distinction between substantive and procedural due process is sometimes overlooked, yet analysis is made easier by identification of whether the claim involves

substantive or procedural due process.

The complaint in this case could only allege substantive due process–not procedural– because there are no allegations of unique individual punishment or conditions. *See* Ronald D. Rotunda, Treatise on Constitutional Law–Substance and Procedure, § 14.6, p. 5 (3rd ed. 2002 pocket pt.)  (stating "generally speaking when an inmate claims he has been subjected to a special type of punishment, or unfavorable conditions to which other inmates have not been subjected, he raises procedural due process..."  "When the prisoner claims the general conditions in the prison fall below constitutionally accepted standards..., he raises substantive due process.")

Now, recognizing the claim must be analyzed as a substantive due process claim, the state statutory violation claim can be quickly dealt with because violations of state statutes do not give rise to substantive due process violations.  Under substantive due process, substantive rights created only by state law are <u>not</u> subject to protection because substantive

due process rights are created only by the
Constitution.  *See Vineyard v. Wilson*,311 F.3d 1340
1356 (11th Cir. 2002) *(citing McKinney v. Pate,* 20 F.3d
1550, 1556 (11th Cir.1994) (en banc)).  The claim based
on violation of a state statute simply fails to state a
cause of action on which relief could be granted.

The second theory–substantive due process violation
for unreasonable delay in placement without
treatment–does not raise a clearly established
constitutional right.  There is no case law, no federal
statute, and no constitutional provision which clearly
establishes the alleged constitutional right.  Simply
put, there is no constitutional right to "treatment"
for a juvenile delinquent committed to state custody
for criminal adjudications.  This issue was more fully
discussed above under the heading Constitutional Right
To Treatment for Juvenile Delinquency.

The undersigned anticipates that counsel for
Plaintiffs will argue that a constitutional right was
established, and notice was provided for purposes of
immunity analysis, as a result of previous litigation

28

by counsel for Plaintiffs against the Defendant and his predecessor.  Those cases are referred to as the *A.W. v. Dupree* and *S.S. v. Wood* cases.  However the undersigned submits that argument has no merit because both the *A.W. v. Dupree* Consent Decree, and the *S.S. v. Wood* Settlement Agreement acknowledged that no violation of the constitution or any federal or state statute was admitted.  In other words, the settlement agreements were to provide more than the constitution required.

Moreover, a constitutional right is established such that a governmental defendant can be on notice only by cases in which the Supreme Court, the Eleventh Circuit, or the pertinent state supreme court has said that specific conduct' is unconstitutional in specific circumstances.  In *Vineyard v. Wilson*, the Eleventh Circuit stated that "we look for cases in which the Supreme Court or [the Eleventh Circuit], or the pertinent state supreme court has said that 'Y Conduct' is unconstitutional in 'Z Circumstances.'"  *Vinyard v. Wilson*, 311 F.3d 1340, 1351-1352 (11th Cir. 2002),

29

(citing *Marsh v. Butler County*, 268 F.3d 1014, 1032-33
n. 10 (11th Cir.2001) (en banc).  The Defendant submits
that nether the settlement in *A.W. v. Dupree*, nor the
settlement in *S.S. v. Wood*, clearly established the
law.  The cases were settled and no appeal to the
Eleventh Circuit was filed.  The fact that counsel for
the Plaintiffs has claimed a right exists does not
establish the right for purposes of constitutional
analysis.  The Plaintiffs must point to case law before
the Eleventh Circuit, the Supreme Court, or the Alabama
Supreme Court adjudicating the particular conduct Wood
is alleged to have committed under circumstances
materially similar to those a defendant faced in a
different case. No such case exists.

Qualified Immunity.  An official is entitled to
immunity if he is performing discretionary functions
and his actions do not violate clearly established
statutory or constitutional rights of which a
reasonable person would have known.  *Lancaster v.
Monroe*, 116 F.3d 1419, 1424 (11th Cir. 1997) citing
*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct.

30

2727, 73 L.Ed.2d 396 (1982). Qualified immunity protects government officials sued in their individual capacities in almost every situation. Only the "plainly incompetent or those who knowingly violate the law" are subjected to liability. *Chesser v. Sparks*, 248 F.3d 1117, 1122 (11th Cir. 2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092 , 1096, 89 L. Ed. 2d 271 (1986)). "The purpose of this immunity is to allow the government officials to carry out their discretionary duties without fear of personal liability or harassing litigation," *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002).

A two-step analysis is required to determine whether a public official is entitled to the defense of qualified immunity: 1) the defendant public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred, and 2) once the defendant public official satisfies his burden of moving forward with the evidence, the burden shifts to the plaintiffs to show lack of good faith on the defendant's part. This

burden is met by proof demonstrating that the defendant public official's actions violated clearly established constitutional law. *Ziegler v. Jackson*, 716 F.2d 847 , 849 (11th Cir. 1983). In most cases in this circuit, rights are "clearly established" by decisions of the United States Supreme Court, the Eleventh Circuit, or the highest court of the state in which the case arose (the Alabama Supreme Court). *Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) (citing *Hamilton v. Cannon*, 80 F.3d 1525, 1532 n.7 (11th Cir.1996)).

There is no evidence that Wood committed an individual wrongful act that caused the alleged constitutional violation. The facts reveal Mr. Wood's role in the system involves the discretionary function of hiring, firing, transferring, assigning, or supervising personnel, including making decisions with regard to allocation of state resources. (See Exhibit 3 and Exhibit 4). The burden is thus on the Plaintiffs to show lack of good faith on the part of Mr. Wood. This they cannot do.

COUNT II—NEGLIGENCE.  To establish negligence, a plaintiff must prove that the defendant breached a duty owed by the defendant to the plaintiff and that the breach proximately caused the plaintiff injury or damage. E.g. *Prince v. Wal-Mart Stores, Inc.*, 804 So.2d 1102, 1104 (Ala.Civ.App.2001); *Lowe's Home Ctrs., Inc. v. Laxson*, 655 So.2d 943, 945-46 (Ala.1994). The Plaintiffs cannot submit a material question of fact whether Mr. Wood breach a duty to J.B. that proximately caused damages.  The facts make clear that the Plaintiff's commitments were for criminal misconduct, his placement in detention was by the committing court, and any delay in placement was not a result of any act or omission by Mr. Wood.

State Agent Immunity.  Moreover, assuming the existence of a material issue of fact regarding a breach of duty and/or proximate cause and/or damages, Mr. Wood is an employee of the State of Alabama and was acting, insofar as the allegations of the complaint are concerned, within his discretionary authority.

33

In *Ex parte Cranman*, 792 So.2d 392 (Ala. 2000), the
Alabama Supreme Court adopted the Restatement (Second)
of Tort's formula for determining whether a state actor
has immunity from tort liability.  The issue presented
in *Cranman* was whether state employed physicians enjoy
immunity from tort actions arising from performance of
their duties.  The Supreme Court summarized the
historical development of State agent immunity and, in
the context of suits against governmental officials in
their individual capacity, analyzed the delicate
balance between the provisions of Art. I, § 14, Ala.
Const. of 1901, which says that the state of Alabama
shall never be made a defendant in any court of law or
equity, and Art. I, § 13, Ala. Const. of 1901, which
guarantees a remedy by due process of law for every
injury to person or property.  The Court recognized
that recent cases have illuminated the distinction
between conduct on one hand involved in administrative
planning or decision-making and conduct on the other to
carry out orders with little choice as to when, where,
how, or under what circumstances to act.  See *Cranman*,

at 10.  Based on that framework, the Court went on to
restate the rule governing State agent immunity:

> A State agent shall be immune from civil
> liability in his or her personal capacity when
> the conduct made the basis of the claim against
> the agent is based upon the agent's
>
> (1) formulating plans, policies, or designs; or
> (2) exercising his or her judgment in the
> administration of a department or agency of
> government, including, but not limited to,
> examples such as:
>> (a) making administrative adjudications;
>> (b) allocating resources;
>> ©) negotiating contracts;
>> (d) hiring, firing, transferring, assigning,
> or supervising personnel; or
> (3) discharging duties imposed on a department
> or agency by statute, rule, or regulation,
> insofar as the statute, rule, or regulation
> prescribes the manner for performing the duties
> and the State agent performs the duties in that
> manner; or
> (4) exercising judgment in the enforcement of
> the criminal laws of the State, including, but
> not limited to, law-enforcement officers'
> arresting or attempting to arrest persons; or
> (5) exercising judgment in the discharge of
> duties imposed by statute, rule, or regulation in
> releasing prisoners, counseling or releasing
> persons of unsound mind, or educating students.

*Cranman*, at 11-12.  Cranman goes on to state:

35

> a State agent shall not be immune from civil
> liability in his or her personal capacity
>
>   (1) when the Constitution or laws of the United
> States, or the Constitution of this State, or
> laws, rules, or regulations of this State enacted
> or promulgated for the purpose of regulating the
> activities of a governmental agency require
> otherwise; or
>
>   (2) when the State agent acts willfully,
> maliciously, fraudulently, in bad faith, beyond
> his or her authority, or under a mistaken
> interpretation of the law.

(Cranman, at 12).

The pivotal issue determinative of whether an employee is entitled to immunity under this test is whether the employee was performing a function that requires the exercise of judgment, see *City of Bayou La Batre v. Robinson*, 785 So.2d 1128, 2000 WL 1801279 (Ala. 2000), in the formulation of governmental policy, see *Horton v. Briley*, 792 So.2d 432, 2001 WL 29327 (Ala.Civ.App. 2001). Such actions are akin to "administrative planning or decision-making" discussed in Cranman as clearly protected by State agent immunity. There can be no serious argument whether Mr. Wood was exercising administrative planning and decision making with regard to the allegations in the

complaint.  It is axiomatic that the Director's responsibility is administrative planning and decision making in connection with formulation of policy, hiring, firing, transferring, assigning or supervising personnel, exercising judgment in connection with releasing prisoners, counseling or releasing persons of unsound mind, or educating students, and his actions are thus specifically listed in Cranman as actions for which State agent immunity extends.

COUNT III—WANTONNESS.  Likewise, the claim for wantonness fails to raise a material issue of fact. "Wantonness is not merely a higher degree of culpability than negligence. Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability. Implicit in wanton, willful, or reckless misconduct is an acting, with knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury.... *Ex parte Anderson*, 682 So.2d 467, 470 (Ala. 1996).

Thus, it appears that wantonness is a similar concept to "deliberate indifference." There is no material question of a material fact sufficient to establish that Mr. Wood is guilty of wantonness.

Moreover, if a claim of wantonness were asserted under the facts of this case, Wood would be entitled to immunity. "[W]anton misconduct, an aggravated form of negligence, does not rise to the level of willfulness and maliciousness necessary to put the State agent beyond the immunity recognized in *Cranman*." *Ex parte Randall*, --- So.2d ----, 2007 WL 1229208, (Ala. 2007), citing *Giambrone v. Douglas*, 874 So.2d 1046, 1057 (Ala.2003) (holding that State-agent immunity "is not abrogated for negligent and wanton behavior; instead, immunity is withheld only upon a showing that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority")

PRISON LITIGATION REFORM ACT. The Prisoner Litigation Reform Act ("PLRA") states:

> [n]o Federal civil action may be brought by a
> prisoner confined in jail, prison, or other

38

>correctional facility, for mental or
>emotional injury suffered while in custody
>without a prior showing of physical injury.

42 U.S.C. § 1997e(e). J.B. sustained no physical

injury. He was in custody at the time this lawsuit was

filed and is in custody again. The claim should be

dismissed pursuant to the provisions of the PLRA.

<u>CONCLUSION</u>

Summary judgement is due to be granted to the

Defendant, J. Walter Wood, Jr., in his individual

capacity, as to all counts in the complaints. The 1983

claim must be analyzed under the Eighth Amendment. It

fails to state a constitutional violation. The facts

of this case cannot be construed to create a question

whether Mr. Wood acted deliberately and in callous

disregard to punish J.B. by causing him to be held in

detention without treatment pending DYS placement.

However, for the sake of argument, if the 1983 claim is

analyzed under the Fourteenth Amendment, and if the

Court is of the opinion that a constitutional violation

has been alleged, the Defendant is entitled to immunity

39

because his actions were taken in good faith and there are no facts from which an inference of bad faith could be drawn.

The negligence claim fails because there is no question of fact whether Mr. Wood individually either (1) had a duty to the Plaintiff, (2) breached that duty, (3) proximately caused (4) damages to the Plaintiff J.B.  However, assuming for the sake of argument that a fact question exists as to negligence, Mr. Wood is entitled to state-agent immunity.

Finally, the wantonness claim fails because the facts do not raise a triable question whether Mr. Wood acted with wanton, willful, or reckless misconduct. The facts cannot reasonably be construed, in any light whatsoever, to present a fact question whether Mr. Wood acted in bad faith.  Alternatively, assuming a fact question could be said to exist, Mr. Wood is entitled to immunity for the wantonness claim.

Finally, the complaints are due to be dismissed under the provisions of the Prison Litigation Reform

Act.

                              Respectfully submitted

                              TROY KING

                              ATTORNEY GENERAL


                              **s/ T. Dudley Perry, Jr.**
_____
                              T. Dudley Perry, Jr.

                              Bar Number: 3985-R67T

                              Deputy Attorney General

                              Post Office Box 66

                              Mt. Meigs, AL 36057

                              Telephone: (334) 215-3803

                              Fax: (334) 215-3872

                              E-Mail:
                              dudley.perry@dys.alabama.gov


## **CERTIFICATE OF SERVICE**

    I hearby certify that on the 29th day of May, 2007, I electronically filed the foregoing **BRIEF IN SUPPORT OF SUMMARY JUDGMENT,** with the Clerk of the Court Using the CM/ECF system which will send notification of such filing to the following:


Michael J. Crow, Esq.

**BEASLEY, ALLEN, CROW**

**METHVIN, PORTIS & MILES, P.C.**

Post Office Box 4160

Montgomery, AL 36103-4160

Robert D. Drummond, Jr., Esq.
**ATTORNEY AT LAW**
6767 Taylor Circle
Montgomery, AL 36117


                                        __s/T. Dudley Perry, Jr._____
_____    T. Dudley Perry, Jr.
                                        Bar Number: 3985-R67T
                                        Deputy Attorney General
                                        Attorney For Defendant
                                        J. Walter Wood, Jr.

42

# EXHIBIT
# 3

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE
MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

J.B., a minor child, by and )
through his next friend, )
Addie Ward, on behalf of )
himself and all others )
similarly situated, )
)
Plaintiff, )
) CIVIL ACTION NO.
v. ) 2:06cv755-MHT
)
WALTER WOOD, in his )
individual capacity, )
)
Defendant. )


J.B., a minor child, by and )
through his next friend, )
Addie Ward, on behalf of )
himself and all others )
similarly situated, )
)
Plaintiff, )
) CIVIL ACTION NO.
v. ) 2:06cv908-MHT
)
WALTER WOOD, in his )
individual capacity, )
)
Defendant. )

EXHIBIT

3

## AFFIDAVIT OF J. WALTER WOOD, JR.

BEFORE ME, the undersigned authority, a Notary Public in and for said County and State, personally appeared J. Walter Wood, Jr., who being known to me and being by me first duly sworn, deposes and says as follows:

My name is J. Walter Wood, Jr., and I am the Executive Director of the Alabama Department of Youth Services.  This affidavit has been prepared by DYS Legal Counsel and is given by me based upon my personal knowledge.

I was appointed Executive Director of the Alabama Department of Youth Services by the Alabama Youth Services Board on July 19, 1999.  I have worked in juvenile justice and juvenile corrections for over 34 years.

As Executive Director, I carry out the policy and procedure established by the Alabama Youth Services Board for the operation of the Department within the budget limitations established by the Legislature in the allocation of funds for the Department.

1

As Executive Director of the Alabama Department of Youth Services I carry out the policy and procedure of the Alabama Youth Services Board.  I am responsible for the operation of the Department within the budget allocation for the Department.

For many years the DYS staff has closely monitored intake and the time committed juveniles await placement.  Over the years we have improved the information available to determine how many juveniles are waiting and whether they are in detention.

I do not personally place juveniles in detention or in DYS facilities.  Juveniles are placed in detention by committing courts and placement in DYS facilities is a detailed process carried out by the DYS Screening & Placement Division.  I am aware that on occasion particular juveniles have been required to wait in detention for placement.  As a routine matter, when a juvenile is required to wait in detention more than 25 days we notify the committing court for a determination whether the court deems appropriate the juvenile's release pending placement.   It is my understanding

2

that courts sometimes release juveniles pending placement and sometimes do not.

Placement options available to the Screening & Placement Division are a product of a combination of the RFP (request for proposal) process and DYS operated facilities. Both were in place in 1999 when I was appointed Executive Director. Although DYS continues to operate institutions, I have chosen to continue directing resources to the RFP process as opposed to DYS operated facilities for a number of reasons, some of which include the following: First, the RFP process is more cost efficient in my opinion. Second, the RFP process brings beds on line faster. Third, the RFP process is more flexible and responsive to the constantly changing needs of juveniles in the state.

The RFP process is carried out through a committee. One major function of the RFP committee is to attempt to anticipate, for the coming three year period, the placement needs of juveniles expected to be committed to state custody.

3

The RFP committee is staffed by, and receives input from, various individuals. The committee is chaired by DYS Deputy Director for Administration Alan Peaton. It includes representatives from the DYS Screening & Placement Committee, the DYS Treatment Coordinator, DYS Legal Division, and representatives from the University of Alabama School of Social Work--the Alabama Youth Services Institute--and others. I understand the Youth Services Institute of the University of Alabama Department of Social Work receives input from various experts. A brief summary of the committee's RFP process is as follows:

Beginning in October, every three years, the RFP committee conducts research and planning to anticipate "service categories" for the next three years and the number of slots anticipated within each category. Essentially, this means every three years the committee makes its "best guess" as to the types of juveniles (or service categories) expected to be committed to DYS custody during the next three years and numbers of

4

juveniles within each type (or service category) expected to be committed.

Based on the RFP committee's service category estimates, RFPs are written to solicit proposals for providing slots for each service category. RFPs were last announced on January 6, 2005. A deadline approximately four months after RFPs are announced is established for receipt of vendor proposals. After the vendor proposal deadline the University of Alabama School of Social Work-the Youth Services Institute-- reviews the proposals over a period of approximately two months. RFPs are then chosen by the RFP committee based on the University of Alabama's review, the cost, and other relevant factors, and the final selections are forwarded to the me for approval.

Within approximately one month after final approval, the successful vendors are notified of their selection. A period of approximately two months follows for execution of contracts and for negotiation of contracts within service categories where no single vendor submitted an acceptable bid. The contracts are

5

effective within approximately three months of their execution.

As a result of the RFP process there are within each service category on any given day a specific number of beds available for placement of juveniles. Placement decisions are judgment calls made by the Screening & Placement Committee with the purpose in mind of matching the needs of the particular juvenile to the characteristics of the placement categories available.

The number of beds within each placement category is usually a static number derived through the RFP process. Yet actual commitments within each classification are a function of adjudications by the juvenile judges in the 67 Alabama counties. As commitments within each classification fluctuate, actual commitments sometimes do not perfectly match anticipated needs derived by the RFP committee. An increase in commitments within a particular service category at a time when all DYS beds within that

6

category are already full creates a wait list
situation.

When commitments within a particular classification
spike and current commitments exceed anticipated needs
within a particular classification, temporary
reallocation of resources is sometimes possible within
the limitations of the strict rules for state
contracts.  Likewise, within DYS facilities adjustments
can be made within the limits of availability of staff,
state laws such as the merit system and teacher tenure
laws, and physical plant.  Such reallocation, as
recommended by DYS staff, is the only means under my
control of adjusting to the vicissitudes in commitments
by the juvenile courts in the 67 counties to DYS
custody of particular classifications of juveniles.
Such reallocation of resources is a function I exercise
based on input from DYS staff.  For many years, intake
has been closely monitored by DYS staff under my
direction.  I have occasionally been able to reallocate
DYS resources to eliminate or minimize, within
applicable categories of placement options, wait lists

7

when they have occurred.  It has not, however, been possible to perfectly predict the number of beds needed within each service category or quickly reallocate resources to avoid altogether any waiting.

It goes without saying that the resources of the Department are not unlimited and it is simply impossible to contract for a large enough source of beds in each category to allow vacant beds in every category regardless of the numbers of commitments. The system requires a prediction of the number of beds within each category and allocation of limited resources to contracts consistent with those predictions. Beds within each category are necessarily limited and when actual commitments exceed the number of available beds, temporary wait lists must be dealt with.

The alternative for DYS would be to allow courts to place an unknown number of juveniles with unknown characteristics at times determined by the courts.  In my judgment this alternative is unreasonable and dangerous.  Juveniles placed in DYS facilities would,

8

for example, have unknown medical problems, unknown victimization issues, and unknown predatory characteristics. Some would be physically frail, some would be young and small and some would be older and physically larger and stronger. Obvious dangers would therefore be associated with allowing placement of miscellaneous juveniles by the courts of the 67 counties. In my judgment the juvenile justice system, of which DYS is merely a part, makes it imperative that juveniles not be dumped into DYS facilities without an opportunity to carefully screen them for placement so obvious dangers can be minimized.

Further the affiant sayeth not.

Done this 29th day of May, 2007.

J. Walter Wood, Jr.

Sworn to and subscribed before me this the 29th day of May, 2007.

Notary Public
My Commission Expires: 8/10/08

9

# EXHIBIT
# 4

IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

J.B., a minor child, by and )
through his next friend, )
Addie Ward, on behalf of )
himself and all others )
similarly situated, )
)
Plaintiff, )
) CIVIL ACTION NO.
v. ) 2:06cv755-MHT
)
WALTER WOOD, in his )
individual capacity, )
)
Defendant. )


J.B., a minor child, by and )
through his next friend, )
Addie Ward, on behalf of )
himself and all others )
similarly situated, )
)
Plaintiff, )
) CIVIL ACTION NO.
v. ) 2:06cv908-MHT
)
WALTER WOOD, in his )
individual capacity, )
)
Defendant. )



EXHIBIT

## AFFIDAVIT OF PATRICK PENDERGAST

**STATE OF ALABAMA**

**COUNTY OF MONTGOMERY**

BEFORE ME, the undersigned authority, a Notary Public in and for said County and State, personally appeared Patrick Pendergast, who being known to me and being by me first duly sworn, deposes and says as follows:

I am Pat Pendergast, and I am over the age of twenty one (21). This affidavit has been prepared by DYS Legal Counsel and is given by me based upon my personal knowledge. I am the Screening and Placement Coordinator for the Alabama Department of Youth Services (DYS). I have been employed with DYS for approximately 31 years. As Screening and Placement Coordinator I participate in the Screening and Placement Committee. The Screening and Placement Committee classifies and places (or "staffs") all children committed to DYS custody. Classification decisions are made by the Committee based on court orders, risk assessment scores, and reports from probation officers, psychologists and others familiar

1

with the child being staffed.

The Mission Statement of DYS states that it is the mission of DYS to enhance public safety by holding juvenile offenders accountable through the use of institutional, educational, and community services that balance the rights and needs of victims, communities, courts, and offenders. Delinquent children from the 67 Alabama counties are committed to DYS, and in certain cases children in need of supervision (CHINS), and the Committee staffs each child according to his or her characteristics.

When a child is committed to DYS custody, the Screening and Placement Committee meets and reviews the child's characteristics to determine where the child would most appropriately be staffed. The Screening and Placement Committee currently has available for placement 6 operated DYS facilities and 26 contract placements. The DYS operated facilities staffing are:

Autauga Campus          Mt. Meigs Campus,

Chalkville Campus,      Thomasville Campus,

Mobile Group Home,      Vacca Campus.

2

The contract facilities are:

Alabama Youth Homes, Inc., (locations in Wetumpka, Westover, and Oneonta)

Big Brothers Home Away From Home,

J & M Manor,

Laurel Oaks Behavioral Health Center,

Lee County Youth Development Center, (S.T.A.R.S. program and BEAMS program)

Southern Oaks Center,

The Bridge, (GEMS Program),

The Bridge, (REACH Program),

The Bridge, (STEPS Program),

The Bridge, (Camp Cobia),

The Bridge, (About Face),

The Bridge, (Camp 180),

Three Springs, (Madison),

Three Springs (Tuskegee),

Three Springs, (Choices, Male),

West Alabama Youth Services, (W.A.Y.S.),

West Alabama Youth Services, (Chances)

New Life Center for Change,

Restoration Resources, Inc.,

Group Homes for Children,

Troy University, Troy Group Home,

Montgomery Group Home,

3

|                          |              |
|--------------------------|--------------|
| University of Alabama, Alabama Home. | North North Group |

These contract facilities are created through the State of Alabama's contract process which I understand is based on a cycle of approximately three years. Estimated staffing needs are projected by DYS staff, proposals are prepared, and contracts are solicited. DYS adheres to the standards of the American Correctional Association with regard to staffing ratios, and facility standards.

Staffing is thus a complex process. It is not unusual for the Committee to experience fluctuations in commitments within the various categories of children as a result of unpredictable spikes in specific types of commitments from the courts of the 67 Alabama counties. Those spikes tend to be sporadic and unpredictable. Capacity at each facility is limited by factors including facility capacity, contract amounts, and ACA standards including staffing ratios. When a particular facility has no beds are available due to lack of capacity, and if

4

no alternate appropriate placement is available, placement is delayed until a bed becomes available. Sometimes these children are required by the various courts to wait in detention until a bed is available.

The Screening and Placement Committee classifies students to determine their staffing needs. They are classified as either (a) SJO, (b) Regular Commitment, ( c ) Sex Offender, (d) Community/Residential, (e) Pure Hit, (f) Special Needs, or (g) any combination of two or more of the above. Classification is based on the type of commitment order, risk assessment scores, reports from probation officers, psychologists and others familiar with the child. Commitment orders from the 67 counties vary widely. The following is an attempt to categorize the types of commitment orders.

HIT (high intensity treatment). HIT commitments are generally not committed to state custody but are adjudicated and placed on probation, with a condition of probation being that they complete a HIT program.

SJO (serious juvenile offenders). Serious juvenile offenders are committed for serious crimes and are

5

required to be incarcerated for a minimum period of one year in a secure facility. They are staffed at Mt. Meigs Campus.

Dependent Children Adjudicated Delinquent. Dependent Children Adjudicated Delinquent may be committed to DYS. They are usually placed in residential facilities.

CHINS (children in need of supervision). CHINS are a unique category and are different from most delinquents. CHINS who are also delinquent may be staffed in a facility with delinquent children if the court also finds the child is not amenable to treatment or rehabilitation under a prior disposition or if the child is adjudicated a CHINS for a second time.

Status Offenders Under A Valid Court Order. Status offenders include truants, children committed for contempt of court, violation of probation (VOP), possession of alcohol by a minor, and children under 16 committed for traffic offenses. This group may overlap with, but is distinct from, CHINS. They have different characteristics, and different needs, from most other children in DYS custody.

6

Delinquent Children.  A delinquent child is a child committed for an act designated a violation, misdemeanor, or felony offense under the law of Alabama or another state if the act occurred in another state or under federal law or a violation of a municipal ordinance except violations of municipal curfew ordinances.

Determinate Sentence Commitments.  Judge sometimes order a child to remain in DYS custody for a specific time.  The characteristics of these children vary widely. In my experience for example  I have observed that some determinate sentence commitments are violent and some are not.  As a result of the differences in characteristics of these children, their needs vary widely.

Criminal Sex Offenders.  Juvenile criminal sex offenders are adjudicated for the following offenses:

> Rape in the first or second degree, as proscribed by Section 13A-6-61 or 13A-6-62; provided that a sentencing court may exempt from this article a juvenile or youthful offender criminal sex offender for a criminal sex offense as defined in Section 13A-6-62(a)(1).

> Sodomy in the first or second degree, as proscribed by Section 13A-6-63 or

7

13A-6-64.

Sexual torture, as proscribed by Section 13A-6-65.1.

Sexual abuse in the first or second degree as proscribed by Section 13A-6-66 or 13A-6-67.

Enticing a child to enter a vehicle, room, house, office, or other place for immoral purposes, as proscribed by Section 13A-6-69.

Promoting prostitution in the first or second degree, as proscribed by Section 13A-12-111 or 13A-12-112.

Violation of the Alabama Child Pornography Act, as proscribed by Section 13A-12-191, 13A-12-192, 13A-12-196, or 13A-12-197.

Kidnaping of a minor, except by a parent, in the first or second degree, as proscribed by Section 13A-6-43 or 13A-6-44.

Soliciting a child by computer for the purposes of committing a sexual act and transmitting obscene material to a child by computer, as proscribed by Sections 13A-6-110 and 13A-6-111.

Any solicitation, attempt, or conspiracy to commit any of the offenses listed in paragraphs a. to j., inclusive.

Any crime committed in any state or a federal, military, Indian, or a foreign country jurisdiction which, if it had been committed in this state under the current

8

provisions of law, would constitute an offense listed in paragraphs a. to k., inclusive.

The foregoing notwithstanding, any crime committed in any jurisdiction which, irrespective of the specific description or statutory elements thereof, is in any way characterized or known as rape, sodomy, sexual assault, sexual battery, sexual abuse, sexual torture, solicitation of a child, enticing or luring a child, child pornography, lewd and lascivious conduct, taking indecent liberties with a child, or molestation of a child.

Juvenile criminal sex offenders receive a risk assessment prior to release to the public. DYS, in cooperation with the University of Alabama and Auburn University, has developed the Accountability Based Sex Offender Program (known as ABSOP), for holding juvenile criminal sex offenders accountable and providing treatment and rehabilitation of criminal juvenile sex offenders. The ABSOP program is located at Mt. Meigs campus. Approximately 50% of the physical bed space at Mt. Meigs is occupied by the ABSOP program. All juvenile criminal sex offenders are staffed at Mt. Meigs in the ABSOP program.

Multiple Needs. Multi-needs children include

9

children at imminent risk of out-of-home placement or a placement in a more restrictive environment as a result of the conditions of emotional disturbance, behavior disorder, mental retardation, mental illness, dependency, chemical dependency, educational deficit, lack of supervision, delinquency, or physical illness or disability, or any combination thereof, and whose needs require the services of two or more of the following entities: DYS, public school system (services for exceptional needs), Department of Human Resources, Department of Public Health, juvenile court probation services, or Department of Mental Health and Mental Retardation.  These children present the various juvenile courts with perhaps the most challenging set of placement decisions.  They are seldom staffed in DYS operated facilities or DYS contract facilities.

Each of the above categories of children compete for DYS placement resources.  They have different and competing claims on DYS resources.

With regard to assessment of juveniles for placement, DYS contracts with mental health centers to assist in

10

assessment and evaluation of juveniles in detention. (They evaluate juveniles in DYS facilities in certain cases.) The information from the evaluation process is utilized by Screening & Placement whenever possible. One of the he first steps in appropriately placing and providing appropriate services to a particular juvenile is obviously assessment of the juvenile's characteristics. The mental health assessment system is used by Screening & Placement and subsequently by treatment staff in development of a service plan. In essence, the assessments provided by the mental health centers are a part of the system of providing services to delinquent juveniles in DYS custody and frequently this initial service is provided before placement.

DATED THIS 29th day of May, 2007.

_____
Patrick Pendergast

SWORN TO AND SUBSCRIBED BEFORE ME, this 29th day of May, 2007.

_____
NOTARY PUBLIC
MY COMMISSION EXPIRES:
8/10/08

11

# EXHIBIT
# 1

Alabama Department of Youth Services

Date/Time Printed: 03/05/2007  09:50:35 AM



Alabama Department of Youth Services
# Main Juvenile Information

Case No.: AUTA-8215  Name: J█████ C B█████

**Alias:**
C█████

**Gender:**
Male

**S.S.N:**
██████████

**Date of Birth:**
███████

**Age:**
16 *(Current)*
15 *(At Commitment )*

**Commitment Information:**

Probation Officer:
 Ray Williams
Office#:
 334-261-4100
Beeper #:

DYS Returnee?
 No
HIT Returnee?
 No

Commitment Type:
 Regular DYS
Committing County:
 Montgomery
Main Committing Offense:
 BURGLARY
Other Commiting Offenses:

Main Offense Category:
 Offenses against property
# Past Offenses:
 4

**Date/Risk Information:**

Commitment Date By Court:
 05/18/2005
Date Notification Order Received by DYS:
 05/24/2005
Screening and Placement Staffing Date:

Initial Date of Entry into DYS:
 06/28/2005
Service Plan Staffing Date:

Anticipated Entry/ Return Date:

Psych. Evaluation/IIntake Date:

Anticipated Release Date:
 10/04/2005
Placement:
 Released from DYS Custody
 Placed on Aftercare
Actual Entry Date Into Facility:
 08/16/2005
Status:
 RELEASED
Case Manager:
 Phyllis Taylor

Risk Score:
 11
Needs Score:

Multiple Needs?

Drug & Alcohol Score:
Medical Risk?
 No
Suicide Risk?
 No
Security Risk?
 No
Substance Abuse?
 Yes
Gang Affiliation?
 Yes
Occult Involvement?
 No
Weapon Involvement?
 Yes

Other Custody:

Release Type:

**EXHIBIT**

1

41

# EXHIBIT
# 2

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF ALABAMA
2                  NORTHERN DIVISION

3    J. B., a minor
     child, by and
4    through his next
     friend, ADDIE
5    WARD, on behalf
     of himself and
6    all other
     similarly              CASE NO.
7    situated;              2:06-CV-908-MHT
     Plaintiff,             CLASS ACTION
8
     vs.
9
     J. WALTER WOOD,
10   in his individual
     capacity,
11   Defendant.

12          *      *      *      *      *      *

13          DEPOSITION OF J. B.

14   taken pursuant to notice and

15   stipulation on behalf of the

16   Defendant, in the Central Office,

17   Mt. Meigs Complex, 1000 Industrial

18   School Road, Mt. Meigs, Alabama,

19   before Mishan Williamson, Certified

20   Shorthand Reporter and Notary Public

21   in and for the State of Alabama at

22   Large, on March 26, 2007, commencing

23   at approximately 10:04 a.m.

EXHIBIT
2

```
1                    A P P E A R A N C E S

2


3      F O R  T H E  P L A I N T I F F :

4                    MICHAEL J. CROW, ESQ.

5                    Beasley, Allen, Crow,

6                    Methvin, Portis & Miles

7                    218 Commerce Street

8                    Montgomery, Alabama 36104

9

10                   ROBERT D. DRUMMOND, ESQ.

11                   Attorney at Law

12                   6767 Taylor Circle

13                   Montgomery, Alabama 36117

14

15     F O R  T H E  D E F E N D A N T  J.  W A L T E R  W O O D :

16                   T. DUDLEY PERRY, JR., ESQ.

17                   Alabama Department of Youth

18                   Services

19                   Montgomery, Alabama

20

21     A L S O  P R E S E N T :

22                   ADDIE WARD

23                   PHYLLIS CARNEY
```

```
 1         start today and work backward?
 2    A.   It would be easier to work from the
 3         past to now.
 4    Q.   Okay.  What was the -- when were you
 5         first committed to state custody?
 6    A.   In '05 for burglary and theft.  And
 7         then I had ran.  And they put me back
 8         in state custody after I ran.  And
 9         then in '06, for violation of
10         aftercare.
11              THE REPORTER:  Violation of
12                   what?
13              THE WITNESS:  Violation of
14                   aftercare.
15              MR. DRUMMOND:  Speak a little
16                   slower so she can hear
17                   you and write.
18              THE WITNESS:  Yes, sir.
19    A.   And I ran from Mobile again, and they
20         brought me back to Mt. Meigs.  And
21         this time, for possession of small
22         pistol and theft of property.
23    Q.   So how many times is that?
```

```
 1        my dad came and got me from

 2        Birmingham.

 3   Q.   How did you get to Birmingham?

 4   A.   The person I ran with mother came and

 5        got us.

 6                 MR. DRUMMOND:  Don't ask that.

 7                 MR. PERRY:  I wonder how that

 8                     worked out for her.

 9   Q.   All right.  Then in '06, you were

10        committed for aftercare violation?

11   A.   Yes, sir.

12   Q.   That was a drug offense?

13   A.   Yes, sir.

14   Q.   Did you test positive, or did they

15        catch you with drugs on you?

16   A.   My grandmother found the marijuana in

17        my room.

18   Q.   Okay.  Now, weren't you sent to jail

19        at one time?

20   A.   To the county jail in October of 2006.

21   Q.   All right.  That was for firing a

22        pistol at Waffle house?

23   A.   Yes, sir.  I was with another --
```

```
 1        another person and we went into the

 2        woods behind Holiday Inn and shot the

 3        gun.  And then they asked some people

 4        to say that we shot in the parking

 5        lot.

 6   Q.   Now, before that -- a couple of weeks

 7        before that, you had been detained.

 8              (Off-the-record discussion.)

 9              MR. DRUMMOND:  Dudley, this

10                   case is still pending.  I

11                   just want to make sure

12                   there's not a pending

13                   case still out there.  It

14                   would be inappropriate

15                   for him to answer your

16                   questions, one that

17                   obviously he's been

18                   adjudicated on.

19                   So, anyway -- go

20                   ahead, if that comes up,

21                   then I'm going to object.

22              MR. PERRY:  Well, I guess what

23                   you're telling me is,
```

Alabama Department of Youth Services                Date/Time Printed: 03/05/2007  09:50:35 AM



Alabama Department of Youth Services
# Main Juvenile Information

Case No.: AUTA-8215  Name: J██████ C B█████

Alias:                     Gender:                        Date of Birth:
C████████                   Male                           ████████
S.S.N:                                                     Age:
████████████                                                16  *(Current)*
                                                            15  *(At Commitment )*

**Commitment Information:**

Probation Officer:              Commitment Type:
 Ray Williams                    Regular DYS
Office#:                        Committing County:
 334-261-4100                    Montgomery
Beeper #:                       Main Committing Offense:
                                 BURGLARY
DYS Returnee?                   Other Commiting Offenses:
 No
HIT Returnee?                   Main Offense Category:
 No                              Offenses against property
                                # Past Offenses:
                                 4

**Date/Risk Information:**

Commitment Date By Court:
 05/18/2005
Date Notification Order Received by DYS:    Risk Score:
 05/24/2005                                  11
Screening and Placement Staffing Date:      Needs Score:

Initial Date of Entry into DYS:             Multiple Needs?
 06/28/2005
Service Plan Staffing Date:                 Drug & Alcohol Score:
                                            Medical Risk?
Anticipated Entry/ Return Date:              No
                                            Suicide Risk?
Psych. Evaluation/IIntake Date:              No
                                            Security Risk?
Anticipated Release Date:                    No
 10/04/2005                                 Substance Abuse?
Placement:                                   Yes
 Released from DYS Custody                  Gang Affiliation?
 Placed on Aftercare                         Yes
Actual Entry Date Into Facility:            Occult Involvement?
 08/16/2005                                  No
Status:                                     Weapon Involvement?
 RELEASED                                    Yes
Case Manager:
 Phyllis Taylor                             Other Custody:

                                            Release Type:

**EXHIBIT**

tabbies®

1

41

# EXHIBIT
# 2

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF ALABAMA
 2                       NORTHERN DIVISION

 3    J. B., a minor
      child, by and
 4    through his next
      friend, ADDIE
 5    WARD, on behalf
      of himself and
 6    all other
      similarly                  CASE NO.
 7    situated;                   2:06-CV-908-MHT
      Plaintiff,                  CLASS ACTION
 8
      vs.
 9
      J. WALTER WOOD,
10    in his individual
      capacity,
11    Defendant.

12         *       *       *       *       *       *

13              DEPOSITION OF J. B.

14    taken pursuant to notice and

15    stipulation on behalf of the

16    Defendant, in the Central Office,

17    Mt. Meigs Complex, 1000 Industrial

18    School Road, Mt. Meigs, Alabama,

19    before Mishan Williamson, Certified

20    Shorthand Reporter and Notary Public

21    in and for the State of Alabama at

22    Large, on March 26, 2007, commencing

23    at approximately 10:04 a.m.
```

**EXHIBIT**

2

```
 1                    A P P E A R A N C E S

 2

 3      F O R   T H E   P L A I N T I F F :

 4                      MICHAEL J. CROW, ESQ.

 5                      B e a s l e y ,  A l l e n ,  C r o w ,

 6                      M e t h v i n ,  P o r t i s  &  M i l e s

 7                      2 1 8  C o m m e r c e  S t r e e t

 8                      M o n t g o m e r y ,  A l a b a m a  3 6 1 0 4

 9

10                      ROBERT D. DRUMMOND, ESQ.

11                      A t t o r n e y  a t  L a w

12                      6 7 6 7  T a y l o r  C i r c l e

13                      M o n t g o m e r y ,  A l a b a m a  3 6 1 1 7

14

15      F O R   T H E   D E F E N D A N T  J .  W A L T E R  W O O D :

16                      T. DUDLEY PERRY, JR., ESQ.

17                      A l a b a m a  D e p a r t m e n t  o f  Y o u t h

18                      S e r v i c e s

19                      M o n t g o m e r y ,  A l a b a m a

20

21      A L S O   P R E S E N T :

22                      ADDIE WARD

23                      PHYLLIS CARNEY
```

```
1          start today and work backward?
2    A.    It would be easier to work from the
3          past to now.
4    Q.    Okay.  What was the -- when were you
5          first committed to state custody?
6    A.    In '05 for burglary and theft.  And
7          then I had ran.  And they put me back
8          in state custody after I ran.  And
9          then in '06, for violation of
10         aftercare.
11              THE REPORTER:  Violation of
12                   what?
13              THE WITNESS:  Violation of
14                   aftercare.
15              MR. DRUMMOND:  Speak a little
16                   slower so she can hear
17                   you and write.
18              THE WITNESS:  Yes, sir.
19   A.    And I ran from Mobile again, and they
20         brought me back to Mt. Meigs.  And
21         this time, for possession of small
22         pistol and theft of property.
23   Q.    So how many times is that?
```

```
 1              my dad came and got me from

 2              Birmingham.

 3    Q.        How did you get to Birmingham?

 4    A.        The person I ran with mother came and

 5              got us.

 6                   MR. DRUMMOND:  Don't ask that.

 7                   MR. PERRY:  I wonder how that

 8                       worked out for her.

 9    Q.        All right.  Then in '06, you were

10              committed for aftercare violation?

11    A.        Yes, sir.

12    Q.        That was a drug offense?

13    A.        Yes, sir.

14    Q.        Did you test positive, or did they

15              catch you with drugs on you?

16    A.        My grandmother found the marijuana in

17              my room.

18    Q.        Okay.  Now, weren't you sent to jail

19              at one time?

20    A.        To the county jail in October of 2006.

21    Q.        All right.  That was for firing a

22              pistol at Waffle house?

23    A.        Yes, sir.  I was with another --
```

1       another person and we went into the

2       woods behind Holiday Inn and shot the

3       gun.  And then they asked some people

4       to say that we shot in the parking

5       lot.

6   Q.  Now, before that -- a couple of weeks

7       before that, you had been detained.

8               (Off-the-record discussion.)

9           MR. DRUMMOND:  Dudley, this

10              case is still pending.  I

11              just want to make sure

12              there's not a pending

13              case still out there.  It

14              would be inappropriate

15              for him to answer your

16              questions, one that

17              obviously he's been

18              adjudicated on.

19                  So, anyway -- go

20              ahead, if that comes up,

21              then I'm going to object.

22          MR. PERRY:  Well, I guess what

23              you're telling me is,

J. B. -- March 26, 2007                                         11

```
 1                    there's 5th Amendment
 2                    privilege issue.
 3           MR. DRUMMOND:  Well, let's see
 4                    if we get to -- it may
 5                    not even come up.
 6   Q.   Okay.  J. B., are there pending cases
 7        hanging out there now?
 8   A.   The case in the county for conspiracy
 9        to commit robbery.
10   Q.   Well, tell me what that's about.
11           MR. DRUMMOND:  I object to
12                    that.  Dudley, do you
13                    really need to ask that?
14                    I'm going to
15                    instruct him to the 5th
16                    -- if you ask him
17                    anything about what it's
18                    about.
19   Q.   All right.  That is not the
20        shoplifting at Parisian?
21   A.   No, sir.
22   Q.   All right.  The shoplifting at
23        Parisian's was a couple of weeks
```