**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **J.B., a minor child, by and through his next friend, ADDIE WARD, on Behalf of himself and all others similarly situated;** | * * * * * | |
| **Plaintiff,** | * * | |
| **vs.** | * * * | **CASE NO: 2:06cv00755-MHT** |
| **WALTER WOOD, in his individual capacity,** | * * * | |
| **Defendant.** | * | |

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **J.B., a minor child, by and through his next friend, ADDIE WARD, on Behalf of himself and all others similarly situated;** | * * * * * | |
| **Plaintiff,** | * * | |
| **vs.** | * * * | **CASE NO: 2:06cv00908-MEF** |
| **WALTER WOOD, in his individual capacity,** | * * * | |
| **Defendant.** | * | |

**<u>PLAINTIFF'S BRIEF IN SUPPORT OF OPPOSITION
TO SUMMARY JUDGMENT</u>**

**INTRODUCTION**

These actions were initiated by Addie Ward on behalf of J.B., a minor. Both

actions allege violations of J.B.'s substantive due process rights under the Fourteenth

Amendment to the Constitution of the United States and the failure of the Defendant to accept J.B. within seven days of notice of commitment, pursuant to §12-15-61(c) Code of Alabama (1975).

The respective claims, violation of due process and failure to accept within seven days, have separate and distinct legal foundation, neither relying on the other.

Defendant Wood has moved for Summary Judgment on three grounds. First, he argues he is entitled to qualified immunity. Second, he argues he is entitled to state-agent immunity. Third, he alleges the cases should be dismissed under 42 U.S.C. §1997e(e). None of these arguments have merit.

## DEFENDANT'S EVIDENTIARY SUPPORT

In support of his Motion for Summary Judgment, Defendant submits four exhibits. The "Undisputed Facts" as set forth by the Defendant are unsupported by the evidence offered through the exhibits.

Exhibits three (3) (Affidavit of Walter Wood) and four (4) (Affidavit of Patrick Pendergast) offer no evidence as to Plaintiff, J.B. and in fact do not reference the Plaintiff at any time or manner.

In addition, the Defendant has failed to establish an absence of a genuine issue of material fact. Because the movant has not satisfied his burden under Rule 56(c) F.R.C.P., he would not be entitled to a judgment as a matter of law.

The Plaintiff submits Defendant's Motion for Summary Judgment is to be summarily denied. Absent such denial, the Plaintiff states as follows:

## STATEMENT OF THE FACTS

### SUMMARY OF THE CASES

The first lawsuit, 2:06-CV-755 filed on August 23, 2006, asserts claims based upon events occurring as a result of J.B.'s commitment to the Alabama Department of Youth Services on May 18, 2005. (Exhibit 1) The second lawsuit, 2:06-CV-908, was filed on October 6, 2006, asserts claims based upon events occurring as a result of J.B.'s commitment to the Alabama Department of Youth Services on April 4, 2006. (Exhibit 2)

The lawsuits assert identical causes of action and relief based upon their respective dates of occurrence.

### J.B.'S FIRST COMMITMENT (CV-06-755)

On May 18, 2005 the Juvenile Court of Montgomery County, Alabama entered an Order finding J.B. to be a delinquent child. The Order included, inter alia, that J.B. was in need of care or rehabilitation treatment; that custody was placed with the Alabama Department of Youth Services (hereinafter referred to as "DYS") for a period to be determined by DYS, referral to "CAPS" (Drug program) and that pending transfer to DYS, J.B. is to be detained at the Montgomery County Youth Facility. (Exhibit 3)

On June 28, 2005 J.B. was placed at the 28-day Autauga "HIT" (High Intensive Treatment) program located in Prattville, Alabama. Subsequent to completion of the "HIT" program, J.B. was placed at the 64-day "Bridge" program, located in Mobile, Alabama for drug treatment where he completed the program and was released. (Exhibit 4 and 5)

### J.B.'S SECOND COMMITMENT (CV-06-908)

On April 4, 2006 the Juvenile Court of Montgomery County, Alabama entered an Order again committing J.B. to the custody of the Alabama Department of Youth Services and specifically noted that J.B. was "Committed for inpatient drug treatment". The Order further directed that J.B. be detained at the Montgomery County Youth Facility pending transfer to DYS.   (Exhibit 6)  J.B was placed at a drug treatment facility in Mobile, Alabama on May 9, 2006.  (Exhibit 7)

## HOW A CHILD ENDS UP AT DYS

The statutory framework of the Alabama juvenile justice system is found at §12-15-1 et seq. and §44-1-1 et seq. Code of Alabama.

§12-15-1.1 provides – This chapter shall be known as the Alabama Juvenile Justice Act.  The purpose of this chapter is to facilitate the care, protection, and discipline of children who come within the jurisdiction of the juvenile court, while acknowledging the responsibility of the juvenile court to preserve the public peace and security.  In furtherance of this purpose, the following goals have been established for the juvenile court:

(1) To preserve and strengthen the child's family whatsoever possible, including improvement of home environment.

(2) To remove the child from the custody of his or her parents only when it is judicially determined to be in his or her best interest or for the safety and protection of the public.

(3) To reunite a child with his or her parents as quickly and as safely as possible when the child has been removed from the custody of his or her parents.

(4) To secure for any child removed from parental custody the necessary treatment, care guidance, and discipline to assist him or her in becoming a responsible productive member of society.

(5) To promote a continuum of services for children and their families from prevention to aftercare, considering wherever possible, prevention, diversion, and early intervention.

(6) To promote the use of community based alternatives as deterrents to acts of juvenile delinquency and as least restrictive dispositional alternatives.

(7) To hold a child found to be delinquent accountable for his or her actions to the extent of the child's age, education, mental and physical condition, background, and all other relevant factors and to provide a program of supervision, care, and rehabilitation, including restitution by the child to the victim of his or her delinquent acts.

4

(8) To achieve the foregoing goals in the least restrictive setting necessary, with a preference at all times for the preservation of the family and the integration of parental accountability and participation in treatment and counseling programs.

Judicial procedures through which these goals are accomplished will assure the parties a fair hearing where their constitutional and other statutory rights are recognized and enforced.

This chapter shall be liberally construed to the end that each child coming within the jurisdiction of the juvenile court shall receive the care, guidance, and control, preferably in his or her own home, necessary for the welfare of the child and the best interest of the state.

§12-15-1(5) provides – Commit. Transfer legal and physical custody.

§12-15-1(9) provides – Delinquent child. A child who has committed a delinquent act and **is in the need of care or rehabilitation**.  **[Emphasis added.]**

§12-15-1(17) provides – Legal custody. A legal status created by court order which vests in a custodian the right to have physical custody of the child and **to determine where and with whom the child shall live** within the state and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, clothing, education, and ordinary medical care, all subject to the powers, rights, duties, and responsibilities of the guardian of the person of the child and subject to any residual parental rights and responsibilities.  An individual granted legal custody shall exercise the rights and responsibilities personally unless otherwise authorized by the juvenile court.  **[Emphasis added.]**

§12-15-61(c) provides – After October 1, 1991, the Department of Youth Services shall accept all children committed to it within seven days of notice of disposition.

§12-15-71(c) provides – If a child is found to be delinquent or in need of supervision, the court may make any of the following order or dispositions for the child's supervision, care, and rehabilitation:

(1)    Permit the child to remain with the parents, guardian, or other custodian of the child, subject to the conditions and limitations the court may prescribe.

(2)    Place the child on probation under conditions and limitations the court may prescribe.

(3)    **Transfer legal custody to any of the following:**

a.    **The Department of Youth Services, with or without a commitment order to a specific institution.  [Emphasis added.]**

5

§12-15-71(j) provides – Whenever the court commits a child to a state or local agency or orders a state or local agency to provide services or treatment for a child, that agency shall accept the child for commitment, ordered services, or treatment within seven days of the court's order. However, if compliance with the court's order within seven days would place an agency in violation of either a state statute or standard, then compliance is not required.

§12-15-71(g) provides – Whenever the court vests legal custody in an agency or department, it shall transmit with the order copies of clinical reports, predisposition study, and other information it has pertinent to the care and treatment of the child.

## THE ALABAMA DEPARTMENT OF YOUTH SERVICES

The Alabama Department of Youth Services is statutorily created:

§44-1-1 provides - The purpose of this chapter is to promote and safeguard the social wellbeing and general welfare of the youth of the state through a comp rehensive and coordinated program of public services for the prevention of juvenile delinquency and **the rehabilitation of delinquent youth.    [Emphasis added]** This state program shall provide the following:
   (1)    Social and educational services and facilities for any youth whom a juvenile judge deems in need of such state services;
   (2)    The establishment of standards for social and educational services and facilities for such youth;
   (3)    Cooperation with public and voluntary agencies, organizations and citizen groups in the development and coordination of programs and activities directed toward the prevention, control and treatment of delinquency;
   (4)    The promotion and improvement of community conditions, programs and resources to aid parents in discharging their responsibilities for the care, development and well-being of their children; and
   (5)    The promotion of improved communications between the public and voluntary agencies and bodies of this state responsible for said youth and the juvenile courts of this state. (Acts 1973, No. 816, p. 1261 §1)

Among other statutory provisions DYS is to:

§44-1-2(14) provides – Legal custody.  A legal status created by a court order embodying the following rights and responsibilities: the right to have physical possession of the youth; the right and the duty to protect, train and discipline him; the responsibility to provide him with food, clothing, shelter, education, and medical, dental and hospital care and **the right to**

**determine where and with whom he shall reside**.  **[Emphasis added]**

§44-1-30 provides – When the legal custody of a youth has been vested in the department of youth services by order of the juvenile judge, the department shall, under rules established by it, study and evaluate such youth and investigate all pertinent circumstances of his behavior and life in order to prepare a service plan while he or she is detained in the state training schools.  Data concerning such youth secured in any previous study and evaluation undertaken under this chapter may be utilized by the department in lieu of or in supplementation of a new study and evaluation. The police authorities, the school authorities and other public officials and agencies of the state or any county or municipality in the state shall, upon the request of the department, promptly make available to the department all pertinent information in their possession with respect to a youth whose custody is vested in the department; provided, that this section shall not require any disclosure which would be inconsistent with the requirements of any federal statute or regulation under which grants are made to the state or any state law.  The department shall make available its findings pursuant to this section to any juvenile court in the state.  (Acts 1973, No. 816, p. 1261, §21.)

§44-1-32 provides – (a) When legal custody of a youth has been vested in the department of youth services and so long as such legal custody is such vested in the department. The department may, after an objective consideration of all available information, take one of the following social service actions:

(1)    The department may place the youth in a state training school within the state or in another state in accordance with the provisions of the Interstate Compact on Juveniles, under such conditions as it believes best designed for his welfare or for the protection of the public;

(2)    The department may release the youth to the jurisdiction of the committing court;

(3)    The department may arrange temporary return or a trial visit of the youth to his own home, as often as conditions appear desirable.

(b)    The committing court shall be kept informed by the department of the physical location of the youth at all times.  (Acts 1973, No. 816, p. 1261, §23.)

### HOW A CHILD GETS OUT OF DYS CUSTODY

§44-1-36(c) provides – A committed youth shall be discharged who, in the judgment of the director, has gained optimal rehabilitation from the programs of the department and will not be received again by the department under the original commitment order.

§44-1-36(d) provides – A committed youth shall be released into aftercare when the department determines that said youth is no longer in need of the services of the state training schools and can function within the open society under the supervision of a probation officer in accordance with the terms and conditions as established by the committing court.   The department shall notify the committing court in writing at least 10 days in advance of the release.  The committing court, at the time of release into aftercare, shall then invest custody in a party which the court deems suitable.

The Alabama Department of Youth Services has established Policies 17.11 and

18.1, which sets the criteria for release. This policy states as follows:

Release from departmental programs is an integral part of any student's service plan.  Release from custody should be planned during the development of the service plan and accomplished in an orderly and effective manner.  The committing court must be informed 30 days prior to the release of any student and only after substantial completion of the service plan.  Substantial completion is defined as meeting goals of the plan unless there is reasonable justification to the contrary.

The following is the procedure to be used to release a student from DYS custody:

1.    Notify the committing court and legal custodian 30 days prior to the pending release from custody.

2.    The case manager prepares release summary documenting substantial completion of the service plan.

3.    The service delivery liaison which prepared the service plan meets with student to determine release.

4.    The service delivery team certifies to the program director that **the service plan has been substantially met**.

5.    Program director certifies to the division head that plan has been met.

6.    Division head prepares release papers and recommends release to the Executive Director.

(Exhibit 8)

The service plan is the driving force of the child's stay at DYS. It is the blue print,

based upon individual needs, to provide appropriate services to each youth placed at DYS. Thus, a child remains in DYS custody until the service plan is substantially completed, such is communicated to the director and the director of DYS releases the child. (Exhibit 9) The service plan is created upon placement at a facility, not by Screening & Placement, and is based upon review of all relevant information, including evaluations, etc. DYS Policy 16.3.

### STATUTORILY CREATED DYS ACCEPTANCE PROCESS

Upon commitment of a child to DYS, the court Order and other pertinent documents in the committing court's possession are to be transmitted to DYS. §12-15-71(g) Code of Alabama (1975). (Exhibit 9)

> §12-15-61(c) provides – After October 1, 1991, the Department of Youth Services shall accept all children committed to it within seven days of notice of disposition.

> §12-15-71(j) provides – Whenever the court commits a child to a state or local agency or orders a state or local agency to provide services or treatment for a child, that agency shall accept the child for commitment, ordered services, or treatment within seven days of the court's order. However, if compliance with the court's order within seven days would place an agency in violation of either a state statute or standard, then compliance is not required.

### THE DYS ACCEPTANCE PROCESS

Upon receipt of the commitment Order, DYS, through the office of screening and placement, generates a letter to the probation officer acknowledging receipt of the Court Order and other materials. (Exhibit 10)

The notification letter provides the receipt status of the materials and specifies: "Please forward missing materials as soon as possible so we can staff and admit your client." DYS will not staff a child until all materials are received. The letter also states:

"You will be contacted shortly as to a specific intake date. (Exhibit 11)

Although not established by statute or DYS Board promulgated rule, regulation or policy, Defendant Wood has adopted a practice of requiring the submission of certain materials in addition to the commitment Order. These are: 1) the completed DYS social history form; 2) DYS risk/needs assessment; 3) immunization record; 4) cumulative school transcripts; and 5) social security number. (Exhibit 12)

<u>**PENDERGAST DEPO PG. 77, LINES 2-7**</u>

Q.    Can you point to me any statutory authority that says DYS doesn't have to staff or place this child until the other information is received?
            MR. PERRY:  Same objection.
A.    This is the way we've been doing it.

When all materials are submitted to DYS, the child's name is placed on a list to be "staffed." Staffing[1] is the process of classifying and determining initial placement of the committed child.  Staffing takes place on Wednesday of each week. Regardless when a child's material are received, the child will not be staffed until the following Wednesday, meaning that a week can pass before DYS reviews the child for placement.

The Screening and Placement committee (hereinafter referred to a S/P) is the entity that "staffs" a child. The Defendant asserts: "When a child is committed to DYS custody, the Screening and Placement Committee meets and reviews the child's characteristics to determine where the child would most appropriately be staffed." (Pendergast Affidavit pg. 2)

According to the DYS Classification Manual:

---

[1] Definition of staffing means classifies and places.  (See Pendergast Aff. pg. 1)

"The Screening and Placement Committee will initially classify all juveniles referred to the Alabama Department of Youth Services within two weeks of completed notification.   The classification and placement decisions are made simultaneously. Classification decisions are based upon court orders, risk assessment scores, and reports from probation officers, psychologists and others familiar with the child. Placement decisions match resources with the identified needs of the student.   A three-member panel (described later) has the responsibility and authority to make classification and placement decisions."   (Exhibit 13)   Notwithstanding §12-15-61(c) Code of Alabama (1975), Defendant Wood has adopted the above policy whereby committed children can wait two (2) weeks after the Court Order and all materials are received by DYS to be "staffed".   This time period exceeds the statutory time limitation for actual acceptance by DYS by one week.

The Defendant would have the Court believe that the screening and placement of committed children is a detailed comprehensive process (Defendant's Brief Pg. 4; Exh. 3, Exh. 4).    However, the classification and placement decisions are made simultaneously.   (Exhibit 13)   Staffing is a function of determining the type of facility to which a child will be placed and where his Service Plan will be developed.   (Pendergast depo pg. 166, line 6-9)   Those service categories are pretty general.   (Wood Depo pg. 244)   (Exhibit 9)

A secondary consideration in the classification process would be to assess subjective testing and/or reports in the case file which denote high or low risk factors concerning the child's emotional/mental health, potential for aggression, response to previous treatment programs and family stability.   (Exhibit 13)

11

Testing will be provided by DYS when existing evaluations need to be updated or are non-existent. The testing will take the form of a mental status exam, drug and alcohol involvement scale; brief social history; diagnosis and recommendations. Testing can be used for classification, placement and service plan development. (Exhibit 13, pg. 2)

According to Pendergast "When a particular facility has no beds available due to a lack of capacity, and if no alternate appropriate placement is available, placement is delayed until a bed becomes available. (Pendergast affidavit at page 4,5)

The actual staffing process occurs in the following way:

* The coordinator of Screening and Placement, (Pendergast) upon notice of commitment, causes a file to be created on the committed child.

* If all materials are received, the child is placed on the following week's staffing docket. Staffing is held once a week for the benefit of the people in the department. (Up to a week after receipt of all materials) (Pendergast depo pp. 95-99)

* A single copy of the child's file is created for the four members of the screening/placement committee to review prior to the Wednesday staffing at 1:00 p.m. (Pendergast depo pg. 99-109)

* The S/P Coordinator reviews each file prior to staffing and notates on the file his recommended placement. (Pendergast depo. pg. 105-108)

* The S/P coordinator (Pendergast) makes his recommendation at the staffing meeting and absent discussion regarding the recommendation, the S/P coordinator's recommendation is adopted.

* The placement recommendation is noted on the screening and placement

staffing report and entered into the approach/tracking computer system.  (Pendergast depo. pg. 62; Exhibit 22 and 25)

    * The placement decision is not communicated to the committing court, the probation officer, the parent or guardian or the child.  (Pendergast depo. pg. 29-32)

    * The date placement is any projected placement date that is not communicated to the committing court, the probation officer, the parent or guardian or the child. (Pendergast depo. pg. 29-32)

    *Intake to facilities occurs on Tuesdays. If a particular child is to be placed on Tuesday S/P notifies the probation officer and/or detention facility prior to Thursday or Friday.

    * If a child or parent were to call Pendergast to get information about the placement or intake date, Pendergast would not provide staffing or placement information to them, in fact he would not speak to them, nor would the information be communicated to a parent or guardian.  (Pendergast Depo pg. 38-39)

## THE HISTORY OF THE PLACEMENT PROCESS
## AND DEFENDANT WOOD'S ROLE THEREIN

    The issue of children waiting for DYS placement subsequent to commitment is not a novel issue. It is an issue that has plagued DYS since the mid-nineties. The issue was first judicially addressed in 1996 in the litigation known as "AW".[2] Specifically the issue was addressed when Judge Hobbs issued his Order of June 25, 1996.  The Order provides in part the following:

> The Fourteenth Amendment's protection against deprivations of liberty without due process of law apply at the Department of Youth Services, and conditions and procedures at detention facilities must be evaluated under that standard.  See e.g., H.C. ex rel. Hewett v. Jarrard,

---

[2] A.W. v. Dupree, CV-92-H-104-N

786 F.2d. 1080, 1084-85 (11th Cir. 1986). The Defendant appears to argue that because limited services are provided to juveniles during the pre-evaluation or pre-placement detention period, the juvenile has no constitutional interest in ending the detention period. If the Defendant is suggesting that because such juveniles receive some limited services, there is no constitutional violation from the failure to evaluate and place juveniles in a timely manner, then the court rejects this suggestion. A juvenile's constitutional interest in "freedom from institutional restraints, even for the brief time involved here, is undoubtedly substantial." Schall v. Martin, 467 U.S. 253, 265, 104 S. Ct. 2403, 2410 (1984) (citing In re Gault, 387 U.S. 1, 87 S. Ct. 1428 (1967)). Although a state's parens patriae duty to juvenile offenders permits it to impose restraints on them even in a civil setting, i.d., due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the juvenile is committed. Alexander S. v. Boyd, 876 F. Supp. 773, 797-98 (D.S.C. 1995) (citing Jackson v. Indiana, 406 U.S. 715, 738, 92 S. Ct. 1845, 1858 (1972) (applying standard to pretrial detention of civilly-committed, mentally-ill criminal defendant) and Youngberg v. Romeo, 457 U.S. 307, 102 S. Ct. 2452 (1982) (applying similar standard to civilly-committed mentally-retarded individuals)).

At DYS, the delay in obtaining evaluations for and placement of committed juveniles may seriously interfere with their constitutional interest in a commitment period that is reasonably related to the purposes of their commitment. The court was particularly troubled in this regard by evidence at the May 1996 hearing indicating that some juveniles wait in detention longer than they serve in DYS programs. Evaluations may result in immediate release for a juvenile, or, more typically, in placement in a fixed-period program that leads to release from DYS. The court reiterates the constitutional principle underlying the evaluation and placement provisions of the Consent Order and Interim Consent Order-- that an unreasonable delay in getting placed in an appropriate program, leads to unjustifiably prolonged restraints on a juvenile's liberty and is unconstitutional. Such a violation requires action on the part of this court. (The entire Order is attached here as Exhibit 14).

The issue was next addressed in S.S. v Wood, CV-01-224-N, In the United States District Court for the Middle District of Alabama, wherein the Defendant entered into a settlement agreement whereby he would place committed youth within the time specified by state law. (Exhibit 15)

The issue was again addressed in A.G. v. Wood and Pendergast, CV-02-A-182-

N, In the United States District Court for the Middle District of Alabama, wherein the Court issued its Memorandum Opinion and Order on Defendant's Motion to Dismiss. The case was settled thereafter. (Exhibit 16)

In addition, the Defendant was sued and settled the cases of R.P. v. DYS, Case No.: CV-2002-34; J.N. v. DYS, Case No.: CV-2002-94; and C.F. v. Walter Wood, Case No.: CV-2002-119, all actions in the Circuit Court of Montgomery County, Alabama. All claims were premised on the Defendant's failure to provide timely placement, care and services. (Exhibit 31)

As a result of the aforementioned litigation, Wood adopted several policies, procedures or practices: These include:

* The creation of the consent decree report, which provides students staffing information. (Exhibit 17)

* The creation of the waiting list report, which provides the number of children awaiting placement. (Exhibit 18)

* The creation of the 25-day letter that Defendant Wood sends requesting the court allow the child to remain at home pending DYS placement. These letters are sent by Wood 25 days after staffing if the child has not been placed. (Exhibit 19)[3]

Defendant Wood acknowledges he is the final decision maker regarding placement. (Wood depo pg. 72, 73, 89)

Defendant Wood acknowledges he could remove all children from detention and make temporary arrangements without the committing courts approval. (Wood depo pg. 118)

_____

[3] Exhibit 19 consists of 661 25-day non-placement notifications. Instead of submitting all 661 letters, Plaintiff's are submitting the first and last letter it received from Defendant Wood.

Defendant Wood had a myriad of options:

**<u>WOOD DEPO PG. 110, LINE 15 – PG. 117, LINE 11</u>**

Q.    Mr. Wood, recognizing the statutes that we
      have reviewed so far, and regardless of
      somebody's interpretation -- but as the
      statute reads, we have reviewed that when
      you have legal custody, you can place a
      child where and when you want.  We've
      reviewed that statute.
      Would you agree with me, Mr. Wood, that
      in exercising your statutory rights, you, as
      the ultimate decision-maker in this
      regard -- other than SJO, you could place a
      child waiting in detention on electronic
       monitoring?
      MR. PERRY:  I'm going to object to
      the form of the question;
      of the
      testimony thus for.
      But go ahead, Mr. Wood.
      If you understand, you can
      answer.
A.    If I understand what you're asking, that is
      a -- it is conceivable or possible or
      allowable, yes, sir, that is a possibility.
Q.    Okay.  You could, for a child waiting in
      detention -- other than a SJO, you could
      place that child on home detention?
      MR. PERRY:  Objection to form.
      Objection to form.
       Are you asking him
      whether he could place any
      child regardless of his
      characteristics, or are you
      asking whether he could place
      an appropriate child?
Q.    It's not a trick question, guys.
       MR. PERRY:  Well, it sounded like one.
      MR. DRUMMOND:  Dudley, I'm going
      to say this one time, and I
      mean it as genuinely as I can
      mean it.
      There's a purpose here,
      and trickery isn't it.  It

isn't it.

Q.   So my question, Mr. Wood, is, other than a SJO, you could place a child at home pending placement at DYS, couldn't you?

A.   Well, if I understand the provisions and what's allowable or not, under certain circumstances that that is a possibility, yes, sir.

Q.   Other than a SJO, you could allow a child to go home and have his evaluation done while he's at home, couldn't you?

A.   I can -- I assume under certain circumstances, if that was --

Q.   Mr. Wood, other than --

A.    -- possible in that particular case, that that would be possible, yes, sir.

Q.   Other than a SJO -- and I'm not sure you couldn't do it with a SJO.  But other than a SJO, you could place a child at home on electronic monitoring and require him to go -- come out to DYS and get their evaluation, out to Mt. Meigs or Vacca or Chalkville, couldn't you?

A.   That's conceivable, yes, sir.

Q.   You could, while a child is waiting in detention, have him at home and develop his service plan while he's at home, couldn't you?

A.   It's conceivable.  Under the right circumstances, yes, sir.

Q.   And, Mr. Wood, it's also statutorily possible for you to create the service plan and have the child participate in community resources to satisfy that service plan, couldn't you?

A.   I'm not sure if under certain circumstances that would be allowable.  Of course, that, you know, invokes the need for staff and supervision and community probation-like services that we don't -- don't have.

Q.   Well, Mr. Wood, you already said that pursuant to DYS policy, if there's a service that's needed for a child, the department can contract with community services to provide that, can't it?

A.   Yes, sir.

Q.    Okay.  And so under that scenario, a service plan could be developed for a child at home; and if the need is not available at one of the campuses, the department can secure or procure that service in the community, can't it?

MR. PERRY:  Object to the form. Argumentative.  It assumes facts that don't exist.

A.    If I understand what you're asking, those possibilities exist, yes, sir.

Q.    And a child committed to the HIT program could go up to Autauga during the day and participate in the HIT components during the day, couldn't they?

A.    I wouldn't -- I wouldn't think so, no, sir.

Q.    Well, why not?

A.    It is a residential program and not a day program.

Q.    Well, can you tell me what services are provided for a child between nine p.m. and six a.m. at the Autauga or Thomasville HIT program that contribute toward their service plan?

A.    Just by virtue of being in custody under supervision and monitoring behavior and -- during any hour of the day, the staff are effectively trying to accomplish a treatment plan.  So even in off hours and odd hours, there are still components of the treatment plan that are in play.

Q.    Well, you could certainly hire day staff to work at the HIT program for a group of kids, couldn't you?

A.    I'm not sure it would be workable or practical.  But those -- you know, I guess it's a possible scenario under certain circumstances.

Q.    And students at DYS group homes go to schools in the local community, don't they?

A.    Yes, sir.

Q.    They receive counseling sometimes at the group homes, sometimes through community resources?

A.    That's correct.

Q.    As a matter of fact, at most group home

             placements is it not accurate that most of
             the services are provided in the community
             and not actually at the group home?

A.      For that specific low risk population, yes,
             sir, that's correct.

Q.      So a child that's on the waiting list to go
             to a group home and is in detention could
             actually be placed in their home or a foster
             home and receive services in the community,
             couldn't they?

A.      I don't know.  I'm not sure how that would
             work.

Q.      Well, Mr. Wood, of all these possibilities
             that I've just mentioned, tell me during
             your tenure which one have you reviewed the
             viability of and rejected.

A.      Well, I'm not sure that we've done any of
             those.  They sound nice.  But as a practical
             matter, they -- since we deal with a
             case-by-case basis, I'm not sure that as a
             practical matter we would be successful in
             any of those.

Defendant Wood is required by DYS policy to review the space requirements of each facility on an annual basis and document corrective action.  (Exhibit 20)

Defendant Wood has no documentation reflecting this review, nor any documentation reflecting corrective action.  (Wood depo. pgs. 12-16)

The DYS is required by statute, §44-1-55 Code of Alabama (1975) to submit to the Governor annually a report setting forth, inter alia; 1) the need for facilities under its jurisdiction and, 2) juvenile conditions in the state….  Neither, the annual FY 2004, nor FY 2005 reports to the Governor mention the need for additional facilities nor the waiting list issue.  (Exhibits 21 and 22)  In 2004 and 2005, the waiting list and length of detention time pending placement rose steadily.  (Exhibit 17 and 18)

Defendant Wood, every three years, initiates a RFP (Request for Proposal) process to anticipate placement needs of children expected to be committed to state

custody. Choosing to contract for beds instead of operating DYS facilities, Defendant Wood explains in his affidavit: "Beginning in October, every three years, the RFP committee conducts research and planning to anticipate "service categories" for the next three years and the number of slots anticipated for each category. Essentially, this means every three years the committee makes its "best guess" as to the types of juveniles (or services categories) expected to be committed to DYS custody during the next three years and numbers of juveniles within each type (or service category) expected to be committed."  (Wood Affidavit pg. 3 and 4)

Defendant Wood does not know what is a reasonable or unreasonable time to stay in detention pending placement and there is no person at DYS vested with responsibility of determining whether or not the length of stay in detention is reasonable or unreasonable.  (Wood Depo pg. 240, 241) (See Wood Depo. excerpt below.)

<u>**WOOD DEPO PG. 241, LINE 6 – PG. 243, LINE 6:**</u>
Q.     Who at the department is vested with the responsibility of determining whether or not the length of stay in detention is reasonable or unreasonable, if anybody?
          MR. PERRY:  Objection to form.
A.     I don't know that there is a person who makes that determination.
Q.     In the staffing that you have done with the committee, the RFP committee, every three years, does that group give you any information as to what is a reasonable length of stay pending placement?
A.     No, sir.
Q.     In your determination as to how many beds are needed in the system, did you take into account how many beds were needed for children to only wait twenty-one days, fourteen days, seven days, or zero days?
A.     No, sir.  None of the above.
Q.     Mr. Wood, then how can you determine how many beds the department needs if no

determination has been made as to what a
reasonable length of stay in detention is?

A.    That determination about beds is not just
about detention.  It's about capacity for
the projected estimate of the numbers and
the kinds of children that might come in the
system.

Q.    To be placed within what time period?

A.    It's an effort to have enough beds so that
commitments can come in as quickly as would
be possible given the system.

Q.    So then the goal when you're deciding how
many beds to ask for is not to get them
within seven days, but just whatever the
system will allow for?

A.    That's not really what I said.

Q.    Please correct it.

A.    The work is -- the effort is -- centers not
around how long someone will sit in
detention.  It is focused on trying to
create a system where there are enough beds
for all commitments to come in.  And if it
is possible, given their location,
their -- the court staff, the transfer of
paperwork, whatever that short time could
be, that's what we would like to see happen.

### THE SCREENING AND PLACEMENT PROCESS
### AS APPLIED TO J.B. 2005 COMMITMENT

5/18/05 – J.B. was committed to DYS, but was detained in the Montgomery
County Youth Facility.  (Exhibit 3)

5/24/05 – DYS received J.B.'s Commitment Order, Social Summary, Risk/Needs
Assessment.  (Exhibit 10)

6/2/05 – DYS received J.B.'s school records, social security records and
immunization card.  (Exhibit 12)

6/8/05 – The S/P committee staffed and recommended J.B. be placed at the
Autauga/ A&D Combo.

6/12/05 – J.B. was evaluated while he was still in detention at the Montgomery County Youth Facility and where his drug assessment determined he was chemically dependant.  The Screening and Placement Committee never considered the evaluation as a placement decision to the HIT Boot Camp Program, as his placement had already been made.  (Exhibit 23)

6/17/05 – Screening and Placement received his evaluation indicating J.B. was chemically dependant.  (Exhibit 23)

6/28/05 – J.B. was transferred to the HIT Program in Prattville, Alabama.  (Exhibit 4)

While at the Montgomery County Youth Facility, J.B. received no services, care, or treatment for his drug dependency.  Subsequent to J.B.'s staffing, neither he nor his parent or guardian was informed of his potential placement or the date of such placement and he had no way of receiving a service plan, beginning his service plan or being released upon substantial completion of his service plan.  (Pendergast depo. pgs. 29-32)  (Wood Depo pgs. 96-101)

Although the committing Court in its Order referred J.B. to drug treatment, and despite the June 12, 2005 evaluation establishing J.B. as chemically dependent, J.B. remained in detention without treatment until he was placed at the HIT Program on June 28, 2005.  While at the HIT Program, J.B. received no treatment for his chemical dependency, but did receive generic drug education.  (Exhibit 4)

### J.B.'S SECOND DYS COMMITMENT 2006

4/4/06 – J.B. was committed to the custody of DYS for inpatient drug treatment, and remained in detention at Montgomery County Youth Facility.  (Exhibit 6)

4/12/06 – DYS received J.B.'s Commitment Order.  (Exhibit 7)

4/19/06 – S/P committee decided to place J.B. in the Mobile Drug Treatment Program.  (Exhibit 25)

5/9/06 – J.B. remained in Montgomery County Youth Facility, where he receive no care, services, treatment or rehabilitative opportunities, and was finally transferred to the Mobile Drug Treatment Program.  (Exhibit 25)

For both commitments to DYS, J.B. remained in detention without any ability to receive treatment and secure his release from DYS custody.  On both occasions J.B. remained in detention without any information as to where he would be placed, when he would be placed, what he must do to be released, or when he would be released. On both occasions he remained in detention without treatment for his DYS identified chemical dependency and other needs.  (Exhibits 8, 9, and 24; Pendergast depo. pg. 29-32)

### THE DEFENDANT'S POSITION ON DETAINED CHILDREN AWAITING DYS PLACEMENT

J.B.'s plight is common to DYS committed children.  For example:

J.W. was a 15-year-old male from Covington County.  He had a risk score of one (1), the lowest possible.  He was committed to DYS on November 27, 2006 and staffed on December 6, 2006.  The jacket of his file indicates a recommendation by Pat Pendergast of either a Group Home or Wilderness Program.  At staffing it was determined his placement would be a Group Home, and that the Group Home would be the Big Brother Group Home.  A group home is a non-secure facility.  It is one of the least restrictive placements available.  J.W. remained in detention, the most restrictive setting possible for over 45 days from the day DYS received his Court Order and

materials until he was placed the Big Brother Group Home on January 16, 2007. (Exhibit 26)

Mr. Wood testified regarding J.W. that he did not know if that was reasonable. (Wood depo pgs. 238, lines 14, pg. 241, line 5)

Mr. Wood also testified that he doesn't know what is reasonable or unreasonable. (Wood depo pgs. 238, lines 14, pg. 241, line 5)

C.J. was a 16 year old girl, with severe mental health issues and needs, and at risk of suicide, with a risk score of 4, who remained in detention without services or treatment from the date DYS received her materials, April 10, 2006 until placement on June 6, 2006, Mr. Wood could not say whether this was reasonable or unreasonable. (Exhibit 27 and 28)

When asked about whether it was unreasonable for these children to remain in detention Defendant Wood states as follows: (Wood depo pg. 238, line 14; pg. 241, line 5)

> ### WOOD DEPO PG. 238, LINE 14 – PG. 241, LINE 5
> Q.     Mr. Wood, we've looked now at three
>        different examples, J.B., J.W., and this
>        young lady. We had one young man who waited
>        in detention for longer than the program he
>        went to, that being J.B. You would agree
>        with that, would you not?
> A.     I think we talked about that, yes, sir.
> Q.     Okay. There's J.W., who had a risk score of
>        one who was staffed by your employees to go
>        to a group home?
> A.     Yes, sir.
> Q.     And he remained in detention for at least
>        twenty-five days before being placed in a
>        non-secure group home?
> A.     It appears so, yes, sir.
> Q.     We have a young lady with
>        evaluation-identified mental health needs,

would you agree with that, named C.J.?

A.    Yes, sir, it appears to be so.

Q.    And she remained in detention for at least six weeks, if not longer, before being placed by the department?

A.    It appears so, yes, sir.

Q.    Given those three different examples, which one of those children remained in detention for an unreasonable length of time, if any?

A.    Well, I don't -- I don't know what's reasonable or unreasonable.  These are three examples of individual cases that were handled within the existing system.  And each of the three, obviously, had a twenty-five day letter mailed out.

Q.    Are there any of those three examples, Mr. Wood, that you find that the length of stay was unreasonable?

        MR. PERRY:  Objection to the
                form.  Based on the facts that
        you have given him here today?
        Is that your question?

 Q.    Based on what you've reviewed in the screening and placement files, Mr. Wood.

A.    Well, I -- I don't know how to define what's reasonable.  Those cases had different amounts of time and --

Q.    Mr. Wood, if you don't know, who can define for these three students and all of the others what's reasonable or unreasonable?  In your opinion, who can?

A.    I don't know how to answer that.

Q.    In your opinion, Mr. Wood -- let me make sure I understand your testimony right.  You can't testify whether in any of these three cases, or any of the others -- whether their stay in detention was reasonable or unreasonable; is that correct?

A.    No.  I'm saying that I don't know what is reasonable or not reasonable.  Those are individual cases that came through the system.  And based on the resources and the procedure that's in place, that is -- that is what happened in those cases.

When Pendergast was asked about the reasonableness of these children in

detention, the information children receive, and services to detained children, including

J.B., Pendergast testified as follows:

## PENDERGAST DEPO PG. 169, LINE 5 – PG. 197, LINE 19

Q.  So this young man stayed in detention, a
secure facility, for six weeks before being
placed in the least restrictive environment
that DYS has to offer?
A.  That appears to be the case.
Q.  Okay.  Does that -- is that reasonable to
you?
MR. PERRY:  Object to the form of
the question.
A.  That's the way it is.
Q.  I understand that, Pat.  But my question is,
is that reasonable to you?
A.  I -- I can't really say.
Q.  Is it unreasonable?
A.  I can't say that either.
Q.  If it were your child, would you consider
six weeks in a secure facility to go to an
unsecure, least restrictive environment, to
be reasonable or unreasonable?
MR. PERRY:  Objection to form.
A.  I don't really know.
Q.  Would you consider it -- it's either
reasonable or unreasonable.  Which do you
consider it to be?
MR. PERRY:  Object to the form.
He's answered your question.
Q.  It's not an I don't know question.  It's
either one or the other.  Either it's
reasonable or it's unreasonable.
My question to you, Pat, is as
administrator of screening and placement, is
it reasonable or unreasonable for a child to
sit in a secure facility for six weeks
before being placed in the least restrictive
environment that DYS has?
MR. PERRY:  Objection to the
question.  Argumentative.
You can go ahead --
MR. PERRY:  Asked and answered.
Q.  You can --

MR. PERRY:  You've asked him
several times, and he's -- he's
already answered.
 MR. DRUMMOND:  Dudley, let's not
 do what we did yesterday.  He
can answer the question.  He
 knows whether it's reasonable
or not reasonable.

Q.   Pat, you know, this -- well --

A.   This is the way it is.

Q.   Okay.

A.   That's what happened in this case.

Q.   Is the way it is in this case reasonable or
unreasonable?
MR. PERRY:  Objection.  Same
objection.

Q.   Pat, you're not a defendant.  I'm just
asking you --

A.   It's the way -- it's the way it is.  The
system is imperfect.

Q.   Why is the system imperfect?

A.   Because that's the way it is.

Q.   Okay.  If you were the parent of J.W. --
well, let me ask you more directly.  After
you staffed J.W. to go to a group home, did
you contact his mother or father or legal
guardian to tell them he would be going to a
 group home?

 A.   I can't tell from this.

Q.   Well, if normal procedure would have been
followed, parents would not have been
notified by your office, would they?

A.   No.

Q.   Did you contact, or anyone from your office
contact, J.W. to inform him he was going to
a group home?
MR. PERRY:  Objection to form.
Asked and answered.

Q.   I'm sorry.  I thought I said the child,
J.W.
MR. PERRY:  You just asked him the
same --
MR. DRUMMOND:  No, I said parents
before.
MR. PERRY:  I'm sorry.
THE WITNESS:  He said parents.

27

MR. PERRY:  I'm sorry.

Q.  I'm sorry?

A.  No.

Q.  Okay.  Did you contact the probation officer and say, this child is going to a group home?

A.  I can't tell from this.

Q.  If normal procedure were followed, would you have initiated that information to the probation officer?

A.  I might have.

Q.  But only the Thursday before the child was taken, absent some other circumstances, correct?

A.  I --
MR. PERRY:  Objection to form.
That's not what his testimony was earlier today when you covered this for the first time.

Q.  You can go ahead and answer.

A.  Really.  I mean, I really feel like we're going back over the same thing over again.
MR. PERRY:  We are.  Just --

A.  And I'm just going to say --

Q.  I'm asking you about this specific child.

A.  -- I might have and I might not have.  I don't know.

Q.  Well, if you had contacted anyone, it would it?

A.  One would think so.

Q.  Okay.  Because given the thousands of kids that you have to deal with, you don't rely on your memory to keep up with what you do in relation to each child, do you?

A.  Right.

Q.  Do you keep a daily log of your activities?

A.  Typically, I keep a log -- I keep my activities of that nature in the student's file.

Q.  Okay.  Is it safe to assume -- is it safe to conclude that if you had made contact with probation officers subsequent to staffing and prior to actual placement a notation would be reflected in the file?

A.  I might not have.

28

Q.  Okay.  Well, generally, you would make that
    notation, wouldn't you?
Q.  Okay.  After placement, a decision was made,
    you knew this child was sitting in
    detention, didn't you?
A.  After the placement decision was made, I had
    access to the information.
Q.  Well, it would be reflected on the consent
    decree report, wouldn't it?
A.  It would.
Q.  Okay.
A.  That's the access I'm referring to.
Q.  Okay.  And as a matter of fact, under a
    prior settlement agreement, you knew to take
    kids that are in detention and give them
    priority from kids not in detention, didn't
    you?
A.  No, that's not true.
Q.  Are you telling me that you don't give
    priority for placement for kids that are
    being held in detention?
A.  No.
Q.  Is it your testimony that a child not
    waiting in detention for the same bed would
     be placed before a child waiting in
    detention?
A.  Well, if it came down to choosing between
    a -- working our way down the waiting list,
    I might have to make that decision, you
    know, prioritizing one over the other.  But
    it's not -- it doesn't impact who we take in
    and when.
Q.  Do you maintain a list of -- a separate list
    of this is the facility, these are the kids
    waiting to go in that facility?
A.  It's not a separate list, no.
Q.  Where is that list?
A.  It's -- it's that consent decree.  It's
    that.
Q.  Is there any other document than this --
    than this consent decree report which
    reflects, here is the facility, here is our
    list of kids waiting to go into that
    facility, other than the consent decree
    report?
A.  I don't believe so.

Q.  You don't believe so or there's not one?

A.  There's not one that I'm aware of.

MR. DRUMMOND:  Dudley -- never mind.

MR. PERRY:  He just -- he answered your question honestly.

MR. DRUMMOND:  Well, fine.  We're not going to go back to I believes, and then go, oh, yeah, I found this document. We're just not going to do that.

MR. PERRY:  Well, neither -- neither is he --

A.  Have you got it?

MR. PERRY:  Neither is he going to sit here and give you definitive answers to questions that he's not definitive about.  And I don't appreciate -- you're browbeating him for being honest in his deposition.

Q.  You asked -- you just asked me if I have that document, or if I have a document like that.  I want to ask you again, is there some other document --

A.  No.

Q.  All right.  You said, we work our way down the waiting list?

A.  Right.

Q.  Okay.  What waiting list are you talking about?

A.  What you don't understand --

MR. DRUMMOND:  Let him answer the question, Dudley.

A.  -- is that that document is the waiting list.

Q.  Well, that document is not what is sent to Mr. Wood every week, is it?

A.  Not the one that I think you're referring to.  He doesn't get that one.

Q.  You e-mail him a waiting list every week showing the facilities and --

A.  Right.

Q.  -- how many kids are --

A.  Right.
Q.  -- waiting?
    How did this child know how long after
    staffing he was going to have to wait in
    detention?
A.  How did he know?
Q.  Yes.
A.  How long?
Q.  Yes.
A.  My guess is that he didn't know.
Q.  Whose responsibility is it to let him know?
    MR. PERRY:  Objection to the form
    of the question.
A.  You know -- whose responsibility is it to
    let him know?
    MR. PERRY:  Do you know the answer
    to the question?
A.  There's really not --
    MR. PERRY:  Do you know the answer
    to the question?
    THE WITNESS:  No.
    MR. PERRY:  If you know, answer.
    If you don't --
A.  No.
    MR. PERRY:  -- tell him you don't
    know.
A.  I don't know.
Q.  Does somebody have a responsibility to
    notify this child of where he's going to be
    placed?
    MR. PERRY:  Are you asking him
    whether legally that's an
    obligation or are you asking
    him whether somebody that works
    for him or he has that job
    responsibility?
    MR. DRUMMOND:  I'm not that smart
    to break it down.  It's just a
    question.
    MR. PERRY:  Well, then, I object
    to the question as far as --
    MR. DRUMMOND:  You can object to
    the form.
Q.  You can go ahead and answer.
    MR. PERRY:  -- it calls for a --
A.  I don't know of anybody --

MR. PERRY:  -- legal conclusion.

A.   I don't know anybody whose responsibility it
     is to let him know.  I told you before, the
     probation officers are my contacts on these
     things.

Q.   Okay.  And tell me when you notified J.W.'s
     probation officer where he was going to be
     placed prior to the Thursday before he went
     on Tuesday?
     MR. PERRY:  We've covered this
     twice now.  This is the third
     time.
     MR. DRUMMOND:  They say it's the
     charm.

A.   As a matter of fact, this one -- this court
     did get a notification on January 2nd that
     he was awaiting a bed at Big Brother.

Q.   Okay.  And that was after a twenty-five day
     letter was sent?

A.   That was the twenty-five day letter, part of
     it.

Q.   What do you mean, part of it?

A.   It was added to the bottom of it.

Q.   Okay.  Who added it to the bottom of it?

A.   Arnea.

Q.   So any notations on the bottom of these
     reports to the court indicate where -- the
     bed that the child is waiting for?

A.   If it's on there, yes.

Q.   If it's not on there, what does that mean?

A.   I'm not quite sure.  But I know that if it's
     on there, that's what it means.

Q.   Well, if it's on there, that's something.
     If it's not on there --
     MR. PERRY:  What does something
     that's not there mean or not
     mean?

A.   Really.

Q.   Have you given your staff instructions to
     put on the twenty-five day letters -- if a
     child is waiting to put the information
     where they're waiting?

A.   We have -- we have done that when we know
     that the child is close to coming in, yes.

Q.   Pat, is it that you put it on there -- or
     rather --

32

A.   It's as a courtesy to the judge.

Q.   Well, did you not put it on there because you hadn't made a final decision of where the child is going to go?

A.   No.  The reason it may not be on there is because somebody just didn't realize we were getting close to bringing that child in.  It's a courtesy.

Q.   So you consider close to bringing a child in to be how long?

A.   A week or so.

Q.   Okay.  Well, if the letter went out twenty-five days after staffing, he stayed there for another three weeks, didn't he?

A.   Unh-unh (negative response).  He stayed there until June -- January 16th.  The letter went out on the 2nd.

Q.   How do you justify holding a child in detention for six weeks to be placed in a least -- a less -- an absolute least-restrictive environment?
     MR. PERRY:  Objection to the form of the question.  It assumes all kind of facts that aren't here.

A.   I really don't know that I can justify it.  It's just the way it is.

Q.   Do you review an individual's needs assessment?

A.   I do.

Q.   Do you review the PO's social summary?

A.   I do.

Q.   So if there's information in that social summary, you use that information in making your placement decision?

A.   In the social summary, yes.

Q.   And in the needs assessment?

A.   Yes.

Q.   And in the risk assessment?

A.   Yes.

Q.   And you said earlier -- I thought you said the risk assessment was just a number?

A.   It is a number, right.  It's not something that we can use as the sole reason for placement.

Q.   Okay.  I'll ask you to take a look at that

file.  I'll represent to you that's what was
copied out of the skeleton file.
 (Off-the-record discussion.)
 (Brief pause in proceedings.)
(Plaintiffs' Exhibit Number 5 marked
for identification.)

Q.  (Mr. Drummond continuing) Pat, that's -- let
me mark that as Plaintiffs' 5.
Pat, I don't remember asking Phyllis to
make a copy of the file jacket on this one.
I think that's why it's not there.
Can you identify Plaintiffs' 5 for me?

A.  It says C.J.

Q.  Would that be her skeleton file from
screening and placement?

A.  It appears that it is.

Q.  What was her risk score?

A.  Four.

Q.  Which is in what range?

A.  Low range.

Q.  What were her needs?  What were her needs,
her needs score?

A.  Twenty.

Q.  In that file at the time of the placement
staffing, was there an evaluation that y'all
could review?

A.  Was there an evaluation, yes, there was.

Q.  Did y'all review that evaluation?

A.  I would think that we did.  I mean, it was
in the file, so ...
MR. PERRY:  Do you remember this
case other than --

A.  I can't remember reading the evaluation
before staffing.
MR. PERRY:  Okay.

Q.  If that evaluation was in the file, would
you have read it?

A.  Normally I would, yes.

Q.  This child was staffed to go where?

A.  Chalkville.

Q.  And reading the evaluation, do you find that
she has any mental health needs?

A.  Yes.

Q.  What is the date of y'all's staffing on her?

A.  April 12th, '06.

Q.  And what was the date of her evaluation?

A.  The evaluation was done February 21st of
'06.

Q.  Okay.  So within a few weeks, that's how
recent an evaluation y'all had?

A.  A couple of months.

Q.  Did you find that she had either attempted
suicide or --

A.  Yes, she had.

Q.  Would you consider, based on that report,
that this young lady had mental health
needs?

A.  Yes.

Q.  At the time of placement, you would have
known that she was in detention?

A.  Could have access to that information.  And
I'm not sure if she was in detention or
not.  I don't know.  I'm not sure if she was
in detention or not based on the court
order.  We would have had to have done a
little more research to figure that out.

Q.  What was the staffing date on there?

A.  4/12 of '06.  There may be something else in
here that indicates that.  But I can't tell
from looking at the court order, which is
usually where it is at.

Q.  Pat, I'm going to show you what we'll mark
as Plaintiffs' Exhibit 6 and ask if you can
Identify that document.

A.  This is a consent decree report.

Q.  For what time period?

A.  April 12 of '06.

Q.  Does that form reflect whether she was or
was not in detention?

A.  I'm pretty sure this is her.  C.J. is listed
as being from Cullman County, staffed on
that day.  Let's see, commitment order,
4/6.  Completion date, 4/10.  I feel
reasonably sure that this is that person.
And what was your question?  Was she in
detention?

Q.  Yes, sir.

A.  She's in Tennessee Valley Detention, yes.

Q.  And your consent decree report reflects that
information, that she's in detention?

A.  This report does, yes.

Q.  How long did she remain in detention?

35

A.  I don't know what day we brought her in.
    Oh, wait a minute.  I do.  June 6th.
Q.  So she stayed in detention for how long?
A.  Two months.  Almost two months.
Q.  Can you tell me what mental health needs DYS
    provided to this child in its custody during
    those two months?
A.  Not any, that I'm aware of.
Q.  Tell me what persons you contacted after
    staffing and informed them that she would be
    placed at Chalkville.
A.  I don't know from -- from looking at this
    that we informed anybody.
Q.  Tell me how the child would have known that
    she was going to be placed at Chalkville.
A.  She might have guessed that she was going to
    Chalkville.
Q.  How would this child have known how long she
    would be in detention waiting placement?
A.  She might not have known that.
Q.  During those two months, could she have done
    anything to get out of DYS custody?
A.  To get out of DYS custody?
Q.  Yes.
A.  I suppose her attorney could have filed an
    appeal or something of this nature.
Q.  How could she have done anything while she
    was in detention to have developed a service
    plan?
A.  She would not have had a service plan
    developed in the detention center.
Q.  Is it your knowledge that students cannot
    get out of DYS until they generally
    substantially complete their service plan?
A.  That is true.
Q.  How would she have had the opportunity to
    complete her service plan?
A.  By coming into our facility and completing
    the service plan.
Q.  Was it reasonable for her to wait two months
    to be placed in a facility?
    MR. PERRY:  Objection to the form
    of the question.  That's --
    here we go again.
A.  I can't say.
Q.  Was it unreasonable?

MR. PERRY:  Objection to the
question.

A.  I can't say.

Q.  How many days for her to wait in detention,
Pat, would have been reasonable before she
was placed?

MR. PERRY:  Same objection.

A.  I can't say.

Q.  Why did this child have to go two months
without receiving any services from DYS?

MR. PERRY:  I'm sorry, did you ask
why did she have to go two
months without receiving any
services from DYS?

MR. DRUMMOND:  That was my
question.

A.  She went two months without receiving
services from DYS because there was not a
bed open at the Chalkville campus.

Q.  Was there a bed open at any other facility?

A.  I can't say from looking at this information
you have right here.  But she was staffed to
go to the Chalkville campus based on the
things that she was exhibiting prior to, you
know, coming in.

Q.  Is there not a secure facility for girls
other than Chalkville?

A.  There is.  But I think that in this case
Chalkville was recommended and Chalkville
was warranted.

Q.  Chalkville was recommended by who?

A.  By the placement committee.

Q.  Well, what other secure facility was there
for girls?

A.  In 6 of '06, we had -- wait a minute now.
The only possible place that we would have
had as a secure facility in 6 of '06, I
believe, would have been the Chances program
in west Alabama.

Q.  And that's a secure program just like
Chalkville, is it not?

A.  It's similar, but it's not just like
Chalkville.

Q.  Well, it's a secure facility, right?

A.  It is.  It is secure.

Q.  Service plans are developed at that program?

A.   They are.

Q.   And services are provided to meet that service plan?

A.   Yes.

Q.   So how would it be any different than Chalkville?

A.   Well, there are other things to consider. In the case of this girl right here, she was -- she had some issues that would require the expertise at Chalkville as opposed to the level of care that she would get in the secure facility at WAYS.

Q.   Well, if she had a service plan developed at both facilities that identified needs, the department would provide those services to meet those needs, wouldn't they?

A.   There may not be those abilities at that particular place. Now, I'm -- looking at the date -- and I'm going on my best recollection of what was available at that time. And I don't think that would have been available at the detention -- Chances program at that time.

Q.   So your belief is that she needed the services and expertise that could best be offered at Chalkville?

A.   That's correct.

Q.   On what date did she need those services and expertise that were available at Chalkville?

A.   On the date we staffed her.

Q.   Okay.  And she went two months without those services and expertise, didn't she?

A.   It appears so.

Q.   Is that reasonable?

MR. PERRY:  Objection. Argumentative.

A.   I don't know.

Q.   Let me ask you this way.  In your opinion as a juvenile -- do you consider yourself a juvenile justice professional?

A.   Yes.

Q.   Is it your impression as a juvenile justice professional that it was in that child's best interest to go two months without receiving services and expertise to meet her needs?

A.  I don't know.

Q.  Well, when you say you don't know, you believe there is a scenario that exists where a child that needs services and expertise that can only be offered at Chalkville can wait two months to receive those services?

A.  I just don't know.

Q.  Okay.  Pat, you've prepared -- well, without being cynical, much to his credit, Dudley prepared an affidavit for you, which he acknowledged he prepared it, not you -- but that you reviewed it and provided the information.  But you provided Dudley information to prepare an affidavit, and you signed that affidavit?

A.  Right, I did.

Q.  And now I can't find it anywhere.  In preparing that affidavit, Pat, what documents did you review, if any?  It's not a trick question.  If any.

A.  I'm trying to remember.  We talked about it some time ago.  But there were options, placement options.  I'm sure I looked at our list that we have of our facilities.  I may have looked at the classification manual for some things.  I -- I don't know.  I would to -- I would really have to see the affidavit to help me remember, if anything.

Q.  Pat, if you would take a look at your affidavit.  Tell me if in fact that is your affidavit.

A.  Yes, this is -- this is my affidavit.

Q.  Did I overlook something?  You never mention the plaintiff in this case, do you, in your affidavit, J.B.?

A.  No, I didn't.

Q.  You don't offer any information at all about J.B., do you?

A.  Not in here, no.

Q.  Before you signed this affidavit, did you review J.B.'s file?

A.  No.  I don't even know who J.B. is.

Q.  Okay.  Is J.B. just a name on a list?
        MR. PERRY:  Objection to the form.

Q.  I don't mean that cynically, Pat.  I mean

39

   that seriously.

A.  Every kid on the list means something to us
at DYS.  And to infer that they're just a
name on a list is baloney, and you know
that.  That's absolutely ridiculous, Rick.

Q.  Okay.  And that's why I'm glad you said
that, Pat.  Because this is what I want to
ask you.

A.  Well, ask.

Q.  If every child on that list means something
to you or somebody else at DYS, explain to
me how J.W., with a risk score of one, can
sit in detention for six weeks only to go to
a group home?
MR. PERRY:  Objection to the form
of the question.

**A.  Because that's the way it is.  (Emphasis added)**

### THE DEFENDANT'S EVIDENCE REGARDING J.B.'S PLACEMENT

The Defendant offers in support of his motion for summary judgment no evidence regarding the placement of J.B. In fact, neither the affidavit of Wood nor Pendergast references J.B.  (See Defendants Exhibit's 3 and 4)

The Defendant does not assert, claim or offer any evidence that the acceptance of J.B. within seven days, or any time period for that matter, would cause DYS to be in violation of a state statute or standard. (Wood Depo pg. 160, line 7 – pg. 166, line 11)

Defendant Wood could not set forth any statute or standard which would have been violated, had any detained child, including J.B., been accepted with seven (7) days.  (Wood depo. pg. 161-169)

The Defendant, neither directly or through the affidavit of Pendergast, offers any evidence that the period of time J.B. waited in detention pending placement on either occasion was reasonable. In fact, the Defendant by his failure to specify what was reasonable or unreasonable for J.B., creates a general issue of fact, and therefore

precludes the granting of his Motion for Summary Judgment. (Pendergast Depo pg. 169, line 5 – pg. 197, line 19)

## ARGUMENT

## SUMMARY JUDGMENT STANDARD

The Defendant asserts that he is entitled to summary judgment on the §1983 claim because there is no evidence that he violated a constitutional right; that he is entitled to qualified immunity and because he is entitled to state-agent immunity on the state claims. Finally, Defendant asserts that the claim should be dismissed pursuant to 42 U.S.C. section 1997e(e).

Federal Rules of Civil Procedure 56(c) provides that Summary Judgment shall be granted:

> If the pleadings, depositions, answers to Interrogatories, and Admissions on file, together with Affidavits if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

A factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.   A fact is "material if it might affect the outcome of the suit under the governing substantive law."   In Beck v. Sommerset Technologies, Inc., 882 Fed. 2d 993, 996 (5th Cir. 1998) (citing Anderson v. Liberty Lobby, Inc., 447 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

The basic issue before a court on a Motion for Summary Judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party may prevail as a matter of law.  The moving party has the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material submitted and all factual instances arising from it,

must be viewed in the light most favorable to the non-moving party.  Once the movant

satisfies its initial burden under Rule 56(c) of demonstrating the absence of a genuine

issue of material fact, the burden shifts to the non-movant to "come forward with specific

facts showing that there is a genuine issue for trial."  A scintilla of evidence supporting

the non-moving parties position will not suffice; there must be enough of a showing that

a jury could reasonably find for that party.  Where the record taken as a whole could not

lead a rationale trier-of-fact to find for the non-moving party, there is no genuine issue

for trial.

### J.B.'S SUBSTANTIVE DUE PROCESS RIGHTS

"…An unreasonable delay in getting evaluated, or a subsequent unreasonable

delay in getting placed in an appropriate program, leads to unjustifiably prolonged

restraints on a juveniles liberty and is unconstitutional."  A.W. v. Dupree, Civil Action

No.: CV-92-H-104-N (June 25, 1996) (Exhibit 14)

"If the purpose of the commitment is to secure treatment, the state violates due

process if it does not, in fact, provide treatment."  D.W. v. Rogers, 113 F. 3d 1214, 1218

(11 Cir. 1997)

### DEFENDANT WOOD'S DELIBERATE INDIFFERENCE

Defendant Wood has known throughout his DYS tenure, that the unreasonable

delay in placement of detained children is unconstitutional.  Notwithstanding this

knowledge, Defendant Wood has caused, and continues to cause scores of children,

including J.B., to languish in detention centers without services, treatment, or

rehabilitative opportunities.

Moreover, detained children, including J.B., are denied the fundamental

information as to where and when they will be offered services, treatment, or rehabilitative opportunities. The Defendant, with the full ability and legal authority, to exercise a myriad of options, chooses instead to allow these children, including J.B. to languish. Defendant Wood acknowledges he could exercise a myriad of options regarding detained children, including J.B., instead he does nothing. (Wood depo pg. 110-117)

Defendant Wood does not document corrective action requests regarding annual facility space needs, nor does he not report to the Governor annually, as legally required, the facility needs of the department. (Exhibit 21; Wood depo pg.14-16, 43-47)

In his brief, Defendant Wood does not argue that the waiting period for J.B. was reasonable. Rather, Defendant Wood argues that J.B. and all committed children have no recognized right to treatment. (Defendant's brief at pg. 21)

As Judge Harold Albritton stated in his Memorandum Opinion and Order, in A.G. v. Wood, in denying Wood's Motion to Dismiss based upon the same argument, the U.S. Supreme Court in Hope v. Pelzer, 122 S. Ct. 2508 (2002), broaden somewhat the scope of what can give a reasonable official fair warning that his actions were unconstitutional.

Being the Defendant in litigation on this issue no less than five times, Mr. Wood has had more than fair warning that the unreasonable delay in placement of detained committed children is unconstitutional.

Defendant Wood has undeniably acted with deliberate indifference to all detained committed children, including J.B. A finding of deliberate indifference precludes qualified immunity.

## QUALIFIED IMMUNITY

The Defendant claims that qualified immunity protects him from liability for damages for the Plaintiff's §1983 claim.  Qualified immunity shields government officials sued in their individual capacities "insofar as their conduct does not violate clearly established…constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 817-18 (1982).  "For a constitutional right to be clearly established so that qualified immunity does not apply, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Id. (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

Here, the Plaintiff has alleged that the Defendant violated his clearly established constitutional right to be free from unjustifiably prolonged restraints on his liberty. Judge Hobbs precisely recognized this clearly established right in A.W. v. Dupree "[A]n unreasonable delay in getting evaluated, or a subsequent unreasonable delay in getting placed in getting in an appropriate program, leads to unjustifiably prolonged restraints on a juvenile's liberty and is unconstitutional."  (See Exhibit 14).  Schall v. Martin, 467 U.S. 253, 265 (1984) ("The juvenile's countervailing interest in freedom from restraint, even for the brief time involved here, is undoubtedly substantial as well."); Youngberg v. Romeo, 457 U.S. 307, 324 (1982) (involuntarily committed mentally retarded person has right to "conditions of confinement [that] would comport fully with the purpose of [his] commitment"); Jackson v. Indiana, 406 U.S. 715, 738 (1972) ("At the very least, due process requires that the nature and duration of commitment [on account of incapacity to proceed to trial] bear some reasonable relation to the purpose for which

the individual is committed."); D.W. v. Rogers, 113 F. 3d 1214, 1218 (11th Cir. 1997) ("[I]f the purpose of the commitment is to secure treatment, the state violates due process if it does not, in fact, provide treatment.").

Plaintiff's substantial evidence establishes, Defendant Wood has known that the unreasonable delay in placement is unconstitutional.  Notwithstanding his knowledge, Defendant Wood caused unreasonable delay in J.B.'s placement on two occasions.

For these reasons, Defendant Wood is not entitled to qualified immunity.

## SUPERVISORY LIABILITY

"The Supervisory Defendant may be found liable under the theory of supervisory liability if Plaintiffs eventually prove 'a causal connection between [their actions] and the alleged constitutional deprivation.'" Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999). One such means of demonstrating a causal connection is by pointing out that a supervisory official was aware of the ongoing violation yet failed to act. Id. Plaintiffs need not prove actual knowledge, however; the law will impute constructive knowledge to the Supervisory Defendants upon a showing that "[t]he deprevations [are] obvious, flagrant, rampant, and of continued duration." Id.An official is liable under the theory of supervisory liability "either when the supervisor personally participates in the alleged violation or when there is a causal connection between the actions of the supervisory official and the alleged constitutional deprivation."    Hackett v. Fulton County School District, 238 F. Supp. 2d 1330, 1359 (N.D. Ga. 2002).

Elaborating on the personal involvement of the supervisor the second circuit stated:

> 'Personal involvement' is not limited to direct participation by
> the supervisor in the challenged conduct, but may also be

established by evidence of an official's (1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or a (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates. Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 254 (2d.Cir. 2001)(citing Colon v. Coughlin, 58 F.3d 865, 873(2d.Cir. 1995).

"The casual connection can be established when a history of widespread abuse put the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations…must be obvious, flagrant, rampant, and of such continuous duration, rather than isolated occurrences." Hackett, 238 F.Supp.2d 1330, 1359. Defendant Wood has been fully aware of the failure to place children within a reasonable time. (Exhibits 17 and 18)

In order to establish supervisory liability in a situation where the supervisor does not personally participate, a plaintiff must first establish the existence of a causal connection between the actions of the supervisory official and the constitutional deprivation. Cross, 49 F.3d at 1508. Such a casual connection can be established (1) when a history of widespread abuse puts the reasonable supervisor on notice of the need to correct the alleged deprivation, and he fails to do so; or (2) the supervisor's improper "custom or policy" results in deliberate indifference to plaintiff's constitutional rights. Cross, 49 F.3d at 1508; Hartley, 193 F.3d 1269.

Here, no argument can be made that Wood is not personally involved, however without doubt he has been fully aware each week that children were waiting in detention for unreasonable time periods and he was deliberately indifferent to J.B.'s rights. (Exhibit 17 and 18)

46

## STATE CLAIMS

Defendant Wood asserts he is entitled to state agent immunity.

Plaintiff has alleged that Defendant Wood acted negligently and wantonly in failing to comply with §12-15-61(c) Code of Alabama.  The substantial evidence is that Defendant Wood had a duty to accept J.B. within seven days, that he breached that duty and that the breach caused J.B. to have his liberty restrained for each day thereafter until placement.

The Alabama Supreme Court restated the standard applicable in cases involving State-agent immunity in Ex parte Cranman, 792 So.2d 392 (Ala. 2000)[4]

The Alabama Supreme Court has established a "burden-shifting" process when a trial court is presented with the defense of State-agent immunity:

> " '[A] State officer or employee is not protected by discretionary immunity if in performing his discretionary functions he willfully, maliciously, fraudulently, or in bad faith injures someone.  [Nonetheless, ] [o]nce a defendant demonstrates that a plaintiff's claims arise from the defendant's performance of a discretionary function [i.e., a function now entitling the defendant to State-agent immunity], the burden then shifts to the plaintiff to establish that the defendant acted in bad faith or with malice or willfulness, in order to deny the defendant discretionary immunity from suit…'

> "Ex parte Davis, 721 So.2d 685, 689 (Ala. 1998) (citations omitted [in Ryan]).

> "'In order to claim the benefits of [State] immunity, a State officer or employee bears the burden of showing that the plaintiff's claims arise from the officer or employee's performance of a discretionary duty on behalf of the State. Upon such a showing, the burden shifts to the plaintiff, who must show that the officer or employee acted fraudulently,

---

[4] The opinion in Cranman was plurality opinion of this Court.  However, a majority of this Court later used the Cranman restatement to control the outcome in Ex parte Rizk, 791 So.2d 911 (Ala. 2000), and the majority explicitly adopted the Cranman restatement in Ex parte Butts, 775 So.2d 173, 177-78 (Ala. 2000).

47

willfully, maliciously, or in bad faith.'

"Ex parte Alabama Dep't of Transp., 764 So.2d 1263, 1268-69 (Ala. 2000) (citation omitted [in Ryan])."

Ryan v. Hayes, [Ms. 1001578, March 22, 2002] 831 So. 2d. 21, 28 (Ala. 2002).

In Cranman, we stated:

"A State agent shall be immune from civil liability on his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's

"(1) formulating plans, policies, or designs; or

"(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:

"(a) making administrative adjudications;

"(b) allocating resources;

"(c) negotiating contracts;

"(d) hiring, firing, transferring, assigning, or supervising personnel; or

"(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or

"(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing persons of unsound mind, or educating students.
"Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity

"(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency

48

require otherwise; or

    "(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law."

In Ex parte Butts, the Alabama Supreme Court adopted "a new test for determining when State employees sued in their individual capacities are entitled to assert the defense of State-agent immunity." Id. Under the Alabama Supreme Court's new test, "[I]f any *employee failed to discharge duties pursuant to detailed rules or regulations*, such as those stated on a checklist, or acted willfully, maliciously, fraudulently, in bad faith, beyond his authority, *or under a mistaken interpretation of the law,* then it is possible that the employee would not be entitled to State-agent immunity." Id. at 178 (emphasis added).[5]

Here, the Plaintiff has clearly alleged that Defendant "failed to discharge duties pursuant to detailed rules or regulation" – i.e., the seven day mandatory requirement. (§12-15-61(c) Alabama Code (1975)).

---

[5] Although in Ex parte Cranman, 2000 WL 772850, "11-12 (June 16, 2000), the Alabama Supreme Court purported to abandon its prior distinction between "discretionary" and "ministerial" acts in determining whether a state-agent is immune, the court nevertheless continues to refer to "ministerial" acts as acts that are not immune from liability for damages. See Ex parte Tuscaloosa County, 2000 WL, "6 (Sept. 8, 2000) ("Qualified immunity shields a State employee from liability if the employee is engaged in discretionary function, instead of a ministerial one, when the alleged [tort] occurs.") (quoting Defoor v. Evesque, 694 So. 2d 1302, 1305 (Ala. 1997)). "A ministerial act envisions direct adherence to a governing rule or standard with a compulsory result. It is performed in a prescribed manner without the exercise of judgment or discretion as the propriety of the action." Ex parte Alabama Dept. of Forensic Sciences, 709 So. 2d 455, 458 (Ala. 1997). The Defendant's duty to accept all children committed to its custody within seven days of disposition is ministerial, not discretionary. That duty is prescribed by state law, leaving no room for discretion. See Alabama Code §12-25-61(c) states that: "After October 1, 1991, the Department of Youth Services *shall accept all children committed to it within seven days* of notice of disposition."); see also Alabama Code §12-15-71(j). §12-15-71(j) provides – Whenever the court commits a child to a state or local agency or orders a state or local agency to provide services or treatment for a child, that agency shall accept the child for commitment, ordered services, or treatment within seven days of the court's order. However, if compliance with the court's order within seven days would place an agency in violation of either a state statute or standard, then compliance is not required.

Defendant Wood can not establish that accepting J.B. within seven days is a discretionary function. However, presuming he did, the substantial evidence is that Defendant Wood has never asserted that accepting J.B. on either occasion would cause DYS to be in violation of a statute or standard; that J.B. was not placed within seven days; that he failed to discharge his duties pursuant to detailed rules or regulations (in this case state law); that his actions were willful; and that he acted in bad faith. For these reasons, Defendant Wood is not entitled to state agent immunity.

## PRISON LITIGATION REFORM ACT

The Defendant asserts this lawsuit should be dismissed pursuant to §42 U.S.C. 1997 e(e). His argument in support thereof is as follows:

"J.B. sustained no physical injury." "He was in custody at the time this lawsuit was filed and is in custody again." (Wood brief, pg. 39) Defendant's arguments lack merit.

Because the two lawsuits have been consolidated, CV-06-755 and CV-06-908, it is unclear which lawsuit Defendant is addressing. Assuming 42 U.S.C. § 1997 e(e) applied, and Plaintiff contends it does not, Defendant offers no evidence that Plaintiff was in custody when either lawsuit was filed. Defendant's conclusory statement is totally unsupported by any evidence offered by Defendant. Presuming, Defendant had offered evidence in support of his conclusions, 42 U.S.C. §1997 e(e) does not apply for the following reasons:

1.    The issue raised by Plaintiff is not a claim for mental or emotional injury suffered during any attendant custodial detention for which the PLRA would apply. In other words, if the Plaintiff filed his initial complaint while in custody, the events made

the basis of the claims occurred during his prior custodial event.

2.    Because J.B. is a minor child, he does not have the capacity to sue, but must do so by and through his next friend.  Rule 17(c), F. R. C. P. Section 1997 e(e) places limitations on a "prisoner" bringing the action.  The action is "brought" by J.B.'s next friend, Addie Ward.  The Defendant has offered no evidence that Ms. Ward, at the time of the filing of either lawsuit, was a confined prisoner.

3.    Presuming, Defendant can offer evidence that either lawsuits was filed while J.B. was in custody, and presuming the Court were to conclude §1997 e(e) applies to either lawsuit, a reading of the complaints and the evidence offered in response to Defendants Summary Judgment shows that J.B. was physically restrained without treatment, that he was a chemically dependent child physically restrained without treatment, and in addition to these injuries he suffered mental anguish. Therefore, any applicable §1997 e(e) requirements have been satisfied, therefore neither lawsuit is due to be dismissed.


　　　　　　　　　　　　　　　　　　　／s/Robert D. Drummond, Jr.　　　　　　　　　
　　　　　　　　　　　　　　　　　　　ROBERT D. DRUMMOND, JR. (DRU004)
　　　　　　　　　　　　　　　　　　　Attorney for Plaintiff


OF COUNSEL:

323 De La Mare Avenue
Fairhope, Alabama 36532
(251) 990-6249

　　　　　　　　　　　　　　　　　　　／s/Michael J. Crow　　　　　　　　　　　　
　　　　　　　　　　　　　　　　　　　MICHAEL J. CROW (CRO039)
　　　　　　　　　　　　　　　　　　　Attorney for Plaintiff

OF COUNSEL:

BEASLEY, ALLEN, CROW,
  METHVIN, PORTIS & MILES, P.C.
P.O. Box 4160
Montgomery, AL 36103-4160
(334) 269-2343 - Telephone
(334) 954-7555 - Facsimile

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 9th day of July, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

T. Dudley Perry
P.O. Box 66
Mt. Meigs, AL 36057

Michael Crow
P.O. Box 4160
Montgomery, AL 36103-4160

Robert D. Drummond
Attorney at Law
323 De LaMare
Fairhope, AL 36532

/s/Robert D. Drummond, Jr.
OF COUNSEL