# IN THE DISTRICT COURT OF THE UNITED STATES
## FOR THE MIDDLE DISTRICT OF ALABAMA,
### NORTHERN DIVISION

2007 JUL 27  P 3: 59

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| **J.B., a minor child, by and through his next friend, ADDIE WARD, on behalf of himself and all other similarly situated;** ) | |
| ) | |
| **Plaintiff,** ) | **Case No: 2:06-CV-755-MHT** |
| ) | |
| **vs.** ) | |
| ) | |
| **WALTER WOOD, in his individual capacity,** ) | |
| ) | |
| **Defendant.** ) | |


| | |
|---|---|
| **J.B., a minor child, by and through his next friend, ADDIE WARD, on behalf of himself and all other similarly situated;** ) | |
| ) | |
| **Plaintiff,** ) | **Case No: 2:06-CV-908-MHT** |
| ) | |
| **vs.** ) | |
| ) | |
| **WALTER WOOD, in his individual capacity,** ) | |
| ) | |
| **Defendant.** ) | |

**DEFENDANT'S REPLY
TO PLAINTIFF'S BRIEF IN
OPPOSITION TO SUMMARY JUDGMENT**

Comes now the Defendant J. Walter Wood, Jr., through counsel, and submits the following reply to the Plaintiff's Brief in Opposition to Summary Judgment.

Procedural Background and Facts.  The following paragraphs will synthesize the undisputed facts in a light that gives the Plaintiff all benefit of doubt.

On August 23, 2006, when the Plaintiff J.B. filed his first lawsuit, J.B. was in the custody of the Department of Youth Services.  He had been committed on April 4, 2006, and was subsequently released into the aftercare of the Montgomery County Juvenile Court on September 29, 2006.  (Exhibit 1 attached to Evidentary Submissions, p. 3).  The Defendant answered the complaint and asserted the provisions of the Prison Litigation Reform Act, 42 U.S.C. 1997e, (the "PLRA").[1] (Doc. 6).

---

[1] The PLRA bars the first lawsuit because the Plaintiff was in the custody of the state when the lawsuit was filed.

2

The first lawsuit complains that the Plaintiff remained too long in detention after his commitment on May 18, 2005, in violation of his alleged right to treatment. (Doc. 38, Plaintiff's Opposition Brief, Exhibit 3). On May 18, 2005, J.B. was adjudicated <u>delinquent</u> for burglary 1st degree. (Doc. 38, Plaintiff's Opposition Brief, Exhibit 3). The committing judge ordered J.B. detained, post adjudication, in the Montgomery County Detention Facility until placed by DYS. On June 28, 2005, J.B. was placed at the DYS campus at Autauga. J.B. completed the Autauga program and on May 10, 2006, was transferred to the Bridge STEP program in Mobile for alcohol and drug treatment. (Exhibit 1 attached to Evidentary Submissions, p. 4).

In response to the Defendant's assertion of the PLRA in the Answer to the first lawsuit, on October 6, 2006, the Plaintiff filed his second lawsuit. The second lawsuit, based on an April 4, 2006, commitment, alleged identical claims as the first lawsuit. At the time J.B. filed his second lawsuit he was no longer in

3

DYS custody.[2]

The second lawsuit complains that J.B. remained in detention too long after on April 4, 2006, commitment. As discussed above, J.B. was committed for possession of drugs on April 4, 2006.  (Doc. 38, Exhibit 6).  On May 9, 2006, he was placed again at the Bridge.  On July 17, 2006, he ran away from the Bridge, (Exhibit 1, p. 4), and was placed in ITU, which is a secure facility at Mt. Meigs.  On September 29, 2006, he completed alcohol and drug treatment and was released into the Court's aftercare.  (Exhibit 1 attached to Evidentary Submissions, p. 1).

The Plaintiff argues that Mr. Wood failed to perform several vague obligations and would have the Court jump to the conclusion, without supporting facts or argument, that these failures are the proximate cause of J.B.'s wait in detention.

The Plaintiff incorrectly argues that the FY 2004 and FY 2005 annual report to the Governor proves the

---

[2] Neither lawsuit alleges physical injury.

4

Executive Director failed to take or document the need for corrective action regarding space requirements. There is no requirement for the Executive Director to create a specific document to show his review and corrective action for space needs. However, attached to the Evidentiary Submissions filed simultaneously herewith is the 2004-2005 Budget Request which specifically includes the Executive Director's analysis of performance indicators, which is a review of space requirements and request for funds for sufficient capacity to place youth timely. (Exhibit 2 attached to Evidentary Submissions, p. 9). Also attached as Exhibit 3 is the 2005-2006 Budget request which specifically analyzes projected bed space needs and requests funding for "sufficient capacity to place youth in a timely manner as required by S.S. v. Wood Consent Decree." (Exhibit 3, p. 6).

If the Defendant had failed to document corrective action, which he did not as shown in the immediately preceding paragraph, that failure could not establish deliberate indifference. Also attached to the

Evidentiary Submissions filed simultaneously herewith an affidavit of Patrick Pendergast which discusses just a few of the Executive Director's corrective actions regarding wait lists. (Exhibit 4 attached to Evidentary Submissions). These facts are not in dispute. The Plaintiff simply hopes the Court will conclude that because the wait lists occasionally exist, the Executive Director *must* be personally at fault. Deliberate indifference requires much more culpability than the Plaintiff believes. The wait lists, when they occur, are a result of problems within the **system**, not the deliberate indifference of the Executive Director. Again, the Plaintiff simply wants to hold the Executive Director strictly liable for the system's problems. He cannot prevail.

Because it is an undisputed fact that the Executive Director has payed close attention to the problem and taken action when and where he could, there can be no legitimate argument that the Director has been deliberately indifferent. Never mind the fact that the problem itself is systemic.

The Plaintiff's argument that the Executive Director caused J.B. to wait in detention by failing to review and/or document space requirement needs during 2004-2005 is an oversimplification of the problem the undisputed facts reveals.  To put it simply, the argument fails to recognize the big picture-even within the Department of Youth Services.  The undisputed evidence reveals that total space available at DYS was <u>not the problem</u>.  For example during the 2004-2005 time period the Plaintiff referenced when the "waiting list" "rose steadily"(as the Plaintiff puts it at p. 19 of his brief, Doc. 38)[3] there were almost always times when

_____

[3]  Attached to the Evidentiary Submissions filed simultaneously herewith as Exhibit 4 is an affidavit of Pat Pendergast and a copy of the "wait list" report dated November 10, 2004.  The November 10, 2004 report was chosen for this illustration because on that date total juveniles awaiting placement reached its highest level in three years.  However, as shown by the Weekly Population Report for the same time period, <u>empty beds</u> were available even then for the following facilities: Montgomery Group Home, North Alabama Group Home, Wetumpka Group Home, WAYS, Wilderness, and Care Unit. Placement cannot be made simply on the basis of availability of bed space alone.  To appropriately meet the needs of juveniles, empty beds in the <u>right</u> categories and at the <u>right</u> times must be available for placement.  Otherwise, juveniles must wait for

7

there was no wait for certain categories.  Likewise, when commitments have been relatively low, there are occasionally wait lists in certain categories.  Wait lists thus do not simply occur as a result of insufficient overall bed space within the DYS system. Wait lists occur when there is insufficient capacity in <u>certain</u> categories at <u>certain</u> times.  And those insufficiencies change from category to category from time to time, based on myriad factors, but not based simply on whether total commitments exceed total beds within the system.

This is not simply a case involving a "wait list." There are dozens of categories, each of which is a "wait list" from time to time, and each of which has <u>no</u> wait list from time to time.  The target perpetually

---

placement.  On the other hand, the attached affidavit of Pat Pendergast shows that even at certain times when there were more total beds in the system than juveniles committed, there were occasional wait lists for certain categories.  This illustrates that the real problem is vicissitudes <u>within categories</u> of juveniles committed by the 67 counties to DYS–not simply lack of overall available space.  The Plaintiff's entire premise is thus in error.

8

moves from time to time as the characteristics of committed youth change and as myriad other factors within the system change-almost none of which are under the control of the DYS Executive Director.  Mr. Wood has consistently addressed those factors that ARE under his control and it is ludicrous to suggest that the Executive Director caused J.B. to wait in detention by deliberate indifference.

The implication that the Executive Director intentionally failed to pay attention to the problem and was deliberately indifferent couldn't be farther from the truth.  The Executive Director conducted periodic meetings with DYS administrators for the purpose of monitoring the problem and, to the extent possible within the system, shifting resources where needed.  (Exhibits 4, 5 and 7, attached to Evidentary Submissions).  It is indisputable that this issue has constantly received the Executive Director's attention.[4]

---

[4] The Plaintiff, to no avail, attempts to use this fact to support his novel "*ipso facto*" theory of vicarious liability.

<u>The Plaintiff Failed to Submit Facts to Establish</u>
<u>Deliberate Indifference</u>.   In response to the
Defendant's Motion for Summary Judgement, the Plaintiff
discusses the Juvenile Justice Code, the Department of
Youth Services enabling legislation, and the DYS
Screening and Placement Committee procedure.   He first
argues that the Screening and Placement Classification
Manual process violates state law by allowing up to two
weeks for staffing.   The Plaintiff incorrectly claims,
without factual support, that Mr. Wood adopted the
policy. He did not.   *See* §§ 44-1-21 defining the powers
of the Executive Director[5],

---

[5] Section 44-1-21 states:
State youth services director.
(a) The state youth services director shall have at a
minimum a master's degree in behavioral or social
science or a related field from an accredited school
and shall have at least six years' experience in the
field of services to children and youth, with at least
three years of that experience being in the field of
juvenile delinquency services. The last three years of
such experience must have been in an administrative
and/or management position with demonstrated competence
as indicated by promotion or other indications of
responsibility.

(b) The director may be removed from office by a vote
of nine members of the board for reasons fully set

and 44-1-52, Code of Alabama, as amended, defining the

powers of the Board[6]. The statutes make clear that the

_____

forth in the minutes of the meeting at which such
removal takes place.

(c) The director shall have the following powers and
duties:

(1) Subject to the provisions of the state merit
system, to appoint all officers and employees of the
department, or to authorize any superintendent,
division or bureau head or other administrator to
select with his approval all staff members and
employees.

(2) To exercise supervision over all the officers and
employees of the department, and should any such
officer or employee fail to perform faithfully any of
the duties which are lawfully prescribed for him or if
he fails or refuses to observe or conform to any rule,
regulation or policy of the board, to remove him from
office, in conformity with the state merit system law.

(3) To make agreements with the heads of other
executive departments of the state providing for the
coordination of the functions of the various
departments of the state.

(4) Serve as the administrator of the Interstate
Compact on Juveniles.


    [6] Section 44-1-52 states:
The youth services board shall have the following
powers:

(1) To appoint the state youth services director and to

11

DYS Board creates policy, not the Executive Director.
The Executive Director supervises the employees of the
Department who execute policy.

The Plaintiff next quibbles about the screening and
placement process, discussing minutia about how the
"actual staffing process occurs." (Doc. 38, p. 12-13).
However, nowhere does the Plaintiff establish that the
minutia over which he quibbles has anything to do with
his own claim. It does not. The Plaintiff waited in
detention because when he was committed there was <u>no</u>

---

fix his salary.

(2) To institute and defend legal proceedings in any
court of competent jurisdiction and proper venue.

(3) To contract with any private person, organization
or entity or any combination thereof capable of
contracting, if it finds such act to be in the public
interest.

(4) To establish and promulgate reasonable rules,
policies, orders and regulations for the carrying out
of its duties and responsibilities.

(5) To purchase or lease land or to acquire property by
eminent domain and to purchase, lease, let, sell,
exchange or otherwise transfer property, land or
buildings in order to carry out its duties and
responsibilities under the provisions of this chapter.

12

<u>available bed</u> in the system for him.  The staffing
process was not the cause of J.B.'s wait in
detention-the problem was no available bed space in his
needs category and the committing judge's order the he
be held in detention pending placement.

The Plaintiff implies that the Screening and
Placement process and the Service Plan process are
unrelated as though any child can be placed in any
facility and a service plan delivered without regard to
whether needs fit the capability of the facility to
deliver services.  The purpose of the discussion is not
clear because no evidence has surfaced from which an
inference could be drawn that Mr. Wood was deliberately
indifferent in connection with the Screening and
Placement committee's placement decisions.  Moreover
the Plaintiff's argument defies common sense.  J.B. was
adjudged delinquent in 2005 for burglary and placed in
DYS custody for delinquency.  His committing judge also
recommended alcohol and drug treatment.  So the
Screening and Placement committee staffed J.B. for two
programs: HIT, and A&D.

At the time J.B. was staffed in 2005, there were several different types of placements available to teach discipline to delinquents. Among them were HIT programs. The programs devised for children staffed for HIT are different from programs for children staffed for, for example, Mt. Meigs[7]. HIT is an entry level program for low risk offenders.

Likewise there were two A&D placements available and they were very different. CAPS was at Mt. Meigs. The Bridge was for lower risk and first time offenders like J.B. The Screening and Placement Committee determined that J.B. would be most appropriately placed at the Bridge.

Insofar as the question of whether Screening and Placement has an impact on the Service Plan process, it is quite clear that the system is designed so that Screening and Placement is the starting point.

As for Mr. Wood's role in the placement process,

---

[7] J.B. at first had a relatively low risk score and would have been inappropriately placed at Mt. Meigs, which is a secure institution for higher risk offenders.

14

there is no dispute that Mr. Wood had no personal involvement in J.B.'s placement.  Instead, the Plaintiff focuses on the history of the "wait list" litigation in the state.  That history can be summarized as follows: every time a different set of factors combined to create a serious wait list situation, a client of Plaintiff's counsel filed a lawsuit.  The Plaintiff concedes that placement subsequent to commitment "has plagued DYS since the mid-nineties." (Doc. 38, p. 13).  By that, counsel for Plaintiff means to say that his clients began suing DYS over this issue in the mid-nineties.  What the Plaintiff doesn't point out is the fact that Mr. Wood became Executive Director in 1999.  Plaintiff's counsels' clients have sued whomever happened to be Executive Director and the allegations have been the same: it is the Executive Director's fault.

     The complaint alleged that Mr. Wood acted with deliberate indifference and the Defendant submitted case law to show that the case must be analyzed under the Eighth Amendment standard.  However, in response to

15

the motion for summary judgment, the Plaintiff did not

address the Eighth Amendment and assumed the case will

be analyzed under the Fourteenth Amendment.  As the

Defendant submitted on page 13-25 of his Brief in

Support of Summary Judgment (Doc. 30), in this Circuit

juvenile conditions of confinement cases are analyzed

under the Eighth Amendment.  E.g., *Morales v. Turman*,

562 F.2d 993, 999 n. 1 (5th Cir. 1977) (stating "[t]he

eighth amendment applies to juvenile detention centers

as well as to adult prisons");  *D.R. by Robinson v.*

*Phyfer*, 906 F.Supp. 637, 644 (M.D.Ala. 1995); *Hill v.*

*Dekalb Regional Youth Detention Center*, 40 F.3d 1176,

1195-1197 (11th Cir. 1994); see also, *Edwards v.*

*Gilbert*, 867 F.2d 1271 (11th Cir. 1989) (applying

deliberate indifference standard without

differentiation between Eighth and Fourteenth Amendment

claims in juvenile setting).[8]  The Plaintiff made no

---

[8]  The Supreme Court has not ruled on this issue.
*See Ingraham v. Wright*, 430 U.S. 651, 669 n. 37, 97
S.Ct. 1401, 1411 n. 37, 51 L.Ed.2d 711 (1977)
(expressly reserving the question whether the Eighth
Amendment applies to juvenile institutions).

16

argument and submitted no case law to show why this post delinquency adjudication conditions of confinement case should be analyzed under Fourteenth Amendment and not the Eighth. The applicable standard is deliberate indifference and the Eighth Amendment Applies.

To be liable on a deliberate indifference claim, a defendant prison official must both "know[ ] of and disregard[ ] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. The Plaintiff submitted no facts to show that Mr. Wood acted with the requisite intent. The Plaintiff mentioned in his brief that Mr. Wood's affidavit attached to the Defendant's Brief in Support of Summary Judgment "offer[s] no evidence as to Plaintiff, J.B. and in fact do not reference the Plaintiff at any time or manner." (Doc. 38, p. 2). This is true because as the Defendant stated in his Brief in Support of Summary Judgment, p. 24, Mr. Wood was not familiar with J.B. before this lawsuit. The undisputed evidence is that Mr. Wood did not personally know any details about J.B. or participate in his placement. (Exhibit 6 attached

17

to Evidentary Submissions, Wood Depo. P. 174, lines 8-22).  The Plaintiff has sued Mr. Wood in his individual capacity for deliberately and intentionally causing J.B. to remain in detention, but the Plaintiff has no evidence to prove that allegation.  The Plaintiff's entire case for individual liability against Mr. Wood rests on the mere fact that Mr. Wood is Executive Director of the agency.  The Plaintiff has the burden of proving that Mr. Wood consciously and deliberately **chose not** to remedy the problem.  *See Gebser*, 524 U.S. at 291, 118 S.Ct. 1989 (equating deliberate indifference to "an official decision not to remedy the violation"). He has not, and cannot possibly, meet that burden.  (See Exhibits 4, 5 and 7 attached to Evidentary Submissions).

Plaintiff has somewhat changed the "juvenile delinquency treatment" argument asserted in previous lawsuits and has argued that J.B. needed drug treatment for chemical dependency. However, J.B. was adjudicated delinquent for serious criminal misconduct and committed to DYS custody.  While it is true that

18

juvenile delinquents may also have serious medical
needs that require treatment under the Cruel and
Unusual Punishment Clause, it would be an error to
conclude that all juvenile delinquents are mentally ill
or have a constitutional right to drug treatment.  J.B.
was, according to his committing judge, first and
foremost a juvenile delinquent. The committing judge
**ordered** as follows: "pending transfer to DYS, child is
directed to be detained at MCYF." (Doc. 38, Exhibit 3
and 6).  (MCYF referrs to the Montgomery County
detention facility.)  The committing judge wanted J.B.
in detention for a reason.  If the Plaintiff's argument
that J.B. had a constitutional right to drug
rehabilitation treatment had merit, his recourse would
have been to file an appeal of the commitment order or
a *habeas corpus* petition–not to sue the Executive
Director of the juvenile correctional agency.

   Moreover, while in DYS custody for his delinquency,
it is undisputed that J.B. did in fact receive alcohol
and drug treatment.  (Doc. 30, Exhibit 2, J.B. dep. P
20-24).  The Plaintiff merely argues that he had to

19

wait to get it.  J.B. has thus failed to establish
facts on which any claim could be based under the
applicable standard-i.e. the Cruel and Unusual
Punishment Clause of the Eighth Amendment.  As stated
in the Defendant's brief in support of summary
judgment, there is no constitutional right to drug
rehabilitation and the conditions necessary for drug
addition therapy to rise to the level of a serious
medical need have not been shown to exist.  *See, e.g.,*
*Abdul-Akbar v. Department of Corrections*, 910 F.Supp.
986, 1002 (D.De. 1995); *Toney v. Goord*, 2006 WL 2496859
(D. N.Y. 2006); *Smith v. Follette*, 445 F.2d 955, 961
(D. N.Y. 1971); *Doe v. Goord*, 2005 WL 3116413, at * 16
(D. N.Y. 2005) (citing *Smith v. Follette & Gill v.*
*United States Parole Comm'n*, 692 F.Supp. 623, 628 (D.
Va. 1988) for the proposition that "[i]nmates have no
constitutional right to any rehabilitation treatment or
programs such as the drug program sought here.")  Even
if he had not, for the sake of argument, gotten drug
treatment, which` he did, no constitutional claim would
exist.

20

To satisfy the objective and subjective elements necessary for a deliberate indifference claim, the Plaintiff must show an (1) objectively serious medical need and ( 2 ) deliberate indifference to that need. *See e.g. Brown v. Johnson*, 387 F.,3d 1344, 1351 (11th Cir. 2004). The deliberate indifference standard requires a sufficiently culpable state of mind. *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). The defendant must have acted with a specific intent to punish. *Salas v. Tillman*, 12 Fed. Appx. 918, 921, 2006 WL 122426, 3 (11th Cir. 2006). The Plaintiff has not articulated an argument that the burden of proof has been met.

Plaintiff completely ignores the Eighth Amendment. Although he framed his complaint around "deliberate indifference", he ignores that issue and argues that Mr. Wood is liable for the system's conditions. This he cannot successfully do. The Eighth Amendment outlaws cruel and unusual "punishments," not "conditions," and the failure to alleviate a significant risk that an official should have perceived

21

but did not, while no cause for commendation, cannot be
condemned as the infliction of punishment under the
Court's cases. Petitioner's invitation to adopt a
purely objective test for determining liability-whether
the risk is known or should have been known-should be
rejected. This Court's cases "mandate inquiry into a
prison official's state of mind," id., at 299, 111
S.Ct., at 2324, and it is no accident that the Court
has repeatedly said that the Eighth Amendment has a
"subjective component." Pp.. See, *Farmer v. Brennan*,
511 U.S. 825, 835-837 (1994).

   <u>Fourteenth Amendment</u>.  The Defendant asserts that
the claim must be analyzed under the Eighth Amendment,
and maintains that the distinction is important.
Plaintiff cites Judge Hobb's 1996 order applying the
Fourteenth Amendment but fails to address the US
Supreme Court's ruling in *Graham v. Connor*, 490 U.S.
386 (1989).  For the sake of thoroughness, the
following paragraphs will reply to the Plaintiff's
brief as though the claims could be analyzed under the
Fourteenth Amendment.

22

<u>Due Process for Violation of State Statute</u>.  The
Defendant pointed out that under *Vineyard v. Wilson*,
311 F.3d 1340, 1356 (11th Cir. 2002) and *McKinney v.
Pate*, 20 F.3d 1550, 1556 (11th Cir. 1994) (en bank),
there is no due process claim for violation of the
state statute.  The Plaintiff apparently concedes that.
But it is also true that the statutory framework itself
places a limitation on the 7 day requirement.  As the
Plaintiff cited, there are two statutes in issue: § 12-
15-61( c ) and § 12-15-71( j ), Code of Alabama, 1975,
as amended.  These statutes must be read together.  §
12-15-71( j ) specifically states that "if compliance
with the court's order within seven days would place an
agency in violation of either a state statute or
standard, then compliance is not required."  Common
sense screams that overcrowding juvenile facilities
violates standards.

Specifically, the Board of Directors of the Alabama
Department of Youth Services has directed that programs
adhere to the standards for the American Correctional
Association.  For example, Ala. Admin. Code §

950-1-7-.01, American Correctional Association

Standards For Juvenile Training Schools, states:

> The Department of Youth Services has
> adopted the Standards for Juvenile
> Correctional Institutions, 2002, and as
> subsequently amended.  This manual was
> formerly known as Juvenile Training
> Schools.  Facilities have a one-year
> period to comply with these standards.
> Copies of these standards can be
> obtained from the American
> Correctional Association.

The ACA standards prevent overcrowding facilities,

prevent staffing juveniles in facilities where there is

inadequate physical space, require sufficient staff to

safely supervise youths, and require adherence to fire

and safety codes and facility rated occupancy

requirements.  When facilities are full, there is

simply no state law requirement to overfill them.

   <u>Right to Treatment.</u>  Plaintiff cites *DW v. Rogers*,

113 F.3d 1214, 1218 (11th Cir. 1997).  *D.W.* was a case

against the Commissioner of the Alabama Department of

Mental Health and Mental Retardation.  As stated in the

Defendant's brief in support of summary judgment, the

semantics of "treatment" is important.  The Defendant

24

J. Walter Wood, Jr. is the Executive Director of the state agency created to reduce juvenile delinquency. DYS is not Mental Health and Mental Retardation. J.B. was committed to the State of Alabama because he was a delinquent not because he is mentally ill. J.B. claims, nevertheless, that he required treatment and he should receive monetary damages because he had to wait to get out of detention before he got it.

It is important to note that J.B.'s committing judge determined that detention was the place for him. This is because there is a difference in kind-not just a difference in degree-between on one hand commitment and placement in detention for juvenile delinquency, and on the other hand commitment and placement in detention for mental health treatment. Although it is true that juvenile delinquents committed to state custody may have serious medical needs-including mental health needs-the Plaintiff has failed to show any facts that would rise to the level of deliberate indifference by the Executive Director of the Alabama Department of Youth Services to J.B.'s <u>serious treatment needs</u>.

25

<u>The History of Right To Treatment Litigation in</u>
<u>Alabama.</u>  The Plaintiff argues that the issue of
children waiting in detention first came up in *A.W. v.*
*Dupree*, CV-92-H-104-N.[9]  That case, just like every case
regarding this issue, was filed by Plaintiff's counsel.
It, and each succeeding case regarding the issue, was
settled by consent without a judicial finding regarding
any constitutional rights or state laws.  That well is
now dry.

To support his argument that a right to treatment
exists and holding children in detention pending
placement violates that right, on page 13-14, the
Plaintiff excerpts a portion of an order by Judge Hobbs
in the *A.W.* case.  But that order was actually in
connection with Plaintiff counsel's efforts to force
compliance with the provisions of the *A.W.* consent
decree.  It was not, contrary to J.B.'s insistence to
the contrary, a ruling on the substantive due process

---

[9] This court terminated the A.W. Consent decree on
December 14, 1998.  (Exhibit 8 attached to Evidentary
Submissions).

claims in the case.  In this order, Judge Hobbs discussed the Department's agreement to obtain evaluations, within fourteen days of notice of commitment, for use in placement decisions for the purpose of enforcement of the consent decree.[10]  The Plaintiff herein argues that Judge Hobbs' language in that order enforcing the consent decree puts the Defendant on notice of a clearly established constitutional right.  The Defendant does not agree. As Judge Hobbs subsequently specifically stated in an Order dated December 14, 1998, "it is questionable whether any violations of the Consent Decree in recent years constituted violations of a federal right."  (See Attached Exhibit 8, p. 11, n. 6).

Judge Hobbs' June 25, 1996, order obviously should be construed in light of his subsequent finding on December 14, 1998, that none of the recent years'

---

[10] It is interesting that the Plaintiff's brief herein (Doc. 38, p. 11) complains that the 14 day requirement in the Screening and Placement Manual violates state law when Plaintiff's counsel consented to that requirement as class counsel in *A.W.*

violations of the consent decree constituted "violations of a federal right." Judge Hobbs' application of the Fourteenth Amendment to the consent decree enforcement action in the June 25, 1996 order does not, in light of his December 14, 1998 order, establish a federal right.

In his June 25, 1996, order, Judge Hobbs cited *H.C. ex rel Hewett v. Jarrard*, 786 F.2d 1080, 1084-85 (11th Cir. 1986), and stated that "the Fourteenth Amendment's protection against deprivations of liberty without due process apply at the Department of Youth Services and conditions and procedures at detention facilities must be evaluated under that standard." However, *Hewett v. Jarrard* was a **pre-trial** detention case clearly not applicable to this case-which is a post adjudication conditions of confinement case. Judge Hobbs' use of *Hewett v. Jarrard* in construing the *A.W.* consent decree should not be used to base an erroneous conclusion that the Fourteenth Amendment applies to this case rather than the more specific provisions of the Eighth Amendment or that a right to treatment exists.

28

Likewise *Schall v. Martin*, 467 U.S. 253 (1984),
cited by Judge Hobbs, and referenced by the Plaintiff
in his brief, is a pre-trial detention case.
Moreover, the Supreme Court in *Schall* **upheld** a state
statute that allowed juveniles to be held in detention
pending trial.  Again, the case currently before this
Court is a post delinquency adjudication conditions of
confinement case and *Schall* is not applicable.
However, if *Schall* were applicable, would support the
Defendant's argument–not the Plaintiff's.

Judge Hobbs also cited *Alexander v. Boyd*, 876 F.
Supp. 773, 797-98 (D. SC 1985), a South Carolina
District Court case challenging overcrowding conditions
of juvenile facilities in that state.  The District
judge in that case wrote the order to avoid the Violent
Crime Control and Law Enforcement Act of 1994, 18
U.S.C. § 3626, (which barred litigation of claims under
the Eighth Amendment and therefore would have barred
the consent decree before that court). **With the consent
of the parties**, the District Judge found that the

29

Fourteenth Amendment governed.[11]  Oddly enough, the

District Judge expressly referenced the Fifth Circuit's

holding in *Morales v. Turman*, 562 F.2d 993, 998-99

(5th Cir.1977)[12], in which the Fifth Circuit adopted the

Eighth Amendment as the standard applicable to state

juvenile detention facility conditions cases.  *Id.* at

795.[13]  Similarly, Judge Hobbs and the District Judge in

*Alexander v. Boyd*, both cited *Jackson v. Indiana*, 406

U.S. 715, 738 (1972), which is a mental health right to

treatment case not applicable to post-adjudication

juvenile delinquent "treatment" cases.

Judge Hobbs' discussion at page 5 of his June 25,

---

[11] It is notable that in that case both parties
actually urged the court to adopt a constitutional
standard higher than the court was willing to adopt.
*Alexander v. Boyd*, 876 F. Supp. 773, 779 (D. SC 1985).

[12] In *Bonner v. City of Prichard*, 661 F.2d 1206,
1209 (11th Cir.1981) (en banc), the Eleventh Circuit
adopted as binding precedent all of the decisions that
the former Fifth Circuit issued prior to October 1,
1981.

[13] For some reason the District Judge also cited
*H.C. ex rel. Hewett v. Jarrard*, 786 F.2d 1080, 1084-85
(11th Cir.1986), for the proposition that the Eleventh
Circuit adopted the Fourteenth Amendment.  That
conclusion simply appears to be incorrect.

1996 order, indicates his apparent acquiescence in the *parens patriae* theory in connection with the consent decree enforcement action on which he was ruling. (See, Doc. 30, p. 20, n. 6). That theory has never been adopted and has since fallen by the wayside. The undersigned submits that the Constitution includes no right to juvenile delinquency treatment distinct from the Cruel and Unusual Punishment clause.

This confusing legal morass discussed in the immediately preceding paragraphs highlights the importance of careful analysis of the constitutional issues, as outlined in the Defendant's brief in support of summary judgment.

<u>Qualified Immunity</u>: The Supreme Court has set forth a two-part test for qualified immunity analysis. "The threshold inquiry a court must undertake in a qualified immunity analysis is whether the Plaintiff's allegations, if true, establish a Constitutional violation. *Hope v. Pelzer*, – U.S. –, 122 S. Ct. 2508, 2513, 153 L. Ed.2d 666 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272

31

(2001)).

   As a the general rule, to prevail on a claim of
substantive due process violation, the plaintiff must
prove conduct that "shocks the conscience." *Sacramento
v. Lewis*, 523 U.S. 833, 836, 846-47, 118 S. Ct. 1708,
140 L. Ed.2d 1043 (1998). Contrary to the Plaintiff's
position in this case, negligence is categorically
insufficient to make out a Constitutional due process
claim. Id. at 849, 118 S. Ct. 1708. To establish a
Constitutional violation the Plaintiff must prove at a
minimum conduct by Mr. Wood that amounted to deliberate
indifference. "Only a gross deviation from the
standard of care owed- specifically in this case a
callous indifference to [the Plaintiff's constitutional
rights]- is actionable." *Williams v. Bennett*, 689 F.2d
1370, 1382, (11th Cir. 1982). The Plaintiff must
therefore produce evidence that Mr. Wood acted to
intentionally cause a violation Plaintiff's
constitutional rights. No evidence exists to raise a
factual question that Mr. Wood acted with such evil
intent. The evidence establishes that the he acted in

32

good faith and that the delay in placement was the result of limitations in bed space, due to a myriad of complicated factors, and the terms of the commitment order, not intentional indifference to the Plaintiff's Constitutional rights.

The Plaintiff must establish causation by showing that Mr. Wood, with deliberate indifference, did an affirmative act, participated in another's affirmative act, or omitted to perform an act he was legally required to perform that **caused** the deprivation. *Johnson v. Duffy*, 588 F.2d 740 , 743 (9th Cir. 1978) (emphasis added).  The inquiry into causation must be individualized and must focus on the duties and responsibilities of the individual defendant.  *See Rizzo v. Goode*, 423 U.S. 362, 370-71, 375-77, 96 S. Ct. 598, the 603-04, 606-07, 46 L. Ed. 2d 561 (1976); *Williams v. Bennett*, 689 F.2d 1370, 1381 (11th Cir. 1982), *cert. denied*, 464 U.S. 932 , 100 4 S. Ct. 335, 78 L. Ed. 2d 305 (1983).  The Plaintiff however, merely speculates that Mr. Wood "has caused, and continues to cause scores of children, including J.B., to languish

in detention centers."  The Plaintiff does not bother to tell us what Executive Director Wood did to cause such a result.  Throughout this case it appears that he would have the court adopt a theory of liability similar to negligence *per se*, or an *ipso facto* theory of liability against the Executive Director.

The following paragraphs, based on the Plaintiff's entire brief along with the Defendant's deposition testimony, will discuss each act by the Executive Director to which J.B. makes reference to show deliberate indifference:

First, Plaintiff's counsel questioned Mr. Wood during his deposition about several possible alternatives to detention pending placement, none of which have been shown applicable to J.B.  Specifically, Plaintiff counsel asked about "electronic monitoring," placing children on "home detention," developing service plans for children to "participate in community resources," participating in "day programs" where they return to their homes at night, and Foster home or group home placement.  In other words, Plaintiff

34

counsel suggested that J.B. could simply have stayed home after commitment.  (Doc. 38, p. 16-19).

It thus appears that the Plaintiff suggests Mr. Wood failed to: (1) place J.B. on electronic monitoring (Doc. 38, Exhibit 29, Wood dep. P. 112-113); (2) send J.B. home (Doc. 38, Exhibit 29, Wood dep. P. 113); (3) allow J.B. to participate in "community services" (Doc. 38, Exhibit 29, Wood dep. P. 113-114); (4) allow J.B. to go to the HIT program during the day (and presumably to go home at night) (Doc. 38, Exhibit 29, Wood dep. P. 115-116); or (5) place J.B. in a group home or foster home (Doc. 38, Exhibit 29, Wood dep. P. 116).  However, none of these possibilities were shown, nor can they be shown, to have been applicable to J.B.  J.B. was committed for acts including burglary in the 1st degree, possession of drugs, theft of property, and possession of a pistol.  J.B. therefore has absolutely no basis to recover monetary damages from the Executive Director of DYS because he had to wait in detention until a bed

came open.[14]

With regard to each of the above "choices", the undisputed evidence shows first of all that Mr. Wood did not know about J.B.'s case and therefore did not chose to take, or not to take, any of the above referenced actions.  Thus the subjective element of the deliberate indifference standard cannot be met and Mr. Wood must have qualified immunity under these circumstances.

Moreover, the Plaintiff submits no evidence that the programs, services, contracts, and other systemic conditions even existed for those alternatives.  In other words, there is no evidence that a viable electronic monitoring program existed, no evidence of Mr. Wood's ability to send J.B. home pending placement

---

[14] It is important to note that whenever a non-violent child has waited in detention for 25 days, the Executive Director has caused a letter to be sent to the committing judge requesting that the judge allow the child to wait at home.  The Executive Director did so even for the Plaintiff J.B. after his first commitment.  The committing judge determined that he should continue waiting in detention.  Obviously that was the only appropriate decision.

36

at DYS, no evidence of contracts for "community services" J.B. could have participated in from his home, and no evidence of a day HIT program that J.B. could have participated in from home.[15]

The Plaintiff furthermore offers no analysis or evidence to prove that J.B. would have qualified for any of the above referenced alternative placements-if they had existed--or that it would have been possible for Mr. Wood to have chosen such options-had he known about J.B.'s specific case.  The answer is found in J.B.'s commitment order, which states: "pending transfer to DYS, child is directed to be detained at MCYF."  (Doc. 38, Exhibits 3, and 6).  If any of the "alternatives" existed and if Mr. Wood had chosen to use any of them, he would have been subject to contempt of court by J.B.'s committing judge for refusal to abide by a valid court order.  Mr. Wood obviously has qualified immunity for "choosing" not to violate J.B.'s commitment order-had he had specific knowledge of it,

---

[15] They did not exist. (See Exhibit 4 attached to Evidentary Submissions, Pendergast Affidavit).

which he did not.  "There can be no duty, the breach of
which is actionable, to do that which is beyond the
power, authority, or means of the charged party.
*Willians v. Bennett*, 689 F.2d 1370, 1384 (11th Cir.
1982).

Second, Plaintiff argues that Mr. Wood "does not
document corrective action requests regarding annual
facility space needs, nor does he report to the
Governor annually, as legally required, the facility
needs of the department."  As discussed above, that
allegation is simply factually wrong.  Moreover, the
Court would have to leap a logical Grand Canyon to
connect that alleged failure to J.B.'s time in
detention.  In any event, it is axiomatic that reports
to the Governor in connection with budget requests are
proper subjects for qualified immunity.

In the qualified immunity analysis, this Court
should decide the question of whether Mr. Wood has
acted reasonably in regard to J.B.'s case.  *See Marsh
v. Butler County, Ala.*, 225 F.3d 1243, 1257, n. 7 (11th
Cir. 2000); *Mencer v. Hammonds*, 134 F.3d 1066, 1071

(11th Cir.1998) (examining whether the plaintiff proved the requisite subjective intent in a case where subjective intent is an element of the underlying constitutional violation in an interlocutory qualified immunity appeal); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491-92 (11th Cir.1996) (in an interlocutory appeal of the district court's denial of summary judgment, turning first to plaintiff's evidence of the constitutional violation itself and holding, "plaintiff has failed to show a violation of due process, and it necessarily follows that the defendants are entitled to summary judgment on qualified immunity grounds"); *Adams v. Poag*, 61 F.3d 1537 (11th Cir.1995) (in another interlocutory appeal of the district court's denial of summary judgment, holding defendants were entitled to summary judgment based on qualified immunity because plaintiffs failed to present evidence of deliberate indifference to support their eighth amendment claim); see also *Johnson v. City of Fort Lauderdale*, 126 F.3d 1372, 1379 (11th Cir.1997); *Walker v. Schwalbe*, 112 F.3d 1127, 1132 (11th Cir.1997); *McMillian v. Johnson*,

39

101 F.3d 1363, 1368 (11th Cir.1996) (Propst, J.,
specially concurring); *Foy v. Holston*, 94 F.3d 1528,
1534-36 (11th Cir.1996); *Dolihite v. Maughon*, 74 F.3d
1027, 1033 n. 3 (11th Cir.1996). The Defendant submits
that he acted reasonably in regard to J.B.'s case and
the Plaintiff has submitted no evidence that he acted
unreasonably.

Supervisory Liability: The Plaintiff argues that
Mr. Wood is liable for the unspecified actions of some
unidentified employees of the department. (Doc. 38, p.
45-46). The theory requires a causal connection
between the supervisor's acts and an unlawful or
unconstitutional custom or policy executed by a
subordinate. In limited cases, and under the right
circumstances, a supervisor may be held responsible if
the supervisor's acts in fact caused a constitutional
deprivation. The Plaintiff simply has not shown
evidence from which an inference could be drawn that
Mr. Wood caused a deprivation of J.B.'s constitutional
rights. J.B. remained in detention until a bed was
available. No evidence exists that Mr. Wood

40

intentionally or by deliberate indifference caused that
systemic problem.

Moreover, for supervisory liability to exist, the
supervisory defendant must be the finial policy maker.
See *Rizzo v. Goode*, 423 U.S. 362, 371 (1976).  The
Defendant does not have final decision making
authority.  See §§ 44-1-21, 44-1-52. The Department of
Youth Services is an agency operated by a Board.  The
Board is the policy making authority and the Executive
Director carries out the policy and procedure
established by the Alabama Youth Services Board for the
operation of the Department.  This he does within the
budget limitations established by the Legislature in
the allocation of funds for the Department.  Mr. Wood
is not a policy maker and should not be held personally
liable for the policies of the Department if they could
be said to have violated the Plaintiff's constitutional
rights, which they cannot.

The Plaintiff bases his argument of supervisory
liability on the fact that Mr. Wood has for years
monitored the number of children waiting for placement

41

and the fact that children sometimes still have to
wait.  The Plaintiff states: "no argument can be made
that Wood is not personally involved; however without
doubt he has been fully aware each week that children
were waiting in detention for unreasonable time
periods..."  He then merely speculates, without
reference to facts to support the speculation, that Mr.
Wood "was deliberately indifferent."  (Doc. 38, p. 46).
Supervisory liability requires much more culpability
than that.  Even assuming Mr Wood had been negligent,
which he was not, mere negligence has specifically been
rejected.  See *Greason v. Kemp*, 891 F.2d 829, 836 (11th
Cir. 1990).  The courts have also rejected respondeat
liability as a standard for supervisory liability and
generally require a high degree of personal culpability
to impose supervisory liability.  See *Hill v. Dekalb
Reg'l Youth Detention Ctr.*, 40 F.3d 1176, 1192 (11th
Cir. 1994) ("reckless or callous indifference").  The
Plaintiff has failed to satisfy his burden of proof
that Mr. Wood created, or caused to exist, a policy by
deliberate indifference.

42

<u>Negligence/Wantonness</u>.  The Plaintiff did not make a serious argument to support the elements of the state law tort claims.  Instead, the Plaintiff attempts to rely on the pleadings which say Mr. Wood "failed to discharge duties pursuant to detailed rules or regulations" i.e., the seven day requirement.  However, no evidence of Mr. Wood's alleged negligence is given. The Plaintiff simply would have the court conclude that because children are occasionally not placed within 7 days, Mr. Wood is necessarily liable.  He argues that "placing children within 7 days is not discretionary", but the evidence conclusively shows that Mr. Wood does not place children.  He is the Executive Director of the Agency and his discretionary functions have been discussed in the attached affidavits and the affidavits submitted along with the Defendant's Brief in Support of Summary Judgment.  There is absolutely no evidence that he acted in bad faith in the execution of any of his duties.  Clearly, this claim must fail under state-agent immunity.

Moreover, the premise that children must be placed,

43

without limitation, within seven days is contrary to

the statute and contrary to common sense.  The statute

states that "if compliance with the court's order

within seven days would place an agency in violation of

either a state statute or standard, then compliance is

not required."  If the Executive Director had

personally intervened, which he did not, and if the

result of his intervention had been overcrowding DYS

facilities as the Plaintiff insists he should have

done, **then** he would have been in violation of the

statutes and standards and one of Plaintiff counsel's

clients would most likely have filed an altogether

different lawsuit.

Respectfully submitted

TROY KING
ATTORNEY GENERAL


T. Dudley Perry, Jr.
Bar Number: 3985-R67T
Deputy Attorney General
Alabama Department of
Youth Services
Post Office Box 66

44

Mt. Meigs, AL 36057
Telephone: (334) 215-3803
Fax: (334) 215-3872
E-Mail:
dudley.perry@dys.alabama.gov

### CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the above and forgoing via United States mail, properly addressed to the following:

Michael J. Crow, Esq.
Beasley, Allen
Post Office Box 4160
Montgomery, AL 36103-4160

Robert D. Drummond, Jr., Esq
Attorney At Law
323 De La Mare Avenue
Fairhope, AL 36532

Dated this the 27th day of July, 2004.

T. Dudley Perry, Jr.
Deputy Attorney General
Alabama Department of
Youth Services
Deputy Attorney General
Alabama Department of
Youth Services

45