**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **J.B., a minor child, by and through** | * | |
| **his next friend, ADDIE WARD, on** | * | |
| **Behalf of himself and all others** | * | |
| **similarly situated;** | * | |
| | * | |
| **Plaintiff,** | * | |
| **vs.** | * | **CASE NO: 2:06cv00755-MHT** |
| | * | |
| | * | |
| **WALTER WOOD, in his individual** | * | |
| **capacity,** | * | |
| | * | |
| **Defendant.** | * | |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **J.B., a minor child, by and through** | * | |
| **his next friend, ADDIE WARD, on** | * | |
| **Behalf of himself and all others** | * | |
| **similarly situated;** | * | |
| | * | |
| **Plaintiff,** | * | |
| **vs.** | * | **CASE NO: 2:06cv00908-MEF** |
| | * | |
| | * | |
| **WALTER WOOD, in his individual** | * | |
| **capacity,** | * | |
| | * | |
| **Defendant.** | * | |

**PLAINTIFF'S CONSOLIDATED RESPONSE TO DEFENDANT'S**
**MOTION TO SUPPRESS AND SUMMARY JUDGMENT REPLY BRIEF**

COMES NOW the plaintiff, by and through counsel, and in response to the

defendant's Motion To Suppress and Defendant's Summary Judgment Reply Brief states

as follows:

Subsequent to the filing of plaintiff's brief in opposition to summary judgment, the defendant filed a motion to suppress certain portions of the brief and exhibits attached thereto, and later filed a reply brief. (Documents 43 and 49 respectively). Both documents assert facts not raised in the motion for summary judgment and brief in support thereof.

The motion to suppress appears to be premised on defendant's assertion that: "Plaintiff's entire case is a sham because every fact he disputes is immaterial." See page 3 of the motion to suppress.

The reply brief primarily attempts to correct defendant's original factually inaccurate "Undisputed Facts" and asserts new facts and exhibits.

## LEGAL CONTEXT OF PLAINTIFF'S CLAIMS

The plaintiff has set forth two causes of action, each separate and distinct from the other; the §1983 claim and state law claims. Neither cause of action relies in whole or part on the other and each claim could have been brought as the only count or cause of action in these lawsuits.

More specifically, the §1983 claim is premised on the unreasonable delay in detention without care, treatment or services pending appropriate placement by the defendant. This claim is unaffected by Alabama law which requires committed children to be placed within seven days of notice of commitment. Plaintiff does not contend that violation of the seven day placement requirement constitutes, per se, a violation of plaintiff's due process rights under the United States Constitution. Rather, the only relationship the seven day requirement has to the constitutional claim, is as Judge Albritton pointed out in *A.G. V. Wood*, "A violation of a state statute is not necessarily the equivalent of a federal constitutional violation… A violation of a state defined procedure can however, also constitute a violation of federal due process." See

Albritton order, page 5, Exhibit 16 to plaintiff's summary judgment brief.

Thus, while the state seven day requirement does not form the basis of the §1983 claim, a violation of the seven day rule provides strong support for the conclusion that the defendant was fully aware of the wrongful character of his conduct, and the Court may conclude that detention delays beyond seven days are unreasonable.

Conversely, if the state of Alabama had a requirement that children need not be placed for 21 days, such a statutory provision could well be found to be an unreasonable delay and therefore unconstitutional. Moreover, §12-15-71(j), Code of Alabama (1975) which states if acceptance of a child would cause an agency to be in violation of a state statute or standard, then seven day compliance is not required, could well be found to be violative of due process for detained children and thus unconstitutional.

This particular question is not before the Court in this case as the overwhelming evidence establishes that acceptance of J.B. within seven days would not have caused DYS to be in violation of any state statute or standard. Although the defendant intimates in his reply brief that acceptance of J.B within seven days would have caused a violation of a state statute or standard, the defendant does not identify either.

While the federal claim stands alone, the seven-day state law requirement is illustrative of the reasoning of the Alabama legislature as to the amount of time considered reasonable for placement. Likewise, the state law claims, premised solely on state law, can be adjudicated without reference to United States Constitutional due process requirements.

It is possible, for example, that the federal claim, is not successful for some reason, yet the state claims be adjudicated in favor of the plaintiff if the evidence establishes that placement did not occur within seven days and all other elements of the cause of action are proven.

Throughout defendant's motion for summary judgment, brief, motion to suppress and reply brief, the context of these respective claims is lost and/or misrepresented. As each cause of action stands alone, the evidence before the court is overwhelming that defendant is not entitled to summary judgment on either count.

## THE DEFENDANT'S EVIDENCE IN THE CONTEXT
## OF THE RESPECTIVE CAUSES OF ACTION

Critical to the respective causes of action is the defendant's evidence regarding fundamental issues: As to the federal claim: the reasonableness of J.B.'s detention time pending placement. As to the state claims: whether acceptance of J.B. within seven days would have caused DYS to be in violation of a state statute or standard.

As established by the motion for summary judgment and supporting brief, the defendant never asserts, claims or offers evidence that 1) the length of J.B's detention was reasonable; or 2) that acceptance of J.B. within seven days would have caused DYS to be in violation of a state statute or standard.

As established by the motion to suppress and reply brief, the defendant still does not assert that J.B.s detention stay was reasonable. In his reply brief, on the last page, 44, defendant intimates that acceptance of J.B. would have caused DYS to be in violation of "statutes and standards". Just as he did in his deposition, the defendant does not identify a single statute or standard that would have been violated. As established herein, the reason the defendant has not, will not and never will be able to make such assertion is that numerous appropriate beds were available for J.B.'s placement. (Pendergast Affidavit Exh. 4 to Reply Brief)

## DEFENDANT'S MOTION TO SUPPRESS

Defendant's motion to suppress asserts various evidentiary submissions are immaterial. Because of the defendant's unfocused assertions from page 2-13, it is impossible to determine with any degree of certainty defendant's contentions.

* On page 13, the defendant requests suppression of pages 9-13 of plaintiffs brief and Exhibit 13 attached thereto. Pages 9-13 of plaintiff's brief, part of the "Statement of Facts", set forth the statutory provisions regarding DYS acceptance of committed children. Although the defendant's conduct in regard to J.B. and hundreds of other children suggests he believes the statutes to be immaterial, plaintiff believes they are material as they establish the basis of plaintiff's state law claims.

* Also on pages 9-13 are facts, fully supported, detailing the policies, procedures and practices of the defendant and DYS relating to the receipt of commitment notices through placement of children. As to each respective cause of action, the section entitled "DYS Acceptance Process" sets forth facts material to the dispositive issues. For example, §12-15-61(c) Code of Alabama, (1975) requires placement within seven days of notice of commitment. The facts to which defendant objects set forth that the defendant has perpetuated a policy, procedure or practice whereby committed children are not even placed on the staffing list until certain ancillary documentation is sent to DYS. Likewise Wood adopted a policy, procedure or practice whereby Screening and Placement has two weeks to classify and staff a child, which is one week longer that the statutory period to actually accept a child. (Exhibit 13 to plaintiff's S/J brief) These examples, like all other facts fully supported in plaintiff's statement of facts are material to the issue of deliberate indifference, defendant's claim of qualified immunity, defendant's supervisory liability, as well as his negligence and wantonness under state law.

\* The defendant next asserts the entire depositions of Wood and Pendergast, not directly referenced in the brief, should be suppressed. The defendant cites no authority for such an assertion, he simply complains that "they are replete with objectionable questions, immaterial and irrelevant testimony and otherwise inadmissible testimony."

In the plaintiff's statement of facts there are no less than twenty-two distinct and direct references to deposition testimony. As the defendant's responses are only fully representative if read in the context of the lines of questioning, it would be unfair to the defendant to target a single page or line without providing the full context. Likewise, it would be misleading to the Court to only have targeted portions of testimony without the context in which the response was given.

Equally as important, in this case, is the testimony that the defendant and Pendergast did not give, namely that no assertion is made that J.B.s delay in placement was reasonable or that placement of J.B. within seven days would have caused DYS to be in violation of some statute or standard. Plaintiff has no way of supporting this fact without submission of the entire deposition. Moreover, plaintiff was fully aware that defendant in his reply brief would attempt to suggest that J.B.'s placement within seven days would cause DYS to be in violation of a statute or standard. Absent submission of the entire deposition, plaintiff would have no way to establish defendant's testimony on the issue as a sur-reply brief is not normally permitted.

Additionally, denial of qualified immunity is immediately appealable to the Eleventh Circuit, whereby the Court would look, de novo, to the entire record. Absent submission of the entire deposition plaintiff could not support his contention that the defendant never made assertions regarding the reasonableness issue or the seven-day placement issue.

Finally, counsel for the defendant had every opportunity to examine the defendant at

deposition and declined to do so.

Although rarely the case, the submission of the entire depositions of Wood and Pendergast is proper, appropriate and necessary to the disposition of defendant's motion for summary judgment.

* Defendant next asserts that pages 16-19 of plaintiff's brief, excerpted from defendant's deposition should be suppressed. Again, defendant cites not authority to support his assertion. Instead, he argues that plaintiffs argument is erroneous. Defendant's position is properly argued in a reply brief not a motion to suppress. If one adopted defendant's rationale, the majority of his "Undisputed Facts:" in his summary judgment brief would be stricken for being erroneous, as he recognizes in his reply brief wherein he corrects his many factual inaccuracies.

* Defendant's next suppression target, is a statement on page 19 of plaintiff's brief, wherein plaintiff states:

"Defendant Wood is required by DYS policy to review the space requirements of each facility on an annual basis and document corrective action. (Exhibit 20)" Plaintiff then states "Defendant Wood has no documentation reflecting this review, nor any documentation reflecting corrective action. (Wood depo. Pgs. 12-16)" Both statements are factually supported by the evidence. Wood cites a portion of his testimony at page 15 of his deposition to attempt to establish his point that the statements are erroneous.

A review of the statements made and supporting cites by the plaintiff shows that plaintiff referenced five (5) pages, 12-16, of deposition testimony so that all the responses of Wood, which gave rise to plaintiff's fact statement, could be given consideration. The defendant decries the submission of extensive deposition testimony offered to be balanced, yet what he submits to the court is a few lines out of 5 pages which completely ignores the testimony giving rise to

plaintiff's factually accurate statement. Defendant's suggestion on this point is hypocritical and any objection should be argued in his reply brief.

* Defendant next seeks suppression of the FY 2004 and FY 2005 annual reports to the Governor. The statute mandating these reports is brief and without detail, however, despite the brevity of the filing requirements, the statute is specific regarding setting forth in the report, inter alia, the need for facilities under DYS's jurisdiction and the juvenile conditions in the state. Neither report contains such information, despite the need for additional facilities and despite an ever-growing waiting list and length of detention stays pending placement.

It is obvious the defendant believes these reports to be irrelevant, as evidenced by his acknowledged failure to comply with the statutory reporting mandates. However, the failure of the defendant to comply with his statutory obligation is yet another of many acts and omissions evidencing defendant's deliberate indifference and the reports are obviously relevant to that issue.

* The defendant next seeks suppression of excerpts of Wood's and Pendergast's deposition relating to a fundamental issue; that being what the defendant considered a reasonable detention time pending placement. Defendant argues that neither deponent could answer because reasonable depends on "ALL" the circumstances of the individual case-not just a limited hypothetical set of circumstances dreamed up by J.B.'s attorney. What defendant's counsel conveniently fails to disclose to the Court is that in answering this line of questions Wood and Pendergast reviewed and had before them the entire screening and placement file utilized by the Screening and Placement committee at the time of the respective children's commitment, detention and placement. In answering these questions regarding reasonableness the deponents had all the information available to DYS at the time the child was staffed. This testimony is

relevant, material and is properly submitted as part of plaintiff's brief.

For the reasons set forth above the Motion to Suppress is due to be denied.

### DEFENDANT'S REPLY BRIEF

In his reply brief the defendant restates his previously provided "Undisputed Facts" and goes on to argue various points and offer new facts. From his reply, it is clear the defendant incorrectly assumes the plaintiff believes that plaintiff's supported facts of defendant's conduct, acts and omissions, regarding space review requirements, annual reports, corrective action documentation, etc, individually, are tantamount to deliberate indifference. What plaintiff does not comprehend is that each of these acts or omissions, and countless others, are evidence of his deliberate indifference.

* Defendant argues on page 6 of his reply brief, that any waiting list is the product of systemic deficiencies. What plaintiff ignores is that while the number of children on the waiting list is important, the issue is not the number of children on the list, the issue is the length of time any one child, including J.B., languishes in detention awaiting placement. Further, the waiting list could have just a single child on the list, but if that wait in detention pending placement exceeded seven days, or was unreasonable for due process purposes, the same lawsuit as filed by J.B. would be viable.

Equally disturbing is defendants failure to recognize that the system he decries was adopted and perpetuated or in fact created by the defendant. For example, the defendant requires committing courts to send additional marginally relevant materials to DYS before the child is staffed; Wood allows staffing only once a week, for the benefit of his employees, further delaying placement; Wood does not even contemplate alternative placements to detention. Wood, instead of addressing space needs annually does so only facilities; Wood fails to utilize

existing resources to meet the needs of committed children. Wood bemoans the very system that he created and/or perpetuates.

* Wood further argues that it is certain categories at certain times that result in a waiting list. See page 8 of the reply brief. Wood goes on to say: "There are dozens of categories, each of which is a wait list from time to time." This argument is not only a fraud upon this Court, it is a fraud perpetrated on the juvenile Courts of this state, the citizens of this state and the children committed to DYS custody. This fraud is created when the defendant espouses that committed children are classified and staffed by the Screening and Placement Committee and staffing is the result of classifying students according to their needs and determinations made as to appropriate placement.

As evidenced by the testimony of two Screening and Placement Committee members, the screening and placement process, as lauded by the defendant, is a farce. Six year committee member Garry Gregg testified that:

* Screening and Placement does not classify children. (Gregg depo. pg 17 lines 47)

* Screening and Placement does not categorize children. (Gregg depo. Pg lines 810)

* Screening and Placement makes treatment decisions regarding children. (Gregg depo. Pg 17 lines11-13)

* He doesn't know if Screening and Placement has a classification manual. (Gregg depo. Pg 16 lines 22-pg 17 line 3)

Seven year committee member Queen Barker testified that:

* Screening and Placement exists to determine which placement a child could be housed to receive their services. (Barker depo. Pg 7 line 22-pg 8 line 40)

* Screening and Placement is not there to develop service plans. (Barker depo. Pg8 lines

5-8)

      * Screening and Placement neither classifies nor categorizes, and she's not sure what classification means. (Barker depo. Pgs 26-28)

      * She is unaware of what a drug and alcohol score of 52 means. (Barker depo. Pg 29) (JB's score was 52 which is in the chemically dependent range)

      * She understands it to be DYS policy that whatever facility a child is placed DYS is to secure the services to meet his needs. (Barker depo. Pg 42.)

      Because each deposition was brief in duration, due to a one hour limitation imposed by the magistrate in this case, Doc. #55, the plaintiff was unable to comprehensively examine the deponents. The above deposition related statements are a compilation of the testimony of the deponents and are subject to context. Plaintiff has attached hereto the relatively short transcripts in the interest of fairness and completeness. Exhibits 1 and 2

      * In his reply, Wood argues for the first time, other than in his Motion to Suppress, that J.B. was not placed because when he was committed there was "no available bed in the system for him. Wood reply brief at pgs. 12, 13 (A review of the summary judgment brief reveals this assertion is never made.) Wood goes on to argue "The staffing process was not the cause of J.B.'s wait in detention-the problem was no detention pending placement." Page 13 of reply brief. This assertion and the following statement of Wood reflect the "system" that Wood has created and perpetuated, which he now decries as the culprit, and which directly leads to children waiting so long for placement.

      Wood states " The Plaintiff implies that the Screening and Placement process and the Service Plan process are unrelated as though any child can be placed in any facility and a service plan delivered without regard to whether needs fit the capability of the facility to deliver

services." Reply brief at page 13. This statement exposes Wood's and/or his legal counsel's complete lack of comprehension regarding their legal responsibility for the provision of care, services, treatment and rehabilitation opportunities for committed children.

What Wood and counsel ignore is that the initial placement of a committed child is for the assessment, development and implementation of the service plan and is based on generic characteristics, such as gender, age, risk assessment, etc; not based on what the Screening and Placement committee determines are program needs of the child. See Pendergasr depo. at pg. 166 lines 6-9, and DYS Policy 16.3 attached as Exhibit 9 to plaintiff's S/J brief) However, this is exactly what Wood has created and/or perpetuated. Instead of placing children into appropriate housing where their needs can be evaluated and then a service plan developed and implemented, Wood has contracted for programmatic beds in a manner that he himself describes as "guesswork" (Exhibit 3 to S/J brief at page 4) , not only creating these "category waiting list" but equally and maybe more so troubling depriving children of accurate assessments of their needs and 14 development and implementation of appropriate service plans.

Wood now seeks to hide behind the very system he created and/or perpetuated and seeks relief by in essence asserting that his "guesswork" was wrong. Even assuming that Wood's guesswork scheme was appropriate, when questioned as to what length of detention stay, 7, 14, 21, days, was used in determining the number of beds needed, Wood stated he didn't take that into account. (Wood depo. at page 241).

Because Wood has intentionally chosen to guess on the number of beds needed and to do so every three years utilizing private providers, children, including J.B. are pigeonholed into programs and must wait unreasonable times to be placed into a facility which will only provide what the program has to offer instead of what the child needs.

* In Wood's brief he renews his argument that this case be analyzed under the Eight Amendment. Based on the prior decisions of the Middle District of Alabama and the Eleventh Circuit on this and related issues, plaintiff rejects that notion.

* In regard to his new assertion that a bed was not available to J.B. and the intimation that acceptance of J.B. within seven days would cause a violation of a state statute or standard, the evidence is as follows:

According to the Pendergast affidavit, Exhibit 4 to the reply brief, during both J.B. staffing dates beds at numerous facilities were available including the Montgomery Group Home, the Mt Meigs campus, the Alabama Youth Home in Westover, the Mobile Group Home and the Alabama Youth Home in Wetumpka.

As Wood testified in deposition at pages 110-119 children can be placed at these facilities and receive community services. Wood, not only failed to place J.B. in one of the available beds, where his service plan could have been developed and implemented, he never even considered such option. All Wood did was send a letter to the committing Court stating that J.B. was non-violent and asking the Court to send him home. Wood did this, knowing he had full authority to place J.B. anywhere he desired. Wood acknowledges he is the final decision maker regarding placement. (Wood depo. Pages 37, 62). Because these beds were available, Woods can not assert that acceptance of J.B. would have caused DYS to be in violation of a statute or standard. Wood has had six opportunities, Motion for Summary Judgment, Motion to Suppress, Reply Brief, deposition testimony, and two affidavits to claim and identify any such statute or standard which would have been violated by the placement of J.B. within seven days or a reasonable time. The reason he has declined on six occasions is because such assertion would be false. This fact is undeniable.

* The defendant next argues "Right to Treatment Issues." While the plaintiff recognizes that the right to treatment concept for juveniles is unresolved, this is not a right to treatment case. It is a due process deprivation of liberty case and inquiry into a right to treatment, while important, is not dispositive of the issue.

Defendant in attempting to distinguish the case of *D.W. v Rogers*, 113 F.3d 1214, 1218 (11th Cir. 1007), a case decided by the Eleventh Circuit a year after Judge Hobbs A.W. Order, misses the point. What defendant misses from the case is the distinction the Court made between those in state custody and those committed to the legal custody of the state yet not physically in state custody. A reading of the Court's opinion leaves no doubt that the Court would have reached a different conclusion had the minor child been in detention awaiting a mental health placement. The issue was one of substantive due process and when does such right attach. The Court concluded it attaches when the state physically deprives one of their liberty.

Wood next continues to argue that J.B. does not have a constitutional right to placement in a reasonable time. This issue is undebatable. His predecessors have been told so by Judge Hobbs, he had been told so by Judge Albritton and he personally has settled with monetary payment to the plaintiffs in a least five different cases. Defendant asserts, "That well is now dry." (Page 26 of reply brief.) Plaintiff can only hope and pray that what defendant means is that he will no longer cause hundreds of children to languish in detention awaiting placement, such that future litigation is unnecessary.

## PRISON LITIGATION REFORM ACT

The defendant asserts "The PLRA bars the first lawsuit because the Plaintiff was in the custody of the state when the lawsuit was filed." The defendant cites no authority for this conclusory statement which in fact is incorrect.

14

Because the defendant fails to offer any facts, authority or argument for this blanket assertion it is impossible to respond other than to the reference by defendant to §1997(e) (page 2 of reply brief) This section, if it is even applicable, and plaintiff asserts it is not as discussed in the summary judgment brief, does not bar a lawsuit it merely physical injury. Even assuming application of the provision, plaintiff has alleged unjustifiable restrain on his liberty and thus satisfies the physical injury requirement.

The United States Supreme Court in addressing the PLRA noted the following:

"But the interpretation respondents advocate creates its own inconsistencies. Section 1997e(e) contains similar language, "[n]o . . . action may be brought . . . for mental or emotional injury suffered while in custody without a prior showing of physical injury," yet respondents cite no case interpreting this provision to require dismissal of the entire law suit if only one claim does not comply, and again we see little reason for such an approach. Accord, Cassidy v. Indiana Dept. of Corrections, 199 F.3d 374, 376-377 (CA7 2000) (dismissing only the portions of the complaint barred by Sec. 1997e(e)); see also Williams v. Ollis, 230 F.3d 1361 (CA6 2000) (unpublished table decision) (same). Interpreting the phrase "no action shall be brought" to require dismissal of the entire case under Sec. 1997e(a) but not Sec. 1997e(e) would contravene our normal rules of statutory construction. National Credit Union Admin. v. First Nat. Bank & Trust Co., 522 U.S. 479, 501-502 (1998)." *Jones v. Bock,* 127 S. Ct 910, 166 L. Ed.2d 798 (2007)

Thus, assuming the PLRA applied to the initial lawsuit, only the federal claim therein would be subject to dismissal. However, as plaintiff has set forth in his brief, the PLRA is not applicable and if applicable plaintiff has satisfied all requirements.

Submitted on this the 9th day of August, 2007.

s//Robert D. Drummond, Jr. Robert D.
Drummond, Jr. (DRU004)
Attorney for the Plaintiff
ASB-4619-O78R


323 De La Mare Ave.
Fairhope, AL 36532 251-
990-6249 fax:251-650-1264


s//Michael J. Crow
Michael J. Crow (CRO039)
Attorney for the Plaintiff


BEASLEY. ALLEN, CROW,
METHVIN, PORTIS &MILES
P.O. 4160 Montgomery, AL 36103-4160
334-269-2343

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of August, 2007, the foregoing was electronically filed with the Clerk of this Court thereby providing service to counsel for the defendant, T. Dudley Perry, Esq.

s//Robert D. Drummond, Jr.

# DEPOSITION OF GARRY L. GREGG

## August 1, 2007

## Pages 1 through 63

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Deposition of Garry L. GreggJ.B. vs. WOOD                August 1, 2007

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


J.B., a minor child, by and through
his next friend, ADDIE WARD, on
behalf of himself and all others
similarly situated,

     Plaintiff,

vs.                               CASE NO:
                                  02:06cv755-MHT

WALTER WOOD, in his individual
capacity,

     Defendant.


J.B., a minor child, by and through
his next friend, ADDIE WARD, on
behalf of himself and all others
similarly situated,

     Plaintiff,

vs.                               CASE NO:
                                  02:06cv908-MHT

WALTER WOOD, in his individual
capacity,

     Defendant.


* * * * * * * * * * * *

DEPOSITION OF GARRY L. GREGG

* * * * * * * * * * * *

Deposition of Garry L. GreggJ.B. vs. WOOD                    August 1, 2007

Page 2

```
 1        DEPOSITION OF GARRY L. GREGG, taken pursuant
 2   to stipulation and agreement before Julie A. Duncan,
 3   Court Reporter and Commissioner for the State of
 4   Alabama at Large, in the Offices of Beasley, Allen,
 5   Crow, Methvin, Portis & Miles, 218 Commerce Street,
 6   Montgomery, Alabama, on Wednesday, August 1, 2007,
 7   commencing at approximately 12:30 p.m.
 8
 9        * * * * * * * * * * * * *
10
         APPEARANCES
11
     ON BEHALF OF THE PLAINTIFF:
12
     Mr. Michael J. Crow
13   BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES
     Attorneys at Law
14   218 Commerce Street
     Montgomery, Alabama  36104
15
     Mr. Robert D. Drummond, Jr.
16   Attorney at Law
     323 De la Mare Avenue
17   Fairhope, Alabama  36532
18   ON BEHALF OF THE DEFENDANT:
19   Mr. T. Dudley Perry, Jr.
     State of Alabama
20   Department of Youth Services
     Deputy Attorney General
21   Post Office Box 66
     Mt. Meigs, Alabama  36057
22
23        * * * * * * * * * * * * *
```

Page 3

```
 1        EXAMINATION INDEX
 2
     GARRY L. GREGG
 3
       BY MR. DRUMMOND . . . . . . . . . .   4
 4
 5
         EXHIBIT INDEX
 6
     (No exhibits marked to this deposition.)
 7
 8
 9        * * * * * * * * * * * * *
10
11        STIPULATION
12        It is hereby stipulated and agreed by and
13   between counsel representing the parties that the
14   deposition of GARRY L. GREGG is taken pursuant to the
15   Federal Rules of Civil Procedure and that said
16   deposition may be taken before Julie A. Duncan, Court
17   Reporter and Commissioner for the State of Alabama at
18   Large, without the formality of a commission, that
19   objections to questions other than objections as to
20   the form of the question need not be made at this time
21   but may be reserved for a ruling at such time as the
22   said deposition may be offered in evidence or used for
23   any other purpose by either party provided for by the
```

Page 4

```
 1   Statute.
 2        It is further stipulated and agreed by and
 3   between counsel representing the parties in this case
 4   that the filing of said deposition is hereby waived
 5   and may be introduced at the trial of this case or
 6   used in any other manner by either party hereto
 7   provided for by the Statute regardless of the waiving
 8   of the filing of the same.
 9        It is further stipulated and agreed by and
10   between the parties hereto and the witness that the
11   signature of the witness to this deposition is hereby
12   waived.
13
14        * * * * * * * * * * * * *
15
16        GARRY L. GREGG
17   The witness, after having first been duly sworn
18   to speak the truth, the whole truth and nothing but
19   the truth testified as follows:
20        EXAMINATION
21   BY MR. DRUMMOND:
22   Q.  Would you state your full name, please.
23   A.  Garry L. Gregg.
```

Page 5

```
 1   Q.  Garry, what do you do with the Department of
 2        Youth Services?
 3   A.  I work in the community services division.
 4        I'm a treatment coordinator.
 5   Q.  Garry, have you ever given a deposition
 6        before?
 7   A.  No, sir.  This is the first time.
 8   Q.  Garry, I'm going to ask you a series of
 9        questions.  In asking you those questions, if
10        you don't understand the question, if you
11        would ask me to restate it, I'll be glad to do
12        that, okay?
13   A.  Okay.
14   Q.  Likewise, if you don't ask me to restate or
15        rephrase it, I will presume and conclude that
16        you're answering that question with a full
17        understanding of that question; is that a fair
18        agreement between us?
19   A.  Yes, sir.
20   Q.  All right.  How long have you been a treatment
21        coordinator in -- with community services?
22   A.  Probably -- let me see.  July -- a little
23        over -- I started in July.  Six years.  About
```

Deposition of Garry L. Gregg                                    J.B. vs. WOOD                                    August 1, 2007

---

Page 6

1      six years.
2   Q.   All right.  How long have you been on the
3      screening and placement committee?
4   A.   The whole time since I've been there.
5   Q.   Okay.  Is that what you know it as, the
6      screening and placement committee?
7   A.   Yes, sir.
8   Q.   What is the screening and placement committee?
9   A.   The screening and placement is when youth
10      files come, we have a committee.  And the
11      first thing they do is they get all of the
12      information on the youth as far as shot
13      records, the PO's evaluation, the court order,
14      any pertinent information to do with the
15      youth.  And then after they gather all that
16      information, they have a file.  And then
17      that's when I look at them.  And on -- we
18      start reading them usually on Monday.  And
19      then the meeting is at one o'clock on
20      Wednesdays.
21   Q.   What do you mean you usually begin reading
22      them on Monday?
23   A.   Well, after the files start coming in --

---

Page 7

1      Monday for me.  I can't speak for anybody
2      else.  On me, most of my days are to restaff,
3      because I'm the one that has the restaffs come
4      in from the private providers.  So usually
5      Monday morning I'm gathering restaffs from the
6      different facilities.  And then if there's
7      someone like from Mt. Meigs that they're
8      recommending go to a group home, they'll send
9      me all that information.
10   Q.   Do y'all have a restaff meeting on Mondays?
11   A.   Yes, sir.
12   Q.   What time is that normally held?
13   A.   One o'clock.
14   Q.   And that's with Mr. Booker?
15   A.   Yes, sir.
16   Q.   And there's a number of people on that restaff
17      committee?
18   A.   Yes, sir.
19   Q.   How long does that normally last?
20   A.   That usually lasts about -- I would say
21      usually about an hour.
22   Q.   Okay.  And then do you have duties after that
23      restaffing meeting for the rest of the day?

---

Page 8

1   A.   Just other than, you know, calling the people
2      back and letting them know what the decisions
3      were as far as if we decided that the youth
4      was going to be moved or they were going to
5      stay or did we have enough information.
6   Q.   All right.  So Monday morning then is utilized
7      with your time in preparing for that restaff
8      meeting?
9   A.   Yes, sir.
10   Q.   Okay.  So the first time you would have an
11      opportunity to look at files for the Wednesday
12      staffing would be sometime Monday after two
13      o'clock?
14   A.   Yes, sir.
15   Q.   Okay.  And so you would have from -- maybe
16      from two to five on Monday afternoons?
17   A.   Yes, sir.
18   Q.   Okay.  What about Tuesdays?
19   A.   Usually I set aside all day for Tuesday.
20   Q.   Okay.  So Tuesdays you have no duties other
21      than reviewing files for Wednesday?
22   A.   Reviewing files.
23   Q.   Okay.  And that's what you do?

---

Page 9

1   A.   Yes, sir.
2   Q.   So, for example, staffing today is at one
3      o'clock -- is it going to be today at one
4      o'clock?
5   A.   Well, it's going to be at two o'clock today
6      then.
7          MR. PERRY:  Actually, no, it's back
8         to one.
9   A.   One.  Okay.  One.
10   Q.   So every file that you're going to go over
11      today at two o'clock, or one o'clock, you have
12      already reviewed all of those files?
13   A.   Yes, sir.
14   Q.   And in each of those files, have you made a
15      recommendation for classification?
16   A.   What do you mean by that?
17   Q.   Well, you've reviewed each of the files,
18      correct?
19   A.   Yes, sir.
20   Q.   Okay.  How many files are there for tomorrow?
21   A.   I didn't really count today.  It's usually --
22      on the busy weeks, it's like in the sixties.
23      And last week it was like -- I'd say about

---

Deposition of Garry L. Gregg    J.B. vs. WOOD                    August 1, 2007

Page 10

1    forty. And today, I haven't even counted.
2  Q. But you reviewed all of the files?
3  A. Yes, sir.
4  Q. And in reviewing those files, have you already
5      made a -- in your mind, a recommendation
6      regarding classification?
7  A. Yes, sir. On most of them, I have.
8  Q. Okay. And what are the various
9      classifications that you could possibly be
10     recommending?
11 A. Well, I mean, you have some that's like --
12     they have a sex offense charge. So, I mean,
13     they, you know, go to the sex offender
14     program. You have some that -- substance
15     abuse. And then you've got some that just --
16 Q. So one classification is sex offender?
17 A. Yes, sir.
18 Q. One classification is substance abuse?
19 A. Yes, sir.
20 Q. Okay. What are the other classifications?
21 A. Well, you could have one that goes to thirty
22     day HIT.
23 Q. Okay. I'm not asking where they go.

Page 11

1  A. Okay.
2  Q. I'm asking what are the classifications.
3  A. I don't understand what you mean by
4      classification. Because what we have is --
5      what I was meaning was, other than someone
6      going to Mt. Meigs, Chalkville, or Vacca,
7      other than that classification, everything
8      else under the HIT program is a private
9      provider. And as far as classification, I
10     guess you would say that they were community
11     based, like group homes and places of that
12     sort.
13 Q. Did I understand you right, that everything
14     other than the classification of Meigs, Vacca,
15     Chalkville and HIT is a private provider?
16 A. Yes, sir.
17 Q. Well, I want to make sure I understand.
18 A. Okay.
19 Q. When you classify a child -- and that's one of
20     your duties as part of screening and
21     placement, correct?
22 A. Yes, sir.
23 Q. Is it your testimony that classification

Page 12

1    really means placement decision?
2  A. Now, run that by me again now.
3  Q. Well, I asked you what the various
4      classifications were.
5  A. Yes, sir.
6  Q. And you started telling me facilities.
7  A. Yes, sir.
8  Q. Is that right?
9  A. Yes, sir.
10 Q. Well, is that what classification means, what
11     facility they're going to go to?
12 A. No, sir.
13 Q. Okay. Then what does classification mean?
14 A. Classification, to me, means that after the
15     youth has committed a delinquent act -- is
16     develop a service plan where that delinquent
17     act can be dealt with and where they've
18     learned something where they won't come back.
19 Q. So your definition of classification is after
20     they've been committed to develop a service
21     plan?
22 A. Well, I mean, that's part of it. Because with
23     youth, as far as when they come to us, it's

Page 13

1    not like an adult where you have a -- so much
2    a set amount of time. It is driven by
3    developing a service plan.
4  Q. Okay. Well, Garry, help --
5  A. Okay.
6  Q. You have no responsibility in developing a
7      service plan, do you?
8  A. Not really. But what I'm saying is, when I
9      read a file and I'm looking at it, I'm trying
10     to the best of my ability to determine what
11     this youth needs from the file.
12 Q. Well, all right. So as you're making your
13     placement recommendation, you're making a
14     recommendation based on what you think the
15     child needs, correct?
16 A. Yes, sir.
17 Q. And that's a placement decision or a treatment
18     decision?
19 A. That's a treatment decision.
20 Q. So as a member of screening and placement,
21     you're making a treatment decision for the
22     child?
23 A. Yes, sir.

Deposition of Garry L. Gregg J.B. vs. WOOD                    August 1, 2007

| Page 14 |

1    Q.  And is that how -- is that the purpose of
2        screening and placement, from your
3        understanding, to make a treatment decision
4        regarding the child?
5    A.  Yes, sir.
6    Q.  And have you received any training or any
7        instructions from anyone other than -- from
8        anyone that teaches you anything different,
9        that screening and placement -- as a member
10       that you're there to make a treatment decision
11       for the child?
12   A.  Now, what was that again now?
13   Q.  Have you received any information or any
14       training, other than that's what screening and
15       placement is supposed to do, that being make a
16       treatment decision?
17   A.  I don't understand your question.
18   Q.  Okay.  You said as a member of screening and
19       placement you're there to make a treatment
20       decision for the child, correct?
21   A.  Yes, sir.
22   Q.  Okay.  What document reflects that that's what
23       your role is, is to make a treatment decision

| Page 15 |

1        for the child?
2    A.  What document?
3    Q.  Yes.
4    A.  I would say the only document is it's part of
5        my duties and responsibilities that's on my
6        evaluation.
7    Q.  Okay.  Well, has somebody said or showed you
8        any document -- how long have you been on
9        screening and placement, six years?
10   A.  Yes, sir.
11   Q.  And during those entire six years, each week
12       when you sit in there, in your mind, you're
13       making a treatment decision regarding that
14       child?
15   A.  Yes, sir.
16   Q.  And is it your belief that's what Pat is doing
17       as well?
18   A.  Yes, sir.
19   Q.  And is it your belief and observation that
20       that's what Ms. Barker is doing as well?
21   A.  Yes, sir.
22   Q.  And is it your belief and observation that
23       that's what Ms. Ross is doing as well?

| Page 16 |

1    A.  Yes, sir.
2    Q.  Okay.  And so in the -- when I say the term
3        classification, that, to you, means develop a
4        service plan?
5    A.  Yes, sir.  I mean, if I understand what you're
6        saying, because --
7    Q.  Well, I'm just going by what you said, Garry.
8        So is it your understanding --
9    A.  Well, let me hear that again then.  Explain it
10       to me one more time.
11   Q.  Well, tell me again, so I understand.  When I
12       say or ask you as part of screening and
13       placement do you classify children --
14   A.  Well, I mean, what does classification --
15       that's the problem.  I don't understand what
16       you mean by classification.
17   Q.  Okay.  Well, does the department have a
18       classification manual?
19   A.  I don't know.  I mean, I -- I mean, that -- I
20       wouldn't know about -- I mean, they -- I don't
21       know.
22   Q.  Does screening and placement have a
23       classification manual?

| Page 17 |

1    A.  A classification manual?
2    Q.  Yes.
3    A.  I don't know.
4    Q.  Okay.  When I use the term -- well, let me ask
5        you this.  Does screening and placement
6        classify children?
7    A.  No, sir.  No.
8    Q.  Does screening and placement categorize
9        children?
10   A.  No, sir.
11   Q.  Does screening and placement make treatment
12       decisions regarding children?
13   A.  Yes, sir.
14   Q.  What is your background in terms of -- what is
15       your educational background?
16   A.  I have a bachelor's degree in business.  I
17       have a master's degree in counseling.  And
18       then I had been working on my master's degree
19       in special education.
20   Q.  Okay.  So you have a master's in counseling?
21   A.  Yes, sir.
22   Q.  Can you walk me through what happens?  You've
23       reviewed the file.  You're going at -- the

Deposition of Garry L. Gregg J.B. vs. WOOD                    August 1, 2007

---

Page 18

1    procedures that you used last week at one
2    o'clock, are they the same procedures, the
3    same flow at the meeting as has been in place
4    for the last three years?
5    A.  Well, what do you mean by flow?
6    Q.  Have y'all been doing the same thing last week
7    as you did three years ago?
8    A.  I don't know what I did three years ago.
9    That's a long time.
10   Q.  That's a bad -- that's a bad question.  The
11   process that you use once the meeting starts
12   at one o'clock on Wednesdays, is it the same
13   process you're still using?
14   A.  What do you mean process is what I'm asking?
15   Q.  Is it the same -- the events that take place
16   during --
17   A.  I can't say it's the same every -- I mean --
18   Q.  Okay.  Can you walk me through a screening and
19   placement meeting as it exists now?  What
20   happens once a meeting gets started?
21   A.  Okay.  Well, at one o'clock it starts.  So
22   after it starts, the first file -- Pat opens
23   the first file.  He reads the name out.  He

---

Page 19

1    reads the risk.  And during that time, he asks
2    if there's any discussion on the individual.
3    We may ask about the court order.  We may have
4    something on there that maybe we didn't
5    know -- what was clear, because Pat may have
6    got some information in that we didn't know
7    about, whether he could have talked to a PO in
8    the last few minutes or sometime during the
9    day.  Some things may not just be clear.
10        So from that regard, then we go through
11   each one.  And then a decision will be made,
12   what is the best for that youth.
13   Q.  Okay.  What decision is made, a classification
14   decision is made?
15   A.  I don't -- I wouldn't say classification.
16   That's a word I get hung up on, because I
17   don't classify.  I'm not ...
18   Q.  What decision is made regarding each child?
19   A.  What the individual needs to stop doing the
20   delinquent behavior that got him or her to the
21   Department of Youth Services.
22   Q.  Okay.  So y'all spend roughly three to four
23   minutes a child?

---

Page 20

1    A.  I haven't ever timed it.
2    Q.  Well, how long do the meetings normally last?
3    A.  I really don't look at the clock.  It could
4    be -- I couldn't tell you.  It could be --
5    it's according to how many there is that
6    week.  I mean, there's sometimes, I'm sure,
7    we've stayed close to four or four-thirty.
8    And sometimes it hasn't been that long.
9    Q.  Okay.  Well, if Pat in his deposition said on
10   one particular day -- for example, the day
11   before his deposition was taken, staffing
12   started at one and finished at three-thirty
13   and there were fifty-one kids to staff that
14   day, so two and a half hours, so about three
15   minutes a kid.  Does that sound about right?
16   A.  I mean, I can't tell you what Pat said.
17   Q.  Does that sound about right in terms of how
18   many kids you do in that amount of time?
19   A.  Well, I mean, I don't know, because I haven't
20   really timed it to see.
21   Q.  And so whatever amount of time there is per
22   child, you -- based on what's in the file, you
23   review their needs?

---

Page 21

1    A.  Yes, sir.
2    Q.  And you determine a treatment plan for them?
3    A.  Yes, sir.
4    Q.  And based on that treatment plan that the
5    committee determines of what the child needs,
6    then you do what?
7    A.  Then what we're going to do is put them in a
8    program that can meet those needs.
9    Q.  Okay.  So once the needs are determined, you
10   decide what program the child needs, or what
11   program can meet those needs?
12   A.  Yes, sir.
13   Q.  Is it which program can meet their needs or
14   which facility can meet their needs, or is it
15   the same thing?
16   A.  What is your definition of program and
17   facility?  I mean, what do you mean by that?
18   Q.  I'm just --
19   A.  I don't know.  I don't know what you're
20   asking.
21   Q.  Well, is it the -- once the needs are
22   determined, then you decide what facility the
23   child ought to go to?

---

Deposition of Garry L. GreggJ.B. vs. WOOD                August 1, 2007

Page 22

1    A.  No.  What we decide is what kind of program
2        will meet those needs.
3    Q.  Okay.  That's what I just asked, is it program
4        or facility that you're deciding.  So which is
5        it?
6    A.  What we're doing -- okay.  I'm having a --
7        okay.  I don't understand what you -- what's
8        the difference between the program and the
9        facility.  That's -- I don't know what you
10       mean by that.
11   Q.  Well, once you decide what a child's needs
12       are, what do you do after that?
13   A.  After we decide the needs, we want to have
14       them in a program which can meet their needs.
15   Q.  Okay.  So, for example, if a child is
16       chemically dependent, what kind of program
17       would they need?
18   A.  He would need a substance -- he or she would
19       need a substance abuse program.
20   Q.  Okay.  Is there a difference between a person
21       that is abusing drugs and one that's
22       chemically dependent on drugs?
23   A.  Yes, sir.

Page 23

1    Q.  What's the difference?
2    A.  Well, if you have someone who has abused it,
3        it could have been he or she, the first time
4        had tried it.  They could have been using it
5        to deal with some problem happening in life.
6        We could say they're using it as a crutch.
7        But the bottom line on that is he or she can
8        stop.
9            Now, the difference, when you say that
10       someone is addicted, he or she cannot stop.
11       That's the difference.  He or she just cannot
12       stop.
13   Q.  Well, if you have somebody that has a CAPS
14       score, or a drug score of thirty-five, what
15       does that mean to you?
16   A.  What I like is -- on those scores is I like
17       a -- a more in-depth assessment.  I mean -- I
18       mean, I'm wondering what the treatment is.  I
19       like an assessment, and we can look at that --
20       at his assessment.  But I think a lot of times
21       you need to sit down with the youth and find
22       out really what's going on with her or him.
23   Q.  Well, you're presented at screening and

Page 24

1        placement with a child that has a score of
2        thirty-five.  What do you do with that?  What
3        do you do with that child?
4    A.  Well, I would have to read the file.  I would
5        have to look to the best of my ability all
6        what's going on.  Because on that scale, it
7        can be yes and no questions.  And if I'm
8        filling out an assessment and I don't know
9        I've got a problem, I could be denying it.  So
10       on them scores, the way I look at it is, is
11       anytime you have a youth that has been huffing
12       or drinking or drugs, or whatever, it needs to
13       be something that needs to be looked at and
14       just see.
15   Q.  Well, who is going to look at it?
16   A.  Well, when they go to a program is -- we want
17       the case manager, when dealing with the youth,
18       to find out is there any underlying factors
19       for the youth's behavior.
20   Q.  What if a child has a drug score of fifty-two,
21       and that's what you have at screening and
22       placement?
23   A.  It's still the same thing.

Page 25

1    Q.  Well, would you send that child to -- if a
2        child is chemically dependent, what does that
3        child need as you're sitting there at
4        screening and placement?
5    A.  Well, if he's chemically dependent, you know,
6        what we're looking at is -- is a score.  But
7        also that kid could need just the education
8        part, and he could need the treatment.
9    Q.  Well, would that child go to the HIT program?
10   A.  If he had a high drug score.
11   Q.  Would a child with a fifty-two on a CAPs score
12       go to the HIT program?
13   A.  I couldn't -- I mean, I couldn't tell you.  I
14       mean, I -- I don't know on that particular --
15       you know, because you're giving me a score.
16       And when you give me a score, on the -- and
17       the treatment end of it is, you know, there's
18       so many other factors than just that score.
19   Q.  What other factors would you consider, his
20       risk score?
21   A.  Well, not so much his risk score, his home
22       environment.
23   Q.  And tell me -- well, was there ever a time

Deposition of Garry L. Gregg  J.B. vs. WOOD                    August 1, 2007

Page 26

1   that you, as a member of screening and
2   placement, determined that with kids who
3   needed drug treatment, that they needed some
4   other component of a program first?
5   A.  Yes, sir.
6   Q.  Tell me about that.
7   A.  Well, when you're looking at it, someone may
8   not be going to school, or whatever it is, and
9   maybe they needed the discipline, maybe they
10  need to comply with rules.  And also, they
11  could have a substance abuse problem.
12  Q.  Okay.  Well, did screening and placement at
13  some point during your tenure on the committee
14  decide that for drug and alcohol we're going
15  to send some kids to drug and alcohol first
16  and some kids we'll send to drug and alcohol
17  after something else?
18  A.  Now, what was that now?  Would you repeat
19  that?
20  Q.  Was there ever a time during your tenure on
21  the screening and placement committee that the
22  committee determined that there are some kids
23  that need drug treatment, that we're going to

Page 27

1   give it to them up front, and there's other
2   kids we're going to give it to them after
3   sending them to some other program first?
4   A.  Yes, sir.
5   Q.  Okay.  Tell me about that.
6   A.  Well, I mean -- I mean, some of them the
7   decision may be made that they could go to a
8   HIT program.
9   Q.  Let me ask you this first.
10  A.  Okay.
11  Q.  Is there a time in your mind when screening
12  and placement consciously made that decision,
13  that we're going to start doing this?
14  A.  What do you mean consciously?  I mean, what do
15  you mean by that?
16  Q.  Well, was there ever a time that screening and
17  placement determined we're going to send kids
18  that need drug treatment to some other program
19  first, just as a broad concept?
20  A.  What do you mean broad concept?
21  Q.  Was there ever a time when screening and
22  placement decided that instead of sending some
23  kids to drug and alcohol treatment we're going

Page 28

1   to send them somewhere else first?
2   A.  Well, that word some -- we look at it as
3   individually.
4   Q.  When you say you look at it individually --
5   A.  Well, each youth is an individual.
6   Q.  Okay.  Well, Garry --
7   A.  So I -- go ahead.
8   Q.  No, I'm sorry.  Go ahead.  Go ahead and
9   finish.
10  A.  That's all right.  Go ahead.
11  Q.  Okay.  When you say you look at each youth as
12  an individual --
13  A.  Uh-huh (positive response).
14  Q.  Tell me by what authority you're making a
15  treatment decision about that individual.
16         MR. PERRY:  Objection to the form.
17  Q.  Are you a psychologist?
18  A.  No.  No, sir.
19  Q.  Do you have the evaluation of that child when
20  you're reviewing their file for screening and
21  placement?
22  A.  Sometimes we do.  Sometimes we don't.
23  Q.  Okay.  And if you don't, you're still making

Page 29

1   treatment decisions for that child, aren't
2   you?
3   A.  Now, re -- you're saying what now?
4   Q.  Whether you have the evaluation or not, you're
5   making treatment decisions for that child,
6   aren't you?
7   A.  Making treatment decisions on what we have,
8   yes, sir.
9   Q.  By what authority, Garry, do you think you
10  have the ability to make a treatment decision
11  for a child?
12  A.  What authority?  What do you mean by
13  authority?
14  Q.  Garry, have you ever seen this document
15  before, which is Plaintiff's Exhibit 13 to the
16  opposition for summary judgment?
17  A.  Have I ever seen this?
18  Q.  Yes, sir.
19  A.  I've seen this before.
20  Q.  What is that document?
21  A.  That document is the general policies
22  regarding what -- classification of committed
23  youth.

Deposition of Garry L. GreggJ.B. vs. WOOD                    August 1, 2007

---

Page 30

1  Q.  Okay.  What are the classifications for
2      committed youth to DYS?
3  A.  What are the classifications?  I do not know
4      each one.  I mean, I read them right here.  I
5      mean --
6  Q.  What are the classifications for committed
7      youth?
8  A.  I don't know what you mean.  I mean, other
9      than these right here?  Is this what you're
10     talking about?
11 Q.  Garry, I'm just asking what are the -- you're
12     looking at the classification manual, are you
13     not?
14 A.  Yes, sir.
15 Q.  Okay.  Tell me what the classifications are
16     for committed youth to DYS.
17 A.  Serious juvenile offender, regular commitment,
18     sex offender, community residential, pure HIT,
19     special needs, any combination of two or
20     more.
21 Q.  Are there any other classifications that you
22     know of?
23 A.  No.  If that's what the manual says, that's --

---

Page 31

1      that's here.
2  Q.  And you have reviewed that manual previously?
3  A.  Yes, sir.
4  Q.  Okay.  Do you use that on a regular basis?
5  A.  Do I look at this manual, no, sir.
6  Q.  Do you --
7  A.  Not regular -- not on a regular basis.
8  Q.  Have you ever used that manual in screening
9      and placement to do your job?
10 A.  Yes, sir.
11 Q.  When was the last time you used it?
12 A.  The last time I used it, when I started with
13     placement and screening to learn these
14     different things.
15 Q.  Okay.  Does screening and placement or anybody
16     at that office, to your knowledge, contact
17     children -- after you staff them on Wednesday,
18     contact children and let them know where
19     they're going and when they're going to go?
20 A.  That's done over in placement and screening.
21     I mean, over with Pat and Ms. Ross.
22 Q.  Okay.  So it's your belief that children are
23     told where they're going to go and when

---

Page 32

1      they're going to go after y'all staff them?
2  A.  Yes, sir.
3  Q.  Do you think that's appropriate, that children
4      are informed of that information?
5  A.  Well, if they're at home or detention, I
6      believe that they should know.
7  Q.  Okay.  And if a child is in detention, is it
8      your belief that a child should be told when
9      and where they're going to go?
10 A.  I would hope so.
11 Q.  Why would you hope so?
12 A.  Well, I mean, I would hope that somebody, you
13     know, would tell them.  I mean, if I was a
14     child, I would -- you know, I would want to be
15     told.
16 Q.  Well, as a master's level counselor, do you
17     think it has some impact on a child to have
18     the benefit of that information?
19 A.  I think it would depend on the child.
20 Q.  So you think -- well, are there any children
21     that would benefit to have that information?
22 A.  It may make them sleep better at night.
23 Q.  Okay.  Anything else?

---

Page 33

1  A.  I mean, I think a lot of times just in life
2      the unknown of not knowing, you know, is
3      stress on an individual.
4  Q.  Okay.  And do you know that as a master's
5      level counselor, that uncertainty causes
6      stress in people's life?
7  A.  I couldn't say for that.  But personally, I
8      know it does for me.
9  Q.  Well, as a master's level counselor, is that
10     something you counsel people about, about the
11     issues of certainty and trying to determine
12     certainty to reduce stress in their lives?
13 A.  Yes, sir.
14 Q.  Do you believe that a child has a right to
15     know after you staff them how long they're
16     going to be sitting in detention and where
17     they're going to go?
18         MR. PERRY:  Objection to the form.
19         You can answer.
20 A.  Am I supposed to answer that?
21 Q.  Yes.
22         MR. PERRY:  Yes.  You can answer.
23 A.  Now, what was the question again?

---

Deposition of Garry L. GreggJ.B. vs. WOOD                    August 1, 2007

Page 34

1  Q.  Do you believe a child has that right to know
2      that information?
3  A.  If I -- the child, the parent, yes.
4  Q.  Okay.  And you believe that information is
5      communicated to the child?
6  A.  Yes, sir.
7  Q.  What if I told you, Garry, that that
8      information is not communicated to a child?
9  A.  I mean, I would have to -- I would wonder
10     why.  I mean, I'm not on the other side.  So
11     for what -- the court or detention or home or
12     whatever, I wouldn't know.
13           MR. DRUMMOND:  Dudley, how much time
14            do you have left?
15           MR. PERRY:  Thirty minutes.
16           MR. DRUMMOND:  Okay.  Let's take a
17            short break.
18           (Brief pause in proceedings.)
19  Q.  (Mr. Drummond continuing) Garry, you've been
20      under the belief for the last six years that
21      you're there, as part of screening and
22      placement, to make treatment decisions,
23      correct?

Page 35

1  A.  Yes, sir.
2  Q.  Would you agree with me, Garry, that the
3      facility a child gets placed to, once that
4      child gets there, the services that that child
5      can receive are limited to what can be secured
6      for that child at that facility; would you
7      agree with that?
8  A.  Rephrase the question, please.
9  Q.  Sure.  Once a child is placed at a facility --
10  A.  Okay.
11  Q.  -- do you agree with me that the services a
12      child can receive are limited by what that
13      facility can provide?
14  A.  No, sir.
15  Q.  Okay.  Tell me why that's not a true
16      statement.
17  A.  Because there's situations where you have
18      someone like -- just an example, let's just
19      say a group home.  You've got local mental
20      health.  They can come in and help you.  You
21      know, that's one thing.  Maybe sometimes an
22      individual don't fully know what the
23      individual needs, but we're getting the

Page 36

1      community involved.  Maybe they can bring
2      people in or help people go out and teach them
3      things that maybe they just could not learn at
4      the facility.
5  Q.  So would you agree with me as part of
6      screening and placement, and in your general
7      position with DYS, that once a service plan is
8      developed, whatever services are needed to be
9      provided under that service plan could be
10     secured through other sources, can't they?
11  A.  Okay.  Ask -- now, rephrase that now.
12  Q.  Once a service plan is developed for a child,
13      the services can be secured through other
14      sources, can't they?
15  A.  I'm not understanding what you're saying.
16  Q.  Once a service plan is developed for a child.
17  A.  Okay.
18  Q.  Are we together so far?
19  A.  Yes, sir.
20  Q.  And that service plan says a child needs this
21      service.
22  A.  Yeah.  Okay.
23  Q.  Okay.  If the facility doesn't have that

Page 37

1      service, it can go out and be secured through
2      other sources?
3  A.  Yes, sir.
4  Q.  Okay.  And, in fact, are you aware that that
5      is the policy of the DYS board, that services
6      not available are to be secured in the
7      community?
8  A.  Yes, sir.
9  Q.  Okay.  Do you know that as DYS policy?
10  A.  In writing, or what do you mean?
11  Q.  Either way.  Whether you've ever seen it in
12      writing or do you know that to be the policy?
13  A.  I know we do it.  I don't know if it's
14      policy.
15  Q.  Okay.  And so do we agree so far, Garry, that
16      if a child is placed in a facility and that's
17      where the child is physically housed, all of
18      their services could be provided in the
19      community, couldn't they?
20  A.  No, sir.
21  Q.  Why is that not a true statement?
22  A.  Well, what I'm saying is, you've got some
23      facilities that's maybe in a more rural place

Deposition of Garry L. Gregg          J.B. vs. WOOD                    August 1, 2007

Page 38

1    than others. You've got some facilities, for
2    example, that they have a good GED program
3    and --
4  Q. But, Garry, I thought you said if a child goes
5    to a facility, then if a facility can't meet
6    those services, they can secure those services
7    elsewhere?
8  A. Yes, sir.
9  Q. Is that true?
10 A. Now, rephrase. Okay. What -- are you saying
11   at that facility?
12 Q. While the child is at that facility, the
13   services can be secured somewhere else?
14 A. What do you mean, somewhere else?
15 Q. A child can be placed in a group home,
16   correct?
17 A. Yes, sir.
18 Q. Okay. And if the group home -- if the child
19   at that group home needs drug treatment --
20 A. Yes, sir.
21 Q. -- outpatient drug treatment, well, the group
22   home doesn't have that treatment at the group
23   home, does it?

Page 39

1  A. Some do. Some don't.
2  Q. Okay. And the ones that don't, you would send
3    down to the local mental health drug treatment
4    program, wouldn't you?
5  A. You could or you could restaff them and put
6    them in a substance abuse program.
7  Q. Okay. So a child that needs drug treatment,
8    that there's not a bed at one of the
9    designated drug treatment facilities, could go
10   to a group home and still receive drug
11   treatment, couldn't they?
12 A. Now, rephrase that again. Now, what did you
13   say?
14 Q. A child that needs drug treatment and has been
15   staffed to go to a drug treatment program but
16   there's not a bed there available for him --
17   do you understand that part?
18 A. No. Start back now. Start from the
19   beginning.
20 Q. Y'all determine a child needs drug treatment?
21 A. Okay. Who is y'all?
22 Q. Screening and placement.
23 A. Okay. Okay.

Page 40

1  Q. Are we together so far?
2  A. Yes. Yes.
3  Q. Okay.
4  A. I'm with you.
5  Q. Screening and placement determines a child
6    needs drug treatment.
7  A. Okay.
8  Q. Okay. There's not a bed at the drug treatment
9    program. Okay. Are we together so far?
10 A. Yes, sir.
11 Q. Okay. But the child's risk score is low
12   enough where he could go to a group home. He
13   could go to that group home, couldn't he?
14 A. He could. But if he needs substance abuse,
15   he's going to be on a waiting list to get to
16   the substance abuse program.
17 Q. Well, if he's at a group home, he could go
18   down to the local mental health drug treatment
19   program, couldn't he?
20 A. I don't follow you right there, because you're
21   on one subject and then you're going to
22   another subject. And that's --
23 Q. We'll go back over it as long --

Page 41

1  A. All right.
2  Q. -- as we need to.
3  A. Okay. Go ahead.
4  Q. Tell me which part you're getting lost.
5  A. Okay.
6  Q. Screening and placement says a child is going
7    to go to a drug treatment program.
8  A. Yes, sir.
9  Q. They put him on a waiting list for that drug
10   treatment program.
11 A. Yes, sir.
12 Q. He's sitting in detention for a month waiting
13   to go to that drug treatment program. Are we
14   together so far?
15 A. I mean, if you say he was waiting a month, I
16   guess he was.
17 Q. I'm talking about any child. That's the
18   situation I'm giving you, okay?
19 A. Okay.
20 Q. He has a risk score that's low enough he could
21   go to a group home, all right?
22 A. Okay.
23 Q. You've already told me that if a child is at a

Deposition of Garry L. Gregg    J.B. vs. WOOD                August 1, 2007

Page 42

1    group home and he needs a service, he could
2    get that service in the community, couldn't
3    he?
4  A.  If they provide it in that community.
5  Q.  Okay.  And so that same child that's on a
6    waiting list to go to drug treatment somewhere
7    could go to that group home and get drug
8    treatment in a local community somewhere?
9  A.  If they offered it.
10 Q.  Okay.  But there's no reason that couldn't
11    happen, is there?
12 A.  No.  In the perfect world, no.
13 Q.  Okay.  Now, I want you to tell me then, Garry,
14    how many -- and let's talk about a kid named
15    J.B., okay?
16 A.  Okay.
17 Q.  Do you know who J.B. is?
18 A.  No, sir.
19 Q.  Okay.  When you have a kid who is sitting in
20    detention for a month and you know that that
21    child needs drug treatment --
22 A.  Yes, sir.
23 Q.  -- okay -- there's a bed open at a group home

Page 43

1    in Montgomery County, okay?
2  A.  Okay.
3  Q.  That happens frequently, doesn't it?
4  A.  Yes, sir.
5  Q.  Okay.  As a matter of fact, Pat submitted an
6    affidavit saying that there's times that that
7    happens.  So you know that happens, don't
8    you?
9  A.  If what happens?
10 Q.  Where there's kids on a waiting list to go
11    somewhere, but there's maybe a group home bed
12    open.
13 A.  Repeat what you're asking now.
14 Q.  A situation where a child is waiting to go to
15    a drug treatment program sitting in detention
16    waiting for that drug program, but there's a
17    group home bed open.  That --
18 A.  So what's your --
19 Q.  -- happens, doesn't it?
20 A.  You're saying Pat said it happened?
21 Q.  If a group home bed is open in Montgomery --
22    do you live in Montgomery?
23 A.  Yes, sir.

Page 44

1  Q.  Okay.  You know that Montgomery is one of the
2    four largest cities in Alabama, don't you?
3  A.  That's what I heard.
4  Q.  Okay.  And I presume you would agree with me
5    that there's a lot of resources for drug
6    treatment in Montgomery County, aren't there?
7  A.  Not as many as you think.
8  Q.  Okay.  Well, how many are there?
9  A.  What do you mean, for children or adults or --
10 Q.  How many programs are there for drug treatment
11    for children in Montgomery?
12 A.  Meadhaven is for adults.  Okay.  CAPs on
13    Air Base Boulevard has kids out there.
14    There's the Lighthouse.  Other than that,
15    there may be some counselors that are
16    certified alcohol and drug counselors,
17    outpatient.
18 Q.  All right.  So a child could be placed in a
19    group home and get drug treatment through one
20    of those sources, couldn't he?
21 A.  In Montgomery County, yes.
22 Q.  Okay.  And so if a young man y'all have
23    staffed to drug treatment is waiting in

Page 45

1    detention for a month yet there's a bed open
2    at the Montgomery group home and his risk
3    score says he's appropriate for a group home,
4    he could go to that group home and get drug
5    treatment in Montgomery, couldn't he?
6  A.  Yes, sir.
7  Q.  Okay.  How many times have you, being on that
8    screening and placement committee, looked at a
9    child and said, they're on the waiting list to
10    go to this program, but we could put him in a
11    group home or some other program and get him
12    the service locally?
13 A.  How -- I couldn't tell you how many times.
14 Q.  Have you ever done that?
15 A.  Have I ever done what?
16 Q.  Have you ever participated in that decision
17    process, Garry?
18 A.  What?
19 Q.  What I just described.
20 A.  Explain it to me again.
21 Q.  What I just described, where you have a
22    child --
23 A.  You'll have to explain it to me again.  When I

Deposition of Garry L. Gregg J.B. vs. WOOD                August 1, 2007

Page 46

1    ask you -- if I don't know something and I ask
2    you, I don't understand. And from the start,
3    you told me if I didn't understand, you would
4    say it again.
5    Q.  Sure.
6    A.  And that's what I'm asking.
7    Q.  I'll be glad to.
8        You have a child that screening and
9    placement has put on a waiting list for a drug
10   program. Do you understand that?
11   A.  Yes, sir.
12   Q.  Okay. You have a bed open at the Montgomery
13   group home.
14   A.  Okay.
15   Q.  How many times have you participated in
16   decision-making as part of the screening and
17   placement committee where you have said, we'll
18   take the child, get him off the waiting list
19   for the drug program, we'll put him in a group
20   home, and he can get his drug treatment
21   locally?
22   A.  Yes, sir. Because there's CAPs here. He
23   could do that here.

Page 47

1    Q.  Okay. How many times have you participated in
2    that?
3    A.  I couldn't tell you. Over six years, I
4    couldn't tell you. I do not know.
5    Q.  So you've done that?
6    A.  Have I done what? Had -- because they're
7    getting drug treatment at Montgomery group
8    home. They're getting it -- we're saying are
9    they getting drug treatment. Yes. And you've
10   said Montgomery. At Montgomery, they can get
11   drug treatment through CAPs. Some other group
12   homes don't have that. So when you just say
13   Montgomery and just use Montgomery, that would
14   be a true statement.
15   Q.  Well, how many times have you put a kid on a
16   waiting list for a drug program, seen that
17   he's going to sit in detention for a long
18   time, and go ahead and just put him in a group
19   home and let him get his drug treatment
20   locally?
21   A.  Well, the first thing you're asking is from my
22   perspective. I sometimes -- or I don't ask
23   how long they've been in detention. I mean, I

Page 48

1    don't ask that question.
2    Q.  Why do you not ask that question?
3    A.  I'm looking at what they need. And what I'm
4    looking at is whether they're at detention or
5    home, that's where they're at.
6    Q.  So if a child is sitting in detention and has
7    been sitting there for a month --
8    A.  Okay.
9    Q.  -- on a waiting list to go to a drug
10   program -- are we together so far?
11   A.  Yes, sir. We're together.
12   Q.  And he could just as well -- if y'all went
13   back the next week and said, no, let's put him
14   in this group home and get him his drug
15   treatment locally, you could do that, couldn't
16   you?
17   A.  Yeah. I mean, if -- I mean, there's certain
18   situations it may not work. I mean, one, the
19   kid could be from Montgomery County, and his
20   family is there and ...
21   Q.  My question to you is, how many times have you
22   participated in the decision where a kid is on
23   a waiting list waiting to go to a drug program

Page 49

1    and you've said something like, well, he's in
2    detention, we can get him into a group home
3    quicker, let's do that?
4    A.  I've done that, but I couldn't tell you how
5    many times. I don't know.
6    Q.  Okay. So your testimony is screening and
7    placement has put a kid on a waiting list for
8    a drug program and you have participated in
9    decisions where you have moved him off the
10   waiting list for the drug treatment program
11   and moved him into a group home?
12   A.  He's getting drug treatment at the group home.
13   Q.  Okay.
14        MR. PERRY:  Garry, listen carefully
15        to his question.
16        THE WITNESS:  Okay.
17        MR. PERRY:  He's asking you a
18        specific -- if that specific
19        incident or occurrence has ever
20        happened, when the committee has
21        gone back -- after they have
22        staffed a kid, then gone back
23        and said, look, let's get him

Deposition of Garry L. Gregg     J.B. vs. WOOD                    August 1, 2007

Page 50

1           off the waiting list and let's
2           put him someplace other than
3           where we staffed him.  He's
4           asking you did that ever --
5   A.  Yeah, that's happened.
6           MR. PERRY:  That has happened.
7   A.  That has happened.
8   Q.  Okay.  Tell me the circumstances that has
9       happened.
10  A.  Well, I mean, in a situation -- we're trying
11      to get kids off the waiting list as quick as
12      we can.
13  Q.  How do you get them off the waiting list as
14      quick as you can?
15  A.  Get them into a program.
16  Q.  I don't understand what you mean by a
17      program.  What do you mean get them into a
18      program?
19  A.  As quickly as we can, get them in and start
20      helping them.
21  Q.  Well, do you think it hurts them to sit in
22      detention and not get the help they need?
23  A.  Does it -- what now?

Page 51

1   Q.  Does it hurt them to sit in detention and not
2       have them get the help they need?
3   A.  I mean, to me, personally speaking, I don't
4       think any youth -- and this is personally
5       speaking -- should have to stay in detention,
6       but it happens.
7   Q.  Garry, I would represent to you that
8       Mr. Pendergast filed an affidavit with the
9       court in which he said that between May 18th
10      of '05 and June 28th of '05 that there were
11      vacant beds in Montgomery group home.
12  A.  Okay.
13  Q.  My question to you is, if during that time
14      period there was a child on the waiting list
15      that needed drug treatment and they had a risk
16      score that allowed them to go to a group home,
17      could it have been possible that that child
18      could have gone to that group home?
19  A.  Under those circumstances, they could.  I
20      mean, if it's all right with the court and the
21      judge and everybody else.
22  Q.  Okay.  Now, why do you say if it's all right
23      with the court?

Page 52

1   A.  Because what I'm saying is, is after we get
2       through with placement and screening, to the
3       best of my knowledge, Ms. Ross and
4       Mr. Pendergast call the PO up and -- with
5       their findings and where the child is going to
6       go.
7           And there may be some situations -- I
8       don't know -- personally know, because I don't
9       personally at that time talk to the PO.  Maybe
10      there's something added to it.  Maybe just,
11      you know, we're -- where we're looking at it
12      is, maybe the child in the last week or so --
13      maybe their mother died, okay, maybe that
14      happened.  So how you would have to look at it
15      is, would it be best to put the -- you know,
16      the child in a group home knowing he or she is
17      under all of those problems or not.  I mean,
18      I'm just using that as a example.
19  Q.  Sure.  Garry, is it your belief that after
20      staffing on Wednesday that Pat or Jada contact
21      the probation officer and tell them where the
22      child is going to go?
23  A.  Yes, sir.

Page 53

1   Q.  You know that happens or you --
2   A.  Well, I mean, I don't know.  I mean, I -- you
3       know, it would -- I mean, all I know is after
4       that and they go back -- for us to get the
5       kids to us, there would have to be some kind
6       of conversation.  I mean, I don't think it
7       would be where somebody would just drive up
8       and honk the horn and say, come on.  I mean,
9       there would have to be something more than
10      that.
11  Q.  Not much more.  Garry, if you believe you're
12      there at screening and placement to make
13      treatment decisions for a child, what does
14      having a social security number have anything
15      to do with making that treatment decision for
16      the child?
17  A.  What now, the social security number?
18  Q.  Yes.  Why would y'all have to have the social
19      security number to make a treatment decision
20      regarding the child?
21  A.  I don't even know why we'd have to have a
22      social security number.  I mean, just -- what
23      I'm thinking is sometimes there's kids that

Deposition of Garry L. Gregg    J.B. vs. WOOD                    August 1, 2007

Page 54

1    have similar names. And sometimes when you
2    look on the screen, if I did not see the
3    social security number, I wouldn't know which
4    one that was.
5    Q.  Why do you only have staffing once a week?
6    A.  Why? I mean, I don't know why it's once a
7    week. I know it's once a week, but I don't
8    know why.
9    Q.  Well, Garry, why should a child -- if you get
10    the complete packet on a Thursday, why should
11    a child have to wait until the following
12    Wednesday before y'all decide where it's
13    appropriate to go?
14    A.  I couldn't answer that question.
15    Q.  Do you think that's fair to the child?
16    A.  He sat from Thursday to Wednesday. I mean, it
17    would -- it is what it is. I mean, it's not
18    just meeting on it. It's getting, you know,
19    departments to bring kids.
20    Q.  I'm not talking about placement.
21    A.  Okay.
22    Q.  I'm talking about for y'all to meet and decide
23    where a child is going to go, why should a

Page 55

1    child have to wait up to a week before that
2    process happens?
3    A.  I don't know.
4    Q.  Have you ever suggested that we do it quicker
5    than a week?
6    A.  No.
7    Q.  Do you think that it's fair to that child to
8    have to wait a week?
9    A.  I don't know.
10    Q.  When you review the files, Garry, do you make
11    notations in the file?
12    A.  Sometimes I do. Sometimes I don't.
13    Q.  How do you make notations, and where would you
14    make your notations?
15    A.  Usually in my head, or I might scribble
16    something down on a piece of paper.
17    Q.  Well, do you have something you keep in
18    your -- when you review a file, tell me how
19    you review that file.
20    A.  Well, I start with page one. And I look and
21    find the individual's name, what county, risk,
22    look at the court order, look at what the PO
23    has to say. I look if there's any kind of

Page 56

1    medical conditions, are they on any kind of
2    medication, do they have any kind of DHR
3    involvement.
4    Q.  And from that, do you form an initial
5    impression about what your recommendation will
6    be as to where they should be placed?
7    A.  No, sir.
8    Q.  Do you make a notation from your review of the
9    file things that when you see this child's
10    name again you can remember anything about
11    that child?
12    A.  Sometimes. I mean, when I look at them is --
13    there are going to be some that you can read
14    the file, and there's nothing really that --
15    that sticks out.
16    Q.  Well, on Wednesday, you don't -- when you're
17    in a screening and placement meeting, you
18    don't read the file again, do you?
19    A.  Well, if there's something I may question or
20    something, I may say, can I see the file
21    again; there's something I may have forgotten
22    or I didn't notate.
23    Q.  So as a general proposition, you make no notes

Page 57

1    or notations anywhere of the files that you
2    review?
3    A.  I do. I mean, some I do. Some I don't.
4    Q.  Okay. And where are those documents? Where
5    do you keep those?
6    A.  I tear them up afterwards. I mean, that's for
7    my personal use.
8    Q.  So as you're reviewing each file, do you have
9    a notebook you use? Do you have --
10    A.  Just a yellow piece of paper.
11    Q.  And so on a yellow sheet of paper you'll have
12    information on about fifty kids on average?
13    A.  Well, not fifty. If there's one I have some
14    questions about.
15    Q.  Well, then, how do you remember the other
16    forty-five, Garry, anything about them that
17    you can make a competent decision about?
18    A.  Well, what I'm saying is, is when I've read
19    them and I take them, the ones I'm writing
20    down is ones I'm kind of questioning where
21    they go, because --
22    Q.  So then the other ones that you're not
23    questioning where they go, you've already got

Deposition of Garry L. Gregg J.B. vs. WOOD                    August 1, 2007

Page 58

1    in your mind a general impression of where
2    they should go?
3  A.  No, I don't have a general impression.
4    Because then when we get in there and meet, I
5    haven't made an absolute certain decision.
6    Because I'm not going to be so concrete that
7    when I get there that I'm going to say, it's
8    got to be a certain way. Because there's
9    three other people in there.
10  Q.  So you're telling me for the forty kids you
11    don't make notes on each week, you can
12    remember enough details about that kid to make
13    a credible recommendation about --
14  A.  Well, what I --
15  Q.  -- where that child should go?
16  A.  -- what I've done -- what I've done is -- when
17    you say credible is -- we go over them. And
18    as we go over them, we're open for
19    discussion. And ones I know, to the best of
20    my ability, that this is what they need, this
21    is -- this is what I go by. And then the ones
22    that I'm not sure, maybe they're too young or
23    this or that or others, you know, I make

Page 59

1    little notations and ask some questions when
2    we get there.
3  Q.  Do you understand that the decision that you
4    make each Wednesday dictates what happens to
5    that child for the next three or six months or
6    a year?
7  A.  Yes, sir. I mean, I don't -- I don't take it
8    lightly. I mean, I -- personally, it's an
9    awesome responsibility. Because I know that,
10    you know, individual lives are being held at
11    stake and ...
12  Q.  And if that's the case, Garry, tell me in your
13    mind what impact it has for a kid that has a
14    one on a risk assessment to sit in detention
15    for six weeks only when he's finally placed to
16    go to a group home, a non-secure program.
17    What significance does that have to you?
18  A.  Well, that's not good. But I don't know all
19    the -- I don't know all of the factors why he
20    or she has been in detention six weeks. I
21    mean, like I said a few moments ago,
22    personally I wish that no child had to go to
23    detention for the first day.

Page 60

1  Q.  Well, besides saying it's not good for a
2    child, does it have any other significance to
3    you?
4  A.  What do you mean?
5  Q.  Have you gotten your master's yet?
6  A.  Yes, sir.
7  Q.  The second one you're working on?
8  A.  No, sir. I kind of slowed down. I went to
9    school so much.
10  Q.  All right.
11      MR. DRUMMOND: Mr. Perry may have
12      some questions for you. If not,
13      thank you.
14      MR. PERRY: Thank you, Garry.
15      THE WITNESS: All right. Thank
16      you.
17
18      (The deposition concluded at
19      approximately 1:30 p.m.)
20
21     * * * * * * * * * * * *
22     FURTHER DEPONENT SAITH NOT
23     * * * * * * * * * * * *

Page 61

1      REPORTER'S CERTIFICATE
2
3  STATE OF ALABAMA:
4  BUTLER COUNTY:
5     I, Julie A. Duncan, Court Reporter and
6  Commissioner for the State of Alabama at Large, do
7  hereby certify that I reported the deposition of:
8     GARRY L. GREGG
9  who was first duly sworn by me to speak the truth,
10  the whole truth and nothing but the truth, in the
11  matter of:
12     J.B., a minor child, by and through
13     his next friend, ADDIE WARD, on
14     behalf of himself and all others
15     similarly situated,
16     Plaintiff,
17     vs.
18     WALTER WOOD, in his individual
19     capacity,
20     Defendant.
21     CASE NO: 02:06cv755-MHT
22
23     * * * * * * * * * *

Deposition of Garry L. Gregg J.B. vs. WOOD                    August 1, 2007

---

Page 62

1        J.B., a minor child, by and through
2        his next friend, ADDIE WARD, on
3        behalf of himself and all others
4        similarly situated,
5        Plaintiff,
6        vs.
7        WALTER WOOD, in his individual
8        capacity,
9        Defendant.
10       CASE NO: 02:06cv908-MHT,
11       In the United States District Court
12       for the Middle District of Alabama
13       Northern Division,
14   on Wednesday, August 1, 2007.
15       The foregoing 62 computer-printed pages
16   contain a true and correct transcript of the
17   examination of said witness by counsel for the parties
18   set out herein.  The reading and signing of same is
19   hereby waived.
20       I further certify that I am neither of kin
21   nor of counsel to the parties to said cause
22   nor in any manner interested in the results
23   thereof.

---

Page 63

1        This 9th day of August, 2007.
2
3
4        _____
         Julie A. Duncan,
5        Court Reporter and
         Commissioner for the State
6        of Alabama at Large
     7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

# DEPOSITION OF QUEEN BARKER

## August 1, 2007

## Pages 1 through 49

## PREPARED BY:

**Haislip, Ragan, Green, Starkie & Watson, P.C.**
**566 South Perry Street**
**Post Office Box 62**
**Montgomery, AL  36104**
**Phone: (334) 263-4455**
**Fax: (334) 263-9167**
**E-mail: haislipragan@charter.net**

Case 2:06-cv-00755-MHT-CSC    Document 58-3    Filed 08/09/2007    Page 2 of 14

Deposition of Queen Barker   J.B. vs. WOOD                    August 1, 2007

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


J.B., a minor child, by and through
his next friend, ADDIE WARD, on
behalf of himself and all others
similarly situated,

       Plaintiff,

vs.                              CASE NO:
                                 02:06cv755-MHT

WALTER WOOD, in his individual
capacity,

       Defendant.


J.B., a minor child, by and through
his next friend, ADDIE WARD, on
behalf of himself and all others
similarly situated,

       Plaintiff,

vs.                              CASE NO:
                                 02:06cv908-MHT

WALTER WOOD, in his individual
capacity,

       Defendant.


* * * * * * * * * * * *

DEPOSITION OF QUEEN BARKER

* * * * * * * * * * * *

Deposition of Queen Barker   J.B. vs. WOOD                     August 1, 2007

---

Page 2

1    DEPOSITION OF QUEEN BARKER, taken pursuant to
2    stipulation and agreement before Julie A. Duncan,
3    Court Reporter and Commissioner for the State of
4    Alabama at Large, in the Offices of Beasley, Allen,
5    Crow, Methvin, Portis & Miles, 218 Commerce Street,
6    Montgomery, Alabama, on Wednesday, August 1, 2007,
7    commencing at approximately 1:35 p.m.
8
9            * * * * * * * * * * * * *
10
     APPEARANCES
11
     ON BEHALF OF THE PLAINTIFF:
12
     Mr. Michael J. Crow
13   BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES
     Attorneys at Law
14   218 Commerce Street
     Montgomery, Alabama  36104
15
     Mr. Robert D. Drummond, Jr.
16   Attorney at Law
     323 De la Mare Avenue
17   Fairhope, Alabama  36532
18   ON BEHALF OF THE DEFENDANT:
19   Mr. T. Dudley Perry, Jr.
     State of Alabama
20   Department of Youth Services
     Deputy Attorney General
21   Post Office Box 66
     Mt. Meigs, Alabama  36057
22
23

---

Page 3

1        EXAMINATION INDEX
2
     QUEEN BARKER
3
       BY MR. DRUMMOND . . . . . . . . . .  4
4
5        EXHIBIT INDEX
6
     (No exhibits marked to this deposition.)
7
8
9            * * * * * * * * * * * * *
10
         STIPULATION
11        It is hereby stipulated and agreed by and
12   between counsel representing the parties that the
13   deposition of QUEEN BARKER is taken pursuant to the
14   Federal Rules of Civil Procedure and that said
15   deposition may be taken before Julie A. Duncan, Court
16   Reporter and Commissioner for the State of Alabama at
17   Large, without the formality of a commission, that
18   objections to questions other than objections as to
19   the form of the question need not be made at this time
20   but may be reserved for a ruling at such time as the
21   said deposition may be offered in evidence or used for
22   any other purpose by either party provided for by the
23   Statute.

---

Page 4

1        It is further stipulated and agreed by and
2    between counsel representing the parties in this case
3    that the filing of said deposition is hereby waived
4    and may be introduced at the trial of this case or
5    used in any other manner by either party hereto
6    provided for by the Statute regardless of the waiving
7    of the filing of the same.
8        It is further stipulated and agreed by and
9    between the parties hereto and the witness that the
10   signature of the witness to this deposition is hereby
11   waived.
12
13            * * * * * * * * * * * * *
14
15        QUEEN BARKER
16        The witness, after having first been duly sworn
17   to speak the truth, the whole truth and nothing but
18   the truth testified as follows:
19            EXAMINATION
20   BY MR. DRUMMOND:
21   Q.  Queen, this is Mike Crow.  He is co-counsel.
22        And I guess I've known you for twenty years or
23        so.

---

Page 5

1    A.  Uh-huh (positive response).
2    Q.  That sounds right.  It's good to see you
3        again.
4    A.  It's good to see you.
5    Q.  Have you been deposed before, Queen?
6    A.  Huh?
7    Q.  Have you ever given a deposition before?
8    A.  No.  This is my first time.
9    Q.  Queen, I'm going to ask you a series of
10       questions.  In asking you those questions, if
11       I misstate or say something stupid, which is
12       likely, or ask a bad question, if you would
13       ask me to rephrase it or restate it, I'll be
14       glad to do that, okay?
15   A.  Okay.
16   Q.  Likewise, if I don't ask you -- or if you
17       don't ask me to rephrase it, I'll presume and
18       conclude that you're answering it with a full
19       understanding, okay?
20   A.  (Witness nodding head).
21   Q.  You have to speak out loud so she can get
22       you.  She can't get a head nod.
23   A.  Okay.

Deposition of Queen Barker   J.B. vs. WOOD                    August 1, 2007

Page 6

```
 1   Q.  It probably isn't going to be fun for the next
 2       hour, but it will be okay, okay?
 3   A.  Okay.
 4   Q.  Queen, what is your position with the
 5       department?
 6   A.  I am a special education coordinator.
 7   Q.  Okay.
 8   A.  And the assessment coordinator.
 9   Q.  Queen, how long have you served on the
10       screening and placement committee?
11   A.  For about seven or eight years.
12   Q.  How is it decided who will be on that
13       committee?
14   A.  I am on the committee.  I can only tell you
15       about why I am on it.
16   Q.  Okay.
17   A.  I am on the committee to -- because I'm in
18       education, to identify the special education
19       students and/or the grades and schools which
20       the students attended and to help in making a
21       decision where placement is concerned.
22   Q.  Okay.  What is the purpose of the screening
23       and placement committee?
```

Page 7

```
 1   A.  Okay.  The purpose of the screening and
 2       placement committee?
 3   Q.  Yes, ma'am.
 4   A.  Is to get together, read -- first, we read the
 5       records of all of the students, incoming
 6       students.  And we make a decision as to where
 7       they are going to go based on the reasons for
 8       coming in, which may be the crime that they
 9       have committed, their needs, which includes
10       educational needs, and so forth, and on their
11       stay.  And there may be others I may be not
12       saying.
13   Q.  Does screening and placement exist to make
14       treatment decisions?
15   A.  We make decisions, but not so much -- it may
16       be related to what treatment they may need for
17       placement.  But when you say treatment, we
18       don't treat kids, so -- we make decisions
19       based on the treatment, you know, where they
20       may need to go or be placed for a particular
21       treatment.
22   Q.  Okay.  So, Queen, is it fair to say that the
23       purpose of screening and placement, from your
```

Page 8

```
 1       perspective or your understanding, is to
 2       determine which placement a child could be
 3       housed at to receive their services?
 4   A.  Yes.
 5   Q.  Okay.  And by that, I mean, screening and
 6       placement is not there to develop service
 7       plans, are they?
 8   A.  No.
 9   Q.  Okay.  They're not there to take a look at the
10       file and say, these are the services we're
11       going to provide to a child?
12   A.  Can you further explain that for me?
13   Q.  Sure.  You know the service plan -- what a
14       service plan is, correct?
15   A.  Yes.
16   Q.  Okay.  And a child doesn't get out of DYS
17       because they've satisfied what Pat Pendergast
18       or Queen Barker says they need to do, do they?
19   A.  No.
20   Q.  They get out of DYS by completing the service
21       plan?
22   A.  Yes.
23   Q.  Okay.  Screening and placement does not
```

Page 9

```
 1       develop the service plan, correct?
 2   A.  Correct.
 3   Q.  So it is -- once a child gets to a facility
 4       and that service plan is developed, it's the
 5       services that that child gets to meet his
 6       needs in the service plan, his completion of
 7       those, that's what gets him released from
 8       DYS?  Is that true?
 9   A.  I'm going to have to ask you to state that --
10       that last phrase, say it over again, please --
11   Q.  Sure.
12   A.  -- so I can pay more attention to the last
13       phrase.
14   Q.  Once a child is placed at a facility --
15   A.  Uh-huh (positive response).
16   Q.  -- then there's a whole policy, procedure, and
17       practice in place for the development of a
18       service plan, correct?
19   A.  That's correct.
20   Q.  Okay.  And it is those services that that
21       child is provided and his completion of those
22       services -- that's what leads to his release
23       from DYS; is that correct?
```

Deposition of Queen Barker   J.B. vs. WOOD                    August 1, 2007

                                                                 Page 10
1   A.  That's correct.
2   Q.  Okay.  So then, Queen, can you explain to
3       me -- let me ask you this way.  If screening
4       and placement plays no role in the development
5       of a service plan -- which is true, correct?
6       Is that correct?
7   A.  Uh-huh (positive response).
8   Q.  Okay.  She needs --
9   A.  Correct.
10  Q.  Okay.  If they play no role in the development
11      of that service plan, then screening and
12      placement is there to decide which facility a
13      child can be housed at most appropriately to
14      have his service plan developed; is that
15      correct?
16  A.  Correct.
17  Q.  Queen, if screening and placement is there
18      simply to determine housing placement, then
19      does it use a risk assessment in part in
20      making that determination?
21  A.  Yes.
22  Q.  Okay.  And would that be the primary
23      consideration -- is that the first, other than

                                                                 Page 11
1       gender maybe?  But is the risk assessment the
2       primary consideration in the type of housing a
3       child will need?
4   A.  No.
5   Q.  Okay.  If it's not risk that is the primary,
6       is it a primary consideration?
7   A.  It's one of the considerations.
8   Q.  Okay.  Then what other consideration
9       determines what type of housing a child will
10      need in order to get their service plan
11      developed?
12  A.  It would be -- the risk is not the primary --
13      it's one of them.  It's just one of them.
14  Q.  Okay.
15  A.  The treatment is based on what the child needs
16      based on what they have done to get to that
17      point in the first place.
18  Q.  All right.  Let me stop you there.  Let's take
19      it piece by piece.
20  A.  Okay.
21  Q.  Screening and placement doesn't develop the
22      service plan.  So screening and placement,
23      would you not -- they play no role in the

                                                                 Page 12
1       development of the service plan, do they?
2   A.  No.
3   Q.  Okay.  And so when you're talking about needs,
4       it doesn't matter what needs a child has.
5       Once they get to a facility, then his service
6       plan will be developed to decide what needs he
7       has and how best to serve those needs; isn't
8       that true?
9   A.  That's true.
10  Q.  Then what role, Queen, does screening and
11      placement, say in looking at a need, have any
12      role in determining where a child is going to
13      be housed to have his service plan developed?
14  A.  We look at the crime that the child has
15      committed.  And we think about the facilities
16      we have that may be able to -- even though we
17      don't play a role in treatment, that may be
18      the best placement for that child to get that
19      treatment.
20  Q.  Okay.  Well, for example, if a child needs
21      drug treatment as one of his needs -- well,
22      you might decide he needs drug treatment,
23      right?  If he has drug treatment needs, you

                                                                 Page 13
1       might say, well, let's get him into a drug
2       treatment program, right?
3   A.  We do.
4   Q.  Okay.  And in fact, his drug treatment may be
5       just one need out of many that he has, right?
6   A.  That's true.
7   Q.  Okay.  For whatever reason, besides Meigs,
8       Vacca, Chalkville, HIT, and the group homes,
9       everything is private provider now, isn't it?
10  A.  That's true.
11  Q.  And there's over thirty private providers,
12      aren't there?  However many there are, it
13      doesn't matter.  But the number of private
14      providers -- you know as a screening and
15      placement member that each one has different
16      attributes for certain types of children,
17      correct?
18  A.  That's correct.
19  Q.  Okay.  And so if you decide that a child needs
20      drug treatment, he's going to go on a drug
21      treatment placement list, right?
22  A.  He will go to a facility that would be able to
23      service him in that area.

Deposition of Queen Barker   J.B. vs. WOOD                    August 1, 2007

Page 14

1  Q.  Okay.  Well, in all of these private
2      placements that exist, is it true or not true
3      that screening and placement, or you, or Pat,
4      I don't care who it is -- that somebody has
5      made the decision, if we think the child is
6      this person based on some characteristics,
7      we're going to put him in X program, for
8      example, Camp Cobia, or the Bridge A & D; is
9      that accurate?
10 A.  I wouldn't say that's altogether accurate.
11 Q.  Okay.  You tell me, Queen.  You're the one on
12     the committee.
13 A.  Okay.  We read the records of all of the
14     incoming students.  We look at their needs.
15     And like I say, you say we're not there for
16     needs.  I understand what you're saying.  That
17     is correct.
18 Q.  Okay.  What I'm saying --
19 A.  But we have to --
20 Q.  -- is correct about that, right?
21 A.  -- make a decision --
22 Q.  Okay.
23 A.  -- where they can get -- best get the

Page 15

1      treatment that they may need.
2  Q.  Well, Queen, let's take J.B., for example, a
3      young man back in 2005, spring of 2005.  He
4      had a low risk score.  He was committed with a
5      specific recommendation for drug treatment.
6      And he was placed on -- well, something called
7      HIT -- no, Autauga slash AD combo.  What is
8      that?
9  A.  HIT is a twenty-eight day program that they
10     will go to to, hopefully, make some changes
11     where -- the behavior component.  It's a
12     structured program.  A & D will be one of our
13     programs, drug programs, that will service
14     that child relative to the drug issues that he
15     or she will have -- or with him, I guess.
16 Q.  Well, what does it mean if y'all staff them at
17     Autauga slash AD combo?
18 A.  We're giving the child a little bit more
19     time.  You know, when I say that, the HIT
20     components are there to help children to learn
21     to develop better decision-making processes
22     and how to work together as a whole.  The
23     A & D program slash -- that's a combo.  That

Page 16

1      means he's going to HIT and then he's going to
2      go to the A & D program.  He's going to go to
3      both programs.
4  Q.  Okay.  And that's a treatment decision you've
5      made about that child, isn't it?
6  A.  That is a decision that we make to, hopefully,
7      get him the treatment he needs.
8  Q.  Well, now, wait a minute, Queen.  You don't
9      develop the service plan.  Your sending him to
10     HIT is a treatment decision, isn't it?
11          MR. PERRY:  Objection to the form.
12          Argumentative.
13 Q.  You can go ahead and answer.  Screening and
14     placement is determining, we think he needs
15     HIT; isn't that right?
16 A.  Correct.
17 Q.  And then you're making a decision he needs
18     drug treatment, right?
19 A.  That's correct, if he needed it.
20 Q.  Okay.  But it's not your role to decide what
21     programs he needs, is it?
22          MR. PERRY:  Objection to the form.
23 Q.  It's your role to get him into an appropriate

Page 17

1      facility to have his service plan developed;
2      isn't that right?
3  A.  That's not altogether true.
4  Q.  Okay.  Well, Queen, we've got about forty-five
5      minutes to make it altogether true.  You know,
6      you've been with the department a long time.
7      And you're the one person that knows this.
8           When you -- when screening and
9      placement -- well, let's go about it this
10     way.  HIT is a program, isn't it?
11 A.  True.
12 Q.  Okay.  HIT happens to be a program that is at
13     the Autauga campus, correct?
14 A.  True, that's one of them.
15 Q.  Is Thomasville still operational?
16 A.  Yes.
17 Q.  So HIT are not destinations?  HIT are programs
18     that happen to be at Autauga and Thomasville,
19     correct?
20 A.  Correct.
21 Q.  Okay.  So when J.B. -- it was determined that
22     he was going to go to the HIT program, that
23     was a program treatment decision, wasn't it?

Deposition of Queen Barker   J.B. vs. WOOD                    August 1, 2007

Page 18

1   A.  Based on what the committee felt that the
2       child needed.
3   Q.  Okay.  But, Queen, screening and placement
4       doesn't have the authority, do they -- by
5       policy, have any authority to decide what the
6       needs are for a child's service plan, do they?
7            MR. PERRY:  Objection to the form.
8   Q.  Do they, Queen?
9            MR. CROW:  You can answer.
10  Q.  You can go ahead and answer.
11           MR. PERRY:  I'm sorry.  Yes.
12  A.  Okay.
13  Q.  Y'all don't have that authority, do you?
14  A.  I would say that --
15           MR. PERRY:  He's not asking for --
16           Queen, he's not asking for an
17           opinion.  He's asking you if --
18           he's asking you what is the
19           answer to the question.
20  A.  I couldn't give you that answer without giving
21      my opinion.
22  Q.  Okay.  Well, you're welcome to give your
23      opinion.  My next question is going to be,

Page 19

1       direct me to what authority there is.  So you
2       tell me what authority screening and placement
3       has to make treatment decisions regarding any
4       child.
5            MR. PERRY:  Queen, you're here to
6            answer the questions that you
7            know the answer to.  Tell him
8            what you know.  Answer the
9            questions to the best of your
10           ability if you --
11  A.  I don't know.
12  Q.  Okay.  I would represent to you that Pat in an
13      affidavit has sworn to the court that in May
14      of 2005 that there were beds open at the
15      Montgomery group home.  Okay.  I'm making that
16      representation to you.  Mr. Perry will make it
17      too if you ask him.  He's the one that wrote
18      it.
19           A child that is on -- that has a risk
20      score -- or, I'm sorry, has a score indicating
21      that he needs drug treatment, if he had a risk
22      score that allowed him to go to a group home,
23      he could go to that group home, couldn't he?

Page 20

1            MR. PERRY:  Objection to form.
2            Why don't you represent to
3            her the other material facts?
4   Q.  You can go ahead and answer.
5   A.  It is based on his needs.  And I know what
6       you're going to go back to, but it's --
7   Q.  Well, if his --
8   A.  -- based on his needs.
9   Q.  Well, if his need is drug treatment, because
10      the court said he needs drug treatment, he
11      could go to a group home and get drug
12      treatment, couldn't he?
13           MR. PERRY:  Objection to the form.
14  A.  I couldn't answer that --
15  Q.  Well --
16  A.  -- without my opinion being there.
17  Q.  Okay.  Well, let's go back, Queen.  Kids that
18      go to a group home have all sorts of needs,
19      don't they?
20  A.  That would be assuming, and I don't want to do
21      that.
22  Q.  Well, what kind of kids do you send to group
23      homes?

Page 21

1   A.  These are very low risk kids.  Kids who most
2       likely can function out there in society,
3       because these kids are able to move freely
4       sometimes.
5   Q.  Well, even a kid that waits six weeks in
6       detention could be staffed by y'all to go to a
7       group home, couldn't he?
8            MR. PERRY:  Objection to the form.
9            What kid?
10  Q.  Any kid.  Any kid that's in detention, y'all
11      might staff them to go to a group home,
12      couldn't you?
13           MR. PERRY:  Objection to the form.
14  A.  There are other variables that must be met.
15  Q.  Queen, when you go into the -- when you review
16      the files each week, when do you do that?
17  A.  When do I review the files?
18  Q.  Yes.
19  A.  Sometimes I start reading on Monday, Tuesday,
20      and Wednesday mornings.
21  Q.  Okay.  So the earliest that you would start
22      reviewing for Wednesday afternoon would be
23      Monday sometime?

Deposition of Queen Barker   J.B. vs. WOOD                    August 1, 2007

Page 22

1    A.  Uh-huh (positive response).
2    Q.  Okay.  And how do you -- do the files come to
3        you or do you go to the files?  What do you
4        do?
5    A.  I go and get the files from the screening and
6        placement area.
7    Q.  Okay.  And then as you're reviewing them, do
8        you make notes?
9    A.  Yes.
10   Q.  Where do you -- how do you keep those notes,
11       in a diary or a log or something?
12   A.  Usually, I keep them on paper, but I
13       eliminate -- get rid of the paper after the
14       meeting.
15   Q.  Do you make a note about each child, some sort
16       of note?
17   A.  I do to a great extent.
18   Q.  Okay.  For example, what would you make notes
19       about a child regarding?
20   A.  If the child has been in a system before, what
21       the educational problems appear to be.
22   Q.  What notes do you make about your impression
23       as to an initial placement?

Page 23

1    A.  I look at the court order also.  And many
2        times the PO, or in the court order there will
3        be a suggestion for placement.  I might write
4        it on the file -- on the folder.  I might
5        write it on my paper, but it's only a
6        suggestion.
7    Q.  Okay.  I would represent to you in Pat's
8        deposition he said that generally what
9        happened, y'all would start the meeting, he
10       would pull the file, he would, basically, say
11       what his recommendation is and then there
12       would be some discussion.  If there was some
13       descension, there might be more discussion,
14       and then y'all would come to a consensus; is
15       that accurate?
16   A.  That's accurate.
17   Q.  Okay.  Is it the sense that Pat comes in, he
18       pulls the file, he says, it's so and so, I've
19       got him down as this is the placement, any
20       thoughts?  Is that pretty much how it works?
21   A.  Not really.  We look at the suggestions made
22       by the court, and we discuss it.
23   Q.  What I'm trying to find out is, who makes the

Page 24

1        initial placement comment?  Who says, here is
2        where I think they ought to go?
3    A.  Oh, no, we don't have that kind of thing, not
4        during my -- okay.  We -- we talk about it.
5        And I may say, you know, well, he needs this.
6        And then we'll look at it.  And we may make a
7        decision, but ...
8    Q.  All right.  The decision is made, Queen.  Is
9        that decision communicated to the child?
10   A.  We don't have any kids there.
11   Q.  Well, the kids that are at home or in
12       detention, do y'all communicate what you've
13       decided to the child?
14   A.  I do not.  I can't say what anyone else does.
15   Q.  Do you think a child ought to be notified?
16   A.  I don't know.  I don't know whether they do it
17       or not.  I don't know what the situation is
18       with that.
19   Q.  Okay.  So if a child is going to be waiting in
20       detention for a month, do you think that child
21       ought to be notified that it's anticipated
22       he's going to be waiting there for three or
23       four weeks waiting for a placement?

Page 25

1    A.  I don't know.
2    Q.  Okay.  When you have a child that is sitting
3        in detention and you, through Child Find,
4        determine -- do you use Child Find if you
5        don't know whether or not they're special ed?
6    A.  I do.
7    Q.  Okay.  You find that a child is entitled to
8        special ed.  Do you ensure that they have an
9        interim IEP while they're waiting?
10   A.  While they're waiting in detention?
11   Q.  Yes.
12   A.  No.
13   Q.  When I say make any effort, I'm not
14       criticizing.  Is there any effort made to make
15       sure that that child is being provided his
16       educational entitlements while he's waiting in
17       detention to be placed?
18   A.  Based on the educational procedures, the
19       school in that particular area where the
20       teaching facility is, is responsible for
21       making sure that those kids receive their
22       special education.
23   Q.  Okay.  Is it your belief that that's being

Deposition of Queen Barker   J.B. vs. WOOD                    August 1, 2007

Page 26

1   done?
2   A. I don't want to speculate that it's not being
3      done. I hope so.
4   Q. Queen, are you familiar with the
5      classification manual? Are you familiar with
6      the classification manual?
7   A. Explain what you are talking about when you
8      say classification manual.
9   Q. All right. Do you know whether or not
10     screening and placement utilizes a
11     classification manual?
12  A. Can you explain that more, because what I may
13     be thinking may not be what you're thinking.
14  Q. Well, tell me what you're thinking.
15  A. We have categories such as serious juvenile
16     offenders. Is that what you're talking
17     about?
18  Q. Does screening and placement categorize
19     children?
20  A. Based --
21  Q. Does screening and placement either
22     classify --
23  A. No.

Page 27

1   Q. -- or categorize children?
2   A. We don't categorize. We -- we're given
3      classifications based on what comes in the
4      files.
5   Q. What are the classifications that -- what are
6      all the different classifications y'all could
7      be given?
8   A. A child may be a serious juvenile offender.
9   Q. Okay.
10  A. The child may be -- it's based on what they
11     have done.
12  Q. Based on what?
13  A. What they have done, you know.
14  Q. Well, what are the different classifications
15     that you would review on a weekly basis?
16  A. Drug offenders.
17  Q. So drug offenders is a classification or a
18     category?
19  A. A category, I guess.
20  Q. Okay. I think you had said there were some
21     classifications based on what you get in.
22     What are the other classifications besides
23     SJO?

Page 28

1   A. I would like for you to -- if you don't mind,
2      to explain what you mean by classification.
3      And to the best of my ability, I will answer.
4   Q. Sure. Queen, I'm just asking you -- you said
5      that the -- there's classifications based on
6      what comes in. I don't know. That's why I'm
7      asking you. What classifications are there
8      that you would review weekly? How do y'all
9      classify kids?
10  A. I wouldn't say we classify them. I'm looking
11     at needs, what may be best for the child.
12  Q. So in looking at needs, what may be best for
13     the child, that's before the service plan is
14     developed, correct?
15  A. Correct.
16  Q. And you're making a placement decision based
17     on your perceived needs of the child before
18     the service plan is developed?
19  A. We're making decisions on what would be the
20     best facility that may service based on the
21     child's needs, what is recommended or the
22     crime he committed.
23  Q. And then a child then goes to that facility,

Page 29

1      because that facility can meet the child's
2      needs, as you perceive them to be?
3   A. Correct.
4   Q. Okay. And then what happens -- what is a
5      fifty-two on the drug and alcohol score?
6   A. I don't know. I don't know.
7   Q. Would a fifty-two be a high score or a low
8      score or --
9   A. I don't know.
10  Q. Queen, as I look through the list of private
11     providers, to me they fall generally into
12     secure programs, somewhat secure programs, and
13     non-secure programs; would that be right?
14  A. Correct.
15  Q. And so take, for example -- other than drug
16     treatment, there's some programs that DYS has
17     private providers that are known as drug
18     treatment programs, right?
19  A. They are known to be able to service students
20     who may have -- or have a need for drug
21     treatment.
22  Q. Well, for example, The Bridge is a drug
23     treatment program?

Deposition of Queen Barker   J.B. vs. WOOD                    August 1, 2007

Page 30

1   A.  The Bridge is known to have a component to
2       service a child who needs drug treatment.
3   Q.  What about Steps?  What is it?
4   A.  Steps is known to have a component also that
5       service kids with drug problems.
6   Q.  Queen, other than drug treatment and sex
7       offender treatment, other than those two
8       categories, what's the difference in all of
9       the other facilities?
10  A.  Okay.  The difference is, we look at the
11      educational.
12  Q.  Let me stop you there.  Regardless of any
13      facility that a child is placed at, their
14      education is going to be provided, right?
15  A.  Right.
16  Q.  So it should make no difference in a placement
17      decision about the educational needs, should
18      it?
19  A.  Correct.
20  Q.  Okay.  So then we've wiped out education.
21      Other than sex offender and drug treatment,
22      tell me what's the difference in all of these
23      other facilities where children can be placed?

Page 31

1   A.  We have group homes that when a -- will enable
2       kids to -- you know, who may have a GED or who
3       is a low risk kid can go to to get a job, go
4       to college.
5   Q.  But the kid that goes to a group home could
6       just as well go to a Wilderness program,
7       couldn't he?
8   A.  Repeat that again.
9   Q.  A kid that goes to a group home could just as
10      well go to a Wilderness program, couldn't he?
11  A.  I wouldn't suggest that.
12  Q.  Well, tell me what criteria that you review
13      that says a person can go to a group home but
14      can't go to a Wilderness program.
15  A.  I would look at their risk score and the crime
16      in which they committed to come in, and the
17      length of time and what they really need.
18  Q.  Well --
19  A.  Yes.
20  Q.  But, Queen, screening and placement is there
21      not to make treatment decisions, are they?
22  A.  Again, I say they do not.
23  Q.  So a child -- I'm sorry.  Did you finish?

Page 32

1   A.  But we make decisions on facilities that may
2       be able to treat the child.
3   Q.  Right.  And it's the decision that screening
4       and placement makes, their decision as to
5       which facility they're going to put a child,
6       whether or not they're going to end up on a
7       waiting list if that particular --
8           MR. PERRY:  Objection to the form.
9   Q.  -- if that particular facility doesn't have a
10      bed; is that true?
11  A.  I hate to tell you this, but you need to
12      repeat that again.
13  Q.  I'll be glad to.  Your decision, screening and
14      placement, to place a child in any particular
15      facility is what determines whether they're
16      going to have to wait or not to get into that
17      program, aren't they?
18          MR. PERRY:  Objection to the form.
19  A.  Sometimes.
20  Q.  And so if you decide program X is where we're
21      going to put him, but program Y -- if a
22      decision had been made to put him in program Y
23      and there's no waiting list, he could go right

Page 33

1       away, couldn't he?
2   A.  We decide program X is where he's going.  I'm
3       trying to see if I understand you, okay?
4   Q.  Sure.
5   A.  But program Y does not have -- has a bed?
6   Q.  Yes.
7   A.  Program X does not have a bed, but this is our
8       decision.
9   Q.  Yes.
10  A.  So your question is about X and Y?
11  Q.  He could go to the program that has an open
12      bed, couldn't he?
13          MR. PERRY:  Objection to the form.
14  Q.  He could go to the facility that has the open
15      bed, couldn't he?
16          If he met the risk score -- if the risk
17      score didn't keep him out of that facility, he
18      could go to that facility, couldn't he?
19  A.  There are variables that are being left out
20      here.
21  Q.  Listen to my question.  Mr. Perry can ask you
22      whatever questions he wants when we're done.
23          If you staffed him to program X, but

Deposition of Queen Barker   J.B. vs. WOOD                    August 1, 2007

Page 34

1  there is a bed open in program Y, and his risk
2  score says he could go to program Y, he could
3  go to program Y, couldn't he?
4          MR. PERRY: Queen, if the answer to
5          your question -- don't worry
6          about whether I'm going to ask
7          you any questions.  If you know
8          the answer, answer it.  If there
9          are things that are being left
10         out, tell him there's things
11         being left out.  But don't let
12         him force you to answer a
13         question when things are being
14         left out.
15 A.  He's right.  There are things that are being
16     left out.
17 Q.  All right.  If you recognize screening and
18     placement doesn't make treatment decisions
19     other than the risk score and gender, tell me
20     what's being left out.
21 A.  We're looking at -- believe it or not, we're
22     looking at age.  We're looking at education.
23 Q.  All right.  Stop.  Let's take --

Page 35

1  A.  We're looking at --
2  Q.  Let's take them one at a time.  Let's take
3      them one at a time.  You said the first one is
4      age.  It would be another variable, right?
5  A.  Uh-huh (positive response.)
6  Q.  Okay.  The second one you said is education?
7  A.  Uh-huh (positive response.)
8  Q.  Right?  Which you testified a minute ago
9      doesn't matter, because wherever they're going
10     to be, they're going to get what they're
11     entitled to, right?
12 A.  Hopefully.
13 Q.  Okay.  So we have age.  Education is gone.
14     What else?
15 A.  The risk.
16 Q.  Well, we already said risk is the first one.
17 A.  We're looking at how many times the student
18     has been -- which creates -- helps to create
19     that risk score.
20 Q.  Well, that's the same as risk, isn't it?
21 A.  Yeah.  But you're looking at their behavior.
22 Q.  Well, that's all reflected in the risk score,
23     isn't it?

Page 36

1  A.  Not everything is reflected in the risk,
2      but -- the behavior.  When I read a record, I
3      look at behavior.  And I might recognize
4      something.
5  Q.  Queen, the risk score takes into account all
6      of those considerations related to behavior
7      and past offenses, doesn't it?
8  A.  Did you want me to read it all?
9  Q.  No.  I'm just asking you about the risk
10     assessment, Queen, whether or not that entails
11     all of the things you're -- so what else is
12     there besides age and risk?
13 A.  But, now, I'm sure you know, like I know, you
14     just cannot look at a number and determine,
15     even though that's there, what a child needs
16     just based on a number.  Two kids may have the
17     same number, but they're unique in their own
18     way.  It's not the same.
19 Q.  Queen, your background is education, right?
20 A.  Yes.
21 Q.  Okay.  So when it comes to treatment needs
22     other than education, not that you're not
23     qualified -- but you're not qualified to make

Page 37

1      those determinations, are you?
2  A.  No.
3  Q.  Okay.  And you agree with that, don't you?
4  A.  Yes.
5  Q.  Now, when it comes to education at DYS, you
6      are the education guru.  I'll even tell John
7      Stewart I said that.
8          But when it comes to treatment needs of
9      children other than education, that's outside
10     your field of expertise, isn't it?
11 A.  Yes.
12 Q.  Okay.  You've worked with Garry for six years
13     now, right?
14 A.  Garry?  Garry Gregg?
15 Q.  Yes.
16 A.  Maybe.  I don't know.  I don't keep up with
17     years.
18 Q.  Who else is on screening and placement with
19     you?
20 A.  With me now?
21 Q.  Yes.
22 A.  Garry, Jada, Mr. Pendergast, myself.
23 Q.  All right.  You would agree with me that Jada

Deposition of Queen Barker     J.B. vs. WOOD                    August 1, 2007

Page 38

1  doesn't have the expertise to make treatment
2  decisions regarding children?
3  A.  I can't say that.  I don't know.
4  Q.  Do you think Jada has the educational or
5  experience to make treatment needs regarding
6  children?
7           MR. PERRY:  You just asked her and
8       she just answered.
9  Q.  You can go ahead and answer.
10          MR. PERRY:  You didn't like her
11      answer.  You want to make her
12      change it?
13 A.  I honestly do not know.
14 Q.  Okay.  Do you know what Garry's background is?
15 A.  I know he works with community service.
16 Q.  Okay.  Queen, with all due respect, other than
17     your education, tell me who on that committee
18     is qualified to make placement decisions
19     regarding that child based on anything other
20     than age, gender, and risk?
21 A.  Me?  Ask that question, please, again.  I
22     don't want to give you the wrong answer.
23 Q.  There's not a right or wrong answer.

Page 39

1           MR. DRUMMOND:  Julie, can you read
2       it back.
3           COURT REPORTER:  Question:  Queen,
4       with all due respect, other than
5       your education, tell me who on
6       that committee is qualified to
7       make placement decisions
8       regarding that child based on
9       anything other than age, gender,
10      and risk?
11 A.  I think the others are.  I can assume that
12     they are.
13 Q.  I'm sorry.  I didn't understand.
14 A.  I do the education and I help make decisions
15     about the kids and where they are going.  So I
16     guess you're saying I'm not qualified to do
17     that.
18 Q.  That's not what I said.  I said other than the
19     education component, who is qualified to make
20     those decisions on that committee?
21 A.  Mr. Pendergast and Jada and Garry, if you
22     eliminate education, which is mainly, you
23     know, what I'm looking at.  And I do look at

Page 40

1  other things.
2  Q.  Sure.  Why do y'all only meet once a week?
3  A.  We meet once a week.
4  Q.  Why do you only meet once a week?
5  A.  Why?
6  Q.  Yes.
7  A.  We usually get the folders -- I mean, we get
8     children's records sent in starting on Friday
9     afternoon up through Wednesday.
10 Q.  Well, Queen, if all the records are in on
11     Wednesday or Thursday, everything is there,
12     why should a child, particularly a child in
13     detention, have to wait a whole week before
14     y'all make a recommendation regarding that?
15 A.  I didn't say they were in on Thursday.  We
16     meet on kids whose records tend to start
17     coming in maybe that Friday or maybe that
18     Monday.  And it's not all the time that it
19     happens like that, so ...
20 Q.  Queen, are you aware that every day completed
21     packets are sent to DYS?
22 A.  We may get packages.
23 Q.  Okay.  And my question to you is, why should a

Page 41

1  child, particularly in detention, have to wait
2  an entire week before a committee meets to
3  make a recommendation about where he'll be
4  placed?
5  A.  We may be waiting on something that's not in
6     the records --
7  Q.  No, ma'am.
8  A.  -- when it's sent to us.
9  Q.  My question is, the entire packet is complete,
10     everything is there, why should a child have
11     to wait up to a week to get staffed?
12 A.  I'm not saying that he's waiting, he or she is
13     waiting a week.  Because we're talking about
14     maybe three days after we meet.
15 Q.  Are you saying that because you believe that
16     the packets are put together on Friday and
17     then y'all can begin looking at them on
18     Monday?
19 A.  No.  I'm saying that packages are put together
20     when they come in.  And once they are put
21     together -- they may come in on Monday,
22     Tuesday, Wednesday prior to our meeting.  We
23     get those packages, and we read them.  I read

Deposition of Queen Barker   J.B. vs. WOOD                    August 1, 2007

Page 42

1     this morning before I had to come here.
2   Q.  Queen, do you understand DYS receives
3     completed packages every day of the week?  Do
4     you understand that?
5   A.  I'm sure they probably do.
6   Q.  Okay.
7   A.  Yes.
8   Q.  And my question is to you, why should a child
9     have to wait up to a week before y'all review
10    that child and make a decision about where
11    he'll be placed?
12  A.  I don't know.  I don't know.
13  Q.  Queen, if a --
14          MR. DRUMMOND:  What's the time?
15          MR. PERRY:  About ten minutes.
16  Q.  Queen, do you agree with me and do you
17    understand it's DYS policy that if a child has
18    a need, whatever facility he's at, DYS is to
19    secure that service for him to meet that need?
20  A.  Yes.
21  Q.  Do you know that to be DYS policy?
22  A.  In good faith they try.
23  Q.  And so you're familiar with electronic

Page 43

1     monitoring?
2   A.  I've heard about it.
3   Q.  You're aware that a child who has been
4     committed to DYS could be placed on electronic
5     monitoring by DYS, aren't you?
6   A.  I don't know.
7   Q.  All right.  Well, have you ever considered
8     during your time on screening and placement of
9     placing a child on electronic monitoring while
10    they're waiting for their placement?
11  A.  No.
12  Q.  A child could have their service plan
13    developed in detention, couldn't they?
14  A.  You said I'm not qualified to do that.
15  Q.  No, I didn't say you do it.  I just said
16    screening and placement could -- DYS could
17    develop service plans for kids in detention
18    while they're waiting, couldn't they?
19  A.  I can't say that.  I'm not on a service
20    plan -- you know, people who develop the
21    service plans.
22  Q.  Well, we've already established that you make
23    recommendations to send kids to the HIT

Page 44

1     program, correct?  Right?
2   A.  Right.
3   Q.  And that's a treatment decision as we've
4     talked about, right?
5   A.  We make decisions, screening and placement.
6     We don't make -- you said earlier, and I
7     agreed, we don't do treatment plans.  We make
8     decisions as to what facility may be able to
9     be the best place for the treatment.
10  Q.  Well, Queen, since you, other than Pat, have
11    the most seniority on that committee, how many
12    times have you sent a child on -- placed him
13    at home under home supervision and gone ahead
14    and done their evaluation and developed their
15    service plan while they're waiting to come in?
16  A.  It's hard.  I can't determine numbers, how
17    many times.  I know that there were kids who
18    were evaluated while they were at home.
19  Q.  Okay.  But kids that are in detention, DYS can
20    place those kids at home, can't they?
21  A.  I don't know.
22  Q.  Okay.  Have you ever contemplated having a kid
23    in detention -- making a recommendation that

Page 45

1     he be placed at home or placed on electronic
2     monitoring?
3   A.  No.
4   Q.  Okay.  So, Queen, in reality, what y'all do is
5     you take your list of facilities that exist
6     within the system, correct?  You take that
7     list and you decide where that child should be
8     placed initially?
9   A.  With other variables in mind, court decisions,
10    PO recommendations, what's needed in
11    treatment.  I like to feel that what we're
12    doing makes a difference in the child's life.
13  Q.  Do you think it makes a difference in a
14    child's life to be sitting in detention for a
15    month to go to a twenty-eight day program?
16  A.  I can't make a decision about that.  That's
17    out of my control.
18  Q.  Queen, how many times have you recommended
19    during your six years that a child be placed
20    on electronic monitoring and sent home from
21    detention pending placement?
22  A.  Never.
23  Q.  How many times have you recommended that the

Deposition of Queen Barker   J.B. vs. WOOD                August 1, 2007

|  |  |
|---|---|
| Page 46 | Page 48 |

**Page 46**

1     child be placed back at home under some rules
2     established by the department and that he come
3     to one of the campuses and participate in
4     various programs?
5  A.  Never.
6  Q.  How many times have you or screening and
7     placement recommended that a child be at home
8     and participate in the CAPS program at the
9     Mt. Meigs campus?
10 A.  I have never.
11 Q.  Okay. How many times have you, as part of
12     screening and placement, ever even
13     contemplated those options?
14 A.  Never.
15       MR. DRUMMOND: Mr. Perry may have
16       some questions for you. If not,
17       we're done.
18       MR. PERRY: No.
19       MR. DRUMMOND: Thank you, ma'am.
20       It's nice seeing you again.
21       THE WITNESS: Good seeing you too.
22       (The deposition concluded at
23       approximately 2:30 p.m.)

**Page 48**

1   Defendant.
2   CASE NO: 02:06cv755-MHT
3   * * * * * * * * *
4   J.B., a minor child, by and through
5   his next friend, ADDIE WARD, on
6   behalf of himself and all others
7   similarly situated,
8   Plaintiff,
9   vs.
10 WALTER WOOD, in his individual
11 capacity,
12 Defendant.
13 CASE NO: 02:06cv908-MHT,
14 In the United States District Court
15 for the Middle District of Alabama
16     Northern Division,
17 on Wednesday, August 1, 2007.
18     The foregoing 48 computer-printed pages
19 contain a true and correct transcript of the
20 examination of said witness by counsel for the parties
21 set out herein. The reading and signing of same is
22 hereby waived.
23     I further certify that I am neither of kin

|  |  |
|---|---|
| Page 47 | Page 49 |

**Page 47**

1      * * * * * * * * * * * * *
2      FURTHER DEPONENT SAITH NOT
3      * * * * * * * * * * * * *
4
5      REPORTER'S CERTIFICATE
6 STATE OF ALABAMA:
7 BUTLER COUNTY:
8
9     I, Julie A. Duncan, Court Reporter and
10 Commissioner for the State of Alabama at Large, do
11 hereby certify that I reported the deposition of:
12       QUEEN BARKER
13 who was first duly sworn by me to speak the truth,
14 the whole truth and nothing but the truth, in the
15 matter of:
16       J.B., a minor child, by and through
17       his next friend, ADDIE WARD, on
18       behalf of himself and all others
19       similarly situated,
20       Plaintiff,
21       vs.
22       WALTER WOOD, in his individual
23       capacity,

**Page 49**

1   nor of counsel to the parties to said cause
2   nor in any manner interested in the results
3   thereof.
4     This 9th day of August, 2007.
5
6
7      _____
8      Julie A. Duncan,
        Court Reporter and
        Commissioner for the State
9      of Alabama at Large
10