RECEIVED
2007 NOV 16 P 4:13

**IN THE DISTRICT COURT OF THE UNITED STATES FOR THE MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION**

| | | |
|---|---|---|
| **J.B., a minor child, by and through his next friend, ADDIE WARD, on behalf of himself and all other similarly situated;** | ) | |
| **Plaintiff,** | ) | **Case No: 2:06-CV-755-MHT** |
| **vs.** | ) | |
| **WALTER WOOD, in his individual capacity,** | ) | |
| **Defendant.** | ) | |

| | | |
|---|---|---|
| **J.B., a minor child, by and through his next friend, ADDIE WARD, on behalf of himself and all other similarly situated;** | ) | |
| **Plaintiff,** | ) | **Case No: 2:06-CV-908-MHT** |
| **vs.** | ) | |
| **WALTER WOOD, in his individual capacity,** | ) | |
| **Defendant.** | ) | |

**MOTION TO SUPPLEMENT THE RECORD**

Comes now the Defendant J. Walter Wood, Jr., and moves for leave to amend the record with the submission

of the attached affidavit of Hon. Danielle Lipow, with attachments (Exhibit 1).

Respectfully submitted

T. Dudley Perry, Jr.
Bar Number: 3985-R67T
General Counsel
Alabama Dept of Youth Services
Post Office Box 66
Mt. Meigs, AL 36057
Telephone: (334) 215-3803
Fax: (334) 215-3872
E-Mail:
dudley.perry@dys.alabama.gov

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the above and forgoing via United States mail, properly addressed to the following:

Michael J. Crow, Esq.
Beasley, Allen
Post Office Box 4160
Montgomery, AL 36103-4160

Robert D. Drummond, Jr., Esq
Attorney At Law
323 De La Mare Avenue
Fairhope, AL 36532

Dated this the 16th day of November, 2007.

T. Dudley Perry, Jr.
General Counsel
Alabama Department of
Youth Services
Deputy Attorney General
Alabama Department of
Youth Services

**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE MIDDLE DISTRICT OF ALABAMA,**
**NORTHERN DIVISION**

J.B., a minor child, by and through his next friend, ADDIE WARD;

Plaintiff,

vs.

WALTER WOOD, in his individual capacity,

Defendant.

Case No: 2:06-CV-755-MHT

J.B., a minor child, by and through his next friend, ADDIE WARD;

Plaintiff,

vs.

WALTER WOOD, in his individual capacity,

Defendant.

Case No: 2:06-CV-908-MHT

STATE OF ALABAMA

COUNTY OF BALDWIN

AFFIDAVIT

BEFORE ME, the undersigned authority, a Notary Public in and for said County and State, personally appeared Hon. Danielle Lipow, who being known to me and being by me first duly sworn, deposes and says as follows:

1. I am over the age of twenty one (21).

EXHIBIT
tabbies
1

2. I have been a member of the Alabama Bar since 2002. I am currently employed by the Southern Poverty Law Center, where I have worked as an attorney since 2001. My practice has been concentrated in juvenile justice since 2002, and I have served as Co-Director of the Southern Juvenile Defender Center (SJDC) since 2005. As SJDC's Co-Director, I also serve on the National Advisory Board for the National Juvenile Defender Center. I have been actively and substantively engaged in comprehensive system reform campaigns in Louisiana in cooperation with the Juvenile Justice Project of Louisiana, in Mississippi in cooperation with the Mississippi Youth Justice Project, and in Alabama as the coordinator of the Alabama Youth Justice Coalition.[1] I have also consulted on and assisted with similar reform efforts in other states. All of my juvenile justice work shares three common goals: to reduce juvenile incarceration, to expand access to community-based services for troubled youth and families, and to improve the quality of legal representation for court-involved children.

3. At present, I am heavily involved in a number of interrelated juvenile justice reform efforts in Alabama. I am a member of the Statewide Steering Committee for the Juvenile Detention Alternatives Initiative (JDAI), the Juvenile Code Revision Legislative Subcommittee, the Juvenile Probation Officer Education Planning Committee, the Justice and Mental Health Interagency Taskforce, the CITY Long Range Planning Committee, and the Board of Directors of the Children First Foundation.

4. Most relevant to this affidavit is my work as a member of the RFP (Request for Proposals) Planning Committee at the Alabama Department of Youth Services (DYS). As noted

[1] The Alabama Youth Justice Coalition is a collaborative venture of family members and advocacy groups dedicated to reducing juvenile crime, ensuring that taxpayer money is spent wisely, empowering families and communities, and providing youth with the tools and opportunities they need to become and remain healthy, responsible, productive adults.

in an affidavit executed by Defendant Walter Wood in support of his motion for summary judgment, "[o]ne major function of the RFP committee is to attempt to anticipate, for the coming three year period, the placement needs of juveniles expected to be committed to state custody." 5/29/07 Def.'s Motion for Summ. J (Doc. 30), Ex. 3 (Wood Aff.) at 3. The RFP Committee has just begun the planning process for the upcoming three-year cycle. The first meeting of this cycle took place on October 30, 2007. The next meeting will take place on November 20, 2007.

5. Because a large majority of the children admitted to DYS every year are patently inappropriate for out-of-home placements, *see infra* at ¶¶ 9-11, several members of the RFP Planning Committee (including myself) believe that DYS should substantially reduce its residential capacity and redirect resources to more effective and less expensive interventions. Currently only 8% of children admitted to DYS have been committed for a violent felony. *See* Ex. 1: Annie E. Casey Foundation, Casey Strategic Consulting Group, *Reducing Reliance on Juvenile Incarceration in Alabama: Discussion document for meeting with the Youth Services Board* at 4 (Sept. 28, 2007).

6. The low-risk children who fill DYS residential placements could be served much more effectively – and for far less money – in the community via home-based services. Accordingly, I anticipate that the reduction in residential capacity within DYS will occur in conjunction with a variety of other reforms, all designed to redirect resources from expensive and unnecessary residential facilities to individualized, home-based, family-focused interventions proven to rehabilitate troubled children, hold them accountable for their actions, help them lead productive and law-abiding lives, and strengthen families in crisis.

7. I have reviewed the pleadings and record in the above-referenced case. I am familiar with the facts and the legal issues. I understand that the Plaintiff has raised two distinct claims

against Walter Wood, the Executive Director of DYS, who has been sued in his individual capacity. First, Plaintiff claims that the Defendant violated his federal constitutional rights by failing to incarcerate him in a DYS facility within forty-one days of his commitment order on May 18, 2005, and failing to incarcerate him in a DYS facility within thirty-five days of his commitment order on April 4, 2006. Second, Plaintiff claims that the Defendant violated state law by failing to incarcerate him in a DYS facility within seven days of the commitment order.[2]

8. I am submitting this affidavit to provide evidence relevant to four material issues:

a. A large majority of children confined in detention centers and DYS facilities in Alabama are non-violent and pose no threat to public safety.

b. A growing body of research and scholarship has demonstrated that the experience of institutionalization is damaging to children and may actually increase the likelihood that a child will break the law.

c. Previous litigation against DYS on this issue has driven significant expansions in residential capacity at DYS. As a result of those expansions, Alabama now has one of the most institutionally-biased systems in the country. A finding of liability in this case is likely to create incentives to further expand capacity, draining public resources that could otherwise be invested in non-residential interventions that are proven to reduce crime and help children and families succeed.

d. In partnership with Governor Bob Riley and the Annie E. Casey Foundation, the Defendant is presently engaged in a comprehensive systems reform effort aimed at reducing juvenile incarceration statewide. That reform effort began in 2005.

**Alabama Has an Exceptionally High Commitment Rate and a High Percentage of Low-Risk Children in Custody**

9. Relative to other states, Alabama incarcerates a much higher percentage of its youth. Overall, Alabama's commitment rate (number of juveniles committed to residential juvenile

---

[2] This Court has also suggested that this second claim may have constitutional implications. *See* 5/20/07 Mem. Opinion & Order Denying Pl.'s Motion for Class Cert. at 13-14 (Doc. 31) (noting that the Plaintiff "might wish to pursue the legal theory that, regardless of individual circumstances, DYS's failure to place a juvenile within seven days of a commitment order is per se unconstitutional," but declining to recognize predominance for Rule 23 purposes "under such a dubious legal theory").

justice placements for every 100,000 juveniles aged 10 to 17 in the general population) was 22% higher than the national average. In Alabama, 267 youth are committed for every 100,000 in population; the national figure is only 219. In 2003, Alabama's commitment rate was the fourth highest in the nation. *See* Ex. 2: Howard N. Snyder & Melissa Sickmund, National Center for Juvenile Justice, *Juvenile Offenders and Victims: 2006 National Report* at 201.

*10.* Alabama's exceptionally high commitment rate is **not** attributable to an exceptionally high juvenile crime rate. More than 70% of children admitted to DYS institutions in Alabama are non-violent. *See* Ex. 3: FY 2007 Demographics (showing 77% admitted for non-violent offenses); Ex. 4: FY 2006 Demographics (showing 79% admitted for non-violent offenses). In 2003 (the most recent year for which national data is available), an astonishing 40% children in DYS institutions in Alabama were in custody as a result of a status offense (e.g., being truant, ungovernable, etc.) or a technical violation (e.g., a probation violation). Nationally, only 20% of youth confined in juvenile justice facilities were held for status offenses and technical violations. *See* Ex. 1: *Juvenile Offenders and Victims: 2006 National Report* at 203. Alabama's high commitment rate is driven largely by the tendency of juvenile courts in many of the state's sixty-seven counties to commit children to DYS for probation violations. In fact, youth referred to court for probation violations are even more likely to be committed to DYS than youth referred for felony offenses. *See* Ex. 2: CSCG, *Reducing Juvenile Incarceration in Alabama* at 7.

11. The purpose of DYS is to protect public safety by rehabilitating dangerous youth. But there is no correlation between the number of children admitted to DYS custody and the number of children arrested for violent crimes. Thirteen years ago, the ratio of DYS admissions to juveniles arrested for violent crimes was nearly one-to-one. In 1994, there were 1,448 juvenile arrests for violent offenses and 1,747 admissions to DYS. When juvenile crime dropped in 1995,

the DYS admission rate declined accordingly: there were 1,232 juveniles arrested for violent offenses, and 1,385 admissions to DYS custody. *See* Ex. 5: DYS Admissions v. Violent Juvenile Arrests (1994-2006) (compiling statistics from the Alabama Criminal Justice Information Center and DYS); *see also* Ex. 2: CSCG, *Reducing Juvenile Incarceration in Alabama* at 7. But since 1995, DYS admissions (and DYS capacity) have risen steadily, despite a continuing decline in juvenile arrests for violent offenses. By 2005, the ratio of DYS admissions to juveniles arrested for violent offenses had risen from 1.1 to 4.6.

**Incarceration is Harmful to Children and Communities**

12. Research has demonstrated that the experience of institutionalization is damaging to children and may actually increase the likelihood that a child will break the law. The following excerpts are illustrative of current scholarship on this issue:

There is . . . a growing body of evidence that exposure of youth to secure

> correctional confinement is detrimental and increases rather than decreases their likelihood of further penetrating the justice system.
>
> Secure correctional confinement of youth is not only the most expensive dispositional option available in most jurisdictions, it is also widely recognized as possessing the greatest number of potentially damaging consequences for young people. . . . Secure correctional confinement of youth is increasingly viewed as a disposition of last resort, for use only when all other less secure options have been exhausted. Research conducted over the past 20 years has established that youth exposed to secure custody exhibit higher rates of recidivism than those in less restrictive settings; they are more likely to experience deterioration in their mental health and an increased propensity toward suicidal behavior; they are less likely to further or complete their education, and their prospects for gainful employment are significantly reduced.

Ex. 6: Tim Roche & Kelly Dedel, *Conditions of Confinement at the Arkansas Juvenile Assessment and Treatment Center* at 10 (2007).

> A recent literature review of youth corrections shows that detention has a profoundly negative impact on young people's mental and physical well-being, their education, and their employment. One psychologist found that for one-third of incarcerated youth diagnosed with depression, the onset of the depression occurred after they began their incarceration, and another suggests that poor mental health, and the conditions of confinement together conspire to make it more likely that incarcerated teens will engage in suicide and self-harm. Economists have shown that the process of incarcerating youth will reduce their future earnings and their ability to remain in the workforce, and could change formerly detained youth into less stable employees. Educational researchers have found that upwards of 40 percent of incarcerated youth have a learning disability, and they will face significant challenges returning to school after they leave detention. Most importantly, for a variety of reasons to be explored, there is credible and significant research that suggests that the experience of detention may make it more likely that youth will continue to engage in delinquent behavior, and that the detention experience may increase the odds that youth will recidivate, further compromising public safety.

Ex. 7: Barry Holman & Jason Ziedenberg, Justice Policy Institute, *The Dangers of Detention: The Impact of Incarcerating Youth in Detention and Other Secure Facilities* at 2-3 (2006) (footnotes omitted).

> Behavioral scientists are finding that bringing youth together for treatment or services may make it more likely that they will become engaged in delinquent behavior. Nowhere are deviant youth brought together in greater numbers and

> density than in detention centers, training schools, and other confined congregate "care" institutions.
>
> Researchers at the Oregon Social Learning Center found that congregating youth together for treatment in a group setting causes them to have a higher recidivism rate and poorer outcomes than youth who are not grouped together for treatment. The researchers call this process "peer deviancy training," and reported statistically significant higher levels of substance abuse, school difficulties, delinquency, violence, and adjustment difficulties in adulthood for those youth treated in a peer group setting. The researchers found that "unintended consequences of grouping children at-risk for externalizing disorders may include negative changes in attitudes toward antisocial behavior, affiliation with antisocial peers, and identification with deviancy."

*Id.* at 5; *see also* Ex. 8: Richard A. Mendel, American Youth Policy Forum, *Less Cost, More Safety: Guiding Lights for Reform in Juvenile Justice* at 8-9 (2001) ("[L]arge training schools have never proved effective in rehabilitating youthful offenders or steering them from crime. Recidivism from large training schools is uniformly high. . . . [V]irtually every study examining recidivism among youth sentenced to juvenile training schools in the past three decades has found that at least 50 to 70 percent of offenders are arrested within one or two years after release.").

13. Incarceration is particularly harmful and counterproductive for low-risk children. *See, e.g.*, Ex. 9: National Institutes of Health, *State-of-the-Science Conference Statement: Preventing Violence and Related Health-Risking Social Behaviors in Adolescents*, 34 J. Abnormal Child Psychology at 461 (2006) (noting that the incarceration of juvenile offenders raises "the hazard of 'contagion'" because "[w]hen young people with delinquent proclivities are brought together, the more sophisticated can instruct the more naïve in precisely the behaviors that the intervener wishes to prevent").

14. Given this ever-expanding universe of evidence about the individual and societal harms of institutionalization, it makes no sense to frame the constitutional right to rehabilitative

treatment as including a per se right to be incarcerated in a state facility (i.e., a DYS institution) rather than a county facility (i.e., a juvenile detention center).

**Pressures created by litigation over the waitlist have contributed to the steady expansion of residential capacity within DYS.**

15. In my opinion, litigation similar to the present case has played a significant role in driving the expansion of residential capacity within DYS. Although there has been a substantial decline in juvenile arrests for violent offenses since 1994, DYS admissions have risen dramatically. *See* Ex. 5. It is not a coincidence that DYS saw spikes in their admissions numbers in the wake of *A.W. v. Dupree* (1993-1996) and *S.S. v. Wood* (2001). *See* Ex. 10: Children First Trust Fund, 2003 Annual Report at 15 (listing "to provide adequate bed space in order to comply with the *S.S. v. Wood* Consent Decree" as a long-term goal); Ex. 11: Children First Trust Fund, 2004 Annual Report at 42 (noting that DYS "[s]upported compliance with the *S.S. v. Wood* Consent Decree through the purchase of 309 bed spaces for committed youth"). Both *A.W.* and *S.S.* fueled expansions that were quickly consumed not only by children who had previously awaited placement in detention – but also by children who clearly would not otherwise have been committed to DYS.



16. As a result of these expansions, the juvenile justice system in Alabama today is one of the most institutionally-biased systems in the country. *See* Ex. 1 at 203 (showing that Alabama has the fourth highest commitment rate in the nation). In 2006, there were 512,625 children aged 10-17 in Alabama[3] and 1,461 juvenile justice beds. *See* Ex. 12: List of institutions in the DYS System (showing 1,195 state-funded beds in 33 DYS institutions); Ex. 13: List of county-operated CAMP programs subsidized by DYS (showing an additional 266 beds in 8 state-subsidized boot camps operated at the county level). In other words, Alabama's juvenile justice system has sufficient capacity to incarcerate 1 out of every 351 youth in the at-risk population (10- to 17-year-olds). By contrast, the State of Mississippi had 345,660 children aged 10-17 in 2006. As of last week, no more than 278 children were confined in juvenile justice facilities (*see*

[3] *See* Puzzanchera, C., Finnegan, T. & Kang, W., *Easy Access to Juvenile Populations*, online resource derived from data originally collected by the U.S. Census Bureau and subsequently modified by the National Center for Health Statistics, available at http://www.ojjdp.ncjrs.gov/ojstatbb/ezapop/.

Ex. 14: Decl. of S. Bedi) – i.e., 1 out of every **1,243** youth in the at-risk population.

**Current Reform Efforts**

17. There is no question that juvenile justice reform is badly needed in Alabama. Recognizing that obvious fact, Governor Bob Riley reached out to the nation's foremost experts in child-care systems, the Annie E. Casey Foundation, to ask for technical assistance with reform. As a result of the Governor's request – which was echoed by the Defendant, the Chief Justice of the Alabama Supreme Court, and numerous juvenile court judges – Casey is presently engaged in a comprehensive juvenile justice reform effort in the State of Alabama.

18. The Casey Foundation is the only foundation in the country that is exclusively dedicated to improving outcomes for disadvantaged youth across the United States. Casey has particular expertise in child welfare and juvenile justice. The foundation's "juvenile justice reform agenda is designed to improve the odds that delinquent youth can make successful transitions to adulthood, primarily by reforming juvenile justice system so that they lock up fewer youth, rely more on proven, family-focused interventions, and create opportunities for positive youth development."[4]

19. The State of Alabama's efforts to attract the Casey Foundation to invest in juvenile justice reform in Alabama began in 2005, when Governor Riley first wrote to the Casey Strategic Consulting Group to solicit their assistance:

> We would be very grateful for the Strategic Consulting Group's guidance in helping the State of Alabama to design and implement a network of more effective, less expensive community-based sanctions for our court-involved youth. As Walter Wood . . . has repeatedly told his Board, the Alabama

[4] The Annie E. Casey Foundation, *Our Work: Juvenile Justice*, *available at* http://www.aecf.org/OurWork/JuvenileJustice.aspx (visited Nov. 11, 2007).

> legislature, and the public, there are far too many "non-criminal" youth in state custody in Alabama. I hope Casey will help us reduce reliance on large secure care institutions and develop programs that will effectively and efficiently reduce juvenile crime.

*See* Ex. 15: 12/21/05 Ltr. by Governor Riley to K. Feely et al.

20. Governor Riley's initial letter to Casey specifically referenced the "waitlist" that is central to this litigation. The Governor's letter suggested that the waitlist was best understood as a by-product of the large volume of inappropriate commitments of low-risk children to DYS:

> Of youth admitted to DYS in 2004, 57% were committed to residential care for "public order" and status offenses – including Children in Need of Supervision, probation violations, and aftercare violations. At the moment, we have more than 1,000 youth in custody at DYS and an additional 130 on a waiting list. DYS Director Wood estimates that **at least** 25% of those youth could be served in the community . . . .

*Id.*

21. Upon learning that the Casey Foundation was unable to immediately respond to Alabama's request for technical assistance, both the Governor and Defendant Wood sent follow-up letters in early 2006, urging Casey to seriously consider the Governor's invitation. Both letters emphasized the severity of the problem and the depth of the State's commitment to reform. The Governor wrote:

> Alabama presents a unique opportunity for Casey. We have a very serious problem with incarcerating non-criminal youth, but we recognize that problem and are dedicated to correcting it. This dedication is not limited to my office. The Department of Youth Services ("DYS") and the advocacy community agree that de-institutionalization is a priority issue and would welcome Casey's assistance in developing a network of graduated sanctions for non-criminal youth and low level offenders.

Ex. 16: 3/17/06 Ltr. by Gov'r Riley to K. Feely et al. The Defendant, DYS Director Walter Wood, elaborated on the same theme:

> Why get involved with Alabama? As is not the case in most states, you will find the environment here "ripe for change." Our Governor, the Youth Services

> Department and staff, Legislative leadership working in the juvenile justice arena and system advocates are communicating on a regular basis, identifying problems, and working together to address needs, together. We need a catalyst to bring our work to full consensus and to assist us with implementing needed changes. You will not find this level of cooperation in other states.

Ex. 17: 4/20/06 Ltr. by W. Wood to K. Feely et al.

22. The Casey Strategic Consulting Group (CSCG) began working in Alabama in April 2007 and is now working closely with the Defendant, the Governor's policy staff, and senior DYS officials to help the state reduce juvenile incarceration and expand access to community-based, non-residential services for troubled youth and families.

23. Another division of the Casey Foundation, the Juvenile Detention Alternatives Initiative (JDAI), has begun working with juvenile courts in Jefferson, Mobile, Montgomery, and Tuscaloosa Counties to help those jurisdictions reduce reliance on secure juvenile detention for children who are pending trial or pending placement at DYS. JDAI began work in Alabama in August 2007. *See* Ex. 18: 8/1/07 Ltr. from B. Lubow to Chief Justice Cobb ("I am pleased to inform you that Alabama has been chosen as a replication site for the Juvenile Detention Alternatives Initiative (JDAI). We look forward to a stimulating multi-year partnership with state and county officials in these endeavors to strengthen juvenile justice.").

24. JDAI became involved in Alabama at the request of Chief Justice Sue Bell Cobb. When JDAI personnel responded to the Chief Justice's request by coming to Alabama to visit with a group of juvenile justice professionals, the Defendant provided the financial support needed to allow judges, juvenile probation officers, and detention administrators to attend the meeting. *See* Ex. 19: 3/20/07 Ltr. by Chief Justice Sue Bell Cobb to D. Lipow.

**With assistance from Casey, the Defendant and the RFP Planning Committee are on track to implement profound changes that would address the issues raised in this lawsuit.**

25. Over the past two years, the Defendant has taken a number of steps to reduce the flow of inappropriate commitments to DYS custody. The most significant such step was the Defendant's decision to solicit technical assistance from the Casey Foundation. In addition, DYS has participated in a collaborative, multi-agency process to craft revisions to Alabama's Juvenile Code. The revisions proposed in the 2007 Regular Session of the Alabama Legislature included sentencing restrictions that prohibited the use of secure custody to confine extremely low-risk youth. Although that legislative effort was ultimately unsuccessful in the 2007 session, the sentencing restrictions will be reintroduced in the 2008 session.

26. The Defendant has also sought to reduce the flow of inappropriate commitments to DYS by providing grants to jurisdictions that pledge to reduce DYS commitments. For example, DYS provides $300,000 per year to the Morgan County Commission for a program called "SOS" (System of Services). As a result of the SOS program, Morgan County consistently has one of the lowest DYS commitment rates in the state: 1 admission to DYS for every 1,000 children under 18 in the county. By comparison, the statewide average is 3 admissions to DYS for every 1,000 children in the state. *See* Ex. 20: DYS Commitment Rates by County (FY 2006 and FY 2007).

27. Under the Defendant's leadership, DYS has become more strategic about grants for alternatives to DYS. For example, based on the historically high number of commitments from Jefferson County, the Defendant is currently engaged in discussions with the Jefferson County Family Court about a possible grant to fund alternatives in that county. As part of the Casey Foundation's engagement in Alabama, CSCG is providing technical assistance to DYS and to the Jefferson County Family Court to ensure that DYS-funded programs are effective and that they are used to serve children who would otherwise have been committed to DYS.

28. The Defendant has also recently taken steps to accelerate the release of children who no longer require – and perhaps never required – confinement within a state institution. Rather than seeking the committing court's permission to release a child who is no longer in need of DYS supervision, the agency now adheres to the process outlined in the Alabama Code, *see* Ala. Code § 44-1-36(d), and simply provides the court with notice of release. This new procedure has allowed the agency to reduce the number of children who remain in DYS custody beyond the completion of their individual service plans. That reduction has contributed to the agency's ability to quickly accept custody of committed children.

29. Admissions to DYS have declined in the past year. In FY 2006, there were 3,340 admissions to DYS custody. *See* Ex. 4: FY 2006 Demographics. When the fiscal year closed on September 30, 2006, it is my understanding that an additional 45 children were on the waitlist. In FY 2007, there were 3,262 admissions to DYS. *See* Ex. 3: FY 2007 Demographics. When the fiscal year closed in September 2007, there were no children on the waitlist pending placement. If children who were still on the waitlist on September 30, 2006, are included in the admissions total for FY 2006 (when they would have been admitted if DYS had unlimited capacity) instead of FY 2007 (when they were actually admitted), the adjusted totals are 3,385 in FY 2006 and 3,217 in FY 2007 – a 5% drop.

30. When a specific child has been committed to DYS custody and is being held in a juvenile detention center pending placement, the only action that DYS may take to cause that child to be released from detention is to place the child in DYS custody.[5] At present, the DYS system

[5] In my capacity as the Co-Director of the Southern Juvenile Defender Center (SJDC), I help support trainings for juvenile defense attorneys in Alabama, Florida, Georgia, Louisiana, Mississippi, North Carolina, and South Carolina. During the past twelve months, I have personally conducted four trainings for juvenile defense attorneys in Alabama; SJDC has helped to coordinate and fund six additional trainings. Each of those trainings has included a specific discussion of a juvenile defense attorney's ongoing responsibility to a waitlisted client. Whenever I conduct

consists exclusively of residential placements. Over the next several months, the RFP Planning Committee will explore a number of options for building state and local capacity to provide rehabilitative services for youth who are not appropriate for out-of-home placements. One option might be for DYS to contract for truly community-based services that would allow DYS to "place" a child under DYS supervision in his or her own home.

31. The RFP Committee may also choose to borrow a page from Mississippi, where the Division of Youth Services recently issued an RFP to encourage and support the development of home-based supervision plans (including wrap-around services) for low-risk children who might otherwise have been committed to a DYS facility. *See* Ex. 21: State of Mississippi, Department of Human Services, Division of Youth Services, Request for Proposals: The Tony Gobar Individualized Assessment & Comprehensive Community Intervention Initiative (IACCII) (issued 2007). The pilot initiative described in that RFP was designed:

> 1. To prevent low-risk, low-need youth from entering the juvenile justice system and then receiving high levels of supervision and services.
>
> 2. To prevent low-risk, high-need (IACCII eligible) youth from entering the training school by providing them with individualized, strength-based assessments and comprehensive community treatment plans.
>
> 3. To identify IACCII eligible youth who are committed to the training schools and to divert them to the community by developing individualized, strength-based assessments and comprehensive community treatment plans.

*Id.* at 12.

32. With support from the Casey Foundation and DYS leadership (including the Defendant), members of the RFP Committee reflect a more community-based orientation than in the past,

---

trainings, I urge attorneys to monitor the status of their clients following the issue of the disposition order to make sure that children are not languishing in detention unnecessarily. When a client is in detention pending placement, I

underscoring the desire of DYS to shift its focus away from reliance on secure and other residential placements. This change in orientation is a significant shift in DYS policy, and will only succeed in combination with a number of other reforms currently under consideration. In my opinion, it would have been difficult – and perhaps impossible – for DYS to successfully implement such profound reforms in the absence of the Casey Strategic Consulting Group's engagement in Alabama, which did not begin until April 2007.

DATED THIS 16 day of November, 2007.

Danielle J. Lipow

SWORN TO AND SUBSCRIBED BEFORE ME, this ___ day of November, 2007.

George N. Willis
NOTARY PUBLIC

MY COMMISSION EXPIRES:

GEORGE N. WILLIS NOTARY MY COMMISSION EXPIRES 07/24/2010 PUBLIC ALABAMA STATE AT LARGE

---

urge attorneys to develop supervision plans and file motions with the committing court to seek release pending placement. I do not know whether such a motion was filed on behalf of the Plaintiff in this case.

*Annie E. Casey Foundation*

# Reducing Reliance on Juvenile Incarceration in Alabama

*Discussion document for meeting with Youth Services Board*



*Date: September 28, 2007*

*Casey Strategic Consulting Group*

# We want to provide an overview of the Alabama juvenile justice system, share major findings, and discuss next steps

- ***Review Alabama's juvenile justice system, where outcomes are influenced by many constituents***
- Analysis found three serious factors:
  1. There are too many low-risk youth entering the system and inappropriately incarcerated
  2. There are inadequate community-based alternatives that support and hold youth accountable
  3. There is significant commitment variability for youth across the system including racial disproportionality
- Discuss the need to develop a detailed, action plan to transform the juvenile justice system

# By statute, the Alabama juvenile justice system seeks to promote safe, supportive communities and facilities

***Goals for Delinquency Proceedings***

- Advance family preservation
- Reunify child and family as quickly as possible
- Secure appropriate treatment for children removed from parental custody
- Promote a continuum of care from prevention to aftercare
- Support the use of alternatives to incarceration
- Encourage the use of restitution such as community service
- Achieve goals in least restrictive setting necessary with a preference at all times to preserve the family

***Goals for Juvenile Justice System***

- Offer social and educational services and facilities for youth that meet minimum standards
- Develop programs that prevent, control and treat delinquency through collaborative public and private partnerships
- Provide programs to improve risky community conditions and aid parents in discharging their responsibilities for the care, development and well-being of their children
- Coordinate public service programs that prevent juvenile justice delinquency and rehabilitate delinquent youth

Source: Code of Alabama Title 12-5a-1

# We have identified misalignment between the Juvenile Justice system goals and reality

## ***Observed inconsistencies***

- Less than one in five youth ordered to DYS are high-risk
- Just 8% of youth are ordered to DYS custody for violent felonies, along with 13% for index property offenses
- Youth are more likely to be committed for a probation violation than any other type of offense
- 25% of all referrals are from school
- Commitment rates differ greatly across counties for youth accused of similar offenses
- Limited community options to prevent out-of-home placement

# At each stage of this complex system, multiple factors appear to drive the overuse of incarceration

## IDENTIFIED CAUSES FOR OVERUSE OF INCARCERATION IN ALABAMA

| | COMMUNITY[2] | COUNTY AND LOCAL JURISDICTIONS | | | | STATE |
|---|---|---|---|---|---|---|
| | **Referral to JJ system** | **Prosecute/ Divert/ Dismiss Decision** | **Placement Pre-Court** | **Delinquency Determination** | **Post-Court Placement** | **DYS Commitment** |
| **Event(s)[1]** | Referrals for reasons other than delinquent acts | Inappropriate referrals move forward | Low-risk youth sent to detention | Low-risk youth sent to DYS | | Youth placed inappropriately |
| **Contributing Factors** | ▸ Misunderstand referral criteria<br>▸ Lack alternatives for disruptive, but non-delinquent behavior (esp. schools and DHR)<br>▸ Lack disincentives or consequences for misuse | ▸ Lack clear, standardized criteria<br>▸ Inconsistent practices across judges/ counties<br>▸ Lack disincentives to move inappropriate youth through the system | Juvenile Detention Alternative Initiative | ▸ Lack graduated, community-based alternatives to incarceration<br>▸ Lack local services (e.g., MH, substance abuse)<br>▸ Frustration with repeated misbehavior even if non-delinquent<br>▸ Inconsistent practices across judges/ counties<br>▸ Public pressure to punish and/or send "bad" kids away | | ▸ DYS commitment = out-of-home placement<br>▸ Placement not based on risk/need<br>▸ DYS not fully utilizing their authority |

| | PROBATION | | |
|---|---|---|---|
| | **Referral to JJ system** | **DYS Commitment** | **After Care** |
| **Event(s)[1]** | Violation of probation for other than delinquent acts | Hundreds of youth sent to DYS for probation/ after care violations | Don't get enough support and/or "right" support to successfully transition back to home and avoid future trouble |
| **Contributing Factors** | ▸ Supervision and compliance focus vs. youth development and tailored support<br>▸ Pressure to make best use of scarce resources creates incentive to violate most vexing youth<br>▸ Frustration with repeated misbehavior<br>▸ Limited ability to vary intensity of supervision and support given capacity, resources, authority, and overwhelming case load (as high as 150 in some counties) | | In addition, the following are unique factors:<br>▸ Insufficient planning prior to release<br>▸ Lack of supportive services to successfully reintegrate youth with their families and communities<br>▸ Coordination challenges between DYS and other entities involved in reentry |

[1] These are events that lead to the overuse and/or inappropriate use of incarceration for at-risk Alabama youth
[2] Community referral sources include: police, schools, neighbors, victims, family. Other state agencies such as DHR also refer youth to the system

Source: Team interviews with DYS, AOC, local court officials and staff, private providers, and Alabama youth

□ = primary entity for process step
■ = major juvenile justice process step

# We want to provide an overview of the Alabama juvenile justice system, share major findings, and discuss next steps

- Review Alabama's juvenile justice system, where outcomes are influenced by many constituents

- ***Analysis found three serious factors:***
  - ***There are too many low-risk youth entering the system and inappropriately incarcerated***
  - ***There are inadequate community-based alternatives that support and hold youth accountable***
  - ***There is significant commitment variability for youth across the system including racial disproportionality***

- Discuss the need to develop a detailed, action plan to transform the juvenile justice system

# Due in part to the high number of probation violations, Alabama commits a large number of youth to DYS

COMMITTED YOUTH PER 100,000 JUVENILES, 2003
215
219
267
Other Southern States 1
U.S.
AL
Alabama's rate is 22% higher than U.S.

PERCENTAGE OF YOUTH IN CUSTODY FOR TECHNICAL VIOLATIONS AND STATUS OFFENSES, 2003
22%
20%
40%
Other Southern States 1
U.S.
AL
3rd Highest Rate in Nation

**PROBABILITY OF COMMITMENT BY REFERRAL REASON**

22%

29%

Felony Offense
Probation Violation

Youth referred for probation violations are more likely to be committed than youth referred for felony offenses

***Alabama's high commitment rate is driven largely by probation violators***

[1] Southern states included in the analysis are FL, LA, MS, GA, TN, SC

Sources: Office of Juvenile Justice and Delinquency Prevention, "Census of Juveniles in Residential Placement Databook" and *Juvenile Offenders and Victims* (2006); Team analysis of AOC 2006 data

# Despite a significant decline in serious juvenile arrests, DYS admissions have not decreased

- ***DYS admissions are not correlated with violent juvenile arrests***
- ***In 2005, DYS admissions were nearly 5 times greater than violent juvenile arrests, while 10 years earlier the ratio was nearly 1 to 1***

[1] This calculation is the Compound Annual Growth Rate, which is the year-over-year rate of change in a value between two specified times

[2] If this data was calculated based on the Federal Bureau of Investigation 1995-2005 data, the ratio would be 1.3 for 1995 and 6.8 for 2005

Sources: Alabama Criminal Justice Information Center (http://acjic.state.al.us/crime.cfm#cia); DYS Website (dys.alabama.gov), "Youth Admitted by DYS in 1990-2006"

ILLUSTRATIVE

# Just by reducing commitments for CHINS/violations to the national average would result in a significant reduction of DYS youth

***This slide is only meant to be illustrative of the effect that this one transformation would have on the size of the DYS population. It is not representative of all desired changes to the system.***

[1] Assumes AL prevented CHINS admissions and limited percentage of youth in custody for technical and status offenses to national average

Source: Team analysis of DYS (2006) data base

# The high commitment rate in Alabama is partially driven by inadequate availability of community-based services

ALABAMA COUNTIES NAMING JJ SERVICES[1] AS TOP 3 SERVICE NEED
100% = 67 Counties
3 OUT OF TOP 3 SERVICE NEEDS ARE JJ RELATED
0 OUT OF TOP 3 PRIORITY NEEDS ARE JJ RELATED
13%
2 OUT OF TOP 3 SERVICE NEEDS ARE JJ RELATED
1 OUT OF TOP 3 SERVICE NEEDS ARE JJ RELATED
87% of counties list JJ community services as a top three service need

**QUOTES**

**"I commit kids to DYS because services like substance abuse treatment are not available in my community." – *Juvenile Judge***

**"For the record, in my tenure here I've never seen the huge numbers (of referrals) from schools like we have had in the past two weeks. I don't know what is going on out there..." - *Court intake officer (in August, 2007)***

**"Many youth we currently have here at Mt Meigs can be safely managed in their communities if more certified therapist and related resources existed there." – *Therapist, DYS Mt Meigs***

**"We need to reduce barriers to screening and referral for treatment of children and youth with mental health, mental retardation, or behavioral disorders to avoid unnecessary and expensive incarceration or other inappropriate placements." – *Executive Director, Mobile County Children's Policy Council***

## The need for more appropriate services is broadly shared across the state

The requested Juvenile Justice services include adolescent substance abuse treatment, anti truancy programs, afterschool programs, juvenile court programs
Source: 2006 Children's Policy Council Report; Interviews with court and DYS personnel and county officials

# The commitment rate for low-risk youth is inconsistent across the state

COMMITMENT VARIABILITY ACROSS COUNTIES
Top 10 Committing Counties
Total & Probation Violation/CHINS Commitments
% Probation Violation/ CHINS
Jefferson
544
194
36%
Mobile
264
145
55%
Tuscaloosa
227
112
49%
Madison
225
79
35%
Baldwin
194
106
55%
Houston
134
76
57%
Montgomery
133
30
23%
Lee
104
70
67%
Elmore
86
52
60%
Etowah
85
25
29%
Alabama Avg. = 39%
Source: Team analysis of DYS 2006 data

Even among the top committing counties, there is considerable variation in the type of offenses for which youth have committed

The percentage of youth ordered to DYS custody for violations and as CHINS ranged from less than a quarter to two-thirds

- Total admission
- Admission for VOP/CHINS

# Alabama's Black youth are more likely than Whites to be referred to the juvenile justice system and committed to DYS facilities

REFERRALS TO JUVENILE JUSTICE SYSTEM
Referral Rate per 100,000 Youth by Race
14,494
7,430
White
Black
Total Number of Referrals by Race
502K
49K
White
67%
51%
Black
AL Population 10 - 17
Referrals to Juvenile Court 5 -17

LIKELIHOOD OF ORDER TO DYS FACILITY BY COURT REFERRAL OFFENSE[1]
Violent Felony
45%
31%
Other Person Offense
12%
9%
Non-Person Offense
14%
10%
Probation Violation
31%
28%
CHINS
3%
2%

COMMITTED TO DYS FACILITIES
DYS Admissions Rate per 100,000 Youth by Race
1,247
377
White
Black
Total Number of DYS Admissions by Race
502K
3.3K
38%
White
67%
Black
AL Population 10 - 17
Committed to DYS 10 -19

***Black youth are disproportionately committed to DYS***

[1] Includes youth wavier to adult court

Source: Team analysis of AOC data (2006); DYS Data 2006

Black Youth

White Youth

We want to provide an overview of the Alabama juvenile justice system, share major findings, and discuss next steps

- Review Alabama's juvenile justice system, where outcomes are influenced by many constituents

- Analysis found three serious factors:
  - There are too many low-risk youth entering the system and inappropriately incarcerated
  - There are inadequate community-based alternatives that support and hold youth accountable
  - There is significant commitment variability for youth across the system including racial disproportionality

- ***Discuss the need to develop a detailed, action plan to transform the juvenile justice system***

# Proposed next steps are to complete an action plan to improve the system

**Potential responses to address recommendations**

| HIGH LEVEL RECOMMENDATIONS | POTENTIAL RESPONSES |
|---|---|
| Significantly reduce number of youth in secure and group care | • DYS should not accept CHINS and VOP unless in exceptional circumstances<br>• Ensure consistent and effective use of risk assessment tools |
| Decrease inappropriate referrals and minority disproportionality | • Explore changes to the juvenile code<br>• Educate constituents and stakeholders in the system that these two issues are "big" problems |
| Close beds and reinvest savings into community-based services | • Close residential beds and reinvest in alternatives<br>• Shift incentives to increase usage of home based services and stop sending low-risk youth to DYS |
| Expand community-based service options | • Use evidence-based programs as alternative to incarceration (e.g. Multi-systemic therapy (MST), Family Functional Therapy (FFT)) through DYS service solicitation process<br>• Assist residential providers transition to community service providers |
| Identify and implement best-practice monitoring and accountability methods | • Set up tracking mechanism to monitor state's improvement<br>• Create cross-county forums so counties can learn from each other |



National Report

# Juvenile Offenders and Victims: 2006 National Report

Violent and drug arrest rates for young... from 1980 to 2003 as their overall ar...

OJJDP Report

EXHIBIT
Affidavit
2
tabbies



**Statistical Briefing Book**

# OJJDP's Online Statistical Briefing Book

**The fastest path to the latest statistical information on:**

Juvenile offending

Victimization of juveniles

Youth in the juvenile justice system

SBB makes it easy for policymakers, juvenile justice practitioners, the media, and the general public to access information on topics that mirror the major sections of *Juvenile Offenders and Victims: National Report*.

- Find timely, reliable answers to frequently asked questions.
- With "Easy Access" tools and downloadable spreadsheets, create your own national, state, and county tables on juvenile populations, arrests, court cases, and custody populations.
- Consult the "Compendium of National Juvenile Justice Data Sets" for practical guidance on how to use a set of major national data resources that inform juvenile justice issues.
- Link to more than 25 Web-based resources.
- Search OJJDP's online library of hundreds of statistical publications.

Make SBB your first stop for statistical information on juvenile justice. Visit the OJJDP Web site at www.ojp.usdoj.gov/ojjdp and click on "Statistics."



# Juvenile Offenders and Victims: 2006 National Report

**Howard N. Snyder**

**Melissa Sickmund**

**National Center for Juvenile Justice**

**March 2006**

**Office of Justice Programs**
Partnerships for Safer Communities
*www.ojp.usdoj.gov*

**Office of Juvenile Justice and Delinquency Prevention**
*www.ojp.usdoj.gov/ojjdp*

**U.S. Department of Justice**
**Office of Justice Programs**
810 Seventh Street NW.
Washington, DC 20531

**Alberto R. Gonzales**
*Attorney General*

**Regina B. Schofield**
*Assistant Attorney General*

**J. Robert Flores**
*Administrator*
Office of Juvenile Justice and Delinquency Prevention

This Report was prepared by the National Center for Juvenile Justice, the research division of the National Council of Juvenile and Family Court Judges, and was supported by cooperative agreement #1999–JN–FX–K0002 with the Office of Juvenile Justice and Delinquency Prevention, Office of Justice Programs, U.S. Department of Justice.

Points of view or opinions expressed in this document are those of the authors and do not necessarily represent the official position or policies of the U.S. Department of Justice.

Copyright 2006
National Center for Juvenile Justice
3700 S. Water Street, Suite 200
Pittsburgh, PA 15203-2363

Suggested citation: Snyder, Howard N., and Sickmund, Melissa. 2006. *Juvenile Offenders and Victims: 2006 National Report.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

The Office of Juvenile Justice and Delinquency Prevention is a component of the Office of Justice Programs, which also includes the Bureau of Justice Assistance, the Bureau of Justice Statistics, the National Institute of Justice, and the Office for Victims of Crime.

# Foreword

America's youth are facing an ever-changing set of problems and barriers to successful lives. As a result, we are constantly challenged to develop enlightened policies and programs to address the needs and risks of those youth who enter our juvenile justice system. The policies and programs we create must be based on facts, not fears. Too often, the facts are unknown or not readily available. This Report is designed to remedy, at least in part, that information gap.

*Juvenile Offenders and Victims: 2006 National Report* draws on reliable data and relevant research to provide a comprehensive and insightful view of juvenile crime across the nation. The Report offers Congress, state legislators and other state and local policymakers, professors and teachers, juvenile justice professionals, and concerned citizens empirically based answers to frequently asked questions about the nature of juvenile crime and victimization and about the justice system's response.

Citing FBI and other data sources, the Report demonstrates that the rate of juvenile violent crime arrests has consistently decreased since 1994, falling to a level not seen since at least the 1970s. However, during this period of overall decline in juvenile violence, the female proportion of juvenile violent crime arrests has increased (especially for the crime of assault), marking an important change in the types of youth entering the juvenile justice system and in their programming needs. The Report also describes when and where juvenile violent crime occurs, focusing attention on the critical afterschool hours.

Statistics presented throughout the Report find that racial disparity in the juvenile justice system is declining. For example, the black juvenile violent crime arrest rate in the late 1980s was six times the white rate—by 2003, it had fallen to four times the white rate. During the same period, the black juvenile arrest rate for drug abuse violations fell from five times to less than double the white rate.

The Report also presents new findings from OJJDP's national Census of Juveniles in Residential Placement. The daily number of committed youth held in public and private facilities increased 28% between 1991 and 2003, with the increase far greater in private than in public facilities. However, after peaking in 1999, the number of youth in custody began to fall—for the first time in a generation.

In sum, *Juvenile Offenders and Victims: 2006 National Report* offers a clear view of juvenile crime and the justice system's response at the beginning of the 21st century. It is an indispensable resource for informed professionals who strive to shape the juvenile justice system today.

**J. Robert Flores**
*Administrator*
Office of Juvenile Justice and Delinquency Prevention

# Acknowledgments



This Report is the result of an ongoing effort that has benefited from the assistance of many individuals in addition to the authors.

Information and/or assistance were provided by the following individuals:

Chris Bailey
   National Council of Juvenile and
   Family Court Judges
Allen Beck
   Bureau of Justice Statistics
Latrice Brogsdale-Davis
   Census Bureau
Heather Hammer
   Temple University
James Howell
   National Youth Gang Center
Michael Rand
   Bureau of Justice Statistics
Charlene Sebold
   Census Bureau
Andrea Sedlak
   Westat, Inc.
Regina Yates
   Census Bureau

Within the Office of Juvenile Justice and Delinquency Prevention, Janet Chiancone serves as the project manager under the direction of J. Robert Flores. Additional reviews of the report within OJJDP were provided by Barbara Allen-Hagen, Steve Antkowiak, Catherine Doyle, Heidi Hsia, Dennis Mondoro, Stephanie Rapp, Elissa Rumsey, Robert Samuels, Karen Stern, Gregory Thompson, and Phelan Wyrick.

Within NCJJ, Nancy Tierney was responsible for report production (desktop publishing, graphics design, page layout, and copy editing). Assistance and review were provided by Gregg Halemba and Hunter Hurst, Jr. (child maltreatment case processing), Carl McCurley (juvenile offending behavior), Patrick Griffin (gangs), Linda Szymanski (statutes), Charles Puzzanchera (population and juvenile court data), Anne Stahl (juvenile court data), Sarah Livsey (index), Terrence Finnegan and Anthony Sladky (computer programming), and Kevin Spangenberg (resource library).

Production assistance was also provided by the staff of the Juvenile Justice Clearinghouse under the direction of Catherine Doyle, OJJDP: Denise Collins (cover design), Sam Brown (print preparation and quality control of electronic files), and Lynn Marble and Beverly Sullivan (editing and document quality control) under the supervision of Pearl Coleman.

Ultimately, this work would not be possible without the efforts of the many individuals who collect and report the data at the local, state, and federal levels—data that are the heart and soul of this report.



# Table of Contents

**Chapter 1: Juvenile population characteristics .................1**

Juvenile population demographics .............................. 2
Juveniles in poverty ........................................... 7
Living arrangement of juveniles ............................... 10
Births to teens ............................................... 12
School dropouts ............................................... 14
Chapter 1 sources ............................................. 16

**Chapter 2: Juvenile victims .............................. 19**

Juvenile homicide victims ..................................... 20
Firearm-related homicides of juveniles ........................ 23
Juvenile suicide .............................................. 25
Victimization survey of juveniles ............................. 27
Victims of school crime ....................................... 29
Victimization risk factors .................................... 30
Juvenile victims of reported violent crimes ................... 31
Offenders who victimize juveniles ............................. 33
Time-of-day analysis of juvenile victimization ................ 34
Location of juvenile victimization ............................ 36
Juvenile victims of statutory rape ............................ 37
Juvenile victimization on the Internet ........................ 38
Juvenile kidnap victims ....................................... 40
Missing children .............................................. 42
Runaway and thrownaway children ............................... 45
Missing children trends ....................................... 46
Child maltreatment case processing ............................ 47
Child maltreatment trends ..................................... 51
Child maltreatment demographics ............................... 54
Child maltreatment perpetrators ............................... 55
Child maltreatment fatalities ................................. 56
Foster care ................................................... 57
Adoption ...................................................... 59
Chapter 2 sources ............................................. 60

**Chapter 3: Juvenile offenders ............................ 63**

Self-reports vs. official data ................................ 64
Homicides by juveniles ........................................ 65
Juvenile homicide offender characteristics .................... 67
Juvenile offending behavior demographics ...................... 70

Offending into the adult years . . . . . . . . . 71
Juvenile offending behavior and associated factors . . . . . . . . . 72
School crime . . . . . . . . . 73
Weapons use . . . . . . . . . 74
Drug and alcohol use . . . . . . . . . 75
Drug and alcohol use trends . . . . . . . . . 79
Co-occurrence of substance use behaviors . . . . . . . . . 81
Gangs . . . . . . . . . 82
Time-of-day analysis of juvenile offending . . . . . . . . . 85
Chapter 3 sources . . . . . . . . . 90

**Chapter 4: Juvenile justice system structure and process . . . . . . 93**

History and overview of the juvenile justice system . . . . . . . . . 94
U.S. Supreme Court cases and the juvenile justice system . . . . . . . . . 100
State definitions of juvenile court jurisdiction . . . . . . . . . 103
Juvenile justice system case processing . . . . . . . . . 104
Public access to juvenile proceedings . . . . . . . . . 108
State provisions for trying juveniles as adults . . . . . . . . . 110
Judicial waiver, concurrent jurisdiction, and statutory exclusion . . . 112
Blended sentencing . . . . . . . . . 115
Juveniles in the federal justice system . . . . . . . . . 117
Chapter 4 sources . . . . . . . . . 119

**Chapter 5: Law enforcement and juvenile crime . . . . . . . . . . . . 121**

Introduction to juvenile arrest data . . . . . . . . . 122
Gender, age, and racial variations in juvenile arrests . . . . . . . . . 125
Juvenile proportion of arrests . . . . . . . . . 126
Juvenile arrest 10-year trends . . . . . . . . . 127
Female juvenile arrest trends . . . . . . . . . 128
Young juvenile arrest trends . . . . . . . . . 130
Violent Crime Index arrest trends . . . . . . . . . 132
Murder arrest trends . . . . . . . . . 133
Forcible rape arrest trends . . . . . . . . . 134
Robbery arrest trends . . . . . . . . . 135
Aggravated assault arrest trends . . . . . . . . . 136
Property Crime Index arrest trends . . . . . . . . . 137
Burglary arrest trends . . . . . . . . . 138
Larceny-theft arrest trends . . . . . . . . . 139
Motor vehicle theft arrest trends . . . . . . . . . 140
Arson arrest trends . . . . . . . . . 141
Simple assault arrest trends . . . . . . . . . 142
Weapons law violation arrest trends . . . . . . . . . 143
Drug abuse violation arrest trends . . . . . . . . . 144
Juvenile crime vs. adult crime . . . . . . . . . 145
Clearance statistics . . . . . . . . . 146
Violent crime arrest rates by state . . . . . . . . . 148
Violent crime arrest rates by county . . . . . . . . . 149
Property crime arrest rates by state . . . . . . . . . 150
Property crime arrest rates by county . . . . . . . . . 151
Police disposition of juvenile arrests . . . . . . . . . 152
Chapter 5 sources . . . . . . . . . 153

**Chapter 6: Juvenile offenders in court ..................... 155**

Introduction to *Juvenile Court Statistics* .......................... 156
Delinquency caseload ........................................ 157
Trends in delinquency cases ................................. 158
Gender variations in delinquency cases ...................... 160
Offense profiles by gender .................................. 162
Racial variations in delinquency cases ...................... 163
Age variations in delinquency cases ......................... 166
Detention ................................................... 168
Detention variations by demographics ........................ 169
Formal vs. informal case processing ......................... 171
Adjudication ................................................ 173
Disposition ................................................. 174
Delinquency case processing ................................. 177
Delinquency case processing by offense and demographics ........ 178
Judicial waiver ............................................. 186
Monitoring racial disparity in the justice system ................ 188
Status offense cases ........................................ 191
Chapter 6 sources ........................................... 193

**Chapter 7: Juvenile offenders in correctional facilities ........ 195**

Introduction to custody data ................................ 196
Juvenile custody population ................................. 197
Offense trends in private and public facilities ................... 198
Offender trends in juvenile facilities ........................... 199
Detained and committed populations .......................... 200
State custody rates .......................................... 201
Offense profiles of the custody population by state ............... 203
Offense profiles of detained and committed offenders by state ...... 204
Gender variations in the custody population .................... 206
Racial variations in the custody population ..................... 211
Racial variations in custody rates by state ...................... 213
Length of stay for juveniles in custody ......................... 215
Types of facilities .......................................... 218
Facility security features .................................... 219
Security arrangements for juveniles in custody .................. 220
Facility size ................................................ 222
Crowding in juvenile custody facilities ......................... 223
Screening for substance abuse, mental health, and suicide risk ..... 225
Deaths in custody facilities .................................. 229
Sexual violence in custody facilities ........................... 230
Youth reentry population ..................................... 232
Recidivism and the youth custody population .................. 234
Juveniles in jails ............................................ 236
Juveniles in prisons ......................................... 237
Death penalty ............................................... 239
Chapter 7 sources ........................................... 241

**Index ............................................... 243**

# Juvenile Offenders and Victims: 2006 National Report

**Chapter 1: Juvenile population characteristics** ..................1

Juvenile population demographics ............................... 2
Juveniles in poverty ............................................ 7
Living arrangement of juveniles ................................ 10
Births to teens ................................................ 12
School dropouts ................................................ 14
Chapter 1 sources .............................................. 16

Copyright 2006
National Center for Juvenile Justice
3700 S. Water Street, Suite 200
Pittsburgh, PA 15203-2363

Suggested citation: Snyder, Howard N., and Sickmund, Melissa. 2006. *Juvenile Offenders and Victims: 2006 National Report.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.



# Chapter 1

1

## Juvenile population characteristics

Juveniles in the U.S. today live in a world very different from that of their parents or grandparents. Problems experienced by children at the turn of the century are the products of multiple and sometimes complex causes. Data presented in this chapter indicate that in many ways conditions have improved in recent years, but only marginally. For example, the proportion of juveniles living in poverty has declined recently, but juveniles are still far more likely to live in poverty today than 20 years ago. Similarly, teenage birth rates have declined in recent years but still remain high. Fewer children are being raised in two-parent families. Although high school dropout rates have fallen for most juveniles, the rates are still too high, especially in an employment market where unskilled labor is needed less and less.

This chapter presents a brief overview of some of the more commonly requested demographic, economic, and sociological statistics on juveniles. These statistics pertain to factors that are directly or indirectly associated with juvenile crime and victimization. Although these factors may be correlated with juvenile crime and/or victimization, they may not be the immediate cause and may be linked to the causal factor. The sections summarize demographic, poverty, and living arrangement data developed by the U.S. Census Bureau, birth statistics from the National Center for Health Statistics, and education data from the National Center for Education Statistics.



# At the beginning of the 21st century, 1 in 4 U.S. residents was under age 18

### The juvenile population is increasing similarly to other segments of the population

For 2002, the U.S. Census Bureau estimated that 72,894,500 persons in the United States were under the age of 18, the age group commonly referred to as *juveniles.* The juvenile population reached a low point in 1984, at 62.5 million, then grew each year through 2002, increasing 17%.

Current projections indicate that the juvenile population will continue to grow throughout the 21st century. The Census Bureau estimates that it will increase 14% between 2000 and 2025—about one-half of one percent per year. By 2050, the juvenile population will be 36% larger than it was in 2000.

In 2002, juveniles were 25% of the U.S. resident population. The Census Bureau estimates that this proportion will remain essentially constant through at least 2050; i.e., the relative increases in the juvenile and adult populations will be equivalent during the first half of the 21st century.

### The racial character of the juvenile population is changing

The Census Bureau has changed its racial classifications. Prior to the 2000 decennial census, respondents were asked to classify themselves into a single racial group: (1) white, (2) black or African American, (3) American Indian or Alaska Native, or (4) Asian or Pacific Islander. In the 2000 census, Asians were separated from Native Hawaiians and Other Pacific Islanders. In addition, respondents could classify themselves into more than one racial group. In 2000, 1.4% of the total U.S. population and 2.5% of the juvenile population classified themselves as multiracial.

Most national data systems have not yet reached the Census Bureau's level of detail for racial coding—and historical data cannot support this new coding structure, especially the mixed-race categories.* Therefore, this report generally uses the four-race coding structure. For ease of presentation, the terms white, black, American Indian, and Asian are used.

With that understood, in 2002, 77.9% of the juvenile population was classified as white, 16.4% black, 1.4% American Indian, and 4.4% Asian. These proportions will change in the near future if the anticipated differential growth of these subgroups comes to pass.

Percent change within racial segments of the juvenile population (ages 0–17):

| Race | 1980–2000 | 2000–2020 |
|---|---|---|
| White | 8% | 7% |
| Black | 25 | 9 |
| American Indian | 85 | 16 |
| Asian | 160 | 59 |
| Total | 14 | 10 |

### The Hispanic portion of the juvenile population will increase

In 2002, 18% of juveniles in the U.S. were of Hispanic ethnicity. Ethnicity is different from race. More than 9 of every 10 Hispanic juveniles were classified racially as white. More specifically, 92% of Hispanic juveniles were white, 5% black, 2% American Indian, and 1% Asian.

In 2002, 21% of white juveniles were also Hispanic. A similar proportion of American Indians (24%) also described their ethnicity as Hispanic. This proportion was far smaller for black juveniles and Asian juveniles (5% each).

The Census Bureau estimates that the number of Hispanic juveniles in the U.S. will increase 58% between 2000 and 2020. This growth will bring the Hispanic proportion of the juvenile population to 23% by 2020 and to 31% by 2050.

### How useful are race/ethnicity classifications?

Using race and Hispanic origin as characteristics to classify juveniles assumes meaningful differences among these subgroups. If Hispanic and non-Hispanic juveniles have substantially different characteristics, then such comparisons could be useful. Furthermore, if Hispanic ethnicity is a more telling demographic trait than race, then a five-category classification scheme that places all Hispanic youth in their own category and then divides other youth among the four racial categories may be useful—assuming available data support such groupings.

However, this is only one of many race/ethnicity classification schemes. For example, some argue that the Hispanic grouping is too broad—that data should, for example, distinguish youth whose ancestors came from Mexico, Puerto Rico, Cuba, and other countries. Similar proposals make finer distinctions among juveniles with ancestry in the various nations of Asia and the Middle East, as well as the various American Indian nations.

* To facilitate the transition to a more broad-based use of the new racial coding structure, the National Center for Health Statistics modified Census' population data, removing the 31 mixed-race categories. Bridging the new racial coding structure back to the old structure was accomplished by estimating a single racial group classification of mixed-race persons, based on responses to the National Health Interview Survey that asked respondents to classify themselves using both the old and new racial coding structures.

In the 1920s, the Children's Bureau (then within the U.S. Department of Labor) asked juvenile courts to classify referred youth by their nativity, which at the time distinguished primarily among various European ancestries. Today, the idea of presenting crime and justice statistics that distinguish among juveniles with Irish, Italian, and German ancestry seems nonsensical. The demographic classification of juveniles is not a scientific process, but a culturally related one that changes with time and place. Those reading our reports 100 years from now will likely wonder about the reasons for our current racial/ethnic categorizations.

### Juvenile justice systems serve populations that vary greatly in racial/ethnic composition

In 2002, at least 9 of every 10 juveniles in Vermont, Maine, New Hampshire, and West Virginia were non-Hispanic and white. In contrast, New Mexico's juvenile population was 51% Hispanic. Other states with large Hispanic juvenile populations were California (45%), Texas (42%), Arizona (37%), Nevada (30%), and Colorado (24%). In 2002, three quarters of all Hispanic juveniles lived in California, Texas, New York, Florida, Illinois, Arizona, and New Jersey.

In 2002, four states had juvenile populations with more than 10% American Indians or Alaska Natives. These states were Alaska (21%), South Dakota (14%), New Mexico (12%), and Oklahoma (12%).

The states with the greatest proportion of black juveniles in their populations in 2002 were Mississippi (45%), Louisiana (40%), South Carolina (37%), Georgia (34%), Maryland (33%), and Alabama (32%). The juvenile population in the District of Columbia was 72% black.

**In 2002, more than 1 in 4 juveniles in New Mexico, California, Texas, Arizona, and Nevada were Hispanic**

| | 2002 juvenile population (ages 0–17) | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Non-Hispanic | | | | | Percent change |
| State | Number | White | Black | American Indian | Asian | Hispanic | 1990–2002 |
| U.S. total | 72,894,500 | 61% | 16% | 1% | 4% | 18% | 14% |
| Alabama | 1,107,100 | 64 | 32 | 1 | 1 | 2 | 5 |
| Alaska | 192,400 | 62 | 5 | 21 | 5 | 6 | 8 |
| Arizona | 1,476,900 | 50 | 4 | 7 | 2 | 37 | 47 |
| Arkansas | 677,500 | 72 | 21 | 1 | 1 | 5 | 9 |
| California | 9,452,400 | 36 | 8 | 1 | 11 | 45 | 18 |
| Colorado | 1,151,100 | 67 | 5 | 1 | 3 | 24 | 31 |
| Connecticut | 872,900 | 70 | 12 | 0 | 3 | 14 | 16 |
| Delaware | 189,700 | 65 | 25 | 0 | 3 | 7 | 15 |
| Dist. of Columbia | 112,100 | 15 | 72 | 0 | 2 | 11 | –1 |
| Florida | 3,882,300 | 55 | 22 | 0 | 2 | 20 | 30 |
| Georgia | 2,268,500 | 56 | 34 | 0 | 2 | 7 | 30 |
| Hawaii | 295,500 | 23 | 3 | 0 | 61 | 13 | 6 |
| Idaho | 370,400 | 84 | 1 | 2 | 1 | 12 | 18 |
| Illinois | 3,254,500 | 59 | 19 | 0 | 4 | 18 | 11 |
| Indiana | 1,594,900 | 82 | 11 | 0 | 1 | 5 | 11 |
| Iowa | 698,000 | 89 | 4 | 0 | 2 | 5 | –3 |
| Kansas | 696,500 | 77 | 8 | 1 | 2 | 11 | 5 |
| Kentucky | 931,600 | 87 | 10 | 0 | 1 | 2 | –2 |
| Louisiana | 1,185,700 | 55 | 40 | 1 | 1 | 3 | –2 |
| Maine | 279,100 | 95 | 1 | 1 | 1 | 1 | –9 |
| Maryland | 1,379,900 | 57 | 33 | 0 | 4 | 6 | 17 |
| Massachusetts | 1,463,300 | 76 | 8 | 0 | 5 | 11 | 8 |
| Michigan | 2,570,300 | 73 | 19 | 1 | 2 | 5 | 4 |
| Minnesota | 1,252,100 | 83 | 7 | 2 | 5 | 5 | 6 |
| Mississippi | 760,700 | 52 | 45 | 1 | 1 | 2 | 4 |
| Missouri | 1,397,500 | 80 | 15 | 1 | 1 | 3 | 6 |
| Montana | 216,300 | 85 | 1 | 10 | 1 | 3 | –3 |
| Nebraska | 439,400 | 82 | 6 | 1 | 2 | 9 | 2 |
| Nevada | 572,600 | 55 | 9 | 1 | 5 | 30 | 81 |
| New Hampshire | 308,400 | 94 | 1 | 0 | 2 | 3 | 11 |
| New Jersey | 2,127,400 | 59 | 17 | 0 | 7 | 17 | 17 |
| New Mexico | 500,500 | 33 | 2 | 12 | 1 | 51 | 10 |
| New York | 4,613,300 | 55 | 19 | 0 | 6 | 20 | 8 |
| North Carolina | 2,068,800 | 63 | 27 | 1 | 2 | 7 | 27 |
| North Dakota | 146,800 | 87 | 1 | 8 | 1 | 2 | –14 |
| Ohio | 2,879,900 | 80 | 16 | 0 | 1 | 3 | 4 |
| Oklahoma | 873,600 | 68 | 11 | 12 | 2 | 8 | 4 |
| Oregon | 855,100 | 77 | 3 | 2 | 4 | 14 | 15 |
| Pennsylvania | 2,863,500 | 79 | 14 | 0 | 2 | 5 | 2 |
| Rhode Island | 239,200 | 74 | 8 | 1 | 3 | 15 | 6 |
| South Carolina | 979,200 | 59 | 37 | 0 | 1 | 3 | 6 |
| South Dakota | 195,600 | 81 | 2 | 14 | 1 | 2 | –2 |
| Tennessee | 1,404,700 | 74 | 22 | 0 | 1 | 3 | 15 |
| Texas | 6,102,300 | 42 | 13 | 0 | 3 | 42 | 24 |
| Utah | 713,000 | 83 | 1 | 2 | 3 | 12 | 14 |
| Vermont | 139,700 | 96 | 1 | 1 | 1 | 1 | –3 |
| Virginia | 1,779,400 | 65 | 24 | 0 | 4 | 6 | 17 |
| Washington | 1,513,400 | 73 | 6 | 2 | 7 | 12 | 16 |
| West Virginia | 389,200 | 94 | 4 | 0 | 1 | 1 | –11 |
| Wisconsin | 1,338,100 | 81 | 9 | 1 | 3 | 6 | 3 |
| Wyoming | 122,300 | 85 | 1 | 3 | 1 | 9 | –10 |

Note: Detail may not total 100% because of rounding.

Source: Authors' adaptation of Puzzanchera et al.'s *Easy access to juvenile populations* [online analysis].

Case 2:06-cv-00755-MHT-CSC Document 72-4 Filed 11/16/2007 Page 14 of 35

**Proportion of non-Hispanic white youth in the juvenile population (ages 0–17), 2002**

Percent white, non-Hispanic
0% to 65%
65% to 85%
85% to 95%
95% or more

**Proportion of non-Hispanic black youth in the juvenile population (ages 0–17), 2002**

Percent black, non-Hispanic
0% to 1%
1% to 3%
3% to 15%
15% or more

Source: Authors' adaptation of National Center for Health Statistics' *Estimates of the July 1, 2000–July 1, 2002 United States resident populations from the vintage 2002 postcensal series by year, age, sex, race, and Hispanic origin* [machine-readable data file].

**Proportion of non-Hispanic American Indian youth in the juvenile population (ages 0–17), 2002**

Percent American Indian, non-Hispanic
0% to 1%
1% to 2%
2% to 10%
10% or more

**Proportion of non-Hispanic Asian youth in the juvenile population (ages 0–17), 2002**

Percent Asian, non-Hispanic
0% to 1%
1% to 2%
2% to 4%
4% or more

Source: Authors' adaptation of National Center for Health Statistics' *Estimates of the July 1, 2000–July 1, 2002 United States resident populations from the vintage 2002 postcensal series by year, age, sex, race, and Hispanic origin* [machine-readable data file].

**Proportion of Hispanic youth in the juvenile population (ages 0–17), 2002**

Percent Hispanic
0% to 1%
1% to 3%
3% to 10%
10% or more

**Change in the juvenile population (ages 0–17), 1990–2002**

Percent change, 1990–2002
–10% and less
–10% to 10%
10% to 65%
65% and greater

Source: Authors' adaptation of National Center for Health Statistics' *Estimates of the July 1, 2000–July 1, 2002 United States resident populations from the vintage 2002 postcensal series by year, age, sex, race, and Hispanic origin* [machine-readable data file] and *Bridged-race intercensal estimates of the July 1, 1990–July 1, 1999 United States resident population by state, county, age, sex, race, and Hispanic origin* [machine-readable data file].



# In 2002, poverty was more common among children under age 5 than any other age group

### Juvenile poverty appears to be associated with juvenile crime

Research has often found a connection between poverty and self-reported delinquency. For example, Farrington found that low family income measured when the youth was age 8 predicted self-reported violence in the teenage years and conviction rates for violent offenses. Research, however, indicates that the linkage may not be direct. For example, Sampson found that poverty exerts much influence on family disruption (e.g., marital separation, divorce), which in turn has a direct influence on juvenile violent crime rates. He also found that family disruption had a stronger influence on juvenile violence than adult violence. Therefore, differential poverty levels are likely to influence juvenile crime trends.

### One of every six juveniles lived in poverty in 2002

Each person and family is assigned a poverty threshold according to the size of the family and the ages of the members.* The national poverty thresholds are used throughout the U.S. and are updated for inflation annually. In 1990, the poverty threshold for a family of four with two children was $13,254. In 2002, this threshold was $18,244. In comparison, the poverty threshold for a family of six with four children was $24,038 in 2002. Although the thresholds in some sense reflect families' needs, they are not intended to be a complete description of what individuals and families need to live.

In 2002, 12% of all persons in the U.S. lived at or below their poverty

* Family members are defined as being related by birth, marriage, or adoption.

**Although the proportion of juveniles living below the poverty level has declined substantially from its peak in 1993, it is still considerably larger than that of older Americans**

- In the mid-1970s, the proportions of juveniles and senior citizens living in poverty were essentially equal. In the last quarter of the 20th century, the proportion of senior citizens living in poverty declined, while the juvenile poverty rates increased before falling back at the end of the century to the levels of the mid-1970s.

**In 2002, black juveniles and Hispanic juveniles were more than 3 times as likely to live in poverty as non-Hispanic white juveniles**

- Regardless of race or Hispanic ethnicity, the proportions of juveniles living in poverty in 2002 were at or near their lowest levels since the mid-1970s.

Notes: Poverty statistics on American Indians and Alaska Natives were not presented in the source reports. Racial categories do not include persons of Hispanic ethnicity.

Source: Authors' adaptation of Proctor and Dalaker's Poverty in the United States: 2002, *Current Population Reports*.

thresholds. This proportion was far greater for persons under age 18 (17%) than for those ages 18–64 (11%) and those above age 64 (10%). The youngest children were the most likely to live in poverty: 16% of juveniles ages 5–17 lived in households with resources below the established poverty thresholds, but 19% of children under age 5 did so.

Many children live far below their poverty thresholds. One technique for gaining a perspective on this is to see how many children live below 50% of the poverty level—e.g., in 2002, how many children lived in families of four with two children and incomes less than $9,122, or half the poverty threshold of $18,244. In 2002, 6.9% of persons under age 18 were living below 50% of the poverty level, compared with 4.6% of persons ages 18–64 and 2.2% of persons over age 64. This proportion was once again highest for children under age 5 (8.6%). In all, more than 40% of juveniles living in poverty lived in what can be characterized as extreme poverty.

**More than 1 of every 4 juveniles in the District of Columbia, Arkansas, Louisiana, Mississippi, and West Virginia lived below the poverty level in 2002**

| State | Percent of persons living below the poverty threshold: All ages | Ages 0–17 | Ages 18–64 | Over age 64 |
|---|---|---|---|---|
| United States | 12.1% | 16.7% | 10.6% | 10.4% |
| Alabama | 14.5 | 19.1 | 12.2 | 15.7 |
| Alaska | 8.8 | 11.3 | 7.9 | * |
| **Arizona** | **13.5** | **19.3** | **12.6** | **6.0** |
| **Arkansas** | **19.8** | **31.2** | **15.9** | **16.6** |
| **California** | **13.1** | **18.7** | **11.4** | **8.9** |
| Colorado | 9.8 | 12.5 | 8.7 | 9.8 |
| Connecticut | 8.3 | 11.0 | 7.6 | 5.9 |
| Delaware | 9.1 | 12.6 | 8.5 | 6.0 |
| **Dist. of Columbia** | **17.0** | **33.0** | **12.4** | * |
| **Florida** | **12.6** | **16.5** | **11.3** | **11.3** |
| **Georgia** | **11.2** | **16.0** | **9.2** | **10.7** |
| Hawaii | 11.3 | 14.4 | 10.4 | 9.4 |
| Idaho | 11.3 | 15.0 | 11.0 | 3.6 |
| Illinois | 12.8 | 17.7 | 11.5 | 8.1 |
| **Indiana** | **9.1** | **10.5** | **8.4** | **9.3** |
| **Iowa** | **9.2** | **10.7** | **8.1** | **11.8** |
| **Kansas** | **10.1** | **12.0** | **9.2** | **10.2** |
| Kentucky | 14.2 | 21.4 | 12.1 | 10.9 |
| Louisiana | 17.5 | 26.4 | 14.4 | 13.6 |
| Maine | 13.4 | 19.1 | 11.9 | 12.0 |
| **Maryland** | **7.4** | **7.4** | **6.8** | **11.0** |
| **Massachusetts** | **10.0** | **13.0** | **8.8** | **10.9** |
| **Michigan** | **11.6** | **15.0** | **10.3** | **11.5** |
| Minnesota | 6.5 | 7.7 | 5.9 | 6.9 |
| Mississippi | 18.4 | 25.3 | 15.3 | 19.1 |
| Missouri | 9.9% | 15.3% | 8.4% | 6.4% |
| Montana | 13.5 | 18.5 | 12.3 | 10.6 |
| Nebraska | 10.6 | 13.0 | 9.7 | 10.6 |
| **Nevada** | **8.9** | **12.1** | **7.7** | **7.6** |
| **New Hampshire** | **5.8** | **5.8** | **5.5** | **7.1** |
| **New Jersey** | **7.9** | **9.3** | **7.2** | **9.1** |
| New Mexico | 17.9 | 24.4 | 15.7 | 14.5 |
| New York | 14.0 | 20.5 | 11.9 | 12.4 |
| North Carolina | 14.3 | 20.6 | 12.5 | 10.6 |
| **North Dakota** | **11.6** | **16.5** | **9.9** | **11.1** |
| **Ohio** | **9.8** | **11.8** | **9.4** | **7.5** |
| **Oklahoma** | **14.1** | **19.3** | **12.7** | **10.5** |
| Oregon | 10.9 | 13.9 | 10.6 | 6.2 |
| Pennsylvania | 9.5 | 13.8 | 8.3 | 7.7 |
| Rhode Island | 11.0 | 15.2 | 9.2 | 12.6 |
| **South Carolina** | **14.3** | **19.0** | **12.2** | **14.7** |
| **South Dakota** | **11.5** | **12.2** | **10.5** | **14.4** |
| **Tennessee** | **14.8** | **20.0** | **13.0** | **14.4** |
| Texas | 15.6 | 22.0 | 12.8 | 15.4 |
| Utah | 9.9 | 12.5 | 8.1 | 12.4 |
| Vermont | 9.9 | 12.8 | 9.2 | 8.4 |
| **Virginia** | **9.9** | **13.8** | **8.3** | **9.8** |
| **Washington** | **11.0** | **14.1** | **10.3** | **7.9** |
| **West Virginia** | **16.8** | **25.1** | **15.2** | **11.6** |
| Wisconsin | 8.6 | 12.1 | 7.1 | 9.1 |
| Wyoming | 9.0 | 10.7 | 8.7 | * |

* The percentage has been suppressed because the denominator (i.e., the total population in the age group) is less than 75,000, making it statistically unreliable.

Source: Authors' adaptation of U.S. Census Bureau's *Annual demographic survey, March supplement, POV46, poverty status by state.*

**In 2002, almost one-third of black juveniles lived in poverty, and one-fifth of black children under age 5 lived in extreme poverty (incomes less than half the poverty threshold)**

| | Living below the poverty level | | | | | Living below 50% of the poverty level | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | All | White | Black | Asian | Hispanic | All | White | Black | Asian | Hispanic |
| All ages | 12.1% | 8.0% | 24.1% | 10.1% | 21.8% | 4.9% | 3.2% | 10.6% | 4.9% | 8.5% |
| Under age 18 | 16.7 | 9.4 | 32.3 | 11.7 | 28.6 | 6.9 | 3.6 | 15.4 | 5.0 | 11.2 |
| Under age 5 | 19.0 | 11.2 | 37.5 | 9.2 | 29.3 | 8.6 | 4.6 | 20.8 | 4.2 | 11.9 |
| Ages 5–17 | 15.8 | 8.8 | 30.4 | 12.7 | 28.3 | 6.3 | 3.3 | 13.5 | 5.4 | 10.9 |
| Ages 18–64 | 10.6 | 7.5 | 19.9 | 9.7 | 18.1 | 4.6 | 3.3 | 8.8 | 5.3 | 7.3 |
| Over age 64 | 10.4 | 8.3 | 23.8 | 8.4 | 21.4 | 2.2 | 1.8 | 4.8 | 2.1 | 3.9 |

- In 2002, for white and Asian populations, the juvenile poverty rates were about 20% above those of adults ages 18–64. In contrast, for black and Hispanic populations, the rate differences were about 60%.

Note: Racial categories do not include persons of Hispanic ethnicity.

Source: Authors' adaptation of U.S. Census Bureau's *Annual demographic survey, March supplement, POV01, age and sex of all people, family members and unrelated individuals iterated by income-to-poverty ratio and race.*

**Proportion of juveniles (ages 0–17) living in poverty, 2002**

Percent living in poverty
0% to 10%
10% to 20%
20% to 30%
30% to 60%

# In the last half of the 20th century, the proportion of juveniles living in single-parent households increased

### Family structure is related to juveniles' problem behaviors

A recent study by McCurley and Snyder explored the relationship between family structure and self-reported problem behaviors. The central finding was that youth ages 12–17 who lived in families with both biological parents were, in general, less likely than youth in other families to report a variety of problem behaviors, such as running away from home, sexual activity, major theft, assault, and arrest. The family structure effect was seen within groups defined by age, gender, or race/ethnicity. In fact, this study found that family structure was a better predictor of these problem behaviors than race or ethnicity. The family structure effect emerged among both youth who lived in neighborhoods described as "well kept" and those in neighborhoods described as "fairly well kept" or "poorly kept." For these reasons, it is useful to understand differences and trends in youth living arrangements. However, it is important to note that family structure may not be the proximate cause of the youth behavior, but rather the conditions often linked with it.

### About 7 of every 10 children live with married parents

Analyses of the 1960 decennial census found that 88% of children under age 18 lived in two-parent families. The Census Bureau's Current Population Survey found that the proportion of children living in two-parent families declined throughout the 1970s and the 1980s and through the first half of the 1990s. In 2002, 69% of children were living in two-parent families—a level that has held since the mid-1990s. Most other children lived in one-parent households. (Even if a second adult is present and is a biological parent or functions in a parental role, the Census Bureau still classifies the household as single-parent if the two adults are unmarried.) The proportion of children living in single-parent households increased from 9% in 1960 to 27% in 2002.

Historical data are not available to document the changing proportion of children who live with two unmarried biological parents. However, the Survey of Income and Program Participation (SIPP) captured this distinction for 1996. SIPP found that only 2% of children lived in families with two unmarried biological parents in 1996. This proportion varied with race and ethnicity: white non-Hispanic (2%), black (2%), American Indian (6%), Asian (1%), and Hispanic (5%). SIPP also found that 69% of U.S. children under age 18 lived with married parents. This proportion was highest for Asian (82%) and white non-Hispanic (77%) children, lower for Hispanic (64%) and American Indian (56%) children, and lowest for black children (35%).

According to the Census Bureau, most children who live in single-parent households live with their mothers. The proportion of children living with their mothers in single-parent households grew from 8% of the juvenile population in 1960 to 23% in 2002. In 1970, the mothers of 7% of the children living in single-mother households had never been married; this proportion grew to 42% in 2002.

The proportion of children living with their fathers in one-parent households grew from 1% in 1960 to almost 5% in 2002. In 1970, the fathers of 4% of the children living in single-father households had never been married; this proportion grew to 38% in 2002, a pattern similar to the mother-only households.

The Census Bureau found a major difference between mother-only and father-only households: cohabitation (living with an unrelated adult of the opposite gender who is not one's spouse) was much more common in father-only households. In 2002, children living in single-parent households were three times more likely to have a cohabiting father (33%) than a cohabiting mother (11%).

Some children live in households headed by other relatives or by nonrelatives. In 2002, 3% of children lived in households headed by other relatives, with about 3 of every 5 of these children living with a grandparent. (Across all household types, 8% of children lived in households that included a grandparent.) In 2002, 1% of all children lived with nonrelatives.

### Most children live in families with at least one parent in the labor force

Overall, 88% of children in 2002 lived in families with one or both parents in the labor force. (Being in the labor force means that the person is employed or is actively looking for work.) Of all children living with two parents, 97% had at least one parent in the labor force, and 62% had both parents in the labor force. When just one parent in two-parent families was in the labor force, 87% of the time it was the father. Among children living in single-parent households, those living with their fathers only were more likely to have the parent in the labor force than those living with their mothers only (89% versus 77%).

Chapter 1: Juvenile population characteristics

**The proportion of children under age 18 living in two-parent households declined between 1970 and 2002, regardless of race**

Percent under age 18 living in two-parent household
90%
80%
70%
60%
50%
40%
30%
20%
10%
0%
White
All youth
Hispanic
Black
70 72 74 76 78 80 82 84 86 88 90 92 94 96 98 00 02
Year

- Between 1970 and 2002, the proportion of children living in single-parent households increased from 9% to 22% for whites and from 32% to 53% for blacks. The proportion for Hispanic children increased from 21% in 1980 to 30% in 2002.

Note: Race proportions include persons of Hispanic ethnicity. Persons of Hispanic ethnicity may be of any race; however, most are white.

Source: Authors' adaptation of the U.S. Census Bureau's *Families and living arrangements, historical time series.*

**Black children were the least likely to live with both parents—regardless of the marital status of the parents**

All races
White
White non-Hispanic
Black
American Indian
Asian
Hispanic
71%
23%
4%
77%
17%
3%
79%
16%
3%
38%
52%
8%
62%
30%
6%
84%
13%
2%
68%
26%
4%
0% 10% 20% 30% 40% 50% 60% 70% 80% 90% 100%
Percent of children (ages 0–17), 1996
Two parents, including nonmarried parents
Father only
Mother only
Neither parent

Note: Persons of Hispanic ethnicity may be of any race.

Source: Authors' adaptation of Fields' Living arrangements of children: Fall 1996, *Current Population Reports.*

## Children in single-parent families are more likely to live in poverty

The economic well-being of children is related to family structure. In 2002, 17% of all juveniles lived below the poverty level. However children living in two-parent families were far less likely to live in poverty (8%) than were children living with only their fathers (19%), only their mothers (38%), or neither parent (48%). Viewed another way, more than half (52%) of all children living below the poverty level in 2002 were living in single-mother families and about one-third (32%) were living in two-parent families.

Family structure is also related to the proportion of children in households receiving public assistance or food stamps. Overall, 5% of children in 2002 lived in households receiving public assistance and 11% lived in households receiving food stamps, but the proportions were far greater for children living in single-mother families.

| | Percent of children receiving | |
|---|---|---|
| Family structure | Public assistance | Food stamps |
| All families | 5% | 11% |
| Two-parent | 2 | 4 |
| Mother only | 13 | 29 |
| Father only | 5 | 13 |
| Neither parent | 12 | 15 |

In 2002, 62% of all children receiving public assistance and 61% receiving food stamps lived in single-mother families. Two-parent families accounted for 32% of children receiving public assistance and 23% of those receiving food stamps.

*Juvenile Offenders and Victims: 2006 National Report* 11



# The teenage birth rate fell substantially between 1950 and 2002

## Teen birth rates continue to decline

Tatem-Kelley and her coauthors have stated that having a baby as a teenager has serious and often deleterious consequences for the lives of both the young mother and her baby. Teenage mothers and fathers are often ill equipped to effectively parent and often draw heavily on the resources of their extended families and communities. For teenage parents who themselves were raised in dysfunctional or abusive families, parenting problems may be even more evident and family support more limited.

In 2002, the birth rate for older juveniles (i.e., women ages 15–17) was 23.2 live births for every 1,000 women in the age group. In the same year, the birth rate for young adults (i.e., women ages 18 and 19) was 3 times greater (72.8). The birth rates for older juveniles and young adults varied by race and Hispanic ethnicity.

Births per 1,000 women, 2002:

| Race/ ethnicity | Ages 15–17 | Ages 18–19 |
|---|---|---|
| All races | 23.2 | 72.8 |
| White non-Hispanic | 13.1 | 51.9 |
| Black non-Hispanic | 41.0 | 110.3 |
| Hispanic | 50.7 | 133.0 |

The birth rate for Hispanic females ages 15–17 in 2002 was almost 4 times that for white non-Hispanics. The rate for black non-Hispanic females was more than 3 times that for white non-Hispanics.

Between 1991 and 2002, birth rates declined more for older juveniles (40%) than for young adults (23%). The decline for older juveniles was greater for non-Hispanic whites (45%) and blacks (52%) than for Hispanics (27%).

**Following a peak in 1991, the birth rate for females ages 15–17 fell consistently so that by 2002, the rate was 40% below its 1970 level**

- The birth rate for older juvenile females (ages 15–17) fell 21% between 1970 and 1986, and then increased over the next 5 years back to its 1970 level.
- The birth rate for young adult females (ages 18 and 19) dropped even more than the rate for older juveniles between 1970 and 1986, falling 31%. Although the rate for young adults also then increased to a peak in 1991, this peak was far below the 1970 level. Similar to older juveniles, the birth rate for young adults in 2002 was 37% below its 1970 level.

**The annual birth rate for females ages 15–19 declined substantially between 1950 and 2000, while the proportion of these births that were to unmarried women increased**

- In 1950, 13% of all births to females ages 15–19 were to unmarried women. By 2000, this proportion had increased to 79%.
- In 1950, of the 82 births per 1,000 females ages 15–19, 71 were to married women and 11 were to unmarried women. In 2000, of the 48 births per 1,000 females ages 15–19, 10 were to married women and 38 were to unmarried women.

Source: Authors' adaptation of Martin et al.'s Births: Final data for 2002, *National Vital Statistics Reports*, 52(10); Ventura et al.'s Births to teenagers in the United States, 1940–2000, *National Vital Statistics Reports*, 49(10); and Ventura et al.'s Births: Final data for 1999, *National Vital Statistics Reports*, 49(1).

**Birth rates for women ages 15–17 varied greatly across states in 2002, ranging from 8.1 in New Hampshire to 38.2 in Texas**

| State | Births per 1,000 females in age group, 2002 | | | Ratio of ages |
|---|---|---|---|---|
| | Ages 15–19 | Ages 15–17 | Ages 18–19 | 15–17 to 18–19 |
| United States | 43.0 | 23.2 | 72.8 | 32% |
| Alabama | 54.5 | 31.5 | 88.7 | 36 |
| Alaska | 39.5 | 18.9 | 73.7 | 26 |
| Arizona | 61.2 | 35.0 | 102.5 | 34 |
| Arkansas | 59.9 | 31.6 | 101.7 | 31 |
| California | 41.1 | 22.6 | 69.1 | 33 |
| Colorado | 47.0 | 26.2 | 79.1 | 33 |
| Connecticut | 25.8 | 14.1 | 45.1 | 31 |
| Delaware | 46.3 | 24.7 | 77.8 | 32 |
| District of Columbia | 69.1 | 44.8 | 101.5 | 44 |
| Florida | 44.5 | 23.2 | 78.4 | 30 |
| Georgia | 55.7 | 31.4 | 92.8 | 34 |
| Hawaii | 38.2 | 17.7 | 66.4 | 27 |
| Idaho | 39.1 | 18.4 | 69.1 | 27 |
| Illinois | 42.2 | 23.4 | 70.5 | 33 |
| Indiana | 44.6 | 22.6 | 78.5 | 29 |
| Iowa | 32.5 | 16.4 | 55.4 | 30 |
| Kansas | 43.0 | 21.4 | 74.2 | 29 |
| Kentucky | 51.0 | 26.5 | 84.8 | 31 |
| Louisiana | 58.1 | 31.7 | 96.1 | 33 |
| Maine | 25.4 | 11.9 | 45.2 | 26 |
| Maryland | 35.4 | 20.0 | 59.6 | 34 |
| Massachusetts | 23.3 | 12.5 | 39.6 | 32 |
| Michigan | 34.8 | 18.0 | 60.8 | 30 |
| Minnesota | 27.5 | 14.2 | 47.3 | 30 |
| Mississippi | 64.7 | 37.6 | 103.3 | 36 |
| Missouri | 44.1 | 22.2 | 76.6 | 29 |
| Montana | 36.4 | 17.8 | 63.3 | 28 |
| Nebraska | 37.0 | 18.3 | 64.2 | 29 |
| Nevada | 53.9 | 28.0 | 96.7 | 29 |
| New Hampshire | 20.0 | 8.1 | 39.0 | 21 |
| New Jersey | 26.8 | 14.7 | 46.1 | 32 |
| New Mexico | 62.4 | 37.8 | 99.5 | 38 |
| New York | 29.5 | 15.7 | 50.1 | 31 |
| North Carolina | 52.2 | 28.6 | 89.3 | 32 |
| North Dakota | 27.2 | 11.7 | 48.7 | 24 |
| Ohio | 39.5 | 20.1 | 69.4 | 29 |
| Oklahoma | 58.0 | 30.1 | 97.6 | 31 |
| Oregon | 36.8 | 18.2 | 64.8 | 28 |
| Pennsylvania | 31.6 | 17.2 | 53.7 | 32 |
| Rhode Island | 35.6 | 19.6 | 59.0 | 33 |
| South Carolina | 53.0 | 29.2 | 87.2 | 33 |
| South Dakota | 38.0 | 17.3 | 67.8 | 26 |
| Tennessee | 54.3 | 28.2 | 94.2 | 30 |
| Texas | 64.4 | 38.2 | 104.3 | 37 |
| Utah | 36.8 | 17.8 | 62.4 | 29 |
| Vermont | 24.2 | 10.4 | 44.4 | 23 |
| Virginia | 37.6 | 19.0 | 66.0 | 29 |
| Washington | 33.0 | 16.8 | 57.6 | 29 |
| West Virginia | 45.5 | 21.5 | 80.7 | 27 |
| Wisconsin | 32.3 | 15.9 | 57.1 | 28 |
| Wyoming | 39.9 | 17.7 | 72.1 | 25 |

- Comparing birth rates for older juveniles (ages 15–17) to those of young adults (ages 18 and 19) shows that the older juvenile rate ranged from 21% of the young adult rate in New Hampshire to 44% of the young adult rate in the District of Columbia.

Source: Authors' adaptation of Martin et al.'s Births: Final data for 2002, *National Vital Statistics Reports*, 52(10).

**The teenage birth rate in the U.S. is high compared with other industrialized nations**

A recent report by the National Center for Health Statistics presented teenage birth rates for a large number of nations. While it was not possible to obtain such rates for a common year, the authors of the report did show the most recent data from each nation.

Births per 1,000 women ages 15–19:

| Country | Birth rate | Data year |
|---|---|---|
| United States | 48.7 | 2000 |
| Russian Federation | 44.7 | 1995 |
| New Zealand | 34.0 | 1996 |
| United Kingdom | 30.2 | 1997 |
| Canada | 24.5 | 1995 |
| Portugal | 21.3 | 1997 |
| Australia | 20.5 | 1995 |
| Israel | 16.7 | 1997 |
| Ireland | 16.1 | 1996 |
| Austria | 14.7 | 1997 |
| Norway | 12.8 | 1997 |
| Greece | 12.1 | 1997 |
| Belgium | 11.9 | 1992 |
| Germany | 9.7 | 1996 |
| Finland | 9.1 | 1997 |
| Denmark | 8.3 | 1996 |
| France | 7.9 | 1993 |
| Sweden | 7.8 | 1996 |
| Spain | 7.5 | 1996 |
| Italy | 6.8 | 1995 |
| Switzerland | 5.7 | 1996 |
| Netherlands | 5.6 | 1996 |
| Japan | 4.3 | 1997 |

Source: Authors' adaptation of Ventura et al.'s Births to teenagers in the United States, 1940–2000, *National Vital Statistics Reports*, 49(10)

The teenage birth rate in the United States was roughly equal to the Russian rate; double the rates in Canada and Australia; 3 times the rates in Israel and Ireland; 6 times the rates in Denmark, France, and Sweden; and more than 10 times the Japanese rate.

Chapter 1: Juvenile population characteristics Case 2:06-cv-00755-MHT-CSC Document 72-4 Filed 11/16/2007 Page 24 of 35

# Although the dropout rate fell over the last 30 years, nearly a half million youth quit high school in 2000

## Educational failure is linked to law-violating behavior

The difficulties finding employment for high school dropouts can be documented by examining their labor force and unemployment status. The National Center for Education Statistics (NCES) found that 64% of the 2000/2001 school year dropouts were in the labor force (employed or actively looking for work), with more than one-third (36%) of those in the labor force unemployed. In comparison, 81% of the 2001 high school graduates who were not in college were in the labor force, and a far smaller proportion of this workforce (21%) was unemployed.

Within the juvenile justice system, programs often attempt to bring youth into the labor market. Sherman and his colleagues prepared a report for Congress in 1997 stating that, although there are some exceptions, research generally provides strong theoretical and empirical support for the conclusion that employment helps to prevent or reduce delinquent behavior.

If, as research has found, educational failure leads to unemployment (or underemployment), and if educational failure and unemployment are related to law-violating behavior, then patterns of educational failure over time and within specific groups may help to explain patterns of delinquent behavior.

## The dropout rate varies across demographic subgroups

NCES develops annual estimates of (1) the number of persons in grades 10–12 who dropped out of school in the preceding 12 months and (2) the percent of persons ages 16–24

**The annual proportion of students in grades 10–12 who left school without completing a high school program was lower in the 1990s than in the 1970s**

Percent of youth who dropped out of grades 10–12 in the preceding 12 months
18%
16%
14%
12%
10%
8%
6%
4%
2%
0%
Low-income families
Middle-income families
Total
High-income families
76
78
80
82
84
86
88
90
92
94
96
98
00
Year

Note: Low income is defined as the bottom 20% of family incomes for the year, middle is between 20% and 80% of all family incomes, and high is the top 20% of all family incomes.

**Dropout rates for white youth have remained below the rates for other racial/ethnic groups**

Percent of youth who dropped out of grades 10–12 in the preceding 12 months
14%
12%
10%
8%
6%
4%
2%
0%
Hispanic
Black
Total
White
76
78
80
82
84
86
88
90
92
94
96
98
00
Year

Note: Race proportions do not include persons of Hispanic ethnicity. Persons of Hispanic ethnicity can be of any race.

Source: Authors' adaptation of Kaufman et al.'s *Dropout Rates in the United States: 2000.*

14 *Juvenile Offenders and Victims: 2006 National Report*

who were dropouts. The first statistic (the event dropout rate) provides an annual assessment of flow into the dropout pool. The second statistic (the status dropout rate) provides an assessment of the proportion of dropouts in the young adult population.

Almost 5 of every 100 persons (4.8%) enrolled in high school in October 1999 left school before October 2000 without successfully completing a high school program—in other words, in the school year 1999/2000, about 488,000 youth dropped out and the event dropout rate was 4.8%. The event dropout rate in 2000 was higher for males (5.5%) than females (4.1%). The event dropout rates did not differ statistically among the various racial/ethnic groups: Asian (3.5%), white non-Hispanic (4.1%), black non-Hispanic (6.1%), and Hispanic (7.4%). However, the event dropout rate was far lower (1.6%) for youth living in families with incomes in the top one-fifth of all family incomes than for youth living in families with incomes in the bottom one-fifth of all family incomes (10.0%).

Over the years, demographic disparities in annual event dropout rates have accumulated to produce noticeable differences in status dropout rates—i.e., the proportion of young adults (persons ages 16-24) who are not enrolled in school and have not completed high school (or received an equivalency certificate). In October 2000, the status dropout rate among young adults was 10.9%. The rate was greater for males (12.0%) than females (9.9%). The status dropout rate was also substantially greater for Hispanics (27.8%) than black non-Hispanics (13.1%), white non-Hispanics (6.9%), or Asians (3.8%). A closer look at the data for Hispanics shows that the status dropout rate was much higher for Hispanics born outside the U.S. (44.2%) than those born in the U.S. (15.2%).

**Juveniles in the labor force**

**In 2002, 25% of juveniles ages 15–17 were in the labor force.** Being in the labor force means the juvenile was working either full-time or part-time as a paid employee with an ongoing relationship with a particular employer, such as working in a supermarket. Juveniles were not considered to be in the labor force if they worked in "freelance jobs" that involved doing tasks without a specific employer, such as babysitting or mowing lawns. Labor force participation increased with age: 9% of 15-year-olds, 26% of 16-year-olds, and 41% of 17-year-olds. About equal proportions of males and females ages 15–17 were in the labor force in 2002 (24% vs. 26%).

The unemployment rate is the proportion of persons in the labor force who are unemployed. For juveniles ages 15–17 in 2002, the unemployment rate was 21%. In comparison, for adults ages 25–54 the unemployment rate in 2002 was 5%. The unemployment rate for juveniles ages 15–17 varied by race and ethnicity in 2002. The unemployment rate for non-Hispanic white juveniles (18%) was significantly lower than the rates for black (40%) and Hispanic (24%) juveniles.



# Sources

Bureau of Labor Statistics, U.S. Department of Labor. 2002. *National Longitudinal Survey of Youth 1997 cohort, 1997–1999 (rounds 1–2)* [machine-readable data file]. Chicago, IL: National Opinion Research Center, University of Chicago [producer]. Columbus, OH: Center for Human Resource Research, Ohio State University [distributor].

Farrington, D. 1989. Early predictors of adolescent violence and adult violence. *Violence and Victims, Vol. 4.*

Fields, J. 2001. Living arrangements of children: Fall 1996. *Current Population Reports*, P70–74. Washington, DC: U.S. Census Bureau.

Fields, J. 2003. Children's living arrangements and characteristics: March 2002. *Current Population Reports*, P20–547. Washington, DC: U.S. Census Bureau.

Ingram, D., Parker, J., Schenker, N., Weed, J., Hamilton, B., Arias, E., and Madans, J. 2003. United States Census 2000 population with bridged race categories. *Vital and Health Statistics,* 2(135). Hyattsville, MD: National Center for Health Statistics.

Kaufman, P., Alt, M., and Chapman, C. 2001. *Dropout Rates in the United States: 2000.* Washington, DC: National Center for Education Statistics.

Martin, J., Hamilton, B., Sutton, P., Ventura, S., Menacker, F., and Munson, M. 2003. Births: Final data for 2002. *National Vital Statistics Reports*, 52(10). Washington, DC: National Center for Health Statistics.

McCurley, C., and Snyder, H. Forthcoming. Risk, protection, and family structure. *OJJDP Juvenile Justice Bulletin.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

National Center for Health Statistics. *Bridged-race intercensal estimates of the July 1, 1990–July 1, 1999 United States resident population by state, county, age, sex, race, and Hispanic origin* [machine-readable data file]. Prepared by the U.S. Census Bureau with support from the National Cancer Institute. Released April 15, 2003. <www.cdc.gov/nchs/about/major/dvs/popbridge/popbridge.htm>.

National Center for Health Statistics. *Estimates of the July 1, 2000–July 1, 2002 United States resident population from the vintage 2002 postcensal series by year, age, sex, race, and Hispanic origin* [machine-readable data file]. Prepared under a collaborative arrangement with the U.S. Census Bureau. Released August 1, 2003. <www.cdc.gov/nchs/about/major/dvs/popbridge/popbridge.htm>.

Proctor, B., and Dalaker, J. 2003. Poverty in the United States: 2002. *Current Population Reports,* P60-222. Washington, DC: U.S. Census Bureau.

Puzzanchera, C., Finnegan, T,. and Kang, W. *Easy access to juvenile populations* [online analysis]. Updated May 10, 2004. <www.ojjdp.ncjrs.gov/ojstatbb/ezapop>.

Sampson, R. 1987. Urban black violence: The effect of male joblessness and family disruption. *American Journal of Sociology,* 93(2).

Sherman, L., Gottfredson, D., MacKenzie, D., Eck, J., Reuter, P., and Bushway, S. 1997. *Preventing Crime: What Works, What Doesn't, What's Promising. Report to the U.S. Congress.* Washington, DC: U.S. Department of Justice.

Tatem-Kelley, B., Thornberry, T., and Smith, C. 1997. *In the Wake of Childhood Maltreatment.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

U.S. Census Bureau. *Annual demographic survey, March supplement, POV01, age and sex of all people, family members and unrelated individuals iterated by income-to-poverty ratio and race.* Revised July 14, 2004. <ferret.bls.census.gov/macro/032003/pov/new01_000.htm>.

U.S. Census Bureau. *Annual demographic survey, March supplement, POV46, poverty status by state.* Revised July 14, 2004. <ferret.bls.census.gov/macro/032003/pov/new46_001_100125.htm>.

U.S. Census Bureau. *Families and living arrangements, historical time series.* Revised July 1, 2003. <www.census.gov/population/www/socdemo/hh-fam.html>.

U.S. Census Bureau. *Population projections of the United States by age, sex, race, Hispanic origin, and nativity: 1999 to 2100.* Revised January 19, 2001. <www.census.gov/population/www/projections/natdet.html>.

U.S. Census Bureau. *Small area income & poverty estimates 2000* [machine-readable data file]. Downloaded August 15, 2004. <www.census.gov/hhes/www/saipe/download.html>.

U.S. Census Bureau. *U.S. population estimates by age, sex, race, and Hispanic origin: 1980 to 1999* [machine-readable data files]. Released April 11, 2000. <www.census.gov/popest/archives/1990s/nat-detail-layout.txt>.

Ventura, S., Martin, J., Curtain, S., Menacker, F., and Hamilton, B. 2001. Births: Final data for 1999. *National Vital Statistics Reports*, 49(1). Washington, DC: National Center for Health Statistics.

Ventura, S., Mathews, T., and Hamilton, B. 2001. Births to teenagers in the United States, 1940–2000. *National Vital Statistics Reports*, 49(10). Washington, DC: National Center for Health Statistics.

Young, B. 2003. *Public High School Dropouts and Completers From the Common Core of Data: School Year 2000–01*. Washington, DC: National Center for Education Statistics.

# Juvenile Offenders and Victims: 2006 National Report

**Chapter 2: Juvenile victims** .............................. 19

Juvenile homicide victims .................................... 20
Firearm-related homicides of juveniles .......................... 23
Juvenile suicide ............................................ 25
Victimization survey of juveniles ............................... 27
Victims of school crime ...................................... 29
Victimization risk factors ..................................... 30
Juvenile victims of reported violent crimes ...................... 31
Offenders who victimize juveniles .............................. 33
Time-of-day analysis of juvenile victimization ..................... 34
Location of juvenile victimization .............................. 36
Juvenile victims of statutory rape .............................. 37
Juvenile victimization on the Internet ........................... 38
Juvenile kidnap victims ...................................... 40
Missing children ............................................ 42
Runaway and thrownaway children ............................. 45
Missing children trends ...................................... 46
Child maltreatment case processing ............................ 47
Child maltreatment trends .................................... 51
Child maltreatment demographics .............................. 54
Child maltreatment perpetrators ............................... 55
Child maltreatment fatalities .................................. 56
Foster care ................................................ 57
Adoption .................................................. 59
Chapter 2 sources ........................................... 60

Copyright 2006
National Center for Juvenile Justice
3700 S. Water Street, Suite 200
Pittsburgh, PA 15203-2363

Suggested citation: Snyder, Howard N., and Sickmund, Melissa. 2006. *Juvenile Offenders and Victims: 2006 National Report.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.



# Chapter 2

## Juvenile victims

Juveniles of all ages are the victims of violent crime. Some of their offenders are family members; this is often the case for very young victims. Some juveniles are the victims of abuse and neglect at the hands of their caregivers. Research has shown that child victimization and abuse are linked to problem behaviors that become evident later in life. So an understanding of childhood victimization and its trends may lead to a better understanding of juvenile offending.

This chapter summarizes what is known about the prevalence and incidence of juvenile victimizations. It answers important questions to assist policymakers, practitioners, researchers, and concerned citizens in developing policies and programs to ensure the safety and well-being of children. How often are juveniles the victims of crime? How many are murdered each year? How often are firearms involved? Who are their offenders? How many youth commit suicide? How many children are victims of crime at school? What are the characteristics of school crime? When are juveniles most likely to become victims of crime? What is known about missing and runaway youth? How many children are abused and neglected annually? What are the trends in child maltreatment?

Data sources include the Bureau of Justice Statistics' National Crime Victimization Survey and the Federal Bureau of Investigation's Supplementary Homicide Reporting Program and its National Incident-Based Reporting System. School victimization data are drawn from both the National Center for Education Statistics and the Bureau of Justice Statistics. Child maltreatment is reported by the National Center on Child Abuse and Neglect. Data from the Office of Juvenile Justice and Delinquency Prevention's National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children are presented, as well as suicide information from the National Center for Health Statistics.



# On average, between 1980 and 2002 about 2,000 juveniles were murdered annually in the U.S.

### Homicide is one of the leading causes of juvenile deaths

The National Center for Injury Prevention and Control (within the Centers for Disease Control and Prevention) reports that homicide was the fourth leading cause of death for children ages 1–11 in 2002. Only deaths caused by unintentional injury, cancer, and congenital anomalies were more common for these young juveniles. That same year, homicide was the third leading cause of death for juveniles ages 12–17, with the more common causes of death being unintentional injury and suicide.

### The FBI and NCHS maintain detailed records of murders

The Federal Bureau of Investigation's (FBI's) Uniform Crime Reporting Program asks local law enforcement agencies to provide detailed information on all homicides occurring within their jurisdiction. These Supplementary Homicide Reports (SHRs) contain information on victim demographics and the method of death. Also, when known, SHRs capture the circumstances surrounding the death, the offender's demographics, and the relationship between the victim and the offender. Although not all agencies report every murder every year, for the years 1980 through 2002, the FBI received SHR records on more than 90% of all homicides in the U.S.

For 2002, the FBI reported that law enforcement identified the offender in 64% of murders nationwide, which means that for many of these crimes, the offenders remain unknown. Based on SHR data from 1980 through 2002, an offender was not identified by law enforcement in 24% of the murders of persons under age 18, in 34% of the murders

**The number of juvenile homicides in 2002 was 44% below the peak year of 1993 and at its lowest level since the mid-1980s**

- Between 1980 and 2002, juvenile offenders participated in 1 of every 4 homicides of juveniles in which the offenders were known to law enforcement. In about one-sixth of the juvenile homicides in which juvenile offenders participated, adult offenders were also involved.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].

**Between 1980 and 2002, the likelihood of being a murder victim peaked for persons in their early twenties, although for females, the first year of life was almost as dangerous**

- Until their teen years, boys and girls were equally likely to be a homicide victim.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].

**The large increase in juvenile homicides between 1984 and 1993 and the subsequent decline were nearly all attributable to changes in homicides of older juveniles**

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].

**In terms of gender, the large increase in juvenile homicides between 1984 and 1993 and the subsequent decline were nearly all attributable to changes in homicides of male juveniles**

- Unlike the number of male victims, the annual number of juvenile females murdered has not differed substantially between 1980 and 2002.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].

of adults, and in 33% of murders overall.

Within the Centers for Disease Control and Prevention (CDC), the National Center for Health Statistics (NCHS) maintains the National Vital Statistics System. This system receives reports on homicides from coroners and medical examiners. Annual estimates of juvenile homicides by NCHS tend to be about 10% higher than those from the FBI. The reasons for this difference are unclear but are probably related to inconsistent reporting and/or to differences in definitions, updating procedures, and/or imputation techniques.

A critical aspect of this Report is the delineation of patterns among victim and offender characteristics. Because the NCHS data capture no offender information, the discussion that follows is based on the FBI's SHR data.

### The likelihood of being murdered in 2002 was the same as in 1966

According to FBI estimates, 16,200 murders occurred in the U.S. in 2002. When compared with trends over the last 40 years, the number of murders in the U.S. was relatively stable between 1999 and 2002, with the 2002 FBI estimate just 4% above the estimate for the historically low year of 1999—when the FBI estimated that 15,500 persons were murdered.* Before 1999, 1970 is the most recent year with fewer murders than in 2002.

However, the U.S. population grew 40% between 1970 and 2002. So, although the number of murders in

* The 3,047 victims (9 of whom were under age 18) of the terrorist attacks on September 11, 2001, are not in the counts of murder victims.

1970 and 2002 was about the same, the murder rate in 2002 was actually about 40% lower than in 1970. Before 1999, the most recent year with a murder rate comparable to 2002 (5.6 murders/100,000 persons in the U.S. population) is 1966. This means the probability that a U.S. resident would be murdered was less in 2002 than in nearly all of the previous 35 years.

### In 2002, on average, 4 juveniles were murdered daily in the U.S.

An estimated 1,600 persons under age 18 were murdered in the U.S. in 2002—10% of all persons murdered that year. About one-third (36%) of these juvenile murder victims were female. About 4 in 10 (39%) of these victims were under age 6, 1 in 10 (10%) were ages 6–11, 1 in 10 (8%) were ages 12–14, and 4 in 10 (43%) were ages 15–17.

More than half (51%) of juvenile murder victims in 2002 were white, 45% were black, and 4% were either American Indian or Asian. Given that white youth constituted 78% of the U.S. resident juvenile population in 2002 and black youth 16%, the murder rate for black youth in 2002 was more than 4 times the white rate. This disparity was seen across victim age groups and increased with victim age:

| Victim age | 2002 homicide rate* White | 2002 homicide rate* Black | Black to white rate ratios |
|---|---|---|---|
| 0–17 | 1.4 | 6.0 | 4.2 |
| 0–5 | 1.9 | 6.5 | 3.4 |
| 6–11 | 0.4 | 1.6 | 3.6 |
| 12–14 | 0.7 | 2.8 | 4.4 |
| 15–17 | 3.3 | 18.1 | 5.5 |

* Homicide rates are the number of homicides per 100,000 juveniles in the age group.

**Between 1984 and 1993, while homicides of white juveniles increased 50%, homicides of black juveniles increased 150%**

- Black youth accounted for 16% of the juvenile population between 1980 and 2002, but were the victims in 47% of juvenile homicides
- In the early 1980s, the homicide rate for black juveniles was 4 times the rate for white juveniles. This disparity increased so that by 1993 the black rate was 6 times the white rate. The relatively greater decline in black juvenile homicides between 1993 and 2002 dropped the disparity in black-to-white homicide rates back to 4-to-1.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].

**Of the 46,600 juveniles murdered between 1980 and 2002, most victims under age 6 were killed by a parent, while parents were rarely involved in the killing of juveniles ages 15–17**

| Offender relationship to victim | Age of victim 0–17 | 0–5 | 6–11 | 12–14 | 15–17 | Victim ages 0–17 Males | Females |
|---|---|---|---|---|---|---|---|
| Offender known | 74% | 88% | 81% | 72% | 64% | 72% | 88% |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Parent/stepparent | 31 | 62 | 40 | 11 | 3 | 26 | 61 |
| Other family member | 7 | 7 | 15 | 11 | 5 | 6 | 7 |
| Acquaintance | 47 | 28 | 30 | 58 | 66 | 50 | 29 |
| Stranger | 15 | 3 | 15 | 20 | 25 | 18 | 3 |
| Offender unknown | 26% | 12% | 19% | 28% | 36% | 28% | 12% |

- Over the 23-year period, strangers were involved in *at least* 15% of the murders of juveniles. This figure is probably greater than 15% because strangers are likely to account for a disproportionate share of crimes in which the offender is unknown.

Note: Detail may not total 100% because of rounding.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].



Chapter 2: Juvenile victims

# Between 1980 and 2002, at least 3 of every 4 murder victims ages 15–17 were killed with a firearm

### Trends in the number of juvenile homicides are tied to homicides involving firearms

Almost half (48%) of all juveniles murdered in 2002 were killed with a firearm, 22% were killed by the offender's hands or feet (e.g., beaten/kicked to death or strangled), and 11% were killed with a knife or blunt object. The remaining 19% of juvenile murder victims were killed with another type of weapon, or the type of weapon used is unknown.

Firearms were used less often in the killings of young children. In 2002, firearms were used in 17% of murders of juveniles under age 12 but in 78% of the murders of juveniles ages 12–17. In 2002, a greater percentage of black than white juvenile murder victims were killed with a firearm (54% vs. 44%). In 2002, firearms were used more often in the murders of juvenile males (57%) than in the murders of juvenile females (33%).

Between 1980 and 2002, the deadliest year for juveniles was 1993, when an estimated 2,880 were murdered. Within the period, 1993 was also the year when the proportion of murdered juveniles killed with a firearm was the largest (61%). In fact, across the period, the annual number of juveniles murdered by means other than a firearm generally declined—a remarkable pattern when compared with the large increase and subsequent decline in the number of firearm-related murders of juveniles. Except for killings of young children and killings of juveniles by family members, murder trends in all demographic segments of the juvenile population between 1980 and 2002 were linked primarily to killings by firearms.

**The large drop in the number of juveniles killed with a firearm after 1993 resulted in the overall number of juvenile homicides in 2002 falling to its lowest level since 1984**

Juvenile homicide victims
1,800
1,600
1,400
1,200
1,000
800
600
400
200
0
Firearm involved
No firearm involved
1980 1982 1984 1986 1988 1990 1992 1994 1996 1998 2000 2002

**The proportion of homicides committed with firearms differed with victim demographics**

Firearm percent of homicide victims
80%
60%
40%
20%
0%
Adult
Juvenile
80 82 84 86 88 90 92 94 96 98 00 02
Year

Firearm percent of juvenile homicide victims
100%
80%
60%
40%
20%
0%
Ages 15–17
Ages 12–14
Ages 6–11
Ages 0–5
80 82 84 86 88 90 92 94 96 98 00 02
Year

Firearm percent of juvenile homicide victims
80%
60%
40%
20%
0%
Male
Female
80 82 84 86 88 90 92 94 96 98 00 02
Year

Firearm percent of juvenile homicide victims
80%
60%
40%
20%
0%
Black
White
80 82 84 86 88 90 92 94 96 98 00 02
Year

- More so than for adults, the period from 1980 through 2002 saw big changes in the use of firearms in the murders of older juveniles.
- The proportions of firearm-related murders of male and female juveniles showed similar growth and decline patterns over the period.
- Although firearms were involved in a greater proportion of black juvenile homicides than white, trends in the proportion of firearm-related homicides were similar for the racial groups.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].

*Juvenile Offenders and Victims: 2006 National Report* 23

### Young children are killed by family members—older juveniles by acquaintances

In the 2002 SHR data, the offender information is missing for 27% of juvenile murder victims either because the offender is unknown or because the information was not recorded on the data form. The proportion of unknown offenders in 2002 increased substantially with victim age: ages 0–5 (13%), ages 6–11 (15%), ages 12–14 (21%), and ages 15–17 (43%).

Considering only murders in 2002 for which the offender is known, a stranger killed 4% of murdered children under age 6, while parents killed 61%, other family members 7%, and acquaintances 28%. Older juveniles were far more likely to be murdered by nonfamily members. Five percent (5%) of victims ages 15–17 were killed by parents, 5% by other family members, 32% by strangers, and 58% by acquaintances.

Differences in the characteristics of the murders of juvenile males and juvenile females are linked to the age profiles of the victims. Between 1980 and 2002, the annual numbers of male and female victims were very similar for victims at each age under 13. However, older victims were disproportionately male. For example, between 1980 and 2002, 84% of murdered 17-year-olds were male. In general, therefore, a greater proportion of female murder victims are very young. So, while it is true that female victims were more likely to be killed by family members than were male victims (51% vs. 32%), this difference goes away within specific age groups. For example, for victims under age 6, 68% of males and 70% of females were killed by a family member between 1980 and 2002.

**Between 1980 and 2002, murder victims most likely to be killed by firearms were those age 16, regardless of gender**

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].

**Of the 46,600 juveniles murdered between 1980 and 2002, half (50%) were murdered with a firearm**

| | Age of victim | | | | | Victim ages 0–17 | |
|---|---|---|---|---|---|---|---|
| Weapon | 0–17 | 0–5 | 6–11 | 12–14 | 15–17 | Males | Females |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Firearm | 50 | 10 | 41 | 66 | 78 | 60 | 30 |
| Knife/blunt object | 14 | 11 | 19 | 17 | 14 | 13 | 17 |
| Personal | 19 | 48 | 11 | 5 | 2 | 15 | 27 |
| Other/unknown | 17 | 31 | 29 | 12 | 6 | 12 | 26 |

- Nearly half (48%) of murder victims under age 6 were killed by offenders using only their hands, fists, or feet (personal).
- More than three-fourths (78%) of victims ages 15–17 were killed with a firearm.
- Juvenile male victims were twice as likely as juvenile female victims to be murdered with a firearm.

Note: Detail may not total 100% because of rounding.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].



# Persons ages 7–17 are about as likely to be victims of suicide as they are to be victims of homicide

### Since the early 1980s, for every 1 juvenile female suicide there were 4 juvenile male suicides

Through its National Vital Statistics System (NVSS), NCHS collects information from death certificates filed in state vital statistics offices, including causes of death of juveniles. NVSS indicates that 23,900 juveniles ages 7–17 died by suicide in the U.S. between 1981 and 2001. For all juveniles ages 7–17, suicide was the fourth leading cause of death over this period, trailing only unintentional injury (140,600), homicide (30,300), and cancer (27,600)—with the numbers of homicide, cancer, and suicide deaths being very similar. Suicide was the third leading cause of death for males ages 7–17 and the fourth leading cause of death for females in that age group.

Between 1981 and 2001, 79% of all juvenile suicide victims were male, with the annual proportion remaining remarkably stable over the period. Consequently, suicide trends were similar for juvenile males and females.

Sixty percent (60%) of all juvenile suicides between 1981 and 2001 were committed with a firearm, 27% by some form of suffocation (e.g., hanging), and 9% by poisoning. The method of suicide differed for males and females, with males more likely than females to use a firearm and less likely to use poison.

Method of suicide by persons ages 7–17, 1981–2001:

| Method | Male | Female |
|---|---|---|
| Total | 100.0% | 100.0% |
| Firearm | 63.5 | 49.0 |
| Suffocation | 27.7 | 23.2 |
| Poisoning | 5.6 | 22.5 |
| Other | 3.3 | 5.3 |

Note: Detail may not total 100% because of rounding.

### Between 1981 and 2001, juveniles ages 12–15 were about as likely to be a suicide victim as they were to be a murder victim

- Far more males than females ages 12–16 were victims of suicide or murder between 1981 and 2001. However, for each gender, the number of suicides was about the same as the number of murders.
- Between 1990 and 2001, suicide was more prevalent than homicide for non-Hispanic white juveniles, while the reverse was true for Hispanic juveniles and non-Hispanic black juveniles.
- At each age between 12 and 24, suicide was more common than murder for non-Hispanic whites between 1990 and 2001, in sharp contrast to patterns for Hispanics and non-Hispanic blacks. More specifically, for every 10 white homicide victims ages 10–17 there were 26 suicide victims (a ratio of 10 to 26); the corresponding ratio was 10 to 1 for black juveniles and 10 to 3 for Hispanic juveniles.

Note: White victims and black victims are not of Hispanic ethnicity.

Source: Authors' analysis of the National Center for Health Statistics' *WISQARS (Web-based Injury Statistics Query and Reporting System)* [interactive database system].

### Between 1981 and 2001, juvenile suicide victims outnumbered juvenile murder victims in 33 states

| State | Suicide rate 1981–2001 | Suicide/ homicide ratio | State | Suicide rate 1981–2001 | Suicide/ homicide ratio |
|---|---|---|---|---|---|
| Total U.S. | 28.1 | 0.79 | Missouri | 30.2 | 0.71 |
| Alabama | 28.2 | 0.79 | Montana | 60.5 | 3.21 |
| Alaska | 74.7 | 2.37 | Nebraska | 34.5 | 1.86 |
| **Arizona** | **43.6** | **1.04** | **Nevada** | **41.7** | **1.03** |
| **Arkansas** | **36.6** | **1.02** | **New Hampshire** | **32.7** | **3.84** |
| **California** | **22.3** | **0.41** | **New Jersey** | **14.2** | **0.61** |
| Colorado | 46.4 | 1.81 | New Mexico | 56.4 | 1.34 |
| Connecticut | 19.0 | 0.64 | New York | 15.4 | 0.37 |
| Delaware | 26.0 | 1.58 | North Carolina | 30.1 | 1.02 |
| **Dist. of Columbia** | **15.3** | **0.05** | **North Dakota** | **50.0** | **8.77** |
| **Florida** | **26.0** | **0.72** | **Ohio** | **25.4** | **1.25** |
| **Georgia** | **26.9** | **0.73** | **Oklahoma** | **36.9** | **1.20** |
| Hawaii | 23.4 | 2.05 | Oregon | 37.1 | 2.04 |
| Idaho | 59.3 | 4.98 | Pennsylvania | 25.6 | 1.07 |
| Illinois | 22.5 | 0.36 | Rhode Island | 18.2 | 0.85 |
| **Indiana** | **28.6** | **1.14** | **South Carolina** | **25.7** | **0.89** |
| **Iowa** | **35.4** | **3.49** | **South Dakota** | **56.3** | **4.90** |
| **Kansas** | **35.3** | **1.43** | **Tennessee** | **29.2** | **1.01** |
| Kentucky | 28.0 | 1.66 | Texas | 32.0 | 0.76 |
| Louisiana | 32.2 | 0.57 | Utah | 50.2 | 3.38 |
| Maine | 36.9 | 4.17 | Vermont | 31.0 | 3.11 |
| **Maryland** | **23.8** | **0.49** | **Virginia** | **30.0** | **1.07** |
| **Massachusetts** | **17.3** | **0.92** | **Washington** | **32.4** | **1.33** |
| **Michigan** | **28.3** | **0.62** | **West Virginia** | **29.1** | **1.49** |
| Minnesota | 36.4 | 2.74 | Wisconsin | 35.7 | 1.77 |
| Mississippi | 28.1 | 0.73 | Wyoming | 63.1 | 4.14 |

Notes: The suicide rate is the average annual number of suicides of youth ages 7–17 divided by the average annual population of youth ages 7–17 (in millions). The suicide/homicide ratio is the total number of suicides of youth ages 7–17 divided by the total number of homicides of youth ages 7–17. A ratio of more than 1.0 indicates that the number of suicides was greater than the number of homicides.

Source: Authors' analysis of the National Center for Health Statistics' *WISQARS (Web-based Injury Statistics Query and Reporting System)* [interactive database system].

## American Indians have the highest juvenile suicide rate

Beginning with the 1990 data, NVSS distinguished fatalities by the victim's Hispanic ethnicity, enabling racial and ethnic comparisons of juvenile suicides. Between 1990 and 2001, the juvenile suicide rate for white non-Hispanic youth (i.e., suicides per million persons ages 7–17 in this race/ethnicity group) was 30.9. The suicide rates were substantially lower for Hispanic (20.0), black non-Hispanic (18.6), and Asian non-Hispanic (17.9) juveniles ages 7–17. In contrast, the suicide rate for American Indian juveniles (59.5) was nearly double the white non-Hispanic rate and triple the rates for the other racial/ethnic groups.

## Over the period 1981 to 2001, the juvenile suicide rate rose and fell

The juvenile suicide rate grew almost 50% between 1981 and 1988. The increase over this period was similar for males and females but was much larger for black than for white juveniles. The juvenile suicide rate remained essentially constant between 1988 and 1994 and then began to fall. By 2001, the overall rate had returned to its levels of the early 1980s. This general pattern was reflected in the trends of white and black juveniles and those of males and females. The proportion of juvenile suicides committed with a firearm peaked in 1994 at 69% and then fell so that by 2001 less than half (44%) of juvenile suicides involved a firearm.



Chapter 2: Juvenile victims

# The nonfatal violent victimization rate of youth ages 12–17 in 2003 was half the rate in 1993

### NCVS tracks crime levels

Since 1973, the Bureau of Justice Statistics (BJS) has used the National Crime Victimization Survey (NCVS) to monitor the level of violent crime in the U.S. NCVS gathers information on crimes against persons ages 12 or older from a nationally representative sample of households. For those interested in juvenile justice, NCVS is critical for understanding the volume and nature of crimes against juveniles ages 12–17 as well as trends in these crimes. A major limitation, however, is that crimes against youth younger than age 12 are not captured.

### Juveniles are more likely than adults to be victims of violence

NCVS monitors nonfatal violent victimizations (i.e., the crimes of rape, sexual assault, robbery, aggravated assault, and simple assault). A 2005 BJS report summarized NCVS data for the years 1993–2003 to document the trends in nonfatal violent victimizations of youth ages 12–17. The report found that these youth experienced relatively high levels of violent crimes during these years and that their rate of nonfatal violent victimization had declined substantially over the period.

On average from 1993 through 2003, juveniles ages 12–17 were about 2.5 times more likely than adults (i.e., ages 18 and older) to be the victim of a nonfatal violent crime. That means that in a typical group of 1,000 youth ages 12–17, 84 experienced nonfatal violent victimizations, compared with 32 per 1,000 persons ages 18 and older.

The victimization rate from 1993 to 2003 was higher among juveniles than adults for each nonfatal violent crime. Compared with adults, youth ages 12–17 were twice as likely to

**The large decline in the serious violent victimization rate between 1993 and 2003 was experienced by youth ages 12–14 and 15–17, male and female youth, and white and black youth**

Serious violent victimizations per 1,000 juveniles in age group
50
45
40
35
30
25
20
15
10
5
0
Ages 15–17
Ages 12–14
Ages 12–17
81 83 85 87 89 91 93 95 97 99 01 03
Year

Serious violent victimizations per 1,000 juveniles ages 12–17
70
60
50
40
30
20
10
0
Male
Female
81 83 85 87 89 91 93 95 97 99 01 03
Year

Serious violent victimizations per 1,000 juveniles ages 12–17
80
70
60
50
40
30
20
10
0
Black
White
Other races
81 83 85 87 89 91 93 95 97 99 01 03
Year

- From 1980 through 2003, the serious violent crime victimization rate for youth ages 15–17 averaged about 25% more than the rate for youth ages 12–14, the average rate for juvenile males was more than double the female rate, and the rate for black juveniles averaged 67% above the white rate.

Notes: **Serious violent crimes** include aggravated assault, rape, robbery, and homicide. Aggravated assault, rape, and robbery data are from NCVS and homicide data are from the FBI's Uniform Crime Reporting Program.

Source: Federal Interagency Forum on Child and Family Statistics' *America's Children: Key National Indicators of Well-Being, 2005.*

*Juvenile Offenders and Victims: 2006 National Report* 27

be robbery or aggravated assault victims, 2.5 times as likely to be victims of a rape or sexual assault, and almost 3 times as likely to be victims of a simple assault.

Between 1993 and 2003, most offenders whose victims were youth ages 12–14 and ages 15–17 were acquaintances or others well known to the victim (61% and 47%, respectively). For these two age groups, a small proportion of offenders were family members or intimates (5% and 10%, respectively). Youth ages 12–14 were less likely than youth ages 15–17 to experience nonfatal violent victimizations in which the offender was a stranger (34% vs. 43%).

Between 1993 and 2003, a weapon (e.g., firearm, knife, or club) was involved in 23% of violent crimes with victims ages 12–17, with the proportion being greater for youth ages 15–17 (27%) than youth ages 12–14 (18%). Older youth were 3 times as likely as younger youth to be victims of crimes involving firearms (9% vs. 3%). In 28% of the violent victimizations of both younger and older youth, an injury (mostly minor) occurred. Serious injuries (including rape injury) occurred in 2.5% of violent crimes with younger victims and 4.5% of crimes with victims ages 15–17.

School was the most common setting for violent victimizations: 53% of the victimizations of youth ages 12–14 and 32% of victimizations of youth ages 15–17 occurred at or in school. The NCVS data also showed that the riskiest period for youth ages 12–17 was after school (between 3 p.m. and 6 p.m.). Finally, between 1993 and 2003, 57% of the offenders of victims ages 12–14 and 40% of the offenders of victims ages 15–17 were the victims' schoolmates.

From 1993 to 2003, about one quarter of all nonfatal violent victimizations against youth ages 12–14 were reported to law enforcement. About one-third of similar victimizations against youth ages 15–17 were reported

### Victimization rates are higher for juvenile males and urban youth

From 1993 through 2003, the nonfatal violent victimization rate for males ages 12–17 (100.4) was about 50% greater than that for females (66.4). Over this 11-year period, urban youth ages 12–17 had a significantly higher nonfatal violent victimization rate (98.5) than did suburban (83.4) and rural (65.9) youth.

Over the 1993–2003 period, the nonfatal violent victimization rates of non-Hispanic white (86.7) and non-Hispanic black (87.0) youth ages 12–17 were similar, and these rates were somewhat higher than the Hispanic rate (76.9). However, when the crime of simple assault was excluded from the victimization rate (a statistic that BJS labels the serious violent victimization rate), the rate for black youth was more than 50% greater than the rate for white youth.

### Declines in violent victimizations were similar for juveniles and adults

To study trends in juvenile violent victimization over the 1993–2003 period, BJS compared the average rate for 1993–1995 to the average for 2001–2003. The rate of nonfatal violent victimization for youth ages 12–17 decreased about 55%, similar to the decline experienced by adults (52%). More specifically, the declines over the 1993–2003 period in robbery and simple assault victimization rates were similar for juveniles and adults; in contrast, the aggravated assault victimization rate declined more for juveniles than for adults. Between 1993 and 2003, the rape/sexual assault victimization rate for youth ages 12–17 fell 46%. The percent change in the overall adult rape/sexual assault victimization rate was not specifically reported, but the declines in the rates for persons ages 18–24 (42%) and for older adults (55%) imply that the overall decline in the adult rate was similar to that for youth ages 12–17.

Percent change in victimization rate from 1993–1995 to 2001–2003:

| Type of crime | Ages 12–17 | Ages 18 and older |
|---|---|---|
| Nonfatal violence | –55% | –52% |
| Rape/sex assault | –46 | NA |
| Robbery | –59 | –59 |
| Aggravated assault | –64 | –55 |
| Simple assault | –52 | –50 |

Declines in the nonfatal violent victimization rates were also similar for juveniles and adults within subpopulations (i.e., male, female, white, black, Hispanic, urban, suburban, rural).

The nonfatal violent victimization rate from 1993 through 2003 declined more for youth ages 12–14 (59%) than for youth ages 15–17 (50%), a pattern replicated in robbery, aggravated assault, and simple assault victimizations.

Percent change in victimization rate from 1993–1995 to 2001–2003:

| Type of crime | Ages 12–14 | Ages 15–17 |
|---|---|---|
| Nonfatal violence | –59% | –50% |
| Robbery | –66 | –53 |
| Aggravated assault | –69 | –61 |
| Simple assault | –57 | –46 |

Note: NCVS samples were too small to produce reliable estimates of rape/sexual assault trends for these two age groups.



# In 2001, students were safer in school and on their way to and from school than they were in 1992

## Crimes against juveniles fell substantially between 1992 and 2001 both in and out of school

For several years, a joint effort by the National Center for Education Statistics and the Bureau of Justice Statistics has monitored the amount of nonfatal crime that students ages 12–18 experience when they are in (or on their way to and from) school and when they are away from school. Findings indicate that between 1992 and 2001, the rates of violent crime and theft each declined substantially both in and away from school.

From 1992 to 2001, the rate of nonfatal crimes against students ages 12–18 occurring away from school fell about 60%, while the violent crime rate in school fell about 40%. In 2001, these youth experienced roughly equal numbers of violent crimes in and out of school. From 1992 to 2001, the rate of theft against students ages 12–18 fell about 50% both in and out of school. During this period, about 3 in 5 thefts occurred in school.

In 2001, the violent victimization rate in school did not differ significantly for males and females; for whites, blacks, and Hispanics; or for students living in urban, suburban, and rural areas. In comparison, while the violent victimization rate out of school was again similar for males and females, it was greater for students living in urban areas than for those living in other areas and greater for black students than for white students. In 2001, white students experienced significantly more theft in school than did black or Hispanic students, while male and urban students experienced more theft out of school.

**Both male and female students ages 12–18 experienced far fewer crimes of violence and theft in their schools in 2001 than in 1992**

- Male and female students also experienced large declines in victimizations outside of school over the same period.
- In 2001, about half of all violent crimes experienced by male students and by female students (and almost 3 of every 5 thefts) occurred in school or on the way to and from school.
- Serious violence accounted for about 20% of all violent victimization as measured by NCVS. In 2001, 35% of all serious violent crimes experienced by male and female students occurred in school or on the way to and from school.

Source: Authors' adaptation of the Bureau of Justice Statistics' *National Crime Victimization Survey* for the years 1992 through 2001.

# A youth's risk of being a violent crime victim is tied to family and community characteristics, not race

### Factors related to the risk of juvenile victimization are difficult to disentangle

Research has shown that a juvenile's risk of becoming a victim of a violent crime is potentially related to many factors. In general, factors can be grouped under three categories: individual characteristics (e.g., age, gender, race, lifestyle, and friendship patterns); family characteristics (e.g., family structure, income, and level of supervision); and community characteristics (e.g., crime and poverty levels and the age profile of the community's population). Even though researchers know these factors predict victimization, it has been difficult to determine their relative importance. For example, when juveniles report higher levels of violent victimization, is it mostly due to their individual factors, to their family factors, or to their community factors? To assess the relative impact of these various factors, research must capture information on the factors simultaneously, and this has been hard to do. But if it could be done, some factors (such as race) might be shown to be no longer predictive once other factors are taken into account.

### New research documents the large influence of community characteristics on victimization

A recent study by Lauritsen has succeeded in looking at individual, family, and community factors simultaneously. With expanded access to the 1995 National Crime Victimization Survey data, the researcher linked self-reports of youth ages 12–17 and their family information with data on the communities in which the youth lived.

The study found that youth in single-parent families experienced a 50% greater risk of violence than youth in two-parent families. Youth were also more likely to be the victim of a violent crime if they lived in disadvantaged communities (i.e., high percentages of persons living in poverty, single-parent families with children, unemployment, and households receiving public assistance). The research found that youth were at greater risk if they lived in communities with a high concentration of single-parent families and young persons and when they lived in families who had recently moved into the community.

Most importantly, the study found that after controlling for family and community influences, there were no racial or ethnic differences in the risk of violent victimization. Also, income was not related to victimization risk. This is important because it suggests that youth in single-parent families are not at greater risk because they are poor.

These findings indicate that prevention programs should be located on the basis of areas' family and age composition rather than racial, ethnic, or economic factors. Youth are at greater risk when they have lower levels of supervision, live in a community with high proportions of young people, and have not yet learned the neighborhood's rules and problem areas because they are new to the community.

**Living in a disadvantaged community strongly influences a youth's risk of victimization only if the community is severely disadvantaged**

- The different types of communities in which youth live can explain racial and ethnic differences in juvenile victimization.
- Unlike youth from single-parent families, youth living in two-parent families appear to be much better protected from the negative consequences of living in the most disadvantaged areas.

Note: Community disadvantage is an index that captures the relative level of socioeconomic disadvantage in an area. The average community disadvantage index for white youth, black youth, and Latino youth is indicated.

Source: Authors' adaptation of Lauritsen's How families and communities influence youth victimization, *OJJDP Juvenile Justice Bulletin*.



# 1 in 4 violent crime victims known to law enforcement is a juvenile, and most juvenile victims are female

### Juvenile victims are common in violent crimes handled by law enforcement

Not all crimes committed are reported to law enforcement. Those that are reported can be used to produce the portrait of crime as seen by the nation's justice system. As noted earlier, based on the FBI's Supplementary Homicide Reports, 10% of all persons murdered in 2002 were under age 18 and 36% of these murdered juveniles were female. No other data source with comparable population coverage characterizes the victims of other violent crimes reported to law enforcement. However, data from the National Incident-Based Reporting System (NIBRS) covering incidents in 2000 and 2001 capture information on more than 418,000 violent crime victims known to law enforcement in 22 states. From these data, an arguably representative description of violent crime victims can be developed.

### Sexual assaults accounted for just over half of the juvenile victims of violent crime known to law enforcement

Defining violent crime to include murder, violent sexual assault, robbery, and aggravated assault, NIBRS indicates that 26% of the victims of violent crime reported to law enforcement agencies in 2000 and 2001 were juveniles—persons under age 18. More specifically, juveniles were the victims in 10% of murders, 70% of sexual assaults, 11% of robberies, and 17% of aggravated assaults reported to law enforcement. Of all juvenile victims of violent crime known to law enforcement, fewer than one-half of 1% were murder victims, 8% were robbery victims, 39% were victims of aggravated assault, and 52% were victims of sexual assault.

**In sexual assaults reported to law enforcement, 67% of female victims and 88% of male victims were under age 18**

Victims (per 1,000 total sexual assault victims)

■ The modal age for sexual assault victims was age 14 for female victims but age 5 for male victims.

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master files* for the years 2000 and 2001 [machine-readable data files].

**The number of robbery victims known to law enforcement increased with age through the juvenile years, peaking at age 19**

Victims (per 1,000 total robbery victims)

■ Persons under age 18 accounted for 14% of all male robbery victims and 6% of all female robbery victims.

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master files* for the years 2000 and 2001 [machine-readable data files].

**In aggravated assaults reported to law enforcement, 18% of male victims and 16% of female victims were under age 18**

■ Unlike the pattern for simple assaults, more males than females were victims of aggravated assault at each victim age.

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master files* for the years 2000 and 2001 [machine-readable data files].

**In simple assaults reported to law enforcement, a greater proportion of male victims than female victims were under age 18 (24% vs. 14%)**

■ Until age 16, more simple assault victims were male; at age 20, twice as many females as males were simple assault victims, a pattern that continued until at least age 50.

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master files* for the years 2000 and 2001 [machine-readable data files].

### Sexual assault accounted for 3 in 4 female juvenile victims and 1 in 4 male juvenile victims of violent crime

The majority (59%) of the juvenile victims of violent crimes known to law enforcement in 2000 and 2001 were female. Victims under age 18 accounted for 32% of all female victims of violent crime known to law enforcement but only 21% of all male victims. The types of violent crimes committed against male and female juvenile victims differed. For juvenile female victims, 72% of the crimes known to law enforcement were sexual assaults, 25% were aggravated assaults, and just 3% were robberies. In contrast, for juvenile male victims, 59% of crimes were aggravated assaults, 16% were robberies, and 24% were sexual assaults.

### More than one-third of the juvenile victims of violent crime were under age 12

The age profile of juvenile victims became clearer with the introduction of NIBRS. Other sources of information on victims had to limit their focus to persons old enough to respond reliably to the questions of interviewers or items on survey instruments. NIBRS data for 2000 and 2001 show that 17% of the juvenile victims of violent crimes known to law enforcement were younger than age 6, 20% were ages 6–11, 27% were ages 12–14, and 36% were ages 15–17. Victims under age 12 represented half (50%) of all juvenile murder victims, 47% of juvenile sexual assault victims, 14% of juvenile robbery victims, and 28% of juvenile victims of aggravated assault.



# As juveniles age, offenders who violently victimize them are less likely to be family members

### Offenders in juvenile victimizations are likely to be adults

Analyses of the 2000 and 2001 NIBRS data files provide an understanding of the offenders who victimize juveniles in violent crime incidents known to law enforcement. Although these data may not be nationally representative, the NIBRS sample, which includes incidents involving more than 328,000 juvenile victims of violent crime (including simple assault), is large enough to give credence to patterns derived from NIBRS data.

Based on NIBRS data, an adult (i.e., a person over age 17) was the primary offender against 60% of all juvenile victims of violent crime (i.e., murder, kidnapping, sexual assault, robbery, aggravated assault, and simple assault) known to law enforcement in 2000 and 2001. Adult offenders were more common in juvenile kidnappings (90%), murders (86%), and sexual assaults (63%) and less common in juvenile aggravated assaults (53%), robberies (51%), and simple assaults (48%).

The proportion of adult offenders in juvenile victimizations varied with the juvenile's age. In general, the proportion was greater for the youngest juveniles (under age 6) and the oldest juveniles (ages 15–17) than for those between ages 6 and 14. This pattern held for juvenile murder, aggravated assault, simple assault, and robbery (although robbery of the youngest juveniles was very rare). The pattern was different for sexual assaults of juveniles (the proportion of adult offenders generally increased with victim age) and for kidnapping (the proportion declined consistently with victim age). Due in part to these age and offense variations, female juvenile violent crime victims were more likely than male victims to have an adult offender.

**Who are the offenders of juvenile violent crime victims?**

| | Percent of all offenders | | | | | | |
|---|---|---|---|---|---|---|---|
| Victim-offender relationship by offense | All juvenile victims | Victim age 0–5 | 6–11 | 12–14 | 15–17 | Juvenile victim gender Female | Male |
| Violent crime | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Family | 31 | 59 | 43 | 23 | 17 | 33 | 27 |
| Acquaintance | 57 | 37 | 49 | 66 | 65 | 59 | 56 |
| Stranger | 12 | 5 | 8 | 11 | 17 | 8 | 17 |
| Sexual assault | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Family | 35 | 56 | 47 | 24 | 19 | 34 | 41 |
| Acquaintance | 60 | 42 | 49 | 71 | 74 | 61 | 55 |
| Stranger | 5 | 2 | 3 | 5 | 7 | 5 | 3 |
| Robbery | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Family | 1 | * | 1 | 1 | 1 | 1 | 0 |
| Acquaintance | 35 | * | 34 | 40 | 34 | 29 | 37 |
| Stranger | 64 | * | 66 | 59 | 66 | 70 | 63 |
| Aggravated asslt. | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Family | 27 | 59 | 33 | 24 | 20 | 33 | 23 |
| Acquaintance | 61 | 31 | 58 | 65 | 66 | 58 | 63 |
| Stranger | 12 | 10 | 9 | 11 | 15 | 9 | 14 |
| Simple assault | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Family | 27 | 65 | 30 | 22 | 25 | 31 | 24 |
| Acquaintance | 65 | 30 | 63 | 70 | 67 | 64 | 66 |
| Stranger | 7 | 4 | 7 | 7 | 8 | 6 | 9 |

| | Percent of juvenile offenders | | | | | | |
|---|---|---|---|---|---|---|---|
| Offense | All juvenile victims | Victim age 0–5 | 6–11 | 12–14 | 15–17 | Juvenile victim gender Female | Male |
| Violent crime | 40% | 34% | 45% | 46% | 33% | 34% | 49% |
| Sexual assault | 37 | 47 | 43 | 35 | 22 | 33 | 51 |
| Robbery | 49 | * | 76 | 68 | 35 | 30 | 53 |
| Aggravated asslt. | 47 | 12 | 53 | 62 | 42 | 41 | 50 |
| Simple assault | 52 | 14 | 56 | 68 | 45 | 47 | 57 |

- Although relatively uncommon overall, the proportion of juvenile victims victimized by strangers is greater in robberies than in other violent crimes.
- Aggravated and simple assaults of juvenile females are more likely to involve a family member than are assaults of juvenile males.
- In crimes reported to law enforcement, the youngest juveniles (those under age 6) are far more likely than the oldest juveniles (those ages 15–17) to be assaulted by a family member: sexual assault (56% vs. 19%), aggravated assault (59% vs. 20%), and simple assault (65% vs. 25%).

* Too few victims in sample (fewer than 100) to obtain reliable percentage.

Source: Author's analyses of the FBI's *National Incident-Based Reporting System master files* for the years 2000 and 2001 [machine-readable data files].

# Some violent crimes with juvenile victims are most common after school, others around 9 p.m.

### Juveniles' risk of victimization varies over a 24-hour period

To understand the nature of juvenile victimization, it helps to study when different types of crimes occur. To this end, the authors analyzed the FBI's NIBRS data for the years 2000 and 2001 to study the date and time of day that crimes known to law enforcement occurred. Confirming prior analyses, the daily timing of violent crimes differed for juvenile and adult victims. In general, the number of violent crimes with adult victims increased hourly from morning through the evening hours, peaking between 9 p.m. and midnight. In contrast, violent crimes with juvenile victims peaked between 3 and 4 p.m., fell to a lower level in the early evening hours, and declined substantially after 9 p.m.

The 3 p.m. peak reflected a unique situational characteristic of juvenile violence and was similar for both male and female victims. This situational component was clarified when the hourly patterns of violent crimes on school and nonschool days were compared. For adult victims, the school- and nonschool-day patterns were the same. On nonschool days, the juvenile victimization pattern mirrored the general adult pattern, with a peak in the late evening hours. But on school days, the number of juvenile violent crime victimizations peaked in the afterschool hours between 3 and 4 p.m.

Based on violent crimes reported to law enforcement, juveniles were 140% more likely to be victimized between 3 and 4 p.m. on school days than in the same time period on nonschool days (i.e., weekends and the summer months). On school days, juveniles were over 90% more likely to be violently victimized in the 4 hours between 3

**The timing of violent crimes with juvenile victims differs on school and nonschool days and varies with the victim's relationship to the offender**

- Sexual assaults with juvenile victims are more frequent in the late evening hours on nonschool days than on school days. Sexual assaults of juveniles have mealtime peaks on both school and nonschool days and a marked peak at 3 p.m. on school days.
- Time-of-day patterns of robberies with juvenile victims are the same for school and nonschool days and do not exhibit an afterschool peak.
- Unlike robbery offenders, sexual assault and aggravated assault offenders who are strangers to their juvenile victims are far less common than offenders who are acquaintances or family members.
- Sexual assaults by acquaintances or family members are most common at 8 a.m. and noon (i.e., mealtimes) and in the hour after school.
- For all violent crimes against juveniles, crimes by acquaintances peak in the hour after school, while crimes by strangers peak around 9 p.m.

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master files* for the years 2000 and 2001 [machine-readable data files].

Chapter 2: Juvenile victims

**The timing of crimes with juvenile victims differs from that of crimes with adult victims**

Victimizations per 1,000 serious violent crime victims in age group
Serious violent crime
Under age 18
Age 18 and older
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Victimizations per 1,000 simple assault victims in age group
Under age 18
Simple assault
Age 18 and older
6 a.m.
noon
6 p.m.
midnight
6 a.m.

- The afterschool peak in juvenile victimizations is found in serious violent crimes as well as simple assaults.

**Children under age 6 are at high risk of violent victimization at mealtimes (i.e., 8 a.m., noon, and 6 p.m.) by both family and nonfamily offenders.**

Violent victimizations per 1,000 victims under age 6
Victims under age 6
Family
Nonfamily
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Violent victimizations per 1,000 victims ages 6–11
Victims ages 6–11
Nonfamily
Family
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Violent victimizations per 1,000 victims ages 12–14
Victims ages 12–14
Nonfamily
Family
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Violent victimizations per 1,000 victims ages 15–17
Victims ages 15–17
Nonfamily
Family
6 a.m.
noon
6 p.m.
midnight
6 a.m.

- The afterschool peak in victimizations for juveniles ages 6–14 is a result of crimes committed by nonfamily members.
- The timing of violent crimes with juvenile victims ages 15–17 reflects a transition between the pattern of younger teens (with the afterschool peak) and adults (with the 9 p.m. peak).

Note: Serious violent crimes include murder, sexual assault, robbery, and aggravated assault. Violent crimes include serious violent crimes and simple assault.

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master files* for the years 2000 and 2001 [machine-readable data files].

and 7 p.m. than they were in the 4 hours between 8 p.m. and midnight. Similarly, the risk of violent juvenile victimization was 60% greater in the 4 hours after school than in the 8 p.m.-to-midnight period on non-school days.

Peak hours for juvenile victimization varied with victim age. The hour of the day that violent crimes against older juveniles (ages 15–17) were most common was 9 p.m., with a slight peak in the afterschool hour of 3 p.m. Violent crimes against juvenile victims ages 6–14 showed a clear peak in the afterschool hour. For younger victims, the peaks were at mealtimes (8 a.m., noon, and 6 p.m.).

### The timing of juvenile violence is linked to offender characteristics

It is informative to consider when various types of offenders victimize juveniles. When the offenders of juvenile victims are divided into three classes (i.e., family members, acquaintances, and strangers), different timing patterns emerge. Most violent offenders were acquaintances of their juvenile victims. The timing of crimes by acquaintances reflected the afterschool peak, indicating the importance this time period (and probably unsupervised interactions with other juveniles) has for these types of crimes. Crimes by family members were most frequent at noon and in the hours between 3 and 7 p.m., although, unlike acquaintance crime, there was no conspicuous peak at 3 p.m. Violent crimes committed by strangers against juvenile victims peaked at 9 p.m. but were relatively frequent throughout the 3–11 p.m. period.

Juvenile Offenders and Victims: 2006 National Report 35

# About two-thirds of violent crimes with juvenile victims occur in a residence

## Where juvenile violence occurs varies with crime and victim age

A portrait of violence against juveniles requires an understanding of where these crimes occur. The NIBRS data capture locations of crimes reported to law enforcement agencies. The 2000 and 2001 data show that the location of violent crime against juveniles varies with the nature of the crime and the age of the victim.

Overall, 64% of violent crimes (i.e., murders, sexual assaults, robberies, and aggravated assaults) with a juvenile victim occurred in a residence, 19% occurred outdoors, 10% in a commercial area, and 6% in a school. Most sexual and aggravated assaults occurred in a residence (81% and 51%, respectively) and most robberies occurred outdoors (51%).

| Location | Sexual assault | Robbery | Aggravated assault |
|---|---|---|---|
| Total | 100% | 100% | 100% |
| Residence | 81 | 17 | 51 |
| Outdoors | 6 | 51 | 30 |
| Commercial | 7 | 27 | 11 |
| School | 6 | 4 | 8 |

Note: Detail may not total 100% because of rounding.

The location of juvenile violence varied with victim age. For example, 88% of violence with victims under age 6 occurred in residences, compared with 50% of crimes with victims ages 15–17. Compared with other juveniles, victims ages 12–14 had the largest proportion of crimes committed in schools.

| Location | Under age 6 | Ages 6–11 | Ages 12–14 | Ages 15–17 |
|---|---|---|---|---|
| Total | 100% | 100% | 100% | 100% |
| Residence | 88 | 75 | 59 | 50 |
| Outdoors | 6 | 15 | 21 | 26 |
| Commercial | 5 | 5 | 9 | 17 |
| School | 2 | 4 | 10 | 7 |

Note: Detail may not total 100% because of rounding.

### Violent crime with juvenile victims peaked in residences in the afterschool hours

- Violent victimization of juveniles outdoors also peaked between 3 and 4 p.m.
- Violent victimization of juveniles in commercial areas peaked between 9 and 10 p.m.

### The proportion of juvenile victimizations occurring outdoors remained relatively constant between 3 and 10 p.m.

Note: The detailed NIBRS coding structure of location can be simplified for analyses into four general locations: a residence (that may be the victim's, the offender's, or someone else's); the outdoors (streets, highways, roads, woods, fields, etc.); schools (including colleges); and commercial areas (such as parking lots, restaurants, government buildings, office buildings, motels, and stores).

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master files* for the years 2000 and 2001 [machine-readable data files].



# Few statutory rapes reported to law enforcement involve both juvenile victims and juvenile offenders

### Statutory rape victims are considered incapable of giving informed consent

Statutory rape occurs when individuals have voluntary and consensual sexual relations and one is either too young or otherwise unable (e.g., mentally retarded) to legally consent to the behavior. The victims of statutory rape are primarily juveniles, and the crime has some attributes of child abuse.

A recent study exploring the victim and offender characteristics in statutory rapes known to law enforcement analyzed the 1996 through 2000 data from the FBI's NIBRS. In that work, the FBI's definition of statutory rape was used: nonforcible sexual intercourse with a person who is under the statutory age of consent.

To develop a rough idea of the annual number of statutory rapes in the U.S., the researchers counted the number of statutory rapes and the number of forcible rapes with juvenile victims in the NIBRS data. They found 1 statutory rape for every 3 forcible rapes. If this ratio holds nationally, then an estimated 15,700 statutory rapes were reported to law enforcement in 2000.

### The majority of victims were females ages 14 or 15

Although a small proportion (5%) of statutory rape victims were male, most were female. Fifty-nine percent (59%) of female victims and 56% of male victims were either age 14 or age 15, with roughly equal proportions in each age group.

Some of the attributes of statutory rape incidents and forcible rape incidents are similar. For example, the vast majority of forcible rapes (83%) and statutory rapes (85%) took place in a residence. (From the data, it is impossible to tell if the residence is that of the victim, an offender, or someone else.) Locations of the other statutory rapes (from most frequent to least frequent) were hotels/motels, fields/woods, streets/highways, parking lots, and schools.

### Male offenders were much older than their female victims

In the NIBRS data for 1996 through 2000, almost all (over 99%) of the offenders of female statutory rape victims were male, while 94% of the offenders of male victims were female.

Numerous incidents undoubtedly involve underage juveniles having consensual sexual relations with persons close to their ages, but these are not the typical statutory rape incidents reported to law enforcement. Overall, 82% of the offenders of female victims were age 18 or older (i.e., adults). The offender was an adult in 99% of the incidents involving a 17-year-old female victim. The proportion of adult offenders declined as the victim's age declined: age 16 (98%), age 15 (87%), and age 14 (86%). Even for the youngest female victims (under age 14), two-thirds (68%) of the offenders in statutory rape incidents were adults.

Not only were most offenders adults, most were substantially older than their victims. Almost half (48%) of the offenders of 17-year-old females were over age 24—at least a 7-year difference in age. About 4 of every 10 (42%) of the offenders of 16-year-old female victims were age 24 or older, as were 1 in 4 (25%) of the offenders of 15-year-old victims. In general, about half of the male offenders of female victims in statutory rapes reported to law enforcement were at least 6 years older than their victims. For male victims, the difference was even larger; in these incidents, half of the female offenders were at least 9 years older than their victims.

### The probability of arrest increased with offender age

In the NIBRS data used in this study, an arrest occurred in 35% of forcible rape incidents and 42% of statutory rape incidents. The probability of arrest in statutory rape incidents was related to several factors. First, the younger the victim, the more likely the offender was arrested. For example, arrests occurred in 30% of incidents with 17-year-old victims and 42% of incidents with 14-year-old victims. The probability of arrest increased with offender age. For example, 37% of offenders ages 15–17 were arrested, compared with 45% of offenders over age 20.

Arrest was also related to the nature of the relationship between the victim and the offender. In statutory rape incidents, law enforcement coded the victim/offender relationship as boyfriend/girlfriend in 3 of every 10 (29%) of the incidents, as acquaintances in 6 of every 10 (62%), and as a family member in about 1 of every 10 (7%). Incidents involving boyfriends and girlfriends were less likely to result in arrest than were those involving acquaintances or family members (37%, 44%, and 47%, respectively).

# Many youth are subjected to inappropriate and potentially dangerous experiences on the Internet

### Study highlights several different types of online victimization

In 1999, the Youth Internet Safety Survey collected information about incidents of possible online victimization. The survey conducted telephone interviews with a national sample of 1,500 youth ages 10–17 who used the Internet at least once a month for the prior 6 months. More than three-quarters of the respondents said they had used the Internet in the past week. About half of the respondents were male (53%); most were non-Hispanic whites (73%), 10% were black, and 2% were Hispanic. The survey addressed three main issues: sexual solicitations and approaches, unwanted exposure to sexual material, and harassment.

### Unwanted or inappropriate online sexual solicitations of youth were relatively common

Although nearly 1 in 5 Internet users ages 10–17 surveyed said they had received an unwanted sexual solicitation in the past year, none of the solicitations led to an actual sexual contact or assault. Most of the youth who were solicited appeared to brush off the encounter, treating it as a minor annoyance. A small proportion (5%) of the surveyed youth said they received a solicitation that made them feel very or extremely upset or afraid. A smaller proportion (3%) were solicited by someone who asked to meet them somewhere, called them on the telephone, or regularly sent them something (mail, money, or gifts). Females were twice as likely as males to be solicited; females accounted for 2 in 3 youth solicited. Most of those who were solicited were teens 14–17 years old (76%), but younger youth (ages 10–13) were more likely to be upset by the solicitation.

The majority of these unwanted solicitations happened when the youth was using a computer at home (70%), and most of the remaining 30% happened at someone else's home. Chat rooms accounted for the bulk of solicitations (66%), and 24% were received through instant messages (e-mail messages sent and received in real time).

### Solicitors often did not fit the stereotype of an older male predator

Youth reported that most of the solicitors were strangers (97%). Because identities are easy to disguise on the Internet, the solicitors may not have been the age or gender they claimed to be. According to the youth, adults (age 18 or older) made 24% of all solicitations and 34% of aggressive solicitations. Juveniles made 48% of all solicitations and 48% of aggressive solicitations. The age of the solicitor was unknown in the remaining incidents. Two-thirds of all solicitations came from males. One-quarter of aggressive solicitations came from females.

### Youth often did not tell anyone about unwanted solicitations

In almost half of incidents (49%), the youth did not tell anyone about the solicitation. In 29% of incidents, the youth told a friend or sibling, and in 24% the youth told a parent. In most incidents, the youth ended the solicitations, using strategies like logging off, leaving the site, or blocking the person. Only 10% were reported to an authority such as a teacher, an Internet service provider, or a law enforcement agency. Even with aggressive episodes, youth did not tell anyone in 36% of incidents and only 18% were reported to an authority.

**What is online victimization?**

People can be victimized online in many ways. The Youth Internet Safety Survey asked respondents about three kinds of victimization that have been prominent in discussions of youth and the Internet: sexual solicitation and approaches, unwanted exposure to sexual material, and harassment.

**Sexual solicitations and approaches:** Requests to engage in sexual activities or sexual talk or give personal sexual information that were unwanted or, whether wanted or not, made by an adult.

**Aggressive sexual solicitation:** Sexual solicitations involving offline contact with the perpetrator through regular mail, by telephone, or in person or attempts at or requests for offline contact.

**Unwanted exposure to sexual material:** When doing online searches, surfing the Web, or opening e-mail or e-mail links, and without seeking or expecting sexual material, being exposed to pictures of naked people or people having sex.

**Harassment:** Threats or other offensive behavior (not sexual solicitation) sent online to the youth or posted online about the youth for others to see.

Not all such incidents were distressing to the youth who experienced them. **Distressing incidents** were episodes in which youth rated themselves as very or extremely upset or afraid as a result of the incident.

### Unwanted exposure to sexual material via the Internet was more common than unwanted solicitation

One-quarter of the surveyed youth said they had been exposed to sexually explicit pictures online in the past year without seeking or expecting it. Most of these exposures occurred while the youth was searching or surfing the Internet (71%), and 28% happened while the youth was opening e-mail or clicking on links in e-mail or instant messages. More than 60% of the unwanted exposures happened to youth age 15 or older. Seven percent (7%) happened to 11- and 12-year-old youth. None of the 10-year-olds reported unwanted exposures to sexual images.

Approximately one-quarter of both boys and girls were exposed to unwanted sexual material. To what sorts of images were youth exposed?

- 94% of the images were of naked persons.
- 38% showed people having sex.
- 8% involved violence, in addition to nudity and/or sex.
- 23% of the incidents of unwanted exposure were described as very or extremely upsetting; however, most incidents were not reported to be distressing.

In 67% of the incidents, youth were at home when the unwanted exposure occurred; in 15%, they were at school; in 13%, they were at someone else's home; and in 3%, they were at a library. Youth reported 39% of episodes to parents; 44% of incidents were undisclosed.

### Most families did not use filtering or blocking software

At the time of the survey, most of the families with youth who used the Internet regularly did not use filtering or blocking software. Thirty-eight percent (38%) had used such software at some time in the past year, but 5% had discontinued its use.

### Some youth experienced online harassment

A small proportion of the survey respondents (6%) reported harassment incidents (threats, rumors, or other offensive behavior) during the past year. Two percent (2%) of the surveyed youth reported episodes of distressing harassment (i.e., the incident made them feel very or extremely upset or afraid).

The harassment took the form of instant messages (33%), chat room exchanges (32%), and e-mails (19%); 76% of incidents occurred when the youth was logged on at home. Boys and girls were about equally likely to say they were harassed (51% and 48%). Seven in 10 episodes happened to youth age 14 or older; fewer than 2 in 10 targeted youth were age 12 or younger. Most harassment perpetrators were reported to be male (54%), but 20% were reportedly female. In 26% of instances, the gender was unknown.

Nearly two-thirds (63%) of harassment perpetrators were other juveniles. Almost a quarter (24%) of harassment perpetrators lived near the youth (within an hour's drive). In distressing episodes, 35% of perpetrators lived near the youth. In contrast to the sexual solicitation episodes, where only 3% of perpetrators were known to the youth offline, 28% of the harassment episodes involved known perpetrators. Of the harassment episodes involving perpetrators who were not face-to-face acquaintances of the youth, 12% included an actual or attempted contact by telephone, regular mail, or in person.

Parents were told about harassment episodes half the time. Slightly more than a third of youth told friends. More than one-quarter of the episodes were reported to Internet service providers, teachers, or a law enforcement agency, but one-quarter were undisclosed. It is noteworthy that, compared to sexual solicitations and unwanted exposures, a larger proportion of the harassment episodes were reported to parents and authorities. As with solicitation, in most incidents, the harassment ended when the youth used strategies like logging off, leaving the site, or blocking the person.

# One-third of all kidnap victims known to law enforcement are under age 18

### NIBRS provides insight in kidnappings

The FBI defines kidnapping as the unlawful seizure, transportation, and/or detention of a person against his or her will. For minors (who are legally too young to provide consent), kidnapping includes situations in which a minor is transported without the consent of the custodial parent(s) or legal guardian. Although there is no accepted annual estimate of kidnappings reported to law enforcement, NIBRS can depict the characteristics of a large number of these crimes and provide a rough national estimate of them (see box on next page). (A national study of missing children discussed later in this chapter provides even more insight into the prevalence and characteristics of kidnapping cases.)

In the 2000 and 2001 NIBRS data on kidnapping incidents, it was the only offense in about half of the incidents. In the remaining incidents, the kidnapping occurred along with other crimes, such as sexual assault, robbery, aggravated assault, and simple assault. About 3 of every 4 kidnap victims (72%) were female, but this ratio varied with victim age. Among kidnap victims under age 6 known to law enforcement, the numbers of male and female victims were essentially equal. For victims ages 12 to 17, the ratio was almost three female victims for each male victim. For victims ages 25–34, the ratio was almost 4 to 1.

One of every 5 kidnap victims known to law enforcement (19%) was under age 12, and 1 of every 3 (35%) was under age 18—a juvenile. A greater proportion of male than female kidnap victims were under age 18. Almost half (47%) of male kidnap victims known to law enforcement were juveniles, compared with 30% of female kidnap victims.

**The risk of kidnapping increased substantially for juvenile females after age 9; the risk for males remained essentially constant**

- The risk of kidnapping peaked at age 20 for females and at age 2 for males.

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master files* for the years 2000 and 2001 [machine-readable data files].

### Characteristics of kidnappings vary with victim age

In more than half (55%) of adult kidnappings known to law enforcement, the offender was an acquaintance. Twenty-two percent (22%) of adult victims were kidnapped by a family member and 23% by a stranger. In 97% of adult kidnappings, the offender was also over age 17. In 67% of adult kidnappings, another crime occurred; in 24% the offender possessed a firearm; and in 41% the adult victim was injured. Finally, 47% of offenders in adult kidnappings were arrested.

In contrast, most kidnappings of juvenile victims were committed by a family member (50%). Thirty percent (30%) were kidnapped by an acquaintance and 20% by a stranger. In 90% of juvenile kidnappings, the offender was over age 17. In just 23% of juvenile kidnappings, another crime occurred; in 8% the offender possessed a firearm; and in 12% the juvenile victim was injured. Finally, 26% of offenders in juvenile kidnappings were arrested.

The attributes of the kidnappings of younger and older juveniles differed. Compared with kidnappings of victims ages 12–17, kidnappings of victims under age 12 were less likely to involve another crime (9% vs. 41%), more likely to involve an adult offender (95% vs. 84%), more likely to involve an offender who was a family member (70% vs. 22%), and less likely to involve an offender who was a stranger (15% vs. 28%). Younger juvenile victims were less likely to be injured (5% vs. 21%), and their victimizations were less likely to involve a firearm (4% vs. 12%). Finally, offenders in the kidnappings of younger juveniles were less likely to be arrested (21% vs. 31%).

**The kidnappings of persons under age 12 were most likely to be committed by a family member—primarily a parent**

- About two-thirds of female victims ages 15–17 were kidnapped by an acquaintance, and one-quarter by a stranger.
- The kidnappings of males and females under age 6 are similar in both volume and offender type.

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master files* for the years 2000 and 2001 [machine-readable data files].

**NIBRS can provide a rough estimate of juvenile kidnappings**

The NIBRS data for the years 2000 and 2001 can be used to develop an estimate of kidnappings reported to law enforcement in the U.S. once an assumption is made. The assumption is this: the ratio of the estimated number of reported crimes in the FBI's *Crime in the United States* (*CIUS*) report to the number of crimes in the NIBRS data is similar for all offenses.

This assumption can be tested by first calculating the ratio of the FBI's estimate of reported aggravated assaults in 2001 to the number reported in the 2001 NIBRS data. This ratio is 6.5—meaning for every 1 aggravated assault reported in the 2001 NIBRS file, the FBI estimated there were 6.5 aggravated assaults in the U.S. When this same ratio is calculated for forcible rape, it is 5.5. The two ratios are not equal, but they are close enough to indicate the ratio has some value for developing a "rough estimate" of kidnappings.

Based on an average 2001 *CIUS*-to-NIBRS ratio of 6 to 1, and the 8,700 kidnappings reported in the 2001 NIBRS file, a rough estimate of kidnappings reported to law enforcement in the U.S. in 2001 is about 50,000. NIBRS data show that about 35% of all kidnappings involve juvenile victims. Therefore, roughly 17,000 kidnappings of persons under age 18 were reported to law enforcement in the U.S. in 2001.

# Only a small fraction of missing children are abducted—most by family members

### A child can be "missing" because of a range of circumstances

The stereotypical missing child scenario involves a nonfamily abduction where the child is transported at least 50 miles away, held overnight or for ransom, abducted with the intent to keep the child permanently, or killed. This scenario is a parent's worst nightmare and attracts much media attention, but it represents an extremely small proportion of all missing children.

The most recent National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children (NISMART–2) provided national estimates of missing children based on surveys of households, law enforcement agencies, and juvenile residential facilities. In conceptualizing the missing child problem, NISMART–2 researchers noted that, "fundamentally, whether a child is 'missing' depends on the knowledge and state of mind of the child's caretaker, rather than the child's actual condition or circumstance." They counted two basic categories of missing children:

**Caretaker missing.** The child's whereabouts were unknown to the primary caretaker and the caretaker was alarmed for at least 1 hour and tried to locate the child.

**Reported missing.** The child's whereabouts were unknown to the primary caretaker and the caretaker contacted police or a missing children's agency to locate the child.

NISMART–2 researchers considered several different types of episodes that might cause a child to become missing: nonfamily abductions (including stereotypical kidnappings); family abductions; runaway/thrownaway; missing involuntary, lost, or injured; and missing benign explanation. (See box.)

### The types of missing-child episodes that were counted in NISMART–2 ranged from abduction-homicides to benign situations involving caretaker-child miscommunication

**Nonfamily abduction.** A nonfamily abduction occurs when a nonfamily perpetrator takes a child by the use of physical force or threat of bodily harm or detains a child for at least one hour in an isolated place by the use of physical force or threat of bodily harm without lawful authority or parental permission; or when a child who is younger than 15 years old or is mentally incompetent, without lawful authority or parental permission, is taken or detained by or voluntarily accompanies a nonfamily perpetrator who conceals the child's whereabouts, demands ransom, or expresses the intention to keep the child permanently.

**Stereotypical kidnapping.** A stereotypical kidnapping occurs when a stranger or slight acquaintance perpetrates a nonfamily abduction in which the child is detained overnight, transported at least 50 miles, held for ransom, abducted with intent to keep the child permanently, or killed.

**Family abduction.** A family abduction occurs when, in violation of a custody order, a decree, or other legitimate custodial rights, a member of the child's family, or someone acting on behalf of a family member, takes or fails to return a child, and the child is concealed or transported out of state with the intent to prevent contact or deprive the caretaker of custodial rights indefinitely or permanently. (For a child 15 or older, unless mentally incompetent, there must be evidence that the perpetrator used physical force or threat of bodily harm to take or detain the child.)

**Runaway/thrownaway.** A runaway incident occurs when a child leaves home without permission and stays away overnight; or a child 14 years old or younger (or older and mentally incompetent) who is away from home chooses not to return when supposed to and stays away overnight; or a child 15 years old or older who is away from home chooses not to return and stays away two nights. A thrownaway incident occurs when a child is asked or told to leave home by a parent or another household adult, no adequate alternative care is arranged for the child by a household adult, and the child is out of the household overnight; or a child who is away from home is prevented from returning home by a parent or another household adult, no adequate alternative care is arranged for the child by a household adult, and the child is out of the household overnight.

**Missing involuntary, lost, or injured.** A missing involuntary, lost, or injured episode occurs when a child's whereabouts are unknown to the child's caretaker and this causes the caretaker to be alarmed for at least one hour and try to locate the child, under one of two conditions: (1) the child was trying to get home or make contact with the caretaker but was unable to do so because the child was lost, stranded, or injured; or (2) the child was too young to know how to return home or make contact with the caretaker.

**Missing benign explanation.** A missing benign explanation episode occurs when a child's whereabouts are unknown to the child's caretaker and this causes the caretaker to (1) be alarmed, (2) try to locate the child, and (3) contact the police about the episode for any reason, as long as the child was not lost, injured, abducted, victimized, or classified as runaway/thrownaway.

Source: Sedlak et al.'s National estimates of missing children: An overview.

### In 1999, the annual missing child rate was 19 per 1,000 children ages 0–17 in the general population

According to NISMART–2, in 1999, an estimated 1.3 million children were missing from their caretakers. This figure includes those who were reported missing and those who were not. It represents a rate of 19 per 1,000 children ages 0–17. An estimated 797,500 children were reported missing (11 per 1,000). Thus, about 60% of children missing from caretakers were reported missing to police or a missing children's agency.

According to NISMART–2 researchers, "only a fraction of 1 percent of the children who were reported missing had not been recovered by the time they entered the study data. Thus, ... although the number of caretaker missing children is fairly large and a majority come to the attention of law enforcement or missing children's agencies, all but a very small percentage are recovered fairly quickly."

### Children may not be where they are supposed to be, but may not be considered "missing"

For example, NISMART–2 estimated that there were 1,682,900 runaway or thrownaway children in 1999, but only 37% were counted as caretaker missing and 21% were reported missing. The others may have run away, but either their caretakers did not realize they were gone, knew they were away from home but knew where they were, or were not alarmed or did not try to find them.

**Runaway/thrownaway episodes were the most common type of missing children episode, accounting for almost half of cases**

| Episode type | National estimate | 95% confidence interval* | Percent | Rate per 1,000 |
|---|---|---|---|---|
| Caretaker missing | 1,315,600 | 1,131,100–1,500,100 | 100% | 19 |
| Runaway/thrownaway | 628,900 | 481,000–776,900 | 48 | 9 |
| Missing benign explanation | 374,700 | 289,900–459,500 | 28 | 5 |
| Missing involuntary, lost, or injured | 204,500 | 131,300–277,800 | 15 | 3 |
| Family abduction | 117,200 | 79,000–155,400 | 9 | 2 |
| Nonfamily abduction** | 33,000 | 2,000–64,000 | 3 | <1 |
| Reported missing | 797,500 | 645,400–949,500 | 100% | 11 |
| Runaway/thrownaway | 357,600 | 238,000–477,200 | 45 | 5 |
| Missing benign explanation | 340,500 | 256,000–425,000 | 43 | 5 |
| Missing involuntary, lost, or injured | 68,100 | 24,800–111,300 | 8 | 1 |
| Family abduction | 56,500 | 22,600–90,400 | 7 | 1 |
| Nonfamily abduction** | 12,100 | <100–31,000 | 2 | <1 |

- 48% of caretaker missing children and 45% of reported missing children were missing because of a runaway/thrownaway episode.
- The second most common category was children who became missing because of benign explanation circumstances (28% of caretaker missing and 43% of reported missing).
- Children abducted by family members were less than 10% of missing children (9% of caretaker missing and 7% of reported missing children).
- The least common category was children abducted by nonfamily members. Nonfamily abductions accounted for just 3% of caretaker missing children and 2% of reported missing children.

Note: Estimates are rounded to the nearest 100. Detail sums to more than totals because children could experience more than one episode type.

*The 95% confidence interval indicates that if the study were repeated 100 times, 95 of the replications would produce estimates within the ranges noted.

**Estimates of nonfamily abductions are based on an extremely small sample of cases; therefore, their precision and confidence intervals are unreliable.

Source: Authors' adaptation of Sedlak et al.'s National estimates of missing children: An overview; and Sedlak et al.'s National estimates of children missing involuntarily or for benign reasons.

### NISMART–2 profiles family abduction episodes

NISMART–2 estimated that family members abducted 203,900 children during 1999. Of these, 117,200 were considered missing by their caretakers; 56,500 of them were reported to authorities. The remaining children abducted by family members (86,700) were not considered missing because their caretakers knew of their whereabouts but were unable to recover them.

**NISMART–2 family abduction caretaker screening questions**

- Was there any time when anyone tried to take the child away from you against your wishes?
- In the past 12 months, did any family member outside your household, such as a spouse, an ex-spouse, an ex-partner, brother, sister, parent, in-law, or any other person you consider a family member or someone acting for them, do any of the following things:
  - Take or try to take the child in violation of a custody order, an agreement, or other child living arrangement?
  - Keep or try to keep the child from you when you were supposed to have him/her even if for just a day or weekend?
  - Conceal the child or try to prevent you from having contact with him/her?
  - Kidnap or try to kidnap the child?

Source: Authors' adaptation of Hammer et al.'s Children abducted by family members: National estimates and characteristics.

Most children abducted by family members were taken by a perpetrator acting alone (61%), in most cases their biological father (53%). Many family-abducted children were younger than 6 (44%); substantially fewer were age 12 or older (21%). Nearly half were gone less than 1 week (46%), and very few had not been returned by the time of the survey.

| Characteristics of family abductions | Percent |
|---|---|
| Total (*n*=203,900) | 100% |
| Age of child | |
| 0–2 | 21 |
| 3–5 | 23 |
| 6–11 | 35 |
| 12–17 | 21 |
| Gender of child | |
| Male | 49 |
| Female | 51 |
| Race/ethnicity of child | |
| White, not Hispanic | 59 |
| Black | 12 |
| Hispanic | 20 |
| Other/no information | 10 |
| Perpetrators | |
| One | 61 |
| Two or more | 35 |
| No information | 4 |
| Relationship to child | |
| Father | 53 |
| Mother (or her boyfriend) | 27 |
| Grandparent | 14 |
| Stepparent/other relative | 7 |
| Child's prior location | |
| Own home/yard | 36 |
| Other home/yard | 37 |
| Other location | 28 |
| Duration of episode | |
| Less than 1 day | 23 |
| 1–6 days | 23 |
| 1 week–1 month | 24 |
| 1 month or more | 21 |
| Located, but not returned | 6 |
| No information | 3 |

Note: Detail may not total 100% because of rounding.

Source: Authors' adaptation of Hammer et al.'s Children abducted by family members: National estimates and characteristics.

### Stereotypical kidnappings of children are extremely rare

NISMART–2 researchers caution that nonfamily abductions are so rare that "the estimates of the number of caretaker missing and reported missing children abducted by a nonfamily perpetrator are not very reliable and have very large confidence intervals." As noted earlier, the stereotypical kidnapping is the type of nonfamily abduction that receives the most public attention; however, these kidnappings account for a tiny proportion of all missing children. Most nonfamily child abductions do not include the elements of the extremely alarming kind of crime that comes to mind when we think about kidnapping by strangers. According to NISMART–2, an estimated 115 of the children abducted by nonfamily members were stereotypical kidnappings (with the true figure somewhere between 60 and 170) and 90 of those were reported missing (with the true figure somewhere between 35 and 140). (Even stereotypical kidnappings might not be reported if no one notices the child is missing or if the discovery of the child's body is the first evidence of the episode.)

Contrary to public perceptions, NISMART–2 found that the majority of victims of stereotypical and other nonfamily abductions were teens—not younger children—and most were kidnapped by someone they knew somewhat—not by strangers or slight acquaintances. The NISMART–2 researchers point out the implications these findings have for prevention efforts, which have tended to focus on "stranger danger" and have targeted young children.



# An estimated 1.7 million youth had a runaway or thrownaway episode; fewer than 4 in 10 were "missing"

### Most runaway/thrownaway youth were older teens

Teens ages 15–17 accounted for 68% of the estimated 1.7 million youth in 1999 who were gone from their homes either because they had run away or because their caretakers threw them out. Males and females were equally represented. Most runaway/thrownaway youth were non-Hispanic whites (57%).

| Characteristics of runaways/thrownaways | Percent |
|---|---|
| Total (n=1,682,900) | 100% |
| Age of child | |
| 7–11 | 4 |
| 12–14 | 28 |
| 15–17 | 68 |
| Gender of child | |
| Male | 50 |
| Female | 50 |
| Race/ethnicity of child | |
| White, not Hispanic | 57 |
| Black | 17 |
| Hispanic | 15 |
| Other/no information | 11 |
| Season | |
| Summer | 39 |
| Fall | 20 |
| Winter | 20 |
| Spring | 20 |
| Police contact | 32 |
| Miles traveled | |
| Not more than 1 | 8 |
| More than 1 to 10 | 30 |
| More than 10 to 50 | 31 |
| More than 50 to 100 | 10 |
| More than 100 | 13 |
| No information | 9 |
| Duration of episode | |
| Less than 1 day | 19 |
| 1–6 days | 58 |
| 1 week to less than 1 month | 15 |
| 1 month or more | 7 |
| Located, but not returned | <1 |
| Not located | <1 |

Note: Detail may not total 100% because of rounding.

Source: Authors' adaptation of Hammer et al.'s Children abducted by family members: National estimates and characteristics.

The most common time of year for youth to run away was the summer (39%). Less than one-quarter of runaways/thrownaways traveled 50 miles or more from home; 9% left their home state. The vast majority of youth who ran away or were thrown away were gone less than 1 week (77%).

### Runaway/thrownaway episodes vary greatly in their seriousness or dangerousness

The stereotype of a runaway is a youth roaming the streets of a large, unfamiliar city alone or in the company of drug dealers or pimps. NISMART–2 data show that not all runaway/thrownaway youth experience episodes filled with such dangers. Some youth stay with friends or relatives who care for them.

For 21% of the 1.7 million runaway/thrownaway youth, their episode involved abuse (physical or sexual) at home prior to their leaving or fear of abuse upon their return. For these youth, being returned home may increase rather than decrease their risk of harm.

Substantial numbers of youth were considered endangered during their episode because they reported that they were substance dependent (19%), were in the company of someone known to abuse drugs (18%), or were using hard drugs (17%). Youth were also considered endangered if they spent time in a place where criminal activity was known to occur (12%) or engaged in criminal activity during the course of the episode (11%). Runaway/ thrownaway youth may also be at risk of physical assault—7% were with a violent person, 4% were victims of assault (actual or attempted). Four percent (4%) of youth had previously attempted suicide, which also put them at risk of harm. A substantial number of runaway/thrownaway youth missed at least 5 days of school (70,500 or 4%).

Fewer than 1% of youth reported that they exchanged sex for money, drugs, food, or shelter. One percent (1%) of runaway/thrownaway youth reported that they were victims of sexual assault (actual or attempted) and 2% were with a sexually exploitative person. NISMART–2 estimated that 38,600 youth were at risk of some form of sexual endangerment or exploitation because they were runaways/thrownaways.

**NISMART–2 runaway/thrownaway caretaker screening questions**

In the last year, did the child leave home without permission and stay away for at least a few hours?

Did the child stay away for at least one night?

Did the child choose not to come home from somewhere when he/she was supposed to, and stay away for at least two nights?

Did you or any adult member of your household force or tell the child to leave home, or decide not to allow him/her back in the home?

Did the child leave for at least one night?

Was there any time when having the child in your home became a lot of trouble and he/she left?

Other than anything you have already told me about, has there been any time, either currently or during the past 12 months, when you did not know where the child was living?

Source: Authors' adaptation of Hammer et al.'s Runaway/thrownaway children: National estimates and characteristics.



# Comparisons of NISMART–1 and –2 find no evidence of an increase in the incidence of missing children

### NISMART–2 enabled comparisons of missing children for 1988–1999

NISMART–1 provided estimates of children reported missing for 1988. NISMART–2 provided estimates for 1999. Although researchers changed definitions and methodology for the second study based on what was learned in the first study, they also conducted analyses using the original definitions to permit comparisons between 1988 and 1999 for family abductions, runaways, and lost, injured, or otherwise missing children. Nonfamily abductions and thrownaway children were excluded from the trend analyses because differences between the NISMART–2 and NISMART–1 definitions of these categories of missing children and the methods used to develop incidence estimates could not be reconciled.

### Incidence rates for broadly defined family abductions and lost, injured, or otherwise missing children declined

The incidence rate for children who experienced broadly defined family abductions went from 5.62 per 1,000 children ages 0–17 in 1988 to 4.18 in 1999—a statistically significant decline. For the broadly defined category of lost, injured, or otherwise missing, the incidence rate drop from 1988 to 1999 was also statistically significant (from 6.95 per 1,000 children to 3.40).

Although the incidence rate for broadly defined runaways in 1999 (5.28) was lower than the rate for 1988 (7.09), the difference was not statistically significant. The observed difference in estimated rates may have resulted merely from chance (or sampling error) and not from a decline in the actual rate.

None of the incidence rates for more serious types of family abductions, runaways, and lost, injured, or otherwise missing children showed a statistically significant change from 1988 to 1999.

### NISMART–1 definitions used in trend analysis distinguished two levels of seriousness for several types of missing child episodes

| Broadly defined: | Defined as serious: |
|---|---|
| **Parental/family abduction**<br>A family member took a child or failed to return a child at the end of an agreed-upon visit in violation of a custody agreement/decree, with the child away at least overnight. | A family member took the child out of state or attempted to conceal/prevent contact with the child, or an abductor intended to keep the child or permanently change custodial privileges. |
| **Runaway**<br>A child who left home without permission and stayed away at least overnight or who was already away and refused to return home. | A runaway who during a runaway episode was without a secure and familiar place to stay. |
| **Otherwise missing**<br>Children missing for varying periods depending on age, disability, and whether the absence was due to injury. | An otherwise missing child case where police were called. |

Source: Authors' adaptation of Finkelhor, Hotaling, and Sedlak's *Missing, Abducted, Runaway, and Thrownaway Children in America. First Report: Numbers and Characteristics, National Incidence Studies.*

### The NISMART trends are encouraging, but ...

The authors of the NISMART–2 trends bulletin comment that, "The period between 1988 and 1999 saw a significant mobilization on behalf of missing children. Law enforcement officers received special training, and public awareness grew as a result of media coverage and educational programs disseminated to schools and families . . . Although the findings reported [here] are encouraging, they are no cause for complacency. The . . . estimates for 1999 . . . reveal large numbers of children and youth still caught up in circumstances of crisis and vulnerability. The family and community problems these statistics reflect are unlikely to disappear anytime soon."

Source: Authors' adaptation of Hammer et al.'s National estimates of missing children: Selected trends, 1988–1999.



# Most abuse and neglect cases enter the child welfare system through child protective services agencies

### What are child protective services?

The term "child protective services" generally refers to services provided by an agency authorized to act on behalf of a child when parents are unable or unwilling to do so. In all states, laws require these agencies to conduct assessments or investigations of reports of child abuse and neglect and to offer rehabilitative services to families where maltreatment has occurred or is likely to occur.

Although the primary responsibility for responding to reports of child maltreatment rests with state and local child protective services (CPS) agencies, prevention and treatment of abuse and neglect can involve professionals from many disciplines and organizations.

States vary in the way child maltreatment cases are handled and in the terminology that is used to describe that processing. Although variations exist among jurisdictions, community responses to child maltreatment generally share a common set of decision points and can thus be described in a general way.

### State laws require many professions to notify CPS of suspected maltreatment

Individuals likely to identify maltreatment are often those in a position to observe families and children on an ongoing basis. This may include educators, law enforcement personnel, social services personnel, medical professionals, probation officers, daycare workers, mental health professionals, and the clergy, in addition to family members, friends, and neighbors.

Professionals who come into contact with children as part of their jobs, such as medical and mental health professionals, educators, childcare providers, social services providers, law enforcement personnel, and clergy, are required by law to notify CPS agencies of suspicions of child maltreatment. Some states require reporting by any person having knowledge of child maltreatment.

CPS or law enforcement agencies usually receive the initial referral alleging abuse or neglect, which may include the identity of the child, information about the nature and extent of maltreatment, and information about the parent or other person responsible for the child. The initial report may also contain information identifying the individual suspected of causing the alleged maltreatment, the setting in which maltreatment occurred, and the person making the report.

### CPS agencies "screen in" most referrals as reports to be investigated or assessed

Protective services staff must determine whether the referral constitutes an allegation of abuse or neglect and how urgently a response is needed. If the intake worker determines that the referral does not constitute an allegation of abuse or neglect, the case may be closed. If there is substantial risk of serious physical or emotional harm, severe neglect, or lack of supervision, a child may be removed from the home under provisions of state law. Most states require that a court hearing be held shortly after the removal to approve temporary custody by the CPS agency. In some states, removal from the home requires a court order.

Some referrals are out-of-scope for CPS and may be referred to other agencies. Other referrals lack sufficient information to enable followup. Agency workload and resources may also influence screening decisions. For these and other reasons, CPS agencies "screen out" about a third of all referrals.

Once a referral is accepted or "screened in," CPS must determine whether the child was maltreated. CPS may initiate an investigation or assessment of the alleged incident, or it may pursue an alternate response. Whether the agency investigates or seeks another response, it must decide if action is required to protect the child. The CPS agency also determines if the child and family are in need of services and which services are appropriate.

The initial investigation involves gathering and analyzing objective information from and about the child and family to determine if the allegations are substantiated. Protective services agencies may work with law enforcement and other agencies during this period. Caseworkers generally respond to reports of abuse and neglect within 2 to 3 days. A more immediate response may be required if it is determined that a child is at imminent risk of injury or impairment.

Following the initial investigation, the protective services agency decides whether the evidence substantiates the allegations. Should sufficient evidence not exist to support an allegation of maltreatment, additional services may still be provided if it is believed there is risk of abuse or neglect in the future. In a few states, the agency may determine that maltreatment or the risk of maltreatment is indicated even if sufficient evidence to conclude or substantiate the allegation does not exist. Some states use an alternative response system that provides for

responses other than substantiated, indicated, and unsubstantiated. In these states, children may or may not be determined to be maltreatment victims.

### CPS agencies assess child and family needs before developing case plans

Protective services staff attempt to identify the factors that contributed to the maltreatment and determine what services would address the most critical treatment needs.

CPS staff then develop case plans in conjunction with other treatment providers and the family in an attempt to alter the conditions and/or behaviors resulting in child abuse or neglect. Together with other treatment providers, CPS staff then implement the treatment plan for the family. If the family is uncooperative, the case may be referred for court action.

### Protective services agencies are also responsible for evaluating and monitoring family progress

After the treatment plan has been implemented, protective services and other treatment providers evaluate and measure changes in family behavior and the conditions that led to child abuse or neglect, assess changes in the risk of maltreatment, and determine when services are no longer necessary. Case managers often coordinate the information from several service providers when assessing a case's progress.

### CPS agencies provide both preventive and remedial services

Preventive services are targeted toward families with children at risk of maltreatment and are designed to improve caregivers' child-rearing competencies. Types of preventive services include such things as respite care, parenting education, substance abuse treatment, home visits, counseling, daycare, and homemaker help. CPS agencies offer postinvestigation (remedial) services on a voluntary basis. Courts may also order services to ensure children's safety. Postinvestigation services are designed to address the child's safety and are typically based on an assessment of the family's strengths, weaknesses, and needs. These services might include counseling, in-home family

**What are the stages of child maltreatment case processing through the child protective services and juvenile/family court systems?**

Note: This chart gives a simplified view of caseflow through these systems. Procedures vary among jurisdictions.

preservation services, foster care services, or other family-based or court services.

Some cases are closed because, although the family resists intervention efforts, the child is considered to be at low risk of harm. Other cases are closed when it has been determined that the risk of abuse or neglect has been eliminated or sufficiently reduced to a point where the family can protect the child from maltreatment without further intervention.

If it is determined that the family will not be able to protect the child, the child may be removed from the home and placed in foster care. If the child cannot be returned home to a protective environment within a reasonable timeframe, parental rights may be terminated so that a permanent alternative for the child can be found.

### One option available to child protective services is referral to juvenile court

Substantiated reports of abuse and neglect may not lead to court involvement if the family is willing to participate in the CPS agency's treatment plan. The agency may, however, file a complaint in juvenile court if it thinks the child is at serious and imminent risk of harm and an emergency removal (without parental consent) is warranted or if the parents are otherwise uncooperative.

Emergency removals require the scheduling of a shelter care hearing typically 1 to 3 working days before removal. If an emergency removal is not requested, the timing of court proceedings is more relaxed—often 10 days or more after the filing of court documents alleging child maltreatment. The juvenile court holds a preliminary hearing to ensure that the child and parent(s) are represented by counsel and determine whether probable cause exists, whether the child should be placed or remain in protective custody, the conditions under which the child can return home while the trial is pending, and the types of services (including visitation) that should be provided in the interim. At this stage, the parents may decide to cooperate, and the court may agree to handle the case informally.

### Adjudicatory hearings focus primarily on the validity of the allegations—dispositional hearings address the case plan

If sufficient probable cause exists, the petition is accepted. The court will hold an adjudicatory hearing or trial to determine whether the evidence supports the maltreatment allegations and the child should be declared a dependent of the court.

If petition allegations are sustained, the court proceeds to the disposition stage and determines who will have custody of the child and under what conditions. The disposition hearing may immediately follow adjudication or may be scheduled within a short time period (typically no longer than 30 days). Although adjudication and disposition should be separate and distinct decisions, the court can consider both at the same hearing. Preferred practice in many jurisdictions is to hold a bifurcated hearing where dispositional issues are addressed immediately after adjudication.

If the court finds that the child is abused or neglected, typical dispositional options include both short-term and long-term aspects and address the basic issue of whether the child should be returned home and if not, where the child should be placed:

- Reunification or protective services provided by protective services agencies are designed to enable the child to return home safely—subject to specific conditions including ongoing case involvement and/or supervision by the agency.
- Custody may be granted to the state child protective agency, the noncustodial parent or other relative, or foster care if the court decides that returning the child home could be dangerous.

At the disposition hearing, the agency presents its written case plan, which addresses all aspects of the agency's involvement with the family. In many states, statutes require the court to approve, disapprove, or modify provisions contained in the plan. These include changes in parental behavior that must be achieved, services to be provided to help achieve these changes, services to be provided to meet the special needs of the child, terms and conditions of visitation, and the timelines and responsibilities of each party in achieving individual case plan objectives.

### Juvenile courts often maintain case oversight responsibility beyond the disposition hearing

Although not all abuse and neglect cases come before the court, the juvenile court is playing an increasingly significant role in determining case outcomes. In the vast majority of instances, the court will keep continuing jurisdiction of the case after disposition and monitor efforts by the agency to reunify the family.

The Federal Adoption Assistance and Child Welfare Act of 1980 (Public Law 96–272) required greater judicial oversight of CPS agency performance. This legislation was passed in an attempt to keep children from being needlessly placed in foster care or left in foster care indefinitely. The goal of the legislation was to enable the child to have a permanent living arrangement (e.g., return to family, adoption, or placement with other relatives) as soon as possible. More recently, the Federal Adoption and Safe Families Act (ASFA) of 1997 (Public Law 103–89) amended the federal foster care law to make safety and permanency the primary focus of the law. ASFA was enacted to remedy chronic problems with the child welfare system. The regulations went into effect in March 2000.

Courts routinely conduct review hearings to revisit removal decisions and assess progress with agency case plans both before and after a permanency plan has been developed. The court must also decide whether to terminate parental rights in cases involving children unable to return home. Courts maintain ongoing involvement until the child either is returned home; placed in a permanent, adoptive home; or reaches the age of majority.

### Federal law establishes permanency preferences

After the initial disposition (placement of the child, supervision of the child and family, and services delivered to the child and family), the court holds review hearings to assess the case service plan and determine if the case is progressing. After 12 months, during which time the child and family receive services and the family must comply with conditions set forth by the court, the court must make a permanency determination. The court considers five basic permanency choices in the following hierarchy:

1. Reunification with the family is the preferred choice.
2. Adoption is considered when family reunification is not viable (termination of parental rights is required).
3. Permanent legal guardianship (a judicially created relationship that includes certain parental rights) is considered when neither reunification nor adoption is possible .
4. Permanent placement with a fit and willing relative is considered if reunification, adoption, and guardianship are not feasible.
5. An alternative planned permanent living arrangement (APPLA) may be found, but the agency must document "compelling reasons" why the other four choices are not in the best interests of the child.

APPLA placements may be independent living arrangements that include the child's emancipation. Although ASFA doesn't define these types of placements, they are nevertheless intended to be permanent arrangements for the child. APPLA placements are not foster care placements that can be extended indefinitely.

In many states, the juvenile court will continue to conduct post-permanency review hearings at periodic intervals to ensure that the permanency plan remains satisfactory and that the child is safe and secure. This is in addition to any termination of parental rights, guardianship, and/or adoption finalization hearings that may be required to accomplish the selected permanency goal. The final action the court makes is to terminate the child's status as a dependent and close the case.

**The Adoption and Safe Families Act (ASFA) establishes deadlines courts must meet in handling dependency cases**

| ASFA requirement | Deadline | Start date |
|---|---|---|
| Case plan | 60 days | Actual removal |
| Reasonable effort to prevent child's removal from the home | 60 days | Actual removal |
| 6-month periodic review | 6 months | Foster care entry* |
| Permanency determination | 12 months | Foster care entry* |
| Reasonable efforts to finalize permanency plan | 12 months | Foster care entry* |
| Mandatory filing of a termination of parental rights petition | 15 months† | Foster care entry* |

* Foster care entry is the earlier of the date the court found the child abused or neglected or 60 days after the child's actual removal from the home.

† A termination of parental rights petition must be filed when a child accrues 15 months in foster care within a 22-month period. Time when the child is on a trial home visit (or during a runaway episode) does not count toward the 15-month limit.

Source: Authors' adaptation of Ratterman et al.'s *Making Sense of the ASFA Regulations: A Roadmap for Effective Implementation.*



# Child protective services agencies receive 50,000 maltreatment referrals weekly—18% are substantiated

**The National Child Abuse and Neglect Data System monitors the child protective services caseloads**

In response to the 1988 amendments to the Child Abuse Prevention and Treatment Act, the Children's Bureau in the U.S. Department of Health and Human Services developed the National Child Abuse and Neglect Data System (NCANDS) to collect child maltreatment data from state child protective services (CPS) agencies. The Children's Bureau annually collects and analyzes both summary and case-level data collected under NCANDS. For 2003, 43 states and the District of Columbia reported case-level data on all children who received an investigation or assessment by a CPS agency. These states accounted for 79% of the U.S. population younger than 18. The case-level data provide descriptive information on cases referred to CPS agencies during the year, including:

- Characteristics of the referral of abuse or neglect made to CPS.
- Characteristics of the victims.
- Alleged maltreatments.
- Disposition (or findings).
- Risk factors of the child and the caregivers.
- Services provided.
- Characteristics of the perpetrators.

The remaining seven states that are unable to provide case-level data submit aggregate counts of key indicators that are used with the case-level data to develop national estimates.

**In 2003, referrals were made to CPS agencies at a rate of 39 per 1,000 children**

In 2003, CPS agencies in the U.S. received an estimated 2.9 million referrals alleging that children were abused or neglected. An estimated 5.5 million children were included in these referrals. This translates into a rate of 39 referrals for every 1,000 children younger than 18 in the U.S. population. The referral rate for 2003 was up slightly from the 2002 referral rate of 36 per 1,000.

**The National Child Abuse and Neglect Data System counts several different aspects of child maltreatment**

**Referral:** Notification to the CPS agency of suspected child maltreatment. This can include one or more children. It is a measure of "flow" into the CPS system.

**Report:** A referral of child maltreatment that was accepted for an investigation or assessment by a CPS agency.

**Investigation:** The gathering and assessment of objective information to determine if a child has been or is at risk of being maltreated. It results in a disposition as to whether the alleged report is substantiated.

**Assessment:** The process by which CPS determines if a child or other person involved in a report of alleged maltreatment needs services.

**Alleged victim:** Child about whom a report regarding child maltreatment has been made to a CPS agency.

**Victim:** Child having a maltreatment disposition of substantiated, indicated, or alternate response.

**Substantiated:** Investigation disposition that concludes that the allegation of maltreatment (or risk of maltreatment) was supported by or founded on state law or state policy. This is the highest level of finding by a CPS agency.

**Indicated:** Investigation disposition that concludes that maltreatment cannot be substantiated under state law or policy, but there is reason to suspect that the child may have been maltreated or was at risk of maltreatment. Only a few states distinguish between substantiated and indicated dispositions.

**Alternate response system:** A maltreatment disposition system used in some states that provides for responses other than substantiated, indicated, and unsubstantiated. In these systems, children may or may not be determined to be maltreatment victims. These systems are also referred to as "diversified" or "in need of services" systems.

**Unsubstantiated:** Investigation disposition that determines that there is not sufficient evidence under state law to conclude or suspect that the child has been maltreated or is at risk of maltreatment. Included in this category are intentionally false allegations.

**Court action:** Legal action initiated by the CPS agency on behalf of the child. This includes authorization to place the child in foster care, filing for temporary custody or dependency, or termination of parental rights. As used here, it does not include criminal proceedings against a perpetrator.

**Alleged perpetrator:** Person who is alleged to have caused or knowingly allowed the maltreatment of a child.

**Perpetrator:** Person who has been determined to have caused or knowingly allowed the maltreatment of a child.

### Professionals were the most common source of maltreatment reports

Professionals who come in contact with children as a part of their occupation (e.g., teachers, police officers, doctors, childcare providers) are required by law in most states to notify CPS agencies of suspected maltreatment. Thus, professionals are the most common source of maltreatment reports (57%). Sources other than professionals account for the remaining 43% of reports.

| Source | Percent of total |
|---|---|
| Professional | 57% |
| Educator | 16 |
| Law enforcement | 16 |
| Social services | 12 |
| Medical | 8 |
| Mental health | 3 |
| Child daycare provider | 1 |
| Foster care provider | 1 |
| Family and community | 43% |
| Relative—not parent | 8 |
| Parent | 7 |
| Friend or neighbor | 6 |
| Anonymous | 9 |
| Other* | 13 |

*Includes alleged victims, alleged perpetrators, and sources not otherwise identified.

**The child maltreatment investigation rate increased 27% from 1990 to 2003, but the child maltreatment victimization rate declined 7%**

- In 2003, CPS agencies conducted investigations or assessments involving 3,353,000 children. This translates to an investigation rate of 45.9 per 1,000 children ages 0–17.
- An estimated 906,000 children were found to be victims—about 26% of all children who received an investigation or assessment in 2003 (or about 18% of initial referrals).
- In 2003, the national rate of maltreatment victimization was 12.4 victims per 1,000 children ages 0–17.

Note: A child was counted as a victim each time he or she was found to be a victim of maltreatment.

Source: Authors' adaptation of Walter R. McDonald and Associates' *Child Maltreatment 2003*.

### CPS response times vary, but average 3 days

CPS agencies receive referrals of varying degrees of urgency; therefore, the time from referral to investigation varies widely. State response time standards also vary. Some states set a single standard and others set different standards depending on the priority or urgency of the case. Many specify a high-priority response as within 24 hours; some specify 1 hour. Lower priority responses range from 24 hours to 14 days. In 2003, the average response time for states that reported this information was 3 days.

### CPS agencies investigate more than two-thirds of referrals

In 2003, CPS agencies screened in 68% of all referrals received. Thus, CPS agencies conducted investigations or assessments in an estimated 1.9 million reports in 2003 involving more than 3.3 million children.

Once a report is investigated or assessed and a determination is made as to the likelihood that maltreatment occurred or that the child is at risk of maltreatment, CPS assigns a finding to the report—known as a disposition. States' dispositions and terminology vary but can be summarized into the following categories: substantiated, indicated, alternate response (victim and nonvictim), and unsubstantiated (terms defined in box on previous page).

Nationally, 26% of investigated reports were substantiated, 4% were

**State child maltreatment victimization rates varied substantially in 2003**

DC
Maltreatment victims per 1,000 children ages 0–17, 2003
20.1 and above (5 states)
15.1 to 20.0 (9 states)
10.1 to 15.0 (12 states)
5.1 to 10.0 (17 states)
1.0 to 5.0 (7 states)
No data (1 state)

- Child maltreatment victimization rates ranged from a low of 1.6 to a high of 42.2 per 1,000 children ages 0–17.
- Half of states had child maltreatment victimization rates lower than 10.4 per 1,000 children ages 0–17.

Note: A child was counted as a victim each time he or she was found to be a victim of maltreatment.

Source: Authors' adaptation of Walter R. McDonald and Associates' *Child Maltreatment 2003*.

indicated, and 57% were unsubstantiated. Dispositions of alternate response victim accounted for less than 1% and dispositions of alternate response nonvictim were 6% of investigated reports.

Law enforcement or other legal/justice personnel were the referral source for 27% of substantiated reports and 11% of unsubstantiated reports. Educators accounted for 14% of substantiated and 18% of unsubstantiated reports.

### The average CPS investigator handled about 63 investigations in 2003

In most sizable jurisdictions, different CPS personnel perform screening and investigation functions. In smaller agencies, one staff person may perform both functions. In 2003, the average yearly number of investigations or assessments per investigation worker was 63. Among states with specialized screening and investigation workers, the investigation workers outnumbered the screening workers nearly 7 to 1. Even in locations with specialized personnel, CPS staff typically perform numerous other activities and some CPS workers may be responsible for more than one function.

### Neglect was the most common form of maltreatment for victims in 2003

Many children were the victims of more than one type of maltreatment, but if categories of maltreatment are considered independently, 61% of victims experienced neglect (including medical neglect), 19% were physically abused, 10% were sexually abused, 5% were emotionally or psychologically maltreated, and 17% experienced other forms of maltreatment such as threats of harm, abandonment, and congenital drug addiction. The rates of most types of abuse remained relatively stable from 1998 through 2003.

### Different types of maltreatment have different source-of-referral patterns

Nearly half of all physical abuse victims were reported by education (22%) or law enforcement/justice system (21%) personnel. Law enforcement/justice system personnel also accounted for substantial proportions of victims reported to CPS for neglect (26%), sexual abuse (26%), and psychological maltreatment (30%). Medical personnel reported 27% of medical neglect victims.

# Rates of child maltreatment victimization varied across demographic groups

### Girls' victimization rate was higher than the rate for boys

In 2003, girls made up a slightly greater share of maltreatment victims than did boys (52% vs. 48%). The victimization rate for girls was 13.1 per 1,000 girls younger than age 18, and the rate for boys was 11.6 per 1,000 boys younger than age 18.

### More than half of all victims of child maltreatment were white

In 2003, white children made up the largest share of child maltreatment victims (54%), followed by black children (26%) and Hispanic children (12%). American Indian/Alaska native children (2%) and Asian/Pacific Islander children (1%) made up substantially smaller proportions of maltreatment victims.

Although they accounted for a small share of victims, Pacific Islanders and American Indians had higher child maltreatment victimization rates than other race/ethnicity groups—nearly double the rate for white children. Similarly, the rate for black children was well above the rate for white children.

Note: Children of Hispanic ethnicity may be of any race.

### The rate of maltreatment victimization was inversely related to age—the youngest children had the highest rate

- Infants younger than 1 accounted for 1 in 10 victims of maltreatment in 2003. One-year-olds accounted for 6% of victims, as did each age through age 7—about the proportion expected if victimization were spread evenly over all ages. The proportion of victims dropped off sharply for older teens; 17-year-olds accounted for just 2% of victims.
- Infants and toddlers were victimized at a rate of 16.4 per 1,000 children age 3 or younger. The victimization rate decreased steadily with age: 13.8 for ages 4–7, 11.7 for ages 8–11, 10.7 for ages 12–15, and 5.9 for ages 16–17.

Note: A child was counted as a victim each time he or she was found to be a victim of maltreatment.

Source: Authors' adaptation of Walter R. McDonald and Associates' *Child Maltreatment 2003*.



# The overwhelming majority of child maltreatment perpetrators are parents of the victims

### Women are overrepresented among both caregivers and maltreatment perpetrators

Child maltreatment is by definition an act or omission by a parent or other caregiver that results in harm or serious risk of harm to a child. Incidents where children are harmed by individuals who are not their parents or caregivers would generally not come to the attention of child protective services agencies, but rather would be handled by law enforcement.

Compared to their share of the population (51%), women are overrepresented among child caregivers. Within families, mothers usually are the primary caregivers, and women far outnumber men in caregiver occupations. Women account for more than 90% of childcare providers and early childhood teachers, more than 80% of nonphysician healthcare workers, and more than 70% of recreation workers and teachers below college level. In 2003, females made up more than half of maltreatment perpetrators (58%). This proportion is lower than their proportion among child caregivers

Among perpetrators, females tended to be younger than males. Half of all female perpetrators were younger than 31 years old; half of all male perpetrators were older than 34. A higher proportion of female than male perpetrators were in their 20s.

Perpetrator age profile:

| Age | Perpetrator Total | Male | Female |
|---|---|---|---|
| Total | 100% | 100% | 100% |
| Younger than 20 | 5 | 6 | 4 |
| Ages 20–29 | 34 | 27 | 40 |
| Ages 30–39 | 39 | 38 | 39 |
| Ages 40–49 | 17 | 22 | 14 |
| Older than 49 | 5 | 7 | 4 |
| Median age | 32 | 34 | 31 |

**The vast majority of perpetrators were parents (80%), including birth parents, adoptive parents, and stepparents**

Percent of perpetrators
90%
80%
70%
60%
50%
40%
30%
20%
10%
0%
80%
6%
4%
4%
4%
1%
Parent
Other relative
Other caregiver
Parent's partner
Unknown
Daycare staff
Perpetrator relationship to victim

- Nonparental relatives, unmarried partners of parents, and daycare providers each made up small proportions of child maltreatment perpetrators in 2003. Foster parents, residential facility staff, and legal guardians each made up less than 1% of all maltreatment perpetrators.

Notes: A child was counted as a victim each time he or she was found to be a victim of maltreatment. A victim can have more than one perpetrator. "Other caregivers" are camp counselors, school employees, hospital staff, etc.

Source: Authors' adaptation of Walter R. McDonald and Associates' *Child Maltreatment 2003.*

**Parents were less likely to commit sexual abuse than were other types of perpetrators**

| Types of maltreatment | Total | Parent | Parent's partner | Other relative | Foster parent | Daycare | Facility staff |
|---|---|---|---|---|---|---|---|
| | Perpetrator relationship to victim | | | | | | |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Neglect | 57 | 62 | 38 | 38 | 50 | 48 | 46 |
| Physical abuse | 11 | 11 | 17 | 10 | 17 | 13 | 19 |
| Sexual abuse | 7 | 3 | 11 | 30 | 6 | 23 | 11 |
| Psychological or other abuse | 9 | 9 | 14 | 6 | 7 | 2 | 8 |
| Multiple types | 16 | 15 | 20 | 16 | 20 | 13 | 15 |

- Perpetrators who were nonparental relatives had the highest proportion of sexual abuse maltreatment (30%) and parents the lowest (3%).

Notes: A child was counted as a victim each time he or she was found to be a victim of maltreatment. A victim can have more than one perpetrator and can suffer more than one type of maltreatment. Total includes relationships not detailed. Detail may not total 100% because of rounding.

Source: Authors' adaptation of Walter R. McDonald and Associates' *Child Maltreatment 2003.*



# Reported child maltreatment fatalities typically involve infants and toddlers and result from neglect

### The youngest children are the most vulnerable child maltreatment victims

Although children younger than 1 year old were just 10% of all maltreatment victims in 2003, they accounted for 44% of maltreatment fatalities. Similarly, children younger than 4 were 28% of all victims but 79% of maltreatment fatalities.

Maltreatment victim age profile:

| Victim age | Fatalities | All victims |
|---|---|---|
| Total | 100% | 100% |
| Younger than 1 | 44 | 10 |
| 1 | 16 | 6 |
| 2 | 13 | 6 |
| 3 | 7 | 6 |
| 4–7 | 10 | 24 |
| 8–11 | 5 | 21 |
| 12–17 | 6 | 25 |

Note: Detail may not total 100% because of rounding.

Several factors make infants and toddlers younger than 4 particularly vulnerable, including their dependency, small size, and inability to defend themselves.

### Infant boys had the highest maltreatment fatality rate in 2003

Boys younger than 1 year old had a maltreatment fatality rate of 17.7 deaths per 100,000 boys of the same age in the population. For infant girls, the rate was 14.1 per 100,000. For both males and females, fatality rates declined with children's age.

Maltreatment fatality rate per 100,000 children in age/gender group:

| Victim age | Male | Female |
|---|---|---|
| Total | 2.2 | 1.9 |
| Younger than 1 | 17.7 | 14.1 |
| 1 | 5.8 | 5.7 |
| 2 | 5.2 | 4.0 |
| 3 | 2.4 | 2.9 |
| 4–7 | 1.1 | 0.9 |
| 8–11 | 0.6 | 0.4 |
| 12–17 | 0.4 | 0.3 |

### Mothers were the most common perpetrators in child maltreatment fatalities

Nearly 4 in 10 maltreatment fatalities resulted from neglect alone. Physical abuse accounted for 3 in 10 fatalities, and about the same proportion resulted from multiple forms of maltreatment in combination.

Mothers were involved in 59% of maltreatment fatalities. Fathers were involved in 39% of maltreatment fatalities.

| Fatality perpetrators | Percent |
|---|---|
| Total | 100% |
| Mother alone | 30 |
| Mother and other than father | 8 |
| Mother and father | 20 |
| Father alone | 18 |
| Father and other than mother | 1 |
| Nonparent | 18 |
| Unknown | 4 |

Note: Detail may not total 100% because of rounding.

### Most maltreatment fatality victims were previously unknown to the CPS agency

Most child maltreatment fatalities involved families without a recent history with CPS. Of all child maltreatment fatalities, 11% involved children whose families had received family preservation services from a CPS agency in the previous 5 years and 3% involved children who had been in foster care and reunited with their families in the previous 5 years.

### Is the child maltreatment fatality rate increasing?

The rate of child maltreatment fatalities increased from 1.85 per 100,000 in 2000 to 2.00 in 2003. Estimates of maltreatment fatalities are based on data reported by CPS agencies and data from other sources such as health departments and child fatality review boards. Child maltreatment fatalities, particularly those resulting from neglect, are thought to be underreported. Some studies have estimated that as many as 50% of maltreatment deaths are not recorded. Some child fatalities recorded as "child homicides," accidents, or Sudden Infant Death Syndrome (SIDS) might be attributed to maltreatment if more comprehensive investigations were conducted and if coding of maltreatment on death certificates were more uniform.

An estimated 1,500 children died from abuse or neglect in 2003. In 2000, the figure was 1,300. It is not clear whether this increase represents an actual increase in maltreatment fatalities or is the result of improved reporting.



# Increases in children exiting foster care led to a drop in the foster care rolls between 1998 and 2003

### AFCARS data track trends in foster care and adoption

Foster care is defined in federal regulations as 24-hour substitute care for children outside their own homes. Foster care settings include, but are not limited to, family foster homes, relative foster homes (whether payments are being made or not), group homes, emergency shelters, residential facilities, child-care institutions, and preadoptive homes.

Under federal regulation, states are required to submit data to the Adoption and Foster Care Analysis and Reporting System (AFCARS), which collects case-level information on all children in foster care for whom state child welfare agencies have responsibility and on children who are adopted under the auspices of state public child welfare agencies. AFCARS also includes information on foster and adoptive parents. Data are reported for 12 months as of September 30th of each year.

### Children ages 11–15 make up the largest share of foster care entries

The median age of children who entered foster care in 2002 was 8.6 years. Logically, the average age of the standing foster care population is greater than the average age of children entering foster care. The average age of children in foster care in 2002 was 10.8 years.

Age profile of children entering foster care:

| Age | 1998 | 2002 |
|---|---|---|
| Total | 100% | 100% |
| Younger than 1 | 13 | 14 |
| 1–5 | 25 | 26 |
| 6–10 | 22 | 20 |
| 11–15 | 29 | 29 |
| 16–18 | 11 | 11 |

**Between 1998 and 2003, entries into foster care remained relatively stable and exits increased slightly**

- An estimated 297,000 children entered foster care in 2003. Between 1998 and 2003, foster care entries remained stable—around 300,000 per year. The number of children exiting foster care annually increased from an estimated 248,000 to roughly 278,000.

**The number of children in foster care has decreased steadily since 1999**

- An estimated 523,000 children were in foster care on September 30, 2003, down 7% from the 1998 figure.
- Despite the drop in the number of children in foster care, child welfare agencies reported little change in the number of children served during the year. For every two children in foster care, three children received services. In 2003, child welfare agencies served an estimated 800,000 children.

Source: Authors' adaptation of the Children's Bureau's *National adoption and foster care statistics.*

### Minority youth are overrepresented in foster care

In 2002, minority youth were 22% of the U.S. population ages 0–17. In comparison, 60% of children in foster care in 2002 were minority youth.

Race/ethnicity profile of children in foster care:

| Race/ethnicity | 1998 | 2002 |
|---|---|---|
| Total | 100% | 100% |
| White | 36 | 40 |
| Minority | 64 | 60 |
| Black | 45 | 38 |
| Hispanic | 16 | 17 |
| American Indian | 2 | 2 |
| Asian/Pacific Islander | 1 | 1 |
| Two or more races | NA | 3 |

NA = data not available

Note: Youth of Hispanic ethnicity can be of any race.

### Half of children in foster care on September 30, 2002, entered foster care before April 2001

On September 30, 2002, half of children in foster care had been in foster care for 18 months. On September 30, 1998, the median time in foster care was 21 months.

Profile of children in foster care on September 30th:

| Median time in foster care | 1998 | 2002 |
|---|---|---|
| Total | 100% | 100% |
| Less than 1 month | 4 | 5 |
| 1–5 months | 15 | 18 |
| 6–11 months | 15 | 16 |
| 12–17 months | 11 | 12 |
| 18–23 months | 9 | 8 |
| 24–29 months | 7 | 7 |
| 30–35 months | 5 | 5 |
| 3–4 years | 16 | 13 |
| 5 years or more | 18 | 16 |

For children who exited foster care during 2002, the median time in foster care was 12 months. The figure for those who exited in 1998 was 11 months.

### Reunification was the permanency goal for 45% of children in foster care in 2002

| | Profile of children in foster care | | | | |
|---|---|---|---|---|---|
| Permanency goal | 1998 | 1999 | 2000 | 2001 | 2002 |
| Total | 100% | 100% | 100% | 100% | 100% |
| Reunify with parent(s) | 40 | 42 | 43 | 44 | 45 |
| Adoption | 20 | 19 | 20 | 22 | 21 |
| Guardianship | 3 | 3 | 3 | 3 | 3 |
| Live with other relative(s) | 3 | 5 | 5 | 5 | 5 |
| Long-term foster care | 7 | 8 | 9 | 8 | 9 |
| Emancipation | 5 | 6 | 6 | 6 | 6 |
| Goal not yet established | 23 | 18 | 15 | 11 | 10 |

- Reunification with parents was the most common permanency goal (45% in 2002); adoption was the second most common goal (21% in 2002). Other permanency goals together accounted for less than one-quarter of children in foster care in 2002.
- The proportion of children in the "goal not yet established" category changed substantially from 1998 to 2002. In 1998, children without permanency goals were 23% of those in foster care. By 2002, the figure had dropped to 10%.

### The most common placement setting for children in foster care in 2002 was the home of an unrelated foster family

| | Profile of children in foster care | | | | |
|---|---|---|---|---|---|
| Placement setting | 1998 | 1999 | 2000 | 2001 | 2002 |
| Total | 100% | 100% | 100% | 100% | 100% |
| Foster family (nonrelative) | 48 | 47 | 47 | 48 | 46 |
| Foster family (relative) | 29 | 26 | 25 | 24 | 23 |
| Institution | 8 | 10 | 10 | 10 | 10 |
| Group home | 8 | 8 | 8 | 8 | 9 |
| Preadoptive home | 3 | 4 | 4 | 4 | 5 |
| Trial home visit | 3 | 3 | 3 | 3 | 4 |
| Runaway | 1 | 1 | 2 | 2 | 2 |
| Supervised independent living | 1 | 1 | 1 | 1 | 1 |

- Nearly half of all children in foster care on September 30, 2002, were living in the home of an unrelated foster family (46%). Relative foster families had 23% of children in foster care.
- Other placement settings were less common, each accounting for no more than 10% of children in foster care.

Note: Detail may not total 100% because of rounding.

Source: Authors' adaptation of the Children's Bureau's *National adoption and foster care statistics*.



# The number of children adopted from public foster care increased 40% from 1998 to 2003

### Most children adopted from foster care were adopted by their foster parents

In 2002, foster parents adopted approximately 32,500 (61%) of the children adopted from foster care. Relatives accounted for 24% of adoptions, and the remaining 15% of adoptions involved nonrelatives. The proportion of children adopted by relatives in 2002 (24%) was greater than in 1998 (15%).

Married couples adopted the majority of children adopted out of foster care (66%), although many were adopted by single females (30%). Single males and unmarried couples each accounted for about 2% of children adopted out of foster care. The family structures of adoptive families showed a similar profile in 1998.

### The race profile of adoptions changed between 1998 and 2002, but the median age did not

Minority youth were about the same proportion of children adopted out of foster care (60%) as children in foster care (59%). Compared with 1998, adoptions in 2002 had a smaller proportion of black children and a larger proportion of Hispanic children. The median age of children adopted out of foster care was 6.3 years in 2002—the same as in 1998.

Race/ethnicity profile of children adopted:

| Race/ethnicity | 1998 | 2002 |
|---|---|---|
| Total | 100% | 100% |
| White | 38 | 41 |
| Minority | 62 | 59 |
| Black | 46 | 37 |
| Hispanic | 13 | 17 |
| American Indian | 1 | 1 |
| Asian/Pacific Islander | 1 | 1 |
| Two or more races | NA | 3 |

NA = data not available

Note: Youth of Hispanic ethnicity can be of any race.

**Reunification was the most common outcome for children exiting foster care in 2002**

| | Profile of children exiting foster care | | | | |
|---|---|---|---|---|---|
| Outcome | 1998 | 1999 | 2000 | 2001 | 2002 |
| Total | 100% | 100% | 100% | 100% | 100% |
| Reunify with parent(s) | 62 | 59 | 57 | 57 | 56 |
| Adoption | 14 | 16 | 17 | 18 | 18 |
| Live with other relative(s) | 9 | 10 | 10 | 10 | 10 |
| Emancipation | 7 | 7 | 7 | 7 | 7 |
| Transfer to another agency | 3 | 3 | 3 | 3 | 4 |
| Runaway | 3 | 2 | 2 | 2 | 3 |
| Guardianship | 2 | 3 | 4 | 3 | 2 |

- In 2002, more than half (56%) of children exiting foster care were reunited with their parent(s) and 18% were adopted. Compared with 1998, a smaller proportion were reunited and a greater share were adopted in 2002.

Note: Detail may not total 100% because of rounding.

Source: Authors' adaptation of the Children's Bureau's *National adoption and foster care statistics*.

**An estimated 53,000 children were adopted from the public foster care system in 2002; in 2003, the figure was 49,000**

- Adoption requires termination of parental rights for the child's parents. In 2003, parental rights were terminated for the parents of an estimated 67,000 children in foster care.
- For half of all adopted children, less than 1 year passed between termination of parental rights and adoption.

Source: Authors' adaptation of the Children's Bureau's *National adoption and foster care statistics*.

# Sources

Baum, K. 2005. Juvenile victimization and offending, 1993–2003. *Bureau of Justice Statistics Special Report*. Washington, DC: Bureau of Justice Statistics.

Bureau of Justice Statistics. Various years. *National Crime Victimization Survey* for the years 1992 through 2001 [machine-readable data files]. Washington, DC: U.S. Department of Justice, Office of Justice Programs, BJS.

Bureau of Labor Statistics. 2004. *Women in the Labor Force: A Databook*. Washington, DC: U.S. Department of Labor.

Children's Bureau. *National adoption and foster care statistics*. Updated December 6, 2004. <www.acf.hhs.gov/programs/cb/dis/afcars/publications/afcars.htm>.

DeVoe, J., Peter, K., Ruddy, S., Miller, A., Planty, M., Snyder, T., and Rand, M. 2003. *Indicators of School Crime and Safety: 2003*. Washington, DC: National Center for Education Statistics and Bureau of Justice Statistics.

Federal Bureau of Investigation. Various years. *National Incident-Based Reporting System master files* for the years 1996 through 2001 [machine-readable data files]. Washington, DC: FBI.

Federal Bureau of Investigation. Various years. *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files]. Washington, DC: FBI.

Federal Interagency Forum on Child and Family Statistics. *America's children: Key indicators of well-being, 2005*. Accessed September 2005. <www.childstats.gov/americaschildren/xls/beh4a.xls>.

Federal Interagency Forum on Child and Family Statistics. 2005. *America's Children: Key Indicators of Well-Being, 2005*. Washington, DC: U.S. Government Printing Office.

Finkelhor, D., Hammer, H., and Sedlak, A. 2002. Nonfamily abducted children: National estimates and characteristics. *NISMART: National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Finkelhor, D., Hotaling, G., and Sedlack, A. 1990. *Missing, Abducted, Runaway, and Thrownaway Children in America. First Report: Numbers and Characteristics, National Incidence Studies*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Finkelhor, D., Mitchell, K., and Wolak, J. 2001. Highlights of the youth Internet safety survey. *OJJDP Fact Sheet*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Finkelhor, D., Mitchell, K., and Wolak, J. 2000. *Online Victimization: A Report on the Nation's Youth*. Alexandria, VA: National Center for Missing and Exploited Children.

Hammer, H., Finkelhor, D. and Sedlak, A. 2002. Children abducted by family members: National estimates and characteristics. *NISMART: National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Hammer, H., Finkelhor, D. and Sedlak, A. 2002. Runaway/thrownaway children: National estimates and characteristics. *NISMART: National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Hammer, H., Finkelhor, D., Sedlak, A., and Porcellini, L. 2004. National estimates of missing children: Selected trends, 1988–1999. *NISMART: National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Klaus, P., and Rennison, C. 2002. *Age Patterns in Violent Crime Victimization, 1973–2000*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Lauritsen, J. 2003. How families and communities influence youth victimization. *OJJDP Juvenile Justice Bulletin*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

National Center for Health Statistics, National Center for Injury Prevention and Control. *WISQARS (Web-based Injury Statistics Query and Reporting System)* [interactive database system]. Accessed June 2004. <www.cdc.gov/ncipc/wisqars>.

National Center for Health Statistics. *Bridged-race intercensal estimates of the July 1, 1990–July 1, 1999 United States resident population by county, single-year of age, sex, race, and Hispanic origin* [machine-readable data files]. Prepared by the U.S. Census Bureau with support from the National Cancer Institute. Released July 26, 2004. <www.cdc.gov/nchs/about/major/dvs/popbridge/popbridge.htm>.

National Center for Health Statistics. *Estimates of the July 1, 2000–July 1, 2003, United States resident population from the vintage 2003 postcensal series by year, county, age, sex, race, and Hispanic origin* [machine-readable data files]. Prepared under a collaborative arrangement with the U.S. Census Bureau. Released September 14, 2004. <www.cdc.gov/nchs/about/major/dvs/popbridge/popbridge.htm>.

National Center for Juvenile Justice. 1993. *Processing of Abuse, Neglect and Dependency Cases in the Hamilton County Department of Human Services Family and Children's Services Division*. Pittsburgh, PA: NCJJ.

National Center on Child Abuse and Neglect. 1996. *The Third National Incidence Study of Child Abuse and Neglect (NIS-3)*. Washington, DC: U.S. Department of Health and Human Services.

Ratterman, D., Davidson, H., Epstein, H., Fiermonte, C., Hardin, M., Hemrich, V., Hicks, M., Klain, E., Lancour, A., Laver, M., and Renne, J. 2001. *Making Sense of the ASFA Regulations: A Roadmap for Effective Implementation*. Rauber, D. (ed.). Washington, DC: American Bar Association.

Sedlak, A., Finkelhor, D., and Hammer, H. 2004. National estimates of children missing involuntarily or for benign reasons. *NISMART: National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Sedlak, A., Finkelhor, D., Hammer, H., and Schultz, D. 2002. National estimates of missing children: An overview. *NISMART: National Incidence Studies of Missing, Abducted, Runaway, and Thrownaway Children*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Troup-Leasure, K., and Snyder, H. 2005. Statutory rape known to law enforcement. *Juvenile Justice Bulletin*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Walter R. McDonald and Associates, American Humane Association. 2004. *Child Maltreatment 2002: Reports from the States to the National Child Abuse and Neglect Data System*. Washington, DC: U.S. Department of Health and Human Services, Children's Bureau.

Walter R. McDonald and Associates, American Humane Association. 2005. *Child Maltreatment 2003: Reports from the States to the National Child Abuse and Neglect Data System*. Washington, DC: U.S. Department of Health and Human Services, Children's Bureau.

# Juvenile Offenders and Victims: 2006 National Report

**Chapter 3: Juvenile offenders** .......... **63**

Self-reports vs. official data .......... 64
Homicides by juveniles .......... 65
Juvenile homicide offender characteristics .......... 67
Juvenile offending behavior demographics .......... 70
Offending into the adult years .......... 71
Juvenile offending behavior and associated factors .......... 72
School crime .......... 73
Weapons use .......... 74
Drug and alcohol use .......... 75
Drug and alcohol use trends .......... 79
Co-occurrence of substance use behaviors .......... 81
Gangs .......... 82
Time-of-day analysis of juvenile offending .......... 85
Chapter 3 sources .......... 90

Copyright 2006
National Center for Juvenile Justice
3700 S. Water Street, Suite 200
Pittsburgh, PA 15203-2363

Suggested citation: Snyder, Howard N., and Sickmund, Melissa. 2006. *Juvenile Offenders and Victims: 2006 National Report.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.



# Chapter 3

## Juvenile offenders

3

High profile—often very violent—incidents tend to shape public perceptions of juvenile offending. It is important for the public, the media, elected officials, and juvenile justice professionals to have an accurate view of (1) the crimes committed by juveniles, (2) the proportion and characteristics of youth involved in law-violating behaviors, and (3) trends in these behaviors. This understanding can come from studying victim reports, juvenile self-reports of offending behavior, and official records.

As documented in the following pages, many juveniles who commit crimes (even serious crimes) never enter the juvenile justice system. Consequently, developing a portrait of juvenile law-violating behavior from official records gives only a partial picture. This chapter presents what is known about the prevalence and incidence of juvenile offending prior to the youth entering the juvenile justice system. It relies on data developed by the Bureau of Justice Statistics' National Crime Victimization Survey, the Bureau of Labor Statistics' 1997 National Longitudinal Survey of Youth, the Centers for Disease Control and Prevention's Youth Risk Behavior Surveillance Survey, the Federal Bureau of Investigation's Supplementary Homicide Reports and its National Incident-Based Reporting System, and the National Institute on Drug Abuse's Monitoring the Future Study. Information on gangs is drawn from the National Youth Gang Survey, supported by the Office of Juvenile Justice and Delinquency Prevention (OJJDP). Information on the association between offending and contact with the juvenile justice system comes from one of OJJDP's Causes and Correlates Studies.

On the pages that follow, readers can learn the answers to many commonly asked questions: How many murders are committed by juveniles, and whom do they murder? What proportion of youth are involved in criminal behaviors? How many students are involved in crime at school? Is it common for youth to carry weapons to school? Are students fearful of crime at school? What is known about juveniles and gangs? How prevalent is drug and alcohol use? When are crimes committed by juveniles most likely to occur? Are there gender and racial/ethnic differences in the law-violating behaviors of juvenile offenders?



# Self-reports and official records are the primary sources of information on juvenile offending

### Self-report studies ask victims or offenders to report on their experiences and behaviors

There is an ongoing debate about the relative ability of self-report studies and official statistics to describe juvenile crime and victimization. Self-report studies can capture information on behavior that never comes to the attention of juvenile justice agencies. Compared with official studies, self-report studies find a much higher proportion of the juvenile population involved in delinquent behavior.

Self-report studies, however, have their own limitations. A youth's memory limits the information that can be captured. This, along with other problems associated with interviewing young children, is the reason that the National Crime Victimization Survey does not attempt to interview children below age 12. Some victims and offenders are also unwilling to disclose all law violations. Finally, it is often difficult for self-report studies to collect data from large enough samples to develop a sufficient understanding of relatively rare events, such as serious violent offending.

### Official statistics describe cases handled by the justice system

Official records underrepresent juvenile delinquent behavior. Many crimes by juveniles are never reported to authorities. Many juveniles who commit offenses are never arrested or are not arrested for all of their delinquencies. As a result, official records systematically underestimate the scope of juvenile crime. In addition, to the extent that other factors may influence the types of crimes or offenders that enter the justice system, official records may distort the attributes of juvenile crime.

### Official statistics are open to multiple interpretations

Juvenile arrest rates for drug abuse violations in recent years are substantially above those of two decades ago. One interpretation of these official statistics could be that juveniles have been breaking the drug laws more often in recent years. National self-report studies (e.g., Monitoring the Future), however, find that illicit drug use is substantially below the levels of the mid-1980s. If drug use is actually down, the higher arrest rates for drug crimes may represent a change in society's tolerance for such behavior and a greater willingness to bring these youth into the justice system for treatment or punishment.

Although official records may be inadequate measures of the level of juvenile offending, they do monitor justice system activity. Analysis of variations in official statistics across time and jurisdictions provides an understanding of justice system caseloads.

### Carefully used, self-report and official statistics provide insight into crime and victimization

Delbert Elliott, Director of the Center for the Study and Prevention of Violence, has argued that to abandon either self-report or official statistics in favor of the other is "rather shortsighted; to systematically ignore the findings of either is dangerous, particularly when the two measures provide apparently contradictory findings." Elliott stated that a full understanding of the etiology and development of delinquent behavior is enhanced by using and integrating both self-report and official record research.

**The growth and decline in violent crime by juveniles between 1980 and 2003 are documented by both victim reports and arrests**

**Violent crimes** include rape, robbery, aggravated assault, and homicide. **Victimizations** are those in which the victim perceived that at least one offender was between the ages of 12 and 17.

In every year from 1980 to 2003, the number of victimizations was substantially greater than the number of arrests. To more clearly show the comparative trends in the two statistics, however, each value on the graph is the annual number's percent difference from the 24-year average of the statistic.

Source: Authors' analysis of BJS's Victim's perception of the age of the offender in serious violent crime and of the FBI's *Crime in the United States* for the years 1980 through 2003.



# In 2002, the number of murders by juveniles dropped to its lowest level since 1984

### About one-third of murders in the U.S. are not solved

In 2002, the FBI reported that 16,200 persons were murdered in the U.S. In about 10,400 (64%) of these murders, the incident was cleared by arrest or by exceptional means—that is, either an offender was arrested and turned over to the court for prosecution or an offender was identified but law enforcement could not place formal charges (e.g., the offender died). In the other 5,800 murders (36%) in 2002, the offenders were not identified and their demographic characteristics are not known.

Estimating the demographic characteristics of these unknown offenders is difficult. The attributes of unknown offenders probably differ from those of known murder offenders. For example, it is likely that a greater proportion of known offenders have family ties to their victims and that a larger proportion of homicides committed by strangers go unsolved. An alternative to estimating characteristics of unknown offenders is to trend only murders with known juvenile offenders. Either approach—to trend only murders with known juvenile offenders or to estimate characteristics for unknown juvenile offenders—creates its own interpretation problems.

Acknowledging the weaknesses in the approach, the analyses of the FBI's Supplementary Homicide Reports (SHRs) presented in this Report assume that the offenders in cleared murders (known offenders) are similar to the offenders in unsolved murders (unknown offenders). This approach ensures that the number and characteristics of murder victims are consistent throughout the report.

**Between 1994 and 2002, the number of murders involving a juvenile offender fell 65%, to its lowest level since 1984**

- In the 1980s, 25% of the murders involving a juvenile offender also involved an adult offender. This proportion grew to 31% in the 1990s and averaged 36% for the years 2000–2002.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].

**Murders by juveniles in 2002 were less likely to be committed by a juvenile acting alone than in any year since at least 1980**

- Between 1980 and 2002, the annual proportion of murders involving a juvenile offender acting alone gradually declined, from 66% in the 1980s, to 59% in the 1990s, to 55% in the years 2000 to 2002.
- Between 1994 and 2002, murders by juveniles acting alone fell 68% and murders with multiple offenders declined 60%.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].

## In 2002, 1 in 12 murders involved a juvenile offender

Juvenile offenders were involved in an estimated 1,300 murders in the U.S. in 2002—8% of all murders. The juvenile offender acted alone in 52% of these murders, acted with one or more other juveniles in 9%, and acted with at least one adult offender in 39%.

Because nearly half (48%) of the 1,300 murders with juvenile offenders involved multiple offenders, the number of offenders in these murders was greater than the number of victims. The 1,300 murders involved an estimated 1,600 juvenile offenders. Also involved in these 1,300 murders were 900 adult offenders, the vast majority (87%) of whom were under age 25.

In 2002, 82% of the victims of juvenile murderers were male, 51% were white, and 46% were black. Most (69%) were killed with a firearm. Family members accounted for 16% of the victims, acquaintances 47%, and strangers (i.e., no personal relationship to the juvenile offenders) 37%.

From 1980 through 2002, the proportion of murders with a juvenile offender that also involved multiple offenders gradually increased. In the first half of the 1980s, about one-third of all murders with juvenile offenders involved more than one offender; in 2002, this proportion was nearly half (48%). Similarly, the proportion of murders with a juvenile offender that also involved an adult gradually increased, from less than 25% in the first half of the 1980s to 39% in 2002. Throughout this period, on average, 89% of these adult offenders were under age 25.

**Between 1980 and 2002, half of all murder victims killed by juveniles were ages 14–24**

- Of all the murder victims of juvenile offenders, 25% were themselves under age 18, and 4% were over age 64.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].

**Between 1980 and 2002, the murder victims most likely to be killed by a juvenile offender were age 14**

- Among all murder victims from 1980 through 2002, the proportion killed by juvenile offenders dropped from 34% for victims age 14 to 5% for victims age 25, then remained at or near 5% for all victims older than 25.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].



# The drop in minority males killing minority males with firearms drove the decline in murders by juveniles

### Murder trends shaped public perception of crime in the 1990s

During the 1990s, widespread concern about juvenile violence resulted in a number of changes in state laws with the intent to send more juveniles into the adult criminal justice system. The focal point of this concern was the unprecedented increase in murders by juveniles between 1984 and 1994. Then just as quickly the numbers fell: by 2002, juvenile arrests for murder were below the levels of the early 1980s. A better understanding of this rapid growth and decline is useful for juvenile justice practitioners and the public.

### The overall trend in murders by juveniles is a composite of separate trends

Examining the FBI's SHR data to understand the characteristics of juvenile murder offenders and their crimes makes it clear that specific types of murders drove the overall trends. Between 1984 and 1994, the overall annual number of juveniles identified by law enforcement as responsible for a murder tripled. However, the number of juvenile females identified in murder investigations increased less than 40%, while the number of juvenile males increased more than 200%. Thus, the increase between 1984 and 1994 was driven by male offenders.

During the same period, the number of juveniles who committed murder with a firearm increased about 320%, while murders committed without a firearm increased about 40%. Thus, the overall increase was also linked to firearm murders.

Finally, from 1984 to 1994, the number of juveniles who killed a family member increased about 20%, while the numbers of juveniles who killed

**The annual number of male juvenile homicide offenders varied substantially between 1980 and 2002, unlike the number of female offenders**

- The number of known male juvenile murder offenders in 2002 was lower than in any year since 1984.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].

**In 2002, as in 1980, equal numbers of black juveniles and white juveniles committed murders**

- Between 1984 and 1994, the number of known white juvenile murder offenders doubled and the number of black offenders quadrupled.
- In 2002, the numbers of known white murder offenders and black murder offenders were near their lowest levels in a generation.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].

an acquaintance or a stranger both increased about 240%. Therefore, during the period, murders by female juveniles, murders with weapons other than a firearm, and murders of a family member contributed little to the large increase in juvenile murders. In fact, just 10% of the increase in murders by juveniles between 1984 and 1994 can be attributed to murders with these characteristics.

So what types of murders by juveniles increased between 1984 and 1994? Ninety percent (90%) of the overall increase was murders of nonfamily members committed by males with a firearm—generally a handgun. This type of murder increased 400% between 1984 and 1994. A closer look at these crimes reveals that the increase was somewhat greater for murders of acquaintances than strangers and somewhat greater for juveniles acting with other offenders than for a juvenile offender acting alone. Nearly three-quarters of the increase was the result of crimes committed by black and other minority males—and in two-thirds of these murders, the victims were minority males.

The decline in murders by juveniles from 1994 to 2002 reversed the earlier increase. About 80% of the overall decline was attributable to the drop in murders of nonfamily members by juvenile males with a firearm; most of this decline was in murders of minority males committed by minority juvenile males.

**The national trend in murders by juvenile offenders reflected the growth and subsequent decline in crimes committed with firearms**

- The large growth and decline in the annual number of juvenile offenders who committed their crimes with a firearm between 1980 and 2002 stands in sharp contrast to the relative stability of the nonfirearm pattern over the period.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].

**Between 1980 and 2002, the annual number of juvenile offenders who killed family members changed little, in stark contrast to the number of those who killed acquaintances and strangers**

- In 1980, 16% of known juvenile homicide offenders killed family members. The proportion was 7% in 1994 and 13% in 2002.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files].

**In the 10 years from 1993 through 2002, the nature of murders committed by juvenile offenders varied with the age, gender, and race of the offenders**

| | Known juvenile offenders, 1993–2002 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Characteristic | All | Male | Female | Younger than age 16 | Age 16 | Age 17 | White | Black |
| Victim age | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Under 13 | 5 | 4 | 23 | 8 | 4 | 3 | 6 | 4 |
| 13 to 17 | 21 | 22 | 13 | 24 | 22 | 19 | 24 | 19 |
| 18 to 24 | 30 | 31 | 22 | 22 | 30 | 35 | 29 | 31 |
| Above 24 | 44 | 44 | 42 | 46 | 43 | 43 | 41 | 46 |
| Victim gender | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Male | 85 | 87 | 62 | 81 | 85 | 87 | 83 | 86 |
| Female | 15 | 13 | 38 | 19 | 15 | 13 | 17 | 14 |
| Victim race | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| White | 50 | 50 | 51 | 51 | 50 | 49 | 90 | 22 |
| Black | 46 | 46 | 46 | 45 | 46 | 47 | 8 | 76 |
| Other | 4 | 4 | 3 | 4 | 4 | 4 | 2 | 2 |
| Victim/offender relationship | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Family | 9 | 7 | 36 | 15 | 8 | 7 | 14 | 7 |
| Acquaintance | 54 | 55 | 46 | 50 | 54 | 57 | 54 | 54 |
| Stranger | 37 | 38 | 18 | 35 | 38 | 37 | 32 | 40 |
| Firearm used | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Yes | 74 | 77 | 35 | 70 | 74 | 77 | 66 | 80 |
| No | 26 | 23 | 65 | 30 | 26 | 23 | 34 | 20 |
| Number of offenders | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| One | 46 | 45 | 55 | 47 | 45 | 46 | 44 | 48 |
| More than one | 54 | 55 | 45 | 53 | 55 | 54 | 56 | 52 |

- Between 1993 and 2002, a greater percentage of the victims of male juvenile murder offenders were adults than were the victims of female offenders (75% vs. 64%). The juvenile victims of female offenders tended to be younger than the juvenile victims of male offenders.
- Adults were the victims of 70% of white juvenile murder offenders and 77% of black juvenile murder offenders.
- Although 76% of the victims of black juvenile murder offenders were black, black murder offenders were much more likely than white offenders to have victims of another race (24% vs. 10%). In contrast, juvenile murder offenders' age and gender were unrelated to the race of the victim.
- Female juvenile murder offenders were much more likely than male juvenile murder offenders to have female victims (38% vs. 13%) and to have victims who were family members (36% vs. 7%).
- Firearms were more likely to be involved in murders by male offenders than female offenders (77% vs. 35%) and in murders by black offenders than white offenders (80% vs. 66%).
- Female juvenile murder offenders were more likely than male offenders to commit their crimes alone (55% vs. 45%). In contrast, juvenile murder offenders' age was unrelated to the proportion of crimes committed with co-offenders, and offenders' race was only weakly related to this aspect of the incident.

Note: Detail may not total 100% because of rounding.

Source: Authors' analyses of the FBI's *Supplementary Homicide Reports* for the years 1993 through 2002 [machine-readable data files].

# 8% of 17-year-olds reported ever belonging to a gang, 16% sold drugs, and 16% carried a handgun

### Survey provides a portrait of law-violating behavior of youth

Most juvenile crime does not come to the attention of the juvenile justice system. To understand the amount of violent crime committed by juveniles, one could ask their victims. However, to understand the proportion of youth who commit various types of crimes (i.e., violent and nonviolent crime), one must ask the youth themselves.

To provide this and other information about youth, in 1997 the Bureau of Labor Statistics mounted the National Longitudinal Survey of Youth (NLSY97). Between 1997 and 2001, the NLSY97 annually interviewed a nationally representative sample of nearly 9,000 youth who were ages 12–16 on December 31, 1996, asking them about many aspects of their lives—including law-violating behaviors. Results from the first five waves of interviews (through 2001) provide a detailed portrait of the law-violating behaviors of youth ages 12–17 at the beginning of the 21st century.

For most law-violating behaviors studied, males were significantly more likely than females to report engaging in the behavior by age 17. The one exception was running away from home. The differences among white, black, and Hispanic youth were not as consistent. For some behaviors (i.e., running away and carrying guns) there were no differences among the three racial groups. White youth were significantly more likely than black or Hispanic youth to report committing vandalism. Black youth were significantly more likely than white or Hispanic youth to report committing an assault. Black youth at age 17 were significantly less likely than white or Hispanic youth to report having sold drugs.

**The prevalence of problem behavior among juveniles differs by gender, race, and age**

| | Proportion of youth reporting ever engaging in the behavior by age 17 | | | | | |
|---|---|---|---|---|---|---|
| Behavior | All youth | Male | Female | White | Black | Hispanic |
| Suspended from school | 33% | 42% | 24% | 28% | 56% | 38% |
| Ran away from home | 18 | 17 | 20 | 18 | 21 | 17 |
| Belonged to a gang | 8 | 11 | 6 | 7 | 12 | 12 |
| Vandalized | 37 | 47 | 27 | 39 | 33 | 34 |
| Theft less than $50 | 43 | 47 | 38 | 44 | 38 | 41 |
| Theft more than $50 | 13 | 16 | 10 | 12 | 15 | 14 |
| Assaulted with intent to seriously hurt | 27 | 33 | 21 | 25 | 36 | 28 |
| Sold drugs | 16 | 19 | 12 | 17 | 13 | 16 |
| Carried a handgun | 16 | 25 | 6 | 16 | 15 | 15 |

| | Proportion of youth reporting behavior at specific ages | | | | | |
|---|---|---|---|---|---|---|
| Behavior | Age 12 | Age 13 | Age 14 | Age 15 | Age 16 | Age 17 |
| Suspended from school | 6% | 9% | 14% | 13% | 12% | 10% |
| Ran away from home | na | na | 5 | 6 | 7 | 6 |
| Belonged to a gang | 2 | 2 | 2 | 2 | 2 | 2 |
| Vandalized | 14 | 17 | 16 | 14 | 13 | 9 |
| Theft less than $50 | 0 | 13 | 14 | 13 | 12 | 11 |
| Theft more than $50 | 3 | 3 | 4 | 5 | 5 | 4 |
| Assaulted with intent to seriously hurt | 9 | 10 | 11 | 11 | 11 | 9 |
| Sold drugs | 1 | 2 | 5 | 6 | 8 | 8 |
| Carried a handgun | 5 | 4 | 5 | 6 | 5 | 4 |

- By age 17, 33% of all youth said they had been suspended from school at least once, 18% had run away from home (i.e., had at least once left home and stayed away overnight without a parent's prior knowledge or permission), and 8% had belonged to a gang.
- By age 17, a greater proportion of juveniles reported that they had committed an assault with the intent of seriously hurting the person than reported ever having run away from home, sold drugs, carried a handgun, stolen something worth more than $50, or belonged to a gang.
- Males were significantly more likely than females to report ever being suspended from school (42% vs. 24%) or ever belonging to a gang (11% vs. 6%) and were 4 times more likely to report ever carrying a handgun (25% vs. 6%).
- White youth were significantly less likely than black or Hispanic youth to report ever belonging to a gang.
- With the exception of selling drugs, the proportions of youth who reported committing the above behaviors at age 17 are either the same or less than the proportions reporting the same behaviors at earlier ages.

Note: As a general rule, the confidence interval around the above percentages is about plus or minus 2 percentage points. Readers should consider figures to differ only when their confidence intervals do not overlap (i.e., a difference of at least 4 percentage points).

Source: Authors' adaptation of McCurley's Self-reported law-violating behavior from adolescence to early adulthood in a modern cohort.



# About one-quarter of juveniles who offended at ages 16–17 also offended as adults at ages 18–19

### Many juvenile offenders do not continue their law-violating behaviors into adulthood

Some persons commit crimes when they are juveniles and continue to do so into their adult years. Others commit crimes only as juveniles, while others begin their offending careers as adults. The analysis that follows summarizes the National Longitudinal Survey of Youth data for all youth who were interviewed at ages 16, 17, 18, and 19 during the first five waves of data collection (1997–2001) to study the continuity in offending from the juvenile years (ages 16–17) to the early adult years (ages 18–19).

Although the details vary somewhat with the type of offending behavior, the general pattern is consistent. For example, when interviewers asked youth at ages 16, 17, 18, and 19 if they had assaulted someone since the last interview with the intent of seriously hurting them, most (78%) reported never committing such a crime. Among the other 22% of youth who reported an assault in at least one of the four interviews, most (74%) reported the behavior at ages 16–17 and fewer (54%) reported assaulting someone at ages 18–19; about one-quarter (27%) reported the behavior at least once in both the juvenile period (ages 16–17) and the adult period (ages 18–19). This means that most of the youth who reported committing an assault in the later juvenile years stopped the behavior, reporting none in the early adult years. It also implies that half of the respondents who reported committing an assault as young adults did not do so as older juveniles. (The accompanying table provides similar details on other types of offenses and for subgroups of offenders.)

**About two-thirds of juveniles who reported committing specific offenses at ages 16 or 17 did not report doing so at ages 18 or 19**

| Behavior/ demographic | Of all youth reporting the behavior at ages 16–19, the percent reporting: Only at ages 16–17 | In both age groups | Only at ages 18–19 | Behavior/ demographic | Of all youth reporting the behavior at ages 16–19, the percent reporting: Only at ages 16–17 | In both age groups | Only at ages 18–19 |
|---|---|---|---|---|---|---|---|
| Vandalized | 57% | 24% | 20% | Assaulted to seriously hurt | 46% | 27% | 26% |
| Male | 55 | 27 | 18 | Male | 44 | 28 | 29 |
| Female | 59 | 17 | 24 | Female | 51 | 27 | 23 |
| White | 60 | 21 | 19 | White | 47 | 29 | 24 |
| Black | 45 | 30 | 25 | Black | 39 | 28 | 33 |
| Hispanic | 57 | 21 | 22 | Hispanic | 45 | 27 | 27 |
| Theft less than $50 | 58 | 23 | 19 | Sold drugs | 40 | 29 | 31 |
| Male | 55 | 25 | 20 | Male | 37 | 31 | 32 |
| Female | 62 | 20 | 18 | Female | 46 | 26 | 27 |
| White | 61 | 23 | 16 | White | 42 | 30 | 28 |
| Black | 50 | 22 | 29 | Black | 29 | 28 | 44 |
| Hispanic | 53 | 21 | 26 | Hispanic | 35 | 27 | 37 |
| Theft more than $50 | 57 | 14 | 29 | Carried a handgun | 46 | 24 | 30 |
| Male | 57 | 14 | 29 | Male | 44 | 27 | 29 |
| Female | 58 | 14 | 29 | Female | 56 | 6 | 37 |
| White | 59 | 14 | 27 | White | 52 | 27 | 21 |
| Black | 49 | 14 | 37 | Black | 33 | 14 | 53 |
| Hispanic | 60 | 12 | 28 | Hispanic | 28 | 26 | 46 |

- Among black youth ages 16–19 who reported assaulting someone with the intent to seriously injure, 39% reported the behavior only in the older juvenile years (ages 16–17), 33% only in the young adult years (ages 18–19), and 28% in both the older juvenile and young adult years. Among the 67% of black offenders who reported assaulting someone as older juveniles, less than half (28%) also reported assaulting someone as young adults.

Note: Detail may not total 100% because of rounding.

Source: Authors' analyses of the Bureau of Labor Statistics' *National Longitudinal Survey of Youth 1997 cohort, 1997–2001 (rounds 1–5)* [machine-readable data files].



# Juvenile law-violating behavior is linked to family structure and to school/work involvement

### Juveniles' self-reported law-violating behavior is related to their family structure

A recent study using data from NLSY97 explored the factors associated with a youth's self-reported law-violating behaviors. One significant factor was a youth's family structure. In general, the research showed that juveniles who lived with both biological parents had lower lifetime prevalence of law-violating behaviors than did juveniles who lived in other family types.

For example, the study found that 5% of youth age 17 who lived with both biological parents reported ever being in a gang, compared with 12% of youth who lived in other family arrangements. Similarly, youth at age 17 living with both biological parents reported a lower lifetime prevalence, compared with youth living in other types of families, for a wide range of problem behaviors: marijuana use (30% vs. 40%), hard drug use (9% vs. 13%), drug selling (13% vs. 19%), running away from home (13% vs. 25%), vandalism (34% vs. 41%), theft of something worth more than $50 (19% vs. 17%), assault with the intent to seriously injure (20% vs. 35%).

Family structure is correlated with a youth's race and ethnicity; that is, white non-Hispanic youth are more likely to live in families with two biological parents than are black or Hispanic youth. Therefore, patterns that indicate racial or ethnic differences in self-reported behavior may in reality be reflecting differences in family structure.

**Family structure is linked to problem behavior similarly for females and males**

| | Female respondents | | | Male respondents | | |
|---|---|---|---|---|---|---|
| Experience | All | Both biological parents | All other families | All | Both biological parents | All other families |
| Suspended ever | 17% | 9% | 26% | 33% | 23% | 45% |
| Runaway ever* | 12 | 7 | 17 | 11 | 7 | 15 |
| Sex in past year* | 28 | 20 | 35 | 30 | 22 | 40 |
| Smoke in past month* | 21 | 17 | 25 | 20 | 17 | 23 |
| Drink in past month*† | 23 | 21 | 26 | 23 | 23 | 24 |
| Marijuana in past month* | 9 | 6 | 11 | 10 | 8 | 13 |
| Vandalize in past year† | 10 | 8 | 13 | 19 | 18 | 21 |
| Petty theft ever | 30 | 25 | 34 | 38 | 33 | 43 |
| Major theft in past year | 3 | 2 | 4 | 6 | 4 | 8 |
| Assault in past year | 8 | 5 | 12 | 14 | 11 | 18 |
| Gang in past year | 1 | 1 | 2 | 3 | 2 | 4 |
| Handgun in past year‡ | 2 | 1 | 2 | 9 | 9 | 10 |
| Sell drugs in past year | 4 | 3 | 5 | 7 | 5 | 9 |
| Arrested in past year | 4 | 2 | 5 | 7 | 4 | 10 |

* Not significantly different at the 95% level of confidence for comparisons of females and males.

† Not significantly different at the 95% level of confidence for comparisons of the two types of family structures for males.

‡ Not significantly different at the 95% level of confidence for comparisons of the two types of family structures for females or males.

Source: Authors' adaptation of McCurley and Snyder's Risk, protection, and family structure.

### Many other factors influence a youth's involvement in law-violating behaviors

The study also found other factors related to juveniles' self-reported involvement in law-violating behaviors. The most closely related factor was the presence of friends or family members in gangs. For example, compared with juveniles who did not have friends or families in gangs, those who did were at least 3 times more likely to report having engaged in vandalism, a major theft, a serious assault, carrying a handgun, and selling drugs. They were also about 3 times more likely to use hard drugs and to run away from home.

Connectedness to school and/or work also was related to juveniles' self-reported law-violating behavior. Juveniles who were neither in school nor working had a significantly greater risk of engaging in a wide range of problem behaviors—using marijuana and hard drugs, running away from home, belonging to a gang, committing a major theft or a serious assault, selling drugs, and carrying a handgun.

### Some problem behaviors cluster

Analyses of NLSY97 data also found that involvement in some problem behaviors predicted elevated involvement in other problem behaviors. For example, juveniles who reported belonging to a gang were twice as likely as other juveniles to have committed a major theft, 3 times more likely to have sold drugs, 4 times more likely to have committed a serious assault, and 5 times more likely to have carried a handgun.



# School crime was common in 2003—1 in 8 students were in fights, 1 in 3 had property stolen or damaged

### National survey monitors youth health risk behaviors

The Centers for Disease Control and Prevention's Youth Risk Behavior Survey (YRBS) monitors health risk behaviors that contribute to the leading causes of death, injury, and social problems among youth in the U.S. Every 2 years, YRBS provides data representative of 9th–12th graders in public and private schools nationwide. The 2003 survey included responses from 15,214 students from 32 states and 18 large cities.

### Fewer than 4 in 10 high school students were in a physical fight—4 in 100 were injured

According to the 2003 survey, 33% of high school students said they had been in one or more physical fights during the past 12 months, down from 43% in 1993. Regardless of grade level or race/ethnicity, males were more likely than females to engage in fighting. Fighting was more common among black and Hispanic students than white students.

Percent who were in a physical fight in the past year:

| | Total | Male | Female |
|---|---|---|---|
| Total | 33.0% | 40.5% | 25.1% |
| 9th grade | 38.6 | 44.8 | 31.9 |
| 10th grade | 33.5 | 41.8 | 25.0 |
| 11th grade | 30.9 | 38.5 | 23.0 |
| 12th grade | 26.5 | 35.0 | 17.7 |
| White | 30.5 | 38.4 | 22.1 |
| Black | 39.7 | 45.6 | 34.0 |
| Hispanic | 36.1 | 42.6 | 29.5 |

Although physical fighting was fairly common among high school students, the proportion of students injured and treated by a doctor or nurse was relatively small (4%). Males were more likely than females to have been injured in a fight. Black and Hispanic students were more likely than white students to suffer fight injuries.

Percent who were injured in a physical fight in the past year:

| | Total | Male | Female |
|---|---|---|---|
| Total | 4.2% | 5.7% | 2.6% |
| 9th grade | 5.0 | 6.4 | 3.6 |
| 10th grade | 4.2 | 6.2 | 2.2 |
| 11th grade | 3.6 | 4.9 | 2.4 |
| 12th grade | 3.1 | 4.3 | 1.8 |
| White | 2.9 | 4.0 | 1.7 |
| Black | 5.5 | 7.3 | 3.7 |
| Hispanic | 5.2 | 6.5 | 3.9 |

Nationwide, 13% of high school students had been in a physical fight on school property one or more times in the 12 months preceding the survey, down from 16% in 1993. Male students were substantially more likely to fight at school than female students at all grade levels and across racial/ethnic groups. Hispanic and black students were more likely than white students to fight at school. Fighting at school decreased as grade level increased.

Percent who were in a physical fight at school in the past year:

| | Total | Male | Female |
|---|---|---|---|
| Total | 12.8% | 17.1% | 8.0% |
| 9th grade | 18.0 | 23.3 | 12.2 |
| 10th grade | 12.8 | 18.1 | 7.3 |
| 11th grade | 10.4 | 14.2 | 6.4 |
| 12th grade | 7.3 | 9.6 | 4.7 |
| White | 10.0 | 14.3 | 5.3 |
| Black | 17.1 | 21.5 | 12.6 |
| Hispanic | 16.7 | 19.3 | 13.8 |

### About 3 in 10 high school students had property stolen or vandalized at school

High school students were more likely to experience property crime than fights at school. Nationally, 30% said they had property such as a car, clothing, or books stolen or deliberately damaged on school property one or more times during the past 12 months. A greater proportion of male than female students experienced such property crimes at school, regardless of grade level or race/ethnicity. Students' reports of school property crime decreased as grade level increased.

Percent who had property stolen or deliberately damaged at school in the past year:

| | Total | Male | Female |
|---|---|---|---|
| Total | 29.8% | 33.1% | 26.2% |
| 9th grade | 34.8 | 37.4 | 31.9 |
| 10th grade | 30.5 | 34.3 | 26.6 |
| 11th grade | 27.2 | 30.5 | 23.9 |
| 12th grade | 24.2 | 27.9 | 20.2 |
| White | 28.2 | 30.6 | 25.6 |
| Black | 30.4 | 33.9 | 27.0 |
| Hispanic | 32.3 | 37.0 | 27.6 |

### Fear of school-related crime kept 5 in 100 high schoolers home at least once in the past month

Nationwide in 2003, 5% of high school students missed at least 1 day of school in the past 30 days because they felt unsafe at school or when traveling to or from school, up from 4% in 1993. Hispanic and black students were more likely than white students to have missed school because they felt unsafe. Freshmen were more likely than other high school students to miss school because of safety concerns.

Percent who felt too unsafe to go to school in the past 30 days:

| | Total | Male | Female |
|---|---|---|---|
| Total | 5.4% | 5.5% | 5.3% |
| 9th grade | 6.9 | 7.1 | 6.6 |
| 10th grade | 5.2 | 5.3 | 5.1 |
| 11th grade | 4.5 | 4.3 | 4.6 |
| 12th grade | 3.8 | 3.8 | 3.9 |
| White | 3.1 | 3.3 | 2.9 |
| Black | 8.4 | 7.9 | 9.0 |
| Hispanic | 9.4 | 8.9 | 10.0 |

The proportion of high school students who said they had avoided school because of safety concerns ranged from 3% to 9% across states.



# The proportion of high school students who carried a weapon to school dropped to 6% in 2003

### One-third of students who carried a weapon took it to school

The 2003 Youth Risk Behavior Survey found that 6% of high school students said they had carried a weapon (e.g., gun, knife, or club) on school property in the past 30 days—down from 12% in 1993. Males were more likely than females to say they carried a weapon at school. The proportion who carried a weapon to school was about one-third of those who said they had carried a weapon anywhere in the past month (17%). In addition, 6% of high schoolers reported carrying a gun (anywhere) in the past month, down from 8% in 1993.

Percent who carried a weapon on school property in the past 30 days:

| | Total | Male | Female |
|---|---|---|---|
| Total | 6.1% | 8.9% | 3.1% |
| 9th grade | 5.3 | 6.6 | 3.8 |
| 10th grade | 6.0 | 8.9 | 3.0 |
| 11th grade | 6.6 | 10.3 | 2.7 |
| 12th grade | 6.4 | 10.2 | 2.5 |
| White | 5.5 | 8.5 | 2.2 |
| Black | 6.9 | 8.4 | 5.5 |
| Hispanic | 6.0 | 7.7 | 4.2 |

### In 2003, 9% of high school students were threatened or injured with a weapon at school

The overall proportion of students reporting weapon-related threats or injuries at school during the year did not change from 1993.

Percent threatened or injured with a weapon at school in the past year:

| | Total | Male | Female |
|---|---|---|---|
| Total | 9.2% | 11.6% | 6.5% |
| 9th grade | 12.1 | 15.4 | 8.3 |
| 10th grade | 9.2 | 11.3 | 7.0 |
| 11th grade | 7.3 | 9.2 | 5.4 |
| 12th grade | 6.3 | 8.5 | 3.9 |
| White | 7.8 | 9.6 | 5.8 |
| Black | 10.9 | 14.3 | 7.5 |
| Hispanic | 9.4 | 11.9 | 6.9 |

**Across reporting states, the proportion of high school students carrying weapons to school in 2003 ranged from 3% to 10%**

| | Percent reporting they carried a weapon on school property in the past 30 days | | | Percent reporting they were threatened or injured with a weapon on school property in the past year | | |
|---|---|---|---|---|---|---|
| Reporting states | Total | Male | Female | Total | Male | Female |
| U.S. total | 6.1% | 8.9% | 3.1% | 9.2% | 11.6% | 6.5% |
| Alabama | 7.3 | 11.7 | 2.8 | 7.2 | 9.0 | 5.2 |
| Alaska | 7.1 | 11.8 | 1.7 | 8.1 | 10.9 | 4.9 |
| Arizona | 4.9 | 7.5 | 2.5 | 9.2 | 12.6 | 5.8 |
| Delaware | 5.0 | 6.6 | 2.9 | 7.7 | 9.7 | 5.5 |
| Florida | 5.3 | 7.7 | 2.8 | 8.4 | 10.5 | 6.2 |
| Georgia | 5.0 | 7.7 | 2.3 | 8.2 | 9.8 | 6.4 |
| Idaho | 7.7 | 11.1 | 3.9 | 9.4 | 12.0 | 6.5 |
| Indiana | 6.2 | 9.7 | 2.7 | 6.7 | 8.4 | 4.9 |
| Kentucky | 7.4 | 11.5 | 3.0 | 5.2 | 7.7 | 2.3 |
| Maine | 6.6 | 11.0 | 1.8 | 8.5 | 10.6 | 5.7 |
| Massachusetts | 5.0 | 7.6 | 2.2 | 6.3 | 8.2 | 4.2 |
| Michigan | 5.1 | 6.8 | 3.4 | 9.7 | 12.6 | 6.5 |
| Mississippi | 5.2 | 8.6 | 1.8 | 6.6 | 8.1 | 5.2 |
| Missouri | 5.5 | 8.5 | 2.2 | 7.5 | 9.3 | 5.6 |
| Montana | 7.2 | 10.6 | 3.2 | 7.1 | 9.0 | 4.8 |
| Nebraska | 5.0 | 8.3 | 1.5 | 8.8 | 12.0 | 5.5 |
| Nevada | 6.3 | 9.0 | 3.5 | 6.0 | 7.0 | 5.0 |
| New Hampshire | 5.8 | 8.9 | 2.4 | 7.5 | 9.5 | 5.3 |
| New York | 5.2 | 7.5 | 2.8 | 7.2 | 9.7 | 4.6 |
| North Carolina | 6.3 | 8.3 | 4.3 | 7.2 | 8.2 | 6.1 |
| North Dakota | 5.7 | 9.6 | 1.4 | 5.9 | 7.1 | 4.6 |
| Ohio | 3.6 | 5.2 | 2.0 | 7.7 | 8.9 | 6.3 |
| Oklahoma | 8.0 | 13.5 | 2.5 | 7.4 | 7.9 | 6.6 |
| Rhode Island | 5.9 | 8.6 | 3.0 | 8.2 | 10.8 | 5.2 |
| South Dakota | 7.1 | 12.4 | 1.5 | 6.5 | 8.6 | 4.4 |
| Tennessee | 5.4 | 8.4 | 2.5 | 8.4 | 10.7 | 6.1 |
| Texas* | 5.8 | 9.1 | 2.3 | 7.7 | 9.5 | 5.6 |
| Utah | 5.6 | 8.8 | 2.1 | 7.3 | 9.9 | 4.6 |
| Vermont | 8.3 | 12.8 | 3.3 | 7.3 | 9.5 | 4.9 |
| West Virginia | 6.6 | 9.5 | 3.5 | 8.5 | 10.3 | 6.7 |
| Wisconsin | 3.2 | 4.2 | 2.2 | 5.5 | 5.9 | 4.8 |
| Wyoming | 10.1 | 16.0 | 3.9 | 9.7 | 13.3 | 5.9 |
| Median | 5.8 | 8.8 | 2.5 | 7.5 | 9.5 | 5.4 |

* Survey did not include students from one of the state's large school districts.

Source: Authors' adaptation of the Centers for Disease Control and Prevention's Youth risk behavior surveillance—United States, 2003.



# More than half of high school seniors have used an illicit drug at least once—more have used alcohol

### The Monitoring the Future Study tracks the drug use of secondary school students

Each year, the Monitoring the Future (MTF) Study asks a nationally representative sample of nearly 50,000 secondary school students in approximately 400 public and private schools to describe their drug use patterns through self-administered questionnaires. Surveying seniors annually since 1975, the study expanded in 1991 to include 8th and 10th graders. By design, MTF excludes dropouts and institutionalized, homeless, and runaway youth.

### Half of seniors in 2003 said they had used illicit drugs

In 2003, 51% of all seniors said they had at least tried illicit drugs. The figure was 41% for 10th graders and 23% for 8th graders. Marijuana is by far the most commonly used illicit drug. In 2003, 46% of high school seniors said they had tried marijuana. About half of those in each grade who said they had used marijuana said they had not used any other illicit drug.

Put another way, more than half of the 8th and 12th graders and nearly half of the 10th graders who have ever used an illicit drug have used something in addition to, or other than, marijuana. About 3 in 10 seniors (28%) (slightly more than half of seniors who used any illicit drugs) used an illicit drug other than marijuana. Almost half of high school seniors had used marijuana at least once, 35% used it in the past year, and 21% used it in the previous month. MTF also asked students if they had used marijuana on 20 or more occasions in the previous 30 days. In 2003, 6% of high school seniors said they used marijuana that frequently.

In 2003, 14% of high school seniors reported using amphetamines at least once, making amphetamines the second most prevalent illicit drug after marijuana. Amphetamines also ranked second to marijuana in terms of current (past month) use. Specifically, 6% of seniors had used methamphetamine at least once and 4% had used ice (crystal methamphetamine). Narcotics other than heroin were the next most prevalent drug after amphetamines: 13% of seniors reported using a narcotic such as Vicodin, Percocet, or Oxycontin.

In 2003, 8% of seniors said they had used cocaine at least once in their life. More than half of this group (5% of all seniors) said they used it in the previous year, and about one-quarter of users (2% of seniors) had used it in the preceding 30 days. About 1 in 28 seniors reported previous use of crack cocaine: about 1 in 45 in the previous year, and about 1 in 110 in the previous month. Heroin was the least commonly used illicit drug, with less than 2% of seniors reporting they had used it at least once. Nearly half of seniors who reported heroin use said they only used it without a needle.

### Alcohol and tobacco use is widespread at all grade levels

In 2003, more than 3 in 4 high school seniors said they had tried alcohol at least once; nearly 2 in 4 said they used it in the previous month. Even among 8th graders, the

**More high school seniors use marijuana on a daily basis than drink alcohol daily**

| | Proportion of seniors in 2003 who used | | | |
|---|---|---|---|---|
| | in lifetime | in last year | in last month | daily* |
| Alcohol | 76.6% | 70.1% | 47.5% | 3.2% |
| Been drunk | 58.1 | 48.0 | 30.9 | 1.6 |
| Cigarettes | 53.7 | – | 24.4 | 15.8 |
| Marijuana/hashish | 46.1 | 34.9 | 21.2 | 6.0 |
| Amphetamines | 14.4 | 9.9 | 5.0 | 0.5 |
| Narcotics, not heroin | 13.2 | 9.3 | 4.1 | 0.2 |
| Inhalants | 12.2 | 4.5 | 2.3 | 0.4 |
| Tranquilizers | 10.2 | 6.7 | 2.8 | 0.2 |
| Sedatives | 9.1 | 6.2 | 3.0 | 0.2 |
| MDMA (ecstasy) | 8.3 | 4.5 | 1.3 | 0.1 |
| Cocaine, not crack | 6.7 | 4.2 | 1.8 | 0.1 |
| Methamphetamine | 6.2 | 3.2 | 1.7 | 0.2 |
| LSD | 5.9 | 1.9 | 0.6 | <0.1 |
| Crystal methamphetamine | 3.9 | 2.0 | 0.8 | 0.1 |
| Crack cocaine | 3.6 | 2.2 | 0.9 | 0.1 |
| Steroids | 3.5 | 2.1 | 1.3 | 0.2 |
| PCP | 2.5 | 1.3 | 0.6 | 0.2 |
| Heroin | 1.5 | 0.8 | 0.4 | 0.1 |

- Three out of 10 seniors said they were drunk at least once in the past month.

* Used on 20 or more occasions in the last 30 days.

– Not included in survey.

Source: Authors' adaptation of Johnston et al.'s Monitoring the Future: National survey on drug use, 1975–2003.

use of alcohol was common: two-thirds had tried alcohol, and almost one-fifth used it in the month prior to the survey.

Perhaps of greater concern are the juveniles who indicated heavy drinking (defined as five or more drinks in a row) in the preceding 2 weeks. Recent heavy drinking was reported by 28% of seniors, 22% of 10th graders, and 12% of 8th graders.

Tobacco use was less prevalent than alcohol use, but it was the most likely substance to be used on a daily basis. In 2003, 54% of 12th graders, 43% of 10th graders, and 28% of 8th graders had tried cigarettes, and 24% of seniors, 17% of 10th graders, and 10% of 8th graders smoked in the preceding month. In addition, 16% of seniors, 9% of 10th graders, and 5% of 8th graders reported currently smoking cigarettes on a daily basis. Overall, based on various measures, tobacco use is down compared with use levels in the early to mid-1990s.

### Higher proportions of males than females were involved in drug and alcohol use, especially heavy use

In 2003, males were more likely than females to drink alcohol at all and to drink heavily. Among seniors, 52% of males and 44% of females reported alcohol use in the past 30 days, and 34% of males and 22% of females said they had five or more drinks in a row in the previous 2 weeks. One in 20 senior males reported daily alcohol use compared with 1 in 50 females.

Males were more likely than females to have used marijuana in the previous year (38% vs. 32%), in the previous month (25% vs. 17%), and daily during the previous month (8% vs. 3%). The proportions of male and female high school seniors reporting overall use of illicit drugs other than marijuana in the previous year were more similar (21% and 18%), but there were variations across drugs. Males had higher annual use rates for cocaine, inhalants, steroids, LSD, and heroin. Males and females had similar use rates for amphetamines.

### Blacks had lower drug, alcohol, and tobacco use rates than whites or Hispanics

In 2003, 10% of black seniors said they had smoked cigarettes in the past 30 days, compared with 29% of whites and 19% of Hispanics. Fewer than one-third of black seniors reported alcohol use in the past 30 days, compared with more than one-half of white seniors and nearly one-half of Hispanic seniors. Whites were 3 times more likely than blacks to have been drunk in the past month (36% vs. 12%). The figure for Hispanics was 24%.

The same general pattern held for illicit drugs. The proportion of seniors who reported using marijuana in the past year was lower among blacks (26%) than whites (38%) or Hispanics (31%). Whites were nearly 5 times more likely than blacks to have used cocaine in the previous year. Hispanics were nearly 4 times more likely.

### Fewer than 1 in 10 high school students used alcohol or marijuana at school

According to the Centers for Disease Control and Prevention's 2003 Youth Risk Behavior Survey, 6% of high school students said they had

**Drug use was more common among males than females and among whites than blacks**

| | Proportion of seniors who used in previous year | | | | |
|---|---|---|---|---|---|
| | Male | Female | White | Black | Hispanic |
| Alcohol* | 51.7% | 43.8% | 52.3% | 29.9% | 46.4% |
| Been drunk* | 34.9 | 26.9 | 35.6 | 11.7 | 23.9 |
| Cigarettes* | 26.2 | 22.1 | 29.4 | 10.0 | 19.0 |
| Marijuana/hashish | 37.8 | 31.6 | 37.9 | 26.3 | 31.1 |
| Narcotics, not heroin | 10.7 | 7.8 | 10.2 | 2.1 | 5.2 |
| Amphetamines | 9.8 | 9.6 | 12.4 | 2.8 | 6.8 |
| Tranquilizers | 6.9 | 6.3 | 8.7 | 1.3 | 4.5 |
| Sedatives | 6.7 | 5.4 | 7.6 | 1.7 | 4.1 |
| Cocaine, not crack | 5.4 | 2.9 | 4.9 | 1.0 | 3.9 |
| Inhalants | 5.2 | 2.9 | 4.9 | 1.5 | 2.7 |
| MDMA (ecstasy) | 4.8 | 4.0 | 6.4 | 1.4 | 5.3 |
| Steroids | 3.2 | 1.1 | 2.4 | 1.1 | 1.8 |
| LSD | 2.5 | 1.2 | 3.0 | 0.8 | 1.8 |
| Crack cocaine | 2.3 | 1.9 | 2.2 | 1.2 | 2.9 |
| Heroin | 0.8 | 0.5 | 0.8 | 0.7 | 0.8 |

Note: Male and female proportions are for 2003. Race proportions include data for 2002 and 2003, to increase subgroup sample size and provide more stable estimates.

*Alcohol and cigarette proportions are for use in the past 30 days.

Source: Authors' adaptation of Johnston et al.'s Monitoring the Future: National survey on drug use, 1975–2003.

at least one drink of alcohol on school property in the past month. Similarly, 6% said they used marijuana on school property during the same time period.

Overall, males were more likely than females to drink alcohol or use marijuana at school. This was true for most grades and racial/ethnic groups. Females showed more variation across grade levels than males, with a greater proportion of 9th graders drinking alcohol or using marijuana at school than 12th graders. Hispanic students were more likely than non-Hispanic white students to drink alcohol or use marijuana at school.

Percent who used on school property in the past 30 days:

| | Total | Male | Female |
|---|---|---|---|
| **Alcohol** | | | |
| Total | 5.2% | 6.0% | 4.2% |
| 9th grade | 5.1 | 5.1 | 5.2 |
| 10th grade | 5.6 | 6.1 | 5.0 |
| 11th grade | 5.0 | 6.4 | 3.5 |
| 12th grade | 4.5 | 6.5 | 2.6 |
| White | 3.9 | 4.5 | 3.2 |
| Black | 5.8 | 7.9 | 3.8 |
| Hispanic | 7.6 | 7.4 | 7.9 |
| **Marijuana** | | | |
| Total | 5.8% | 7.6% | 3.7% |
| 9th grade | 6.6 | 8.1 | 5.1 |
| 10th grade | 5.2 | 7.2 | 3.0 |
| 11th grade | 5.6 | 7.9 | 3.3 |
| 12th grade | 5.0 | 7.1 | 2.6 |
| White | 4.5 | 5.8 | 3.1 |
| Black | 6.6 | 9.7 | 3.6 |
| Hispanic | 8.2 | 10.4 | 6.0 |

### In 2003, fewer than 1 in 3 high school students said they were offered, sold, or given drugs at school in the past year

Nationally, 29% of high school students said they were offered, sold, or given an illegal drug on school property at least once during the past 12 months. The proportion was higher for males than for females, especially among black and Hispanic students and among seniors. Hispanic students were more likely than white or black students to report being offered, sold, or given illegal drugs at school. Among females, seniors were less likely than 9th, 10th, and 11th graders to say they were offered, sold, or given an illegal drug on school property.

Percent who were offered, sold, or given an illegal drug on school property in past 12 months:

| | Total | Male | Female |
|---|---|---|---|
| Total | 28.7% | 31.9% | 25.0% |
| 9th grade | 29.5 | 32.1 | 26.7 |
| 10th grade | 29.2 | 31.9 | 26.5 |
| 11th grade | 29.9 | 33.5 | 26.1 |
| 12th grade | 24.9 | 29.7 | 19.6 |
| White | 27.5 | 30.2 | 24.5 |
| Black | 23.1 | 27.7 | 18.3 |
| Hispanic | 36.5 | 40.6 | 32.5 |

### High school students were nearly 3 times more likely to use alcohol than marijuana before age 13

| | Percent who had used before age 13 | | | | | |
|---|---|---|---|---|---|---|
| | Alcohol | | | Marijuana | | |
| | Total | Male | Female | Total | Male | Female |
| Total | 27.8% | 32.0% | 23.3% | 9.9% | 12.6% | 6.9% |
| 9th grade | 36.4 | 39.4 | 33.3 | 11.7 | 13.6 | 9.7 |
| 10th grade | 28.5 | 33.3 | 23.5 | 10.8 | 14.3 | 7.3 |
| 11th grade | 23.0 | 27.6 | 18.2 | 8.1 | 10.9 | 5.2 |
| 12th grade | 20.3 | 25.1 | 15.2 | 7.8 | 11.0 | 4.3 |
| White | 25.7 | 30.0 | 21.2 | 8.7 | 10.5 | 6.8 |
| Black | 31.2 | 35.7 | 26.8 | 12.1 | 18.5 | 5.8 |
| Hispanic | 30.2 | 34.1 | 26.3 | 10.7 | 13.0 | 8.5 |

- Fewer than 1 in 3 high school students said they had drunk alcohol (more than just a few sips) before they turned 13; 1 in 10 high school students reported trying marijuana before age 13.
- Females were less likely than males to have used alcohol or marijuana before age 13, and whites were less likely than blacks.
- Juniors and seniors were generally less likely to say they used alcohol or marijuana before age 13 than were freshmen and sophomores.

Source: Authors' adaptation of the Centers for Disease Control and Prevention's Youth risk behavior surveillance—United States, 2003.

### Drinking and driving is a high-risk teen behavior

Motor vehicle crashes are the leading cause of death for high school students, accounting for 77% of all deaths in 2002 among teens ages 14–17. According to the 2003 Youth Risk Behavior Surveillance Survey, 3 in 10 high school students said that in the past month they rode in a vehicle with a driver who had been drinking. The proportion varied across states, ranging from 18% to 43%.

In addition, 3 in 25 high school students said that in the past month they drove a vehicle after drinking alcohol. The proportion was lower for freshmen (who typically are not yet of driving age) than for other high school students. Across states, the proportion ranged from 7% to 27%.

**Across states, the proportion of high school students who were offered, sold, or given an illegal drug on school property during the past year ranged from 18% to 35%**

| Reporting states | Percent who used alcohol on school property in the past 30 days | | | Percent who used marijuana on school property in the past 30 days | | | Percent who were offered, sold, or given an illegal drug on school property in the past year | | |
|---|---|---|---|---|---|---|---|---|---|
| | Total | Male | Female | Total | Male | Female | Total | Male | Female |
| U.S. total | 5.2% | 6.0% | 4.2% | 5.8% | 7.6% | 3.7% | 28.7% | 31.9% | 25.0% |
| **Alabama** | **4.1** | **5.4** | **2.7** | **2.6** | **3.5** | **1.7** | **26.0** | **28.1** | **23.8** |
| **Alaska** | **4.9** | **5.4** | **4.0** | **6.5** | **7.9** | **4.9** | **28.4** | **30.8** | **25.8** |
| **Arizona** | **6.6** | **9.3** | **4.1** | **5.6** | **7.4** | **3.9** | **28.1** | **31.2** | **25.2** |
| Delaware | 4.8 | 5.5 | 3.9 | 6.0 | 7.4 | 4.4 | 27.9 | 33.4 | 22.1 |
| Florida | 5.1 | 6.6 | 3.6 | 4.9 | 6.8 | 2.9 | 25.7 | 29.9 | 21.3 |
| Georgia | 3.7 | 4.3 | 3.1 | 3.2 | 4.4 | 2.0 | 33.3 | 38.4 | 28.3 |
| **Idaho** | **3.8** | **4.5** | **3.0** | **2.7** | **3.7** | **1.5** | **19.6** | **21.3** | **17.6** |
| **Indiana** | **3.9** | **4.2** | **3.6** | **3.8** | **4.9** | **2.7** | **28.3** | **32.3** | **23.9** |
| **Kentucky** | **4.8** | **5.4** | **4.1** | **4.3** | **5.8** | **2.6** | **30.4** | **31.7** | **28.9** |
| Maine | 3.7 | 4.9 | 2.1 | 6.3 | 9.1 | 3.3 | 32.6 | 38.5 | 26.4 |
| Massachusetts | 5.3 | 6.8 | 3.7 | 6.3 | 8.6 | 3.9 | 31.9 | 36.5 | 27.2 |
| Michigan | 4.6 | 4.9 | 4.3 | 7.0 | 8.4 | 5.5 | 31.3 | 34.6 | 28.0 |
| **Mississippi** | **4.9** | **6.0** | **3.8** | **4.4** | **7.3** | **1.5** | **22.3** | **27.6** | **16.6** |
| **Missouri** | **2.6** | **3.3** | **1.8** | **3.0** | **4.0** | **1.9** | **21.6** | **25.2** | **18.0** |
| **Montana** | **6.7** | **8.0** | **5.3** | **6.4** | **8.6** | **3.8** | **26.9** | **29.2** | **24.7** |
| Nebraska | 4.6 | 5.9 | 3.3 | 3.9 | 5.4 | 2.3 | 23.3 | 27.6 | 18.6 |
| Nevada | 7.4 | 7.7 | 7.1 | 5.3 | 5.5 | 5.1 | 34.5 | 35.5 | 33.4 |
| New Hampshire | 4.0 | 4.1 | 3.9 | 6.6 | 8.6 | 4.2 | 28.2 | 31.7 | 24.2 |
| **New York** | **5.2** | **6.5** | **3.9** | **4.5** | **6.0** | **3.0** | **23.0** | **27.5** | **18.4** |
| **North Carolina** | **3.6** | **3.8** | **3.4** | **3.5** | **4.9** | **2.0** | **31.9** | **34.2** | **29.6** |
| **North Dakota** | **5.1** | **7.5** | **2.6** | **6.3** | **7.9** | **4.4** | **21.3** | **25.5** | **16.8** |
| Ohio | 3.9 | 4.6 | 3.1 | 4.2 | 5.0 | 3.4 | 31.1 | 35.7 | 26.2 |
| Oklahoma | 3.2 | 3.4 | 2.7 | 4.3 | 5.6 | 3.1 | 22.2 | 25.2 | 19.1 |
| Rhode Island | 4.6 | 5.9 | 3.2 | 7.4 | 10.3 | 4.5 | 26.0 | 28.3 | 23.6 |
| **South Dakota** | **5.4** | **7.8** | **3.0** | **4.5** | **5.6** | **3.4** | **22.1** | **25.9** | **18.1** |
| **Tennessee** | **4.2** | **5.3** | **2.9** | **4.1** | **6.3** | **1.9** | **24.3** | **29.2** | **19.5** |
| **Texas*** | **4.6** | **5.7** | **3.4** | **4.8** | **6.8** | **2.7** | **27.3** | **28.1** | **26.5** |
| Utah | 3.8 | 5.0 | 2.7 | 3.7 | 5.9 | 1.3 | 24.7 | 29.5 | 19.8 |
| Vermont | 5.3 | 6.4 | 4.1 | 8.0 | 10.0 | 5.7 | 29.4 | 33.5 | 24.8 |
| West Virginia | 4.1 | 4.5 | 3.7 | 4.5 | 6.6 | 2.3 | 26.5 | 27.7 | 25.2 |
| **Wisconsin** | – | – | – | – | – | – | **26.3** | **28.4** | **23.9** |
| **Wyoming** | **6.2** | **6.3** | **6.1** | **5.1** | **6.4** | **3.8** | **18.1** | **20.1** | **16.0** |
| **Median** | **4.6** | **5.4** | **3.6** | **4.5** | **6.4** | **3.1** | **26.7** | **29.3** | **23.9** |

* Survey did not include students from one of the state's large school districts.

– Data not available.

Source: Authors' adaptation of the Centers for Disease Control and Prevention's Youth risk behavior surveillance—United States, 2003.



# Juvenile illicit drug use has been relatively constant since the mid-1990s after declining during the 1980s

**In 2004, the proportion of high school seniors who reported using illicit drugs in the previous month was above levels of the early 1990s but well below levels of the early 1980s**

- After years of continuous decline, reported drug use by high school seniors grew in several categories after 1992. Similar increases in drug use were reported by 8th and 10th graders, although their levels of use were below those of 12th graders.
- In recent years, the proportion of students reporting use of illicit drugs during the 30 days prior to the survey appears to have stabilized or declined for many categories of drug use. For marijuana, the most widely used illicit drug, use declined from 1997 to 2004 for 12th graders (–16%), 10th graders (–22%), and 8th graders (–37%).
- In 2004, the proportion of seniors who said they used marijuana in the past month was nearly double the proportion who reported past-month use of illicit drugs other than marijuana (20% vs. 11%) but less than half the proportion who reported past-month alcohol use (48%).
- Past-month cocaine use among seniors peaked in 1985 at nearly 7%. Although use levels for cocaine increased between 1992 and 1999 (100% for seniors), levels have stabilized recently (at around 2% for seniors).
- For all three grades, past-month alcohol use in 2004 was at or near its lowest levels since the mid-1970s—48% for 12th graders, 35% for 10th graders, and 19% for 8th graders.

* The survey question on alcohol use was revised in 1993 to indicate that a "drink" meant "more than a few sips." In 1993, half the sample responded to the original question and half to the revised question. Beginning in 1994, all respondents were asked the revised question.

Source: Authors' adaptation of Johnston et al.'s Overall teen drug use continues gradual decline; but use of inhalants rises. *Monitoring the Future press release.*

### Change in students' use of marijuana and alcohol is tied to their perception of possible harm from use

The annual Monitoring the Future Study, in addition to collecting information about students' use of illicit drugs, alcohol, and tobacco, also collects data on students' perceptions regarding the availability of these substances and the risk of harm from using them.

Between 1975 and 2004, the proportion of high school seniors reporting use of marijuana in the 30 days prior to the survey fluctuated, peaking in 1978 and then declining consistently through 1992. After that, reported use increased then leveled off, although the 2004 rate was still far below the peak level of 1978. When the perceived risk of harm (physical or other) from either regular or occasional use of marijuana increased, use declined; when perceived risk declined, use increased. The perception that obtaining marijuana was "fairly easy" or "very easy" remained relatively constant between 1975 and 2004.

Students' reported use of alcohol also shifted from 1975 to 2004. After 1978, alcohol use declined through 1993. Alcohol use fluctuated within a limited range thereafter, although the 2004 rate was far lower than the 1978 rate. As with marijuana, when the perceived risk of harm from either weekend "binge" drinking or daily drinking increased, use declined; when perceived risk declined, use increased.

**Over the past 3 decades, while marijuana and alcohol availability remained constant, changes in use reflected changes in perceived harm**

**Perceived availability:** Percent saying fairly easy or very easy to get.
**Perceived risk:** Percent saying great risk of harm in regular use.
**Past month use:** Percent using once or more in the past 30 days.

**Perceived risk:** Percent saying great risk of harm in having five or more drinks in a row once or twice each weekend.
**Past month use:** Percent using once or more in the past 30 days. (The survey question on alcohol use was revised in 1993 to indicate that a "drink" meant "more than a few sips." In 1993, half the sample responded to the original question and half to the revised question. Beginning in 1994, all respondents were asked the revised question.)

Source: Authors' adaptation of Johnston et al.'s Overall teen drug use continues gradual decline; but use of inhalants rises. *Monitoring the Future press release.*



# Youth who use alcohol are more likely than other youth to report using marijuana and selling drugs

### Juveniles report co-occurrence of substance use behaviors

The National Longitudinal Survey of Youth asked a representative sample of youth ages 12–17 in 1997 and 1998 to report if in the last 30 days they had (1) consumed alcohol, (2) used marijuana, and (3) sold or helped to sell any of a wide range of drugs. Analyses found that if one substance-related behavior was reported, others were much more likely.

More specifically, among youth ages 12–17 who used alcohol in the past 30 days, 32% reported using marijuana and 23% reported selling drugs; among youth who did not report using alcohol, just 2% reported using marijuana and 3% reported selling drugs. This pattern was seen in both older and younger youth. Of all youth ages 15–17 who reported alcohol use (35% of youth in this age group), 34% said they used marijuana and 25% reported selling drugs. Of youth ages 15–17 who reported they did not use alcohol in the past 30 days, just 4% used marijuana and 6% sold drugs. Of youth ages 12–14 who reported alcohol use (11% of youth in this age group), 27% said they used marijuana and 17% reported selling drugs. Of youth ages 12–14 who reported they did not use alcohol in the past 30 days, just 1% used marijuana and 1% sold drugs.

Although a significantly larger proportion of non-Hispanic white youth (26%) reported recent alcohol use than did non-Hispanic black (14%) and Hispanic (22%) youth, the proportion of these youth who also reported marijuana use and drug selling was the same across the three groups. Regardless of race/ethnicity, that proportion was greater among youth who used alcohol than among those who did not.

**Most youth who either used marijuana in the past 30 days or reported selling drugs in the past 30 days also reported drinking alcohol in the period**

Youth ages 12–17
Used marijuana: 9%
Used alcohol: 23%
Sold drugs: 8%

Used alcohol and marijuana: 7%
Used alcohol and sold drugs: 5%
Used marijuana and sold drugs: 4%
Used alcohol and marijuana and sold drugs: 4%

- Most youth ages 12–17 who reported using alcohol in the past 30 days did not report using marijuana or selling drugs in the past 30 days, although they were more likely to do so than youth who did not use alcohol.

**Patterns of substance-related behavior co-occurrence were similar among males and females ages 12–17**

Male youth ages 12–17
Used marijuana: 10%
Used alcohol: 23%
Sold drugs: 9%

Female youth ages 12–17
Used marijuana: 9%
Used alcohol: 23%
Sold drugs: 6%

Used alcohol and marijuana: 7%
Used alcohol and sold drugs: 4%
Used marijuana and sold drugs: 3%
Used alcohol and marijuana and sold drugs: 3%

Used alcohol and marijuana: 8%
Used alcohol and sold drugs: 6%
Used marijuana and sold drugs: 5%
Used alcohol and marijuana and sold drugs: 4%

- Although recent drug selling was more prevalent among males than females, the levels of alcohol and marijuana use did not differ significantly.

Source: Authors' adaptation of McCurley and Snyder's Co-occurrence of substance use behaviors.



# The prevalence of youth gangs declined in nonurban areas, but gangs remain a substantial urban problem

### Law enforcement agencies are the primary source for data on youth gangs nationwide

Accurately estimating the scope of the youth gang problem is difficult in part because of the lack of consensus about what "counts"—what combination of size, stability, hierarchy, symbolic communication, and ongoing criminal activity distinguishes a true gang from a transitory collection of individuals, not to mention what level of involvement in and adherence to the gang distinguishes a real member from a hanger-on or "wannabe." In addition, the available sources of information on gangs are unreliable. Gangs are, after all, inherently secret groups. Outsiders are apt to miss or misinterpret signs of their presence. Insiders are liable to distort the signs.

Nevertheless, based on surveys of local authorities, it appears that the overall number of communities with active youth gangs grew sharply during the last few decades of the 20th century, peaked in the mid-1990s, and recently declined somewhat.

A comparison of the number of localities reporting problems with youth gangs during the 1970s with the number reporting gang problems in the 1990s found a tenfold increase in gang jurisdictions—including more suburban, small-town, and rural jurisdictions with reported gang problems than ever before. On the basis of law enforcement agency responses to the 1996 National Youth Gang Survey, which gathered data on gangs from a representative sample of police and sheriff departments across the country, the nation's total youth gang membership was estimated at more than 846,000, with 31,000 gangs operating in 4,824 local jurisdictions. Estimates based on subsequent surveys have steadily receded from those highs. Based on the 2004 survey, youth gang membership was estimated at 760,000 and total youth gangs at 24,000. Youth gangs were estimated to be active in more than 2,900 jurisdictions served by city (population of 2,500 or more) and county law enforcement agencies.

The drop between 1996 and 2004 in the number of localities reporting gang problems was almost entirely attributable to small cities and suburban and rural jurisdictions—where gang problems had tended to be relatively minor and less persistent. Nearly 8 in 10 cities with populations of 50,000 or more continued to report gang problems. Thus, most Americans still live in or near areas that have problems with youth gangs.

**The number of law enforcement agencies reporting gang problems appears to have stabilized**

Notes: Large cities have populations of 50,000 or more. Small cities have populations of 2,500 to 49,999. The observed changes in the percentage of agencies in small cities and rural counties reporting gang problems between 2000 and 2004 are within the range attributable to sample error and, thus, do not indicate actual change.

Source: Authors' adaptation of Egley and Ritz's Highlights of the 2004 National Youth Gang Survey.

### A third of public high school and middle school principals report gang activity in their schools

In a 1999–2000 survey of a nationally representative sample of public school principals, 18% reported "undesirable gang activities" in their schools—including 31% of the middle school and 37% of the secondary school principals. Apart from being more common in schools located in urban areas, in poor communities, and in communities with large minority populations, gang activity was strongly linked with school size: principals of schools with enrollments of 1,000 or more were about 4 times more likely to report gang activity than those with enrollments of less than 500.

In 2001 and again in 2003, as part of the School Crime Supplement to the National Crime Victimization Survey, students ages 12–18 were asked about the presence of gangs in their schools during the prior 6 months. In both years, about 1 in 5 reported that gangs were present. Among minority students, students in city schools, and those in upper grades, much higher proportions reported gang presence. For instance, in 2003,

42% of urban Hispanic students said they attended schools in which gangs were present.

### Youth gang members are overwhelmingly male and predominantly minorities

Law enforcement agencies responding to National Youth Gang Surveys over a number of years have reported demographic details regarding gang members in their jurisdictions, including age, gender, and racial and ethnic background. Although reported characteristics varied considerably by locality—with emergent gangs in less populous areas tending to have more white and more female members—overall, gang demographics have been fairly consistent from year to year.

Estimated race/ethnicity of U.S. youth gang members, 2004:

| | |
|---|---|
| Hispanic | 49% |
| Black | 37 |
| White | 8 |
| Asian | 5 |
| Other | 1 |
| Total | 100% |

On the basis of responses to the 2004 survey, gang membership was estimated to be 94% male. Youth gang membership was estimated to consist of 41% juveniles and 59% young adults (18 or older).

Gang demographic profiles based on law enforcement estimates differ from profiles emerging from youth surveys. Self-reported gang members tend to include many more females and nonminority males. For example, in one large-scale 1995 survey of public school 8th graders, 25% of self-reported gang members were white and 38% were female. Even when more restrictive criteria for gang membership were applied to these self-report results—in an effort to filter out fringe or inactive members and isolate only the most active core gang members—significant demographic differences from law enforcement estimates persisted.

### Sustained gang membership is rare even among high-risk youth

Law enforcement estimates of nationwide juvenile gang membership suggest that no more than about 1% of all youth ages 10–17 are gang members. Self-reports, such as the 1997 National Longitudinal Survey of Youth (NLSY97), find that 2% of youth ages 12–17 (3% of males and 1% of females) say they were in a gang in the past year. NLSY97 also found that 8% of 17-year-olds (11% of males and 6% of females) said they had ever belonged to a gang. These proportions obviously vary considerably from place to place. For example, researchers tracking a sample of high-risk youth in Rochester, NY, reported that 30% joined gangs between the ages of 14 and 18.

Gang membership tends to be short-lived, even among high-risk youth. Among the Rochester gang members, half of the males and two-thirds of the females stayed in gangs for a year or less, with very few youth remaining gang members throughout their adolescent years.

### Many factors are related to whether youth join gangs

When asked directly what led them to join gangs, 54% of Rochester gang members said they had followed the lead of friends or family members who preceded them, 19% said they did it for protection, and 15% said it was for fun or excitement. Younger gang members were somewhat more likely to cite protection as the primary motivation.

However they may characterize their own motivations, gang members' backgrounds commonly include certain features that may make them more inclined to join gangs. The following risk factors have been found to predict gang membership:

- Individual factors: early delinquency (especially violence and drug use) and early dating and precocious sexual activity.
- Family factors: non-two-parent structure, poverty, and other gang-involved members.
- School factors: low achievement, commitment, and aspirations; truancy; negative labeling by teachers; and lack of a sense of safety in school.
- Peer factors: associations with delinquent or aggressive peers.
- Community factors: poverty, drug availability, gang presence, lack of a sense of safety and attachment.

Some risk factors are more predictive than others. In a longitudinal study of youth living in high-crime neighborhoods in Seattle, for example, pre-adolescents (ages 10–12) who later joined gangs were distinguished most markedly by very early marijuana use, neighborhood conditions making marijuana readily available, and learning disabilities. The presence of any of these factors in a juvenile's background more than tripled the odds of his or her later becoming a gang member. Childhood risk factors that were predictive of later sustained (as opposed to transient) gang membership included early violence, acting out, and association with antisocial peers.

The more risk factors present in a youth's background, the more likely that youth is to join a gang. In Seattle, for example, those with two or three identified risk factors at ages 10–12 were 3 times more likely to go on to join a gang than those with none or one, those with four to six risk factors were 5 times more likely, and those with seven or more were 13 times more likely. Having background risk factors in more than one area of life—that is, individual, family, community, etc.—increases the likelihood of gang involvement even more than a general accumulation of factors. The Rochester study, which divided risk factors into seven general domains, found that 61% of the boys and 40% of the girls with problems in all seven areas were gang members.

### Gang members are responsible for a disproportionate share of violent and nonviolent offenses

By their own account, gang members are more likely to engage in criminal activity than their peers. In response to interview questions regarding their activities in the prior month, Seattle gang members were 3 times more likely than nongang members to report committing break-ins and assaults, 4 times more likely to report committing felony thefts, and 8 times more likely to report committing robberies. When asked about their activities during the prior year, gang members were 3 times more likely to say they had been arrested, and 5 times more likely to say they had sold drugs.

In surveys of high-risk youth, gang members represent a minority of these youth but account for most of the reported crime. In the Rochester study, gang members made up 30% of the sample but accounted for 54% of the arrests, 68% of the property crimes, 69% of the violent offenses, 70% of the drug sales, and 82% of the serious delinquencies. A similar study of high-risk Denver youth found that gang members constituted just 14% of the sample but committed 80% of the serious and violent crimes.

### Guns are a key factor in gang members' heightened criminality

A body of longitudinal research discredits the notion that gangs are simply collections of antisocial individuals who would be offending at the same rates even if they were not organized into gangs. For one thing, gang members have been found to be more criminally active and violent than delinquents who are not gang affiliated, even those who associate to the same extent with other delinquents. Furthermore, this heightened criminality and violence occur only during periods of gang membership—not before or after. Rochester juveniles who were gang members during only 1 year between ages 14 and 18 committed more offenses during that 1 gang year than they did in any of the remaining 3 years. Denver youth involved in gangs over some part of a 5-year period committed 85% of their serious violent offenses, 86% of their serious property offenses, and 80% of their drug sales while gang-involved. All of these findings strongly suggest that the gang structure itself tends to facilitate or even demand increased involvement in delinquency.

A significant factor may be the strong association between gang membership and gun possession. Gang members are far more likely than nonmembers to own or have access to guns, to carry them on the street, and to use them to commit crimes. Gang membership both facilitates juveniles' access to guns—through illegal markets and through borrowing—and provides strong and constant incentives for being armed in public. Rochester gang members' rates of gun-carrying were 10 times higher than those of nonmembers. For these youth, gun-carrying not only multiplies opportunities to commit violent crimes and raises the risk that ordinary disputes will escalate into violence—it may increase a youth's crime-readiness by supplying an all-purpose, aggressive confidence that unarmed youth do not have.

### Gang membership has lasting negative consequences for gang members themselves

Being a member of a gang sharply raises a young person's risk of being a *victim* of violence, not just a perpetrator. Gangs may harm members in subtle as well as obvious ways, cutting them off from people and opportunities that could help them with the transition to adulthood and disrupting their lives even after they have moved beyond the gang.

Researchers tracking the lives of Rochester gang members to age 22 found evidence of serious adult dysfunction that could not be explained by other factors. Young adults who had been in gangs were more likely to have ended their education prematurely, become pregnant or had children early, and failed to establish stable work lives—all of which were associated with an increased likelihood of being arrested as adults. The differences were more notable among those who had been in gangs for a long time and persisted even when gang members were compared with nonmembers who had histories of delinquency and association with delinquent peers.



# The daily patterns of juvenile violent, drug, and weapons crimes differ on school and nonschool days

**Peak time periods for juvenile violent crime depend on the day**

The FBI's National Incident-Based Reporting System (NIBRS) collects information on each crime reported to contributing law enforcement agencies, including the date and time of day the crime occurred. For calendar year 2001, agencies in 20 states and the District of Columbia reported information on the time of day of reported crimes. Analyses of these data show that for many offenses juveniles commit crimes at different times than do adults, and the juvenile patterns vary on school and nonschool days.

The number of violent crimes by adult offenders increased hourly through the morning, afternoon, and evening hours, peaking around 10 p.m., then declining to a low point at 6 a.m. In contrast, violent crimes by juveniles peaked between 3 p.m. and 4 p.m. (the hour at the end of the school day) and then generally declined hour by hour until the low point at 6 a.m. At 10 p.m. when the number of adult violent crimes peaked, the number of violent crimes involving juvenile offenders was about half the number at 3 p.m.

The importance of the afterschool period in juvenile violence is confirmed when the days of the year are divided into two groups: school days (Mondays through Fridays in the months of September through May, excluding holidays) and nonschool days (the months of June through August, all weekends, and holidays). A comparison of the school- and nonschool-day violent crime patterns finds that the 3 p.m. peak occurs only on school days and only for juveniles. The timing of adult violent crimes is similar on school and nonschool days, with one exception: the peak occurs a

**Unlike violent crime by adult offenders, violent crime by juvenile offenders peaks in the afterschool hours on school days**

- The small difference in the adult patterns on school and nonschool days probably is related to the fact that nonschool days are also weekend or summer days.

Notes: Violent crimes include murder, violent sexual assault, robbery, aggravated assault, and simple assault. Data are from 20 states and the District of Columbia.

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master file* for the year 2001 [machine-readable data file].

Chapter 3: Juvenile offenders

little later on nonschool days (i.e., weekends and summer days). Finally, the time pattern of juvenile violent crimes on nonschool days is similar to that of adults.

### Afterschool programs have more crime reduction potential than do juvenile curfews

The number of school days in a year is essentially equal to the number of nonschool days in a year. Based on 2001 NIBRS data, 61% of all violent crimes (i.e., murder, forcible rape, robbery, aggravated assault, and simple assault) committed by juveniles occur on school days. In fact, 1 of every 5 juvenile violent crimes (20%) occurs in the 4 hours between 3 p.m. and 7 p.m. on school days. A smaller proportion of juvenile violent crime (14%) occurs during the standard juvenile curfew hours of 10 p.m. to 6 a.m. However, the annual number of hours in the curfew period (i.e., 8 hours every day in the year) is 4 times greater than the number of hours in the 3 p.m. to 7 p.m. period on school days (i.e., 4 hours in half of the days in the year). Therefore, the rate of juvenile violence in the afterschool period is almost 6 times the rate in the juvenile curfew period. Consequently, efforts to reduce juvenile crime after school would appear to have greater potential to decrease a community's violent crime rate than do juvenile curfews.

**The daily patterns of juvenile violent crimes (including the afterschool peak on school days) are similar for males and females and for whites and blacks**

Offenders (per 1,000 male juvenile violent crime offenders)
Male
School days
Nonschool days
80
70
60
50
40
30
20
10
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Offenders (per 1,000 female juvenile violent crime offenders)
Female
School days
Nonschool days
80
70
60
50
40
30
20
10
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Offenders (per 1,000 white juvenile violent crime offenders)
White
School days
Nonschool days
80
70
60
50
40
30
20
10
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Offenders (per 1,000 black juvenile violent crime offenders)
Black
School days
Nonschool days
80
70
60
50
40
30
20
10
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Note: Violent crimes include murder, violent sexual assault, robbery, aggravated assault, and simple assault. Data are from 20 states and the District of Columbia.

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master file* for the year 2001 [machine-readable data file].

86 *Juvenile Offenders and Victims: 2006 National Report*

Chapter 3: Juvenile offenders

**Aggravated assaults by juvenile offenders peak at 3 p.m. on school days, coinciding with the end of the school day**

Offenders (per 1,000 aggravated assault offenders in age group)
Aggravated assault
Under age 18
Age 18 and older
100
80
60
40
20
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Offenders (per 1,000 juvenile aggravated assault offenders)
Juvenile aggravated assault
School days
Nonschool days
70
60
50
40
30
20
10
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Offenders (per 1,000 sexual assault offenders in age group)
Sexual assault
Under age 18
Age 18 and older
90
80
70
60
50
40
30
20
10
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Offenders (per 1,000 juvenile sexual assault offenders)
Juvenile sexual assault
School days
Nonschool days
60
50
40
30
20
10
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Offenders (per 1,000 robbery offenders in age group)
Robbery
Under age 18
Age 18 and older
120
100
80
60
40
20
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Offenders (per 1,000 juvenile robbery offenders)
Juvenile robbery
School days
Nonschool days
60
50
40
30
20
10
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

- Sexual assaults by juvenile offenders spike at 8 a.m. and 3 p.m. on both school and nonschool days and at noon on nonschool days.
- Unlike other violent crimes, the daily timing of robberies by juvenile offenders is similar to the adult patterns, peaking in the late evening hours on both school and nonschool days.
- Juveniles are most likely to commit a violent sexual assault between 2 p.m. and 5 p.m., especially on school days.
- Before 8 p.m., persons are more at risk of becoming an aggravated assault victim of a juvenile offender on school days than on nonschool days (i.e., weekends and all summer days).

Note: Data are from 20 states and the District of Columbia.

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master file* for the year 2001 [machine-readable data file].

*Juvenile Offenders and Victims: 2006 National Report* 87

**Violent crime that results in injury to the victim is most likely in the afterschool hours on school days for juvenile offenders, between 9 p.m. and midnight for adult offenders**

**In a pattern similar to that for adults, juveniles are most likely to commit a crime with a firearm between 9 p.m. and 10 p.m.—although there is also a minor peak in the afterschool hours**

**The afterschool peak in juvenile violent crime largely involves crimes with victims who are acquaintances of the offenders**

- The timing of violent crimes by adult offenders differs substantially from the juvenile pattern. For adult offenders, violent crimes against strangers peak in the hours after midnight; for victims who are family members, the most dangerous hours are between 8 p.m. and 11 p.m.

Note: Violent crimes include murder, violent sexual assault, robbery, aggravated assault, and simple assault. Data are from 20 states and the District of Columbia.

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master file* for the year 2001 [machine-readable data file].

Chapter 3: Juvenile offenders

**Unlike violent offending, the time patterns of shoplifting are similar on school and nonschool days for both male and female juvenile offenders—peaking between 3 p.m. and 6 p.m.**

Offenders (per 1,000 male juvenile shoplifting offenders)

Male juvenile shoplifting
School days
Nonschool days
70
60
50
40
30
20
10
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Offenders (per 1,000 female juvenile shoplifting offenders)
Female juvenile shoplifting
School days
Nonschool days
70
60
50
40
30
20
10
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

**The time and day patterns of drug law violations known to law enforcement for both male and female juveniles indicate how often schools are a setting for drug crimes and their detection**

Offenders (per 1,000 male juvenile drug law violation offenders)
Male juvenile drug law violation
School days
Nonschool days
50
40
30
20
10
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Offenders (per 1,000 female juvenile drug law violation offenders)
Female juvenile drug law violation
School days
Nonschool days
60
50
40
30
20
10
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

- Drug law violations by both male and female juveniles peak during school hours on school days and in the late evening hours on both school and nonschool days.

**The time and day patterns of juvenile weapons law violations by males and especially by females reflect the major role schools play in bringing these matters to the attention of law enforcement**

Offenders (per 1,000 male juvenile weapons law violation offenders)
Male juvenile weapons law violation
School days
Nonschool days
70
60
50
40
30
20
10
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Offenders (per 1,000 female juvenile weapons law violation offenders)
Female juvenile weapons law violation
School days
Nonschool days
120
100
80
60
40
20
0
6 a.m.
noon
6 p.m.
midnight
6 a.m.

Note: Data are from 20 states and the District of Columbia.

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master file* for the year 2001 [machine-readable data file].

*Juvenile Offenders and Victims: 2006 National Report* 89



# Sources

Bureau of Justice Statistics. Victim's perception of the age of the offender in serious violent crime, 1973–2003. *Key facts at a glance*. Revised December 12, 2004 <www.ojp.usdoj.gov/bjs/glance/tables/offagetab.htm>.

Bureau of Labor Statistics, U.S. Department of Labor. 2002. *National Longitudinal Survey of Youth 1997 cohort, 1997–2001 (rounds 1–5)* [machine-readable data file]. Chicago, IL: National Opinion Research Center, University of Chicago [producer]. Columbus, OH: Center for Human Resource Research, Ohio State University [distributor].

Centers for Disease Control and Prevention. 2004. Youth Risk Behavior Surveillance—United States, 2003. *Morbidity and Mortality Weekly Report*, 53(SS–2).

DeVoe, J., Peter, K., Kaufman, P., Miller, A., Noonan, M., Snyder, T., and Baum, K. 2004. *Indicators of School Crime and Safety: 2004*. Washington, DC: U.S. Departments of Education and Justice.

Egley, A. 2000. Highlights of the 1999 National Youth Gang Survey. *OJJDP Fact Sheet* (#20). Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Egley, A. 2002. National Youth Gang Survey trends from 1996 to 2000. *OJJDP Fact Sheet* (#03). Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Egley, A. 2005. Highlights of the 2002–2003 National Youth Gang Surveys. *OJJDP Fact Sheet* (#01). Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Egley, A., and Arjunan, M. 2002. Highlights of the 2000 National Youth Gang Survey. *OJJDP Fact Sheet* (#04). Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Egley, A., and Major, A. 2003. Highlights of the 2001 National Youth Gang Survey. *OJJDP Fact Sheet* (#01). Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Egley, A., and Major, A. 2004. Highlights of the 2002 National Youth Gang Survey. *OJJDP Fact Sheet* (#01). Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Egley, A., and Ritz, C. Forthcoming. Highlights of the 2004 National Youth Gang Survey. *OJJDP Fact Sheet*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Elliott, D. 1994. Serious violent offenders: Onset, developmental course, and termination. *Criminology*, 32(1).

Esbensen, E., Winfree, L., He, N., and Taylor, T. 2001. Youth gangs and definitional issues: When is a gang a gang, and why does it matter? *Crime & Delinquency*, 47(1).

Federal Bureau of Investigation. 2003. *National Incident-Based Reporting System master file* for the year 2001 [machine-readable data files]. Washington, DC: FBI.

Federal Bureau of Investigation. Various years. *Crime in the United States* for the years 1980 through 2003. Washington, DC: FBI.

Federal Bureau of Investigation. Various years. *Supplementary Homicide Reports* for the years 1980 through 2002 [machine-readable data files]. Washington, DC: FBI.

Hill, K., Lui, C., and Hawkins, J. 2001. Early precursors of gang membership: a study of Seattle youth. *OJJDP Juvenile Justice Bulletin*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Johnston, L., O'Malley, P., Bachman, J., and Schulenberg, J. 2004. Demographic subgroup trends for various licit and illicit drugs, 1975–2003. *Monitoring the Future Occasional Paper* (No. 60). Ann Arbor, MI: Institute for Social Research.

Johnston, L., O'Malley, P., Bachman, J., and Schulenberg, J. 2004. Monitoring the Future: National survey results on drug use, 1975–2003. *Volume I: Secondary school students* (NIH Publication No. 04-5507). Bethesda, MD: National Institute on Drug Abuse.

Johnston, L., O'Malley, P., Bachman, J., and Schulenberg, J. 2004. Overall teen drug use continues gradual decline; but use of inhalants rises. *Monitoring the Future press release*. Released December 21, 2004 <www.monitoringthefuture.org/press.html>.

Loeber, R., Kalb, L., and Huizinga, D. 2001. Juvenile delinquency and serious injury victimization. *OJJDP Juvenile Justice Bulletin*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

McCurley, C. 2005. Self-reported law-violating behavior from adolescence to early adulthood in a modern cohort. Unpublished manuscript. Pittsburgh, PA: National Center for Juvenile Justice.

McCurley, C., and Snyder, H. Forthcoming. Co-occurrence of substance use behaviors. *OJJDP Juvenile Justice Bulletin*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

McCurley, C., and Snyder, H. Forthcoming. Risk, protection, and family structure. *OJJDP Juvenile Justice Bulletin*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Miller, W. 2001. *The Growth of Youth Gang Problems in the United States: 1970–98 Report*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Moore, J., and Terrett, C. 1998. Highlights of the 1996 National Youth Gang Survey. *OJJDP Fact Sheet* (#86). Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Thornberry, T., Huizinga, D., and Loeber, R. 2004. The Causes and Correlates Studies: Findings and policy implications. *Juvenile Justice,* (IX)1.

Thornberry, T., Krohn, M., Lizotte, A., Smith, C., and Tobin, K. 2003. *Gangs and Delinquency in Developmental Perspective*. Cambridge, UK: Cambridge University Press.

Wyrick, P., and Howell, J. 2004. Strategic risk-based response to youth gangs. *Juvenile Justice,* (IX)1.



# Juvenile Offenders and Victims: 2006 National Report

**Chapter 4: Juvenile justice system structure and process ...... 93**

History and overview of the juvenile justice system ............... 94
U.S. Supreme Court cases and the juvenile justice system ......... 100
State definitions of juvenile court jurisdiction .................... 103
Juvenile justice system case processing ......................... 104
Public access to juvenile proceedings ........................... 108
State provisions for trying juveniles as adults .................... 110
Judicial waiver, concurrent jurisdiction, and statutory exclusion ... 112
Blended sentencing ......................................... 115
Juveniles in the federal justice system ......................... 117
Chapter 4 sources ........................................... 119

Copyright 2006
National Center for Juvenile Justice
3700 S. Water Street, Suite 200
Pittsburgh, PA 15203-2363

Suggested citation: Snyder, Howard N., and Sickmund, Melissa. 2006. *Juvenile Offenders and Victims: 2006 National Report.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.



# Chapter 4

## Juvenile justice system structure and process

The first juvenile court in the United States was established in Chicago in 1899, more than 100 years ago. In the long history of law and justice, juvenile justice is a relatively new development. The juvenile justice system has weathered significant modifications since the late 1960s, resulting from Supreme Court decisions, federal legislation, and changes in state legislation.

Perceptions of a juvenile crime epidemic in the early 1990s fueled public scrutiny of the system's ability to effectively control violent juvenile offenders. As a result, states adopted numerous legislative changes in an effort to crack down on juvenile crime. Although some differences between the criminal and juvenile justice systems have diminished in recent years, the juvenile justice system remains unique, guided by its own philosophy and legislation and implemented by its own set of agencies.

This chapter describes the juvenile justice system, focusing on structure and process features that relate to delinquency and status offense matters. (The chapter on victims discusses the handling of child maltreatment matters.) Sections in this chapter provide an overview of the history of juvenile justice in this country, present the significant Supreme Court decisions that have shaped the modern juvenile justice system, and describe case processing in the juvenile justice system. This chapter also summarizes changes made by states with regard to the system's jurisdictional authority, sentencing, corrections programming, confidentiality of records and court hearings, and victim involvement in court hearings. Much of the information was drawn from National Center for Juvenile Justice analyses of juvenile codes in each state. (Note: For ease of discussion, the District of Columbia is often referred to as a state.)

# The juvenile justice system was founded on the concept of rehabilitation through individualized justice

### Early in U.S. history, children who broke the law were treated the same as adult criminals

Throughout the late 18th century, "infants" below the age of reason (traditionally age 7) were presumed to be incapable of criminal intent and were, therefore, exempt from prosecution and punishment. Children as young as 7, though, could stand trial in criminal court for offenses committed and, if found guilty, could be sentenced to prison or even given a death sentence.

The 19th-century movement that led to the establishment of the juvenile court in the U.S. had its roots in 16th-century European educational reform movements. These earlier reform movements changed the perception of children from one of miniature adults to one of persons with less than fully developed moral and cognitive capacities.

As early as 1825, the Society for the Prevention of Juvenile Delinquency was advocating the separation of juvenile and adult offenders. Soon, facilities exclusively for juveniles were established in most major cities. By mid-century, these privately operated youth "prisons" were under criticism for various abuses. Many states then took on the responsibility of operating juvenile facilities.

**John Augustus—planting the seeds of juvenile probation (1847)**

**"I bailed nineteen boys, from 7 to 15 years of age, and in bailing them it was understood, and agreed by the court, that their cases should be continued from term to term for several months, as a season of probation; thus each month at the calling of the docket, I would appear in court, make my report, and thus the cases would pass on for 5 or 6 months. At the expiration of this term, twelve of the boys were brought into court at one time, and the scene formed a striking and highly pleasing contrast with their appearance when first arraigned. The judge expressed much pleasure as well as surprise at their appearance, and remarked that the object of law had been accomplished and expressed his cordial approval of my plan to save and reform."**

### The first juvenile court in this country was established in Cook County, Illinois, in 1899

Illinois passed the Juvenile Court Act of 1899, which established the nation's first juvenile court. The British doctrine of *parens patriae* (the state as parent) was the rationale for the right of the state to intervene in the lives of children in a manner different from the way it intervenes in the lives of adults. The doctrine was interpreted to mean that, because children were not of full legal capacity, the state had the inherent power and responsibility to provide protection for children whose natural parents were not providing appropriate care or supervision. A key element was the focus on the welfare of the child. Thus, the delinquent child was also seen as in need of the court's benevolent intervention.

### Juvenile courts flourished for the first half of the 20th century

By 1910, 32 states had established juvenile courts and/or probation services. By 1925, all the rest but two had followed suit. Rather than merely punishing delinquents for their crimes, juvenile courts sought to turn delinquents into productive citizens—through treatment.

**Louise deKoven Bowen—fighting to make Chicago safe for children (1920)**

**"Probably no one thing has so tended to decrease delinquency as this public movement to furnish constructive recreational and social opportunities to boys and girls who would otherwise be denied these privileges."**

The mission to help children in trouble was stated clearly in the laws that established juvenile courts. This benevolent mission led to procedural and substantive differences between the juvenile and criminal justice systems.

During the next 50 years, most juvenile courts had exclusive original jurisdiction over all youth under age 18 who were charged with violating criminal laws. Only if the juvenile court waived its jurisdiction in a case could a child be transferred to criminal court and tried as an adult. Transfer decisions were made on a case-by-case basis using a "best interests of the child and public" standard, and were thus within the realm of individualized justice.

### The focus on offenders and not offenses, on rehabilitation and not punishment, had substantial procedural impact

Unlike the criminal justice system, where district attorneys selected cases for trial, the juvenile court controlled its own intake. And unlike criminal prosecutors, juvenile court intake considered extra-legal as well as legal factors in deciding how to handle cases. Juvenile court intake also had discretion to handle cases informally, bypassing judicial action.

### The first cases in juvenile court

After years of development and months of compromise, the Illinois legislature passed on April 14, 1899, a law permitting counties in the state to designate one or more of their circuit court judges to hear all cases involving dependent, neglected, and delinquent children younger than age 16. The legislation stated that these cases were to be heard in a special courtroom that would be designated as "the juvenile court room" and referred to as the "Juvenile Court." Thus, the first juvenile court opened in Cook County on July 3, 1899, was not a new court, but a division of the circuit court with original jurisdiction over juvenile cases.

The judge assigned to this new division was Richard Tuthill, a Civil War veteran who had been a circuit court judge for more than 10 years. The first case heard by Judge Tuthill in juvenile court was that of Henry Campbell, an 11-year-old who had been arrested for larceny. The hearing was a public event. While some tried to make the juvenile proceeding secret, the politics of the day would not permit it. The local papers carried stories about what had come to be known as "child saving" by some and "child slavery" by others.*

At the hearing, Henry Campbell's parents told Judge Tuthill that their son was a good boy who had been led into trouble by others, an argument consistent with the underlying philosophy of the court—that individuals (especially juveniles) were not solely responsible for the crimes they commit. The parents did not want young Henry sent to an institution, which was one of the few options available to the judge. Although the enacting legislation granted the new juvenile court the right to appoint probation officers to handle juvenile cases, the officers were not to receive publicly funded compensation. Thus, the judge had no probation staff to provide services to Henry. The parents suggested that Henry be sent to live with his grandmother in Rome, New York. After questioning the parents, the judge agreed to send Henry to his grandmother's in the hope that he would "escape the surroundings which have caused the mischief." This first case was handled informally, without a formal adjudication of delinquency on the youth's record.

Judge Tuthill's first formal case is not known for certain, but the case of Thomas Majcheski (handled about two weeks after the Campbell case) might serve as an example. Majcheski, a 14-year-old, was arrested for stealing grain from a freight car in a railroad yard, a common offense at the time. The arresting officer told the judge that the boy's father was dead and his mother (a washerwoman with nine children) could not leave work to come to court. The officer also said that the boy had committed similar offenses previously but had never been arrested. The boy admitted the crime. The judge then asked the nearly 300 people in the courtroom if they had anything to say. No one responded.

Still without a probation staff in place, the judge's options were limited: dismiss the matter, order incarceration at the state reformatory, or transfer the case to adult court. The judge decided the best alternative was incarceration in the state reformatory, where the youth would "have the benefit of schooling."

A young man in the audience then stood up and told the judge that the sentence was inappropriate. Newspaper accounts indicate that the objector made the case that the boy was just trying to obtain food for his family. Judge Tuthill then asked if the objector would be willing to take charge of the boy and help him become a better citizen. The young man accepted. On the way out of the courtroom, a reporter asked the young man of his plans for Thomas. The young man said "Clean him up, and get him some clothes and then take him to my mother. She'll know what to do with him."

In disposing of the case in this manner, Judge Tuthill ignored many possible concerns (e.g., the rights and desires of Thomas's mother and the qualifications of the young man—or more directly, the young man's mother). Nevertheless, the judge's actions demonstrated that the new court was not a place of punishment. The judge also made it clear that the community had to assume much of the responsibility if it wished to have a successful juvenile justice system.

---

* Beginning in the 1850s, private societies in New York City rounded up street children from the urban ghettos and sent them to farms in the Midwest. Child advocates were concerned that these home-finding agencies did not properly screen or monitor the foster homes, pointing out that the societies were paid by the county to assume responsibility for the children and also by the families who received the children. Applying this concern to the proposed juvenile court, the Illinois legislation stated that juvenile court hearings should be open to the public so the public could monitor the activities of the court to ensure that private organizations would not be able to gain custody of children and then "sell" them for a handsome profit and would not be able to impose their standards of morality or religious beliefs on working-class children.

Source: Authors' adaptation of Tanenhaus' *Juvenile justice in the making.*

In the courtroom, juvenile court hearings were much less formal than criminal court proceedings. In this benevolent court—with the express purpose of protecting children—due process protections afforded criminal defendants were deemed unnecessary. In the early juvenile courts, and even in some to this day, attorneys for the state and the youth are not considered essential to the operation of the system, especially in less serious cases.

A range of dispositional options was available to a judge wanting to help rehabilitate a child. Regardless of offense, outcomes ranging from warnings to probation supervision to training school confinement could be part of the treatment plan. Dispositions were tailored to "the best interests of the child." Treatment lasted until the child was "cured" or became an adult (age 21), whichever came first.

### As public confidence in the treatment model waned, due process protections were introduced

In the 1950s and 1960s, many came to question the ability of the juvenile court to succeed in rehabilitating delinquent youth. The treatment techniques available to juvenile justice professionals often failed to reach the desired levels of effectiveness. Although the goal of rehabilitation through individualized justice—the basic philosophy of the juvenile justice system—was not in question, professionals were concerned about the growing number of juveniles institutionalized indefinitely in the name of treatment.

In a series of decisions beginning in the 1960s, the U.S. Supreme Court required that juvenile courts become more formal—more like criminal courts. Formal hearings were now required in waiver situations, and delinquents facing possible confinement were given protection against self-incrimination and rights to receive notice of the charges against them, to present witnesses, to question witnesses, and to have an attorney. Proof "beyond a reasonable doubt" rather than merely "a preponderance of evidence" was now required for an adjudication. The Supreme Court, however, still held that there were enough "differences of substance between the criminal and juvenile courts . . . to hold that a jury is not required in the latter." (See Supreme Court decisions later in this chapter.)

Meanwhile, Congress, in the Juvenile Delinquency Prevention and Control Act of 1968, recommended that children charged with noncriminal (status) offenses be handled outside the court system. A few years later, Congress passed the Juvenile Justice and Delinquency Prevention Act of 1974, which as a condition for state participation in the Formula Grants Program required deinstitutionalization of status offenders and nonoffenders as well as the separation of juvenile delinquents from adult offenders. (In the 1980 amendments to the 1974 Act, Congress added a requirement that juveniles be removed from adult jail and lockup facilities.) Community-based programs, diversion, and deinstitutionalization became the banners of juvenile justice policy in the 1970s.

### In the 1980s, the pendulum began to swing toward law and order

During the 1980s, the public perceived that serious juvenile crime was increasing and that the system was too lenient with offenders. Although there was substantial misperception regarding increases in juvenile crime, many states responded by passing more punitive laws. Some laws removed certain classes of offenders from the juvenile justice system and handled them as adult criminals in criminal court. Others required the juvenile justice system to be more like the criminal justice system and to treat certain classes of juvenile offenders as criminals but in juvenile court.

As a result, offenders charged with certain offenses now are excluded from juvenile court jurisdiction or face mandatory or automatic waiver to criminal court. In several states, concurrent jurisdiction provisions give prosecutors the discretion to file certain juvenile cases directly in criminal court rather than juvenile court. In some states, certain adjudicated juvenile offenders face mandatory sentences.

### The 1990s saw unprecedented change as state legislatures cracked down on juvenile crime

Five areas of change emerged as states passed laws designed to combat juvenile crime. These laws generally involved expanded eligibility for criminal court processing and adult correctional sanctioning and reduced confidentiality protections for a subset of juvenile offenders. Between 1992 and 1997, all but three states changed laws in one or more of the following areas:

- Transfer provisions—Laws made it easier to transfer juvenile offenders from the juvenile justice system to the criminal justice system (45 states).
- Sentencing authority—Laws gave criminal and juvenile courts expanded sentencing options (31 states).

- Confidentiality—Laws modified or removed traditional juvenile court confidentiality provisions by making records and proceedings more open (47 states).

In addition to these areas, there was change relating to:

- Victims rights—Laws increased the role of victims of juvenile crime in the juvenile justice process (22 states).
- Correctional programming—As a result of new transfer and sentencing laws, adult and juvenile correctional administrators developed new programs.

The 1980s and 1990s saw significant change in terms of treating more juvenile offenders as criminals. Recently, states have been attempting to strike a balance in their juvenile justice systems among system and offender accountability, offender competency development, and community protection. Juvenile code purpose clauses also incorporate restorative justice language (offenders repair the harm done to victims and communities and accept responsibility for their actions).

### Some juvenile codes emphasize prevention and treatment goals, some stress punishment, but most seek a balanced approach

States vary in how they express the purposes of their juvenile courts—not just in the underlying assumptions and philosophies, but also in the approaches they take to the task. Some declare their goals and objectives in great detail; others mention only the broadest of aims. Many juvenile court purpose clauses have been amended over the years, reflecting philosophical or rhetorical shifts and changes in emphasis in the states' overall

### Several core requirements of the Juvenile Justice and Delinquency Prevention Act address custody issues

The Juvenile Justice and Delinquency Prevention Act of 2002 (the Act) establishes four custody-related requirements.

The **"deinstitutionalization of status offenders and nonoffenders"** requirement (1974) specifies that juveniles not charged with acts that would be crimes for adults "shall not be placed in secure detention facilities or secure correctional facilities." This requirement does not apply to juveniles charged with violating a valid court order or possessing a handgun, or those held under interstate compacts.

The **"sight and sound separation"** requirement (1974) specifies that, "juveniles alleged to be or found to be delinquent and [status offenders and nonoffenders] shall not be detained or confined in any institution in which they have contact with adult inmates" in custody because they are awaiting trial on criminal charges or have been convicted of a crime. This requires that juvenile and adult inmates cannot see each other and no conversation between them is possible.

The **"jail and lockup removal"** requirement (1980) states that juveniles shall not be detained or confined in adult jails or lockups. There are, however, several exceptions. There is a 6-hour grace period that allows adult jails and lockups to hold delinquents temporarily while awaiting transfer to a juvenile facility or making court appearances. (This exception applies only if the facility can maintain sight and sound separation.) Under certain conditions, jails and lockups in rural areas may hold delinquents awaiting initial court appearance up to 48 hours. Some jurisdictions have obtained approval for separate juvenile detention centers that are collocated with an adult facility; in addition, staff who work with both juveniles and adult inmates must be trained and certified to work with juveniles.

Regulations implementing the Act exempt juveniles held in secure adult facilities if the juvenile is being tried as a criminal for a felony or has been convicted as a criminal felon. Regulations also allow adjudicated delinquents to be transferred to adult institutions once they have reached the state's age of full criminal responsibility, where such transfer is expressly authorized by state law.

In the past, the **"disproportionate minority confinement"** (DMC) requirement (1988) focused on the extent to which minority youth were confined in proportions greater than their representation in the population. The 2002 Act broadened the DMC concept to encompass all stages of the juvenile justice process; thus, DMC has come to mean **disproportionate minority contact.**

States must agree to comply with each requirement to receive Formula Grants funds under the Act's provisions. States must submit plans outlining their strategy for meeting these and other statutory requirements. Noncompliance with core requirements results in the loss of at least 20% of the state's annual Formula Grants Program allocation per requirement.

As of 2005, 56 of 57 eligible states and territories were participating in the Formula Grants Program. Annual state monitoring reports show that the vast majority were in compliance with the requirements, either reporting no violations or meeting *de minimis* or other compliance criteria.

approaches to juvenile delinquency. Others have been left relatively untouched for decades. Given the changes in juvenile justice in recent decades, it is remarkable how many states still declare their purposes in language first developed by standards-setting agencies in the 1950s and 1960s.

Most common in state purpose clauses are components of Balanced and Restorative Justice (BARJ). BARJ advocates that juvenile courts give balanced attention to three primary interests: public safety, individual accountability to victims and the community, and development of skills to help offenders live law-abiding and productive lives. Some states are quite explicit in their adoption of the BARJ model. Others depart somewhat from the model in the language they use, often relying on more traditional terms (treatment, rehabilitation, care, guidance, assistance, etc.).

Several states have purpose clauses that are modeled on the one in the Standard Juvenile Court Act. The Act was originally issued in 1925 and has been revised numerous times. The 1959 version appears to have been the most influential. According to its opening provision, the purpose of the Standard Act was that "each child coming within the jurisdiction of the court shall receive . . . the care, guidance, and control that will conduce to his welfare and the best interest of the state, and that when he is removed from the control of his parents the court shall secure for him care as nearly as possible equivalent to that which they should have given him."

Another group of states use all or most of a more elaborate, multipart purpose clause contained in the *Legislative Guide for Drafting Family and Juvenile Court Acts*, a late 1960s

**States' juvenile code purpose clauses vary in their emphasis**

| State | BARJ features | Juvenile Court Act language | *Legislative Guide* language | Accountability/ protection emphasis | Child welfare emphasis |
|---|---|---|---|---|---|
| Alabama | ■ | | | | |
| Alaska | ■ | | | | |
| Arkansas | | ■ | ■ | | |
| California | ■ | ■ | | | |
| Connecticut | | | | ■ | |
| Dist. of Columbia | | | | | ■ |
| Florida | ■ | ■ | | | |
| Georgia | | ■ | | | |
| Hawaii | | | | ■ | |
| Idaho | ■ | | | | |
| Illinois | ■ | ■ | | | |
| Indiana | ■ | | | | |
| Iowa | | ■ | | | |
| Kansas | ■ | | | | |
| Kentucky | | | | | ■ |
| Louisiana | | ■ | | | |
| Maine | | ■ | ■ | | |
| Maryland | ■ | | | | |
| Massachusetts | | ■ | | | ■ |
| Michigan | | ■ | | | |
| Minnesota | ■ | ■ | | | |
| Mississippi | | ■ | | | |
| Missouri | | ■ | | | |
| Montana | ■ | | ■ | | |
| Nevada | | ■ | | | |
| New Hampshire | | | ■ | | |
| New Jersey | ■ | ■ | ■ | | |
| New Mexico | | | ■ | | |
| North Carolina | | | | ■ | |
| North Dakota | | | ■ | | |
| Ohio | | | ■ | | |
| Oregon | ■ | | | | |
| Pennsylvania | ■ | | | | |
| Rhode Island | | ■ | | | |
| South Carolina | | ■ | | | |
| Tennessee | | | ■ | | |
| Texas | | | ■ | ■ | |
| Utah | | | | ■ | |
| Vermont | | | ■ | | |
| Washington | ■ | | | | |
| West Virginia | | | | | ■ |
| Wisconsin | ■ | | | | |
| Wyoming | | | ■ | ■ | |

Note: States not listed do not have purpose clauses that fit into these categories.

Source: Authors' adaptation of Griffin and Bozynski's National overviews. *State juvenile justice profiles.*

publication. The *Guide's* opening section lists four purposes:

- To provide for the care, protection, and wholesome mental and physical development of children involved with the juvenile court.
- To remove from children committing delinquent acts the consequences of criminal behavior, and to substitute therefore a program of supervision, care and rehabilitation.
- To remove a child from the home only when necessary for his welfare or in the interests of public safety.
- To assure all parties their constitutional and other legal rights.

Purpose clauses in some states can be loosely characterized as "tough," in that they stress community protection, offender accountability, crime reduction through deterrence, or outright punishment. Texas and Wyoming, for instance, having largely adopted the multipurpose language of the *Legislative Guide*, pointedly insert two extra items—"protection of the public and public safety" and promotion of "the concept of punishment for criminal acts"—at the head of the list.

A few jurisdictions have statutory language that emphasizes promotion of the welfare and best interests of the juvenile as the sole or primary purpose of the juvenile court system. For example, Massachusetts has language stating that accused juveniles should be "treated, not as criminals, but as children in need of aid, encouragement and guidance."



# U.S. Supreme Court cases have had an impact on the character and procedures of the juvenile justice system

### The Supreme Court has made its mark on juvenile justice

Issues arising from juvenile delinquency proceedings rarely come before the U.S. Supreme Court. Beginning in the late 1960s, however, the Court decided a series of landmark cases that dramatically changed the character and procedures of the juvenile justice system.

### *Kent* v. *United States* 383 U.S. 541, 86 S.Ct. 1045 (1966)

In 1961, while on probation from an earlier case, Morris Kent, age 16, was charged with rape and robbery. Kent confessed to the offense as well as to several similar incidents. Assuming that the District of Columbia juvenile court would consider waiving jurisdiction to the adult system, Kent's attorney filed a motion requesting a hearing on the issue of jurisdiction.

The juvenile court judge did not rule on this motion filed by Kent's attorney. Instead, he entered a motion stating that the court was waiving jurisdiction after making a "full investigation." The judge did not describe the investigation or the grounds for the waiver. Kent was subsequently found guilty in criminal court on six counts of housebreaking and robbery and sentenced to 30 to 90 years in prison.

Kent's lawyer sought to have the criminal indictment dismissed, arguing that the waiver had been invalid. He also appealed the waiver and filed a writ of habeas corpus asking the state to justify Kent's detention. Appellate courts rejected both the appeal and the writ, refused to scrutinize the judge's "investigation," and accepted the waiver as valid. In appealing to the U.S. Supreme Court, Kent's attorney argued that the judge had not made a complete investigation and that Kent was denied constitutional rights simply because he was a minor.

The Court ruled the waiver invalid, stating that Kent was entitled to a hearing that measured up to "the essentials of due process and fair treatment," that Kent's counsel should have had access to all records involved in the waiver, and that the judge should have provided a *written* statement of the reasons for waiver.

Technically, the *Kent* decision applied only to D.C. courts, but its impact was more widespread. The Court raised a potential constitutional challenge to *parens patriae* as the foundation of the juvenile court. In its past decisions, the Court had interpreted the equal protection clause of the 14th amendment to mean that certain classes of people could receive less due process if a "compensating benefit" came with this lesser protection. In theory, the juvenile court provided less due process but a greater concern for the interests of the juvenile. The Court referred to evidence that this compensating benefit may not exist in reality and that juveniles may receive the "worst of both worlds"—"neither the protection accorded to adults nor the solicitous care and regenerative treatment postulated for children."

### *In re Gault* 387 U.S. 1, 87 S.Ct. 1428 (1967)

Gerald Gault, age 15, was on probation in Arizona for a minor property offense when, in 1964, he and a friend made a crank telephone call to an adult neighbor, asking her, "Are your cherries ripe today?" and "Do you have big bombers?" Identified by the neighbor, the youth were arrested and detained.

The victim did not appear at the adjudication hearing, and the court never resolved the issue of whether Gault made the "obscene" remarks. Gault was committed to a training school for the period of his minority. The maximum sentence for an adult would have been a $50 fine or 2 months in jail.

An attorney obtained for Gault after the trial filed a writ of habeas corpus that was eventually heard by the U.S. Supreme Court. The issue presented in the case was that Gault's constitutional rights (to notice of charges, counsel, questioning of witnesses, protection against self-incrimination, a transcript of the proceedings, and appellate review) were denied.

The Court ruled that in hearings that could result in commitment to an institution, juveniles have the right to notice and counsel, to question witnesses, and to protection against self-incrimination. The Court did not rule on a juvenile's right to appellate review or transcripts, but encouraged the states to provide those rights.

The Court based its ruling on the fact that Gault was being punished rather than helped by the juvenile court. The Court explicitly rejected the doctrine of *parens patriae* as the founding principle of juvenile justice, describing the concept as murky and of dubious historical relevance. The Court concluded that the handling of Gault's case violated the due process clause of the 14th amendment: "Juvenile court history has again demonstrated that unbridled discretion, however benevolently motivated, is frequently a poor substitute for principle and procedure."

***In re Winship***
**397 U.S. 358, 90 S.Ct. 1068 (1970)**

Samuel Winship, age 12, was charged with stealing $112 from a woman's purse in a store. A store employee claimed to have seen Winship running from the scene just before the woman noticed the money was missing; others in the store stated that the employee was not in a position to see the money being taken.

Winship was adjudicated delinquent and committed to a training school. New York juvenile courts operated under the civil court standard of a "preponderance of evidence." The court agreed with Winship's attorney that there was "reasonable doubt" of Winship's guilt, but based its ruling on the "preponderance" of evidence.

Upon appeal to the Supreme Court, the central issue in the case was whether "proof beyond a reasonable doubt" should be considered among the "essentials of due process and fair treatment" required during the adjudicatory stage of the juvenile court process. The Court rejected lower court arguments that juvenile courts were not required to operate on the same standards as adult courts because juvenile courts were designed to "save" rather than to "punish" children. The Court ruled that the "reasonable doubt" standard should be required in all delinquency adjudications.

***McKeiver* v. *Pennsylvania***
**403 U.S. 528, 91 S.Ct. 1976 (1971)**

Joseph McKeiver, age 16, was charged with robbery, larceny, and receiving stolen goods. He and 20 to 30 other youth allegedly chased 3 youth and took 25 cents from them.

**A series of U.S. Supreme Court decisions made juvenile courts more like criminal courts but maintained some important differences**

*Death penalty case decisions are discussed in chapter 7.

McKeiver met with his attorney for only a few minutes before his adjudicatory hearing. At the hearing, his attorney's request for a jury trial was denied by the court. He was subsequently adjudicated and placed on probation.

The state supreme court cited recent decisions of the U.S. Supreme Court that had attempted to include more due process in juvenile court proceedings without eroding the essential benefits of the juvenile court. The state supreme court affirmed the lower court, arguing that of all due process rights, trial by jury is most likely to "destroy the traditional character of juvenile proceedings."

The U.S. Supreme Court found that the due process clause of the 14th amendment did not require jury trials in juvenile court. The impact of the Court's *Gault* and *Winship* decisions was to enhance the accuracy of the juvenile court process in the fact-finding stage. In *McKeiver*, the Court argued that juries are not known to be more accurate than judges in the adjudication stage and could be disruptive to the informal atmosphere of the juvenile court, tending to make it more adversarial.

### *Breed* v. *Jones*
### 421 U.S. 519, 95 S.Ct. 1779 (1975)

In 1970, Gary Jones, age 17, was charged with armed robbery. Jones appeared in Los Angeles juvenile court and was adjudicated delinquent on the original charge and two other robberies.

At the dispositional hearing, the judge waived jurisdiction over the case to criminal court. Counsel for Jones filed a writ of habeas corpus, arguing that the waiver to criminal court violated the double jeopardy

clause of the fifth amendment. The court denied this petition, saying that Jones had not been tried twice because juvenile adjudication is not a "trial" and does not place a youth in jeopardy.

Upon appeal, the U.S. Supreme Court ruled that an adjudication in juvenile court, in which a juvenile is found to have violated a criminal statute, is equivalent to a trial in criminal court. Thus, Jones had been placed in double jeopardy. The Court also specified that jeopardy applies at the adjudication hearing when evidence is first presented. Waiver cannot occur after jeopardy attaches.

### *Oklahoma Publishing Company* v. *District Court in and for Oklahoma City*
### 480 U.S. 308, 97 S.Ct. 1045 (1977)

The Oklahoma Publishing Company case involved a court order prohibiting the press from publishing the name and photograph of a youth involved in a juvenile court proceeding. The material in question was obtained legally from a source outside the court. The U.S. Supreme Court found the court order to be an unconstitutional infringement on freedom of the press.

### *Smith* v. *Daily Mail Publishing Company*
### 443 U.S. 97, 99 S.Ct. 2667 (1979)

The *Daily Mail* case held that state law cannot stop the press from publishing a juvenile's name that it obtained independently of the court. Although the decision did not hold that the press should have access to juvenile court files, it held that if information regarding a juvenile case is lawfully obtained by the media,

the first amendment interest in a free press takes precedence over the interests in preserving the anonymity of juvenile defendants.

### *Schall* v. *Martin*
### 467 U.S. 253, 104 S.Ct. 2403 (1984)

Gregory Martin, age 14, was arrested in 1977 and charged with robbery, assault, and possession of a weapon. He and two other youth allegedly hit a boy on the head with a loaded gun and stole his jacket and sneakers.

Martin was held pending adjudication because the court found there was a "serious risk" that he would commit another crime if released. Martin's attorney filed a habeas corpus action challenging the fundamental fairness of preventive detention. The lower appellate courts reversed the juvenile court's detention order, arguing in part that pretrial detention is essentially punishment because many juveniles detained before trial are released before, or immediately after, adjudication.

The U.S. Supreme Court upheld the constitutionality of the preventive detention statute. The Court stated that preventive detention serves a legitimate state objective in protecting both the juvenile and society from pretrial crime and is not intended to punish the juvenile. The Court found that enough procedures were in place to protect juveniles from wrongful deprivation of liberty. The protections were provided by notice, a statement of the facts and reasons for detention, and a probable cause hearing within a short time. The Court also reasserted the *parens patriae* interests of the state in promoting the welfare of children.



# State statutes define who is under the jurisdiction of juvenile court

### Statutes set age limits for original jurisdiction of the juvenile court

In most states, the juvenile court has original jurisdiction over all youth charged with a law violation who were younger than age 18 at the time of the offense, arrest, or referral to court. Since 1975, four states have changed their age criteria: Alabama raised its upper age from 15 to 16 in 1976 and to 17 in 1977; Wyoming lowered its upper age from 18 to 17 in 1993; and in 1996, New Hampshire and Wisconsin lowered their upper age from 17 to 16.

Oldest age for original juvenile court jurisdiction in delinquency matters, 2004:

| Age | State |
|---|---|
| 15 | Connecticut, New York, North Carolina |
| 16 | Georgia, Illinois, Louisiana, Massachusetts, Michigan, Missouri, New Hampshire, South Carolina, Texas, Wisconsin |
| 17 | Alabama, Alaska, Arizona, Arkansas, California, Colorado, Delaware, District of Columbia, Florida, Hawaii, Idaho, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Jersey, New Mexico, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Dakota, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, Wyoming |

Many states have higher upper ages of juvenile court jurisdiction in status offense, abuse, neglect, or dependency matters—typically through age 20. In many states, the juvenile court has original jurisdiction over young adults who committed offenses while juveniles.

States often have statutory exceptions to basic age criteria. For example, many states exclude married or otherwise emancipated juveniles from juvenile court jurisdiction. Other exceptions, related to the youth's age, alleged offense, and/or prior court history, place certain youth under the original jurisdiction of the criminal court. In some states, a combination of the youth's age, offense, and prior record places the youth under the original jurisdiction of both the juvenile and criminal courts. In these states, the prosecutor has the authority to decide which court will initially handle the case.

As of the end of the 2004 legislative session, 16 states have statutes that set the lowest age of juvenile court delinquency jurisdiction. Other states rely on case law or common law. Children younger than a certain age are presumed to be incapable of criminal intent and, therefore, are exempt from prosecution and punishment.

Youngest age for original juvenile court jurisdiction in delinquency matters, 2004:

| Age | State |
|---|---|
| 6 | North Carolina |
| 7 | Maryland, Massachusetts, New York |
| 8 | Arizona |
| 10 | Arkansas, Colorado, Kansas, Louisiana, Minnesota, Mississippi, Pennsylvania, South Dakota, Texas, Vermont, Wisconsin |

### Juvenile court authority over youth may extend beyond the upper age of original jurisdiction

Through extended jurisdiction mechanisms, legislatures enable the court to provide sanctions and services for a duration of time that is in the best interests of the juvenile and the public, even for older juveniles who have reached the age at which original juvenile court jurisdiction ends.

As of the end of the 2004 legislative session, statutes in 34 states extend juvenile court jurisdiction in delinquency cases until the 21st birthday.

Oldest age over which the juvenile court may retain jurisdiction for disposition purposes in delinquency matters, 2004:

| Age | State |
|---|---|
| 18 | Alaska, Iowa, Kentucky, Nebraska, Oklahoma, Tennessee |
| 19 | Mississippi, North Dakota |
| 20 | Alabama, Arizona*, Arkansas, Connecticut, Delaware, District of Columbia, Georgia, Idaho, Illinois, Indiana, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nevada**, New Hampshire, New Mexico, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wyoming |
| 21 | Florida |
| 22 | Kansas |
| 24 | California, Montana, Oregon, Wisconsin |
| *** | Colorado, Hawaii, New Jersey |

Note: Extended jurisdiction may be restricted to certain offenses or juveniles.

*Arizona statute extends jurisdiction through age 20, but a 1979 state supreme court decision held that juvenile court jurisdiction terminates at age 18.

**Until the full term of the disposition order for sex offenders.

***Until the full term of the disposition order.

In some states, the juvenile court may impose adult correctional sanctions on certain adjudicated delinquents that extend the term of confinement well beyond the upper age of juvenile jurisdiction. Such sentencing options are included in the set of dispositional options known as blended sentencing.



# Most young law violators enter the juvenile justice system through law enforcement agencies

### Local processing of juvenile offenders varies

From state to state, case processing of juvenile law violators varies. Even within states, case processing may vary from community to community, reflecting local practice and tradition. Any description of juvenile justice processing in the U.S. must, therefore, be general, outlining a common series of decision points.

### Law enforcement agencies divert many juvenile offenders out of the justice system

At arrest, a decision is made either to send the matter further into the justice system or to divert the case out of the system, often into alternative programs. Generally, law enforcement makes this decision after talking to the victim, the juvenile, and the parents and after reviewing the juvenile's prior contacts with the juvenile justice system. In 2003, 20% of all juvenile arrests were handled within the police department and resulted in release of the youth; in 7 of 10 arrests, the cases were referred to juvenile court. The remaining arrests were referred for criminal prosecution or to other agencies.

Federal regulations discourage holding juveniles in adult jails and lock-ups. If law enforcement must detain a juvenile in secure custody for a brief period to contact a parent or guardian or to arrange transportation to a juvenile detention facility, federal regulations require that the juvenile be securely detained for no longer than 6 hours and in an area that is not within sight or sound of adult inmates.

### Most delinquency cases are referred by law enforcement agencies

Law enforcement accounted for 84% of all delinquency cases referred to juvenile court in 2000. The remaining referrals were made by others such as parents, victims, school personnel, and probation officers.

### Intake departments screen cases referred to juvenile court for formal processing

The court intake function is generally the responsibility of the juvenile probation department and/or the prosecutor's office. Intake decides whether to dismiss the case, to handle the matter informally, or to request formal intervention by the juvenile court.

To make this decision, an intake officer or prosecutor first reviews the facts of the case to determine whether there is sufficient evidence to prove the allegation. If not, the case is dismissed. If there is sufficient evidence, intake then determines whether formal intervention is necessary.

Nearly half of all cases referred to juvenile court intake are handled informally. Many informally processed cases are dismissed. In the other informally processed cases, the juvenile voluntarily agrees to specific conditions for a specific time period. These conditions often are outlined in a written agreement, generally called a "consent decree." Conditions may include such things as victim restitution, school attendance, drug counseling, or a curfew.

In most jurisdictions, a juvenile may be offered an informal disposition only if he or she admits to committing the act. The juvenile's compliance with the informal agreement often is monitored by a probation officer. Thus, this process is sometimes labeled "informal probation."

If the juvenile successfully complies with the informal disposition, the case is dismissed. If, however, the juvenile fails to meet the conditions, the case is referred for formal processing and proceeds as it would have if the initial decision had been to refer the case for an adjudicatory hearing.

If the case is to be handled formally in juvenile court, intake files one of two types of petitions: a delinquency petition requesting an adjudicatory hearing or a petition requesting a waiver hearing to transfer the case to criminal court.

A delinquency petition states the allegations and requests that the juvenile court adjudicate (or judge) the youth a delinquent, making the juvenile a ward of the court. This language differs from that used in the criminal court system, where an offender is convicted and sentenced.

In response to the delinquency petition, an adjudicatory hearing is scheduled. At the adjudicatory hearing (trial), witnesses are called and the facts of the case are presented. In nearly all adjudicatory hearings, the determination that the juvenile was responsible for the offense(s) is made by a judge; however, in some states, the juvenile has the right to a jury trial.

### During the processing of a case, a juvenile may be held in a secure detention facility

Juvenile courts may hold delinquents in a secure juvenile detention facility if this is determined to be in the best interest of the community and/or the child.

After arrest, law enforcement may bring the youth to the local juvenile detention facility. A juvenile probation officer or detention worker reviews the case to decide whether the youth should be detained pending a hearing before a judge. In all states, a detention hearing must be held within a time period defined by statute, generally within 24 hours.

At the detention hearing, a judge reviews the case and determines whether continued detention is warranted. In 2000, juveniles were detained in 20% of delinquency cases processed by juvenile courts.

Detention may extend beyond the adjudicatory and dispositional hearings. If residential placement is ordered, but no placement beds are available, detention may continue until a bed becomes available.

### The juvenile court may transfer the case to criminal court

A waiver petition is filed when the prosecutor or intake officer believes that a case under jurisdiction of the juvenile court would be handled more appropriately in criminal court. The court decision in these matters follows a review of the facts of the case and a determination that there is probable cause to believe that the juvenile committed the act. With this established, the court then decides whether juvenile court jurisdiction over the matter should be waived and the case transferred to criminal court.

The judge's decision in such cases generally centers on the issue of the juvenile's amenability to treatment in the juvenile justice system. The prosecution may argue that the juvenile has been adjudicated several times previously and that interventions ordered by the juvenile court

**What are the stages of delinquency case processing in the juvenile justice system?**

Note: This chart gives a simplified view of caseflow through the juvenile justice system. Procedures vary among jurisdictions.

have not kept the juvenile from committing subsequent criminal acts. The prosecutor may also argue that the crime is so serious that the juvenile court is unlikely to be able to intervene for the time period necessary to rehabilitate the youth.

If the judge decides that the case should be transferred to criminal court, juvenile court jurisdiction is waived and the case is filed in criminal court. In 2000, juvenile courts waived fewer than 1% of all formally processed delinquency cases. If the judge does not approve the waiver request, generally an adjudicatory hearing is scheduled in juvenile court.

### Prosecutors may file certain cases directly in criminal court

In more than half of the states, legislatures have decided that in certain cases (generally those involving serious offenses), juveniles should be tried as criminal offenders. The law excludes such cases from juvenile court; prosecutors must file them in criminal court. In a smaller number of states, legislatures have given both the juvenile and adult courts original jurisdiction in certain cases. Thus, prosecutors have discretion to file such cases in either criminal court or juvenile court.

### After adjudication, probation staff prepare a disposition plan

Once the juvenile is adjudicated delinquent in juvenile court, probation staff develop a disposition plan. To prepare this plan, probation staff assess the youth, available support systems, and programs. The court may also order psychological evaluations, diagnostic tests, or a period of confinement in a diagnostic facility.

At the disposition hearing, probation staff present dispositional recommendations to the judge. The prosecutor and the youth may also present dispositional recommendations. After considering the recommendations, the judge orders a disposition in the case.

### Most youth placed on probation also receive other dispositions

Most juvenile dispositions are multifaceted and involve some sort of supervised probation. A probation order often includes additional requirements such as drug counseling, weekend confinement in the local detention center, or restitution to the community or victim. The term of probation may be for a specified period of time or it may be open ended. Review hearings are held to monitor the juvenile's progress. After conditions of probation have been successfully met, the judge terminates the case. In 2000, formal probation was the most severe disposition ordered in 63% of the cases in which the youth was adjudicated delinquent.

### The judge may order residential placement

In 2000, juvenile courts ordered residential placement in 24% of the cases in which the youth was adjudicated delinquent. Residential commitment may be for a specific or indeterminate time period. The facility may be publicly or privately operated and may have a secure, prison-like environment or a more open (even home-like) setting. In many states, when the judge commits a juvenile to the state department of juvenile corrections, the department determines where the juvenile will be placed and when the juvenile will be released. In other states, the judge controls the type and length of stay; in these situations, review hearings are held to assess the progress of the juvenile.

### Juvenile aftercare is similar to adult parole

Upon release from an institution, the juvenile is often ordered to a period of aftercare or parole. During this period, the juvenile is under supervision of the court or the juvenile corrections department. If the juvenile does not follow the conditions of aftercare, he or she may be recommitted to the same facility or may be committed to another facility.

### Status offense and delinquency case processing differ

A delinquent offense is an act committed by a juvenile for which an adult could be prosecuted in criminal court. There are, however, behaviors that are law violations only for juveniles and/or young adults because of their status. These "status offenses" may include behaviors such as running away from home, truancy, alcohol possession or use, ungovernability, and curfew violations.

**A juvenile court by any other name is still a juvenile court**

**Every state has at least one court with juvenile jurisdiction, but in most states it is not actually called "juvenile court." The names of the courts with juvenile jurisdiction vary by state—district, superior, circuit, county, family, or probate court, to name a few. Often the court of juvenile jurisdiction has a separate division for juvenile matters. Courts with juvenile jurisdiction generally have jurisdiction over delinquency, status offense, and abuse/neglect matters and may also have jurisdiction in other matters such as adoption, termination of parental rights, and emancipation. Whatever their name, courts with juvenile jurisdiction are generically referred to as juvenile courts.**

In many ways, the processing of status offense cases parallels that of delinquency cases. Not all states, however, consider all of these behaviors to be law violations. Many states view such behaviors as indicators that the child is in need of supervision. These states handle status offense matters more like dependency cases than delinquency cases, responding to the behaviors by providing social services.

Although many status offenders enter the juvenile justice system through law enforcement, in many states the initial, official contact is a child welfare agency. About half of all status offense cases referred to juvenile court come from law enforcement.

The federal Juvenile Justice and Delinquency Prevention Act states that jurisdictions shall not hold status offenders in secure juvenile facilities for detention or placement. This policy has been labeled deinstitutionalization of status offenders. There is an exception to the general policy: a status offender may be confined in a secure juvenile facility if he or she has violated a valid court order, such as a probation order requiring the youth to attend school and observe a curfew.

# Once a mainstay of juvenile court, confidentiality has given way to substantial openness in many states

### The first juvenile court was open to the public, but confidentiality became the norm over time

The legislation that created the first juvenile court in Illinois stated that the hearings should be open to the public. Thus, the public could monitor the activities of the court to ensure that the court handled cases in line with community standards.

In 1920, all but 7 of the 45 states that established separate juvenile courts permitted publication of information about juvenile court proceedings. The Standard Juvenile Court Act (1925) did not ban the publication of juveniles' names. By 1952, however, many states that adopted the Act had statutes that excluded the general public from juvenile court proceedings. The commentary to the 1959 version of the Act referred to the hearings as "private, not secret." It added that reporters should be permitted to attend hearings, with the understanding that they not disclose the identity of the juvenile. The rationale for this confidentiality was "to prevent the humiliation and demoralizing effect of publicity." It was also thought that publicity might propel youth into further delinquent acts to gain more recognition.

As juvenile courts became more formalized and concerns about rising juvenile crime increased, the pendulum began to swing back toward more openness. By 1988, statutes in 15 states permitted the public to attend certain delinquency hearings.

**Delinquency proceedings are open in some states, closed in others, and in some states, it depends on the type of case**

DC
Delinquency hearing confidentiality
Generally open (14 states)
Open with restrictions (21 states)
Not presumed open or closed (1 state)
Generally closed (15 states)

Source: Authors' adaptation of Szymanski's Confidentiality of juvenile delinquency hearings (2005 update).

### Delinquency hearings are open to the public in 14 states

As of the end of the 2004 legislative session, statutes or court rules in 14 states open delinquency hearings to the general public. Such statutes typically state that all hearings must be open to the public except on special order of the court. The court may close hearings to the public when it is in the best interests of the child and the public. In 7 of the 14 states, the state constitution has broad open court provisions. Ohio has a similar open court provision; however, in 2000, the Ohio supreme court ruled that juvenile proceedings are not presumed to be open or closed to the public. The Ohio court held that the traditional interests of confidentiality and rehabilitation prevent the public from having a constitutional right of access to juvenile delinquency proceedings.

### In 21 states, limits are set on access to delinquency hearings

In addition to the 14 states with open delinquency hearings, 21 states have statutes that open delinquency hearings for some types of cases. The openness restrictions typically involve age and/or offense criteria. For example, a statute might allow open hearings if the youth is charged with a felony and was at least 16 years old at the time of the crime. Some statutes also limit open hearings to those involving youth with a particular criminal history. For example, hearings might be open only if the youth met age and offense criteria and had at least one prior felony conviction (criminal court) or felony adjudication (juvenile court).

### Most states specify exceptions to juvenile court record confidentiality

Although legal and social records maintained by law enforcement agencies and juvenile courts have traditionally been confidential, legislatures have made significant changes over the past decade in how the justice system treats information about juvenile offenders. In most states, the juvenile code specifies which individuals or agencies are allowed access to such records.

Formerly confidential records are now being made available to a wide variety of individuals. Many states open records to schools and youth-serving agencies as well as individuals and agencies within the justice system. However, access is not necessarily unlimited or automatic. It may be restricted to certain parts of the record and may require a court order.

As of the end of the 2004 legislative session, juvenile codes in all states allow information contained in juvenile court records to be specifically released to one or more of the following parties: the prosecutor, law enforcement, social services agencies, schools, the victim, or the public.

In all states, laws allow those with a "legitimate interest" to have at least partial access to juvenile court or law enforcement records. Interested parties generally must obtain the court's permission to gain access. Many states allow access by the juvenile who is the subject of the proceedings (35 states), the juvenile's parents or guardian (40 states), or the juvenile's attorney (40 states).

**Media can access juvenile offenders' identities in most states**

DC
Media access to identity of juvenile offender in delinquency case
Access (15 states)
Access in certain cases (30 states)
Access with permission (4 states)
No access (2 states)

- Access: In 14 of the 15 jurisdictions, media can gain access to the juvenile offender's identity by attending delinquency hearings, which are open to the public. In the District of Columbia, the statute allows the media to attend hearings (although hearings are not public) but prohibits the media from revealing the juvenile's identity.
- Access in certain cases: In 30 states, media can access the juvenile offender's identity for certain cases. Media access is tied to public access to hearings or records, which statutes limit by case characteristics such as the juvenile's age, offense, criminal history, or whether the case is transferred to criminal court.
- Access with permission: In 4 states, media access to delinquency hearings or records (and thus to juvenile offender identities) can only occur if the court gives permission or the media discover the information independently. In these states, statutes require that the court decide the issue on a case-by-case basis.
- No access: In 2 states, statutes prohibit release of the names of all juvenile offenders.
- In 3 states (Maryland, New Jersey, and Wisconsin), under certain circumstances, the media may be prohibited from revealing the juvenile's identity.

Source: Authors' adaptation of Szymanski's Releasing names of juvenile offenders to the media and/or the public (2005 update).

## All states allow certain juvenile offenders to be fingerprinted and photographed; most store information in repositories

As of the end of 2004, all states allow law enforcement agencies to fingerprint juveniles who have been arrested for felonies or who have reached a certain age. All states allow juveniles to be photographed for their criminal history records under certain circumstances.

In 44 states, information (typically fingerprints and other identifying information) about certain juvenile offenders can be reported to a statewide repository. Some states include such information in the criminal history repository for adult offenders; others maintain a separate repository for information on juvenile offenders.

## School notification laws are common

As of the end of the 2004 legislative session, 44 states have school notification laws. Under these laws, schools are notified when students are involved with law enforcement or courts for committing delinquent acts. Some statutes limit notification to youth charged with or convicted of serious or violent crimes.

# All states allow certain juveniles to be tried in criminal court or otherwise face adult sanctions

### Transferring juveniles to criminal court is not a new phenomenon

Juvenile courts have always had mechanisms for removing the most serious offenders from the juvenile justice system. Traditional transfer laws establish provisions and criteria for trying certain youth of juvenile age in criminal court. Blended sentencing laws are also used to impose a combination of juvenile and adult criminal sanctions on some offenders of juvenile age.

Transfer laws address which court (juvenile or criminal) has jurisdiction over certain cases involving offenders of juvenile age. State transfer provisions are typically limited by age and offense criteria. Transfer mechanisms vary regarding where the responsibility for transfer decisionmaking lies. Transfer provisions fall into three general categories:

**Judicial waiver:** The juvenile court judge has the authority to waive juvenile court jurisdiction and transfer the case to criminal court. States may use terms other than judicial waiver. Some call the process *certification*, *remand*, or *bind over* for criminal prosecution. Others transfer or decline rather than waive jurisdiction.

**Concurrent jurisdiction:** Original jurisdiction for certain cases is shared by both criminal and juvenile courts, and the prosecutor has discretion to file such cases in either court. Transfer under concurrent jurisdiction provisions is also known as *prosecutorial waiver*, *prosecutor discretion*, or *direct file*.

**Statutory exclusion:** State statute excludes certain juvenile offenders from juvenile court jurisdiction. Under statutory exclusion provisions, cases originate in criminal rather than juvenile court. Statutory exclusion is also known as *legislative exclusion*.

### In many states, criminal courts may send transferred cases to juvenile court

Several states have provisions for sending transferred cases from criminal to juvenile court for adjudication under certain circumstances. This procedure, sometimes referred to as "reverse waiver," generally applies to cases initiated in criminal court under statutory exclusion or concurrent jurisdiction provisions. Of the 36 states with such provisions at the end of the 2004 legislative session, 22 also have provisions that allow certain transferred juveniles to petition for a "reverse." Reverse decision criteria often parallel a state's discretionary waiver criteria. In some states, transfer cases resulting in conviction in criminal court may be reversed to juvenile court for disposition.

### Most states have "once an adult, always an adult" provisions

In 34 states, juveniles who have been tried as adults must be prosecuted in criminal court for any subsequent offenses. Nearly all of these "once an adult, always an adult" provisions require that the youth must have been convicted of the offenses that triggered the initial criminal prosecution.

### Blended sentencing laws give courts flexibility in sanctioning

Blended sentencing laws address the correctional system (juvenile or adult) in which certain offenders of juvenile age will be sanctioned. Blended sentencing statutes can be placed into two general categories:

**Juvenile court blended sentencing:** The juvenile court has the authority to impose adult criminal sanctions on certain juvenile offenders. The majority of these blended sentencing laws authorize the juvenile court to combine a juvenile disposition with a criminal sentence that is suspended. If the youth successfully completes the juvenile disposition and does not commit a new offense, the criminal sanction is not imposed. If, however, the youth does not cooperate or fails in the juvenile sanctioning system, the adult criminal sanction is imposed. Juvenile court blended sentencing gives the juvenile court the power to send uncooperative youth to adult prison—giving "teeth" to the typical array of juvenile court dispositional options.

**Criminal court blended sentencing:** Statutes allow criminal courts sentencing certain transferred juveniles to impose sanctions otherwise available only to offenders handled in juvenile court. As with juvenile court blended sentencing, the juvenile disposition may be conditional —the suspended criminal sentence is intended to ensure good behavior. Criminal court blended sentencing gives juveniles prosecuted in criminal court one last chance at a juvenile disposition, thus mitigating the effects of transfer laws (at least in individual cases).

## Most states have multiple ways to impose adult sanctions on offenders of juvenile age

| | Judicial waiver | | | Concurrent | Statutory | Reverse | Once an adult/ always | Blended sentencing | |
|---|---|---|---|---|---|---|---|---|---|
| State | Discretionary | Presumptive | Mandatory | jurisdiction | exclusion | waiver | an adult | Juvenile | Criminal |
| Number of states | 45 | 15 | 15 | 15 | 29 | 25 | 34 | 15 | 17 |
| **Alabama** | ■ | | | | ■ | | ■ | | |
| **Alaska** | ■ | ■ | | | ■ | | | ■ | |
| **Arizona** | ■ | | | ■ | ■ | ■ | ■ | | |
| Arkansas | ■ | | | ■ | | ■ | | ■ | ■ |
| California | ■ | ■ | | ■ | ■ | ■ | ■ | | ■ |
| Colorado | ■ | ■ | | ■ | | ■ | | ■ | ■ |
| **Connecticut** | | | ■ | | | ■ | | ■ | |
| **Delaware** | ■ | | ■ | | ■ | ■ | ■ | | |
| **Dist. of Columbia** | ■ | ■ | | ■ | | | ■ | | |
| Florida | ■ | | | ■ | ■ | | ■ | | ■ |
| Georgia | ■ | | ■ | ■ | ■ | ■ | | | |
| Hawaii | ■ | | | | | | ■ | | |
| **Idaho** | ■ | | | | ■ | | ■ | | ■ |
| **Illinois** | ■ | ■ | ■ | | ■ | ■ | ■ | ■ | ■ |
| **Indiana** | ■ | | ■ | | ■ | | ■ | | |
| Iowa | ■ | | | | ■ | ■ | ■ | | ■ |
| Kansas | ■ | ■ | | | | | ■ | ■ | |
| Kentucky | ■ | | ■ | | | ■ | | | ■ |
| **Louisiana** | ■ | | ■ | ■ | ■ | | | | |
| **Maine** | ■ | ■ | | | | | ■ | | |
| **Maryland** | ■ | | | | ■ | ■ | ■ | | |
| Massachusetts | | | | | ■ | | | ■ | ■ |
| Michigan | ■ | | | ■ | | | ■ | ■ | ■ |
| Minnesota | ■ | ■ | | | ■ | | ■ | ■ | |
| **Mississippi** | ■ | | | | ■ | ■ | ■ | | |
| **Missouri** | ■ | | | | | | ■ | | ■ |
| **Montana** | | | | ■ | ■ | ■ | | ■ | |
| Nebraska | | | | ■ | | ■ | | | ■ |
| Nevada | ■ | ■ | | | ■ | ■ | ■ | | |
| New Hampshire | ■ | ■ | | | | | ■ | | |
| **New Jersey** | ■ | ■ | ■ | | | | | | |
| **New Mexico** | | | | | ■ | | | ■ | ■ |
| **New York** | | | | | ■ | ■ | | | |
| North Carolina | ■ | | ■ | | | | ■ | | |
| North Dakota | ■ | ■ | ■ | | | | ■ | | |
| Ohio | ■ | | ■ | | | | ■ | ■ | |
| **Oklahoma** | ■ | | | ■ | ■ | ■ | ■ | | ■ |
| **Oregon** | ■ | | | | ■ | ■ | ■ | | |
| **Pennsylvania** | ■ | ■ | | | ■ | ■ | ■ | | |
| Rhode Island | ■ | ■ | ■ | | | | ■ | ■ | |
| South Carolina | ■ | | ■ | | ■ | | | | |
| South Dakota | ■ | | | | ■ | ■ | ■ | | |
| **Tennessee** | ■ | | | | | ■ | ■ | | |
| **Texas** | ■ | | | | | | ■ | ■ | |
| **Utah** | ■ | ■ | | | ■ | | ■ | | |
| Vermont | ■ | | | ■ | ■ | ■ | | ■ | |
| Virginia | ■ | | ■ | ■ | | ■ | ■ | | ■ |
| Washington | ■ | | | | ■ | | ■ | | |
| **West Virginia** | ■ | | ■ | | | | | | ■ |
| **Wisconsin** | ■ | | | | ■ | ■ | ■ | | ■ |
| **Wyoming** | ■ | | | ■ | | ■ | | | |

■ In states with a combination of provisions for transferring juveniles to criminal court, the exclusion, mandatory waiver, or concurrent jurisdiction provisions generally target the oldest juveniles and/or those charged with the most serious offenses, whereas younger juveniles and/or those charged with relatively less serious offenses may be eligible for discretionary waiver.

Note: Table information is as of the end of the 2004 legislative session.

Source: Authors' adaptation of Griffin's National overviews. *State juvenile justice profiles.*



# In most states, age and offense criteria limit transfer provisions

## Judicial waiver remains the most common transfer provision

As of the end of the 2004 legislative session, in 45 states and the District of Columbia, juvenile court judges may waive jurisdiction over certain cases and transfer them to criminal court. Such action is usually in response to a request by the prosecutor; in several states, however, juveniles or their parents may request judicial waiver. In most states, laws limit waiver by age and offense.

Waiver provisions vary in terms of the degree of decisionmaking flexibility allowed. The decision may be entirely discretionary, there may be a rebuttable presumption in favor of waiver, or waiver may be mandatory. Some provisions mandate that waiver is required once the juvenile court judge determines that certain statutory criteria have been met. Mandatory waiver provisions differ from statutory exclusion provisions in that the case originates in juvenile rather than criminal court.

## Some statutes establish waiver criteria other than age and offense

In some states, waiver provisions target youth charged with offenses involving firearms or other weapons. Most state statutes also limit judicial waiver to juveniles who are "no longer amenable to treatment." The specific factors that determine lack of amenability vary, but they typically include the juvenile's offense history and previous dispositional outcomes. Such amenability criteria are generally not included in statutory exclusion or concurrent jurisdiction provisions.

Many statutes instruct juvenile courts to consider other factors when making waiver decisions, such as the availability of dispositional

### In most states, juvenile court judges may waive jurisdiction over certain cases and transfer them to criminal court

| | | Judicial waiver offense and minimum age criteria, 2004 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| State | Minimum age for judicial waiver | Any criminal offense | Certain felonies | Capital crimes | Murder | Certain person offenses | Certain property offenses | Certain drug offenses | Certain weapon offenses |
| Alabama | 14 | 14 | | | | | | | |
| Alaska | NS | NS | | | | NS | | | |
| California | 14 | 16 | | | 14 | 14 | 14 | 14 | |
| Colorado | 12 | | 12 | | 12 | 12 | | | |
| Dist. of Columbia | NS | 16 | 15 | | 15 | 15 | 15 | | NS |
| Florida | 14 | 14 | | | | | | | |
| Idaho | NS | 14 | NS | | NS | NS | NS | NS | |
| Illinois | 13 | 13 | 15 | | | | | | |
| Kansas | 10 | 10 | 14 | | | 14 | | 14 | |
| Kentucky | 14 | | 14 | 14 | | | | | |
| Maryland | NS | 15 | | NS | | | | | |
| Michigan | 14 | | 14 | | | | | | |
| Missouri | 12 | | 12 | | | | | | |
| Nevada | 14 | 14 | 14 | | | 14 | | | |
| North Carolina | 13 | | 13 | 13 | | | | | |
| North Dakota | 14 | 16 | 14 | | 14 | 14 | | 14 | |
| Oregon | NS | | 15 | | NS | NS | 15 | | |
| Pennsylvania | 14 | | 14 | | | 14 | 14 | | |
| South Dakota | NS | | NS | | | | | | |
| Tennessee | NS | 16 | | | NS | NS | | | |
| Vermont | 10 | | | | 10 | 10 | 10 | | |
| Virginia | 14 | | 14 | | 14 | 14 | | | |
| Wisconsin | 14 | 15 | 14 | | 14 | 14 | 14 | 14 | |
| Wyoming | 13 | 13 | | | | | | | |

Note: Ages in the minimum age column may not apply to all offense restrictions, but represent the youngest possible age at which a juvenile may be judicially waived to criminal court. "NS" indicates that in at least one of the offense restrictions indicated, no minimum age is specified.

Source: Authors' adaptation of Griffin's National overviews. *State juvenile justice profiles.*

alternatives for treating the juvenile, the time available for sanctions, public safety, and the best interest of the child. The waiver process must also adhere to certain constitutional principles of due process.

### States have slowed their expansion of transfer laws

Traditionally, discretionary judicial waiver was the most common transfer mechanism. Beginning in the 1970s, however, state legislatures have changed laws to move juvenile offenders into criminal court based on age and/or offense seriousness without the case-specific consideration offered by the discretionary juvenile court judicial waiver process. State transfer provisions changed extensively in the 1990s. Since 1992, all states but Nebraska have changed their transfer statutes to make it easier for juveniles to be tried in criminal court. But the pace of such changes has slowed considerably. From 1992 through 1995, 40 states and the District of Columbia enacted or expanded transfer provisions. From 1998 through 2002, legislatures in 18 states enacted or expanded their transfer provisions. From 2003 through 2004, only 4 states made substantive changes in transfer provisions, and only 2 of those states expanded them.

### Relatively few states allow prosecutorial discretion

As of the end of the 2004 legislative session, 15 states have concurrent jurisdiction provisions, which give both juvenile court and criminal court original jurisdiction in certain cases. Under such provisions, prosecutors have discretion to file eligible cases in either court. Concurrent jurisdiction is typically limited by age and offense criteria. Often, concurrent jurisdiction is limited to cases involving violent or repeat crimes or offenses involving firearms or other weapons. (Juvenile and criminal courts often also share jurisdiction over minor offenses such as traffic, watercraft, or local ordinance violations.) No national data exist on the number of juvenile cases tried in criminal court under concurrent jurisdiction provisions. In Florida, which has a fairly broad concurrent jurisdiction provision, prosecutors sent more than 2,000 youth to criminal court in fiscal year 2001. In comparison, juvenile court judges nationwide waived fewer than 6,000 cases to criminal court in 2000.

State appellate courts have taken the view that prosecutorial discretion is equivalent to the routine charging decisions prosecutors make in criminal cases. Thus, prosecutorial transfer is considered an executive function, which is not subject to judicial review and is not required to meet the due process standards established by the U.S. Supreme Court. Some states, however, do have written guidelines for prosecutorial transfer.

### Statutory exclusion accounts for the largest number of transfers

Legislatures "transfer" large numbers of young offenders to criminal court by enacting statutes that exclude certain cases from juvenile court jurisdiction. As of the end of the 2004 legislative session, 29 states have statutory exclusion provisions. State laws typically set age and offense limits for excluded offenses. The offenses most often excluded are murder, capital crimes in general (offenses punishable by

**In states with concurrent jurisdiction, the prosecutor has discretion to file certain cases in either criminal court or juvenile court**

| State | Minimum age for concurrent jurisdiction | Concurrent jurisdiction offense and minimum age criteria, 2004: Any criminal offense | Certain felonies | Capital crimes | Murder | Certain person offenses | Certain property offenses | Certain drug offenses | Certain weapon offenses |
|---|---|---|---|---|---|---|---|---|---|
| Arizona | 14 | | 14 | | | | | | |
| Arkansas | 14 | | 16 | 14 | 14 | 14 | | | |
| **California** | **14** | | **14** | **14** | **14** | **14** | **14** | **14** | |
| **Colorado** | **14** | | **14** | | **14** | **14** | **14** | | |
| Dist. of Columbia | 16 | | | | 16 | 16 | 16 | | |
| Florida | NS | 16 | 16 | NS | 14 | 14 | 14 | | 14 |
| **Georgia** | **NS** | | | **NS** | | | | | |
| **Louisiana** | **15** | | | | **15** | **15** | **15** | **15** | |
| Michigan | 14 | | 14 | | 14 | 14 | 14 | 14 | |
| Montana | 12 | | | | 12 | 12 | 16 | 16 | 16 |
| **Nebraska** | **NS** | **16** | **NS** | | | | | | |
| **Oklahoma** | **15** | | **16** | | **15** | **15** | **15** | **16** | **15** |
| Vermont | 16 | 16 | | | | | | | |
| Virginia | 14 | | | | 14 | 14 | | | |
| **Wyoming** | **13** | | **14** | | **14** | **14** | **14** | | |

Note: Ages in the minimum age column may not apply to all offense restrictions, but represent the youngest possible age at which a juvenile's case may be directly filed in criminal court. "NS" indicates that in at least one of the offense restrictions indicated, no minimum age is specified

Source: Authors' adaptation of Griffin's National overviews. *State juvenile justice profiles.*

death or life imprisonment), and other serious offenses against persons. (Minor offenses such as traffic, watercraft, and wildlife violations are often excluded from juvenile court jurisdiction in states where they are not covered by concurrent jurisdiction provisions.)

Although not typically thought of as transfers, large numbers of youth younger than age 18 are tried in criminal court in the 13 states where the upper age of juvenile court jurisdiction is set at 15 or 16. Nearly 2 million 16- and 17-year-olds live in these 13 states. If these youth are referred to criminal court at the same rate that 16- and 17-year-olds elsewhere are referred to juvenile court, then a large number of youth younger than 18 face trial in criminal court because they are defined as adults under state laws. In fact, it is possible that more youth younger than 18 are tried in criminal court in this way than by all other transfer mechanisms combined.

**In states with statutory exclusion provisions, certain cases involving juveniles originate in criminal court rather than in juvenile court**

| State | Minimum age for statutory exclusion | Statutory exclusion offense and minimum age criteria, 2004: Any criminal offense | Certain felonies | Capital crimes | Murder | Certain person offenses | Certain property offenses | Certain drug offenses | Certain weapon offenses |
|---|---|---|---|---|---|---|---|---|---|
| Alabama | 16 | | 16 | 16 | | | | 16 | |
| Alaska | 16 | | | | | 16 | 16 | | |
| Arizona | 15 | | 15 | | 15 | 15 | | | |
| California | 14 | | | | 14 | 14 | | | |
| Delaware | 15 | | 15 | | | | | | |
| Florida | NS | | | | 16 | NS | 16 | 16 | |
| Georgia | 13 | | | | 13 | 13 | | | |
| Idaho | 14 | | | | 14 | 14 | 14 | 14 | |
| Illinois | 13 | | 15 | | 13 | 15 | | 15 | 15 |
| Indiana | 16 | | 16 | | 16 | 16 | | 16 | 16 |
| Iowa | 16 | | 16 | | | | | 16 | 16 |
| Louisiana | 15 | | | | 15 | 15 | | | |
| Maryland | 14 | | | 14 | 16 | 16 | | | 16 |
| Massachusetts | 14 | | | | 14 | | | | |
| Minnesota | 16 | | | | 16 | | | | |
| Mississippi | 13 | | 13 | 13 | | | | | |
| Montana | 17 | | | | 17 | 17 | 17 | 17 | 17 |
| Nevada | NS | 16* | NS | | NS | 16 | | | |
| New Mexico | 15 | | | | 15 | | | | |
| New York | 13 | | | | 13 | 14 | 14 | | 14 |
| Oklahoma | 13 | | | | 13 | | | | |
| Oregon | NS | | | | 15 | 15 | | | |
| Pennsylvania | NS | | | | NS | 15 | | | |
| South Carolina | 16 | | 16 | | | | | | |
| South Dakota | 16 | | 16 | | | | | | |
| Utah | 16 | | 16 | | 16 | | | | |
| Vermont | 14 | | | | 14 | 14 | 14 | | |
| Washington | 16 | | | | 16 | 16 | 16 | | |
| Wisconsin | NS | | | | 10 | NS | | | |

Note: Ages in the minimum age column may not apply to all offense restrictions, but represent the youngest possible age at which a juvenile may be excluded from juvenile court. "NS" indicates that in at least one of the offense restrictions indicated, no minimum age is specified.

* In Nevada, the exclusion applies to any juvenile with a previous felony adjudication, regardless of the current offense charged, if the current offense involves the use or threatened use of a firearm.

Source: Authors' adaptation of Griffin's National overviews. *State juvenile justice profiles.*

## Many states allow transfer of certain very young offenders

In 23 states, no minimum age is specified in at least one judicial waiver, concurrent jurisdiction, or statutory exclusion provision for transferring juveniles to criminal court. For example, Pennsylvania's murder exclusion has no minimum age specified. Other transfer provisions in Pennsylvania have age minimums set at 14 or 15. Among states where statutes specify age limits for all transfer provisions, age 14 is the most common minimum age specified across provisions.

Minimum transfer age specified in statute, 2004:

| Age | State |
|---|---|
| None | Alaska, Arizona, Delaware, District of Columbia, Florida, Georgia, Hawaii, Idaho, Indiana, Maine, Maryland, Nebraska, Nevada, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Washington, West Virginia, Wisconsin |
| 10 | Kansas, Vermont |
| 12 | Colorado, Missouri |
| 13 | Illinois, Mississippi, New Hampshire, New York, North Carolina, Wyoming |
| 14 | Alabama, Arkansas, California, Connecticut, Iowa, Kentucky, Louisiana, Massachusetts, Michigan, Minnesota, New Jersey, North Dakota, Ohio, Texas, Utah, Virginia |
| 15 | New Mexico |



# Like transfer laws, juvenile court blended sentencing allows imposition of adult sanctions on juveniles

### Transfer laws and juvenile court blended sentencing laws have similar impact

As of the end of the 2004 legislative session, 15 states have blended sentencing laws that enable juvenile courts to impose criminal sanctions on certain juvenile offenders. Although the impact of juvenile blended sentencing laws depends on the specific provisions (which vary from state to state), in general, juvenile court blended sentencing expands the sanctioning powers of the juvenile court such that juvenile offenders may face the same penalties faced by adult offenders. Thus, like transfer laws, juvenile court blended sentencing provisions define certain juvenile offenders as eligible to be handled in the same manner as adult offenders and expose those juvenile offenders to harsher penalties.

The most common type of juvenile court blended sentencing provision allows juvenile court judges to order both a juvenile disposition and a criminal (adult) sentence. The adult sentence is suspended on the condition that the juvenile offender successfully completes the terms of the juvenile disposition and refrains from committing any new offenses. The criminal sanction is intended to encourage cooperation and serve as a deterrent to future offending. This type of arrangement is known as an inclusive blend.

Most states with juvenile court blended sentencing have inclusive blends (11 of 15). Generally, statutes require courts to impose a combination of juvenile and adult sanctions in targeted cases. In Massachusetts and Michigan, though, the court is not required to order a combined sanction. The court has the option to order a juvenile disposition, a criminal sentence, or a combined sanction.

Among the four states that do not have inclusive juvenile court blended sentencing, three (Colorado, Rhode Island, and Texas) have some type of contiguous blended sentencing arrangement. Under the contiguous model, juvenile court judges can order a sentence that would extend beyond the state's age of extended jurisdiction. The initial commitment is to a juvenile facility, but later the offender may be transferred to an adult facility. The fourth state without an inclusive juvenile blend, New Mexico, simply gives the juvenile court the option of ordering an adult sentence instead of a juvenile disposition. This is referred to as an exclusive blend.

### Reverse waiver laws and criminal court blended sentencing laws have similar impact

Under criminal court blended sentencing, offenders of juvenile age who have been convicted in criminal court can receive juvenile

**In blended sentencing, juveniles have the same due process protections afforded criminal defendants**

**All states with juvenile court blended sentencing give juveniles facing possible criminal sanctions the same basic procedural rights afforded to criminal defendants, notably the right to be tried by a jury. In Texas, youth in juvenile court blended sentencing cases are also entitled to have a jury make sentencing determinations.**

**As with transfer laws, states' juvenile court blended sentencing provisions are limited by age and offense criteria**

| | Minimum age for juvenile court blended sentence | Juvenile court blended sentencing offense and minimum age criteria, 2004 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| State | | Any criminal offense | Certain felonies | Capital crimes | Murder | Certain person offenses | Certain property offenses | Certain drug offenses | Certain weapon offenses |
| Alaska | 16 | | | | | 16 | | | |
| Arkansas | NS | | 14 | | NS | 14 | | | 14 |
| Colorado | NS | | NS | | | NS | | | |
| Connecticut | NS | | 14 | | | NS | | | |
| Illinois | 13 | | 13 | | | | | | |
| Kansas | 10 | 10 | | | | | | | |
| Massachusetts | 14 | | 14 | | | 14 | | | 14 |
| Michigan | NS | | NS | | NS | NS | NS | NS | |
| Minnesota | 14 | | 14 | | | | | | |
| Montana | NS | | 12 | | NS | NS | NS | NS | NS |
| New Mexico | 14 | | 14 | | 14 | 14 | 14 | | |
| Ohio | 10 | | 10 | | 10 | | | | |
| Rhode Island | NS | | NS | | | | | | |
| Texas | NS | | NS | | NS | NS | | NS | |
| Vermont | 10 | 10 | | | | | | | |

Note: Ages in the minimum age column may not apply to all offense restrictions, but represent the youngest possible age at which a juvenile court blended sentence may be imposed. "NS" indicates that in at least one of the offense restrictions indicated, no minimum age is specified.

Source: Authors' adaptation of Griffin's National overviews. *State juvenile justice profiles.*

dispositions. Like reverse waiver laws, criminal court blended sentencing provisions give defendants of juvenile age an opportunity to show that they belong in the juvenile justice system. Criminal court blended sentencing laws have been described as a "safety valve" or an "emergency exit" because they allow the court to review the circumstances of a case and make an individualized decision regarding the youth's suitability for juvenile or criminal treatment. In this way, youth are given one last chance to receive a juvenile disposition.

Seventeen states allow criminal court blended sentencing. Of these states, 10 have exclusive blended sentencing arrangements: the criminal court has an either/or choice between criminal and juvenile sanctions. Inclusive blend models, in which juvenile offenders convicted in criminal court may receive a combination sentence, exist in the remaining seven states with criminal court blended sentencing. As with the juvenile court inclusive blend model, the criminal court inclusive blend model allows the criminal court to suspend the adult sanction on condition of the youth's good behavior.

Criminal court blended sentencing provisions, 2004:

| Provision | State |
|---|---|
| Exclusive | California, Colorado, Illinois, Kentucky, Massachusetts, Nebraska, New Mexico, Oklahoma, West Virginia, Wisconsin |
| Inclusive | Arkansas, Florida, Idaho, Iowa, Michigan, Missouri, Virginia |

As with transfer and juvenile court blended sentencing laws, the scope of criminal court blended sentencing laws varies from state to state depending on the specifics of the statutory provisions. Limitations typically stem from the transfer provisions. The broadest criminal court blend statutes allow for juvenile sanctions in any case involving a juvenile prosecuted in criminal court (i.e., any transferred juvenile). Others exclude from blended sentencing only those convicted of offenses that carry a mandatory life or death sentence. The narrowest of the criminal court blend provisions limit the juvenile disposition option to juvenile offenders who have been convicted of a lesser offense that is not itself eligible for transfer and criminal prosecution. In still other states, statutes require a "fitness hearing" to determine whether the disposition for a lesser offense should be a juvenile sanction. At the hearing, the court must base its decision on criteria similar to those used in juvenile court discretionary waiver decisions.

**States' "fail-safe" mechanisms—reverse waiver and criminal court blended sentencing—vary in scope**

Many states that transfer youth to criminal court either automatically or at the prosecutor's discretion also provide a "fail-safe" mechanism that gives the criminal court a chance to review the case and make an individualized decision as to whether the case should be returned to the juvenile system for trial or sanctioning. The two basic types of fail-safes are reverse waiver and criminal court blended sentencing. With such combinations of provisions, a state can define cases to be handled in criminal court and at the same time ensure that the court can decide whether such handling is appropriate in individual cases. Of the 44 states with mandatory waiver, statutory exclusion, or concurrent jurisdiction provisions, 29 also have reverse waiver and/or criminal court blended sentencing as a fail-safe.

**Reverse waiver.** In 25 states, provisions allow juveniles whose cases are handled in criminal court to petition to have the case heard in juvenile court.

**Criminal court blended sentencing.** In 17 states, juveniles convicted in criminal court are allowed the opportunity to be sanctioned in the juvenile system.

Some states have comprehensive fail-safes; others do not.

**Comprehensive fail-safes.** In 15 states, no juvenile can be subject to criminal court trial and sentencing either automatically or at the prosecutor's discretion without a chance to prove his or her individual suitability for juvenile handling: Arkansas, Colorado, Delaware, Idaho, Iowa, Mississippi, Montana, Nebraska, Oklahoma, Pennsylvania, South Dakota, Tennessee, Vermont, West Virginia, and Wyoming.

**Partial fail-safes.** In 15 states, fail-safe mechanisms do not cover every transferred case: Arizona, California, Connecticut, Florida, Georgia, Illinois, Kentucky, Maryland, Massachusetts, Michigan, Nevada, New York, Oregon, Virginia, and Wisconsin.

**No fail-safe.** In 15 states, juveniles have no chance to petition for juvenile handling or sanctioning: Alabama, Alaska, District of Columbia, Indiana, Louisiana, Minnesota, New Jersey, New Mexico, North Carolina, North Dakota, Ohio, Rhode Island, South Carolina, Utah, and Washington.

**Need no fail-safe.** Six states need no fail-safe because cases only reach criminal court through judicial waiver: Hawaii, Kansas, Maine, Missouri, New Hampshire, and Texas.



# Some juvenile offenders are handled by federal rather than state or local authorities

### Juvenile prosecutions in the federal system are rare

There is no separate federal juvenile justice system. Juveniles who are arrested by federal law enforcement agencies may be prosecuted and sentenced in United States District Courts and even committed to the Federal Bureau of Prisons. Federal law (Title 18 U.S.C. § 5032) lays out procedures for the handling of juveniles accused of crimes against the U.S. Although it generally requires that they be turned over to state or local authorities, it does provide exceptions.

Juveniles initially come into federal law enforcement custody in a variety of ways. The federal agencies that arrest the most young people are the Border Patrol and the Immigration and Naturalization Service,* the U.S. Marshals Service, the Federal Bureau of Investigation (which has federal law enforcement responsibility on over 200 Indian reservations), and the Drug Enforcement Agency.

Arrest data from fiscal years 1994 through 2001 indicate that these and other federal agencies arrested an average of about 400 persons younger than age 18 per year, and an additional 1,600 18-year-olds, some of whom were undoubtedly juveniles younger than 18 at the time they committed their offenses. Overall, arrests of youth age 18 or younger made up less than 2% of federal arrests. Arrestees 18 or younger were 85% male and 67% white, 19% black, and 10% American Indian. About 43% were non-U.S. citizens. The most common offenses for which federal authorities arrested persons age 18 or younger during the period 1994–2001 were drug offenses (27%) and immigration violations (24%). Marijuana accounted for half of the drug arrests and illegal entry accounted for more than three-quarters of the immigration arrests. Other offenses accounted for smaller proportions of under-18 arrests: violent (13%), property (9%), and public order (10%). Weapons offenses accounted for 4 in 10 arrests for public order offenses.

**From 1994 to 2001, the proportion of federal juvenile arrests for immigration offenses rose while the proportion for violent and public order offenses dropped**

- The number of federal arrests of youth age 18 or younger increased 73% between 1994 and 2001, driven by an 89% increase in the arrest of 18-year-olds. In comparison, the number of arrests of juveniles younger than age 18 rose just 14%.
- These increases in arrests stem largely from 1996 changes in federal laws relating to immigration offenses. Immigration arrests involving youth age 18 or younger increased 145% between 1994 and 2001.
- Drug arrests outnumbered other offenses every year from 1994 through 2001, except 1998.

Source: Authors' adaptation of Sabol's Juveniles and other young persons (18 and under) in the federal criminal justice system.

### Federal prosecutors may retain certain serious cases involving a "substantial federal interest"

Following a federal arrest of a person under 21, federal law requires an investigation to determine whether the offense was a delinquent offense under state law. If so, and if the state is willing and able to deal with the juvenile, the federal prosecutor may forego prosecution and surrender the juvenile to state authorities. However, a case may instead be "certified" by the Attorney General for federal delinquency prosecution, if one of the following

---

* In the recently established U.S. Department of Homeland Security (DHS), the Immigration and Naturalization Service has become U.S. Citizenship and Immigration Services and its enforcement functions reside in DHS's Border and Transportation Security Directorate, as does the Office of Border Patrol.

exceptional conditions exists: (1) the state does not have or refuses to take jurisdiction over the case; (2) the state does not have programs or services available that are adequate to the needs of the juvenile; or (3) the juvenile is charged with a violent felony, drug trafficking, importation, or firearms offense, and the case involves a "substantial federal interest."

A case certified for federal delinquency prosecution is heard in U.S. District Court by a judge sitting in closed session without a jury. Following a finding of delinquency, the court has disposition powers similar to those of state juvenile courts. For instance, it may order the juvenile to pay restitution, serve a period of probation, or undergo "official detention" in a correctional facility. Generally, neither probation nor official detention may extend beyond the juvenile's 21st birthday or the maximum term that could be imposed on an adult convicted of an equivalent offense, whichever is shorter. But for juveniles who are between ages 18 and 21 at the time of sentencing, official detention for certain serious felonies may last up to 5 years.

### A juvenile in the federal system may also be "transferred" for criminal prosecution

When proceedings in a federal case involving a juvenile offender are transferred for criminal prosecution, they actually remain in district court but are governed by federal criminal laws rather than state laws or the Juvenile Justice and Delinquency Prevention Act. Federal law authorizes transfer at the written request of a juvenile of at least age 15 who is alleged to have committed an offense after attaining the age of 15 or upon the motion of the Attorney General in a qualifying

case where the court finds that "the interest of justice" requires it. Qualifying cases include those in which a juvenile is charged with (1) a violent felony or drug trafficking or importation offense committed after reaching age 15; (2) murder or aggravated assault committed after reaching age 13; or (3) possession of a firearm during the commission of any offense after reaching age 13. However, transfer is mandatory in any case involving a juvenile age 16 or older who was previously found guilty of a violent felony or drug trafficking offense and who is now accused of committing a drug trafficking or importation offense or any felony involving the use, attempted use, threat, or substantial risk of force.

### Most federal juvenile arrests result in a guilty plea or a conviction at trial

The U.S. Marshals Service reports data on the disposition of federal arrests. The disposition data reflect both state and federal court results.

In 2001, 73% of arrests of youth age 18 or younger resulted in a guilty plea or a conviction at trial. Another 13% resulted in the charges being dismissed, prosecution being deferred, or a verdict of not guilty.

Federal arrests of youth age 18 or younger:

| Disposition | 1994 | 2001 |
|---|---|---|
| Total | 100% | 100% |
| Guilty plea | 38 | 68 |
| Convicted at trial | 13 | 5 |
| Dismissed/not guilty | 13 | 13 |
| Other or unknown | 36 | 14 |

Arrests of youth age 18 or younger for immigration offenses were more likely to result in convictions and less likely to have charges dropped than arrests for other offenses.

### Juveniles may be committed to the Federal Bureau of Prisons as delinquents or adults

From fiscal years 1994 through 2001, almost 3,000 youth were committed to the custody of the Federal Bureau of Prisons (BOP) for offenses committed while younger than 18. Of these, 1,639 were committed to BOP as delinquents and 1,346 as adults. Among those committed as delinquents, the vast majority (about 70%) were American Indians, but American Indians made up a much smaller proportion (about 31%) of those committed as adults.

Youth age 18 or younger at offense committed to Federal Bureau of Prisons custody, 2001:

| | | Committed as | |
|---|---|---|---|
| | Total | Delinquent | Adult |
| **Gender** | 100% | 100% | 100% |
| Male | 92 | 89 | 96 |
| Female | 8 | 11 | 4 |
| **Race** | 100% | 100% | 100% |
| White | 17 | 13 | 24 |
| Black | 25 | 4 | 61 |
| Amer. Indian | 57 | 82 | 15 |
| Asian | 0 | 1 | 0 |
| **Ethnicity** | 100% | 100% | 100% |
| Hispanic | 11 | 8 | 14 |
| Non-Hispanic | 89 | 92 | 86 |
| **Citizenship** | 100% | 100% | 100% |
| U.S. citizen | 95 | 96 | 93 |
| Noncitizen | 5 | 4 | 7 |

Detail may not total 100% because of rounding.

BOP is required by federal law to place persons younger than 18 in suitable juvenile facilities, which may be operated by private agencies or units of state or local government, rather than in adult facilities.



# Sources

Bernard, T. 1992. *The Cycle of Juvenile Justice.* New York: Oxford University Press.

Bowen, L. 1920. *Fighting to Make Chicago Safe for Children.* Chicago, IL: Juvenile Protective Association. As cited in McNamee, G. (ed.). 1999. *A Noble Experiment? The First 100 Years of the Cook County Juvenile Court: 1899–1999.* Chicago, IL: The Chicago Bar Association with the Children's Court Centennial Committee.

Feld, B. 1987. The juvenile court meets the principle of the offense: Legislative changes in juvenile waiver statutes. *The Journal of Criminal Law and Criminology,* 78(3):471–533.

Feld, B. 1991. Justice by geography: urban, suburban and rural variations in juvenile administration. *The Journal of Criminal Law and Criminology,* 82(1):156–210.

Griffin, P. 2003. Trying and sentencing juveniles as adults: An analysis of state transfer and blended sentencing laws. *Special Projects Bulletin.* Pittsburgh, PA: National Center for Juvenile Justice.

Griffin, P. National overviews. *State juvenile justice profiles.* Updated August 2005. <www.ncjj.org/stateprofiles/>.

Griffin, P., and Torbet, P. (eds.). 2002. *Desktop Guide to Good Juvenile Probation Practice.* Pittsburgh, PA: National Center for Juvenile Justice.

Hurst, H., III. 1985. *Confidentiality of Juvenile Justice Records and Proceedings: A Legacy Under Siege.* Pittsburgh, PA: National Center for Juvenile Justice.

Hutzler, J. 1982. Cannon to the left, cannon to the right: Can the juvenile court survive? In *Today's Delinquent.* Pittsburgh, PA: National Center for Juvenile Justice.

Juvenile Justice and Delinquency Prevention Act of 1974, Public Law 93–415, 18 U.S.C. § 5032, as amended.

Juvenile Justice and Delinquency Prevention Act of 1974, Public Law 93–415, 42 U.S.C. § 5601, as amended.

Krisberg, B. 1992. *Juvenile Justice: Improving the Quality of Care.* San Francisco, CA: National Council on Crime and Delinquency.

Kuhn, J. 1989. *A Digest of Cases of the United States Supreme Court as to Juvenile and Family Law, 1962–July 1988.* Reno, NV: National Council of Juvenile and Family Court Judges.

Kuhn, J. 1990. *Supplement to a Digest of Cases of the United States Supreme Court as to Juvenile and Family Law, Addressing the 1988–1990 Terms.* Reno, NV: National Council of Juvenile and Family Court Judges.

Maloney, D., Romig, D., and Armstrong, T. 1988. Juvenile probation: The balanced approach. *Juvenile & Family Court Journal,* 39(3).

McNamee, G. (ed.). 1999. *A Noble Experiment? The First 100 Years of the Cook County Juvenile Court: 1899–1999.* Chicago, IL: The Chicago Bar Association with the Children's Court Centennial Committee.

Moreland, D. 1941. History and prophecy: John Augustus and his successors. In *National Probation Association Yearbook.* As cited in National Center for Juvenile Justice. 1991. *Desktop Guide to Good Juvenile Probation Practice.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

National Center for Juvenile Justice. 1991. *Desktop Guide to Good Juvenile Probation Practice.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

National Center for Juvenile Justice. 2003. *National Juvenile Court Data Archive: Juvenile court case records 2000* [machine-readable data file]. Pittsburgh, PA: NCJJ [producer].

National Council on Crime and Delinquency. 1959. *Standard Juvenile Court Act: Sixth Edition.* New York, NY: NCCD.

Puzzanchera, C., Stahl, A., Finnegan, T., Snyder, H., and Tierney, N. 2004. *Juvenile Court Statistics 2000.* Pittsburgh, PA: National Center for Juvenile Justice.

Sabol, W. 2004. Juveniles and other young persons (18 and under) in the federal criminal justice system. Unpublished paper. Pittsburgh, PA: National Center for Juvenile Justice.

Sheridan, W. 1969. *Legislative Guide for Drafting Family and Juvenile Court Acts.* Washington, DC: U.S. Children's Bureau.

Snyder, H., and Sickmund, M. 1995. *Juvenile Offenders and Victims: A National Report.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Snyder, H., and Sickmund, M. 1999. *Juvenile Offenders and Victims: 1999 National Report.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Snyder, H., Sickmund, M., and Poe-Yamagata, E. 2000. *Juvenile Transfers to Criminal Court in the 1990's: Lessons Learned from Four Studies.* Washington, DC: Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Stahl, A., Finnegan, T., and Kang, W. 2003. *Easy access to juvenile court statistics: 1985–2000* [online analysis]. Revised August 11, 2003. <www.ojjdp.ncjrs.gov/ojstatbb/ezajcs/>.

Szymanski, L. 1988. *Confidentiality of Proceedings.* Pittsburgh, PA: National Center for Juvenile Justice.

Szymanski, L. 2004. Confidentiality of juvenile delinquency hearings (2004 update). *NCJJ Snapshot.* Pittsburgh, PA: National Center for Juvenile Justice.

Szymanski, L. 2004. Law enforcement, court notice to school of student's delinquent act (2004 update). *NCJJ Snapshot.* Pittsburgh, PA: National Center for Juvenile Justice.

Szymanski, L. 2004. Releasing names of juvenile offenders to the media/public (2004 update). *NCJJ Snapshot.* Pittsburgh, PA: National Center for Juvenile Justice.

Szymanski, L. 2004. Fingerprinting/photographing of juvenile offenders. Unpublished manuscript. Pittsburgh, PA: National Center for Juvenile Justice.

Szymanski, L. 2005. Confidentiality of juvenile delinquency hearings (2005 update). Unpublished analysis. Pittsburgh, PA: National Center for Juvenile Justice.

Szymanski, L. 2005. Fingerprinting/photographing of juvenile offenders (2005 update). Unpublished analysis. Pittsburgh, PA: National Center for Juvenile Justice.

Szymanski, L. 2005. Law enforcement, court notice to school of student's delinquent act (2005 update). Unpublished analysis. Pittsburgh, PA: National Center for Juvenile Justice.

Szymanski, L. 2005. Releasing names of juvenile offenders to the media/public (2005 update). Unpublished analysis. Pittsburgh, PA: National Center for Juvenile Justice.

Tanenhaus, D. 2000. The evolution of transfer out of the juvenile court. In *The Changing Borders of Juvenile Justice.* Chicago, IL: University of Chicago Press.

Tanenhaus, D. 2004. *Juvenile Justice in the Making.* Oxford, NY: Oxford University Press.

Torbet, P., and Thomas, D. 1997. Balanced and restorative justice: Implementing the philosophy. *Pennsylvania Progress,* 4(3).



# Juvenile Offenders and Victims: 2006 National Report

**Chapter 5: Law enforcement and juvenile crime** ............. **121**

Introduction to juvenile arrest data ............................ 122
Gender, age, and racial variations in juvenile arrests .............. 125
Juvenile proportion of arrests ............................... 126
Juvenile arrest 10-year trends ................................ 127
Female juvenile arrest trends ................................ 128
Young juvenile arrest trends .................................. 130
Violent Crime Index arrest trends ........................... 132
Murder arrest trends ........................................ 133
Forcible rape arrest trends .................................. 134
Robbery arrest trends ....................................... 135
Aggravated assault arrest trends ............................ 136
Property Crime Index arrest trends ........................... 137
Burglary arrest trends ...................................... 138
Larceny-theft arrest trends .................................. 139
Motor vehicle theft arrest trends ............................ 140
Arson arrest trends ......................................... 141
Simple assault arrest trends ................................. 142
Weapons law violation arrest trends .......................... 143
Drug abuse violation arrest trends ........................... 144
Juvenile crime vs. adult crime ............................... 145
Clearance statistics ........................................ 146
Violent crime arrest rates by state ........................... 148
Violent crime arrest rates by county .......................... 149
Property crime arrest rates by state .......................... 150
Property crime arrest rates by county ......................... 151
Police disposition of juvenile arrests ......................... 152
Chapter 5 sources ......................................... 153

Copyright 2006
National Center for Juvenile Justice
3700 S. Water Street, Suite 200
Pittsburgh, PA 15203-2363

Suggested citation: Snyder, Howard N., and Sickmund, Melissa. 2006. *Juvenile Offenders and Victims: 2006 National Report.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.



# Chapter 5

## Law enforcement and juvenile crime

For most delinquents, law enforcement is the doorway to the juvenile justice system. Once a juvenile is apprehended for a law violation, it is the police officer who first determines if the juvenile will move deeper into the justice system or will be diverted.

Law enforcement agencies track the volume and characteristics of crimes reported to them and use this information to monitor the changing levels of crime in their communities. Not all crimes are reported to law enforcement, and most of those that are reported remain unsolved. Law enforcement's new incident-based reporting systems include victim reports of offender characteristics in crimes in which the victim sees the offender; for these crimes, even when there is no arrest, law enforcement records can be used to develop an understanding of juvenile offending. For all other types of crimes, an understanding of juvenile involvement comes through the study of arrest statistics. Arrest statistics can monitor the flow of juveniles and adults into the justice system and are the most frequently cited source of information on juvenile crime trends.

This chapter describes the volume and characteristics of juvenile crime from law enforcement's perspective. It presents information on the number and offense characteristics of juvenile arrests in 2003 and historical trends in juvenile arrests. This chapter also examines arrests and arrest trends for female juvenile offenders and offenders under age 13 and compares arrest trends for males and females and different racial groups. It includes arrest rate trends for many specific offenses, including murder and other violent crimes, property crimes, and drug and weapons offenses. The majority of data presented in this chapter were originally compiled by the Federal Bureau of Investigation as part of its Uniform Crime Reporting Program, which includes the Supplementary Homicide Reports and the National Incident-Based Reporting System.



# The FBI's Uniform Crime Reporting Program monitors law enforcement's response to juvenile crime

### Since the 1930s, police agencies have reported to the Uniform Crime Reporting Program

Each year, thousands of police agencies voluntarily report the following data to the Federal Bureau of Investigation's (FBI's) Uniform Crime Reporting (UCR) Program:

- Number of Index crimes reported to law enforcement (see sidebar).
- Number of arrests and the most serious charge involved in each arrest.
- Age, gender, and race of arrestees.
- Proportion of reported Index crimes cleared by arrest and the proportion of these Index crimes cleared by the arrest of persons under age 18.
- Police dispositions of juvenile arrests.
- Detailed victim, assailant, and circumstance information in murder cases.

### What can the UCR arrest data tell us about crime and young people?

The UCR arrest data can provide estimates of the annual number of arrests of juveniles* within specific offense categories. UCR data can also provide detail on juvenile arrests by gender, race, and type of location (urban, suburban, or rural area). The data can be used to compare the relative number of arrests of adults and juveniles within offense categories, to develop estimates of change in arrests over various time periods, and to monitor the proportion of crimes cleared by arrests of juveniles.

### What do UCR data count?

UCR data document the number of crimes reported to police, not the number committed. The UCR Program monitors the number of Index crimes that come to the attention of law enforcement agencies. Although this information is useful in identifying trends in the volume of reported crime, it is important to recognize that not all crimes are brought to the attention of law enforcement.

Crimes are more likely to be reported if they involve a serious injury or a large economic loss and if the victim wants law enforcement involved in the matter. Therefore, some crimes are more likely to come to the attention of law enforcement than are others. For example, the National Crime Victimization Survey for 2003 found that victims reported 77% of motor vehicle thefts to police, 61% of robberies, 59% of aggravated assaults, 54% of burglaries, 42% of simple assaults, 39% of sexual assaults, and 32% of thefts. Overall, victims reported to law enforcement 48% of violent crimes and 38% of property crimes.

Changes in the proportion of crimes reported may, therefore, reflect more than changes in the number of crimes actually committed. They may also reflect changes in the willingness of victims to report crimes to law enforcement agencies.

Another important aspect of UCR data is that they document the number of arrests made, not the number of persons arrested. A person can

---

* In this chapter, "juvenile" refers to persons under age 18. This definition is different from the legal definition of juveniles in 2003 in 13 states—10 states where all 17-year-olds are defined as adults and 3 states where all 16- and 17-year-olds are defined as adults.

---

### What are the Crime Indexes?

The designers of the UCR Program wanted to create indexes (similar in concept to the Dow Jones Industrial Average and the Consumer Price Index) that would be sensitive to changes in the volume and nature of reported crime. They decided to incorporate specific offenses into these indexes based on several factors: likelihood of being reported, frequency of occurrence, pervasiveness in all geographical areas of the country, and relative seriousness.

**Violent Crime Index**—Includes murder and nonnegligent manslaughter, forcible rape, robbery, and aggravated assault.

**Property Crime Index**—Includes burglary, larceny-theft, motor vehicle theft, and arson.

**Crime Index**—Includes all eight crimes in the Violent Crime Index and Property Crime Index.

A substantial proportion of the crimes in the Property Crime Index are generally considered less serious crimes, such as shoplifting, theft from motor vehicles, and bicycle theft, all of which are included in the larceny-theft category. The Violent Crime Index contains what are generally considered to be serious crimes, although some violent crimes, such as kidnapping and extortion, are excluded. However, significant changes in a community's violent crime problem (e.g., a doubling in the number of murders) may not be reflected in the Violent Crime Index because these murder counts could be overwhelmed by small declines in the higher volume violent crimes of robbery and aggravated assault. For this and other reasons, the FBI is considering revisions to the current indexes.

be arrested more than once in a year. Each arrest is counted separately in the UCR data. One arrest can represent many crimes. If a person were arrested for allegedly committing 40 burglaries, it would show up in the UCR data as one arrest for burglary. Also, one crime may result in multiple arrests. For example, three youth may be arrested for one burglary. A single crime with multiple arrests is more likely to occur with juveniles than with adult offenders because juveniles are more likely than adults to commit crimes in groups.

UCR arrest data reflect only the most serious offense for which a person was arrested. An arrest of a person for both aggravated assault and weapons possession would appear in the UCR data as one aggravated assault arrest. The UCR data on number of weapons arrests, therefore, reflect only those arrests in which a weapons charge was the most serious offense charged. This aspect of UCR counting rules must be taken into consideration when the data are used in analysis of arrest volume and trends for less serious offenses.

Clearance data provide another perspective on law enforcement. A crime is considered cleared if someone is charged with the crime or if someone is believed to have committed the crime but for some reason (e.g., the death of the suspect, unwillingness of the victim to prosecute) an arrest cannot be made. If a person is arrested and charged with committing 40 burglaries, UCR records 40 burglary clearances. If three people are arrested for robbing a liquor store, UCR records one robbery cleared.

Dividing the number of crimes cleared by the number of crimes reported in a year gives an estimate of the proportion of crimes cleared in a year. Historically, a greater proportion of violent crimes than property crimes are cleared.

| Most serious offense | Proportion of crimes cleared in 2003 |
|---|---|
| Violent Crime Index | 47% |
| Murder | 62 |
| Forcible rape | 44 |
| Robbery | 26 |
| Aggravated assault | 56 |
| Property Crime Index | 16 |
| Burglary | 13 |
| Larceny-theft | 18 |
| Motor vehicle theft | 13 |
| Arson | 17 |

UCR data also document the proportion of cleared crimes that were cleared by the arrest of persons under age 18. Assessments of the juvenile contribution to the crime problem are often based on this proportion. It is important to note that clearance and arrest statistics generally give very different pictures of the juvenile contribution to crime.

| | 2003 juvenile proportion | |
|---|---|---|
| Most serious offense | Arrests | Crimes cleared |
| Violent Crime Index | 15% | 12% |
| Murder | 9 | 5 |
| Forcible rape | 16 | 11 |
| Robbery | 24 | 14 |
| Aggravated assault | 14 | 12 |
| Property Crime Index | 29 | 19 |
| Burglary | 29 | 17 |
| Larceny-theft | 28 | 20 |
| Motor vehicle theft | 29 | 17 |
| Arson | 51 | 41 |

## How should juvenile arrest and clearance data be interpreted?

Considerations in interpreting UCR data on juvenile arrests and clearances can be demonstrated by attempting to answer a typical question about juvenile crime: "In 2003, what proportion of all robberies were committed by juveniles?" The UCR data show that 24% of all arrests for robbery in 2003 were of persons under age 18 and that 14% of all robberies cleared in 2003 were cleared by the arrest of persons under age 18.

The key to reconciling the difference between the two percentages is the fact, noted previously, that juveniles are more likely than adults to commit crimes in groups. If a police department cleared all seven of its robberies in a year by arresting two juveniles for one incident and six different adults for the other six incidents, the juvenile proportion of arrests for robbery would be 25% (2 in 8), and the juvenile proportion of robberies cleared would be 14% (1 in 7). Arrest percentages are offender based; clearance percentages are incident based.

Clearance data are a better choice than arrest data for determining the juvenile proportion of all robberies committed. There are, however, questions about what clearance figures actually represent.

One question stems from the fact that a crime cleared by the arrest of a juvenile and the arrest of an adult is classified by the FBI as an adult clearance. Therefore, some cleared crimes involving juvenile offenders are not counted in the proportion of crimes cleared by juvenile arrest, which makes the juvenile clearance proportion an underestimate of juvenile involvement in cleared crimes.

Another question is whether it is safe to assume that characteristics of robberies cleared are similar to characteristics of robberies not cleared (i.e., whether the 26% of robberies cleared in 2003 were like the 74% not cleared).

A study by Snyder of more than 21,000 robberies in 7 states between 1991 and 1993 found that robberies by juveniles were more likely to result in arrest than were robberies by adults. The FBI's National Incident-Based Reporting System (NIBRS) data from these states gave the victim's perception of the age of the offender and indicated whether the offender was arrested. This study found that robberies by juveniles were 23% more likely to result in arrest than were robberies by adults. Therefore, the juvenile proportion of cleared robberies was substantially greater than the proportion of robberies actually committed by juveniles. Based on this finding, it appears that UCR clearance percentages overestimate the juvenile responsibility for crime because juvenile offenders are more likely to be arrested.

Arrest data and clearance data can be used to explore different types of questions. Arrest data provide a rough estimate of how many juveniles entered the justice system in a given year, but it must be remembered that a particular individual may have been arrested more than once during the year (and therefore counted more than once) and that a particular arrest may have involved more than one offense (with only the most serious charge counted). Clearance data are more useful than arrest data in estimating the proportion of crimes committed by juveniles, but evidence that juveniles are more likely than adults to be arrested for their crimes indicates that clearance percentages also exaggerate juveniles' actual share of crime. However, the most important thing to remember in using arrest and clearance data to analyze juvenile crime trends is that changes in arrest data are likely to reflect actual changes in the number of juveniles entering the juvenile justice system, whereas changes in clearance proportions can be used to monitor changes in the relative responsibility of juveniles for crime.

### What is the accuracy of the UCR-based juvenile arrest and clearance trends?

Annually, the FBI generates national estimates of reported crimes for the 8 Index offenses and national estimates of total arrests in 29 offense categories. It does not currently produce national estimates of juvenile arrests, but recently it has revived production of juvenile arrest rates for selected offenses. These estimates are all based on data reported to the FBI by contributing law enforcement agencies in a given year. Statisticians characterize these annual samples as "opportunistic" samples—i.e., each sample contains data from every agency that was willing and able to report to the FBI in that year. The essential problem is that the sample is not scientifically determined; therefore, no one can assume that the sample's characteristics (e.g., juvenile arrest proportions, juvenile arrest rates) are representative of all law enforcement agencies in the U.S.

For example, assume that one sample contained a disproportionate number of agencies from large metropolitan areas or cities. In that case, the arrest tables in the FBI's UCR-based report *Crime in the United States* would present a picture of juvenile arrests with a more urban character compared with the U.S. as a whole. The data from the reporting sample would have a higher percentage of violent crime arrests, a higher percentage of juvenile arrests, higher rates of juvenile arrests for violent crimes, and higher proportions and rates of arrest of black juveniles across offense categories.

The quality of the juvenile arrest rate trends derived from the sample data reported in *Crime in the United States* is dependent on the consistent representativeness of the annual reporting samples, and the FBI does not currently assess this representativeness. What is known is that the coverage of the sample has changed substantially in recent years. For 2003, law enforcement agencies with jurisdiction over 70% of the U.S. population contributed data on arrests; between 1980 and 2003, this proportion ranged from 63% to 86%.

The traditional approach to the development of national estimates of juvenile arrests (and clearances) is based on the assumption that the reporting samples in the *Crime in the United States* series are nationally representative. The more this assumption is violated, the less reliable are the estimates. It is possible to adjust for some of the known, or measurable, biases in the samples, but this work has not been done. Even if such adjustments were made, the validity of the estimates would still be in question because of the inherent weaknesses of an opportunistic sample.

From a pragmatic standpoint, those who wish to study arrest and clearance trends should turn to the FBI's UCR Program and its *Crime in the United States* reports. This resource is the best information available, even though it has weaknesses. Users, however, should always be aware of the potential biases in the data and the potential effects of these biases.



# In 2003, law enforcement agencies reported 2.2 million arrests of persons under age 18

**The most serious charge in almost half of all juvenile arrests in 2003 was larceny-theft, simple assault, a drug abuse violation, disorderly conduct, or a liquor law violation**

| | | Percent of total juvenile arrests | | | | | |
|---|---|---|---|---|---|---|---|
| Most serious offense | 2003 juvenile arrest estimates | Female | Ages 16–17 | White | Black | American Indian | Asian |
| Total | 2,220,300 | 29% | 68% | 71% | 27% | 1% | 2% |
| Violent Crime Index | 92,300 | 18 | 67 | 53 | 45 | 1 | 1 |
| Murder and nonnegligent manslaughter | 1,130 | 9 | 89 | 49 | 48 | 1 | 2 |
| Forcible rape | 4,240 | 2 | 63 | 64 | 33 | 2 | 1 |
| Robbery | 25,440 | 9 | 75 | 35 | 63 | 0 | 2 |
| Aggravated assault | 61,490 | 24 | 64 | 59 | 38 | 1 | 1 |
| Property Crime Index | 463,300 | 32 | 63 | 69 | 28 | 1 | 2 |
| Burglary | 85,100 | 12 | 65 | 71 | 26 | 1 | 1 |
| Larceny-theft | 325,600 | 39 | 62 | 70 | 27 | 1 | 2 |
| Motor vehicle theft | 44,500 | 17 | 75 | 56 | 40 | 1 | 2 |
| Arson | 8,200 | 12 | 39 | 81 | 17 | 1 | 1 |
| Other (simple) assault | 241,900 | 32 | 57 | 61 | 36 | 1 | 1 |
| Forgery and counterfeiting | 4,700 | 35 | 87 | 77 | 20 | 1 | 2 |
| Fraud | 8,100 | 33 | 82 | 66 | 32 | 1 | 1 |
| Embezzlement | 1,200 | 40 | 94 | 68 | 30 | 0 | 2 |
| Stolen property (buying, receiving, possessing) | 24,300 | 15 | 73 | 57 | 41 | 1 | 1 |
| Vandalism | 107,700 | 14 | 56 | 80 | 18 | 1 | 1 |
| Weapons (carrying, possessing, etc.) | 39,200 | 11 | 64 | 66 | 32 | 1 | 2 |
| Prostitution and commercialized vice | 1,400 | 69 | 86 | 51 | 47 | 0 | 1 |
| Sex offense (except forcible rape and prostitution) | 18,300 | 9 | 49 | 71 | 26 | 1 | 1 |
| Drug abuse violation | 197,100 | 16 | 83 | 72 | 26 | 1 | 1 |
| Gambling | 1,700 | 2 | 85 | 12 | 86 | 0 | 2 |
| Offenses against family and children | 7,000 | 39 | 65 | 77 | 20 | 2 | 2 |
| Driving under the influence | 21,000 | 20 | 98 | 94 | 4 | 2 | 1 |
| Liquor laws | 136,900 | 35 | 90 | 92 | 4 | 3 | 1 |
| Drunkenness | 17,600 | 23 | 87 | 89 | 8 | 2 | 1 |
| Disorderly conduct | 193,000 | 31 | 59 | 64 | 34 | 1 | 1 |
| Vagrancy | 2,300 | 25 | 75 | 62 | 37 | 1 | 1 |
| All other offenses (except traffic) | 379,800 | 27 | 72 | 74 | 23 | 1 | 2 |
| Suspicion | 1,500 | 24 | 74 | 66 | 33 | 1 | 0 |
| Curfew and loitering law violation | 136,500 | 30 | 71 | 68 | 30 | 1 | 1 |
| Runaway | 123,600 | 59 | 64 | 73 | 20 | 2 | 5 |
| U.S. population ages 10–17 | 33,499,000 | 49 | 24 | 78 | 16 | 1 | 4 |

- Females accounted for the majority of arrests for running away from home (59%) and prostitution and commercialized vice (69%).
- Black youth, who accounted for 16% of the juvenile population in 2003, were involved in a disproportionate number of juvenile arrests for robbery (63%), murder (48%), motor vehicle theft (40%), and aggravated assault (38%).

Notes: UCR data do not distinguish the ethnic group Hispanic; Hispanics may be of any race. In 2003, 92% of Hispanics ages 10–17 were classified racially as white. National estimates of juvenile arrests were developed using FBI estimates of total arrests and juvenile arrest proportions in the reporting sample. Detail may not add to totals because of rounding.

Source: Authors' analyses of the FBI's *Crime in the United States 2003*.



# In 2003, 15% of male arrests and 20% of female arrests involved a person younger than age 18

**Based on arrest proportions, the juvenile involvement in crime varies substantially by the type of offense**

| | Juvenile arrests as a percent of total arrests | | | | | | |
|---|---|---|---|---|---|---|---|
| Most serious offense | All | Male | Female | White | Black | American Indian | Asian |
| Total | 16% | 15% | 20% | 16% | 16% | 16% | 22% |
| Violent Crime Index | 15 | 15 | 16 | 13 | 19 | 14 | 18 |
| Murder and nonnegligent manslaughter | 9 | 9 | 8 | 9 | 9 | 10 | 12 |
| Forcible rape | 16 | 16 | 24 | 16 | 16 | 20 | 12 |
| Robbery | 24 | 24 | 20 | 19 | 27 | 19 | 32 |
| Aggravated assault | 14 | 13 | 16 | 13 | 16 | 13 | 15 |
| Property Crime Index | 29 | 28 | 30 | 29 | 27 | 35 | 37 |
| Burglary | 29 | 30 | 25 | 30 | 28 | 36 | 37 |
| Larceny-theft | 28 | 27 | 30 | 29 | 26 | 34 | 38 |
| Motor vehicle theft | 29 | 29 | 30 | 27 | 33 | 40 | 34 |
| Arson | 51 | 53 | 40 | 53 | 41 | 52 | 58 |
| Other (simple) assault | 19 | 17 | 26 | 18 | 22 | 16 | 21 |
| Forgery and counterfeiting | 4 | 5 | 4 | 5 | 3 | 6 | 5 |
| Fraud | 3 | 3 | 2 | 3 | 3 | 3 | 6 |
| Embezzlement | 7 | 8 | 6 | 7 | 7 | 5 | 9 |
| Stolen property (buying, receiving, possessing) | 19 | 20 | 16 | 18 | 21 | 25 | 25 |
| Vandalism | 39 | 41 | 33 | 41 | 33 | 35 | 38 |
| Weapons (carrying, possessing, etc.) | 23 | 23 | 32 | 25 | 20 | 22 | 34 |
| Prostitution and commercialized vice | 2 | 2 | 2 | 2 | 2 | 2 | 1 |
| Sex offense (except forcible rape and prostitution) | 20 | 20 | 22 | 19 | 22 | 13 | 20 |
| Drug abuse violation | 12 | 12 | 11 | 13 | 9 | 16 | 15 |
| Gambling | 16 | 17 | 3 | 7 | 19 | 20 | 8 |
| Offenses against family and children | 5 | 4 | 9 | 6 | 3 | 7 | 7 |
| Driving under the influence | 1 | 1 | 2 | 2 | 1 | 2 | 1 |
| Liquor laws | 22 | 20 | 30 | 24 | 11 | 23 | 25 |
| Drunkenness | 3 | 3 | 5 | 3 | 2 | 3 | 5 |
| Disorderly conduct | 30 | 28 | 37 | 29 | 34 | 22 | 37 |
| Vagrancy | 8 | 8 | 9 | 9 | 7 | 2 | 6 |
| All other offenses (except traffic) | 10 | 10 | 13 | 12 | 8 | 9 | 13 |

- In 2003, a juvenile was the alleged offender in 51% of arson, 39% of vandalism, 29% of motor vehicle theft and burglary, 23% of weapons law violation, 12% of drug abuse violation, and 9% of murder arrests.
- Juveniles were involved in a greater proportion of female arrests than male arrests for liquor law violations (30% vs. 20%), simple assault (26% vs. 17%), weapons law violations (32% vs. 23%), and disorderly conduct (37% vs. 28%).
- Overall, in 2003, 16% of white arrests and 16% of black arrests involved a person younger than age 18. However, for some offenses, juveniles were involved in a greater proportion of black arrests than white arrests (e.g., robbery and motor vehicle theft). For other offenses, juvenile involvement was greater in white arrests than black arrests (e.g., liquor law violations, arson, and vandalism).

Source: Authors' adaptation of the FBI's *Crime in the United States 2003.*



# Between 1994 and 2003, juvenile arrests for violent crime fell proportionately more than adult arrests

**Over the 10-year period from 1994 to 2003, the percent decline in the number of arrests was greater for juveniles than for adults for each offense within the Violent Crime Index**

| | Percent change in arrests, 1994–2003 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | All persons | | | Juveniles | | | Adults | | |
| Most serious offense | All | Male | Female | All | Male | Female | All | Male | Female |
| Total | –3% | –7% | 12% | –18% | –22% | –3% | 1% | –3% | 17% |
| Violent Crime Index | –16 | –20 | 10 | –32 | –36 | –10 | –12 | –16 | 14 |
| Murder and nonnegligent manslaughter | –36 | –37 | –30 | –68 | –69 | –49 | –30 | –30 | –28 |
| Forcible rape | –22 | –23 | –1 | –25 | –25 | –30 | –22 | –22 | 12 |
| Robbery | –25 | –26 | –12 | –43 | –44 | –38 | –17 | –18 | –2 |
| Aggravated assault | –12 | –17 | 14 | –26 | –31 | –2 | –10 | –15 | 17 |
| Property Crime Index | –23 | –27 | –12 | –38 | –44 | –21 | –15 | –18 | –8 |
| Burglary | –23 | –26 | –3 | –40 | –41 | –27 | –14 | –17 | 9 |
| Larceny–theft | –23 | –27 | –14 | –35 | –43 | –19 | –16 | –19 | –11 |
| Motor vehicle theft | –26 | –30 | –5 | –52 | –54 | –44 | –6 | –12 | 34 |
| Arson | –29 | –29 | –24 | –36 | –36 | –38 | –18 | –19 | –10 |
| Other (simple) assault | 3 | –4 | 32 | 10 | 1 | 36 | 1 | –5 | 31 |
| Forgery and counterfeiting | 1 | –4 | 10 | –47 | –46 | –47 | 6 | 0 | 16 |
| Fraud | –17 | –21 | –12 | –29 | –29 | –27 | –16 | –20 | –11 |
| Embezzlement | 19 | 2 | 42 | 15 | 8 | 28 | 19 | 2 | 43 |
| Stolen property (buying, receiving, possessing) | –21 | –25 | 6 | –46 | –48 | –29 | –11 | –16 | 18 |
| Vandalism | –18 | –21 | 5 | –33 | –36 | –11 | –3 | –7 | 16 |
| Weapons (carrying, possessing, etc.) | –36 | –36 | –34 | –41 | –42 | –22 | –35 | –34 | –38 |
| Prostitution and commercialized vice | –18 | –22 | –15 | 31 | –24 | 86 | –18 | –22 | –16 |
| Sex offenses (except forcible rape and prostitution) | –10 | –10 | –3 | 2 | 0 | 26 | –12 | –13 | –9 |
| Drug abuse violation | 22 | 20 | 35 | 19 | 13 | 56 | 23 | 21 | 33 |
| Gambling | –49 | –51 | –37 | –59 | –58 | –70 | –48 | –50 | –35 |
| Offenses against family and children | 11 | 4 | 41 | 19 | 12 | 31 | 10 | 4 | 42 |
| Driving under the influence | –6 | –10 | 21 | 33 | 25 | 83 | –6 | –11 | 20 |
| Liquor laws | 16 | 8 | 45 | 4 | –5 | 26 | 20 | 12 | 56 |
| Drunkenness | –26 | –28 | –9 | –11 | –18 | 24 | –26 | –28 | –10 |
| Disorderly conduct | –11 | –16 | 4 | 13 | 2 | 46 | –19 | –21 | –11 |
| Vagrancy | 16 | 17 | 10 | –50 | –53 | –37 | 32 | 36 | 20 |
| All other offenses (except traffic) | 17 | 12 | 38 | –2 | –8 | 17 | 19 | 14 | 42 |
| Curfew and loitering law violation | –1 | –3 | 5 | –1 | –3 | 5 | NA | NA | NA |
| Runaway | –42 | –44 | –40 | –42 | –44 | –40 | NA | NA | NA |

- Between 1994 and 2003, female juvenile arrests either increased more or decreased less than male juvenile arrests in many offense categories (e.g., driving under the influence, drug abuse violations, simple assault, liquor law violations, and aggravated assault). As a result, while male juvenile arrests declined 22% over the period, female juvenile arrests declined just 3%.

- Between 1994 and 2003, while both juvenile and adult male arrests for simple assault changed little (1% and –5%, respectively), arrests for both juvenile and adult females increased substantially (36% and 31%, respectively). This implies that the increase in juvenile female arrests for simple assault over the period was a trend for females in general, not for juvenile females specifically.

Source: Authors' adaptation of the FBI's *Crime in the United States 2003.*

# The female proportion of youth entering the juvenile justice system for law violations has increased

### Gender-specific factors influence juvenile arrest trends

If juvenile males and females were contributing equally to an arrest trend, then the female proportion of juvenile arrests would remain constant. If, however, the female proportion changes, that means that the female arrest trend differs from the male trend—and any explanation of juvenile arrest trends must incorporate factors that affect males and females differently.

A major story in the last few years has been the rise in the proportion of females entering the juvenile justice system. In 1980, 20% of all juvenile arrests were female arrests; in 2003, this percentage had increased to 29%—with the majority of this growth since the early 1990s. The female proportion increased between 1980 and 2003 in juvenile arrests for Violent Crime Index offenses (from 10% to 18%) and for Property Crime Index offenses (from 19% to 32%); however, the female proportion of drug abuse violations arrests was the same in 1980 and 2003 (16%). This implies there were (1) different factors influencing the volume and/or nature of law-violating behaviors by male and female juveniles over this time period and/or (2) differential responses by law enforcement to these behaviors.

**Between 1980 and 2003, the female percentage of juvenile violent crime arrests increased, with the overall increase tied mainly to aggravated assault arrests**

**The female percentage of juvenile arrests increased between 1980 and 2003 for each of the four Property Crime Index offenses**

Source: Authors' analyses of the FBI's *Crime in the United States* reports for the years 1980 through 2003.

### A closer look at violence trends points to possible explanations

If juvenile females had simply become more violent, the female proportion of juvenile arrests would be expected to have increased for each violent crime. This did not occur. For example, the female proportion of juvenile arrests remained relatively constant between 1980 and 2003 for robbery (7% to 9%). The change that caused the Violent Crime Index proportion to increase between 1980 and 2003 was the increase in the female proportion of juvenile arrests for aggravated assault (from 15% to 24%). Similarly, a large increase was seen in the female proportion of juvenile arrests for simple assault (from 21% to 32%). To understand the relative increase in female arrests for violence, it is necessary to look for factors related primarily to assault.

One possible explanation for this pattern could be the changing response of law enforcement to domestic violence incidents. Domestic assaults represent a larger proportion of female violence than male violence. For example, analysis of the 2001 NIBRS data finds that 18% of aggravated assaults known to law enforcement committed by juvenile males were against family members or intimate partners, compared with 33% of aggravated assaults committed by juvenile females. Mandatory arrest laws for domestic violence, coupled with an increased willingness to report these crimes to authorities, would yield a greater increase in female than male arrests for assault, while having no effect on the other violent crimes. Thus, policy and social changes may be a stimulus for the increased proportion of juvenile female arrests.

## The female proportion of arrests increased for many offenses

When the female proportion of juvenile arrests remains constant over time, factors controlling this arrest trend are unrelated to gender. This pattern is seen in juvenile robbery and arson arrests from 1980 through 2003. Over this period, the female arrest proportions for some other offenses (e.g., murder, prostitution, and drug abuse violations) first declined and then increased back to earlier levels. However, for most other offenses (e.g., aggravated assault, simple assault, burglary, larceny-theft, motor vehicle theft, vandalism, weapons, liquor, and curfew/loitering law violations), the female proportions of juvenile arrests increased substantially over the 1980–2003 period.

**Between 1980 and 2003, the female proportion of juvenile arrests increased for simple assault, vandalism, weapons, liquor law violations, and curfew and loitering law violations**

- Between 1980 and 2003, the large decline and subsequent growth in the female proportion of juvenile arrests for drug abuse violations reflected a decline in the female arrest rate for drug abuse violations during the 1980s and early 1990s while the male rate generally held constant, followed by a proportionately greater increase in the female rate after the early 1990s.

Source: Authors' analyses of the FBI's *Crime in the United States* reports for the years 1980 through 2003.

# Violent and drug arrest rates for young juveniles rose from 1980 to 2003 as their overall arrest rate fell

### Arrest rates for very young juveniles declined for some offenses, increased for others

A common perception in the last few years was that the rate and proportion of young juveniles (under age 13) entering the juvenile justice system had increased. This statement is not true. In 1980, there were an estimated 1,476 arrests of persons ages 10–12 for every 100,000 persons in this age group in the U.S. population. By 2003, this arrest rate had fallen to 1,296, a decline of 12%. In 1980, 9.5% of all juvenile arrests were arrests of persons under age 13; in 2003, this percentage had decreased to 8.5%—with the majority of the decrease occurring during the mid-1990s.

However, while the overall arrest rate for young juveniles declined, arrests for some offenses increased dramatically, and the types of young juvenile offenders entering the juvenile justice system changed. For example, the Property Crime Index arrest rate for juveniles ages 10–12 fell 51% between 1980 and 2003. Over the same period, the Violent Crime Index arrest rate increased 27%. As a result, while the overall rate of young juvenile arrests fell, a larger proportion of those arrested were arrested for a violent crime. Over the period 1980–2003, the arrest rate for juveniles ages 10–12 fell for burglary (68%), larceny-theft (47%), vandalism (37%), and running away from home (45%). Over the same period, the arrest rate for young juveniles increased for aggravated assault (91%), simple assault (197%), weapons law violations (138%), sex offenses (121%), drug abuse violations (105%), disorderly conduct (116%), and curfew and loitering law violations (126%). As a result, even though the overall arrest rate declined, more young juveniles entered the juvenile justice system charged with violent and drug offenses in 2003 than in 1980. This implies there were (1) different factors influencing the volume and/or nature of law-violating behavior by young juveniles over this time period and/or (2) differential responses by law enforcement to these behaviors.

**While the overall proportion of juvenile arrests involving youth younger than age 13 declined from 1980 to 2003, their proportion of juvenile Violent Crime Index arrests grew from 6% to 9%**

**The proportion of juvenile Property Crime Index arrests involving youth younger than age 13 declined from 16% in the late 1980s to 11% in 2003**

Source: Authors' analyses of the FBI's *Crime in the United States* reports for the years 1980 through 2003.

### Arrest rates of young females outpace those of young males

The 12% decline in the total arrest rate for youth ages 10–12 between 1980 and 2003 was a combination of a 20% decline in the young male arrest rate and a 22% increase in the young female arrest rate. For most

offenses, the arrest rate for young females either increased more or decreased less from 1980 to 2003 than the arrest rate for young males. As a result, a greater number and proportion of the young juvenile arrestees in 2003 were female than in 1980, and these females had very different offending patterns compared with 1980.

Percent change in young juvenile (ages 10–12) arrest rate,1980–2003:

| Offense | Male | Female |
|---|---|---|
| All offenses | –20% | 22% |
| Violent Crime Index | 14 | 135 |
| Aggravated assault | 75 | 186 |
| Property Crime Index | –57 | –28 |
| Burglary | –69 | –49 |
| Larceny-theft | –54 | –26 |
| Simple assault | 174 | 284 |
| Stolen property | –51 | 21 |
| Vandalism | –42 | 26 |
| Weapons violation | 119 | 522 |
| Sex offense | 116 | 186 |
| Drug abuse violation | 95 | 143 |
| Disorderly conduct | 89 | 244 |
| Curfew | 101 | 228 |
| Runaway | –51 | –36 |

### Analysis of race-specific arrest rate trends for very young juveniles is not possible

The FBI's UCR Program captures information on the gender of arrestees subdivided into a large set of detailed age groups (e.g., under 10, 10–12, 13–14, 15, 16, and 17). It also captures information on the race of arrestees, but the only age breakdown associated with these counts is "under 18" and "18 and above." Therefore, age-specific arrest trends for racial groups, including trends for young juveniles, cannot be analyzed with UCR data.

**Between 1980 and 2003, the proportion of juvenile arrests involving youth younger than age 13 increased for weapons, sex, and drug offenses and disorderly conduct**

- In 1980, a greater proportion of juvenile simple assault arrests than aggravated assault arrests involved youth under age 13 (12% vs. 8%); this difference narrowed between 1980 and 2003 (to 13% vs. 11%) because the proportion of juvenile arrests involving youth under age 13 increased more for aggravated assault than for simple assault.

Source: Authors' analyses of the FBI's *Crime in the United States* reports for the years 1980 through 2003.

# In 2003, the juvenile violent crime arrest rate was lower than it was before its increase in the late 1980s

### The juvenile violent crime arrest rate is at its lowest level in a generation

Between 1980 and 1988, the juvenile Violent Crime Index arrest rate was essentially constant. The rate began to increase in 1989; by 1994, it was 61% above its 1988 level. This unsettling trend triggered speculation that the nature of juvenile offenders had changed and spurred state legislators to pass laws that made sanctioning youth in the adult justice system easier. After 1994, however, the juvenile Violent Crime Index arrest rate fell consistently for the next 9 years; by 2003, it had fallen below the levels of the early 1980s.

### The female violent crime arrest rate remains relatively high

In 1980, the male juvenile Violent Crime Index arrest rate was 8.3 times the female rate. With only a few exceptions, this gender disparity declined annually between 1980 and 2003, so that by 2003, the male rate was just 4.2 times the female rate. In the growth period between 1988 and 1994, the female rate increased more than the male rate (98% vs. 56%). The decline in the juvenile violent crime arrest rate between 1994 and 2003 was driven primarily by the male arrest rate, which fell more than the female rate (51% vs. 32%). The convergence in the male and female rates between 1980 and 2003 reflects an overall 26% decline in the male rate coupled with a 47% increase in the female rate.

**By 2003, the juvenile Violent Crime Index arrest rate had fallen to the levels of the late 1980s—but not for females**

**Violent Crime Index arrest rate trends by gender and race**

Source: Authors' analyses of arrest data from the FBI and population data from the U.S. Census Bureau. [See arrest rate source note at the end of this chapter for details.]

### Violent crime arrest rates declined more for black youth than other racial groups

All racial groups experienced large increases in their juvenile Violent Crime Index arrest rate between 1988 and 1994—and large declines between 1994 and 2003. By 2003, the white juvenile Violent Crime Index arrest rate had returned to its 1988 level. In contrast, the 2003 rates for the other races were all below their 1988 levels: blacks (–35%), American Indian (–16%), and Asian (–23%).



# The juvenile arrest rate for murder in 2003 was substantially below any year in the 1980s or 1990s

### The juvenile violent crime wave predicted by some in the mid-1990s has not occurred

The extraordinary growth in juvenile arrests for murder between 1987 and 1993 caused some to say and many to believe that America's youth were out of control. The juvenile arrest rate for murder increased 110% over this period, and speculation was that the rate would continue to grow. However, the juvenile arrest rate for murder then declined, more quickly than it had increased, so that by 1998, the rate returned to its 1987 level. After 1998, the rate continued to decline; by 2003, the rate was about half its level in 1987 and 77% below the peak year of 1993. In 2003, juvenile arrests for murder were at a 30-year low.

### Juvenile murder arrest rates were at generational lows in 2003

During the period from 1980 to 2003, the male juvenile murder arrest rate averaged 12 times the female rate. The growth in the overall juvenile murder arrest rate between 1987 and 1993 was attributable to the large increase (117%) in the much larger male rate. However, during this period, the female rate also increased (36%), although this change had relatively little effect on the overall trend. Both the male and female rates fell substantially between 1993 and 2003 (78% and 62%, respectively). In 2003, both rates were at their lowest levels since at least 1980.

During the period from 1980 through 2003, the black juvenile murder arrest rate averaged more than 6 times the white rate, but their trends over the period were similar. Between 1987 and 1993, both the black rate and the white rate increased substantially (130% and 75%, respectively). Both rates then fell dramatically between 1993 and 2003, so that the 2003 juvenile murder arrest rate was far below the 1987 rate for both black juveniles (–62%) and white juveniles (–43%).

**The arrest rate for murder in 2003 was the lowest since at least 1980 for white, black, male, and female juveniles**

**Murder arrest rate trends by gender and race**

Note: The murder arrest rate for American Indians fluctuated annually because of the small number of arrests, but the average rate over the period was just a little above the white rate (5.2 vs. 4.2).

Source: Authors' analyses of arrest data from the FBI and population data from the U.S. Census Bureau. [See arrest rate source note at the end of this chapter for details.]



Case 2:06-cv-00755-MHT-CSC Document 72-8 Filed 11/16/2007 Page 8 of 35

# Since 1980, the juvenile arrest rate for rape—and the black-white disparity in the rate—have declined

### The forcible rape arrest rate for juveniles in 2003 was at a low for this generation

The FBI's UCR Program defines the crime of forcible rape as the carnal knowledge of a female forcibly and against her will, including rapes by force and attempts or assaults to rape, regardless of the age of the victim. The UCR Program classifies other types of violent sexual assaults, including those with male victims and those involving other types of sexual acts (e.g., forcible sodomy), in other offense categories. Most persons arrested in forcible rapes are male. Between 1980 and 2003, more than 98% of all juveniles arrested for forcible rape were male.

The juvenile arrest rate for forcible rape grew substantially (44%) between 1980 and 1991, a peak year. Unlike other crimes in the Violent Crime Index, the annual number of juvenile arrests for forcible rape began increasing much earlier in the decade, though it peaked near the peak years of the other violent crimes. Like other violent crimes, the juvenile arrest rate for forcible rape fell substantially and consistently between 1993 and 2003, so that in 2003, the rate was 22% of its 1980 level. As with murder, the juvenile arrest rate for forcible rape in 2003 was at its lowest level since at least 1980.

**Between 1991 and 2003, the juvenile arrest rate for forcible rape fell 46%, with a larger decline in the black rate than the white rate**

**Forcible rape arrest rate trends by race**

Note: The forcible arrest rate for American Indians fluctuated annually because of the small number of arrests, but the average rate over the period was just a little above the white rate (12.3 vs. 11.9).

Source: Authors' analyses of arrest data from the FBI and population data from the U.S. Census Bureau. [See arrest rate source note at the end of this chapter for details.]

### White and black arrest rates converged over the last two decades

In 1980, the black juvenile arrest rate for forcible rape was 7.4 times the white rate; by 2003, the black rate was 2.5 times the white rate. This convergence occurred primarily because of the large decline in the black rate.

The white juvenile arrest rate for forcible rape nearly doubled between 1980 and 1991 (up 92%). The black rate also grew in the early 1980s; however, it peaked in 1987, several years before the peak in the white rate—dissimilar to other violent crime patterns. The fall in the black rate from 1987 through 2003, with few exceptions, was consistent and substantial, falling 68%. The white rate also fell after its peak in the early 1990s, but the fall was far less than the decline in the black rate. As a result, in 2003, the white juvenile arrest rate for forcible rape was 27% above its 1980 level, while the black rate was 58% below its 1980 level.



# The substantial growth in the juvenile arrest rate for robbery between 1988 and 1995 was quickly erased

### Recent juvenile robbery arrest rates are well below the 1980 level

After falling through most of the 1980s, the juvenile arrest rate for robbery increased sharply in 1989 and continued through its peak years of 1994 and 1995. Over the 6-year period from 1988 through 1994, the juvenile arrest rate for robbery increased 69%, then held constant in 1995 at its highest level. In the next 3 years, the rate dropped precipitously—falling in 1998 to below the 1988 level and erasing the increase of the prior decade. In the years between 1998 and 2003, the juvenile arrest rate for robbery continued to fall, so that in 2003, the rate was just one-third its level in 1995 and less than one-half the level in 1980. If the annual juvenile robbery arrest rate reflects juveniles' relative involvement in this crime, then juveniles in 2003 were committing far fewer robberies than in any year in the 1980s and 1990s.

### Male, female, white, and black arrest trends for robbery were similar

From 1980 through 2003, trends in the juvenile arrest rates for robbery for males, females, and each racial group were similar, mirroring the pattern of decline, growth, and then substantial decline observed in the overall trend. Over this time period, however, the male rate for robbery averaged 11 times the female rate, with the rates converging slightly over the period.

**Between 1980 and 2003, the annual juvenile arrest rate for robbery declined substantially, even though a period of growth was embedded in the trend**

Source: Authors' analyses of arrest data from the FBI and population data from the U.S. Census Bureau. [See arrest rate source note at the end of this chapter for details.]

The black juvenile arrest rate for robbery averaged 12 times the white rate in the 1980s; in the 1990s, the rates converged, resulting in the black rate averaging 7 times the white rate between 2000 and 2003. In the growth period between 1988 and 1995, the white rate increased substantially more than the black rate (90% vs. 52%). The declines in the white rate and black rate between 1995 and 2003 resulted in the 2003 black rate being 62% below its 1980 level and the white rate 48% below its 1980 level.



# The juvenile arrest rate for aggravated assault declined consistently between 1994 and 2003

### The juvenile aggravated assault arrest rate in 2003 was at the level of the late 1980s

The 38% drop in the juvenile arrest rate for aggravated assault between 1994 and 2003 erased most, but not all, of the increase the rate had experienced in the prior 10 years. This pattern differs from those for other violent crimes, such as murder, forcible rape, and robbery; the juvenile arrest rate in 2003 for each of these crimes was at, or very near, its lowest level since at least 1980.

A study of the various components of the juvenile arrest rate trend for aggravated assault reveals contrasts. The simplest way to see this pattern is to examine the growth in the arrest rate between 1980 and 1994 and the decline between 1994 and 2003 for males and females, whites and blacks.

Percent change in aggravated assault arrest rates:

| | 1980–1994 | 1994–2003 | 1980–2003 |
|---|---|---|---|
| All | 103% | –38% | 26% |
| Male | 94 | –42 | 13 |
| Female | 150 | –22 | 96 |
| White | 84 | –32 | 26 |
| Black | 129 | –47 | 21 |

Large increases in arrest rates between 1980 and 1994 occurred for each of the four subgroups, with the largest for female juveniles and black juveniles. Declines in arrest rates between 1994 and 2003 were also shared by the four subgroups, with the smallest for females. The increases and subsequent declines resulted in the 2003 rates for three of the four subgroups being moderately above their 1980 levels. The exception was the female rate. With the largest increase between 1980 and 1994 and the smallest subsequent decline, the 2003 female arrest rate was nearly double the 1980 rate.

**The large growth and subsequent decline in the juvenile arrest rate for aggravated assault between 1980 and 2003 illustrate the volatility of juvenile violence levels over a relatively short timeframe**

**Aggravated assault arrest rate trends by gender and race**

- One possible explanation for the differential growth in juvenile female arrest rates over the period is policy changes that encourage arrests in domestic violence incidents. This would affect the female arrest rate for assault proportionally more than the male rate since domestic assaults make up a larger proportion of incidents involving females than of those involving males.

Source: Authors' analyses of arrest data from the FBI and population data from the U.S. Census Bureau. [See arrest rate source note at the end of this chapter for details.]



# From 1998 through 2003, the juvenile arrest rate for property crimes declined sharply

## Far fewer juveniles are being arrested for property crimes

From 1980 through 1997, the juvenile arrest rate for Property Crime Index offenses (i.e., the combination of burglary, larceny-theft, motor vehicle theft, and arson arrests) varied little, always remaining within 10% of the average for the 18-year period. However, in 1998, the arrest rate fell below this narrow range and continued to fall annually through 2003. As a result, in 2003, the juvenile arrest rate for Property Crime Index offenses was 39% below its 1997 level.

## The property crime arrest rate trend for juvenile females is not like the overall pattern

Between 1980 and 2003, the juvenile arrest rate for Property Crime Index offenses fell substantially for most subgroups: males (55%), whites (45%), blacks (52%), American Indians (50%), and Asians (64%). The only exception was juvenile females: between 1980 and 2003, their rate fell only 7%. In 1980, the male arrest rate was 4 times the female rate; by 2003, the male rate was just double the female rate. The clear differences in the male and female Property Crime Index arrest rate trends indicate that factors influencing juvenile law-violating and/or arrest over this period differentially affected males and females.

## The Property Crime Index arrest trend has limited interpretability

In 2003, 70% of juvenile Property Crime Index arrests were for larceny-theft, 18% for burglary, 10% for motor vehicle theft, and 2% for arson. Thus, Property Crime Index arrest trends are essentially trends in larceny-theft arrests. Large increases in arrests for the other offenses could be easily hidden by small declines in larceny-theft arrests.

**The juvenile arrest rate trend for Property Crime Index offenses is used as a general barometer of all property crime arrests of juveniles**

**Property Crime Index arrest rate trends by gender and race**

- In 2003, the Property Crime Index arrest rates were similar for white juveniles (1,237) and American Indian juveniles (1,366), while the Asian rate (614) was half the white rate, and the black rate (2,352) was double the white rate. These comparisons have remained relatively constant since at least 1980.

Source: Authors' analyses of arrest data from the FBI and population data from the U.S. Census Bureau. [See arrest rate source note at the end of this chapter for details.]



# The juvenile arrest rate for burglary in 2003 was just one-third its level in 1980

### In 2003, the juvenile arrest rate for burglary reached its lowest point in more than 20 years

The juvenile arrest rate for burglary declined substantially and (with the exception of a few years in the 1980s and 1990s) consistently between 1980 and 2003. Over the period, the juvenile burglary arrest rate fell 68%. Given that the growth in the juvenile population between 1980 and 2003 was marginal (9%), this rate decline means that the justice system processed less than half as many juveniles for burglary in 2003 as it did in 1980.

This large decline in burglary arrests was not seen in adult arrests. From 1994 to 2003, while juvenile arrests for burglary fell 40%, adult burglary arrests fell just 14%. In 1980, 45% of all persons arrested for burglary were under age 18; by 2003, this proportion had fallen to 29%. Whatever factors contributed to the decline in burglary arrests had a greater effect on juveniles than adults.

### Juvenile female arrest rates for burglary declined less than male rates

The large decline in the juvenile burglary arrest rate was primarily the result of the large decline in the male rate. Between 1980 and 2003, the juvenile male arrest rate for burglary declined 70% while the female rate fell just 41%. As a result, females constituted 6% of all juveniles arrested for burglary in 1980 and 12% in 2003. A closer look at these trends reveals that the male rate essentially declined throughout the entire 1980–2003 period while the female rate held relatively constant from the mid-1980s to the late-1990s and then began to fall.

**Juveniles in 2003 were far less likely to be arrested for burglary than juveniles 25 years earlier (i.e., their parents' generation)**

**Burglary arrest rate trends by gender and race**

- From 1980 through 2003, the juvenile arrest rate for burglary declined substantially and comparably in all racial groups: white (67%), black (72%), American Indian (69%), and Asian (79%).

Source: Authors' analyses of arrest data from the FBI and population data from the U.S. Census Bureau. [See arrest rate source note at the end of this chapter for details.]



# After years of stability, the juvenile arrest rate for larceny-theft declined annually from 1995 to 2003

### Juvenile larceny-theft arrest rates fell each year from 1994 to 2003

In 2003, 1 in every 7 juvenile arrests was for larceny-theft. This high-volume crime category is defined as the unlawful taking of property from the possession of another without the use of force, threat, or fraud. It includes offenses such as shoplifting, bicycle theft, theft from a vehicle, or theft from a building or structure where no break-in was involved. The relative stability of the juvenile larceny-theft arrest rate between 1980 and 1994 stands in contrast to the trends in arrests for other property crimes.

After changing little for more than a decade, the juvenile arrest rate for larceny-theft fell 43% between 1994 and 2003. This large decline in a high-volume offense category translated into more than 350,000 fewer juvenile arrests and a much smaller number of juveniles entering the justice system charged with property crimes.

### The female proportion of larceny-theft arrests has grown

In 1980, 26% of juveniles arrested for larceny-theft were female; by 2003, this proportion had grown to 39%. This growth was the result of a 47% decline in the juvenile male arrest rate coupled with a juvenile female arrest rate that essentially did not change (down 4%) between 1980 and 2003. A closer look at these trends finds that while the male rate remained relatively constant between 1980 and the mid-1990s, the female rate increased. Both rates fell between the mid-1990s and 2003, but the female decline followed a growth in the preceding years while the male decline followed a period of stability.

**The juvenile arrest rate for larceny-theft fell in 2003 to its lowest level since at least 1980**

- The decline in the juvenile arrest rate for larceny-theft between 1994 and 2003 was similar in each of the four racial groups: white (42%), black (47%), American Indian (42%), and Asian (53%).

Source: Authors' analyses of arrest data from the FBI and population data from the U.S. Census Bureau. [See arrest rate source note at the end of this chapter for details.]

# The juvenile arrest rate trend for motor vehicle theft differs from trends for burglary and larceny-theft

### The juvenile arrest rate for motor vehicle theft peaked in 1990

Juvenile arrest rates for motor vehicle theft fell to a low point in 1983 for males and females and for whites, blacks, and American Indians. (The Asian rate bottomed out in 1984.) After 1983, the juvenile arrest rate for motor vehicle theft increased each year through 1990, resulting in a rate more than double (138% above) its 1983 level. After this period of rapid growth, the rate then fell through 2003, erasing the increase of the growth period and resulting in a 2003 rate 62% below the 1990 peak and 10% below the 1983 low point. Juveniles in 2003 were arrested for motor vehicle theft at a lower rate than at any time since at least 1980.

The juvenile arrest rate trends for motor vehicle theft differed from those for the other high-volume theft crimes of burglary and larceny-theft. In the 1980s and 1990s, the burglary arrest rate declined consistently and the larceny-theft rate remained relatively stable before dropping in the late 1990s, but the motor vehicle theft rate soared and then dropped dramatically. The motor vehicle theft arrest rate trend is somewhat similar to that of robbery, but the growth begins 5 years before that of robbery and peaks 5 years before the robbery peak.

### The motor vehicle theft arrest rate for white juveniles was at a 20-year low in 2003

The motor vehicle theft arrest rate for black juveniles grew far more than the rate for whites between 1983 and 1990 (233% vs. 98%). Beginning in the early 1990s, rates for both races declined substantially. By 2003, the white rate had fallen to a level 26% below its 1983 low, and the black rate was 22% above its 1983 low.

**The juvenile arrest rate for motor vehicle theft in 2003 was less than half the level a decade earlier**

**Motor vehicle theft arrest rate trends by gender and race**

- Male and female juvenile arrest rates for motor vehicle theft displayed somewhat disparate trends. Both began increasing in 1984, but the male rate peaked in 1990, while the female rate did not peak until 1993. Although both declined thereafter, the male rate by 2003 had fallen to its lowest level since at least 1980, while the female rate was still 42% above its 1983 low point.

Source: Authors' analyses of arrest data from the FBI and population data from the U.S. Census Bureau. [See arrest rate source note at the end of this chapter for details.]



# A high proportion of arrests for arson involve juveniles—including those ages 12 and younger

### Over half of arrests for arson in 2003 involved juveniles

In 2003, 51% of all arrests for arson were of persons under age 18. Arson traditionally has been the criminal offense with the largest proportion of juvenile arrestees. It also has the largest percentage of young juvenile arrestees (ages 12 and under)—13% in 2003. In comparison, 28% of all larceny-theft arrests in 2003 involved juveniles, and 3% involved juveniles under age 13. One reason for arson arrests involving a high percentage of juveniles may be that firesetting is commonly considered an indicator of serious problems in youth who could benefit from the services available in the juvenile justice system.

### Trends in juvenile arson arrests paralleled that of violent crime

The pattern of growth and decline in the juvenile arrest rate for arson in the 1980s and thereafter was similar to the trends in juvenile violent crime arrest rates. Between 1983 and 1994, the juvenile arrest rate for arson increased 60%. Then it began to fall and by 2003 had declined to a point just 8% above its 1983 low.

One major distinction between violent crime and arson arrest rates for juveniles over this period was that white and black rates were similar for arson but not for violent crime. For example, in 2003, the arson arrest rate for white juveniles was 26 arrests for every 100,000 white youth ages 10–17 in the U.S. population and the rate for black juveniles was 25. In contrast, the violent crime arrest rate for black juveniles in 2003 was 4 times the white rate.

**The juvenile arrest rate for arson in 2003 was back to the levels of the early 1980s**

**Arson arrest rate trends by gender and race**

- In 2003, 12% of juveniles arrested for arson were female. Unlike males, their arrest rate for arson held constant during the 1980s and began to increase only in the early 1990s. Both male and female arrest rates peaked in 1994. By 2003, the male rate had returned to the levels of the early 1980s, while the female rate had not.

Source: Authors' analyses of arrest data from the FBI and population data from the U.S. Census Bureau. [See arrest rate source note at the end of this chapter for details.]

# The juvenile arrest rate for simple assault more than doubled between 1980 and 2003—up 138%

### A large proportion of juvenile arrests for assault are for less severe assaults

In contrast to aggravated assault, a simple assault does not involve the use of a weapon and does not result in serious bodily harm to the victim. Because simple assault is less severe, such incidents are less likely to be reported to law enforcement, and law enforcement has more discretion in how to handle the incident. Simple assault is the most common of all crimes against persons.

In 1980, there were 2 juvenile arrests for simple assault for every 1 juvenile arrest for aggravated assault; by 2003, this ratio had grown to 4 to 1—with most of this growth occurring after the mid-1990s. This means that a greater percentage of assaults handled by law enforcement in recent years has been for less serious offenses. This trend was found in arrests of male and female juveniles and of white, black, and American Indian juveniles. For example, in 1980, 66% of all juvenile male arrests for aggravated and simple assault were for simple assault; by 2003, this percentage had grown to 78%. Similarly, the female percentage grew from 74% to 84%.

### Female arrests for simple assault grew far more than male arrests in recent years

As with aggravated assault, the increase in the juvenile female arrest rate for simple assault from 1980 to 2003 far outpaced the increase in the male rate (269% vs. 102%). From 1980 to 2003, simple assault arrest rates increased substantially for white (134%), black (134%), and American Indian (111%) youth; the rates for Asian youth also increased, but much less (23%).

**Unlike other crimes against persons, the juvenile arrest rate for simple assault did not decline substantially after the mid-1990s**

Arrests per 100,000 juveniles ages 10–17
800
700
600
500
400
300
200
100
0
Other (simple) assault
1981 83 85 87 89 91 93 95 97 99 01 2003

**Other (simple) assault arrest rate trends by gender and race**

Arrests per 100,000 juveniles ages 10–17
1,200
1,000
800
600
400
200
0
Male
Female
81 83 85 87 89 91 93 95 97 99 01 03
Year
Arrests per 100,000 juveniles ages 10–17
500
400
300
200
100
0
Female
81 83 85 87 89 91 93 95 97 99 01 03
Year
Arrests per 100,000 juveniles ages 10–17
2,000
1,600
1,200
800
400
0
Black
White
81 83 85 87 89 91 93 95 97 99 01 03
Year
Arrests per 100,000 juveniles ages 10–17
700
600
500
400
300
200
100
0
Amer. Indian
White
Asian
81 83 85 87 89 91 93 95 97 99 01 03
Year

- The larger increase in simple assault arrests for juvenile females than for juvenile males between 1980 and 2003 was paralleled in adult arrests. Between 1980 and 2003, the female proportion of juvenile simple assault arrests grew from 21% to 32%, while the female proportion of adult simple assault arrests grew from 13% to 22%.

Source: Authors' analyses of arrest data from the FBI and population data from the U.S. Census Bureau. [See arrest rate source note at the end of this chapter for details.]



# The juvenile arrest rate for weapons law violations in 2003 was half its 1993 peak

### Juvenile arrests for weapons offenses grew throughout the 1980s and into the mid-1990s

The juvenile arrest rate for weapons law violations grew 144% between 1980 and 1993; it then dropped 49% between 1993 and 2003, retreating to a level close to that of the mid-1980s. It must be remembered that these statistics do not reflect all arrests for weapons offenses. An unknown number of other arrests for more serious crimes also involved a weapons offense as a secondary charge, but the FBI's arrest statistics classifies such arrests by their most serious charge and not the weapons offense.

The pattern of large growth and then decline in juvenile arrest rates for weapons offenses over the 1980–2003 period occurred in the rates for males, females, and each racial group. In general, the decline almost balanced out the increase. Overall, the 2003 juvenile arrest rate for weapons law violations was 18% above its 1980 level. This pattern of a moderately higher juvenile arrest rate in 2003 than in 1980 was true for male (18%), white (26%), and black (27%) juveniles; the 2003 arrest rates for American Indian and Asian youth were actually below their 1980 levels. The one major exception to this pattern was the arrest rate for juvenile females. Between 1980 and 1993, the juvenile female arrest rate for weapons law violations increased almost 248%. This rate also generally declined between 1993 and 2003, but the decline was far less than that for the other juvenile subgroups. As a result, in 2003, the juvenile female arrest rate for weapons law violations was 147% above its 1980 level.

**The juvenile arrest rate trend for weapons law violations generally paralleled the trends in juvenile violent crime arrests**

**Weapons law violation arrest rate trends by gender and race**

- In 1980, the black juvenile arrest rate for weapons law violations was 2.3 times the white rate. Between 1980 and 1993, the rate increased more for blacks than whites (214% vs. 116%); however, the larger decline in the black rate between 1993 and 2003 (59% vs. 42% for whites) returned the rate ratio back to its 1980 level.

Source: Authors' analyses of arrest data from the FBI and population data from the U.S. Census Bureau. [See arrest rate source note at the end of this chapter for details.]



# The juvenile drug arrest rate climbed 77% between 1993 and 1997 but has declined some since then

## Racial disparity in drug arrests increased in the 1980s and early 1990s

The annual juvenile arrest rate for drug abuse violations (a category that includes both drug possession and drug sales) varied within a limited range between 1980 and 1993. This consistency in drug arrest rates contrasts with the large decline in self-reported use of marijuana and other illicit drugs during the period.

A closer look at juvenile drug arrest rate trends over the period finds sharp racial differences. The white rate fell 28% between 1980 and 1993, compared with a 231% increase for blacks. In 1980, the white and black arrest rates were essentially equal, with black youth involved in 15% of all juvenile drug arrests. By 1993, the black rate was over four times the white rate, and black youth were involved in 46% of all juvenile drug arrests.

## Drug arrests soared for all youth between 1993 and 1997

In contrast to the 1980–1993 period, the overall juvenile drug arrest rate increased by 77% in the short period between 1993 and 1997. Large increases were also seen in the rates of juvenile subgroups: male (72%), female (119%), white (109%), American Indian (160%), and Asian (105%). The black juvenile arrest rate for drug abuse violations, which had increased dramatically in the earlier period, increased an additional 25% between 1993 and 1997. Between 1997 and 2003, the juvenile drug arrest rate fell marginally (22%), with most of the overall decline attributable to a drop in arrests of blacks (41%) and males (24%).



**The surge in the juvenile arrest rate for drug abuse violations between 1993 and 1997 occurred during a period when the juvenile violent crime arrest rate was declining**

Arrests per 100,000 juveniles ages 10–17

Drug abuse

**Drug abuse violation arrest rate trends by gender and race**

Arrests per 100,000 juveniles ages 10–17

Male

Female

Arrests per 100,000 juveniles ages 10–17

Female

Arrests per 100,000 juveniles ages 10–17

Black

White

Arrests per 100,000 juveniles ages 10–17

White

Amer. Indian

Asian

Source: Authors' analyses of arrest data from the FBI and population data from the U.S. Census Bureau. [See arrest rate source note at the end of this chapter for details.]



# The attributes of juvenile and adult violence differ when viewed from the perspective of law enforcement

### Juvenile violence is less likely than adult violence to involve female victims and firearms

Based on an analysis of the FBI's National Incident-Based Reporting System (NIBRS) for 2001, the characteristics of violent crimes allegedly committed by juvenile offenders and by adult offenders show large differences in the types of victims, the location of the crime, and weapon possession. For example, violent crimes committed by juvenile offenders were far more likely to have juvenile victims than were violent crimes committed by adults: robberies (42% vs. 6%), aggravated assaults (53% vs. 9%), and simple assaults (61% vs. 10%). Robberies by juvenile offenders were less likely to involve strangers than were robberies by adults (66% vs. 73%), while the proportions of strangers involved did not differ in assaults committed by juvenile offenders and by adult offenders.

Violent crimes known to law enforcement and committed by adults were more likely to have female victims than were violent crimes committed by juveniles: robberies (29% vs. 22%), aggravated assaults (42% vs. 35%), and simple assaults (64% vs. 47%). Firearms were more common in violent crimes committed by adults: robberies (49% vs. 35%) and aggravated assaults (19% vs. 14%). Roughly equal proportions of victims were injured in violent crimes committed by juveniles and by adults: robberies (67% vs. 68%), aggravated assaults (42% vs. 38%), and simple assaults (51% vs. 47%).

Robberies committed by juveniles were more likely to occur outdoors than those committed by adults (46% vs. 28%). The same pattern held for aggravated assault (41% vs. 21%) and simple assault (22% vs. 10%).

**Family members were the victim in a greater proportion of assaults committed by juvenile females than by juvenile males**

| | Robbery offender | | | | Aggravated assault offender | | | | Simple assault offender | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Juvenile | | Adult | | Juvenile | | Adult | | Juvenile | | Adult | |
| Characteristics | Male | Female | Male | Female | Male | Female | Male | Female | Male | Female | Male | Female |
| Victim type | | | | | | | | | | | | |
| Juvenile family | 0% | 0% | 0% | 0% | 4% | 7% | 3% | 6% | 5% | 5% | 4% | 7% |
| Juvenile acquaintance | 22 | 29 | 2 | 2 | 45 | 40 | 4 | 4 | 54 | 49 | 4 | 5 |
| Juvenile stranger | 20 | 15 | 5 | 3 | 6 | 2 | 1 | 1 | 5 | 3 | 1 | 1 |
| Adult family | 0 | 1 | 1 | 2 | 12 | 21 | 21 | 25 | 17 | 23 | 34 | 32 |
| Adult acquaintance | 10 | 19 | 23 | 36 | 21 | 24 | 54 | 56 | 16 | 17 | 50 | 50 |
| Adult stranger | 47 | 35 | 70 | 57 | 12 | 6 | 16 | 7 | 4 | 3 | 7 | 5 |
| Victim gender | | | | | | | | | | | | |
| Female | 19 | 56 | 28 | 40 | 26 | 67 | 43 | 40 | 32 | 78 | 69 | 47 |
| Male | 81 | 44 | 72 | 60 | 74 | 33 | 57 | 60 | 68 | 22 | 31 | 53 |
| Location | | | | | | | | | | | | |
| Residence | 16 | 20 | 20 | 23 | 42 | 54 | 58 | 65 | 40 | 46 | 72 | 71 |
| Outdoors | 46 | 39 | 28 | 23 | 33 | 23 | 22 | 17 | 23 | 20 | 11 | 10 |
| School | 4 | 5 | 0 | 0 | 12 | 10 | 1 | 1 | 26 | 22 | 1 | 1 |
| Commercial | 34 | 37 | 52 | 54 | 13 | 12 | 20 | 17 | 12 | 12 | 17 | 18 |
| Weapon | | | | | | | | | | | | |
| Firearm | 36 | 22 | 51 | 31 | 17 | 4 | 21 | 9 | 0 | 0 | 0 | 0 |
| Personal | 42 | 56 | 27 | 37 | 25 | 30 | 27 | 20 | 82 | 85 | 84 | 83 |
| Other | 13 | 14 | 15 | 22 | 56 | 64 | 50 | 69 | 8 | 6 | 5 | 6 |
| None | 9 | 8 | 8 | 10 | 2 | 2 | 2 | 2 | 10 | 10 | 11 | 11 |
| Injury? | | | | | | | | | | | | |
| Injury | 68 | 54 | 69 | 62 | 43 | 37 | 39 | 36 | 52 | 50 | 46 | 49 |
| No injury | 32 | 46 | 31 | 38 | 57 | 63 | 61 | 64 | 48 | 50 | 54 | 51 |

- Of the aggravated assault victims of juvenile females, 28% were family members, compared with 16% of the victims of juvenile males. Similarly, 28% of the simple assault victims of juvenile females were family members, compared with 22% of the victims of juvenile males. This female-male disparity is present in aggravated assaults committed by adults, but not in their simple assaults.

- Schools were the location in 4% of robberies, 12% of aggravated assaults, and 26% of simple assaults committed by male juveniles; for females, schools were the location in 5%, 10%, and 22% of the respective crimes.

Source: Authors' analyses of the FBI's *National Incident-Based Reporting System master file* for 2001 [machine-readable data file].

# Clearance figures implicate juveniles in 1 in 12 murders, 1 in 8 forcible rapes, and 1 in 7 robberies in 2003

### Clearances give insight into the relative involvement of juveniles and adults in crime

Clearance statistics measure the proportion of reported crimes that are resolved by an arrest or other, exceptional means (e.g., death of the offender, unwillingness of the victim to cooperate). A single arrest may result in many clearances if the arrestee committed several crimes. Or multiple arrests may result in a single clearance if the crime was committed by a group of offenders. The FBI reports information on the proportion of clearances that involved offenders under age 18. This statistic is a better indicator of the proportion of crime committed by this age group than is the arrest proportion, although there are some concerns that even the clearance statistic overestimates the juvenile proportion of crimes. Nevertheless, trends in clearance proportions are reasonable indicators of changes in the relative involvement of juveniles in various crimes.

### The juvenile share of violent crime remains above the levels of the 1980s

The FBI's *Crime in the United States* series shows that the proportion of violent crimes attributed to juveniles declined somewhat in recent years—but is still above the levels of the 1980s. The juvenile proportion of Violent Crime Index offenses cleared by arrest (or exceptional means) grew from an average of 9% in the 1980s to 14% in 1994, then fell to 12% in 1997, where it remained through 2003. Based on these data, it is fair to say a juvenile committed 1 in 8 violent crimes known to law enforcement in 2003.

Each of the four Violent Crime Index offenses showed an increase in juvenile clearances between 1980 and the mid-1990s. The juvenile proportion of murder clearances peaked in 1994 at 10% and then fell. Between 2000 and 2003, the proportion was 5%—the lowest since 1987. The juvenile proportion of cleared forcible rapes peaked in 1995 (15%) and then fell; however, the 2003 proportion (12%) was still above the levels of the 1980s (9%). The juvenile proportion of robbery clearances also peaked in 1995 (20%); it fell substantially by 2003 (to 14%) but was still above the average level of the 1980s (12%). The trend in the juvenile proportion of aggravated assault clearances differed from the others. In 2003 (at 12%), it was slightly below its peak in 1994 (13%) and substantially above the average level of the 1980s (9%).

**After increasing in the mid-1980s to mid-1990s, the juvenile proportion of violent crimes cleared by arrest or exceptional means did not return to its earlier levels**

**The juvenile share of property crime has fallen substantially since 1980**

Source: Authors' analyses of the FBI's *Crime in the United States* reports for the years 1980 through 2003.

Case 2:06-cv-00755-MHT-CSC Document 72-8 Filed 11/16/2007 Page 21 of 35

**Clearance statistics imply that juvenile involvement in each of the violent offenses in 2003 was less than it was 10 years earlier**

Percent of clearances involving juveniles
Murder
Year

Percent of clearances involving juveniles
Forcible rape
Year

Percent of clearances involving juveniles
Robbery
Year

**In 2003, the juvenile shares of clearances for burglary, larceny-theft, and motor vehicle theft were at their lowest points in more than 20 years**

*Arson clearance data were first reported in 1981.

Source: Authors' analyses of the FBI's *Crime in the United States* reports for the years 1980 through 2003.

## In 2003, a juvenile committed roughly 1 in 5 property crimes known to law enforcement

In the 1980s, the juvenile proportion of cleared Property Crime Index offenses decreased from 28% to 20%. This proportion then increased in the early 1990s, peaking in 1995 at 25%. After 1995, the juvenile proportion of clearances for Property Crime Index offenses fell, so that by 2003 it was at its lowest level since at least 1980 (19%).

By 2003, juvenile clearance proportions for the crimes of burglary, larceny-theft, and motor vehicle theft were at their lowest levels since 1980 (17%, 20%, and 17%, respectively). For arson, the juvenile proportion of clearances in 2003 was equal to its average for the 1980–2003 period.

## The juvenile proportion of crimes cleared varied with community

In 2003, in nonmetropolitan areas (average population served per law enforcement agency about 10,000), 9.8% of Violent Crime Index clearances were attributed to juvenile arrest. In comparison, for communities located in metropolitan areas but outside of cities (average population served 37,000), the proportion was 12.7%. In small cities (average population served 3,000), the proportion was 14.6%, and in somewhat larger cities (average population served 35,000) it was 14.9%. Then, as city size increased, the proportion fell: in cities with populations over 1 million, for example, 9.0% of Violent Crime Index clearances were attributed to juvenile arrest. Property Crime Index clearances had a similar pattern.

# In 2003, about one-fourth of the states had a juvenile violent crime arrest rate above the national average

**Among states with at least minimally adequate reporting, those with high juvenile violent crime arrest rates in 2003 were Delaware, Florida, Maryland, Pennsylvania, New Jersey, and California**

| State | Reporting population coverage | Arrests of juveniles under age 18 per 100,000 juveniles ages 10–17: Violent Crime Index | Robbery | Aggravated assault | Other assault | Weapons |
|---|---|---|---|---|---|---|
| United States | 76% | 291 | 77 | 198 | 738 | 116 |
| Alabama | 91 | 126 | 43 | 73 | 470 | 31 |
| Alaska | 97 | 243 | 28 | 180 | 557 | 85 |
| Arizona | 96 | 223 | 45 | 171 | 768 | 72 |
| Arkansas | 66 | 130 | 22 | 102 | 348 | 64 |
| California | 99 | 364 | 111 | 243 | 529 | 181 |
| Colorado | 71 | 231 | 48 | 167 | 756 | 168 |
| Connecticut | 65 | 290 | 84 | 190 | 946 | 90 |
| Delaware | 99 | 595 | 163 | 403 | 1,579 | 147 |
| Dist. of Columbia | 0 | NA | NA | NA | NA | NA |
| Florida | 100 | 524 | 99 | 404 | 993 | 109 |
| Georgia | 54 | 266 | 81 | 169 | 838 | 153 |
| Hawaii | 100 | 197 | 101 | 82 | 814 | 36 |
| Idaho | 94 | 160 | 11 | 136 | 849 | 122 |
| Illinois | 23 | 944 | 342 | 552 | 2,114 | 383 |
| Indiana | 74 | 317 | 36 | 273 | 444 | 28 |
| Iowa | 90 | 251 | 29 | 214 | 816 | 45 |
| Kansas | 48 | 131 | 12 | 107 | 868 | 25 |
| Kentucky | 26 | 229 | 47 | 175 | 394 | 56 |
| Louisiana | 73 | 355 | 64 | 267 | 1,357 | 61 |
| Maine | 100 | 78 | 11 | 53 | 762 | 26 |
| Maryland | 100 | 505 | 184 | 305 | 1,444 | 224 |
| Massachusetts | 70 | 269 | 40 | 219 | 387 | 28 |
| Michigan | 96 | 166 | 31 | 118 | 321 | 53 |
| Minnesota | 83 | 176 | 29 | 121 | 648 | 102 |
| Mississippi | 48 | 136 | 49 | 58 | 711 | 70 |

| State | Reporting population coverage | Arrests of juveniles under age 18 per 100,000 juveniles ages 10–17: Violent Crime Index | Robbery | Aggravated assault | Other assault | Weapons |
|---|---|---|---|---|---|---|
| Missouri | 97% | 295 | 64 | 214 | 1,111 | 87 |
| Montana | 60 | 202 | 33 | 161 | 561 | 32 |
| Nebraska | 86 | 96 | 28 | 59 | 848 | 83 |
| Nevada | 0 | NA | NA | NA | NA | NA |
| New Hampshire | 69 | 71 | 22 | 43 | 717 | 9 |
| New Jersey | 93 | 386 | 144 | 233 | 654 | 214 |
| New Mexico | 55 | 220 | 33 | 178 | 673 | 174 |
| New York | 45 | 264 | 90 | 161 | 449 | 70 |
| North Carolina | 79 | 310 | 95 | 199 | 1,023 | 179 |
| North Dakota | 85 | 45 | 10 | 20 | 600 | 33 |
| Ohio | 49 | 150 | 46 | 84 | 774 | 70 |
| Oklahoma | 100 | 217 | 30 | 171 | 390 | 81 |
| Oregon | 91 | 149 | 34 | 105 | 503 | 53 |
| Pennsylvania | 84 | 402 | 139 | 239 | 734 | 123 |
| Rhode Island | 100 | 288 | 62 | 179 | 970 | 160 |
| South Carolina | 13 | 47 | 10 | 33 | 307 | 73 |
| South Dakota | 86 | 108 | 1 | 88 | 516 | 82 |
| Tennessee | 84 | 223 | 51 | 157 | 767 | 100 |
| Texas | 94 | 185 | 46 | 123 | 793 | 64 |
| Utah | 72 | 216 | 17 | 175 | 804 | 183 |
| Vermont | 77 | 81 | 0 | 62 | 347 | 11 |
| Virginia | 75 | 106 | 33 | 64 | 676 | 88 |
| Washington | 74 | 246 | 60 | 152 | 1,013 | 113 |
| West Virginia | 45 | 40 | 2 | 34 | 157 | 7 |
| Wisconsin | 76 | 184 | 36 | 121 | 558 | 176 |
| Wyoming | 95 | 88 | 4 | 79 | 1,062 | 80 |

NA = Arrest counts were not available for this state in the FBI's *Crime in the United States 2003*.

Notes: Arrest rates for jurisdictions with less than complete reporting may not be representative of the entire state. In the state map, rates were classified as "Data not available" when law enforcement agencies with jurisdiction over more than 50% of the state's population did not report. Readers should consult the related technical note at the end of the chapter.

Source: Authors' analysis of arrest data from the FBI's *Crime in the United States 2003* and population data from the National Center for Health Statistics' *Estimates of the July 1, 2000–July 1, 2003, United States resident population from the vintage 2003 postcensal series by year, county, age, sex, race, and Hispanic origin* [machine-readable data files].

DC
2003 Violent Crime Index arrests per 100,000 juveniles ages 10–17
0 to 150 (11 states)
150 to 225 (12 states)
225 to 350 (11 states)
350 or above (7 states)
Data not available (10 states)



# High violent crime arrest rates are found in a relatively small proportion of counties

In 2002, the national juvenile arrest rate for offenses included in the Violent Crime Index was 291 arrests of persons under age 18 for every 100,000 persons ages 10–17 in the U.S. population. In 2,544 of the 3,141 counties in the U.S. in 2002, law enforcement agencies with jurisdiction over at least 50% of their county's population reported arrest counts; arrest rates were calculated only for these counties. Seventeen percent (17%) of these counties had a juvenile violent crime arrest rate higher than the U.S. average. Six in 10 (58%) reporting counties had rates less than half the U.S. average, half had juvenile violent crime arrest rates less than 115 (making that the median rate), and nearly one-fourth of counties reported no juvenile violent crime arrests at all for the year. However, the fact that high rates of juvenile violent crime arrests are found in counties with small populations as well as in counties with large populations indicates that high levels of juvenile violence can occur in any community.

**Juvenile violent crime arrest rates varied considerably among counties within a state in 2002**

2002 Violent Crime Index arrests per 100,000 juveniles ages 10–17
0 to 75
75 to 150
150 to 275
275 or above
Data not available

Note: Rates were classified as "Data not available" when agencies with jurisdiction over more than 50% of the county's population did not report.

Source: Authors' analysis of the Inter-university Consortium for Political and Social Research's *Uniform Crime Reporting Program data [United States]: County-level detailed arrest and offense data, 2002* [machine-readable data file].



Case 2:06-cv-00755-MHT-CSC Document 72-8 Filed 11/16/2007 Page 24 of 35

# High juvenile property crime arrest rates in 2003 did not necessarily mean high violent crime arrest rates

**The states of Wisconsin, Utah, Alaska, Montana, Idaho, Florida, Washington, and Colorado reported the highest juvenile Property Crime Index arrest rates in 2003**

| State | Reporting population coverage | Arrests of juveniles under age 18 per 100,000 juveniles ages 10–17: Property Crime Index | Burglary | Larceny-theft | Motor vehicle theft | Vandalism |
|---|---|---|---|---|---|---|
| United States | 76% | 1,442 | 271 | 1,012 | 136 | 310 |
| Alabama | 91 | 764 | 123 | 593 | 44 | 104 |
| Alaska | 97 | 2,202 | 344 | 1,600 | 229 | 359 |
| Arizona | 96 | 1,774 | 251 | 1,304 | 195 | 440 |
| Arkansas | 66 | 1,282 | 225 | 1,025 | 23 | 132 |
| California | 99 | 1,180 | 326 | 678 | 153 | 302 |
| Colorado | 71 | 2,051 | 218 | 1,539 | 247 | 428 |
| Connecticut | 65 | 1,347 | 218 | 1,008 | 102 | 293 |
| Delaware | 99 | 1,583 | 328 | 1,131 | 92 | 290 |
| Dist. of Columbia | 0 | NA | NA | NA | NA | NA |
| Florida | 100 | 2,128 | 501 | 1,405 | 207 | 167 |
| Georgia | 54 | 1,411 | 239 | 1,017 | 132 | 126 |
| Hawaii | 100 | 1,387 | 178 | 1,056 | 149 | 214 |
| Idaho | 94 | 2,158 | 246 | 1,751 | 111 | 427 |
| Illinois | 23 | 2,074 | 349 | 900 | 811 | 454 |
| Indiana | 74 | 1,219 | 141 | 966 | 97 | 232 |
| Iowa | 90 | 2,099 | 278 | 1,697 | 100 | 552 |
| Kansas | 48 | 1,055 | 211 | 752 | 71 | 318 |
| Kentucky | 26 | 1,435 | 232 | 1,130 | 56 | 185 |
| Louisiana | 73 | 1,842 | 389 | 1,362 | 77 | 363 |
| Maine | 100 | 1,866 | 314 | 1,423 | 99 | 406 |
| Maryland | 100 | 1,950 | 411 | 1,135 | 348 | 391 |
| Massachusetts | 70 | 512 | 106 | 355 | 40 | 136 |
| Michigan | 96 | 947 | 144 | 725 | 66 | 145 |
| Minnesota | 83 | 1,860 | 210 | 1,513 | 108 | 426 |
| Mississippi | 48 | 1,497 | 296 | 1,075 | 69 | 148 |
| Missouri | 97% | 1,728 | 271 | 1,232 | 193 | 502 |
| Montana | 60 | 2,175 | 164 | 1,818 | 156 | 558 |
| Nebraska | 86 | 1,820 | 196 | 1,494 | 87 | 605 |
| Nevada | 0 | NA | NA | NA | NA | NA |
| New Hampshire | 69 | 674 | 93 | 57 | 43 | 275 |
| New Jersey | 93 | 934 | 188 | 66 | 50 | 396 |
| New Mexico | 55 | 1,367 | 168 | 1,116 | 69 | 199 |
| New York | 45 | 1,218 | 268 | 847 | 79 | 417 |
| North Carolina | 79 | 1,582 | 351 | 1,115 | 97 | 308 |
| North Dakota | 85 | 1,866 | 185 | 1,479 | 177 | 649 |
| Ohio | 49 | 1,222 | 231 | 897 | 68 | 296 |
| Oklahoma | 100 | 1,591 | 269 | 1,191 | 100 | 156 |
| Oregon | 91 | 1,721 | 259 | 1,284 | 115 | 512 |
| Pennsylvania | 84 | 1,222 | 233 | 765 | 197 | 452 |
| Rhode Island | 100 | 1,372 | 233 | 985 | 109 | 583 |
| South Carolina | 13 | 214 | 67 | 139 | 7 | 59 |
| South Dakota | 86 | 1,743 | 234 | 1,434 | 62 | 279 |
| Tennessee | 84 | 1,064 | 178 | 776 | 93 | 219 |
| Texas | 94 | 1,282 | 227 | 955 | 84 | 206 |
| Utah | 72 | 2,511 | 174 | 2,166 | 126 | 644 |
| Vermont | 77 | 559 | 160 | 338 | 42 | 215 |
| Virginia | 75 | 844 | 161 | 605 | 54 | 177 |
| Washington | 74 | 2,088 | 354 | 1,565 | 127 | 416 |
| West Virginia | 45 | 382 | 72 | 266 | 44 | 78 |
| Wisconsin | 76 | 2,813 | 338 | 2,247 | 199 | 713 |
| Wyoming | 95 | 1,885 | 175 | 1,616 | 82 | 368 |

NA = Arrest counts were not available for this state in the FBI's *Crime in the United States 2003*.

Notes: Arrest rates for jurisdictions with less than complete reporting may not be representative of the entire state. In the state map, rates were classified as "Data not available" when law enforcement agencies with jurisdiction over more than 50% of their state's population did not report. Readers should consult the related technical note at the end of the chapter.

Source: Authors' analysis of arrest data from the FBI's *Crime in the United States 2003* and population data from the National Center for Health Statistics' *Estimates of the July 1, 2000–July 1, 2003, United States resident population from the vintage 2003 postcensal series by year, county, age, sex, race, and Hispanic origin* [machine-readable data files].

DC
2003 Property Crime Index arrests per 100,000 juveniles ages 10–17
0 to 1,200 (9 states)
1,200 to 1,600 (12 states)
1,600 to 2,000 (11 states)
2,000 or above (9 states)
Data not available (10 states)



# Property Crime Index arrest rates are a barometer of the flow of youth into the juvenile justice system

The Property Crime Index is dominated by the high-volume crime category of larceny-theft. For juveniles, shoplifting is the most common offense in this category and it is generally considered to be far less serious than other crimes in the Index such as home burglary, auto theft, and arson. Therefore, to assess the nature of juvenile property crimes within a jurisdiction, it is important to consider the various offense categories individually. Nevertheless, many still use the juvenile Property Crime Index arrest rate as a barometer of the flow of juveniles into the juvenile justice system. In 2002, the national juvenile property crime arrest rate was 1,442. More than 7 in 10 reporting counties had rates below the national average. Half of all reporting counties had rates below 924 (i.e., the median rate).

**In 2002, counties within a state varied considerably in their juvenile Property Crime Index arrest rates**

2002 Property Crime Index arrests per 100,000 juveniles ages 10–17
0 to 500
500 to 1,000
1,000 to 2,000
2,000 or above
Data not available

Note: Rates were classified as "Data not available" when agencies with jurisdiction over more than 50% of the county's population did not report.

Source: Authors' analysis of the Inter-university Consortium for Political and Social Research's *Uniform Crime Reporting Program data [United States]: County-level detailed arrest and offense data, 2002* [machine-readable data file].



# What do police do with the juveniles they arrest?

## Many large law enforcement agencies have specialized units that concentrate on juvenile justice issues

The Bureau of Justice Statistics' Law Enforcement Management and Administrative Statistics data collection for 2000 describes more than 800 state and local law enforcement agencies with 100 or more full-time sworn personnel. Among these larger law enforcement agencies are 501 municipal police departments, 222 sheriff's offices, 32 county police departments, and the 49 primary state law enforcement agencies. Together, these agencies employed approximately 402,000 full-time sworn personnel, including 241,000 uniformed officers assigned to respond to calls for service.

The 2000 survey included items about the types of special units agencies operated. Local law enforcement agencies operated a variety of full-time special units to address youth and family problems. For example, most local law enforcement agencies (i.e., county police departments and municipal police departments) had a special unit for drug education in schools (70%). Units targeting juvenile crime were also very common among local agencies (62%). About half of law enforcement agencies had gang units and units dealing with various types of child victimization. Among state agencies, the most common types of units were those for drug education in schools (39%) and missing children (31%).

Percent of agencies operating special units:

|  | Type of agency | |
|---|---|---|
| Special unit | Local | State |
| Drug education in schools | 70% | 39% |
| Juvenile crime | 62 | 10 |
| Gangs | 45 | 18 |
| Child abuse | 46 | 8 |
| Domestic violence | 45 | 10 |
| Missing children | 48 | 31 |
| Youth outreach | 33 | 6 |

## Most arrested juveniles were referred to court

In 13 states, statutes define some persons younger than age 18 as adults for prosecution purposes. These persons are not under the original jurisdiction of the juvenile justice system, but are under the jurisdiction of the criminal justice system. For arrested youth who are younger than 18 and under the original jurisdiction of their state's juvenile justice system, the FBI's UCR Program monitors what happens as a result of the arrest. This is the only aspect of the UCR data collection that is sensitive to state variations in the legal definition of a juvenile.

In 2003, 20% of arrests involving youth eligible in their state for processing in the juvenile justice system were handled within law enforcement agencies, 71% were referred to juvenile court, and 7% were referred directly to criminal court. The others were referred to a welfare agency or to another police agency. The proportion of juvenile arrests referred to juvenile court increased from 1980 to 2003 (from 58% to 71%).

In 2003, juvenile arrests were less likely to result in referral to juvenile court in large cities (population over 250,000) than in moderate size cities (population 100,000–250,000) or small cities (population less than 100,000). In large cities, 67% of juvenile arrests resulted in referral to juvenile court, compared with 74% in moderate size cities and 71% in small cities.



# Sources

Catalano, S. 2004. *Criminal Victimization, 2003.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Federal Bureau of Investigation. 1999. Arrest data for 1980 through 1997 [unpublished data].

Federal Bureau of Investigation. 2003. *National Incident-Based Reporting System master file* for the year 2001 [machine-readable data files]. Washington, DC: FBI.

Federal Bureau of Investigation. Various years. *Crime in the United States* for the years 1980 through 2003. Washington, DC: FBI.

Inter-university Consortium for Political and Social Research, University of Michigan. 2004. *Uniform Crime Reporting Program data [United States]: County-level detailed arrest and offense data, 2002* [machine-readable data file]. Washington, DC: Federal Bureau of Investigation [producer]. Ann Arbor, MI: ICPSR [distributor].

National Center for Health Statistics. *Bridged-race intercensal estimates of the July 1, 1990–July 1, 1999 United States resident population by county, single-year of age, sex, race, and Hispanic origin* [machine-readable data files]. Prepared by the U.S. Census Bureau with support from the National Cancer Institute. Released July 26, 2004. <www.cdc.gov/nchs/about/major/dvs/popbridge/popbridge.htm>.

National Center for Health Statistics. *Estimates of the July 1, 2000–July 1, 2003, United States resident population from the vintage 2003 postcensal series by year, county, age, sex, race, and Hispanic origin* [machine-readable data files]. Prepared under a collaborative arrangement with the U.S. Census Bureau. Released September 14, 2004. <www.cdc.gov/nchs/about/major/dvs/popbridge/popbridge.htm>.

Reaves, B., and Hickman, M. 2004. *Law Enforcement Management and Administrative Statistics, 2000: Data for Individual State and Local Agencies with 100 or More Officers.* Washingon, DC: Bureau of Justice Statistics.

Snyder, H. 1999. The overrepresentation of juvenile crime in robbery clearance statistics. *Journal of Quantitative Criminology,* 15(2).

U.S. Census Bureau. *U.S. population estimates by age, sex, race, and Hispanic origin: 1980 to 1999* [machine-readable data files]. Released April 11, 2000. <www.census.gov/popest/archives/1990s/nat-detail-layout.txt>.

**Technical note**

Although juvenile arrest rates may largely reflect juvenile behavior, comparisons of juvenile arrest rates across jurisdictions should be made with caution because many other factors can affect the magnitude of arrest rates. Arrest rates are calculated by dividing the number of youth arrests made in the year by the number of youth living in the jurisdiction. In general, jurisdictions that arrest a relatively large number of nonresident juveniles would have higher arrest rates than jurisdictions where resident youth behave similarly. For example, jurisdictions (especially small ones) that are vacation destinations or that are centers for economic activity in a region may have arrest rates that reflect the behavior of nonresident youth more than that of resident youth. Other factors that influence arrest rates in a given area include the attitudes of citizens toward crime, the policies of local law enforcement agencies, and the policies of other components of the justice system. Finally, in many counties, not all law enforcement agencies report their arrest data to the FBI; because a county's rate is based on data from reporting agencies, that rate may not accurately reflect the entire county's actual arrest rate (e.g., when a large urban police department does not report).

**Arrest rate source note**

Authors' analysis of arrest data from unpublished FBI reports for 1980 through 1997 and from the FBI's *Crime in the United States* reports for the years 1998 through 2003; population data for the years 1980 through 1989 from the U.S. Census Bureau's *U.S. population estimates by age, sex, race, and Hispanic origin: 1980 to 1999* [machine-readable data files]; population data for the years 1990 through 1999 from the National Center for Health Statistics' *Bridged-race intercensal estimates of the July 1, 1990–July 1, 1999 United States resident population by county, single-year of age, sex, race, and Hispanic origin* [machine-readable data files]; and population data for the years 2000 through 2003 from the National Center for Health Statistics' *Estimates of the July 1, 2000–July 1, 2003, United States resident population from the vintage 2003 postcensal series by year, county, age, sex, race, and Hispanic origin* [machine-readable data files].



# Juvenile Offenders and Victims: 2006 National Report

**Chapter 6: Juvenile offenders in court** . . . . . . . . . . . . . . . . . . . . . 155

Introduction to *Juvenile Court Statistics* . . . . . . . . . . . . . . . . . . . . . . . . . . 156
Delinquency caseload . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157
Trends in delinquency cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158
Gender variations in delinquency cases . . . . . . . . . . . . . . . . . . . . . . . . . 160
Offense profiles by gender . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 162
Racial variations in delinquency cases . . . . . . . . . . . . . . . . . . . . . . . . . . 163
Age variations in delinquency cases . . . . . . . . . . . . . . . . . . . . . . . . . . . 166
Detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 168
Detention variations by demographics . . . . . . . . . . . . . . . . . . . . . . . . . . 169
Formal vs. informal case processing . . . . . . . . . . . . . . . . . . . . . . . . . . . 171
Adjudication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173
Disposition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174
Delinquency case processing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177
Delinquency case processing by offense and demographics . . . . . . . . 178
Judicial waiver . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186
Monitoring racial disparity in the justice system . . . . . . . . . . . . . . . . . 188
Status offense cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191
Chapter 6 sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

Copyright 2006
National Center for Juvenile Justice
3700 S. Water Street, Suite 200
Pittsburgh, PA 15203-2363

Suggested citation: Snyder, Howard N., and Sickmund, Melissa. 2006. *Juvenile Offenders and Victims: 2006 National Report*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.



# Chapter 6

## Juvenile offenders in court

Law enforcement agencies refer approximately two-thirds of all arrested youth to a court with juvenile jurisdiction for further processing. As with law enforcement, the court may decide to divert some juveniles away from the formal justice system to other agencies for service. Prosecutors may file some juvenile cases directly to criminal (adult) court. The net result is that juvenile courts formally process more than 1 million delinquency and status offense cases annually. Juvenile courts adjudicate these cases and may order probation or residential placement or they may waive jurisdiction and transfer certain cases from juvenile court to criminal court. While their cases are being processed, juveniles may be held in secure detention.

This chapter quantifies the flow of cases through the juvenile court system. It documents the nature of, and trends in, cases received and the court's response, and examines gender and race differences. (Chapter 4 on juvenile justice system structure and process describes the juvenile court process in general, the history of juvenile courts in the U.S., and state variations in current laws. Chapter 2 on victims discusses the handling of child maltreatment matters.) The chapter also discusses the measurement of racial disproportionality in the juvenile justice system—i.e., disproportionate minority contact, or DMC—and notes declines in certain DMC indicators since 1992.

The information presented in this chapter is drawn from the National Juvenile Court Data Archive, which is funded by OJJDP, and the Archive's primary publication, *Juvenile Court Statistics.*

6

# The *Juvenile Court Statistics* report series details the activities of U.S. juvenile courts

### *Juvenile Court Statistics* reports have provided data on court activity since the late 1920s

The *Juvenile Court Statistics* series is the primary source of information on the activities of the nation's juvenile courts. The first *Juvenile Court Statistics* report, published in 1929 by the Children's Bureau of the U.S. Department of Labor, described cases handled in 1927 by 42 courts. In the 1950s, the U.S. Department of Health, Education and Welfare took over the work, and in 1974, the newly established Office of Juvenile Justice and Delinquency Prevention (OJJDP) took on the project. Since 1975, the National Center for Juvenile Justice (NCJJ) has been responsible for this OJJDP project. The project, the National Juvenile Court Data Archive, not only produces the *Juvenile Court Statistics* reports, but conducts research and as an archive makes the data available to other researchers.

Throughout its history, the *Juvenile Court Statistics* series has depended on the voluntary support of courts with juvenile jurisdiction. Courts contribute data originally compiled to meet their own information needs. The data NCJJ receives are not uniform but reflect the natural variation that exists across court information systems. To develop national estimates, NCJJ restructures compatible data into a common format. In 2002, juvenile courts with jurisdiction over virtually 100% of the U.S. juvenile population contributed at least some data to the national reporting program. Because not all contributed data can support the national reporting requirements, the national estimates for 2002 were based on data from more than 2,100 jurisdictions containing nearly 75% of the nation's juvenile population (i.e., youth age 10 through the upper age of original juvenile court jurisdiction in each state).

### *Juvenile Court Statistics* documents the number of cases courts handled

Just as the FBI's Uniform Crime Reporting Program counts arrests made by law enforcement (i.e., a workload measure, not a crime measure), the *Juvenile Court Statistics* series counts delinquency and status offense cases handled by courts with juvenile jurisdiction during the year. Each case represents the initial disposition of a new referral to juvenile court for one or more offenses. A youth may be involved in more than one case in a year. Therefore, the *Juvenile Court Statistics* series does not provide a count of individual juveniles brought before juvenile courts.

### Cases involving multiple charges are categorized by their most serious offense

In a single case where a juvenile is charged with robbery, simple assault, and a weapons law violation, the case is counted as a robbery case (similar to the FBI Uniform Crime Reporting Program's hierarchy rule). Thus, the *Juvenile Court Statistics* series does not provide a count of the number of crimes committed by juveniles. In addition, given that only the most serious offense is used to classify the case, counts of—and trends for—less serious offenses must be interpreted cautiously.

Similarly, cases are categorized by their most severe or restrictive disposition. For example, a case in which the judge orders the youth to a training school and to pay restitution to the victim would be characterized as a case in which the juvenile was placed in a residential facility.

### *Juvenile Court Statistics* describes delinquency and status offense caseloads

The *Juvenile Court Statistics* series describes delinquency and status offense cases handled by juvenile courts. The reports provide demographic profiles of the youth referred and the reasons for the referrals (offenses). The series documents the juvenile courts' differential use of petition, detention, adjudication, and disposition alternatives by case type. The series also can identify trends in the volume and characteristics of court activity. However, care should be exercised when interpreting gender, age, or racial differences in the analysis of juvenile delinquency or status offense cases, because reported statistics do not control for the seriousness of the behavior leading to each charge or the extent of a youth's court history.

The *Juvenile Court Statistics* series does not provide national estimates of the number of youth referred to court, their prior court histories, or their future recidivism. Nor does it provide data on criminal court processing of juvenile cases. Criminal court cases involving youth younger than age 18 who are defined as adults in their state are not included. The series was designed to produce national estimates of juvenile court activity, not to describe the law-violating careers of juveniles.



# Juvenile courts handled 1.6 million delinquency cases in 2002—up from 1.1 million in 1985

### Juvenile court caseloads have grown and changed

In 2002, U.S. courts with juvenile jurisdiction handled an estimated 1.6 million cases in which the juvenile was charged with a delinquency offense—an offense for which an adult could be prosecuted in criminal court. Thus, U.S. juvenile courts handled more than 4,400 delinquency cases per day in 2002. In comparison, approximately 1,100 delinquency cases were processed daily in 1960.

Changes in the juvenile court delinquency caseload over the years have strained the courts' resources and programs. The volume of delinquency cases handled by juvenile courts rose 41% between 1985 and 2002. Courts were asked to respond not only to more cases but also to a different type of caseload—one with more person offense and drug cases.

### Law enforcement refers most delinquency cases to court

Delinquency and status offense cases are referred to juvenile courts by a number of different sources, including law enforcement agencies, social services agencies, victims, probation officers, schools, or parents.

Percent of cases referred by law enforcement agencies:

| Offense | 2002 |
|---|---|
| Delinquency | 82% |
| Person | 87 |
| Property | 91 |
| Drugs | 90 |
| Public order | 61 |
| Status offense (formal cases) | |
| Runaway | 55% |
| Truancy | 14 |
| Ungovernability | 30 |
| Liquor | 92 |

**Youth were charged with a person offense in nearly one-quarter of the delinquency cases handled by juvenile courts in 2002**

| Most serious offense | Number of cases | Percent of total cases | Percent change 1985–2002 | Percent change 1997–2002 |
|---|---|---|---|---|
| **Total delinquency** | **1,615,400** | **100%** | **41%** | **–11%** |
| **Person offense** | **387,500** | **24** | **113** | **–2** |
| Violent Crime Index | 75,300 | 5 | 13 | –29 |
| Criminal homicide | 1,700 | 0 | 41 | –25 |
| Forcible rape | 4,700 | 0 | 8 | –14 |
| Robbery | 21,500 | 1 | –13 | –36 |
| Aggravated assault | 47,400 | 3 | 32 | –26 |
| Simple assault | 270,700 | 17 | 174 | 6 |
| Other violent sex offense | 16,400 | 1 | 150 | 31 |
| Other person offense | 25,200 | 2 | 144 | 18 |
| **Property offense** | **624,900** | **39** | **–10** | **–27** |
| Property Crime Index | 431,000 | 27 | –16 | –29 |
| Burglary | 100,000 | 6 | –29 | –29 |
| Larceny–theft | 284,400 | 18 | –13 | –29 |
| Motor vehicle theft | 38,500 | 2 | 0 | –30 |
| Arson | 8,100 | 0 | 18 | –10 |
| Vandalism | 94,800 | 6 | 11 | –18 |
| Trespassing | 50,800 | 3 | –5 | –24 |
| Stolen property offense | 22,100 | 1 | –20 | –32 |
| Other property offense | 26,200 | 2 | 45 | –16 |
| **Drug law violation** | **193,200** | **12** | **159** | **1** |
| **Public order offense** | **409,800** | **25** | **113** | **7** |
| Obstruction of justice | 182,600 | 11 | 180 | 10 |
| Disorderly conduct | 108,500 | 7 | 145 | 18 |
| Weapons offense | 35,900 | 2 | 85 | –19 |
| Liquor law violation | 28,200 | 2 | 57 | 96 |
| Nonviolent sex offense | 15,500 | 1 | 16 | 20 |
| Other public order offense | 39,000 | 2 | 23 | –25 |

- Property crimes accounted for about 4 in 10 delinquency cases in 2002.
- Although juvenile court referrals increased substantially between 1985 and 2002, the recent trend (1997–2002) is one of decline.

Note: Detail may not add to totals because of rounding. Calculations are based on unrounded numbers.

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002.*

In 2002, 82% of delinquency cases were referred by law enforcement agencies. This proportion has changed little over the past two decades. Law enforcement agencies are generally much less likely to be the source of referral for formally handled status offense cases (involving offenses that are not crimes for adults) than delinquency cases. The exception is status liquor law violations (underage drinking and possession of alcohol).



# The long-term growth trend for juvenile court caseloads has been tempered by recent declines

### In most offense categories, juvenile court cases have decreased in recent years

Compared with 1997, cases involving offenses in the FBI's Violent Crime Index were down 29% in 2002. More specifically, criminal homicide was down 25%, forcible rape 14%, robbery 36%, and aggravated assault 26%.

There were also large declines in cases involving property offenses—burglary and larceny-theft were down 29%, and motor vehicle theft 28%. Trespassing and stolen property offenses had declines greater than 30%. Declines were smaller for arson (10%) and vandalism (18%). Drug and public order offenses generally have not declined; however, they have leveled off since 1997.

Trends in juvenile court cases largely parallel trends in arrests of persons younger than 18. FBI data show that arrest rates for persons younger than 18 charged with Violent Crime Index offenses have dropped substantially since their peak in 1994. Similarly, juvenile arrest rates for Property Crime Index offenses were at their lowest level in three decades in 2002. Drug offenses are a noticeable exception—the FBI data show juvenile drug arrest rates peaking in 1997 and falling 25% through 2002. The court data show no such decline in the juvenile court's drug caseload. The data do not fully explain this pattern, but the pattern underscores the fact that not all arrests result in a juvenile court case and that juvenile court cases also come from sources other than police.

**Juvenile courts handled four times as many delinquency cases in 2002 as in 1960**

- Between 1985 and 2002, the volume of delinquency cases handled by juvenile courts nationwide increased 41%. Delinquency cases dropped 11% from their 1997 peak to 2002.
- Caseloads increased in three of the four general offense categories. Person offense and public order offense cases each rose 113% and drug cases rose 159%. Person and public order cases together accounted for 90% of the growth in the delinquency caseload between 1985 and 2002. In contrast, property cases dropped 10%

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002.*

**An offense classification may encompass situations with a wide range of seriousness**

The four general offense categories—person, property, drugs, and public order—are each very broad in terms of the seriousness of the offenses they comprise. Within these general categories, individual offenses (e.g., aggravated assault, robbery) may also encompass a wide range of seriousness. For example:

Aggravated assault is the unlawful intentional infliction of serious bodily injury or unlawful threat or attempt to inflict bodily injury or death by means of a deadly or dangerous weapon with or without actual infliction of injury. Aggravated assault includes the following situations:

- A gang attempts to kill a rival gang member in a drive-by shooting, but he survives the attack.
- A son fights with his father, causing injuries that require treatment at a hospital.
- A student raises a chair and threatens to throw it at a teacher but does not.

Robbery is the unlawful taking or attempted taking of property in the immediate possession of another person by force or threat of force. Robbery includes the following situations:

- Masked gunmen with automatic weapons demand cash from a bank.
- A gang of young men beat up a tourist and steal his wallet and valuables.
- A school bully says to another student, "Give me your lunch money, or I'll punch you."

**Trend patterns for juvenile court caseloads from 1985 through 2002 varied substantially across offense categories**

- Robbery cases peaked in 1995, near 40,000, then fell to levels of the late 1980s.
- Aggravated assault cases peaked in 1995, at 84,400, then fell off sharply. In contrast, simple assault cases climbed steadily through 1997, then leveled off at around 270,000 in 2001 and 2002.
- Burglary caseloads were relatively flat until 1997—since then, they have dropped to their lowest level since at least 1985.
- Larceny-theft cases peaked in 1995 at nearly 426,000 and have also dropped to their lowest level since at least 1985.
- Within the public order category, weapons offense cases peaked in 1994 at 51,100 and have dropped steadily since then.

Source: Authors' analyses of the National Center for Juvenile Justice's *National Juvenile Court Data Archive: Juvenile Court Case Records 1985–2002* [machine-readable data file].

# Cases increased for males and females through the mid-1990s; since then cases have declined for males

### Females account for a relatively small share of delinquency cases

In 2002, juvenile courts handled more than 423,000 delinquency cases involving female juveniles—just over one-quarter of all delinquency cases handled in 2002. Females made up a fairly large share of cases in some offense categories—larceny-theft (38%), disorderly conduct (33%), simple assault (32%), and liquor law cases (32%). For other offense categories, the female share of the caseload was relatively small—violent sex offenses other than rape (5%), robbery (9%), burglary (10%), arson (13%), and weapons offenses (14%).

| Most serious offense | Female proportion |
|---|---|
| Total delinquency | 26% |
| Person offense | 28 |
| Violent Crime Index | 20 |
| Criminal homicide | 13 |
| Forcible rape | 3 |
| Robbery | 9 |
| Aggravated assault | 26 |
| Simple assault | 32 |
| Other violent sex offense | 5 |
| Other person offense | 27 |
| Property offense | 26 |
| Property Crime Index | 30 |
| Burglary | 10 |
| Larceny-theft | 38 |
| Motor vehicle theft | 23 |
| Arson | 13 |
| Vandalism | 16 |
| Trespassing | 19 |
| Stolen property offense | 15 |
| Other property offense | 32 |
| Drug law violation | 18 |
| Public order offense | 28 |
| Obstruction of justice | 29 |
| Disorderly conduct | 33 |
| Weapons offense | 14 |
| Liquor law violation | 32 |
| Nonviolent sex offense | 19 |
| Other public order offense | 25 |

### For most offenses, female caseloads have grown more or decreased less than male caseloads

| | Percent change | | | |
|---|---|---|---|---|
| | 1985–2002 | | 1997–2002 | |
| Most serious offense | Male | Female | Male | Female |
| **Total delinquency** | **29%** | **92%** | **–15%** | **0%** |
| **Person offense** | **91** | **202** | **–5** | **7** |
| Violent Crime Index | 9 | 70 | –30 | –23 |
| Criminal homicide | 39 | 58 | –25 | –25 |
| Forcible rape | 7 | 63 | –14 | 6 |
| Robbery | –16 | 18 | –36 | –42 |
| Aggravated assault | 20 | 84 | –28 | –19 |
| Simple assault | 152 | 238 | 4 | 12 |
| Other violent sex offense | 147 | 240 | 29 | 62 |
| Other person offense | 111 | 322 | 11 | 42 |
| **Property offense** | **–19** | **27** | **–29** | **–18** |
| Property Crime Index | –26 | 23 | –32 | –20 |
| Burglary | –31 | –5 | –30 | –25 |
| Larceny-theft | –27 | 25 | –35 | –19 |
| Motor vehicle theft | –7 | 41 | –31 | –25 |
| Arson | 15 | 44 | –10 | –6 |
| Vandalism | 5 | 65 | –20 | –8 |
| Trespassing | –8 | 12 | –25 | –16 |
| Stolen property offense | –23 | 6 | –33 | –23 |
| Other property offense | 30 | 92 | –18 | –12 |
| **Drug law violation** | **156** | **171** | **–3** | **20** |
| **Public order offense** | **97** | **171** | **2** | **26** |
| Obstruction of justice | 169 | 210 | 4 | 26 |
| Disorderly conduct | 117 | 241 | 12 | 35 |
| Weapons offense | 73 | 223 | –21 | –3 |
| Liquor law violation | 38 | 123 | 79 | 143 |
| Nonviolent sex offense | 16 | 18 | 16 | 42 |
| Other public order offense | 17 | 45 | –27 | –21 |

- Between 1985 and 2002, the overall delinquency caseload for females increased 92%, compared with a 29% increase for males.
- Among females, the number of aggravated assault cases rose substantially (up 84%) from 1985 to 2002. In comparison, among males, aggravated assault cases were up 20%.
- Between 1997 and 2002, the number of aggravated assault cases dropped for both males and females, but the decline for males (28%) was greater than the decline for females (19%).

Note: Detail may not total 100% because of rounding. Calculations are based on unrounded numbers.

Source: Authors' analyses of the National Center for Juvenile Justice's *National Juvenile Court Data Archive: Juvenile Court Case Records 1985–2002* [machine-readable data file].

**Juvenile court caseload trends are different for males and females, and the differences vary by offense category**

- Male delinquency caseloads have been on the decline since the mid-1990s. Female caseloads have not shown a similar decline, although they seem to have leveled off in recent years.
- The decline in male caseloads has been driven by a sharp reduction in the volume of property cases—down 34% from the 1994 peak to 2002.
- For females, the largest 1985–2002 increase was in person offense cases (202%). Drug and public order cases also rose substantially (each 171%).

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002.*

**The female share of delinquency cases increased steadily from 1991 through 2002**

The proportion of delinquency cases that involved females was 19% in 1991; by 2002, it had increased 7 percentage points to 26%. The female share of person offense cases rose 8 percentage points over the same period to 28%. Property cases also saw an 8-point increase in the proportion of females, to 26% in 2002. The female proportion of drug cases went from 12% in 1991 to 18% in 2002, an increase of 6 points. Public order cases had the greatest increase in the proportion of females—9 percentage points from 1991 to 2002, up to 28%.







# In 2002, male and female offense profiles were similar, but not as similar as they were in 1985

**For both males and females, 2002 caseloads had smaller shares of property crimes and more person crimes than in 1985**

Compared with offense profiles in 1985, both male and female delinquency caseloads had greater proportions of person offense cases in 2002.

Offense profile by sex:

| Offense | Male | Female |
|---|---|---|
| 2002 | | |
| Delinquency | 100% | 100% |
| Person | 23 | 26 |
| Property | 39 | 39 |
| Drugs | 13 | 8 |
| Public order | 25 | 27 |
| 1985 | | |
| Delinquency | 100% | 100% |
| Person | 16 | 16 |
| Property | 61 | 59 |
| Drugs | 7 | 6 |
| Public order | 16 | 19 |

Note: Detail may not total 100% because of rounding.

Both male and female caseloads saw substantial reductions in the proportion of cases that involved property crimes. Despite the reduction in the property crime share of delinquency cases, property cases were still the most common type of case for both males and females in 2002.

Compared with males, females had a greater proportion of person offense cases and a smaller proportion of drug offense cases in 2002. In 1985, the offense profiles for cases involving males and females differed less than in 2002.

**Although males accounted for more than twice as many delinquency cases as females in 2002, their offense profiles were similar**

| | Male | | Female | |
|---|---|---|---|---|
| Most serious offense | Number of cases | Percent of cases | Number of cases | Percent of cases |
| **Total delinquency** | **1,192,300** | **100%** | **423,100** | **100%** |
| **Person offense** | **277,900** | **23** | **109,700** | **26** |
| Violent Crime Index | 60,600 | 5 | 14,700 | 3 |
| Criminal homicide | 1,500 | 0 | 200 | 0 |
| Forcible rape | 4,500 | 0 | 200 | 0 |
| Robbery | 19,500 | 2 | 2,000 | 0 |
| Aggravated assault | 35,100 | 3 | 12,300 | 3 |
| Simple assault | 183,400 | 15 | 87,300 | 21 |
| Other violent sex offense | 15,600 | 1 | 800 | 0 |
| Other person offense | 18,300 | 2 | 6,900 | 2 |
| **Property offense** | **460,400** | **39** | **164,500** | **39** |
| Property Crime Index | 301,600 | 25 | 129,400 | 31 |
| Burglary | 89,900 | 8 | 10,100 | 2 |
| Larceny-theft | 174,300 | 15 | 110,100 | 26 |
| Motor vehicle theft | 30,300 | 3 | 8,200 | 2 |
| Arson | 7,000 | 1 | 1,000 | 0 |
| Vandalism | 80,800 | 7 | 14,100 | 3 |
| Trespassing | 41,500 | 3 | 9,300 | 2 |
| Stolen property offense | 18,900 | 2 | 3,100 | 1 |
| Other property offense | 17,600 | 1 | 8,600 | 2 |
| **Drug law violation** | **158,100** | **13** | **35,100** | **8** |
| **Public order offense** | **296,000** | **25** | **113,800** | **27** |
| Obstruction of justice | 130,700 | 11 | 51,900 | 12 |
| Disorderly conduct | 73,500 | 6 | 35,000 | 8 |
| Weapons offense | 30,900 | 3 | 5,000 | 1 |
| Liquor law violation | 19,200 | 2 | 9,000 | 2 |
| Nonviolent sex offense | 12,800 | 1 | 2,800 | 1 |
| Other public order offense | 28,900 | 2 | 10,100 | 2 |

- Compared with males, the female juvenile court caseload had a greater proportion of simple assault and larceny-theft cases and a smaller proportion of robbery, burglary, vandalism, and drug cases.

Note: Detail may not add to totals because of rounding. Calculations are based on unrounded numbers.

Source: Authors' analyses of the National Center for Juvenile Justice's *National Juvenile Court Data Archive: Juvenile Court Case Records 1985–2002* [machine-readable data file].



# A disproportionate number of delinquency cases involved black juveniles

### In 2002, blacks constituted 16% of the juvenile population but 29% of the delinquency caseload

Although a majority of delinquency cases handled in 2002 involved white youth (1,086,700 or 67%), a disproportionate number of cases involved blacks (473,100 or 29%), given their proportion of the juvenile population. In 2002, white youth made up 78% of the juvenile population (youth ages 10 through the upper age of juvenile court jurisdiction in each state), black youth 16%, and youth of other races 6%.*

Racial profile of delinquency cases:

| Offense | White | Black | Other races | Total |
|---|---|---|---|---|
| 2002 | | | | |
| Delinquency | 67% | 29% | 3% | 100% |
| Person | 60 | 37 | 3 | 100 |
| Property | 68 | 28 | 4 | 100 |
| Drugs | 76 | 21 | 3 | 100 |
| Public order | 68 | 29 | 3 | 100 |
| 1985 | | | | |
| Delinquency | 72 | 25 | 3 | 100 |
| Person | 58 | 39 | 2 | 100 |
| Property | 74 | 23 | 3 | 100 |
| Drugs | 79 | 19 | 2 | 100 |
| Public order | 77 | 21 | 2 | 100 |

Note: Detail may not total 100% because of rounding.

The racial profile of delinquency cases overall was essentially the same in 1985 and 2002, although some of the general offense categories had noticeable changes. The proportion of black juveniles changed from 23% in 1985 to 28% in 2002 for property cases and from 21% to 29% for public order cases.

* Throughout this chapter, juveniles of Hispanic ethnicity can be any race; however, most are included in the white racial category.

**The delinquency case rate rose from 1985 to 2002 for all races, but the rate for blacks remained well above the rates for other groups**

- The delinquency case rate for white juveniles increased 35% from 1985 to its 1997 peak then dropped 15% by 2002 for an overall increase from 1985 to 2002 of 15%. Among black juveniles, the delinquency case rate increased 67% from 1985 to its 1995 peak then dropped 24% by 2002 for an overall increase from 1985 to 2002 of 27%. The delinquency case rate for juveniles of other races increased 40% from 1985 to its 1994 peak then dropped 28% by 2002 for an overall increase from 1985 to 2002 of 1%.
- In 2002, the delinquency case rate for blacks (94) was more than 2 times the rate for whites (44) and just over 3 times the rate for youth of other races (31).

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002.*

### Offense profiles for whites and blacks differed

Delinquency caseloads for black juveniles contained a greater proportion of person offenses than did caseloads for white juveniles and those of other races. For all racial groups, property offenses accounted for the largest proportion of cases and drug offenses the smallest proportion. Compared with 1985, for all racial groups, person and public order offenses made up a larger share and property offenses a smaller share of delinquency cases in 2002.

Offense profile of delinquency cases:

| Offense | White | Black | Other races |
|---|---|---|---|
| 2002 | | | |
| Delinquency | 100% | 100% | 100% |
| Person | 22 | 30 | 22 |
| Property | 39 | 36 | 45 |
| Drugs | 13 | 9 | 10 |
| Public order | 26 | 25 | 23 |
| 1985 | | | |
| Delinquency | 100% | 100% | 100% |
| Person | 13 | 25 | 15 |
| Property | 62 | 56 | 63 |
| Drugs | 7 | 5 | 7 |
| Public order | 18 | 14 | 16 |

Note: Detail may not total 100% because of rounding.

Chapter 6: Juvenile offenders in court

**Case rate trends varied across race and offense, but in all offense categories from 1985 through 2002, the rates for black youth were substantially higher than the rates for other youth**

Cases per 1,000 juveniles ages 10–upper age
Person
Black
White
Other races
35
30
25
20
15
10
5
0
1986
1990
1994
1998
2002

Cases per 1,000 juveniles ages 10–upper age
Property
Black
White
Other races
60
50
40
30
20
10
0
1986
1990
1994
1998
2002

Cases per 1,000 juveniles ages 10–upper age
Drugs
Black
White
Other races
14
12
10
8
6
4
2
0
1986
1990
1994
1998
2002

Cases per 1,000 juveniles ages 10–upper age
Public order
Black
White
Other races
30
25
20
15
10
5
0
1986
1990
1994
1998
2002

- Compared with 1985, 2002 person offense case rates were higher for all racial groups—up 93% for whites, 53% for blacks, and 47% for youth of other races. All racial groups experienced recent declines in person offense case rates—down 9% from the 1998 peak for whites, down 18% from the 1995 peak for blacks, and down 17% from the 1994 peak for other races.

- Property case rates dropped for all races between 1985 and 2002—down 28% for whites, 17% for blacks, and 27% for youth of other races. Property case rates for both white and black youth in 2002 were 39% below their 1991 peaks. The rate for youth of other races was highest in 1992 and was down 46% by 2002.

- Case rates for drug offenses more than doubled from 1985 to 2002 for both white (118%) and black (128%) youth. Among youth of other races, the drug case rate rose 52%. For black youth, the drug case rate peaked in 1996 and was down 37% by 2002. For white youth, the rate peaked in 2001 and then dropped 6% in 2002. For youth of other races, the drug offense case rate was higher in 2002 than any year since at least 1985.

- For white youth, the public order case rate was higher in 2002 than any year since at least 1985. Their 2002 rate was 66% higher than the 1985 rate. For blacks, the public order case rate was highest in 1997 and dropped 11% by 2002. Nevertheless, the 2002 rate was 125% above the 1985 rate. Similarly, for youth of other races, the rate in 2002 was 6% below the 1994 rate but still 52% above the 1985 rate.

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002.*

164
*Juvenile Offenders and Victims: 2006 National Report*

### In 2002, the disparity between rates for black youth and white youth was lowest for drug cases

In 2002, case rates for black juveniles were substantially higher than rates for other juveniles in all offense categories, but the degree of disparity varied. The person offense case rate for black juveniles (28.2 per 1,000) was nearly 3 times the rate for white juveniles (9.5), the public order case rate for black juveniles (23.4) was more than 2 times the rate for white juveniles (11.4), and the property case rate for black juveniles (34.2) was nearly 2 times the rate for white juveniles (17.5).

In comparison, in 2002, the drug offense case rate for black juveniles (8.2) was less than 1.5 times the rate for white juveniles (6.0). Although the disparity between black and white drug case rates was relatively small in 2002, that was not always true. In fact, in 1991, the drug offense case rate for black juveniles was more than 5.5 times the rate for white juveniles. No other offense reached this extent of disparity between black and white case rates.

### The racial profile for delinquency cases was similar for males and females in 2002

Among females referred to juvenile court in 2002 for person offenses, blacks accounted for 38% of cases—the greatest overrepresentation among black juveniles. The black proportion among males referred for person offenses was just slightly smaller at 36%.

Racial profile of delinquency cases by gender, 2002:

| Offense | White | Black | Other races | Total |
|---|---|---|---|---|
| Male | | | | |
| Delinquency | 67% | 29% | 3% | 100% |
| Person | 61 | 36 | 3 | 100 |
| Property | 69 | 28 | 4 | 100 |
| Drugs | 73 | 24 | 3 | 100 |
| Public order | 69 | 28 | 3 | 100 |
| Female | | | | |
| Delinquency | 67 | 30 | 4 | 100 |
| Person | 59 | 38 | 3 | 100 |
| Property | 68 | 28 | 4 | 100 |
| Drugs | 87 | 10 | 3 | 100 |
| Public order | 66 | 30 | 3 | 100 |

Note: Detail may not total 100% because of rounding.

Among females referred for drug offenses, blacks were underrepresented. Although they account for 16% of the population of juvenile females, blacks made up just 10% of drug cases involving females in 2002.

Youth of other races make up 6% of the juvenile population; they accounted for less than 5% of cases across all gender and offense groups.

### Offense profiles for both males and females varied somewhat across racial groups

Among males in 2002, blacks had a greater proportion of person offense cases than whites or youth of other races. In addition, black males had a somewhat smaller proportion of property cases than white males or males of other races.

Offense profile of delinquency cases by race and gender, 2002:

| Offense | White | Black | Other races |
|---|---|---|---|
| Male | | | |
| Delinquency | 100% | 100% | 100% |
| Person | 21 | 29 | 22 |
| Property | 39 | 36 | 45 |
| Drugs | 14 | 11 | 11 |
| Public order | 25 | 24 | 23 |
| Female | | | |
| Delinquency | 100% | 100% | 100% |
| Person | 23 | 34 | 21 |
| Property | 40 | 36 | 47 |
| Drugs | 11 | 3 | 8 |
| Public order | 27 | 27 | 24 |

Note: Detail may not total 100% because of rounding.

Among females, person offenses accounted for 34% of the cases involving blacks, compared with 23% of the cases involving whites and 21% of the cases involving youth of other races. The drug offense share of cases involving females was greater for whites (11%) than for blacks (3%) or youth of other races (8%).

Compared with whites and blacks, the property offense share of delinquency cases was greater among youth of other races. This was true for both males and females.



# Although older teens dominate delinquency caseloads, trends are similar for all age groups

### For all ages, 2002 delinquency case rates were lower than rates in the mid- to late 1990s

In 2002, juvenile courts handled 51.5 delinquency cases for every 1,000 juveniles (youth subject to original juvenile court jurisdiction) in the U.S. population. The overall delinquency case rate peaked in 1996, 43% above the 1985 rate, and then declined 17% to the 2002 level. For all ages, delinquency case rates showed similar trend patterns, although the peak years varied from one age to another. Case rates for older juveniles peaked in 1994 or 1995 and rates for younger juveniles tended to peak in the later 1990s. Case rate declines were smaller for juveniles younger than 15 than for older teens.

### Most delinquency cases involve older teens

High-school-age juveniles (ages 14 and older) made up 80% of the delinquency caseload in 2002, older teens (ages 16 and older) accounted for 42%. In comparison, middle-school-age juveniles (ages 12 and 13) were involved in 16% of delinquency cases, while juveniles younger than 12 accounted for 5%. The 2002 age profile of delinquency cases was similar to the 1985 profile.

Age profile of delinquency cases:

| Age | 1985 | 2002 |
|---|---|---|
| Total | 100% | 100% |
| Under 12 | 6 | 5 |
| 12 | 5 | 5 |
| 13 | 10 | 10 |
| 14 | 17 | 16 |
| 15 | 22 | 21 |
| 16 | 23 | 23 |
| 17 | 16 | 17 |
| Over 17 | 2 | 2 |

**Delinquency case rates generally increase with age**

- In 2002, the delinquency case rate for 16-year-olds was 1.6 times the rate for 14-year-olds and the rate for 14-year-olds was 3.1 times the rate for 12-year-olds.
- The increase in rates between age 13 and age 17 was sharpest for drug offenses; the rate for drug offenses for 17-year-old juveniles was 8 times the rate for 13-year-olds.
- The growth in age-specific case rates was less dramatic for person offense cases. Person offense rates increased steadily through age 16 then dropped off at age 17, unlike rates for other offenses that increased through age 17. The person case rate for 17-year-olds was 84% higher than the rate for 13-year-olds.

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002.*

Age profiles varied somewhat across offenses but have not changed substantially since 1985.

Age profile of delinquency cases, 2002:

| Age | Person | Property | Drugs | Public order |
|---|---|---|---|---|
| Total | 100% | 100% | 100% | 100% |
| Under 12 | 7 | 6 | 1 | 3 |
| 12 | 7 | 6 | 2 | 4 |
| 13 | 13 | 11 | 5 | 9 |
| 14 | 18 | 17 | 12 | 16 |
| 15 | 20 | 21 | 21 | 23 |
| 16 | 20 | 22 | 30 | 24 |
| 17 | 14 | 15 | 26 | 18 |
| Over 17 | 1 | 2 | 3 | 4 |

### Why do juvenile courts handle more 16- than 17-year-olds?

Although comparable numbers of 17-year-olds and 16-year-olds were arrested in 2002, the number of juvenile court cases involving 17-year-olds (271,600) was lower than the number involving 16-year-olds (376,900). The explanation lies primarily in the fact that 13 states exclude 17-year-olds from the original jurisdiction of the juvenile court (see Chapter 4). In these states, all 17-year-olds are legally adults and are referred to criminal court rather than to juvenile court. Thus, far fewer 17-year-olds than 16-year-olds are subject to original juvenile court jurisdiction. Of the more than 31 million youth under juvenile court jurisdiction in 2002, youth ages 10 through 15 accounted for 80%, 12% were age 16, and 8% were age 17.

### In 2002, offense profiles of younger and older youth differed

Compared with caseloads of older juveniles in 2002, the caseload of juveniles younger than 14 had larger

proportions of person and property offenses and smaller proportions of drug and public order offenses. In 1985, the proportions of person offense cases were similar for younger and older youth.

Compared with 1985 caseloads, person offenses were a substantially larger proportion of 2002 caseloads for all age groups. This shift was greatest for the youngest juveniles: person offenses increased from 16% of cases in 1985 to 34% in 2002. Public order offenses also accounted for a greater share of cases in 2002 than in 1985 across all age groups. These increases were offset by the declining share of property offenses.

Offense profile of delinquency cases by age:

| Offense | Under age 12 | Ages 12–13 | Over age 13 |
|---|---|---|---|
| 2002 | | | |
| Delinquency | 100% | 100% | 100% |
| Person | 34 | 31 | 22 |
| Property | 48 | 42 | 38 |
| Drugs | 1 | 6 | 14 |
| Public order | 16 | 22 | 27 |
| 1985 | | | |
| Delinquency | 100% | 100% | 100% |
| Person | 16 | 17 | 16 |
| Property | 75 | 68 | 58 |
| Drugs | 1 | 3 | 8 |
| Public order | 8 | 12 | 18 |

Note: Detail may not total 100% because of rounding.

**Between 1985 and 2002, trends in case rates were generally similar across age groups**

- The person offense case rate for youth ages 14–17 rose from 1985 through 1995 then dropped off. Youth ages 12–13 had a similar pattern. For youth ages 10–11, the person offense rate was highest in 2001.
- For all age groups, property case rates peaked in 1991 and declined steadily thereafter.
- Drug offense case rates were relatively flat for all age groups from the mid-1980s to the mid-1990s, when they began to rise sharply. Rates flattened out again after 1996 for all ages.

Note: Because of the low volume of drug and public order cases involving younger juveniles, their case rates are inflated by a factor of 5 to display the trends over time.

Source: Authors' analyses of Stahl et al.'s *Easy Access to Juvenile Court Statistics: 1985–2002* [data analysis application].

### The age profile of delinquency cases did not differ substantially by gender or race in 2002

At each age, the proportion of cases was not more than 3 percentage points different for males compared to females. Among males, the largest proportion of delinquency cases involved 16-year-olds; among females, the largest proportion involved 15-year-olds. Age profiles across racial groups were also similar.

Age profile of delinquency cases by gender, 2002:

| Age | Male | Female |
|---|---|---|
| Total | 100% | 100% |
| Under 12 | 5 | 3 |
| 12 | 5 | 5 |
| 13 | 10 | 12 |
| 14 | 15 | 18 |
| 15 | 21 | 23 |
| 16 | 24 | 22 |
| 17 | 18 | 15 |
| Over 17 | 2 | 2 |

Note: Detail may not total 100% because of rounding.

Age profile of delinquency cases by race, 2002:

| Age | White | Black | Other races |
|---|---|---|---|
| Total | 100% | 100% | 100% |
| Under 12 | 4 | 6 | 5 |
| 12 | 5 | 7 | 6 |
| 13 | 9 | 12 | 11 |
| 14 | 16 | 17 | 16 |
| 15 | 21 | 22 | 20 |
| 16 | 24 | 22 | 21 |
| 17 | 18 | 13 | 18 |
| Over 17 | 3 | 2 | 3 |

Note: Detail may not total 100% because of rounding.



# In 1 in 5 delinquency cases, the youth is detained between referral to court and case disposition

### When is secure detention used?

A youth may be placed in a secure juvenile detention facility at various points during the processing of a case. Although detention practices vary from jurisdiction to jurisdiction, a general model of detention practices is useful.

When a case is referred to juvenile court, intake staff may decide to hold the youth in a detention facility while the case is being processed. In general, detention is used if there is reason to believe the youth is a threat to the community, will be at risk if returned to the community, or may fail to appear at an upcoming hearing. The youth may also be detained for diagnostic evaluation purposes. In most delinquency cases, however, the youth is not detained.

In all states, law requires that a detention hearing be held within a few days (generally within 24 hours). At that time, a judge reviews the decision to detain the youth and either orders the youth released or continues the detention. National juvenile court statistics count the number of cases that involve detention during a calendar year. As a case is processed, the youth may be detained and released more than once between referral and disposition. Juvenile court data do not count individual detentions, nor do they count the number of youth detained. In addition, although in a few states juveniles may be committed to a detention facility as part of a disposition order, the court data do not include such placements in the count of cases involving detention.

**The number of cases involving detention was higher in 2002 than in 1985 for all but property cases**

- The number of delinquency cases involving detention increased 42% between 1985 and 2002, from 234,600 to 329,800. The largest relative increase was for drug cases (140%), followed by person cases (122%) and public order cases (72%). In contrast, the number of detained property cases declined 12% during this period.
- Despite the growth in the volume of delinquency cases involving detention, the proportion of cases detained was the same in 2002 as in 1985 (20%). The percent of cases detained was highest in 1990 (23%) and lowest in 1995 and 1996 (17%).
- Property cases were the least likely to involve detention—youth were detained in 17% of property cases in 2002. In comparison, youth were detained in 21% of public order cases, 20% of drug cases, and 25% of person cases.
- In 1990, youth were detained in 37% of drug cases—the highest proportion of cases detained for any offense during the 1985–2002 period. In fact, no other offense category ever had more than 27% of cases detained.

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002.*

### The proportion of detained cases involving property offenses has declined

Although property offense cases were the least likely to involve detention in 2002, they still accounted for the largest volume of cases involving detention because they represent the largest share of juvenile court caseloads. Property offense cases represented 32% of all detained delinquency cases in 2002, while person offenses accounted for 29% and public order cases 27%. Drug offense cases made up the smallest share of detained cases at 11%.

Compared with the offense profile of detained cases in 1985, the 2002 detention caseload had a substantially smaller proportion of property offense cases. This was offset by a larger proportion of person offense cases.

Offense profile of delinquency cases:

| Offense | All cases 1985 | All cases 2002 | Detained cases 1985 | Detained cases 2002 |
|---|---|---|---|---|
| Delinquency | 100% | 100% | 100% | 100% |
| Person | 16 | 24 | 19 | 29 |
| Property | 61 | 39 | 52 | 32 |
| Drugs | 7 | 12 | 7 | 11 |
| Public order | 17 | 25 | 22 | 27 |

Note: Detail may not total 100% because of rounding.



# Use of detention varied not only by offense but also by gender, race, and age

**Males accounted for most delinquency cases involving detention and were consistently more likely than females to be detained**

- The number of male cases detained rose 49% from 1985 to 1999 and then dropped 10% for an overall increase of 34%. Females had an 87% increase in detained cases between 1985 and 1999. Between 1999 and 2002, the number of female cases detained changed little—the peak year was 1999 and the overall increase was 87%.
- The likelihood of detention was higher for males than for females, but the 1985-2002 trend lines for the percent of cases detained ran in tandem.

**White youth accounted for the largest number of delinquency cases involving detention, although they were the least likely to be detained**

- The number of delinquency cases involving white youth who were detained rose 44% from 1985 to its peak in 1999 and then dropped 9% for an overall increase of 32%. For black youth, the number of cases detained rose 77% from 1985 to its 1999 peak and then dropped 7% for an overall increase of 64%.
- The number of delinquency cases involving youth of other races who were detained peaked in 1990—79% above the 1985 figure. Between 1990 and 2002, the figure dropped 12% for an overall increase of 57%.
- For all racial groups, trends in the likelihood of detention followed similar patterns, although the proportion of cases involving detention remained lower for white youth than for black youth or youth of other races.
- For all racial groups, the likelihood of detention peaked in 1990 and showed a smaller rise in the late 1990s and subsequent fall into 2000

Source: Authors' analyses of Stahl et al.'s *Easy access to juvenile court statistics: 1985–2002* [online analysis].

**In 2002, the gender disparity in the likelihood of detention was least for drug cases**

In 2002, the likelihood of detention in delinquency cases for males was 1.3 times the likelihood for females (22% vs. 17%). Males were more likely than females to be detained in each of the four general offense categories: 1.6 times more likely for property offenses, 1.3 times for public order offenses, 1.2 for person offenses, and 1.1 for drug offenses.

Percent of cases detained, 2002:

| Offense | Male | Female |
|---|---|---|
| Delinquency | 22% | 17% |
| Person | 26 | 22 |
| Property | 19 | 12 |
| Drugs | 20 | 18 |
| Public order | 23 | 18 |

**The degree of racial disparity in the likelihood of detention varied across offense**

In 2002, the likelihood of detention was greatest for black youth for all but public order offenses—youth of other races had a slightly greater percent of public order cases detained (24%) than black youth (23%). The overall percent of cases detained for blacks was 1.4 times that for whites and 1.2 times that for other races. The greatest disparity between blacks and whites or other races was in the likelihood of detention in drug cases—the proportion for blacks was more than 2 times that for whites and nearly 2 times that for youth of other races.

Percent of cases detained, 2002:

| Offense | White | Black | Other races |
|---|---|---|---|
| Delinquency | 18% | 25% | 21% |
| Person | 23 | 28 | 27 |
| Property | 15 | 22 | 17 |
| Drugs | 16 | 33 | 17 |
| Public order | 21 | 23 | 24 |

## The racial profile for detained delinquency cases was similar for males and females in 2002

In 2002, the black proportion of detained delinquency cases (36%) was substantially greater than the black proportion of the juvenile population (16%) and also greater than the black proportion of delinquency cases handled during the year (29%). The overrepresentation of black juveniles in the detention caseload was greater among person offenses (41%) than other offenses. The black proportion of detained person offense cases was similar among males (40%) and females (41%). Across offenses, for males and females, the black proportion of detained cases was in the 30%–40% range. The one exception was among detained females referred for drug offenses. Blacks accounted for just 19% of this group—close to their representation in the juvenile population (16%).

Racial profile of detained cases by gender, 2002:

| Offense | White | Black | Other races | Total |
|---|---|---|---|---|
| Total | | | | |
| Delinquency | 61% | 36% | 3% | 100% |
| Person | 56 | 41 | 3 | 100 |
| Property | 60 | 36 | 4 | 100 |
| Drugs | 61 | 36 | 2 | 100 |
| Public order | 66 | 31 | 4 | 100 |
| Male | | | | |
| Delinquency | 60 | 36 | 3 | 100 |
| Person | 56 | 40 | 4 | 100 |
| Property | 60 | 36 | 4 | 100 |
| Drugs | 58 | 40 | 2 | 100 |
| Public order | 66 | 31 | 4 | 100 |
| Female | | | | |
| Delinquency | 62 | 35 | 4 | 100 |
| Person | 56 | 41 | 3 | 100 |
| Property | 61 | 35 | 4 | 100 |
| Drugs | 78 | 19 | 4 | 100 |
| Public order | 64 | 32 | 4 | 100 |

Note: Detail may not total 100% because of rounding.

## The offense profile of detained cases varied by race and by gender in 2002

For males, the person offense share of delinquency cases was greater among detained cases involving black youth (31%) than among detained cases involving white youth (26%) or youth of other races (28%). For male youth of other races, drug offense cases accounted for 8% of detained cases, compared with 12% for white males and 13% for black males.

Among females, blacks had a higher proportion of person offenses in the detention caseload (41%) than did either whites (31%) or youth of other races (27%). For white females, drug offense cases accounted for 11% of detained cases, compared with 5% for black females and 9% for females of other races.

Offense profile of detained cases by race and gender, 2002:

| Offense | White | Black | Other races |
|---|---|---|---|
| Total | | | |
| Delinquency | 100% | 100% | 100% |
| Person | 27 | 33 | 28 |
| Property | 32 | 32 | 36 |
| Drugs | 12 | 12 | 8 |
| Public order | 29 | 23 | 28 |
| Male | | | |
| Delinquency | 100% | 100% | 100% |
| Person | 26 | 31 | 28 |
| Property | 34 | 33 | 38 |
| Drugs | 12 | 13 | 8 |
| Public order | 29 | 22 | 26 |
| Female | | | |
| Delinquency | 100% | 100% | 100% |
| Person | 31 | 41 | 27 |
| Property | 27 | 28 | 32 |
| Drugs | 11 | 5 | 9 |
| Public order | 30 | 26 | 32 |

Note: Detail may not total 100% because of rounding.

### Each year from 1985 through 2002, delinquency cases involving youth age 16 or older were more likely to be detained than were cases involving youth age 15 or younger

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002.*



# The petitioned caseload increased 80% from 1985 to 2002 as formal case handling became more likely

### In a formally processed case, petitioners ask the court to order sanctions

Formal case handling involves the filing of a petition requesting that the court hold an adjudicatory or waiver hearing. Decisionmakers (police, probation, intake, prosecutor, or other screening officer) may consider informal case handling if they believe that accountability and rehabilitation can be achieved without formal court intervention. Compared with informally handled (nonpetitioned) cases, formally processed (petitioned) delinquency cases tend to involve more serious offenses, older juveniles, and juveniles with longer court histories.

If the court decides to handle the matter informally, the offender agrees to comply with one or more sanctions such as community service, victim restitution, or voluntary probation supervision. Informal cases are generally held open pending successful completion of the disposition. If the court's conditions are met, the charges are dismissed. If, however, the offender does not fulfill the conditions, the case is likely to be petitioned for formal processing.

### The use of formal handling has increased

In 1985, juvenile courts formally processed 45% of delinquency cases. By 2002, that proportion had increased to 58%. Cases in each of the four general offense categories were more likely to be handled formally in 2002 than in 1985.

In 2002, property offense cases were the least likely to be petitioned for formal handling, and drug cases were the most likely. In fact, from 1985 to 2002, drug offense cases went from least likely to most

**The number of petitioned delinquency cases increased 96% between 1985 and the peak in 1997, then declined 8% by 2002**

- The number of delinquency cases petitioned in 2002 (934,900) was 80% more than the number petitioned in 1985 (520,200). In comparison, the overall number of delinquency cases referred increased 41% in that time.
- Compared with the trend for the petitioned caseload, the trend for nonpetitioned cases was flatter. The number of nonpetitioned delinquency cases increased 28% between 1985 and the peak in 1997 then declined 15% by 2002 for an overall increase of 9%.

**Between 1985 and 2002, the petitioned caseload increased for each of the four general offense categories**

- Between 1985 and 2002, petitioned person offense cases increased 137%, property cases 13%, drug offense cases 26%, and public order cases 178%.
- The up-and-down trend in the petitioned caseload for delinquency cases overall was driven by property cases. The number of petitioned property cases increased 52% between 1985 and the peak in 1996 then declined 25% by 2002. Among the other offense categories, the number of petitioned cases increased and then leveled off but did not decline noticeably.

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002.*

likely to be petitioned. The 61% petitioning rate for drug cases in 2002, however, was substantially lower than the peak rate of 68% in 1991. No other offense category experienced such an upsurge in petitioning between 1985 and 2002.

Percent of delinquency cases petitioned:

| Offense | 1985 | 2002 |
|---|---|---|
| Delinquency | 45% | 58% |
| Person | 54 | 60 |
| Property | 44 | 55 |
| Drugs | 43 | 61 |
| Public order | 45 | 59 |

### The proportion of petitioned cases increased from 1985 to 2002 for all demographic groups

The likelihood of formal case processing increased from 1985 to 2002 for both males and females and for all races and ages.

Percent of delinquency cases petitioned:

| Characteristic | 1985 | 2002 |
|---|---|---|
| Gender | | |
| Male | 48% | 61% |
| Female | 35 | 50 |
| Race | | |
| White | 42 | 55 |
| Black | 56 | 65 |
| Other races | 44 | 58 |
| Age | | |
| 15 or younger | 42 | 55 |
| 16 or older | 50 | 61 |

In 2002, as in 1985, courts petitioned a larger share of delinquency cases involving males than females. This was true for each of the general offense categories. Courts petitioned a larger share of delinquency cases involving blacks than whites or youth of other races.

**In 2002, juvenile courts petitioned nearly 6 in 10 delinquency cases for formal handling and adjudicated youth delinquent in nearly 7 in 10 of those petitioned cases**

| Most serious offense | Number of petitioned cases | Percent of delinquency cases petitioned | Number of adjudicated cases | Percent of petitioned cases adjudicated |
|---|---|---|---|---|
| **Total delinquency** | **934,900** | **58%** | **624,500** | **67%** |
| **Person offense** | **233,300** | **60** | **145,800** | **62** |
| Violent Crime Index | 56,400 | 75 | 37,000 | 66 |
| Criminal homicide | 1,400 | 82 | 800 | 57 |
| Forcible rape | 3,700 | 78 | 2,500 | 68 |
| Robbery | 18,600 | 86 | 11,900 | 64 |
| Aggravated assault | 32,700 | 69 | 21,900 | 67 |
| Simple assault | 147,900 | 55 | 90,500 | 61 |
| Other violent sex offense | 13,300 | 81 | 9,100 | 68 |
| Other person offense | 15,800 | 63 | 9,200 | 58 |
| **Property offense** | **343,500** | **55** | **233,600** | **68** |
| Property Crime Index | 237,600 | 55 | 166,700 | 70 |
| Burglary | 77,800 | 78 | 58,300 | 75 |
| Larceny-theft | 124,100 | 44 | 83,600 | 67 |
| Motor vehicle theft | 30,300 | 79 | 21,500 | 71 |
| Arson | 5,400 | 67 | 3,400 | 63 |
| Vandalism | 49,100 | 52 | 31,800 | 65 |
| Trespassing | 23,900 | 47 | 13,600 | 57 |
| Stolen property offense | 16,500 | 75 | 10,200 | 62 |
| Other property offense | 16,500 | 63 | 11,300 | 68 |
| **Drug law violation** | **117,100** | **61** | **79,100** | **68** |
| **Public order offense** | **240,900** | **59** | **166,000** | **69** |
| Obstruction of justice | 129,500 | 71 | 92,800 | 72 |
| Disorderly conduct | 47,900 | 44 | 29,900 | 62 |
| Weapons offense | 21,400 | 60 | 14,700 | 69 |
| Liquor law violation | 9,800 | 35 | 6,000 | 61 |
| Nonviolent sex offense | 8,500 | 55 | 6,100 | 72 |
| Other public order offense | 23,800 | 61 | 16,500 | 69 |

- Generally, more serious offenses were more likely to be petitioned for formal processing than were less serious offenses.
- For criminal homicide, robbery, and violent sex offenses other than rape, more than 80% of cases were petitioned. The proportion of cases petitioned was lower than 50% for liquor law violations, disorderly conduct, larceny-theft, and trespassing.
- For most offenses, the youth was adjudicated delinquent in more than 60% of petitioned cases.

Note: Detail may not add to totals because of rounding. Calculations are based on unrounded numbers.

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002.*



# From 1985 to 2002, the number of cases in which the youth was adjudicated delinquent rose 85%

### Adjudication was more likely for some types of cases than others

Youth were adjudicated delinquent in a smaller proportion of person offense cases than in cases involving other categories of offenses. This lower rate of adjudication in person offense cases may reflect, in part, reluctance to divert these cases from the formal juvenile justice system without a judge's review.

Adjudication rates also varied by gender, race, and age of the youth. The likelihood of adjudication in 2002 was somewhat less for females than for males. This was true across offense categories. Black youth were less likely to be adjudicated than were white youth or youth of other races. Cases involving youth age 15 or younger were slightly more likely to result in adjudication than cases involving older youth, although older youth had a greater share of cases waived to criminal court.

Percent of petitioned delinquency cases adjudicated:

| Offense | 1985 | 2002 |
|---|---|---|
| Gender | | |
| Male | 66% | 67% |
| Female | 62 | 64 |
| Race | | |
| White | 67 | 71 |
| Black | 59 | 58 |
| Other races | 72 | 75 |
| Age | | |
| 15 or younger | 66 | 67 |
| 16 or older | 64 | 66 |

### Offense profiles for petitioned and adjudicated cases show a shift away from property cases

Compared with 1985, both petitioned and adjudicated cases had increased proportions of person, drug, and public order offenses in 2002. The 2002 offense profile for adjudicated cases was very similar to the profile for petitioned cases.

Offense profile of delinquency cases:

| Offense | 1985 | 2002 |
|---|---|---|
| Petitioned cases | 100% | 100% |
| Person | 19 | 25 |
| Property | 58 | 37 |
| Drugs | 6 | 13 |
| Public order | 17 | 26 |
| Adjudicated cases | 100% | 100% |
| Person | 16 | 23 |
| Property | 59 | 37 |
| Drugs | 7 | 13 |
| Public order | 18 | 27 |

Note: Detail may not total 100% because of rounding.

**The number of cases in which the youth was adjudicated delinquent rose steadily from 1985 to 2002; except for property cases, the offense-specific trends followed the same pattern**

- The number of cases in which the youth was adjudicated delinquent increased for all offense categories between 1985 and 2002 (person 162%, property 16%, drugs 257%, and public order 180%). Only property offenses had a decline in adjudicated cases in recent years—down 13% between 1997 and 2002.

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002*.



# Most adjudicated delinquency cases result in residential placement or formal probation

### Residential placement and formal probation caseloads saw a shift away from property cases

Compared with 1985, both residential placement and formal probation cases had increased proportions of person, drug, and public order offenses in 2002. In 2002, cases ordered to residential placement had a greater share of person and public order cases and a smaller share of drug cases than cases ordered to formal probation.

Offense profile of delinquency cases:

| Offense | 1985 | 2002 |
|---|---|---|
| Residential placement | 100% | 100% |
| Person | 18 | 26 |
| Property | 56 | 37 |
| Drugs | 5 | 10 |
| Public order | 22 | 28 |
| Formal probation | 100% | 100% |
| Person | 16 | 24 |
| Property | 61 | 38 |
| Drugs | 7 | 13 |
| Public order | 16 | 25 |

Note: Detail may not total 100% because of rounding.

### Residential placement and probation caseloads increased between 1985 and 2002

The number of delinquency cases in which adjudicated youth were ordered out of the home to some form of residential placement rose 44% between 1985 and 2002, from 100,400 to 144,000. In comparison, the number of delinquency cases receiving formal probation as the most severe initial disposition following adjudication more than doubled from 1985 to 2002, from 189,600 to 385,400. The growth in formal probation cases was greater than the growth in delinquency cases at referral (41%) and adjudication (85%).

The number of adjudicated cases receiving other sanctions (e.g.,

**In 2002, residential placement or formal probation was ordered in 85% of cases in which the youth was adjudicated delinquent**

| | Adjudicated cases | | | |
|---|---|---|---|---|
| Most serious offense | Number ordered to placement | Percent ordered to placement | Number ordered to probation | Percent ordered to probation |
| **Total delinquency** | **144,000** | **23%** | **385,400** | **62%** |
| **Person offense** | **37,200** | **25** | **92,000** | **63** |
| Violent Crime Index | 12,500 | 34 | 20,900 | 56 |
| Criminal homicide | 400 | 50 | 300 | 43 |
| Forcible rape | 1,000 | 39 | 1,100 | 44 |
| Robbery | 5,000 | 42 | 6,000 | 50 |
| Aggravated assault | 6,100 | 28 | 13,400 | 62 |
| Simple assault | 20,000 | 22 | 59,200 | 65 |
| Other violent sex offense | 2,700 | 30 | 5,800 | 64 |
| Other person offense | 1,900 | 21 | 6,200 | 68 |
| **Property offense** | **52,700** | **23** | **147,300** | **63** |
| Property Crime Index | 39,600 | 24 | 106,200 | 64 |
| Burglary | 15,500 | 27 | 37,400 | 64 |
| Larceny-theft | 15,900 | 19 | 54,100 | 65 |
| Motor vehicle theft | 7,400 | 35 | 12,400 | 58 |
| Arson | 700 | 21 | 2,200 | 64 |
| Vandalism | 5,400 | 17 | 20,800 | 65 |
| Trespassing | 2,300 | 17 | 8,600 | 63 |
| Stolen property offense | 3,100 | 30 | 5,500 | 54 |
| Other property offense | 2,200 | 19 | 6,100 | 54 |
| **Drug law violation** | **14,400** | **18** | **50,900** | **64** |
| **Public order offense** | **39,800** | **24** | **95,200** | **57** |
| Obstruction of justice | 28,400 | 31 | 52,500 | 57 |
| Disorderly conduct | 3,900 | 13 | 17,600 | 59 |
| Weapons offense | 3,200 | 22 | 9,600 | 65 |
| Liquor law violation | 600 | 10 | 3,500 | 59 |
| Nonviolent sex offense | 1,700 | 28 | 3,800 | 62 |
| Other public order offense | 1,900 | 12 | 8,200 | 50 |

- Cases involving youth adjudicated for serious person offenses, such as homicide, rape, or robbery, were the most likely cases to result in residential placement.
- Probation was the most restrictive disposition used in 385,400 cases adjudicated delinquent in 2002—62% of all such cases handled by juvenile courts.
- Obstruction of justice cases had a relatively high residential placement rate, stemming from the inclusion in the category of certain offenses (e.g., escapes from confinement and violations of probation or parole) that have a high likelihood of placement.

Note: Detail may not add to totals because of rounding. Calculations are based on unrounded numbers.

Source: Authors' analyses of the National Center for Juvenile Justice's *National Juvenile Court Data Archive: Juvenile court case records 1985–2002* [machine-readable data file].

community service, restitution) as their most severe disposition rose 140% from 1985 to 2002, from 35,400 to 85,000. However, the majority of cases resulting in other sanctions were handled informally.

### Probation was more likely than residential placement

In 23% of adjudicated delinquency cases, the court ordered the youth to residential placement such as a training school, treatment center, boot camp, drug treatment or private placement facility, or group home. In 62% of adjudicated delinquency cases, probation was the most severe sanction ordered.

Percent of adjudicated delinquency cases, 2002:

| Characteristic | Residential placement | Formal probation |
|---|---|---|
| Total | 23% | 62% |
| Gender | | |
| Male | 25 | 61 |
| Female | 18 | 65 |
| Race | | |
| White | 21 | 62 |
| Black | 27 | 63 |
| Other races | 25 | 54 |
| Age | | |
| 15 or younger | 22 | 65 |
| 16 or older | 25 | 58 |

Once adjudicated, females were less likely than males, and white youth were less likely than black youth or youth of other races, to be ordered to residential placement. These demographic patterns in the use of residential placement and probation, however, do not control for criminal histories and other risk factors related to dispositional decisions and increased severity of sanctions.

**Trends in the number of adjudicated property offense cases ordered to residential placement or probation were different from trends for other offenses**

- The number of adjudicated cases in which the youth was ordered to residential placement increased 44% from 1985 to 2002. Residential placement cases rose 179% for drug offenses, 109% for person offenses, and 83% for public order offenses. For property offenses, the number of adjudicated cases resulting in residential placement decreased 5%.

- Between 1985 and 2002, the number of cases in which the youth was adjudicated delinquent and ordered to formal probation increased for all offense categories (person 198%, property 28%, drugs 267%, and public order 218%). Only property offenses had a substantial decline in recent years in adjudicated cases ordered to formal probation—down 14% between 1998 and 2002.

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002.*

### Probation conditions are designed to control and rehabilitate

Probation is the oldest and most widely used community-based corrections program. Probation is used both for first-time, low-risk offenders and as an alternative to institutional confinement for more serious offenders. During a period of probation supervision, a juvenile offender remains in the community and can continue normal activities such as school and work. However, the juvenile must comply with certain conditions.

Compliance with probation conditions may be voluntary: the youth agrees to conditions in lieu of formal adjudication. Or compliance may be mandatory following adjudication: the youth is formally ordered to a term of probation and must comply with the conditions established by the court. Most (62%) juvenile probation dispositions in 2002 were formal (i.e., enacted under court order following adjudication).

In addition to being required to meet regularly with a probation officer, a juvenile assigned to probation may be ordered to adhere to a curfew, complete a specified period of community service, or pay restitution. More serious offenders may be placed on intensive supervision requiring more frequent contact with their probation officer and stricter conditions. Typically, probation can be revoked if the juvenile violates the conditions. If probation is revoked, the court may reconsider its disposition and impose stricter sanctions.

### Black youth account for a disproportionate share of cases at all stages of case processing

Racial profile, 2002:

| Stage/ offense | White | Black | Other races | Total |
|---|---|---|---|---|
| **Referred** | | | | |
| Delinquency | 67% | 29% | 3% | 100% |
| Person | 60 | 37 | 3 | 100 |
| Property | 68 | 28 | 4 | 100 |
| Drugs | 76 | 21 | 3 | 100 |
| Public order | 68 | 29 | 3 | 100 |
| **Detained** | | | | |
| Delinquency | 61 | 36 | 3 | 100 |
| Person | 56 | 41 | 3 | 100 |
| Property | 60 | 36 | 4 | 100 |
| Drugs | 61 | 36 | 2 | 100 |
| Public order | 66 | 31 | 4 | 100 |
| **Petitioned** | | | | |
| Delinquency | 64 | 33 | 3 | 100 |
| Person | 57 | 40 | 3 | 100 |
| Property | 65 | 31 | 4 | 100 |
| Drugs | 70 | 28 | 3 | 100 |
| Public order | 66 | 31 | 3 | 100 |
| **Waived to criminal court** | | | | |
| Delinquency | 62 | 35 | 3 | 100 |
| Person | 55 | 41 | 4 | 100 |
| Property | 71 | 26 | 3 | 100 |
| Drugs | 58 | 39 | 2 | 100 |
| Public order | 65 | 32 | 4 | 100 |
| **Adjudicated** | | | | |
| Delinquency | 67 | 29 | 4 | 100 |
| Person | 61 | 36 | 4 | 100 |
| Property | 68 | 27 | 4 | 100 |
| Drugs | 74 | 23 | 3 | 100 |
| Public order | 69 | 27 | 4 | 100 |
| **Ordered to residential placement** | | | | |
| Delinquency | 63 | 33 | 4 | 100 |
| Person | 58 | 37 | 4 | 100 |
| Property | 65 | 30 | 5 | 100 |
| Drugs | 59 | 38 | 3 | 100 |
| Public order | 65 | 31 | 4 | 100 |
| **Ordered to formal probation** | | | | |
| Delinquency | 67 | 29 | 3 | 100 |
| Person | 61 | 36 | 3 | 100 |
| Property | 68 | 28 | 4 | 100 |
| Drugs | 75 | 22 | 3 | 100 |
| Public order | 69 | 28 | 3 | 100 |
| **Juvenile population** | | | | |
| Ages 10 to upper age | 78 | 16 | 6 | 100 |

Note: Detail may not total 100% because of rounding.

The overrepresentation of black youth was greatest for person offense cases. At most stages of case processing, the share of white youth was greater for drug offenses than other offense categories. At all stages of the system, youth of other races made up 5% or less of the caseload.

The proportion of cases that involved black youth was the same for adjudicated cases as for cases overall (29%). In fact, the racial profile of cases was similar at referral and adjudication for all offense categories.

The largest proportion of black youth was found in detained and waived person offense cases, where black youth accounted for 41% of cases.



# How were delinquency cases processed in juvenile courts in 2002?

### Juvenile courts can impose a range of sanctions

Although juvenile courts handled more than 4 of 10 delinquency cases without the filing of a petition, more than half of these nonpetitioned cases received some sort of sanction. Juveniles may have agreed to informal probation, restitution, or community service, or the court may have referred them to another agency for services. Although probation staff monitor the juvenile's compliance with the informal agreement, such dispositions generally involve little or no continuing supervision by probation staff.

In 32% of all petitioned delinquency cases, the youth was not adjudicated delinquent. The court dismissed 71% of these cases. The court-dismissed cases, together with the cases that were dismissed at intake, accounted for 477,400 cases (or 295 of 1,000 cases handled).

In a relatively small number of cases (10,000), the juvenile was adjudicated delinquent but was released with no further sanction or consequence. These cases accounted for about 2% of adjudicated cases (or 6 of 1,000 cases processed during the year).

In 66% of all petitioned cases, the courts imposed a formal sanction or waived the case to criminal court. Thus, of every 1,000 delinquency cases handled formally in 2002, 385 resulted in waiver or a court-ordered sanction.

**In 2002, the most severe sanction ordered in 85,000 adjudicated delinquency cases (14%) was something other than residential placement or probation, such as restitution or community service**

**Adjudicated cases receiving sanctions other than residential placement or probation accounted for 53 out of 1,000 delinquency cases processed during the year**

Notes: Cases are categorized by their most severe or restrictive sanction. Detail may not add to totals because of rounding.

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002.*



# Delinquency case processing varied by offense, gender, and race

**In 2002, person offense cases involving males were more likely to result in court-ordered sanctions than cases involving females**

- Among males, 109 of 1,000 person offense cases handled in 2002 resulted in court-ordered placement in a residential facility. In comparison, 63 of 1,000 person offense cases involving females resulted in court-ordered residential placement.
- The male-female difference in residential placement rates among person offense cases reflects the fact that male cases were more likely to be petitioned (63% vs. 54%); if petitioned, were more likely to be adjudicated (63% vs. 60%); and finally, if adjudicated, were more likely to receive residential placement as a sanction (27% vs. 19%).
- Of 1,000 person offense cases involving males, 390 resulted in some sort of court-ordered sanction (residential placement, formal probation, restitution, community service, etc.) following adjudication. The comparative figure for females is 317.
- Person offense cases involving males were more likely to be waived to criminal court (10 in 1,000) than were cases involving females (1 in 1,000).
- These gender differences in the overall handling of person offense cases do not control for differences in offense seriousness, criminal histories, and other risk factors related to dispositional decisions and increased severity of sanctions.

Notes: Cases are categorized by their most severe or restrictive sanction. Detail may not add to totals because of rounding.

Source: Authors' adaptation of the Office of Juvenile Justice and Delinquency Prevention's Juveniles in court. *OJJDP statistical briefing book.*

**For person offense cases in 2002, juvenile courts ordered sanctions after adjudication at similar rates for white youth (369 of 1,000 cases) and black youth (362 of 1,000 cases)**



- Person offense cases involving black youth were substantially more likely to be petitioned to court for formal processing than were cases involving white youth or youth of other races. Among black youth, 661 of 1,000 person cases were petitioned, compared with 567 for white youth and 595 for youth of other races.

- The large disparity between white and black youth in the petitioning of person cases disappeared at adjudication. Of 1,000 person cases involving white youth, 378 were adjudicated delinquent. The figure for black youth was 368 of 1,000. Among youth of other races, however, the youth was adjudicated delinquent in 450 of 1,000 person cases.

- Of 1,000 person offense cases involving white youth, 92 resulted in court-ordered residential placement. The comparative figures for black youth and youth of other races are 98 and 136, respectively.

- Juvenile courts waived to criminal court 7 in 1,000 person cases involving white youth. The waiver rate for person cases was 9 in 1,000 for black youth and for youth of other races.

- These racial differences in the overall handling of person offense cases do not control for differences in offense seriousness, criminal histories, and other risk factors related to dispositional decisions and increased severity of sanctions.

Notes: Cases are categorized by their most severe or restrictive sanction. Detail may not add to totals because of rounding.

Source: Authors' adaptation of the Office of Juvenile Justice and Delinquency Prevention's Juveniles in court. *OJJDP statistical briefing book.*

**Substantial gender differences existed in the handling of property cases in 2002**

**Property offense cases**

**Per 1,000 cases**

- 550 Petitioned
  - 4 Waived
  - 374 Adjudicated delinquent
    - 84 Placed
    - 236 Probation
    - 49 Other sanction
    - 5 Released
  - 172 Not adjudicated delinquent
    - 15 Probation
    - 37 Other sanction
    - 119 Dismissed
- 450 Not petitioned
  - 143 Probation
  - 149 Other sanction
  - 158 Dismissed

**Per 1,000 male cases**

- 593 Petitioned
  - 5 Waived
  - 408 Adjudicated delinquent
    - 99 Placed
    - 254 Probation
    - 49 Other sanction
    - 6 Released
  - 180 Not adjudicated delinquent
    - 15 Probation
    - 40 Other sanction
    - 125 Dismissed
- 407 Not petitioned
  - 128 Probation
  - 127 Other sanction
  - 152 Dismissed

**Per 1,000 female cases**

- 429 Petitioned
  - 1 Waived
  - 279 Adjudicated delinquent
    - 43 Placed
    - 185 Probation
    - 48 Other sanction
    - 3 Released
  - 149 Not adjudicated delinquent
    - 14 Probation
    - 32 Other sanction
    - 104 Dismissed
- 571 Not petitioned
  - 187 Probation
  - 209 Other sanction
  - 174 Dismissed

- Of 1,000 property offense cases involving males, 99 resulted in court-ordered placement in a residential facility and an additional 254 resulted in formal probation. For females, 43 property offense cases per 1,000 were ordered to residential placement and 185 were ordered to formal probation.

- As with person cases, property cases involving males were petitioned at a higher rate than cases involving females (59% vs. 43%); if petitioned, were adjudicated at a higher rate (69% vs. 65%); and if adjudicated, were ordered to residential placement at a higher rate (24% vs. 16%).

- Males and females were equally likely to have their property cases dismissed or otherwise released without the imposition of formal or informal sanctions. Of 1,000 property cases involving males, 283 were dismissed or released. Of 1,000 property cases involving females, 281 were dismissed or released.

- These gender differences in the overall handling of property offense cases do not control for differences in offense seriousness, criminal histories, and other risk factors related to dispositional decisions and increased severity of sanctions.

Notes: Cases are categorized by their most severe or restrictive sanction. Detail may not add to totals because of rounding.

Source: Authors' adaptation of the Office of Juvenile Justice and Delinquency Prevention's Juveniles in court. *OJJDP statistical briefing book.*

**In 2002, property cases involving white or black youth were less likely to result in court-ordered sanctions than those involving youth of other races**

Property offense cases
Per 1,000 white cases
524 Petitioned
4 Waived
374 Adjudicated delinquent
80 Placed
234 Probation
54 Other sanction
5 Released
146 Not adjudicated delinquent
16 Probation
30 Other sanction
99 Dismissed
476 Not petitioned
157 Probation
158 Other sanction
161 Dismissed
Per 1,000 black cases
615 Petitioned
4 Waived
368 Adjudicated delinquent
91 Placed
242 Probation
30 Other sanction
5 Released
242 Not adjudicated delinquent
11 Probation
57 Other sanction
174 Dismissed
385 Not petitioned
113 Probation
125 Other sanction
147 Dismissed
Per 1,000 other race cases
541 Petitioned
3 Waived
412 Adjudicated delinquent
106 Placed
222 Probation
81 Other sanction
3 Released
126 Not adjudicated delinquent
16 Probation
20 Other sanction
91 Dismissed
459 Not petitioned
121 Probation
148 Other sanction
190 Dismissed

- The court ordered sanctions after adjudication for 368 in 1,000 property cases involving whites, 363 in 1,000 cases involving blacks, and 409 in 1,000 cases involving youth of other races.
- Of 1,000 property offense cases involving white youth, the court ordered 80 to residential placement. The figure was 91 for black youth and 106 for youth of other races.
- Court-ordered sanctions other than residential placement or formal probation were less likely in property cases involving black youth (30 in 1,000) than in cases involving white youth (54) or youth of other races (81).
- Black youth were the most likely to have their property offense cases dismissed or otherwise released without the imposition of formal or informal sanctions. Of 1,000 property cases involving black youth, 326 were dismissed or released. Of 1,000 property cases involving white youth, 265 were dismissed or released. For youth of other races, the figure was 284.
- These racial differences in the overall handling of property offense cases do not control for differences in offense seriousness, criminal histories, and other risk factors related to dispositional decisions and increased severity of sanctions.

Notes: Cases are categorized by their most severe or restrictive sanction. Detail may not add to totals because of rounding.

Source: Authors' adaptation of the Office of Juvenile Justice and Delinquency Prevention's Juveniles in court. *OJJDP statistical briefing book.*

**Gender differences in juvenile court handling of drug cases in 2002 diminished as cases proceeded through the system**

**Drug offense cases**

**Per 1,000 cases**

- 606 Petitioned
  - 5 Waived
  - 409 Adjudicated delinquent
    - 75 Placed
    - 263 Probation
    - 62 Other sanction
    - 9 Released
  - 192 Not adjudicated delinquent
    - 19 Probation
    - 35 Other sanction
    - 138 Dismissed
- 394 Not petitioned
  - 135 Probation
  - 134 Other sanction
  - 124 Dismissed

**Per 1,000 male cases**

- 623 Petitioned
  - 6 Waived
  - 419 Adjudicated delinquent
    - 80 Placed
    - 267 Probation
    - 62 Other sanction
    - 9 Released
  - 199 Not adjudicated delinquent
    - 19 Probation
    - 36 Other sanction
    - 143 Dismissed
- 377 Not petitioned
  - 129 Probation
  - 128 Other sanction
  - 120 Dismissed

**Per 1,000 female cases**

- 530 Petitioned
  - 3 Waived
  - 366 Adjudicated delinquent
    - 52 Placed
    - 246 Probation
    - 62 Other sanction
    - 6 Released
  - 161 Not adjudicated delinquent
    - 17 Probation
    - 30 Other sanction
    - 114 Dismissed
- 470 Not petitioned
  - 163 Probation
  - 162 Other sanction
  - 145 Dismissed

- Of 1,000 drug cases involving males, 409 resulted in some sort of court-ordered sanction (residential placement, formal probation, restitution, community service, etc.) after adjudication. The comparative figure for females is 360.
- This apparent gender difference in the handling of drug cases stems from a large difference between males and females in the proportion of cases petitioned for formal processing. Among males, 62% of drug cases were petitioned, compared with 53% for females. For both males and females, juvenile courts imposed formal sanctions in 98% of cases in which the juvenile was adjudicated delinquent.
- Males and females in drug cases were equally likely to receive court-ordered sanctions other than placement or probation, such as referral to another agency for treatment. Of 1,000 drug cases involving males, 62 received such sanctions. The figure was the same for females.
- These gender differences in the overall handling of drug offense cases do not control for differences in offense seriousness, criminal histories, and other risk factors related to dispositional decisions and increased severity of sanctions.

Notes: Cases are categorized by their most severe or restrictive sanction. Detail may not add to totals because of rounding.

Source: Authors' adaptation of the Office of Juvenile Justice and Delinquency Prevention's Juveniles in court. *OJJDP statistical briefing book.*

**Substantial racial differences existed in the processing of drug offense cases in 2002**

Drug offense cases
Per 1,000 white cases
558 Petitioned
4 Waived
400 Adjudicated delinquent
59 Placed
263 Probation
70 Other sanction
9 Released
154 Not adjudicated delinquent
20 Probation
28 Other sanction
106 Dismissed
442 Not petitioned
153 Probation
156 Other sanction
133 Dismissed
Per 1,000 black cases
782 Petitioned
9 Waived
444 Adjudicated delinquent
133 Placed
267 Probation
35 Other sanction
9 Released
329 Not adjudicated delinquent
15 Probation
61 Other sanction
253 Dismissed
218 Not petitioned
77 Probation
57 Other sanction
84 Dismissed
Per 1,000 other race cases
561 Petitioned
4 Waived
405 Adjudicated delinquent
68 Placed
262 Probation
70 Other sanction
5 Released
152 Not adjudicated delinquent
21 Probation
25 Other sanction
106 Dismissed
439 Not petitioned
109 Probation
147 Other sanction
182 Dismissed

- Drug cases involving black youth were much more likely than cases involving white youth or youth of other races to be petitioned at intake. Among blacks, 782 drug cases in 1,000 were petitioned. The figure was 558 among whites and 561 among youth of other races.
- Black youth were substantially more likely than white youth or youth of other races to have their drug cases dismissed or otherwise released without the imposition of formal or informal sanctions. Of 1,000 drug cases involving black youth, 346 were dismissed or released. The majority of such cases (253) were dismissed following an adjudicatory hearing in which the youth was not adjudicated delinquent. Of 1,000 drug cases involving white youth, 248 were dismissed or released. For youth of other races, the figure was 293. Unlike black youth, both white youth and youth of other races were most often dismissed at intake, without an adjudicatory hearing.
- The proportion of drug cases placed on formal probation was similar across racial groups (263 in 1,000 for whites, 267 for blacks, and 262 for other races).
- These racial differences in the overall handling of drug offense cases do not control for differences in offense seriousness, criminal histories, and other risk factors related to dispositional decisions and increased severity of sanctions.

Notes: Cases are categorized by their most severe or restrictive sanction. Detail may not add to totals because of rounding.

Source: Authors' adaptation of the Office of Juvenile Justice and Delinquency Prevention's Juveniles in court. *OJJDP statistical briefing book.*

**Juvenile courts ordered residential placement for 73 in 1,000 public order cases involving females and 106 in 1,000 involving males**

- Of 1,000 public order cases involving males, 237 resulted in court-ordered probation. The figure for females was 219. However, in terms of the proportion of adjudicated public order cases, females were more likely to receive formal probation as their most severe disposition (60%) than were males (56%).
- Residential placement was ordered for 106 of 1,000 public order cases involving males—about the same rate as that for person offense cases involving males (109). This relatively high placement rate reflects this category's inclusion of offenses such as weapons law violations, escape from custody, and probation or parole violations.
- Among females, 73 of 1,000 public order cases resulted in court-ordered residential placement.
- These gender differences in the overall handling of public order offense cases do not control for differences in offense seriousness, criminal histories, and other risk factors related to dispositional decisions and increased severity of sanctions.

Notes: Cases are categorized by their most severe or restrictive sanction. Detail may not add to totals because of rounding.

Source: Authors' adaptation of the Office of Juvenile Justice and Delinquency Prevention's Juveniles in court. *OJJDP statistical briefing book.*

Case 2:06-cv-00755-MHT-CSC Document 72-9 Filed 11/16/2007 Page 24 of 32

**Regardless of race, juvenile courts waived relatively few public order cases to criminal court in 2002**

**Public order offense cases**

Per 1,000 white cases
568 Petitioned
1 Waived
412 Adjudicated delinquent
93 Placed
234 Probation
78 Other sanction
6 Released
155 Not adjudicated delinquent
8 Probation
35 Other sanction
113 Dismissed
432 Not petitioned
126 Probation
127 Other sanction
179 Dismissed

Per 1,000 black cases
629 Petitioned
2 Waived
382 Adjudicated delinquent
105 Placed
226 Probation
46 Other sanction
5 Released
245 Not adjudicated delinquent
5 Probation
78 Other sanction
161 Dismissed
371 Not petitioned
95 Probation
110 Other sanction
166 Dismissed

**Per 1,000 other race cases**

632 Petitioned
2 Waived
471 Adjudicated delinquent
111 Placed
240 Probation
117 Other sanction
4 Released
159 Not adjudicated delinquent
9 Probation
21 Other sanction
129 Dismissed
368 Not petitioned
72 Probation
103 Other sanction
194 Dismissed

- Black youth and youth of other races had their public order cases petitioned at about the same rate (629 per 1,000 for blacks and 632 per 1,000 for youth of other races). However, courts adjudicated youth of other races at a higher rate (471) than black youth (382).
- Youth of other races were more likely than black youth or white youth to have their public order cases result in court-ordered sanctions other than residential placement or formal probation.
- These racial differences in the overall handling of public order offense cases do not control for differences in offense seriousness, criminal histories, and other risk factors related to dispositional decisions and increased severity of sanctions.

Notes: Cases are categorized by their most severe or restrictive sanction. Detail may not add to totals because of rounding.

Source: Authors' adaptation of the Office of Juvenile Justice and Delinquency Prevention's Juveniles in court. *OJJDP statistical briefing book.*



# Courts waived fewer cases in 2002 than in 1985—2001 had the fewest waivers of any year since 1985

## The profile of waived cases has changed

In the late 1980s, property cases accounted for at least half of all delinquency cases judicially waived from juvenile court to criminal court. In the early 1990s, the property offense share of waived cases diminished as the person offense share grew. By 1993, the waiver caseload had a greater proportion of person offense cases than property cases (41% vs. 39%). Drug and public order cases made up smaller proportions of waived cases across all years. For example, in 2002, 14% of waived cases were drug offenses and 9% were public order cases.

The demographic characteristics of judicially waived cases have also changed since the 1980s.

Demographic profiles of judicially waived delinquency cases:

| Characteristic | 1985 | 1994 | 2002 |
|---|---|---|---|
| Gender | | | |
| Male | 95% | 95% | 93% |
| Female | 5 | 5 | 7 |
| Race | | | |
| White | 58 | 53 | 62 |
| Black | 41 | 43 | 35 |
| Other races | 2 | 4 | 3 |
| Age | | | |
| 15 or younger | 6 | 12 | 13 |
| 16 or older | 94 | 88 | 87 |

Note: Detail may not total 100% because of rounding.

**Juvenile courts waived 46% fewer delinquency cases to criminal court in 2002 than in 1994**

- The number of delinquency cases waived to criminal court climbed 83% from 1985 to 1994, from 7,200 to 13,200. By 2001, waived cases were down to 6,300—below the 1985 level. The slight upturn in waived cases for 2002 left the number of waivers in 2002 1% below the number in 1985.
- For most of the period from 1993 through 2002, person offenses outnumbered property offenses among waived cases. Prior to 1993, property cases outnumbered person offense cases among waivers—sometimes by a ratio of nearly 2 to 1.
- The number of waived person offense cases increased 130% from 1985 to 1994 then declined 47% to 2002 for an overall increase of 23% between 1985 and 2002. Over this period, waived property offense cases were down 33% and waived public order offense cases were down 2%.
- The overall proportion of petitioned delinquency cases that were waived was 1.4% in 1985, reached 1.5% in 1991 and 1993, and then dropped to 0.8% by 2002.
- For most years between 1985 and 2002, person offense cases were the most likely type of case to be waived to criminal court. The exception was 1989–1991, when drug offense cases were the most likely to be waived.

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002.*

Chapter 6: Juvenile offenders in court

Although the proportions of judicially waived cases involving females and younger juveniles increased between 1985 and 2002, the vast majority of waived cases involved males age 16 or older. However, the proportion of males age 16 or older among judicially waived cases decreased somewhat, from 89% in 1985 to 80% in 2002.

## The likelihood of waiver varied across case characteristics

In 2002, the proportion of cases waived was greater for males than for females. This was true in each of the four general offense categories. For example, males charged with person offenses were six times as likely as females charged with person offenses to have their cases waived to criminal court. However, this comparison does not control for differences in the seriousness of offenses or a juvenile's offense history.

Percent of petitioned cases judicially waived to criminal court, 2002:

| Offense | Male | Female |
|---|---|---|
| Delinquency | 0.9% | 0.3% |
| Person | 1.6 | 0.3 |
| Property | 0.9 | 0.3 |
| Drugs | 0.9 | 0.5 |
| Public order | 0.3 | 0.1 |

In 2002, black youth were more likely than other youth to be waived for drug offenses. White youth were more likely than other youth to be waived for property offenses. Youth of other races were more likely than white youth or black youth to be waived for person offenses. Regardless of race, person offenses were more likely to be waived than cases involving other offenses.

### Racial differences in case waivers stem primarily from differences in person and drug offense cases

Cases judicially waived to criminal court
4,000
3,000
2,000
1,000
0
White
Property
Person
Drugs
Public order
86 88 90 92 94 96 98 00 02
Year

Percent of petitioned cases waived to criminal court
3%
2%
1%
0%
White
Person
Drugs
Property
Public order
86 88 90 92 94 96 98 00 02
Year

Cases judicially waived to criminal court
3,000
2,500
2,000
1,500
1,000
500
0
Black
Person
Property
Drugs
Public order
86 88 90 92 94 96 98 00 02
Year

Percent of petitioned cases waived to criminal court
6%
5%
4%
3%
2%
1%
0%
Black
Drugs
Person
Property
Public order
86 88 90 92 94 96 98 00 02
Year

- Both whites and blacks experienced sharp increases between 1985 and 1994—and substantial drops between 1994 and 2002—in the number of person offense cases waived.
- For most of the period from 1985 to 2002, the likelihood of waiver was greater for black youth than for white youth regardless of offense category. These data, however, do not control for racial differences in offense seriousness within the general offense categories or differences in the seriousness of juveniles' offense histories.

Source: Authors' analyses of Stahl et al.'s *Easy access to juvenile court statistics: 1985–2002* [online analysis].

Percent of petitioned cases judicially waived to criminal court, 2002:

| Offense | White | Black | Other races |
|---|---|---|---|
| Delinquency | 0.7% | 0.8% | 0.7% |
| Person | 1.2 | 1.3 | 1.5 |
| Property | 0.8 | 0.6 | 0.6 |
| Drugs | 0.7 | 1.2 | 0.7 |
| Public order | 0.3 | 0.3 | 0.3 |

Cases involving younger juveniles were less likely to be waived than were cases involving older juveniles. This was true for each of the four general offense categories. For example, among person offense cases, youth age 16 or older were seven times more likely to be waived than youth age 15 or younger.

Percent of petitioned cases judicially waived to criminal court, 2002:

| Offense | Age 15 or younger | Age 16 or older |
|---|---|---|
| Delinquency | 0.2% | 1.5% |
| Person | 0.4 | 2.7 |
| Property | 0.1 | 1.6 |
| Drugs | 0.0 | 1.4 |
| Public order | 0.1 | 0.5 |

Juvenile Offenders and Victims: 2006 National Report 187



# Monitoring racial disproportionality in the justice system can reveal potential sources of discrimination

### Research finds evidence of disparity in juvenile case processing

While research findings are not completely consistent, reviews (by Pope and Feyerherm and by Pope, Lovell, and Hsia) of existing research literature found that minority (especially black) youth are overrepresented at most stages of the juvenile justice system. Since that review, a rather large body of research has accumulated across numerous geographic regions that reinforces these earlier findings. Based on this research and the fact that juvenile justice systems are fragmented and administered at the local level, it is likely that racial/ethnic disparities exist in some jurisdictions but not in others and that these differences may vary over time.

The extent to which research links disparity to demographic characteristics (thereby implying discrimination) may be affected in part by the research design. For example, the simple proportion of adjudicated youth placed in an out-of-home facility may be greater for minority youth than white youth; however, when the research study controls for the nature of the crimes for which the youth were adjudicated, the statistical effect of race on justice decisionmaking is generally reduced. One could argue that if researchers considered all the factors that decisionmakers consider (e.g., the number and attributes of past offenses, gang involvement, victims' statements, compliance with previous dispositional orders, and family/community support), the statistical effect of race on decisionmaking could be further reduced and possibly even removed. Given that disparity and overrepresentation may exist in the absence of discrimination, it is a challenge for research to determine if there is a unique effect of discrimination on justice system decisionmaking.

### Racial/ethnic disparities occur at various decision points within the juvenile justice system

When racial/ethnic disparities do occur, they can be found at any stage of processing within the juvenile justice system. Research suggests that disparity is most pronounced at arrest, the beginning stage, and that when racial/ethnic differences exist, their effects accumulate as youth are processed through the justice system.

One factor to consider in understanding overrepresentation is that outcomes often depend on the jurisdiction in which the youth is processed (Feld's concept of "justice by geography"). For example, juvenile court cases in urban jurisdictions are more likely to receive severe outcomes (e.g., detention prior to adjudication, out-of-home placement following adjudication) than are cases in nonurban areas. Because minority populations are concentrated in urban areas, this geographical effect may work to overrepresent minority youth at each stage of processing when case statistics are summarized at the state level—even when there is no disparity at the local level.

**The terms overrepresentation, disparity, and discrimination have different meanings**

**Overrepresentation** refers to a situation in which a larger proportion of a particular group is present at various stages within the juvenile justice system (such as intake, detention, adjudication, and disposition) than would be expected based on its proportion in the general population.

**Disparity** means that the probability of receiving a particular outcome (e.g., being detained vs. not being detained) differs for different groups. Disparity may in turn lead to overrepresentation.

**Discrimination** occurs when juvenile justice system decisionmakers treat one group differently from another group based wholly, or in part, on their gender, race, and/or ethnicity.

Neither overrepresentation nor disparity necessarily implies discrimination, although it is one possible explanation. If racial discrimination is a part of justice system decisionmaking, minority youth can face higher probabilities of being arrested, referred to court intake, held in short-term detention, petitioned for formal processing, adjudicated delinquent, and confined in a secure juvenile facility.

Disparity and overrepresentation, however, can result from behavioral and legal factors rather than discrimination. For example, if minority youth commit proportionately more (and more serious) crimes than white youth, they will be overrepresented in secure facilities, even when there was no discrimination by system decisionmakers. In any given jurisdiction, either or both of these causes of overrepresentation/disparity may be operating.

Research is necessary to reveal the decision points at which disparity occurs and to uncover the dynamics that lead to overrepresentation.

### The meaning and measurement of DMC have changed

Prior to 2002, the Juvenile Justice and Delinquency Prevention Act required states to assess their level of disproportionate minority confinement (DMC) by using a statistic that divided the proportion of a given minority group of youth who were detained or confined in a state's secure detention facilities, secure correctional facilities, jails, and lockups by the proportion that group represented in the general population. If this statistic (known as the DMC Index) was significantly greater than 1.0 (which was most often the case), the state was required to develop and implement a plan to reduce the disproportionality.

Problems interpreting the DMC Index soon became apparent. First, comparing one jurisdiction's Index to another's was difficult. For example, assume one community's youth population was 3% minority and its juvenile custody population was 12% minority, resulting in a DMC Index of 4. Now assume the other community's youth population was 50% minority and its custody population was 100% minority, resulting in a DMC Index of 2. Which community's juvenile justice system processing is most racially disparate? Clearly, the value of the DMC Index was related in part to the proportion of minority youth in the general population. Communities with low minority proportions could have very high DMC Indexes while communities with high percentages of minority youth could not.

Another problem with the DMC Index was that it provided limited guidance on where to look for the source(s) of disparity. Was disparity introduced at all stages of the system and did it accumulate from beginning to end, or was it introduced only at the earliest stage and then remained through the end stages?

Recognizing that disparity may exist at many decision points (not just detention and corrections), in 2002, the Juvenile Justice and Delinquency Prevention Act broadened the concept labeled "DMC" from disproportionate minority confinement to disproportionate minority contact. Under this new conceptualization, as youth pass through the different stages of the juvenile justice system, they make contact with a series of decisionmakers, each of whom could render a decision that potentially could result in racial disparity. Measuring the disparity at each decision point gives a better understanding of where disparity is introduced and/or magnified in the handling of cases by the juvenile justice system. To address problems with the DMC Index, OJJDP has developed a tool to measure the levels of disparity at each decision point. This tool is called the DMC Relative Rate Index (RRI).

**The national Relative Rate Index matrix for 2002 finds more racial disparity at arrest and detention than at other decision points**

| Decision points | White | Black | Relative Rate Index |
|---|---|---|---|
| Juvenile arrests | 1,576,400 | 625,500 | |
| Cases referred to juvenile court | 1,086,700 | 473,100 | |
| Cases detained | 199,700 | 118,600 | |
| Cases petitioned | 596,800 | 306,000 | |
| Cases judicially waived to criminal court | 4,400 | 2,500 | |
| Cases adjudicated delinquent | 421,400 | 179,000 | |
| Adjudicated cases resulting in placement | 90,400 | 47,500 | |
| **Rates (per 100)** | | | |
| Juvenile arrests to population* | 6.1 | 11.5 | 1.9 |
| Cases referred to juvenile arrests | 68.9 | 75.6 | 1.1 |
| Cases detained to cases referred | 18.4 | 25.1 | 1.4 |
| Cases petitioned to cases referred | 54.9 | 64.7 | 1.2 |
| Cases waived to cases petitioned | 0.7 | 0.8 | 1.1 |
| Cases adjudicated to cases petitioned | 70.6 | 58.5 | 0.8 |
| Placements to cases adjudicated | 21.5 | 26.5 | 1.2 |

- For every 100 white youth ages 10–17 in the U.S. population, there were 6.1 arrests of white youth under age 18. The rate for black youth was 11.5, yielding an RRI for the arrest decision of 1.9. The black rate was almost double the white rate.
- Except for the adjudication decision point, the RRI shows a degree of racial disparity for black youth. This disparity accumulates throughout the process, so that in the end, while black youth were 16% of the youth population and were involved in 28% of the arrests of youth in 2002, they accounted for 33% of the juvenile court cases that resulted in an out-of-home placement.

* Population ages 10–17 = 25,994,400 (white) and 5,431,300 (black).

Source: Authors' analysis of Puzzanchera et al.'s *Easy access to juvenile populations* [online analysis], Stahl et al.'s *Easy access to juvenile court statistics 1985–2002* [online analysis], and the FBI's *Crime in the United States 2002.*

## The RRI measures disparity at each decision point

The RRI tests for disparity at a series of decision points, typically arrest, referral to juvenile court, detention, petitioning, transfer to criminal court, adjudication, and out-of-home placement following adjudication. (The actual set of decision points used by states and local jurisdictions depends on the structure of their juvenile justice systems and the quality of available data.) The key idea behind the RRI is to quantify the nature of the decisions at each decision point for each racial group and then compare these decisions.

For example, after arrest, law enforcement must decide if the youth should be referred to juvenile court intake. The RRI compares the proportions (or rates) of white and black arrests that are referred to court intake. If, for example, the rate of referral to court intake was 60 out of 100 arrests for whites and 80 out of 100 for blacks, then black arrests were more likely than white arrests to result in referral to juvenile court. There is disparity at this decision point. If the rates had been similar, there would be no evidence of disparity at this decision point. To simplify the comparison of these statistics, the RRI divides the black rate by the white rate at each decision point, and if this ratio (i.e., the Relative Rate Index) is near or equal to 1.0, there is no evidence of disparity; if the ratio is greater than 1.0 (i.e., if the black rate is larger than the white rate), there is evidence of disparity, and this decision process needs further study to understand why.



**The degree of racial disparity in the juvenile justice system declined between 1992 and 2002, especially at two decision points: arrest and waiver to criminal court**

Source: Authors' analysis of Puzzanchera et al.'s *Easy access to juvenile populations* [online analysis], Stahl et al.'s *Easy access to juvenile court statistics 1985–2002* [online analysis], and the FBI's *Crime in the United States 1992* and *Crime in the United States 2002*.

Each decision point has a preceding stage with which it is compared (e.g., arrests are compared to population, court referrals to arrest, detentions to court referrals, petitions to court referrals, adult court transfers to petitions, adjudications to petitions, and out-of-home placements to adjudications). Together this set of decision points and their relative rate indexes form the Relative Rate Index Matrix, a table that can reveal the nature of decision disparities—including their magnitude and differences—in a juvenile justice system that is interdependent though fragmented.

The Relative Rate Index Matrix is a diagnostic tool that can be used by juvenile justice professionals to assess decisionmaking disparity within a jurisdiction for subgroups other than those defined solely by their racial/ethnic classification. For example, the tool could compare the processing of white and minority youth charged with a drug offense or the processing decisions for white and minority youth at their first referral to juvenile court intake. Or it could compare the processing of juvenile males and females, older and younger juveniles, youth from different neighborhoods or school districts, youth with different family structures, or youth with different needs and/or risks. Disparity can exist for many reasons. Although the Relative Rate Index does not diagnose the reasons for disparity, it distills data into statistics that decisionmakers can use to assess the vital signs of the local juvenile justice system and, in doing so, target areas of concern.



# The formal status offense caseload differs substantially from the delinquency caseload

### What are status offenses?

Status offenses are behaviors that are law violations only if committed by a person of juvenile status. Such behaviors include running away from home, ungovernability (being beyond the control of parents or guardians), truancy, and underage drinking (which also applies to young adults through age 20). A number of other behaviors may be considered status offenses (e.g., curfew violations, tobacco offenses), but they are not detailed in these analyses.

In many jurisdictions, agencies other than juvenile courts are responsible for handling status offense cases. In some communities, for example, family crisis units, county attorneys, and social services agencies have assumed this responsibility. If status offense cases are referred to juvenile court, the court may divert some of these youth away from the formal justice system to other agencies for service rather than filing a petition for formal processing. The analyses presented here are based on juvenile court data and are, thus, limited to cases petitioned to court for formal processing between 1985 and 2002.*

Of petitioned status offense cases handled by juvenile courts between 1985 and 2002 involving charges of truancy or liquor law violations, running away from home, or ungovernability, the most common were truancy violations (34%), followed by liquor law violations (30%), running away (19%), and ungovernability (17%).

*Available data cannot support national estimates of the trends and volume of petitioned status offense cases. Data are presented as sample-based profiles of cases disposed during the period 1985–2002.

**The volume of petitioned truancy, runaway, and ungovernability cases peaks at age 15**

- For status liquor law violation cases, the proportion of cases increases substantially throughout the juvenile years.

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002*.

### Females account for most runaway cases

A major difference between delinquency and status offense cases is the large proportion of status cases that involve females.

Percent of petitioned status offense cases involving females, 1985–2002

| Offense | Female proportion |
|---|---|
| Runaway | 61% |
| Truancy | 46 |
| Ungovernability | 46 |
| Liquor | 30 |

### Runaway cases were less likely to be adjudicated than other types of status offense cases

Percent of petitioned status offense cases adjudicated, 1985–2002

| Offense | Total | Male | Female |
|---|---|---|---|
| Runaway | 46% | 47% | 45% |
| Truancy | 63 | 63 | 63 |
| Ungovernability | 63 | 63 | 62 |
| Liquor | 63 | 64 | 61 |

### The juvenile court ordered probation in most adjudicated status offense cases

From 1985 through 2002, among adjudicated runaway, truancy, ungovernability, and liquor law violation cases, formal probation was the most likely disposition. Some cases resulted in out-of-home (residential) placement, and some (primarily liquor cases) resulted in other sanctions such as fines, community service, restitution, or referrals to other agencies for services. The remaining few were released with no additional sanction.

Percent of adjudicated status offense cases receiving disposition, 1985–2002

| Offense | Residential placement | Formal probation |
|---|---|---|
| Runaway | 27% | 61% |
| Truancy | 11 | 78 |
| Ungovernability | 26 | 66 |
| Liquor | 8 | 57 |

**From 1985 through 2002, juvenile courts were less likely to order probation in runaway cases than in other status offense cases**



- Of 1,000 petitioned runaway cases, 282 were ordered to formal probation. In comparison, the figure was 488 for truancy cases, 412 for ungovernability cases, and 362 for liquor law violation cases.

- Among petitioned runaway cases, the youth was not adjudicated in 541 of 1,000 cases. Of these 541 cases, 150 received informal sanctions or were referred to a social services agency for handling, and 391 were dismissed.

- Of 1,000 petitioned truancy cases, 629 were adjudicated, and 617 received some sort of formal sanction. Use of informal sanctions was relatively uncommon in formally processed truancy cases (74 of 1,000).

- Juvenile courts were more likely to order youth to residential placement in petitioned ungovernability cases (160 of 1,000) than in other types of status offense cases, but formal probation was the most likely court-ordered disposition for ungovernability cases (412 of 1,000).

- Among petitioned liquor law violation cases, the most likely outcome was formal probation (362 of 1,000), although the court often ordered formal sanctions other than residential placement or probation (209 of 1,000).

Note: Cases are categorized by their most severe or restrictive sanction. Detail may not add to totals because of rounding.

Source: Authors' adaptation of Stahl et al.'s *Juvenile Court Statistics 2001–2002.*



# Sources

Federal Bureau of Investigation. 1993. *Crime in the United States 1992*. Washington, DC: FBI.

Federal Bureau of Investigation. 2003. *Crime in the United States 2002*. Washington, DC: FBI.

Feld, B. 1991. Justice by geography: Urban, suburban and rural variations in juvenile administration. *The Journal of Criminal Law and Criminology*, 82(1):156–210.

National Center for Juvenile Justice. 2005. *National Juvenile Court Data Archive: Juvenile court case records 1985–2002* [machine-readable data file]. National Center for Juvenile Justice. Pittsburgh, PA.

Office of Juvenile Justice and Delinquency Prevention. Juveniles in court. *OJJDP statistical briefing book*. Released September 13, 2005. <www.ojjdp.ncjrs.gov/ojstatbb/court/JCSCF_Display.asp>.

Pope, E., and Feyerherm, W. 1991. *Minorities and the Juvenile Justice System. Final Report*. Washington, DC: Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Pope, E., Lovell, R., and Hsia, H. 2002. *Disproportionate Minority Confinement: A Review of the Research Literature From 1989 Through 2001*. Washington, DC: Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Puzzanchera, C., Finnegan, T., and Kang, W. *Easy access to juvenile populations* [online analysis]. Updated May 10, 2004. <www.ojjdp.ncjrs.gov/ojstatbb/ezapop>.

Stahl, A., Finnegan, T., and Kang, W. 2005. *Easy access to juvenile court statistics: 1985–2002* [online analysis]. Updated September 13, 2005. <www.ojjdp.ncjrs.gov/ojstatbb/ezajcs>.

Stahl, A., Puzzanchera, C., Finnegan, T., Tierney, N., and Snyder, H. Forthcoming. *Juvenile Court Statistics 2001–2002*. Pittsburgh, PA: National Center for Juvenile Justice.



# Juvenile Offenders and Victims: 2006 National Report

**Chapter 7: Juvenile offenders in correctional facilities ........ 195**

Introduction to custody data .... 196
Juvenile custody population .... 197
Offense trends in private and public facilities .... 198
Offender trends in juvenile facilities .... 199
Detained and committed populations .... 200
State custody rates .... 201
Offense profiles of the custody population by state .... 203
Offense profiles of detained and committed offenders by state .... 204
Gender variations in the custody population .... 206
Racial variations in the custody population .... 211
Racial variations in custody rates by state .... 213
Length of stay for juveniles in custody .... 215
Types of facilities .... 218
Facility security features .... 219
Security arrangements for juveniles in custody .... 220
Facility size .... 222
Crowding in juvenile custody facilities .... 223
Screening for substance abuse, mental health, and suicide risk .... 225
Deaths in custody facilities .... 229
Sexual violence in custody facilities .... 230
Youth reentry population .... 232
Recidivism and the youth custody population .... 234
Juveniles in jails .... 236
Juveniles in prisons .... 237
Death penalty .... 239
Chapter 7 sources .... 241

Copyright 2006
National Center for Juvenile Justice
3700 S. Water Street, Suite 200
Pittsburgh, PA 15203-2363

Suggested citation: Snyder, Howard N., and Sickmund, Melissa. 2006. *Juvenile Offenders and Victims: 2006 National Report.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.



# Chapter 7

## Juvenile offenders in correctional facilities

Juvenile correctional systems have many different components. Some juvenile correctional facilities look very much like adult prisons. Others seem very much like "home." Private facilities continue to play a substantial role in the long-term custody of juveniles, in contrast to adult correctional systems. In fact, nationwide there are more than twice as many privately operated juvenile facilities as publicly operated facilities, although private facilities hold less than half as many juveniles as are held in public facilities.

This chapter describes the population of juveniles detained in and committed to public and private facilities in terms of demographics, offenses, average time in the facility, and facility type. The chapter also includes information on recidivism and descriptions of juveniles reentering the general population after confinement, those held in adult jails and prisons, and those on death row.

The information is based on several data collection efforts by the Office of Juvenile Justice and Delinquency Prevention: Census of Juveniles in Residential Placement; Juvenile Residential Facility Census; Survey of Youth in Residential Placement; and Children in Custody Census of Juvenile Detention, Correctional, and Shelter Facilities. Much of the information on juveniles held in adult correctional facilities is drawn from the Bureau of Justice Statistics' Jail Census, Annual Survey of Jails, and National Corrections Reporting Program.

7



# OJJDP's custody data are the primary source of information on juveniles in residential placement

### Detailed data are available on juveniles in residential placement and the facilities that hold them

Since its inception, the Office of Juvenile Justice and Delinquency Prevention (OJJDP) has collected information on the juveniles held in juvenile detention and correctional facilities. Until 1995, these data were gathered through the biennial Census of Public and Private Juvenile Detention, Correctional, and Shelter Facilities, better known as the Children in Custody (CIC) Census. In the late 1990s, OJJDP initiated two new data collection programs to gather comprehensive and detailed information about juvenile offenders in custody and about the facilities that house them:

- Census of Juveniles in Residential Placement (CJRP)
- Juvenile Residential Facility Census (JRFC).

CJRP and JRFC are administered in alternating years and collect information from all secure and nonsecure residential placement facilities that house juvenile offenders, defined as persons younger than 21 who are held in a residential setting as a result of some contact with the justice system (they are charged with or adjudicated for an offense). This encompasses both status offenders and delinquent offenders, including those who are either temporarily detained by the court or committed after adjudication for an offense.

These censuses do not include federal facilities or those exclusively for drug or mental health treatment or for abused/neglected youth. Nor do they capture data from adult prisons or jails. Therefore, CJRP does not include all juveniles sentenced to incarceration by criminal courts.

CJRP asks all juvenile residential facilities in the U.S. to describe each offender under age 21 assigned a bed in the facility on the fourth Wednesday in October. Facilities report individual-level information on gender, date of birth, race, placement authority, most serious offense charged, court adjudication status, admission date, and security status.

JRFC also uses the fourth Wednesday in October as its census date, but it also gathers past-month and past-year information. JRFC collects information on how facilities operate and the services they provide. It includes detailed questions on facility security, crowding, injuries and deaths in custody, and facility ownership, operation, and services.

The Survey of Youth in Residential Placement (SYRP) is the third component of OJJDP's multitiered effort to collect information on the juvenile custody population. SYRP collects a broad range of self-report information (on youth's custody experience, past offense histories, education, and other important life events) from interviews with individual youth in residential placement.

### One-day count and admission data give different views of residential populations

CJRP provides 1-day population counts of juveniles in residential placement facilities. Such counts give a picture of the standing population in facilities. One-day counts are substantially different from annual admission and release data, which provide a measure of facility population flow.

Juveniles may be committed to a facility as part of a court-ordered disposition, or they may be detained prior to adjudication or after adjudication while awaiting disposition or placement elsewhere. In addition, a small proportion of juveniles may be admitted voluntarily in lieu of adjudication as part of a diversion agreement. Because detention stays tend to be short compared with commitment placements, detained juveniles represent a much larger share of population flow data than of 1-day count data.

### State variations in upper age of juvenile court jurisdiction influence custody rates

Although state custody rate statistics control for upper age of original juvenile court jurisdiction, comparisons among states with different upper ages are problematic. Youth ages 16 and 17 constitute 25% of the youth population ages 10–17, but they account for nearly 50% of arrests of youth under age 18, nearly 40% of delinquency court cases, and more than 50% of juveniles in residential placement. If all other factors were equal, one would expect higher juvenile custody rates in states where older youth are under juvenile court jurisdiction.

Differences in age limits of extended jurisdiction also influence custody rates. Some states may keep a juvenile in custody for several years beyond the upper age of original jurisdiction; others cannot. Laws that control the transfer of juveniles to criminal court also have an impact on juvenile custody rates. If all other factors were equal, states with broad transfer provisions would be expected to have lower juvenile custody rates than other states.

Demographic variations among jurisdictions should also be considered. The urbanicity and economy of an area are thought to be related to crime and custody rates. Available bedspace also influences custody rates, particularly in rural areas.



# The basic profile of juvenile custody facility residents did not change much from 1997 to 2003

### Most residents in juvenile residential placement facilities were juvenile offenders

The majority of residents in juvenile residential placement facilities on October 22, 2003, were accused or adjudicated juvenile offenders (88%). Juvenile offenders held for delinquency offenses accounted for 78% of all residents and 95% of all juvenile offenders. Delinquency offenses are behaviors that would be criminal law violations for adults. The remaining 5% of offenders were status offenders. Status offenses are behaviors that are not law violations for adults, such as running away, truancy, and ungovernability. Some residents were held in a juvenile residential placement facility but were not charged with or adjudicated for an offense (e.g., youth referred for abuse, neglect, emotional disturbance, or mental retardation, or those referred by their parents). Other residents (nonoffenders and youth age 21 or older) accounted for 12% of all residents.

### Private facilities are an important custody resource

Private facilities are operated by private nonprofit or for-profit corporations or organizations; staff in these facilities are employees of the private corporation or organization. State or local government agencies operate public facilities; staff in these facilities are state or local government employees. Private facilities tend to be smaller than public facilities. Thus, although private facilities are more numerous than public facilities nationwide, public facilities hold the majority of juvenile offenders on any given day.

Private and public facilities hold different populations. Compared with public facilities, private facilities have a greater proportion of court-committed juveniles and a smaller proportion of detained juveniles (who are awaiting adjudication, disposition, or placement elsewhere). Juveniles in placement voluntarily as part of a diversion agreement are rare, regardless of facility type.

**6 in 10 juvenile facilities holding offenders were private; public facilities held more than 6 in 10 juvenile offenders**

| | Residential placement facilities | | | | | |
|---|---|---|---|---|---|---|
| | Number | | | | Percent of total | |
| Type of facility | 1997 | 1999 | 2001 | 2003 | 1997 | 2003 |
| All | 2,842 | 2,938 | 2,980 | 2,861 | 100% | 100% |
| Public | 1,106 | 1,134 | 1,197 | 1,170 | 39 | 41 |
| State | 508 | 533 | 533 | 501 | 18 | 18 |
| Local | 598 | 601 | 664 | 669 | 21 | 23 |
| Private | 1,736 | 1,795 | 1,774 | 1,682 | 61 | 59 |
| Tribal | | 9 | 9 | 9 | 0 | 0 |

| | Juvenile offenders in residential placement | | | | | |
|---|---|---|---|---|---|---|
| | Number | | | | Percent of total | |
| Population held | 1997 | 1999 | 2001 | 2003 | 1997 | 2003 |
| All facilities | | | | | | |
| All residents | 116,701 | 120,996 | 118,008 | 109,225 | 100% | 100% |
| Juvenile offenders | 105,055 | 107,856 | 104,413 | 96,655 | 90 | 88 |
| Other residents | 11,646 | 13,140 | 13,595 | 12,570 | 10 | 12 |
| Public facilities | | | | | | |
| All residents | 77,798 | 78,519 | 75,461 | 67,917 | 67 | 62 |
| Juvenile offenders | 75,600 | 76,379 | 73,328 | 66,210 | 65 | 61 |
| Other residents | 9,354 | 11,082 | 11,509 | 10,862 | 8 | 10 |
| State facilities | | | | | | |
| All residents | 48,185 | 49,011 | 45,224 | 38,470 | 41 | 35 |
| Juvenile offenders | 46,516 | 47,504 | 43,669 | 37,335 | 40 | 34 |
| Other residents | 2,586 | 2,293 | 2,376 | 1,855 | 2 | 2 |
| Local facilities | | | | | | |
| All residents | 29,613 | 29,508 | 30,237 | 29,447 | 25 | 27 |
| Juvenile offenders | 29,084 | 28,875 | 29,659 | 28,875 | 25 | 26 |
| Other residents | 9,354 | 10,908 | 11,315 | 10,738 | 8 | 10 |
| Private facilities | | | | | | |
| All residents | 38,903 | 42,298 | 42,353 | 41,177 | 33 | 38 |
| Juvenile offenders | 29,455 | 31,303 | 30,891 | 30,321 | 25 | 28 |
| Other residents | 1,669 | 1,507 | 1,555 | 1,135 | 1 | 1 |
| Tribal facilities | | 179 | 194 | 131 | 0 | 0 |
| Juvenile offenders | | 174 | 194 | 124 | 0 | 0 |
| Other residents | | 5 | 0 | 7 | 0 | 0 |

Notes: Other residents include youth age 21 or older and those held in the facility but not charged with or adjudicated for an offense. Detail may not total 100% because of rounding.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 1997, 1999, 2001, and 2003 [machine-readable data files].

Custody status profile, 2003:

| Custody | Facility operation | | | |
|---|---|---|---|---|
| status | Total | Public | Private | Tribal |
| Total | 100% | 100% | 100% | 100% |
| Committed | 74 | 70 | 85 | 53 |
| Detained | 25 | 30 | 14 | 45 |
| Diversion | 0 | 0 | 1 | 2 |

Note: Detail may not total 100% because of rounding.



# Nationally, nearly 92,000 delinquents were held in residential placement facilities on October 22, 2003

### Compared with public facilities, private facilities hold a smaller share of delinquents and a larger share of status offenders

On the census date in 2003, public facilities held 7 in 10 delinquents in custody and 3 in 10 status offenders. However, public facilities housed more than three-quarters of those held for homicide, robbery, aggravated assault, weapons, and technical violations of probation or parole. In contrast, fewer than 6 in 10 juveniles held for drug offenses other than trafficking were in public facilities. Nevertheless, public and private facilities had fairly similar offense profiles in 2003.

Offense profile by facility type, 2003:

| Most serious offense | All | Public | Private |
|---|---|---|---|
| Total | 100% | 100% | 100% |
| Delinquency | 95 | 98 | 89 |
| Person | 34 | 35 | 32 |
| Homicide | 1 | 1 | 0 |
| Sexual assault | 8 | 7 | 9 |
| Robbery | 6 | 8 | 4 |
| Aggr. assault | 8 | 9 | 6 |
| Simple assault | 8 | 8 | 10 |
| Other person | 3 | 3 | 3 |
| Property | 28 | 28 | 27 |
| Burglary | 11 | 11 | 10 |
| Theft | 6 | 6 | 6 |
| Auto theft | 6 | 6 | 6 |
| Arson | 1 | 1 | 1 |
| Other property | 5 | 5 | 4 |
| Drug | 8 | 7 | 10 |
| Drug trafficking | 2 | 2 | 2 |
| Other drug | 6 | 5 | 9 |
| Public order | 10 | 10 | 9 |
| Weapons | 3 | 4 | 2 |
| Other public order | 7 | 7 | 7 |
| Technical violation | 15 | 16 | 11 |
| Status offense | 5 | 2 | 11 |
| Ungovernability | 2 | 0 | 5 |
| Running away | 1 | 1 | 2 |
| Truancy | 1 | 0 | 2 |
| Curfew violation | 0 | 0 | 0 |
| Underage drinking | 0 | 0 | 1 |
| Other status offense | 1 | 1 | 1 |

Note: Detail may not total 100% because of rounding.

**In 2003, public facilities held 64,662 delinquents and private facilities held 27,059 delinquents on the 2003 census date**

| | Juvenile offenders in residential placement, 2003 | | | Percent change 1997–2003 | | |
|---|---|---|---|---|---|---|
| | Type of facility | | | Type of facility | | |
| Most serious offense | All | Public | Private | All | Public | Private |
| **Total offenders** | **96,655** | **66,210** | **30,321** | **–8%** | **–12%** | **3%** |
| **Delinquency** | **91,831** | **64,662** | **27,059** | **–7** | **–12** | **11** |
| Person | 33,197 | 23,499 | 9,671 | –6 | –13 | 21 |
| Criminal homicide | 878 | 803 | 73 | –54 | –56 | –28 |
| Sexual assault | 7,452 | 4,749 | 2,698 | 34 | 20 | 68 |
| Robbery | 6,230 | 5,157 | 1,073 | –33 | –35 | –22 |
| Aggravated assault | 7,495 | 5,745 | 1,741 | –21 | –24 | –7 |
| Simple assault | 8,106 | 4,984 | 3,113 | 22 | 21 | 25 |
| Other person | 3,036 | 2,061 | 973 | 38 | 22 | 87 |
| Property | 26,843 | 18,740 | 8,073 | –16 | –18 | –10 |
| Burglary | 10,399 | 7,481 | 2,904 | –17 | –21 | –7 |
| Theft | 5,650 | 3,793 | 1,848 | –22 | –26 | –12 |
| Auto theft | 5,572 | 3,756 | 1,812 | –15 | –14 | –16 |
| Arson | 735 | 514 | 220 | –19 | –25 | 0 |
| Other property | 4,487 | 3,196 | 1,289 | –4 | –4 | –6 |
| Drug | 8,002 | 4,851 | 3,137 | –12 | –23 | 15 |
| Drug trafficking | 1,810 | 1,284 | 522 | –37 | –41 | –24 |
| Other drug | 6,192 | 3,567 | 2,615 | 0 | –14 | 28 |
| Public order | 9,654 | 6,782 | 2,866 | 0 | –5 | 11 |
| Weapons | 3,013 | 2,346 | 665 | –28 | –29 | –24 |
| Other public order | 6,641 | 4,436 | 2,201 | 20 | 16 | 29 |
| Technical violation | 14,135 | 10,790 | 3,312 | 14 | 5 | 56 |
| **Status offense** | **4,824** | **1,548** | **3,262** | **–29** | **–11** | **–36** |
| Ungovernability | 1,825 | 253 | 1,570 | –36 | –45 | –34 |
| Running away | 997 | 417 | 577 | –33 | –14 | –43 |
| Truancy | 841 | 207 | 634 | –37 | –49 | –32 |
| Curfew violation | 203 | 65 | 138 | 5 | –18* | 21 |
| Underage drinking | 405 | 210 | 186 | 27 | 86 | –10 |
| Other status offense | 553 | 396 | 157 | –14 | 98 | –64 |

- For most offenses, fewer juveniles were held in 2003 than in 1997. For some offenses (e.g., drug offenses other than trafficking), the public facility population decreased but the private facility population increased. For several offenses (e.g., simple assault), both public and private populations increased.

* Percent change is based on a denominator less than 100.

Note: Total includes juvenile offenders held in tribal facilities.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 2003 [machine-readable data files].

# The 1-day count of juvenile offenders in custody rose from 1991 to 1999 and then dropped through 2003

**Public facilities drive the trend for the delinquency population**

The number of delinquents held in public facilities rose 36% from 1991 to 1999 and then dropped 13% by 2003. The number of delinquents held in private facilities was relatively small in comparison and rose sharply (95%) from 1991 to 1999. The subsequent decline in the private facility delinquent population between 1999 and 2003 was minimal (4%).

In comparison, private facilities drove the trend for the status offender population. The number of status offenders in private facilities was relatively flat from 1991 to 1995 (up just 8%) and then dropped 46% between 1995 and 1999. From 1999 to 2003, the private facility status offender population leveled off again. The number of status offenders in public facilities remained relatively low and flat throughout the period.

**In 2003, public and private facilities held 32% more delinquents and 32% fewer status offenders than in 1991**

- The total number of juvenile offenders in residential placement facilities rose 41% from 1991 to 1999 and then declined 10% from 1999 to 2003. The result was an overall increase of 27% between 1991 and 2003.
- The number of delinquents in juvenile facilities peaked in 1999, 48% above the 1991 figure. Between 1999 and 2003, however, the number dropped 11%.
- The number of status offenders in juvenile facilities was highest in 1995. Between 1995 and 2003, the number dropped 36%.

Note: Because data were not collected from tribal facilities prior to 1999, tribal facility data are excluded from this presentation.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 1997, 1999, 2001, and 2003 [machine-readable data files] and *Children in Custody Census of Public and Private Juvenile Detention, Correctional, and Shelter Facilities* for 1991, 1993, and 1995 [machine-readable data files].



# From 1991 to 2003, the detained population increased more than the committed population

### Offense profiles of detained offenders and committed offenders differ

Delinquents accounted for 95% of both detained and committed offenders in 2003. Compared with the detained population, the committed population had a greater proportion of youth held for sexual assault, burglary, and theft and fewer youth held for technical violations of probation or parole. The committed population also had proportionally more youth held for being ungovernable and fewer youth held for running away from home.

Juvenile offenders held, 2003:

| Most serious offense | Detained | Committed |
|---|---|---|
| Delinquency | 25,019 | 65,636 |
| | 100% | 100% |
| Person | 32 | 38 |
| Homicide | 1 | 1 |
| Sexual assault | 4 | 10 |
| Robbery | 6 | 7 |
| Agg. assault | 9 | 8 |
| Simple assault | 8 | 9 |
| Other person | 4 | 3 |
| Property | 25 | 31 |
| Burglary | 9 | 12 |
| Theft | 5 | 7 |
| Auto theft | 5 | 6 |
| Arson | 1 | 1 |
| Other property | 5 | 5 |
| Drug | 8 | 9 |
| Drug trafficking | 2 | 2 |
| Other drug | 6 | 7 |
| Public order | 11 | 10 |
| Weapons | 3 | 3 |
| Other public order | 7 | 7 |
| Technical violation | 24 | 12 |
| Status offense | 1,250 | 3,371 |
| | 100% | 100% |
| Ungovernability | 27 | 42 |
| Running away | 26 | 17 |
| Truancy | 17 | 18 |
| Curfew violation | 3 | 5 |
| Underage drinking | 6 | 9 |
| Other status offense | 20 | 9 |

Note: Detail may not total 100% because of rounding.

**Between 1991 and 2003, the detained delinquency population in public and private facilities increased 38%**

- Detained youth (those held prior to adjudication or disposition awaiting a hearing in juvenile or criminal court or after disposition awaiting placement elsewhere) made up 35% of delinquents in public facilities in 2003. In comparison, detained offenders were just 9% of the offenders held in private facilities that year.
- The number of committed delinquents held in public or private facilities as part of a court-ordered disposition was 28% greater in 2003 than in 1991. The public facility committed population was 11% greater in 2003 than in 1991; the private facility committed population was 77% greater.

Note: Because data were not collected from tribal facilities prior to 1999, tribal facility data are excluded from this presentation.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 1997, 1999, 2001, and 2003 [machine-readable data files] and *Children in Custody Census of Public and Private Juvenile Detention, Correctional, and Shelter Facilities* for 1991, 1993, and 1995 [machine-readable data files].



# In 2003, 307 juvenile offenders were in custody for every 100,000 juveniles in the U.S. population

**In 2003, the national commitment rate was 2.6 times the detention rate, but rates varied by state**

| State of offense | Juveniles in custody | Custody rate per 100,000 Total | Detained | Committed |
|---|---|---|---|---|
| U.S. total | 96,655 | 307 | 83 | 219 |
| **Upper age 17** | | | | |
| Alabama | 1,794 | 351 | 76 | 267 |
| Alaska | 336 | 370 | 158 | 208 |
| Arizona | 1,890 | 284 | 124 | 144 |
| Arkansas | 675 | 217 | 30 | 186 |
| California | 16,782 | 392 | 128 | 263 |
| Colorado | 1,776 | 344 | 99 | 244 |
| Delaware | 333 | 364 | 187 | 177 |
| District of Columbia | 285 | 625 | 381 | 230 |
| Florida | 8,208 | 452 | 94 | 352 |
| Hawaii | 129 | 97 | 34 | 63 |
| Idaho | 489 | 287 | 65 | 222 |
| Indiana | 3,045 | 415 | 98 | 313 |
| Iowa | 975 | 299 | 63 | 232 |
| Kansas | 1,071 | 336 | 78 | 255 |
| Kentucky | 837 | 185 | 50 | 131 |
| Maine | 222 | 153 | 33 | 116 |
| Maryland | 1,167 | 181 | 75 | 106 |
| Minnesota | 1,527 | 259 | 47 | 208 |
| Mississippi | 528 | 152 | 33 | 118 |
| Montana | 261 | 245 | 37 | 200 |
| Nebraska | 672 | 331 | 111 | 220 |
| Nevada | 921 | 362 | 157 | 204 |
| New Jersey | 1,941 | 199 | 100 | 98 |
| New Mexico | 606 | 258 | 83 | 175 |
| North Dakota | 246 | 347 | 25 | 317 |
| Ohio | 4,176 | 318 | 93 | 224 |
| **Upper age 17 (continued)** | | | | |
| Oklahoma | 1,059 | 265 | 74 | 190 |
| Oregon | 1,275 | 323 | 63 | 259 |
| Pennsylvania | 4,341 | 317 | 67 | 224 |
| Rhode Island | 342 | 295 | 5* | 284 |
| South Dakota | 522 | 564 | 117 | 444 |
| Tennessee | 1,434 | 226 | 38 | 185 |
| Utah | 954 | 307 | 56 | 251 |
| Vermont | 51 | 72 | 43 | 30 |
| Virginia | 2,376 | 289 | 110 | 178 |
| Washington | 1,656 | 236 | 63 | 170 |
| West Virginia | 498 | 269 | 83 | 185 |
| Wyoming | 357 | 606 | 97 | 509 |
| **Upper age 16** | | | | |
| Georgia | 2,451 | 273 | 84 | 155 |
| Illinois | 2,715 | 212 | 56 | 151 |
| Louisiana | 1,821 | 387 | 136 | 246 |
| Massachusetts | 1,302 | 216 | 84 | 128 |
| Michigan | 2,706 | 257 | 63 | 191 |
| Missouri | 1,413 | 246 | 59 | 185 |
| New Hampshire | 198 | 150 | 20 | 127 |
| South Carolina | 1,443 | 346 | 110 | 236 |
| Texas | 7,662 | 318 | 73 | 243 |
| Wisconsin | 1,524 | 274 | 58 | 216 |
| **Upper age 15** | | | | |
| Connecticut | 627 | 210 | 49 | 161 |
| New York | 4,308 | 272 | 48 | 223 |
| North Carolina | 1,203 | 169 | 57 | 109 |

**Detention rate**

DC
0 to 41
42 to 83
84 to 120
121 to 381

**Commitment rate**

DC
0 to 110
111 to 219
220 to 284
285 to 509

* Rate is based on fewer than 10 juveniles.

Notes: Custody rate is the count of juvenile offenders in custody per 100,000 youth ages 10 through the upper age of juvenile court jurisdiction in each state. U.S. totals include 1,398 youth in private facilities for whom state of offense was not reported and 124 youth in tribal facilities.

Source: Authors' analysis of Sickmund et al.'s *Census of Juveniles in Residential Placement databook* [online analysis].

**Although national custody rates declined from 1997 to 2003, not all states experienced a decline**

Detention
DC
Change in detention rate, 1997–2003
Decrease (25 states)
Increase (26 states)

Commitment
DC
Change in commitment rate, 1997–2003
Decrease (32 states)
Increase (19 states)

- Detention rates increased in half of the states and declined in the other half. More than half of the states had lower commitment rates in 2003 than in 1997, but in many states the reverse was true.

Note: Custody rate is the count of juvenile offenders in custody per 100,000 youth ages 10 through the upper age of juvenile court jurisdiction in each state.

Source: Authors' analysis of Sickmund et al.'s *Census of Juveniles in Residential Placement databook* [online analysis].

### Detained youth were in detention centers; committed youth were in many types of facilities

Long-term secure facilities (e.g., training schools) held the largest proportion of committed offenders (45%), but 13% were committed to detention centers.

Facility type profiles, 2003:

| Facility type | Detained offenders | Committed offenders |
|---|---|---|
| Total | 100% | 100% |
| Detention center | 91 | 13 |
| Shelter | 2 | 11 |
| Reception/diagnostic | 14 | 7 |
| Group home | 2 | 11 |
| Boot camp | 0 | 7 |
| Ranch/ wilderness camp | 0 | 4 |
| Long-term secure | 3 | 45 |
| Other | 0 | 1 |

Note: Detail may not total 100% because facilities could select more than one facility type category.

### For all facilities except detention centers, the majority of offenders were committed youth

Not all offenders held in detention centers were held in detained status. In 2003, 27% of offenders in detention centers had been committed to the facility.

Offender population profiles, 2003:

| Facility type | Detained offenders | Committed offenders |
|---|---|---|
| Detention center | 72% | 27% |
| Shelter | 6 | 92 |
| Reception/diagnostic | 19 | 81 |
| Group home | 6 | 92 |
| Boot camp | 2 | 93 |
| Ranch/ wilderness camp | 3 | 91 |
| Long-term secure | 3 | 97 |
| Other | 16 | 84 |

Note: Detail may total less than 100% because some facilities held youth other than detained or committed youth.

# In 2003, offense profiles of custody populations varied substantially across states

**In most states in 2003, person offenders accounted for a greater proportion of the custody population than did property offenders**

| State of offense | Person | Property | Drugs | Public order | Technical viol. | Status |
|---|---|---|---|---|---|---|
| | Offense profile of custody population, 2003 | | | | | |
| U.S. total | 34% | 28% | 8% | 10% | 15% | 5% |
| Alabama | 21 | 23 | 8 | 8 | 25 | 15 |
| Alaska | 33 | 23 | 4 | 11 | 29 | 1 |
| Arizona | 24 | 26 | 14 | 12 | 16 | 8 |
| Arkansas | 22 | 33 | 7 | 17 | 16 | 5 |
| California | 36 | 27 | 7 | 12 | 16 | 2 |
| Colorado | 52 | 26 | 5 | 10 | 6 | 1 |
| Connecticut | 30 | 18 | 10 | 10 | 20 | 13 |
| Delaware | 25 | 25 | 14 | 18 | 16 | 2 |
| Dist. of Columbia | 38 | 26 | 9 | 13 | 13 | 0 |
| Florida | 34 | 36 | 9 | 8 | 14 | <1 |
| Georgia | 38 | 29 | 5 | 10 | 14 | 5 |
| Hawaii | 28 | 21 | 7 | 2 | 37 | 7 |
| Idaho | 29 | 36 | 12 | 13 | 9 | 2 |
| Illinois | 34 | 26 | 7 | 7 | 26 | 1 |
| Indiana | 29 | 28 | 10 | 16 | 8 | 9 |
| Iowa | 32 | 38 | 12 | 7 | 4 | 6 |
| Kansas | 42 | 28 | 7 | 6 | 15 | 2 |
| Kentucky | 33 | 27 | 7 | 13 | 11 | 9 |
| Louisiana | 30 | 36 | 11 | 10 | 5 | 8 |
| Maine | 31 | 39 | 5 | 8 | 15 | 0 |
| Maryland | 27 | 27 | 16 | 7 | 21 | 2 |
| Massachusetts | 48 | 26 | 8 | 11 | 7 | 1 |
| Michigan | 37 | 25 | 3 | 10 | 14 | 11 |
| Minnesota | 25 | 26 | 5 | 18 | 16 | 10 |
| Mississippi | 14 | 33 | 6 | 18 | 23 | 6 |
| Missouri | 31% | 32% | 8% | 10% | 12% | 7% |
| Montana | 28 | 44 | 7 | 10 | 3 | 8 |
| Nebraska | 18 | 30 | 7 | 13 | 15 | 17 |
| Nevada | 23 | 28 | 22 | 12 | 14 | 1 |
| New Hampshire | 59 | 21 | 3 | 5 | 6 | 8 |
| New Jersey | 31 | 15 | 16 | 11 | 28 | <1 |
| New Mexico | 39 | 23 | 8 | 14 | 11 | 4 |
| New York | 34 | 25 | 6 | 6 | 6 | 22 |
| North Carolina | 41 | 37 | 5 | 5 | 6 | 6 |
| North Dakota | 22 | 33 | 9 | 12 | 4 | 21 |
| Ohio | 38 | 28 | 6 | 10 | 16 | 2 |
| Oklahoma | 42 | 35 | 8 | 9 | 3 | 3 |
| Oregon | 57 | 25 | 4 | 5 | 9 | <1 |
| Pennsylvania | 28 | 21 | 15 | 10 | 17 | 9 |
| Rhode Island | 47 | 29 | 11 | 9 | 1 | 3 |
| South Carolina | 27 | 28 | 3 | 10 | 27 | 4 |
| South Dakota | 25 | 26 | 13 | 10 | 11 | 14 |
| Tennessee | 33 | 26 | 9 | 9 | 19 | 4 |
| Texas | 37 | 28 | 8 | 9 | 16 | 2 |
| Utah | 29 | 16 | 10 | 14 | 26 | 4 |
| Vermont | – | – | – | – | – | – |
| Virginia | 37 | 29 | 8 | 5 | 18 | 3 |
| Washington | 36 | 32 | 5 | 8 | 16 | 2 |
| West Virginia | 36 | 32 | 7 | 6 | 4 | 16 |
| Wisconsin | 38 | 30 | 5 | 18 | 2 | 7 |
| Wyoming | 18 | 16 | 8 | 10 | 30 | 17 |

- New Hampshire, Oregon, and Colorado had the highest proportions of person offenders; Mississippi, Nebraska, and Wyoming had the lowest.
- The proportion of juvenile offenders held for drug offenses ranged from 22% in Nevada to 3% in Michigan, New Hampshire, and South Carolina.
- In Alabama, Alaska, Hawaii, Illinois, New Jersey, South Carolina, Utah, and Wyoming, at least 25% of juvenile offenders in custody were held for technical violations of probation, parole, or valid court orders.
- More than 20% of offenders in New York and North Dakota were held for a status offense. Several states had virtually no status offenders in custody.

**Percent of juvenile offenders held for person offenses**

DC
14% to 25%
26% to 34%
35% to 40%
41% to 59%
Not calculated

– Too few juveniles in category to calculate a reliable percentage.

Notes: U.S. totals include 1,398 youth in private facilities for whom state of offense was not reported and 124 youth in tribal facilities. Detail may not total 100% because of rounding.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 2003 [machine-readable data file].



# In some states, the offense profiles of detained and committed populations were very different

**In 1 out of 4 states in 2003, technical violations accounted for a greater share of detained offenders than did person offenses**

| State of offense | Offense profile of detained offenders, 2003 | | | | | |
|---|---|---|---|---|---|---|
| | Person | Property | Drugs | Public order | Technical viol. | Status |
| U.S. total | 31% | 24% | 8% | 10% | 23% | 5% |
| Alabama | 26 | 18 | 5 | 12 | 28 | 12 |
| Alaska | 23 | 27 | 4 | 8 | 38 | 0 |
| Arizona | 23 | 23 | 14 | 5 | 24 | 10 |
| Arkansas | – | – | – | – | – | – |
| California | 34 | 22 | 6 | 10 | 25 | 4 |
| Colorado | 37 | 30 | 4 | 14 | 12 | 2 |
| Connecticut | 16 | 6 | 6 | 6 | 57 | 8 |
| Delaware | 23 | 28 | 12 | 16 | 21 | 2 |
| Dist. of Columbia | 36 | 24 | 12 | 12 | 17 | 0 |
| Florida | 30 | 25 | 8 | 10 | 27 | 1 |
| Georgia | 31 | 26 | 5 | 12 | 21 | 6 |
| Hawaii | – | – | – | – | – | – |
| Idaho | 30 | 30 | 11 | 14 | 14 | 3 |
| Illinois | 36 | 29 | 10 | 8 | 17 | <1 |
| Indiana | 30 | 22 | 12 | 10 | 18 | 10 |
| Iowa | 28 | 35 | 12 | 10 | 14 | 3 |
| Kansas | 40 | 24 | 7 | 8 | 19 | 2 |
| Kentucky | 36 | 18 | 7 | 16 | 14 | 8 |
| Louisiana | 34 | 35 | 11 | 10 | 9 | 2 |
| Maine | – | – | – | – | – | – |
| Maryland | 31 | 28 | 16 | 5 | 20 | 1 |
| Massachusetts | 44 | 27 | 10 | 11 | 8 | 1 |
| Michigan | 33 | 26 | 3 | 8 | 19 | 11 |
| Minnesota | 28 | 24 | 3 | 11 | 27 | 6 |
| Mississippi | 16 | 24 | 11 | 26 | 21 | 5 |

| State of offense | Offense profile of detained offenders, 2003 | | | | | |
|---|---|---|---|---|---|---|
| | Person | Property | Drugs | Public order | Technical viol. | Status |
| Missouri | 31% | 30% | 7% | 6% | 22% | 3% |
| Montana | – | – | – | – | – | – |
| Nebraska | 24 | 28 | 7 | 9 | 27 | 4 |
| Nevada | 20 | 26 | 16 | 14 | 24 | 1 |
| New Hampshire | – | – | – | – | – | – |
| New Jersey | 30 | 12 | 15 | 11 | 31 | 1 |
| New Mexico | 32 | 15 | 6 | 9 | 32 | 6 |
| New York | 33 | 19 | 6 | 7 | 12 | 23 |
| North Carolina | 44 | 33 | 6 | 4 | 10 | 4 |
| North Dakota | – | – | – | – | – | – |
| Ohio | 34 | 24 | 6 | 12 | 22 | 2 |
| Oklahoma | 24 | 43 | 10 | 10 | 7 | 6 |
| Oregon | 34 | 28 | 7 | 5 | 25 | 1 |
| Pennsylvania | 25 | 18 | 8 | 9 | 32 | 8 |
| Rhode Island | – | – | – | – | – | – |
| South Carolina | 33 | 26 | 5 | 18 | 16 | 3 |
| South Dakota | 22 | 22 | 6 | 8 | 28 | 11 |
| Tennessee | 28 | 19 | 6 | 12 | 31 | 5 |
| Texas | 24 | 20 | 8 | 13 | 33 | 2 |
| Utah | 19 | 14 | 7 | 31 | 26 | 3 |
| Vermont | – | – | – | – | – | – |
| Virginia | 29 | 21 | 7 | 9 | 31 | 3 |
| Washington | 36 | 36 | 5 | 8 | 10 | 3 |
| West Virginia | 41 | 25 | 8 | 6 | 6 | 12 |
| Wisconsin | 29 | 30 | 4 | 15 | 3 | 19 |
| Wyoming | – | – | – | – | – | – |

- In Connecticut, offenders detained for a technical violation of probation, parole, or valid court orders accounted for more than half of all detained offenders.
- Massachusetts and North Carolina had the highest proportions of person offenders among detained juveniles (44% in each state). Connecticut and Mississippi had the lowest proportions (16% each).
- In all states, the proportion of juvenile offenders detained for drug offenses was less than 20%.
- In most states, status offenders accounted for less than 10% of detained offenders.

**Percent of detained juvenile offenders held for person offenses**

DC
16% to 24%
25% to 31%
32% to 39%
40% to 44%
Not calculated

– Too few juveniles in category to calculate a reliable percentage.

Notes: U.S. totals include 10 detained youth in private facilities for whom state of offense was not reported and 99 youth in tribal facilities. Detail may not total 100% because of rounding.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 2003 [machine-readable data file].

**In 4 out of 10 states in 2003, person offenders accounted for more than the national average of 36% of the committed custody population**

| State of offense | Person | Property | Drugs | Public order | Technical viol. | Status |
|---|---|---|---|---|---|---|
| | Offense profile of committed offenders, 2003 | | | | | |
| U.S. Total | 36% | 30% | 8% | 10% | 11% | 5% |
| Alabama | 20 | 24 | 9 | 7 | 25 | 15 |
| Alaska | 41 | 21 | 3 | 13 | 22 | 0 |
| Arizona | 25 | 30 | 15 | 16 | 8 | 6 |
| **Arkansas** | **22** | **35** | **7** | **19** | **12** | **5** |
| **California** | **38** | **30** | **8** | **12** | **11** | **1** |
| **Colorado** | **58** | **24** | **5** | **8** | **3** | **1** |
| **Connecticut** | **34** | **21** | **11** | **11** | **8** | **15** |
| Delaware | 28 | 24 | 17 | 20 | 11 | 2 |
| Dist. of Columbia | 40 | 31 | 9 | 14 | 9 | 0 |
| Florida | 35 | 39 | 9 | 7 | 10 | 0 |
| Georgia | 41 | 32 | 5 | 9 | 9 | 3 |
| **Hawaii** | **–** | **–** | **–** | **–** | **–** | **–** |
| **Idaho** | **29** | **37** | **12** | **13** | **8** | **2** |
| **Illinois** | **34** | **25** | **6** | **5** | **29** | **1** |
| **Indiana** | **29** | **31** | **10** | **18** | **5** | **8** |
| Iowa | 33 | 40 | 12 | 6 | 2 | 7 |
| Kansas | 43 | 30 | 7 | 5 | 14 | 1 |
| Kentucky | 33 | 30 | 7 | 12 | 10 | 8 |
| Louisiana | 29 | 37 | 11 | 10 | 2 | 12 |
| **Maine** | **38** | **41** | **4** | **9** | **9** | **0** |
| **Maryland** | **25** | **27** | **17** | **8** | **21** | **2** |
| **Massachusetts** | **50** | **26** | **6** | **10** | **7** | **0** |
| **Michigan** | **39** | **25** | **3** | **10** | **12** | **11** |
| Minnesota | 25 | 26 | 6 | 20 | 14 | 10 |
| Mississippi | 14 | 36 | 5 | 15 | 23 | 7 |

| State of offense | Person | Property | Drugs | Public order | Technical viol. | Status |
|---|---|---|---|---|---|---|
| | Offense profile of committed offenders, 2003 | | | | | |
| Missouri | 31% | 32% | 8% | 11% | 9% | 9% |
| Montana | 25 | 49 | 6 | 13 | 0 | 7 |
| Nebraska | 15 | 30 | 7 | 14 | 9 | 23 |
| Nevada | 25 | 29 | 27 | 10 | 7 | 2 |
| **New Hampshire** | **61** | **21** | **4** | **4** | **4** | **7** |
| **New Jersey** | **32** | **17** | **17** | **10** | **23** | **0** |
| **New Mexico** | **42** | **27** | **10** | **16** | **1** | **3** |
| **New York** | **34** | **26** | **6** | **6** | **5** | **22** |
| North Carolina | 40 | 41 | 5 | 6 | 4 | 5 |
| North Dakota | 23 | 35 | 9 | 11 | 1 | 21 |
| Ohio | 39 | 29 | 7 | 9 | 14 | 2 |
| Oklahoma | 50 | 31 | 7 | 9 | 2 | 2 |
| **Oregon** | **62** | **25** | **3** | **5** | **5** | **0** |
| **Pennsylvania** | **31** | **22** | **17** | **10** | **11** | **10** |
| **Rhode Island** | **48** | **28** | **11** | **9** | **1** | **2** |
| **South Carolina** | **24** | **29** | **3** | **7** | **33** | **5** |
| South Dakota | 26 | 27 | 15 | 11 | 7 | 15 |
| Tennessee | 35 | 27 | 9 | 8 | 17 | 4 |
| Texas | 42 | 30 | 8 | 8 | 11 | 1 |
| Utah | 31 | 17 | 11 | 10 | 27 | 4 |
| **Vermont** | **–** | **–** | **–** | **–** | **–** | **–** |
| **Virginia** | **42** | **34** | **8** | **3** | **11** | **2** |
| **Washington** | **37** | **31** | **5** | **8** | **18** | **1** |
| **West Virginia** | **32** | **35** | **7** | **6** | **3** | **17** |
| Wisconsin | 40 | 30 | 5 | 18 | 2 | 4 |
| Wyoming | 16 | 15 | 9 | 10 | 34 | 16 |

- Oregon and New Hampshire had the highest proportions of person offenders among committed juveniles (62% and 61%, respectively). Mississippi (14%), Nebraska (15%), and Wyoming (16%) had the lowest proportions.
- The proportion of juvenile offenders committed for technical violations of probation, parole, or valid court orders ranged from 34% in Wyoming to 0% in Montana.
- In half of all states, status offenders accounted for less than 5% of committed offenders.

DC
14% to 26%
27% to 36%
37% to 49%
50% to 62%
Not calculated

– Too few juveniles in category to calculate a reliable percentage.

Notes: U.S. totals include 1,386 committed youth in private facilities for whom state of offense was not reported and 25 youth in tribal facilities. Detail may not total 100% because of rounding.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 2003 [machine-readable data file].



# Females account for a small proportion of the custody population, but their numbers have increased recently

### The 14,590 female offenders held in 2003 accounted for 15% of offenders in custody

Male offenders dominate the juvenile system. This is especially true of the custody population. Males represent half of the juvenile population and are involved in approximately three-quarters of juvenile arrests and delinquency cases handled in juvenile court each year, but they represented 85% of juvenile offenders in residential placement in 2003.

The proportion of females has increased over the years from 13% in 1991 to 15% in 2003. The female proportion was greater among status offenders held (40%) than among delinquents (14%), and greater for detained (18%) than for committed (12%) delinquents.

Female proportion of offenders in custody:

| Year | Total | Delinquent | Status |
|---|---|---|---|
| 1991 | 13% | 9% | 45% |
| 1993 | 12 | 9 | 44 |
| 1995 | 12 | 10 | 40 |
| 1997 | 14 | 11 | 47 |
| 1999 | 13 | 12 | 39 |
| 2001 | 14 | 13 | 41 |
| 2003 | 15 | 14 | 40 |

Female proportion of delinquent offenders in custody:

| Year | Total | Detained | Committed |
|---|---|---|---|
| 1991 | 9% | 12% | 8% |
| 1993 | 9 | 12 | 8 |
| 1995 | 10 | 13 | 8 |
| 1997 | 11 | 15 | 10 |
| 1999 | 12 | 17 | 11 |
| 2001 | 13 | 18 | 11 |
| 2003 | 14 | 18 | 12 |

**The number of female offenders in custody increased 52% from 1991 to 2003—the number of delinquents rose 96% and the number of status offenders dropped 38%**

- Among males in juvenile facilities, the number of delinquents increased 26% and the number of status offenders decreased 26% from 1991 to 2003, for an overall increase in male offenders of 23%.
- Status offenders accounted for a greater share of female offenders in custody than of male offenders. However, the status offender proportion of female offenders in custody dropped from 33% in 1991 to 13% in 2003. For males, the status offender proportion held steady between 3% and 6%.

Note: Because data were not collected from tribal facilities prior to 1999, tribal facility data are excluded from this presentation.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 1997, 1999, 2001, and 2003 [machine readable data files] and *Children in Custody Census of Public and Private Juvenile Detention, Correctional, and Shelter Facilities* for 1991, 1993, and 1995 [machine readable data files].

**In nearly all states, females represented a relatively small proportion of juvenile offenders in residential placement in 2003; their proportion was generally larger in private facilities than in public facilities**

| | Female proportion, 2003 | | | |
|---|---|---|---|---|
| | | Committed | | |
| State of offense | Overall | Public | Private | Detained |
| U.S. total | 15% | 12% | 16% | 19% |
| Alabama | 20 | 16 | 21 | 22 |
| Alaska | 11 | 7 | – | 17 |
| Arizona | 18 | 14 | 20 | 23 |
| Arkansas | 17 | 23 | 12 | – |
| California | 13 | 9 | 17 | 17 |
| Colorado | 10 | 5 | 9 | 16 |
| Connecticut | 21 | 0 | 24 | 35 |
| Delaware | 11 | – | – | 14 |
| District of Columbia | 11 | – | – | 10 |
| Florida | 19 | 9 | 19 | 18 |
| Georgia | 15 | 12 | 8 | 20 |
| Hawaii | 26 | – | – | – |
| Idaho | 17 | 16 | – | 22 |
| Illinois | 11 | 10 | 11 | 14 |
| Indiana | 23 | 19 | 29 | 27 |
| Iowa | 21 | 10 | 25 | 25 |
| Kansas | 15 | 10 | 20 | 19 |
| Kentucky | 15 | 10 | 44 | 14 |
| Louisiana | 16 | 12 | 27 | 14 |
| Maine | 11 | 10 | – | – |
| Maryland | 8 | 10 | 5 | 9 |
| Massachusetts | 12 | 0 | 11 | 17 |
| Michigan | 19 | 23 | 16 | 23 |
| Minnesota | 15 | 9 | 18 | 16 |
| Mississippi | 19 | 16 | – | 29 |

| | Female proportion, 2003 | | | |
|---|---|---|---|---|
| | | Committed | | |
| State of offense | Overall | Public | Private | Detained |
| Missouri | 14% | 14% | 19% | 12% |
| Montana | 18 | 16 | – | – |
| Nebraska | 32 | 30 | 49 | 20 |
| Nevada | 21 | 18 | – | 23 |
| New Hampshire | 18 | – | – | – |
| New Jersey | 8 | 6 | – | 10 |
| New Mexico | 12 | 10 | – | 18 |
| New York | 21 | 16 | 25 | 24 |
| North Carolina | 18 | 8 | 18 | 28 |
| North Dakota | 26 | – | 26 | – |
| Ohio | 13 | 10 | 8 | 19 |
| Oklahoma | 17 | 10 | 26 | 21 |
| Oregon | 12 | 10 | 11 | 20 |
| Pennsylvania | 11 | 2 | 9 | 18 |
| Rhode Island | 7 | 7 | 8 | – |
| South Carolina | 17 | 20 | 6 | 24 |
| South Dakota | 25 | 21 | 24 | 36 |
| Tennessee | 11 | 9 | 12 | 14 |
| Texas | 13 | 11 | 7 | 20 |
| Utah | 20 | 23 | 15 | 22 |
| Vermont | – | – | – | – |
| Virginia | 14 | 9 | – | 23 |
| Washington | 13 | 10 | – | 20 |
| West Virginia | 17 | 5 | 26 | 22 |
| Wisconsin | 14 | 14 | 13 | 18 |
| Wyoming | 39 | 53 | 21 | – |

- Nationally, females accounted for 15% of juvenile offenders in residential placement on October 22, 2003.
- The female proportion of committed offenders was higher in private facilities (16%) than in public facilities (12%).
- The female proportion was higher for detained offenders (19%) than for committed offenders (13% for public and private facilities combined).
- In Colorado, Maryland, New Jersey, and Rhode Island, females represented no more than 10% of offenders in custody.
- In Hawaii, Nebraska, North Dakota, South Dakota, and Wyoming, females represented at least 25% of offenders in custody.

DC
7% to 10%
11% to 15%
16% to 20%
21% to 39%
Not calculated

– Too few juveniles in category to calculate a reliable percentage.

Note: U.S. totals include 1,398 youth in private facilities for whom state of offense was not reported and 124 youth in tribal facilities.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 2003 [machine-readable data files].

**Detained youth account for a greater share of the female population of delinquents in custody than the male population**

- Between 1991 and 2003, detained youth constituted about one-quarter of all male delinquents in residential placement, compared with more than one-third of female delinquents in residential placement.
- For both males and females, the detained population increased more from 1991 to 2003 than the committed population. Among males, the increase was 23% for committed delinquents and 29% for detained delinquents. For females, the increase was 88% for committed delinquents and 98% for detained delinquents.

Note: Because data were not collected from tribal facilities prior to 1999, tribal facility data are excluded from this presentation.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 1997, 1999, 2001, and 2003 [machine-readable data files] and *Children in Custody Census of Public and Private Juvenile Detention, Correctional, and Shelter Facilities* for 1991, 1993, and 1995 [machine-readable data files].

## Females are not distributed evenly across facility types

Detention centers held the largest proportion of female offenders in 2003 (45%). Long-term secure facilities (e.g., training schools) held about one-quarter of female offenders and group homes (and halfway houses) held about one-tenth. Long-term secure facilities held the largest proportion of male offenders (37%), closely followed by detention centers (35%).

Facility type profile, 2003:

| Facility type | Male | Female |
|---|---|---|
| Total | 100% | 100% |
| Detention center | 35 | 45 |
| Shelter | 2 | 5 |
| Reception/diagnostic | 6 | 7 |
| Group home | 9 | 12 |
| Boot camp | 4 | 1 |
| Ranch/wilderness camp | 5 | 4 |
| Long-term secure | 37 | 24 |
| Other | 1 | <1 |

Note: Detail may not total 100% because of rounding.

Females made up more than a quarter of offenders in shelter facilities. For detention centers and group homes, about 1 in 5 offenders were female; for long-term secure facilities, 1 in 10 offenders were female.

Percentage of female offenders:

| Facility type | 2003 |
|---|---|
| Detention center | 19% |
| Shelter | 27 |
| Reception/diagnostic | 17 |
| Group home | 19 |
| Boot camp | 6 |
| Ranch/wilderness camp | 12 |
| Long-term secure | 10 |
| Other | 6 |

In 2003, 59% of female offenders were in facilities that also held males. Females were housed in 47% of facilities: 33% held both males and females and 14% held only females.

### Private facilities housed nearly 4 in 10 female offenders in residential placement in 2003

Private facilities held 36% of all female offenders in residential placement in 2003. In comparison, private facilities held 31% of male offenders that year. The proportion of female offenders held in private facilities varied by offense: these facilities housed 84% of females held for ungovernability, 37% of those held for simple assault, and 19% of those held for robbery.

Percent of offenders held in private facilities, 2003:

| Most serious offense | Male | Female |
|---|---|---|
| Total offenders | 31% | 36% |
| Delinquency | 29 | 31 |
| Person | 26 | 34 |
| Homicide | 8 | 10 |
| Sexual assault | 36 | 52 |
| Robbery | 17 | 19 |
| Aggravated assault | 22 | 30 |
| Simple assault | 39 | 37 |
| Other person | 30 | 42 |
| Property | 30 | 31 |
| Burglary | 28 | 28 |
| Theft | 32 | 34 |
| Auto theft | 32 | 35 |
| Arson | 30 | 32 |
| Other property | 29 | 24 |
| Drug | 39 | 43 |
| Drug trafficking | 29 | 30 |
| Other drug | 42 | 45 |
| Public order | 30 | 26 |
| Weapons | 22 | 28 |
| Other public order | 35 | 25 |
| Technical violation | 23 | 24 |
| Status offense | 66 | 70 |
| Ungovernability | 87 | 84 |
| Running away | 53 | 61 |
| Truancy | 74 | 77 |
| Curfew violation | 63 | – |
| Underage drinking | 43 | 52 |
| Other status offense | 28 | 28 |

– Too few juveniles in category to calculate a reliable percentage.

### Females in custody tended to be younger than their male counterparts

Juveniles ages 15 and younger accounted for 46% of females and 33% of males held in 2003. In contrast, the proportion of older offenders (ages 18–21) was greater among males (16%) than among females (7%). The peak age for female offenders in residential placement was 16; for male offenders, it was 17.

Age profile of offenders in custody, 2003:

| Age | Total | Male | Female |
|---|---|---|---|
| Total | 100% | 100% | 100% |
| 12 and younger | 2 | 2 | 2 |
| 13 | 4 | 4 | 6 |
| 14 | 10 | 10 | 14 |
| 15 | 19 | 18 | 24 |
| 16 | 26 | 25 | 27 |
| 17 | 25 | 26 | 20 |
| 18 and older | 14 | 16 | 7 |

Note: Detail may not total 100% because of rounding.

### The female proportion of the custody population was greatest for offenders in their early teens

Overall, females accounted for 15% of offenders in residential placement. Through age 13, the female proportion of offenders in custody increased steadily with age. After age 13, the female proportion of offenders in custody diminished with age.

Female percent of juvenile offenders in residential placement:

| Age | 2003 | Age | 2003 |
|---|---|---|---|
| 10 | 7% | 16 | 16% |
| 11 | 14 | 17 | 13 |
| 12 | 17 | 18 | 8 |
| 13 | 21 | 19 | 6 |
| 14 | 21 | 20 | 5 |
| 15 | 19 | | |

### Minorities made up a smaller share of female than male offenders in custody

In 2003, minority youth made up the majority of both males and females in residential placement. Non-Hispanic whites accounted for 45% of female and 38% of male juvenile offenders in custody.

Race/ethnicity profile of offenders, 2003:

| Race/ethnicity | Total | Male | Female |
|---|---|---|---|
| Total | 100% | 100% | 100% |
| White | 39 | 38 | 45 |
| Minority | 61 | 62 | 55 |
| Black | 38 | 39 | 35 |
| Hispanic | 19 | 20 | 15 |
| Amer. Indian | 2 | 2 | 3 |
| Asian | 2 | 2 | 1 |
| Other | 1 | 1 | 1 |

Note: Detail may not total 100% because of rounding.

From 1997 to 2003, the minority proportion of juvenile offenders in custody increased for females and decreased for males. In 1997, minorities accounted for 51% of female offenders in residential placement and 64% of males. In 2003, minorities constituted 55% of females in custody and 62% of males.

Females made up a smaller share of minority offenders in custody than of white offenders (14% vs. 18% in 2003). However, the female proportion varied across minority groups (e.g., 21% among American Indians, 12% among Hispanics).

Gender profile of offenders, 2003:

| Race/ethnicity | Total | Male | Female |
|---|---|---|---|
| Total | 100% | 85% | 15% |
| White | 100 | 82 | 18 |
| Minority | 100 | 86 | 14 |
| Black | 100 | 86 | 14 |
| Hispanic | 100 | 88 | 12 |
| Amer. Indian | 100 | 79 | 21 |
| Asian | 100 | 86 | 14 |
| Other | 100 | 79 | 21 |

### In a few offense categories, females accounted for more than 20% of offenders held

In 2003, females accounted for 15% of offenders in custody, but that proportion varied by offense. Females represented a much larger proportion of status offenders than delinquent offenders in custody (40% vs. 14%).

Female proportion of offenders:

| Most serious offense | 2003 |
|---|---|
| Total | 15% |
| Delinquency | 14 |
| Person | 13 |
| Homicide | 12 |
| Sexual assault | 2 |
| Robbery | 6 |
| Aggravated assault | 16 |
| Simple assault | 25 |
| Other person | 18 |
| Property | 12 |
| Burglary | 7 |
| Theft | 18 |
| Auto theft | 14 |
| Arson | 10 |
| Other property | 12 |
| Drug | 13 |
| Drug trafficking | 7 |
| Other drug | 15 |
| Public order | 12 |
| Weapons | 6 |
| Other public order | 16 |
| Technical violation | 21 |
| Status offense | 40 |
| Ungovernability | 59 |
| Running away | 38 |
| Truancy | 38 |
| Curfew violation | 35 |
| Underage drinking | 30 |
| Other status offense | 25 |

### Females were more likely than males to be held for simple assault, technical violations, and status offenses in 2003

Offense profile for juvenile offenders in residential placement on October 22, 2003

| | Total | | Detained | | Committed | |
|---|---|---|---|---|---|---|
| Most serious offense | Male | Female | Male | Female | Male | Female |
| Total | 100% | 100% | 100% | 100% | 100% | 100% |
| Delinquency | 96 | 87 | 96 | 90 | 97 | 86 |
| Person | 35 | 30 | 32 | 27 | 36 | 32 |
| Homicide | 1 | 1 | 1 | 1 | 1 | 1 |
| Sexual assault | 9 | 1 | 4 | 1 | 10 | 2 |
| Robbery | 7 | 2 | 6 | 2 | 7 | 3 |
| Aggravated assault | 8 | 8 | 9 | 9 | 7 | 8 |
| Simple assault | 7 | 14 | 7 | 11 | 8 | 15 |
| Other person | 3 | 4 | 3 | 3 | 3 | 4 |
| Property | 29 | 21 | 25 | 18 | 31 | 23 |
| Burglary | 12 | 5 | 10 | 4 | 13 | 5 |
| Theft | 6 | 7 | 4 | 5 | 6 | 8 |
| Auto theft | 6 | 5 | 5 | 5 | 6 | 6 |
| Arson | 1 | 1 | 1 | 0 | 1 | 1 |
| Other property | 5 | 4 | 5 | 3 | 5 | 4 |
| Drug | 8 | 7 | 8 | 6 | 9 | 8 |
| Drug trafficking | 2 | 1 | 2 | 1 | 2 | 1 |
| Other drug | 6 | 6 | 6 | 5 | 7 | 7 |
| Public order | 10 | 8 | 10 | 10 | 10 | 7 |
| Weapons | 3 | 1 | 4 | 1 | 3 | 1 |
| Other public order | 7 | 7 | 6 | 9 | 7 | 6 |
| Technical violation | 14 | 20 | 21 | 29 | 11 | 15 |
| Status offense | 4 | 13 | 4 | 10 | 3 | 14 |
| Ungovernability | 1 | 5 | 1 | 3 | 2 | 6 |
| Running away | 0 | 4 | 1 | 4 | 0 | 4 |
| Truancy | 1 | 2 | 1 | 2 | 1 | 2 |
| Curfew violation | 0 | 0 | 0 | 0 | 0 | 1 |
| Underage drinking | 0 | 1 | 0 | 0 | 0 | 1 |
| Other status offense | 1 | 1 | 1 | 1 | 0 | 1 |

Note: Detail may not total 100% because of rounding.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 2003 [machine-readable data files].

The female share of offenders held for simple assault, technical violations, and all status offense categories exceeded 20%. This was true for both detained and committed offenders. For theft and public order offenses other than weapons violations, females made up about one-quarter of detained offenders, but their share of committed offenders was substantially smaller. For most status offenses, females accounted for 30% or more of youth in custody.

In several offense categories, females accounted for less than 10% of juvenile offenders in custody: burglary and drug trafficking (7%), robbery and weapons (6%), and sexual assaults (2%). For all other offenses, the female share ranged between 10% and 20%.



# The decline in black juveniles in custody led the overall 1997–2003 custody population decline

### Black youth accounted for the majority of nonwhite youth held

In 2003, more than 59,000 minority offenders were in residential placement in juvenile facilities across the country—61% of the custody population nationwide. Black youth accounted for 38% of all offenders in custody.

Juvenile offenders in custody, 2003:

| Race/ethnicity | Number | Percent | Percent change 1997–2003 |
|---|---|---|---|
| Total | 96,655 | 100% | –8% |
| White | 37,347 | 39 | –5 |
| Minority | 59,308 | 61 | –10 |
| Black | 36,740 | 38 | –12 |
| Hispanic | 18,422 | 19 | –5 |
| Amer. Indian | 1,771 | 2 | 10 |
| Asian | 1,462 | 2 | –34 |
| Other/mixed | 913 | 1 | 62 |

Note: Detail may not total 100% because of rounding.

Between 1997 and 2003, the population of offenders in custody dropped 8%. The decline for white youth (5%) was half the decline for minority youth (10%). Among minority youth, Asians had the largest relative drop (34%). However, black offenders accounted for the majority of the overall reduction in the custody population. More than 5,000 fewer black youth were held in juvenile facilities on the census date in 2003 than in 1997. This was 2.5 times the decrease in the white custody population.

Despite the decline in the number of minority offenders in custody, the minority proportion of the custody population decreased only slightly between 1997 and 2003 (from 62% to 61%). Among delinquent offenders held in juvenile facilities, minorities accounted for 62% in 2003, down from 64% in 1997. However, among status offenders held, minorities accounted for 52% in 2003, up from 41% in 1997.

Minority proportion of offenders:

| Year | Total | Delinquent | Status |
|---|---|---|---|
| 1997 | 62% | 64% | 41% |
| 1999 | 62 | 63 | 46 |
| 2001 | 60 | 61 | 50 |
| 2003 | 61 | 62 | 52 |

The minority proportion of committed delinquents decreased from 64% in 1997 to 60% in 2003, but the minority proportion of detained delinquents did not decline. Thus, the minority proportion was greater among detained offenders than committed offenders in 2003.

Minority proportion of delinquents:

| Year | Total | Detained | Committed |
|---|---|---|---|
| 1997 | 64% | 64% | 64% |
| 1999 | 63 | 63 | 63 |
| 2001 | 61 | 63 | 60 |
| 2003 | 62 | 65 | 60 |

### The minority proportion of offenders varied by offense and also by placement status

For some offenses, the minority proportion of detained juveniles was substantially greater than the minority proportion of committed juveniles. For example, blacks represented 44% of detained person offenders, but 39% of committed person offenders. This difference

**In 2003, white youth's share of juveniles held in custody was greatest for the offenses of sexual assault and arson, black youth's share was greatest for robbery and drug trafficking**

| | Race/ethnic profile of juvenile offenders in custody, 2003 | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | Minority | | | | |
| Most serious offense | Total | White | Total minority | Black | Hispanic | American Indian | Asian |
| Total | 100% | 39% | 61% | 38% | 19% | 2% | 2% |
| Delinquency | 100 | 38 | 62 | 38 | 19 | 2 | 2 |
| Homicide | 100 | 27 | 73 | 40 | 26 | 2 | 4 |
| Sexual assault | 100 | 57 | 43 | 26 | 13 | 2 | 1 |
| Robbery | 100 | 15 | 85 | 60 | 22 | 1 | 2 |
| Aggravated assault | 100 | 28 | 72 | 41 | 26 | 2 | 3 |
| Simple assault | 100 | 40 | 60 | 40 | 15 | 2 | 1 |
| Burglary | 100 | 44 | 56 | 33 | 19 | 2 | 1 |
| Theft | 100 | 43 | 57 | 40 | 13 | 2 | 2 |
| Auto theft | 100 | 33 | 67 | 39 | 23 | 2 | 3 |
| Arson | 100 | 57 | 43 | 27 | 11 | 3 | 1 |
| Drug trafficking | 100 | 21 | 79 | 60 | 16 | 1 | 2 |
| Other drug | 100 | 38 | 62 | 36 | 22 | 2 | 1 |
| Weapons | 100 | 21 | 79 | 45 | 30 | 1 | 2 |
| Technical violations | 100 | 39 | 61 | 36 | 21 | 2 | 1 |
| Status offenses | 100 | 48 | 52 | 34 | 12 | 3 | 1 |

Notes: Totals include a small number of youth for whom race/ethnicity was not reported or was reported as "other" or "mixed." Detail may not total 100% because of rounding.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 2003 [machine-readable data files].

stemmed primarily from differences for sexual assault and robbery offense categories. A similar pattern existed for youth held for public order offenses (primarily weapons offenses). In other offense categories, the minority proportions of detained and committed juveniles were comparable. For example, blacks accounted for 41% of detained drug offenders and 42% of committed drug offenders. Similarly, Hispanics constituted 21% of detained drug offenders and 20% of committed drug offenders.

### Minority youth are not distributed evenly across facility types

Detention centers and long-term secure facilities (e.g., training schools) held the largest proportions of minority offenders in 2003—each holding more than one-third of minorities in custody. Shelters, reception centers, group homes, boot camps, and ranch/wilderness camps each held less than one-tenth of the minority population. Other facilities, such as those identifying themselves as residential treatment centers, accounted for more than one-quarter of minorities.

Facility type profile, 2003:

| | Offender | |
|---|---|---|
| Facility type | White | Minority |
| Detention center | 32% | 36% |
| Shelter | 3 | 2 |
| Reception/diagnostic | 6 | 6 |
| Group home | 11 | 7 |
| Boot camp | 3 | 4 |
| Ranch/ wilderness camp | 3 | 7 |
| Long-term secure | 32 | 34 |
| Other | 33 | 27 |

Note: Percents total more than 100% because facilities could select multiple type categories. Most facilities that selected "other" also selected one of the other listed facility types.

### Offense profiles did not vary substantially by race/ethnicity

Offense profile of juvenile offenders in custody, 2003

| | | | Minority | | | | |
|---|---|---|---|---|---|---|---|
| Most serious offense | Total | White | Total minority | Black | Hispanic | American Indian | Asian |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Delinquency | 95 | 94 | 96 | 96 | 97 | 92 | 95 |
| Homicide | 1 | 1 | 1 | 1 | 1 | 1 | 2 |
| Sexual assault | 8 | 11 | 5 | 5 | 5 | 9 | 3 |
| Robbery | 6 | 2 | 9 | 10 | 7 | 3 | 8 |
| Aggravated assault | 8 | 6 | 9 | 8 | 10 | 7 | 14 |
| Simple assault | 8 | 9 | 8 | 9 | 7 | 9 | 7 |
| Burglary | 11 | 12 | 10 | 9 | 11 | 10 | 9 |
| Theft | 6 | 6 | 5 | 6 | 4 | 6 | 6 |
| Auto theft | 6 | 5 | 6 | 6 | 7 | 6 | 10 |
| Arson | 1 | 1 | 1 | 1 | 0 | 1 | 0 |
| Drug trafficking | 2 | 1 | 2 | 3 | 2 | 1 | 2 |
| Other drug | 6 | 6 | 6 | 6 | 7 | 7 | 4 |
| Weapons | 3 | 2 | 4 | 4 | 5 | 2 | 4 |
| Technical violations | 15 | 15 | 15 | 14 | 16 | 13 | 15 |
| Status offenses | 5 | 6 | 4 | 4 | 3 | 8 | 5 |

- Homicide accounted for a very small proportion of juveniles in custody, regardless of race/ethnicity.
- In 2003, 11% of whites were held for sexual assault, compared with 5% of Hispanics and blacks.
- Robbery accounted for a smaller proportion of white (2%) and American Indian (3%) youth held than of other groups.
- For all racial/ethnic groups, the proportion of youth held for drug trafficking was less than half the proportion held for drug offenses other than trafficking.
- Regardless of race/ethnicity, a substantial proportion of youth were held for technical violations of probation, parole, or valid court orders.

Notes: Totals include a small number of youth for whom race/ethnicity was not reported or was reported as "other" or "mixed." Detail may not total 100% because of rounding or because not all offenses are presented.

Source: Authors' analysis of *Census of Juveniles in Residential Placement* for 2003 [machine-readable data files].

Minority youth accounted for nearly half of the custody population in shelters and more than half of the population across all other facility types.

Minority proportion:

| Facility type | 2003 |
|---|---|
| Detention center | 64% |
| Shelter | 48 |
| Reception/diagnostic | 60 |
| Group home | 53 |
| Boot camp | 69 |
| Ranch/wilderness camp | 76 |
| Long-term secure | 63 |
| Other | 56 |



# Nationally, custody rates were highest for black youth and lowest for Asian youth

**For every 100,000 black juveniles living in the U.S., 754 were in custody in a juvenile facility on October 22, 2003—the custody rate was 348 for Hispanics and 190 for whites**

| State of offense | White | Black | Hispanic | American Indian | Asian |
|---|---|---|---|---|---|
| | Custody rate (per 100,000) | | | | |
| U.S. total | 190 | 754 | 348 | 496 | 113 |
| Alabama | 235 | 586 | 368 | 0 | 73 |
| Alaska | 177 | 339 | 0 | 896 | 206 |
| Arizona | 223 | 579 | 363 | 199 | 72 |
| Arkansas | 142 | 468 | 200 | 0 | 108 |
| California | 217 | 1,246 | 448 | 425 | 140 |
| Colorado | 268 | 1,150 | 396 | 646 | 112 |
| Connecticut | 105 | 669 | 316 | 672 | 36 |
| Delaware | 128 | 1,029 | 413 | 0 | 0 |
| Dist. of Columbia | 347 | 683 | 698 | 0 | 0 |
| Florida | 355 | 973 | 186 | 195 | 81 |
| Georgia | 142 | 500 | 237 | 127 | 59 |
| Hawaii | 62 | 199 | 44 | 0 | 111 |
| Idaho | 250 | 725 | 463 | 747 | 328 |
| Illinois | 120 | 589 | 144 | 113 | 14 |
| Indiana | 316 | 1,188 | 381 | 417 | 0 |
| Iowa | 242 | 1,337 | 520 | 1,025 | 117 |
| Kansas | 213 | 1,320 | 364 | 318 | 187 |
| Kentucky | 133 | 653 | 113 | 0 | 76 |
| Louisiana | 202 | 663 | 151 | 269 | 90 |
| Maine | 149 | 182 | 188 | 492 | 0 |
| Maryland | 98 | 319 | 326 | 450 | 22 |
| Massachusetts | 111 | 811 | 522 | 172 | 160 |
| Michigan | 169 | 602 | 231 | 287 | 27 |
| Minnesota | 156 | 1,149 | 400 | 1,712 | 280 |
| Mississippi | 75 | 246 | 60 | 155 | 0 |
| Missouri | 159 | 690 | 287 | 93 | 87 |
| Montana | 188 | 418 | 482 | 588 | 0 |
| Nebraska | 214 | 1,529 | 447 | 1,682 | 194 |
| Nevada | 289 | 958 | 332 | 405 | 152 |
| New Hampshire | 144 | 579 | 197 | 0 | 0 |
| New Jersey | 51 | 795 | 203 | 153 | 15 |
| New Mexico | 153 | 823 | 105 | 212 | 0 |
| New York | 138 | 712 | 261 | 205 | 45 |
| North Carolina | 106 | 332 | 77 | 195 | 45 |
| North Dakota | 235 | 1,384 | 747 | 1,240 | 0 |
| Ohio | 207 | 916 | 296 | 87 | 71 |
| Oklahoma | 196 | 673 | 239 | 343 | 48 |
| Oregon | 291 | 1,075 | 314 | 870 | 181 |
| Pennsylvania | 139 | 1,207 | 639 | 246 | 329 |
| Rhode Island | 192 | 1,425 | 188 | 735 | 409 |
| South Carolina | 201 | 567 | 453 | 193 | 143 |
| South Dakota | 310 | 3,199 | 1449 | 1,575 | 873 |
| Tennessee | 143 | 507 | 251 | 0 | 79 |
| Texas | 194 | 771 | 327 | 139 | 18 |
| Utah | 258 | 951 | 564 | 558 | 324 |
| Vermont | 71 | 0 | 341 | 0 | 0 |
| Virginia | 143 | 715 | 273 | 0 | 71 |
| Washington | 200 | 770 | 207 | 607 | 155 |
| West Virginia | 229 | 953 | 567 | 775 | 0 |
| Wisconsin | 143 | 1,389 | 226 | 580 | 282 |
| Wyoming | 507 | 3,035 | 947 | 1,285 | 0 |

- In every state except Vermont, the custody rate for black juvenile offenders exceeded the rate for whites.
- Wyoming had the highest custody rate for white offenders (507), followed by Florida (355), the District of Columbia (347), Indiana (316), and South Dakota (310).
- Nationally, the ratio of the custody rate for minorities to that for whites was 2.6 to 1.

**Ratio of minority custody rate to white rate**

DC
Less than 2.0
2.0 to 3.0
3.0 to 4.0
4.0 or more

Note: The custody rate is the number of juvenile offenders in residential placement on October 22, 2003, per 100,000 juveniles age 10 through the upper age of jurisdiction in each state. U.S. totals include 1,398 youth in private facilities for whom state of offense was not reported and 124 youth in tribal facilities.

Source: Authors' analysis of Sickmund et al.'s *Census of Juveniles in Residential Placement databook* [online analysis].

**In nearly half the states, the ratio of minority to white custody rates was greater for detained youth than for youth committed to public or private facilities in 2003**

| State of offense | Ratio of minority rate to white rate: Detained | Committed: Public | Committed: Private |
|---|---|---|---|
| U.S. total | 3.1 | 2.9 | 2.0 |
| Alabama | 3.1 | 2.7 | 1.9 |
| Alaska | 5.2 | 3.1 | 3.4 |
| Arizona | 1.3 | 2.0 | 1.0 |
| Arkansas | 2.5 | 2.8 | 3.1 |
| California | 2.2 | 2.7 | 1.3 |
| Colorado | 2.5 | 2.6 | 1.3 |
| Connecticut | 6.9 | 3.5 | 4.1 |
| Delaware | 7.4 | 5.7 | 5.6 |
| District of Columbia | 8.7 | – | 0.5 |
| Florida | 1.6 | 1.2 | 1.7 |
| Georgia | 2.8 | 4.4 | 1.5 |
| Hawaii | 0.6 | 6.6 | – |
| Idaho | 2.1 | 2.4 | 0.8 |
| Illinois | 4.3 | 2.7 | 1.8 |
| Indiana | 3.3 | 3.6 | 1.5 |
| Iowa | 3.8 | 4.6 | 2.9 |
| Kansas | 4.0 | 4.0 | 3.1 |
| Kentucky | 5.0 | 4.0 | 3.0 |
| Louisiana | 2.4 | 4.5 | 2.4 |
| Maine | 1.6 | 2.0 | 0.0 |
| Maryland | 3.2 | 3.2 | 2.7 |
| Massachusetts | 5.6 | 5.1 | 4.7 |
| Michigan | 4.4 | 1.3 | 3.7 |
| Minnesota | 6.9 | 4.6 | 4.9 |
| Mississippi | 3.0 | 3.2 | – |
| Missouri | 6.4 | 2.9 | 5.5 |
| Montana | 3.7 | 2.8 | 3.5 |
| Nebraska | 5.5 | 4.9 | 2.5 |
| Nevada | 1.7 | 1.5 | 1.2 |
| New Hampshire | 2.3 | 3.5 | 0.6 |
| New Jersey | 8.0 | 8.8 | 6.6 |
| New Mexico | 1.6 | 2.3 | 2.6 |
| New York | 3.7 | 6.6 | 1.8 |
| North Carolina | 3.6 | 4.6 | 1.0 |
| North Dakota | 5.5 | 7.4 | 3.8 |
| Ohio | 3.9 | 3.8 | 2.9 |
| Oklahoma | 2.2 | 2.7 | 1.3 |
| Oregon | 2.0 | 1.5 | 1.2 |
| Pennsylvania | 5.9 | 6.6 | 7.4 |
| Rhode Island | – | 3.6 | 2.6 |
| South Carolina | 2.5 | 3.4 | 2.3 |
| South Dakota | 7.9 | 4.2 | 6.0 |
| Tennessee | 4.0 | 2.8 | 3.6 |
| Texas | 2.3 | 2.0 | 2.4 |
| Utah | 3.9 | 2.4 | 1.3 |
| Vermont | 2.7 | 0.0 | 0.0 |
| Virginia | 4.4 | 3.7 | 5.7 |
| Washington | 1.6 | 1.7 | 2.0 |
| West Virginia | 4.5 | 2.8 | 4.6 |
| Wisconsin | 10.3 | 6.3 | 3.6 |
| Wyoming | 2.9 | 2.6 | 2.0 |

**Ratio of minority rate to white rate for detained offenders**

DC
Less than 2.0
2.0 to 3.0
3.0 to 4.0
4.0 or more
Not calculated

**Ratio of minority rate to white rate for committed offenders in public facilities**

DC
Less than 2.0
2.0 to 3.0
3.0 to 4.0
4.0 or more
Not calculated

– Too few juveniles in category to calculate a reliable percentage.

Notes: The custody rate is the number of juvenile offenders in residential placement on October 22, 2003, per 100,000 juveniles age 10 through the upper age of jurisdiction in each state. U.S. totals include 1,398 youth in private facilities for whom state of offense was not reported and 124 youth in tribal facilities.

Source: Authors' analysis of Sickmund et al.'s *Census of Juveniles in Residential Placement databook* [online analysis].



# On the 2003 census day, person offenders had been committed or detained longer than other offenders

## CJRP provides individual-level data on time spent in placement

Information on length of stay is key to understanding the justice system's handling of juveniles in residential placement. Ideally, length of stay would be calculated for individual juveniles by combining their days of stay in placement from their initial admission to their final release relating to a particular case. These individual lengths of placement could then be averaged for different release cohorts of juveniles (cohorts could be identified by year of release, offense, adjudication status, or demographic characteristics).

CJRP captures information on the number of days since admission for each juvenile in residential placement. These data represent the number of days the juvenile had been in the facility up to the census date. Because CJRP data reflect only a juvenile's placement at one facility, the complete length of stay—from initial admission to the justice system to final release—cannot be determined. Nevertheless, CJRP provides an overall profile of the time juveniles had been in the facility at the time of the census—a 1-day snapshot of time in the facility.

Because CJRP data are individual level rather than facility level, more averages can be calculated for different subgroups of the population. In addition, analysts can use the data to get a picture of the proportion of residents remaining after a certain number of days (e.g., what percentage of youth have been held longer than a year). This sort of analysis provides juvenile justice policymakers with a useful means of comparing the time spent in placement for different categories of juveniles.

**In 2003, 34% of committed offenders but just 3% of detained offenders remained in placement 6 months after admission**

- Among detained offenders (those awaiting adjudication, disposition, or placement elsewhere), 68% had been in the facility for at least a week, 49% for at least 15 days, and 28% at least 30 days.
- Among committed juveniles (those held as part of a court-ordered disposition), 80% had been in the facility for at least 30 days, 68% for at least 60 days, and 57% at least 90 days. After a full year, 13% of committed offenders remained in placement.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 2003 [machine-readable data file].

**Offenders' average time in the facility varied by adjudication status, offense, and facility type**

| | Median days in placement | | |
|---|---|---|---|
| | Detained | Committed | |
| Most serious offense | (all facilities) | Public | Private |
| Total | 15 | 105 | 121 |
| Delinquent | 15 | 106 | 124 |
| Person | 19 | 160 | 145 |
| Property | 14 | 97 | 113 |
| Drugs | 15 | 89 | 114 |
| Public order | 14 | 111 | 142 |
| Technical violation | 13 | 50 | 89 |
| Status offense | 10 | 65 | 117 |

- Half of offenders committed to public facilities remained in placement after 105 days (121 days for those committed to private facilities). In contrast, half of detained offenders remained in placement after just 15 days.
- With the exception of person offenses, offenders committed to private facilities had longer stays than those committed to public facilities.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 2003 [machine-readable data file].

**Males tended to stay in facilities longer than females in 2003**



- Among detained females, 25% remained after 28 days; among detained males, 25% remained after 36 days.

- After 45 days, 20% of detained males and 14% of detained females remained in custody.

- After 180 days, 35% of committed males and 29% of committed females remained in custody.

- Among committed females, 25% remained after 204 days; among committed males, 25% remained after 244 days.

**Half of detained white offenders remained in custody after 14 days; half of detained minority offenders remained in custody after 15 days**



- One-quarter of detained minority youth remained in custody after 36 days; one-quarter of detained white youth remained in custody after 30 days.

- Among committed offenders, time in placement was virtually the same for whites and minorities until about the 50-day mark—after 50 days, the proportion of white youth remaining in custody was somewhat greater than the proportion of minority youth remaining.

- After 6 months, 35% of committed white youth and 33% of committed minority youth remained in custody.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 2003 [machine-readable data file].

### Residents' average time in placement varied by offender characteristics

The overall median time in placement for juvenile offenders held in juvenile facilities was 68 days. In other words, after 68 days half of all youth held remained in placement. The median time in placement was greater for males (71 days) than for females (48 days) and greater for white youth (72 days) than for minority youth (64 days).

### Time in placement does not always coincide with offense seriousness

Among committed offenders, those held for criminal homicide had the longest time in placement. For committed homicide offenders, the median number of days in placement was 345 days. Sexual assault offenders had the second longest average time in placement at 271 days.

The median time in placement for committed aggravated assault offenders was just 2 weeks more than the figure for committed simple assault offenders. Simple assault offenders had the same average days in placement as offenders committed for drug trafficking.

The average time in placement for committed status offenders was virtually the same as the average time for weapons, auto theft, burglary, and theft offenders.

Committed offenders, 2003:

| Most serious offense | Median days in placement |
|---|---|
| Homicide | 345 |
| Sexual assault | 271 |
| Robbery | 154 |
| Arson | 141 |
| Public order (not weapons) | 128 |
| Aggravated assault | 126 |
| Simple assault | 112 |
| Drug trafficking | 112 |
| Weapons | 107 |
| Auto theft | 105 |
| Status offense | 105 |
| Burglary | 104 |
| Theft | 103 |
| Drugs (not trafficking) | 97 |
| Technical violation | 62 |

**In 2003, committed person offenders were in placement longer than other types of offenders**

- Time-in-placement patterns largely overlapped for detained youth held for property, drug, public order, and status offenses.
- Time-in-placement patterns also largely overlapped for committed youth held for property, drug, and status offenses.
- After 60 days, 21% of detained person offenders remained in custody.
- After 6 months, 45% of committed person offenders remained in custody.

Source: Authors' analysis of OJJDP's *Census of Juveniles in Residential Placement* for 2003 [machine-readable data file].



# Facility type is related to the kind of agency that operates and staffs the facility

### More public facilities are local than state, but state facilities hold more youth

Local facilities (those staffed by county, city, or municipal employees) make up more than half of all public facilities but held fewer than half of all juvenile offenders in public facilities on the census date in 2002.

Juvenile residential facilities, 2002:

| | Facilities | | Juvenile offenders | |
|---|---|---|---|---|
| | Number | Pct. | Number | Pct. |
| Total | 2,964 | 100% | 102,388 | 100% |
| Public | 1,182 | 40 | 70,243 | 69 |
| State | 513 | 17 | 41,138 | 40 |
| Local | 669 | 23 | 29,105 | 28 |
| Private | 1,773 | 60 | 31,992 | 31 |

Note: Total includes 9 tribal facilities holding 153 juvenile offenders.

During the course of a year, many more juveniles pass through local facilities than state facilities. This is because the majority of local facilities are detention centers, where youth stay for relatively short periods of time. In state facilities, such as training schools, stays are generally longer.

### Group homes outnumber all other types of facilities

JRFC asks respondents to identify the type of facility (detention center, shelter, reception/diagnostic center, group home/halfway house, boot camp, ranch/forestry/wilderness camp/marine program, or training school/long-term secure facility). Although respondents were allowed to select more than one facility type category, the vast majority (88%) selected only one category.

**Detention centers tend to be local facilities, long-term secure facilities tend to be state facilities, and group homes tend to be private facilities**

| | Facility type | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Facility operation | Total | Detention center | Shelter | Reception/ diagnostic center | Group home | Boot camp | Ranch/ wilderness camp | Long-term secure |
| Total | 2,964 | 769 | 289 | 104 | 1,136 | 56 | 157 | 389 |
| **Facility type by operation** | | | | | | | | |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Public | 40 | 80 | 28 | 52 | 18 | 68 | 39 | 67 |
| State | 17 | 18 | 5 | 42 | 10 | 25 | 16 | 56 |
| Local | 23 | 62 | 22 | 10 | 7 | 43 | 23 | 12 |
| Private | 60 | 19 | 72 | 48 | 82 | 32 | 61 | 33 |
| **Operation by facility type** | | | | | | | | |
| Total | 100% | 26% | 10% | 4% | 38% | 2% | 5% | 13% |
| Public | 100 | 52 | 7 | 5 | 17 | 3 | 5 | 22 |
| State | 100 | 27 | 3 | 9 | 23 | 3 | 5 | 42 |
| Local | 100 | 71 | 10 | 1 | 12 | 4 | 5 | 7 |
| Private | 100 | 8 | 12 | 3 | 53 | 1 | 5 | 7 |

- Reception/diagnostic centers are nearly as likely to be private facilities as they are to be public facilities. Boot camps are more likely to be public facilities than private facilities; however, a substantial proportion of boot camps are private.
- The majority of shelters and ranch/wilderness camps are private facilities.
- Detention centers made up 71% of all local facilities and 52% of all public facilities.
- Long-term secure facilities accounted for 42% of all state facilities.
- Group homes account for 53% of all private facilities.

Note: The total number of facilities includes facilities that did not identify themselves as one of the described facility types. Row percents may sum to more than the total because facilities could select more than one facility type category. Detail may not total 100% because of rounding.

Source: Author's analysis of OJJDP's *Juvenile Residential Facility Census* for 2002 [machine-readable data file].

More than 1,100 facilities that identified themselves as group homes/halfway houses were holding juvenile offenders on the census date in 2002. Group homes made up 38% of all facilities and held 12% of juvenile offenders. Facilities identifying themselves as detention centers were the second most common type of facility (26%). Detention centers held 40% of juvenile offenders.



# Security features vary across types of facilities

## Public and private facilities differ in their degree of security

Overall in 2002, 32% of facilities that reported security information in JRFC said that at least some of the time they lock youth in their sleeping rooms to confine them. Very few private facilities locked youth in sleeping rooms (7%). Among public facilities, 73% of local facilities and 58% of state facilities reported locking youth in sleeping rooms.

Percent of facilities, 2002:

| Facility | Locked sleeping rooms |
|---|---|
| Total | 32% |
| Public | 66 |
| State | 58 |
| Local | 73 |
| Private | 7 |

Among facilities that reported they locked youth in sleeping rooms, three-quarters said they did this when the youth were out of control. One-quarter did so when youth were suicidal. Locking youth in their rooms during shift changes was fairly common (43%). More than half (54%) said they locked sleeping rooms whenever youth were in them. Locking sleeping rooms at night was more common (87%). Just over one-quarter said youth were locked in their sleeping rooms part of each day. A few facilities said they locked youth in their rooms most of each day (1%) or all of each day (1%). Six percent said they rarely locked youth in sleeping rooms (they had no set schedule).

Facilities indicated whether they had various types of locked doors or gates intended to confine youth within the facility or to keep intruders out (see boxes on this page and the next). Nearly half of all facilities that reported security information said they had one or more confinement features (other than locked sleeping rooms). Among public facilities, the proportion was 78%. In contrast, among private facilities, it was 24%.

Percent of facilities, 2002:

| Facility | Confinement features | |
|---|---|---|
| | None | One or more |
| Total | 53% | 47% |
| Public | 22 | 78 |
| State | 20 | 80 |
| Local | 23 | 77 |
| Private | 76 | 24 |

Among detention centers and training schools that reported security information, about 9 in 10 said they had one or more confinement features (other than locked sleeping rooms).

Facilities reporting one or more confinement features other than locked sleeping rooms, 2002:

| Facility | Number | Percent |
|---|---|---|
| Total | 1,320 | 47% |
| Detention center | 689 | 91 |
| Shelter | 71 | 25 |
| Reception/diagnostic | 71 | 70 |
| Group home | 171 | 16 |
| Boot camp | 42 | 75 |
| Ranch/ wilderness camp | 29 | 19 |
| Long-term secure | 336 | 87 |
| Other | 166 | 35 |

Among group homes and ranch/ wilderness camp facilities, fewer than 2 in 10 said they had locked doors or gates to confine youth. A facility's staff, of course, also provides security. In some facilities, remote location is a security feature that keeps youth from leaving.

Overall, 16% of facilities reported fences (or walls) with razor wire. This arrangement was most common in detention centers (39%), training schools (37%), and boot camps (32%).

**JRFC asks facilities about their security features**

**Are any young persons in this facility locked into their sleeping rooms by staff at any time to confine them?**

**Does this facility have any of the following features intended to confine young persons within specific areas?**

- **Doors for secure day rooms that are locked by staff to confine young persons within specific areas?**
- **Wing, floor, corridor, or other internal security doors that are locked by staff to confine young persons within specific areas?**
- **Outside doors that are locked by staff to confine young persons within specific buildings?**
- **External gates in fences or walls WITHOUT razor wire that are locked by staff to confine young persons?**
- **External gates in fences or walls WITH razor wire that are locked by staff to confine young persons?**

**Are outside doors to any buildings with living/sleeping units in this facility ever locked? If yes, why?**

- **To keep intruders out?**
- **To keep young persons inside this facility?**

**JRFC did not ask about security features such as roll call (resident counts), cameras, or guard towers.**



# Eight in ten juvenile offenders in custody in 2003 were held in locked rather than staff-secure facilities

### Security arrangements varied by facility characteristics

Juvenile residential placement facilities vary in their degree of security. The use of fences, walls, and surveillance equipment is increasingly common in juvenile facilities, although security hardware is generally not as elaborate as that found in adult jails and prisons. National accreditation standards for juvenile facilities express a preference for relying on staff, rather than on hardware, to provide security. The guiding principle is to house juvenile offenders in the "least restrictive placement alternative." Staff security measures include periodically taking counts of the youth held, using classification and separation procedures, and maintaining an adequate ratio of security staff to juveniles.

**Locked outside doors were to keep intruders out more than to keep residents inside the facility**

**Among the 80% of facilities that reported to the 2002 JRFC that they locked outside doors to buildings with sleeping units, 87% said those outside doors were locked to keep intruders out and 50% said doors were locked to keep residents inside the facility (37% said doors were locked for both reasons). Public facilities were more likely than private facilities to lock doors to keep residents inside (79% vs. 25%), although many public facilities (60%) said they also locked doors to keep intruders out. Private facilities were more likely than public facilities to lock doors to keep intruders out (92% vs. 81%). Few private facilities (17%) said they also locked doors to keep residents inside.**

CJRP asks facilities a series of questions about their use of locked doors or gates during daytime operating hours and nighttime sleeping hours. In 2003, facilities reported that daytime locks confined 8 in 10 juvenile offenders at least some of the time. This represents an increase over 1997, when 7 in 10 offenders were housed in facilities with locked arrangements. The vast majority of juveniles in public facilities were confined in facilities with locked security arrangements.

Daytime security profile of offenders, 2003:

| Facility type | Total | Locked | Staff-secure |
|---|---|---|---|
| Total | 100% | 81% | 19% |
| Public | 100 | 94 | 6 |
| Private | 100 | 53 | 47 |
| Tribal | 100 | 45 | 55 |

Most youth in facilities with daytime locks were in facilities that held all youth under the same security arrangements. More than 7 in 10 youth in locked facilities were in facilities that locked a perimeter fence or wall, the main entrance, or living units during the day for all youth. Smaller proportions of youth were in facilities where all youth were confined during the day by locked sleeping rooms, day rooms, classrooms, or infirmaries.

Percent of youth in daytime locked facilities, 2003:

| Area within locked facilities | Locked for some | Locked for all |
|---|---|---|
| Perimeter | 1% | 73% |
| Main entrance | 1 | 72 |
| Living units | 5 | 75 |
| Sleeping rooms | 9 | 59 |
| Day rooms | 2 | 52 |
| Classrooms | 4 | 35 |
| Cafeteria | 3 | 47 |
| Infirmary | 3 | 61 |

### Security arrangements also varied by placement status and offense category

Overall, a larger proportion of committed juveniles than detained juveniles were held in facilities relying on staff security. This difference stemmed from variation in security arrangements within private facilities. Security arrangements in public facilities varied little—more than 90% of both committed and detained offenders were in locked facilities.

Daytime security profile of offenders, 2003:

| Placement type | Total | Locked | Staff-secure |
|---|---|---|---|
| Total | 100% | 81% | 19% |
| Detained | 100 | 91 | 9 |
| Committed | 100 | 77 | 23 |
| Public | 100 | 94 | 6 |
| Detained | 100 | 93 | 7 |
| Committed | 100 | 94 | 6 |
| Private | 100 | 53 | 47 |
| Detained | 100 | 70 | 30 |
| Committed | 100 | 50 | 50 |

Juveniles in residential placement for homicide, sexual assault, robbery, aggravated assault, arson, and technical violations were the most likely to be held behind locked doors or gates. Compared with juveniles held for delinquency offenses, those in residential placement for status offenses were more likely to be confined under staff-secure arrangements (19% vs. 32%). However, substantial variation existed within the status offense categories. Juveniles held for underage drinking or possession of alcohol were nearly as likely to be held in facilities with locked arrangements as those held for delinquency offenses.

Daytime security profile of offenders, 2003:

| Most serious offense | Total | Locked | Staff-secure |
|---|---|---|---|
| Delinquency | 100% | 81% | 19% |
| Person | 100 | 83 | 17 |
| Homicide | 100 | 92 | 8 |
| Sexual assault | 100 | 85 | 15 |
| Robbery | 100 | 85 | 15 |
| Aggr. assault | 100 | 84 | 16 |
| Simple assault | 100 | 77 | 23 |
| Other person | 100 | 82 | 18 |
| Property | 100 | 80 | 20 |
| Burglary | 100 | 81 | 19 |
| Theft | 100 | 79 | 21 |
| Auto theft | 100 | 78 | 22 |
| Arson | 100 | 84 | 16 |
| Other property | 100 | 80 | 20 |
| Drug | 100 | 73 | 27 |
| Drug trafficking | 100 | 76 | 24 |
| Other drug | 100 | 73 | 27 |
| Public order | 100 | 82 | 18 |
| Weapons | 100 | 81 | 19 |
| Other public order | 100 | 82 | 18 |
| Technical violation | 100 | 84 | 16 |
| Status | 100 | 68 | 32 |
| Ungovernability | 100 | 58 | 42 |
| Running away | 100 | 75 | 25 |
| Truancy | 100 | 64 | 36 |
| Curfew | 100 | 77 | 23 |
| Underage drinking | 100 | 78 | 22 |
| Other status offenses | 100 | 88 | 12 |

## Demographic variation in security arrangements reflected offense variations

Minority juveniles were more likely than white juveniles to be in facilities with locked doors or gates. Among minorities, Hispanic youth were more likely to be held under locked arrangements than were other minorities.

Daytime security profile of offenders, 2003:

| Race/ ethnicity | Total | Locked | Staff-secure |
|---|---|---|---|
| White | 100% | 79% | 21% |
| Minority | 100 | 82 | 18 |
| Black | 100 | 81 | 19 |
| Hispanic | 100 | 84 | 16 |
| Amer. Indian | 100 | 81 | 19 |
| Asian | 100 | 78 | 22 |
| Other | 100 | 72 | 28 |

However, within offense categories, the difference between the proportions of white and minority youth held under locked arrangements diminished. This was especially true for those held for serious offenses. For example, among those held for homicide, locked doors or gates confined 92% of white youth and 92% of minority youth.

The proportion of juveniles held in facilities with locked arrangements was somewhat greater for youth ages 18 and older (82%) than for youth 12 and younger (78%) but didn't really vary much by age. Across all ages, about 8 in 10 youth were in locked facilities. Females were more likely than males to be held under locked arrangements.

Daytime security profile of offenders, 2003:

| Offense type/ gender | Total | Locked | Staff-secure |
|---|---|---|---|
| **Total** | | | |
| Male | 100% | 80% | 20% |
| Female | 100 | 84 | 16 |
| **Delinquency** | | | |
| Male | 100 | 81 | 19 |
| Female | 100 | 86 | 14 |
| **Person** | | | |
| Male | 100 | 83 | 17 |
| Female | 100 | 85 | 15 |
| **Property** | | | |
| Male | 100 | 79 | 21 |
| Female | 100 | 85 | 15 |
| **Drug** | | | |
| Male | 100 | 73 | 27 |
| Female | 100 | 78 | 22 |
| **Public order** | | | |
| Male | 100 | 81 | 19 |
| Female | 100 | 88 | 12 |
| **Technical violation** | | | |
| Male | 100 | 83 | 17 |
| Female | 100 | 88 | 12 |
| **Status** | | | |
| Male | 100 | 66% | 34 |
| Female | 100 | 72 | 28 |

Overall, the race/ethnicity, age, and gender differences in the proportion of juveniles held under locked rather than staff-secure arrangements were largely related to offense variations among the demographic groups. Differences may also reflect facilities' use of locks to protect the residents from outside intruders.

### The Juvenile Justice and Delinquency Prevention Act prohibits placement of status offenders in secure facilities

The Juvenile Justice and Delinquency Prevention Act of 2002 states that "juveniles...charged with or who have committed offenses that would not be criminal if committed by an adult or offenses which do not constitute violations of valid court orders, or alien juveniles in custody, or such nonoffenders as dependent or neglected children, shall not be placed in secure detention facilities or secure correctional facilities..." Federal regulations have interpreted the Juvenile Justice and Delinquency Prevention Act to permit youth charged with status offenses to be held in secure juvenile facilities for up to 24 hours following the initial contact with law enforcement or the court.



# Most facilities were small (fewer than 50 residents) but most offenders were in large facilities

### Large facilities were most likely to be state operated

Very few state-operated facilities held 10 or fewer residents in 2002. In contrast, 46% of private facilities (807 of 1,773) were that small. In fact, these small facilities made up the largest share of private facilities.

Although state-operated facilities made up just 17% of all facilities, they accounted for 66% of facilities holding more than 200 residents. In contrast, private facilities made up 60% of all facilities, but they accounted for 80% of facilities holding 10 or fewer residents.

### Security increases as facility size increases

Among the largest facilities (those with more than 200 residents) that reported security information, 86% said they lock youth in their sleeping rooms to confine them at least some of the time. The vast majority of these large facilities (90%) said they had one or more features (locked doors or gates) intended to confine youth. Although the use of razor wire is a far less common security measure, more than 6 in 10 of these large facilities said they had locked gates in fences or walls with razor wire.

Percent of facilities reporting confinement features, 2002:

| Facility size (residents) | Sleeping rooms locked | One or more features | Razor wire |
|---|---|---|---|
| Total | 32% | 47% | 16% |
| 1–10 | 10 | 19 | 3 |
| 11–20 | 24 | 41 | 10 |
| 21–50 | 45 | 64 | 24 |
| 51–100 | 47 | 70 | 29 |
| 101–200 | 69 | 85 | 34 |
| 201–972 | 86 | 90 | 64 |

**In 2002, more than half of facilities were small (20 or fewer residents) but nearly half of juvenile offenders were held in large facilities (more than 100 residents)**

| Facility size | Facilities | | Juvenile offenders | |
|---|---|---|---|---|
| | Number | Percent | Number | Percent |
| Total facilities | 2,964 | 100% | 102,388 | 100% |
| 1–10 residents | 1,003 | 34 | 4,845 | 5 |
| 11–20 residents | 648 | 22 | 7,806 | 8 |
| 21–50 residents | 704 | 24 | 19,819 | 19 |
| 51–100 residents | 350 | 12 | 20,630 | 20 |
| 101–200 residents | 171 | 6 | 21,664 | 21 |
| 201–972 residents | 88 | 3 | 27,624 | 27 |

- Although the largest facilities—those holding more than 200 residents—accounted for only 3% of all facilities, they held 27% of juvenile offenders in custody nationwide.
- Inversely, although the smallest facilities—those holding 10 or fewer residents—accounted for 34% of all facilities, they held only 5% of juvenile offenders in custody.

Note: Detail may not total 100% because of rounding.

Source: Authors' analysis of OJJDP's *Juvenile Residential Facility Census* for 2002 [machine-readable data file].

**Small group homes holding 20 or fewer residents were the most common type of facility—accounting for 1 in 3 facilities overall**

| Facility size (number of residents) | Facility type | | | | | | |
|---|---|---|---|---|---|---|---|
| | Detention center | Shelter | Reception/ diagnostic center | Group home | Boot camp | Ranch/ wilderness camp | Long-term secure |
| Total facilities | 769 | 289 | 104 | 1,136 | 56 | 157 | 389 |
| | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| 1–10 | 18 | 46 | 13 | 59 | 0 | 4 | 2 |
| 11–20 | 20 | 31 | 15 | 26 | 9 | 10 | 10 |
| 21–50 | 34 | 15 | 18 | 10 | 36 | 50 | 29 |
| 51–100 | 15 | 6 | 24 | 4 | 34 | 25 | 21 |
| 101–200 | 9 | 2 | 18 | 0 | 20 | 10 | 23 |
| 201–972 | 5 | 0 | 12 | 0 | 2 | 2 | 16 |

- Facilities that held 10 or fewer residents accounted for 59% of group homes, 46% of shelters, and less than 20% for each of the other facility types.
- Facilities that held more than 200 residents accounted for 16% of long-term facilities and 12% of reception/diagnostic centers. For other facility types, the proportion was 5% or less.

Notes: Facilities could select more than one facility type category. Detail may not total 100% because of rounding.

Source: Authors' analysis of OJJDP's *Juvenile Residential Facility Census* for 2002 [machine-readable data file].



# Facility crowding affects a substantial proportion of youth in custody

### Many juvenile offenders are in facilities that have more residents than standard beds

Facilities reported both the number of standard beds and the number of occupied makeshift beds on the census date. A facility's occupancy rate is a broad indicator of the adequacy of its living space. Although national standards have not been established in this area, a facility's operational functioning may become impaired as its occupancy rate approaches 100%.

Crowding occurs when the number of residents occupying all or part of a facility exceeds some predetermined limit based on square footage, utility use, or even fire codes. Although not a perfect measure of crowding, comparing the number of residents to the number of standard beds gives a sense of the crowding problem in a facility. However, even if it is not relying on makeshift beds (e.g., cots, roll-out beds, mattresses, sofas), a facility may be crowded. For example, using standard beds in an infirmary for youth who are not sick or beds in seclusion for youth who have not committed infractions may indicate crowding problems.

In 2002, 36% of facilities responding to JRFC said that the number of residents they held on the census date put them at or over the capacity of their standard beds or that they relied on some makeshift beds. These facilities held more than 39,300 residents, the vast majority of whom were offenders younger than 21: 34% of all residents held on the 2002 census date and 34% of offenders younger than 21 were held in facilities operating at or above their standard bed capacity. In comparison, in 2000, such facilities represented 39% of all facilities and held 40% of all residents. In 2002, facilities that reported being over capacity (having fewer standard beds than residents or relying on makeshift beds) accounted for 6% of facilities but held 14% of juvenile offenders. In comparison, in 2000, over-capacity facilities accounted for 7% of facilities and held 16% of offenders.

**Compared with other types of facilities, public detention centers and reception/diagnostic centers were more likely to be at or over the limit of their standard bed capacity in 2002**

| | Percent of facilities at standard bed capacity | | | Percent of facilities over standard bed capacity | | |
|---|---|---|---|---|---|---|
| Type of facility | Total | Public | Private | Total | Public | Private |
| Total | 30% | 16% | 39% | 6% | 15% | 1% |
| Detention center | 14 | 10 | 34 | 18 | 21 | 2 |
| Shelter | 17 | 15 | 18 | 2 | 5 | 0 |
| Reception/diagnostic center | 26 | 19 | 34 | 10 | 17 | 2 |
| Group home | 43 | 29 | 46 | 1 | 3 | 1 |
| Boot camp | 16 | 13 | 22 | 5 | 5 | 6 |
| Ranch/wilderness camp | 25 | 26 | 24 | 2 | 2 | 2 |
| Training school | 23 | 19 | 31 | 9 | 13 | 1 |

Notes: A single bed is counted as one standard bed and a bunk bed is counted as two standard beds. Makeshift beds (e.g., cots, roll-out beds, mattresses, sofas) are not counted as standard beds. Facilities are counted as over capacity if they reported more residents than standard beds or if they reported any occupied makeshift beds. Facilities could select more than one facility type category. Totals include data from nine tribal facilities.

Source: Authors' analysis of OJJDP's *Juvenile Residential Facility Census* for 2002 [machine-readable data file].

**Larger facilities were more likely than smaller facilities to be crowded**

| Facility size (number of residents) | Number of facilities | Percent of facilities under/at/over standard bed capacity: Under | At | Over | Mean number of makeshift beds |
|---|---|---|---|---|---|
| Total | 2,964 | 64% | 30% | 6% | 10 |
| 1–10 | 1,003 | 61 | 38 | 1 | 2 |
| 11–20 | 648 | 63 | 34 | 3 | 3 |
| 21–50 | 704 | 66 | 24 | 10 | 7 |
| 51–100 | 350 | 69 | 17 | 14 | 11 |
| 101–200 | 171 | 63 | 20 | 16 | 21 |
| 201–972 | 88 | 66 | 17 | 17 | 18 |

Notes: A single bed is counted as one standard bed and a bunk bed is counted as two standard beds. Makeshift beds (e.g., cots, roll-out beds, mattresses, sofas) are not counted as standard beds. Facilities are counted as over capacity if they reported more residents than standard beds or if they reported any occupied makeshift beds.

Source: Authors' analysis of OJJDP's *Juvenile Residential Facility Census* for 2002 [machine-readable data file].

**Nationwide in 2002, 1,069 facilities (36%) were at or over standard bed capacity or relied on some makeshift beds**

| | Number of facilities under, at, or over capacity | | | | Percent of juvenile offenders in facilities at or over capacity | |
|---|---|---|---|---|---|---|
| State | Total | Under | At | Over | At | Over |
| U.S. total* | 2,964 | 1,894 | 882 | 187 | 20% | 14% |
| Alabama | 48 | 39 | 7 | 2 | 7 | 9 |
| Alaska | 23 | 14 | 5 | 4 | 12 | 59 |
| Arizona | 51 | 40 | 9 | 2 | 7 | 16 |
| Arkansas | 35 | 25 | 10 | | 22 | 0 |
| California | 286 | 135 | 136 | 15 | 19 | 10 |
| Colorado | 65 | 41 | 16 | 8 | 25 | 36 |
| Connecticut | 26 | 17 | 8 | 1 | 26 | 7 |
| Delaware | 6 | 3 | 0 | 3 | 0 | 83 |
| Dist. of Columbia | 13 | 9 | 4 | 0 | 14 | 0 |
| Florida | 181 | 88 | 83 | 10 | 40 | 11 |
| Georgia | 53 | 27 | 11 | 15 | 8 | 30 |
| Hawaii | 5 | 4 | 0 | 1 | 0 | 65 |
| Idaho | 22 | 17 | 4 | 1 | 6 | 5 |
| Illinois | 45 | 38 | 6 | 1 | 4 | 2 |
| Indiana | 95 | 75 | 18 | 2 | 19 | 8 |
| Iowa | 65 | 46 | 19 | 0 | 36 | 0 |
| Kansas | 56 | 38 | 16 | 2 | 47 | 5 |
| Kentucky | 50 | 39 | 11 | 0 | 13 | 0 |
| Louisiana | 62 | 40 | 19 | 3 | 13 | 5 |
| Maine | 14 | 10 | 4 | 0 | 42 | 0 |
| Maryland | 43 | 22 | 19 | 2 | 41 | 13 |
| Massachusetts | 68 | 20 | 44 | 4 | 59 | 9 |
| Michigan | 94 | 67 | 24 | 3 | 14 | 4 |
| Minnesota | 100 | 79 | 21 | 0 | 16 | 0 |
| Mississippi | 17 | 14 | 2 | 1 | 2 | 1 |
| Missouri | 72 | 48 | 20 | 4 | 7% | 7% |
| Montana | 24 | 19 | 4 | 1 | 5 | 6 |
| Nebraska | 19 | 16 | 1 | 2 | 0 | 33 |
| Nevada | 18 | 11 | 5 | 2 | 39 | 31 |
| New Hampshire | 8 | 5 | 3 | 0 | 70 | 0 |
| New Jersey | 49 | 36 | 5 | 8 | 9 | 31 |
| New Mexico | 27 | 20 | 4 | 3 | 9 | 15 |
| New York | 221 | 113 | 94 | 14 | 25 | 19 |
| North Carolina | 66 | 52 | 12 | 2 | 7 | 4 |
| North Dakota | 11 | 5 | 5 | 1 | 28 | 3 |
| Ohio | 97 | 58 | 23 | 16 | 12 | 21 |
| Oklahoma | 56 | 24 | 32 | 0 | 42 | 0 |
| Oregon | 45 | 29 | 13 | 3 | 25 | 8 |
| Pennsylvania | 179 | 125 | 48 | 6 | 33 | 5 |
| Rhode Island | 14 | 4 | 9 | 1 | 23 | 64 |
| South Carolina | 38 | 29 | 5 | 4 | 7 | 27 |
| South Dakota | 22 | 13 | 8 | 1 | 31 | 1 |
| Tennessee | 58 | 39 | 16 | 3 | 15 | 13 |
| Texas | 129 | 86 | 27 | 16 | 11 | 28 |
| Utah | 47 | 29 | 16 | 2 | 26 | 4 |
| Vermont | 5 | 3 | 2 | 0 | 28 | 0 |
| Virginia | 71 | 49 | 13 | 9 | 16 | 18 |
| Washington | 40 | 33 | 2 | 5 | 1 | 18 |
| West Virginia | 23 | 13 | 6 | 4 | 10 | 24 |
| Wisconsin | 81 | 69 | 12 | 0 | 29 | 0 |
| Wyoming | 21 | 20 | 1 | 0 | 2 | 0 |

Notes: A single bed is counted as one standard bed and a bunk bed is counted as two standard beds. Makeshift beds (e.g., cots, roll-out beds, mattresses, sofas) are not counted as standard beds. Facilities are counted as over capacity if they reported more residents than standard beds or if they reported any occupied makeshift beds. State is the state where the facility is located. Offenders sent to out-of-state facilities are counted in the state where the facility is located, not the state where their offense occurred.

*U.S. total includes nine tribal facilities. These tribal facilities were located in Arizona, Colorado, Montana, Oklahoma, and South Dakota. One of the nine tribal facilities had more residents than standard beds.

Source: Authors' analysis of OJJDP's *Juvenile Residential Facility Census* for 2002 [machine-readable data file].

### On the 2002 census date, public facilities were more likely than private facilities to be crowded

Among publicly operated facilities, 15% were over their standard bed capacity or had residents occupying makeshift beds in 2002. For private facilities, the figure was 1%. A large proportion of private facilities (39%), however, said they were operating at 100% capacity. State-operated public facilities had a somewhat greater proportion of facilities that were over capacity (17%) than did locally run public facilities (13%).

Percent of facilities under, at, or over their standard bed capacity:

| Facility | Under | At | Over |
|---|---|---|---|
| Total | 64% | 30% | 6% |
| Public | 69 | 16 | 15 |
| State | 63 | 20 | 17 |
| Local | 74 | 13 | 13 |
| Private | 60 | 39 | 1 |

Note: Totals include data from nine tribal facilities.

### Use of makeshift beds varied

More than 250 facilities had occupied makeshift beds (averaging 10 per facility). Many facilities rely on makeshift beds, yet many others operate below standard capacity (averaging 7 unoccupied beds). These averages mask a wide range: one facility with 162 residents had 72 standard beds and 90 residents without standard beds; one facility with 1,272 standard beds had 972 residents, leaving 300 unoccupied beds.



# Most youth are in facilities that screen for substance abuse, mental health needs, and suicide risk

### Facilities screening all youth for substance abuse problems held 67% of offenders in custody

As part of the information collected on substance abuse services, the JRFC questionnaire asks facilities about their procedures regarding screening youth for substance abuse problems.

In 2002, 61% of facilities that reported substance abuse screening information said they evaluated all youth to determine whether they had substance abuse problems (problems with drugs and/or alcohol). An additional 20% said they evaluated some youth. Some facilities (19%) said they did not screen any youth.

In facilities that reported substance abuse screening information, facilities that screened all youth held 67% of juvenile offenders. Facilities that screened some youth held an additional 16% of offenders.

Of the facilities that said they screened some but not all youth, most screened youth identified as having substance abuse problems—84% said they screened youth identified by the court or probation officer, 80% said they screened those identified by facility staff. Some facilities (69%) also targeted youth for substance abuse evaluation if they had a drug or alcohol-related offense. A small proportion of facilities listed other triggers for substance abuse screening, including a parent or youth request, any youth adjudicated for a delinquency offense, and youth without previous screening information. A few facilities said they screened a certain proportion of youth (e.g., every third youth admitted).

The most common approach to substance abuse evaluations in 2002 was to screen all youth on the day they arrived at the facility. One in three facilities that screened for substance abuse problems screened all youth on their first day. These facilities held 34% of offenders in screening facilities. The second most common approach was to screen all youth between the first day and the end of the first week (27% of facilities holding 30% of offenders).

**Reception/diagnostic centers, boot camps, and long-term secure facilities were more likely than other types of facilities to screen all youth for substance abuse problems in 2002**

| Substance abuse evaluation practice | Facility type | | | | | | |
|---|---|---|---|---|---|---|---|
| | Detention center | Shelter | Reception/ diagnostic center | Group home | Boot camp | Ranch/ wilderness camp | Long-term secure |
| Total facilities | 769 | 289 | 104 | 1,136 | 56 | 157 | 389 |
| Facilities reporting | 753 | 280 | 101 | 1,074 | 56 | 153 | 386 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| All youth evaluated | 63 | 48 | 74 | 56 | 71 | 69 | 72 |
| Some youth evaluated | 18 | 30 | 20 | 23 | 14 | 12 | 16 |
| No youth evaluated | 19 | 22 | 6 | 21 | 14 | 20 | 13 |

Notes: Facilities could select more than one facility type category. Detail may not total 100% because of rounding.

Source: Authors' analysis of OJJDP's *Juvenile Residential Facility Census* for 2002 [machine-readable data file].

### Most substance abuse screening involved staff-administered questions or observations

The most commonly reported method of determining whether offenders had substance abuse problems was a series of staff-administered questions (reported by 73% of facilities that said they conducted evaluations). Visual observations were also common (66%). Just over half of facilities (55%) used self-report methods (standardized instruments or checklist inventories).

### 73% of facilities holding 77% of offenders conduct urinalysis for drug use

Many facilities said they require urine samples from all youth upon initial admission, each time they reenter the facility, or at randomly scheduled times (37% of reporting facilities). These facilities held 37% of offenders in reporting facilities. An additional 35% of facilities holding 40% of offenders urine-tested a subset of youth or tested only when it was requested by the court or probation officer or when drug use was suspected.

### Most offenders were held in facilities providing onsite substance abuse services

Of the facilities reporting information on substance abuse services, 66% provided onsite services. These facilities held 83% of offenders in reporting facilities.

The most commonly reported onsite service was substance abuse education (97% of facilities),

followed by the development of treatment plans (69%) and therapy provided by a substance abuse treatment professional (individual therapy, 69%, or group therapy, 67%). Individual or group counseling provided by someone other than a substance abuse treatment professional was also quite common (60% each).

Two in ten facilities said that all youth in the facility received ongoing, onsite specialized therapy or counseling for substance abuse problems. Seven in ten facilities said they provided onsite therapy or counseling for substance abuse problems on a case-by-case basis. The remaining 1 in 10 reported other sorts of policies or did not provide onsite therapy or counseling as part of their substance abuse services.

### Relatively few offenders were in facilities relying on offsite substance abuse services

Of the facilities reporting information on substance abuse services, 20% relied on offsite substance abuse services. These facilities held 6% of offenders in reporting facilities.

Substance abuse education was the most commonly reported offsite substance abuse service (81% of facilities). The next most commonly reported offsite substance abuse services were professional therapy (individual, 75%, or group, 69%), Alcoholics Anonymous (70%), Narcotics Anonymous (64%), and treatment plan development (65%).

### In 5 of 10 facilities, in-house mental health professionals evaluate all youth held

In JRFC, facilities provided information about their procedures for evaluating youth's mental health needs. Among the 2,287 facilities that reported mental health evaluation information in 2002, 53% said that in-house mental health professionals evaluate all youth to determine mental health needs. An additional 34% said in-house mental health professionals evaluate some, but not all, youth.

Profile of in-house mental health evaluations:

| Youth evaluated | 2000 | 2002 |
|---|---|---|
| Facilities reporting | 2,201 | 2,287 |
| Total | 100% | 100% |
| All youth | 50 | 53 |
| Some youth | 36 | 34 |
| No youth | 14 | 13 |

Note: Detail may not total 100% because of rounding.

In 2002, a greater proportion of privately operated than publicly operated facilities said that in-house mental health professionals evaluated all youth (62% vs. 41%). However, public facilities reported a greater proportion of facilities that had at least some youth evaluated by an in-house mental health professional (91% vs. 84%).

Profile of in-house mental health evaluations, 2002:

| Youth evaluated | Public | Private |
|---|---|---|
| Facilities reporting | 950 | 1,332 |
| Total | 100% | 100% |
| All youth | 41 | 62 |
| Some youth | 50 | 22 |
| No youth | 10 | 16 |

Note: Detail may not total 100% because of rounding.

Facilities also identified the type of treatment they provided (if any). Facilities that said they provided mental health treatment inside the facility (onsite) were more likely than other facilities to have a mental health professional evaluate all youth (64% vs. 32%). However, not all facilities that said they provided onsite mental health treatment said they had an in-house mental health professional evaluate youth for mental health needs. It may be that youth were evaluated before arriving at these facilities or that outside professionals were contracted to conduct the evaluations.

**Reception/diagnostic centers and long-term secure facilities were more likely than other types of facilities to have in-house mental health professionals evaluate all youth for mental health needs**

| Mental health evaluation practice (by in-house professional) | Facility type | | | | | | |
|---|---|---|---|---|---|---|---|
| | Detention center | Shelter | Reception/ diagnostic center | Group home | Boot camp | Ranch/ wilderness camp | Long-term secure |
| Total facilities | 769 | 289 | 104 | 1,136 | 56 | 157 | 389 |
| Facilities reporting | 591 | 179 | 96 | 825 | 52 | 157 | 389 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| All youth evaluated | 30 | 33 | 66 | 57 | 46 | 45 | 64 |
| Some youth evaluated | 62 | 46 | 34 | 22 | 40 | 35 | 32 |
| No youth evaluated | 8 | 21 | 0 | 21 | 13 | 20 | 4 |

Notes: Facilities could select more than one facility type category. Detail may not total 100% because of rounding.

Source: Authors' analysis of OJJDP's *Juvenile Residential Facility Census* for 2002 [machine-readable data file].

**The most common approach to mental health evaluation in 2002 was to screen all youth by the end of their first week at the facility**

| Timeframe for in-house mental health evaluation | Percent of reporting facilities | | | Percent of juvenile offenders in reporting facilities | | |
|---|---|---|---|---|---|---|
| | Total | All youth evaluated | Some youth evaluated | Total | All youth evaluated | Some youth evaluated |
| Total | 100% | 61% | 39% | 100% | 57% | 43% |
| By end of day 1 | 18 | 15 | 3 | 20 | 17 | 3 |
| Day 2 through end of week 1 | 40 | 30 | 10 | 39 | 25 | 14 |
| After week 1 | 19 | 12 | 7 | 17 | 10 | 7 |
| Other | 23 | 5 | 18 | 24 | 5 | 18 |

- In 45% of facilities that reported information on their mental health evaluation procedures, all youth were evaluated for mental health needs by an in-house mental health professional by the end of their first week in custody.

Notes: Data are based on facilities reporting mental health evaluations by in-house professionals. Detail may not total 100% because of rounding.

Source: Authors' analysis of OJJDP's *Juvenile Residential Facility Census* for 2002 [machine-readable data file].

**JRFC defines mental health professionals by educational specialties and degrees**

**Mental health professionals are defined in JRFC as: psychiatrists, psychologists with at least a master's degree in psychology, or social workers with at least a master's degree in social work. Counselors are defined as persons with a master's degree in a field other than psychology or social work or persons whose highest degree is a bachelor's in any field.**

Profile of in-house mental health evaluations, 2002:

| Youth evaluated | Onsite mental health treatment: Yes | No |
|---|---|---|
| Facilities reporting | 1,500 | 787 |
| Total | 100% | 100% |
| All youth | 64 | 32 |
| Some youth | 27 | 47 |
| No youth | 9 | 21 |

Note: Detail may not total 100% because of rounding.

### Evaluation of all youth by an in-house mental health professional was more likely in large facilities than small facilities

Among facilities that reported mental health information, 57% of those with 51–100 residents said that all youth were evaluated for mental health needs by a mental health professional. For the largest facilities (with 200 or more residents), the proportion was 60%. In comparison, proportions were smaller for facilities housing fewer residents (e.g., 50% for facilities with 11–20 residents). Large facilities were also less likely to say that no youth were evaluated for mental health needs by an in-house mental health professional. For example, 5% of facilities with more than 50 residents said no youth were evaluated by an in-house mental health professional, compared with 21% of the smallest facilities (10 or fewer residents).

### Facilities that screen all youth for suicide risk hold 81% of the juvenile offenders in custody

As part of the information collected on mental health services, the JRFC questionnaire asks facilities about their procedures regarding screening youth for suicide risk. In 2002, 68% of the 2,837 facilities that reported information on suicide screening said they evaluated all youth for suicide risk. An additional 17% said they evaluated some youth. The proportion of facilities reporting that all youth are evaluated for suicide risk increased 6 percentage points from 2000 to 2002. In both years, some facilities said they evaluated no youth for suicide risk.

Profile of suicide risk evaluations:

| Youth evaluated | 2000 | 2002 |
|---|---|---|
| Facilities reporting | 2,754 | 2,837 |
| Total | 100% | 100% |
| All youth | 62 | 68 |
| Some youth | 24 | 17 |
| No youth | 15 | 15 |

Note: Detail may not total 100% because of rounding.

In 2002, a greater proportion of public than private facilities said they evaluated all youth for suicide risk (79% vs. 60%). Among facilities that reported suicide screening information, those that screened all youth held 81% of juvenile offenders who were in residential placement—up from 78% in 2000.

Profile of suicide risk evaluations:

| Youth evaluated | 2000 | 2002 |
|---|---|---|
| Offenders in facilities reporting | 104,956 | 100,110 |
| Total | 100% | 100% |
| All youth | 78 | 81 |
| Some youth | 16 | 12 |
| No youth | 6 | 7 |

Note: Detail may not total 100% because of rounding.

### Professional mental health staff conduct most suicide screening

More than half (56%) of facilities that screened some or all youth for suicide risk reported that screenings were conducted by mental health professionals with at least a master's degree in psychology or social work. Some facilities also used counselors to conduct screenings. Fewer than 1 facility in 5 used untrained staff to screen for suicide.

### Most facilities had no suicides or serious suicide attempts

Eight facilities reported having a resident die of suicide during the year; 114 reported a suicide attempt during the month prior to the census that was serious enough to require hospitalization. These 122 facilities represented less than 4% of all facilities.

Facilities reporting a suicide or a past-month attempt requiring hospitalization, 2002:

| Facility type | Single-purpose facility | Multi-purpose* facility |
|---|---|---|
| Total | 97 | 25 |
| Detention | 37 | 6 |
| Shelter | 4 | 10 |
| Reception/diagnostic | 1 | 7 |
| Group home | 22 | 10 |
| Boot camp | 1 | 1 |
| Ranch/ wilderness camp | 5 | 1 |
| Long-term secure | 8 | 15 |
| Other type | 19 | 9 |

*Counts sum to more than the total number of facilities because facilities could select more than one facility type category.

### Large facilities were more likely than smaller facilities to screen all youth for suicide risk

Among the largest facilities (200 or more residents), 90% of those reporting information on suicide screening said all youth were screened for suicide risk. In comparison, proportions were smaller for facilities housing fewer residents (e.g., 70% for facilities with 11–20 residents). Large facilities were less likely to say that no youth were screened for suicide risk. For example, among facilities with 200 or more residents, 1% said no youth were screened for suicide risk, compared with 15% of the smallest facilities (10 or fewer residents).

### Reception/diagnostic centers and long-term secure facilities were more likely than other types of facilities to screen all youth for suicide risk in 2002

| Suicide risk evaluation practice | Facility type: Detention center | Shelter | Reception/ diagnostic center | Group home | Boot camp | Ranch/ wilderness camp | Long-term secure |
|---|---|---|---|---|---|---|---|
| Total facilities | 769 | 289 | 104 | 1,136 | 56 | 157 | 389 |
| Facilities reporting | 754 | 280 | 101 | 1,074 | 56 | 153 | 386 |
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| All youth evaluated | 84 | 57 | 85 | 55 | 68 | 62 | 82 |
| Some youth evaluated | 10 | 24 | 12 | 20 | 16 | 13 | 12 |
| No youth evaluated | 6 | 19 | 3 | 24 | 16 | 25 | 6 |

### The most common approach to suicide risk evaluation in 2002 was to screen all youth on the day they arrive at the facility

| Timeframe for suicide risk evaluation | Percent of reporting facilities: Total | All youth evaluated | Some youth evaluated | Percent of juvenile offenders in reporting facilities: Total | All youth evaluated | Some youth evaluated |
|---|---|---|---|---|---|---|
| Total | 100% | 80% | 20% | 100% | 88% | 12% |
| By end of day 1 | 66 | 61 | 5 | 74 | 70 | 4 |
| Day 2 through end of week 1 | 15 | 11 | 4 | 12 | 10 | 2 |
| After week 1 | 4 | 3 | 1 | 4 | 3 | 1 |
| Other | 15 | 6 | 9 | 10 | 5 | 6 |

- Facilities that screened all youth and did so on the youth's first day accounted for 61% of facilities that screened for suicide risk; they held 70% of the juvenile offenders in facilities that reported suicide screening.

Notes: Facilities could select more than one facility type category. Data are based on facilities reporting suicide risk evaluations. Detail may not total 100% because of rounding.

Source:Authors' analysis of OJJDP's *Juvenile Residential Facility Census* for 2002 [machine-readable data file].



# The death rate was lower for youth in custody than for youth in the general population

### Deaths of juveniles in custody are relatively rare

According to the 2002 JRFC, 26 youth died while in the legal custody of juvenile facilities, down from 30 in 2000 and 45 in 1994. The 2002 deaths occurred in 24 facilities: 22 facilities each reported a single death; 2 facilities each reported 2 deaths.

More than half of the deaths reported in 2002 occurred inside the facility (14 of 26). Public facilities accounted for most of the deaths that occurred inside the facility. Private facilities accounted for most of the deaths that occurred outside the facility.

Overall, public facilities reported 16 deaths; private facilities reported 10 deaths. Deaths inside the facility accounted for most deaths reported by public facilities. Deaths outside the facility accounted for most deaths reported by private facilities.

Suicide was the most common cause of death. All facilities reporting suicides said they evaluate all residents for suicide risk, and all but two said they evaluate residents within 24 hours of arrival. One facility said it evaluates by the end of the first week, and one said youth are screened for suicide risk at detention intake and if referred for screening by a counselor.

A total of 122 facilities holding juvenile offenders reported transporting at least one juvenile to a hospital emergency room because of a suicide attempt. None of these facilities also reported a suicide death.

**Suicide was the leading cause of death for juveniles in custody during the 12 months prior to the census, followed by accidents**

| | Number of deaths | | | | | | |
|---|---|---|---|---|---|---|---|
| | | Inside the facility | | | Outside the facility | | |
| Cause of death | Total | All | Public | Private | All | Public | Private |
| Total | 26 | 14 | 11 | 3 | 12 | 5 | 7 |
| Suicide | 10 | 8 | 7 | 1 | 2 | 1 | 1 |
| Accident | 6 | 1 | 1 | | 5 | 2 | 3 |
| Illness/natural | 6 | 4 | 2 | 2 | 2 | 1 | 1 |
| Homicide | 2 | 0 | 0 | 0 | 2 | 1 | 1 |
| Other | 2 | 1 | 1 | 0 | 1 | 0 | 1 |

- For youth ages 13–17 in the general population, accidents were the leading cause of death, followed by homicide and suicide.

Note: Data are reported deaths of youth in custody from October 1, 2001, through September 30, 2002. Reported homicides were attributed to nonresidents.

Source: Authors' analysis of OJJDP's *Juvenile Residential Facility Census* for 2002 [machine-readable data file].

**Are youth in custody at greater risk of death than youth in general?**

There has been concern about the risk of death to youth in custody and whether that risk is greater than the risk faced by youth in the general population. Death rates for the general population (detailed by age, sex, race, ethnicity, and cause of death) can be applied to data for the population held in juvenile residential facilities to calculate the number of deaths that would be expected if the custody population had the same rate of death as the general population. Overall, the actual deaths reported to JRFC were substantially lower than the expected deaths. The expected number of deaths was more than 2.5 times the actual number of deaths reported.

| | Number of deaths in juvenile facilities, 2002 | |
|---|---|---|
| Cause of death | Expected | Actual |
| All deaths (includes causes not detailed) | 62 | 26 |
| Suicide | 8 | 10 |
| Homicide (and legal intervention) | 20 | 2 |
| Unintentional (illness, accident, etc.) | 34 | 12 |

The expected number of homicides was 10 times the actual number. The expected number of unintentional deaths was nearly 3 times the actual number. The expected number of suicides was nearly the same as the reported number.

# Officials reported 2,821 sexual violence allegations in juvenile facilities in 2004—3 in 10 were substantiated

### Congress requested statistics on sexual violence in facilities

The Prison Rape Elimination Act of 2003 (PREA) requires the Bureau of Justice Statistics (BJS) to report the incidence and prevalence of sexual violence in adult and juvenile detention and correctional facilities. For this work, sexual violence is divided into (1) youth-on-youth nonconsensual sexual acts, (2) youth-on-youth abusive sexual contacts, (3) staff-on-youth sexual misconduct, and (4) staff-on-youth sexual harassment that includes verbal harassment. (See box on next page for formal definitions.) In the first wave of data collection, BJS gathered information on incidents reported to correctional authorities during 2004. In upcoming years, BJS will move beyond officially reported incidents by conducting confidential interviews with youth.

### Local and private juvenile facilities reported more incidents than state-operated facilities

Of the estimated 2,821 allegations of sexual violence reported by authorities in juvenile facilities in 2004, 59% were youth-on-youth incidents and 41% were staff-on-youth incidents. Within the youth-on-youth incidents, 2 of every 3 were nonconsensual sexual acts. Within the staff-on-youth incidents, 3 of every 4 were staff sexual misconducts.

One-third (33%) of all reported incidents of sexual violence against juveniles occurred in state-operated facilities and two-thirds (67%) occurred in local or privately operated facilities. Staff-on-youth violence accounted for a greater proportion of the incidents in state-operated facilities than in local or privately operated facilities (56% vs. 33%).

### Allegations of sexual violence reported by authorities averaged 1 per 50 beds in 2004

To calculate the relative incidence of sexual violence in state-operated facilities and in local or privately operated facilities, BJS had to control for the different population capacities of the two groups of facilities. In theory, the rate could be calculated using either the number of youth admitted in a defined time period (e.g., a year) or the number of youth in the facilities on an average day (i.e., the average daily population—or ADP).

In reality, it is difficult to obtain a comparable count from facility to facility of the number of youth admitted in a year. Individual youth may move in and out of the facility for various reasons during what some would consider a single admission while others would count each in-and-out incident as a separate admission. ADP is a far more reliable measure of a facility's population and was used by BJS to calculate the sexual violence incident rate.

For its report, BJS calculated the rate of sexual violence by dividing reported incidents in a facility during 2004 by the number of beds in use in the facility on December 31, 2004. Using this measure, the estimated rate of reported sexual violence in 2004 was 22.6 sexual violence incidents per 1,000 beds in state-operated juvenile facilities and 16.5 sexual violence incidents per 1,000 beds in locally operated or private juvenile facilities—or 18.1 sexual violence incidents per 1,000 juvenile beds nationwide. In other words, a juvenile facility with 50 beds would have been expected to have about one report of sexual violence in 2004.

In 2004, the allegation rate for youth-on-youth sexual violence was similar in state-operated and local or privately operated juvenile facilities, while the allegation rate for staff-on-youth sexual violence was greater in state-operated facilities.

Rates* of sexual violence allegations reported to authorities in facilities:

| Sexual violence | State | Local/ private |
|---|---|---|
| Total | 22.6 | 16.5 |
| Youth-on-youth | 9.9 | 11.1 |
| Nonconsensual | 6.7 | 7.3 |
| Abusive contacts | 3.2 | 3.8 |
| Staff-on-youth | 12.7 | 5.4 |
| Sexual misconduct | 11.3 | 3.2 |
| Sexual harassment | 1.3 | 2.2 |

*Rates are allegations per 1,000 beds

### About 30% of reports of sexual violence in juvenile facilities were substantiated

BJS also asked facilities how they handled reports of sexual violence. BJS found that allegations of sexual violence inside state, local, and private juvenile correctional facilities are normally investigated by an authority external to the facility and the juvenile correctional system (e.g., child protective services, state or local law enforcement).

Most local or private juvenile facilities (79%) and state juvenile correctional systems (64%) reported that external authorities had sole or shared responsibility for investigating allegations of youth-on-youth sexual violence. External authorities had sole or shared responsibility for investigating allegations of staff sexual misconduct in 72% of state juvenile correctional systems and 74% of local or private juvenile facilities.

The findings of these investigations can fall into three categories: substantiated (i.e., the event was

determined to have occurred); unsubstantiated (i.e., there was insufficient evidence to determine if the event had occurred); and unfounded (i.e., it was determined that the event had not occurred). After investigation, 25% of sexual violence reports in state-operated facilities and 32% in local or privately operated facilities were substantiated. Reports of youth-on-youth violence were substantiated more often than were staff-on-youth reports.

Percent of reported sexual violence allegations that were substantiated:

| Sexual violence | State | Local/ private |
|---|---|---|
| Total | 25% | 32% |
| Youth-on-youth | 35 | 40 |
| Nonconsensual | 33 | 33 |
| Abusive contacts | 40 | 51 |
| Staff-on-youth | 17 | 15 |
| Sexual misconduct | 15 | 17 |
| Sexual harassment | 31 | 13 |

The somewhat higher rate of sexual violence allegations in state-operated juvenile facilities and their somewhat lower substantiation percentage resulted in similar rates of substantiated incidents of sexual violence in state-operated and local or private juvenile facilities—a rate of 5 substantiated allegations per 1,000 beds per year. This means that the official records of a 200-bed juvenile facility are likely to contain 1 substantiated allegation of sexual violence per year.

### Girls were more likely than boys to be sexually victimized

BJS reported that 34% of the victims in the substantiated incidents of sexual violence in state-operated facilities were female, although females accounted for just 11% of the custody population. Similarly, although females represented 17% of the population in local or private facilities, 37% of the victims in substantiated incidents of sexual violence in these facilities were female.

Although overall, females were more likely than males to be sexually victimized, males constituted a greater proportion of the victims of substantiated nonconsensual sexual acts between youth (78%). Males and females were equally likely to be the victims of abusive youth-on-youth sexual contact. In substantiated incidents of staff sexual misconduct, females accounted for 32% of the victims. In substantiated incidents of sexual violence, a female (youth or staff) was the perpetrator in 24% of incidents in local or private facilities and 36% of incidents overall.

### Comparing reported sexual violence rates in juvenile and adult facilities is problematic

BJS found that the allegation rate of youth-on-youth nonconsensual sexual acts reported by authorities in juvenile facilities in 2004 was more than 6 times the rate of inmate-on-inmate nonconsensual sexual acts reported by authorities in state prisons and more than 7 times the rate in local jails. Similarly, the rate of staff sexual misconduct was 10 times greater in state-operated juvenile facilities than in state prisons and 5 times greater in local or private juvenile facilities than in local jails.

BJS pointed out that these differences may not reflect actual differences in the levels of sexual violence. For example, all sexual acts between youth in juvenile facilities were legally classified as nonconsensual, but consensual acts between inmates were not counted in adult facilities. In addition, professionals in many states are required by law to report any suspicion of child abuse, including sexual contacts among juveniles. Allegations in juvenile facilities were more likely to be investigated by external authorities than those in adult facilities, which might encourage more reporting to juvenile facility authorities. Finally, BJS found that the records systems in juvenile facilities made responding to the survey easier. In all, BJS concluded sexual violence may be more readily reported to authorities in juvenile facilities than in adult facilities.

### How the BJS administrative survey measured sexual violence

The PREA study disaggregated sexual violence into two categories of youth-on-youth sexual acts and two categories of staff-on-youth acts. The youth-on-youth categories were nonconsensual sexual acts and abusive sexual contacts. Nonconsensual acts included forcible rape, sodomy, and statutory rape (because the youth were not of consenting age). Abusive sexual contacts were the intentional touching (either directly or through the clothing) of the genitalia, anus, groin, breast, inner thigh, or buttocks.

The staff-on-youth categories were sexual misconduct and sexual harassment. Staff was defined as an employee, volunteer, official visitor, or agency representative. Sexual misconduct was defined as any consensual or nonconsensual behavior or act of a sexual nature directed toward a youth by staff, and sexual harassment was defined as repeated verbal statements or comments of a sexual nature to a youth by staff, including demeaning references to gender or derogatory comments about body or clothing; or profane or obscene language or gestures.



# The youth reentry population is characterized by multiple risk factors

### Custody data can give insight into the reentry population

Based on data from the 1999 Census of Juveniles in Residential Placement (CJRP), it was estimated that nearly 100,000 juvenile offenders were released from custody facilities following conviction. Analyses of the 2003 CJRP data show that the 1-day count of juveniles committed to facilities following conviction has declined substantially since 1999. From 1999 to 2003, the committed population in custody on the census day dropped 10%. Thus, the size of the reentry population is presumably smaller today than it was in 1999. Data from the 2003 CJRP and 2003 Survey of Youth in Residential Placement (SYRP) provide a current understanding of the characteristics of candidates for reentry programs.

### The reentry population was mostly male, minority, 15 or older, person offenders released from locked public facilities

With the 2003 CJRP, a demographic profile of youth who will become reentry program candidates can be developed. So as not to overrepresent the characteristics of youth with very long lengths of stay, the analysis focuses on committed youth who had been in a facility 4–6 months—neither a very short time nor an extremely long time. These data suggest the following characteristics of the juvenile reentry population:

- 57% of reentry youth come from publicly operated facilities, 45% from state-operated public facilities.
- 43% of reentry youth come from privately operated facilities.
- 86% are male.
- 40% are white, 38% are black, and 18% are Hispanic.
- 12% are age 14 or younger, 44% are age 15 or 16, 44% are age 17 or older.
- 34% were committed for a person offense (most likely simple assault), 32% for a property offense (most likely burglary), 10% for a drug offense, 10% for a public order offense, 10% for a technical violation of probation or parole, and 5% for a status offense.

More than half of these youth were held in public facilities with doors or gates that are locked day and night. More than a third come from facilities that have living quarters, wings, floors, or units that are locked for all youth day and night. The majority of facilities holding these youth said they provide on-site treatment (85%), most often mental health (63%) or substance abuse (67%) treatment. Fewer than 4 in 10 violent offenders were in facilities providing treatment specifically for violent offenders.

### Many reentry candidates had been in custody before—some several times

Analyses of the 2003 SYRP data show that most youth reentry candidates said they had at least one prior commitment (62%). When asked about prior convictions and prior custody experiences, about a quarter (23%) said they had been convicted of an offense but had not been in custody before their current placement. Some had been in custody before, but had not been convicted before (6%) and some said that they had not been convicted or in custody before (8%). Among those who had been in custody before, 2 in 10 said they had been in custody only once before, 4 in 10 said they had been held 2–4 times, and 4 in 10 said they had been held 5 or more times before.

The prior histories of potential reentry candidates varied somewhat by gender, age, and current offense. Similar proportions of girls and boys said they had been committed to custody following conviction at least once before. Of those in custody before, 43% of girls and 39% of boys said they had been held five or more times. Among youth age 15 or older, 64% had been committed before. Surprisingly, for younger youth the proportion was 58%. Among reentry candidates whose most serious current offense was a person offense, 61% said they had been committed at least once before, 22% said they had at least one prior conviction but no prior custody experiences, 6% said they had been in custody at least once before but hadn't been convicted, and 10% reported no prior convictions or custody experiences. Among those held for a property offense, 66% said they had been committed at least once before and 6% reported no prior convictions or custody experiences. The proportions of property offenders with prior custody but no prior convictions, or prior convictions but no prior custody, did not differ from those of person offenders. Further, the number of prior custody experiences did not vary much by offense.

Among youth who were previously in custody and released and subsequently reoffended, 18% committed offenses that were more serious than their previous offense, 40% committed offenses at the same severity level, and 24% committed offenses that were less serious than their prior offense. Girls and older youth were somewhat more apt than their counterparts to report a

decrease in offense severity. Youth whose current offense was a person offense tended to have maintained the same offense severity or increased their offense seriousness.

### Few reentry youth came from two-parent families and many reported emotional problems

When they entered custody, 56% of committed youth had been living with one parent, 19% were living with two parents, and 26% were not living with any parent. Girls and older youth were somewhat more apt than their counterparts to report not living with parents when they entered custody.

As part of the SYRP interviews, youth were asked a series of questions designed to detect several types of emotional problems. Although 10% of youth reported no problems, many reported more than one type of problem (71%). The large majority of committed youth indicated some degree of anger management problem (81%); most also expressed anxiety (61%) or depression (59%). Hallucinations were reported by 1 in 6 youth (17%), 1 in 4 said they had suicidal feelings or ideas (27%), and 1 in 5 said they had attempted suicide at least once in their life (21%). About 4 in 10 female candidates for reentry reported suicide attempts, as did 2 in 10 males. In comparison, in the general population, fewer than 1 in 10 males and females in the same age group reported suicide attempts.

### Reentry youth need support for successful reintegration into the community

These data indicate that substantial proportions of the juvenile reentry population are likely to need extensive supervision and support services when they return to the community. Few of these youth could be classified as "first-timers" in the juvenile justice system. Although most did not return to the system with more serious charges, 2 in 10 of those with a previous custody experience had increased the seriousness of their offending. Most youth will return to live with single parents who may benefit from programs to help them supervise their children. Nearly three-quarters of these youth (71%) expressed multiple types of emotional problems and could benefit from mental health services upon their return home. In addition, many of these youth are or will be parents themselves and could benefit from programs that teach parenting skills (e.g., home nurse visitation). Reentry programs need to address these and other factors that affect youth's ability to succeed and become productive citizens.

**Compared with youth in the general population, at all ages, higher proportions of youth who are reentry candidates are themselves parents**

- Overall, 1 in 11 reentry candidates said they had children of their own.
- Among girls, 6% said they had at least one child and an additional 4% said they were expecting.
- Older youth were more likely than younger youth to say they had or were expecting a child.

Source: Authors' adaptation of Sedlak and Bruce's unpublished analysis of National Longitudinal Survey of Youth 2003 data: Children with children and Sedlak and Bruce's unpublished analysis of 2003 Survey of Youth in Residential Placement data: Profile of the committed population.



# Recidivism is a commonly used, often confusing measure of the success of justice system outcomes

### What is recidivism?

Recidivism is the repetition of criminal behavior. A recidivism rate may reflect any number of possible measures of repeated offending—arrest, court referral, conviction, correctional commitment, and correctional status changes within a given period of time. Typically, the only available statistical indicators of criminal behavior are official records of these system events. For this reason, virtually all measures of recidivism underestimate reoffending since they only include offending that comes to the attention of the system.

The most useful recidivism analyses include the widest possible range of system events that correspond with actual reoffending and include sufficient detail to differentiate offenders by offense severity in addition to other characteristics. Including rearrest, reconviction (or readjudication), and reincarceration (or reconfinement) rates allows flexibility in making comparisons to other studies. Including information on severity of subsequent offenses, time to reoffend, and frequency of reoffending maximizes possibilities for making comparisons. Calculating recidivism rates for more than one timeframe (6 months, 1 year, 2 years, etc.) also increases comparison flexibility. Recidivism findings should include clearly identified units of count and detail regarding the length of time the subject population was in the community.

### What is known about juvenile recidivism?

There is no national recidivism rate for juveniles. Such a rate would not have much meaning since juvenile justice systems vary so much across states. The Virginia Department of Juvenile Justice (VDJJ) contacted other states to collect information on juvenile recidivism studies across the country. Twenty-seven (27) states provided verified data on recidivism of juveniles released from state incarceration (with various dates of studies ranging from 1991 through 2003). VDJJ identified studies according to factors that would enable appropriate comparisons to be made: the state's upper age of juvenile jurisdiction; whether a cohort was followed prospectively; the length of followup and year of the cohort or group; the offenses included (delinquent/criminal or all offenses, including technical violations, traffic, status, etc.); whether the cohort was tracked into the adult system; and the measure of recidivism used (rearrest, rereferral to court, reconviction/readjudication, or reincarceration/reconfinement).

VDJJ found that most states were able to provide a recidivism rate for a 12-month followup period. Several states calculated rates for other timeframes ranging from 3 months to 5 years. Most states followed a cohort of juveniles released from state incarceration, but some states

**Questions that users of recidivism rates need to ask**

"What is counted as recidivism? What is the recidivism timeframe? What comparisons are being made?

The discussion of these three concepts indicates that the definition of recidivism is far from consistent. ... The healthy skeptic should ask questions and hold the purveyor of recidivism data responsible for providing a clear definition of recidivism." (Beck, 2001)

**Reoffending data from studies of juveniles released from state incarceration show that rearrest rates are substantially higher than rates based on other measures of recidivism**

| Recidivism measured for 12-month followup period | States | Average rates across studies: Recidivism | Success |
|---|---|---|---|
| **Rearrest** | | | |
| Delinquent/criminal offenses in the juvenile and adult systems | FL, NY, VA | 55% | 45% |
| **Rereferral to court** | | | |
| Delinquent/criminal offenses in the juvenile and adult systems | CO, MD | 45 | 55 |
| **Reconviction/readjudication** | | | |
| Delinquent/criminal offenses in the juvenile and adult systems | AK, FL, GA, KY, MD, ND, OK, VA | 33 | 67 |
| **Reincarceration/reconfinement** | | | |
| Delinquent/criminal offenses in the juvenile and adult systems | FL, MD, VA | 24 | 76 |
| All offenses in the juvenile and adult systems | AZ, OH, TX | 25 | 75 |
| Delinquent offenses in the juvenile system only | AR, MO, NM | 12 | 88 |

Source: Authors' adaptation of Virginia Department of Juvenile Justice's *Juvenile Recidivism in Virginia.*

followed a subset of releasees (e.g., those from certain programs or facilities). Several states used a retrospective cohort approach, studying a cohort's history rather than following it prospectively. Other states' recidivism rates were based on reoffending rates at a particular stage of the system, such as intake. Most states included only delinquent/criminal offenses, but several included all law violations. Many states were able to track reoffenses in both the juvenile and the adult systems, although some only included juvenile system data. Nine states measured rearrest, 2 measured rereferral to court, 13 measured reconviction/readjudication, and 15 measured reincarceration/reconfinement. Four states (Florida, Hawaii, Massachusetts, and Virginia) provided rearrest, reconviction, and reincarceration rates. Maryland used rereferral, reconviction, and reincarceration. Some states tracked recidivism annually, others launched studies periodically or as needed.

**The rate of rereferral to juvenile court varies with offender age and number of prior referrals—overall, nearly 6 in 10 juveniles returned to juvenile court by the time they turned 18**

| Age at referral | Percent of juveniles who returned to juvenile court after each referral | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Number of prior juvenile court referrals | | | | | | | | At any referral |
| | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | |
| All ages | 41% | 59% | 67% | 71% | 74% | 77% | 77% | 79% | 56% |
| 10 | 61 | 84 | 96 | 97 | – | – | – | – | 71 |
| 11 | 60 | 85 | 91 | 92 | 98 | – | – | – | 72 |
| 12 | 59 | 83 | 89 | 97 | 98 | 95 | 98 | 96 | 72 |
| 13 | 57 | 82 | 90 | 93 | 95 | 97 | 96 | 98 | 73 |
| 14 | 53 | 77 | 86 | 91 | 92 | 94 | 96 | 95 | 70 |
| 15 | 45 | 69 | 80 | 84 | 89 | 89 | 91 | 93 | 66 |
| 16 | 33 | 55 | 68 | 73 | 77 | 81 | 82 | 83 | 54 |
| 17 | 16 | 27 | 36 | 41 | 45 | 48 | 50 | 53 | 30 |

- Among juveniles with no prior referrals, 4 in 10 returned to juvenile court but 6 in 10 did not. Among juveniles 14 or younger with at least 1 prior referral, more than three-quarters returned to juvenile court.

– Too few cases to obtain a reliable percentage.

Source: Author's adaptation of Snyder's *Court Careers of Juvenile Offenders*.

### What difference does the measure of recidivism make?

A closer look at the data from states that used multiple measures of recidivism in studies of juveniles released from state custody showed that the average difference between rearrest recidivism rates and reconviction recidivism rates was 21 percentage points. The average difference between rearrest recidivism and reincarceration recidivism rates was 31 percentage points. The impact of the offenses included was less dramatic. The average difference between recidivism based on only delinquency/criminal offenses versus all offenses was 3 percentage points.

These comparisons all involved studies of juveniles released from state custody. Recidivism rates for other types of cohorts yield very different rates. For example, several jurisdictions around the country focus on juvenile probationers and calculate rates of reoffending while under supervision. On average, 15% of juvenile probationers were readjudicated for offenses committed while they were under supervision. This recidivism rate is much lower than the 12-month reconviction/readjudication rates for juveniles released from state custody, primarily because probationers are less serious offenders than juveniles who have been incarcerated, and probationers may have been under supervision less than 12 months.

### Many jurisdictions focus on success rather than failure rates

In an effort to demonstrate that the juvenile justice system works, many jurisdictions around the country report success rates rather than recidivism rates. For example, the Florida Department of Juvenile Justice (FDJJ) developed a Program Accountability Measure that grades programs by combining program success rates (nonrecidivism) and monetary costs. FDJJ reports this information along with traditional outcome measures to the state legislature.

Numerous counties around the country have been involved in efforts to report juvenile justice performance data. Some efforts have taken the form of a juvenile justice "report card" that provides information on how the system performs in terms of major juvenile justice goals. The focus is on success rates and other measures of accomplishment such as restitution collected, community service hours logged, and successful program completions.



# The number of youth under age 18 held in adult jails quadrupled between 1990 and 1999, then dropped

## In 2004, youth younger than 18 accounted for 1% of jail inmates

According to the Bureau of Justice Statistics, an estimated 7,083 youth younger than 18 were held in adult jails on June 30, 2004. These under-18 inmates accounted for 1.0% of the total jail population, the same as 2003 and less than 2000 (1.2%) and 1994 (1.4%). In 2004, most jail inmates younger than 18 (87%) were held as adults; this proportion was greater than in 2000 (80%) and 1994 (76%). Under-18 inmates are held as adults if they are convicted or awaiting trial as adult criminal offenders, either because they were transferred to criminal court or because they are in a state that considers all 17-year-olds (or all 16- and 17-year-olds) as adults for purposes of criminal prosecution.

**On a typical day in 2004, about 7,000 persons younger than 18 were inmates in jails in the U.S.**

- Between 1990 and 1999, while the adult jail inmate population increased 48%, the jail inmate population under age 18 increased more than 300%.
- Between 1999 and 2004, the adult jail inmate population increased 19%, while the jail inmate population under age 18 decreased 25%.
- The number of jail inmates younger than 18 held as adults was 6,159 in 2004—up 21% from 1994.
- The number of jail inmates younger than 18 held as juveniles in 2004 was 924—down 42% from 1994.

Source: Authors' adaptation of Beck's *Prison and Jail Inmates at Midyear 1999*, Beck and Karberg's *Prison and Jail Inmates at Midyear 2000*, Harrison and Karberg's *Prison and Jail Inmates at Midyear 2002*, and Harrison and Beck's *Prison and Jail Inmates at Midyear 2004.*

**The Juvenile Justice and Delinquency Prevention Act limits the placement of juveniles in adult facilities**

The Act states that "... juveniles alleged to be or found to be delinquent," as well as status offenders and nonoffenders "will not be detained or confined in any institution in which they have contact with adult inmates ...." This provision of the Act is commonly referred to as the "sight and sound separation requirement." Subsequent regulations implementing the Act clarify this requirement and provide that brief and inadvertent contact in nonresidential areas is not a violation. The Act also states that "... no juvenile shall be detained or confined in any jail or lockup for adults ...." This provision is known as the jail and lockup removal requirement. Regulations exempt juveniles being tried as criminals for felonies or who have been convicted as criminal felons from the jail and lockup removal requirement. In institutions other than adult jails or lockups or in jails and lockups under temporary hold exceptions, confinement of juvenile offenders is permitted if juveniles and adult inmates cannot see each other and no conversation between them is possible. This reflects the sight and sound separation requirement.

Some temporary hold exceptions to jail and lockup removal include: a 6-hour grace period that allows adult jails and lockups to hold alleged delinquents in secure custody until other arrangements can be made (including 6 hours before and after court appearances) and a 48-hour exception, exclusive of weekends and holidays, for rural facilities that meet statutory conditions.

Some jurisdictions have established juvenile detention centers that are collocated with adult jails or lockups. A collocated juvenile facility must meet specific criteria to establish that it is a separate and distinct facility. The regulations allow time-phased use of program areas in collocated facilities.

# Between 1997 and 2004, while prison populations grew, the number of prisoners under age 18 fell 54%

### Youth under age 18 accounted for 1% of new court commitments to state adult prisons in 2002

Based on data from the Bureau of Justice Statistics' National Corrections Reporting Program (NCRP), an estimated 4,100 new court commitments to state adult prison systems in 2002 involved youth younger than age 18 at the time of admission. These youth accounted for 1.1% of all new court commitments in 2002—down from a peak of 2.3% in 1996 and two-thirds the level in the mid-1980s. This decline in the youth proportion was primarily the result of the large increase in the overall prison population during this period. Between 1985 and 2002, the annual number of new court commitments to state prisons that involved youth younger than 18 increased 22%, while overall new commitments increased 114%.

### Among youth newly admitted to state prisons in 2002, 6 in 10 had committed a person offense

Youth younger than 18 accounted for 4.3% of all new court commitments to state prisons for robbery in 2002. Their proportions in other offense categories were smaller: homicide (2.5%), assault (1.6%), weapons offenses (1.0%), property offenses (0.9%), and drug offenses (0.3%).

Compared with young adult inmates ages 18–24 at admission, new commitments involving youth younger than 18 had a greater proportion of violent offenses (primarily robbery and assault) and a smaller proportion of drug offenses (notably drug trafficking).

**Between 1996 and 2002, the number of new admissions of youth younger than 18 to state prisons fell 45%**

New admissions to state prisons
400,000
300,000
200,000
100,000
0
All ages
86 88 90 92 94 96 98 00 02
Year

New admissions to state prisons
8,000
6,000
4,000
2,000
0
Younger than 18
86 88 90 92 94 96 98 00 02
Year

- New admissions to state prisons of youth younger than 18 rose steadily each year between 1986 and 1995. In comparison, the total number of inmates newly admitted to state prisons rose steadily from 1985 through 1990 and then essentially leveled off through 1995.
- The large decline in new admissions of youth younger than 18 to state prisons between 1996 and 2002 was in stark contrast to the general stability of adult admissions over this period.
- The decline in new admissions to state prisons of youth younger than 18 between 1996 and 2002 paralleled the decline in juvenile violent crime arrests over the same period.

Source: Authors' analyses of Strom's *Profile of State Prisoners Under Age 18, 1985–97*, Beck and Karberg's *Prison and Jail Inmates at Midyear 2000*, Harrison and Karberg's *Prison and Jail Inmates at Midyear 2002*, and Harrison and Beck's *Prison and Jail Inmates at Midyear 2004*; and authors' analyses of data from the National Corrections Reporting Program.

**New admissions of youth under age 18 is not a count of "juveniles in prison"**

Many youth younger than 18 committed to state prisons are in states where original juvenile court jurisdiction ends when the youth turns age 16 or 17, so these committed youth were never candidates for processing in the juvenile justice system. It is also the case that some youth whose crimes placed them under the original jurisdiction of a juvenile court and who were subsequently transferred to an adult court and sentenced to prison, entered prison after their 18th birthdays. So "new court commitments that involved youth younger than 18 at the time of admission" includes many youth whose criminal activity was always within the jurisdiction of the adult criminal justice system, while it misses prisoners whose law-violating behavior placed them initially within the juvenile justice system but who did not enter prison until after their 18th birthday.

Offense profile of new admissions to state prisons, 2002:

| Most serious offense | Age at admission: Younger than 18 | Age at admission: 18–24 |
|---|---|---|
| All offenses | 100% | 100% |
| Person offenses | 61 | 33 |
| Homicide | 7 | 4 |
| Sexual assault | 6 | 5 |
| Robbery | 32 | 13 |
| Assault | 14 | 10 |
| Property offenses | 23 | 29 |
| Burglary | 14 | 14 |
| Larceny-theft | 4 | 5 |
| Motor vehicle theft | 3 | 3 |
| Arson | 1 | 1 |
| Drug offenses | 9 | 28 |
| Trafficking | 5 | 14 |
| Possession | 3 | 8 |
| Public order offenses | 5 | 9 |
| Weapons | 3 | 4 |

Note: General offense categories include offenses not detailed.

Nearly all (96%) youth younger than 18 newly admitted to prison in 2002 were male and most (79%) were age 17. Blacks accounted for 59% of new admissions under age 18, whites 28%, Hispanics 11%, and youth of other race/ethnicity 2%.

**Prisons differ from jails**

**Jails are generally local correctional facilities used to incarcerate both persons detained pending adjudication and adjudicated/convicted offenders. Convicted inmates are usually misdemeanants sentenced to a year or less. Under certain circumstances, jails may hold juveniles awaiting juvenile court hearings. Prisons are state or federal facilities used to incarcerate offenders convicted in criminal court. Convicted inmates are usually felons sentenced to more than a year.**

**Between 1985 and 1997, the percentage increase in the population of inmates in state prisons was similar for those younger than 18 and those ages 18 and above**

- From 1985 to 1997, the 1-day count of state prisoners younger than 18 grew 135% and the population of older inmates grew 138%.
- The trends of older and younger inmates diverged after 1997. The population of older inmates grew 16% between 1997 and 2004, while the population of inmates younger than age 18 fell 54%.
- The resulting increase between 1985 and 2004 was 8% for inmates younger than 18 and 175% for inmates age 18 and older.

Source: Authors' analyses of Strom's *Profile of State Prisoners Under Age 18, 1985–97*, Beck and Karberg's *Prison and Jail Inmates at Midyear 2000*, Harrison and Karberg's *Prison and Jail Inmates at Midyear 2002*, and Harrison and Beck's *Prison and Jail Inmates at Midyear 2004*.

# Supreme Court decision in *Roper* v. *Simmons* (2005) prohibits the death penalty for youth younger than 18

## A series of challenges to the juvenile death penalty preceded the *Roper* decision

The U.S. Supreme Court decision in *Furman* v. *Georgia* (1972) struck down all existing death penalty statutes. Sentencing under post-*Furman* statutes began in 1973. The constitutionality of these modern-era statutes was not determined until the 1976 decision in *Gregg* v. *Georgia*. Since the *Gregg* decision, the U.S. Supreme Court has been repeatedly asked to rule on the practice of executing offenders for crimes committed as juveniles. In *Eddings* v. *Oklahoma* (1982), the Court reversed the death sentence of a 16-year-old tried as an adult in criminal court. The Court held that a defendant's young age and mental and emotional development should be considered mitigating factors of great weight in deciding whether to apply the death penalty. The Court noted that adolescents are less self-disciplined, mature, and responsible than adults and are less able to consider the long-range implications of their actions. The Court, however, did not address the question of whether the imposition of the death sentence was prohibited because the offender was only 16 years old at the time of the murder.

In *Thompson* v. *Oklahoma* (1988), the issue before the Court was whether imposing the death penalty on an offender who was 15 years old at the time of the murder violated constitutional protections against cruel and unusual punishment. The Court concluded that the Eighth Amendment prohibited application of the death penalty to a person who was younger than 16 at the time of the crime. In *Stanford* v. *Kentucky* (1989), the Court stated: "We discern neither a historical nor a modern societal consensus forbidding the imposition of capital

**Since 1973, 22 offenders have been executed in the U.S. for crimes they committed when they were younger than age 18**

Executions of under-18 offenders: January 1, 1973–December 31, 2004

| Name | Year of execution | State | Age at Offense | Age at Execution | Race/ ethnicity |
|---|---|---|---|---|---|
| Charles Rumbaugh | 1985 | TX | 17 | 28 | white |
| James Terry Roach | 1986 | SC | 17 | 25 | white |
| Jay Kelly Pinkerton | 1986 | TX | 17 | 24 | white |
| Dalton Prejean | 1990 | LA | 17 | 30 | black |
| Johnny Frank Garrett | 1992 | TX | 17 | 28 | white |
| Curtis Paul Harris | 1993 | TX | 17 | 31 | black |
| Frederick Lashley | 1993 | MO | 17 | 29 | black |
| Ruben Montoya Cantu | 1993 | TX | 17 | 26 | Hispanic |
| Christopher Burger | 1993 | GA | 17 | 33 | white |
| Joseph John Cannon | 1998 | TX | 17 | 38 | white |
| Robert Anthony Carter | 1998 | TX | 17 | 34 | black |
| Dwayne A. Wright | 1998 | VA | 17 | 26 | black |
| Sean R. Sellers | 1999 | OK | 16 | 29 | white |
| Douglas Christopher Thomas | 2000 | VA | 17 | 26 | black |
| Steve E. Roach | 2000 | VA | 17 | 23 | white |
| Glen Charles McGinnis | 2000 | TX | 17 | 27 | black |
| Gary Graham (Shaka Sankofa) | 2000 | TX | 17 | 36 | black |
| Gerald L. Mitchell | 2001 | TX | 17 | 33 | black |
| Napoleon Beazley | 2002 | TX | 17 | 25 | black |
| T.J. Jones | 2002 | TX | 17 | 25 | black |
| Toronto Patterson | 2002 | TX | 17 | 27 | black |
| Scott A. Hain | 2003 | OK | 17 | 32 | white |

- Georgia, Louisiana, Missouri, South Carolina, and Texas limit juvenile court jurisdiction to youth 16 and younger; thus, 18 of the 22 executed offenders who were younger than 18 when they committed their crimes were adults at the time, at least for purposes of assessing criminal responsibility.
- Some juvenile death penalty milestones: 1985 saw the first execution in the modern era of an under-18 offender; 1998 saw the first execution since 1973 of an offender who, under state statute, was a juvenile at the time of his crime (Virginia); 1999 saw the first execution of an offender who was 16 at the time of his crime (Oklahoma); 2003 saw the last execution of an offender who was younger than 18 at the time of his crime (Oklahoma). In 2004, no offenders were executed for crimes they committed before age 18.

Source: Authors' adaptation of Death Penalty Information Center's *Juveniles and the death penalty* [online].

Case 2:06-cv-00755-MHT-CSC Document 72-11 Filed 11/16/2007 Page 22 of 24

punishment on any person who murders at 16 or 17 years of age. Accordingly, we conclude that such punishment does not offend the Eighth Amendment prohibition against cruel and unusual punishment."

### The Supreme Court cites a national consensus against the execution of juveniles in deciding *Roper* v. *Simmons*

In *Roper* v. *Simmons* (2005), for the second time in 16 years, the Supreme Court addressed whether under the Constitution it is permissible to execute an offender who was older than 15 but younger than 18 at the time of his crime. The Court was asked to reconsider its 1989 conclusion in *Stanford* v. *Kentucky*. Christopher Simmons had exhausted his appeals when the Supreme Court decided in *Atkins* v. *Virginia* (2002) that the Eighth and Fourteenth Amendments prohibit the execution of a mentally retarded person. Simmons filed a new petition for state postconviction relief, arguing that the *Atkins* reasoning should also mean that the Constitution prohibits the execution of a juvenile. The Missouri Supreme Court set aside Simmons' death sentence (*State ex rel. Simmons* v. *Roper*, 2003), concluding that since *Stanford*, "a national consensus has developed against the execution of juvenile offenders..."

In *Roper* v. *Simmons*, the U.S. Supreme Court noted that several states had abolished their juvenile death penalty since *Stanford* and none had established or reinstated it. The objective evidence of "consensus in this case—the rejection of the juvenile death penalty in the majority of states; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice—provide sufficient evidence that today our society views juveniles, in the words *Atkins* used respecting the mentally retarded, as 'categorically less culpable than the average criminal'." Thus, the Court affirmed the Missouri Supreme Court judgment that set aside the death sentence imposed on Christopher Simmons, concluding that the "Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed."

**Although 20 states had death penalty provisions for offenders age 17 or younger when *Roper* v. *Simmons* was decided in 2005, few applied those provisions**

Application of death penalty for crimes committed at age 17 or younger

- No death penalty for any age
- No death penalty for juveniles
- No executions since 1976, no current death row inmates
- No executions since 1976, some current death row inmates
- Execution(s) since 1976, no current death row inmates
- Execution(s) since 1976, some current death row inmates

■ At the time *Roper* v. *Simmons* was being decided, 30 states and the District of Columbia did not have death penalty provisions that applied to offenders age 17 or younger.

■ Only 4 states had executed one or more offenders for crimes committed at age 17 or younger since 1976 and had such "juvenile" offenders on death row at the time *Roper* v. *Simmons* was being decided (Georgia, South Carolina, Texas, and Virginia).

Source: Authors' adaptation of the Death Penalty Information Center's *Emerging national consensus on the juvenile death penalty* [online].



# Sources

*Atkins* v. *Virginia*, 536 U.S. 304 (2002).

Beck, A. 2000. *Prison and Jail Inmates at Midyear 1999.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Beck, A. 2001. *Recidivism: A Fruit Salad Concept in the Criminal Justice World.* Kansas City, MO: Justice Concepts Incorporated.

Beck, A., and Hughes, T. 2005. *Sexual Violence Reported by Correctional Authorities, 2004.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Beck, A., and Karberg, J. 2001. *Prison and Jail Inmates at Midyear 2000.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Bureau of Justice Statistics and the SEARCH Group. 1981. *Dictionary of Criminal Justice Data Terminology: Second Edition.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, BJS.

Bureau of Labor Statistics, U.S. Department of Labor. 2002. *National Longitudinal Survey of Youth 1997 cohort, 1997–2001 (rounds 1–5)* [machine-readable data file]. Chicago, IL: National Opinion Research Center, University of Chicago [producer]. Columbus, OH: Center for Human Resource Research, Ohio State University [distributor].

Death Penalty Information Center. *Emerging national consensus on the juvenile death penalty.* Downloaded May 16, 2005. <www.deathpenaltyinfo.org>.

Death Penalty Information Center. *Juveniles and the death penalty.* Downloaded May 16, 2005. <www.deathpenaltyinfo.org>.

Deschutes County Juvenile Community Justice. 2005. *Deschutes County Juvenile Community Justice Report Card.* Bend, OR: Deschutes County Juvenile Community Justice.

*Eddings* v. *Oklahoma*, 455 U.S. 104 (1982).

Feld, B. 1991. Justice by geography: urban, suburban and rural variations in juvenile administration. *The Journal of Criminal Law and Criminology,* 82(1):156–210.

Florida Department of Juvenile Justice. 2004. *Program Accountability Measures—The 2005 PAM Report: A Two-Year Analysis.* Tallahassee, FL: FDJJ.

*Furman* v. *Georgia*, 408 U.S. 238 (1972).

*Gregg* v. *Georgia*, 428 U.S. 153 (1976).

Harrison, P., and Beck, A. 2005. *Prison and Jail Inmates at Midyear 2004.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Harrison, P., and Karberg, J. 2003. *Prison and Jail Inmates at Midyear 2002.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Kuhn, J. 1989. *A Digest of Cases of the United States Supreme Court as to Juvenile and Family Law, 1962–July 1988.* Reno, NV: National Council of Juvenile and Family Court Judges.

Kuhn, J. 1990. *Supplement to a Digest of Cases of the United States Supreme Court as to Juvenile and Family Law, Addressing the 1988–1990 Terms.* Reno, NV: National Council of Juvenile and Family Court Judges.

Memory, J. 1989. Juvenile suicides in secure detention facilities: Correction of published rates. *Death Studies,* 13:455-463.

National Center for Health Statistics. *Bridged-race intercensal estimates of the July 1, 1990–July 1, 1999 United States resident population by county, single-year of age, sex, race, and Hispanic origin* [machine-readable data files]. Prepared by the U.S. Census Bureau with support from the National Cancer Institute. Released July 26, 2004. <www.cdc.gov/nchs/about/major/dvs/popbridge/popbridge.htm>.

National Center for Health Statistics *Estimates of the July 1, 2000–July 1, 2003, United States resident population from the vintage 2003 postcensal series by year, county, age, sex, race, and Hispanic origin* [machine-readable data files]. Prepared under a collaborative arrangement with the U.S. Census Bureau. Released September 14, 2004. <www.cdc.gov/nchs/about/major/dvs/popbridge/popbridge.htm>.

National Center for Health Statistics, National Center for Injury Prevention and Control. *WISQARS (Web-based Injury Statistics Query and Reporting System)* [interactive database system]. Accessed September 16, 2004. <www.cdc.gov/ncipc/wisqars>.

Office of Juvenile Justice and Delinquency Prevention. *Census of Juveniles in Residential Placement* for the years 1997, 1999, 2001, and 2003 [machine-readable data files]. Washington, DC: U.S. Bureau of the Census [producer].

Office of Juvenile Justice and Delinquency Prevention. *Children in Custody Census of Public and Private Juvenile Detention, Correctional, and Shelter Facilities* for the years 1990/91, 1992/93, and 1994/95. [machine-readable data files]. Washington, DC: U.S. Bureau of the Census [producer].

Pennsylvania Juvenile Court Judges Commission. 2005. *Juvenile Justice System Outcome Measures*. Harrisburg, PA: Pennsylvania Juvenile Court Judges Commission.

Puzzanchera, C., Finnegan, T., and Kang, W. *Easy access to juvenile populations* [online analysis]. Updated May 10, 2004. <www.ojjdp.ncjrs.gov/ojstatbb/ezapop>.

Roberts, R., Attkisson, C., and Rosenblatt, A. 1998. Prevalence of psychopathology among children and adolescents. *American Journal of Psychiatry,* 155(6).

*Roper* v. *Simmons*, 125 S.Ct. 1183 (2005).

Sedlak, A., and Bruce, C. 2004. Unpublished analysis of National Longitudinal Survey of Youth 2003 data: Children with children. Rockville, MD: Westat.

Sedlak, A., and Bruce, C. 2004. Unpublished analysis of 2003 Survey of Youth in Residential Placement data: Profile of the committed population. Rockville, MD: Westat.

Sickmund, M. Forthcoming. Juvenile Residential Facility Census, 2002: Selected findings. *Juvenile Offenders and Victims: National Report Series Bulletin.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Sickmund, M., Sladky, T., and Kang, W. 2004. *Census of Juveniles in Residential Placement Databook* [online analysis]. Updated November 30, 2005. <www.ojjdp.ncjrs.gov/ojstatbb/cjrp>.

Snyder, H. 1988. *Court Careers of Juvenile Offenders*. Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

Snyder, H., and Sickmund, M. 1995. *Juvenile Offenders and Victims: A National Report.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

South Carolina Department of Juvenile Justice. 2005. *Report Card to Our Citizens for 2004*. Columbia, SC: SCDJJ.

Stahl, A., Finnegan, T., and Kang, W. 2005. *Easy access to juvenile court statistics: 1985–2002* [online analysis]. Updated September 13, 2005. <www.ojjdp.ncjrs.gov/ojstatbb/ezajcs>.

*Stanford* v. *Kentucky*, 492 U.S. 361 (1989).

*State ex rel. Simmons* v. *Roper*, 112 S.W.3d 397 (2003).

Strom, K. 2000. *Profile of State Prisoners Under Age 18, 1985–97.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics.

Teplin, L., Abram, K., McClelland, G., and Dulcan, M. 2002. Psychiatric disorders in youth in juvenile detention. *Archives of General Psychiatry,* 59:1133–1143.

*Thompson* v. *Oklahoma*, 487 U.S. 815 (1988).

Virginia Department of Juvenile Justice. 2005. Juvenile recidivism in Virginia. *DJJ Research Quarterly.* Richmond, VA: VDJJ.

Wasserman, G., MacReynolds, L., Lucas, C., Fisher, P., and Santos, L. 2002. The Voice DISC-IV with incarcerated male youths: Prevalence of disorder. *Journal of the American Academy of Child and Adolescent Psychiatry,* 41(3):314–321.

| Totals | OffCategory | Offense | potentially violent? |
|---|---|---|---|
| 25 | CHINS (Status) Offenses | NONSPECIFIED CHINS OFFENSE | n |
| 25 | CHINS (Status) Offenses | RUNNING AWAY | n |
| 43 | CHINS (Status) Offenses | TRUANCY | n |
| 57 | CHINS (Status) Offenses | UNGOVERNABLE BEHAVIOR | n |
| 241 | Drug Offenses | DRUG OFFENSES - POSSESSION | n |
| 22 | Drug Offenses | DRUG OFFENSES - SELLING | n |
| 1 | Offenses against person | ENTICING A CHILD | n |
| 3 | Offenses against person | RAPE - 2nd DEGREE | n |
| 5 | Offenses against property | AUTO THEFT | n |
| 34 | Offenses against property | BREAKING AND ENTERING | n |
| 49 | Offenses against property | BUYING, RECEIVING OR CONCEALING STOLEN PRO | n |
| 66 | Offenses against property | CRIMINAL MISCHIEF | n |
| 26 | Offenses against property | CRIMINAL TRESPASSING | n |
| 11 | Offenses against property | FORGERY | n |
| 5 | Offenses against property | FRAUD | n |
| 216 | Offenses against property | THEFT OF PROPERTY | n |
| 34 | Offenses against property | UNAUTHORIZED USE OF A MOTOR VEHICLE | n |
| 10 | Public order offenses | Contempt of Court | n |
| 119 | Public order offenses | DISORDERLY CONDUCT | n |
| 5 | Public order offenses | DRUNKENNESS | n |
| 19 | Public order offenses | DUI | n |
| 17 | Public order offenses | ESCAPE | n |
| 13 | Public order offenses | FALSE INFORMATION | n |
| 110 | Public order offenses | HARASSMENT | n |
| 1 | Public order offenses | HINDERING PROSECUTION | n |
| 18 | Public order offenses | LIQUOR LAWS | n |
| 5 | Public order offenses | NON-AMENABLE TO TREATMENT | n |
| 3 | Public order offenses | TRAFFIC VIOLATIONS | n |
| 168 | Public order offenses | VIOLATION OF AFTERCARE | n |
| 1037 | Public order offenses | VIOLATION OF PROBATION | n |
| 126 | Unknown | Unknown | n |
| 2 | Offenses against person | SEXUAL ABUSE  - 2nd DEGREE | n |
| 4 | Offenses against person | SODOMY - 2nd DEGREE | n |
| 12 | Offenses against person | SEXUAL MISCONDUCT | y |
| 23 | Offenses against person | MENACING | y |
| 133 | Offenses against person | ASSAULT | y |
| 131 | Offenses against person | DOMESTIC VIOLENCE | y |
| 2 | Offenses against person | INCEST | y |
| 2 | Offenses against person | MURDER | y |
| 5 | Offenses against person | RAPE - 1st DEGREE | y |
| 20 | Offenses against person | RECKLESS ENDANGERMENT | y |
| 76 | Offenses against person | ROBBERY | y |
| 181 | Offenses against property | BURGLARY | y |
| 24 | Offenses against person | SEXUAL ABUSE - 1st DEGREE | y |
| 24 | Offenses against person | SODOMY - 1st DEGREE | y |
| 10 | Offenses against property | ARSON | y |
| 15 | Public order offenses | RESISTING ARREST | y |
| 84 | Public order offenses | WEAPONS VIOLATIONS | y |



| Totals | OffCategory | Offense | potentially violent? |
|---|---|---|---|
| 3262 | total | | |
| 742 | total violent | | |
| 100% | % non-violent | | |

# FOR EXHIBIT 4, PLEASE SEE EXHIBIT 3



| | Juv. Arrests (Serious) | DYS Admissions | Rate |
|---|---|---|---|
| 1994 | 1,448 | 1,747 | 1.2 |
| 1995 | 1,232 | 1,385 | 1.1 |
| 1996 | 1,020 | 2,532 | 2.5 |
| 1997 | 1,010 | 2,933 | 2.9 |
| 1998 | 938 | 3,373 | 3.6 |
| 1999 | 738 | 3,196 | 4.3 |
| 2000 | 739 | 3,183 | 4.3 |
| 2001 | 630 | 2,899 | 4.6 |
| 2002 | 696 | 3,126 | 4.5 |
| 2003 | 676 | 3,314 | 4.9 |
| 2004 | 644 | 3,088 | 4.8 |
| 2005 | 681 | 3,157 | 4.6 |

Serious Juvenile Arrests and DYS Admissions
4,000
3,500
3,000
2,500
2,000
1,500
1,000
500
0
DYS Admissions
Juv. Arrests (Serious)
1994
1995
1996
1997
1998
1999
2000
2001
2002
2003
2004
2005

# Conditions of Confinement at the Arkansas Juvenile Assessment and Treatment Center

*Submitted to the*
*National Center for Youth Law and the Disability Rights Center*
*August 13, 2007*

**Tim Roche**
TRocheConsulting
413 Halsey Valley Road
Spencer, NY 14883
(607) 589-7557
TRocheConsulting@aol.com

**Kelly Dedel, Ph.D.**
One in 37 Research, Inc.
1608 NW Riverscape
Portland, OR 97209
www.onein37.com

EXHIBIT
Affidavit
6
tabbies

## About the Authors

**Tim Roche** has devoted the bulk of his 25-year career to researching and designing safe and effective community-based alternatives to institutional care for juvenile and adult correctional populations, and to monitoring the conditions of confinement in correctional settings. Mr. Roche, formerly Executive Director of the Justice Policy Institute in Washington, D.C., and past President of the New York State Youth Advocates Program, has served as a monitor for the Federal Court in Washington, D.C. monitoring conditions at the D.C. jail and prisons; and as the Federal Court's expert in Intermediate Sanctions for the adult prison system in Puerto Rico. Mr. Roche currently serves as a juvenile justice expert for the U.S. Department of Justice in the area of protection from harm in juvenile correctional facilities, and as a lead consultant the Annie E. Casey Foundation's Strategic Consulting Group in its efforts to help reform the Alabama Department of Youth Services. Mr. Roche is also an expert consultant with the Annie E. Casey Foundation's Juvenile Detention Alternative Initiative and has been retained as a juvenile justice expert by the Southern Poverty Law Center in Mississippi. His varied practical experience also includes serving as Deputy Receiver for the Washington, D.C. Child Welfare system; as Deputy Special Master for the U.S. District Court in Baltimore, MD regarding the delivery of Special Education services in the Baltimore City Public Schools System and as Deputy Director of the Center on Juvenile and Criminal Justice.

**Kelly Dedel, Ph.D.** is a nationally-recognized expert on the conditions of confinement in juvenile correctional facilities. She is regularly retained by the U.S. Department of Justice as a consultant in the areas of protection from harm and education in juvenile correctional facilities. Further, as the lead monitor of the Memorandum of Agreement between the United States and the State of Maryland, Dr. Dedel is responsible for monitoring and facilitating reforms related to protection from harm, suicide prevention, and quality assurance in three state-operated detention facilities. After beginning her career with the National Council on Crime and Delinquency, where she pioneered the Council's work in education in juvenile correctional facilities, Dr. Dedel founded the Institute on Crime, Justice and Corrections at George Washington University with several of her colleagues. From there, she began her own consulting firm, One in 37 Research, Inc., based in Portland, Oregon. In addition to her work surrounding the conditions of confinement in juvenile facilities, Dr. Dedel also studies situational crime prevention and crime prevention through environmental design and has worked with several agencies to develop and validate objective risk assessment instruments.

# Table of Contents

Executive Summary ........ 4

Introduction ........ 7

Measures to Protect Youth from Harm Due to Unnecessary Exposure to Secure Correctional Confinement ........ 10

Measures to Protect Youth from Harm While in Secure Custody ........ 18

- Measures Designed to Protect Youth From Harm By Other Youth ........ 18
  - Staffing and Supervision. ........ 18
  - Staff Training ........ 21
  - Programming. ........ 25
  - Incident Reporting. ........ 26
  - Medical Attention. ........ 30
  - Behavior Management. ........ 31
  - Isolation ........ 34
  - [illegible]

- Measures Designed to Protect Youth from Self-Harm ........ 39

- Measures Designed to Protect Youth From Harm by Staff ........ 42
  - Avenues for Youth to Report Mistreatment. ........ 44
  - Reporting Allegations of Abuse to the Proper Authority. ........ 46
  - Placing Accused Staff in Non-Contact Positions Pending the Outcome of Investigation ........ 47
  - Child Abuse Investigations and Staff Discipline. ........ 48

Conclusion ........ 51

Appendix A ........ 54

Appendix B ........ 56

## Executive Summary

The following report was prepared in the wake of considerable turbulence at the Arkansas Juvenile Assessment and Treatment Center (Alexander). A long and troubling history of poor practice and mistreating youth in custody resulted in terminating the contract with the previous private provider that operated Alexander. In January 2007, G4S Youth Services, LLC (G4S) assumed operational control of Alexander. Since that time, a number of substantiated incidents of mistreating youth in custody at Alexander have surfaced, prompting the National Center for Youth Law and the Disability Rights Center to request the assistance of experts to evaluate the adequacy of measures taken at Alexander to protect youth from harm.

It was also against this backdrop, in March 2007, that the Arkansas State Legislature took action, in the form of Senate Resolution 31, "<u>to evaluate needed reforms to the state's juvenile justice system to more effectively and efficiently serve youth committed to the Division of Youth Services of the Department of Health and Human Services and to identify best practices that will reduce unnecessary reliance on large juvenile correctional facilities and promote the development of an appropriate continuum of community based treatment alternatives in the least restrictive setting possible</u> consistent with public safety." (emphasis added). The authors of this report hope that its contents, observations and recommendations can form a useful foundation from which to pursue the work contemplated by SR 31.

This report details a series of issues that compromise the safety of youth at Alexander. Based upon numerous interviews with facility administrators, line staff and more than two dozen youth, as well as a review of individual case files, operational policies and procedures, and other documentary evidence, we offer a comprehensive series of observations and recommendations intended to directly address the most common sources of harm to youth in secure correctional confinement: the risk of harm from themselves, from other youth, and from staff.

In the authors' view, however, the over-reliance on secure correctional confinement of young people who do not require this most expensive and restrictive level of custody to protect public safety and promote law-abiding behavior is the most pressing and pervasive issue compromising the safety of youth at Alexander. A growing body of evidence indicates that exposing youth to secure correctional confinement is detrimental and *increases* rather than decreases their likelihood of further penetrating the justice system. Of the 647 youth committed to secure Division of Youth Services facilities during FY 2006, only 212 (33%) were committed for "person" offenses. Only 29 of the 647 youth (4%) were committed for the most serious "Y" felonies, while more than twice that number, 72 youth (11%), were committed for "public order" misdemeanors such as Disorderly Conduct. <u>In FY 2006, a full 45% (293 of 647) of all DYS</u>

commitments to Youth Service Centers were for misdemeanor offenses. In the first quarter of 2007, only 16% of DYS commitments were for felony offenses against persons.

These and other similar data contained in the body of this report confirm that a large percentage of the Alexander population are confined as a result of Violations of Probation (typically technical violations involving no new criminal charges), Misdemeanor law violations, disruptive behavior at school including fights, treatment program violations, as well as for offenses involving public order, property and or drug use, rather than for any "violent" behavior. Such youth are misplaced in a high-security facility such as Alexander and would benefit from thoughtful, individualized programming and supervision in their home communities.

In addition, many of the youth incarcerated at Alexander experience serious mental illnesses, emotional disturbances and/or developmental disabilities and struggle to comply with facility regulations while suffering near-constant torment by other youth, as well as by some staff. According to G4S administrators, approximately 30 percent of the Alexander population is inappropriate for placement at the facility and for their program by virtue of the youths' intellectual, emotional, and/or developmental disabilities. These youth fill beds at Alexander in part because no other more appropriate alternative exists.

While there is no doubt that a segment of the Alexander population poses an unacceptable risk to public safety and requires safe and therapeutic forms of secure care, these youth are in a distinct minority. It is the consensus of those DYS officials, G4S staff and administrators, and others with whom we spoke that many, if not most, of the youth confined at Alexander could be safely managed and well monitored using various community-based programming techniques. By drawing upon well-established community-based supervision and support models to build a full continuum of care, Arkansas officials could redirect scarce funding from maintaining expensive institutions to building local programming in the home communities of Arkansas' most needy youth and families. Such an approach would not only prove far more beneficial to the youth currently confined at Alexander, but could also help drive an economic development engine targeting the most impoverished communities in the state.

It is our opinion and our primary recommendation that the most effective way to ensure the safety of the greatest number of youth is for the Arkansas Division of Youth Services to undertake an aggressive, transformative initiative to reduce the population at Alexander by approximately two-thirds through the design of safe and effective, individualized supervision plans that emphasize home and other community placements, and by reconfiguring secure care in Arkansas to reflect current best practices in the field by permanently closing Alexander and replacing it with one or possibly two secure, therapeutic facilities each with no more than 40 beds.

Included among our other recommendations for immediately improving the safety of
youth at Alexander while broader systemic reforms occur are the following:

- Reduce the exposure of low-risk youth to confinement at Alexander by
  applying a validated external risk assessment instrument to help identify
  youth who can be safely managed in their home communities.

- Accelerate the thoughtful and well-planned discharge and subsequent
  supervision of youth currently in secure confinement by systematically
  targeting misdemeanants, probation violators and other non-violent
  offenders for the development of individualized, community-based plans into
  which youth can be discharged with an assurance that supervision and
  support will be available to guide their success.

- Develop a willing cadre of non-residential, neighborhood-based service
  providers who operate diverse and culturally competent programming in or
  near the home communities of DYS youth, and who are committed to
  working with challenging youth and willing to enter into "no eject – no
  reject" policies as part of their service contracts.

- Examine models of "fiscal realignment" developed in several other states
  that encourage local jurisdictions to treat low-risk youth locally rather than
  committing them to DYS for assignment to Alexander.

- Ensure that staff ratios at Alexander are met consistently and that they
  represent the number of staff actually deployed to supervise youth at any
  given time. Ensure that all staff provide vigilant, pro-active supervision
  designed around positive interaction with youth and efforts to identify and
  de-escalate tensions before they develop into violent confrontations.

## Introduction

A series of recent events involving the safety of youth confined at the Arkansas Juvenile Assessment and Treatment Center (Alexander) prompted a request from the National Center for Youth Law (NCYL) and the Disability Rights Center (DRC) for an assessment of the conditions of confinement and the adequacy of measures to protect youth from harm. Alexander became the focus of much unwanted attention and concern by media, youth advocates and state officials in late 2006 with the revelation that the contracted operator of the facility at that time had forcibly medicated youth in its care. The subsequent termination of that contract and the transfer of operational control of the facility to G4S Youth Services, LLC (G4S) in January 2007 appeared to address the immediate concern caused by the previous contractor, but several more recent substantiated incidents of violence against youth by members of the G4S/Alexander staff fostered lingering worries for the safety of youth confined in that facility.

We toured the Alexander, from June 5 through 8, 2007, during which time we saw all housing units, dining areas, the gym, medical unit, most school areas and recreation yards as well as administrative areas. We also interviewed 30 youth in secure confinement at Alexander, as well as the newly appointed Directors of the Department of Human Resources (DHS) and the Division of Youth Services (DYS), and large numbers of DYS and G4S staff. We also reviewed a range of documents relating to facility operations. (See appendix A for a complete listing of staff interviewed and documents reviewed.) Despite limited access to some key documents[1], we have assembled in this report several observations and recommendations that we hope will prove helpful to G4S, DYS and youth advocates around the state as together they struggle to ensure the safety of those Arkansas youth confined in secure correctional facilities. While the majority of our commentary focuses on the operational practices of G4S, to be clear, DYS is ultimately accountable for the performance of its private contractors and thus is responsible for enacting the various remedies required to protect youth from harm. In addition to implementing required reforms, DYS must also ensure that information is freely exchanged between the various agencies involved (e.g., DYS, G4S, State Police, etc.) so that reforms may be implemented without unnecessary duplicity.

---

[1] Once on site, we were informed that we could not access many key documents based on confidentiality concerns. In some cases, DYS agreed to provide access to certain documents pertaining only to DRC clients (institutional/medical/mental health/education files; documents pertaining to suicide precautions) and in other cases, G4S staff examined the relevant document and reported the findings to us (e.g., log book with information pertaining to a single instance of room confinement). In still other cases, we received copies of documents with the names of youth redacted. In most cases, however, we were denied access to many critical documents. As a result, some of our observations are based on information gleaned from youth and staff interviews and observations of facility operations.

What emerged during the course of our review was an image of a facility, indeed an entire juvenile justice system, struggling to keep pace with the relentless influx of predominantly non-violent youth committed to DYS custody. On June 7, 2007 there were 70 youth (28 of whom were Misdemeanants) committed to DYS custody who were waiting, sometimes for months, in local detention centers until space was created for their absorption into DYS facilities. Alexander's intake staff, case managers, trackers and youth care workers struggle to stay ahead of the constant stream of relatively low-risk youth being added to the system weekly. We witnessed the well-intended but somewhat ad hoc efforts of DYS clinical staff at Alexander to manage the flow by attempting to target misdemeanants for swift release. We heard frustrated theories and countless anecdotes that "the judges send too many misdemeanants", "private providers won't take difficult kids or kick kids out of their programs too quickly" or "technical probation violations and aftercare failures are the biggest problem" to explain the rate at which low-risk youth are committed to costly secure correctional confinement.

Perhaps most striking was the consensus among virtually everyone with whom we spoke that large numbers of youth at Alexander are inappropriately placed in that high-security correctional setting. High-security correctional environments are appropriate only for that small segment of youth that is particularly violent or that presents an appreciable escape risk. In contrast, many of the youth at Alexander are seriously mentally ill, emotionally disturbed and/or developmentally disabled youth who struggle to comply with facility regulations while suffering near-constant torment by other youth, as well as by some staff. (One boy who had been at Alexander for nearly a year has a full-scale IQ of 47.) According to G4S administrators, approximately 30 percent of the Alexander population is inappropriate for placement at the facility and for their program by virtue of the youths' intellectual, emotional, and/or developmental disabilities. These youth, say G4S administrators, are unable to benefit from their confinement at Alexander. They are commonly the most difficult to protect from other youth and they stretch the patience of staff to dangerous breaking points.

Of equal concern is the large number of youth whose crimes and history suggest that they pose little or no physical threat to public safety. These youth, identified during our interviews with both staff and youth, confirmed that a large percentage of the Alexander population is confined as a result of Violations of Probation (typically technical violations involving no new charges), Misdemeanor law violations, disruptive behavior at school including fights, treatment program violations, as well as for offenses involving public order, property and or drug use, rather than for any "violent" behavior. Although these behaviors by adolescents are difficult, challenging, even maddening to deal with, they are seldom truly dangerous and should not be managed by reliance on our most expensive and extreme correctional option.

<u>While there is no doubt that a segment of the Alexander population poses an unacceptable risk to public safety and requires safe and therapeutic forms of secure</u>

care, these youth are in a distinct minority. It was the consensus among those DYS officials, G4S staff and administrators, and others with whom we spoke that many, if not most, of the youth housed at Alexander could be safely managed and well monitored using various community-based programming techniques. In fact, it is our estimate, based on interviews and available data regarding committing offenses and histories of youth at Alexander, that approximately 100 of the facility's 140 youth should be transitioned home or into other community-based settings with the support of a range of local services designed to ensure public safety and guide the youth on a constructive path to adulthood.

This over-reliance on secure correctional custody for youth who could be safely managed in less restrictive settings is not only wasteful from a fiscal standpoint, it is also inconsistent with the stated goals and mission of DYS to, "*Provide safe, secure, effective individualized treatment for juveniles to enhance integration back to society with the life-skills that promote a crime-free life style*." Treatment that is characterized largely by placement in a setting that was not designed to and is not capable of meeting the youth's specific needs can hardly be called effective or individualized. Relying on secure custody for the many low-risk youth at Alexander is also at odds with the role of Alexander as defined in the DHHS/DYS 2007-2009 Budget Request: "*Alexander Juvenile Correctional Facility provides centralized intake for juveniles committed to [the] Division. The target population of juveniles assigned to Alexander is the most serious violent offenders, difficult to place sexual offenders, and juveniles who disrupted a placement due to behavior management issues*."

DYS possesses the statutory authority to manage most committed youth in the setting it believes is best suited to protect public safety and to rehabilitate the youth. Alexander, therefore, does not have to be the default placement for so many non-dangerous youth, and every effort should be made to alter this long-standing practice of relying on Alexander and other forms of secure correctional confinement to manage challenging youth. To be clear, DYS has the statutory authority to manage these youth in other settings that are better suited to safely address their many needs than is possible at Alexander.

In spite of all this, and perhaps because if it, DYS is presented with a clear choice – either continue to pour money into the sprawling Alexander, or transform itself into a system worthy of the children and families of Arkansas. New executive leadership, unencumbered by decades of practice within failed juvenile correctional models, brings with it new hope that secure correctional confinement will be reserved only for those Arkansas youth who pose a legitimate threat to public safety, and the rest can be managed with the aid of willing local service providers committed to ensuring public safety and the safety of youth through the thoughtful and creative use of community-based services in the home communities of DYS youth.

It is our opinion, an opinion shared by many individuals with whom we spoke that the most effective way to ensure the safety of the greatest number of youth is to undertake an aggressive, transformative initiative to reduce the population at Alexander by approximately two-thirds through the design of safe and effective, individualized supervision plans that emphasize home and other community placements, and by reconfiguring secure care in Arkansas to reflect current best practices in the field by permanently closing the Alexander and replacing it with one or possibly two secure, therapeutic facilities each with no more than 40 beds.

It is our opinion that the conditions of confinement described below are in part a product of the muddled role Alexander is forced to fill. As home to all of the state's confined juvenile sex offenders, most of the state's violent offenders, girls committed for a wide variety of offenses, and a vast assortment of other far less serious but nonetheless *needy* youth, Alexander is a patchwork of correctional fabric that has evolved based on the needs of the system, rather than on the needs of youth. Unfortunately, it has not met the needs of either with any great success. By stepping back and refocusing its mission more squarely on public safety and meeting the needs of Arkansas' most challenging youth and families, DYS can safely reduce its reliance on secure custody and redirect savings to fund meaningful services in the home communities of DYS youth and their families.

Arkansas Senate Resolution 31 could supply the vehicle for a thoughtful, in-depth examination of Alexander's role within DYS, and for a detailed analysis as to the risks and needs presented by youth currently confined in DYS secure facilities. By harnessing the potential within SR31 to align the needs of youth (and their families) with a rich and fully funded continuum of services in the neighborhoods where DYS youth live, and restricting its use of secure correctional confinement to those youth who pose a legitimate threat to public safety, Arkansas' DYS could emerge from its current state of turmoil to assume the stature of a model state juvenile justice system.

## Measures to Protect Youth from Harm Due to Unnecessary Exposure to Secure Correctional Confinement

Youth in correctional facilities are at risk of harm from several sources. The three most commonly recognized sources of harm include: 1) other youth; 2) themselves; and 3) staff. A forth and more expansive source of harm, however, stems from reliance on secure correctional confinement for youth who do not require this level of custody to protect public safety and promote law-abiding behavior. There is in fact a growing body of evidence that exposure of youth to secure correctional confinement is detrimental and increases rather than decreases their likelihood of further penetrating the justice system.

Secure correctional confinement of youth is not only the most expensive dispositional option available in most jurisdictions, it is also widely recognized as possessing the greatest number of potentially damaging consequences for young people. It is for these reasons that national standards for compulsory placement of youth in out-of-home settings call for reliance on the least restrictive option consistent with public safety. Secure correctional confinement of youth is increasingly viewed as a disposition of last resort, for use only when all other less secure options have been exhausted. Research conducted over the past 20 years has established that youth exposed to secure custody exhibit higher rates of recidivism than those in less restrictive settings; they are more likely to experience deterioration in their mental health and an increased propensity toward suicidal behavior; they are less likely to further or complete their education, and their prospects for gainful employment are significantly reduced.

***Observations***: Despite evidence that secure custody is a strong predictor for recidivism, Arkansas continues to incarcerate a highly disproportionate number of first-time commitments and non-violent offenders to DYS secure facilities. According to the DYS Statistical Report for SFY 2006, a total of 647 youth were committed to DYS youth service centers in 2006. Of those youth, 517 (80%) were first time commitments. An additional 87 had only one prior DYS commitment to a youth service center.

Compounding the human and fiscal costs of relying too heavily on secure correctional custody for youth in Arkansas is the fact that a great many of these youth have been committed to secure facilities as a result of non-violent behavior that poses only a very limited risk to public safety, a risk that in most instances could be safely managed through the use of high-quality, non-residential, community-based programs. Of the 647 youth committed to secure DYS facilities during SFY 2006, only 212 (33%) were committed for "person" offenses. Only 29 of the 647 youth (4%) were committed for the most serious "Y" felonies, while more than twice that number, 72 youth (11%), were committed for "public order" misdemeanors such as Disorderly Conduct. In FY 2006, a full 45% (293 of 647) of all DYS commitments to Youth Service Centers were for misdemeanor offenses. In the first quarter of 2007, only 16% of DYS commitments were for felony offenses against persons.

During the course of our review, we encountered many youth committed to secure DYS institutions for the first time as a result of non-violent and/or relatively non-serious behavior. Below are brief descriptions of some of these youth:

- A 17 year old female diagnosed with bi-polar disorder who spent the previous five years in foster care after being raped by a neighbor at age 12. After multiple foster home placements the girl was moved to a residential facility at age 16 after hitting a foster parent. She was successfully discharged from the residential program but was placed in an emergency shelter while a more suitable placement was sought. Although emergency shelters are intended for brief stays of approximately 72 hours, this girl remained in the shelter for 10 weeks until

she finally left and resumed an earlier pattern of serious drug use. She was eventually arrested and sent to Alexander on Violation of Probation and Domestic Battery charges stemming from the incident with the foster parent.

- A 16 year old boy reported having been at Alexander for five months on his first DYS commitment stemming from a school fight. He was arrested by school police and because he was on probation for driving without a license, his probation was revoked and he was placed in secure correctional confinement at Alexander. This boy reported being in 10th grade and living with his mother and two siblings. He was scheduled to be released a few weeks after our interview. He reported to know little about the specifics of his aftercare plan but would be returning to live at home and attend school.

- Another youth interviewed was a 15 year old boy on his first commitment to DYS. He had been in secure confinement for two months. He reported originally being placed on probation almost two years before for a curfew violation. Most recently, he reported being kicked out of school due to disruptive behavior and was placed on electronic monitoring (EM) for 30 days. While on EM he reported receiving a call informing him that his brother was in trouble a few blocks away. He left his house to aid his brother and was subsequently charged with violating the terms of his probation.

- One 17 year old youth who was soon to be released had been at Alexander for six months after running away from a treatment program. The youth was originally arrested for stealing three car stereos and a golf cart from a local garage. He reported having no violent offense history. Although all the stolen items were returned, he did not appear for his dispositional hearing because he feared the outcome. He was subsequently taken into custody and sent to a treatment program that he believed required him to obtain his GED prior to being released. Having failed his GED test on more than one occasion in the past, he was convinced he could not earn his release before turning 18. Consequently he ran away from the program and was later taken into custody and sent to Alexander.

- Another 17 year old we interviewed reported being charged with two counts of Theft of Property after breaking into a local motorcycle shop. He was immediately caught and all the merchandise was returned. Due to an underlying substance abuse problem, he was sent to a drug program where he received his GED and successfully completed the program. Upon his return to court, however, he learned that the family who held legal custody had relinquished custody. Absent another placement, the youth was sent to Alexander.

The youth described above are only a small fraction of the many youth currently incarcerated at Alexander whose risk to public safety appears sufficiently low to make

them excellent candidates for individualized community-based supervision and monitoring. Given the cost of secure confinement and evidence that exposure to secure correctional environments will contribute to their likelihood of recidivism, these youth and others like them should be spared this experience in favor of safe and effective community-based programming.

As noted, there are also a significant number of youth who experience seriously disabling conditions that, when combined with their offense history, present a risk to public safety sufficient to warrant their placement in a safe, secure and therapeutic environment. While it is true that these youth may need a secure environment, their placement at Alexander is neither appropriate nor therapeutic and serves to exacerbate their problem behaviors. Below are brief descriptions of some of these youth:

- PT is a very slight, 16 year old boy with a full scale IQ of 47. He was committed to DYS after engaging in inappropriate sexual activity with his disabled 7 year old brother. PT's ability to focus and follow simple directions is limited, creating unique supervision and management needs for staff. He has a poor sense of social boundaries and frequently invades the personal space of others, provoking the ire of some youth. He is also a frequent bed-wetter. He was expelled from a previous placement for inappropriate sexual acting out behavior, which given his history and limitations, should have been expected. His management needs far exceed the ability of Alexander staff to meet.

- DA is a 16 year old boy with a history of Schizophrenia, Bipolar Disorder, PTSD and who is prescribed several psychotropic medications. He has a history of serious suicide attempts and experiences visual and auditory command hallucinations. He has engaged in head banging that has resulted in a loss of consciousness and self-biting that has drawn blood. He has trouble controlling his bowels and is tormented and ridiculed by other youth and staff after soiling himself. He was moved to Alexander from a hospital setting where he assaulted a staff member who physically abused him. He is frequently the target of abuse by other youth and staff, which presents serious safety/management problems at Alexander and requires that he be assigned a one-on-one staff person for much of the week.

- HC is 15 years old and experiences auditory hallucinations, depression with multiple suicide attempts, and has a full scale IQ of 75. HC also has a history of a congenital gastro-intestinal abnormality resulting in an inability to control his bowel and occasional soiling. He was committed to DYS on a sexual assault charge in which the victim was another child. He is a common target of torment by other youth and is deeply fearful for his safety.

These and many other youth like them fill beds at Alexander in part because no other more appropriate alternative exists. For these youth, exposure to the Alexander

correctional environment is a hostile experience that heightens their fears and anxieties, often provoking negative behavior from them, other youth and from staff. These are youth who carry the deep scars of physical and emotional abuse inflicted long before their commitment to DYS, and whose developmental disabilities cry out for a small, safe and therapeutic setting rather than 140-bed secure correctional environment that is Alexander.

## Recommendations for Reducing Unnecessary Exposure to Secure Correctional Confinement

DYS officials need not wait for the results contemplated by SR31, but can begin immediately to take steps that will safely reduce the costly burden of low-risk/high-needs youth in secure correctional confinement. Below are a series of steps that could be formalized to begin the process of realigning DYS resources with the actual public safety needs of the community and the rehabilitative needs of those youth committed to its care.

1. **Limit Admissions and Reduce Length of Stay.** The primary means by which unnecessary exposure to secure correctional settings can be prevented is by limiting the number of youth who enter such facilities and reducing the length of stay for those who do enter. This can be accomplished through a series of administrative and programmatic policies designed to reserve secure correctional confinement exclusively for those youth who pose a legitimate threat to public safety that cannot be satisfactorily mitigated through less restrictive options. For the many other youth committed to DYS who can be safely and successfully managed in a non-residential, community-based setting, a rich continuum of programs and services drawing upon proven models of care must be developed in communities and neighborhoods across the state. By establishing fiscal incentives for jurisdictions to supervise and treat youth locally, and disincentives to the commitment of low-risk youth to DYS, the foundation can be laid for transforming juvenile justice in Arkansas into a coherent system that builds and relies more upon the strengths of communities to care for their youth, and less upon expensive and ineffective correctional confinement for youth who do not require that level of custody.

The three general target populations at Alexander ripe for community-based programming are Probation Violators (including those youth who have been discharged from alternative programs due to rule violations), Misdemeanants, and all variety of Non-violent Offenders. By aggressively and systematically targeting these categories for youth to fill non-custodial programming, the population at Alexander could be reduced as a first step toward closing and replacing this youth prison with small, therapeutically-oriented secure facilities.

- **Probation Violators** – Although we were unable to obtain an accurate count of youth committed to Alexander for violating the terms of their probation or aftercare plan, many officials with whom we spoke believed that such violations constituted a relatively large percentage of Alexander youth. We were also told by supervisors within the intake and clinical teams that probation violations were typically unaccompanied by a new charge but rather constituted "technical" or rule violations. Given that these youth were viewed as presenting a sufficiently limited risk to public safety that they were initially placed on probation, every effort should be made to impose sanctions for misbehavior

short of incarceration. Many jurisdictions are turning to the use of a structured "sanctions grids" to ratchet-up sanctions on youth for technical violations of probation as an alternative to secure correctional confinement. Other jurisdictions limit the amount of time for which a youth can be returned to custody for a technical violation. Many probation violations stem from failures by youth to comply with all the rules of a community-based program. It is certainly true that some service providers are quicker than others to eject a youth who presents challenges for program staff. Challenging youth, however, are the nature of the beast in juvenile justice. Truly committed service providers understand this and are commonly willing to abide by contractual agreements not to "eject or reject" youth who are in or referred to their programs.

- **Misdemeanants** – On June 7, 2007 a total of 70 youth committed to DYS were backed up in local detention facilities, often for months, awaiting space in a secure DYS facility, typically Alexander. Of these 70 youth, 28 were misdemeanants. As noted earlier, the proportion of misdemeanants already in DYS secure facilities is already considerable. According to the Arkansas DHHS statistical report for SFY 2006, 293 of the 647 (45%) youth committed to DYS secure facilities were misdemeanants. By definition a misdemeanor is a low-level offense that rarely involves any serious violence. These are offenses that often fall within the range of behaviors in which youth commonly engage. While the behavior is clearly illegal and not to be excused, the response by authorities to such behavior should be proportional and measured to equal the severity of the act. Again, youth who engage in the wide range of misdemeanor offense behaviors are typically neither violent nor predatory offenders, but rather youth whose behavior can and should be addressed through an array of community-based sanctions instead of secure correctional confinement.

- **Non-Violent Offenders** – In FY 2006, only 128 of 647 youth (20%) committed to secure DYS Youth Service Centers were committed as a result of felony offenses against a person. The remaining 519 were committed as a result of misdemeanor, property, public order, drug and "other" offenses. These are the very types of offenses for which community-based sanctions and programming is best suited. Halting the flow of these offenders into the DYS custodial system by creating alternative plans prior to absorption into the system and further reducing their numbers by expediting discharge plan development for those already in confinement, would form another step toward safely reducing the population at Alexander in preparation for its closure.

2. **Develop an External Classification System**. Along with the concerted effort to reduce secure correctional confinement of low-risk/high-needs youth, a structured external classification instrument should also be developed, empirically validated, and used to guide placement decisions for youth committed to DYS. Given the preponderance of evidence that higher rates of recidivism, substance abuse,

delinquency, violence and poorer school performance are found among youth who experience confinement in congregate facilities -- a phenomenon that researchers term, “peer deviancy training” – efforts must be made to identify those many youth who do not require, and will not benefit from secure confinement. Developing and relying upon a sound and empirically validated classification system that is capable of identifying those youth who should be managed in the community should be a priority of DYS.

Although DYS uses an external “risk assessment guideline form”, this instrument is seldom used to inform decision making. The form does not appear to be consistently completed nor does it have any bearing on placement decisions for youth. Several G4S administrators and members of the DYS intake team noted that many of the youth in custody at Alexander score very low on the risk assessment guideline form – well below the threshold for secure correctional confinement. The risk assessment form identifies those with scores of six or below as being low risk and not eligible for secure placement. Nonetheless, according to those Alexander officials familiar with the instrument and its use, youth are regularly placed at Alexander who score in the lowest risk range. We were not able to obtain a census of youth at Alexander arranged by risk scores. Such a census, however, could be a useful tool for identifying segments of the population at Alexander who should be immediately considered for less secure placement.

**3. Replace Alexander with Small, Secure and Therapeutic Environments.**
Simultaneously, while safely reducing Alexander’s population through individualized community-based service planning, one or possibly two small, secure and therapeutically-oriented facilities could be established to house those youth for whom there is a legitimate public safety risk. The State of Missouri has successfully pioneered this small, therapeutic approach to safely manage high-risk youthful offenders, becoming what many juvenile justice professionals regard as the best juvenile rehabilitation system in the country. By relying on an expansive array of community-based alternatives, Missouri juvenile justice officials are able to devote expensive secure bed-space exclusively to those youth who pose a public safety risk. Missouri’s model of secure care is unique in that it relies on a number of small (fewer than 40 beds) secure but home-like settings typically located within 50 miles of the home communities of each youth. These secure facilities place an emphasis on rehabilitative programming and have become a national model for secure care of youth, boasting a recidivism rate of just 8%. Arkansas could benefit enormously from this approach to safely manage its most high-risk youth.

## Measures to Protect Youth from Harm While in Secure Custody

The next section of this report is organized according the risk of harm presented to youth by other youth, by themselves and by staff. Under each major section, various issues pertaining to the facility's ability to protect youth from these forms of harm are discussed, along with observations regarding the adequacy of the measures currently in place. Each section also includes recommendations for improving the quality of protection from harm in each area.

While many of the ways in which youth are harmed in the correctional setting can be mitigated by improving facility operations, clearly the best way to protect youth from these harms is to limit their exposure to the correctional setting in the first place. Although this report provides a comprehensive review of the various risks of harm faced by youth at Alexander, we want to be clear that our professional opinion is that for many youth, their unnecessary placement at Alexander in the first place is a threshold matter that must be addressed for DYS to overcome the challenges that have plagued its operations for many years.

### *Measures Designed to Protect Youth From Harm By Other Youth*

#### Staffing and Supervision.

Adequate numbers of staff must be deployed to supervise youth during waking and sleeping hours in order to protect youth from harm. The number of staff available to supervise youth is directly relevant to nearly all of the measures designed to protect youth from harm. Without adequate numbers of staff, it is difficult to engage youth in structured programming or to closely supervise and monitor tensions brewing among youth. Staff are also unable to de-escalate these tensions effectively because they must attend to the needs of so many other youth. Some staff may not intervene in fights immediately, choosing instead to await the arrival of backup staff, which creates the potential for youth to inflict more serious injuries during physical altercations. These ratios are not meant to be calculated based on the number of staff in the building, but rather those who are *directly supervising* youth at any given time. Generally, supervisors, floaters/relief staff, and those assigned to control rooms and intake areas are not counted toward these ratios.

- ***Observations***. Facility administrators reported that the G4S contract provides for a continuous staff-youth ratio of 1 staff for every 8 youth (1:8). In contrast to the previous provider, Cornell Companies, Inc., G4S includes only Youth Care Workers (YCW) and Assistant Unit Managers in the ratio, and specifically excludes case managers and Unit Managers from these calculations. This reportedly provides

richer staff coverage than had been provided previously at Alexander. Interviews with G4S staff, facility administrators, and line staff and a review of a single day's staffing roster (June 8, 2007) suggested that, on paper, the housing units were staffed according to the targeted 1:8 ratio most of the time. Staff reported that, at times, the staffing level may fall out of ratio for short periods when a staff person was required to transport youth to another part of the campus but that Unit Managers and roving Security staff would provide additional coverage as needed.

However, there were numerous times throughout our visit when the 1:8 ratio was not maintained for longer periods of time. At approximately 1:30pm on a weekday, we toured the New Dorm and made several counts of youth and staff in order to pinpoint the ratio. Among the four pods, the following ratios were observed: 1:12, 1:10, and two pods with 1:9. A YCW was posted in each pod, and an additional YCW was reportedly taking a break, although relief coverage had not been provided. The Unit Manger was on the unit, but is not counted in the staff-youth ratio, per facility administrators.

At other times, the number of staff was sufficient to meet the 1:8 ratio, but staff did not appear to be properly deployed to maximize their ability to supervise the youth and to intervene at the first sign of tension. During outdoor recreation one afternoon, approximately 35 youth were observed playing basketball, loading into a van, or sitting in groups in the same general area. Although there were sufficient numbers of staff in the area, they were not well deployed. Several staff members were huddled together in a group leaving large numbers of youth relatively unsupervised. During this recreation period a fight between two youth erupted in the van parked near the basketball court. Staff responded to intervene but better deployment of staff in the first place could have prevented the fight from occurring.

Similarly, while the 1:8 ratio may be achieved much of the time, a lack of quality or proactive supervision by assigned staff provides opportunities for youth to harm each other. For example, nighttime staffing in the Girls' Dorm frequently consists of three staff and 19 girls. Although this would fall within the 1:8 ratio, the quality of supervision by staff was questionable. Several girls reported that numerous incidents had occurred in their unit during the previous few weeks. One such incident occurring only days before our tour allegedly involved a fight among two girls that started in the gym and continued later in the unit. One or more girls began "popping [i.e. opening]" the doors of other girls' cells as they passed while being escorted to the bathroom. This resulted in many girls being out of their cells at once, escalating the fight into a multi-youth disturbance. According to youth, security was called and several girls were restrained before order was restored in the unit. This incident, and others like it, could be prevented by better de-escalation techniques and other efforts to reduce non-compliant behaviors among the youth.

Many youth stated that they feared for their safety and worried about being "jumped" by other youth. These concerns were clearly evident in a review of the Grievances from March, April and May 2007. In just one two-week period in May 2007, the following issues were brought separately to the attention of the grievance officer:

- "[Youth] hit me..."
- "[Youth] threatened me..."
- "[Youth] punched me in the stomach..."
- "[Youth] hit me in the jaw...staff didn't see it."
- "[Youth] hit me..."
- "Keep [youth] away from me..."
- "Please change my unit. I'm scared..."

In the interviews, youth were particularly concerned for their safety in the school building (although outdoor recreation areas and the gymnasium were also mentioned) given that classroom supervision often consists of one teacher and one YCW.[2] In the minds of some youth this staffing pattern creates opportunities for more aggressive youth to strike out at others without detection. Further, youth reported that some staff turned a blind eye to activity that places them at risk of harm. This practice by staff can take several forms including responding in a less-than-immediate fashion to a physical altercation between youth. One girl reported that certain staff are known for their slow response to altercations. She stated that she had heard girls recently say they would wait until a particular member of the staff was working to retaliate against another girl because it was known that this member of the staff would respond slowly, allowing for the greatest amount of harm to be inflicted.

Meeting the 1:8 ratio during both waking and sleeping hours may be difficult at times because of the number of vacant YCW positions. When G4S assumed operational control of the facility, there were approximately 50 vacancies. The number of current vacant YCW positions is approximately 27, which requires a significant number of staff to work overtime. G4S staff reported the facility pays approximately 2,000 to 3,000 hours of overtime (per month) to staff in order to meet the 1:8 ratio. Staff report that working overtime can be tiresome, but provides needed supplementary income.

Meeting the targeted 1:8 ratio is particularly difficult when individual staff are assigned to protect the safety of individual youth, such as those on extreme suicide precautions or those with special needs. For example, one youth who has been at Alexander nearly one year has a full scale IQ of 47 and requires close supervision and specific instructions. Several other youth experience incontinence or enuresis. One

[2] We did not observe the school in operation as we arrived and toured the facility during the school's summer break.

such youth reported being constantly taunted, teased, spit on and hit by youth, largely as a result of his occasional "accidents." To help manage this situation, this youth was assigned a one-on-one staff person throughout much of the day. While this may have helped to protect that individual youth, it appeared that the staff person assigned as the one-on-one was drawn from the existing staff compliment on the unit rather than being specifically assigned to augment the unit staff. The deployment of regularly scheduled staff to one-on-one supervision duties clearly reduces the staffing ratio and makes it difficult to properly supervise the other youth on the housing unit.

- ***Recommendation***. The precise number of staff needed to conform to generally accepted practice will vary depending on the facility's population and the physical plant of each housing unit.
  1. Conduct a post analysis to identify the precise number of staff needed. Calculate a relief factor that compensates for staff illness, training, vacation, temporary "non-contact" assignments, 1x1 suicide precaution or other safety plan duties, etc.
  2. Allocate sufficient numbers of Youth Care Worker positions so all housing units can conform to the accepted 1:8 ratio at all times. When youth movement or staff breaks require altering the staff ratio, provide continuous support from Unit Managers or security staff until the regularly assigned staff person returns to his or her post.

## Staff Training

Staff in juvenile correctional settings need to be trained in behavior management, de-escalation and the use of force to develop their skills in diffusing tensions among youth and in intervening safely in situations that escalate to physical violence. The generally accepted practice is for these topics to be a central feature of pre-service training, generally lasting between 80 and 120 hours, and to comprise a large portion of a standard 40-hour annual training curriculum. On-going training is essential for staff to refresh their skills and knowledge in de-escalating tensions among youth and to develop confidence in using a variety of physical restraint techniques when needed.

- ***Observations***. When G4S assumed operational control of Alexander, all existing Cornell employees were reportedly screened to assess their qualifications for hire by G4S. Each staff person reportedly underwent a criminal background check and a drug test. Each personnel file was reviewed, and each needed to be recommended for hire by both Cornell and DYS. Facility administrators reported that those who passed this initial screening were required to complete a Transition Training, which was planned as a 40-hour curriculum. This training reportedly reviewed several "emergency issues," and required all employees to sign a form indicating that they

would abide by the following rules: a) not taking aggressive or combative youth into offices or other areas that are out of view of surveillance cameras; b) immediately notifying Master Control when a potentially hostile situation is developing; c) committing to using the least restrictive means necessary to de-escalate and control potentially volatile situations; d) reporting all incidents of physical intervention on an incident report. Finally, the transition training reportedly included information on a variety of G4S policies and procedures, including wearing uniforms, clocking in/out, ensuring perimeter security, and serving food. It is worth noting that during the course of our tour, we became aware of several situations in which staff had violated one of the "emergency issues" that were reportedly covered during G4S' early tenure. For example, DRC recently investigated a case in which a youth was deliberately pulled into a staff office—where there is no security camera coverage—during the course of a restraint. As will be discussed in more detail, the analysis of incident reports did not reveal a commitment among some staff to use the least amount of force necessary to de-escalate a situation—instead, many youth are taken to a prone position for behavior describe as "disobedient" or "refusing to comply with directives." This appears to underscore the challenge faced by both DYS and Alexander administrators as they attempt to change a culture of force that has existed for many years and is common in large, secure correctional settings.

A roster of current employees was provided by the State. This roster included 79 full-time Youth Care Workers. Training records were supplied for a sample of these employees (those with employee numbers ending in 3, 6, or 9). Of the 79 YCWs, training records were received for 69 YCWs. A total of 27 of these staff had worked under the Cornell administration and had been re-hired by G4S. Approximately 30% received the entire employee orientation program shortly after G4S assumed control of the facility and 7% received re-certification training in Safe Crisis Management (SCM) and First Aid. However, <u>63% of former Cornell staff did not receive any additional training beyond a few hours of staff meetings or campus-wide meetings</u>. This is particularly troubling given the volume of mistreatment and abuse allegations that emerged during Cornell's tenure.

These data paint quite a different picture than what was presented by the Facility Administrators, and suggest that the majority of former Cornell employees did not receive training on the new philosophies, procedures, and practices put forward by G4S. This is particularly unfortunate given the obvious staff training deficiencies of Cornell. Ensuring that ALL staff have the opportunity to develop new skills, become familiar with new procedures, and to put these into practice is the only way to ensure that the quality of care at the facility improves.

The roster of 79 full-time Youth Care Workers also included 42 staff who were hired since G4S assumed control of Alexander. Approximately 90% of these staff received new employee Orientation training on or before their hire date. The remaining 10

percent (n=5 staff) either received the training at some point after their hire date, or did not receive the full complement of training.

The training materials assembled by G4S reinforce the concepts that force is to be used as a last resort, residents are to be treated with dignity and respect, and grounds a variety of behavior management skills in theoretical perceptions of adolescent development. While the topics appear to be comprehensive, the training curriculum totals only 40-hours, which is well short of contemporary standards of 80 to 120 hours of new employee training.

Facility administrators indicated their intent to switch from SCM to Handle With Care (HWC; another widely used use of force training curriculum) in mid-June 2007. Neither SCM nor HWC training currently includes a competency-based assessment of staff skill and knowledge in using the approved techniques. Finally, the suicide prevention component of the training does not currently include instruction on how to intervene in a situation where a youth is hanging by the neck (e.g., relieving pressure on the neck, using a cutdown tool, etc.). In fact, the suicide component of the training appears to only require 30 minutes to administer (based on the training records provided), suggesting that it lacks depth and detail.

All staff will reportedly receive additional training in the HWC curriculum over the coming months. Administrators report that a total of 12 HWC instructors have been certified at the facility. Training on an array of special topics has also been developed, among them, incident report writing, working with sex offenders, and gender-specific training for working with girls. Although not yet developed, G4S reports its intention to train staff in Motivational Interviewing. G4S plans to implement a 24-hour annual refresher training course, but has yet to do so. Contemporary standards suggest that at least 40 hours of refresher training should be provided on an annual basis. None of the aforementioned trainings had been scheduled at the time of our tour. It is important to note that the many well-intended plans described by G4S administrators to train staff, develop operational policies and provide generally improved oversight of operations at Alexander would be ambitious under the very best of circumstances. Achieving the stated objectives with a staff consisting largely of hold-overs from a terminated contractor will make attaining these goals all the more challenging. Further complicating the task for G4S is the constant pressure caused by a steady influx of low-risk/high-needs youth.

All staff interviewed reported that they had received training either when they transitioned from Cornell to G4S employees, or as new G4S employees. All staff commented on the "culture change" at the facility since G4S assumed control. Most characterized this shift as the administration "looking out more for the kids," whether by providing them with additional incentives for good behavior, attending more closely to the needs of the girls, or the administrators' willingness to talk directly with the youth. Most also commented that G4S was committed to reducing

the frequency with which staff used physical restraints, reserving them as a response of "last resort." all staff commented that using force was "much less acceptable" under the G4S administration than it had been under Cornell. G4S staff reported that the frequency of youth being "taken to the floor" had decreased significantly since they assumed control of the facility. In May 2006, there were 131 instances of take downs recorded in incident reports, compared to only 18 take downs recorded in May, 2007 (these data were not independently verified). Many staff felt this was a positive development, believing that proactive supervision and de-escalation skills could effectively control the vast majority of situations that arise at Alexander. However, the extent to which staff have been trained in alternative means of responding to incidents is questionable given the small proportion of staff that has been fully retrained since G4S assumed control.

Staff descriptions of G4S' training suggested that it focused on techniques for de-escalating conflicts among youth and ways to prevent the need for physical force to be used. Several staff commented that they were hesitant to intervene in fights, not because of a lack of confidence in their own skills, but because they perceived that the staff were "never believed" if a youth made a child abuse allegation and they feared the loss of their jobs. While the fact that staff are cognizant of the consequences of alleged abuse and their perceptions that G4S takes these allegations very seriously are both very positive indicators of G4S' commitment to protect youth from harm. It is also true, however, that staff must have confidence to intervene when needed and must not be timid when an altercation occurs.

- ***Recommendations***.
  1. Align Orientation Training with contemporary standards of care (e.g., require 80 to 120 hours; include intensive training on Suicide Prevention, Child Abuse Reporting, and the Use of Force, among other topics).
  2. Use real-world scenarios in physical restraint training so that staff develop confidence in their ability to intervene effectively and their knowledge of what is permissible. Rather than requiring staff to restrain a willing co-worker, some jurisdictions invite youth to assist with training and direct them to resist.
  3. Incorporate a measure of skill-based assessment to certify that staff can execute techniques properly.
  4. Continue to require at least 40 hours of On the Job Training in which new staff are paired with veteran staff, shadowing them throughout the day until they are ready to supervise youth independently.
  5. Require all staff to participate in 40 hours of training annually so they can refresh their skills.

## Programming.

The frequency of misbehavior and violence is reduced when youth are engaged in structured activities throughout the day. Not only can such activities help to prevent tensions from brewing and youth from colluding with each other, but they can also contribute to the process of discharge planning by connecting relevant programming to real world experiences in the communities to which youth will return. During the weekdays, youth should be engaged in a full day of academic instruction, and should have the opportunity to participate in a variety of programs after school. Like those that could be held on weekend days, these can be facilitated by volunteers or direct care staff and should be focused on helping youth to accomplish developmental tasks and to address their criminogenic needs. Generally accepted practices also dictate that youth should be engaged in large muscle activity for one hour on weekdays and two hours each weekend day.

- ***Observations,*** With the exceptions of school and recreation, programming is limited for most youth at Alexander. Alexander is intended to serve as a intake/assessment center for many youth, and thus the original planning for the facility was to defer access to treatment programming to the subsequent placement. Regrettably, however, youth frequently become stuck in the Intake status, often because service providers are not willing to work with the youth. These youth are often left to complete their commitments at Alexander with minimal programming. Fifty-seven of the youth at Alexander on the first day of our tour were designated as Intake status, seven of whom had been in Intake status since March 2007 or before.

  Although required by a Consent Agreement with the U.S. Department of Justice to operate a vocational program, none was in place at the time of our tour. We were informed by school officials at Alexander that the fledgling vocational program came to an abrupt halt when the instructor died in January 2007. We are also aware of serious and long-standing inadequacies in the special education program at Alexander and reviewed findings by the Arkansas Department of Education stemming from its April 3 and 4, 2007 monitoring visit to Alexander.

  One programmatic bright spot at Alexander is the Boys and Girls Clubs program that provides physical education for all Alexander youth during the school day and an after school program consisting of art, music, independent living skills and job readiness components. Youth from all housing units at Alexander have daily access for one hour to the after school program on a staggered schedule. The Boys and Girls Club is also in the final year of a multi-year Intensive Aftercare Program grant which provides targeted reentry services to youth from Pulaski and Saline Counties. These reentry services have shown promise in reducing recidivism in part by working closely with youth and their families to reenroll youth in schools, and by assisting

with employment and other needed services. Youth are seen face-to-face at least three times weekly during their first 90 days post discharge.

- ***Recommendations.*** Investments in structured programming will likely result in reduced tensions and fewer fights among youth, and therefore will provide greater protection from harm.
  1. Combine a discharge planning component into all programming designed to make sure the skills being taught have applicability in the home communities of youth. This would include establishing connections in home communities of youth that can both hasten and provide programmatic continuity upon discharge.
  2. Ensure that all youth, including those in disciplinary isolation, attend school for a full day each weekday.
  3. Expand high-interest, developmentally-appropriate programming to be delivered in the evenings and on weekends.
  4. Provide all youth, including those in disciplinary isolation, with at least one hour of large muscle activity on weekdays and two hours on weekend days.

## Incident Reporting.

Juvenile correctional facilities need a process for reporting all fights between youth, youth assaults on staff, attempted escapes, suicide gestures, and other situations in which the youth's safety or the facility's security is at risk. The generally accepted practice is for these reports to include a detailed narrative account of the incident, statements from the youth involved and from others who witnessed the incident, statements from all staff involved, and a meaningful supervisory review that assesses the extent to which standard policies and procedures were followed. The reports should be reviewed in a meaningful way—that is, there is little point in requiring staff to document incidents if the information is not used for any purpose. At the very least, they should be reviewed for patterns across youth (to identify on-going tensions, programmatic gaps, youth who may need additional attention from mental health staff, youth who may need additional protection or a different housing assignment) as well as training opportunities for staff (in de-escalation, staying on post, proper use of force techniques, etc.). A more sophisticated use for these reports is to identify hotspots within the facility—times, places and situations that seem to provide opportunities for fights, escape, contraband—so that the environment can be manipulated strategically.

- ***Observations.***

  Facility administrators described the process for completing and reviewing incident reports. While some identifying information on the youth, staff, time and place is required at the top of the incident report form, the bulk of the form provides for an

unstructured narrative account of the incident. Certain critical incidents are required to be reported within an hour, but most are to be reported by the end of the shift. The Shift Supervisor is responsible for assembling the incident report packet, but facility administrators said the supervisor is not expected to critique the staff's handling of the incident. This contradicts what is stated on the form itself, which asks specifically for shift supervisors to comment on how the incident could have been prevented or anticipated by staff. While G4S intends to require that all staff present complete a witness statement, this was not Cornell's policy, has not yet been required by G4S and it was not made clear when this requirement might take effect. All incident reports reportedly include a "Marks Sheet" that is completed by trained medical staff.[3] By the end of each shift, all incident reports should be faxed to staff in DYS's Internal Affairs Unit. The facility's Management Team reportedly reviews each incident from the prior day at their morning meeting. References to specific incidents and to the practice of daily incident report review were made by most of the Assistant Facility Administrators and Unit Managers, suggesting that this review does in fact occur on a routine basis. When questions arise about how a particular incident was handled, the facility-based investigator (discussed in more depth later in this report), cues up the video footage and reviews the incident. We were also told that if indicated, constructive discussions are held with staff about how they could have prevented the incident, or formal investigations of misconduct, policy violations, or abuse are initiated at that point.

All YCWs interviewed were aware of their responsibility to complete an incident report following a youth-on-youth assault, attempted escape, assault on staff or other serious incident. However, this practice appears to extend only to incidents that are actually observed by staff. When asked how they would document a youth's report that he or she had been assaulted outside the view of staff, most responded that they would only make a notation in the unit log book, but would not complete an incident report (others responded that they would only question the youth involved, but would not document the allegation in writing at all). A sound incident reporting process would require documenting ALL instances, whether observed or reported, of youth-on-youth assault. The failure to recognize the importance of reporting an incident like the one presented is of concern and suggests that facility administrators may only receive documentation on a relatively small subset of incidents occurring in the facility.

We reviewed redacted copies of approximately 450 incident reports from January 21, 2007 through April 28, 2007. This review was not intended as an exhaustive review of the volume of incidents occurring at the facility, but rather as an assessment of the quality of the incident reporting process and its ability to identify

[3] A "Marks Sheet" is a standardized form that is used to identify and describe injuries. It includes an outline of a body on which staff are to identify the specific location of injuries, along with space for a narrative description of the injury.

and respond to issues that compromise youth's safety. A sub-sample of 80 reports (approximately 18%) was randomly chosen for more in-depth analysis. This analysis revealed several troubling inadequacies:

- In many situations, the amount of force used appeared excessive as youth were taken to the floor in response to rather minor rule violations (e.g., cussing or failing to comply with staff directives). These incidents suggest that staff are not working their way through the continuum, beginning with verbal commands, increasing staff presence, and attempting to encourage compliance using less restrictive means (e.g., escort, upper torso) before taking the youth to the floor. While some youth will continue to be non-compliant, in the absence of aggression or a clear threat of harm, non-physical means should be exhausted first, and then less restrictive physical means should be employed. Staff should recognize the fact that laying their hands on an agitated youth can escalate the situation, *causing* a more extreme use of force, in a situation where less invasive means could have ended the incident without physical restraint being needed.

- None of the incident reports provided youth witness statements from the youth involved in the incident or those who observed it. This is particularly problematic in a facility with a history of unprofessional and abusive treatment by staff as these statements are one of the first indicators that the incident needs to be flagged for additional review. Youth should be provided with the opportunity to give their own accounts of the incident. The information provided is often useful to staff to identify ongoing conflicts among youth and also gives important clues for better handling of future incidents with that youth.

- Not all of the incident reports included witness statements from all staff who were present. Among those that were included, many suffered from a lack of detail that prevents a clear understanding of how the incident occurred and the staff's response to it. Staff should be asked to describe the youths' behavior, their own role in the incident, and what they observed other staff doing during the incident. Each staff person should also clearly state where they were posted and how many youth they were supervising, so that staff deployment can be evaluated.

- While nearly all staff identified a specific SCM physical restraint technique (e.g., hook and carry, upper torso, etc.), they did not provide sufficiently detailed descriptions of how the technique was executed (e.g. which arm they were holding, where other staff were positioned, whether the youth struggled against the restraint or complied). In addition, many staff placed the youth in a prone position on the floor, and it is not clear from the narrative whether they properly balanced their own weight so as to ensure

that they were not placing pressure on the youth's torso. These details are essential in situations where injuries occur or youth allege abuse.

- A significant number of incident reports did not include Marks Sheets for all youth who were involved in the incident, suggesting that they did not receive medical attention after their involvement in an altercation or a restraint. Further, some of the Marks Sheets revealed significant delays (e.g., several hours) in the delivery of medical attention. Except during nighttime hours, medical treatment should be provided within an hour or less. In a few cases, the Marks Sheet was completed by staff, not by licensed medical practitioners.

- None of the incident reports evidenced a thoughtful review by a supervisor. Most of the incident reports were signed by a supervisor, but very few provided any comment. The few supervisory reviews that were completed did not discuss how the incident could have been prevented or anticipated (as required by the form and as required by contemporary standards of care), nor did they make any mention of the inadequacies present in the incident report packages themselves. For example, some of the staff witness statements were contradictory, yet the supervisor did not make any attempt to gain clarity.

These deficits limit the usefulness of the incident reporting process as a tool for protecting youth from harm. They do not provide the necessary details to critique the staff's execution of various physical restraint techniques or to account for the positioning and deployment of all staff in the area. They suggest that additional work is needed to ensure a commitment to using the least amount of force necessary to ensure that youth do not hurt themselves, staff or other youth. Using force is not about controlling the situation (i.e. making the youth do what the staff wants them to do)—it should be solely about protecting the youth and staff from harm. The G4S training materials subscribe to this idea, but the incident reports suggest that not all staff have adopted it as their own. Making the incident reporting process more useful toward this end will require more training and better oversight from shift supervisors who must learn to think critically about the incidents and to guide staff in the moment toward avenues that can at least anticipate, but hopefully prevent, subsequent incidents.

- ***Recommendations*.**
  1. Require staff to complete an incident report on ALL incidents of youth-on-youth violence, whether or not the incident was observed by staff or simply reported by youth involved.
  2. Develop key questions for staff response to ensure that all key information is included in the narrative, e.g., what precipitated the incident? How many staff were present and where were they posted? How many youth were present and what were they doing? What efforts were made to de-escalate the incident non-

verbally and verbally, prior to using physical force? If physical force was used, specifically, what did each staff do? How did the youth respond? What happened after staff gained control of the situation?

3. Require all staff to submit written witness statements. These should account for their own actions, as well as those of the youth and other staff.
4. Develop procedures for youth involved in or witnessing incidents to provide written statements.
5. Require shift supervisors or unit managers to critique each incident as to how staff might have been able to prevent its occurrence, how staff responded to youth's behavior, whether the situation was controlled using the least restrictive means possible, etc.
6. Utilize videotaped footage to verify that the incident occurred as described. This footage will also be useful in crafting prescriptions for how similar incidents could be prevented in the future.
7. Ensure that all youth involved in the incident receive prompt treatment by medical professionals and that the provision of treatment is documented in each report using a Marks Sheet.
8. In addition to reviewing individual reports, analyze the volume of incident reports to identify patterns among youth, staff, location, time of day, and circumstance that could be used in efforts to decrease the likelihood of similar incidents in the future. An analysis structure with this capability is reportedly used at other G4S facilities.

## Medical Attention.

Generally accepted standards dictate that ALL youth involved in incidents with the potential for harm (e.g., fights, suicide gestures or attempts, accidental injuries) should receive medical attention in a timely manner, usually interpreted to be within 2 hours of the incident. Even if youth report that they are not injured, they should be assessed by a nurse or other licensed medical professional. The receipt of medical attention should be documented in two ways—on the incident report itself (or via an attachment) and in a progress note in the youth's medical chart. The nurse should inquire about what happened, assess and treat any injuries sustained. Most jurisdictions also require the nurse to photograph any injuries sustained, particularly in situations in which the youth alleges mistreatment by staff.

- ***Observations***. Facility administrators and nursing staff reported that all youth are required to be assessed by medical staff following their involvement in an incident that involves an altercation or restraint. These assessments are documented on a "Mark Sheet" which is attached to each incident report (by giving it to the accompanying direct care staff before the youth leaves the clinic), with a copy placed in the youth's medical file. One of the first operational changes made once

Alexander came under G4S control was to require the "Mark Sheet" to be completed by licensed medical staff (under Cornell, direct care staff were permitted to make assessments and decisions pertaining to the medical condition of youth). All YCWs interviewed referenced the completion of the "Mark Sheet" as one of the steps involved in the incident reporting process.

The Marks Sheets attached to the incident reports provided by DYS revealed that medical treatment was provided promptly to some, but not all, youth involved in altercations or restraints. Among the 80 incident reports analyzed, some did not include a Marks Sheet for all youth involved, some evidenced a significant delay in the provision of medical treatment, and some of the Marks Sheets were completed by non-medical staff. None of the incident reports indicated that photographs of injuries were taken, which is contrary to contemporary standards of care. Prompt medical treatment following an incident or restraint is essential to limiting the harm sustained by youth involved in these situations. In situations were abuse or mistreatment is alleged, an assessment of injury by medical personnel is essential. Thus, it is essential that treatment is provided to ALL youth who are involved.

- ***Recommendations***.
  1. Ensure that all youth receive prompt medical attention following their involvement in a critical incident, whether or not they report being injured.
  2. Photograph all injuries sustained. In situations where mistreatment by staff is alleged, photograph the areas in which the youth reports injury, even if no injury is visible.
  3. Document the delivery of medical treatment on the incident report itself.
  4. Document the delivery of medical treatment in the youth's medical file, to ensure that medical staff's subsequent contacts with youth are fully informed of the youth's history.

## Behavior Management.

Adolescents exhibit a range of nuisance behaviors that, while annoying to staff, do not pose an immediate threat to the safety and security of the facility, staff or other youth. In addition, youth sometimes engage in more serious behaviors (e.g., assault, attempted escape, etc.) that require a firm and predictable response. Disciplinary isolation, considered by some an appropriate response to certain serious behaviors, is never an appropriate response to nuisance behavior. A behavior management system (BMS) that rewards youth for positive behavior and penalizes youth for non-compliance or negative behavior can be a key tool to protect youth from harm, if it is properly designed and implemented. The range of incentives should be meaningful to youth; should affect a large proportion, if not all, of the youth; and should be frequently available. The range of consequences should be proportional to the severity of the behavior, should be clearly articulated, and should be consistently and fairly applied by staff. The BMS

should be used in all sectors of the facility—in the housing units, in school, in the dining hall, and during programming and should be effective on both weekdays and weekends.

- ***Observations***. The basic behavior management program at Alexander is conceptualized as a levels system where youth accumulate points and advance to different levels with progressively more privileges.
  The housing units use different labels for the levels (Learner, Practicing, Role Model; Pride, Gold Star, Show; Pearls, Dolls, Princess) and award differing numbers of points per day, but the concept remains the same. Youth begin the day with a maximum number of points, and points are deducted by teachers, YCWs and others in response to negative behavior and rule violations. Points are used only to advance from one level to the next, and cannot be used to purchase rewards. Privileges associated with the level vary across housing units, but are very limited in scope in all instances. Staff described the higher levels receiving progressively more TV time, recreation time, or later bedtimes, but that the behavior management program was otherwise limited in what it could provide to youth to encourage positive behavior. Recently, Saturday Activities were reportedly implemented for those who had achieved Role Model status, but the details of this program are not known.

  Administrators at Alexander acknowledged that the behavior management system varies in its application from unit to unit, and lacks consistency among staff. Youth do not have any way to "earn" points based on performance, but can only "lose" points based on misbehavior. Such a design obviously lacks an incentive for youth to perform well. If, for instance, a youth looses a significant number of points early in the day, there is no incentive for them to improve their behavior in the remainder of the day in the hope of earning back lost points. All staff commented that the scope of both sanctions and rewards available through the current program were not sufficient to encourage positive behavior and to discourage negative behavior. Youth were aware of the behavior management system and could, in virtually all cases, identify their level. According to most youth, however, the system lacks meaningful rewards to be a factor in motivating good behavior. Many youth were unable to describe the difference between the first two levels, believing that the two levels share identical privileges.

  Several staff were concerned that the level system unintentionally reinforced negative behavior by providing one-to-one attention to youth who misbehave and by excusing them from school if they acted out during the school day. For many youth who struggle in the classroom, their objective in acting out in the classroom is exactly this—to leave the environment that challenges them and to receive individual attention from staff. Staff noted that youth who were meeting expectations were rarely given individual staff attention as a reward, even though most staff felt this would be a compelling incentive for youth to behave. Two staff indicated that when they tried to restrict non-compliant youths' access to recreational programming (e.g., movies or special events), they did not have

sufficient staff to hold the youth in their rooms and ended up simply allowing the youth to participate with the others.

The variety of sanctions available is extremely limited, as the youth's level is dropped in response to nearly every instance of misbehavior. Youth reported that in response to most misbehavior, a "long form" is completed by the case manager that in the extreme could result in added custody time, but often does not result in a tangible sanction. More serious behaviors also include a period of room restriction (discussed in the next section). None of the youth or staff reported the use of any other type of sanctions—writing an essay, writing a letter of apology, tutoring a peer, campus beautification project, etc.—relying only on the loss of privileges associated with one's level. The problem with this practice is that for some youth, the rewards and sanctions available through the levels system are not particularly meaningful and do not serve as effective incentives for positive behavior. In response to major rule violations, youth are placed on MCV (major community violation status), which has relatively few privileges associated with it.

Facility administrators reported their intention to move away from the point/level system and to one that responds to misbehavior in a more interactive fashion. In other words, when a youth commits a rule violation, the youth and staff will engage in a conversation to determine the appropriate sanction. This process should result in a far more individualized system that could account for the broad range of cognitive abilities among Alexander youth. Further, it can be tied more clearly to programming, treatment and discharge planning goals and thus could become a coherent part of G4S' rehabilitative mission. However, this shift was only in the very early planning phase and has yet to be fully designed. There is currently no projected date by which implementation is anticipated at Alexander.

- ***Recommendations***. Fortifying the behavior management system may lead to a reduction in the number of youth-on-youth assaults and the number of youth who fear for their safety. Program enhancements should include efforts to:
  1. Redesign the program to provide a richer and more meaningful array of rewards and sanctions to encourage positive behavior. Every effort should be made to integrate individual youth's treatment and discharge goals in the behavior management program, thereby creating meaningful incentives for achievement.
  2. Train staff to apply the system properly and consistently. Not only should training include real-world scenarios for staff decision-making, but also should help staff to utilize the system in a strength-based manner (e.g., encouraging good behavior rather than constantly threatening sanctions for negative behavior).
  3. Develop a range of incentives that can be purchased as part of a token economy with earned points. Engage youth in designing the list of items and their cost, to ensure the array is seen as both valuable and worthwhile.

## Isolation.

Considerable debate exists within the juvenile justice community as to the appropriate use of isolation. Generally accepted practice is to view isolation within a juvenile correctional facility as a tool to be used sparingly to de-escalate youth who are violent, out of control, and who represent an immediate threat to the safety of youth and staff and the security of the facility. If the purpose of de-escalation is to be served, youth must be placed in a separate environment so that they can regain control, calm down and work through some of the issues that sparked the violent behavior. This type of isolation is used only when youth are agitated—after a fight or after an intense verbal altercation with staff—and should be short-term. Most youth will calm down within a couple of hours, and some even sooner. The length of stay depends entirely on the youth—how quickly they regain control, and whether they are willing to commit to letting the issue pass. However, ensuring the length of stay is commensurate with the youth's demeanor also depends on the frequency and intensity of staff interaction with the youth. Staff should visit the youth frequently and should attempt to engage them in conversation and to counsel them to prepare for return to the general population.

Increasing numbers of jurisdictions have ceased to use isolation as a punitive sanction. Effective sanctions used in other jurisdictions include point reductions, community service, writing assignments, apology letters, losing the privilege of attending a social event, among others. Time in isolation does little to change the underlying causes of the troublesome behavior. If youth are put in isolation for swearing or being generally annoying to staff, they are not being taught to express themselves appropriately and will likely emerge from isolation even more frustrated. Fewer and fewer jurisdictions look to isolation as punishment but rely instead on sanctions that more directly address the underlying causes of the behavior. It is certainly more in line with best practice to limit the use of isolation to those situations in which the youth presents an immediate risk of harm to himself, staff, or other youth, and thus must be held in isolation until he is calm and this risk has subsided.

- ***Observations***. Although G4S and facility administrators indicated their desire to alter the Alexander's isolation practices no clear date exists by which intended modifications are to be implemented. Current practices suggest that isolation is used at Alexander in a manner that is inconsistent with contemporary standards of care. YCWs reported that isolation (also called room restriction, social separation or social isolation) was commonplace under Cornell but has become less pervasive since G4S assumed operational control. Although possibly used less frequently, there was a striking lack of consistency across staff in response to questions about when the use of isolation is authorized, procedures for placing a youth in isolation, and the documentation that must accompany its use. These varied and inconsistent responses from staff suggest that isolation is imposed arbitrarily and without the

procedures normally required to protect youth's due process rights and to ensure their safety during the period in which they are confined to their rooms.

Administrators stated that they are in the process of modifying their use of isolation, moving to a "Controlled Observation" approach to room confinement intended not to exceed 24 hours and to involve frequent interviews by staff with youth confined to their rooms to gauge their mood and ability to return safely to the general population. Administrators stated that visual checks of youth on room confinement are to be conducted every 15 minutes and documented in the unit log. They noted, however, that 15 minute checks and documentation is the "expectation" and they are aware that this practice is not being adhered to uniformly by all staff. They also noted that youth are to be released from room confinement as soon a youth has calmed down and can safely function on the unit; and that room confinement is not to be used as a form of punishment. This too, however, was noted by administrators to be an area where they know deviation occurs. Administrators at Alexander acknowledge the importance of proper and sufficient training for staff in this area. At the time of our tour, however, no dates had been fixed by which the needed training would be initiated or completed.

In practice, we saw examples where isolation was used as punishment without any of the necessary procedures to ensure the youths' safety and welfare, or to protect their due process rights. One of DRC's clients who reported that she had been on "social separation" for two weeks was used as a case study to obtain a snapshot of the facility's practices surrounding the use of isolation. From February 21, 2007 through approximately March 4, 2007, frequent entries were noted in the Girls Unit Log indicating that the youth in question had been confined to her room for extended periods of time. Documentation was not sufficient to ascertain the reason for this confinement, who authorized it, or whether it was implemented throughout the entire period above or whether the youth was released to the general population at certain periods. Facility administrators searched the incident report files for this information, but to no avail. Whatever caused the youth's lock-down status had not been reported through the required channels. Further, contrary to facility policy (as reported by facility administrators) which requires safety/welfare checks of all youth confined to their rooms at 15-minute intervals, documentation of these checks in the log book were sporadic, at best. Many times, an entry was made indicating that the youth was on the unit (e.g., "1Youth, 1Staff on unit") but additional entries were not made to verify the youth's well-being.

In addition to placing youth in room confinement for extended periods without the standard precautions to ensure fairness, safety and the protection of their due process rights, Alexander staff also reportedly utilize group punishment, which is incompatible with contemporary standards of care. The majority of youth interviewed reported that they are frequently punished in mass for the behavior of one or two youth on the unit. Youth from all housing units provided many examples

of this practice. Several girls mentioned one girl in particular whose misbehavior is frequently the cause of group punishment. Boys from various units also mentioned the names of one or two youth whose misbehavior resulted in blanket forms of punishment for all. These challenging and often deeply troubled youth commonly become the targets of retaliation for their actions by others on their units, placing them at high risk of harm by other youth.

- ***Recommendations***.
  1. Develop procedures strictly limiting the use of isolation as a method for de-escalating youth behavior and helping them to regain control.
     - Identify the circumstances under which isolation is permitted (but not required), such as immediately after a fight with another youth, after attempting to assault or assaulting a staff member, after attempting to escape, etc.
     - Identify the frequency with which Youth Care Workers or Supervisors must meet with the youth (e.g., every 2 hours) and the types of questions to be asked to assess the youth's readiness to return to the general population. Require supervisors to document the reason for continuing isolation (e.g., making threats, history of continued aggression upon release, etc.).
     - Require staff to make frequent welfare checks of the youth while confined (e.g. at random intervals, no less than 6 per hour) and to document these observations on an Observation Form. Maintain these documents in an organized fashion so they may be audited to verify that policies have been properly implemented.
  2. Develop written policies delineating minor and major rule violations and the authorized sanctions for each type of infraction.
     - Develop a range of creative sanctions for violations that do not warrant confinement.
     - Ensure that sanctions are proportional and germane to the nature of the offense itself; and
     - Grant youth the right to appeal the sanction to the Facility Administrator or designee.

## Classification.

One of the key challenges in safely managing a large juvenile correctional facility such as Alexander is the diversity of offenders in the general population. Given the large number of very low-risk offenders that fill Alexander, limiting their exposure to more sophisticated delinquent youth is extremely difficult. Youth at Alexander charged with status offenses and probation violations are housed along with those accused of very serious violent crimes. Youth of all different ages, sizes, and levels of sophistication and

maturity are housed in close proximity, creating a risk of harm to those who are more vulnerable. There are few places where deviant youth are more tightly concentrated than in a correctional facility, and Alexander is certainly no exception. As discussed in the first section of this report, "external" classification systems use a set of empirically derived factors to identify the specific level of supervision that is needed by a particular youth, based on his or her risk of recidivism. Within correctional facilities, a different type of classification system is needed. "Internal" classification instruments distinguish potentially predatory youth from those who could be easily victimized, leading to housing assignments that prevent contact between these two groups and suggests supervision strategies to diminish the risks involved. An internal classification instrument is composed of a variety of factors such as the youth's committing offense, age, size, maturity, and prior involvement in institutional misconduct to determine the appropriate classification level and housing strategy. High quality instruments are used throughout the country, but all should be locally validated to ensure they will lead to accurate decisions within a new setting, before being adopted. Without a local validation, a jurisdiction risks implementing a system that could actually *create harm* (by housing inappropriate types of offenders together) rather than mitigate it.

- ***Observations***. Alexander does not use any type of objective internal classification instrument. The housing units were characterized as follows:
    - Dorm 1: sex offender unit; 18 single cells
    - New Dorm: older boys, general population; 48 beds in open dormitory setting (four 12-bed pods)
    - Boys Intake: intake unit, younger boys; 18 single cells
    - Girls Intake: sole housing unit for girls; 12 rooms that can be double/triple/quadruple bunked
    - House of Hope: sanction unit; 15 single cells
    - JUMP: sanction unit; 24 single cells (3 6-bed pods)

  Most of the DYS and G4S administrators commented that Alexander was not being used as originally intended. The facility is designed as an Intake and Assessment center, intended to admit boys and girls once committed to DYS custody, complete a 30- to 45- day assessment process, and transfer the youth to an appropriate placement. While this quick turn-around reportedly does occur for a small segment of youth, the population includes many youth for whom suitable placements cannot be located (e.g., those who are developmentally disabled; those with significant cognitive deficits; those who have failed at prior non-secure placements). These youth often languish at Alexander for months, sometimes years, even though Alexander was not intended as a long-term placement. Further, the sex offender programs are located at Alexander which suggests at least some intention to provide ongoing programming. This heterogeneous youth population presents a significant challenge for housing decisions. While the Alexander is large and has multiple housing units, most are

somewhat specialized, leaving very little flexibility in terms of bed assignments. For example, one girl reported a scenario that perfectly illustrates this point: she was concerned for her safety because one of the girls in her four-person room had made unwanted sexual advances toward her. She wanted to be moved to a different room, but could not because the combination of offenses (sex offenders must be housed in a single room), medical needs (girls with injuries, weight problems, and other chronic conditions that required their assignment to a lower bunk), and alliances/tension among the other girls left very few choices within the single housing unit for females.

The threat of unwanted sexual advances or of having to witness consensual sexual activity among roommates was a common complaint among the youth interviewed. When questioned about the issue, staff appeared to be at a loss for effective strategies to combat the behavior, stating that it occurs at night when youth are in their rooms/on their bunks (and not as well supervised as during the day), and that they are very limited in their ability to re-assign beds in response to these complaints. A more structured and strategic housing assignment process could provide staff with additional tools to manage this behavior more effectively.

The dormitory setting of New Dorm also presents a security challenge. While particularly vulnerable or predatory youth could be shuffled among the four pods, there are few options for boys to be housed separately, unless they are sex offenders or have some sort of disciplinary issue taking them to House of Hope or JUMP. Particularly in the dormitory setting, youth of all different sizes, levels of maturity, and histories are all housed together, with no formal distinction between those who are potentially vulnerable and those who are potentially predatory. Bed assignments may be posted on individual doors or individual rooms, but no historical record of these assignments is kept, which limits the ability to adequately investigate allegations of inappropriate sexual contact or other forms of assault. The failure to use an objective process to assess each youth's potential for violence within Alexander and to house them accordingly creates a serious risk of youth-on-youth violence.

- ***Recommendations***.
  1. Develop/adopt and validate objective internal classification instruments to guide housing decisions. The validation should be conducted by qualified researchers who examine the statistical relationship between the items on the instrument and the youth's involvement in institutional misconduct.
  2. Classify all youth upon admission, and re-classify them after they have been housed at the facility for a specified period of time (e.g., 30 days) or after they have been involved in a major rule violation.
  3. Develop a housing plan that identifies the type of youth that may be placed in each room in each unit. For example, dormitory beds closest to the control

center should house those who are potentially aggressive and those who may need more intensive supervision (e.g., those on suicide precautions).

4. Maintain and audit housing assignment sheets to verify that classification procedures have been implemented as designed.

## *Measures Designed to Protect Youth from Self-Harm*

Adequate policies and procedures need to be established and implemented in all juvenile correctional settings to identify, supervise, and protect youth who indicate a risk of self-harm. Youth in correctional settings are known to be at higher risk of suicide than their counterparts in the community. In fact, young people with behavioral health problems who are confined in secure correctional settings tend to get worse, not better.

Youth in secure confinement express the risk of self harm in various ways and staff must be trained to identify and to respond to them in developmentally-appropriate ways. Their responses will vary somewhat with the individual needs of youth, but in general, will include a combination of enhanced supervision and mental health treatment to address the underlying issues. Adolescents who experience suicidal feelings typically do better when fully-integrated into normal program activities and when their positive relationships with others are sustained. The risk for suicide may be present upon admission and must be identified using a validated and developmentally-appropriate suicide risk assessment instrument. Because the risk for suicide may develop during the period of incarceration, staff must be trained to identify warning signs and to refer youth for assessment by qualified mental health professionals.

In general, all ideation, gestures, and attempts should trigger suicide precautions. Once the risk is identified, the generally accepted practice utilizes multiple levels of precautions with increasingly intensive levels of supervision. The welfare of those at lower risk is commonly assessed approximately every 15 minutes (and documented accordingly), while those at higher risk are assessed approximately every 5 or 10 minutes. Some youth may be placed under constant visual observation and/or one-to-one supervision if suicide is thought to be imminent. Observations should be made in a random and unpredictable fashion, not at predetermined intervals, commonly articulated as "check at random intervals, no less than 6 per hour." In addition to differences in the intensity of supervision, the levels of precautions also typically differ in terms of the required proximity of staff to youth (e.g., those at great risk must be within arm's length) and whether enhanced supervision is required during both waking and sleeping hours.

Typically, any staff person should be able to place a youth on suicide precautions, with the default being the most intensive level of supervision. Only a qualified mental health professional should reduce the level of precautions, and only in response to a clinical

risk assessment. Youth originally maintained on the highest levels of precautions should be gradually stepped down to lower levels of supervision before being taken off suicide precautions altogether. Finally, mental health professionals should provide direct care staff with specific instructions about any restrictions on activities or possessions that are needed to ensure the youth's safety. The youth's person and environment should be searched regularly to ensure the youth has not obtained any implements that could be used to harm himself.

- ***Observations.*** Clerical staff in charge of maintaining the suicide precaution documentation described a process that, by design, is compatible with contemporary standards of care. All ideation, gestures or attempts should be documented on an incident report, which is forwarded to the Unit Manager. The youth is automatically placed on 1x1 supervision and clothed in a blue uniform to enhance visibility, and the psychologist and unit therapist are immediately notified. The youth is assessed by a qualified mental health professional (QMHP; masters-level, licensed) within 24 hours. If the youth remains on precautions for longer than 24 hours, the youth is assessed by the psychiatrist. Two levels of precautions are available: *Close Observation* which features 15 minute safety checks by unit staff; and *Continuous Observation* which features 1x1 supervision within arm's-length, with behavioral ratings documented at 5 minute intervals. These observations are documented on a Precaution Tracking Form. A list of youth on suicide precautions is updated each morning and is circulated to a variety of facility staff (Facility Administrator, medical staff, psychologist, psychiatrist, and unit staff). These youth are also discussed each morning at the Management Team meeting. The list of youth on suicide precautions includes the youth's name, housing unit, date/time placed on precautions, date/time taken off precautions and includes warnings about any items that are prohibited to ensure the youth's safety. Again, our ability to verify adherence to the procedures described was limited to a relatively small number of DRC clients and therefore lacks what we consider to be a thorough audit of actual practice.

  As described by G4S officials, the policy includes most of the components of a sound suicide precaution strategy. However, confusion exists among staff about the supervision requirements of the two levels—most explained them somewhat differently and were uncertain about the differences between them. Staff also reported (and administrators confirmed) that emergency "cut-down" tools are not available at the facility and staff have not been trained to properly release a youth who is found hanging by the neck. For obvious reasons, this is a critical omission in training and one that could have dire consequences.

  The translation of policy into practice was assessed by reviewing a collection of suicide precaution forms for six DRC clients. Observation forms could not be located for three of the six youth, suggesting that they were either never completed or that document storage procedures need to be enhanced. Those that were located were

in large part complete, meaning that observations were documented throughout the period of time that precautions were indicated on the Suicide Precautions observation form.

However, in both policy and practice, the concept of conducting welfare checks at random intervals is absent. Staff record observations at exact 5- and 15- minute intervals, and are not required to record the actual time at which checks are conducted. Further, the observation forms that were provided were in complete disarray, suggesting that no formal auditing process occurs to ascertain the extent to which staff are fulfilling their supervision responsibilities.

Given the history of successful suicides by hanging at Alexander and the deeply troubled youth who make up part of the facility's population, consistent adherence to suicide prevention protocols is essential. The widely inconsistent patterns of practice among staff that emerged from our review are troubling, especially in light of the approximate 30 minutes devoted to administering suicide prevention training as determined by our review of training records.

- ***Recommendations***. Adequate policies and procedures must be designed to identify, respond to, and ultimately prevent attempts by youth to harm themselves. The following recommendations focus on the role of direct care staff, although mental health staff will play an essential role in the assessment and treatment of suicidality. Their role should be fully articulated and relevant training should be required as well.
  1. Continue to assess suicide risk upon admission. Ensure that youth who score in the warning range are placed on precautions and are promptly referred to and seen by a qualified mental health professional (QMHP).
  2. Develop and implement policies and procedures and secure the tools needed to intervene appropriately when a youth has hung him or herself. Ensure that all staff have quick and easy access to cut-down tools, yet control access to them so they cannot be used as a weapon by other youth.
  3. Incorporate the concept of observation at random intervals into policy and practice.
  4. Include the issues listed above in the curriculum for mandatory pre-service and annual staff training.
  5. Maintain all risk assessments and observation forms in a manner that will permit a regular audit of these documents to verify that policies and procedures are being followed. Streamline the document maintenance procedures to ensure that the majority of documents are stored in a central location so they can be audited most easily.

## *Measures Designed to Protect Youth From Harm by Staff*

Youth can be harmed by staff both intentionally and accidentally. If staffing levels are not sufficient to safely manage out-of-control behavior by youth, and/or if staff are not trained to use physical and mechanical restraints properly, the risk of accidental injury increases. In addition to physical harm, youth also have a right to be protected from offensive and degrading language by adults in whose care they are placed. Regrettably, limits on our access prevented us from rendering firm conclusions as to actual practice in this key area. Given the many alleged incidents of abuse of youth by staff at Alexander in the recent past, however, reaching supportable conclusions as to the potential for youth to be harmed by staff is particularly important.

- ***Observations.*** Well over half the youth interviewed reported experiencing various forms of physical and/or verbal abuse by staff. This was viewed by most youth as a relatively common occurrence, although it was noted by several youth that in their opinions abuse by staff is less common now than when the previous contractor operated Alexander. Youth reported that many of the staff known for their harsh treatment of youth have either quit or been terminated by G4S administrators. Nonetheless, several youth reported either witnessing or being subject to physical restraints by G4S staff that involved inflicting intentional pain above and beyond what is necessary to safely accomplish the restraint. Youth described recent incidents where staff would drive the points of their elbows and knees into the backs and necks of youth during the execution of physical restraints. Others reported having seen staff punch or slap youth. Other youth described a practice permitted by some staff where youth are allowed to take "body-shots" at one another. This practice, which is said to occur less since G4S has assumed control of the facility, involves youth striking each other with closed fists in the torso outside the view of security cameras. One youth described being paid by staff with Popeye's Chicken to beat up other youth.

  During our tour of the facility, we spoke with many youth, some of whom were DRC's clients and some who were not. Most youth interviewed reported that staff frequently use profane language and sometimes racial slurs when addressing youth. A youth in the JUMP unit described a member of the staff telling youth that their sisters and/or mothers are "whores." This, he said, was done to humiliate and provoke youth into a physical confrontation. Facility administrators admit that profanity is an issue on the campus and report they have recently terminated at least three staff for using profanity. The facility's many security cameras have an audio feature that has been very useful in identifying the offending staff and holding them accountable.

  As previously noted, Alexander is home, largely by default, to many youth who experience a wide range of very serious physical, mental and emotional impairments

that cause them to become targets of abuse by other youth as well as by staff. Interviews were conducted with at least three boys who experience incontinence and/or enuresis. These conditions have caused these boys to be singled out among both their peers and staff for humiliation as well as alleged physical and verbal abuse. One boy with a history of a congenital gastro-intestinal disorder described a recent occasion where he had an "accident" in which he soiled his pants. Staff loudly and publicly made fun of the youth's situation, "That boy stinks. You shouldn't do that in your pants," which resulted in incessant taunting, teasing and various forms of physical abuse by other youth on the unit. This was corroborated by other youth.

Another boy with a long history of schizophrenia with visual and auditory command hallucinations, multiple serious suicide attempts and a history of sexual abuse, also recently soiled himself. He reported that two staff became angry with him and attempted to rub his face in the excrement. Once aware of the incident, Alexander administrators attempted to intervene by assigning a one-on-one staff member to this youth during part of the day and by instructing the staff alleged to be involved to stay away from the youth. Unfortunately, according to this youth, the one-on-one staff member is not available to him while he is in school or on weekends, limiting the effectiveness of this precaution. Furthermore, one of the staff members allegedly involved in this incident sat next to the boy at a basketball game earlier on the day of our interview. According to the youth, his one-on-one staff was seated elsewhere watching the game. The boy reported being scared when the identified staff member sat next to him. He reportedly told the staff member that he was not supposed to be near him. The staff member just laughed and said, "Now what are you going to do?" The boy moved to a different location away from the staff member.

This same youth described an earlier incident where another youth on his unit placed something over the window of his cell, thereby blocking the light and darkening the cell. The youth in his room became very frightened and began to bang and cry for help from staff. Staff were reportedly slow to respond to his cries and banging. As his fear escalated, the boy began to experience command hallucinations instructing him to bite himself. He ultimately bit deep into his arm in several places drawing blood. It was reported by this youth that one member of the staff was "written-up" as a result of this incident.

Finally, several of the dorms on the Alexander campus are configured with "dry" cells, requiring youth to be allowed out of their rooms by staff at night to use the bathroom. Youth complained that some members of the staff are slow to respond to requests to use the bathroom. Some youth viewed this as a form of intentional punishment; others saw it as a reflection of disinterested and uncaring staff. In either case this slow response has on occasion contributed to youth urinating on the floor of their cells, which only serves to increase tensions between youth who share rooms, as well as between youth and staff who have to ensure the floor is cleaned.

## Avenues for Youth to Report Mistreatment.

Youth should have free access to a confidential process for reporting mistreatment, abuse or neglect. Whether this process takes the form of written grievances or a telephone hotline, staff should be required to provide access upon request. Although access does not necessarily have to be granted immediately, it should certainly be provided as soon as possible. A very limited number of facility staff should have access to the grievances so that youth can be assured of their privacy. Once received, all grievances should be logged so that an auditor may track compliance with protocol and timelines. Staff assigned to handle grievances should investigate matters by speaking directly with the youth; talking to staff involved, including those from medical, food services, or whichever service area was implicated in the grievance; providing youth with a written resolution; and disciplining staff as appropriate or referring the matter for further investigation. All of these steps should be accomplished in a reasonable time frame—generally, youth should be contacted within 48 hours and the matter should be resolved within 72 hours thereafter in most cases. Obviously, more complicated issues, those requiring staff discipline or further investigation, may take longer to resolve.

Youth should also be provided with the opportunity to express concerns about their treatment during the incident reporting process. The generally accepted practice is for all youth involved in incidents to provide a written statement shortly thereafter. If the youth initially refuse to write a statement, they should be provided with the opportunity again after they have calmed down. Youth who have difficulty writing or who have limited English proficiency should be offered assistance from an impartial staff person or counselor. Youth should write their statements independently, to limit the opportunities for collusion among the youth involved. If any of these statements alleges excessive force, mistreatment, or outright abuse, the incident should be reported to Child Protective Services and investigated accordingly.

Many jurisdictions provide an additional avenue for youth to voice their concerns by requiring medical staff to conduct a confidential interview with youth when they are brought to the clinic following an incident. Medical staff should record the youth's statement verbatim, and the supervisor reviewing the incident report package should be alert to claims of mistreatment and abuse and should react accordingly.

- ***Observations***. The grievance system is well-used by youth: in February, 114 grievances were submitted, 72 in March and 105 in April. Approximately 50 percent of the grievances submitted in March, April and May, 2007 were reviewed (the names of youth and staff were redacted to protect their privacy). A significant number of grievances related to issues of safety—youth reported feeling threatened by particular youth or having been assaulted by a youth undetected by staff. Most of these were addressed within a reasonable period of times (48 hours or less) by the

Assistant Facility Administrator speaking directly with the two youth involved. A significant number also alleged mistreatment, verbal abuse, or physical abuse by staff. In all cases, the youth was contacted to gather information, but whether or not the complaint was taken further (e.g., reported to the Child Abuse Hotline, investigated by any of the agencies responsible for doing so) could not be discerned. It is essential that all allegations of mistreatment, verbal and physical abuse are reported, investigated and resolved with appropriate disciplinary measures when warranted.

While the assigned Grievance Officer clearly takes the responsibility seriously, and contacts the youth quickly to learn more about the issue, the grievance process suffers from a paucity of information about how the issue was ultimately resolved. Many of the responses to the complaints indicate what the Grievance Office (or Unit Manager if so designated) "will" do or "plans" to do, without ever verifying what if anything was actually done and how the issue was addressed.

Most youth interviewed were aware of the existence of a grievance system and many had confidence in the system as an avenue to report concerns ranging from alleged abuse or unfair treatment, to complaints about the food. Not only could most youth describe the process, where to obtain grievance forms and where to deposit them, but they could also name the member of the staff charged with responding to grievances. While not all youth interviewed had filed a grievance, many had and most saw it as a legitimate means of voicing concerns. The grievance system is one that was seen by most youth as having improved considerably since G4S assumed operational control of the facility.

In addition to the grievance system, many youth interviewed knew or had fairly good relations with one or more members of the Alexander administration and felt they could raise issues of concern directly with them. Youth tended to know members of the Alexander administration by name, including the Facility Administrator and Assistant Facility Administrators, all of whom were observed circulating through the facility at irregular hours throughout our tour. There appeared to be a fairly high degree of trust between youth and the facility administrators. Interestingly, the level of trust did not seem to extend as broadly to the YCWs and other line staff. Although there were certainly exceptions, many youth had trouble identifying members of the staff as individuals they trusted. Case workers, trackers and teachers also received a very mixed review from youth. Some were seen as helpful individuals who had the youths' interest at heart, others, however, were seen as in it for the pay check with little regard for the youth.

- ***Recommendations***.
  1. Take steps to prevent the occurrence of abuse in the first place by properly training and deploying staff. Utilize Alexander's videotape and audiotape resources to conduct random observations of staff interactions with youth to

ensure that staff conform to expected standards of professionalism, in both their words and actions. Given that DYS administrators have desktop access to audio and video footage, periodic monitoring of G4S operations is an important quality assurance mechanism.

2. Enhance the current Grievance system by requiring staff to indicate the specific actions taken, and the results of these actions on each grievance form, rather than stating only what the staff anticipates doing to resolve the issue.
3. Ensure that all allegations of staff mistreatment and abuse are reported to the proper authority, are investigated, and are resolved with appropriate disciplinary measures.
4. Ensure the incident reporting policy and practice require youth involved in the incident to submit their own statements in writing. Provide a second opportunity to submit a statement to those youth who initially refuse. Alternative means should be available to those who do not read or write or those with limited English proficiency.
5. Develop a process for confidential interviews of youth by medical staff following their involvement in an incident in which force is used. Upon transport to the clinic, nurses should hold a confidential interview with youth to gather information about the incident. The nurses should copy the youth's statement, verbatim, into the progress notes and should also clearly indicate whether the youth has alleged mistreatment by staff, affirm that the allegation was reported to Child Protective Services and make an assessment of whether the youth's statement conflicts with or is corroborated by the type of injury sustained. Formalize this process in local policy and train staff accordingly.
6. Attend to the quality of interactions between youth and staff and the overall culture at Alexander so that youth might become more comfortable expressing their concerns directly to staff.

## Reporting Allegations of Abuse to the Proper Authority.

When an allegation of abuse is made, it must be reported to the proper authorities to investigate the veracity of the allegation. All staff working at a correctional facility are mandated child abuse reporters by state law. As such, they must report all instances of alleged abuse, no matter how credible, to the state Child Protective Services agency, law enforcement, or both. In most states, direct care staff are not required to actually call the agency themselves, but rather to report the allegation immediately to the facility director or designee who makes the call to the agency. However, they must do so without filtering information or making subjective decisions about which are serious enough or credible enough to be reported.

- ***Observations***. Facility administrators reported that Arkansas child abuse reporting mandates identify local law enforcement as the agency to handle abuse allegations

of youth in state custody. The State Police operate a Hotline for this purpose that is staffed 24-hours per day. Once reported, the hotline indicates its intention to accept or screen out the allegation for investigation. In the Q1 of FY 2007, the Hotline received a total of 45 calls from all DYS facilities, and accepted only 25 of them for investigation. Facility administrators reported that State Police contacts have made them feel as if the police believe Alexander should report only a subset of the allegations they receive, that there are some (e.g., those without injury) that will not be accepted for investigation and therefore Alexander staff should not "overuse" the Hotline. Facility administrators have properly decided to continue to report ALL allegations of abuse to the Hotline, as required by law.

All staff interviewed were aware of their responsibility to report allegations of mistreatment and abuse on an Incident Report and to notify their shift supervisor or other facility administrators. However, the extent to which all allegations of abuse were reported and investigated could not be discerned from the data available for review.

- ***Recommendations.*** All youth deserve to have their concerns handled appropriately. When these issues rise to the level of mistreatment, definitive action must be taken to initiate the investigation process.
  1. Report ALL allegations of misconduct or abuse to the State Police Hotline. Misconduct and abuse include verbal mistreatment, threats and actual physical violence, and sexual misconduct. Hold all staff to these standards and disciplined them appropriately.
  2. Document the date/time Hotline calls were made and develop a tracking system to provide quick information on the status of all cases.

## Placing Accused Staff in Non-Contact Positions Pending the Outcome of Investigation

The generally accepted practice requires staff to be placed on non-contact status pending the outcome of a child abuse investigation. By immediately moving accused staff to a position in which they do not have direct contact with youth, the facility protects youth from harm and protects itself from liability if the staff person were to commit additional misconduct pending the outcome of the initial investigation. Obviously, since many allegations are unfounded, it is vital that child abuse investigations be completed in a timely manner so that wrongly accused staff can be relieved of the stress involved and can return to their normal posts.

- ***Observations***. Facility administrators reported that when an allegation is made, the first action taken is to review the videotape for the date/time/location of the event in question. If audio or video evidence suggests that staff may be culpable or may

not have followed required procedures, administrators assert that he or she is removed from duty immediately or called at home and told not to report for their next shift. Because we did not have access to the volume of incident reports and hotline calls, we could not assess the extent to which the practice follows the prescribed policy. Those staff who were interviewed believed that they would be placed on non-contact status if they were named in a child abuse allegation.

- ***Recommendations***.
  1. Continue the practice of immediately reviewing videotape footage of the date/time/location in question to gain an immediate sense of the severity of the allegation.
  2. Place all staff accused of misconduct or abuse on non-contact status, either moving them into positions in which they do not have direct contact with youth or placing them on administrative leave.

## Child Abuse Investigations and Staff Discipline.

All allegations of abuse should be investigated at some level. State Police may choose to screen out those in which no injury was sustained, but these should still be investigated at the agency and facility level to determine whether any staff misconduct occurred. These investigations should be timely; should involve interviews with all parties involved; should utilize supplementary sources of information from log books, videotapes, etc.; and should form conclusions that are reasonable given the evidence. If substantiated, staff should be disciplined accordingly.

- ***Observations***. Although the State Police have accepted a few allegations for investigation they have not shared the full-text of these investigations with facility staff. They provide only a short statement of whether sufficient information existed for criminal charges to be brought. Obviously, the failure to share such vital information places youth at risk of harm from staff. While the evidence may be insufficient to file charges, the evidence flowing from an investigation can highlight issues related to policy, practice, training, etc. that have a tangible impact on the ability to protect youth from harm.

  Each allegation of mistreatment or abuse is also investigated by the Internal Affairs Unit of DYS, according to facility administrators. It is not known whether IAU accepts all allegations for investigation, who completes the investigations, the quality of the investigatory protocol or whether this protocol leads to reasonable conclusions—DYS refused to allow access to these investigations. Without this information, we can make no conclusions about the adequacy of these measures to protect youth from harm by staff. At any rate, the potential for duplicity and miscommunication between DYS and G4S highlights the critical need for coordination and a free exchange of information about youth housed at Alexander.

To supplement the State Police's investigations and those completed by DYS/IAU, the facility recently hired a retired state police officer to serve as a facility-investigator. At the time of our tour, he had been on staff for only a few weeks, and thus had yet to formalize the procedures, protocols and practices that should come to define his role. However, we were provided access to one of his investigations and had the opportunity to review several videotapes showing staff response to various types of incidents. These videotapes reportedly serve as an important source of information about the culture of the facility, areas in which staff need additional training, and for identifying staff who violate the codes of professional conduct so that appropriate discipline can be imposed.

Since G4S assumed operational control of Alexander, a total of 11 staff were terminated in response to employee misconduct:

- Verbal abuse/use of profanity (most of these were in the month prior to our tour, and were based on evidence gathered via the audiotaping function of the surveillance cameras);
- Excessive use of force (in January, 2007; staff "threw a youth into a wall");
- Violating youth confidentiality;
- Inappropriate use of force (using physical force when there was no threat to safety or security);
- Falsifying company records (duplicating treatment plans); and
- Sleeping while on duty.

- ***Recommendations.***
  1. Develop a clear division of labor among the facility-based investigatory process, DYS/IAU investigations, and those completed by the State Police. While the lines of responsibility should not overlap, full and complete information must be freely shared among the three agencies to ensure that developing patterns (across staff, youth, times, places, etc.) are identified and prevention strategies are developed.
  2. Use the facility-based investigatory process to review incidents, supplement investigations by State Police and IAU, and to determine whether staff violated policy or employee rules of conduct. Discipline or exonerate staff, as appropriate.
  3. Ensure the facility-based process meets generally accepted investigatory standards in terms of the quality of the written product, the individuals interviewed and the sequence of those interviews, the collection and preservation of evidence, and the adequacy of the factual basis for all conclusions.
  4. Develop the necessary interagency linkages with State Police to ensure that allegations from the facility will be taken seriously and investigated properly.

When possible, ask State Police to expedite their investigation processes so staff can either be returned to post, disciplined, or terminated, as appropriate.

5. Obtain copies of all State Police and IAU investigations and review for any violations of policy or employee codes of conduct. These issues are typically not addressed by criminal investigations and thus must be examined by a facility-based process. Discipline staff as appropriate.

## Conclusion

The issues raised in this report as to the risks faced by youth confined at Alexander are intended to help guide DHS and DYS in their efforts to ensure the safety of all youth in committed status. As noted in the Introduction, although the majority of our comments address G4S operations, DYS is ultimately responsible for the performance of its private providers. As detailed herein, Alexander poses a series of especially complex and costly problems that must be corrected for the safety of youth in its care to be ensured. But Alexander should not be seen as a separate problem that exists in isolation of the much needed systemic overhaul of juvenile justice statewide. Viewing this report and its recommendations against the backdrop of SR31 may help to spark new and more creative thinking by stakeholders in pursuing the mandates of the Senate Resolution.

Arkansas is not alone in re-examining its juvenile justice system. Many states throughout the South and across the country are struggling with the very same issues that confront Arkansas relative to the operation of large, costly and ineffective secure institutions, over-reliance on institutional confinement of low-risk youth, and establishing a flexible continuum of non-residential community-based services that more effectively address the needs of public safety and the rehabilitation of youth who do not require secure correctional confinement. We urge Arkansas' Governor, juvenile justice officials, legislators, policy makers, youth advocates, service providers and other stakeholders in communities throughout the state to unite in their embrace of the opportunities presented by new and willing DHS/DYS leadership and by SR31 to fundamentally remake juvenile justice in the state. SR31, passed in March, 2007 by the Arkansas Legislature, created an interim legislative committee to identify needed reforms of the state's juvenile justice system. The resolution requires the committee to develop ways to reduce unnecessary reliance on large correctional facilities and to promote a continuum of community care so that youth committed to DYS may be served in the least restrictive setting possible, consistent with public safety.[4] As described throughout this report, there are many safer, more effective and less costly alternatives to the largely failed models that depend on institutions to improve the behavior of youth. Abandoning the troubled Alexander facility in favor of small, secure and therapeutic facilities, complimented by a vibrant network of neighborhood-based services for youth and families is an approach that would benefit the youth and communities of Arkansas, both in terms of public safety and improved outcomes.

As immediate steps that can be taken to ensure the safety of youth in Alexander while broader, systemic reform plans are developed, we recommend that DYS and G4S develop immediate plans to rectify the following conditions so that youth committed to Alexander are no longer at risk of harm:

[4] The full text of SR31 is included in the Appendix of this report.

1. Reduce the exposure of low-risk youth to confinement at Alexander by applying a validated external risk assessment instrument to help identify youth who can be safely managed in their home communities

2. Accelerate the thoughtful and well-planned discharge and subsequent supervision of youth currently in secure confinement by systematically targeting misdemeanants, probation violators and other non-violent offenders for the development of individualized, community-based plans into which you can be discharged with an assurance that supervision and support will be available to guide their success.

3. Develop a willing cadre of non-residential, neighborhood-based service providers who operate diverse and culturally competent programming in or near the home communities of DYS youth, and who are committed to working with challenging youth and willing to enter into "no eject – no reject" policies as part of their service contracts.

4. Examine models of "fiscal realignment" developed in several other states that encourage local jurisdictions to treat low-risk youth locally rather than committing them to DYS for assignment to Alexander.

5. Ensure that staff ratios at Alexander are met consistently and that they represent the number of staff actually deployed to supervise youth at any given time. Ensure that all staff provide vigilant, pro-active supervision designed around positive interaction with youth and efforts to identify and de-escalate tensions before they develop into violent confrontations.

6. Ensure all staff have dependable access to the full G4S training curriculum. New employees should receive at least 80 hours of training on all topics, along with 40 hours of on-the-job training before they are assigned to supervise youth independently. Existing employees should receive a 40-hour refresher course annually, focusing heavily on behavior management and de-escalation, the use of force, suicide prevention, and child abuse reporting.

7. Develop a process for supervisory review and critique of all incidents. Not only should supervisors certify the incident report is complete, but should also provide guidance on how the incident could have been prevented or anticipated and whether staff followed the use of force policy or could have responded with less restrictive interventions.

8. Develop additional incentives, rewards and programs to encourage positive behavior among youth. Tie these rewards to developmentally-appropriate skills, problem-solving strategies and behaviors that youth should be expected to master.

**9.** Develop procedures to protect the safety of youth placed in isolation, including room check procedures, supervisory oversight, contact with mental health staff and documentation.

**10.** Continue to hold staff accountable for upholding G4S core tenets and for treating all youth with dignity and respect.

**11.** Develop a series of timelines by which staff training, new policy implementation and other planned initiatives and improvements at Alexander are to be satisfactorily completed. As noted throughout our report, G4S has verbally committed to a great many training, policy and operational enhancements that will improve the safety of youth in confinement at Alexander. Ensuring accountability as to the timely completion of these enhancements is in the interest of all.

## Appendix A

The Division of Youth Services (DYS) contracts with G4S Youth Services, LLC (G4S) for the operation of the Alexander. We reviewed many documents including:

- Arkansas Division of Youth Services *Juvenile Operational and Facilities Master Plan*, produced by KMD Justice/Chinn Planning Design Team, August 2006;
- Arkansas Department of Health and Human Services, Division of Youth Services, Statistical Report FY 2006;
- Arkansas Division of Youth Services, Task Force Meeting February, 2007, PowerPoint presentation;
- Arkansas Department of Health and Human Services, Organizational Chart
- Survey of Arkansas Community-Based Resources, produced by Stacy Moak, January, 2007;
- Settlement Agreement between the United States Department of Justice and the State of Arkansas, Division of Youth Services and the Arkansas Department of Human Services;
- Monitoring Report on Special Education Services at Alexander prepared by the Arkansas Department of Education, June 8, 2007;
- *It's Not Punishment, It's Rehabilitation*, report produced by the Disability Rights Center, November 2006;
- *Study of Intake and Assessment Process at Alexander Juvenile Correctional Facility (Alexander)*, report produced by Gail Browne, G4S Youth Services, LLC, April 2007;
- *Examination of Risk Assessment and Classification Systems: A Technical Assistance Report*, report by Robert DeComo, National Council on Crime and Delinquency, February 2006;
- Materials pertaining to two investigations of alleged abuse initiated by the Disability Rights Center in 2006-2007;
- Youth Grievances from March, April, and May, 2007;
- Training curricula for direct care staff;
- Rosters of direct care staff, along with dates of hire, and training completed to date for a sample of staff;
- Copy of the complete training curriculum for direct care staff;
- Incident reports generated from the date G4S assumed operational control in January through April, 2007 (with youth names redacted); and
- List of all youth placed on suicide precautions from January through April, 2007.

We also interviewed a large number of staff and youth including:
- Director of the Department of Human Services
- Director of the Division of Youth Services
- G4S Headquarters staff

- DYS Clinical Director and staff
- DYS Intake staff and trackers
- Facility administrator, and 3 Assistant Facility Administrators (AFAs)
- Facility-based Investigator
- Case Managers
- Chief of Security and Physical Plant
- Facility-based Training Officer
- Clerk responsible for maintaining documentation on suicide precautions
- Direct care staff, one from each of six housing units
- Nurse
- 22 boys from each of the five boys' housing units
- 8 girls from the single girls' housing unit

Appendix B

State of Arkansas
86th General Assembly
Regular Session, 2007

By: Senator Broadway

# SENATE RESOLUTION

REQUESTING THE SENATE INTERIM COMMITTEE ON CHILDREN AND YOUTH AND THE HOUSE INTERIM COMMITTEE ON AGING, CHILDREN AND YOUTH, LEGISLATIVE AND MILITARY AFFAIRS TO STUDY WAYS TO IMPROVE THE STATE'S JUVENILE JUSTICE SYSTEM FOR YOUTH COMMITTED TO THE DIVISION OF YOUTH SERVICES OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES.

## Subtitle

REQUESTING A STUDY FOR WAYS TO IMPROVE THE STATE'S JUVENILE JUSTICE SYSTEM FOR YOUTH.

WHEREAS, there is cause to evaluate needed reforms of the state's juvenile justice system to more effectively and efficiently serve youth committed to the Division of Youth Services of the Department of Health and Human Services and to identify best practices that will reduce unnecessary reliance on large juvenile correctional facilities and promote the development of an appropriate continuum of community-based treatment alternatives in the least restrictive settings possible consistent with public safety; and

WHEREAS, an interim study proposal is required for the retention of independent expert consultants to assist the Division of Youth Services of the Department of Health and Human Services to conduct comprehensive needs and risk assessments of juveniles incarcerated at the Alexander Juvenile Correctional Facility and other facilities of the Division of Youth Services of the Department of Health and Human Services to identify gaps in existing community-based alternative placements and services necessary to more effectively and efficiently serve juveniles committed to the Division of Youth Services of the Department of Health and Human Services in the least restrictive settings possible consistent with public safety; and

WHEREAS, there is a pressing need to develop a juvenile justice reform plan by no later than twelve (12) months from the effective date of this interim study proposal that incorporates the evaluations, assessments, and recommendations of the independent experts provided for by this interim study proposal and other stakeholders, including the Juvenile Justice Center of the University of Arkansas at Little Rock, the Department of Education, the Division of Behavioral Health of the Department of Health and Human Services, the Division of Developmental Disabilities Services of the Department of Health and Human Services, Arkansas Advocated for Children and Families, the Arkansas Disability Rights Center, the Juvenile Ombudsman Division of the Public Defender Commission, the Division of Children and Family Services of the Department of Health and Human Services, the Administrative Offices of the Courts, and families and youth; and

WHEREAS, there exists an urgent need for construction, renovation, acquisition, purchase of equipment, maintenance, and other operating expenses to implement the reform plan provided for in this interim study proposal and to replace the facilities where conditions of confinement support ceasing operation with facilities that meet contemporary juvenile justice national best practices. These treatment services, programs, and centers shall incorporate best practices for the provision of rehabilitative and other services for juveniles and be consistent with applicable standards of accreditation from the American Correctional Association.

NOW THEREFORE,
BE IT RESOLVED BY THE SENATE OF THE EIGHTY-SIXTH GENERAL ASSEMBLY OF THE STATE OF ARKANSAS:

THAT the Senate requests that the Senate Interim Committee on Children and Youth and the House Interim Committee on Aging, Children and Youth, Legislative and Military Affairs study ways to improve the state's juvenile justice system for youth committed to the Division of Youth Services of the Department of Health and Human Services.



Justice Policy
INSTITUTE

A Justice Policy Institute Report

By Barry Holman and Jason Ziedenberg

EXHIBIT
Affidavit
17

# The Dangers of Detention:

*The Impact of Incarcerating Youth in Detention and Other Secure Facilities*

# The Dangers of Detention:

*The Impact of Incarcerating Youth in Detention and Other Secure Facilities*

A Justice Policy Institute Report
by Barry Holman and Jason Ziedenberg

## The Dangers of Detention[1]

### Introduction: The Growing Impact of Youth Detention

Despite the lowest youth crime rates in 20 years, hundreds of thousands of young people are locked away every year in the nation's 591 secure detention centers. Detention centers are intended to temporarily house youth who pose a high risk of re-offending before their trial, or who are deemed likely to not appear for their trial. But the nation's use of detention is steadily rising, and facilities are packed with young people who do not meet those high-risk criteria—about 70 percent are detained for nonviolent offenses.[2]

> *"Detention: A form of locked custody of youth pre-trial who are arrested—juvenile detention centers are the juvenile justice system's version of "jail," in which most young people are being held before the court has judged them delinquent. Some youth in detention are there because they fail the conditions of their probation or parole, or they may be waiting in detention before their final disposition (i.e. sentence to a community program, or juvenile correctional facility)."[3]*

*"[F]airly viewed, pretrial detention of a juvenile gives rise to injuries comparable to those associated with the imprisonment of an adult."*

*–Justice Marshall for the minority in Schall v. Martin, 1984.*

The increased and unnecessary use of secure detention exposes troubled young people to an environment that more closely resembles adult prisons and jails than the kinds of community and family-based interventions proven to be most effective. Detention centers, said a former Deputy Mayor of New York of that city's infamous Spofford facility, are "indistinguishable from a prison."[4] Commenting on New York's detention centers, one Supreme Court Justice said that, "fairly viewed, pretrial detention of a juvenile gives rise to injuries comparable to those associated with the imprisonment of an adult."[5]

Detained youth, who are frequently pre-adjudication and awaiting their court date, or sometimes waiting for their placement in another facility or community-based program, can spend anywhere from a few days to a few months in locked custody. At best, detained youth are physically and emotionally separated from the families and communities who are the most invested in their recovery and success. Often, detained youth are housed in overcrowded, understaffed facilities—an environment that conspires to breed neglect and violence.

A recent literature review[i] of youth corrections shows that detention has a profoundly negative impact on young people's mental and physical well-being, their education, and their employment. One psychologist found that for one-third of incarcerated youth diagnosed with depression, the onset of the depression occurred after they began their incarceration,[6] and another suggests that poor mental health, and the conditions of confinement together conspire to make it more likely that incarcerated teens will engage in suicide and self-harm.[7] Economists have shown that the process of incarcerating youth will reduce their future earnings and their ability to remain in the workforce, and could change formerly detained youth into less stable employees. Educational researchers have found that upwards of 40 percent of incarcerated youth have a learning disability, and they will face significant challenges returning to school after they leave detention. Most importantly, for a variety of reasons to be explored, there is credible and significant research that suggests that the experience of detention may make it more likely that

youth will continue to engage in delinquent behavior, and that the detention experience may increase the odds that youth will recidivate, further compromising public safety.

*Each year it is estimated that approximately 500,000 youth are brought to juvenile detention centers. On any given day more than 26,000 youth are detained.[8]*

Detention centers do serve a role by temporarily supervising the most at-risk youth. However, with 70 percent being held for nonviolent offenses, it is not clear whether the mass detention of youth is necessary—or being borne equally. While youth of color represent about a third of the youth population, the latest figures show that they represent 61 percent of detained youth.[9] Youth of color are disproportionately detained at higher rates than whites, even when they engage in delinquent behavior at similar rates as white youth.

This policy brief looks at the consequences of detention on young people, their families, and communities. This policy brief shows that, given the new findings that detaining youth may not make communities safer, the costs of needlessly detaining young people who do not need to be there are simply too high. Policymakers, instead, should look to detention reform as a means to reduce the number of young people needlessly detained, and reinvest the savings in juvenile interventions proven to reduce recidivism and crime, and that can help build healthy and safe communities.

[i]This policy brief brings together the best existing literature on the efficacy and impact of detention, and also examines the reported outcomes of incarcerating juveniles in secure, congregate detention facilities in order to provide practitioners and policymakers with a deeper understanding of "the dangers" of overusing detention. Some of the findings reported here are the result of research conducted on youth and young adults in facilities or programs outside of juvenile detention facilities. The implications and conclusion drawn from research outside of detention centers proper is worthy of consideration: detention is usually the first form of congregate institutional confinement that youth falling under the authority of juvenile justice agencies will experience, and like residential or adult correctional or pretrial institutions, it is reasonable to infer that the impact of other kinds of incarceration and secure, congregate facilities do apply to the detention experiences. Every attempt has been made to accurately portray the population that the cited authors were studying, and the environment in which the study was conducted—generally, we referred to "detention" when the youth were detained, and "incarceration" when they were somewhere else.

## The Impact of Detention on Crime, Rehabilitation, and Public Safety

### Detention can increase recidivism

Instead of reducing crime, the act of incarcerating high numbers of youth may in fact facilitate increased crime by aggravating the recidivism of youth who are detained.

A recent evaluation of secure detention in Wisconsin, conducted by the state's Joint Legislative Audit Committee reported that, in the four counties studied, 70 percent of youth held in secure detention were arrested or returned to secure detention within one year of release.[10] The researchers found that *"placement in secure detention may deter a small proportion of juveniles from future criminal activity, although they do not deter most juveniles."*

**Prior Incarceration was a Greater Predictor of Recidivism than Carrying a Weapon, Gang Membership, or Poor Parental Relationship**

Source: Benda, B.B. and Tollet, C.L. (1999). "A Study of Recidivism of Serious and Persistent Offenders Among Adolescents." Journal of Criminal Justice, Vol. 27, No. 2 111-126.

Studies on Arkansas' incarcerated youth[11] found not only a high recidivism rate for incarcerated young people, but that the experience of incarceration is the most significant factor in increasing the odds of recidivism. Sixty percent of the youth studied were returned to the Department of Youth Services (DYS) within three years. The most significant predictor of recidivism was prior commitment; the odds of returning to DYS increased 13.5 times for youth with a prior commitment. Among the youth incarcerated in Arkansas, two-thirds were confined for nonviolent offenses. Similarly, the crimes that landed the serious offenders under the supervision of adult corrections were overwhelmingly nonviolent—less than 20 percent were crimes against persons.

## Congregating delinquent youth together negatively affects their behavior and increases their chance of re-offending

Behavioral scientists are finding that bringing youth together for treatment or services may make it more likely that they will become engaged in delinquent behavior. Nowhere are deviant youth brought together in greater numbers and density than in detention centers, training schools, and other confined congregate "care" institutions.

Researchers at the Oregon Social Learning Center found that congregating youth together for treatment in a group setting causes them to have a higher recidivism rate and poorer outcomes than youth who are not grouped together for treatment. The researchers call this process "peer deviancy training," and reported statistically significant higher levels of substance abuse, school difficulties, delinquency, violence, and adjustment difficulties in adulthood for those youth treated in a peer group setting. The researchers found that "unintended consequences of grouping children at-risk for externalizing disorders may include negative changes in attitudes toward antisocial behavior, affiliation with antisocial peers, and identification with deviancy."[12]

## Detention pulls youth deeper into the juvenile and criminal justice system

*"Locking up kids is the easiest way. But once they get in the juvenile justice system, it's very hard to get them out."*

*—San Jose Police Chief Bill Landsdowne*[13]

Similar to the comment by the San Jose police chief, studies have shown that once young people are detained, even when controlling for their prior offenses, they are more likely than non-detained youth to end up going "deeper" into the system; these studies show that detained youth are more likely to be referred to court, see their case progress through the system to adjudication and disposition, have a formal disposition filed against them, and receive a more serious disposition.

**Detained Youth Are More Likely to:**

Source: Frazier, C.E. and Cochran, J.K. (1986) Detention of Juveniles: Its Effects on Subsequent Juvenile Court Processing and Decisions. Youth and Society, Vol. 17, No. 3, March 1986, p. 286-305 (N=9,317; p=.05)

A study done in Florida in the late 1980s found that, when controlling for other key variables such as age, race, gender, and offense severity, detained youth faced a greater probability of having a petition filed at intake (6.2 percent), a greater probability for having a petition filed by the State Attorney (9 percent), and a greater probability of receiving formal judicial interventions (8.5 percent) than youth not detained. Another study in Florida by the Office of State Court Administrators found that when controlling for other factors—including severity of offense—youth who are detained are *three times more* likely to end up being committed to a juvenile facility than similar youth who are not detained.[14]

## Alternatives to detention can curb crime and recidivism better than detention

Several studies have shown that youth who are incarcerated are more likely to recidivate than youth who are supervised in a community-based setting, or not detained at all. Young people in San Francisco's Detention Diversion Advocacy Program, for example, have about *half the recidivism rate* of young people who remained in detention or in the juvenile justice system.[15]

*Research from Florida shows that when controlling for other factors, youth who are detained are three times more likely to end up being committed to a juvenile facility than similar youth who are not detained.*

**Various Measures of Recidivism between Detention and Diversion**

Source: Sheldon, R.G. (1999), "Detention Diversion Advocacy: An Evaluation," Juvenile Justice Bulletin Washington, DC: Department of Justice, Office of Juvenile Justice and Delinquency Prevention (DDAP n=271; Comparison n=271)

Research from Texas suggests that young people in community-based placements are 14 percent less likely to commit future crimes than youth that have been incarcerated.[16]

## Detention can slow or interrupt the natural process of "aging out of delinquency"

Many young people in fact engage in "delinquent" behavior, but despite high incarceration rates, not all youth are detained for delinquency. Dr. Delbert Elliott, former President of the American Society of Criminology and head of the Center for the Study of the Prevention of Violence has shown that as many as a third of young people will engage in delinquent behavior[17] before they grow up but will naturally "age out" of the delinquent behavior of their younger years. While this rate of delinquency among young males may seem high, the rate at which they end their criminal behavior, (called the "desistance rate") is equally high.[18] Most youth will desist from delinquency on their own. For those who have more trouble, Elliott has shown that establishing a relationship with a significant other (a partner or mentor) as well as employment correlates with youthful offenders of all races "aging out" of delinquent behavior as they reach young adulthood.

**Most Young People Age Out of Crime on Their Own**

Source. FBI Crime in the United States (1993).

*There is little observed relationship between the increased use of detention, and crime.*

Whether a youth is detained or not for minor delinquency has lasting ramifications for that youth's future behavior and opportunities. Carnegie Mellon researchers have shown that incarcerating juveniles may actually interrupt and delay the normal pattern of "aging out" since detention disrupts their natural engagement with families, school, and work.[19]

## There is little relationship between detention and overall crime in the community

While there may be an individual need to incarcerate some high-risk youth, the mass detention of a half-million youth each year is not necessarily reducing crime.

During the first part of the 1990s, as juvenile arrests rose, the use of detention rose far faster (See table, "Different Directions"). By the middle of the 1990s, as juvenile arrests began to plummet (and the number of youth aged 10-17 leveled off), the use of detention continued to rise. *In other words, while there may be some youth who need to be detained to protect themselves, or the public, there is little observed relationship between the increased use of detention, and crime.*

**Different Directions: Detention Populations vs. Arrest Rates for U.S. Juveniles in the 1990s**

**DIFFERENT DIRECTIONS:** Detention Populations vs. Arrest Rates for U.S. Juveniles in the 1990's

Sources: Detention data adapted from Sickmund, M. (forthcoming). *Juveniles in Corrections.* Washington, D.C.: Office of Juvenile Justice and Delinquency Prevention; arrest data from FBI Uniform Crime Reports.

■ U.S. Juveniles Confined in Public and Private Detention C

Juvenile Index Crime Arrests in the U.S. (in thousands)

*Researchers believe that the combination of mental health disorders youth bring into detention coupled with the negative effects of institutionalization places incarcerated youth at a higher risk of suicide than other youth.[21]*

To the contrary, several communities ranging from the Western United States (Santa Cruz, California and Portland, Oregon) to one of the nation's biggest urban centers (Chicago, Illinois) have found ways to both reduce detention and reduce crime, better serving the interests of youth development and public safety. Between 1996 and 2002, violent juvenile arrests in the country fell by 37 percent; Santa Cruz matched that decline (38 percent), and Portland and Chicago exceeded it (45 percent and 54 percent, respectively).[20] And during roughly the same time, juvenile detention populations fell between 27 and 65 percent in those jurisdictions.

## The Impact of Detention on Young People's Mental Health, and Propensity to Self-Harm.

Of all the various health needs that detention administrators identify among the youth they see, unmet mental and behavioral health needs rise to the top. While researchers estimate that upwards of two-thirds of young people in detention centers could meet the criteria for having a mental disorder, a little more than a third need ongoing clinical care—a figure twice the rate of the general adolescent population.[22]

Why is the prevalence of mental illness among detained youth so high? First, detention has become a new "dumping ground" for young people with mental health issues. One Harvard academic theorizes that the trauma associated with the rising violence in the late 1980s and early 1990s in some urban centers had a deep and sustained impact on young people. At the same time, new laws were enacted that reduced judicial discretion to decide if youth would be detained, decreasing the system's ability to screen out and divert youth with disorders. All the while, public community youth mental health systems deteriorated during this decade, leaving detention as the "dumping ground" for mentally ill youth.

### Detention makes mentally ill youth worse

*A Washington state detention administrator interviewed by the U.S. House of Representatives said, "We are receiving juveniles that five years ago would have been in an inpatient mental health facility. . . . [W]e have had a number of juveniles who should no more be in our institution than I should be able to fly."*

Another reason for the rise in the prevalence of mental illness in detention is that the kind of environment generated in the nation's detention centers, and the conditions of that confinement, conspire to create an unhealthy environment. Researchers have found that at least a third of detention centers are overcrowded,[23] breeding an environment of violence and chaos for young people. Far from receiving effective treatment, young people with behavioral health problems simply get worse in detention, not better. Research published in Psychiatry Resources showed that for one-third of incarcerated youth diagnosed with depression, the onset of the depression occurred after they began their incarceration.[24] *"The transition into incarceration itself,"* wrote one researcher in the medical journal, *Pediatrics, "may be responsible for some of the observed [increased mental illness in detention] effect."*[25]

An analysis published in the *Journal of Juvenile Justice and Detention Services* suggests that poor mental health and the conditions of detention conspire together to generate higher rates of depression and suicide idealization:[26] 24 percent of detained Oregon youth were found to have had suicidal ideations over a seven-day period, with 34 percent of the youth suffering from *"a current significant clinical level of depression."*

An indicator of the shift was spelled out by a 2004 Special Investigations Division Report of the U.S. House of Representatives, which found that two-thirds of juvenile detention facilities were holding youth who were waiting for community mental health treatment, and that on any given night, *7 percent of all the youth held in detention were waiting for community mental health services.* As one detention administrator told Congress, *"we are receiving juveniles that 5 years ago would have been in an inpatient mental health facility. . . [W]e have had a number of juveniles who should no more be in our institution than I should be able to fly."*[27]

### Detention puts youth at greater risk of self-harm

While some researchers have found that the rate of suicide in juvenile institutions is about the same as the community at large,[28] others have found that incarcerated youth experience from *double to four times* the suicide rate of youth in community.[29] The Office of Juvenile Justice and Delinquency Prevention reports that 11,000 youth engage in more than 17,000 acts of suicidal behavior in the juvenile justice system annually.[30] Another monograph published by OJJDP found that juvenile correctional facilities often incorporate responses to suicidal threats and behavior in ways that endanger the youth further, such as placing the youth in isolation.[31]

## The Impact of Detention on the Education of Detained Youth

### Detained youth with special needs fail to return to school

Juvenile detention interrupts young people's education, and once incarcerated, some youth have a hard time returning to school. A Department of Education study showed that 43 percent of incarcerated youth receiving remedial education services in detention did not return to school after release, and another 16 percent enrolled in school but dropped out after only five months.[32] Another researcher found that most incarcerated 9th graders return to school after incarceration but within a year of re-enrolling two-thirds to three-fourths withdraw or drop out of school: After four years, less than 15 percent of these incarcerated 9th graders had completed their secondary education.[33]

*In one study, 43 percent of incarcerated youth receiving remedial education services did not return to school after release. Another 16 percent enrolled in school but dropped out after only 5 months.*

**Detention May Affect Youth's Ability to Re-enroll in School**

Incarcerated youth who received education while incarcerated re-enrolled in school, but dropped out 5 months later 16%
Other 41%
Incarcerated youth who received education while incarcerated but did not re-enroll in school 43%

Source: LeBlanc, (1991). "Unlocking Learning" in Correctional Facilities. Washington, D.C. Department of Education.

Young people who leave detention and who do not reattach to schools face collateral risks: High school dropouts face higher unemployment, poorer health (and a shorter life), and earn substantially less than youth who do successfully return and complete school.[34] The failure of detained youth to return to school also affects public safety. The U.S. Department of Education reports that dropouts are 3.5 times more likely than high school graduates to be arrested.[35] The National Longitudinal Transition Study reveals that approximately 20 percent of all adolescents with disabilities had been arrested after being out of school for two years.[36]

## The Impact of Detention on Employment

### Formerly detained youth have reduced success in the labor market

If detention disrupts educational attainment, it logically follows that detention will also impact the employment opportunities for youth as they spiral down a different direction from their

non-detained peers. A growing number of studies show that incarcerating young people has significant immediate and long-term negative employment and economic outcomes.

A study done by academics with the *National Bureau of Economic Research* found that jailing youth (age 16-25) reduced work time over the next decade by 25-30 percent.[37] Looking at youth age 14 to 24, Princeton University researchers found that youth who spent some time incarcerated in a youth facility experienced three weeks less work a year (for African-American youth, five weeks less work a year) as compared to youth who had no history of incarceration.[38]

**Annual Estimated Loss or Work Weeks Due to Youth Incarceration**

Source: Western, Bruce and Beckett, Katherine (1999), "How Unregulated Is the U.S. Labor Market?: The Penal System as a Labor Market Institution," The American Journal of Sociology, 104: 1030-1060.

*"Having been in jail is the single most important deterrent to employment...the effect of incarceration on employment years later [is] substantial and significant," according to the National Bureau of Economic Research.*

Due to the disruptions in their education, and the natural life processes that allow young people to "age-out" of crime, one researcher posits, *"the process of incarceration could actually change an individual into a less stable employee."*[39]

A monograph published by the *National Bureau of Economic Research* has shown that incarcerating large numbers of young people seems to have a negative effect on the economic well-being of their communities. Places that rely most heavily on incarceration reduce the employment opportunities in their communities compared to places that deal with crime by means other than incarceration. *"Areas with the most rapidly rising rates of incarceration are areas in which youths, particularly African-American youths, have had the worst earnings and employment experience."*[40]

The loss of potentially stable employees and workers—and of course, county, state, and federal taxpayers—is one of numerous invisible costs that the overuse of detention imposes on the country and on individual communities.

## The Larger Economic Impact of Detention on Communities

### Detention is expensive— more expensive than alternatives to detention

The fiscal costs of incarcerating youth are a cause for concern in these budget-strained times. According to Earl Dunlap, head of the National Juvenile Detention Association, the annual average cost per year of a detention bed—depending on geography and cost of living—could range from $32,000 ($87 per day) to as high as $65,000 a year ($178 per day), with some big cities paying far more. Dunlap says that the cost of building, financing, and operating a single detention bed costs the public between $1.25 and $1.5 million over a twenty-year period of time.[41]

*"It is quite reasonable to suggest that a single detention bed costs the public between $1.25 and $1.5 million over a twenty-year period of time."*

*—Earl Dunlap, CEO, National Juvenile Detention Association*

By contrast, a number of communities that have invested in alternatives to detention have documented the fiscal savings they achieve on a daily basis, in contrast to what they would spend per day on detaining a youth. In New York City (2001), one day in detention ($385) costs 15 times what it does to send a youth to a detention alternative ($25).[42] In Tarrant County, Texas (2004), it costs a community 3.5 times as much to detain a youth per day ($121) versus a detention alternative ($35), and even less for electronic monitoring ($3.75).[43]

## Detention is not cost effective

Whether compared to alternatives in the here and now, or put to rigorous economic efficiency models that account for the long-term costs of crime and incarceration overtime, juvenile detention is not a cost-effective way of promoting public safety, or meeting detained young people's needs.

The Washington State Institute for Public Policy (WSIPP), a non-partisan research institution that—at legislative direction—studies issues of importance to Washington State, was directed to study the cost effectiveness of the state's juvenile justice system. WSIPP found that there had been a 43 percent increase in juvenile justice spending during the 1990s, and that the main factor driving those expenditures was the confinement of juvenile offenders. While this increase in spending and juvenile incarceration was associated with a decrease in juvenile crime, WSIPP found, *"the effect of detention on lower crime rates has decreased in recent years as the system expanded. The lesson: confinement works, but it is an expensive way to lower crime rates."*[44] The legislature directed them to take the next step, and answer the question, *"Are there less expensive ways to reduce juvenile crime?"*

WSIPP found that, for every dollar spent on county juvenile detention systems, $1.98 of "benefits" in terms of reduced crime and costs of crime to taxpayers was achieved. By sharp contrast, diversion and mentoring programs produced $3.36 of benefits for every dollar spent, aggression replacement training produced $10 of benefits for every dollar spent, and multi-systemic therapy produced $13 of benefits for every dollar spent. Any inefficiencies in a juvenile justice system that concentrates juvenile justice spending on detention or confinement drains available funds away from interventions that may be more effective at reducing recidivism and promoting public safety.

**Cost Effectiveness of Interventions per Dollar Spent**

Source: Aos, S. (2002). The Juvenile Justice System in Washington State: Recommendations to Improve Cost-Effectiveness. Olympia, Washington: Washington State Institute for Public Policy.

Given the finding by the Journal of Qualitative Criminology that the cost of a youth offender's crimes and incarceration over their lifetime (including adult) can cost as much as $1.7 million,[45] a front-end investment in interventions proven to help young people would seem to be more effective public safety spending.

## The rise of youth detention: policy or politics?

*"The effect of detention on lower crime rates has decreased in recent years as the system expanded... it is an expensive way to lower crime rates."*

*—Washington State Institute for Public Policy*

With falling youth crime rates, and a growing body of research that shows that alternatives are less expensive and more effective than detention, why do we continue to spend valuable resources building more locked facilities to detain low-risk youth?

Similar to the fate of the adult criminal justice system, the traditional mission of the juvenile justice system has been altered by the politicization of crime policy in this country.

At the turn of the century, when reformers developed the nation's first juvenile court in Chicago, Illinois, they set up a separate system for youth to meet the needs of adolescents, acknowledging that youth have different levels of culpability and capacity than adults. They also believed that youth deserved a second chance at rehabilitation. Within 30 years, every state in the nation had a juvenile court system based on the premise that young people were developmentally different than adults.

But the "tough-on-crime" concerns of the 1990s changed the priorities and orientation of the juvenile justice system. Rising warnings of youth "superpredators," "school shootings," and the amplification of serious episodes of juvenile crime in the biggest cities fueled political momentum to make the system "tougher" on kids. By the end of the 1990s, every state in the nation had changed their laws in some way to make it easier to incarcerate youth in the adult system. As many states made their juvenile justice systems more punitive, the courts made more zealous use of detention.

## The rise of youth detention borne by youth of color

*By the end of the 1990s, the system became more punitive, and every state in the nation had changed their laws in some way to make it easier to incarcerate youth in the adult system. An adult charge often means a young person must be held pre-trial in either a detention center or an adult jail.*

The rapid expansion of the use of juvenile detention has hit some communities harder than others. From 1985 to 1995, the number of youth held in secure detention nationwide increased by 72 percent. But during this time, the proportion of white youth in detention actually dropped, while youth of color came to represent a majority of the young people detained. The detained white youth population increased by 21 percent, while the detained minority youth population grew by 76 percent. By 1997, in 30 out of 50 states (which contain 83 percent of the U.S. population) minority youth represented the majority of youth in detention.[46] Even in states with tiny ethnic and racial minority populations, (like Minnesota, where the general population is 90 percent white, and Pennsylvania, where the general population is 85 percent white) more than half of the detention population are youth of color. In 1997, OJJDP found that in every state in the country (with the exception of Vermont), the minority population of detained youth exceeded their proportion in the general population.[47]

The latest figures show that the shift in the demographics of detention that occurred during the 1980s and 1990s continues today: In 2003 African-American youth were detained at a rate 4.5 higher than whites; and Latino youth were detained at twice the rate of whites. Minority youth represented 61 percent of all youth detained in 2003.[48]



Source: Sickmund, Melissa, Sladky, T.J., and Kang, Wei (2004), "Census of Juveniles in Residential Placement Databook," http://www.ojjdp.ncjrs.org/ojstatbb/cjrp/.

The greatest levels of racial disparity in the use of detention are found in the least serious offense categories. For example, surveys from the late 1990s found that whites used and sold drugs at rates similar to other races and ethnicities, but that African Americans were detained for drug offenses at more than twice rate of whites.[49] White youth self-reported using heroin and cocaine at 6 times the rate of African-American youth, but African-American youth are almost three times as likely to be arrested for a drug crime.[50] On any given day, African Americans comprise nearly half of all youth in the United States detained for a drug offense.[51]

*While white youth and minority youth commit several categories of crime at the same rate, minority youth are more likely to be arrested.*

**WHITE YOUTH REPORT USING DRUGS AT 6 TO 7 TIMES THE RATE OF AFRICAN AMERICANS, BUT AFRICAN AMERICAN YOUTH ARE ARRESTED AT HIGHER RATES THAN WHITES FOR DRUG CRIMES**

**Sources for both graphs:** Yamagata, Eileen Poe and Michael A. Jones. *And Justice for Some: Differential Treatment of Minority Youth in the Justice System.* Washington, DC: Building Blocks for Youth, April 2000; *U.S. Population Estimates by Age, Sex, Race, and Hispanic Origin: 1980–1999.* Population Estimates Program, Population Divisions, U.S. Census Bureau, 2000; *Monitoring the Future Report, 1975–1999,* Volume I. Washington, DC: National Institute on Drug Abuse, 2000.

The causes of the disproportionate detention of youth of color are rooted in some of the nation's deepest social problems, many of which may play out in key decision-making points in the juvenile justice system.

While white youth and minority youth commit several categories of crime at the same rate, minority youth are more likely to be arrested. Once arrested, white youth tend to have access to better legal representation and programs and services than minority youth.

People involved in the decision to detain a youth may bring stereotypes to their decision. One study shows that people charged with the decision of holding youth prior to adjudication are more likely to say a white youth's crimes are a product of their environment (i.e. a broken home), while an African-American youth's delinquency is caused by personal failings—even when youth of different races are arrested for similar offenses and have similar offense histories.[52]

*The way to reduce the impact of detention is to reduce the number of youth needlessly or inappropriately detained.*

## A Better Way: Juvenile Detention Reforms Taking Hold Across the Nation

The way to reduce the impact of detention on young people is to reduce the number of youth needlessly or inappropriately detained. The Juvenile Detention Alternatives Initiative (JDAI) is a response to the inappropriate and unnecessary detention of youth in the nation's juvenile justice systems. JDAI is a public-private partnership being implemented nationwide; pioneering jurisdictions include Santa Cruz County, California Multnomah County (Portland), Oregon; Bernalillo County (Albuquerque), New Mexico; and Cook County (Chicago), Illinois.

JDAI is a process, not a conventional program, whose goal is to make sure that locked detention is used only when necessary. In pursuing that goal, JDAI restructures the surrounding systems to create improvements that reach far beyond detention alone.

To achieve reductions in detention populations, the JDAI model developed a series of core strategies, which include:

- **Inter-governmental collaboration:** bringing together the key actors in the juvenile justice system—especially courts, probation, and the police—as well as actors outside the justice system such as schools and mental health.

- **Reliance on data:** beginning with data collection and leading to continuous analysis of data as well as the cultural expectation that decisions will be based on information and results.

- **Objective admissions screening:** developing risk assessment instruments and changing procedures so they are always used to guide detention decisions.

- **Alternatives to secure confinement:** creating programs and services in the community to ensure appearance and good behavior pending disposition, and to be available as an option at sentencing.

- **Expedited case processing:** to move cases along so youth don't languish in detention for unnecessarily long time periods.

- **Improved handling of "special cases":** Youth who are detained for technical probation violations, outstanding warrants, and youth pending services or placement create special management problems and need special approaches.

- **Express strategies to reduce racial disparities:** "good government" reforms alone do not eliminate disparities; specific attention is needed to achieve this goal.

- **Improving conditions of confinement:** to ensure that the smaller number of youth who still require secure detention are treated safely, legally, and humanely.

The fundamental measure of JDAI's success is straightforward: a reduction in the number of youth confined on any day and admitted to detention over the course of a year, and a reduction in the number of young people exposed to the dangers inherent in a detention stay.

**Detention Reform Decreases Detention Populations: Admissions Impact of JDAI on Select Sites.**

| County | Average Daily Population | | Annual Admissions | |
|---|---|---|---|---|
| | Pre-JDAI | 2003 | Pre-JDAI | 2003 |
| Cook | 623 | 454 (-27.1%) | 7,438 | 6,396(-14.0%) |
| Multnomah | 96 | 33 (-65.6%) | 2,915 | 348 (-88.1%) |
| Santa Cruz | 47 | 27 (-42.6%) | 1,591 | 972 (-38.9%) |

Source: Cook County, Multnomah, and Santa Cruz Probation Departments.

Decreasing the use of detention has not jeopardized public safety. In the counties implementing JDAI, juvenile crime rates fell as much as, or more than, national decreases in juvenile crime. These communities have also experienced an improvement in the number of young people who appear in court after they have been released from detention, further reducing the need for detention.

**Detention Reform Coincides with Crime Declines, and Failure to Appear Rates Fall.**

| County | Violent Juvenile Arrest Rate | Failure to Appear | |
|---|---|---|---|
| | (1996-2002) | Pre-JDAI | 2003 |
| Cook | -54% | 39% | 13%(-66.7%) |
| Multnomah | -45% | 7% | 7% |
| Santa Cruz | -38% | N/A | 3% |
| United States Average | -37% | | |

Source: Uniform Crime Report, Crime in the United States Survey (1996; 2002); Cook County, Multnomah and Santa Cruz Probation Departments

Like the impact of detention—which can extend beyond the walls of the locked facility—reducing detention populations influences the entire juvenile justice system. In Cook County, the number of youth sent from local detention to state prison beds declined from 902 in 1997 to 498 in 2003, at average annual savings of $23,000 per bed.[53] In addition, more kids who rotated through the juvenile justice system re-enrolled in school and obtained scholarships for college.

Cities and counties engaged in detention reform also note their progress by their acceptance in the community. Cook County engaged system kids and their parents for advice about how to improve the system, and persevered (and supported the staff) through some daunting complaints. In the aftermath, the probation department adjusted its office hours and locations, changed the way it communicated with clients and their families, and institutionalized feedback mechanisms. Now community members are genuinely engaged in decisions including policy formulation, program development, and even hiring. It is not a formal measure, but it leads to improved services and priceless levels of respect and engagement in the community.

**A better future: invest juvenile justice funds in programs proven to work**

If detention reform is successful, communities should be able to reinvest the funds once spent on detention beds and new detention centers in other youth-serving systems, or other interventions proven to reduce recidivism.

The Center for the Study and Prevention of Violence, the Office of Juvenile Justice and Delinquency Prevention, the Washington State Institute for Public Policy, and a plethora of other research institutes have shown that several programs and initiatives are proven to reduce recidivism and crime in a cost-effective matter. Some common elements in proven programs include:

- Treatment occurs with their family, or in a family-like setting

- Treatment occurs at home, or close to home

- Services are delivered in a culturally respectful and competent manner

- Treatment is built around the youth and family strengths

- A wide range of services and resources are delivered to the youth, as well as their families.

Most of these successful programs are designed to serve the needs of youth in family-like settings, situated as close to home as possible with services delivered in a culturally sensitive and competent manner.

*In the counties implementing JDAI, juvenile crime rates fell as much as, or more than the national decreases in juvenile crime.*

These proven programs identify the various aspects of a youth—their strengths and weaknesses as well as the strengths and resources of their families and communities. Progress is based on realistic outcomes and carefully matches the particular needs of the youth and family to the appropriate intervention strategy.

For online information and assistance on detention reform, visit: *www.jdaihelpdesk.org*

To learn more about the work and research of the Justice Policy Institute, visit: *www.justicepolicy.org*.

## Authors

Barry Holman is a criminal justice researcher and author. He is the Senior Associate of Research and Quality Assurance for the Department of Youth Rehabilitation Services of Washington, D.C. and the former Director of Research and Public Policy for the National Center on Institutions and Alternatives. He authored forthcoming Annie E. Casey Foundation, *Doing Deadtime: An Assessment of Detained Youth Awaiting Placement, the Process that Keeps Them Waiting and Findings from an Alternative Placement Project.*

Jason Ziedenberg is the Executive Director of the Justice Policy Institute, a Washington, D.C. based public policy organization dedicated to ending society's reliance on incarceration by promoting effective and just solutions to social problems. He is author of the Annie E. Casey foundation publication *Pathway's 8: Reducing Racial Disparity in Detention.*

## Acknowledgements

The Justice Policy Institute is a Washington DC-based think tank dedicated to ending society's reliance on incarceration and promoting effective and just solutions to social problems. This policy brief has been adapted from the forthcoming "The Dangers of Detention: The Impact of Incarcerating Youth in Detention and Other Secure Congregate Facilities," Baltimore, Maryland: Annie E. Casey Foundation. This report was edited by Anjula Razdan, designed by Robert Lewis, and supported by a generous grant from the Annie E. Casey Foundation. For more information, visit our website, www.justicepolicy.org

[1] Adapted from the publication by Holman, Barry and Ziedenberg, Jason, *The Dangers of Detention: The Impact of Incarcerating Youth in Detention and Other Secure Congregate Facilities* (forthcoming). Baltimore, Maryland: Annie E. Casey Foundation.

[2] Sickmund, M., Sladky, T.J., and Kang, W. (2004), "Census of Juveniles in Residential Placement Databook." Online. Available: *http://www.ojjdp.ncjrs.org/ojstatbb/cjrp/*

[3] Schiraldi, V. and Ziedenberg, J. (2003), "The Multnomah Experiment: Reducing Disproportionate Minority Confinement." Washington, D.C.: The Justice Policy Institute.

[4] Herbert Sterz, New York City's Deputy Mayor for Criminal Justice, 1984.

[5] *Ellen Schall, Commission of New York City Department of Juvenile Justice v. Gregory Martin et al. Robert Abrams, Attorney General of New York.* No. 82-1248, 82-1278. (Decided, June 4, 1984).

[6] Kashani, J.H., Manning, G.W., McKnew D.H., Cytryn, L., Simonds, J.F. and Wooderson, P.C. (1980), "Depression Among Incarcerated Delinquents." *Psychiatry Resources* Volume 3 185-191, Forrest, C.B., Tambor, E., Riley, A.W., Ensminger, M.E. and Starfield, B. (2000), "The Health Profile of Incarcerated Male Youths." *Pediatrics* Vol. 105, No. 1 286-291.

[7] Mace, D., Rohde, P., and Gnau, V. (1997), "Psychological Patterns of Depression and Suicidal Behavior of Adolescents in a Juvenile Detention Facility." *Journal of Juvenile Justice and Detention Services* Vol. 12 No. 1 18-23.

[8] Sickmund, M., Sladky, T.J., and Kang, W. (2004), "Census of Juveniles in Residential Placement Databook" *http://www.ojjdp.ncjrs.org/ojstatbb/cjrp/*. In regards to the estimate of the number of youth moving through detention each year, the most recent data available from surveys administered by the National Council on Juvenile Justice (NCJJ) estimate that 350,000 youth were detained in 1999 (OJJDP, 2001b). This figure, however, does not include youth detained while they are awaiting a court-ordered out-of-home placement. Further, according to Dr. Barry Krisberg, "The NCJJ data covers court hearings for detention—many youths come into detention via law enforcement agencies, schools, parents, social service agencies etc. and are released before a court hearing is held—this might also include probation and parole violators in some jurisdictions." Personal correspondence (2003).

[9] Sickmund, Melissa, Sladky, T.J., and Kang, Wei (2004), "Census of Juveniles in Residential Placement Databook." Online. Available: *http://www.ojjdp.ncjrs.org/ojstatbb/cjrp/*

[10] Bezruki, D., Varana, D. and Hill, C. (1999), *An Evaluation of Secure Juvenile Detention.* Madison WI: Legislative Audit Bureau.

[11] Benda, B.B. and Tollet, C.L. (1999), "A Study of Recidivism of Serious and Persistent Offenders Among Adolescents," *Journal of Criminal Justice* Vol. 27, No. 2 111-126.

[12] Dishion, T. J., McCord, J, and Poulin, F. (1999), "When Interventions Harm: Peer Groups and Problem Behavior." *American Psychologist* Vol. 54, No. 9 755-764.

[13] Hubner, J. and Wolfson, J. *Unlocking the Future: Detention Reform in the Juvenile Justice System.* Washington, DC: Coalition for Juvenile Justice.

[14] Frazier, C.E. and Cochran, J.C. (1986), "Detention of Juveniles: Its Effects on Subsequent Juvenile Court Processing Decisions," Youth and Society Vol. 17 No. 3 286-305. Office of State Courts Administrator, *Florida Juvenile Delinquency Court Assessment.* (2003) Tallahassee, FL: Office of Court Improvements. This study shows that the odds of a previously detained youth receiving commitment are 3.22 times greater than that of a youth who has never been detained.

[15] Shelden, R.G. (1999), "Detention Diversion Advocacy: An Evaluation," *Juvenile Justice Bulletin* Washington, DC Department of Justice, Office of Juvenile Justice and Delinquency Prevention.

[16] Fendrich, M. and Archer, M. (1998), "Long-Term Re-arrest Rates in a Sample of Adjudicated Delinquents: Evaluating the Impact of Alternative Programs," *The Prison Journal* Vol. 78 No. 4 360-389. In a 12-year study that compared the outcomes of 266 juvenile defenders in Texas placed in correctional centers and alternatives to detention centers, Fendrich and Archer found that the recidivism rate of youth in alternatives was 65percent, whereas the recidivism rate of those placed in correctional facilities was 71percent.

[17] Elliott, D. S. (1994), "Serious Violent Offenders: Onset, Developmental Course, and Termination. The American Society of Criminology 1993 Presidential Address." Criminology, Volume 32, Number 1.

[18] Sampson, R. and Laub, J. (1993), *Crime in the Making: Pathways and Turning Points Through Life.* Cambridge, MA: Harvard University Press.

[19] Golub, A. (1990), *The Termination Rate of Adult Criminal Careers.* Pittsburgh: Carnegie Mellon.

[20] Uniform Crime Report, Crime in the United States Survey (1996; 2002); Cook County, Multnomah and Santa Cruz Probation Departments.

[21] Mace, D., Rohde, P., and Gnau, V. (1997), "Psychological Patterns of Depression and Suicidal Behavior of Adolescents in a Juvenile Detention Facility," *Journal of Juvenile Justice and Detention Services* Vol. 12 No. 1 18-23.

[22] Grisso, Thomas (2004), *Double Jeopardy: Adolescent Offenders with Mental Disorders.* University of Chicago Press.

[23] Using research from the mid-1980s, the Coalition for Juvenile Justice, two-thirds of the detention centers in the country were crowded. Using research from this data—and after a massive expansion of the detention system—the Office of Juvenile Justice and Delinquency Prevention reports that 32 percent of detention centers are crowded, measured by being at or over standard bed capacity. Unlocking the Future: *Detention Reform in the Juvenile Justice System.* (2003) Washington, DC: Coalition for Juvenile Justice. Synder, Howard N., and Sickmund, Melissa. (2006), *Juvenile Offenders and Victims 2006 National Report.* Washington, DC: U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention.

[24] Kashani, J.H., Manning, G.W., McKnew D.H., Cytryn, L., Simonds, J.F. and Wooderson, P.C. (1980), "Depression Among Incarcerated Delinquents," *Psychiatry Resources* Volume 3 185-191.

[25] Forrest, C.B., Tambor, E., Riley, A.W., Ensminger, M.E. and Starfield, B. (2000), "The Health Profile of Incarcerated Male Youths." *Pediatrics* Vol. 105, No. 1 286-291.

[26] Mace, D., Rohde, P., and Gnau, V. (1997), "Psychological Patterns of Depression and Suicidal Behavior of Adolescents in a Juvenile Detention Facility," *Journal of Juvenile Justice and Detention Services* Vol. 12 No. 1 18-23.

[27] Committee on Government Reform, Special Investigations Division, Minority Staff (2004) Incarceration of Youth who are waiting for Community Mental Health Services in the United States, Prepared for Sen. Susan Collins, and Rep. Henry A. Waxman. Available at *www.house.gov/reform/min*; Committee on Government Reform, Special Investigations Division, Minority Staff (2002) *Incarceration of Youth with Mental Health Disorders in New Mexico*, Prepared for Sen. Jeff Bingaman, Rep. Tom Udall, and Rep. Henry A. Waxman. Available at *www.house.gov/reform/min*.

[28] There is a debate within the juvenile justice research community surrounding the true suicide rate in juvenile institutions, and how that compares to youth in the community at large. One researcher posits that the suicide rate is no higher in juvenile institutions than what is the rate in the community at large, while another has recently found that it is at least double what is about the same as the rate in the community at large. The reason for the difference reflects a debate among researchers as to how you calculate rates in a correctional population that "turns over"

frequently. Others question whether the number of suicides being accounted in more recent studies accurately reflects the true number of suicides in juvenile institutions (Hayes, Personal Communications; 2006). It beyond the scope of this paper to answer which method yields a more accurate reflection of true youth risk of "successful" suicidal behavior—something resulting in a young person's death, rather than the kind of self-harm behaviors young people engage in when in custody. As the researcher who finds no difference in "free-world" and juvenile custody suicide rates notes, *"any suicide in custody is unacceptable. Its circumstances should be investigated and practice adjusted when possible."* Synder, Howard (2005), "Is Suicide More Common Inside Or Outside of Juvenile Facilities," Corrections Today; Gallagher, Catherine A. and Dobrin, Adam. "The Comparative Risk of Suicide in Juvenile Facilities and the General Population: The Problem of Rate Calculations in High Turnover Institutions." (forthcoming). *Criminal Justice and Behavior.*

[29] Parent, D.G., Leiter, V., Kennedy, S., Livens, L., Wentworth, D. and Wilcox, S. (1994), *Conditions of Confinement: Juvenile Detention and Corrections Facilities,*. Washington, D.C.: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention.

[30] Parent, D.G., Leiter, V., Kennedy, S., Livens, L., Wentworth, D. and Wilcox, S. (1994), *Conditions of Confinement: Juvenile Detention and Corrections Facilities.* Washington, D.C.: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention.

[31] Hayes, L.M. (1999), *Suicide Prevention in Juvenile Correction and Detention Facilities.* Washington, D.C.: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention.

[32] LeBlanc (1991), *Unlocking Learning; Chapter 1 in Correctional Facilities,* Washington, DC: US Department of Education.

[33] Balfanz, R., Spiridakis, K., Neild, R. and Legters, N. (2003), "Neighborhood Schools and the Juvenile Justice System: How Neither Helps the Other and How that Could Change." Presented at the School to Jail Pipeline Conference, Harvard University.

[34] See finding from the National Dropout Prevention Center, *http://www.dropoutprevention.org/stats/quick_facts/econ_impact.htm*

[35] U.S. Department of Education (1994), *Mini-digest of Education Statistics.* Washington, DC: National Center for Education Statistics.

[36] Wagner, M., D'Amico, R., Marder, C., Newman, L., & Blackorby, J. (1992), "What Happens Next? Trends in Postschool Outcomes of Youth with Disabilities." *The Second Comprehensive Report from the National Longitudinal Transition Study of Special Education Students.* Menlo Park, CA, SRT International.

[37] Freeman, R.B. (1991), *Crime and the Employment Disadvantage of Youth,* Cambridge, MA: National Bureau of Economic Research.

[38] Western, Bruce and Beckett, Katherine (1999), "How Unregulated Is the U.S. Labor Market?: The Penal System as a Labor Market Institution," *The American Journal of Sociology,* 104: 1030-1060.

[39] Bushway, S.D. (1998), *"The Impact of an Arrest on the Job Stability of Young White American Men," Journal of Research in Crime and Delinquency* Vol. 34 No. 4 454-479.

[40] Freeman, R.B. and Rodgers, W.M. (1999), *Area Economic Conditions and the Labor Market Outcomes of Young Men in the 1990s Expansion.* Cambridge, MA: National Bureau of Economic Research.

[41] Personal correspondence, Earl Dunlap, July 29,2005.

[42] New York City Department of Juvenile Justice (2001), as cited by the Correctional Association of New York, Position Paper: *www.correctionalassociation.org/JJP_Juvenile_ Detention_factsheet.htm*

[43] Tarrant County Juvenile Services (2004).

[44] Aos, S. (2002), *The Juvenile Justice System in Washington State: Recommendations to Improve Cost-Effectiveness.* Olympia, Washington: Washington State Institute for Public Policy. Researchers analyzed the benefit-to-cost ratios for different types of programs that have been shown to work or not work in lowering juvenile crime rates. To calculate this, they measured the benefits the programs produced for taxpayers and victims, and divided this by the cost of the program.

[45] Cohen, Mark A. (1998), "The Monetary Value of Saving a High Risk Youth," *The Journal of Qualitative Criminology.,* 14, (1), 5-33.

[46] Sickmund, M. and Snyder, H. (1997), *Juvenile Offenders and Victims: 1997 Update on Violence—. Statistical Summary,* Washington, D.C.: Office of Juvenile Justice and Delinquency Prevention.

[47] Snyder, Howard et al. (1999), *Easy Access to Juvenile Court Statistics*: 1988-1997 [data presentation and analysis package], Pittsburgh, PA: National Center for Juvenile Justice [producer], Washington, D.C.: Office of Juvenile Justice and Delinquency Prevention [distributor].

[48] Sickmund, M., Sladky, T.J., and Kang, W. (2004), "Census of Juveniles in Residential Placement Databook," *http://www.ojjdp.ncjrs.org/ojstatbb/cjrp/.* According to the Census of Juveniles in Residential Placement Survey, 214 African Americans and 106 Latinos were detained for every 100,000 juveniles. Only 47 whites for every 100,000 juveniles were detained.

[49] Sickmund, M., Sladky, T.J., and Kang, W. (2004). "Census of Juveniles in Residential Placement Databook," *http://www.ojjdp.ncjrs.org/ojstatbb/cjrp/*

[50] Sickmund, M., Sladky, T.J., and Kang, W. (2004), "Census of Juveniles in Residential Placement Databook." *http://www ojjdp.ncjrs.org/ojstatbb/cjrp/.*

[51] Sickmund, M., Sladky, T.J., and Kang, W.i (2004), "Census of Juveniles in Residential Placement Databook," *http://www.ojjdp.ncjrs.org/ojstatbb/cjrp/.*

[52] Bridges, George S. and Steen, Sara (1998), "Racial Disparities in Official Assessments of Juvenile Offenders: Attributional Stereotypes as Mediating Mechanisms," *American Sociological Review,* Volume 63, 1998.

[53] Uniform Crime Report, Crime in the United States survey, (1996, 2002); Cook County Department.

**NOTES**

Justice Policy
INSTITUTE

# LESS COST, MORE SAFETY:

## Guiding Lights for Reform in Juvenile Justice

**Richard A. Mendel**

DETENTION ALTERNATIVES

EXHIBIT
Affidavit
8
tabbies

American Youth Policy Forum

# AMERICAN YOUTH POLICY FORUM

The American Youth Policy Forum (AYPF) is a non-profit professional development organization based in Washington, DC. AYPF provides nonpartisan learning opportunities for individuals working on youth policy issues at the local, state and national levels. Participants in our learning activities include Government employees—Congressional staff, policymakers and Executive Branch aides; officers of professional and national associations; Washington-based state office staff; researchers and evaluators; education and public affairs media.

Our goal is to enable policymakers and their aides to be more effective in their professional duties and of greater service—to Congress, the Administration, state legislatures, governors and national organizations—in the development, enactment, and implementation of sound policies affecting our nation's young people. We believe that knowing more about youth issues—both intellectually and experientially—will help our participants formulate better policies and do their jobs more effectively. AYPF does not lobby or take positions on pending legislation. We work to develop better communication, greater understanding and enhanced trust among these professionals, and to create a climate that will result in constructive action. Each year AYPF conducts 35 to 45 learning events (forums, discussion groups and study tours) and develops policy reports disseminated nationally. For more information about these activities and other publications, contact our web site at www.aypf.org.

This publication is not copyrighted and may be freely quoted without permission, provided the source is identified as: *Less Cost, More Safety: Guiding lights for Reform in Juvenile Justice* by Richard A. Mendel. Published in 2001 by the American Youth Policy Forum, Washington, DC. Reproduction of any portion of this report for commercial sale is prohibited. Contact AYPF for additional copies at $5.00 including postage and handling

*AYPF events and policy reports are made possible by the support of a consortium of philanthropic foundations: Ford Foundation, General Electric Fund, William T. Grant Foundation, George Gund Foundation, James Irvine Foundation, Walter S. Johnson Foundation, W.K. Kellogg Foundation, McKnight Foundation, Charles S. Mott Foundation, NEC Foundation of America, Wallace-Reader's Digest Fund, and others. The views reflected in this publication are those of the author and do not necessarily reflect the views of the funders.*

**American Youth Policy Forum**
1836 Jefferson Place, NW
Washington, DC 20036-2505

Phone: 202-775-9731
Fax: 202-775-9733
E-Mail: aypf@aypf.org
Web Site: www.aypf.org

Editors at the American Youth Policy Forum include Samuel Halperin, Betsy Brand, Glenda Partee, and Donna Walker James. Rafael Chargel designed the cover and formatted the document for publication.

**This report made possible by the Walter S. Johnson and William T. Grant Foundations, with dissemination assisted by the Annie E. Casey Foundation.**

**33 CHALLENGE #5: Provide Comprehensive Support and Assistance to Youth (and Children) with Behavioral Disturbances**

**34 Wraparound Milwaukee**
**Systems Reform in a Large Jurisdiction**
35 Understanding the "Wraparound" Approach
35 Wraparound -- *Milwaukee-Style*
36 Blended Funding and "Capitated Rate" Financing
37 Minimizing Out-of-Home Placement
37 Wraparound Success

**39 CHALLENGE #6: Offer Quality Treatment and Youth Development Services for Incarcerated Youth**

**40 The Last Chance Ranch**
**Turning Around Florida's Toughest Juvenile Offenders**
40 Up From the Sea: The Evolution of a Juvenile Justice Model
41 A Ranch for Florida's Toughest Juveniles
41 A Unique Atmosphere
42 Rewards, Punishments, and Hard Work
43 Phase Three -- Making Aftercare a Centerpiece
**43 The New Ferris School** Juvenile Corrections Reform in Delaware
44 Unparalleled Results

**46 CHALLENGE #7: Provide Quality Education and Career Development Services that Enable Youth to Assume Productive Roles in Society**

**47 Preparing Delinquent Youth for Productive Careers**
**The Gulf Coast Training Center**
47 Union Roots
**48 FRESH START at the Living Classrooms Foundation**:
An Old Trade Leads to New Success
48 Vocational Corrections
51 More Work, Less Recidivism

**53 CHALLENGE #8: Reduce Inappropriate Detention of Youth Awaiting Trial or Pending Placement**

**54 Juvenile Justice Operational Master Plan**
**Bringing Detention Reform to Seattle and King County, WA**
55 Framing a Master Plan
55 Targets for Reform
**56 The Annie E. Casey Foundation's Juvenile Detention Alternative**
58 The Fruits of Reform

**60 CONCLUSION**

**61 ENDNOTES**

**66 ABOUT THE AUTHOR**

# INTRODUCTION

*"America has both the knowledge and the money we need to substantially reduce adolescent crime and youth violence. We have the know-how to reduce the number of young people likely to join the next generation of adult criminals. Better yet, we can likely achieve this goal at a cost no greater (and perhaps considerably less) than what we will spend if current juvenile justice policies and programs remain in place."*

**Less Hype, More Help: Reducing Juvenile Crime, What Works – and What Doesn't**
(Washington, DC: American Youth Policy Forum, June 2000)

During the 1990s, juvenile crime pierced the national consciousness. Delinquency and youth violence soared to new heights early in the decade. Alarming stories about juvenile "superpredators" and a "ticking time bomb" of adolescent crime haunted the covers of *Time* and *Newsweek*. Then the school shootings in Jonesboro and Paducah and at Columbine High shook the nation. Even a sharp decline in juvenile delinquency and violence since the early 1990s has not lessened Americans' continuing sense of alarm.

In June 2000, the American Youth Policy Forum and six national partner organizations published a report analyzing America's youth crime challenge at the turn of the millennium and assessing the effectiveness of new and existing juvenile crime policies nationwide. The report, entitled *Less Hype, More Help: Reducing Juvenile Crime, What Works – and What Doesn't*, found reason for great optimism. Juvenile justice experts and practitioners have developed an array of effective tools over the past two decades with proven power to reduce violence and other lawbreaking by adolescents.

The report also revealed causes for grave concern. Responding to public demand for action against youth crime, our nation's political leaders have responded aggressively to the perceived crisis. Virtually every state has enacted sweeping new laws since 1992 – erecting new correctional facilities, imposing procedures to shift more accused youth to adult criminal courts, and launching a bevy of new juvenile justice and youth crime prevention programs.

Unfortunately, many of the so-called "reforms" enacted in recent years have ignored the real causes for delinquency and neglected the promising cures. Many states have embraced tough-sounding strategies that appeal to voters but don't work, and most have failed to address longstanding weaknesses and imbalances in our nation's juvenile justice institutions.

Reducing the situation to a simple metaphor, scholars and practitioners have blazed a promising new trail toward progress in reigning in America's adolescent crime problem – a trail leading to less crime, lower costs, and fewer lost youth. Yet many of our nation's policymakers are instead marching full steam ahead in other directions – directions fraught with alarming costs and inevitable failure both for protecting the public and for maximizing success among troubled youth.

## EIGHT CHALLENGES FOR JUVENILE JUSTICE REFORM

This report follows up on *Less Hype, More Help* by focusing more squarely on the critical needs and problems facing juvenile justice efforts nationwide. Specifically, the report spotlights eight cross-cutting challenges – both to take advantage of new opportunities created by advances in research and practice, and to overcome commonplace problems that now cripple America's efforts to reduce delinquent offending and steer troubled youth away from crime. These challenges include:

1. Reducing Overreliance on Incarceration for Non-Dangerous Youthful Offenders

2. Developing a Continuum of Community-Based Sanctions and Interventions for Delinquent but Non-Dangerous Youth

3. Employing Research-Proven Program Strategies to Reduce Delinquency

4. Identifying and Intervening Intensively With Youth at Extreme Risk for Chronic Delinquency

5. Providing Comprehensive Support to Youth With Behavioral Disturbances

6. Ensuring Quality Treatment and Youth Development Services for Incarcerated Youth

7. Providing Quality Education and Career Development Services to Help Youth Outgrow Delinquency and Assume Productive Roles in Society

8. Reducing Inappropriate Detention for Youth Awaiting Trial or Pending Placement

For each of these challenges, this report highlights one or more existing programs, policies or initiatives that show how the challenge can be (and is being) met successfully at the state and local levels. (See table on pages 4-7.) ***By putting research into practice, employing best practice reforms, creating better incentives, improving multi-agency cooperation, and eliminating inefficiency, each of the guiding light programs is demonstrating that success is possible in juvenile justice. Recidivism can be lowered. Teen crime rates can be reduced. More positive outcomes for high-risk youth can be achieved.***

## LESS COST, MORE SAFETY AND SUCCESS

As the following pages will detail, guiding lights programs not only produce far better outcomes than are now commonplace in juvenile justice systems nationwide. They also yield vast savings for taxpayers.

Most of the model initiatives profiled in this report achieve their notable successes for a price significantly lower than what more conventional programs currently spend on failure. Even those with high price-tags are proving cost-effective because they frequently solve problems the first time, rather than failing repeatedly and ensuring that youths return to the justice system and require repeated confinement.

***Spend less, achieve more safety and more youth success: that is the opportunity available to America in juvenile justice reform – if we demonstrate the energy and resourcefulness and dedication to put our knowledge into practice.***

| Challenge | Exemplary Response | Critical Characteristics |
|---|---|---|
| **No. 1**<br><br>**Over-reliance on Incarceration** | **Missouri Division of Youth Services (State of Missouri)** | Statewide system based on:<br>• small-scale residential facilities (rather than training schools)<br>• extensive 24-hour/day therapy<br>• quality education programs<br>• heavy family outreach/counseling<br>• well-qualified, highly-trained staff<br>• extensive non-residential programming and aftercare support |
| **No. 2**<br><br>**Continuum of Community Sanctions and Interventions** | **Tarrant County Juvenile Services (Tarrant County, TX)** | County Probation Agency with :<br>• limited number of locked pre-trial detention beds<br>• extensive array of non-residential sanctions, including advocate programs, family preservation, and community service-restitution<br>• strong partnerships with community-based service providers<br>• limited use of confinement and residential treatment |
| **No. 3**<br><br>**Research-Based Program Models** | **Youth Villages (Memphis, TN)** | Private non-profit agency serving youth with emotional and behavioral disorders (including many delinquents), providing a continuum of residential and non-residential care, including:<br>• Multisystemic Therapy, a highly effective home-based, family-focused mental health intervention<br>• Multidimensional Treatment Foster Care, another highly effective, research-based treatment model |
| **No. 4**<br><br>**Youth at Extreme Risk** | **"8 Percent Solution" (Orange County, CA)** | County probation program aimed at reducing the number of chronic juvenile offenders by:<br>• identifying the characteristics of youth at highest risk to become chronic juvenile offenders<br>• screening all first-time offenders to identify those with highest probability to become chronic offenders<br>• enrolling potential chronic offenders in an intensive day treatment program including family therapy, substance abuse counseling, remedial academic education, and case management |

| Evidence of Effectiveness | Other Noteworthy Responses |
|---|---|
| 1. Far lower recidivism rates than most other state juvenile corrections agencies.<br>2. Far smaller budget than juvenile corrections agencies in other states. | **Reclaim Ohio** – Statewide funding reform to reward counties for treating juvenile offenders locally and preventing excessive commitments to state training schools.<br>**California Youth Authority** – New sliding scale funding formula requiring counties to pay a large share of the costs for non-serious offenders committed to state custody. |
| 1. Substantial reductions in juvenile crime and violence.<br>2. 90-day failure rate for probation programs lower than most large urban counties in Texas.<br>3. County's long-term recidivism for youth served in local probation programs is second lowest among Texas' large urban counties. | **San Diego County** – Developed comprehensive strategy including programs to prevent the onset of delinquency and non-residential programming to reverse delinquent behavior before juvenile offenders commit serious crimes and require incarceration or transfer to adult courts. |
| 1. Only agency in the nation to replicate these two state-of-the-art treatment models.<br>2. Using these models, substantially increased long-term success of troubled youth compared with traditional residential treatment programs used previously.<br>3. Achieving greater success at a far lower cost per participant than residential treatment. | **Washington State's Community Juvenile Accountability Act** –A grant program to local juvenile courts for replication of delinquency program strategies with proven power to reduce re-offending cost-effectively. |
| 1. Just 49% of youth in initial pilot were re-arrested within 1 year, vs. 93% arrest rate for youth with identical characteristics in an earlier study.<br>2. In a controlled evaluation, youth who completed the program suffered two or more subsequent arrests 29% less often than youth randomly assigned to a control group.<br>3. "8%" youth also had fewer arrests, fewer court petitions, and spent fewer days in confinement than control group youth. | **Repeat Offender Prevention Project** – State-funded project to support the "8 Percent" program and other early intervention programs in 7 additional California jurisdictions, with a controlled evaluation design to measure the programs' impact scientifically. |

| Challenge | Exemplary Response | Critical Characteristics |
|---|---|---|
| **No. 5**<br><br>**Youth With Behavioral Disturbances** | **Wraparound Milwaukee (Milwaukee County, WI)** | County mental health program to reduce out-of-home treatment for disturbed (and often delinquent) youth using pooled funding ($28 million/year) from county juvenile probation, child welfare, and mental health agencies.<br>• comprehensive home-based services<br>• intensive case-management<br>• strength-based treatment philosophy<br>• extensive service-provider network<br>• mobile treatment team for crisis management and prevention of admissions to psychiatric hospitals |
| **No. 6**<br><br>**Chronic and Violent Youth Offenders** | **Florida Environmental Institute (Glades County, FL)** | Small, privately-operated correctional facility for serious and violent youth offenders:<br>• working ranch located in the Florida Everglades, with no locked cells or restraints<br>• high staff-to-offender ratio and close staff-offender relationships<br>• intensive behavior management (reward/punishments for good/bad behavior)<br>• extensive chores and work activities as well as in-depth educational programming<br>• intensive aftercare support for six months |
| **No. 7**<br><br>**Quality Education and Career Development for Delinquent Youth** | **Gulf Coast Trades Center (New Waverly, TX)** | Residential corrections facility using vocational training as a primary strategy to rehabilitate juvenile offenders:<br>• all students enrolled in one of 9 career tracks, each with a 915-hour applied curriculum<br>• students receive two hours per day of academic instruction<br>• most students participate in paid work experience on campus, in community agencies, or in new low-income housing construction<br>• intensive aftercare, including job search/job placement assistance |
| **No. 8**<br><br>**Juvenile Detention Reform** | **Juvenile Justice Operational Master Plan (King County, WA)** | Comprehensive analysis of county juvenile justice operations in order to:<br>• reduce overcrowding at juvenile detention center<br>• eliminate need for construction and operation of added detention beds<br>• identify alternative programs/policies to improve outcomes for juvenile offenders and reduce juvenile offending rates |

| Evidence of Effectiveness | Other Noteworthy Responses |
|---|---|
| 1. Reduced use of residential treatment from 360 youth per day to 135 per day.<br>2. Reduced psychiatric hospitalizations of children/adolescents by 80 percent.<br>3. Reduced arrests of delinquent youth participants by more than 70 percent from year prior to year after treatment.<br>4. Substantially improved participants' behavioral functioning as measured by mental health assessments. | See **Youth Villages** (Challenge #3) |
| 1. Recidivism rate has averaged 15.8 percent from 1997-2000, compared to recidivism rates of >40 percent for youth in other Florida residential corrections programs.<br>2. Despite longer stays and higher cost per day than most Florida training schools, the program ranks among the most cost-effective in the state for high-risk offenders due to far higher success rates. | **Ferris School** – The new Delaware training school built in the 1990s after years of litigation over substandard conditions and inadequate programming in an older facility. "New Ferris" offers high quality education and other programming – a dramatic improvement over past practice. |
| 1. Recidivism rates are far below those of other moderate security facilities – and more than 30% below "expected recidivism" based on risk profile of participants.<br>2. Sixty percent of graduates find paid employment in their chosen occupational fields, with average starting wage of $7.50.<br>3. Sixty percent earn GEDs. | **Fresh Start** – Baltimore-based day program that teaches delinquent youth boat building and other vocational skills as part of comprehensive, 40-week (plus aftercare) rehabilitation strategy. Most graduates are employed, and fewer than one-fifth are re-arrested. |
| County adopted master plan in August 2000:<br>• new policies/procedures/programs established to prevent unnecessary placements into detention and reduce lengths of stay;<br>• average detention population down 30 percent since January 1999;<br>• construction of new detention facility on hold indefinitely;<br>• some funds not used for construction invested in state-of-the-art intervention programs for high risk offenders and their families. | **Juvenile Detention Alternatives Initiative** – Multi-million dollar project of the Annie E. Casey Foundation that enabled three local jurisdictions to reduce overcrowding in juvenile detention, develop sound alternatives-to-detention programs, and streamline case processing to reduce unnecessarily long stays in detention for youthful offenders. |

## CHALLENGE #1:
# REDUCE OVERRELIANCE ON INCARCERATION

*"Evaluation research indicates that incarcerating young offenders in large, congregate care juvenile institutions does not effectively rehabilitate and may actually harm them... A century of experience with training schools and youth prisons demonstrates that they constitute the one extensively evaluated and clearly ineffective method to treat delinquents."*[1]

Barry Feld, University of Minnesota Law School

Nationwide, juvenile justice agencies spent between $10 and $15 billion in 2000 to prosecute, supervise, punish and treat adolescents accused or convicted of delinquent or criminal behavior, or to prevent adolescent crimes before they occur. The majority of these funds were paid to confine a small segment of the juvenile offender population, and most confined youth were sent to "training schools" – large correctional institutions typically housing 100 to 500 juvenile offenders. Conditions of confinement in these facilities are often poor, and educational and mental health services are often inadequate. Moreover, the process of isolating youth exclusively with other delinquent peers tends to exacerbate rather than mitigate the law-breaking tendencies of youthful offenders.

Decisions to send youthful offenders to training schools (or correctional boot camps) are typically based upon two rationales: (1) the young person poses a danger to society and must be removed; or (2) a period of confinement will teach the young person a needed lesson. The evidence belies both of these rationales as justification for devoting the lion's share of juvenile justice resources to incarceration.

***Most youth placed into training schools are* not *dangerous criminals.*** Nationwide, 27 percent of youthful offenders in out-of-home placements in October 1997 were guilty of violent felony crimes. (The large majority of these placements were to correctional units, with the rest being residential treatment centers or group homes.) A 1993 study of 28 states found that only 14 percent of offenders in correctional training schools were committed for violent felonies. More than half of the youthful offenders in state institutions were committed for property or drug crimes and were serving their first terms in a state institution.[2]

Meanwhile, large training schools have never proved effective in rehabilitating youthful offenders or steering them from crime. Recidivism from large training schools is uniformly high. A follow-up study on youth released from Minnesota's two training schools in 1991 found that 91 percent were arrested within five years of release. In Maryland, a study of 947 youths released from correctional facilities in 1994 found that 82 percent were referred to juvenile or criminal courts within two and one-half years after release.[3] In Washington State, 59 percent of incarcerated youth re-offended within one year and 68 percent within two years.[4]

**"Decisions to send youthful offenders to training schools (or correctional boot camps) are typically based upon two rationales: (1) the young person poses a danger to society and must be removed; or (2) a period of confinement will teach the young person a needed lesson. The evidence belies both of these rationales.... Most youth placed into training schools are not dangerous criminals.... Meanwhile, large training schools have never proved effective in rehabilitating youthful offenders or steering them from crime. Recidivism from large training schools is uniformly high.**

***In fact, virtually every study examining recidivism among youth sentenced to juvenile training schools in the past three decades has found that at least 50 to 70 percent of offenders are arrested within one or two years after release. Clearly, training schools are not derailing the criminal careers of youthful offenders.***

Why then do states continue to rely so heavily on training school incarceration – despite the powerful evidence against its effectiveness? One factor is that public pressures to "get tough" on youth crime have dissuaded political leaders from embracing less punitive rehabilitation strategies. Also, many local jurisdictions have declined to invest adequate resources in *community-based* juvenile corrections programs that can punish, supervise and rehabilitate young offenders without removing them to state institutions. Many states have created financial incentives against local investment in these needed programs.

Experience shows that states and localities which overcome these obstacles can substantially reduce their reliance on incarceration – saving millions for taxpayers, increasing public safety, and sparing many youth a needless and potentially damaging experience in corrections

## UN-PRISONMENT: MISSOURI DEPARTMENT OF YOUTH SERVICES

Steel-gray cement floor. White cinder-block walls. Narrow cot and open, stainless steel toilet. The room looks like tens of thousands of training school cells throughout our nation.

Yet here at the Riverbend juvenile correctional facility in St. Joseph, Missouri, this cell is the only one of its kind – and it is empty. Though the young people confined at Riverbend clean the cell every week, it has remained unoccupied for more than one year, reserved for emergencies that seldom arise. Rather than living in individual or two-person cells, the 33 residents of Riverbend – most convicted of felonies – sleep in three open dormitories. There are no handcuffs here, and no restraints. Only the 14-foot perimeter fence signals that this is a correctional facility.

Like all of Missouri's juvenile correctional facilities, Riverbend's 33-bed capacity is far smaller than the "training schools" that dominate juvenile corrections in most other states. Nationwide, only 12 percent of youth confined by public correctional agencies are housed in facilities with 30 or fewer residents, and 62 percent are confined in facilities with more than 110 residents.[5] Missouri closed it's only training school in 1983 (and converted it for use as an adult prison). Today in Missouri, no juvenile correctional facility contains more than 85 beds, and all except three contain 33 beds or fewer.

### AN ALTERNATIVE TO "TRAINING SCHOOL"

Clearly, Missouri's secure juvenile corrections facilities look quite different from those in most states. They are also used more sparingly. Whereas neighboring Nebraska, Illinois, Kansas, Arkansas, Oklahoma, Iowa, and Tennessee each confine between 200 and 2,200 youth in training schools and other high-security correctional facilities, Missouri confines only 180 youth in heavily locked facilities like Riverbend.[6] Three-fourths of youthful offenders committed to Missouri's youth corrections agency, the Division of Youth Services (DYS), are assigned to non-residential community programs, group homes, and less secure residential facilities.

**Community-Based Programs**. On any given day in Missouri, 255 juvenile offenders committed to state custody participate in "day treatment programs" like the Star program in Gladstone, where 15 youth spend from 8 a.m. to 3 p.m. every weekday in a combination of academic education and counseling. After school, many participate in community-service or academic tutoring activities, or in individual or family counseling. For most youth, the day treatment program is a step down

**A central tenet of the Missouri approach is that "treatment occurs 24-hours-per-day." Not only therapy sessions, but all activities must reinforce the messages of individual responsibility and discipline – and never reward youth for overpowering others or slacking in their assigned tasks or behavioral standards. Missouri maintains this 24-hour regimen by ensuring that youth are overseen at all times by at least two skilled, educated, and highly trained staff members.**

following residential confinement. This allows DYS to provide eyes-on supervision when youth return to the community, and it provides the young people extra support during the difficult and dangerous transition period. Day treatment also enables youth to continue their education without interruption, rather than enduring a delay between their release from confinement and the opening of a new semester in the public schools.

In addition to day treatment, DYS assigns "trackers" to monitor and support 800 delinquent teens each day in community supervision. These trackers – usually college students pursuing a degree in social work or a related discipline – maintain close contact with delinquent young people and their families, offering support, mentoring, and troubleshooting assistance. In addition, 500 youth statewide are supervised each day on "aftercare" status – through which youth who have graduated from DYS programs continue to be supervised by the same case manager who has overseen their case all throughout their time with DYS.

Statewide, only 12 percent of youth committed to state custody are enrolled immediately into a community-based program. However, the length of stay for Missouri youth in residential care programs is typically short – median stay is six months – and most youth spend time in community programs following their return from residential care.

**Less-Secure Residential Programs**. In addition to these non-residential programs, the Missouri Department of Youth Services also operates six non-secure group homes with 10-12 beds each, as well as 18 "moderately secure" residential programs serving 20-30 youth each. The group homes typically house youth who have committed only status offenses or misdemeanors. These young people pose no danger to the community, but require more structure, support and supervision than their families can provide. Group home youth spend considerable time away from their facilities in jobs, group projects, and other community activities. Within the facilities, they participate in extensive individual, group and family counseling.

Missouri's "moderately secure" residential programs are dotted across the state in residential neighborhoods, state parks, and two college campuses. Though many youth sent to these facilities are felons, they too spend time in the community. Closely supervised by staff, residents regularly go on field trips and undertake community service projects. Those who make progress in the counseling component of the program and demonstrated trustworthiness are often allowed to perform jobs with local nonprofit or government agencies – thanks to a $678,000 per year DYS work experience program.

## UN-PRISON ATMOSPHERE

At the moderately secure residential sites – and even at high-security facilities like Riverbend – the atmosphere is anything but prison-like. Residents joke easily with staff, with whom most are on a first name basis. The furnishings are new and cheerful, and the grounds are immaculate. Each of the facilities is organized into treatment groups of 10-12 youth who share a dormitory and participate together in academic classes and group therapy sessions. Many groups tend their own pet or pets – a dog, a turtle, a rabbit. Colorful bulletin boards designed by youth cover most of the walls – featuring their work or positive messages written by youth expressing gratitude to staff or other participants.

Youth attend six 50-minute periods of academic instruction every weekday all year round. They break into small groups for GED instruction or classwork toward their high school diplomas, work together on special projects or current events, or do individual lessons in a computer learning lab. In some DYS facilities, youth participate in a statewide stock market game where groups invest a theoretical $100,000 over 10 weeks. These DYS groups study the markets carefully, and many participants can knowledgeably discuss the stock performance of dozens of companies. Several DYS groups have ranked among the top groups statewide in the performance of their investments – outdueling classes from Missouri's regular public schools.

**Treatment**. In addition to academics, another critical element of the DYS residential programs is what residents and staff refer to as "treatment." Ninety-minute group sessions are conducted five times per week at all of Missouri's residential and day treatment programs. Facilitated by highly-trained, college-educated youth specialists and group leaders, these sessions help youth explore their own identities, reflect on their family histories, learn to understand their emotions, and build skills to recognize and reverse their destructive behavior patterns.

The walls at all DYS facilities are covered with work completed by youth as part of this treatment process. "Genograms" are family trees which include not only the names of relatives but also the problems and challenges they faced: alcoholism, drug abuse, domestic violence, mental health problems, physical disabilities, or others. For the "line of body"exercise, participants trace the outline of their own bodies and then write and illustrate essential elements of their histories, hopes, emotions and identities.

**In conversations with DYS youth, the impact of these treatment activities is unmistakable. Young people speak openly about their troubled pasts, their hopes for the future, and the changes they are making in themselves to ensure they don't repeat their past mistakes. Without prompting, many youth acknowledge the pain they have caused the victims of their crimes – and their determination not to create any future victims.**

Families are also a critical element of the Missouri treatment approach. Unlike most other states, Missouri's juvenile corrections systems is divided into five sub-state regions, enabling almost every youth to be housed within a one or two hour drive from their family homes. DYS family therapists travel to the homes of residents' parents and guardians, or they drive family members to and from the residential facilities to make visits and participate in family therapy sessions.

In conversations with DYS youth, the impact of these treatment activities is unmistakable. Young people speak openly about their troubled pasts, their hopes for the future, and the changes they are making in themselves to ensure they don't repeat their past mistakes. Without prompting, many youth acknowledge the pain they have caused the victims of their crimes – and their determination not to create any future victims. Many relate how resistant they were at first to examining the emotional wounds and traumatic experiences that helped propel them into anti-social behaviors and thus into trouble. And those who have been confined for some time talk about the responsibility they feel to help new arrivals overcome their skepticism and fear about opening their feelings to others – and to themselves.

## SAFETY, SAVINGS, AND SUCCESS

Missouri's emphasis on treatment and on least-restrictive care, rather than incarceration and punishment, is paying big dividends. While the Division of Youth Services does not track the long-term recidivism of youthful offenders released from its care, several indicators demonstrate that Missouri's unconventional approach is far more successful and cost-effective than the training school-oriented systems of most state juvenile corrections agencies.

### Ohio and California: Using Financial Incentives to Reduce Counties' Dependence on State Training Schools

Whereas Missouri has developed its continuum of community-based and non-residential programs at the state level, other states are using financial incentives to encourage county courts and probation agencies to meet the challenge at the local level.

In Ohio, counties have historically inundated state juvenile correctional institutions with many non-serious offenders. That began to change in 1993, however, when the state legislature enacted a new funding initiative, **Reclaim Ohio**. Until then, the state bore the entire cost of training school confinement for any young person the counties chose to send, while counties bore the full cost for any young person retained in the community and enrolled in a non-residential or community-based treatment program. Thus, the counties faced a powerful financial incentive to commit youth to state facilities – whether or not such a commitment was in the best interests of the individual young person (or public safety).

Reclaim Ohio turned these incentives upside down. The new program offered counties a yearly funding allocation (based on each county's percentage of statewide felony delinquents) for the treatment of juvenile offenders. The state then began charging counties 75 percent of the costs for any young person committed to state care, but only 50 percent of the costs for any young person retained in a local corrections facility. Any unspent funds could be used by the counties for non-residential community corrections programs. Thus, Reclaim Ohio provided counties both the incentive and the means to establish local alternatives to training school confinement of juvenile offenders.

When it was tested in 1994 in nine pilot counties, Reclaim Ohio caused a 43 percent drop in commitments to state custody. Reclaim Ohio is now a permanent program statewide, serving more than 15,000 youth per year in local juvenile corrections programs costing $25.6 million in 1999 alone. Meanwhile, the percentage of juvenile felony offenders committed to state care declined every year from 1994 to 1997, and overcrowding in state training schools has fallen substantially.

California has also taken steps to reduce over-reliance on training school incarceration. For decades, the state paid almost the entire cost of confinement for any youth committed by county courts to the California Youth Authority. In 1996, California created a new sliding scale funding formula. For serious offenders, the state continued to pay the lion's share of costs for training school confinement. However, the state began charging counties 50 percent of the costs of confinement for moderately serious offenders, 75 percent of the bill for youth with less serious felonies, and 100 percent for youth with technical parole violations or misdemeanors – a hefty $2,600 per juvenile per month. The impact of this new funding scheme was immediate: within two years the admission rate for less serious offenders declined by 41 percent.

**CONTACTS:**

*Reclaim Ohio*
Carol Rapp Zimmerman, Asst. Director
Ohio Department of Youth Services
51 North High Street
Columbus, OH 43215
Phone: (614) 466-8783

*California's Sliding Scale Funding Formula*
Tracy Kenny
Legislative Analyst's Office
925 L Street, Suite 1000
Sacramento, CA 95814
Phone: (916) 445-4660

In each of the past two years, only 11 percent of young people released from DYS custody or transferred from a residential to a non-secure community program were either rearrested or returned to juvenile custody within one year. A 1993 DYS study found that only 28 percent of youth released from residential care violated parole or were recommitted to DYS within three years of

their release – a failure rate one-half to two-thirds below that of most other states. More than 90 percent of the 917 youth committed to DYS in 1991 were first time commitments; only 8 percent had been committed to DYS previously. And a study of five thousand youth discharged from DYS in the 1980s found that only 15 percent were arrested as adults.[7]

Perhaps most impressively, ***Missouri's juvenile corrections system has achieved these superior outcomes at a cost well below that of most states.*** By avoiding over-reliance on expensive residential confinement programs, limiting the length of stay in these programs, and minimizing recidivism, Missouri's Division of Youth Services operated with a budget of just $61 million in 2000 – about $94 for each young person in the state aged 10-17. By comparison, juvenile corrections budgets in the eight states surrounding Missouri average approximately $140 per young person – one third more than Missouri.[8]

## THE KEYS TO SUCCESS

Despite these impressive results, other states have not been willing or able to emulate Missouri. Less than a handful of states have entirely scrapped training schools, as Missouri has, and all but a handful have declined to develop a broad network of small residential and non-residential juvenile corrections programs. Why not? And how can youth advocates and taxpayer rights groups in other states overcome resistance and build support for Missouri-style juvenile justice reform? Several factors appear most important:

- **Attention to safety.** Given the public's understandable concerns about youth crime and violence, placing adjudicated youth into non-secure programs and allowing confined youth to participate in off-campus activities is a dangerous proposition. One major incident can create a firestorm of political protest. Missouri has been extremely successful in avoiding such incidents, thanks to a combination of: 1) **careful screening** of youthful offenders before allowing them to interact with the general population; 2) **careful supervision** of confined youth during occasional outings into the community; and 3) use of **trackers to monitor youth** residing in the community to identify and address problem situations as they arise.

- **High quality staff.** A central tenet of the Missouri approach is that "treatment occurs 24-hours-per-day." ***Not only therapy sessions, but all activities must reinforce the messages of individual responsibility and discipline – and never reward youth for overpowering others or slacking in their assigned tasks or behavioral standards.*** Missouri maintains this 24-hour regimen by ensuring that youth are overseen at all times by at least two skilled, educated, and highly trained staff members. All youth specialists and direct care workers in Missouri are college graduates, and all must complete 120 hours of in-service training during their first two years on the job. In most states, incarcerated youth spend only a handful of hours per week in therapy activities with trained counselors. For the remainder of the time, youth are overseen by less skilled, lower-paid correctional officers who often lack the skills (and perhaps the inclination) to rigorously enforce a treatment philosophy.

- **Constituency-building.** To overcome public fears of delinquent youth and political momentum toward ever-tougher approaches to delinquency, ***long-time Division of Youth Services Director Mark Steward has carefully cultivated a network of prominent supporters statewide – including leaders in both political parties.*** By inviting judges, state legislators and other powerful figures to tour its facilities – and by allowing youth themselves to guide these tours and describe in their own words the value of the DYS treatment process – Steward and DYS have gained the faith of Missouri leaders across the political spectrum. Also, by placing dozens of facilities throughout the state, it has built a powerful base of grassroots support to maintain its decentralized programming at a time when most other states are only building more training school beds. "Missouri has resisted the get large philosophy,

mostly [because] Steward went out and talked with people around the state and built a consensus in support of his approach," reports Paul DeMuro, a leading juvenile justice consultant. "Steward may be the most longstanding juvenile corrections director in the nation. He knows how to work the system, and he's very well respected."[9]

## CONCLUSION

Missouri's *un-prisonment* approach to juvenile justice is by no means perfect. Investments in community-based delinquency prevention efforts are not extensive statewide, and the state contributes only a modest (though growing) $6 million per year to support local juvenile court programs that intervene early in the delinquency careers of adolescents and reduce the chances that youth will be committed to DYS in the future. Missouri also fails to collect long-term recidivism data for youth after leaving its juvenile corrections programs.

On balance, though, ***Missouri's approach should be a model for the nation. Its success offers definitive proof that states can protect the public, rehabilitate youth, and safeguard taxpayers far better if they abandon incarceration as the core of their juvenile corrections systems.***

"It's the best system in the country in my opinion for [the correctional phases of] juvenile justice," says Paul DeMuro. Bart Lubow, a Senior Associate at the Annie E. Casey Foundation, also ranks Missouri's Division of Youth Services among the finest juvenile corrections agencies in the nation. "It shows what's possible," Lubow says, "when you put in place a smart array of options and you tailor the dispositions to the needs and risks of the individual kids."[10]

| | |
|---|---|
| **Operating Agency** | Missouri Division of Youth Services |
| **Program Type** | State Juvenile Corrections Agency |
| **Program Goals** | Public Safety, Rehabilitation of Youthful Offenders |
| **Target Group** | Youthful Offenders Committed to State Custody |
| **Key Strategies** | Small correctional facilities, heavy treatment emphasis, extensive use of non-residential "tracker" and "day treatment" programs, intensive family outreach |
| **Primary Funding Source(s)** | State of Missouri, US Office of Juvenile Justice and Delinquency Prevention |
| **Evidence of Effectiveness** | Very low recidivism, far lower cost than juvenile corrections systems in most surrounding states |
| **Contact Information** | Mark Steward, Director<br>Missouri Division of Youth Services<br>P.O. Box 447<br>Jefferson City, MO 65102<br>Phone: (573) 751-3324; Fax: (573) 526-4494 |

## CHALLENGE #2:
# OFFER A BROAD ARRAY OF COMMUNITY-BASED SANCTIONS AND INTERVENTIONS FOR DELINQUENT BUT NON-DANGEROUS YOUTH

*"A judge in one county has many options to craft appropriate orders for young offenders. In the next county over, especially if it is an urban county, a judge may have very few options between probation and incarceration. That's like choosing between aspirin or a lobotomy for a migraine."*[11]

Christine Todd Whitman, Governor of New Jersey

The vast majority of young people arrested and referred to juvenile courts nationwide are not incarcerated. Instead, 43 percent are never formally charged with an offense, and two-fifths of those who are charged in juvenile courts either have their cases dropped or subsequently sign an informal probation agreement. Thus, only one-third of delinquency cases ultimately result in a court finding of delinquency (i.e., a conviction). Among youth found to be delinquent, more than two-thirds receive a sentence of probation, release, or alternative sanction. Thus, only 11 percent of delinquency cases result in out-of-home placement to corrections or to a group home or residential treatment center.

Within our nation's juvenile justice systems, however, most of the energy and the funding are devoted to confining these 11 percent. Far less effort and creativity, and many fewer resources, are devoted to appropriately punishing youth who remain at home or to addressing the underlying problems that may be causing their delinquent behavior.

Theoretically, juvenile courts have a wide range of options to deal with youthful offenders who are allowed to remain in the community. These options can include restitution, community service, home curfew, academic tutoring, anger management training, individual or family counseling, substance abuse treatment, plus many others, or supervision by a probation officer without any of these activities. If a youth violates probation, the court might have a range of possible punishments – tightened curfew, added community service, short-term "quick dip" incarceration, more frequent drug testing, or reduced privileges.

Or the judge might have few of these options – as is too often the case. As Eric Joy, director of the Allegheny County (PA) juvenile courts, told a congressional committee in 1997, "Utilizing a system of progressive sanctions can be difficult if the means to carry them out are not available."[12]

***One disposition that historically has not been available in most communities, or has been used only for a select few, is intensive non-residential treatment and/or youth development services – aggressive intervention programs to resolve behavior problems in young people's natural environment.*** This gap is not due to a lack of willingness on the part of juvenile courts and probation agencies to invest

**Theoretically, juvenile courts have a wide range of options to deal with youthful offenders who are allowed to remain in the community. These options can include restitution, community service, home curfew, academic tutoring, anger management training, individual or family counseling, substance abuse treatment, plus many others.... Or the judge might have few of these options – as is too often the case.**

money in treatment programs; rather, most jurisdictions regularly place troubled youth into group homes and residential treatment programs, often paying $200 or more per day for these services. Yet, in most communities, juvenile justice authorities have declined to invest in intensive programming for youth who remain in their own homes.

This failure is especially striking given the tremendous success achieved by a handful of intensive non-residential program models such as Multisystemic Therapy, Multidimensional Treatment Foster Care, and Functional Family Therapy (see Challenge #3). These and other intensive non-residential juvenile corrections programs, even when they provide extensive services, cost far less per day than training schools or residential treatment programs. Often, their results are as good or better. Yet these intensive community-based programs, even more than other components of a progressive sanctions continuum, remain all too rare nationwide.

As the following pages explain, Tarrant County, Texas is one jurisdiction demonstrating that where intensive non-residential programming is provided – and particularly when it is integrated into a seamless continuum of graduated sanctions and services – the results are often both superior to and less costly than those realized using the old "aspirin or lobotomy" approach.

## BUILDING A COMMUNITY-BASED CONTINUUM
## TARRANT COUNTY (TX) JUVENILE SERVICES DEPARTMENT

Soon after George W. Bush was first elected Governor of Texas in 1994 with juvenile justice reform as a major plank in his campaign platform, the Texas legislature authorized $37.5 million dollars in general revenue bonds for construction or expansion of local juvenile corrections facilities.

Half of these funds were designated for Texas' seven most populous urban counties, and six of the counties snatched up the funds and quickly added more than 500 new correctional beds. One jurisdiction, however, opted not to accept the funds. Despite the fact that it had many fewer correctional beds than most urban counties even before the new construction began, Tarrant County declined its $3.7 million share of the state's offer.

Why? Because when the county juvenile probation department conducted an internal study, it found that added correctional beds were unnecessary. Moreover, while the new Texas program would pay the bill for construction, it would not pay most of the ongoing costs for operating and maintaining the new facilities. Thus, going ahead with construction would cost county taxpayers millions per year in added costs once the beds were built. Tarrant County decided that it could protect the public better, serve delinquent youth more effectively, and save county taxpayers more money by investing a continuum of non-residential, community-based responses to delinquency. In doing so, the county ratified its reputation as a lone ranger in a state where "law and order" have reigned for decades and "zero tolerance" increasingly rules juvenile justice.

### THE TARRANT COUNTY CONTINUUM

The above anecdote offers just one illustration of how Tarrant County's approach differs from conventional practice both in Texas and nationwide. During the 1990s, the Texas Youth Commission nearly tripled the number of youth it incarcerated each night in state training schools. Most county probation agencies in Texas also took increasingly hard line approaches toward juvenile offenders. Many erected new boot camps or other correctional centers, and many expanded their pre-trial detention centers – further adding to the number of youth incarcerated statewide.

Tarrant County, home to the city of Fort Worth, took a different approach. Instead of building detention and correctional facilities, Tarrant County developed an array of programs and

**During the 1990s, the Texas Youth Commission nearly tripled the number of youth it incarcerated each night in state training schools. Most county probation agencies in Texas also took increasingly hard line approaches toward juvenile offenders. Many erected new boot camps or other correctional centers, and many expanded their pre-trial detention centers – further adding to the number of youth incarcerated statewide.... Tarrant County, home to the city of Fort Worth, took a different approach.**

punishments to sanction juvenile offenders while at home. Instead of sending large numbers of youth to state correctional institutions, Tarrant County placed most delinquents into non-residential programs. Instead of placing youth accused of less serious offenses on routine probation – providing few services and little support – Tarrant enrolled most into rigorous counseling, community service, and/or youth development programs designed to reverse behavior problems before they escalated into serious criminality.

**Tarrant County Advocate Program**. Back in 1992, Tarrant County juvenile services director Carey Cockerell began scouring the nation for local correctional programs that could serve as alternatives to committing young offenders to the Texas Youth Commission (which operates the state's correctional training schools), or to residential treatment facilities for adolescents that cost the county up to $200 per day (and produced only mixed success). Cockerell seized upon Youth Advocate Programs, Inc. (YAP), an operation based in Harrisburg, Pennsylvania that has provided intensive support and supervision to more than fifty thousand delinquent and troubled youth over the past 25 years in seven states and the District of Columbia.

Designed as an alternative both to pre-trial detention and to incarceration and other out-of-home placements following adjudication, YAP trains and assigns local community residents to serve as advocates for troubled teens. These advocates mentor and monitor the youth, and they facilitate a child/family team including neighbors, volunteers, professional staff (such as child welfare workers, or clinical social workers) relatives, parents, and youth themselves. By keeping close tabs on delinquent youth, the advocate programs offer a cost-effective alternative to confinement for youth who pose no immediate danger to themselves or others. In addition, advocates facilitate a "wraparound" services approach that helps youth and their families build on their strengths, solicit needed counseling and support services, and stabilize behavior problems.

With funding from Cockerell's agency, YAP established the Tarrant County Advocate Program (TCAP) late in 1992 in one high-crime Fort Worth neighborhood. Within a year, the commitments to secure juvenile corrections facilities dropped by 44 percent for youth in the targeted neighborhood. In 1999, TCAP served 385 young people. Despite a record of multiple prior arrests among many participants, 91 percent of the young people discharged from the program did not incur a more serious delinquent charge (although some youth were re-arrested on minor charges) during their 4-6 month stay in the program. In 2000, TCAP's success rate dipped to 78 percent.[13]

**A Comprehensive Continuum.** Today, TCAP is only one element in a comprehensive continuum of services and sanctions for youthful offenders in Tarrant County. Other program offerings include:

- **Community service restitution** and **monetary restitution**, in which youth are court-ordered to perform 30-100 hours of service or make a financial payment to victims. During 2000, 996 juveniles completed 19,775 hours of work for local community agencies. In addition, Tarrant County juvenile offenders made monetary restitution payments of more than $65,000.

**By spurning calls to build more detention cells and place more youth into expensive confinement programs, Tarrant County has saved local taxpayers millions. And contrary to the fears of an alarmed public, Tarrant's home-based, treatment-oriented approach has led to a substantial reduction in juvenile crime.**

- **Family preservation**, providing intensive home-based counseling for troubled youth and their families. The program offers a combination of counseling, 24-hour crisis intervention, and training in social skills (such as parenting, anger management, conflict resolution and problem solving) for families of emotionally disturbed youth at risk for commitment to the Texas Youth Commission (TYC). In 1999 and 2000, 389 of the 455 youth (85.5 percent) completing the program successfully averted a TYC placement. For the life of the program (January 1992 through July 2000), just 103 of 1,141 participants (9 percent) were subsequently committed to TYC, and three-fourths of the remaining participants had no subsequent contact with the juvenile court.

- **Juvenile Drug Court**, which offers substance-abusing youth the opportunity to enroll in supervised drug treatment as an alternative to formal probation. Youth are monitored closely in their treatment and drug tested regularly, and charges are dismissed when and if youth complete their course of treatment successfully. Of 172 youth who exited the program in 2000,

**San Diego County**
**The Comprehensive Strategy**

Like Tarrant County, San Diego County (CA) is also working hard to build a continuum of local sanctions and intervention programs for juvenile offenders. San Diego was one of the first communities in the nation to receive federal funding to implement the Office of Juvenile Justice and Delinquency Prevention's "Comprehensive Strategy" against juvenile violence.

In 1996, San Diego embarked on an intensive study and planning effort involving more than 200 area leaders. Since then, it has mounted an impressive flurry of new activity aimed at reducing youth crime and promoting the healthy development of young people. New efforts include: intensive full-day programs for high-risk first offenders and for other youth at risk of out-of-home placements, significantly expanded adolescent substance abuse treatment, new after-school programming, and new comprehensive community centers to serve youth and their families.

San Diego has raised well over $10 million to support these efforts since 1996. However, while far more extensive than the services offered in most jurisdictions, the county's new model programs still serve only a fraction of the juvenile population that could benefit. San Diego's once serious detention overcrowding problem has begun to ease as the detention population declined from 630 in 1998 to 470 in 1999. However, the detention rate remains high in relation to other jurisdictions of similar size.

**CONTACT:**

David Simmons
Director, Comprehensive Strategy
The Children's Initiative
4438 Ingraham Street
San Diego, CA 92109
Phone: (619) 490-1670



Less Cost, More Safety 19

TARRANT COUNTY VS. DALLAS COUNTY
JUVENILE PROBATION PROGRAMS, SERVICES AND COSTS
500
400
300
200
100
0
48.2
91.1
21.4
74.8
123.8
136.7
231
417
$105
$195
Secure Detention Beds (per 100,000 juveniles)
County-Sponsored Correctional Beds (per 100,000 juveniles)
Annual Commitments to TYC (1996-98) (per 100,000 juveniles)
1998 Total Out-of-Home Placements Rate (per 100,000 juveniles)
1998 County Spending for Juvenile Probation (per juvenile ages 10-17)
Tarrant County
Dallas County
Total Juvenile Populations:
Tarrant County (149,407), Dallas County (245,838)
Sources: Data supplied by Tarrant and Dallas County Probation Departments.

135 (78 percent) graduated successfully, while 35 were returned to court to face formal charges. Juvenile Drug Court participants submitted 1,958 urinalysis drug tests during 2000, of which 257 (13 percent) showed a positive result for illicit drugs.

- **Non-residential sex offender treatment,** provided by thee local community agencies to youth accused of indecent exposure, indecency with a younger child, or sexual assault. As of January 2001, only one of the 183 youth enrolled into the program from 1998-2000 committed a new sexual offense. In 2000, 66 of 72 youth (92 percent) completing the program were successful, meaning that they completed the requirements of the treatment and were committed to the Texas Youth Authority or placed into residential treatment

- **Intensive supervision probation (ISP)** for juvenile probationers at highest risk for placement into TYC. Unlike the ISP programs in many other counties, the Tarrant County ISP staff not only supervise youthful offenders and monitor their compliance with curfews and probation orders. They also support families and provide referrals to academic, vocational, and counseling programs that help keep high-risk youth away from trouble. Of 304 offenders completing ISP in 2000, 82 percent completed the program without being committed to TYC or other residential placements, or transferred to stand trial as an adult. This success rate was well above a state-imposed standard of 75 percent.

## CROSS-COUNTY CONTRAST

Unlike most large jurisdictions in Texas, Tarrant County operates no local boot camp or correctional ranch programs for adolescent offenders. Moreover, Tarrant's juvenile detention center (housing adolescent offenders pending trial) has just 72 beds – many fewer than the detention facilities of other large counties in Texas or nationwide. Beyond detention, Tarrant County utilizes only two small residential programs for juvenile offenders. One uses a 16-bed wing of the county detention center for short-term (10-20 days) confinement of youth who violate probation (instead of immediate commitment to TYC); and the second – a new program in 2000 – uses another 16-bed unit to provide intensive treatment and supervision for juvenile sex offenders.

Nor has Tarrant County followed the path of many Texas counties by sending as many young people as possible to the state corrections agency, thereby avoiding the expense of punishing and supervising offenders locally. Tarrant County committed an average of 185 teens per year to TYC between 1996 and 1998. That's 35 percent fewer than the average (285) committed by Bexar County (San Antonio) which has almost an identical population as Tarrant, and barely half the average number (336) committed by neighboring Dallas County (whose population is only 50 percent larger than Tarrant's).

**Right Next Door and a World Apart.** In fact, comparing Tarrant County with Dallas County offers perhaps the most vivid evidence of how

sharply Tarrant County differs in its approach to juvenile crime from most Texas counties – and how much more cost-effective its non-punitive continuum is in reigning in juvenile crime and reducing recidivism. Dallas and Tarrant share an airport and a 30 mile border as well as a similar history, similar demographics, and a similar economy. Yet the juvenile justice systems of Dallas and Tarrant Counties are a world apart.

Dallas County, with a youth population of 212,000, operates a juvenile detention facility with 224 beds to confine youths awaiting trial or pending correctional placement. Dallas County also operates two local correctional facilities with capacity for 184 youth. Tarrant County, with a juvenile population two-thirds as large as Dallas County (144,000 vs. 212,000), maintains one-third as many detention beds (72 versus 224), and – unlike Dallas – Tarrant County maintains only the 32 local correctional beds detailed above. Nonetheless, Tarrant County sends many fewer juvenile offenders to TYC than Dallas County. (See Table p.19) Overall in 1998, Dallas County placed almost twice as many youth into out-of-home dispositions per capita as Tarrant County (417 versus 231 per 100,000). Dallas taxpayers also spent far more local tax dollars on juvenile justice than Tarrant – $42 million per year (equal to $200 per young person in the county) versus $15 million in Tarrant ($105 per young person). Yet juvenile crime rates dropped substantially in both counties during the 1990s, and they look quite similar today. Dallas County had higher rates of juvenile murder, rape, and robbery from 1995-97, Tarrant County suffered higher rates of aggravated assault and a higher overall juvenile arrest rate.

## LESS COST, MORE SAFETY

By spurning calls to build more detention cells and place more youth into expensive confinement programs, Tarrant County has saved local taxpayers millions. And contrary to the fears of an alarmed public, Tarrant's home-based, treatment-oriented approach has led to a substantial reduction in juvenile crime. In fact, ***the failure rates of youth enrolled in Tarrant County's community corrections programs consistently rank among the lowest of any urban county in Texas.*** Likewise, an August 2000 report from Texas' non-partisan Criminal Justice Policy Council found that the long-term recidivism rates of Tarrant County youth placed into non-incarceration programs are second lowest of Texas' major urban counties. Less cost, more safety.

| | |
|---|---|
| **Operating Agency** | Tarrant County Juvenile Services |
| **Program Type** | County Probation Agency |
| **Program Goals** | Effective Treatment for Delinquent and Troubled Youth, Public Safety, Cost-Effectiveness |
| **Target Group** | Juvenile offenders in Tarrant County |
| **Key Strategies** | Continuum of non-residential sanctions and services, minimum reliance on detention, incarceration, or other expensive out-of-home confinement |
| **Primary Funding Source(s)** | Tarrant County, Texas Juvenile Probation Commission |
| **Evidence of Effectiveness** | Reduced juvenile crime rates since early '90s; very low failure rates for youth in local probation programs |
| **Contact Information** | Carey Cockerell, Director<br>Tarrant County Juvenile Services<br>2701 Kimbo Road<br>Fort Worth, TX 76111<br>Phone: (817) 838_4600; Fax: (817) 838_4646 |

## CHALLENGE #3:
# REPLICATE RESEARCH-PROVEN PROGRAM STRATEGIES TO REDUCE DELINQUENCY

*"To date, most of the resources committed to the prevention and control of youth violence, both at the national and local levels, have been invested in untested programs based on questionable assumptions and delivered with little consistency or quality control."[14]*

Delbert Elliot, Director, Center for the Study and Prevention of Violence

Twenty-five years ago, a prestigious study panel examined the evidence that had been gathered to that time about the effectiveness of rehabilitation programs for adult and juvenile offenders. Their findings were stark – and became popularized in some circles as providing the definitive word that "nothing works" in rehabilitation.[15]

In fact, these researchers never found that nothing works – only that social scientists had yet to validate rehabilitation strategies in careful scientific trials. Nonetheless, the reality as recently as 20 years ago was that we had little evidence that any particular models made a marked difference in controlling crime or delinquency.

In 2001, those seem like the dark ages.

Over the past two decades prevention and juvenile justice policy innovators have developed and validated a number of intervention models that substantially lower either recidivism by youthful offenders or the onset of delinquent behavior by youth at risk for delinquency.

Some pundits and political leaders today still like to pretend that nothing works, that prevention is just a dangerous waste of money. On the other hand, some advocates like to pretend that we always knew how to prevent crime – that it's just common sense. The reality is that only in the past two decades have we begun to figure out what works and doesn't work – and some of those findings have been unexpected.

***For youth already engaged in delinquency, three models have emerged as proven, powerful successes. All three work with young people in their own homes and communities, rather than in institutions, and they focus heavily on the family environment.*** One strategy, called Multisystemic Therapy (MST), has reduced future days in corrections or residential treatment by at least 47 percent in eight scientific trials. MST costs only about $6,000 per youth, less than one-fourth the cost of an eight-month stay in juvenile corrections.

Another home-based strategy, Functional Family Therapy, has reduced the recidivism rates of delinquent youth by 25 to 80 percent in repeated trials dating back to 1972. It costs only $2,000 per youth. The third model, Multidimensional Treatment Foster Care, combines short-term, therapeutic foster care with intensive counseling for the natural family, followed by rapid re-unification and ongoing support. It reduced subsequent offending by more than 50 percent among chronic delinquents, a recent study found, and saved more than $14 in future justice system costs for each extra dollar spent on the treatment.

Despite these successes, however, none of these models is in widespread use today. Multisystemic Therapy and Functional Family Therapy each served approximately 5,000 young people in 2000 – this in a nation that arrests more than 2.5 million adolescents each year and confines more than 100,000 every night. Likewise, despite its overwhelming advantages over other forms of

treatment, Multidimensional Treatment Foster Care is being replicated in only a handful of sites nationwide.

By heeding the research, by replicating what works, America has an opportunity to substantially improve its success against juvenile crime.

## PUTTING RESEARCH INTO PRACTICE
## YOUTH VILLAGES IN MEMPHIS, TENNESSEE

During his first 13 years at the helm of Youth Villages, a youth-serving agency based in Memphis, Tennessee, Patrick Lawler helped the nonprofit grow from three residential treatment facilities serving 25 emotionally disturbed youth around Memphis to 23 residences serving 240 youth throughout Tennessee as well as in Mississippi and Arkansas.

The only problem was, despite long and expensive stays in its residential treatment facilities, many of the young people served by Youth Villages relapsed into delinquency or other problem behaviors soon after leaving. As with similar systems across the country, Lawler's agency was never punished for this problem, because Tennessee never required residential treatment providers to monitor the long-term success of participants. "The state would ask us at the end of each year what we did with their money," Lawler recalls, "and we would tell them the truth: we spent it."

In 1993, Lawler hired a local MBA candidate to examine his operation with fresh eyes. Not only were many youth being incarcerated or returning to residential treatment after leaving Youth Villages, the study found, but the families of troubled youth were often plagued with urgent needs, and no one was helping them.

### LOOKING TO THE RESEARCH

Based on this report, Lawler looked to the research and turned Youth Villages' operations upside down.

**Multisystemic Therapy**. First Lawler identified Multisystemic Therapy (MST), a non-residential model designed by University of South Carolina psychologist Scott Henggeler. MST employs trained mental health counselors to work with troubled teens in their homes, engaging not just the young person but his or her whole family based on the understanding that most adolescent misbehavior can be traced back to the family system. Therapists seek to determine the negative dynamics that propel the young person toward delinquency – be they poor parenting, substance abuse, a learning disability, or attachment to delinquent peers. The therapist engages the family in strategies to overcome these root problems, while at the same time coaching parents in behavior management strategies to begin re-establishing order and respect in the home. During the process, therapists might refer the youth, parents, or even siblings to a wide range of possible supports – a substance abuse program, a job placement service, an after-school youth program, whatever it takes to overcome the problems and stabilize the family.

Henggeler's model has been tested in eight scientific trials since 1986. In every case, it dramatically reduced the number of days that delinquent and otherwise trouble youth spend in corrections or residential treatment compared with conventional treatment strategies. Violent and chronic offenders treated with MST in rural South Carolina had 43 percent fewer arrests, committed 66 percent fewer self-reported offenses, and spent 64 percent fewer weeks in youth

**[Multisystemic Therapy] has been tested in eight scientific trials since 1986. In every case, it dramatically reduced the number of days that delinquent and otherwise trouble youth spend in corrections or residential treatment compared with conventional treatment strategies. Multisystemic Therapy costs about $6,000 per youth, far less than incarceration or placement into a group home or residential treatment center.**



**MULTISYSTEMIC THERAPY VERSUS USUAL JUVENILE JUSTICE SERVICES FOR SERIOUS ADOLESCENT OFFENDERS**

Results of a Randomized Trial in Simpsonville, SC
59 Weeks After Treatment

Source: Henggeler, Scott W., *Treating Serious Anti-Social Behavior in Youth: The MST Approach* (Washington, DC: Office of Juvenile and Delinquency Prevention, May 1997).

prisons or treatment centers than youth randomly assigned to usual court sanctions and treatments.[16] (See Table #2.) In Columbia, Missouri, youth who completed MST showed a five-year re-arrest rate of 22.1 percent – less than one-third that of youth who completed individual therapy (71.4 percent). In two other clinical studies, MST reduced days spent in out-of-home placements by 47 percent and 50 percent compared with youth treated in traditional programs.[17] Multisystemic Therapy costs about $6,000 per youth, far less than incarceration or placement into a group home or residential treatment center.

Based on this track record, Lawler began hiring and training a new breed of counselors in 1993 to engage the families of troubled young people using the MST model. The first and most important step for these counselors was to examine the underlying conditions in a young person's life, and then to "find the fit" – the causal connection through which problem behaviors are the logical outcome of a young person's overall life situation. The next crucial step was to identify strengths and assets in the young person's life that might reverse the problem. MST therapists at Youth Villages helped youth pursue personal interests and goals by connecting them with activities in anything from employment to sports to computers – and thereby weakened the young people's attachments to anti-social peers. At the same time, MST therapists worked with parents, teachers, and other responsible adults to promote responsible behavior. Therapists concentrated most on caretakers – helping them overcome their own psychological, emotional, and substance abuse issues, and teaching caretakers to provide positive and consistent structure and discipline within the home. Once the young person's behavior was stabilized, counselors focused on building an ongoing support system for the family to ensure success after the MST process concluded.

**Multidimensional Treatment Foster Care.** In 1996, Lawler identified another research-based program, Multidimensional Treatment Foster Care. Designed in Oregon to help serve troubled youth whose families remained unprepared to care for them, the program offers two key services simultaneously: 1) short-term therapeutic foster care, in which troubled youth live with trained foster parents who employ strict behavioral monitoring with support from a licensed therapist; and 2) intensive counseling and parenting skills training for the youths' parent(s) or legal guardian(s). After six to nine months, following a series of increasingly frequent and lengthy visits home, the families are reunited. Ongoing counseling continues until the home

situation is stable and the young person is re-acclimated to his or her home environment.

Like MST, Multidimensional Treatment Foster Care has a strong foundation in research. In one clinical trial with serious and chronic youthful offenders, youth participating in Multidimensional Treatment Foster Care proved twice as likely as youth placed into groups homes to complete the program (and not run away), and they spent an average of 75 fewer days incarcerated over the subsequent two years.[18] (See Table #3.) In another trial focused on very serious offenders, youth in Multidimensional Treatment Foster Care were arrested less than half as often as youth sent to group homes (2.6 vs. 5.4 arrests). They also spent less than half as many days incarcerated following treatment and were six times as likely to remain arrest free in the year after treatment (41 percent to seven percent).[19] As a result, the treatment foster care program saved $14 in justice costs for each dollar spent on treatment.

For Youth Villages, the addition of Multidimensional Treatment Foster Care filled an important gap between its continuing residential treatment services and its new in-home (MST) therapy. By adding MST and Multidimensional Treatment Foster Care, Youth Villages created a comprehensive continuum of services for troubled youth ranging from home-based (MST) counseling to treatment foster care to residential treatment and hospitalization.

## BRINGING SUCCESS TO SCALE

As the clinical trials predicted, Youth Villages' success rates soared using the MST and Multidimensional Treatment Foster Care models, while costs plummeted. More than 80 percent of youth participating in the new program (which cost as little as $6,000 per youth) continued to live successfully at home one year after treatment, Lawler reports, compared to about 63 percent of youth one year after returning home from the old residential treatment program (which ran more than $50,000 for a typical ten-month stay).

Launching these family-oriented programs was the easy part, however. Lawler then had to convince

state bureaucrats to pay for them. He also had to build in sophisticated supervision and accountability systems to ensure that programs which worked well in small-scale tests remained successful when implemented agency-wide.

**Changing Funding Formulas to Reward Success.** Historically, Tennessee's policy for serving emotionally disturbed youth – like the policies of many other states – was simple: if a young person is a danger to oneself or others, the state would pay for hospitalization or placement into residential treatment center or group home. If the troubled young person was not a danger, the state provided little support beyond out-patient counseling from underfunded and ill-equipped county mental health departments. Funding for intensive, family-focused treatment had no place in the state's plans, and reimbursement for any agency providing these services was not permitted.

Thus, while Youth Villages' received up to $200 per day from Tennessee for each young person in its longstanding residential programs, it could not collect a penny from the state for its $65-$70 per day MST program – even though the home-based services were producing better outcomes than the more-expensive residential treatment.

Based on the success of Youth Villages' initial tests of MST (funded with private grants), Lawler began seeking a change in state funding. For two years, state officials ignored his calls. Finally in 1995, with a new governor in office and the state budget in deep deficit, Tennessee accepted Youth Villages' offer to tear up its existing contracts, serve one-third more youth for the same money, and for the first time guarantee positive outcomes for most youth following treatment. In return, Youth Villages gained the freedom to offer a continuum of services, including both home-based and residential treatment.

Thanks to its growing use of MST and treatment foster care, Youth Villages served 1,600 Tennessee youth in 2000 – four times the number it served in 1993. Many spent a short time in residential treatment, but most proceeded quickly to family-focused non-residential therapy. Eighty percent

## Putting Proven Models Into Practice: Washington State's Community Juvenile Accountability Act

In 1995, Washington State juvenile justice leaders had a bold idea. Based on increasingly compelling research showing that a small handful of chronic offenders commit the bulk of all serious juvenile crime, they convinced Washington's legislature to support a new early intervention program – funding counties to provide enhanced treatment services and supervision for their highest-risk youth offenders.

Unfortunately, it didn't work. A preliminary evaluation by the Washington State Institute for Public Policy, a state-funded research agency, found that youth enrolled into the enhanced programs proved no less likely to re-offend than non-participating youth. In implementing the program, most counties had simply intensified their existing strategies without consulting the research into what works.

Based on this experience, Washington's legislature enacted a new law in 1997, the Community Juvenile Accountability Act (CJAA). It promised new funding for local juvenile courts, but only for programs with proven power to reduce re-offending rates cost-effectively. After the law was passed, the Institute for Public Policy searched for juvenile justice intervention program models with proven impact, and then it conducted elaborate cost-benefit analyses to demonstrate that the models were indeed cost-effective.[20] Consulting with local court officials, the Institute identified five programs for potential replication using the CJAA funding stream – Functional Family Therapy (FFT) and Multisystemic Therapy (MST), both profiled in Challenge #3, along with less intensive program models to control aggression, provide community mentors, and improve coordination among agencies serving delinquent and high-risk youth.

Following a statewide training conference, local officials from the state's 34 local juvenile courts initially selected to implement only two of the models – FFT and "Anger Replacement Therapy," a 10-week behavioral skills training curriculum. The State legislature appropriated $7.65 million to support these two programs from July 1999 through June 2001, and three counties also established MST programs using federal block grant funds.

As of August 2000, Washington's counties had developed more than 40 local replication programs and enrolled more than 2,000 youth. The Institute for Public Policy has begun an intensive evaluation comparing the outcomes for participating youth with those for similar youth placed on waiting lists. While program evaluation outcomes will not be known until 2002, Policy Institute analyst Steve Aos believes the program is already a success. The extensive consultation between his agency and local juvenile courts has helped break down longstanding mistrust between the state and local officials, Aos says: "It meets a test of intergovernmental cooperation that is often lacking....

"For the state level," Aos says, "it has been positive because the state is saying for the first time that we're only going to put our money into programs with a track record of success."[21]

**CONTACT:**

Robert Barnoski, Senior Research Associate
Washington State Institute for Public Policy
110 E. Fifth Avenue, Suite 214
Olympia, WA 98504-0999
(360) 586-2744

will remain home successfully for at least nine months. Based on these results, Tennessee has made its arrangement with Youth Villages the model for all contracts to serve troubled adolescents statewide.

As a result, Youth Villages now employs 100 MST counselors and clinical supervisors and serves more than 500 families in MST per year, making Youth Villages by far the largest provider of MST services in the nation. Likewise, Youth Villages serves 420 youth every day in Multidimensional Treatment Foster Care, making it one of only a handful sites nationwide to adopt this powerful intervention model.

However, in neighboring Arkansas (as in most states), rules still forbid payments for most home based services. Arkansas contracts with Youth Villages to care for troubled adolescents, but only in residential treatment centers, not in home-based counseling. As a result, Arkansas pays more to reap less safety and less success.

**Ensuring Program Quality**. Unlike many therapy methods, MST is highly regimented. The program is based on nine core principles, and the process for implementing these principles is spelled out in exacting detail in MST program manuals. Moreover, MST calls for therapists to review each case three times per week – once with their supervisor, once with the supervisor plus other therapists on their treatment team, and once with a senior MST clinical consultant. Likewise, Multidimensional Treatment Foster Care is guided by a specific treatment philosophy and a clear set of treatment procedures.

In his ongoing research into the effectiveness of MST, program designer Scott Henggeler has found that fidelity to these program requirements is a critical factor for success. While no clinical trial of MST has resulted in failure, Henggeler has found in several studies that participants achieve far better outcomes when providers follow the MST guidelines. For instance, when MST was tested against usual juvenile justice services for juvenile offenders in Orangeburg and Spartanburg, South Carolina, an analysis of therapists reports "indicated that outcomes were substantially better in cases where treatment adherence ratings were high."[22]

For many local nonprofit and county mental health agencies, adhering to these exacting procedures and strict standards is unfamiliar and difficult. However,

**MULTIDIMENSIONAL TREATMENT FOSTER CARE VERSUS GROUP HOMES**

Results of a Randomized Trial for Chronic Juvenile Offenders

Population: Delinquent boys averaging 13 prior arrests and 4.6 felony arrests.

Source: Chamberlain, Patricia, *Blueprints for Violence Prevention, Book Eight: Multidimensional Treatment Foster Care* (Boulder, CO: Center for the Study and Prevention of Violence, 1998).

under Patrick Lawler, Youth Villages has won several awards for innovative management and quality assurance, including two "Excellence in Service Quality" awards from the United Way of America. Youth Villages' capacity to develop the elaborate quality assurance systems required to implement complex programs effectively has been an important key to its success in bringing promising research into productive practice.

| | |
|---|---|
| **Operating Agency** | Youth Villages, Inc. |
| **Program Type** | Private, Nonprofit Youth Serving Agency |
| **Program Goals** | Effective Treatment of Emotionally Disturbed and Delinquent Youth |
| **Target Group** | Youth with emotional disturbances who have been placed into residential treatment programs |
| **Key Strategies** | Continuum of care including home-based counseling using the acclaimed Multisystemic Therapy (MST) model, and treatment foster care using a proven program model developed in Oregon |
| **Primary Funding Source(s)** | Tennessee Department of Children's Services, States of Mississippi and Arkansas |
| **Evidence of Effectiveness** | Reduced cost-per-participant and substantially improved success rates for Youth Villages participants since adoption of MST and treatment foster care models |
| **Contact Information** | Patrick W. Lawler, Administrator<br>Youth Villages, Inc.<br>P.O. Box 341154<br>Memphis, TN 38184-1154<br>Phone: (901) 252-7200; Fax: (901) 252-7280<br>www.youthvillages.org |

# CHALLENGE #4: IDENTIFY AND INTERVENE INTENSIVELY WITH YOUTH AT EXTREME RISK FOR CHRONIC DELINQUENCY

*"The lack of consistent intervention with juvenile offenders soon after their initial contact with the police or other authorities has long been recognized as perhaps the single largest gap in services for troubled youth."*[23]

National Council on Crime and Delinquency

In 1972, Marvin Wolfgang and his colleagues at the University of Pennsylvania published a seminal study, *Delinquency in a Birth Cohort*, which tracked delinquency and criminal behavior among ten thousand Philadelphians born in 1945 throughout childhood, adolescence and young adulthood.[24] Wolfgang repeated the analysis with more than 25,000 youth born in 1958, and in recent years several more cohort studies have been conducted by other criminologists.[25] In each of these studies, a small group of boys – just six to eight percent – committed the majority of all serious and violent juvenile crimes. For instance, Wolfgang's second analysis found that seven percent of Philadelphia youth committed 61 percent of all offenses, 65 percent of all aggravated assaults, 60 percent of homicides, 75 percent of rapes, and 73 percent of robberies.[26] The implications are obvious: ***To be effective in reducing youth crime, prevention and intervention efforts must target those young people at highest risk to become chronic offenders.***

More recently, delinquency scholars have identified clear developmental pathways that children follow on the way to becoming chronic delinquents and then adult criminals. Experts have isolated critical "risk" and "protective" factors that influence whether or not a young person will turn to delinquency and – if they do – whether they will persist in criminal behavior over time. Also, juvenile justice agencies have consistently found that young people arrested at an early age are far more likely than other youth to become chronic juvenile offenders. Together, these findings make it possible for juvenile courts and juvenile justice agencies to identify early those youth who are at extreme risk for serious delinquency – and then to develop intensive programming targeting these highest-risk youth.

However, the reality throughout our nation is that few local juvenile justice systems take the time to assess objectively the risk of re-offending for first-time youthful offenders – even for second- or third- or seventh-time offenders – provided they have not yet committed a crime serious enough to spark the attention of a juvenile court prosecutor, judge or probation officer. The result, writes the National Council on Crime and Delinquency, is an "all-too-common pattern: several encounters with authorities; short-term detentions with no coherent, intensive interventions; repeated offenses; and eventual incarceration in juvenile and adult correctional facilities."[27]

In recent years, a handful of jurisdictions have begun to break that pattern. Beginning with Orange County, CA, these trailblazers are showing that chronic criminal careers can be nipped in the bud.

## NIPPING CRIMINAL CAREERS IN THE BUD THE *8 PERCENT SOLUTION,* ORANGE COUNTY, CALIFORNIA

As research director for the Orange County, California Probation Department in the late 1980s, Gwen Kurz began studying the county's young offender population. The good news, she found, was that 70 percent of Orange County youth referred to juvenile court never returned, and another 22 percent came back only once or twice within three years. However, there was a small group – 8 percent of all offenders ever referred to juvenile court – who appeared four or more times within three years. These chronic offenders committed more than half of all repeat juvenile crimes. They reappeared in juvenile or adult court an average of eight times in the six years following their initial referral to juvenile court, and nearly all committed at least one very serious and/or violent crime. The chronic offenders were incarcerated an average of 20 months over the three years at a cost of $44,000 each.[28]

Kurz and her boss, Michael Schumacher, then began looking for traits that would predict these chronic offenders at the first offense. They found that the youth most likely to became chronic delinquents differed from other juvenile offenders in two ways. First, those arrested at a young age (before 16) were far more likely than other youth offenders to become chronic delinquents. Second, youth who exhibited multiple problems – family discord, school failure, substance abuse, and/or pre-delinquent behavior – were at highest risk for recurring lawbreaking.

Based on this research, Orange County developed an intensive intervention program for youth meeting the "8 percent" profile. Specifically, the county created an objective assessment instrument to determine which young people referred to juvenile court on delinquency charges were: a) first-time offenders; b) 15 or younger; and c) suffering three or more risk factors. The county then placed youth who met these criteria into an all-day program operating five days per week. The county monitored the success of the likely chronic offenders and found that only 49 percent suffered subsequent adjudications in the 12 months after enrollment, barely half the historic re-arrest rate (93 percent) for youth with the same profile.[29]

Based on this initial success, Orange County has expanded the program to serve 350 youth county-wide, and it is utilizing a rigorous evaluation design to compare the outcomes for extreme-risk youth enrolled in the program with outcomes for youth with equivalent profiles who are randomly assigned to conventional juvenile court services and sanctions. Preliminary results are highly favorable, making Orange County's "8 Percent Solution" one of the most promising models in our nation's evolving efforts to bring adolescent crime under control.

### IDENTIFYING POTENTIAL "8 PERCENT YOUTH"

As part of its strategic planning efforts preparing to enter the 1990s, the Orange County Probation Department analyzed two cohorts of more than 3,000 youthful offenders – one comprised of youth who entered the county's juvenile justice system for the first time during the first half of 1985, the other entering during the first half of 1987. After determining that only a small number (i.e., 8 percent) were chronic offenders, Kurz and Schumacher pored over the data to identify characteristics that would identify these potential chronic offenders early.

**"There will never be enough money, people, or programs to solve all the problems faced by each youth in our society. In the fight against juvenile crime, we must focus our efforts on the group with the greatest potential to burden and victimize society and the ones most likely to fail in life. This group cries out for our attention."**



**"8 PERCENT SOLUTION" PROGRAM, ORANGE COUNTY, CA IMPACT ON MULTIPLE RE-OFFENDING***

Percentage Arrested Two or More Times After Program Entry

* Analysis based on juveniles who had reached their 12-month post-assignment date as of June 30, 2000.

Source: Data provided via e-mail by Ms. Shirley Hunt, Orange County Probation Department, December 2000.

One factor jumped out right away: *age*. The data revealed that 57 percent of all chronic offenders were 15 or younger when they were first adjudicated. Moreover, youth first adjudicated at age 15 or younger were four times as likely (32 percent) to become chronic offenders as youth first adjudicated at ages 16 or above (8 percent).

Finding additional factors proved more complex, because (other than age) no single problem or characteristic could be found in all or most chronic offenders. However, the data did show that ***future chronic offenders displayed an unusually wide range of difficulties during their initial screening interviews.*** Based on this finding, the county crafted a "Multi-Problem Factor" to identify problems in four domains:

- **School performance/behavior,** including attendance problems (truancy or frequent absenteeism); behavior problems (recent suspensions or expulsions); and/or academic failure (failing grades).

- **Family problem factor,** including poor parental supervision/control (parent[s] unaware of where child goes, with whom, etc., and report little influence over these matters); significant family problems (illness, substance abuse, trauma, financial crisis, etc.); criminal family members exerting influence on the youth; and/or documented child abuse or neglect, or other family violence.

- **Substance abuse factor,** including any use beyond experimentation.

- **Delinquency factor,** including pattern of stealing, pattern of running away from home, and/or gang membership or affiliation.

Remarkably, among youth suffering with problems in three or more of these domains who were referred to juvenile court before age 16, 93 percent became chronic offenders.

## THE "8 PERCENT" PROGRAM MODEL

Once Orange County had developed the screening tools to identify likely chronic offenders in their initial contact with the juvenile court, the next challenge was to design an intervention program that would effectively steer these youth away from delinquency.

County staff scoured the research literature regarding what works with juvenile offenders and other troubled adolescents. Then they decided upon a multi-pronged approach centered around a new "Youth and Family Resource Center." Core elements of the approach include:

- **All-day academic and youth development programming.** All youth are picked up at or near their homes every morning and delivered to one of five Youth and Family Resource Centers operated by the county Probation Department. Once there, participants spend most of the morning receiving academic instruction from county board of education teachers. In the afternoons, students typically participate in recreation, study hall, community service projects or life skills workshops.

### John, Rudy, and the Case for Early Intervention

*"They both run from a liquor store with six-packs of beer, only to fall into the waiting arms of store security staff. Both are ordered by the court to pick up trash for 10 weekends as their punishment. So long as this is done, their relationship with juvenile court concludes until the next offense, if there is one.*

*"Rudy is a potential 8 percenter, whereas John is not. John's family is outraged at his behavior and takes appropriate steps to deal with it, restricting him to home for weeks and taking away television privileges. John is embarrassed by the whole episode and never again steps over the line of criminal behavior.*

*"Rudy's problems are much larger than stealing a six-pack of beer. The weekend trash duty will not turn him around. He ditches school, abuses drugs, and hangs around with other kids who do the same. His parents have little or no impact on his life, so there is no 'righting of the ship' after his first brush with the law.*

*"The juvenile justice system may not pay much attention to Rudy until crime number three or four, unless he seriously victimizes someone. By then, however, bad habits will have been formed. It is often much too late."*

*Excerpt from* The 8% Solution: Preventing Serious, Repeat Juvenile Crime *(Thousand Oaks, CA: Sage Publications, 2000), by Michael Schumacher and Gwen Kurz.*

- **Family involvement and counseling.** In addition to teachers, each Youth and Family Resource Center (serving 30-60 youth) is staffed with two therapists trained in both individual and family counseling, two in-home counselors from a private counseling agency, a county drug/alcohol specialist who counsels both youth and their parents, a nurse practitioner who helps the entire family secure needed medical care, and 4.5 full-time staff from a community-based agency providing parent education, teen parenting training, and community service programming for youth and their families.

- **Focus on substance abuse.** Because roughly two-thirds of Orange County's "8 Percent" youth abuse drugs and/or alcohol, the program offers every participant at least one hour of substance abuse education or counseling every week. Youth known to regularly abuse substances or come from families where substance abuse is problematic receive more in-depth treatment, as well as drug testing and home inspections from county probation staff.

## MEASURING SUCCESS – THE "8 PERCENT" DIVIDEND

Since 1997, Orange County has been participating in a rigorous evaluation of its intervention program for potential chronic offenders. After completing a screening interview to determine whether first time offenders meet the criteria for participation in the program – i.e., below 16 with three or more problem areas – the county randomly assigned some youth to the program and others to a control group receiving normal court services and sanctions. Initial results from this evaluation indicate that the program is significantly reducing the offending behavior of extreme-risk youth.

Among the 71 youth who completed the program by June 30, 1999, 33.8 percent committed two or more offenses in the 12 months after program entry.

By contrast, 48.5 percent of control group youth not placed into the program committed two or more offenses during the 12-month period. (See Table #4.) In addition, participating youth have had fewer new court petitions, fewer arrest warrants, and spent fewer days in custody than control group youth in the first 12 months.[30] The "8 Percent" intervention program is also proving cost-effective. With a cost of $14,000 per individual per year, the intervention is substantially reducing future costs for incarceration as well as damages suffered by would-be victims of future crimes.

Based on the success of Orange County's preliminary efforts, the California legislature has funded a Repeat Offender Prevention Project since 1996 to continue the program in Orange County and to replicate and test the early intervention concept in seven other jurisdictions statewide. These programs, too, include a rigorous, control-group evaluation design, and results of these programs also find that youth enrolled in targeted, intensive early intervention services are committing substantially fewer felony crimes than youth assigned to control groups. Participating youth are also failing drug tests far less often, and they are earning significantly more school credits and higher grades than non-participating youth.[31]

Though the early intervention concept is still alien to juvenile justice agencies in most jurisdictions nationwide, a handful of states and communities are beginning to study and replicate this promising approach. As Kurz and Schumacher explain, the logic behind the strategy is obvious: "There will never be enough money, people, or programs to solve all the problems faced by each youth in our society. In the fight against juvenile crime, we must focus our efforts on the group with the greatest potential to burden and victimize society and the ones most likely to fail in life. This group cries out for our attention."[32]

| | |
|---|---|
| **Operating Agency** | Orange County Probation Department |
| **Program Type** | County-Run Delinquency Intervention Program |
| **Program Goals** | Reduce Chronic Offending by High Risk Youth |
| **Target Group** | Juvenile offenders 15 and younger who demonstrate high risk for chronic delinquency |
| **Key Strategies** | Screening first-time juvenile offenders to identify those at extreme risk chronic delinquency, intensive day treatment for potential chronic offenders |
| **Primary Funding Source(s)** | Orange County, California Board of Corrections |
| **Evidence of Effectiveness** | Participants demonstrate significantly lower arrest rates than similar youth receiving conventional probation services |
| **Contact Information** | Jeff Corp, Director of Community Programs<br>Orange County Probation Department<br>160 W. Cerritos Ave., Building #4<br>Anaheim, CA 98205<br>Phone: (714) 687-6703; Fax: (714) 533-6884 |

# CHALLENGE #5:
# PROVIDE COMPREHENSIVE SUPPORT AND ASSISTANCE TO YOUTH (AND CHILDREN) WITH BEHAVIORAL DISTURBANCES

*"Research and experience demonstrate that the services available in the juvenile justice system to alleviate [mental health] problems are entirely inadequate."*[33]

Shay Bilchik, former Administrator
Office of Juvenile Justice and Delinquency Prevention
U.S. Department of Justice

Young people who commit juvenile offenses and become entangled in the juvenile justice system suffer disproportionately from emotional disturbances and mental illness.

By some estimates, up to 90 percent of young people referred to juvenile courts for delinquency exhibit the general symptoms of "conduct disorder" or "oppositional defiance disorder." The majority suffer with problems of substance abuse or dependency. Roughly one-third suffer with attention deficit (ADD) or attention deficit hyperactivity disorder (ADHD). Clinical depression and post-traumatic stress disorder are also disturbingly commonplace. Though estimates differ, the majority of studies on the mental health needs of juvenile offenders find that at least 20 percent suffer ***severe*** mental health disorders.[34]

**"In the past, admission to [residential treatment centers] has been justified on the basis of community protection, child protection, and benefits of residential treatment per se. However, none of these justifications have stood up to research scrutiny. In particular, youth who display seriously violent and aggressive behavior do not appear to improve in such settings."**

**Dr. David Satcher, U.S. Surgeon General**

Despite the direct connection between delinquency and mental health, however, our nation's efforts to meet the mental health needs of adolescents are seriously inadequate. The problems are three-fold:

- **Overreliance on Out-of-Home Treatment.** One-half of all the money spent in the United States for mental health treatment of children and youth pays for inpatient hospitalization. Another 25 percent pays for residential care for troubled youth in treatment centers and group homes costing hundreds of dollars per day.[35] Even with their high costs, however, hospitalization and other out-of-home treatments have not proven effective in resolving the mental health problems of youth. In 1999, U.S. Surgeon General David Satcher concluded that "Inpatient [hospital] care is the clinical intervention with the weakest research support." Satcher also complained that: "In the past, admission to [residential treatment centers] has been justified on the basis of community protection, child protection, and benefits of residential treatment per se. However, none of these justifications have stood up to research scrutiny. In particular, youth who display seriously violent and aggressive behavior do not appear to improve in such settings."[36] In a six-state study of children treated in publicly-funded residential treatment centers, 75 percent were either readmitted to a mental health facility (about 45 percent) or incarcerated in a correctional setting (about 30 percent) within seven years.[37]

- **Underinvestment in High-Quality Community-Based Services.** The inevitable result of America's overreliance on expensive and ineffective out-of-home treatment has been lack of investment in non-residential services for disturbed children and adolescents. This oversight is particularly tragic given the striking success achieved by a handful of home-based and family-focused mental health treatment models. For instance, Multisystemic Therapy (see Challenge #3) has dramatically improved the outcomes for youth who are hospitalized for emotionally disturbances. Likewise, so-called "wraparound services" (see below) – offering customized and comprehensive support and treatment services for youth in their own homes – have also shown potential to improve outcomes for troubled youth while decreasing costs for taxpayers. However, rather than providing these or other intensive community-based service strategies, most communities offer only a hodge-podge of fragmented and outdated adolescent mental health services.

- **Lack of Coordination Between Concerned Agencies.** Typically, youth troubled with emotional disturbances, developmental disabilities, or other mental health problems come in contact with multiple public agencies: department of mental health, child protective services, special education, juvenile justice, and others. However, these agencies rarely coordinate their services for youth whose cases they share in common. As a result, treatment and support efforts often work at cross purposes – leaving youth and their families confused, distrustful and ultimately unsuccessful in controlling behavior, preventing delinquency, and averting expensive placements into psychiatric hospitals, treatment centers, and juvenile corrections facilities.

## WRAPAROUND MILWAUKEE
## SYSTEMS REFORM IN A LARGE JURISDICTION

In the early 1990s, the leaders of Milwaukee County's mental health division had a problem. The county was spending $18 million each year to buy care for emotionally disturbed young people in group homes and residential treatment programs. And it wasn't working.

These youth were clearly troubled and needing services. The majority had been arrested for delinquent crimes. Many were a danger to themselves and others – and the rest were at serious risk to become a danger. However, like many jurisdictions nationwide, Milwaukee County offered emotionally disturbed youth only an expensive, one-size-fits-all response: out-of-home placement. The county was largely ignoring the homes and families from which troubled children came – and to which they would return – and it was not working with families to overcome brewing problems before they reached crisis proportions. Moreover, even youth placed into $135 per day treatment programs often failed to stabilize their behavior or avoid relapses when they returned home after completing the treatment.

Milwaukee County began experimenting with other treatment options in 1989, after receiving an initial foundation grant. In 1994 it secured a $15 million, 5-year federal grant to build an entirely new adolescent mental treatment system, Wraparound Milwaukee. The county's plan was predicated on three elements: 1) developing the capacity to offer intensive, comprehensive assistance to troubled youth and their families in their own homes; 2) pooling funds

**"The hospital and the residential treatment center have a place in the care of emotionally disturbed youth, but they should be a stabilizing place, not a place for change. You can't use the hospital to try and reform or restructure their personalities. That needs to happen in a more normalized environment that's a true reflection of their day to day life."**

and coordinating efforts from the various agencies working with emotionally troubled youth; and 3) sharply reducing the reliance on out-of-home care by avoiding placements whenever possible and by limiting lengths of stay for youth who are placed in residential care.

Given the high costs of residential treatment and the limited evidence of its effectiveness, as well as the growing promise of wraparound and other home-based treatment strategies for troubled youth, these might seem like common sense solutions. In reality, however, they are anything but commonplace. By putting these reforms into practice – pooling $28 million per year from county agencies and Medicaid reimbursements to fund the Wraparound program, dramatically reducing delinquency and emotional distress for 600-700 youth per year while keeping these youth at home with their families – Milwaukee County has made itself a model for the entire nation.

## UNDERSTANDING THE "WRAPAROUND" APPROACH

The "Wraparound" philosophy was initially developed in Canada during the 1970s, and it was transported to the United States during the 1980s by innovators in Alaska, Chicago, and Vermont. The concept revolves around five fundamental principles:

- **Address problems in youths' natural environment** – i.e., home – rather than an artificial environment, where lessons learned will be difficult to translate when youth return home.

- **Work with and listen to the whole family, especially parents.** Evidence increasingly finds that the family system is both the most important determinant of behavior problems and the most important ally for therapists in reversing negative behavior patterns. Unlike most mental health modalities, where the professional is the "expert" and the individual and/or family has the problems, wraparound is based on the belief that families know best what they need. Thus, the job of professionals is to help families achieve their own goals and build the skills to sustain success.

- **Individualize services based on the needs of each youth and family,** rather than employing the one-size-fits-all approach typical in residential treatment programs. This notion of "wrapping" needed services "around" each individual young person lies at core of the wraparound concept.

- **Focus on strengths.** Even the most troubled adolescents and families have hidden aptitudes, interests, and desires. Tapping these strengths and building families' capacity to anticipate and solve problems can be critical to avoiding crises in the future.

- **Build a support system.** Most youth have relatives, family friends, or other interested adults who care about them and are willing to provide guidance and support. Recruiting support from these natural allies – to be mentors, or provide a respite for beleaguered parents – can be an invaluable step in creating a stable environment for young people.

## WRAPAROUND – *MILWAUKEE-STYLE*

Milwaukee County has built a unique system for applying wraparound principles to local needs. Wraparound Milwaukee targets services only to emotionally disturbed youth who are either in residential treatment or face imminent risk of placement. Though youth can be referred to the program by local child welfare officials as well as the local probation agency, most (70 percent) have a history of delinquency and many are on probation at the time of their referral to the Wraparound Milwaukee program.

Wraparound Milwaukee's program involves four key components:

- **Care Coordinators** – The county's Wraparound office contracts with eight local nonprofit agencies to hire, train, and supervise care coordinators, who serve as the cornerstone of the wraparound process. Though they are not trained therapists or social workers, these coordinators are college graduates who receive extensive pre-service and in-service

training in the wraparound model. Working with a caseload of up to eight youth, the coordinators: a) conduct in-depth assessments of each youth and family to identify strengths and needs; b) assemble a "child and family team" (see below) including family members, counselors, and other adults committed to helping the young person succeed; c) facilitate development of a plan of care by the child and family team; d) identify providers to offer needed services; and e) monitor the delivery of services and the overall progress of the young person.

- **Child and Family Teams** – The actual plan for each young person's wraparound care is developed by a "Child and Family Team" – a collection of all the adults involved in supporting the family to care for the young person. These include family members, natural supporters (i.e., relatives, church members, and friends), and professionals such as probation officers, child welfare workers, and mental health professionals. Convened by the care coordinator on at least a monthly basis, the teams are responsible to create and periodically revise the plan of care for each young person.

- **Service Provider Network** – To help care coordinators find qualified providers to meet the identified needs of troubled youth, Wraparound Milwaukee has enrolled more than 170 community agencies to provide any of 60 services – everything from tutoring and after school programming to substance abuse treatment to transportation. To hold down costs, Wraparound Milwaukee has set a standard rate for each service, using its bargaining power as a large consumer of services to press providers to accept below-market rates.

- **Mobile Crisis Team** – In addition to their care coordinator and child and family team, each youth and family enrolled in Wraparound Milwaukee also has access to a Mobile Urgent Treatment Team – a 24-hour-per-day service continuously on call to intervene in family crises that might otherwise result in rapid placement into out-of-home care. Through this mobile team, and through the crisis safety plans created for every young person in the program, Wraparound Milwaukee brings urgent situations under control without removing participants from their homes and unraveling progress made to date.

## BLENDED FUNDING AND "CAPITATED RATE" FINANCING

Before Milwaukee launched the wraparound program, the county paid for more than 360 young people per night to sleep in residential treatment facilities, and it maintained a waiting list of youth approved for residential treatment and awaiting placement. Placements into residential treatment were made by a variety of county agencies – child welfare, juvenile justice, and mental health – and each agency paid the bills for any young person it referred. The average length of stay in residential treatment was 14 months, at a daily cost of $135 per day per youth. That resulted in an overall cost of $18 million per year – or $60,000 for each young person.

Wraparound Milwaukee replaced this funding hodge-podge with a unified system. It collected the funds previously spent for out-of-home care by the county's child welfare ($8 million/year), juvenile justice ($8 million/year), and mental health ($1.5 million/year) agencies, and used these funds to support a continuum of services including both wraparound and residential care. Wraparound Milwaukee also captures additional funds ($10 million per year) in Medicaid reimbursements for eligible youth, creating a total budget of $28 million in 1999.

To ensure that the project minimizes unnecessary out-of-home care, Wraparound Milwaukee is paid on a "capitated rate" basis similar to that used by health maintenance organizations. Wraparound Milwaukee receives $3,300 per month per child for every juvenile justice and child welfare case referred to the program, plus $1,542 per month for each young person on Medicaid. Wraparound Milwaukee pools all of these funds and pays for all services needed by each youth participant, regardless of cost. Nonetheless, the fixed-rate funding formula ensures that the program maintains its focus on cost-effectiveness and avoids unnecessary out-of-home placements.

## MINIMIZING OUT-OF-HOME PLACEMENT

The use of wraparound services and the capitated rate financing system have both helped limit the number of young people placed into expensive residential treatment. In addition, the county also took two additional steps to limit the use of residential placements:

- **Limiting commitment periods.** Prior to wraparound, most youth placed into residential treatment (either by child welfare agencies or probation) were sent on court orders with a one-year duration. Only through a new court order could youth be released from the facility before the year was up. Today, most youth ordered into residential treatment are placed in the custody of Wraparound Milwaukee, and the initial term of treatment is usually just 90 days. The case are reviewed regularly and each young person is discharged (to begin home-based wraparound care) at the earliest possible date. ***Through this system, Wraparound Milwaukee has reduced the average length of stay in residential treatment from 14 months to just 3.5 months.***

- **County-wide crisis intervention.** Whereas most services provided by Wraparound Milwaukee are limited only to youth formally enrolled as wraparound participants, the project makes one service available to any young person in the county anytime: the Mobile Urgent Treatment Team. Historically, many young people have been placed into long-term residential treatment programs after a crisis erupts – a suicide attempt, perhaps, or an assault on a family member. The mobile team helps youth and families weather such crises without triggering a long-term residential placement. The mobile team reviews all requests for inpatient psychiatric admissions for adolescents countywide, and it offers services to help defuse crises: group homes providing short-term (up to 14 days) housing, plus treatment teams made up of psychologists and social workers who offer up to 30 days of emergency case management and family preservation assistance.

**WRAPAROUND MILWAUKEE: IMPACT ON OFFENDING RATES OF DELINQUENT YOUTH PARTICIPANTS***

Average Number of Arrests

* Data through October 31, 2000

Source: Milwaukee County Mental Health Division

## WRAPAROUND SUCCESS

When it was first establishing its wraparound program in the mid-90s, Milwaukee County conducted a pilot project targeting 25 young people who were then in residential treatment programs and had no date for release. Using Wraparound, the county enabled 17 of the 25 to return home within 90 days – thereby reducing the average three-month cost from over $5,000 per young person to $2,700. Eventually, 24 of the young people left residential treatment facilities and returned to the community: 17 were reunited with their families, and seven entered foster homes.

By 2000, Wraparound Milwaukee was proving that such success was possible on a broad scale. ***Countywide, the program has reduced the daily population in residential treatment programs from 360 (plus wait list) down to 135 per day. In addition, psychiatric hospitalization of adolescents has declined by 80 percent since Wraparound Milwaukee went into effect.***

Even more impressive have been the substantial behavior improvements and reductions in delinquency displayed by Wraparound participants. Among 169 delinquent youth for whom one year follow-up data were available in October 2000, the average number of arrests per participant declined from 2.32 arrests during the year prior to enrollment in Wraparound Milwaukee, to .98 arrests per participant during the year of enrollment, to .63 arrests per participant in the year following treatment. (See Table #5.) Whereas 57 percent of participants committed two or more offenses during the year prior to enrollment, only 15 percent committed two or more offenses in the year following treatment – a reduction of 74 percent.

Likewise, Wraparound Milwaukee participants have also significantly improved their clinical outcomes: measures such as the Child Behavior Check List and the Child and Adolescent Functional Assessment Scale show significant improvement in emotional functioning and stability.

"The hospital and the residential treatment center have a place in the care of emotionally disturbed youth, but they should be a stabilizing place, not a place for change," explains Dr. Chris Morano, who heads Wraparound Milwaukee's Mobile Urgent Treatment Teams. "You can't use the hospital to try and reform or restructure their personalities. That needs to happen in a more normalized environment that's a true reflection of their day to day life."

| | |
|---|---|
| **Operating Agency** | Milwaukee County Mental Health Division, Child & Adolescent Services Branch |
| **Program Type** | County-run System of Care for Emotionally Disturbed Youth |
| **Program Goals** | Providing Effective Treatment and Reducing Out-of-Home Care for Emotionally Disturbed and Delinquent Youth |
| **Target Group** | Emotionally disturbed adolescents (including many delinquents) at risk for immediate placement into a residential treatment program |
| **Key Strategies** | Comprehensive home-based services; strength-based treatment; partnership with families and other caring adults; crisis intervention to prevent residential placements; capitated-rate funding to discourage unnecessary or lengthy out-of-home placements. |
| **Primary Funding Source(s)** | Pooled funding from child-serving agencies (probation, child welfare, mental health), Medicaid, as well as federal grant funding (expired in 1999). |
| **Evidence of Effectiveness** | Dramatic reductions in out-of-home placements for youth county-wide; sharp reductions in offending by delinquent participants; substantial gains in behavioral functioning |
| **Contact Information** | Bruce Kamradt, Director<br>Children's Mental Health Branch<br>Milwaukee County Division of Mental Health<br>9501 Watertown Plank Road<br>Wauwatosa, WI 53226<br>Phone: (414) 257-7611; Fax: (414) 257-7575 |

# CHALLENGE #6: OFFER QUALITY TREATMENT AND YOUTH DEVELOPMENT SERVICES FOR INCARCERATED YOUTH

*"The majority of delinquents, even those who have committed serious crimes, will be released back into their communities [while they are still] in their teens and twenties.... Without an education, without health care, without practical skills, without transition steps back into their communities, without programs that have turned their antisocial activity into meaningful life lessons, what chance do they have of becoming productive, law abiding citizens? What chance does our society have of being safe?"*[38]

Coalition for Juvenile Justice

Every day in America, about 105,000 young people are held in custody. They include 27,600 awaiting trial or pending placement, and 76,500 who have been found delinquent and committed to correctional facilities. Most of the youth offenders committed to a residential placement are housed in state-funded "training schools" – large, congregate care facilities that often mirror adult prisons both in physical environment and correctional philosophy.

Nationwide, only one-fourth of young people confined in training schools have been convicted of (or "adjudicated" for) violent felonies, and many have committed only status offenses, drug possession, disorderly conduct, or other less serious crimes. Thus, many or most could be safely and more effectively sanctioned in community-based correctional programs. Indeed, the success of Missouri's Division of Youth Services (see Challenge #1) proves that many youth now committed to state care could be safely supervised in the community – and that community-based correctional programs can produce recidivism rates far below those typically achieved by training schools.

However, in Missouri and every other state, there remain youthful offenders who have committed crimes so heinous or suffer behavioral problems so severe and potentially dangerous that secure (i.e., locked) residential placement is the only safe option. Simply locking up these youth does not guarantee public safety, however. Because most youth will return to the community within 12-18 months (and almost all will return by their early twenties), the quality of the corrections program is critically important.

Unfortunately, the quality of juvenile corrections facilities nationwide is highly uneven. Several problems are commonplace:

- **Substandard conditions of confinement.** In 1993, the U.S. Justice Department released a comprehensive study finding that 62 percent of confined youth were held in overcrowded facilities, which suffer higher rates of violence against both staff and other youth than non-crowded facilities.[39] Also, physical abuse by juvenile corrections staff has been documented in several states. Overall, 37 successful lawsuits have been filed on behalf of juvenile offenders in 25 states in the past three decades regarding both overcrowding and abuse issues, and the problems show no sign of abating.[40]

- **Inadequate programming.** Though required to provide educational services to all youth 16 and younger, many training schools offer educational activities for only a few hours per day. These educational activities often lack academic rigor, and they seldom include quality special education services for youth with learning disabilities (as required by law). Inadequate mental health screening and treatment are also pervasive in juvenile

corrections facilities, despite the high rates of mental, emotional and substance abuse problems plaguing juvenile inmate populations.

- **Undertrained staff.** Day-to-day supervision of juvenile offenders in most training schools is provided by low-paid workers without college education or in-depth training in youth development. Thus, even if quality education and counseling services are provided for a few hours each day, confined youth spend the bulk of their waking hours overseen by staff without the skills or motivation to maintain a positive, therapeutic environment.

- **Inadequate aftercare.** Perhaps the most self-defeating weakness in juvenile justice today is the lack of support and supervision for youth returning home from juvenile correctional institutions. By definition, these are the most dangerous and high-risk of all youth. Yet in most states and communities these young people are provided only modest supervision as they re-enter the community and few services to help them achieve success and remain crime-free.

"Research shows that subjecting youth to such harsh confinement conditions increases rates of violence and recidivism," concluded the American Bar Association in 1998. "In a society that already faces daily violence and crime, deficiencies in the care of incarcerated youth serve only to further threaten the well-being of our children, families, and communities."[41]

## THE LAST CHANCE RANCH
## TURNING AROUND FLORIDA'S TOUGHEST JUVENILE OFFENDERS

For more than twenty years, Florida's juvenile courts have been sending some of their most difficult and dangerous cases to a unique program in the Everglades, the Florida Environmental Institute. So too have Florida's criminal court judges, giving hard case adolescents a final opportunity in the juvenile justice system before sentencing them to adult prison.

Here's why: unlike virtually every other juvenile corrections facility in the nation, Florida Environmental Institute has a long track record of effectively rehabilitating serious and violent juvenile offenders. "This is a demonstration project that shows that when you look at sending these kinds of kids to prison, it doesn't make sense," says Frank Orlando, for 21 years a judge in Broward County, Florida and now Director of the Center for the Study of Youth Policy at Nova Southeastern University in Ft. Lauderdale. "We're talking about kids, most of whom have a much more serious background than the majority of kids being transferred to adult courts today. But the recidivism rates are very low. Public safety is enhanced."[42]

### UP FROM THE SEA: THE EVOLUTION OF A JUVENILE JUSTICE MODEL

The roots of the Florida Environmental Institute date back to 1969, when Florida Atlantic University in Boca Raton launched a new oceanographic research institute. That same year, the Institute's director accepted several troubled boys to work on the Institute's research projects. Quickly, institute leaders saw that the marine research activities had a powerfully positive effect on participating youth. Over time, they devoted more and more of the Institute's efforts to redirecting the lives of troubled youth, rather than research.

The initial program for juvenile offenders in Boca Raton was replicated in Tampa and St. Petersburg in 1972, then in three more sites by 1974. Each program was (and still is) run by an autonomous, non-profit corporation with a local board of directors. However, an umbrella organization, Associated Marine Institutes (AMI), was created in 1974 to provide the local programs with management and administrative support.

**"We have no lock-up room at FEI and we don't teach our staff to 'take kids down' by wrestling them to the ground and pinning them. We are convinced that the more unusual you treat a kid, the more unusual he will act."**
**AMI President, Robert Weaver.**

Today, the AMI network includes 51 institutes in seven states and the Cayman Islands. Thirty of these are non-residential day programs, like the initial marine project in Boca Raton. The remaining 21 are residential juvenile corrections centers, including seven in Florida. Among them, the oldest and most successful is Florida Environmental Institute.

## A RANCH FOR FLORIDA'S TOUGHEST JUVENILES

Located at Fish Eating Creek in the township of Venus, 40 miles northwest of Lake Okeechobee, the Florida Environmental Institute (FEI) is surrounded by miles of open, humid, alligator-and mosquito-infested swamp and forest. When delinquent youths first started arriving in 1982, they slept in tents. There was no choice: no buildings yet stood on the 40-acre site. Since then, participants and staff have erected several structures – including two dormitories, general education and vocational classrooms, a tool shed, a barn, and a dining hall. They have also turned the property into a working ranch, raising cattle and pigs, tending horses, and growing corn, peas, cucumbers, and other crops.

FEI earned its "Last Chance Ranch" nickname in the 1980s, soon after opening. The label was coined by the participants themselves, all of whom were sent to FEI on serious felony charges. Though all were 17 or younger when committing their offenses, many of the youth had been transferred to adult criminal courts. Local judges sent them to the FEI juvenile program as a final opportunity – a last chance – before a sentence to adult prison. A study in the 1980s reported that FEI youths had been charged with an average of 18 delinquent offenses each, including 11.5 felonies. In 1997-98, the average youth released from FEI had accumulated a remarkable 32.7 charges, including 11.8 felony charges, the highest felony rate among the 35 Florida programs serving serious juvenile offenders and the second highest rate of total offenses.[43]

## A UNIQUE ATMOSPHERE

Despite the serious profile of juvenile offenders sent to FEI, the facility has never used iron bars, handcuffs, or locked cells. The nearest state road is 15 miles away – and the nearest town is another 20 miles beyond that. Thus, despite the lack of correctional hardware, escape is virtually impossible. (FEI's most recent escape attempt came in 1998, unlike Florida's "secure" juvenile corrections facilities which suffer several escapes every year.) The lack of bars and physical restraints has long been a core element of the Associated Marine Institute philosophy – and it provided the rationale for AMI's decision to locate the facility in the remote Everglades.

According to Frank Orlando, who helped found the initial program in Boca Raton and still sits on AMI's board of trustees, "If the program was in the community, it would have to be hardware secure. This way, the kids don't get the feeling that they are being caged like animals."

"We have no lock-up room at FEI and we don't teach our staff to 'take kids down' by wrestling them to the ground and pinning them," explains AMI President Robert Weaver. "We are convinced that the more unusual you treat a kid, the more unusual he will act."[44]

Orlando also points to FEI's unusually small population as a key to its success. The ranch has capacity only for 22 participants at a time, compared with the 100-400 youth capacity of Florida's prison-like "youth development centers." According to Orlando, "The small population at Last Chance Ranch gives the program the opportunity to carry out its mission, which is to address the kids' problems and change their behavior."

## REWARDS, PUNISHMENTS, AND HARD WORK

When a young man is referred to the Ranch, his ride to the program ends on the side of the road two miles from the main facility. He is met there by the program's director and another counselor. Freed from handcuffs, leg irons, and any other restraints, he then hikes through the swamp and palmetto forest as staff begin explaining to him the programs rules, philosophy and expectations. The hike ends at "O Camp," just outside the main FEI campus, where the offender will talk with staff and senior participants and begin the physical work (grass cutting, weeding, etc.) that will be a steady part of his days at FEI. At O Camp, new participants must agree to abide by the many rules that govern life at the Ranch, and they begin to bond with staff and peers. If all goes well in O Camp, the new participant will join the rest of the FEI population for the evening meal on the third day. If the participants resists or acts out, the process may extend one or two additional days.

**Phase One**. Upon entering the main FEI campus, participants begin the first of the three stages in the FEI rehabilitation process. In Phase One, which lasts six months or longer, youth sleep in an austere dorm with a hard floor, bunk beds, plywood walls, screened windows without glass, and no television or other amenities. Despite the steamy climate, the Phase One dorm has no air conditioning, although ceiling fans are provided to circulate the hot air.

The participants' days are consumed with two kinds of work: 1) individualized academic education, where they make progress toward a high school diploma or GED; and 2) physical labor tending farm animals, caring for crops, digging up tree stumps to clear land, cleaning and maintaining ranch facilities, making repairs and improvements to the ranch buildings (and sometimes building new ones), and more.

**"The small population at Last Chance Ranch gives the program the opportunity to carry out its mission, which is to address the kids' problems and change their behavior."**

However, youths' primary task at FEI is to earn credit toward going home. FEI, like all of the Associated Marine Institute programs, is operated on a strict behavior management regimen. Participants are ranked five times per day on seven areas of behavior: being on time, appearance, attitude, leadership, participation, enthusiasm, and manners. In the short-term, these rankings determine the order in which participants are seated in the cafeteria, and who is first to receive a second portion. The primary importance of the weekly rankings, however, is long-term: FEI youth are released from the program only after they have earned enough "point cards" to progress through all of the required levels. Each participant earns between half and one-and-a-half point cards per week, and each must earn 12 cards to complete each of FEI's six levels. While fighting, rule breaking and disobeying instructions do not land young people in physical restraints or solitary confinement, as in a typical youth corrections facility, they do set back the youth's progress toward going home, and often lead to an extra helping of tough physical chores.

"Their behavior and their attitude determines their whole length of stay," says FEI director, Mike Shumans. "If they're not doing well and they don't earn the point cards they need to progress, then they can be here a long time. If they follow the rules and do well, they can get out in a year. It's basically up to them."

**Phase Two**. In Phase One, participants must progress from the "Tenderfoot" level to the "Ranch Hand" level and finally to the "Buckaroo" level. Once they complete this third level, youth shift into Phase Two, which begins with a move into a more comfortable, air-conditioned dormitory with a television, more comfortable furnishings, and bit of private space. Participants continue their academic and ranch work during this phase, and they also take part in occasional community service and environmental projects. Toward the end of Phase Two, which also lasts six months or longer,

students earn the right to go back to their home towns with an FEI staff member and begin finding work, rebuilding family relationships, and making living arrangements (if there is no safe and healthy family home).

## PHASE THREE – MAKING AFTERCARE A CENTERPIECE

Unlike many juvenile corrections programs, where the treatment largely stops when youth leave the facility, the FEI program has always included a heavy focus on the transition home. During the month prior to leaving the ranch, youth work closely with their counselors to develop plans for their return. Once home, youth receive five visits per week from an FEI community coordinator, plus frequent calls from the case manager on staff at the FEI campus.

Community coordinators monitor the progress of the young people – and can even return youth to the ranch if their behavior lapses. As at the ranch, however, the emphasis is more on supporting youth

### The New Ferris School
### Juvenile Corrections Reform in Delaware

Back in the early 1990s, Delaware's Ferris training school was a terrible place. Designed to house 47 youthful offenders, the facility typically held 80 or 90 – even 100. "The conditions were atrocious," said Judith Mellen, executive director of the American Civil Liberties Union for Delaware. "The physical plant was not only in very poor repair, it was almost impossible to keep clean. Food was not adequate. Clothing was not adequate. Education was not adequate."[45]

The ACLU filed suit in 1990 to protest conditions at Ferris, but nobody in state government listened until Governor Thomas Carper was elected and settled the suit in 1993. Under a consent decree, Delaware razed the old Ferris School and spent $14 million to build a new 69,000 square-foot facility. Moreover, it adopted a new correctional philosophy. Today, all youth in Ferris School receive drug and alcohol education, anger management, conflict resolution, sex education and HIV prevention. As part of that new approach, all direct care workers at Ferris must now have a bachelor's degree in education or a behavioral science.

Perhaps the most impressive advance at the "New Ferris" has been the education program. Thanks to a unique partnership with the DuPont Company, almost every youth in the facility now has a mentor. DuPont provides financial support for the program and 78 volunteers – DuPont executives, chemists, engineers, and researchers — who meet weekly with youth and help them with their academic work. Since the new Ferris School opened in 1997 and the mentoring program began, students have averaged a remarkable increase of 2.5 grade levels during their six-nine month stays at Ferris.

"It may not be common practice for the American Civil Liberty Union to publicly laud state officials who have faced them in court and over the negotiating table," wrote Delaware ACLU Director, Judith Mellen in February 2000, "but Ferris' transformation is an uncommonly successful result of the initiative of state officials and the ACLU. The Delaware experience should serve as a model, not only for Ferris, but also for the cooperative process that went into achieving this result."[46]

**CONTACT:**

Dianne Gadow, Superintendent
The Ferris School
Delaware Youth & Family Center
956 Centre Road
Wilmington, DE 19805
(302) 993-3811

than threatening them. Coordinators get actively involved in helping youth to gain admission to schools or colleges or employment, assisting youths' families to secure needed services or benefits, and advocating for youth with schools or employers. The intensive support continues for six months before the youth finally graduates from the FEI program.

## UNPARALLELED RESULTS

Each year, the Florida Department of Juvenile Justice evaluates each of the more-than-100 juvenile corrections programs operating statewide. The Department calculates the success rates and costs per successful completion for each program, and it measures each program's success against an "expected success rate" that is based upon the specific demographic and offending profile of youths assigned to the program.

***For the four-year period from 1997 through 2000, only nine of 57 (15.8 percent) serious juvenile offenders released from FEI were found guilty of a new offense in their first 12 months after completing the program. This compares to an average reconviction rate of more than 40 percent for all Florida institutions serving serious juvenile offenders.*** In 2000, only one FEI graduate out of 21 – just 4.6 percent – was found by a court to have committed a new offense.

The average cost for one youth to complete a term at FEI, $75,000, runs well above the rates ($30,000 - $50,000) in Florida's four prison-like juvenile corrections facilities for serious offenders. However, despite this disparity – which is due to FEI's high staff-to-participant ratio and the longer than average periods of confinement at FEI – the program also scores well in terms of cost-effectiveness. For the two-year period from July 1996 through June 1998 (in which FEI experienced a 21.6 percent reconviction rate), the program's average cost per successful completion ($58,120) was higher than two of Florida's four "youth centers" and lower than two others.

However, this figure does not include the costs of continued crime committed by youth after leaving these training schools. According to an analysis published by the Florida Department of Juvenile Justice in September 2000, each time a juvenile offender reoffends following release from a commitment program, it costs the state $165,571 in criminal justice and victim costs.[47] Each of the larger programs suffers reconviction rates of 45-55 percent – more than twice the FEI rate. Had Last Chance Ranch graduates reoffended at the rates of the larger Florida

**FLORIDA ENVIRONMENTAL INSTITUTE VS. OTHER "LEVEL 8" JUVENILE CORRECTIONS FACILITIES IN FLORIDA:**

* Data for juvenile offenders released from correctional facilities during fiscal years 1996-97 and 1997-98.

** Success is defined as no offenses within one year of release.

*** Expected success rates are calculated by the Florida Department of Juvenile Justice based on characteristics of juvenile offenders placed into each facility.

Source: *Program Accountability Measures for DJJ Commitment Programs: A Two-Year Analysis, FY 1999-2000*, Management Report # 2000-9 (Tallahassee, FL: Florida Department of Juvenile Justice, March 2000), p. 12.

■ Actual Success Rate**
■ Expected Success Rate***

programs, at least 20 additional offenses would have been committed – at a sum cost of more than $3 million to victims and taxpayers. Clearly, FEI is not only more effective than traditional incarceration programs; it is also more cost-effective. Less cost, more safety.

| | |
|---|---|
| **Operating Agency** | Associated Marine Institutes |
| **Program Type** | Privately-Run Residential Corrections Facility |
| **Program Goals** | Rehabilitation of Serious and Chronic Juvenile Offenders |
| **Target Group** | Serious and chronic juvenile offenders, including many who have been transferred to adult courts |
| **Key Strategies** | Remote location in the Florida Everglades; small scale (22 youth); no locked cells or restraints; high staff-to-offender ratio; intensive behavior management; extensive aftercare support |
| **Primary Funding Source(s)** | Florida Department of Juvenile Justice |
| **Evidence of Effectiveness** | 20 year-record of extremely low recidivism; strong cost-effectiveness despite high cost-per-participant |
| **Contact Information** | Robert Weaver, President<br>Associated Marine Institutes<br>5915 Benjamin Center Drive<br>Tampa, FL 33634<br>Phone: (813) 887-3300; Fax: (813) 889-8092 |

## CHALLENGE #7:
# PROVIDE QUALITY EDUCATION AND CAREER DEVELOPMENT SERVICES THAT ENABLE YOUTH TO ASSUME PRODUCTIVE ROLES IN SOCIETY

*"For too long, education has been regarded as just another service for incarcerated youth. For too long, yesterday's pedagogy has failed to educate delinquent youth for today's world. It is time to change."*[48]

Robert Gemignani, National Office for Social Responsibility

Overwhelmingly, young people who become chronic delinquents and adult criminals suffer from two crippling problems: 1) weak academic achievement; and 2) poor preparation for the world of work.

If we want to hasten the pace at which delinquent youth mature into adulthood and terminate delinquent behavior patterns (as most eventually do), helping youth prepare for and enter the labor market is critical. That means education. That means job readiness. That means vocational skills. And for troubled youth long used to failure, many of whom suffer learning disabilities and behavioral disorders, each of these goals requires hands-on learning opportunities providing both a first taste of success and a clear path toward employment.

Nationwide, detailed information about the scope and quality of education and training programs for delinquent youth is virtually non-existent. The latest national survey of juvenile correctional education programs was completed in 1996 (using data from 1992), and it included little more than an incomplete checklist from 39 states. The report listed state budgets for juvenile correctional education, the agency responsible for administering correctional education programs, and simple yes-no lists of program types offered (elementary & secondary education, GED prep, vocational education, etc.). The report included few data regarding how many youth participate in these programs, and no data at all on participant outcomes.[49]

As one federally-funded study concluded, "No systematic and cumulative data exist to show what programs [youthful offenders] receive, from what kinds of staff, at what cost – let alone what results."[50]

Even without national data, however, it is clear that most juvenile justice systems remain substantially unprepared to provide delinquent youth with a quality education and prepare them for the labor market. According to the National Center on Education, Disability, and Juvenile Justice: "Education programs in many juvenile correctional facilities are inadequate.... Juvenile correctional institutions often have limited capacity to support appropriate educational interventions for the youth confined to their care and custody. Major systemic impediments include overcrowding, insufficient financial resources, ineffective governance structures, isolation of correctional schools from education reform practices and from public schools, inadequate transition and aftercare services, and lack of collaboration and coordination with treatment and security components within the juvenile facility."[51]

Particularly serious in juvenile corrections is the lack of career preparation. The majority of youth who are removed from home and placed in juvenile corrections facilities never again return to school – and most never complete high school. "While correctional educators must find better ways to motivate students to return to school," writes

correctional education expert, Robert Gemignani, "they must also provide students with the knowledge, skills, and attitudes needed in entry-level jobs."[52]

"The relationship [between youth and correctional staff] and a sense of safety are the absolute, necessary fundamental things that have to be in place" in juvenile corrections," explains juvenile justice consultant, Paul DeMuro. "Once they are in place, you can step back and look at what causes the delinquency in the first place, and I think in most cases that is lack of opportunity. So if that's the cause, then skills enhancing is clearly an important part of the solution."

## PREPARING DELINQUENT YOUTH FOR PRODUCTIVE CAREERS THE GULF COAST TRAINING CENTER

In New Waverly, Texas, a new neighborhood is sprouting up – eight houses purchased since 1998 by moderate income families at affordable prices, and five more on the drawing board. With wall-to-wall carpeting, modern kitchens and central heating, the homes look conventional in every respect. But in one way they are entirely unique: all were primarily built by delinquent juvenile offenders.

The development and construction of these homes has been spearheaded by the Gulf Coast Trades Center, a juvenile corrections program located in the Sam Houston National Forest outside of New Waverly, an hour's ride north of Houston. By teaching youthful offenders practical, hands-on vocational skills (in construction and several other career tracks) and providing opportunities to employ those skills in a real world context, Gulf Coast Trades Center stands virtually alone in our nation's juvenile justice infrastructure – a residential program for serious juvenile offenders that makes education and career preparation the cornerstone of its treatment and rehabilitation philosophy.

Not only for new homeowners, but also for the young people served and Texas citizens concerned about youth crime, the results of Gulf Coast's vocational approach are noteworthy: low recidivism and high rates of success for program graduates in finding well-paying employment in their chosen occupations.

**Gulf Coast Trades Center stands virtually alone in our nation's juvenile justice infrastructure – a residential program for serious juvenile offenders that makes education and career preparation the cornerstone of its treatment and rehabilitation philosophy.**

### UNION ROOTS

Gulf Coast Trades Center came to life in 1971 on the grounds of an abandoned site of the federal Job Corps program. The Gulf Coast Trades Union, in partnership with city government in Houston, secured funding from the federal Model Cities program to continue using the site to train low-income youths. The new program struggled until former union organizer Mike Buzbee took over in 1974. Though Buzbee and five staff members went without pay for three months in these early days, Gulf Coast captured contracts with the Texas Youth Commission and the federal CETA job training program early in 1975 and began training delinquent teens for trades and careers.

A quarter century later, Buzbee remains in charge at Gulf Coast, and the agency retains its union-based focus on trades and careers. Gulf Coast provides academic and vocational training, work experience, counseling and aftercare for 176 delinquent youth each day. Sixty percent of these youth are referred from the Texas Youth Commission (TYC) – either as a step down from their initial stays in TYC training schools, a consequence for violating parole, or as a direct placement following adjudication. The remaining 40 percent are referred to Gulf Coast directly from county courts and probation agencies throughout Texas.

**FRESH START at the Living Classrooms Foundation: An Old Trade Leads to New Success**

Down on the waterfront in Baltimore's Fells Point neighborhood, once home to a thriving shipbuilding industry, 20 young men arrive each morning to learn that honored old trade. Five days per week for 40 weeks, they practice boatbuilding, carpentry and other hands-on skills. They also receive valuable job readiness training, advance academically, and learn self-discipline with the help of an innovative daily self-evaluation process. By the time they graduate from this **"Fresh Start"** program, most of the youth – all juvenile offenders ages 16 to 21 – are ready to succeed in employment and/or education. Even more importantly, unlike youth confined in Maryland's more conventional juvenile corrections programs, they are unlikely ever to be rearrested or reincarcerated.

"Fresh Start" was launched in 1989 by the Living Classrooms Foundation, a Baltimore-based nonprofit dedicated to youth development through hands-on learning. Funded primarily by the Maryland Department of Juvenile Justice, the program serves 20 youth at a time in a curriculum with five eight-week modules. All participants are referred by a probation officer or a juvenile court judge. More than half reside at the Maryland Youth Residence Center, a locked facility, while the remainder reside either in state-funded group homes(about one-fourth) or in their own family homes.

Because Fresh Start is voluntary and uses no locks or restraints, the program operates with a strict behavioral code: youth who commit or threaten violence , and those found with or under the influence of drugs, are automatically expelled. Also, youth are allowed three personal days during each eight-week cycle. Absence counts as one personal day, and any lateness counts for half a day. If they exceed the three-day limit, youth are removed from the program and must apply for re-admission. As a result, Fresh Start has a daily attendance rate of more than 90 percent.

Although Fresh Start participants spend only 75 minutes per day in a classroom, most make substantial academic progress thanks to the program's extensive hands-on learning activities. Youth gain an average of 1.85 grades in reading, 1.0 grades in writing, and .65 grades in math. Of those who enter the program at an 8th grade level or higher, 77 percent earn their GEDs. Fresh Start youth also earn

The main 46-acre Gulf Coast campus – which has no perimeter fence and uses no locked cells or physical restraints – houses 144 youth in six dormitories. Another 32 participants – mostly older youth who are unlikely to return to their family homes – reside on an independent living campus.[53] All participants are between the ages of 16 and 18, and 80 percent are male. One-fifth of participants are white, while African American and Hispanic youths each comprise about two-fifths of the Gulf Coast population.

## VOCATIONAL CORRECTIONS

The Gulf Coast program offers a strong dose of academic education. Participants spend two hours every day in Gulf Coast's Learning Resource Center where they work on basic skills, study for the GED, or earn high school credits with the help of a 20-station computer lab, as well as videos, workbooks, and individual tutoring from the Center's academic instructors. Students work at their own pace, using individualized plans developed and updated by staff based on extensive pre-testing and ongoing assessments.

These academic activities (as well as the vocational training described below) are overseen entirely by Gulf Coast, which established an independent charter school in 1998 after struggling to partner with local school districts throughout the prior two decades. With the charter school, Gulf Coast is now free to hire its own instructors, set its own hours, and establish its own curriculum – rather than trying to fit its program into the regulations and routines of the public schools.

dollars during the program through work with student-run businesses to build and sell boats and patio furniture. Youth typically earn $500 to $800 over the course of the program, although they can claim these rewards only if they graduate the program.

According to John Dillow, who oversees Fresh Start as director of Living Classrooms' Maritime Institute, the key to Fresh Start's success is the close personal attention participants receive both during and after the program. At Living Classrooms, each group of four-five participants has its own instructor, and each participant meets daily with the instructor to review his performance. Following graduation, Fresh Start continues to monitor and counsel graduates, with help from a team of "retention specialists."

Because of the close supervision and strict rules of the program, Fresh Start has a high attrition rate. Of the 154 youth who have entered the program between July 1997 and June 2000 and completed at least two weeks, 112 completed at least one 8-week module and 50 (32 percent) completed the entire 40-week program cycle. However, the long-term success of these graduates underscores the value of Fresh Start: 66 percent of graduates were either employed and/or enrolled in education in December 2000. Wages among the 52 percent of graduates who were employed averaged $7.67.[54]

Perhaps most impressively, only 19 percent of Fresh Start graduates had been rearrested since leaving the program, and only 7 percent had been reincarcerated – this in a state where 76 percent of youth released from state-funded juvenile corrections facilities are re-arrested within three years. Despite its far higher success rates, the 40-week Fresh Start program costs the state less than half as much as a 40-week stay in a juvenile corrections facility. Less cost, more safety.

**CONTACT:**

John Dillow, Director
Maritime Institute
Living Classrooms Foundation
802 South Caroline Street
Baltimore, MD 21231
Phone: (410) 685-0295

**Nine Vocations.** In addition to its academic activities, every Gulf Coast participant also enrolls in one of nine vocational programs:

- construction carpentry
- painting and decorating
- bricklaying/stone masonry
- culinary arts (cooking)
- horticulture-related occupations
- building trades (plumbing/electrical)
- automotive technology (and repair)
- mill and cabinetmaking
- office support systems (and office technology)

For each vocational track, Gulf Coast has a customized workshop, a dedicated instructor, and a 915-hour vocational curriculum. These curricula include a mixture of classroom lectures and hands-on learning activities. In the automotive shop, for instance, participants perform maintenance on the 36 vehicles owned by Gulf Coast. In the office support systems shop, they learn to operate office software programs and perform diagnostic tests and repairs on Gulf Coast's office computers. In addition, all participants take part in job readiness training to prepare them for the world-of-work, and most also take drivers education training.

**Real-World Work Experience.** In each vocational track, participants must demonstrate mastery of several dozen competencies in order to earn a vocational certificate. During their stays at Gulf Coast (which average six to nine months), 80 to 90 percent of Gulf Coast youth earn this credential, at which point they can participate in Gulf Coast's work experience activities (and begin wearing green shirts, rather than the blue trainee shirts they've worn until then).



Source: Data provided via fax by Dr. Chuck Jeffords, Texas Youth Commission, December 2000.

Work assignments include maintenance or office work activities within the Gulf Coast campus itself, or part-time jobs with local government agencies and nonprofit corporations in the New Waverly area. Gulf Coast staff transport the youth to and from these assignments, and they monitor participants' performance on the job through written agreements with the employers, plus frequent phone calls and site visits. The work activities are supported through the federal Workforce Investment Act (successor to the Job Training Partnership Act), and participants are paid minimum wage for all hours worked. Some money is deducted from many participants' wages for restitution, and the remaining wages are placed in savings accounts to be used for expenses related to finding employment. The balance is released when youth begin working in unsubsidized jobs in their home communities.

While work experience opportunities have long been a cornerstone of Gulf Coast's rehabilitative strategy, these opportunities have become even a more positive tool over the past three years thanks to the agency's new housing construction efforts. Gulf Coast established its own housing development corporation in 1998. Since then, with funding from the U.S. Department of Housing and Urban Development's YouthBuild program (which provides funding for education and training and for wages), as well as a companion state "YouthWorks" program (which provides funding for materials and construction costs), Gulf Coast has built eight new homes, with another five scheduled to begin construction in January 2001.

At any one time, 35 youth can participate in Gulf Coast's YouthBuild program, and these youth split their time evenly between academics and on-the-job construction training. They participate in most aspects of the construction process – from laying foundation, to framing, to sheet-rocking, to roofing. Only highly technical areas, such as electrical wiring and plumbing, are left primarily to experienced professionals. Once finished, Gulf Coast sells the houses to low and moderate-income families at bargain prices (as low as $50,000 for a new three-bedroom home).

**Aftercare (and Job Placement).** After training delinquent youth for careers and providing them on-the-job work experience, Gulf Coast does not simply send them home and wish them luck. Rather, the agency provides extensive aftercare support – including job search and job placement assistance. Roughly half of the graduates take part in an intensive 90-day aftercare program, in which Gulf Coast staff serve as advocates and mentors, visiting youth in their homes at least three times per week. Another 40 percent of graduates take part in a more moderate aftercare program, and 10 percent live too far away

from Gulf Coast to receive aftercare support. Regardless of where they live, all Gulf Coast graduates receive job placement and job coaching assistance.

**Behavior Management and Supervision.** In addition to its strong emphases on academics, vocational training, work experience, and aftercare, Gulf Coast utilizes many behavioral management and counseling strategies typical in other juvenile corrections facilities. Gulf Coast uses a level system to rate each youth weekly on their behavior and cooperation, and then it allots privileges – recreational time, use of a game room, off-campus outings – for youth ranked at level three or level four (the top level). Youth can be dropped a level at any time for serious misconduct, and it takes two weeks of good behavior to restore a youth to his or her prior level. Gulf Coast also supports a Youth Leadership program, in which youth who volunteer can meet quarterly with the agency's board and have a say in facility policies, serve on an appeals board to hear other participants' grievances, qualify for the YouthBuild program, and go on occasional special outings.

Unfortunately, both staff and participants at Gulf Coast report that the behavior management regimen has suffered in recent years due to problems with the direct care workers who supervise youth in their dorms. In the past, many of these direct care workers were criminology students at nearby Sam Houston State College. However, as the economy has picked up in recent years, fewer and fewer students have applied for these jobs. As a result, Gulf Coast is increasingly forced to hire local residents with limited skills. Even after granting a wage increase in 2000, Gulf Coast pays the direct care workers a maximum of only $7 per hour during their first year on the job. Thus, staff turnover is high, and some of those hired lack the skills or motivation to rigorously enforce the Gulf Coast behavior management philosophy.

## MORE WORK, LESS RECIDIVISM

Despite these staffing challenges, performance data from Gulf Coast reveal that its vocational approach to juvenile corrections is working. According to the Texas Youth Commission (TYC), only 15.7 percent of youth who graduated from Gulf Coast from 1995 through 1999 were incarcerated within one year of release – compared to 37.6 percent of Texas youth released from other moderate security residential facilities during this same period. TYC also performed a statistical analysis (involving 20-30 variables) to calculate the predicted incarceration rate based on the specific profiles of youth in the Gulf Coast program, and it found that 36 percent fewer Gulf Coast graduates were incarcerated than its sophisticated model predicted. Likewise, the one-year arrest rate for violent offenses among Gulf Coast graduates was 29 percent lower than expected. Also, a three-year recidivism analysis found that Gulf Coast graduates' overall incarceration rate was 32 percent lower than expected and its incarceration rate for felony offenses was 31 percent lower.[55]

In addition to staying out of trouble, Gulf Coast graduates also excelled in terms of academic and occupational achievement. Roughly 60 percent of Gulf Coast graduates complete their GEDs, and 60 percent find employment in their chosen occupational field at an average starting wage of $7.50 per hour.

| | |
|---|---|
| **Operating Agency** | Gulf Coast Trades Center |
| **Program Type** | Privately-Run Residential Corrections Facility |
| **Program Goals** | Rehabilitation and Career Preparation for Juvenile Offenders |
| **Target Group** | Youthful offenders committed to state custody |
| **Key Strategies** | Intensive vocational training in nine career tracks; job readiness training and work experience; strong aftercare supervision and support |
| **Primary Funding Source(s)** | Texas Youth Commission; county probation agencies; US Department of Housing and Urban Development; Workforce Investment Act |
| **Evidence of Effectiveness** | Low recidivism, high percentage of graduates employed at living wages |
| **Contact Information** | Thomas M. "Mike" Buzbee, Executive Director<br>Gulf Coast Trades Center<br>P.O. Box 515<br>New Waverly, TX 77358<br>Phone: (936) 344-6677; Fax: (936) 344-2386 |

## CHALLENGE #8:
# REDUCE INAPPROPRIATE DETENTION OF YOUTH AWAITING TRIAL OR PENDING PLACEMENT

*"The inappropriate use of secure detention poses hazards for youth, jurisdictions, and society at large. Research indicates that detention does not deter future offending, but it does increase the likelihood that children will be placed out of their homes in the future, even when controlling for offense, prior history, and other factors."*[56]

Annie E. Casey Foundation

When an adolescent is arrested, one of the most important decisions affecting his or her future will be made almost immediately: *detention.*

The choice whether or not to hold a young offender in a juvenile detention center – analogous to a local jail in the adult justice system – is not just a question of short-term liberty for the offender. Rather, this decision can have serious consequences for ultimate disposition of the young person's case. According to Mark Soler of the Youth Law Center, "Youth who are detained, rather than let go to their parents or released to some other program, are much more likely to be incarcerated at the end of the process."[57]

Unfortunately, evidence is abundant that ***pre-trial detention is used excessively, inefficiently, and inequitably in many jurisdictions nationwide, perhaps most.*** Under the law, juvenile detention centers are intended to house young people pending trial only if they pose a danger to themselves or others, or if they are a risk to flee the jurisdiction rather than appear for scheduled court hearings. However, 79 percent of all youth held in juvenile detention nationwide in 1997 were not charged with violent felony crimes. Many were accused only of a misdemeanor, status offense, or property crime. Many more were detained after failing to appear at an earlier court hearing – often following a long delay from arrest to hearing date and minimal (if any) follow-up to remind the youth of the hearing or encourage attendance.

**Meaningful detention reform can ease chronic overcrowding and avert the need for new multi-million dollar juvenile lock-ups.... It can also be a fulcrum for a more fundamental change in juvenile justice – embracing what works and discarding unproductive but still-common practices that waste money, damage youth, and fail to protect citizens.**

Meanwhile, inefficient case processing lengthens the duration of stay for many detained youth – causing young people to spend far more time than necessary away from their families and out of school. Once youth are convicted of crimes ("adjudicated delinquent" in the parlance of juvenile courts), many spend weeks or months more in detention waiting idly for placement into a corrections or treatment program.

These problems are a large part of the reason why the population housed in juvenile detention facilities nationwide has risen dramatically in the past two decades – not only during the period of rapidly increasing juvenile crime (from 1984 to 1993) but also since 1993 when juvenile crime rates have declined sharply. In 1995, 62 percent of youth held in detention were in overcrowded facilities – placing them at heightened risk for violence, and decreasing the quality of education, health and other services provided.

Fortunately, a number of jurisdictions have shown in recent years that over-use of detention can be overcome. In 1987, youth advocates filed suit in Broward County, Florida to protest overcrowding in the local juvenile detention center, which was overflowing with an average daily population of 160 young offenders. The county responded with a multi-pronged detention reform initiative. It introduced an objective screening device to determine whether each offender was a danger to himself or others, or a risk to flee, and it only detained those who met one of those two criteria. The county created new procedures to minimize "failures to appear" for court hearings, a major problem in Broward (and many other juvenile courts) and a cause for youth to be rounded up and detained. And Broward launched alternatives-to-detention programs to provide intensive oversight as well as mentoring and case-management for higher-risk youth released pending trial. Through these efforts, Broward County reduced its average daily headcount by two-thirds over five years – to only 56 young people per day – and the county saved $5.2 million in operating costs, construction, and overtime.[58]

Broward County's success in reforming juvenile detention paved the way for the Annie E. Casey Foundation's multi-city Juvenile Detention Alternatives Initiative (see sidebar on p. 56) – which demonstrated again that many young people now languishing in detention beds can be safely supervised in the community or more rapidly placed into correctional programs. So too does the Juvenile Justice Operational Master Plan project in King County (Seattle), Washington, which is detailed in the following pages.

Meaningful detention reform can ease chronic overcrowding and avert the need for new multi-million dollar juvenile lock-ups. As the King County story demonstrates, it can also be a fulcrum for a more fundamental change in juvenile justice – embracing what works and discarding unproductive but still-common practices that waste money, damage youth, and fail to protect citizens.

## Juvenile Justice Operational Master Plan
## Bringing Detention Reform to Seattle and King County, WA

Like most urban centers in America, the Seattle area has seen a sharp drop in serious juvenile crime since the early 1990s. Yet, like a lot of places, the juvenile detention center in King County – opened in 1991 – brimmed to capacity in the late 1990s. Admissions to detention rose 27 percent from 1993 to 1998, and the average length of stay in detention rose 39 percent – causing the average daily population to jump from 119 to 199. In January 1999, the detention population topped 200, though the facility was designed to house only 160 youth. The overcrowding forced King County to draw up plans for another detention center: construction for a 80-bed unit would cost $11 million, and operational costs would add another $5.8 million per year.

Such an investment would be worth every penny if the safety of King County residents was at stake. But was a new detention center the only option to prevent the county from having dangerous young criminals loose on the streets? A team of community and local government leaders began examining this question in 1997 as part of a larger review of county juvenile justice programs for the new millennium.

Here's what they found: Without jeopardizing safety, King County could dramatically reduce the detention population, avert the need for a new detention center, and reduce subsequent offending. The only catch was, to achieve these goals the county would have to change virtually everything about how its juvenile justice system did business. In August 2000, the King County Council voted to do just that – placing the proposed new detention center on indefinite hold and instead investing would-be construction and operations funds into long-needed administrative reforms and far-sighted prevention and treatment programs.

These reforms, which are now in varying stages of implementation, have already reduced King County's

detention population by 30 percent while offering troubled youth an array of new and improved programs with proven power to prevent or reverse delinquency.

## FRAMING A MASTER PLAN

King County's Juvenile Justice Operational Master Plan (Master Plan), commissioned by County Executive Ron Sims in December 1997, was developed over three years by a 22-person oversight team with support from a 16-person working group, expert consultants, and various project teams involving more than 100 representatives from county and city agencies, courts, community agencies, and schools.

In the first phase, the study team interviewed several dozen stakeholders in the Seattle area and held juvenile justice policy workshops in May and June 1998. These efforts, along with research by project staff and deliberations by the oversight committee, formed the basis for an interim report in August 1998. This report concluded, in part, that "Additional detention capacity will be needed to meet the current and future demand for the county if community based alternative programs... and other diversion programs are not expanded." However, the Phase One report stated, "This analysis found a high potential for the use of alternatives, which are more effective in terms of cost and impact for a high percentage of the youth entering the juvenile justice system."[59]

**"We are at a crossroads regarding the future of juvenile justice in King County. The choices are clear. We can continue to do what we did throughout the 1990s and face the need to construct and operate a major new juvenile detention facility, or we may rethink how we do business and find other ways to promote justice, protect the public, and help youth in trouble make responsible choices."**

In the second phase of the study process, the Master Plan team developed a mountain of data regarding the options for reform in the local juvenile justice system. Not only did the study team identify 17 policy and program recommendations, but it also went the next step of combining these recommendations into three reform scenarios (ranging from limited implementation to full implementation of the recommendations). The team then developed a model to project the impact of each scenario on the size of the detention population and the county's juvenile justice costs over time.

"We are at a crossroads regarding the future of juvenile justice in King County," the Phase Two report found. "The choices are clear. We can continue to do what we did throughout the 1990s and face the need to construct and operate a major new juvenile detention facility, or we may rethink how we do business and find other ways to promote justice, protect the public, and help youth in trouble make responsible choices."[60]

## TARGETS FOR REFORM

The Master Plan identified many areas ripe for reform, including several that contributed directly to overcrowding in the county detention facility.

**Objective Detention Screening**. Historically, when police arrested young people for charges and decided not to release them with a warning, they would bring offenders to detention and simply drop them off. Only then would probation staff assess youth to determine whether they posed a threat to public safety or a risk to flee. If the young person did not pose a danger, detention center staff tried to find an adult or guardian to take custody -- often unsuccessfully. Thus, many low-risk youth found their way behind bars. When a team of consultants and staff analyzed the problem, they found that by providing police with specific detention criteria, and then prohibiting officers from bringing less serious offenders to detention, the county could free up many detention beds.

**Alternatives to Detention**. As of October 1998, 46 percent of the youth locked inside King County's detention center were charged with a misdemeanor or status offense. Only 28 percent were charged with a serious felony. However, only about twenty

## The Annie E. Casey Foundation's Juvenile Detention Alternatives Initiative

After the dramatic success of its grants to support juvenile detention reform in Florida's Broward County (see p.54), the Annie E. Casey Foundation decided to take its show on the road. Beginning in December 1992, the foundation developed, launched, and supported a multi-million dollar, multi-site project to help develop a model for detention reform that could be used throughout the nation.

Specifically, the **Juvenile Detention Alternatives Initiative (JDAI)** provided implementation grants of $2.25 million each to Sacramento County, CA, Multnomah County (Portland), OR, and Cook County (Chicago), IL over a period of three years.[61] The aim of the grants was to help these localities achieve four goals: (1) build a consensus on the purposes of juvenile detention (and thereby eliminate unnecessary and inappropriate detention placements); (2) reduce the number of youth who fail to appear in court for scheduled hearings or commit a new offense while pending adjudication; (3) improve cost-efficiency in detention by developing responsible alternatives to secure confinement; and (4) improve conditions and alleviate overcrowding in secure (i.e., locked) detention facilities.

The results from this JDAI initiative effort were rich – both for the localities involved, and for juvenile justice practitioners nationwide thanks to the wealth of tangible information disseminated by Casey through this initiative.

"Every measure we have suggests that in Chicago, Portland, and Sacramento, JDAI achieved significant reductions in detention admissions and significant improvements in the conditions of confinement," reports Barry Krisberg, president of the National Council on Crime and Delinquency and chief evaluator of JDAI. "And there were no increases in either failure-to-appear rates or pretrial crime rates."

In the three counties, staff from juvenile justice agencies and the courts made their most significant progress in three areas:

- *Reducing inappropriate admissions to detention.* In each of the three jurisdictions, juvenile probation agencies developed objective risk-assessment instruments to measure which youth offenders were really dangerous or likely to skip their scheduled court hearings. These objective measures replaced haphazard screening processes that previously allowed many youth to sit in detention as punishment (which is unfair to youth who not yet been convicted) or because no guardian could be located.

youth each day participated in alternatives-to-detention programs such as home detention, electronic monitoring, or intensive supervision, and an alternatives-to-detention intake worker was assigned to only one of the county's four juvenile courtrooms. In other jurisdictions, alternative programs report success rates of 85-90 percent supervising youth without arrests and getting them to scheduled court hearings – and at a fraction of the cost of secure detention. Expanding its alternative programs, analysts found, would free up many beds.

**Appearance Rates for Juvenile Court**. Twenty-nine percent of youth admitted to King County's detention center in 1996 were arrested on bench warrants because they failed to appear in court. Though 78 percent of these youth were accused of misdemeanors or minor property felonies, most were admitted to detention – at an average cost of $144 per day. Despite these costs, the county did little to encourage youth to appear – mailing a reminder letter, in English only, and often to incorrect addresses. Juvenile justice staff recommended a new plan to begin phoning youth and their parents just prior to hearing dates, a procedure that could cut the failure to appear rate and free more beds.

**Truants and Status Offenders**. In 1995, the state of Washington passed the "Becca Bill," named for Rebecca Hedman, a 13-year-old runaway who was

- *Expedited case-processing and reduced lengths of stay in detention.* Sacramento and Multnomah Counties made dramatic strides in eliminating unnecessary and expensive delays in juvenile cases and reducing the periods of confinement for youth initially placed into detention. In both of these jurisdictions, probation staff began to meet with prosecution and defense attorneys as soon as possible after arrest to resolve cases and/or find alternatives to locked detention for youth who posed few dangers.

- *Detention alternatives for non-dangerous youth.* In Cook County, the most impressive outcome of the JDAI project was an array of new detention alternatives programs to supervise youth in the community while they awaited court hearings. These alternatives – including evening reporting centers, home confinement, community service work projects, and non-secure shelters – have succeeded with more than 90 percent of the youth assigned. The alternatives have allowed the county to reduce the number of youth placed into secure detention and lower the average daily population in its detention facility (designed for 498 youth) from more than 750 per night early in 1996 to fewer than 550 in the summer and fall of 1999.

In addition to these concrete accomplishments in the targeted cities, JDAI also produced valuable information for juvenile justice practitioners in other jurisdictions. The Casey Foundation hosted a national juvenile detention conference in December 1996, and it has since published a series of thirteen "Pathways to Detention Reform" reports examining aspects of detention reform, plus an interim evaluation report. (A final evaluation report is pending.) Thus, for the first time, juvenile justice practitioners have a wealth of information at their disposal to understand and address detention reform – a critical but little-understood battleground in the larger juvenile justice reform challenge.

**CONTACT:**

Bart Lubow, Senior Associate
The Annie E. Casey Foundation
701 St. Paul Street
Baltimore, MD 21202
(410) 547-6600

murdered while walking the streets. The law granted wide discretion to the courts to intervene with and confine young people who have not committed crimes – including runaways, truants, and other status offenders. The results in King County were dramatic: within two years the number of non-offenders admitted to detention increased by 1800 percent, from 34 in 1995 to 615 in 1997. Consultants and staff found that many cost-effective options were available to avert detention and reduce court costs for non-offenders. These included non-court truancy boards to resolve problems before court petitions are filed, truancy sweeps by police to round up truant youth and intervene before truancy becomes ingrained, and mediation to resolve problems between unmanageable youth and their guardians without court involvement.

**Lengths of Stay**. From 1993 to 1998 the average period of confinement for youth in the King County detention rose from 7.6 days to 10.6 days, accounting for 62.5 percent of the overall growth in average daily population at the detention center. These increasingly lengthy periods of detention could be reversed, staff found, by adopting clear sentencing guidelines to expedite transfers out of detention following adjudication hearings and by speeding up required assessments for youth bound for state juvenile corrections facilities.

**Research-driven Intervention Programs.** In 1997, the Washington State Legislature passed a new "Community Juvenile Accountability Act" that set aside $7.65 million for local juvenile courts to implement research-proven intervention models that reduce recidivism among high- and moderate-risk youthful offenders. (See sidebar in Challenge #3.) Using these funds, King County implemented programs for Functional Family Therapy (serving 150-200 youth in 2000), Multisystemic Therapy (serving 45 youth in 2000), and a less intensive ($400 per participant) classroom-based social competency training called Aggression Replacement Training (serving 300 in 2000). Juvenile justice staff expect these programs to substantially reduce recidivism among participating youth – lowering both the crime rate and the need for juvenile detention beds.

## THE FRUITS OF REFORM

In April 2000, the juvenile justice staff compiled a package of four options for King County Executive Ron Sims and the King County Council. The first option involved no change in policies, and the remaining three ranged from moderate to aggressive implementation of the reforms detailed above. Whereas the status quo option would require 255 detention beds by 2005, necessitating construction of a new detention center, the three reform plans would result in space needs ranging from an estimated 175 beds for the least aggressive option to 137 beds for the most aggressive plan. Weighing added costs for detention alternatives and other new services against the savings in reduced detention, these three options would result in a net savings to King County of $3.9 to $5.4 million per year.[62]

Even before the final decision was made in August 2000, King County began to implement many of the proposed reforms. Police officers now carry cards detailing precise criteria for which youth can be taken to detention center and which youth must be released to parents or guardians. Volunteers now operate a "warrant reduction" phone bank to remind youth and parents of upcoming hearing dates and encourage them to attend. Model intervention programs are up and running, and the county has funding proposals pending to significantly expand these programs in the coming years. As a result, the King County detention population has begun to decline, falling from more than 200 in January 1999 to fewer than 140 in August 2000.

Though the Master Plan's long-term prospects for success are clouded somewhat by administrative issues,[63] many signs of progress are now evident in King County's juvenile justice efforts. At a cost far below what would have been required to build a new detention facility, King County youth are participating in new alternatives to detention and home-based intervention programs that have solid records for reducing future offending rates.

When it comes to detention, perhaps even more than other areas in juvenile justice, the opportunities are many for less spending, more safety.

| | |
|---|---|
| **Operating Agency** | King County Juvenile Justice Operational Master Plan Oversight Committee |
| **Program Type** | County-Sponsored Study Commission |
| **Program Goals** | Reduce Overcrowding in Juvenile Detention; Eliminate Need for Construction of New Detention Facility; Develop Alternative Programs/Policies to Lower Delinquency and Improve Outcomes for Youthful Offenders |
| **Target Group** | Delinquent offenders and children in need of supervision |
| **Key Strategies** | Prevent unnecessary placements into juvenile detention; reduce failures-to-appear in court by delinquent youth; implement alternatives to secure detention; replicate model intervention programs to reduce recidivism among delinquent offenders. |
| **Primary Funding Source(s)** | King County, State of Washington, US Office of Juvenile Justice and Delinquency Prevention |
| **Evidence of Effectiveness** | Sharp drop in daily detention population, construction of new detention facility deferred indefinitely, and model delinquency intervention programs being replicated in King County |
| **Contact Information** | Michael Gedeon, Project Coordinator<br>Juvenile Justice Operational Master Plan<br>1211 East Alder Street<br>Seattle, WA 98122<br>Phone: (206) 205-9532; Fax: (206) 205-9349 |

# CONCLUSION

**Less cost, more safety.** Lower recidivism, more youth success. These are the bottom line results of the programs and initiatives highlighted in this report.

Nor are these highlighted programs alone in demonstrating that substantial progress is attainable through juvenile justice reform. Other guiding light programs and initiatives in other jurisdictions are also proving that the eight challenges identified in this report can be effectively met and overcome. In addition, *Less Help, More Hype* identified several more weaknesses that now cripple juvenile justice efforts nationwide and several more challenges for juvenile justice reform: reducing excessive transfers of youthful offenders to adult courts; engaging community organizations and volunteers to help supervise juvenile offenders; improving legal representation for youthful offenders; and carefully monitoring the success of juvenile justice programs and institutions. Guiding light programs are also tackling these challenges, proving again that far greater success is attainable.

**Particularly when it comes to juvenile offenders, a strategy of human reclamation is not a pie-in-the-sky fantasy. Rather, as the programs highlighted in this report demonstrate, reforming juvenile justice represents a common sense, dollars-and-cents opportunity – a sound and sorely needed investment in our safety and in our future.**

In its cover story for the week of November 13, 2000, *Newsweek* reflected on the paradoxical trend in America – the land of the free – toward incarcerating an ever-increasing proportion of our nation's poor and minority youth. "We believe in making people pay for their crimes," wrote reporter Ellis Cose, "in protecting the weak from the vicious. We believe in justice. And we believe in simple truths.

"Our strivings to protect society may have weakened it," Cose continued, "for they fuel the notion that we can afford to throw human beings away. And they discourage us from asking whether it is morally or economically justifiable to invest so much in locking lost souls down and so little in salvaging them.

"In fact," the *Newsweek* story concluded, "a strategy of human reclamation may be the only thing that makes sense in the long run, not only for those fated to spend time locked down, but for the communities to which they seem destined to return—communities that now are doubly damned: to suffer when wrongdoers are taken away and yet again when they come back."[64]

Particularly when it comes to juvenile offenders, a strategy of human reclamation is not a pie-in-the-sky fantasy. Rather, as the programs highlighted in this report demonstrate, reforming juvenile justice represents a common sense, dollars-and-cents opportunity – a sound and sorely needed investment in our safety and in our future.

# ENDNOTES

[1] Feld, Barry C., "Juvenile and Criminal Justice Systems' Responses to Youth Violence," in Tonry, M. & Moore, M.H. (Eds.), *Youth Violence: Crime and Justice, A Review of Research*, Vol. 24 (Chicago, IL: University of Chicago Press, 1998), pp.236-237.

[2] DeComo, R., Tunis, S., Krisberg, B., & Herrera, N., *Juveniles Taken Into Custody Research Program: FY1992 Annual Report* (Washington, DC: Office of Juvenile Justice and Delinquency Prevention, 1993), cited in Jones, M.A., & Krisberg, B., *Images and Reality: Juvenile Crime, Youth Violence, and Public Policy* (San Francisco, CA: National Council on Crime and Delinquency, 1994), p.27.

[3] *Maryland Department of Juvenile Justice Recidivism Analyses: A Program By Program Review of Recidivism Measures at Major Facilities for Department of Juvenile Justice Youths* (Baltimore, MD: Maryland Department of Juvenile Justice, 1997), p.8.

[4] Cited by Feld, B.C., *Bad Kids: Race and the Transformation of the Juvenile Court* (New York: Oxford University Press, 1999), p.280.

[5] *Juvenile Offenders and Victims: 1999 National Report* (Pittsburgh, PA: National Center for Juvenile Justice, 1999), p.206.

[6] Some of these states, including Arkansas, operate a mix of training schools and smaller juvenile corrections facilities. Kentucky, the final state bordering Missouri, relies exclusively on small-scale juvenile correctional facilities. However, Kentucky's juvenile corrections system has a troubled history. A consent decree signed in 1995 cited the state's juvenile justice facilities for 140 violations ranging from harsh isolation practices to routine abuse and neglect. Fortunately, the situation has improved since then. See Alexander, Bill, "Once Lame Juvenile Justice System Jockeys to the Lead," *Youth Today*, vol.10, no.1, December/ January 2001.

[7] Gorsuch, K.R., Steward, M.D., Van Fleet, R.K., & Schwartz, I.M., "Missouri Department of Youth Services: An Experience in Delinquency Reform," in *Missouri and Hawaii: Leaders in Youth Correction Policy* (Ann Arbor, MI: Center for the Study of Youth Policy, 1992), pp.10-11.

[8] State juvenile corrections budgets were compiled from various sources, including phone interviews, state documents, and survey data provided by the Council on Juvenile Correctional Administrators.

[9] Phone interview with the author, January 2001.

[10] Interview with the author, December 2000.

[11] Cited in *Juvenile Justice: Views From Both Sides of the Aisle* (San Francisco, CA: National Council on Crime and Delinquency, 1996).

[12] Joy, E.L., Testimony Before the Subcommittee on Crime of the Committee on the Judiciary, U.S. House of Representatives, March 20, 1997.

[13] Data for this program (and for other programs cited below) provided by Lyn Willis, Tarrant County Juvenile Services, January 2001.

[14]   Cited in the "Editor's Introduction" to *Blueprints for Violence Prevention Book Six: Multisystemic Therapy* (Boulder, CO: Center for the Study and Prevention of Violence, 1998), p.xi.

[15]   Lipton, Douglas, R. Martinson, and J. Wilks, *The Effectiveness of Correctional Treatment: A Survey of Treatment Evaluation Studies* (New York: Praeger Press, 1975).

[16]   Henggeler, S.W., Melton, G.B., & Smith, L.A., "Family Preservation Using Multisystemic Therapy: An Effective Alternative to Incarcerating Serious Juvenile Offenders," *Journal of Consulting and Clinical Psychology*, vol. 60, 1992, pp. 953-961, cited in *Blueprints for Violence Prevention Book Six: Multisystemic Therapy* (Boulder, CO: Center for the Study and Prevention of Violence, 1998).

[17]   Borduin, C.M., Mann, B.J., Cone, L.T., Henggeler, S.W., Fucci, B.R., Blaske, D.M.. & Williams, R.A., "Multisystemic Treatment of Serious Juvenile Offenders: Long-Term Prevention of Criminality and Violence," *Journal of Consulting and Clinical Psychology*, vol. 63, no. 4, 1995, pp. 569-578.

[18]   Chamberlain, P., "Comparative evaluation of Specialized Foster Care for Seriously Delinquent Youths: A First Step," *Comparative Alternatives: International Journal of Family Care*, vol.2, 1990, p.21-36, cited in *Blueprints for Violence Prevention Book Eight: Multidimensional Treatment Foster Care* (Boulder, CO: Center for the Study and Prevention of Violence, 1998).

[19]   Chamberlain, P., & Reid, J.B., *Comparison of Two Community Alternatives to Incarceration for Juvenile Offenders*, manuscript submitted for publication, 1997, cited in *Blueprints for Violence Prevention Book Eight,* ibid.

[20]   Aos, S., P. Phipps, R. Barnoski, & R. Leib, *The Comparative Costs and Benefits of Programs to Reduce Crime: A Review of National Research Findings With Implications for Washington State* (Olympia, WA: Washington State Institute for Public Policy, May 1999).

[21]   Phone interview with the author, December 2000.

[22]   Henggeler, Scott W., *Treating Serious Anti-Social Behavior in Youth: The MST Approach* (Washington, DC: Office of Juvenile Justice and Delinquency Prevention, 1997), p.6.

[23]   *Promising Approaches for Graduated Sanctions,* (San Francisco: National Council on Crime and Delinquency, n.d.)

[24]   Wolfgang, M.E., Figlio, R.M., & Sellin, T., *Delinquency in a Birth Cohort* (Chicago, IL: University of Chicago, 1972).

[25]   Tracy, P., Wolfgang, M.E., & Figlio, R.M., *Delinquency in Two Birth Cohorts*, Washington, DC: Office of Juvenile Justice and Delinquency Prevention, 1990), cited in Howell, J.C. (Ed.), *Guide for Implementing the Comprehensive Strategy for Serious, Violent, and Chronic Juvenile Offenders* (Washington, DC: Office of Juvenile Justice and Delinquency Prevention, 1995).

[26]   *Guide for Implementing*, ibid, p.2.

[27]   Ibid.

[28]  Schumacher, M., & Kurz, G.A., *The 8% Solution: Preventing Serious, Repeat Juvenile Crime* (Thousand Oaks, CA: Sage Publications, 2000), pp.4-5, 41-42.

[29]  Ibid, p.66.

[30]  Data provided by Ms. Shirley Hunt, Orange County Probation Department, December 2000.

[31]  *Repeat Offender Prevention Project: Status Report to the Legislature (July 2000)* (Sacramento, CA: California Board of Corrections, 2000).

[32]  Schumacher, M., & Kurz, G.A., *The 8% Solution: Preventing Serious, Repeat Juvenile Crime* (Thousand Oaks, CA: Sage Publications, 2000), p.41.

[33]  Bilchik, S., *Mental Health Disorders and Substance Abuse Problems Among Juveniles* (Washington, DC: Office of Juvenile Justice and Delinquency Prevention, July 1998).

[34]  Cocozza, Joseph J., and Skowyra, Kathleen R., "Youth With Mental Health Disorders: Issues and Emerging Responses," *Juvenile Justice*, vol.7, no.1, April 2000, p.6.

[35]  Satcher, D.A., *Mental Health: A Report of the Surgeon General* (Rockville, MD: U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Mental Health Services, National Institutes of Health, National Institute of Mental Health, 1999), p.185.

[36]  Ibid.

[37]  Cited in Satcher, ibid.

[38]  *Ain't No Place Anybody Would Want to Be: Conditions of Confinement for Youth*, 1999 Annual Report (Washington, DC: Coalition for Juvenile Justice, 1999), pp.12-13.

[39]  Parent, D.G., Leiter, V., Kennedy, S., Livens, L., Wentworth, D., & Wilcox, S., *Conditions of Confinement: A Study to Evaluate Conditions in Juvenile Detention and Corrections Facilities - Executive Summary* (Washington, DC: Office of Juvenile Justice and Delinquency Prevention, 1993).

[40]  *Juvenile Detention and Training School Crowding: A Clearinghouse of Court Cases* (Richmond, KY: National Juvenile Detention Association, 1998).

[41]  Puritz, P. & Scali, M., *Beyond the Walls: Improving Conditions of Confinement for Youth in Custody* (Washington, D.C.: Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice, 1998).

[42]  Phone interview with the author, December 2000.

[43]  Data reported in *2000 Outcome Evaluation Report* (Tallahassee: Florida Department of Juvenile Justice, Bureau of Data and Research, February 2000), Appendix 4, p.120.

[44]  Cited in Lerner, Steve, *The Good News About Juvenile Justice: The Movement Away from Large Institutions and Toward Community-based Services (Bolinas, CA: Commonweal Research Institute, 1990), p. 120.*

[45]  Cited in Fields, Gary, "Reform School Gets High Marks," *Detroit News*, December 22, 1999.

[46]  Judith Mellen, "State spending for troubled youth is wise investment," Letter to the Editor, *The [Wilmington, DE] News Journal*, February 20, 2000.

[47]  *The Fiscal Impact of Reducing Juvenile Crime* (Tallahassee, FL: Florida Department of Juvenile Justice, Bureau of Data and Research, September 2000), p.9.

[48]  Gemignani, Robert J., *Juvenile Correctional Education: A Time for Change*, OJJDP Update on Research (Washington, DC: Office of Juvenile Justice and Delinquency Prevention, October 1994).

[49]  Kirshstein, Rita, & Best, Clayton, *Survey of State Correctional Education Systems: Analysis of Data from 1992 Field Test* (Washington, DC: Pelavin Research Institute, 1996).

[50]  Coffey, O.D., & Gemignani, R.G., *Effective Practices in Juvenile Correctional Education: A Study of Literature and Research 1980-1992* (Washington, DC: Office of Juvenile Justice and Delinquency Prevention, 1994), p.6, cited in Dedel, Kelly, *Assessing the Education of Incarcerated Youth* (San Francisco: National Council on Crime and Delinquency, 1997).

[51]  *Juvenile Correctional Education Programs*, Issue Summary by National Center on Education, Disability, and Juvenile Justice, downloaded from EDJJ website [http://www.edjj.org/education.html], November 2000.

[52]  Gemignani, supra note 41.

[53]  These figures do not include another 48 beds reserved for a new 90-day "conservation corps" program established by Governor George W. Bush for youth who have violated parole.

[54]  *The Fresh Start Program Report for 1997-2000* (Baltimore, MD: Living Classrooms Foundation, December 2000).

[55]  Data provided via fax by Chuck Jeffords, Texas Youth Commission, December 20, 2000.

[56]  Rust, Bill, "Juvenile Jailhouse Rocked," *AdvoCasey* (Baltimore, MD: Annie E. Casey Foundation, Fall/Winter 1999).

[57]  Cited in "Juvenile Jailhouse Rocked," ibid.

[58]  *Juvenile Detention Alternatives Initiative: An Experiment in Reform*, downloaded from the website of the Annie E. Casey Foundation, www.aecf.org/initiatives/juvenile/exper.htm.

[59]  *King County Juvenile Justice Operational Master Plan, Phase One: Final Draft Report* (Seattle, WA: Chinn Planning, Inc., in association with CGA Consulting Services, Inc., August 3, 1998).

[60]  *King County Phase II Juvenile Justice Operational Master Plan* (Seattle, WA: Christopher Murray and Associates, March 2000).

[61]  A fourth site, New York City, dropped out of JDAI during the implementation phase.

[62] *King County Phase II Juvenile Justice Operational Master Plan* (Seattle, WA: Christopher Murray and Associates, March 2000), p.9.

[63] Operational control of the local probation agency was taken away from the local administrative agency and shifted back to the courts in January 2000, due to longstanding management problems in the agency. Likewise, the juvenile detention center was placed under the county's adult probation agency, which operates the local jail for adult offenders.

[64] Cose, Ellis, "US: The Prison Paradox," *Newsweek*, November 13, 2000.

# ABOUT THE AUTHOR

Richard Mendel is an independent writer and researcher on poverty-related issues in youth development, neighborhood safety, employment and training, and community economic development. In June 2000, he authored *Less Hype, More Help: Reducing Juvenile Crime, What Works - And What Doesn't*, a comprehensive review of delinquency prevention and juvenile justice co-published by the American Youth Policy Forum, Child Welfare League of America, Coalition for Juvenile Justice, National Collaboration for Youth, National Crime Prevention Council, National League of Cities, and National Urban League.

Mr. Mendel worked for four years at the South Bronx Overall Economic Development Corporation, ending in 1998 as Assistant Vice President for Program Development and Evaluation. From 1986 to 1991 he was staff associate at MDC, Inc., a non-profit employment policy research firm in Chapel Hill, NC. In addition, Mr. Mendel has completed projects for the Enterprise Foundation, National League of Cities, Lilly Endowment, Annie E. Casey Foundation, Jobs for the Future, and Surdna Foundation, among others. He has written for *The Atlantic*, *Washington Post*, *Miami Herald*, *Baltimore Sun*, *Washington Monthly*, and others. Previously for the American Youth Policy Forum, Mr. Mendel wrote *The American School-to-Career Movement: A Background Paper for Policymakers and Foundation Officers* (1994), and *Prevention or Pork: A Hard-Headed Look at Youth-Oriented Anti-Crime Programs* (1995). Mr. Mendel earned a bachelor's degree in public policy from Duke University (1983) and a master's in journalism from the University of Maryland (1992).

# USEFUL PUBLICATIONS FROM THE AMERICAN YOUTH POLICY FORUM

(See our complete catalog at www.aypf.org)

***LESS HYPE, MORE HELP: Reducing Juvenile Crime, What Works – And What Doesn't*** by Richard A. Mendel. Demonstrates that trying youthful offenders in adult courts – "adult time for adult crime" – is a counterproductive fad that actually exacerbates juvenile crime. A groundbreaking new report describes alternative approaches that are far more effective in preventing teens from committing crimes – and in protecting the communities in which they live.
**90 pages** **$5.00 prepaid**

***PREVENTION OR PORK? A Hard-Headed Look at Youth-Oriented Anti-Crime Programs*** by Richard A. Mendel. Surveys what is known about the effectiveness of youth crime prevention programs. What works and what doesn't. Readable and helpful in competing for crime prevention funding.
**40 pages** **$5.00 prepaid**

***A GUIDE FOR THE POWERLESS – AND THOSE WHO DON'T KNOW THEIR OWN POWER; A Primer on the American Political Process*** by Samuel Halperin. A guide to getting what you need from any legislative body. How to work with politicians and develop the attitudes and skills that assure success for your program.
**60 pages** **$5.00 prepaid**

***HIGH SCHOOLS OF THE MILLENNIUM.*** High schools need to be redesigned to meet the needs of today's youth. Offers a new vision of high school that uses all the resources of the community to crate smaller learning environments, to engage youth in their striving for high academic achievement, to support them with adult mentors and role models, and to provide opportunities to develop their civic, social and career skills.
**49 pages** **$4.00 prepaid**

***LOOKING FORWARD: School-to-Work Principles and Strategies for Sustainability.*** Organized around Ten Essential Principles, this report assists policymakers, practitioners and the wider community in thinking about ways to sustain successful school-to-work approaches: improving the school experience for young people, expanding and improving work-based learning opportunities, and building and sustaining public/private partnerships. Identifies national funding that could support these state and local gains.
**43 pages** **$4.00 prepaid**

***RAISING ACADEMIC ACHIEVEMENT FOR AMERICA'S YOUTH: A Study of 20 Successful Programs.*** Evaluation summaries show evidence of success on multiple measures and suggest a combination of strategies leading to program effectiveness.
**92 pages** **$4.00 prepaid**

**Prepaid orders only please. Cost covers shipping and handling in contiguous U.S. Send all orders to: American Youth Policy Forum, 1836 Jefferson Place, NW, Washington, D.C. 20036-2505. (Federal ID 31-1576455). Call (202) 775-9731 for rates on quantity orders.**

ISBN 1-887031-71-5

J Abnorm Child Psychol (2006) 34:457–470
DOI 10.1007/s10802-006-9043-x

ORIGINAL PAPER

# National Institutes of Health State-of-the-Science Conference Statement

## Preventing Violence and Related Health-Risking, Social Behaviors in Adolescents, October 13–15, 2004

Published online: 2 August 2006
© Springer Science+Business Media, Inc. 2006

NIH consensus and state-of-the-science statements are prepared by independent panels of health professionals and public representatives on the basis of (1) the results of a systematic literature review prepared under contract with the Agency for Healthcare Research and Quality (AHRQ), (2) presentations by investigators working in areas relevant to the conference questions during a 2-day public session, (3) questions and statements from conference attendees during open discussion periods that are part of the public session, and (4) closed deliberations by the panel during the remainder of the second day and morning of the third. This statement is an independent report of the panel and is not a policy statement of the NIH or the Federal Government.

The statement reflects the panel's assessment of medical knowledge available at the time the statement was written. Thus, it provides a "snapshot in time" of the state of knowledge on the conference topic. When reading the statement, keep in mind that new knowledge is inevitably accumulating through medical and behavioral research.

### Background

The National Institutes of Health (NIH) convened a State-of-the-Science Conference on Preventing Violence and Related Health-Risking Social Behaviors in Adolescents on October 13–15, 2004. The National Institute of Mental Health (NIMH) and the Office of Medical Applications of Research (OMAR) of the NIH were the primary sponsors of this meeting. The Agency for Healthcare Research and Quality (AHRQ), the Centers for Disease Control and Prevention, the National Institute on Alcohol Abuse and Alcoholism, the National Institute of Child Health and Human Development, the National Institute on Drug Abuse, the National Institute of Nursing Research, the National Library of Medicine, the Office of Behavioral and Social Sciences Research, the Substance Abuse and Mental Health Services Administration, the U.S. Department of Education, and the U.S. Department of Justice were the cosponsors.

AHRQ supported the NIH State-of-the-Science Conference on Preventing Violence and Related Health-Risking Social Behaviors in Adolescents through its Evidence-based Practice Center program. Under contract to the AHRQ, the Southern California Evidence-based Practice Center (SC-EPC) and its partner, Childrens Hospital Los Angeles, developed the systematic review and analysis that served as one of the references for discussion at the conference. The National Library of Medicine, in collaboration with the SC-EPC and Childrens Hospital Los Angeles, conducted the literature search for the systematic review.

This two-and-a-half-day conference at the NIH examined and assessed the current state of knowledge regarding adolescent violence and related health-risking social behavior and identified directions for future research.

Experts presented the latest research findings on risk and protective factors involved in the development of adolescent violence and related behaviors and on interventions to reduce those behaviors. After a day-and-a-half of presentations and public discussion, an independent panel weighed the available evidence and drafted a statement addressing the following key questions:

- What are the factors that contribute to violence and associated adverse health outcomes in childhood and adolescence?
- What are the patterns of co-occurrence of these factors?
- What evidence exists on the safety and effectiveness of interventions for violence?
- Where evidence of safety and effectiveness exists, are there other outcomes beyond reducing violence? If so,

EXHIBIT
Affidavit
9
tabbles



what is known about effectiveness by age, sex, and race/ethnicity?
- What are the commonalities among interventions that are effective and those that are ineffective?
- What are the priorities for future research?

On the final day of the conference, the panel chairperson read the draft statement to the conference audience and invited comments and questions. A press conference followed to allow the panel to respond to questions from the media.

## Introduction

Violence affects all of us at some level and represents an issue of vital national and international importance. As upsetting as violence in general may be, the notion of our children engaging in significant violence is particularly distressing. While rates of adolescent violence have decreased from their peak levels of a decade ago, violent crime rates and consequences remain high and are substantially higher in the United States than in most industrial countries. Thus, adolescent violence is a public health issue of the highest level of concern with tremendous human and economic costs.

The field of adolescent violence prevention is complicated by the fact that it involves multiple scientific disciplines (e.g., medicine, nursing, psychology, sociology, architecture and civil engineering, economics, social work, criminology) and a multitude of professional jurisdictions (e.g., education, public health agencies, law enforcement, legislatures, the judiciary system). Each of these constituencies has different conceptualizations of the problem, including different terminologies, different intellectual as well as financial stakes in its origins and putative solutions, and differing views on approaches to its resolution. And yet, to effectively address adolescent violence, common perspectives, research agendas, and implementation plans must be developed.

### A maturing and promising field

The field of adolescent violence prevention has many strengths. The involvement of many highly-productive, creative investigators has allowed the field to advance considerably over the past two decades. Research has suggested the existence of distinct trajectories potentially leading toward violence with different intervention implications. Numerous developmental antecedents of violence and related behaviors and of risk constructs have been identified.

We can, today, identify a variety of interventions addressing children and youth across developmental and risk involvement spectra that have evidence of effectiveness even when stringent criteria are established for this designation.

In addition, current trends offer the capacity for future gains in this field, including the establishment of specific, articulated criteria for the categorization of intervention effectiveness and a system for evaluating and disseminating information on cost effectiveness. Although this potential has not yet been fully realized, the plethora of fields and disciplines involved in adolescent violence prevention allows for extensive methodological and design cross-fertilization.

### Opportunities for further advances in the field

Great advances have already been made within the violence prevention research field; more substantive advances will be possible when this field further integrates advances in methodology, theory, and conceptualization from other related fields. Theory can be further used, as it has in other fields, to develop specific intervention components and corresponding evaluations of putative determinants of intervention effect. Such efforts enable a progressive research development process in which one generation of studies informs the next iteration of intervention efforts across disciplinary lines. Likewise, as has been recognized in other disciplines, community-based effectiveness trials may require different experimental paradigms.

To date, there has been relatively minimal incorporation of new developments in researchers' understanding of the human genome and human brain development into the field of violence prevention. Much has been learned over the past decade about understanding behavior and behavioral change in differing ethnic and cultural groups, but this growing knowledge base does not appear to be reflected in many violence prevention efforts. In addition, substantial evidence from other fields and a growing body of evidence within the field of violence prevention speak to the need to examine possible adverse effects as well as beneficial effects of suggested interventions. Moreover, the violence prevention field, while admirably struggling with questions of bringing research to wider scale implementation, does not appear to have benefited fully from the experience of other research fields in this regard. Intervention efforts in other fields have been able to take advantage of potentially strategic moments such as those that might occur for violence prevention in the emergency room or at the police department with victims and/or perpetrators of violence. Efforts to draw upon the research findings from these disparate fields will be hampered until a common research language has been developed and agreed upon—and data is widely shared.

Even within the field of violence prevention, the extent to which interventions have been based on significant epidemiologic and behavioral findings within the field remains opaque. For example, it is not clear whether the existing interventions have adequately recognized the likelihood of differing risk trajectories and how intervention effects may



differ depending on whether youth violence reflects early-onset violent behaviors that are likely to endure or later-onset, adolescent-limited violent behaviors that cease with the transition to adulthood, or if they endure, are likely to have shorter trajectories.

## Organization of the remainder of this paper

The panel has responded to the six questions posed by the conveners of this conference. The panel's responses are intended to highlight the complexities of the field and to indicate the panel's perceptions of the directions in which future gains can be made. The panel understands and wishes to state that responding to the directions implied in its comments will require the development of interdisciplinary investigative methods and innovative transdisciplinary interventions. Moreover, such responses will require realignment of funding sources for both research and the implementation of effective programs.

1. *What are the factors that contribute to violence and associated adverse health outcomes in childhood and adolescence?*

The term adolescent violence is used to encompass a broad spectrum of behaviors ranging from bullying at school to murder. While the greatest concern is about violent behaviors like aggravated assault, armed robbery, rape, and homicide, many studies focus on more serious violence precursors, such as delinquency, physical aggression, or antisocial behavior.

Identifying risk factors for adolescent violence allows us to better understand which adolescents are likely to become violent—and to learn how to reduce violence. In this context, a risk factor is any characteristic or behavior that is associated with an increased chance that a young person will become violent. Factors that reduce the chance of violence are called protective factors. Risk factors can be useful in identifying people who are at high risk of violence. It should be emphasized, however, that having a risk factor does not mean a person will be violent; it just means that he or she is more likely to be violent than a similar person without the factor.

Some risk factors are causal. That is, the presence of the factor leads directly to violent behavior. Knowing about causal risk factors helps point to how to intervene. A causal relationship is suggested if the risk factor precedes the outcome, if the association is strong and consistent, and if there is a plausible underlying theory that predicts the relationship. To the extent that causal factors are modifiable, removing the risk factor will reduce the chance of violence.

Finally, risk factors can serve another function. When a risk factor reliably predicts the outcome of interest, the factor can be thought of as a proxy for the outcome. That is, interventions that can be shown to reduce the prevalence of the risk factor are likely to reduce the chance of the outcome itself. Such proxy outcomes are useful when the outcome of interest is rare, removed in time, or difficult to measure. Identifying good proxy measures for adolescent violence would help researchers conduct studies of reasonable size and duration by focusing on more common outcomes that are violence precursors, such as physical aggression.

Reflecting the importance of the issue, there is a growing body of literature regarding possible risk factors for adolescent violence. Because the studies come from multiple disciplines and employ a variety of study designs, it is difficult to summarize them succinctly. Moreover, the field is limited by a lack of consistent language in defining violence and in how putative risk factors are defined and measured. Further complications arise from the fact that the strength of a risk factor may change as an individual ages and may be modified by personal experience or changing social contexts.

Nonetheless, drawing on longitudinal studies in the United States and elsewhere, researchers have been able to draw a number of consistent inferences.

A number of analyses have attempted to identify factors that are shown to be associated with adolescent violence and related proximate outcomes like delinquency across research studies and populations using meta-analytic approaches. These analyses rely on data from longitudinal studies of children as they transition into adolescence and adulthood. The types of risk factors that have been examined commonly include characteristics of individual children and youth, their families, their schools, and their communities, reflecting both individual and ecological perspectives. Some specific factors have consistently emerged as antecedent situations or characteristics that are associated with increased or decreased probabilities of violence. For example, being male has consistently been identified as a risk factor for violence because male youth are much more likely to engage in violent behavior than female youth. Analyses of other factors, such as race/ethnicity or parental socioeconomic status, have produced ambiguous results.

There is evidence suggesting that adolescent violence develops along distinct trajectories, each with different natural histories and sets of risk and protective factors. For example, there is evidence for an early-onset form of violence that commonly persists well into adulthood as well as a later-onset and limited-duration form of adolescent violence that ceases with the transition to adulthood, or if it persists, has a shorter trajectory. Regardless of the trajectory, risk and protective factors differ by developmental stage. Examples of individual-level risk factors that are important in early childhood are incidents of the child fighting, crimes or status offenses, victimization, or childhood substance use. At the family level, risk factors include inconsistent or harsh parenting and family conflict. In contrast, poor peer relations, involvement in gangs, lack of connection to school,

and living in a violent neighborhood emerge as important risk factors in adolescence rather than in early childhood.

Further research and analysis needs to focus on identifying the causal pathways between risk and protective factors and adolescent violence using longitudinal studies of representative samples of children and youth. Oversampling of areas with high prevalence of adolescent violence will be necessary to ensure adequate numbers of violent behaviors. Collecting contextual information about the survey respondents' school and neighborhood environments will greatly improve the utility of surveys. Promising areas for further research include identifying factors associated with the observed decline in the late-onset form of adolescent violence and examining the possible association of violence in media and video games with behaviors.

2. *What are the patterns of co-occurrence of these factors?*

In the violence literature, the term co-occurrence often refers to the observation that adolescents who commit violent acts also tend to engage in other dangerous behaviors (e.g., substance abuse, physical aggression, delinquency). These co-occurring behaviors should be considered comorbidities. In this section, we describe the state of the science on how various risk factors cluster.

In general, the identification of co-occurring predictive risk factors and the explication of relationships between them is complex. The concurrent presence of two or more risk factors as predictors of a particular outcome can be due to the factors' independent prediction of the outcome or to the moderation of the effect of one risk factor by levels of another (synergism or interaction). For example, an aggressive child may only become violent when parenting skills fall short in certain ways. Competent parenting skills, such as monitoring, consistent discipline, and supportiveness, may reduce the likelihood of the child engaging in more violent, antisocial behaviors. Further, one risk factor may be mediated by the presence of another factor in the causal pathway toward serious violence. For example, when low socioeconomic status or low family income is studied alone, it appears to be an important risk factor. However, when other factors are taken into account in statistical models, the effect of socioeconomic status diminishes or disappears—suggesting that other factors explain the effect of socioeconomic status on violence.

In violence, there is even more complexity. Co-occurring factors can operate at multiple levels (e.g., individual, contextual) and may differ by subgroups of the population (e.g., gender, ethnicity, urban/rural, cultural groups, developmental stage) and by the type and severity of the violent outcome studied. In addition, the ability to identify risk factors will vary by the quality of the measurement and research design. For example, individual child characteristics predictive of serious violence must be understood in the context of family, peer group, school, and community contextual risk factors, which vary over developmental stages and in different settings. Analytic advances in statistical methodology (e.g., structural equation models with latent class variables, hierarchical linear models) aid the understanding of the complex dynamics of time-varying risk factor constructs during the life course of youth in studies of developmental trajectories. The research evidence, however, is not adequate to untangle the dynamics of the co-occurrence of risk factors or their developmental trajectories. To understand these dynamics, there must be more long-term cohort studies that measure a rich set of risk factors (including individuals, families, peers, and neighborhoods) in diverse populations and that are analyzed using state-of-the-art statistical methods.

3. *What evidence exists on the safety and effectiveness of interventions for violence?*

The good news is that there are a number of intervention programs that have been shown in high-quality randomized controlled trials (RCTs) to reduce either arrests or violence precursors. The Blueprints for Violence Prevention prepared by the University of Colorado Center for the Study and Prevention of Violence used the following criteria to certify the effectiveness of programs designed to reduce substance abuse, delinquency, or violence: (1) experimental design (RCT); (2) statistically significant positive effect; (3) effect sustained for at least 1 year postintervention; (4) at least one external RCT replicating the results; (5) RCTs adequately address threats to internal validity; and (6) no known health compromising side effects.

Two programs reducing arrests for violent crimes or violence precursors met all the criteria: Functional Family Therapy and Multisystemic Therapy. Functional Family Therapy is a short-term family-based prevention and intervention program to treat high-risk youth and their families. Participating youth and families attend 12 1-hour sessions (and up to 30 sessions for difficult cases) over 3 months. Program evaluations demonstrate reductions in rearrest rates, violent crime arrests, and out-of-home placements that were sustained over 4 years. Multisystemic Therapy provides community-based clinical treatment for violent and chronic juvenile offenders who are at risk for out-of-home placement. The average duration of treatment is about 4 months, which includes approximately 60 hours of therapist–family contact. Therapists with low case loads (4–6 families), available 24 hours a day, 7 days a week, provide the treatment. Program evaluations have demonstrated reductions in long-term rates of rearrest, violent crime arrest, and out-of-home placements. Positive results were maintained for nearly 4 years after treatment ended.

Six programs addressing arrest or violence precursors were classified as "effective with reservation;" that is, they only had internal rather than external RCT replications.

Those programs include: Big Brothers Big Sisters (e.g., reduction in hitting); Multidimensional Treatment Foster Care (e.g., reduction in incarceration); Nurse Family Partnership (e.g., reduction in arrests, crime); Project Towards No Drug Abuse (e.g., reduction in weapon carrying); Promoting Alternative Thinking Strategies (e.g., reduction in peer aggression); and Brief Strategic Family Therapy (e.g., reduction in conduct disorder, socialized aggression).

Safety, however, is much more difficult to assess because the intervention literature does not report systematically on safety (side effect) issues. Among the most important safety issues to be considered is the hazard of "contagion." When young people with delinquent proclivities are brought together, the more sophisticated can instruct the more naïve in precisely the behaviors that the intervener wishes to prevent. This provides a substantial objection to programs that aggregate violent youth rather than providing an individualized home and school-based treatment program. Even when treatments are individualized, contagion is possible. For example, clinical interventions may facilitate interactions between clients on the way to and from program activities as well as on program premises (e.g., "hanging out" at the clinic, using common public transportation, creating friendship networks as the result of having met in the treatment program).

The evidence indicates that "scare tactics" don't work and there is some evidence that they may make the problem worse rather than simply not working. One of the hazards of the juvenile court system is the impact of having a record on the child's subsequent life course. Such evidence as there is indicates that group detention centers, boot camps, and other "get tough" programs can provide an opportunity for delinquent youth to amplify negative effects on each other. The Centers for Disease Control and Prevention has reviewed evidence that indicates that laws increasing the ease of transferring juveniles to the adult judicial system are counterproductive and lead to greater violence in the juveniles moving through the adult systems without deterring juveniles in the general population from violent crime.

In other fields, it has been shown that identifying children as being at risk has its own hazards. Labeling a child as deficient in some respect may lead to a self-fulfilling prophecy. Researchers must be certain that similar problems do not happen here.

Ineffective programs may not harm the participants directly (although some do) but they may have an important toxic effect nonetheless; namely the "opportunity cost" of funds misspent on an unsuitable program that might have been spent on an effective one.

The juvenile violence literature does not pay enough attention to secular effects and ecological change and their consequences for life trajectories. What, for example, is the impact of an intervening economic recession, the dismantling of a housing project, or the gentrification of the neighborhood? There is little in the juvenile violence literature that rigorously addresses such questions. Because secular change is so significant in modern life, this becomes a significant problem for longitudinal studies. That is, the life circumstances when youngsters enter a study may have changed so greatly by the time they enter the age of risk that the findings based on one cohort no longer apply to the new generation of youngsters. This is an argument for employing accelerated longitudinal designs in epidemiologic studies; that is, entering cohorts of different age (e.g., 1 year, 5 years, 9 years) at the beginning of the study so that after a followthrough of 4 years, one can have a sample extending from 1 to 21 (instead of waiting 21 years).

The difficulty of doing sophisticated meta-analytic studies of intervention outcomes is compounded by the fact that different investigators often do not collect similar data or report them in a standard fashion. Indeed, no meta-analysis of individual-level data has ever been done in the field of violence. We strongly recommend that the Federal agencies concerned with violence (U.S. Department of Health and Human Services, U.S. Department of Labor, U.S. Department of Justice, and U.S. Department of Education) jointly convene a meeting of leading investigators with the aim of achieving consensus on a core of common data elements to make such comparisons possible. Investigators would obviously be free to collect additional data but all studies would collect at least these elements. Further, all data sets ought to be deposited at a common site, established, for example, by the National Library of Medicine, so that the data can be reexamined through pooling of data by all investigators (with proper controls for protecting privacy and guaranteeing the rights of the individual investigator). In addition, a national adolescent violence registry modeled on the National Cancer Institute's Surveillance, Epidemiology, and End Results (SEER) program should be considered. (SEER is a population-based registry of cancer incidence, treatment, and outcomes.)

To promote the translation of research studies in the service settings, there is a need for additional economic research on the cost effectiveness of different programs. One such project has been undertaken by the Washington State Institute for Public Policy. This economic analysis attempts to make available data on the cost savings produced by an intervention compared to the cost of the intervention itself. This makes it possible to discard both ineffective services and costly services that bring only a small benefit and, in principle, to redirect the available funds toward cost-effective interventions. An additional problem is that effective programs are often not widely implemented. There needs to be more emphasis on the implementation and dissemination of these programs.

In both theory-based research and bringing programs to scale, it is necessary to address the competing needs for

fidelity in program implementation and the need for local "ownership" of a program, which generally includes modification of the intervention. Successful programs require repeated review and careful supervision to maintain the fidelity of the intervention and the enthusiasm of the interveners. Continuing education, supervision, and technical assistance for staff, as well as periodic surveys of outcomes to be fed back to staff, are important to maintain program morale.

Because of the nature of the problem studied, diversity among researchers and implementers is of particular importance. Federal agencies, universities, and funders must develop programs to increase diversity among investigators and service-delivering personnel. This is not an equal opportunities employment maneuver to create jobs, but is essential to the intellectual integrity of the field itself. A more diverse group of researchers (especially a group more reflective of the populations that need service) will more likely take into account cultural factors that characterize those diverse populations and may gain easier entry into those communities. That is, a more diverse set of investigators will lead to higher quality research.

The evidence presented makes clear the role of neighborhood and community (in addition to individual and family) factors in protecting against or generating antisocial behavior. What is missing is a substantial body of research directed at changing neighborhoods to enhance their role in protecting young people. We have in mind the notion of "collective efficacy" as a constructive factor in economically-deprived neighborhoods that reduces delinquent acts in contrast to similarly deprived neighborhoods without a similar sense of efficacy. For example, when adults intervene to separate children in a fight, stop someone painting graffiti, or ask a child why he or she is out of school during school hours, this identifies an effective neighborhood that also demands trash collection, police services, and street repair—and has less youth crime. The evidence that moving children out of high-risk neighborhoods is associated with a reduction in delinquent behavior is striking. How often does this work? How feasible is it as a public policy measure? Are there negative side effects for the child or family? What is the response of the receiving neighborhood? These questions merit closer examination.

There is a long history of research attempting to identify the effects of violence in the media. Because television is but one variable in a complex set of life circumstances, it has been difficult to demonstrate long-term as opposed to short-term effects. There is even more reason for concern now that violent video games and music videos that exalt macho lifestyles have been added to the steady diet of violence on television. The relationship between media and violence is a critical area for investigation.

The barriers to implementing clearly-effective programs inevitably include the resistance by the individuals operating ineffective programs to having their institutions closed and their jobs abolished. Often, resistance is fostered by the honest belief of those involved that what they are doing works. Hence, program ineffectiveness, like effectiveness, should be established by the highest quality research. Further, despite the evidence for intensive multisystem therapy, communities may be apprehensive at having delinquent youngsters treated in their midst as opposed to segregating them in detention centers that have the appearance of being safer by keeping the children invisible.

A conference audience member who works in a trauma center suggested that such settings provide opportunities for intervention in an escalating war of violence. Typically, trauma centers deal with the emergency itself and have no staff or space for providing ongoing care once the immediate crisis has been resolved. Federal agencies might encourage research on patients identified at trauma centers and systems for providing services to the youth, the family, and the perpetrators on a rapid response time basis.

4. *Where evidence of safety and effectiveness exists, are there other outcomes beyond reducing violence? If so, what is known about effectiveness by age, sex, and race/ethnicity*?

Successful prevention programs influence other types of outcomes besides the reduction of violence. Interventions that aim to reduce violence invariably have other outcomes on the way to that terminal objective (e.g., reducing physical aggression). Interventions that seek to decrease problematic behavior and violence typically set out to do so by reinforcing elements thought to strengthen subsequent positive behaviors. These include parenting effectiveness (e.g., communication style, behavior management, goal setting, problem solving, monitoring), individual coping on the part of the child/adolescent (e.g., impulse control, anger management, decreased risk taking, communication skills), academic achievement (e.g., school readiness, organization skills, good learning habits, reading), peer relations (e.g., conversational and other social skills), and the social climate of schools (e.g., classroom and playground management, parent–teacher collaboration). As a whole, prevention programs have had the most impact when addressing conduct problems and reducing risk behaviors (e.g., alcohol/drug use, smoking, delayed sexual initiation). More research on prevention programs by race/ethnicity and gender is indicated.

Age has demonstrated importance in shaping prevention strategies. Effective programs conceptualize interventions and the outcome measures in terms of specific and appropriate developmental stages. Indeed, some studies deliberately focus on developmentally-important transitions, such as entry into first grade or the moves to middle school and high school. Age and developmental stage are important in predicting serious delinquency or violence. Predictors of eventual delinquency in younger children may not

be the same as predictors of delinquency in older children. Developmentally-appropriate family management will vary from primary school through middle and high school. Direct supervision is possible in the younger grades, but monitoring when the adolescent has a driver's license will often take the form of teen check-ins. Age has regularly been equated with developmental stage, but that association cannot be assumed to hold within normal parameters if the child/adolescent is substantially developmentally challenged.

A number of effective interventions have been sensitive to how circumstances vary by race/ethnicity (e.g., Nurse Family Partnership and Multisystemic Therapy). More attention needs to be paid to adapting intervention protocols for diverse communities. Given the demographic changes in many neighborhoods across the Nation, there is a compelling need to implement and conduct intervention research in different racial and ethnic communities. Over the past three decades, the United States has witnessed a radical change in its racial and ethnic profile—much of it due to immigration of people from Latin and Asian countries. Since racial and ethnic groups may differ in the cultural meanings they ascribe to various facets of life, there is a compelling need for prevention science to incorporate mechanisms that make program elements responsive to and appropriate for diverse communities. For example, while parenting style may be an important construct that helps prevent violence across groups, parents and children from some families may derive different meanings from specific behaviors (e.g., eye contact). Without attending to these cultural differences, inappropriate assessments will be made about the behavior. Moreover, more intervention research in diverse communities may need to focus on different targets of intervention. Gangs, for example, are responsible for a significant proportion of violent behavior. Since racial and ethnic minorities comprise a large segment of the gang population, it seems likely that more programmatic research is needed to identify ways to intervene with gangs to prevent violence. We are in urgent need of population-based studies that deal with culture and race/ethnicity in the detail they demand. That is, children are not "Hispanic American" but Puerto Rican, Cuban, Dominican, Mexican American, etc. The label Asian American is a generic term that conceals as much as it reveals about Japanese Americans, Chinese Americans, Korean Americans, and Vietnamese Americans. In a similar way, within each of these groups, the children of concern are not "immigrants" as a generic category, but first-, second-, or third-generation immigrants.

Gender is a strong predictor for violence in that males are more likely to commit serious violence as they age. This variable is, however, one that underscores the need to continue to ask questions about whether findings in one decade hold in other times as societal norms change. There is evidence that the ratio of male to female violence has changed in the past few decades, with the gap in gendered violence rates closing by half. The rarely-studied social construction of gender roles is likely to be important in understanding the dynamics of youth violence, particularly in fleshing out why being male is a risk factor and why females are increasingly becoming juvenile offenders.

5. *What are the commonalities among interventions that are effective and those that are ineffective?*

At one time there was a suspicion that when it came to developing programs to prevent violence, nothing worked. Today it is known that efficient programs exist. The task is to identify those efficacious programs, to separate them from programs that do not work or even harm, and to discover the mechanisms that underlie treatments that are successful in preventing violence. That is, the task is to identify common features and components of effective versus ineffective programs. In the panel's opinion, the violence research field has not yet organized specific research efforts (i.e., across program component analyses) sufficient to do this.

A good start, however, has been made. The materials prepared for the panel in advance, and presentations made to the panel, reveal that successful interventions tend to share a constellation of characteristics. In particular, the information available allows us to identify the following common characteristics of successful programs:

- They are derived from sound theoretical rationales
- They address strong risk factors
- They involve long-term treatments, often lasting a year and sometimes much longer
- They work intensively with those targeted for treatment and often use a clinical approach
- They follow a cognitive/behavioral strategy
- They are multimodal and multicontextual
- They focus on improving social competency and other skill development strategies for targeted youth and/or their families
- They are developmentally appropriate
- They are not delivered in coercive institutional settings
- They have the capacity for delivery with fidelity

There are other interventions (for which this list is not as appropriate) that also appear to reduce subsequent problem behavior. The most prominent, perhaps, is dramatically changing neighborhood environments, as in the Moving to Opportunity intervention. In addition, any program that increases educational attainment and decreases school dropout rates is likely to have the tangential benefit of reducing violence among those who are helped.

It should be noted that, currently, few of the interventions that appear effective in reducing violence (Head



Start-type programs being the notable exception) have been brought to scale (i.e., moved from demonstration programs to widespread implementation). Ultimately, a capacity to scale will be necessary for any program to have a substantial long-term impact on reducing adolescent violence. This, too, will require research and experimentation, although there is a body of knowledge on bringing health and other initiatives to scale that researchers in violence prevention can and should draw on.

Turning to programs that do not work, there are many flaws in both theory and execution that can cause an intervention to fail. The panel has been presented with evidence that identifies some characteristics of programs that have been shown to be unsuccessful as well as factors that make prospects for success poor. Some are the obverse of factors that lead to success, such as the failure to address strong risk factors, limited duration, and developmentally inappropriate interventions. Others include:

- Programs that aggregate high-risk youth in ways that facilitate contagion (i.e., most likely to have harmful, iatrogenic effects)
- Implementation protocols that are not clearly articulated
- Staff who are not well-supervised or held accountable for outcomes
- Programs limited to scare tactics (e.g., Scared Straight)
- Programs limited to toughness strategies (e.g., classic boot camps)
- Programs that consist largely of adults lecturing at youth (e.g., classic D.A.R.E.)

In addition to these findings that appear to be supported by good evidence, there are aspects of interventions that have been studied very little but that may be important contributors to the effectiveness or ineffectiveness of programs. One dimension that merits more attention is the cultural appropriateness of programs and the cultural competency of the interveners. Another is greater involvement of relevant communities in establishing goals for, and contributing to, the design of interventions. There is also traditional punishment in juvenile facilities. We did not review this area in depth, but there appears to be little evidence of strong deterrence, and there is some evidence that youth with records of incarceration, or indeed juvenile court involvement, are later handicapped in finding employment with possible criminogenic consequences. At the same time, there may be crime-reducing benefits from incapacitation through incarceration, but as with deterrence, this is not an area we have delved into deeply.

In searching for commonalities among programs that work and flaws in those that do not, one must bear in mind that the effectiveness of treatments can be highly context dependent. Thus, a set of common characteristics that predict intervention effectiveness in one context (e.g., among adolescents or with respect to primary interventions) may not predict effectiveness in another context (e.g., among first-graders or with respect to tertiary interventions). It may, of course, also be the case that context itself is a factor that predicts intervention effectiveness. This has several important implications. First, there is unlikely to be a universal set of necessary or sufficient factors for successful treatment. Rather, what is necessary or sufficient will vary by the context in which treatments are administered, the group targeted, and the aims of the treatment. Second, research must proceed in different contexts to be sure that what works in one setting will work in others. Third, time itself is a context, and as time brings changes (e.g., proliferation of HIV, destruction of high-rise public housing developments, introduction of violent video games, spread of cell phones), programs that have worked may need to be adjusted. Thus, monitoring of program effectiveness must be ongoing. Finally, interventions cost money. Even if a program works, it may not be the most cost-effective way to achieve results. In particular, some aspects of a program may be important to its success while others are not. Even successful programs can be improved or made more cost-effective as we come to better understand what ingredients are essential to their success and what are peripheral.

6. *What are the priorities for future research* ?

- A research agenda needs to be developed that shows whether reductions in proxy measures (e.g., physical aggression, delinquency) reliably translate into reductions in actual violence.
- Federal agencies concerned with violence (U.S. Department of Health and Human Services, U.S. Department of Labor, U.S. Department of Justice, and U.S. Department of Education) should jointly convene a meeting of leading investigators with the aim of achieving consensus regarding a taxonomy for violent behavior and a minimal common data set to make possible the collection and reporting of standardized data.
- The Federal Government should establish a population-based registry of adolescent violence modeled on the National Cancer Institute's SEER program.
- In order to broaden and widen the horizons of research, Federal agencies, private foundations, and universities should increase the diversity of students in research training programs.
- Given the role of the neighborhood and community in protecting against or generating antisocial behavior, there is an urgent need for research directed at changing neighborhoods to enhance their role in protecting young people.
- More long-term cohort studies that measure a rich set of risk factors (from the individual to the contextual level) in diverse populations and that are analyzed using state-of-the-art qualitative and statistical methods are

needed to untangle the dynamics of the co-occurrences of risk factors. Potential biologic markers also should be explored.

- Systematic procedures for adapting established intervention protocols need to be developed for diverse communities with special attention to race, ethnicity, culture, and immigrant status (e.g., language issues).
- Across-program component analysis should be carried out to develop a more rigorous understanding of the mechanisms that underlie successful and unsuccessful interventions.
- More research on the gendered aspect of violence is needed. In particular, we need research targeting women, given the growing percentage of women involved in violence.
- Programs should be evaluated in different contexts to be sure that apparently-important aspects of successful demonstration programs have external validity.
- More dissemination research is needed so that programs that work can be implemented more effectively in community settings. Successful programs need to be monitored in an ongoing fashion to ensure their effects are maintained as circumstances change over time.

## Conclusions

In conclusion, we highlight the following findings and recommendations:

- Violence affects all of us at some level and represents an issue of vital national and international importance.
- Some interventions have been shown by rigorous research to reduce violence precursors, violence, and arrest. However, many interventions aimed at reducing violence have not been sufficiently evaluated or proven effective, and a few widely implemented programs have been shown to be ineffective and perhaps harmful.
- Programs that seek to prevent violence through fear and tough treatment appear ineffective. Intensive programs that aim at developing skills and competencies can work.
- Interventions to reduce violence may be context dependent. Research must proceed in varying contexts and take account of local culture.
- Attention to diversity among investigators involved in violence prevention research is important. Universities and funding agencies should make improving the situation a priority.
- We encourage funding sufficient to promote the dissemination of violence prevention programs that have been shown to be effective through rigorous RCT research. Funding must include support for research, and monitoring must continue as these programs are more widely implemented.

## State-of-the-Science Panel

**Robert L. Johnson, M.D.**
Panel and Conference Chairperson
Professor and Chair
Department of Pediatrics
Professor of Psychiatry
Director of Adolescent and Young Adult Medicine
University of Medicine and Dentistry of New Jersey
New Jersey Medical School
Newark, New Jersey

**Shrikant I. Bangdiwala, Ph.D.**
Professor
Collaborative Studies Coordinating Center
Department of Biostatistics and Injury Prevention Research Center
University of North Carolina at Chapel Hill
Chapel Hill, North Carolina

**Michael F. Cataldo, Ph.D.**
Professor of Behavioral Biology
Departments of Pediatrics and Psychiatry
The Johns Hopkins University School of Medicine
Director
Department of Behavioral Psychology
Kennedy Krieger Institute
Baltimore, Maryland

**J. Virgil Costley, Jr., J.D.**
Juvenile Court Judge (Retired)
Professor of Paralegal Studies and Criminal Justice
Dekalb Technical College
Covington Campus
Covington, Georgia

**Angela Diaz, M.D., M.P.H.**
Professor of Pediatrics and Community Medicine
Mount Sinai School of Medicine
Director
Mount Sinai Adolescent Health Center
Mount Sinai Medical Center
New York, New York

**Leon Eisenberg, M.D.**
Presley Professor of Social Medicine
Professor of Psychiatry, Emeritus
Department of Social Medicine
Harvard Medical School
Boston, Massachusetts

**Richard O. Lempert, Ph.D., J.D.**
Eric Stein Distinguished University Professor of Law and Sociology
University of Michigan
Director



Division of Social and Economic Sciences
National Science Foundation
Arlington, Virginia

**Angela Barron McBride, Ph.D., R.N., F.A.A.N.**
Distinguished Professor
Indiana University School of Nursing
Indianapolis, Indiana

**Lisa Schwartz, M.D., M.S.**
Senior Research Associate
Veterans Affairs Outcome Group
Associate Professor of Medicine and Community and Family Medicine
Dartmouth Medical School
Hanover, New Hampshire
Veterans Affairs Medical Center
White River Junction, Vermont

**Freya L. Sonenstein, Ph.D.**
Professor and Director
Center for Adolescent Health Promotion and Disease Prevention
The Johns Hopkins Bloomberg School of Public Health
Baltimore, Maryland

**Bonita Stanton, M.D.**
Schotanus Professor and Chair
Carman and Ann Adams Department of Pediatrics
Children's Hospital of Michigan
Wayne State University
Detroit, Michigan

**David T. Takeuchi, Ph.D.**
Professor
School of Social Work and Department of Sociology
University of Washington
Seattle, Washington

**Steven Woloshin, M.D., M.S.**
Senior Research Associate
Veterans Affairs Outcomes Group
Associate Professor of Medicine and Community and Family Medicine
Dartmouth Medical School
Hanover, New Hampshire
Veterans Affairs Medical Center
White River Junction, Vermont

**Speakers**

**Steve Aos, M.S.**
Associate Director
Washington State Institute for Public Policy
Olympia, Washington

**Deborah M. Capaldi, Ph.D.**
Senior Scientist
Oregon Social Learning Center
Eugene, Oregon

**Richard F. Catalano, Ph.D.**
Director
Social Development Research Group
University of Washington, Seattle
Seattle, Washington

**Patricia Chamberlain, Ph.D.**
Senior Research Scientist
Oregon Social Learning Center
Eugene, Oregon

**Linda S. Chan, Ph.D.**
Professor
Department of Pediatrics
Director
Biostatistics and Outcomes Assessment
Los Angeles County and University of Southern California Medical Center
Los Angeles, California

**Rand D. Conger, Ph.D.**
Professor
Human and Community Development
University of California, Davis
Davis, California

**Thomas J. Dishion, Ph.D.**
Professor of Psychology
Child and Family Center
University of Oregon
Eugene, Oregon

**Kenneth A. Dodge, Ph.D.**
William McDougall Professor of Public Policy
Professor of Psychology
Duke University
Director
Center for Child and Family Policy
Durham, North Carolina

**Felton Earls, M.D.**
Professor
Department of Social Medicine
Harvard Medical College
Cambridge, Massachusetts

**Delbert S. Elliott, Ph.D.**
Director
Center for the Study and Prevention of Violence
Institute of Behavioral Science
University of Colorado
Boulder, Colorado

**Scott Walter Henggeler, Ph.D.**
Director
Family Services Research Center
Professor
Department of Psychiatry and Behavioral Sciences
Medical University of South Carolina
Charleston, South Carolina

**Sheppard G. Kellam, M.D.**
Director
Center for Integrating Education and Prevention Research in Schools
American Institutes for Research
Baltimore, Maryland

**Michele D. Kipke, Ph.D.**
Professor
Department of Pediatrics
University of Southern California Keck School of Medicine
Director
Division of Research on Children, Youth, and Families
Childrens Hospital Los Angeles
Los Angeles, California

**Benjamin B. Lahey, Ph.D.**
Professor of Psychiatry and Chief of Psychology
Department of Psychiatry
University of Chicago
Chicago, Illinois

**John A. Landsverk, Ph.D.**
Director
Child and Adolescent Services Research Center
Children's Hospital Health Center, San Diego
San Diego, California

**Rolf Loeber, Ph.D.**
Distinguished Professor of Psychiatry, Psychology, and Epidemiology
University of Pittsburgh
Pittsburgh, Pennsylvania

**Terrie E. Moffitt, Ph.D.**
Professor
Department of Psychology
University of Wisconsin
Madison, Wisconsin

**David Olds, Ph.D.**
Director
Prevention Research Center for Family and Child Health
Professor of Pediatrics
University of Colorado Health Sciences Center
University of Colorado
Denver, Colorado

**John B. Reid, Ph.D.**
Executive Director
Oregon Social Learning Center
Eugene, Oregon

**Robert J. Sampson, Ph.D.**
Henry Ford II Professor of the Social Sciences
Department of Sociology
Harvard University
Cambridge, Massachusetts

**Carolyn Webster-Stratton, Ph.D.**
Professor
Family and Child Nursing
University of Washington, Seattle
Seattle, Washington

**Planning Committee**

**Farris K. Tuma, Sc.D.**
Planning Committee Chairperson and Chief
Traumatic Stress Program and Disruptive Behaviors/ ADD Program
Division of Mental Disorders, Behavioral Research, and AIDS
National Institute of Mental Health
National Institutes of Health Bethesda, Maryland

**Karen Babich, Ph.D., R.N.**
Director
Office of Global Mental Health
National Institute of Mental Health
National Institutes of Health
Bethesda, Maryland

**Jacqueline S. Besteman, J.D., M.A.**
Director
EPC Program
Center for Practice and Technology Assessment
Agency for Healthcare Research and Quality
U.S. Department of Health and Human Services
Rockville, Maryland

**Gail M. Boyd, Ph.D.**
Prevention Research Branch
Division of Clinical and Prevention Research
National Institute on Alcohol Abuse and Alcoholism
National Institutes of Health
Bethesda, Maryland

**Elsa A. Bray**
Senior Advisor for Consensus Development
Office of Medical Applications of Research
Office of the Director
National Institutes of Health
Bethesda, Maryland

**William Bukoski, Ph.D.**
Associate Director for Research Coordination
Office of the Director
Division of Epidemiology, Services, and Prevention Research
National Institute on Drug Abuse
National Institutes of Health
Bethesda, Maryland

**Nancy A. Carney, Ph.D.**
Assistant Professor of Emergency Medicine
Oregon Health & Science University
Portland, Oregon

**Adam Glazer**
Librarian
Public Services Division
National Library of Medicine
National Institutes of Health
Bethesda, Maryland

**W. Rodney Hammond, Ph.D.**
Director
Division of Violence Prevention
National Center for Injury Prevention and Control
Centers for Disease Control and Prevention
Atlanta, Georgia

**Mark Helfand, M.D., M.P.H., M.S.**
Director
Evidence-Based Practice Center
Oregon Health & Science University
Portland, Oregon

**Scott Walter Henggeler, Ph.D.**
Director
Family Services Research Center
Professor
Department of Psychiatry and Behavioral Sciences
Medical University of South Carolina
Charleston, South Carolina

**Sally T. Hillsman, Ph.D.**
Director
Office of Research and Evaluation
National Institute of Justice
Office of Justice Programs
U.S. Department of Justice
Washington, DC

**Kimberly Hoagwood, Ph.D.**
Associate Director
Child and Adolescent Research
National Institute of Mental Health
National Institutes of Health
Rockville, Maryland

**Marian D. James, Ph.D.**
Center for Practice and Technology Assessment
Agency for Healthcare Research and Quality
U.S. Department of Health and Human Services
Rockville, Maryland

**Robert L. Johnson, M.D.**
Panel and Conference Chairperson
Professor and Chair
Department of Pediatrics
Professor of Psychiatry
Director of Adolescent and Young Adult Medicine
University of Medicine and Dentistry of New Jersey
New Jersey Medical School
Newark, New Jersey

**Michele D. Kipke, Ph.D.**
Professor
Department of Pediatrics
University of Southern California Keck School of Medicine
Director
Division of Research on Children, Youth, and Families
Childrens Hospital Los Angeles
Los Angeles, California

**Joanne Klevens, M.D., Ph.D., M.P.H.**
Epidemiologist
Program Development and Evaluation Branch
Division of Violence Prevention
National Center for Injury Prevention and Control
Centers for Disease Control and Prevention
Atlanta, Georgia

**Doreen S. Koretz, Ph.D.**
Associate Director for Prevention and Chief
Developmental Psychopathology and Prevention Research Branch
Division of Mental Disorders, Behavioral Research, and AIDS
National Institute of Mental Health
National Institutes of Health
Bethesda, Maryland

**Barnett S. Kramer, M.D., M.P.H.**
Director
Office of Medical Applications of Research
Office of the Director
National Institutes of Health
Bethesda, Maryland

**Kelli K. Marciel, M.A.**
Communications Director
Office of Medical Applications of Research
Office of the Director
National Institutes of Health
Bethesda, Maryland

**Susan E. Martin, Ph.D.**
Health Scientist Administrator
National Institute on Alcohol Abuse and Alcoholism
National Institutes of Health
Bethesda, Maryland

**Peggy McCardle, Ph.D., M.P.H.**
Associate Chief
Child Development and Behavior Branch
National Institute of Child Health and Human Development
National Institutes of Health
Rockville, Maryland

**Denise Middlebrook, Ph.D.**
**Senior Social Science Analyst**
Division of Program Development, Special Populations, and Projects
Center for Mental Health Services
Substance Abuse and Mental Health Services Administration
Rockville, Maryland

**William Modzeleski, M.P.A.**
Director
Safe and Drug-Free Schools Program
Office of Elementary and Secondary Education
U.S. Department of Education
Washington, DC

**Richard K. Nakamura, Ph.D.**
Deputy Director
Office of the Director
National Institute of Mental Health
National Institutes of Health
Bethesda, Maryland

**Karen Patrias, M.L.S.**
Senior Resource Specialist
Public Services Division
National Library of Medicine
National Institutes of Health
Bethesda, Maryland

**Janice Phillips, Ph.D., R.N., F.A.A.N.**
Program Director
Health Promotion and Risk Behaviors
Office of Extramural Programs
National Institute of Nursing Research
National Institutes of Health
Bethesda, Maryland

**John B. Reid, Ph.D.**
Executive Director
Oregon Social Learning Center
Eugene, Oregon

**Cynthia A. Rooney**
Senior Advisor to the Consensus Development Program
Office of Medical Applications of Research
Office of the Director
National Institutes of Health
Bethesda, Maryland

**Susan Rossi, Ph.D., M.P.H.**
Deputy Director
Office of Medical Applications of Research
Office of the Director
National Institutes of Health
Bethesda, Maryland

**Mona J. Rowe, M.C.P.**
Associate Director
Office of Science Policy, Analysis, and Communications
National Institute of Child Health and Human Development
National Institutes of Health
Bethesda, Maryland

**Bruce Simons-Morton, Ed.D., M.P.H.**
Chief
Prevention Research Branch
Division of Epidemiology, Statistics, and Prevention Research
National Institute of Child Health and Human Development
National Institutes of Health
Rockville, Maryland

**Susan Solomon, Ph.D.**
Senior Advisor
Office of Behavioral and Social Sciences Research
Office of the Director
National Institutes of Health
Bethesda, Maryland

**Ellen L. Stover, Ph.D.**
Director
Division of Mental Disorders, Behavioral Research, and AIDS
National Institute of Mental Health
National Institutes of Health
Bethesda, Maryland

**Melanie Zimmer-Gembeck, Ph.D.**
Senior Lecturer
School of Applied Psychology
Director
Family Interaction Program
Deputy Director
Griffith University Psychological Health Research Centre
Griffith University
Gold Coast Campus
Queensland, Australia

**Was approved as co-Institute coordinator as of September 2001**
LeShawndra N. Price, Ph.D.
Chief

Disruptive Behavior Disorders Program
Division of Pediatric Translational Research and Treatment
Development
National Institute of Mental Health
National Institutes of Health
Bethesda, Maryland

**Conference Sponsors**

**National Institute of Mental Health**
Thomas R. Insel, M.D.
Director

**Office of Medical Applications of Research**
Barnett S. Kramer, M.D., M.P.H.
Director

**Conference Cosponsors**

**Agency for Healthcare Research and Quality**
Carolyn Clancy, M.D.
Director

**Centers for Disease Control and Prevention**
Julie Louise Gerberding, M.D., M.P.H.
Director

**National Institute on Alcohol Abuse and Alcoholism**
Ting-Kai Li, M.D.
Director

**National Institute of Child Health and Human Development**
Duane Alexander, M.D.
Director

**National Institute on Drug Abuse**
Nora D. Volkow, M.D.
Director

**National Institute of Nursing Research**
Patricia A. Grady, Ph.D., R.N., F.A.A.N.
Director

**National Library of Medicine**
Donald A.B. Lindberg, M.D.
Director

**Office of Behavioral and Social Sciences Research**
Virginia S. Cain, Ph.D.
Acting Director

**Substance Abuse and Mental Health Services Administration**
Charles G. Curie, M.A., A.C.S.W.
Administrator

**U.S. Department of Education**
Rod Paige, Ph.D.
Secretary

**U.S. Department of Justice**
John Ashcroft, J.D.
Attorney General

# CHILDREN FIRST TRUST FUND

# SPENDING OVERVIEW FY 2003

**ABC BOARD**

| | |
|---|---|
| $ 120,837.54 | Responsible Vendor Program |
| $ 375,345.12 | Enforcement Division |

**AOC - JUVENILE PROBATION SERVICES**

| | |
|---|---|
| $5,913,973.00 | Personnel Costs |
| $1,668,267.00 | Employee Benefits |
| $ 104,376.00 | Travel-In-State |
| $ 2,030.00 | Repairs and Maintenance |
| $ 22,766.00 | Rentals and Leases |
| $ 58,443.00 | Utilities and Communications |
| $ 3,806.00 | Professional Services |
| $ 161,672.00 | Supplies, Materials, and Operating Expenses |
| $1,498,335.00 | Grants and Benefits |

**CHILDREN'S TRUST FUND**

| | |
|---|---|
| $2,293,863.00 | Community-Based Prevention Programs |
| $ 250,000.00 | Corporate Foundation for Children (Professional Development) |
| $ 205,900.00 | CPC Executive Directors |

**EDUCATION**

| | |
|---|---|
| $8,112,737.00 | Alternative Education Programs |
| $ 231,915.00 | Monitoring and Technical Assistance |
| $ 200,000.00 | School Based Social Workers |
| $3,065,063.00 | School Safety Enhancement |
| $2,687,896.39 | Teacher Background Checks |

**FORENSIC SCIENCES**

| | |
|---|---|
| $ 86,775.00 | Capital Outlay |
| $ 2,726.00 | Professional Service |
| $ 360,537.00 | Salaries and Benefits |
| $ 839.00 | Supplies |

**HUMAN RESOURCES**

| | |
|---|---|
| $4,000,000.00 | Foster Care board payments |
| $7,000,000.00 | Therapeutic Foster Services |

**MEDICAID AGENCY**

| | |
|---|---|
| $ 0.00 | |

**MENTAL HEALTH/MENTAL RETARDATION**

| | |
|---|---|
| $ 50,000.00 | Child Psychiatric Services Training |
| $ 468,276.00 | Community Contracted Crisis Stabilization/ In home services |
| $ 50,000.00 | Community Contracted expansion of Case Management for SED Children |
| $ 102,299.63 | Community Contracted Services Abuse Services |
| $ 92,774.73 | Contracted Community Service for Dually Diagnosed children |
| $ 50,000.00 | Early Intervention Services |
| $ 581,080.32 | Mental Health Juvenile Court Liaisons |
| $ 133,027.96 | MR Community Contracted In-Home Services |
| $ 26,026.15 | MR Community Contracted Service Coordination |
| $ 109,795.59 | Office of Children's Services |
| $ 100,000.00 | State Match for Federal Grant |

**MULTI-NEEDS CHILDREN'S FUND**

| | |
|---|---|
| $2,750,000.00 | Services for Multi-Needs children |

**PUBLIC HEALTH**

| | |
|---|---|
| $ 260,000.00 | Medication for HIV positive pregnant women & their infants |
| $ 440,000.00 | Newborn screenings |
| $4,800,000.00 | ALLKids Child Health Insurance Pgm (CHIP) |

**REHABILITATION SERVICES**

| | |
|---|---|
| $ 275,000.00 | Child Death Review |

**YOUTH SERVICES**

| | |
|---|---|
| $7,884,734.00 | Contract Placements |
| $ 500,000.00 | Day Programs |
| $ 205,150.00 | Juvenile Detention Centers |
| $ 37,994.00 | Multi-Needs Children |
| $ 120,000.00 | Other Children Services. |

**TOTAL SPENT FOR ALL AGENCIES: $57,464,260**

EXHIBIT
Affidavit
10
tabbies

# THE HISTORY OF CHILDREN FIRST

The Children First Trust Fund was initiated in the mid 1990's by a group of advocates and legislators who wanted to improve the lives of children in Alabama. Efforts focused on increasing cigarette taxes to fund a wide array of needed programs and services. For several years the Children First legislation was introduced but not passed, each year gaining more credibility and supporters. During the same period negotiations were being conducted between tobacco companies and the states to settle lawsuits stemming from the health costs of smoking.

At the end of the legislative session in 1998 any potential tobacco settlement funds were linked to Children First. Later that year the landmark agreement between the states and big tobacco was reached, and settlement dollars began to come to the state in late 2000.

The 21st Century Fund was set up to receive the settlement and distribute funds to pay for economic development bonds, medical care, and programs for the elderly, with the majority of the settlement going to the Children First Trust Fund. CFTF dollars not spent by agencies each year are to remain in the Children First Trust Fund for future use.

Compiled here is the Children First Annual Report for Fiscal Year 2003. It details the expenditures of Children First dollars for each of the twelve state agencies that received funds in FY03.

## FY04 CFTF Spending Estimates

| | CFTF balance from FY03 | Estimated FY04 settlement receipts | Estimated FY04 agency spending | Estimated balances at the end of FY04 |
|---|---|---|---|---|
| ABC Board | $ 983,662 | $ 467,998 | $ 733,350 | $ 718,310 |
| AOC - JP | $ 5,082,724 | $ 4,679,979 | $ 9,958,168 | $ (195,465) |
| CTF | $ 3,280,961 | $ 2,339,989 | $ 3,827,453 | $ 1,793,497 |
| Education | $ 13,070,588 | $ 10,295,953 | $ 20,157,550 | $ 3,208,992 |
| Forensic Sciences | $ 1,131,498 | $ 467,998 | $ 750,000 | $ 849,496 |
| Human Resources | $ 13,372,281 | $ 9,359,958 | $ 14,540,694 | $ 8,191,545 |
| Medicaid Agency | $ 3,039,649 | $ 1,637,993 | $ 2,165,000 | $ 2,512,642 |
| Mental Health | $ 5,624,744 | $ 2,339,989 | $ 5,004,659 | $ 2,960,074 |
| Multiple Needs | $ 5,365,717 | $ 2,339,989 | $ 3,000,000 | $ 4,705,706 |
| Public Health | $ 1,694,611 | $ 4,679,979 | $ 6,370,000 | $ 4,590 |
| Rehabilitation | $ 179,596 | $ 233,999 | $ 350,000 | $ 63,595 |
| Youth Services | $21,257,201 | $ 7,955,964 | $ 14,182,800 | $ 15,030,365 |
| | $74,083,232 | $46,799,788 | $81,039,674 | $39,843,347 |

# How the Tobacco Settlement Funds Children First

When tobacco settlement dollars come to Alabama they are deposited into the 21st Century Fund ($95.8 million FY01), where approximately 9% are used first for debt service on economic development bonds. Assisting Honda to locate in Alabama is one of several economic efforts funded through these bonds.

The remaining tobacco dollars are then split between Children First (approx. 45%), Medicaid (approx. 44%), and Senior Services Trust Fund (2%). Once money comes to Children First, the fund then divides among 12 agencies for specific programs as instructed by law (Section 41-15B-2.2). As an example, Education must spend its funds on alternative schools and safety programs.

Once funds are deposited into Children First they cannot be spent for other purposes. Unspent money remains within the fund and individual departments accrue a balance.

### *The Master Settlement Agreement*

The Master Settlement Agreement is a legal compact between the states and the four major tobacco companies that pays states an annual amount based on the number of cigarettes sold. An estimated $.85 of the total cost per pack goes to pay for the agreement. Alabama receives a small portion (approximately 1.6%) of the overall national settlement. There are three important facts everyone should know about the settlement and Children First:

*The settlement is based on consumption.* If states do well in getting kids and adults to stop smoking, or if tobacco companies go bankrupt, then the amount Alabama receives could go down substantially or be lost entirely. Settlement dollars are not guaranteed, and their loss would leave agencies and their programs without a funding source.

*The settlement is structured so that states get some extra initial payments that cease in 2004.* Estimates of settlement dollars drop more than 13% in 2004, and do not recover until 2008.

*Alabama's fiscal year begins in October, yet receives its annual payment in late April.* It is the savings each department has built in the past two years that are used to fund programs before new money comes. The savings also provides insurance in case the annual payment drops, or does not come at all.

Understanding the settlement makes clear that some funds must be saved each year to provide money throughout the year, and as insurance for the future. Over the past three years, Alabama has done just that.





# Alcoholic Beverage Control Board

**FY 2003 Appropriation Bill:**

One percent of the funds shall be allocated to the Alcoholic Beverage Control Board for education and enforcement of Chapter 11 of Title 28, which prohibits access to tobacco products by minors.

**Contact**
Jan Byrne
(334) 271-3840

**Address**
2715 Gunter Park Drive West
Montgomery, AL 36109

**Long Term Goals**

- ❑ Prevent the purchase of tobacco products by minors using law enforcement and education.

| Year | Received | Released | Un-Spent | Balance |
|---|---|---|---|---|
| FY 2000 | $502,809 | $125,728 | $23,035 | $400,116 |
| FY 2001 | $567,263 | $298,763 | $ 12,694 | $681,309 |
| FY 2002 | $660,247 | $600,000 | $107,956 | $849,513 |
| FY 2003 | $630,332 | $550,000 | $ 53,817 | $983,662 |
| FY 2004 | *$467,998 | $733,350 | | $718,310 |

*Estimated total

## 2003 Spending Overview

| | |
|---|---|
| Responsible Vendor Program | $ 120,837.54 |
| Enforcement Division | $ 375,345.12 |
| **Total** | **$496,182.66** |

## 2004 Spending Plans

| | |
|---|---|
| Responsible Vendor Program | $ 198,124.00 |
| Enforcement Division | $ 535,226.00 |
| **Total** | **$733,350.00** |

# Administrative Office of Courts

**FY 2003 Appropriation Bill:**

Allocations to the Juvenile Probation Services Fund shall be expended by the Administrative Office of Courts to unify and upgrade the juvenile justice system and improve the delivery of services to children who have been referred to the juvenile court.

| Year | Received | Released | Un-Spent | Balance |
|---|---|---|---|---|
| FY 2000 | $5,028,093 | $1,257,275 | $ 338,254 | $4,109,072 |
| FY 2001 | $5,672,628 | $2,623,813 | $2,448,392 | $9,606,279 |
| FY 2002 | $6,602,465 | $8,688,000 | $ 692,330 | $8,213,074 |
| FY 2003 | $6,303,318 | $9,954,610 | $ 520,942 | $5,082,724 |
| FY 2004 | *$4,679,979 | $9,958,168 | | $ (195,465) |

*Estimated total

**Contact**
Tom Monroe
(334) 242-0300

**Address**
Judicial Building
300 Dexter Avenue
Montgomery, AL 36104

**Long Term Goals**

- ❑ Provide a unified system of juvenile probation services by certified state juvenile probation officers in the remaining 62 counties.
- ❑ Assist the counties of Jefferson, Madison, Montgomery, Morgan and Shelby in the provision of juvenile probation services through their local juvenile/family courts by subsidizing the base salaries of certified county juvenile probation officers.

**2003 Outcomes**

- ❑ Funded 66% of the $14,364,800 total cost
- ❑ Served 213,986 Children
- ❑ 242 certified JPO positions in the 62 assumed counties
- ❑ 81.5 support positions in the 62 assumed counties
- ❑ Subsidize the salaries of 92 of the 115 certified JPO positions in 5 unassumed counties

## 2003 Spending Overview

| | |
|---|---|
| Personnel Costs | $5,913,973.00 |
| Employee Benefits | $1,668,267.00 |
| Travel-In-State | $ 104,376.00 |
| Repairs and Maintenance | $ 2,030.00 |
| Rentals and Leases | $ 22,766.00 |
| Utilities and Communications | $ 58,443.00 |
| Professional Services | $ 3,806.00 |
| Supplies, Materials, and Operating Expenses | $ 161,672.00 |
| Grants and Benefits | $1,498,335.00 |
| **Total** | **$9,433,668.00** |

## 2004 Spending Plans

| | |
|---|---|
| State Juvenile Probation Services | $7,283,465.00 |
| County Juvenile Probation Officers | $2,478,021.00 |
| **Total** | **$9,761,486.00** |

Children First represents approximately 55% of the total anticipated cost of the State and County Juvenile Probation Services paid through state funds.

# CHILD ABUSE & NEGLECT PREVENTION BOARD
## CHILDREN'S TRUST FUND

**FY 2003 Appropriation Bill:**

Allocations to the Children's Trust Fund shall be expended as follows:

a. Seventy-five percent for grants for programs targeted toward at-risk children.

b. Twenty-five percent for grants to Family Resource Centers.

**CONTACT**
Alicia Luckie
(334) 242-5710

**ADDRESS**
RSA Union Building
100 North Union Street
Montgomery, AL 36104-3702

| Year | Received | Released | Un-Spent | Balance |
|---|---|---|---|---|
| FY 2000 | $2,514,047 | $ 628,637 | $0 | $1,885,410 |
| FY 2001 | $2,836,314 | $2,514,047 | $20,109 | $2,227,786 |
| FY 2002 | $3,301,232 | $2,650,000 | $46 | $2,879,064 |
| FY 2003 | $3,151,600 | $2,750,000 | $237 | $3,280,961 |
| FY 2004 | *$2,339,989 | $3,827,453 | | $1,793,497 |

*Estimated total

**LONG TERM GOALS**

- ❑ Provide funds for community-based programs.
- ❑ Provide funds for at-risk youth programs.
- ❑ Provide funds for seven Executive Directors of Local Children's Policy Councils.
- ❑ Provide funds to the Corporate Foundation for Children (CFC) for training and consultation services to CTF grantees only.

### 2003 Spending Overview

| | |
|---|---|
| Community-Based Prevention Programs | $2,293,863.00 |
| Corporate Foundation for Children (Professional Development) | $ 250,000.00 |
| CPC Executive Directors | $ 205,900.00 |
| **TOTAL** | **$2,749,763.00** |

**2003 Outcomes**

- ❑ Served 130,142 Children
- ❑ Served 289,469 Adults
- ❑ 7 Children's Policy Council Executive Directors funded

### 2004 Spending Plans

| | |
|---|---|
| Community-Based Programs (Unification of Prevention Services) | $1,602,900.00 |
| Community-Based Programs (At-Risk Children or Teens) | $ 1,417,459.00 |
| Professional Development for Grantees | $ 131,250.00 |
| CPC Executive Directors | $ 175,000.00 |
| Personnel | $ 367,924.00 |
| Personnel Benefits | $ 132,920.00 |
| **TOTAL** | **$3,827,453.00** |

# DEPARTMENT OF EDUCATION

**FY 2003 Appropriation Bill:**

Allocations to the State Board of Education shall be expended as follows:

a. The first $490,000 for the Background Checks Initiative at the State Department of Education.

b. Ninety-eight percent of the remaining allocations for the operation of alternative schools and the School Safety Enhancement Program.

c. Two percent of the remaining allocations for monitoring local school programs funded by Children First allocations, identifying the most effective local school programs and creating a best practices program to train local school system personnel in the most effective programs.

## CONTACT

Dr. Sue Adams
(334) 242-8165

## ADDRESS

3318 Gordon Persons Building
50 North RipleyStreet
P.O. Box 302101
Montgomery, AL 36130-2101

| Year | Received | Released | Un-Spent | Balance |
|---|---|---|---|---|
| FY 2000 | $11,061,805 | $ 2,766,004 | $0 | $8,295,801 |
| FY 2001 | $12,479,781 | $11,061,805 | $50,048 | $9,763,825 |
| FY 2002 | $14,525,423 | $11,452,450 | $664,101 | $13,500,899 |
| FY 2003 | $13,867,301 | $15,879,750 | $1,582,139 | $13,070,588 |
| FY 2004 | *$10,295,953 | $20,157,550 | | $3,208,992 |

*Estimated total

## LONG TERM GOALS

- ❑ Provide training of school safety/drug prevalence for LEA personnel; student, teacher, and parent surveys; school climate survey for schools.
- ❑ Implement education programs that provide students with alternatives to suspension, expulsion, or dropping out of school, that emphasize individual social behavioral needs, and that provide the academic requirements necessary to enable children to perform.
- ❑ Develop School Safety Enhancement programs to prevent or reduce school disciplinary or school safety problems.
- ❑ Provide Program Evaluation.
- ❑ Provide background checks for approximately 35,000 teachers and other school personnel who may have unsupervised access to children.
- ❑ Initiate pilot Social Worker program for ten (10) LEAs.

## 2003 Spending Overview

| | |
|---|---|
| Alternative Education Programs | $8,112,737.00 |
| Monitoring and Technical Assistance | $ 231,915.00 |
| School Based Social Workers | $ 200,000.00 |
| School Safety Enhancement | $3,065,063.00 |
| Teacher Background Checks | $2,687,896.39 |
| **TOTAL** | **$14,297,611.39** |

## 2004 Spending Plans

| | |
|---|---|
| Alternative Education Programs | $12,288,195.00 |
| Monitoring and Tech. Assistance | $ 136,282.00 |
| School Based Social Workers | $ 200,000.00 |
| School Safety Enhancement | $3,072,049.00 |
| Teacher Background Checks | $3,780,240.00 |
| Training and data analysis | $191,274.00 |
| **TOTAL** | **$20,157,550.00** |

# DEPARTMENT OF FORENSIC SCIENCES

**FY 2003 Appropriation Bill:**

Allocations to the Department of Forensic Sciences shall be expended as follows:
a. Sixty percent for educational training.
b. Forty percent for equipment purchase.

**CONTACT**
F. Taylor Noggle
Interim Director
(334) 844-4648

**ADDRESS**
C.J. Rehling Laboratories
991 Wire Road
P.O. Box 3510
Auburn, AL 36831-3510

**LONG TERM GOALS**

- ❑ Provide training to staff on child deaths.
- ❑ Accurately determine cause and manner of death involving children.
- ❑ Provide expert testimony in child deaths.
- ❑ Provide accurate toxicology results on cases involving children.

| Year | Received | Released | Un-Spent | Balance |
|---|---|---|---|---|
| **FY 2000** | $502,809 | $125,728 | $10,566 | $387,647 |
| **FY 2001** | $567,263 | $386,294 | $83,088 | $651,704 |
| **FY 2002** | $660,246 | $600,000 | $240,095 | $952,043 |
| **FY 2003** | $630,332 | $550,000 | $99,123 | $1,131,498 |
| **FY 2004** | *$467,998 | $750,000 | | $849,496 |

*Estimated total

**2003 Outcomes**
- ❑ 278 Child Deaths
- ❑ 610 Cases Involving Child Deaths
- ❑ 1509 Cases involving Chiuldren as Suspects
- ❑ 2119 Total cases involving children as Suspects and Subjects

## 2003 Spending Overview

| | |
|---|---|
| Capital Outlay | $ 86,775.00 |
| Professional Service | $ 2,726.00 |
| Salaries and Benefits | $ 360,537.00 |
| Supplies | $ 839.00 |
| **TOTAL** | **$ 450,877.00** |

## 2004 Spending Plans

| | |
|---|---|
| Toxicology Services | $ 140,000.00 |
| Training of physicians and investigators | $ 35,311.00 |
| Salaries and Benefits | $ 514,689.00 |
| Expert Testimony | $ 10,000.00 |
| Vehicle Purchase | $ 45,000.00 |
| Autopsy Equipment | $ 5,000.00 |
| **TOTAL** | **$ 750,000.00** |

# Department of Human Resources

FY 2003 Appropriation Bill:

Allocations to the Department of Human Resources shall be divided among day care initiatives, foster care basic monthly maintenance rates of foster families, and expenditures related to the RC Consent Decree. Day Care Initiatives shall include a one-time expenditure of $300,000 to organize a liability insurance pool for the states' child care management agencies.

**Contact**
Jim Connell
(334) 242-9425

**Address**
50 Ripley Street, Suite 2118
Montgomery, AL 36130

| Year | Received | Released | Un-Spent | Balance |
|---|---|---|---|---|
| **FY 2000** | $10,056,186 | $ 6,800,000 | $0 | $ 3,256,186 |
| **FY 2001** | $11,345,256 | $ 5,988,437 | $102,200 | $ 8,715,205 |
| **FY 2002** | $13,204,930 | $10,154,492 | $0 | $11,765,643 |
| **FY 2003** | $12,606,638 | $11,000,000 | $0 | $13,372,281 |
| **FY 2004** | *$9,359,958 | $14,540,694 | | $ 8,191,545 |

*Estimated total

## Long Term Goals

- ❑ To enable children placed in out of home care to live in community-cased therapeutic foster family homes to meet complex emotional needs.
- ❑ To provide for increased support and compenstation to foster family homes in order to provide services to children.
- ❑ To provide direct services to sexually and severly abused children.

## 2003 Spending Overview

| | |
|---|---|
| Foster Care board payments | $4,000,000.00 |
| Therapeutic Foster Services | $7,000,000.00 |
| **Total** | **$11,000,000.00** |

## 2004 Spending Plans

| | |
|---|---|
| Foster Care board payments | $4,000,000.00 |
| Therapeutic Foster Services | $9,700,094.00 |
| Children's Advocacy Center | $840,600.00 |
| **Total** | **$14,540,694.00** |

# ALABAMA MEDICAID AGENCY

**FY 2003 Appropriation Bill:**

Allocations to the Alabama Medicaid Agency shall be expended for the benefit of the needs of children and AIDS waiver.

**CONTACT**
Mike Lewis
(334) 242-2290

**ADDRESS**
P.O. Box 5624
Montgomery, AL 36103

**LONG TERM GOALS**

| Year | Received | Released | Un-Spent | Balance |
|---|---|---|---|---|
| FY 2000 | $1,759,832 | $0 | $0 | $1,759,832 |
| FY 2001 | $1,985,420 | $2,222,628 | No expenditures made, but all funds were carried over in Medicaid accounts for future expenditures | $1,522,624 |
| FY 2002 | $2,310,863 | $3,000,000 | $0 | $833,487 |
| FY 2003 | $2,206,162 | $1,925,000 | $1,925,000 | 3,039,649 |
| FY 2004 | *$1,637,993 | $2,165,000 | | $2,512,642 |

*Estimated total

## 2003 Spending Overview

**TOTAL** $ 0.00

## 2004 Spending Plan

**NO PLANS HAVE BEEN RECEIVED** $ 0.00

# Dept. of Mental Health/Mental Retardation

**FY 2003 Appropriation Bill:**

Allocations to the Department of Mental Health and Mental Retardation shall be expended for community-based programs and programs for children and families in crisis, including, but not limited to, drug and alcohol treatment programs.

**Contact**
Steve LaFreniere
(334) 353-7832

**Address**
100 North Union Street
Montgomery, AL 36130

| Year | Received | Released | Un-Spent | Balance |
|---|---|---|---|---|
| FY 2000 | $2,514,047 | $2,514,047 | $1,674,339 | $1,674,339 |
| FY 2001 | $2,836,314 | $2,335,476 | $1,825,742 | $4,000,919 |
| FY 2002 | $3,301,232 | $3,432,000 | $ 366,213 | $4,236,364 |
| FY 2003 | $3,151,600 | $2,750,000 | $ 986,720 | $5,624,744 |
| FY 2004 | *$2,339,989 | $5,004,659 | | $2,960,074 |

*Estimated total

**Long Term Goals**

- ❑ Expansion of Intensive Outpatient programs for adolescents with substance abuse issues.
- ❑ Provide services to expand the Continuum of Care for children and adolescents with Serious Emotional Disturbances.
- ❑ Provide for expansion of services for children with Mental Retardation who need In-Home services, Service Coordination and crisis stabilization/ transition services.
- ❑ Provide expanded Community Based and Crisis services across the Mental Health Service System to children and adolescents that have multiple agency involvement and cross DMH/MR Divisional responsibilities.

## 2003 Spending Overview

| Item | Amount |
|---|---|
| Child Psychiatric Services Training | $ 50,000.00 |
| Community Contracted Crisis Stabilization/In home services | $ 468,276.00 |
| Community Contracted expansion of Case Management for SED Children | $ 50,000.00 |
| Community Contracted Services Abuse Services | $ 102,299.63 |
| Contracted Community Service for Dually Diagnosed children | $ 92,774.73 |
| Early Intervention Services | $ 50,000.00 |
| Mental Health Juvenile Court Liaisons | $ 581,080.32 |
| MR Community Contracted In-Home Services | $ 133,027.96 |
| MR Community Contracted Service Coordination | $ 26,026.15 |
| Office of Children's Services | $ 109,795.59 |
| State Match for Federal Grant | $ 100,000.00 |
| **Total** | **$1,763,280.38** |

## 2004 Spending Plans

| Item | Amount |
|---|---|
| Mental Health Juvenile Court Lianons | $ 770,000.00 |
| Multiple Needs Children | $ 349,000.00 |
| "Our Kids" Projects | $ 678,788.00 |
| Community and crisis services for children and adolescents with dual diagnosis | $ 566,475.00 |
| Office of Children's Services | $ 129,006.00 |
| Crisis stabilization / in home services | $ 468,276.00 |
| Service Coordination | $ 30,000.00 |
| In Home Services | $ 133,028.00 |
| Expansion ofCrisis Stabalization Services | $ 200,000.00 |
| Expansion of Service Coordination | $ 143,543.00 |
| Expansion of In Home Services | $ 200,000.00 |
| Expand Case Management | $ 75,000.00 |
| Respite Care Services | $ 98,000.00 |
| State Match for Federal Grant | $ 200,000.00 |
| Expand FIND Teams | $ 270,000.00 |
| Adolexcent Outpatient Substance Abuse | $ 250,000.00 |
| Expand Adolescent Outpatient Programs | $ 443,543.00 |
| **Total** | **$5,004,659.00** |

# MULTIPLE NEEDS CHILD OFFICE

**FY 2003 Appropriation Bill:**

Allocations to the State Multiple Needs Children Fund shall be distributed by the Alabama Children's Services Facilitation Team pursuant to the written plan called for in Section 41-15B-2.2(5), Code of Alabama 1975. Monies not obligated by local children's service facilitation teams by the end of the second quarter of the fiscal year shall revert to the Alabama Children's Services Facilitation Team.

**CONTACT**
Donna Glass
(334) 223-0744

**ADDRESS**
RSA Tower, Suite 1670
201 Monroe Street
Montgomery, AL 36130-2755

| Year | Received | Released | Un-Spent | Balance |
|---|---|---|---|---|
| FY 2000 | $2,514,047 | $628,512 | $101,813 | $1,987,348 |
| FY 2001 | $2,836,314 | $1,200,000 | $27 | $3,623,689 |
| FY 2002 | $3,301,232 | $2,000,000 | $39,136 | $4,964,057 |
| FY 2003 | $3,151,660 | $2,750,000 | $0 | $5,365,717 |
| FY 2004 | *$2,339,989 | $3,000,000 | | $4,705,706 |

*Estimated total

**LONG TERM GOALS**

- ❑ Provide services to children identified as Multiple Needs Children at the State level.
- ❑ Provide services to children identified as Multiple Needs Children at the County level.
- ❑ Provide technical assistance to County Children's Services Facilitation Teams to enhance services to Multiple Needs Children. Additional services to include quality assurance and accounting oversight of funds.

## 2003 Spending Overview

| | |
|---|---|
| Services for Multi-Needs children by the State Team | $ 1,375,000.00 |
| Services for Muilti Needs children by County Teams | $ 1,375,000.00 |
| **TOTAL** | **$2,750,000.00** |

## 2004 Spending Plan

| | |
|---|---|
| Purchase of services by the Alabama Children's Services Facilitation Team. | $ 1,475,000.00 |
| Purchse of Services by county Children's Services Facilitation Teams | $ 1,375,000.00 |
| Administrative (hiring staff) | $ 150,000.00 |
| **TOTAL** | **$3,000,000.00** |

# DEPARTMENT OF PUBLIC HEALTH

**FY 2003 Appropriation Bill:**

Allocations to the Department of Public Health shall be expended for children's health issues. An allocation totaling $150,000 shall also be expended for support of the Alabama Qualified Health Center Grant Program and on an allocation totaling $260,000 shall be expended for the AIDS Drug Assistance Program.

**CONTACT**
Kathy Vincent
(334) 206-5300

**ADDRESS**
RSA Tower, Suite
201 Monroe Street
Montgomery, AL 36130

| Year | Received | Released | Un-Spent | Balance |
|---|---|---|---|---|
| **FY 2000** | $5,028,093 | $5,028,093 | $0 | $ 0 |
| **FY 2001** | $5,672,628 | $5,583,983 | $183 | $ 88,828 |
| **FY 2002** | $6,602,465 | $5,800,000 | $0 | $ 891,293 |
| **FY 2003** | $6,303,318 | $5,500,000 | $0 | $1,694,611 |
| **FY 2004** | *$4,679,979 | $6,370,000 | | $ 4,590 |

*Estimated total

**LONG TERM GOALS**

- ❑ Provide newborn screening for metabolic disorder detection.
- ❑ Provide ALL Kids Coverage to eligible low income children.
- ❑ Prevent transmission of HIV/AIDS to newborns.

**2003 Outcomes**

- ❑ 62,499 children insured through All Kids / CHIP
- ❑ 29 women and 9 children provided HIV Medication
- ❑ 600,000 new born screenings for metabolic disorders

## 2003 Spending Overview

| | |
|---|---|
| Medication for HIV positive pregnant women & their infants | $ 260,000.00 |
| Newborn screenings | $ 440,000.00 |
| ALLKids Child Health Insurance Pgm (CHIP) | $4,800,000.00 |
| **TOTAL** | **$5,500,000.00** |

## 2004 Spending Plans

| | |
|---|---|
| Medication for HIV positive pregnant women & their infants | $ 260,000.00 |
| Newborn screenings | $ 810,000.00 |
| ALLKids Child Health Insurance Pgm (CHIP) | $5,000,000.00 |
| Community Grants | $300,000.00 |
| **TOTAL** | **$6,370,000.00** |

# DEPARTMENT OF REHABILITATION SERVICES

**FY 2003 Appropriation Bill:**

Allocations to the Department of Rehabilitation Services shall be expended as follows:

a. The first $300,000 received, for child death review teams.

b. The remainder for early intervention services and services for children with traumatic brain injuries.

**CONTACT**
Steve Shivers
(334) 281-8780

**ADDRESS**
2129 East South Boulevard
Montgomery, AL 36116

**LONG TERM GOALS**

- To better understand how and why children die in Alabama.

| Year | Received | Released | Un-Spent | Balance |
|---|---|---|---|---|
| **FY 2000** | $251,405 | $ 62,864 | $0 | $188,541 |
| **FY 2001** | $283,631 | $362,864 | $0 | $109,308 |
| **FY 2002** | $330,123 | $300,000 | $0 | $139,431 |
| **FY 2003** | $315,165 | $275,000 | $0 | $179,596 |
| **FY 2004** | *$233,999 | $350,000 | | $ 63,595 |

*Estimated total

## 2003 Spending Overview

| | |
|---|---|
| Child Death Review | $ 275,000.00 |
| **TOTAL** | **$ 275,000.00** |

## 2004 Spending Plans

| | |
|---|---|
| Child Death Review | $ 300,000.00 |
| Early Intervention Services | $ 50,000.00 |
| **TOTAL** | **$ 350,000.00** |

# DEPARTMENT OF YOUTH SERVICES

**FY 2003 Appropriation Bill:**

Allocations to the Department of Youth Services shall be expended for intensive programs that may include wilderness programs, boot camps, day treatment programs, and other local alternative programs.

**CONTACT**
Allen Peaton
(334) 215-3852

**ADDRESS**
P.O. Box 66
Mt. Meigs, AL 36057

| Year | Received | Released | Un-Spent | Balance |
|---|---|---|---|---|
| FY 2000 | $ 8,547,758 | $ 1,250,000 | $ 700,000 | $ 7,977,758 |
| FY 2001 | $ 9,643,467 | $17,545,451 | $14,234,543 | $14,330,317 |
| FY 2002 | $11,224,190 | $ 8,600,000 | $2,334,931 | $19,289,438 |
| FY 2003 | $10,715,641 | $ 10,900,000 | $2,152,122 | $21,257,201 |
| FY 2004 | *$7,955,964 | $14,182,800 | | $15,030,365 |

*Estimated total

**LONG TERM GOALS**

- ❑ To provide adequate bed space in order to comply with the S.S. v. Wood Consent Decree.
- ❑ To provide alternative programs in order to reduce commitments to State DYS Custody.
- ❑ To adequately provide services to youth with multiple needs and disabilities.

## 2003 Spending Overview

| | |
|---|---|
| Contract Placements | $7,884,734.00 |
| Day Programs | $ 500,000.00 |
| Juvenile Detention Centers | $ 205,150.00 |
| Multi-Needs Children | $ 37,994.00 |
| Other Children Services | $ 120,000.00 |
| **TOTAL** | **$8,747,878.00** |

**2003 Outcomes**
- ❑ 1,361 youth served through contract placements
- ❑ 550 juvenile detention beds subsidized
- ❑ 598 youth served through day treatment programs
- ❑ 80,000 youth received "Play By The Rules" publication

## 2004 Spending Plans

| | |
|---|---|
| Contract Placements | $10,160,000.00 |
| Day Programs | $ 500,000.00 |
| Juvenile Detention Centers | $ 992,800.00 |
| Multi-Needs Children | $ 400,000.00 |
| "Our Kids" Project | $ 1,000,000.00 |
| Alternative Programs | $ 630,000.00 |
| Wilderness Programs | $ 500,000.00 |
| **TOTAL** | **$14,182,800.00** |

# Children First Trust Fund

# 2004

# Annual Report

Published by the:
Department of Children's Affairs
201 Monroe Street
Suite1670
Montgomery, AL 36130
www.dca.state.al.us
(334) 223-0502

# The History of Children First

The Children First Trust Fund was initiated in the mid 1990's by a group of advocates and legislators who wanted to improve the lives of children in Alabama. Efforts focused on increasing cigarette taxes to fund a wide array of needed programs and services. For several years the Children First legislation was introduced but not passed, each year gaining more credibility and supporters. During the same period negotiations were being conducted between tobacco companies and the states to settle lawsuits stemming from the health costs of smoking.

At the end of the legislative session in 1998 any potential tobacco settlement funds were linked to Children First. Later that year the landmark agreement between the states and big tobacco was reached, and settlement dollars began to come to the state in late 2000.

The 21st Century Fund was set up to receive the settlement and distribute funds to pay for economic development bonds, medical care, and programs for the elderly, with the majority of the settlement going to the Children First Trust Fund. CFTF dollars not spent by agencies each year are to remain in the Children First Trust Fund for future use.

Compiled here is the Children First Annual Report for Fiscal Year 2004. It details the expenditures of Children First dollars for each of the twelve state agencies that received funds in FY04.

# The Master Settlement Agreement

The Master Settlement Agreement is a legal compact between the states and major tobacco companies that pays states an annual amount based on the number of cigarettes sold. An estimated $.85 of the total cost per pack goes to pay for the agreement. Alabama receives a small portion (approximately 1.6%) of the overall national settlement. There are three important facts everyone should know about the settlement and Children First:

*The settlement is based on consumption.* If states do well in getting children and adults to stop smoking, or if tobacco companies go bankrupt, then the amount Alabama receives could go down substantially or be lost entirely. Settlement dollars are not guaranteed, and their loss would leave many agency programs without a funding source.

*The settlement was structured so that states got extra initial payments each year through FY2003. The loss of this payment has meant a 16%decrease in receipts into the Children First Trust Fund.* Estimates of settlement dollars anticipate a return to FY2003 levels in 2008.

*Alabama's fiscal year begins in October, but it receives its annual payment in late April.* The savings each department has built in the past are used to fund programs before new money becomes available. The savings also provide insurance in case the annual payment drops, or does not come at all.

Most agencies are currently surviving on the savings accumulated in the first years of Children First. Each agency spent more money than they received in FY04 and had to utilize money saved in previous years to make up the difference. The trend of decreasing revenues and increasing expenses can not continue for many more years.

# How the Tobacco Settlement Funds Children First

When tobacco settlement dollars come to Alabama they are deposited into the 21st Century Fund ($102 million FY04), where $13,000,000 is used first for debt service on economic development bonds. Assisting Honda and Hyundai to locate in Alabama is one of several economic efforts funded through these bonds.

The remaining tobacco dollars are then split between Children First (approx. 52%), Medicaid (approx. 31%), and several other small funds. Once money comes to Children First, the fund then divided among 12 agencies for specific programs as instructed by law (Section 41-15B-2.2). As an example, Education must spend its funds on alternative schools and safety programs.

Once funds are deposited into Children First Trust Fund they cannot be spent until the Legislature appropriates them to the agency. Until then the funds can not be used for other purposes. Unspent money remains within the fund and individual departments accrue a balance.

Payments by tobacco companies

MSA Escrow Account

These initial payments stop in FY04, causing a drop of more than 16% for CFTF

These strategic payments are planned to begin in FY08, returning CFTF to FY03 levels

Alabama Initial Payments

Alabama Annual Payments (in April of each year)

Alabama Strategic Payments

Alabama State-Specific Account

100% $101,871,679

21st Century Fund

After full funding of pledged revenues to bonds then monies are paid to the CFTF

12.8% Economic Development Bond Issue $13,000,000

52% Children First Trust Fund $53,069,034

31% Alabama Medicaid (maximum $45m per year) $31,841,421

1.5% Senior Services Trust Fund $1,516,258

2% General Fund - Aging Medicaid Waiver $2,274,387

.17% Children's Affairs Administration $170,579

funds allocated to departments can not be spent until appropriated by legislature.

.5% Rehab Services
1% Forensic Sciences
1% ABC
3.5% Medicaid
Public Health 10%
Mental Health 5%
Multiple Needs 5%
Children's Trust Fund 5%
Juvenile Probation 10%
Youth Services 17%
Human Resources 20%
Education 22%

**FY04 Allocations**

| | |
|---|---:|
| Public Health | $5,306,903 |
| Education | $11,675,187 |
| Human Resources | $10,613,807 |
| Children's Trust Fund | $2,653,452 |
| Multiple Needs | $2,653,452 |
| Mental Health | $2,653,452 |
| Juvenile Probation Serv | $5,306,903 |
| Youth Services | $9,021,736 |
| Medicaid | $1,857,416 |
| ABC Board | $530,690 |
| Forensic Sciences | $530,690 |
| Rehabilitation Services | $265,345 |

# The Next Step

Each agency begins the year with the dollars remaining from previous years. This is a combination of funds that were not appropriated to them by the legislature and funds that were unspent for various reasons. The balance available at the beginning of FY04 was $73,537,542. The majority of these funds were received five months earlier in May 2003.

| | Balance at the End of FY03 | FY04 Reciepts | FY04 Available | FY04 Appropriation |
|---|---|---|---|---|
| Public Health | $ 1,738,697.20 | $ 5,306,903.40 | $ 7,045,600.60 | $ 6,370,000.00 |
| Education | $ 14,070,815.99 | $ 11,675,187.48 | $ 25,746,003.47 | $ 20,157,550.00 |
| Human Resources | $ 13,460,452.00 | $ 10,613,806.80 | $ 24,074,258.80 | $ 14,540,694.00 |
| Children's Trust Fund | $ 3,303,004.34 | $ 2,653,451.70 | $ 5,956,456.04 | $ 3,827,453.00 |
| Multiple Needs | $ 5,415,329.86 | $ 2,653,451.70 | $ 8,068,781.56 | $ 3,000,000.00 |
| Mental Health | $ 5,646,624.60 | $ 2,653,451.70 | $ 8,300,076.30 | $ 5,004,659.00 |
| Juvenile Probation Serv | $ 5,135,891.33 | $ 5,306,903.40 | $ 10,442,794.73 | $ 9,958,168.00 |
| Youth Services | $ 21,332,146.95 | $ 9,021,735.78 | $ 30,353,882.73 | $ 14,182,800.00 |
| Medicaid | $ 1,130,079.00 | $ 1,857,416.19 | $ 2,987,495.19 | $ 2,165,000.00 |
| ABC Board | $ 988,052.59 | $ 530,690.34 | $ 1,518,742.93 | $ 733,350.00 |
| Forensic Sciences | $ 1,134,647.23 | $ 530,690.34 | $ 1,665,337.57 | $ 750,000.00 |
| Rehabilitation Services | $ 181,801.25 | $ 265,345.17 | $ 447,146.42 | $ 350,000.00 |
| | $ 73,537,542.34 | $ 53,069,034.00 | $119,560,975.74 | $ 81,039,674.00 |

# Trends

While the first few years were marked by low spending and increasing receipts, 2004 marked a clear change as expenses exceeded receipts by over $21 million. The balance which provides cashflow until tobacco settlements are received in April and reserves has taken a dramatic decline. Lack of a balance will hamper agencies abilities to expend funds throughout the first half of the year and will necessitate a decline in spending to match receipts.



# Plans of Investment

Beginning in FY2004 each agency must have a Plan of Investment approved by the Commissioner of the Department of Children's Affairs before they allowed to spend the money appropriated to them. This process requires planning for the use of Children First Funds and requires agencies to identify outcome measures for determining the effectiveness of these programs. All 12 CFTF agencies had approved plans.

## Children First Plan of Investment

| | |
|---|---|
| *Agency* | Department of Youth Services |
| *Address* | P. O. BOX 66, Mt. Meigs, AL 36057 |
| *Contact* | J. Walter Wood, Jr., Executive Director / Allen L. Peaton, Support Operations Administrator |
| *Phone* | 334 - 215 - 3800 / 334 - 215 - 3852 |
| *Fax* | 334 - 215 - 3011 |
| *e-mail* | apeaton@mail.state.al.us |

| Quality Assurance Items | | | | | |
|---|---|---|---|---|---|
| **Long Term Outcome** | **Expense Category** | **Legislative Authorization** | **Budget Amount** | **Measure of Success** | **Report Frequency** |
| **To provide adequate bedspace in order to comply with the S.S. v. Wood Consent Decree.** | Contract Placements | secure beds and graduated release facilities | $ 10,160,000 | Number of bed spaces purchased | Quarterly |
| | | | | Number of youth served | Quarterly |
| **To provide alternative programs in order to reduce commitments to State DYS custody.** | Day Programs | alternative programs which shall include ... day reporting centers | $ 500,000 | Percentage reduction in low risk commitments from counties served | Annually |
| | | | | Number of youth served | Quarterly |
| | Alternative Programs | alternative programs which shall include ... boot camps | $ 630,000 | Number of youth served | Quarterly |
| | Wilderness Programs | alternative programs to include ... wilderness programs | $ 500,000 | Number of girls to be served | Quarterly |
| **To adequately provide services to youth with multiple needs and disabilities** | Multi-needs Children | secure beds and graduated release facilities | $ 400,000 | Percentage of DYS referrals accepted for multi-needs placement | Quarterly |
| | | | | Number of youth accepted for placement | Quarterly |
| | "Our Kids" Project | other children services | $ 1,000,000 | Number of joint agency contracts issued | Annually |
| | Juvenile Detention Centers | subsidies for regional detention centers | $ 992,800 | 7 % of new Children First allotment provided to detention centers | Quarterly |
| | | | $ 14,182,800.00 | | |

# Alcoholic Beverage Control Board

## Long Term Outcomes

1. Prevent the purchase of tobacco products by minors.

## Accomplishments

1. Upgraded presentation equipment to allow video and graphics to be used in training of merchants. This enables our training to go further in depth showing fake and altered drivers licenses, risky sales situations, and role play alternatives.
2. Presented statewide Trainers of Trainers course with accompanying materials which could be left with participants to take back to the work environment and continue practicing.
3. Completed 2,012 Minor Compliance Checks of locations selling tobacco products with 248 cases made, resulting in an overall non-compliance rate of 12.33%.
4. Successfully protected millions of dollars in federal funding for the Alabama Department of Mental Health and Mental Retardation by completed federally required SYNAR checks. 533 SYNAR Compliance Checks were completed with 74 SYNAR cases being filed, resulting in a SYNAR non-compliance rate of 13.88%; or well below the federally required standard of 20%.
5. Successfully issued tobacco permits to locations selling tobacco products within the state and completion of 5,179 inspections of these premises.
6. Filed 95 cases for Minor in Possession of Tobacco Products to deter under age tobacco use.

## FY 2004 Fiscal Status

| | |
|---|---|
| **FY03 Balance** | **$988,053** |
| **FY04 Receipts** | **$530,690** |
| **FY04 Budget** | **$733,350** |
| **FY04 Expended** | **$578,863** |
| **FY04 Balance** | **$939,880** |

## Contact Information

Jan Byrne
2715 Gunter Park Drive West
Montgomery, AL 36109
334-271-3840
jan-rvp-aa@juno.com

## FY2004 Expenditures

| | |
|---|---|
| 1. Responsible Vendor Program | $126,578.02 |
| 2. Enforcement | $452,284.70 |
| **TOTAL** | **$578,862.72** |

## FY 2005 Plan

| | |
|---|---|
| 1. Responsible Vendor Program | $198,124 |
| 2. Enforcement | $535,226 |
| **TOTAL** | **$733,350** |

## Outcome Measures

1. Merchant Trainings
   655 Individuals
   123 Vendors
2. Materials
   15,000 Register Stickers
   2,500 I.D. Checking Guides
3. 2,012 Compliance Checks
4. 248 Actual Sells to Minors
5. 12.33% Non-Compliance Rate

# Alcoholic Beverage Control Board

## Detailed Expenditures

| ACTIVITY | PAYEE | COUNTY SERVED | AMOUNT | TOTALS |
|---|---|---|---|---|
| ENFORCEMENT | SALARIES | STATEWIDE | $40,026.26 | |
| ENFORCEMENT | SALARIES | STATEWIDE | $59,116.79 | |
| ENFORCEMENT | SALARIES | STATEWIDE | $38,046.20 | |
| ENFORCEMENT | SALARIES | STATEWIDE | $41,161.12 | |
| ENFORCEMENT | SALARIES | STATEWIDE | $37,831.81 | |
| ENFORCEMENT | SALARIES | STATEWIDE | $38,940.08 | |
| ENFORCEMENT | SALARIES | STATEWIDE | $19,544.45 | |
| ENFORCEMENT | SALARIES | STATEWIDE | $35,032.56 | |
| ENFORCEMENT | SALARIES | STATEWIDE | $38,848.18 | |
| ENFORCEMENT | SALARIES | STATEWIDE | $37,665.71 | |
| ENFORCEMENT | SALARIES | STATEWIDE | $43,593.12 | |
| ENFORCEMENT | FINANCE RISK MAAGEMENT | STATEWIDE | $6,323.06 | |
| ENFORCEMENT | J C PENNEY COMPANY | STATEWIDE | $400.00 | |
| ENFORCEMENT | JV002500220193 ADJ J C PENNY PMT | STATEWIDE | ($330.04) | |
| ENFORCEMENT | J C PENNEY COMPANY | STATEWIDE | $3,499.40 | |
| ENFORCEMENT | TECHNOLOGY AMERICA | STATEWIDE | $10,836.00 | |
| ENFORCEMENT | TECHNOLOGY AMERICA | STATEWIDE | $1,750.00 | |
| | | | | $452,284.70 |
| RVP | SALARIES | STATEWIDE | $8,644.28 | |
| RVP | SALARIES | STATEWIDE | $9,666.97 | |
| RVP | SALARIES | STATEWIDE | $4,859.58 | |
| RVP | SALARIES | STATEWIDE | $12,430.11 | |
| RVP | SALARIES | STATEWIDE | $8,644.28 | |
| RVP | SALARIES | STATEWIDE | $8,844.28 | |
| RVP | SALARIES | STATEWIDE | $8,644.27 | |
| RVP | SALARIES | STATEWIDE | $8,644.30 | |
| RVP | SALARIES | STATEWIDE | $8,644.28 | |
| RVP | SALARIES | STATEWIDE | $8,644.28 | |
| RVP | SALARIES | STATEWIDE | $8,644.28 | |
| RVP | BIG BEAR AUDIO/VISUAL INC | STATEWIDE | $427.00 | |
| RVP | CAPITOL CHEVROLET INC | STATEWIDE | $16,135.10 | |
| RVP | DELL MARKETING LP | STATEWIDE | $7,384.00 | |
| RVP | DRUNK BUSTERS OF AMERICA | STATEWIDE | $499.00 | |
| RVP | FINANCE PRINTING & PUB | STATEWIDE | $773.31 | |
| RVP | FINANCE RISK MAAGEMENT | STATEWIDE | $1,328.84 | |
| RVP | HSBC BUSINESS SOLUTIONS | STATEWIDE | $484.12 | |
| RVP | KLENTON T MCLEMORE III | STATEWIDE | $108.00 | |
| RVP | LJK INC | STATEWIDE | $139.66 | |
| RVP | LJK INC | STATEWIDE | $143.95 | |
| RVP | LONGS ELECTRONICS INC | STATEWIDE | $470.53 | |
| RVP | OFFICE DEPOT INC | STATEWIDE | $198.63 | |
| RVP | OFFICE DEPOT INC | STATEWIDE | $232.22 | |
| RVP | ROYAL OFFICE EQUIPMENT | STATEWIDE | $495.00 | |
| RVP | SAM'S CLUB | STATEWIDE | $177.12 | |
| RVP | SOUTHERN LINC | STATEWIDE | $416.00 | |
| RVP | SOUTHERN LINC | STATEWIDE | $46.00 | |
| RVP | WILSON & WILSON | STATEWIDE | $85.02 | |
| RVP | WILSON & WILSON | STATEWIDE | $304.00 | |
| RVP | WRS GROUP LTD | STATEWIDE | $418.00 | |
| COMPTROLLER | JV 090099 YRND ROUNDING ADJ | | $1.61 | |
| | | | | $126,578.02 |
| | TOTAL FY 2004 EXPENDITURES | | $578,862.72 | $578,862.72 |

# Children's Trust Fund

## Long Term Outcomes

1. Provide funds for community-based grant awards.

2. Provide funds for at-risk youth grant awards.

3. Provide staff to monitor and provide technical assistance to all funded programs.

4. Provide benefits to staff to monitor and provide technical assistance to all funded programs.

## Accomplishments

1. 58 child abuse and neglect prevention grants funded statewide for family support programs and family resource centers.

2. 73 child abuse and neglect prevention grants funded statewide serving at-risk youth.

3. Funded seven Children Policy Council Executive Director positions.

4. Corporate Foundation for Children conducted training, consulting, and FDC credentialing to 53 agencies and approximately 400 participants serving families and children.

## FY 2004 Fiscal Status

| | |
|---|---|
| **FY03 Balance** | **$3,303,004** |
| **FY04 Receipts** | **$2,653,452** |
| **FY04 Budget** | **$3,827,453** |
| **FY04 Expended** | **$3,642,177** |
| **FY04 Balance** | **$2,314,279** |

## FY2004 Expenditures

| | |
|---|---|
| 1. Salaries | $ 308,847.00 |
| 2. Benefits | $ 93,024.59 |
| 3. Community Based Programs | $1,622,900.00 |
| 4. At- Risk Programs | $1,314,572.58 |
| 5. Children's Policy Council Ex. Dlrs | $ 171,583.00 |
| 6. Grantee Professional Development | $ 131,250.00 |
| **TOTAL** | **$3,642,177.17** |

## FY 2005 Plan

| | |
|---|---|
| 1. Grant Awards - Community Based | $1,560,049 |
| 2. Grant Awards - At Risk Programs | $1,560,049 |
| 3. Salaries | $ 527,738 |
| 4. Benefits | $ 179,617 |
| **TOTAL** | **$3,827,453** |

## Outcome Measures

200,000 families served through Community Based Programs

38,000 children/teens served through programs for At-Risk Children

35 workshops were provided to grantees

400 grantees participated in training workshops

131 site visits conducted

520 Financial / Programmatic Reports reviewed

1,950 contacts with grantee programs

## Contact Information

Paul Smelley
RSA Union Building
100 North Union Street
Montgomery, AL 36104-3702
(334) 242-5710
paul.smelley@ctf.alabama.gov

# Children's Trust Fund

## Detailed Expenditures

### Famliy Support

| Organization Name | Program Name | County | Final Award |
|---|---|---|---|
| Baldwin County Mental Health Center | Reaching and Encouraging Active Parenting | Baldwin | $30,000.00 |
| Exchange Club Family Center of Mobile | Parent Network | Mobile | $25,000.00 |
| Exchange Club Family Center of Mobile | Parent Aide Program | Mobile | $30,000.00 |
| Goodwill Easter Seals of the Gulf Coast | Parent Education and Support | Mobile | $18,000.00 |
| GRCMA Early Childhood Directions | Caring for the Caregiver | Mobile | $30,000.00 |
| ACES Crenshaw County | Building Healthy Families | Crenshaw | $20,000.00 |
| Alfred Saliba Family Services Center | Children First | Houston | $25,000.00 |
| Montgomery Public Schools | Parents As Teachers | Montgomery | $30,000.00 |
| Parenting Institute- Family Guidance Center of Alabama | Building Healthy Homes | Montgomery | $35,000.00 |
| Parenting Institute- Family Guidance Center of Alabama | Healthy Parenting | Montgomery | $15,000.00 |
| Southeast Alabama Child Advocacy Center | Parent Enrichment Project | Houston | $25,000.00 |
| Success By 6 (Montgomery YMCA) | Chisholm Prevention Project | Montgomery | $20,000.00 |
| ACES Auburn University | Healthy Couples, Healthy Children 2003 | Statewide | $40,000.00 |
| Alabama Department of Public Health | Parents as Teachers - Cherokee County | Cherokee | $20,000.00 |
| Chambers County Council for Neglected and Dependent Children and Youth Incorporated, doing business as The Circle of Care Center for Families | Special Deliveries | Chambers | $40,000.00 |
| Child Care Resource Center, Inc. | Parent Provide Connection | Lee | $30,000.00 |
| Children's Advocacy Center of Cherokee County | Parent Enhancement | Cherokee | $15,000.00 |
| East Alabama Mental Health/Mental Retardation Center | The Godparent Project | Lee | $25,000.00 |
| Family Services Ctr. Of Calhoun Co., Inc. | Parenting Education and In Home Support | Calhoun | $40,000.00 |
| First Family Service Center | BABY Program | Talladega | $20,000.00 |
| Talladega Clay Randolph Child Care Corp. | A Child's Haven | Talladega | $25,000.00 |
| Children and Family Connection | Nurturing Parent Program | Russell | $20,000.00 |
| ACES Cullman County | First Years Count | Cullman | $30,000.00 |
| Childcare Resource Network | Success-By-6 | | $22,000.00 |
| DeKalb County Schools Early Intervention Program | Ready Set Schools | DeKalb | $35,000.00 |
| Franklin County School | ALSAH | Franklin | $20,000.00 |
| United Way of Etowah CountySuccess by 6 | All Aboard the Brain Train | Etowah | $17,500.00 |
| Lauderdale County Board of Education | Parent Partners | Lauderdale | $24,400.00 |
| Lawrence County Board of Education | Parents as Teachers | Lawrence | $28,000.00 |
| Parents and Children Together (PACT) | Strengthening Families through Wrap-Around Services | Morgan | $35,000.00 |
| Parents and Children Together (PACT) | Parents as Teachers (PAT) | Morgan | $40,000.00 |

# Children's Trust Fund

## Detailed Expenditures

| | | | |
|---|---|---|---|
| West Way Child Development Center, Inc. | (NECAP) Nurturing Environment for Children and Parents | | $20,000.00 |
| Alabama Public Television | Alabama Public Television's Ready to Learn/Right from Birth | Statewide | $10,000.00 |
| Better Basics, Inc. | Family Reading/Parent Education Program | Jefferson | $10,000.00 |
| Childcare Resources | Parents as Teachers | Jefferson | $20,000.00 |
| Exchange Club Ctr. Of Jefferson Co. | Parent Aide | Jefferson | $20,000.00 |
| Exchange Club Ctr. Of Jefferson Co. | The Nurturing Program | Jefferson | $10,000.00 |
| Glenwood, Inc. | FACS(Family and Community Services) Home Visitation Program | Jefferson | $25,000.00 |
| Glenwood, Inc. | F.A.S.T. | Jefferson | $20,000.00 |
| Kid One Transport System | Kid One Transport-Transportation to Medical Care for Children and Expectant Mothers | Jefferson | $35,000.00 |
| Child Development Resources | Baby Talk | Tuscaloosa | $40,000.00 |
| Children of the Village Network, Inc. | Effective Parenting Course | | $13,000.00 |
| Health and Wellness Educational Center | HIPE Helping Infants and Parents to Excel | | $25,000.00 |
| HERO Family Resource Center | Active Nurturing and Growth Through Early Learning (ANGEL) | Hale | $35,000.00 |
| Tuscaloosa Family Resource Center | Families Are Our Future | Tuscaloosa | $10,000.00 |
| **TOTAL** | | | **$1,122,900.00** |
| **Family Support** | | | |
| Catholic Social Services for Family Service Center- Bay Minette | Family Service Center- Bay Minette | Baldwin | $45,000.00 |
| Hope Place Family Resource Center | Hope Place Career Center | Escambia | $50,000.00 |
| Mobile County Health Department | Family Support Program | Mobile | $35,000.00 |
| ACES Conecuh County | Rainbow Family Resource Center/Parenting Program | Conecuh | $20,000.00 |
| Autauga County Family Support Center, Inc. | F.A.S.T.(Family Action Support Team) | Autauga | $45,000.00 |
| Butler County Board of Education | Butler County Education and Community Center | Butler | $45,000.00 |
| Family Services Center of Coffee County | Building Blocks and Young Parents | Coffee | $45,000.00 |
| Geneva Co. Children's Non-Profit Council | Geneva Co. Family Resource Ctr. | Geneva | $35,000.00 |
| East Alabama Mental Health/Mental Retardation Center | Special Deliveries Program | Lee | $35,000.00 |
| Marshall-Jackson Mental Retardation Authority | Special Families/Special Needs Program | Marshall/Jackson | $20,000.00 |
| National Children's Advocacy Center | Healthy Families North Alabama | Madison | $25,000.00 |
| IMPACT Family Counseling, Inc. | IMPACT Wrap-Around Program | Jefferson | $30,000.00 |
| HERO Family Resource Center | Jump Start Early Learning Center | Hale | $30,000.00 |
| Tuscaloosa Family Resource Center | There's No Place Like Home | Tuscaloosa | $40,000.00 |

# Children's Trust Fund

## Detailed Expenditures

### At-Risk

| Organization Name | Program Name | County | Award Amount |
|---|---|---|---|
| Baldwin County Judicial Volunteer Program | Baldwin County Judicial Volunteer Program | Baldwin | 8,000.00 |
| Baldwin County Mental Health Center | Community Mentors | Baldwin | 10,000.00 |
| Baldwin Youth Services | Parent and Child Training | Baldwin | 6,000.00 |
| Big Brothers Big Sisters of the Metropolitan Mobile YMCA, Inc. | Big Brothers Big Sisters School-Based Mentoring Program | Mobile | 20,000.00 |
| Boys & Girls Club of South Alabama, Inc. | Project FLEX | Mobile | 20,417.87 |
| Boys and Girls Club of South Alabama, Inc. | Project Bond | Mobile | 20,000.00 |
| Boys and Girls Club of South Alabama - GROWTH | GROWTH'S Safe Start | Mobile | 45,000.00 |
| CARE House, Inc. | Solutions | Baldwin | 25,000.00 |
| CASA Mobile, Inc. | Program Director CASA Mobile | Mobile | 20,000.00 |
| Dumas Wesley Community Center | Children-Youth March to Adulthood | Mobile | 15,000.00 |
| Girl Scouts of the Deep South Council, Inc. | STUDIO 2B and Badge Work Program | Mobile | 15,000.00 |
| Alabama Writers' Forum, Inc. | "WRITING OUR STORIES: AN ANTI-VIOLENCE CREATIVE WRITING PROGRAM" | Montgomery | 10,000.00 |
| Boys and Girls Clubs of South Central Alabama | P.L.A.A.Y. Hayneville (Partners for the Lives of At-Risk Youths) | Lowndes | 15,000.00 |
| Boys and Girls Clubs of South Central Alabama | P.L.A.A.Y. William "Kid" Franklin Unit (Partners for the Lives of At-Risk Youths) | Montgomery | 20,000.00 |
| Brantwood On-Site Education Program | Brantwood On-Site Education Program (BOSEP) | Montgomery | 35,000.00 |
| Butler County Board of Education | LIFT(Linking Infrastructures For Teens) | Butler | 30,000.00 |
| Elmore County Juvenile Court | Juvenile Conference Committee | Elmore | 7,000.00 |
| Family Guidance Center of Alabama-Parenting Institute | Youth Connection | Montgomery | 14,764.71 |
| Southeast Alabama Youth Services | Building Blocks for Emotional Health | Houston | 38,000.00 |
| Alcoholism/Substance Abuse Council | PANDA Project of Cherokee Co. | Cherokee | 29,000.00 |
| Boys & Girls Clubs of Greater Lee County | Project Empowerment | Lee | 15,000.00 |
| Boys & Girls Clubs of the Lake Martin Area | SMART Moves | Tallapoosa | 15,000.00 |
| Calhoun County Schools Alternative Education Program | Calhoun County Schools Alternative Education Program | Calhoun | 20,000.00 |
| Chambers County Council for Neglected and Dependent Children and Youth Incorporated, doing business as The Circle of Care Center for Families | Skill Builders | Chambers | 25,000.00 |
| Clay County Arts League | 2004 Arts Camp for Kids | Clay | 8,000.00 |
| Community Enabler Developer, Inc. | Conflict without Violence | | 10,000.00 |
| Coosa Valley Youth Services | Coosa Valley Youth Services Parenting Project | Coosa | 18,500.00 |

# Children's Trust Fund

## Detailed Expenditures

| | | | |
|---|---|---|---|
| Sylacauga Alliance for Family Enhancement, Inc. | Turning Point | Talladega | 23,000.00 |
| Beacon House/Concerned Citizens for Our Youth, Inc. | BEACON (Beneficial Educational Activities Centered on Needs) | | 27,000.00 |
| Big Brothers Big Sisters of Northeast Alabama | P.A.L.S./Site-Based Mentoring | | 15,000.00 |
| Boys & Girls Club of Northeast Alabama | Project Learn | | 20,000.00 |
| Child Advocacy Center of Marshall County | Family Wellness and Anger Management | Marshall | 5,000.00 |
| Cullman County Judicial Volunteer Program | Cullman County Juvenile Conference Committee | Cullman | 7,500.00 |
| DeKalb County Children's Advocacy Center, Inc. | School Based At-Risk Therapy | DeKalb | 20,000.00 |
| DeKalb County Children's Advocacy Center, Inc. | Parent Project, Junior | DeKalb | 12,000.00 |
| Etowah County Board of Education | Transition Specialist | Etowah | 30,000.00 |
| Etowah County Board of Education | S.E.E. Plus | Etowah | 20,000.00 |
| Thirteenth Place, Inc. | P.E.A.C.E. (Positive Educational Alternatives to help our Children Excel) | | 15,000.00 |
| Walker Co. Children's Policy Council, Inc. | Parent Project of Walker Co. | Walker | 20,000.00 |
| Administrative Office of Courts-Morgan Co. JVP | Morgan Co. JVP | Morgan | 5,000.00 |
| Big Brothers/Big Sisters of North AL | The Sharpe Team | | 15,000.00 |
| Boys & Girls Clubs of Northwest Alabama, Inc. | Positive Place for Kids | | 35,000.00 |
| Colbert-Lauderdale Attention Home | HEART (Helping Encourage At-Risk Teens | Colbert/Lauderdale | 40,000.00 |
| Girls Inc. of Huntsville | Teens Loving Children | Madison | 18,390.00 |
| Huntsville/Madison County Mental Health Board, Inc. | Panda Project | Madison | 25,000.00 |
| Lawrence County Schools | Reconnecting Youth | Lawrence | 30,000.00 |
| Sheffield City Schools | Aim High Mentoring | | 15,000.00 |
| Camp Fire USA Central Alabama Council | Links-Up Mentoring | Jefferson | 20,000.00 |
| Children's Aid Society | Teen Parent Program | Jefferson | 30,000.00 |
| Friends of the Court, Inc./CASA of Shelby County | Friends of the Court, Inc./CASA of Shelby County | Shelby | 20,000.00 |
| Grace House Ministries, Inc. | Growing In Grace Through Artistic Expression | Jefferson | 20,000.00 |
| Hoover City Schools | The BRIDGES Program | Jefferson | 20,000.00 |
| IMPACT Family Counseling, Inc. | IMPACT Family Court Program | Jefferson | 30,000.00 |
| SafeHouse of Shelby County | Caroline E Jackson Child Development Center Abuse Prevention Program | Shelby | 25,000.00 |
| St. Clair County Day Program | LEAP Project | St. Clair | 25,000.00 |
| Tarrant Middle School | CATS Program | | 10,000.00 |

# Children's Trust Fund

## Detailed Expenditures

| | | | |
|---|---|---|---|
| Alabama Blues Project | After School/Summertime Blues Camp | Tuscaloosa | 15,000.00 |
| BAMA Kids, Inc. | BAMA Kids and Families | Wilcox | 20,000.00 |
| Child Abuse Prevention Services of Tuscaloosa, Inc. | Second Step | Tuscaloosa | 30,000.00 |
| Hale County Judicial Volunteer Program | Hale County Judicial Volunteer Program | Hale | 7,500.00 |
| Pickens County Family Resource Center | Supporting the At Risk Student (STARS) | Pickens | 32,000.00 |
| Project B.E.T.H.E.L. | Project Bethel | Tuscaloosa | 20,000.00 |
| Teen Moms/Youth for Christ | Teen Moms | Tuscaloosa | 10,000.00 |
| Tuscaloosa Family Resource Center | R.E.A.L. Ready to Excel in Academics and Life | Tuscaloosa | 25,000.00 |
| Tuscaloosa Judicial Volunteer Program | Tuscaloosa Volunteer Juvenile Conference Committee | Tuscaloosa | 7,500.00 |
| YMCA of Tuscaloosa-Central Branch YMCA | PATHS Programs | Tuscaloosa | 10,000.00 |
| Youth Emergency Services | Family Weekends | | 25,000.00 |
| **TOTAL AT-RISK YOUTH GRANT** | | | **1,314,572.58** |
| | | | |
| Professional Development(CFC) | Corporate Foundation for Children | | **$ 131,250.00** |
| | | | |
| CPC Executive Directors | MOBILE CO. CPC | Mobile | $ 25,000.00 |
| | COVINGTON CO. CPC | Covington | $ 25,000.00 |
| | CHILTON\SHELBY MENTAL HEALTH | Shelby | $ 25,000.00 |
| | WALKER CO. CPC | Walker | $ 25,000.00 |
| | LAUDERDALE CO. CPC | Lauderdale | $ 21,583.00 |
| | JEFFERSON CO. COMMISSION | Jefferson | $ 25,000.00 |
| | LOWNDES CO. PARTNERSHIP FOR | Lowndes | $ 25,000.00 |
| | **TOTAL CPC GRANT** | | **$ 171,583.00** |

# Department of Education

## Long Term Outcomes

1. Provide an alternative education program that provides students with an alternative to dropping out of school with emphasis on individual social/behavioral needs and provisions of the academic requirements designed to enable children to perform in traditional classroom settings.
2. Develop School Safety Enhancement programs to prevent or reduce violence in the school and community and reduce school disciplinary or school safety problems.
3. Continue pilot Social Worker program for ten (10) LEAs.
4. Provide Program Evaluation and monitoring personnel/materials/supplies/equipment.
5. Provide training for school safety/drug prevalence for LEA personnel; student, teacher, and parent surveys; school climate survey for schools.
6. Provide background checks for approximately 35,000 teachers and other school personnel who may have unsupervised access to children and who were not checked during FY03.

## FY 2004 Fiscal Status

| | |
|---|---|
| **FY03 Balance** | **$14,070,816** |
| **FY04 Receipts** | **$11,675,187** |
| **FY04 Budget** | **$20,157,550** |
| **FY04 Expended** | **$20,000,194** |
| **FY04 Balance** | **$ 5,745,809** |

## Contact Information

Dr. Sue B. Adams
3318 Gordon Persons Building
50 North Ripley Street
P.O.Box 302101
Montgomery, AL 36130
(334) 242-8165

## Accomplishments

1. **Alternative Programs**

The CFTF allocation provides additional funding to Alabama's school districts in establishing alternative education programs, which may include but are not limited to alternative behavior and discipline programs, alternative academic programs, alternative education personnel and alternative education training.

2. **School Safety Enhancement Programs**

The CFTF allocation provides additional funding to Alabama's school districts in establishing school safety enhancement programs, which may include but are not limited to school safety equipment (e.g., cameras, surveillance, metal detectors), school safety curriculum programs (e.g., conflict training, drug awareness, health awareness), school safety personnel (e.g., school resource officers, nurses, social workers) and school safety training (administration, safety personnel, faculty and staff).

3. **Teacher Background Checks**

The CFTF allocation provides additional funding for the state in processing teacher background checks, which may include but are not limited to background checks, fingerprinting, clearances, and investigations.

## FY2004 Expenditures

| | |
|---|---|
| 1. Alternative Education Programs | $10,797,054.00 |
| 2. School Safety Enhancement Programs | $ 4,563,189.00 |
| 3. School Based Social Workers | $ 200,000.00 |
| 4. Monitoring and Technical Assistance | $ 301,964.49 |
| 5. Teacher Background Checks | $ 4,137,986.89 |
| **TOTAL** | **$20,000,194.38** |

## FY 2005 Plan

| | |
|---|---|
| 1. Alternative Education Programs | $ 8,856,000 |
| 2. School Safety Enhancement Programs | $ 2,214,000 |
| 3. School Based Social Workers | $ 200,000 |
| 4. Monitoring and Technical Assistance | $ 138,000 |
| 5. Training and Data Analysis | $ 102,000 |
| 6. Teacher Background Checks | $ 490,000 |
| **TOTAL** | **$12,000,000** |

## Outcome Measures

Alternative Discipline Programs served 24,371 children who showed a 17.0% improvement in academic achievement and a 16.8% improvement in behavior.

Alternative Academic Programs served 20,251 children who showed a 15.3% improvement in academic achievement and a 5.7% improvement in behavior.

School within a school programs served 17,287 children who showed a 2.2% improvement in academic achievement and a 2.9% improvement in behavior.

Collaborative Programs served 22,834 children who showed a 1.6% improvement in academic achievement and a .7% improvement in behavior.

School Safety Programs served 276,930 children who showed a .6% improvement in academic achievement and a 3.4% improvement in behavior.

Other Programs served 65,436 children who showed a 1.0% improvement in academic achievement and a .4% improvement in behavior.

# Department of Education

## Detailed Expenditures

| | | BUDGETED | Spent | BALANCE |
|---|---|---|---|---|
| **MONITORING (Administration)** | | | | |
| 01 | Salaries | $ 79,936.70 | $ 79,935.80 | $ 0.90 |
| 02 | Benefits | 25,671.64 | $ 23,582.96 | 2,088.68 |
| 03 | Travel In-State | 2,682.28 | $ 2,682.28 | - |
| 05 | Repairs | | $ - | - |
| 06 | Rentals & Leases | 5,600.22 | $ 5,600.22 | - |
| 07 | Utilities | 2,243.19 | $ 2,243.19 | - |
| 08 | Professional Services | | $ - | - |
| 09 | Supplies and Materials | 185,163.30 | $ 181,051.61 | 4,111.69 |
| 14 | Equipment | 6,868.43 | $ 6,868.43 | - |
| | | | $ - | |
| | | $ 308,165.76 | $ 301,964.49 | $ 6,201.27 |
| | | | $ - | |
| **TEACHER BACKGROUND CHECKS** | | | $ - | |
| 08 | Professional Services | $ 396,770.48 | $ 395,002.53 | $ 1,767.95 |
| 09 | Supplies and Materials | 51,619.76 | $ 13,142.58 | 38,477.18 |
| | | | $ - | |
| | | $ 448,390.24 | $ 408,145.11 | $ 40,245.13 |
| | | | $ - | |
| | | | $ - | |
| 01 | Salaries | $ 267,724.50 | $ 265,742.30 | $ 1,982.20 |
| 02 | Benefits | 87,093.35 | $ 85,738.76 | 1,354.59 |
| 03 | Travel In-State | 30,752.18 | $ 9,622.48 | 21,129.70 |
| 05 | Repairs | 71,291.00 | $ 71,290.79 | 0.21 |
| 06 | Rentals & Leases | 29,372.77 | $ 27,343.11 | 2,029.66 |
| 07 | Utilities | 18,165.29 | $ 17,620.85 | 544.44 |
| 08 | Professional Services | 2,010,524.70 | $ 2,010,524.08 | 0.62 |
| 09 | Supplies and Materials | 456,973.21 | $ 434,106.84 | 22,866.37 |
| 11 | Grants and Benefits | 431,260.00 | $ 431,260.00 | - |
| 14 | Equipment | 376,593.00 | $ 376,592.57 | 0.43 |
| | | | $ - | |
| | | $ 3,779,750.00 | $ 3,729,841.78 | $ 49,908.22 |
| **LEA** | | | | |
| 11 | City/County School Systems | $ 15,621,244.00 | $ 15,560,243.00 | $ 61,001.00 |
| | | | $ - | |
| | | | $ - | |
| | **TOTALS** | $ 20,157,550.00 | $ 20,000,194.38 | $ 157,355.62 |

# Department of Education

## Detailed Expenditures

| School Systems | Alternative Programs Funds | | | | | School Safety Enhancement Funds | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Personnel/ Services | Computer Hrdwr & | Facility | Materials & Supplies | Other | School Social Worker | School Nurses | Metal Detectors | Cameras/ Surveillance | Safety Personnel | Other Security Devices |
| Albertville City | $47,489 | $18,000 | | $4,595 | | | | | | | $5,000 |
| Alexander City | $25,224 | | | | | | $21,335 | | $27,420 | | |
| Andalusia City | $36,787 | | | | | | | | | | |
| Anniston City | $56,492 | | | | | | | | | | |
| Arab City | $50,345 | $2,500 | | $3,381 | $550 | | | | | | |
| Athens City | $54,180 | | | | $1,000 | | | | $3,800 | | |
| Attalla City | $28,318 | $12,670 | | $400 | | | | | | | |
| Auburn City | $65,277 | | | $28,120 | $2,700 | | | | | | |
| Bessemer City | | | | $100 | $3,000 | | $88,064 | | | | |
| Birmingham City | $89,849 | $155,000 | | $25,000 | $9,810 | $97,469 | $145,390 | | $30,000 | | |
| Brewton City | $17,784 | | | $64 | | | $10,005 | | | | |
| Cullman City | $38,676 | $4,500 | | $4,086 | $2,500 | $4,600 | $500 | | $500 | | |
| Daleville City | $6,000 | | | $500 | $3,625 | | | | $15,000 | | $10,005 |
| Decatur City | $185,593 | | | | | | | | | | |
| Demopolis City | $21,178 | | | | $25,572 | | | | $2,500 | | |
| Dothan City | $172,465 | $2,881 | | $4,069 | $8,221 | | | | | | |
| Elba City | $14,530 | | | | $601 | | | | | | $5,600 |
| Enterprise City | $106,989 | | | $3,000 | | | | | | | |
| Eufaula City | $61,044 | | | | | | | | | | |
| Fairfield City | $34,923 | $5,000 | | $5,073 | | | | | $3,650 | | |
| Florence City | | | | | $9,472 | | $21,512 | | $20,000 | $8,001 | $30,000 |

# Department of Education

## Detailed Expenditures

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Hartselle City | $39,484 | | | | | | $24,836 | | | | |
| Homewood City | $500 | $5,000 | | $422 | | | | | | $61,550 | |
| Hoover City | $1,500 | $3,381 | | $2,500 | $3,000 | $138,743 | | | | $35,800 | $39,585 |
| Huntsville City | $88,876 | $110,948 | | $20,880 | $1,592 | | | | $245,388 | $6,166 | |
| Jacksonville City | $34,394 | | | $1,387 | | | | | | | |
| Jasper City | $3,700 | $28,200 | | $1,059 | | | | | $8,900 | $14,997 | |
| Lanett City | $8,001 | | | | | | $6,518 | | $8,000 | | |
| Leeds City | | | | | | | | | | $26,598 | |
| Linden City | $12,936 | | | | | | | | | | |
| Madison City | $15,768 | | | | | | $95,561 | | $14,700 | | $14,347 |
| Midfield City | $23,962 | | | $606 | | | | | | | |
| Mt. Brook City | $61,628 | | | | | | $23,617 | | | | |
| Muscle Shoals City | $22,260 | | | | | | $17,958 | | $11,660 | | |
| Oneonta City | | | | | | | $22,010 | | $4,196 | $800 | |
| Opelika City | $93,604 | | | | | | | | | | |
| Opp City | | | | | | | | | $13,395 | | $15,450 |
| Oxford City | | | | | | | $49,290 | | $24,210 | | $2,400 |
| Ozark City | $59,038 | | | | | | | | | | |
| Pell City | $51,014 | | | | | $24,817 | $6,978 | | | | |
| Phenix City | $97,677 | | | $8,604 | | | | | | | |
| Piedmont City | $22,481 | | | | | | | | | | |
| Roanoke City | $24,845 | | | | | | | | $5,974 | | |
| Russellville City | $45,480 | | | $3,675 | | | | | | | |
| Scottsboro City | $56,877 | | | $145 | | | | | | | |

# Department of Education

## Detailed Expenditures

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Thomasville City | $7,326 | | | | | | | | | | $27,526 |
| Troy City | $22,904 | $1,839 | | $530 | | | | | $9,112 | | $15,000 |
| Tuscaloosa City | $79,969 | | | | | | $125,801 | | | | |
| Tuscumbia City | $28,811 | | | | | | | | | | |
| Vestavia Hills City | | | | | | | $51,265 | | | $47,597 | |
| Winfield City | $2,000 | $7,310 | | | | | | | $7,500 | | $10,600 |
| Alabama School of Fine Arts | | | | | | | | | | | $7,138 |
| Total City Districts | $2,333,694 | $399,053 | | $126,333 | $77,343 | $322,601 | $714,882 | | $472,221 | $250,913 | $251,598 |
| Autauga County | $138,173 | | | $5,025 | $4,000 | | | | | $40,920 | |
| Baldwin County | $222,615 | $160,000 | | $98,178 | $10,800 | | | | | | |
| Barbour County | $6,081 | | | | | | | | $12,926 | $12,000 | |
| Bibb County | $21,943 | | | | | | | | $37,446 | | $19,000 |
| Blount County | $77,585 | | | $2,468 | | $9,404 | | | | $16,698 | |
| Bullock County | $19,887 | | | $10,000 | $2,601 | | | | $7,000 | | |
| Butler County | $28,364 | $4,200 | | $2,500 | $2,000 | | $35,352 | | $1,572 | | |
| Calhoun County | $103,267 | | | $5,910 | | | $51,895 | | $30,000 | | |
| Chambers County | $63,118 | | | | | | $6,848 | | | $21,299 | |
| Cherokee County | $86,166 | | | | | | | | | | |
| Chilton County | $65,217 | | | | | | | | $81,892 | | |
| Choctaw County | $45,852 | | | $134 | | | | | | | |
| Clarke County | $51,719 | | | $5,000 | $3,000 | | | | $12,000 | | $4,134 |
| Clay County | $22,737 | | | $1,142 | | | | | $25,000 | | |
| Cleburne County | $51,035 | | | $3,300 | | | | | $1,112 | | |
| Coffee County | $18,504 | $10,000 | | $6,295 | $1,000 | | | | | $7,000 | |

# Department of Education

## Detailed Expenditures

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Dale County | $55,782 | | | $500 | | | | | | |
| Dallas County | $75,967 | | | | | | | | $19,326 | |
| DeKalb County | $9,330 | | | | | $157,858 | | | | |
| Elmore County | $86,722 | $46,726 | | $1,822 | | $79,259 | | $7,500 | | $3,500 |
| Escambia County | $91,102 | | | $137 | | | | | $9,082 | |
| Etowah County | $102,577 | $15,000 | | | | | | | $60,757 | |
| Fayette County | $34,170 | | | | | $9,960 | | $2,000 | $10,250 | |
| Franklin County | $51,107 | | | | | $12,375 | | | | |
| Geneva County | $31,468 | | | $10,242 | | | | $5,000 | $10,000 | |
| Greene County | $36,646 | | | | | | | | | |
| Hale County | $47,698 | | | $2,048 | | $20,936 | | | | |
| Henry County | $56,609 | | | $122 | | | | | | |
| Houston County | $116,752 | | | | | | | | | $12,944 |
| Jackson County | | | | | | $129,890 | | | | |
| Jefferson County | $809,653 | | | | $4,948 | | | | | |
| Lamar County | $26,878 | | | | | | | $27,428 | | |
| Lauderdale County | $159,737 | $26,208 | | | | | | | | |
| Lawrence County | $115,267 | $1,682 | | $560 | | | | | $7,250 | |
| Lee County | $87,832 | | | | | | | $22,000 | $56,000 | $28,056 |
| Limestone County | $20,277 | $2,000 | | $4,188 | $3,450 | $118,001 | | $20,000 | | |
| Lowndes County | $51,528 | | | $2,268 | $500 | | | | | |
| Macon County | $69,629 | | | $1,791 | | $11,428 | | | | |
| Madison County | $254,032 | | | | | | | $94,562 | | |
| Marengo County | $17,121 | | | | $3,000 | | $2,000 | $13,840 | | |

# Department of Education

## Detailed Expenditures

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Perry County | $28,029 | | | $17,725 | | | | | | | |
| Pickens County | | | | $367 | | | $70,446 | | | | |
| Pike County | | | | | $500 | | $31,209 | | $9,949 | | $3,000 |
| Randolph County | $24,706 | | | | | | $20,594 | | $3,000 | | |
| Russell County | $63,750 | $5,450 | | $9,000 | | | | | | | |
| St. Clair County | $84,100 | $10,000 | | $5,872 | | $44,582 | | | $5,386 | | |
| Shelby County | $134,594 | $31,891 | | | | | | | $186,346 | | $104,036 |
| Sumter County | $28,034 | $2,000 | | $3,050 | $2,418 | | | $4,500 | $11,500 | $2,292 | $2,500 |
| Talladega County | $85,955 | | | | | $66,746 | $10,512 | | | | |
| Tallapoosa County | $60,193 | | | $2,410 | | | $8,386 | | | | |
| Tuscaloosa County | | | | | | | $329,808 | | | | $4,655 |
| Walker County | $91,932 | $18,000 | | $9,751 | $1,500 | | $23,530 | | | $25,052 | |
| Washington County | | | | $4,064 | | | $71,224 | | | | |
| Wilcox County | | | | | | | $28,755 | | $4,151 | $18,820 | |
| Winston County | $58,084 | | | $584 | $566 | | | | | | |
| Total County Districts | $6,576,252 | $367,557 | | $239,812 | $128,435 | $225,974 | $1,303,594 | $6,500 | $696,522 | $374,746 | $235,750 |
| Total All Districts | $8,909,946 | $766,610 | | $366,145 | $205,778 | $548,575 | $2,018,476 | $6,500 | $1,168,743 | $625,659 | $487,348 |

# Department of Forensic Sciences

## Long Term Outcomes

1. Provide adequate death investigation services to determine cause and manner of death in children.
2. Out-sourcing of toxicology cases to reduce child death investigation delays and other cases where children are impacted and other professional services.
3. Education of resident physicians and investigators regarding fatal child death issues.
4. Provide funding for expert testimony in court cases involving forensic findings in criminal investigations and child death training.
5. Fund purchase of vans for transport of bodies.
6. Purchase equipment for conducting autopsies.

## FY 2004 Fiscal Status

| | |
|---|---|
| **FY03 Balance** | **$1,134,647** |
| **FY04 Receipts** | **$ 530,690** |
| **FY04 Budget** | **$ 750,000** |
| **FY04 Expended** | **$ 688,013** |
| **FY04 Balance** | **$ 977,325** |

## Contact Information

F. Taylor Noggle, Jr.
P. O. Box 3510
Auburn, Alabama 36831
334-821-6254 ext. 230
taylor.noggle@adfs.alabama.gov

## Accomplishments

1. During FY 2004 ADFS utilized $136,153 for the "out-sourcing" of toxicology cases to a private vendor for analysis. This $136,153 along with approximately $125,000 in General Fund revenues allowed for the completion of 1,034 full panels and 151 special tests for drugs and poisons. This "out-sourcing" reduced the toxicology backlog of unworked cases by 178. Without the Children Trust Fund revenues toxicology backlogs would continue to increase and reports vital for prosecutions and death certificates would have been delayed.
2. Training vital to child death investigations was received by two forensic pathologists. The two forensic pathologists attended the Seventh Annual Pediatric Forensic Issues dealing with Pathology, Diagnosis, Imaging and Investigation of child deaths held in Orlando, Florida. Seven medical examiners were able to attend all or part of the National Association of Medical Examiners Meeting held in Nashville, TN. Two medical examiners attended the American Academy of Forensic Sciences meeting in Dallas, TX. In addition, several investigators attended death investigation seminars that improved their abilities in all aspects of death investigation and child death investigation.
3. The salaries of two pathologists and two investigators were paid with Children First Trust Fund revenues. One of the pathologists was hired during FY 2004 using these funds. There is simply no way to predict how many children's lives are impacted by investigations conducted by the Alabama Department of Forensic Sciences (ADFS). ADFS conducts autopsies of children to determine cause and manner of death. Autopsies of adults to determine cause and manner of death impact children's lives in obtaining insurance benefits and settlement of estates that will impact the child's future. Rape of juveniles is becoming a serious crime and ADFS is involved in the DNA analysis of evidence derived from suspected rapes (approximately 50 cases). Controlled substances confiscated from juvenile offenders are analyzed by ADFS (approximately 1500 cases). ADFS is involved in the scene investigation and analysis of illicitly manufactured methamphetamine. Many children have been found to live in the rooms where this drug is being manufactured. ADFS participates in Child Death Team reviews conducted in the judicial circuits of the state contributing to solutions to reduce child death.
4. Utilizing Children First Trust Fund revenues the ADFS was able to purchase four new vans used in the transport of bodies from across Alabama. These vans were the first new vehicles purchased for body transport since 1992. The vehicles replaced vehicles which were in excess of 200,000 miles.

## FY2004 Expenditures

| | |
|---|---|
| 1. Employee Salaries and Benefits | $ 492,374.00 |
| 2. Toxicology Services | $ 136,153.00 |
| 3. Training of Physicians and Investigators | $ 13,099.00 |
| 4. Expert Testimony | $ 90.00 |
| 5. Vehicle Purchase | $ 44,957.00 |
| 6. Autopsy Equipment | $ 1,340.00 |
| **TOTAL** | **$ 688,013.00** |

## FY 2005 Plan

| | |
|---|---|
| 1. Employee Salaries and Benefits | $ 532,456 |
| 2. Toxicology Services | $ 128,290 |
| 3. Training of Physicians and Investigators | $ 57,000 |
| 4. Expert Testimony | $ 10,000 |
| 5. Vehicle Purchase | $ 40,000 |
| 6. Autopsy Equipment | $ 10,000 |
| 7. Autopsy Supplies | $ 22,254 |
| 8. Grant to Child Death Review Team | $ 50,000 |
| **TOTAL** | **$ 850,000** |

## Outcome Measures

75 Child Deaths Investigated

90 Child Autopsies Performed

1184 out-sourced toxicology cases involving children under 19

23 employees attended child death conferences (pediatric forensic issues, NAME, AAFS, etc.)

173 Appearances in court to render expert testimony in criminal proceedings

4 vehicles purchased

23 children transported by purchased vans

# Department of Forensic Sciences

## Detailed Expenditures

| | Vendor | Sub-Total Amount | Grand Total |
|---|---|---|---|
| Salaries & Benefits | | | $492,374 |
| Toxicology Services | National Medical Services | 1,264 | |
| | " " | 5,669 | |
| | " " | 2,250 | |
| | " " | 667 | |
| | " " | 984 | |
| | " " | 19,437 | |
| | " " | 1,486 | |
| | " " | 7,603 | |
| | " " | 40,600 | |
| | " " | 1,199 | |
| | " " | 54,719 | |
| | | | 135,878 |
| Training | Mathew Dyer - Public Agency Training | 275 | |
| | Leszek Chrostowski | 1,059 | |
| | Leszek Chrostowski - reimbursement for Forensic Pediatrics Conference registration fee | 725 | |
| | Gerald Howard | 333 | |
| | Gerald Howard - reimbursement for Scerarios of Death Investigation Seminar | 249 | |
| | Stephen Boudreau | 1,388 | |
| | *Stephen Boudreau - reimbursement for* Basic Forensic Pathology course. | 950 | |
| | James Sparrow | 733 | |
| | James Sparrow - reimbursement for Medical Death Investigation Seminar | 275 | |
| | Marie Herrmann | 1,729 | |
| | Marie Herrmann - reimbursement for National Association of Medical Examiners Conference | 580 | |
| | Mark Day | 550 | |
| | Mark Day - reimbursement for Investigation of Crimes Seminar. | 250 | |
| | Marie Herrmann | 90 | |
| | Marie Herrmann | 510 | |
| | Marie Herrmann - reimbursement for National Association of Medical Examiners Conference | 60 | |
| | Johnny Glenn | 1,500 | |
| | Johnny Glenn - reimbursement for New England Forensic Science Seminar | 495 | |
| | Marie Herrmann - reimbursement for Alabama | 200 | |
| | Cornors Association Seminar (Reference JV # 40480000033) | 75 | |
| | Marie Herrmann - reimbursement for Alabama | 200 | |
| | State Association of Forensic Scientists | | |
| | Donna Weaver - Departmental training | 300 | |
| | Peter Macchia - Departmental training | 30 | |
| | Donna Weaver - Departmental training | 100 | |
| | William Jones - Departmental training | 100 | |
| | Adam Craig - Departmental training | 100 | |
| | Scott Milroy - Departmental training | 15 | |
| | | | 12,871 |
| Expert Testimony | Vaughn Barron | 8 | |
| | Deborah Dodd | 100 | |
| | Deborah Dodd | 100 | |
| | Vaughn Barron | 22 | |
| | Song Wong | 101 | |
| | *Stephen Boudreau* | 15 | |
| | Johnny Glenn | 200 | |
| | Song Wong (reference Jv # 40480000033) | 47 | |
| | | | 593 |
| Vehicle Purchase & Tr | Mike Patton Ford Inc. (4 F-250 Vans) | | 44,957 |
| Autospy Equipment & | Technology America (1 Laserjet printer) | | 1,340 |
| Grand Total Expenditures | | | $688,013 |

# Department of Human Resources

## Long Term Outcomes

1. To enable children placed in out of home care to live in community based therapeutic foster family homes to meet complex emotional needs.

2. To provide for increased support and compensation to foster family homes in order to provide adequate services to children.

3. To provide direct services to sexually abused children.

## FY 2004 Fiscal Status

| | |
|---|---|
| **FY03 Balance** | **$13,460,452** |
| **FY04 Receipts** | **$10,613,807** |
| **FY04 Budget** | **$14,540,694** |
| **FY04 Expended** | **$14,540,694** |
| **FY04 Balance** | **$ 9,533,565** |

## Contact Information

Margaret Bonham
50 Ripley Street
Montgomery, AL 36130
(334) 242-9502
mbonham@dhr.state.al.us

## Accomplishments

Due to the availability of CFTF's the Department has increased its capacity to serve children in need of therapeutic care. The Department continues to observe children who are coming into care that have issues that require specialized care and services. With CFTF's support, the Department has greater capacity to meet those needs and use the funds to maximize federal revenues. The Department works towards the goal of children remaining in their own home if at all possible. When that is not possible due to safety issues, these funds are critical to their receiving quality out of home care until permanent plans can be made for them. The support from CFTF has allowed children in all areas of the state to receive therapeutic services in the least restrictive environment possible, which is provided through the therapeutic foster home network, in their own home counties or in close proximity to their families. This has allowed children to maintain those important connections to promote healthy self-identity.

The Department of Human Resources further enables the State's network of Child Advocacy Centers to address the trauma that child victims of abuse and neglect experience by offering a range of specialized services and support to these youngsters and their families.

## FY2004 Expenditures

| | |
|---|---|
| 1. Therapeutic Foster Care | $ 9,700,094.00 |
| 2. Foster Care Board Payments | $ 4,000,000.00 |
| 3. Children's Advocacy Center | $ 840,600.00 |
| **TOTAL** | **$14,540,694.00** |

## FY 2005 Plan

| | |
|---|---|
| 1. Therapeutic Foster Care | $ 7,500,000 |
| 2. Foster Care Board Payments | $ 4,000,000 |
| 3. Children's Advocacy Center | $ 870,600 |
| **TOTAL** | **$12,370,600** |

## Outcome Measures

1,438 TFC Homes
1,229 Children Served in TFC Homes
90 Children in TFC transferred to less restrictive environment
69 Children in TFC transferred to more restrictive environment

2,400 Foster Homes
2,767 Children Served in Foster Care

2 Children's Advocacy Center Network Meetings Held
1,273 Forensic Interviews Performed
174 Forensic Assessments Performed
526 Counseling Sessions Performed

# Department of Human Resources

## Detailed Expenditures

| Therapeutic Foster Care | | |
|---|---|---|
| Camellia Therapeutic Foster | $ | 286,445.00 |
| Christian Services | $ | 232,106.00 |
| Families in Transition Homes | $ | 56,876.00 |
| Families in Transitional Homes | $ | 202,901.00 |
| Family Values Networks Inc. | $ | 3,658.00 |
| Gateway | $ | 253,890.00 |
| Glenwood MHS Inc. | $ | 2,285.10 |
| Lee County Youth Development Inc. | $ | 200,954.00 |
| Seraaj Family Homes Inc. | $ | 2,464,371.00 |
| Southeastern Psychiatric Mang | $ | 48,684.00 |
| Specialized Alternatives For | $ | 464,094.00 |
| Therapeutic Programs Inc. | $ | 4,930,453.90 |
| United Methodist Childrens Home | $ | 398,545.00 |
| University of Alabama Tuscaloosa | $ | 147,810.00 |
| Wilmer Hall Children's Home | $ | 7,021.00 |
| | $ | 9,700,094.00 |

# Juvenile Probation Services (AOC)

## Long Term Outcomes

1. Provide and administer juvenile probation services for children referred to the juvenile courts of the 62 counties in which these services became a state function on October 1, 2000.

2. Subsidize the base annual salary of one county juvenile probation officer per 15,000 population or fraction thereof (2000 Census) at the annual rate of $22,000 or one-half the base salary, whichever is greater, in the five counties in which juvenile probation services remains a county function.

## FY 2004 Fiscal Status

| | |
|---|---|
| **FY03 Balance** | **$5,135,891** |
| **FY04 Receipts** | **$5,306,903** |
| **FY04 Budget** | **$9,958,168** |
| **FY04 Expended** | **$9,010,720** |
| **FY04 Balance** | **$1,432,074** |

## Contact Information

Tom Monroe, Juvenile Services Manager
300 Dexter Avenue
Montgomery, AL 36104
(334) 353-5107
tom.monroe@alacourt.state.al.us

## Accomplishments

## FY2004 Expenditures

| | |
|---|---|
| 1. State Juvenile Probation Services | $ 7,070,582.90 |
| 2. County Juvenile Probation Officers | $ 1,940,137.24 |
| **TOTAL** | **$ 9,010,720.14** |

## FY 2005 Plan

| | |
|---|---|
| 1. State Juvenile Probation Services | $ 4,062,066 |
| 2. County Juvenile Probation Officers | $ 500,000 |
| **TOTAL** | **$ 4,562,066** |

## Outcome Measures

229 juvenile probation officer positions in the 62 counties serving 18,463 children

68 support personnel positions for juvenile probation officers in the 62 counties

6 of administrative personnel at the Administrative Office of Courts

45 JPO positions in Jefferson County serving 2,589 children

16 JPO positions in Madison County serving 1,520 children

15 JPO positions in Montgomery County serving 1,872 children

7 JPO positions in Morgan County serving 819 children

10 JPO positions in Shelby County serving 234 children

# Juvenile Probation Services (AOC)

## Detailed Expenditures

| Expense Category | Object Code | Annual Amount Budgeted | Total Commitments To Date |
|---|---|---|---|
| State Juvenile Probation Services | 01 Personnel Costs | $ 5,577,788.00 | $ 5,285,771.72 |
| | 02 Employee Benfits | $ 1,556,760.00 | $ 1,533,829.00 |
| | 03 Travel-In-State | $ 100,000.00 | $ 77,384.72 |
| | 04 Travel-Out-State | $ 20,000.00 | $ - |
| | 05 Repairs/Maint. | $ 15,000.00 | $ 65.00 |
| | 06 Rentals/Leases | $ 47,000.00 | $ 43,984.91 |
| | 07 Utilities/Comm. | $ 55,000.00 | $ 60,859.16 |
| | 08 Professional Svcs. | $ 10,000.00 | $ 225.15 |
| | 09 Supplies, Etc. | $ 100,000.00 | $ 45,705.03 |
| | 10 Trans.Equip. Oper. | $ 10,000.00 | $ 22.68 |
| | 14 Other Equip. Pur. | $ 100,000.00 | $ 22,735.53 |
| County Juvenile Probation Officers | 11 Grants & Benefits | $ 1,951,649.00 | $ 1,940,137.24 |
| Total | | $ 9,543,197.00 | $ 9,010,720.14 |

# Alabama Medicaid Agency

## Long Term Outcomes

1. Provide medical care to uninsured children.

## Accomplishments

1. Number of immunizations reimbursed in FY '04 for Medicaid recipients age 0-20: 131,230
2. Expanded school-based services in FY'04 such that this year 15,891 recipients received services, an increase from the 12,828 recipients in FY '03.
3. Continued improved access to dental care. Only 65,088 recipients under 21 years of age received preventive dental services in 1998. By 2004, 146,957 children under 21 received this care.

## FY 2004 Fiscal Status

| | |
|---|---|
| **FY03 Balance** | **$3,055,079** |
| **FY04 Receipts** | **$1,857,416** |
| **FY04 Budget** | **$4,912,495** |
| **FY04 Expended** | **$ 585,009** |
| **FY04 Balance** | **$4,327,486** |

## FY2004 Expenditures

| | |
|---|---|
| 1. Physician, Pharmacy, EPSDT, etc. | $ 585,009.00 |
| **TOTAL** | **$ 585,009.00** |

## FY 2005 Plan

| | |
|---|---|
| 1. Reimburse for Well Child Check-Ups | $ 2,165,000 |
| **TOTAL** | **$ 2,165,000** |

## Outcome Measures

131,230 Immunizations provided by Medicaid

185,237 EPSDT Screenings Provided by Medicaid

146,957 Dental Screenings provided by Medicaid

## Contact Information

Mike Lewis
501 Dexter Avenue
Montgomery AL 36103
(334) 242- 5942
mlewis@medicaid.state.al.us

# Department of Mental Health / Mental Retardation

## Long Term Outcomes

1. Provide expanded Community Based and Crisis services across the Mental Health Service System to children and adolescents that have multiple agency involvement and cross DMH/MR Divisional responsibilities.
2. Provide for expansion of services for children with Mental Retardation who need In-Home services, Service Coordination and crisis stabilization/ transition services.
3. Provide services to expand the Continuum of Care for children and adolescents with Serious Emotional Disturbances.
4. Expansion of Intensive Outpatient programs for adolescents with substance abuse issues.

## FY 2004 Fiscal Status

| | |
|---|---|
| **FY03 Balance** | **$5,646,625** |
| **FY04 Receipts** | **$2,653,452** |
| **FY04 Budget** | **$5,004,659** |
| **FY04 Expended** | **$2,781,946** |
| **FY04 Balance** | **$5,518,130** |

## Contact Information

Steven Lafreniere, Director
Children's Services Office
100 N. Union Street, P.O. Box 301410
Montgomery, AL 36130-1410
(334) 353-7110
Steven.Lafreniere@mh.alabama.gov

## Accomplishments

1. The Department was pleased to increase expenditures over last year by approximately one million dollars (58%), which in turn increased the number of children and families severed from 3,101 in FY03 to 4,559 in FY04. This represents an increase of 31% in the number of children and families served with Children First Funds by this department. This success is due in part to the contract providers' ability to leverage these funds and draw down payments from third party providers (i.e. Medicaid, ALLkids, etc.) to offset their costs; and maturity and stability of programs that were established in previous years with Children First dollars.
2. In 2004 the Juvenile Court Liaison Program was recognized as one of eight (8) programs nationally by the National Center for Mental Health and Juvenile Justice as a "Promising Practice" for creatively addressing the needs of children and families with mental health needs who are involved with the juvenile justice system. DMH/MR Children First dollars fund twenty two (22) positions across the state.
3. Although much of the expansion activities occurred late in the fiscal year, the department was able to issue Requests for Proposals (RFPs) for new services (crisis residential, substance abuse treatment/ intervention) and expand current contracts for existing services for children and adolescents. All service development is a function of the department's planning process that occurs in each service division and through the department's Plan of Investment. Children First Funds enable the department to enhance the continuums of care in each service division.

## FY2004 Expenditures

| | |
|---|---|
| Mental Health Juvenile Court Liaisons | $585,677 |
| Multiple Needs Children | $349,000 |
| Our Kids Projects | $678,788 |
| Contracted community services and inpatient crisis services for children and adolescents who have dual diagnosis | $65,073 |
| DMH/MR Office of Children's Services (Administration) | $110,085 |
| Community contracted Crisis Stabilization/ In Home Services | $468,276 |
| Community contracted Service Coordination | $23,280 |
| Community contracted In Home Services | $124,992 |
| Expansion of In Home Services | $50,000 |
| Expand Case Management Services | $25,000 |
| State Match for Federal System of Care Grants to collaborate and expand services to children. | $100,000 |
| Expand FIND Teams (In-Home Intervention) | $90,000 |
| Existing Community Contracts for Adolescent Intensive Outpatient Substance Abuse Programs. ( 4 Programs) | $111,775 |
| **TOTAL** | **$ 2,781,946** |

## FY 2005 Plan

| | |
|---|---|
| Mental Health Juvenile Court Liaisons | $770,000 |
| Multiple Needs Children | $349,000 |
| Our Kids Projects | $ 77,042 |
| DMH/MR Office of Children's Services (Administration) | $132,756 |
| Short-Term Crisis Stab. serv for children w/MR and beh. problems. | $397,141 |
| In-Home Interv. Serv. Dually Diag. children in Jefferson County. | $ 90,000 |
| Crisis Stabilization/ In Home Services for Dually Diagnosed (MI/MR) | $468,276 |
| Expand Service Coordination/ Case Management | $173,543 |
| Expand Crisis Services/ Diversion/ Transition services | $333,028 |
| Expansion of In Home Services/ Respite Services | $200,000 |
| Expand Case Management Services | $225,000 |
| Respite Care Services | $ 98,000 |
| Sustain JCCP System of Care Project | $100,000 |
| Expand FIND Teams (In-Home Intervention) | $270,000 |
| Adolescent Intensive Outpatient Services | $250,000 |
| Expansion of Substance Abuse Services (RFP) | $443,543 |
| **TOTAL** | **$4,377,329** |

## Outcome Measures

- 2,053 children served by Mental Health Juvenile Court Liaisons
- 104 Multiple Needs children served
- 1,466 children served through Our Kids Projects
- 93 Dually Diagnosed children served through contracted community services
- 51 children served through crisis stabilization / in home services
- 25 children served through contracted service coordination
- 3 children served through intensive in home wrap around services
- 100% of children maintained in home through intensive in home wrap around serv.
- 108 children served through planned respite care
- 11 children served through expanded case management in 7 counties
- 444 children served through expanded service in Jefferson County
- 7 children served through expanded FIND Teams
- 181 children served Adolescent Intensive Outpatient Substance Abuse Treatment

**4,546 total children served**

# Department of Mental Health / Mental Retardation

## Detailed Expenditures

| EXPENDITURES: | | AMOUNT |
|---|---|---|
| **Administrative Cost:** | | 110,084.65 |
| One Professional and one clerical staff to administer and monitor funds and programs | | |
| **Juvenile Court Liaison Projects:** | | |
| Master's-level therapist working with the Juvenile courts to provide mental Health services and consultation for children/ adolescents coming to the attention of the court with mental health needs. | | |
| **Activity Payee** | **County Served** | |
| Baldwin Co.MH Center | (Baldwin) | 28,156.01 |
| Cahaba MHC | (Dallas, Wilcox, Perry) | 35,000.00 |
| Calhoun Cleburne MHC | (Calhoun,Cleburne) | 8,205.76 |
| Cheaha MHC | (Clay, Randolph, Talledega) | 30,875.18 |
| Chilton Shelby MHC | (Chilton, Shelby) | 35,000.00 |
| Cullman Area MHA | (Cullman) | 31,234.50 |
| East Alabama | (Lee, Tallapoosa, Chambers, Russell) | 35,000.00 |
| East Central MHC | (Pike, Macon, Bullock) | 13,372.79 |
| Etowah-Dekalb-Cherokee MHB | (Etowah, Dekalb, Cherokee) | 28,440.30 |
| Greater Mobile/Wash. Co MHB | (Mobile, Washington) | 35,000.00 |
| Indian Rivers | (Tuscaloosa, Bibb, Pickens) | 31,854.97 |
| Jefferson Blount St. Clair MHA | (Jefferson, Blount, St. Clair) | 35,000.00 |
| Madison County MHC | (Madison) | 35,000.00 |
| Marshall Jackson MHB | (Marshall, Jackson) | 35,000.00 |
| Montgomery Area MHA | (Montgomery, Elmore, Lowndes, Autauga) | 35,000.00 |
| North Central AL MHC | (Morgan. Limestone, Lawrence) | 35,000.00 |
| Northwest AL MHC | (Walker, Lamar, Marion, Winston, Fayette) | 23,174.66 |
| Riverbend Center for MH | (Lauderdale, Colbert, Franklin) | 19,321.69 |
| South Central MHB | (Covington, Crenshaw, Butler, Coffee) | 0.00 |
| Southwest AL MHC | (Monroe, Clark, Conecuh, Escambia) | 19,462.01 |
| West AL MMC | (Marengo, Sumter, Choctaw, Greene, Hale) | 15,598.73 |
| Wiregrass MHB | (Houston, Dale, Henry, Geneva, Barbour) | 20,980.29 |

# Department of Mental Health / Mental Retardation

## Detailed Expenditures

**OUR Kids Projects:**

OUR Kids projects represent a collaborative initiative with DHR and DYS to serve youth in their community and avoid their commitment to a state agency or need for services away from their communities. Cost for these services are shared between DMH/MR, DHR, and DYS.

| Activity Payee | Counties Served | Amount |
|---|---|---|
| Baldwin County MHC | (Baldwin) | 69,112.62 |
| East Alabama MHC (2 projects) | (Lee, Tallapoosa, Chambers, Russell) | 61,350.06 |
| Cahaba MHC | (Dallas, Wilcox, Perry, Marengo, Sumter, Choctaw, Greene, Hale) | 35,269.66 |
| Jefferson Blount St. Clair MHA (2 Projects) | (Jefferson, Blount, St. Clair) | 69,332.58 |
| Marshall Jackson MHB | (Marshall, Jackson) | 12,403.44 |
| North Central AL MHC | (Morgan. Limestone, Lawrence) | 61,242.08 |
| Greater Mobile/Wash. Co MHB | (Mobile) | 84,327.39 |
| Indian Rivers MHC | (Tuscaloosa) | 68,265.75 |
| Cullman Area MHA | (Cullman) | 8,874.61 |
| Montgomery Area MHA | (Elmore, Autauga) | 28,295.73 |
| East Central MHC | (Pike, Macon, Bullock) | 54,192.32 |
| Southeastern Psych. Mang. | (Etowah, Dekalb, Cherokee) | 71,265.51 |
| Shared Services Carryover for FY05 | | 54,856.36 |

**Multiple Needs Children**

DMH/MR uses a portion of Children First funds to support children identified as Multiple Needs through the Multiple Needs Child Office. These funds help serve children statewide through a variety of services. 349,000.00

**Counties Served:** Statewide

Glenwood Mental Health Service 468,276.00

Crisis respite care and in-home type services provided to children/ adolescents and their families who have emotional Disturbances and mental retardation related issues. Respite can be access statewide.

**Counties Served:** Jefferson County and Statewide

Regional 310 Authority

Specialized Case Management for children transitioning to/from residential care. 23,280.00

**Counties Served:** Etowah

# Department of Mental Health / Mental Retardation

## Detailed Expenditures

**Division of Mental Retardation**

Jefferson County MR/DD Jefferson — 91,964.29

Intense in home services to prevent institutionalization of 2 children with developmental disabilities and multiple health care needs

**Counties Served:** Jefferson

MR/DD Board of Mobile — 33,027.96

Intense in home services to prevent institutionalization of a child with developmental disabilities and multiple health care needs

**Counties Served:** Mobile

ARC of Alabama — 50,000.00

Respite Care Services for children/ adolescents with developmental disabilities

**Counties Served:** Statewide

**Division of Mental Illness**

Jefferson-Blount-St.Clair MHA

Federal Match for Child Services Initiative Grant — 99,999.97

**Counties Served:** Jefferson

Montgomery Area Mental Health Authority

Child/ Adolescent Case Management — 12,500.00

**Counties Served:** Montgomery, Autauga, Elmore, Lowndes

Riverbend MHC

Child and Adolescent In-Home Intervention Team — 45,000.00

**Counties Served:** Lauderdale, Colbert, Franklin

South Central AL MHC

Child and Adolescent In-Home Intervention Team — 45,000.00

**Counties Served:** Covington, Crenshaw, Butler, Coffee

Indian Rivers MHC

# Department of Mental Health / Mental Retardation

## Detailed Expenditures

**Division of Substance Abuse**

| | | |
|---|---|---|
| Cheaha MHC | | 18,990.00 |
| | Substance abuse treatment services for adolescents. | |
| | **Counties Served:** Clay, Randolph, Talledega | |
| Greater Mobile | | 82,203.50 |
| | Substance abuse treatment services for adolescents. | |
| | **Counties Served:** Mobile, Washington | |
| Southwest AL MHC | | 10,581.00 |
| | Substance abuse treatment services for adolescents. | |
| | **Counties Served:** Monroe, Clark, Conecuh, Escambia | |
| West AL MMC | (contract terminated in FY04) | 0.00 |
| | Substance abuse treatment services for adolescents. | |
| | **Counties Served:** Marengo, Sumter, Choctaw, Greene, Hale | |
| | **TOTAL** | **2,781,945.85** |

# Multiple Needs Child Office

## Long Term Outcomes

1. Provide services to children identified as Multiple Needs Children at the State level.

2. Provide services to children identified as Multiple Needs Children at the County level.

3. Provide technical assistance to County Children's Services Facilitation Teams to enhance services to Multiple Needs Children. Additional services to include quality assurance and accounting oversight of funds.

## FY 2004 Fiscal Status

| | |
|---|---|
| **FY03 Balance** | **$5,415,330** |
| **FY04 Receipts** | **$2,653,452** |
| **FY04 Budget** | **$3,000,000** |
| **FY04 Expended** | **$2,823,968** |
| **FY04 Balance** | **$5,244,514** |

## Contact Information

Donna Glass, Director
201 Monroe Street, Suite 1670
Montgomery, AL 36130
(334) 223-0744
Donna.Glass@mnc.alabama.gov

## Accomplishments

The Alabama Children's Services Facilitation Team (ACSFT) is charged with the responsibility to serve children identified as Multiple Needs Children (MNC). These children are defined as children at risk of out-of-home placement or placement in a more restrictive environment whose needs require the services of two or more of the following entities: Department of Education, Department of Human Resources, Department of Mental Health/Mental Retardation, Department of Public Health, and Department of Youth Service. These children's needs are often multifaceted and require intensive collaborative efforts and service coordination from the child care agencies.

The Alabama Children's Services Facilitation Team utilized $1,448,968.33 of Children First funds to provide services to 117 multiple needs children representing 46 counties. These children participated in an array of services including wrap-around, crisis intervention, and residential.

The County Children's Services Facilitation Teams received Children First funds based on the current Federal Census child population data for each county totaling $1.375 million. The County Children's Services Facilitation Teams participated in 3614 staffings on the local level.

## FY2004 Expenditures

| | |
|---|---|
| 1. State Multiple Needs Team | $ 1,448,968.33 |
| 2. County Multiple Needs Teams | $ 1,375,000.00 |
| **TOTAL** | $ 2,823,968.33 |

## FY 2005 Plan

| | |
|---|---|
| 1. State Multiple Needs Team | $ 1,475,000 |
| 2. County Multiple Needs Teams | $ 1,375,000 |
| 3. Administration | $ 150,000 |
| **TOTAL** | $ 3,000,000 |

## Outcome Measures

Provided funding for 117 children identified as Multiple Needs Children through the state team.

ACSFT staffed 435 referrals submitted by the County Children's. Services Facilitation Teams

MNC Office provided technical assistance to County Children's Services Facilitation Teams

Developed and implemented monthly County Children Services Facilitation Team reporting procedures.

The MNC participated in funding an array of services including wrap-around, crisis intervention, and residential.

# Multiple Needs Child Office

## Detailed Expenditures

### County Team Distributions

| COUNTY | Total Population | Under 18 | Percent Children | FY 04 |
|---|---|---|---|---|
| AUTAUGA | 43,671 | 12,494 | 1.11% | $ 15,292.75 |
| BALDWIN | 140,415 | 34,320 | 3.06% | $ 42,006.25 |
| BARBOUR | 29,038 | 7,383 | 0.66% | $ 9,036.50 |
| BIBB | 20,826 | 5,286 | 0.47% | $ 6,469.38 |
| BLOUNT | 51,024 | 12,948 | 1.15% | $ 15,848.25 |
| BULLOCK | 11,714 | 3,058 | 0.27% | $ 3,742.75 |
| BUTLER | 21,399 | 5,754 | 0.51% | $ 7,042.75 |
| CALHOUN | 112,249 | 26,456 | 2.36% | $ 32,381.25 |
| CHAMBERS | 36,583 | 9,017 | 0.80% | $ 11,037.13 |
| CHEROKEE | 23,988 | 5,320 | 0.47% | $ 6,512.00 |
| CHILTON | 39,593 | 10,165 | 0.90% | $ 12,441.00 |
| CHOCTAW | 15,922 | 4,148 | 0.37% | $ 5,076.50 |
| CLARKE | 27,867 | 7,811 | 0.70% | $ 9,560.38 |
| CLAY | 14,254 | 3,397 | 0.30% | $ 4,158.00 |
| CLEBURNE | 14,123 | 3,435 | 0.31% | $ 4,204.75 |
| COFFEE | 43,615 | 10,806 | 0.96% | $ 13,226.13 |
| COLBERT | 54,984 | 13,077 | 1.16% | $ 16,006.38 |
| CONECUH | 14,089 | 3,648 | 0.32% | $ 4,464.63 |
| COOSA | 12,202 | 2,891 | 0.26% | $ 3,537.88 |
| COVINGTON | 37,631 | 8,860 | 0.79% | $ 10,844.63 |
| CRENSHAW | 13,665 | 3,372 | 0.30% | $ 4,127.75 |
| CULLMAN | 77,483 | 18,790 | 1.67% | $ 22,998.25 |
| DALE | 49,129 | 13,047 | 1.16% | $ 15,969.25 |
| DALLAS | 46,365 | 13,253 | 1.18% | $ 16,220.88 |
| DEKALB | 64,452 | 15,899 | 1.42% | $ 19,460.38 |
| ELMORE | 65,874 | 16,924 | 1.51% | $ 20,714.38 |
| ESCAMBIA | 38,440 | 9,270 | 0.83% | $ 11,346.50 |
| ETOWAH | 103,459 | 24,654 | 2.19% | $ 30,175.75 |
| FAYETTE | 18,495 | 4,424 | 0.39% | $ 5,414.75 |
| FRANKLIN | 31,223 | 7,645 | 0.68% | $ 9,356.88 |
| GENEVA | 25,764 | 6,183 | 0.55% | $ 7,568.00 |
| GREENE | 9,974 | 2,911 | 0.26% | $ 3,562.63 |
| HALE | 17,185 | 5,087 | 0.45% | $ 6,226.00 |
| HENRY | 16,310 | 3,925 | 0.35% | $ 4,804.25 |

| COUNTY | Total Population | Under 18 | Percent Children | FY 04 |
|---|---|---|---|---|
| HOUSTON | 88,787 | 22,986 | 2.05% | $ 28,133.88 |
| JACKSON | 53,926 | 13,036 | 1.16% | $ 15,955.50 |
| JEFFERSON | 662,047 | 164,240 | 14.62% | $ 201,025.00 |
| LAMAR | 15,904 | 3,750 | 0.33% | $ 4,589.75 |
| LAUDERDALE | 87,966 | 20,267 | 1.80% | $ 24,806.38 |
| LAWRENCE | 34,803 | 8,940 | 0.80% | $ 10,942.25 |
| LEE | 115,092 | 26,772 | 2.38% | $ 32,767.63 |
| LIMESTONE | 65,676 | 16,341 | 1.45% | $ 20,000.75 |
| LOWNDES | 13,473 | 4,068 | 0.36% | $ 4,978.88 |
| MACON | 24,105 | 6,081 | 0.54% | $ 7,442.88 |
| MADISON | 276,700 | 70,787 | 6.30% | $ 86,641.50 |
| MARENGO | 22,539 | 6,422 | 0.57% | $ 7,860.88 |
| MARION | 31,214 | 7,038 | 0.63% | $ 8,614.38 |
| MARSHALL | 82,231 | 20,437 | 1.82% | $ 25,014.00 |
| MOBILE | 399,843 | 109,881 | 9.78% | $ 134,491.50 |
| MONROE | 24,324 | 6,883 | 0.61% | $ 8,424.63 |
| MONTGOMERY | 223,510 | 57,646 | 5.13% | $ 70,556.75 |
| MORGAN | 111,064 | 28,144 | 2.51% | $ 34,447.88 |
| PERRY | 11,861 | 3,537 | 0.31% | $ 4,329.88 |
| PICKENS | 20,949 | 5,711 | 0.51% | $ 6,990.50 |
| PIKE | 29,605 | 7,211 | 0.64% | $ 8,826.13 |
| RANDOLPH | 22,380 | 5,620 | 0.50% | $ 6,879.13 |
| RUSSELL | 49,756 | 13,194 | 1.17% | $ 16,149.38 |
| ST. CLAIR | 64,742 | 16,417 | 1.46% | $ 20,094.25 |
| SHELBY | 143,293 | 37,620 | 3.35% | $ 46,046.00 |
| SUMTER | 14,798 | 4,305 | 0.38% | $ 5,269.00 |
| TALLADEGA | 80,321 | 20,066 | 1.79% | $ 24,560.25 |
| TALLAPOOSA | 41,475 | 10,037 | 0.89% | $ 12,285.63 |
| TUSCALOOSA | 164,875 | 38,543 | 3.43% | $ 47,174.88 |
| WALKER | 70,713 | 16,636 | 1.48% | $ 20,362.38 |
| WASHINGTON | 18,097 | 5,189 | 0.46% | $ 6,351.13 |
| WILCOX | 13,183 | 4,041 | 0.36% | $ 4,945.88 |
| WINSTON | 24,843 | 5,888 | 0.52% | $ 7,206.38 |
| **Total** | **4,447,100** | **1,123,392** | **100.00%** | **$ 1,375,000.16** |

# Department of Public Health

## Long Term Outcomes

1. Provide ALL Kids coverage to eligible low income children

2. Prevent transmission of HIV (AIDS) to newborns

3. Expand newborn screening to include disorders detected through Tandem Mass Spectronomy

4. Initiatives to reduce tobacco use and exposure for children and youth

## FY 2004 Fiscal Status

| | |
|---|---|
| **FY03 Balance** | **$1,738,697** |
| **FY04 Receipts** | **$5,306,903** |
| **FY04 Budget** | **$6,370,000** |
| **FY04 Expended** | **$6,304,581** |
| **FY04 Balance** | **$ 764,848** |

## Contact Information

Kathy Vincent
201 Monroe Street, Suite 1552
Montgomery, AL 36104
(334) 206-5200
kvincent@adph.state.al.us

## Accomplishments

1. CHIP - The Children's Health Insurance Program (CHIP) was able to enroll eligible uninsured children beyond the level stated as the anticipated result in the Children First Plan of Investment. End of FY 04 enrollment was 60,655.
2. Tandem Mass Spectronomy - Testing on the MSMS began Oct 25, 2004. The number of specimens tested through the end of November was 8831. By the end of December approximately 16,500 specimens will be tested. One infant has been identified with MCADD, and several other infants with abnormal amino acid levels have also been identified (mostly due to prematurity). The pilot study was conducted from April to May 2004. There were 6053 specimens included in the pilot study. Biotinidase testing began April 2004. There have been 75,915 specimens tested through the end of November. By the end of December, approximately 85,000 specimens will be tested. There has been one infant identified with Biotinidase Deficiency.
3. Tobacco Control - 532 local community youth have received advocacy training on tobacco prevention and control initiatives to reduce exposure to environmental tobacco smoke. These youth conducted peer advocacy presentations to other peers, impacting 8,953 fellow students on tobacco prevention and control initiatives to reduce tobacco use and exposure to environmental tobacco smoke.
4. HIV/Aids - From Oct 1. 2003 - September 30, 2004, Alabama's ADAP served nine HIV positive pregnant women.

## FY2004 Expenditures

| | |
|---|---|
| 1. Child Health Insurance Benefits | $5,000,000.00 |
| 2. AIDS Drugs | $ 260,000.00 |
| 3. Community Grants | $ 299,992.00 |
| 4. TMS | $ 744,588.59 |
| **TOTAL** | **$6,304,580.59** |

## FY 2005 Plan

| | |
|---|---|
| 1. Child Health Insurance Benefits | $5,000,000 |
| 2. Community Grants | $ 325,000 |
| 3. TMS | $ 721,214 |
| **TOTAL** | **$6,046,214** |

## Outcome Measures

60,655 children enrolled in All Kids

16,500 TMS Screening for newborns and follow-up tests performed

11 projects funded and 532 youth trained in tobacco prevention to serve a total of 8,953 fellow students

8 local councils educated in tobacco prevention.

Local tobacco free facility policies passed.

9 HIV positive pregnant women treated for prevention of HIV/AIDS transmission to newborns

# Department of Public Health

## Detailed Expenditures

CHIP

| Object Code | Payee | Amount Exp | Amt Enc | County Served |
|---|---|---|---|---|
| 0800 | Blue Cross Blue Shield of Alabama | 5,000,000.00 | | Statewide |
| | **Total** | 5,000,000.00 | 0.00 | **5,000,000.00** |

TANDEM MASS

| Object Code | Payee | Amount Exp | Amt Enc | County Served |
|---|---|---|---|---|
| 0100 | Salary | 31,206.00 | | Statewide |
| 0200 | Benefits | 7,438.00 | | Statewide |
| 0400 | Travel | 331.75 | | Statewide |
| 0500 | Neometrics | 20,112.00 | | Statewide |
| 0800 | Reid & O'Donahue Advertising | 2,600.00 | | Statewide |
| 0800 | Assoc of Public Health | 500.00 | | Statewide |
| 0900 | Wilson & Wilson | 29.97 | | Statewide |
| 0900 | Jacksonville Specialty Advertising | 1,401.96 | | Statewide |
| 0900 | Booksamillion Com | 31.50 | | Statewide |
| 0900 | Design Display Inc | 349.00 | | Statewide |
| 0900 | Finance Printing & Publication | 18.86 | | Statewide |
| 0900 | MYOFFICEPRODUCTS.COM | 446.54 | | Statewide |
| 0900 | Office Depot | 42.01 | | Statewide |
| 0900 | Neometrics | 655,081.00 | | Statewide |
| 1100 | UAB Office of Grants & Contracts | 1,172.06 | 23,827.94 | Statewide |
| | **Total** | 720,760.65 | 23,827.94 | **744,588.59** |

# Department of Public Health

## Detailed Expenditures

TOBACCO CONTROL

| Object Code | Payee | Amount Exp | Amt Enc | County Served |
|---|---|---|---|---|
| 1100 | ACAT/Madison Co. | 6,992.00 | | Madison |
| 1100 | Hoover City Schools | 30,000.00 | | Jefferson |
| 1100 | Jefferson Co. Dept. of Health | 30,000.00 | | Jefferson |
| 1100 | Recovery Services of Dekalb | 30,000.00 | | Dekalb |
| 1100 | ACATA/Calhoun Co. | 23,000.00 | | Calhoun |
| 1100 | PASS | 30,000.00 | | Autauga |
| 1100 | Youth Enhancement Services | 30,000.00 | | Elmore |
| 1100 | Faith Outreach Services | 30,000.00 | | Montgomery |
| 1100 | Escambia Co. Board of Education | 30,000.00 | | Escambia |
| 1100 | Wiregrass Mental Health/Spectracar | 30,000.00 | | Houston |
| 1100 | Mobile Co. Health Dept. | 30,000.00 | | Mobile |
| | **Total** | 299,992.00 | 0.00 | **299,992.00** |

HIV-AIDS

| Object Code | Payee | Amount Exp | Amt Enc | County Served |
|---|---|---|---|---|
| 0901 | Amerisource | 260,000.00 | | Statewide |
| | **Total** | 260,000.00 | 0.00 | **260,000.00** |

# Department of Public Health

## Detailed Expenditures

**ADPH BHPCD Tobacco Prevention and Control Division**

Describe the top accomplishments for this year with CFTF dollars

1.    532 local community youth have received advocacy training on tobacco prevention and control initiatives to reduce exposure to environmental tobacco smoke.

2.    532 youth conducted peer advocacy presentations to other peers, impacting 8,953 fellow students on tobacco prevention and control initiatives to reduce tobacco use and exposure to environmental tobacco smoke.

3.    Local youth gathered 948 Citizens Surveys to determine the local community's support for a Clean Indoor Air Ordinance

4.    Local youth have conducted presentations to educate 8 local councils on the benefits of reducing the exposure of environmental tobacco smoke in children through clean air policy initiatives.

5.    The Coalition for a Tobacco Free Alabama featured the efforts of the Hoover Coalition on their website.  The results of the Citizen Survey are posted and an article about the Coalitions presentation to the City Council regarding the effects of increasing tobacco taxes to reduce tobacco prevalence in youth. (please visit: www.tobaccofreealabama.org) The American Cancer Society honored the Hoover Coalition by recognizing us their "Advocate of the Year" for our efforts in tobacco prevention. Hoover Parks and Recreation Board has passed a policy that all their facilities and ballparks will be tobacco free zones.  The Park Board members have requested that the city attorney draft an ordinance and present it to the City Council.  The purpose of the ordinance will be to specify who will enforce the ordinance and what the consequences will be for those who choose to ignore the tobacco free zone ordinance.

Detail outcome measure from Plan of Investment

Provide 11youth-empowered tobacco prevention community grants to reduce tobacco use and eliminate exposure to environmental tobacco smoke among children and youth, as evidenced by the total number of youth trained and empowered on tobacco prevention and control initiatives, the number of decision makers educated, and the policy changes that are made by 6/30/2005.

# Department of Public Health

## Detailed Expenditures

**Newborn Screening**
**Tandem Mass Spectrometry and Follow-Up**

Describe the top accomplishments for this year with CFTF dollars

1.      Laboratory personnel have been trained on instrumentation, Family Health Services has hired an additional FHS Nurse Follow-up Coordinator who is responsible for developing the follow-up infrastructure for this expansion, and a registered nurse has been hired to work with Dr. Rutledge to assist with follow-up of infants identified by MS/MS.

2.      Cut-off values have been established for the first panel of expanded screening tests.  Analytes are used to screen for the following disorders: Maple Syrup Urine Disease, Homocystinuria, Tyrosinemia, Citrullinemia, Medium Chain Acyl-CoA dehydrogenase deficiency (MCADD), Propionic Acidemia, Methylmalonic Acidemia, and Carnitine Transport Defect.

3.      Testing on the MSMS began Oct 25, 2004. The number of specimens tested through the end of November was 8831. By the end of December approximately 16,500 specimens will be tested.   One infant has been identified with MCADD, and several other infants with abnormal amino acid levels have also been identified (mostly due to prematurity).  The pilot study was conducted from April to May 2004. There were 6053 specimens included in the pilot study.  Biotinidase testing began April 2004. There have been 75,915 specimens tested through the end of November. By the end of December, approximately 85,000 specimens will be tested. There has been one infant identified with Biotinidase Deficiency.


Detail outcome measure from Plan of Investment

Expand newborn screening to include disorders detected through Tandem Mass Spectrometry: Number of tests performed = 16,500 (October 25, 2004-December 31, 2004).

# Department of Rehabilitation Services

## Long Term Outcomes

1. Early Intervention services for children from birth to age 3.

2. Child death review teams pursuant to Article 5 of Chapter 16 of Title 26.

## Accomplishments

1. The Child Death Review (CDR) program was administered by the Alabama Department of Public Health to understand how and why children die in Alabama and to take steps to reduce preventable child deaths. As a result during the report year, there were 45 fewer preventable deaths from the previous year; 14 fewer total deaths; an 11.84% reduction in deaths meeting the CDR criteria for review; and a 1.21% increase in the total cases reviewed by CDR.

2. The Alabama Department of Rehabilitation Services provided 10 additional children with Early Intervention services during January through February and 20-22 additional children with Early Intervention services during March through September.

## FY 2004 Fiscal Status

| | |
|---|---|
| **FY03 Balance** | **$181,801** |
| **FY04 Receipts** | **$265,345** |
| **FY04 Budget** | **$350,000** |
| **FY04 Expended** | **$350,000** |
| **FY04 Balance** | **$ 97,146** |

## FY2004 Expenditures

| | |
|---|---|
| 1. Children Death Review | $300,000.00 |
| 2. Early Intervention services | $ 50,000.00 |
| **TOTAL** | **$350,000.00** |

## FY 2005 Plan

| | |
|---|---|
| 1. Children Death Review | $300,000.00 |
| **TOTAL** | **$300,000.00** |

## Outcome Measures

30-32 additional children received Early Intervention services

380 preventable child deaths in CY 2001 reduced to 335 in CY 2002 = reduc tion of 45

911 total child deaths reported in CY 2001; 897 total reported in CY 2002 = 14 or 1.54% reduction

380 child deaths that meet CDR criteria for review in CY 2001 vs. 335 in CY 2002 = 11.84% reduction

280 of 335 child death cases reviewed by CDRreviewed in CY 2002 = 83.58% reviewed vs. 82.37% for CY 2001 = 1.21.% increase in review rate

## Contact Information

Dawn Ellis
2129 E. South Blvd.
Montgomery, AL 36111
(334) 613-2294
dellis@rehab.state.al.us

# Department of Youth Services

## Long Term Outcomes

1. To provide adequate bedspace in order to comply with the S.S. v. Wood Consent Decree.

2. To provide alternative programs in order to reduce commitments to State DYS custody.

3. To adequately provide services to youth with multiple needs and disabilities.

## Accomplishments

1. Supported compliance with the S.S. v. Wood Consent Decree through the purchase of 309 bed spaces for committed youth.

2. Provided community based alternatives to state placement for over 1,000 youth.

3. Continued cooperative efforts with the Department of Human Resources and the Department of Mental Health to serve Multi-Needs Children and support 14 "Our Kids" Projects.

4. Provided $842,050 to support local Juvenile Detention Centers.

## FY 2004 Fiscal Status

| | |
|---|---|
| **FY03 Balance** | **$21,332,147** |
| **FY04 Receipts** | **$ 9,021,736** |
| **FY04 Budget** | **$14,182,800** |
| **FY04 Expended** | **$11,642,836** |
| **FY04 Balance** | **$18,711,047** |

## FY2004 Expenditures

| | |
|---|---|
| Contract Placements | $ 8,120,036 |
| Day Programs | $ 500,000 |
| Alternative Programs | $ 685,402 |
| Multi-needs Children | $ 796,704 |
| "Our Kids" Project | $ 698,644 |
| Juvenile Detention Centers | $ 842,050 |
| **TOTAL** | **$11,642,836** |

## FY 2005 Plan

| | |
|---|---|
| Contract Placements | $ 8,560,084 |
| Day Programs | $ 500,000 |
| Alternative Programs | $ 814,975 |
| Wilderness Programs | $ 500,000 |
| Multi-needs Children | $ 400,000 |
| "Our Kids" Project | $ 700,000 |
| Substance Abuse Treatment | $ 227,000 |
| Juvenile Detention Centers | $ 880,825 |
| **TOTAL** | **$ 12,582,884** |

## Outcome Measures

- 309 additional beds purchased through contract placements
- 1,575 additional youth served through contract placements
- 15.79% reduction in low risk commitments from Morgan County
- 17.39% reduction in low risk commitments from St. Clair County
- 10.00% reduction in low risk commitments from Shelby County
- 643 youth served in Day Programs
- 382 youth served in Alternative Programs
- 65,000 "Play By The Rules" books published
- 100% of DYS referrals to Multi-Needs Accepted
- 9 DYS youth accepted for Multi-Needs Placement
- 14 joint agency contracts issued for "Our Kids"Projects
- 12 regional juvenile detention centers subsidized

## Contact Information

J. Walter Wood, Jr., Executive Director
P. O. BOX 66
Mt. Meigs, AL 36057
(334) 215-3800
allen.peaton@dys.alabama.gov

# Department of Youth Services

## Detailed Expenditures

| Expense Category | Provider | # of beds | # served | Amount paid | Counties Served |
|---|---|---|---|---|---|
| Contract Placements | Lee Co. HIT | 24 | 158 | 541,911 | Statewide |
| " | Oak Mt. Y.S. | 24 | 134 | 685,964 | Statewide |
| " | Bridge - STEPS | 40 | 196 | 1,067,653 | Statewide |
| " | Bridge-Wilderness | 32 | 241 | 625,186 | Statewide |
| " | Bridge - COBIA | 32 | 135 | 833,660 | Statewide |
| " | Bridge-Boot (Female) | 24 | 178 | 440,529 | Statewide |
| " | Bridge - Reach | 24 | 190 | 604,287 | Statewide |
| " | 3 Springs-Madison | 49 | 79 | 2,015,669 | Statewide |
| " | 3 Springs-Wilderness | 24 | 103 | 507,981 | Statewide |
| " | 3 Springs-Wilderness (Female) | 24 | 116 | 524,305 | Statewide |
| " | West Ala. Y.S. | 12 | 45 | 272,891 | Statewide |
| Day Programs | The DAY Program - Shelby | n/a | 120 | 100,000 | Shelby |
| " | Morgan Co Comm (SOS) | n/a | 389 | 300,000 | Morgan |
| " | St Clair Co Comm (JUSTICE) | n/a | 134 | 100,000 | St. Clair |
| Alternative Programs | Henry Co Bd of Ed (SAYLA) | n/a | 266 | 125,000 | Henry, Houston |
| " | Mobile Co Comm (GROWTH) | n/a | 116 | 430,402 | Mobile |
| " | Ala Center for Law & Civic Ed - "Play By the Rules" | n/a | 65,000 | 130,000 | Statewide |
| Juvenile Detention Centers | Baldwin Co Comm | 30 | n/a | 45,930 | Baldwin, Choctaw, Clarke, Escambia, Washington |
| " | Coosa Valley Youth Ser | 48 | n/a | 73,488 | Blount, Calhoun, Cherokee, Cleburne, DeKalb, Etowah, Jackson, Marshall, St Clair, Talladega, Walker |
| " | Jefferson Co Comm | 80 | n/a | 122,480 | Jefferson |
| " | Lee Co Youth Dev Center | 32 | n/a | 48,992 | Bullock, Chambers, Clay, Coosa, Crenshaw, Lee, Macon, Pike, Randolph, Russell, Tallapoosa |
| " | Madison Co Comm | 48 | n/a | 73,488 | Madison |
| " | Mobile Co Comm | 95 | n/a | 145,445 | Mobile |
| " | Montgomery Co Comm | 52 | n/a | 79,612 | Autauga, Butler, Conecuh, Elmore, Monroe, Montgomery |
| " | Shelby Co Comm | 34 | n/a | 52,054 | Bibb, Chilton, Shelby |
| " | Southeast Ala You Ser | 49 | n/a | 75,019 | Barbour, Coffee, Covington, Dale, Geneva, Henry, Houston |
| " | Tennessee Valley Youth Ser | 25 | n/a | 38,275 | Colbert, Cullman, Franklin, Lauderdale, Lawrence, Limestone, Marion, Morgan, Winston |
| " | Tuscaloosa Co Comm | 27 | n/a | 41,337 | Sumter, Tuscaloosa |
| " | West Alabama Youth Ser | 30 | n/a | 45,930 | Dallas, Fayette, Greene, Hale, Lamar, Lowndes, Marengo, Perry, Pickens, Wilcox |
| Multi-needs Children | Dept of Human Resources (Multi-needs) | n/a | n/a | 796,704 | Statewide |
| "OUR Kids" Project | Dept of Human Resources (OUR Kids) | n/a | n/a | 698,644 | Statewide |
| | | | | | |
| Total | | | | 11,642,836 | |

# FOR EXHIBIT 12, PLEASE SEE EXHIBIT 5



# FOR EXHIBIT 13, PLEASE SEE EXHIBIT 5



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**

J.B., a minor child, by and through his next friend, Addie Ward,

Plaintiff,

vs.

WALTER WOOD, in his individual capacity,

Defendant.

2:06-CV-00755-MHT

**DECLARATION OF SHEILA BEDI**

I, Sheila A. Bedi, state that the following is true and correct to the best of my knowledge:

1. I am an attorney employed by the Mississippi Youth Justice Project (MYJP) in Jackson, Mississippi. MYJP is a project of the Southern Poverty Law Center.

2. I have been heavily involved in juvenile justice reform in Mississippi since 2003.

3. The executive agency responsible for juvenile justice in Mississippi is the Department of Human Services (DHS), which includes the Division of Youth Services (DYS).

4. When a youth court in Mississippi orders that a delinquent child be removed from his home for reasons other than mental health commitment, the child is either sent to one of the two DYS-operated training schools for delinquent children – Oakley Training School (for boys) or Columbia Training School (for girls) – or confined in a juvenile detention center pursuant to a disposition order.

5. On any given day in Mississippi, the state's seventeen juvenile detention centers hold approximately 250 children. Of those 250, most are awaiting trial. The rest have been adjudicated delinquent and are being held in detention pursuant to a disposition order by a youth court judge. At the moment, there is no reliable data showing precisely how many children are



currently being held in detention pursuant to a disposition order. The Mississippi Legislature's Performance Evaluation and Expenditure Review Committee (PEER Committee) is currently researching this issue and will issue a report within the next few months. Based on my experience around the state, I estimate that there are no more than 100 children statewide who have been adjudicated delinquent and are being held in detention pursuant to a disposition order.

6. MYJP presently serves as class counsel to all children at Oakley Training School. In that capacity, my colleagues and I conduct regular legal visits with children at Oakley. On November 9, 2007, MYJP staff member Vanessa Carroll visited with children at Oakley and obtained a roster showing all children who were confined there on that day. Attached is a redacted copy of the roster, showing that there were 156 boys confined at Oakley on November 9, 2007. This is an unusually high number for Oakley's population, which during the past few months has ranged from 90 to 120 children on any given day.

7. On November 9, 2007, I attended a legislative hearing before the Juvenile Justice Committee of the Mississippi House of Representatives. Colonel Don Taylor, the Executive Director of the Mississippi Department of Human Services, testified before the committee about juvenile justice. In his testimony, Colonel Taylor noted that as of that morning, there were only twenty-two (22) girls at Columbia Training School. This is not an atypical number for Columbia.

I declare under penalty of perjury that the foregoing is true and correct.

Date: November 15th, 2007

By: ______________________

Sheila A. Bedi
Mississippi Youth Justice Project
A Project of the Southern Poverty Law Center

CAMPUS POPULATION

11/08/2007

| LAST | FIRST | POD | RACE | COUNTY | COMM. | ARR. DATE | BIRTHDATE | AGE | CHARGE | ID# |
|---|---|---|---|---|---|---|---|---|---|---|
| | | MAGNOLIA | B | HANCOCK | 1ST | 11/01/2007 | | 14 | DISORDERLY CONDUCT, DIST. THE PEACE | 23-4286 |
| | | BMU | B | FORREST | 4TH | 08/17/2007 | | 15 | SIMPLE ASSAULT/DOMESTIC VIOLENCE | 18-8988 |
| | | R | B | HINDS | 3RD | 09/27/2007 | | 17 | SIMPLE ASSAULT/DOMESTIC VIOLENCE | 25-4834 |
| | | BMU | B | LAUDERDALE | 1ST | 10/05/2007 | | 16 | CONTEMPT OF COURT | 38-0702 |
| | | HICKORY | B | WALTHALL | 2ND | 08/22/2007 | | 16 | DISORDERLY CONDUCT/DIST. THE PEACE | 74-3308 |
| | | P | W | STONE | 1ST | 09/18/2007 | | 15 | GRAND LARCENY | 66-7040 |
| | | M | B | LOWNDES | 1ST | 07/24/2007 | | 13 | CONTEMPT OF COURT | 44-3933 |
| | | N | B | LAUDERDALE | 3RD | 08/23/2007 | | 14 | MALICIOUS MISCHIEF/VANDALISM | 38-4680 |
| | | WILLOW | B | GRENADA | 1ST | 10/09/2007 | | 14 | ALCOHOL CHARGES | 22-7453 |
| | | WILLOW | B | PIKE | 1ST | 10/24/2007 | | 13 | CONTEMPT OF COURT/VOP/DRUG CHARGE | 57-8104 |
| | | AMU | B | MADISON | 1ST | 11/06/2007 | | 14 | WEAPONS CHARGE | 45-2011 |
| | | WILLOW | B | JONES | 1ST | 10/05/2007 | | 13 | ASSAULT | 34-5072 |
| | | WILLOW | B | COAHOMA | 1ST | 08/24/2007 | | 14 | MALICIOUS MISCHIEF/VANDALISM | 14-3790 |
| | | WILLOW | B | LAUDERDALE | 1ST | 10/05/2007 | | 13 | SIMPLE ASSAULT/DOMESTIC VIOLENCE | 38-8630 |
| | | HICKORY | W | CLAIBORNE | 1ST | 10/04/2007 | | 17 | | 11-5746 |
| | | N | B | YAZOO | 4TH | 10/29/2007 | | 16 | | 82-9932 |
| | | HICKORY | B | PEARL RIVER | 2ND | 09/28/2007 | | 16 | DISORDERLY CONDUCT/DIST. THE PEACE | 55-6254 |
| | | AMU | B | MADISON | 3RD | 11/06/2007 | | 13 | BURGLARY/SIMPLE ASSAULT | 45-0545 |
| | | R | B | LEAKE | 1ST | 09/14/2007 | | 16 | BURGLARY | 40-1396 |
| | | N | B | NESHOBA | 3RD | 10/12/2007 | | 17 | SIMPLE ASSAULT/DOMESTIC VIOLENCE | 50-8090 |
| | | P | B | GRENADA | 2ND | 10/09/2007 | | 15 | BURGLARY/SIMPLE ASSAULT | 22-5973 |
| | | M | B | LAUDERDALE | 1ST | 10/19/2007 | | 14 | DISORDERLYCOND./ SIMPLE ASSAULT/TRUANCY | 38-4223 |
| | | OAK | B | JASPER | 3RD | 10/18/2007 | | 15 | | 31-7203 |
| | | PINE | B | FORREST | 1ST | 10/10/2007 | | 16 | | 18-4912 |
| | | MAGNOLIA | B | MADISON | 1ST | 09/11/2007 | | 16 | WEAPONS CHARGE | 45-1500 |
| | | WILLOW | B | RANKIN | 1ST | 10/03/2007 | | 12 | AGGRA. ASSAULT | 61-0332 |
| | | WILLOW | B | MADISON | 1ST | 09/20/2007 | | 12 | BURGLARY | 45-5539 |
| | | HICKORY | B | HINDS | 1ST | 10/04/2007 | | 16 | BURGLARY | 25-0539 |
| | | HICKORY | W | NEWTON | 1ST | 10/03/2007 | | 16 | BURGLARY/DISORDERLY CONDUCT | 61-0196 |
| | | WILLOW | B | SUNFLOWER | 1ST | 10/08/2007 | | 13 | CONTEMPT OF COURT | 67-0641 |
| | | M | B | PIKE | 4TH | 10/04/2007 | | 13 | BURGLARY/CONTEMPT OF COURT | 57-1636 |
| | | R | B | SHARKEY | 1ST | 09/10/2007 | | 15 | WEAPONS CHARGE | 63-1227 |
| | | MAGNOLIA | W | HANCOCK | 1ST | 10/09/2007 | | 15 | MALICIOUS MISCHIEF/VANDALISM | 23-0770 |
| | | BMU | W | PEARL RIVER | 2ND | 09/06/2007 | | 16 | CONTEMPT OF COURT | 55-5628 |
| | | M | B | CLAIBORNE | 1ST | 10/17/2007 | | 14 | SIMPLE ASSAULT/WEAPONS CHARGE | 11-5552 |
| | | OAK | B | WASHINGTON | 1ST | 10/23/2007 | | 16 | COMTEMPT OF COURT | 76-2941 |
| | | P | W | RANKIN | 2ND | 09/12/2007 | | 16 | PETIT LARCENY | 61-7470 |
| | | OAK | B | LEFLORE | 1ST | 10/23/2007 | | 17 | AGRAVATED ASSAULT | 42-8264 |
| | | R | B | JONES | 4TH | 10/06/2007 | | 15 | DISORDERLY CONDUCT/DIST. THE PEACE | 34-5004 |
| | | MAGNOLIA | B | DESOTO | 1ST | 09/28/2007 | | 15 | GRAND LARCENY | 17-8566 |
| | | P | B | SHARKEY | 1ST | 09/10/2007 | | 15 | WEAPONS CHARGE | 63-7372 |
| | | WILLOW | B | SHARKEY | 1ST | 09/14/2007 | | 14 | PETIT LARCENY | 63-2308 |
| | | WILLOW | B | HARRISON | 1ST | 10/31/2007 | | 14 | DISORDERLY CONDUCT/DIST. THE PEACE | 24-0469 |
| | | HICKORY | B | SUNFLOWER | 3RD | 09/21/2007 | | 17 | SIMPLE ASSAULT/DOMESTIC VIOLENCE | 67-8869 |
| | | P | B | LAUDERDALE | 1ST | 10/05/2007 | | 16 | DRUG CHARGE | 38-8320 |
| | | WILLOW | B | HARRISON | 1ST | 09/14/2007 | | 14 | BURGLARY | 24-2971 |
| | | OAK | B | SCOTT | 1ST | 10/19/2007 | | 16 | SIMPLE ASSAULT/DOMESTIC VIOLENCE | 62-9541 |
| | | PINE | B | COAHOMA | 2ND | 08/24/2007 | | 15 | TRESSPASS | 14-5591 |
| | | [illegible] | B | COAHOMA | 3RD | 11/02/2007 | | 16 | WEAPONS CHARGE | 14-7562 |
| | | HICKORY | W | NESHOBA | 1ST | 10/12/2007 | | 17 | DRUGS CHARGE | 50-0763 |
| | | R | B | WILKINSON | 1ST | 10/01/2007 | | 15 | DISORDERLY CONDUCT/DIST. THE PEACE | 79-0744 |

CAMPUS POPULATION

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | [redacted] | P | B | KEMPER | 1ST | 08/21/2007 | [redacted] | 17 | SIMPLE ASSAULT | 35-2287 |
| [redacted] | [redacted] | PINE | B | DESOTO | 1ST | 10/17/2007 | [redacted] | 16 | | 17-0934 |
| [redacted] | [redacted] | P | W | CARROLL | 3RD | 07/09/2007 | [redacted] | 16 | PETIT LARCENY | 08-7116 |
| [redacted] | [redacted] | M | B | FORREST | 3RD | 09/26/2007 | [redacted] | 13 | BURGLARY/SIMPLE ASSAULT | 18-9906 |
| [redacted] | [redacted] | OAK | W | WAYNE | 2ND | 10/18/2007 | [redacted] | 15 | CONTEMPT OF COURT/DRUGS CHARGE | 77-3868 |
| [redacted] | [redacted] | MAGNOLIA | B | DESOTO | 1ST | 09/28/2007 | [redacted] | 16 | WEAPONS CHARGE | 17-2951 |
| [redacted] | [redacted] | OAK | B | LINCOLN | 1ST | 10/24/2007 | [redacted] | 16 | CONTEMPT OF COURT | 43-5938 |
| [redacted] | [redacted] | PINE | B | ADAMS | 1ST | 11/02/2007 | [redacted] | 16 | | 01-2131 |
| [redacted] | [redacted] | OAK | B | WAYNE | 2ND | 10/18/2007 | [redacted] | 16 | CONTEMPT OF COURT | 77-8789 |
| [redacted] | [redacted] | MAGNOLIA | B | JONES | 1ST | 10/12/2007 | [redacted] | 17 | DRUG CHARGES | 34-7470 |
| [redacted] | [redacted] | HICKORY | B | CLAIBORNE | 1ST | 09/20/2007 | [redacted] | 15 | BURGLARY | 11-8961 |
| [redacted] | [redacted] | WILLOW | B | NEWTON | 2ND | 10/17/2007 | [redacted] | 14 | MALICIOUS MISCHIEF/VANDALISM | 51-0499 |
| [redacted] | [redacted] | M | B | WALTHALL | 1ST | 10/05/2007 | [redacted] | 13 | DISORDERLY CONDUCT/DIST. THE PEACE | 74-7411 |
| [redacted] | [redacted] | MAGNOLIA | B | PIKE | 1ST | 09/14/2007 | [redacted] | 16 | CONTEMPT OF COURT/DISORDERLY CONDUCT | 57-6316 |
| [redacted] | [redacted] | HICKORY | B | PANOLA | 1ST | 08/24/2007 | [redacted] | 16 | DRUGS CHARGE | 54-4491 |
| [redacted] | [redacted] | PINE | B | PEARL RIVER | 1ST | 09/06/2007 | [redacted] | 17 | | 55-4543 |
| [redacted] | [redacted] | R | B | PIKE | 1ST | 08/22/2007 | [redacted] | 15 | BURGLARY | 57-0299 |
| [redacted] | [redacted] | HICKORY | B | WILKINSON | 1ST | 09/26/2007 | [redacted] | 16 | ROBBERY | 79-3627 |
| [redacted] | [redacted] | OAK | B | DESOTO | 1ST | 10/20/2007 | [redacted] | 16 | | 17-2296 |
| [redacted] | [redacted] | N | B | SMITH | 1ST | 10/17/2007 | [redacted] | 16 | SIMPLE ASSAULT | 65-5126 |
| [redacted] | [redacted] | WILLOW | B | SHARKEY | 1ST | 10/09/2007 | [redacted] | 14 | PETIT LARCENY/SIMPLE ASSAULT | 63-7952 |
| [redacted] | [redacted] | P | W | SMITH | 5TH | 08/24/2007 | [redacted] | 01/17/1900 | BURGLARY | 65-5673 |
| [redacted] | [redacted] | P | B | NESHOBA | 5TH | 10/12/2007 | [redacted] | 01/16/1900 | SIMPLE ASSAULT/DOMESTIC VIOLENCE | 50-0136 |
| [redacted] | [redacted] | HICKORY | B | FORREST | 2ND | 09/10/2007 | [redacted] | 01/16/1900 | BURGLARY | 18-2722 |
| [redacted] | [redacted] | M | B | MADISON | 2ND | 08/29/2007 | [redacted] | 01/14/1900 | BURGLARY/DISORDERLY CONDUCT | 45-7179 |
| [redacted] | [redacted] | M | B | HARRISON | 1ST | 09/14/2007 | [redacted] | 01/14/1900 | BURGLARY/MALICIOUS MISCHIEF | 24-6196 |
| [redacted] | [redacted] | BMU | B | DESOTO | 2ND | 10/10/2007 | [redacted] | 16 | WEAPONS CHARGE | 17-1606 |
| [redacted] | [redacted] | N | B | GRENADA | 4TH | 10/23/2007 | [redacted] | 15 | VOP /SIMPLE ASSAULT | 22-0601 |
| [redacted] | [redacted] | P | B | FORREST | 3RD | 10/10/2007 | [redacted] | 16 | | 18-3552 |
| [redacted] | [redacted] | N | B | WALTHALL | 5TH | 08/22/2007 | [redacted] | 15 | DISORDERLY CONDUCT/DIST. THE PEACE | 74-9813 |
| [redacted] | [redacted] | MAGNOLIA | B | LEFLORE | 1ST | 10/12/2007 | [redacted] | 15 | CONTEMPT OF COURT | 42-0322 |
| [redacted] | [redacted] | WILLOW | B | LAUDERDALE | 1ST | 10/19/2007 | [redacted] | 14 | DISORDERLY CONDUCT/DIST. THE PEACE | 38-5049 |
| [redacted] | [redacted] | N | B | CLAIBORNE | 1ST | 10/17/2007 | [redacted] | 17 | GRAND LARCENY | 11-7932 |
| [redacted] | [redacted] | OAK | B | PANOLA | 2ND | 10/18/2007 | [redacted] | 15 | DISORDERLY CONDUCT/DIST. THE PEACE | 54-0002 |
| [redacted] | [redacted] | HICKORY | B | WASHINGTON | 2ND | 10/08/2007 | [redacted] | 14 | CONTEMPT OF COURT | 76-6760 |
| [redacted] | [redacted] | WILLOW | B | HARRISON | 2ND | 08/29/2007 | [redacted] | 11 | BURGLARY/CONTEMPT OF COURT | 24-5168 |
| [redacted] | [redacted] | P | B | YAZOO | 1ST | 10/02/2007 | [redacted] | 17 | WEAPONS CHARGE | 82-7705 |
| [redacted] | [redacted] | N | B | MADISON | 1ST | 10/09/2007 | [redacted] | 15 | BURGLARY | 45-5120 |
| [redacted] | [redacted] | MAGNOLIA | W | PEARL RIVER | 1ST | 10/19/2007 | [redacted] | 17 | DRUG CHARGE | 55-9033 |
| [redacted] | [redacted] | WILLOW | B | GRENADA | 2ND | 09/25/2007 | [redacted] | 14 | SIMPLE ASSAULT/DOMESTIC VIOLENCE | 22-6120 |
| [redacted] | [redacted] | HICKORY | W | FORREST | 1ST | 10/10/2007 | [redacted] | 16 | | 18-4347 |
| [redacted] | [redacted] | WILLOW | B | HARRISON | 2ND | 09/14/2007 | [redacted] | 13 | ROBBERY | 24-6819 |
| [redacted] | [redacted] | M | B | LAUDERDALE | 2ND | 10/20/07 | [redacted] | 13 | PETIT LARCENY | 38-8925 |
| [redacted] | [redacted] | PINE | B | PEARL RIVER | 1ST | 10/04/2007 | [redacted] | 16 | DRUGS CHARGE | 55-6077 |
| [redacted] | [redacted] | MAGNOLIA | B | SUNFLOWER | 1ST | 09/28/2007 | [redacted] | 15 | BURGLARY/PETIT LARCENY | 67-3760 |
| [redacted] | [redacted] | OAK | B | JEFFERSON | 2ND | 11/05/2007 | [redacted] | 16 | BURGLARY | 32-8049 |
| [redacted] | [redacted] | HICKORY | W | GREENE | 1ST | 10/11/2007 | [redacted] | 16 | | 21-4523 |
| [redacted] | [redacted] | OAK | B | SIMPSON | 2ND | 10/18/2007 | [redacted] | 14 | AGGRA. ASSAULT | 64-1262 |
| [redacted] | [redacted] | HICKORY | B | KEMPER | 1ST | 08/21/2007 | [redacted] | 16 | | 35-1824 |
| [redacted] | [redacted] | P | B | SUNFLOWER | 2ND | 08/24/2007 | [redacted] | 17 | CONTEMPT OF COURT/SIMPLE ASSAULT | 67-4450 |
| [redacted] | [redacted] | OAK | W | RANKIN | 1ST | 10/24/2007 | [redacted] | 15 | DRUG CHARGES | 61-3323 |
| [redacted] | [redacted] | WILLOW | B | COAHOMA | 1ST | 08/30/2007 | [redacted] | 14 | SHOPLIFTING/BURGLARY | 14-5859 |
| [redacted] | [redacted] | PINE | B | LAUDERDALE | 2ND | 10/26/2007 | [redacted] | 16 | | 38-9116 |
| [redacted] | [redacted] | OAK | B | SCOTT | 1ST | 10/24/2007 | [redacted] | 14 | BURGLARY/DISORDERLY CONDUCT | 62-2777 |

CAMPUS POPULATION

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | HICKORY | B | LAUDERDALE | 1ST | 09/28/2007 | | 16 | CONTEMPT OF COURT | 38-7164 |
| | | R | B | LAUDERDALE | 5TH | 10/19/2007 | | 16 | DISORDERLY CONDUCT/DIST. SIM.ASS/DOM. VOIL. | 38-0171 |
| | | MAGNOLIA | B | DESOTO | 1ST | 09/28/2007 | | 16 | WEAPONS CHARGE | 17-9339 |
| | | BMU | B | HARRISON | 1ST | 10/31/2007 | | 15 | GRAND LARCENY | 24-9360 |
| | | MAGNOLIA | W | RANKIN | 1ST | 08/22/2007 | | 01/14/1900 | MALICIOUS MISCHIEF/VANDALISM | 61-5194 |
| | | R | B | SUNFLOWER | 9TH | 08/10/2007 | | 01/16/1900 | BURGLARY/SIMPLE ASSAULT | 67-9987 |
| | | BMU | B | JACKSON | 1ST | 09/06/2007 | | 01/15/1900 | WEAPONS CHARGE | 30-9149 |
| | | BMU | B | HINDS | 5TH | 09/20/2007 | | 01/15/1900 | SHOPLIFTING | 25-9433 |
| | | PINE | B | SUNFLOWER | 1ST | 09/28/2007 | | 01/15/1900 | BURGLARY | 67-5804 |
| | | AMU | B | MADISON | 2ND | 11/05/2007 | | 01/16/1900 | WEAPONS CHARGE | 45-3105 |
| | | PINE | B | MADISON | 1ST | 9/111/07 | | 01/15/1900 | SIMPLE ASSAULT/DOMESTIC VIOLENCE | 45-5461 |
| | | N | B | FORREST | 2ND | 10/10/2007 | | 01/16/1900 | SIMPLE ASSAULT/DOMESTIC VIOLENCE | 18-2709 |
| | | N | B | SHARKEY | 1ST | 09/10/2007 | | 01/15/1900 | WEAPONS CHARGE | 63-4314 |
| | | WILLOW | W | JACKSON | 1ST | 10/22/2007 | | | CONTEMPT OF COURT /TRUANCY | 30-3319 |
| | | MAGNOLIA | W | HANCOCK | 2ND | 08/09/2007 | | 14 | HARRASSMENT | 23-4093 |
| | | OAK | O | HARRISON | 1ST | 10/31/2007 | | 15 | MALICIOUS MISCHIEF/VANDALISM | 24-8241 |
| | | PINE | B | WILKINSON | 1ST | 09/26/2007 | | 15 | DISORDERLY CONDUCT/DIST. THE PEACE | 79-0786 |
| | | HICKORY | B | SMITH | 2ND | 10/17/2007 | | 16 | SIMPLE ASSAULT | 65-2575 |
| | | BMU | O | HARRISON | 1ST | 09/14/2007 | | 15 | SIMPLE ASSAULT/DOMESTIC VIOLENCE | 24-3668 |
| | | P | B | JACKSON | 1ST | 06/12/2007 | | 16 | JOYRIDING | 30-0996 |
| | | WILLOW | B | PIKE | 1ST | 09/07/2007 | | 14 | SIMPLE ASSAULT/DOMESTIC VIOLENCE | 57-2299 |
| | | N | B | FORREST | 2ND | 10/10/2007 | | 16 | PETIT LARCENY | 18-4532 |
| | | N | B | GRENADA | 7TH | 10/23/2007 | | 17 | DISORDERLY CONDUCT/DIST. THE PEACE | 22-2405 |
| | | MAGNOLIA | W | HANCOCK | 1ST | 09/07/2007 | | 16 | DRUG CHARGE/CONTEMPT OF COURT | 23-9244 |
| | | WILLOW | W | JACKSON | 1ST | 10/22/2007 | | 13 | CONTEMPT OF COURT / TRUANCY | 30-3319 |
| | | PINE | W | YAZOO | 2ND | 10/02/2007 | | 15 | CONTEMPT OF COURT | 82-0630 |
| | | PINE | B | WASHINGTON | 1ST | 10/08/2007 | | 17 | DISORDERLY CONDUCT/DIST. THE PEACE | 76-8079 |
| | | MAGNOLIA | B | LEE | 1ST | 09/20/2007 | | 16 | CONTEMPT OF COURT/ROBBERY | 41-4918 |
| | | PINE | B | LEFLORE | 1ST | 10/12/2007 | | 15 | BURGLARY | 42-8434 |
| | | OAK | W | GRENADA | 1ST | 10/23/2007 | | 17 | SIMPLE ASSAULT/DOMESTIC VIOLENCE | 22-5890 |
| | | R | B | SUNFLOWER | 5TH | 10/30/2007 | | 16 | DISORDERLY CONDUCT/DIST. THE PEACE | 67-6192 |
| | | OAK | B | COPIAH | 1ST | 10/26/2007 | | 16 | BURGLARY | 15-0404 |
| | | MAGNOLIA | B | SUNFLOWER | 2ND | 09/21/2007 | | 16 | BURGLARY/RUNAWAY | 67-8528 |
| | | BMU | B | HARRISON | 1ST | 09/14/2007 | | 16 | MALICIOUS MISCHIEF/VANDALISM | 24-2244 |
| | | PINE | B | FORREST | 1ST | 09/10/2007 | | 16 | DRUGS CHARGE | 18-3840 |
| | | PINE | B | LAFAYETTE | 1ST | 10/18/2007 | | 15 | CONTEMPT OF COURT | 36-4987 |
| | | MAGNOLIA | B | FORREST | 1ST | 08/17/2007 | | 14 | BURGLARY | 18-4781 |
| | | M | B | CLAY | 1ST | 11/05/2007 | | 14 | BURGLARY/CONTEMPT OF COURT | 13-1137 |
| | | OAK | B | WASHINGTON | 1ST | 10/23/2007 | | 16 | CURFEW | 76-7183 |
| | | MAGNOLIA | B | SUNFLOWER | 2ND | 08/09/2007 | | 16 | SIMPLE ASSAULT | 67-7466 |
| | | HICKORY | W | DESOTO | 1ST | 08/24/2007 | | 17 | CONTEMPT OF COURT | 17-5843 |
| | | HICKORY | B | WILKINSON | 1ST | 09/26/2007 | | 17 | BURGLARY/BREAKING AND ENTERING | 79-4480 |
| | | WILLOW | B | JONES | 3RD | 10/23/2007 | | 14 | CONTEMPT OF COURT | 34-2868 |
| | | R | B | WARREN | 5TH | 10/08/2007 | | 17 | | 75-2496 |
| | | MAGNOLIA | B | HARRISON | 2ND | 10/17/2007 | | 16 | MALICIOUS MISCHIEF/VANDALISM | 24-9170 |
| | | HICKORY | W | HANCOCK | 5TH | 10/18/2007 | | 17 | CONTEMPT OF COURT | 23-4827 |
| | | N | B | RANKIN | 1ST | 10/10/2007 | | 16 | GRAND LARCENY | 61-4297 |
| | | HICKORY | W | BOLIVAR | 1ST | 10/05/2007 | | 17 | PETIT LARCENY | 06-3168 |
| | | PINE | B | GRENADA | 2ND | 10/09/2007 | | 16 | CONTEMPT OF COURT | 22-7216 |
| | | R | B | FORREST | 3RD | 10/10/2007 | | 16 | STOLEN PROPERTY | 18-0918 |
| | | WILLOW | B | WILKINSON | 1ST | 09/26/2007 | | 01/14/1900 | ROBBERY | 79-2622 |

OFFICE OF THE GOVERNOR

BOB RILEY
GOVERNOR

STATE CAPITOL
MONTGOMERY, ALABAMA 36130

(334) 242-7100
FAX: (334) 242-0937

STATE OF ALABAMA

December 21, 2005

Ms. Kathleen Feely
Ms. Tracey Field
Mr. Joe Liu
Casey Strategic Consulting
The Annie E. Casey Foundation
701 St. Paul Street
Baltimore, Maryland 21202

Dear Mses. Feely and Field and Mr. Liu:

**RE: Juvenile Justice in Alabama**

On behalf of Alabama's children and families, I want to express my appreciation for the Casey Foundation's work with my Task Force on Strengthening Families. Casey has been a wonderful partner to us.

I am writing to request your assistance in a related area—juvenile justice. We would be very grateful for the Strategic Consulting Group's guidance in helping the State of Alabama to design and implement a network of more effective, less expensive community-based sanctions for our court-involved youth. As Walter Wood, the Executive Director of our Department of Youth Services (DYS), has repeatedly told his Board, the Alabama legislature, and the public, there are far too many "non-criminal" youth in state custody in Alabama. I hope Casey will help us reduce reliance on large secure care institutions and develop programs that will effectively and efficiently reduce juvenile crime.

Of youth admitted to DYS in 2004, 57% were committed to residential care for "public order" and status offenses – including Children in Need of Supervision, probation violations, and aftercare violations. At the moment, we have more than 1,000 youth in custody at DYS and an additional 130 on a waiting list. DYS Director Wood estimates that **at least** 25% of those youth could be served in the community if we had appropriate alternatives for our juvenile court judges. Although a few counties offer an array of community-based sanctions, those counties are the exception. Judges in our more rural counties are particularly in need of options.

Mses. Feely and Field and Mr. Liu
Page Two
December 21, 2005

I understand that Casey is flooded with requests, and I hope that you will give serious consideration to this invitation. I have been greatly impressed with Casey's expertise and would be pleased to expand our partnership. I am available to meet with you and look forward to hearing from you soon.

Sincerely,

Bob Riley
Governor

BR/rdg



OFFICE OF THE GOVERNOR

BOB RILEY
GOVERNOR

STATE CAPITOL
MONTGOMERY, ALABAMA 36130

(334) 242-7100
FAX: (334) 242-0937

# STATE OF ALABAMA

March 1 7, 2006

Ms. Kathleen Feely
Mr. Bill Buckner
Casey Strategic Consulting
The Annie E. Casey Foundation
701 St. Paul Street
Baltimore, Maryland 21202

**RE: Juvenile Justice in Alabama**

Dear Ms. Feely and Mr. Buckner:

Thank you for your response to my letter. Although I was disappointed to hear that you could not make a decision before June, I appreciate your candor. When your staff is strong enough, I hope you will select Alabama as your next engagement.

Alabama presents a unique opportunity for Casey. We have a very serious problem with incarcerating non-criminal youth, but we recognize that problem and are dedicated to correcting it. This dedication is not limited to my office. The Department of Youth Services (DYS) and the advocacy community agree that de-institutionalization is a priority issue and would welcome Casey's assistance in developing a network of graduated sanctions for non-criminal youth and low level offenders.

The legislature and the judiciary have also taken important steps toward juvenile justice reform. Last month, the Alabama legislature voted to establish a Commission on Girls and Women in the Criminal Justice System. The Commission will meet for the first time in April. Also pending is a bill from the Administrative Office of Courts (AOC) that would make substantial revisions to Alabama's juvenile code. Among other changes, the bill would impose sentencing restrictions designed to reduce the number of non-criminal youth in juvenile prisons.



In the judiciary, the Chief Justice has launched a juvenile justice data integrity project to rationalize and standardize the collection of data by juvenile courts. The project's goal is to ensure that juvenile justice resource and policy decisions are driven by accurate and comprehensive data. Over the next two months, the AOC will work with DYS, child advocates, and other stakeholders to recommend a uniform set of measures to be used in every juvenile matter across the state. I know that everyone involved in that project would be grateful for any suggestions you might have.

If you have any questions or suggestions about any of the projects outlined above, please do not hesitate to contact me or my Senior Policy Advisor, Dave Stewart, at (334) 242-7116. I look forward to hearing from you this summer.

Sincerely,

BR/sl/rs

STATE OF ALABAMA

DEPARTMENT
SERVICES

BOB RILEY
GOVERNOR

POST OFFICE BOX 66
MT. MEIGS, ALABAMA 36057

J. WALTER WOOD, JR.
EXECUTIVE DIRECTOR

April 20, 2006

Ms. Kathleen Feely
Ms. Tracey Field
Mr. Joe Liu
Casey Strategic Consulting
The Annie E. Casey Foundation
701 St. Paul Street
Baltimore, Maryland 21202

Dear Mses. Feely and Field and Mr. Liu:

Alabama's Governor, Honorable Bob Riley, recently communicated with you regarding our state's desire to obtain your guidance and assistance with our juvenile justice system. The purpose of this communication is to follow-up on that request and provide additional information.

As you know, those of us who work within Alabama's juvenile justice system have identified several areas of concern including the use of state facilities for non-criminal offenders, the growing girls committed population and attendant special needs within the girls group, the need to better coordinate Mental Health services (evaluation, screening, and treatment), and related system issues. From your prospective, these may seem to be issues consistent with problems in all states. Why get involved with Alabama? As is not the case in most states, you will find the environment here "ripe for change." Our Governor, the Youth Services Department and staff, Legislative leadership working in the juvenile justice arena and system advocates are communicating on a regular basis, identifying problems, and working together to address needs, together. We need a catalyst to bring our work to full consensus and to assist us with implementing needed changes. You will not find this level of cooperation in other states.

We respectfully request you give serious consideration to assisting us.

Sincerely,

[signature]

J. Walter Wood, Jr.
Executive Director

JWWJr./gjw

EXHIBIT
Affidavit
17



701 St. Paul Street
Baltimore, MD 21202
410 547-6600
FAX 410 547-6624

The Annie E. Casey Foundation

August 1, 2007

Hon. Sue Bell Cobb
Chief Justice
Supreme Court of Alabama
300 Dexter Avenue
Montgomery, AL   36104-3741

Dear Chief Justice Cobb:

Based upon the very productive meetings held last week, I am pleased to inform you that Alabama has been chosen as a replication site for the Juvenile Detention Alternatives Initiative (JDAI).  We look forward to a stimulating multi-year partnership with state and county officials in these endeavors to strengthen juvenile justice.

It is our understanding that Alabama will begin the process of juvenile detention reform in four counties (Jefferson, Mobile, Montgomery and Tuscaloosa).  All of these sites showed great interest in this work and each had local champions who can rally the support and operational leadership needed for success.  Their local collaborative detention reform activities will be coordinated statewide by the Administrative Office of Courts, assisted by state-level stakeholders who will seek to ensure that state law, policy, administrative regulation, practice and funding are appropriately aligned with the reform strategies these counties will pursue.

To support these efforts, we will make a cash grant to the Administrative Office of the Courts for $150,000 for the period August 1, 2007 through July 31, 2008.  Assuming appropriate progress, you can anticipate up to three years of funding at this level.  In the fourth year, most JDAI sites receive a grant equal to half of their prior year's grant.  Subsequently, sites are eligible for "maintenance" grants to cover travel and related costs.  To move the grant process forward, we need a letter from your office affirming your plans to implement JDAI and a budget for the first twelve-month term.  The details of this letter and budget have already been discussed with Karen Trussell.

In addition to this grant, we will support detention reform in Alabama through direct technical assistance and your state's inclusion in the JDAI national network.  Tim Roche, an experienced justice system consultant, will serve as the Foundation's Technical Assistance Team Leader for Alabama.

Most states that pursue JDAI have at least matched our financial support; many have exceeded our grant amounts.  Matching funds have come from government agency budgets, new appropriations, private foundations or federal block grants (e.g., OJJDP



EXHIBIT
Affidavit
18

funds). If there is anything that I might do to assist Alabama officials to increase the funds available for detention reform activities, please let me know. We are very eager to leverage additional resources for this important work.

Please be aware that JDAI's annual national conference will convene in Dallas September 25-27, 2007. This gathering will offer unique opportunities for Alabama officials to immerse themselves in the strategies and innovations now being implemented across the country. We have designated 20 slots for Alabama representatives and I encourage your office to begin assembling the state's delegation and making travel arrangements as quickly as possible. Our grant, of course, may be used to cover conference travel costs. I will forward a detailed conference logistics memorandum to Karen to guide these efforts.

Your support for JDAI was a very significant influence in our decision to undertake this work in Alabama. We genuinely appreciate your leadership and your advocacy on behalf of disadvantaged children. I am personally looking forward to working with you on these endeavors to strengthen Alabama's juvenile justice system.

Sincerely,

Bart Lubow
Director, Program for High Risk Youth

CC: K. Trussell
G. Mumford
T. Roche



**SUPREME COURT OF ALABAMA**
HEFLIN-TORBERT JUDICIAL BUILDING
300 DEXTER AVENUE
MONTGOMERY, ALABAMA 36104-3741
(334) 229-0700

**CHIEF JUSTICE**
SUE BELL COBB, OF EVERGREEN

**ASSOCIATE JUSTICES**
HAROLD SEE, OF NORTHPORT
CHAMP LYONS, JR., OF POINT CLEAR
THOMAS A. WOODALL, OF BIRMINGHAM
LYN STUART, OF BAY MINETTE
PATRICIA M. SMITH, OF INDIAN SPRINGS
MICHAEL F. BOLIN, OF BIRMINGHAM
TOM PARKER, OF MONTGOMERY
GLENN MURDOCK, OF BIRMINGHAM

March 20, 2007

Ms. Danielle J. Lipow, Esq.
Southern Juvenile Defender Center
Southern Poverty Law Center
403 Washington Avenue
Montgomery, AL 36104

Dear Ms. Lipow, Danielle

Alabama, like most states, is experiencing some very real challenges in its local Juvenile Detention systems. Overcrowding, expanding costs, conditions of confinement, and competition for funding are just some of the issues I have heard about in recent months.

I have asked the Annie E. Casey Foundation's "Juvenile Detention Alternatives Initiative" (JDAI) to come and speak with a small group about what the JDAI might offer Alabama and to determine if Alabama might be a good candidate for JDAI's expertise. This would be an exploratory meeting, but one in which honest talk and thoughtful listening would be critical.

The meeting will be on Wednesday, April 4, in the large classroom on the lobby level of the Heflin-Torbert Building, beginning at 2 p.m. and ending by 4 p.m. Parking is available at the Center of Commerce parking deck which is located at the intersection Adams and Hull Streets. Please access via the Hull Street entrance and enter the parking code of 167*. As part of this collaborative effort, Walter Wood, Executive Director of the Department of Youth Services, has graciously agreed to pay per diem and mileage reimbursement to all in-state attendees.

JDAI has an excellent reputation for its success in addressing detention issues with local and state authorities in a number of locations around the country. You can access their website and read about their efforts at www.aecf.org.

I am asking that you participate in this small group as one of the key persons familiar with detention problems in our state. You will be joined by representatives from the state and local judicial, executive, and legislative branches, as well as representatives from allied organizations.

Please let me know of your attendance plans at your earliest convenience. You may do that by contacting Karen Trussell at 334-954-5063, or by e-mail at karen.trussell@alacourt.gov.

I look forward to seeing you at the meeting and I am confident that this will be a most worthwhile discussion.

Sincerely,

Sue Bell Cobb

Sue Bell Cobb
Chief Justice

EXHIBIT
Affidavit
19
tabbies

| County | 2006 Juvenile Pop'n (0-17 y-o) | 2006 Admissions | 2006 Rate (per 10,000 juveniles in pop'n) | 2007 Admissions | 2007 Rate (per 10,000 juveniles in pop'n) | Change in Admissions (%) |
|---|---|---|---|---|---|---|
| Coosa | 2,422 | 13 | 54 | 21 | 87 | 62% |
| Conecuh | 3,210 | 13 | 40 | 27 | 84 | 108% |
| Greene | 2,506 | 15 | 60 | 20 | 80 | 33% |
| Tallapoosa | 9,428 | 90 | 95 | 70 | 74 | -22% |
| Covington | 8,360 | 37 | 44 | 56 | 67 | 51% |
| Bibb | 5,131 | 41 | 80 | 32 | 62 | -22% |
| Randolph | 5,447 | 48 | 88 | 33 | 61 | -31% |
| Franklin | 7,411 | 29 | 39 | 44 | 59 | 52% |
| Pickens | 5,109 | 15 | 29 | 29 | 57 | 93% |
| Tuscaloosa | 39,270 | 215 | 55 | 203 | 52 | -6% |
| Houston | 23,624 | 142 | 60 | 121 | 51 | -15% |
| Baldwin | 37,954 | 215 | 57 | 178 | 47 | -17% |
| Elmore | 18,231 | 89 | 49 | 84 | 46 | -6% |
| Marengo | 5,084 | 29 | 57 | 23 | 45 | -21% |
| Autauga | 12,996 | 51 | 39 | 56 | 43 | 10% |
| Hale | 4,655 | 14 | 30 | 20 | 43 | 43% |
| Barbour | 6,681 | 44 | 66 | 27 | 40 | -39% |
| Dallas | 12,123 | 53 | 44 | 48 | 40 | -9% |
| Lee | 27,858 | 107 | 38 | 109 | 39 | 2% |
| Etowah | 23,830 | 66 | 28 | 92 | 39 | 39% |
| Madison | 73,244 | 228 | 31 | 270 | 37 | 18% |
| Chambers | 8,444 | 30 | 36 | 30 | 36 | 0% |
| Geneva | 5,763 | 27 | 47 | 20 | 35 | -26% |
| Calhoun | 26,325 | 63 | 24 | 80 | 30 | 27% |
| Jefferson | 160,016 | 570 | 36 | 480 | 30 | -16% |
| Monroe | 6,089 | 18 | 30 | 18 | 30 | 0% |
| Jackson | 12,243 | 23 | 19 | 35 | 29 | 52% |
| St. Clair | 17,562 | 38 | 22 | 49 | 28 | 29% |
| Pike | 6,992 | 32 | 46 | 19 | 27 | -41% |
| Talladega | 19,064 | 57 | 30 | 51 | 27 | -11% |
| Cherokee | 5,266 | 12 | 23 | 14 | 27 | 17% |
| Russell | 12,846 | 32 | 25 | 34 | 26 | 6% |
| Bullock | 2,676 | 13 | 49 | 7 | 26 | -46% |
| Choctaw | 3,460 | 8 | 23 | 9 | 26 | 13% |
| Chilton | 10,255 | 28 | 27 | 26 | 25 | -7% |
| Winston | 5,531 | 17 | 31 | 14 | 25 | -18% |
| Fayette | 3,953 | 13 | 33 | 10 | 25 | -23% |
| Escambia | 8,816 | 19 | 22 | 21 | 24 | 11% |
| Marshall | 22,015 | 50 | 23 | 52 | 24 | 4% |
| Macon | 5,111 | 17 | 33 | 12 | 23 | -29% |
| Mobile | 107,090 | 248 | 23 | 235 | 22 | -5% |
| Blount | 13,382 | 18 | 13 | 29 | 22 | 61% |
| Lauderdale | 18,808 | 39 | 21 | 39 | 21 | 0% |
| Montgomery | 58,213 | 133 | 23 | 120 | 21 | -10% |
| Coffee | 10,866 | 18 | 17 | 21 | 19 | 17% |
| Dale | 13,091 | 34 | 26 | 25 | 19 | -26% |
| Perry | 3,245 | 5 | 15 | 6 | 18 | 20% |



| County | 2006 Juvenile Pop'n (0-17 y-o) | 2006 Admissions | 2006 Rate (per 10,000 juveniles in pop'n) | 2007 Admissions | 2007 Rate (per 10,000 juveniles in pop'n) | Change in Admissions (%) |
|---|---|---|---|---|---|---|
| Clarke | 7,067 | 8 | 11 | 13 | 18 | 63% |
| Cleburne | 3,356 | 3 | 9 | 6 | 18 | 100% |
| Marion | 6,442 | 10 | 16 | 11 | 17 | 10% |
| Lawrence | 8,049 | 8 | 10 | 13 | 16 | 63% |
| Walker | 15,944 | 20 | 13 | 25 | 16 | 25% |
| Limestone | 16,886 | 22 | 13 | 24 | 14 | 9% |
| Sumter | 3,560 | 9 | 25 | 5 | 14 | -44% |
| Clay | 2,975 | 5 | 17 | 4 | 13 | -20% |
| Lowndes | 3,398 | 4 | 12 | 4 | 12 | 0% |
| Shelby | 45,658 | 54 | 12 | 52 | 11 | -4% |
| Morgan | 27,791 | 26 | 9 | 29 | 10 | 12% |
| DeKalb | 16,773 | 18 | 11 | 17 | 10 | -6% |
| Colbert | 12,184 | 13 | 11 | 12 | 10 | -8% |
| Cullman | 18,336 | 17 | 9 | 18 | 10 | 6% |
| Washington | 4,520 | 3 | 7 | 3 | 7 | 0% |
| Lamar | 3,123 | 1 | 3 | 2 | 6 | 100% |
| Henry | 3,759 | 1 | 3 | 2 | 5 | 100% |
| Butler | 5,038 | 1 | 2 | 2 | 4 | 100% |
| Crenshaw | 3,179 | 0 | 0 | 1 | 3 | |
| Wilcox | 3,817 | 0 | 0 | 0 | 0 | |

**STATE OF MISSISSIPPI**
**DEPARTMENT OF HUMAN SERVICES**
**DIVISION OF YOUTH SERVICES**

# REQUEST FOR PROPOSALS

# THE TONY GOBAR INDIVIDUALIZED ASSESSMENT AND COMPREHENSIVE COMMUNITY INTERVENTION INITIATIVE (IACCII)

**(BOLIVAR, LEE, RANKIN)**

**Application Issue Date: Thursday, September 6, 2007**
**Application Submission Deadline: Friday, October 5, 2007 - 5:00 P.M.**

**Mississippi Department of Human Services**
**750 North State Street**
**Jackson, Mississippi 39202**



## SECTION I. INTRODUCTION

The purpose of this Request for Proposal (RFP) is to solicit proposals from interested parties/organizations which can most effectively and cost-efficiently replicate the Tony Gobar Individualized Assessment and Comprehensive Community Intervention Initiative (IACCIII). The IACCIII is a highly-structured, intensive, community-based service for eligible youth. The program provides comprehensive strength-based needs assessments, individualized treatment plans and community-based services for eligible youth. Major keys to program success are: (1) the intensity and regularity of the supervision effort, (2) the constant provision of clinical counseling interventions addressing the child's developing social and coping skills; and, (3) the daily interaction, support, and mutual acceptance of responsibility among community agencies responsible for various services, i.e., Youth Court Judges and staff, Division of Youth Services (DYS) staff, educational system staff, law enforcement, mental health staff, and related groups.

Therefore, through the proposal process, MDHS/DYS intends to award funds specifically for the purpose of developing IACCII sites, to the Proposer(s) in Bolivar County, Lee County, and Rankin County; who, in the sole judgment of MDHS/DYS, is best suitable to accomplish the establishment and successful operation of an IACCII within the conditions, rules, and guidelines established in this RFP. MDHS/DYS will conduct training sessions for all established IACCII's.

The total obligation of MDHS and the State of Mississippi for all services and performances required by this Request for Proposals (RFP) shall not exceed the balance of the funding that MDHS has on hand for the IACCII. The anticipated amount shall not exceed $250,000.00. **The proposed Period of Performance for subgrant contracts will run from December 1, 2007 to June 30, 2008.**

**The closing date for proposal submission is no later than 5:00 p.m. on Friday, October 5, 2007.** No proposals will be accepted after 5:00 p.m. on Friday, October 5, 2007.

## SECTION II. RFP PROCESS

This RFP provides background information and describes the subgrant services desired by MDHS. It delineates the requirements for this procurement and specifies the contractual conditions required by MDHS.

Parties responding to this RFP will be referred to as "Proposers." The successful Proposer to whom a subgrant will be awarded will be referred to as "Proposer."

### A. Receipt of Proposer's Questions

Proposer's questions regarding this RFP or questions related to the information that must be provided in response to it must be submitted in writing prior to September 18, 2007. All questions must be addressed to: **Ms. Kathy Pittman, Director, Division of Youth Services, Mississippi Department of Human Services, 750 North State Street, Jackson, MS 39202.**

policies and procedures of MDHS and/or the State of Mississippi;

3. Bias, discrimination, or conflict of interest existed on the part of an evaluator; or

4. Scope and intent of the project as specified in the executed subgrant differ materially from the scope and intent of the RFP.

Protests not based on the above described criteria will be rejected.

Resolution of Protests. Protests allowed by this Section shall follow MDHS' procedures for hearing contested cases, which will be made available upon request.

**L. Fidelity/Dishonesty Bond**

Upon receipt of notification of an award, the Proposer shall submit to MDHS a Fidelity/Dishonesty Bond in favor of MDHS with surety or sureties satisfactory to MDHS for the term of the subgrant. The amount of the Bond must equal 25% of the total subgrant amount. Failure to provide the Fidelity/Dishonesty Bond within the stated time period may result in the Proposer being deemed as non-responsive and the proposal will be immediately disqualified with no further consideration given for potential awarding of the subgrant to said Proposer.

The Bond must be secured from a company authorized to transact business in the State of Mississippi. The Bond shall be made payable to MDHS.

The Bond shall become effective upon written notification that a subgrant has been awarded to the Proposer. The Bond shall remain in full force and effect for the entire duration of the subgrant. Any action by the Proposer and/or the bonding company to revoke and/or cancel the Bond prior to the expiration of the subgrant will constitute a breach of subgrant and will result in immediate cancellation of the subgrant.

**M. Publicity**

Any use or reference of this RFP by the Proposer to promote, solicit, or disseminate information regarding the award of the Subgrant or the services being provided is prohibited, unless otherwise agreed to in writing by MDHS.

**N. Proposal Submission**

1. Proposals must be received by MDHS no later than 5:00 p.m. on Friday, October 5, 2007. Proposals must be sent to: **Ms. Kathy Pittman, Director, Division of Youth Services, Mississippi Department of Human Services, 750 North State Street, Jackson, MS 39202,** or hand delivered to the first floor lobby of the same address to the Division of Youth Services designated employee.

   Proposals must be received (regardless of postmark) by the above named party by 5:00 p.m. **Friday, October 5, 2007**, to be considered. Proposals will be time-stamped as they are received. Any proposals received after 5:00 p.m. on Friday, October 5, 2007, will be marked LATE and will not be evaluated.

No facsimiles (faxes) will be accepted.

All Proposals, including revisions, will be considered confidential until a final determination has been made by MDHS.

2. In order to be considered for selection, Proposers must submit a complete response to this RFP. One signed original and three (3) copies of the proposal must be submitted to the party designated in number 1 above by **5:00 p.m., October 5, 2007.** No other distribution of the proposals must be made by the Proposer. The proposal must be clearly marked "Transmittal Letter and Proposal in response to MDHS' Adolescent Offender Program Initiative" on the outside of the envelope.

**MDHS RESERVES THE RIGHT TO REJECT ANY AND ALL PROPOSALS WHERE THE PROPOSER TAKES EXCEPTION TO THE TERMS AND CONDITIONS OF THE RFP AND/OR FAILS TO MEET THE TERMS AND CONDITIONS AND/OR IN ANY WAY ATTEMPTS TO LIMIT THE RIGHTS OF MDHS AND/OR THE STATE OF MISSISSIPPI, INCLUDING BUT NOT LIMITED TO, THE REQUIRED CONTRACTUAL TERMS AND PROVISIONS SET FORTH IN THIS RFP.**

## SECTION III. PROPOSAL FORMAT

Acceptable proposals must offer all services identified in Section IV, Scope of Work, and agree to the Subgrant conditions specified in Section VII, Subgrant Terms and Provisions.

### A. Proposal Preparation

Proposals shall be signed by an authorized representative of the Proposer. All information requested must be submitted. Failure to submit all information requested will result in MDHS' requiring prompt submission of missing information and/or giving a lower evaluation of the proposal. Proposals which are substantially incomplete or lack key information will be rejected by MDHS.

Proposals must be organized in the order in which the requirements are presented in the RFP. All pages of the proposal should be numbered. Each paragraph in the proposal should reference the paragraph number or letter of the corresponding section of the RFP. If the response covers more than one page, the paragraph number and/or letter should be repeated at the top of the next page. The proposal should contain a table of contents which cross references the RFP requirements. Information which the Proposer desires to present that does not fall within any of the requirements of the RFP should be inserted at an appropriate place or be attached at the end of the proposal and designated as additional material. Proposals that are not organized in this manner risk elimination from consideration if the evaluators are unable to find where the RFP requirements are specifically addressed.

The proposal must be typed with double spacing and be no more than 25 one-sided pages (8½ x 11), excluding appendices, in length. The proposals must be separately bound, each

in a 3-Ring Binder, and indexed in a manner to allow ease of handling and review by MDHS. All documentation submitted with the proposal must be bound in the 3-Ring Binder.

**B. Required Proposal Contents**

Responses to this RFP shall consist of the following components. Each of these components must be separate from the others and uniquely identified. They also must conform to the format and content specified below.

1. Transmittal Letter

2. Management and Technical Proposal

   a. Statement of Understanding
   b. Services Approach and Proposed Work Plan
   c. Relevant Proposer /Lead or Key Staff's Experiences/Qualifications
   d. Financial Stability of Proposer
   e. Budget and Budget Narrative

3. Required Information and Statements

   Proposals must be accompanied by the information or statements described below. Failure by any Proposer to include the information or statements will result in its being declared unacceptable or non-responsive, and the Proposer will receive no further consideration for award of the Subgrant.

   a. Examination of Records

      (1) At the time a proposal is submitted, Proposer must include a statement as to whether there is a reasonable expectation that it is or would be associated with any parent, affiliate, or subsidiary organization in order to supply any service, supplies or equipment to comply with the performance requirements under the resulting Subgrant of the RFP. This statement is required whether the association is a formal or informal arrangement. If an association may exist, the Proposer will also be required to submit with the proposal written authorization from the parent, affiliate, or subsidiary organization granting the right to MDHS to examine directly, pertinent books, documents, papers, and records involving such transactions that are related to the resulting Subgrant.

      (2) If, at any time after a proposal is submitted and a Subgrant has been awarded, such an association arises as described in sub-paragraph above, the Proposer will be required to obtain a similar certification and authorization from the parent, affiliate, or subsidiary organization within ten (10) working days after forming the relationship. Failure to submit such certification and authorization will constitute grounds for termination of the Subgrant at the option of the State. (Nothing

herein shall be construed to require MDHS to agree to services being performed by such parent, affiliate, or subsidiary organization).

b.   Single Audit Act

Proposers must include a statement that they agree to obtain a financial and compliance audit made in accordance with the Single Audit Act Amendments of 1996 (31 U.S.C. Sections 7501 - 7507) and, as applicable, revised United States Office of Management and Budget (OMB) Circular A-122 or A-133.

c.   Conflict of Interest

Proposer shall disclose any Subgrant or other contractual relationship with any State personnel, Subgrantor or Subcontractor involved in the development of the RFP or procurement of the Subgrant. Any real or potential conflicts of interest shall, at the sole discretion of MDHS, be grounds for rejection of the Proposer's proposal or termination of any Subgrant awarded. All proposals must include the following:

(1)   A statement identifying those individuals who were involved with the preparation of the proposal and/or the procurement of the Subgrant.

(2)   A statement identifying all Proposer personnel currently under contract or Subgrant with MDHS who participated, either directly or indirectly, in any activities related to the preparation of the Proposer's proposal, and a statement identifying in detail the nature and extent of such activities.

(3)   A statement certifying that the Proposer's personnel have not had any contacts with any MDHS personnel involved in the development of the RFP, or, if such contacts have occurred, a statement identifying in detail the nature and extent of such contacts and the personnel involved.

d.   Proposer shall furnish MDHS with certified copies of its Articles of Incorporation, By-laws, Resolutions, and/or any other documentation, acceptable to MDHS that would prove that the organization offering the proposal is a legal entity. The Proposer must also furnish documentation that evidence the authority of the signatory to execute a binding Subgrant on behalf of the Proposer.

e.   CERTIFICATIONS OF COMPLIANCE AND ASSURANCE. The Proposer must sign and date the certification, assurances, and notification attached hereto as Exhibit B.

## C.   Transmittal Letter

The transmittal letter must accompany the proposal. The letter must be in the form of a standard business letter and be signed in ink by an individual authorized to legally bind the

Proposer. It must describe the Proposer's approach to the delivery of services required by the RFP and provide MDHS with a broad understanding of the entire proposal. The letter must list the name of the project and the name, telephone number and fax number of a contact person with authority to answer questions concerning the proposal. The letter must define the Proposer's approach for service delivery and not just reiterate the RFP. Additionally, it must include:

1. A statement identifying all proposed contractors and Subcontractors and indicating the exact amount of work to be done by the Proposer and each Subcontractor.

2. A statement of acceptance, without qualification, of all terms and conditions stated in this RFP or clearly outline any exceptions.

3. A statement that the Proposer has sole and complete responsibility for the completion of all services provided under the Subgrant, except for those items specifically defined as State responsibilities.

4. A statement that the Proposer does not discriminate in its employment practices with regard to race, color, religion, creed, age, marital status, national origin, sex, sexual orientation, political beliefs, or mental or physical disability.

5. Certification that each person signing this proposal is the person in the Proposer's organization responsible for, or authorized to make, decisions as to the prices quoted.

6. A statement from each Subcontractor, appended to the transmittal letter and signed by an individual authorized to legally bind the Subcontractor, stating the general scope of the work to be performed by the Subcontractor, the Subcontractor's willingness to perform the work indicated, and that the subcontractor does not discriminate in its employment practices with regard to race, color, religion, creed, age, marital status, national origin, sex, sexual orientation, political beliefs, or mental or physical disability.

**D. Management and Technical Proposal**

1. Statement of Understanding

   This component of the proposal must demonstrate the Proposer's understanding of the services requested in this RFP and any problems anticipated in accomplishing the work.

2. Service Approach and Proposed Work Plan

   This component of the proposal must present a description of the approach to successfully provide the services requested in this RFP for the duration of the term of the Subgrant. Proposers shall respond fully and directly to each criteria of the Scope of Work (Section IV).

a.   Staff to meet program requirements with organization chart, narrative description of organizational structure, and work flow charts.

b.   Description of how all mandatory requirements will be met.

c.   Details as to how the Proposer plans to operate its program and applicable timetable.

d.   A description of the Proposer's training and development programs that will assure that all personnel assigned to perform under any resultant Subgrant shall be capable and qualified in the work assigned to them;

e.   Internal controls that will be used by the Proposer in detecting deficiencies in program operations and implementing corrective actions whenever such deviations/deficiencies are discovered and documenting actions taken by the Proposer.

3.   Relevant Proposer and Lead or Key Staff's Experience and Qualifications

This segment of the proposal must include previous experiences that will demonstrate the Proposer's ability to deliver the services requested in this RFP. It also must describe the expertise of the Proposer's staff and information on current or recent projects of a similar size and scope, and data relevant to the Proposer's performance on such projects. For each of the aforesaid programs or projects, the Proposer must include the name and contact person (including a current telephone and address) of the entity for which the services were provided or the entity providing funds for the project, time period of the project, and a detailed description of the scope of services provided that relate to this RFP and resulting subgrant.

The Proposer must disclose the number and nature of queries, monitoring, and or audit findings that have been made against it and/or any key or management staff by any government (state and/or federal) authority or agency. The Proposer must provide a list of any litigation, past or pending, against the Proposer.

The Proposer must disclose whether it has been a party to any subgrant or agreement for any services within the scope of this RFP which has been terminated, rescinded, or not renewed. The Proposer must provide complete information on the contracting entities and a contact person (including names and addresses of the parties and a summary of the circumstances).

The Proposer must also describe the number of personnel to be used on the project, employee title, current position within the Proposer's organization, experience and qualifications, and other information to show that personnel can successfully perform the work required under this RFP.

4.   Financial Stability of Proposer

Proposers, including the parent corporation of any subsidiary corporation submitting a response, must include in their proposal evidence of financial responsibility and

stability for the performance of the contract. At a minimum, the proposal must include an independent audit for Fiscal Year 2006; however, if the FY 2006 audit has not been completed at the time the proposal is submitted, the FY 2005 audit may be submitted along with a certified statement from the Proposer's Certified Public Accounting (CPA) firm verifying that the FY 2005 audit will not be completed by the proposal submission deadline and stating the projected date of its completion. A compiled financial statement is unacceptable. The Proposer must obtain and submit a letter from the Certified Public Accountant who conducted audit(s) stating the Proposer's accounting system is adequate to safeguard funds received from MDHS. MDHS reserves the right to request any additional information to assure itself of a Proposer's financial status.

In the event a Proposer is either substantially or wholly owned by another corporate entity, the proposal must also include an independent audit for Fiscal Year 2005 for the parent organization. If the FY 2006 audit is not completed, refer to the instructions above in providing the FY 2005 audit and CPA certification. A compiled financial statement is unacceptable. There must also be a written guarantee by the parent organization that it will unconditionally guarantee performance by the Proposer of each and every term, covenant, and condition of such contract as may be executed by the parties.

5. Budget and Budget Narrative

The Proposer must include an itemized list of expenditures for the services and activities covered by the proposals. Further, the proposal must contain a written justification (narrative) adequately explaining the Proposer's funding needs. This narrative must relate funding needs to the operation of individual programs or activities. Sufficient detail within each line item of expenditure and each activity must be used to clearly explain the funding needs of the operation.

<u>Administrative costs in connection with any of these activities are subject to a 15% limitation</u>.

## SECTION IV. SCOPE OF WORK TO BE PERFORMED

### A. Program Objectives

The purpose of the Individualized Assessment and Comprehensive Community Intervention Initiative (IACCII) is to provide comprehensive strength-based needs assessments, individualized treatment plans and community-based services for eligible youth. The comprehensive strength based assessment will include an individualized treatment plan which addresses the supervision and programming needs of IACCII eligible youth. The IACCII has the following objectives:

1. To prevent low-risk, low-need youth from entering the juvenile justice system and then receiving high levels of supervision and services.

2. To prevent low-risk, high-need (IACCII eligible) youth from entering the training school by providing them with individualized, strength-based assessments and comprehensive community treatment plans.

3. To identify IACCII eligible youth who are committed to the training schools and to divert them to the community by developing individualized, strength-based assessments and comprehensive community treatment plans.

**B. Cooperative Agreement**

This program is based on an agreement between the participating courts and the Division of Youth Services. Participating courts agree not to send youth who fit a specific low-risk profile to the training schools. In the event that training school staff determines that a participating court has committed an IACCII eligible youth to the training school, staff will initiate the IAACI process at the training school. IACCII eligible youth will then be returned to the community with a comprehensive plan within two weeks of arrival at the training school. Participating courts agree to waive the twenty day notice requirement codified in Miss. Code Ann. § 43-21-605 (g) (iii) for the sole the purpose of serving IAACI eligible youth.

Participating courts shall make every effort to ensure that IACCII eligible youth are not committed to the training school. The program is designed to divert both low-risk , low-need and low-risk, high-need youth from the training schools. The program's effectiveness will be reviewed on an annual basis. If a participating county continues to commit IACCII eligible youth to the training school, that court's participation in the program may be terminated.

Initially up to three courts will be selected to participate in the initial phase of program. The program will be implemented in all youth courts by 2010, as long as funds remain available.

**C. Program Eligibility**

Two categories of youth are identified and impacted by this program – low-risk, low-need youth and low risk, high need youth. Risk is defined as the likelihood that a youth will re-offend; and need is linked to the criminogenic factors linked to delinquent behavior Needs are the clinical and non-clinical challenges facing a youth and his/her family. Needs include, but are not limited to mental illness, special education eligibility, involvement with the foster-care system, academic difficulty, substance abuse, and lack of effective communication within the family unit.

Low-risk, low-need youth will be identified as early as possible and diverted to appropriate programs and services. Low-risk, high-need youth will receive the specialized services described in this program.

**D. Assessments**

The Youth Assessment Screening Instrument (YASI) is being used as the Division's primary screening tool. It identifies criminogenic needs in eight categories:

1. family/environment,
2. school,
3. community/peers,
4. alcohol/drugs,
5. mental health,
6. attitudes/behaviors,
7. skills, and
8. use of free time.

Assessment, case planning, and interventions across the Division of Youth Services is being based on a frame work which utilizes these eight categories and definitions for these terms that are consistent with the YASI.

Youth will typically meet one or more of the following additional criteria:

- Youth who have penetrated the juvenile justice system from the foster care/neglect system;
- Youth who have academic difficulties;
- Youth with substance abuse problems;
- Youth with developmental delays;
- Youth with mental health diagnosis;
- Youth from families that needs clinical and/or non-clinical support in order to support the growth and development of the youth.

A screening assessment will be completed as soon after the youth is referred to the juvenile justice system as possible. If the youth is determined to be a low-risk, low-need youth, the youth will be handled non-judicially or placed on supervision with minimal services. If the youth is determined to be a low-risk, high need youth, a full assessment will be done and they will be considered for services through this pilot project.

Participating courts will agree to identify youth who are low-risk, high-need and adjudicated delinquent, and at imminent risk for training school commitment. Youth placed in the IACCII should be youth who would otherwise be sent to the training school. Participating courts agree that the Massachusetts Youth Screening Instrument 2 (MAYSI-2), the Youth Assessment Screening Inventory (YASI), and the How I Think Questionnaire will be

administered on all adjudicated youth who meet preliminary IACCII eligibility. Based on results of that screening, further testing may be completed and a level of risk and a level of need will be established. Courts must identify youth who are viable candidates for this program forty-eight hours before a scheduled disposition hearing.

Once identified, the intake staff will notify the DYS program manager and the case worker in the community. The DYS program manager will then decide whether to evaluate the youth for inclusion in this program.

**E. Supervision**

One person will be hired by DYS to manage the program. This person will be located in Jackson, and will report to the Community Services Director of the Division of Youth Services. This manager will do the following:

1. Screen cases referred by community counselors and approve their referral to the Proposer for assessment and case planning;

2. Review proposed individualized treatment plans and approve their implementation; and

3. Audit case files.

**F. Proposer Scope of Work**

The Proposer will provide assessments of youth referred to the program, general supervision of youth placed in the IACCII program, and specialized treatment services and interventions needed by those youth. The successful vendor will have demonstrated, successful experience providing wrap-round services to underserved rural and urban communities.

1. Policy and Procedure

The vendor will develop and submit a manual of policies and procedures which will be the guide work to be done through the IACCII project within sixty (60) days of the contract being awarded. DYS must approve those policies and procedures before the vendor begins program implementation.

2. Staffing

The Proposer may initially hire one community case worker in each county where the program is in operation. If case loads in a given county reach or exceed ten, the Proposer may hire a second community case worker in that county. The Proposer may not hire more than two case workers in any of the three pilot counties.

Case workers working in the program will function as supervising case managers providing intensive supervision and treatment services, in addition to monitoring services/interventions that will be purchased based on need in individual cases. None will have a case load with more than ten cases. The case workers will be trained and provide generalized evidence-based practices to include cognitive-based counseling, education, and thinking interventions. Case workers will ensure compliance with the treatment plans and will work with the youth and the family to remove barriers to compliance. The case workers will also be responsible for reporting non-compliance to the court and recommending appropriate sanctions, given the specific needs of each youth. When a youth is having difficulty adjusting, the case worker will convene a family and community support meeting to assess the effectiveness of the community plan and to make any necessary adjustments to that plan.

3. Secondary Assessment/Case Planning

The community case worker will complete a comprehensive community assessment. This will include a home visit and an interview of primary family members and related community contacts (e.g. extended family, teachers, ministers, etc.]. This community assessment will be completed as soon as possible – in no case more than 3-5 days after a youth has been initially identified.

The Proposer may conduct additional assessments to further assess risk and/or define the criminogenic needs which are to be addressed through the program, but they may not introduce an alternative or contradictory classification matrix.

A service plan will be developed for each youth placed in the IACCII program. The Proposer may develop its own service plan format, but it is expected that format will be consistent with the service plan format being used by DYS. This plan, and any proposed changes to the plan, must be submitted to the Program Manager, before implementation.

4. Interventions

Youth who are accepted to the program will be placed in the community (either in their home or foster home) with appropriate support and interventions as indicated in their treatment plan. IACCII eligible youth shall not be placed in detention centers or training schools. A limited number of IACCII eligible youth may require short-term treatment in a therapeutic residential treatment facility. But no IACCII funds shall support residential treatment for a period of longer than 60 days.

The case plan will define the interventions that will be used to manage risk and to reduce or resolve the areas of need. These interventions must be supported by

empirical research, or be modeled after programs that have been validated. For example, if family counseling is to be utilized as an intervention for resolving family/community needs, the program of family counseling must be one that is empirically validated (for example – multi-systemic family therapy).

The interventions that are utilized must be criminogenic need specific. A generic program where all youth go through the same sequence of counseling or supervision will not be accepted.

The Proposer will develop a specific list of the programs and/or interventions that will be used to address areas of risk and need (for example, a list of programs or interventions for skills, another for use of free time, etc.), and submit that list for DYS review and approval. Once approved, the vendor may use those programs or interventions when developing a case plan for a specific youth.

5.    Specialized Individualized Services

The Proposer will develop contracts for specialized treatment services. These services will be based on the needs of the youth being served in a given location. For example, a contract may be issued with a treatment provider for a specific number of hours of multi-systemic family therapy. Additional examples of services provided for such youth may include therapeutic foster care, substance abuse treatment, anger management, and family therapy. Non-clinical services may include assistance to apply for and maintain public benefits, special education advocacy, counseling, mentoring, remedial literacy services, parenting classes and other appropriate supports as indicated in the individualized treatment plan.

The therapeutic modalities utilized in the IACCII may include, but is not limited to day treatment, group counseling, individual counseling, recreational therapy, and family intervention. All treatment is definitively designed to safely divert adolescent offenders from having further contact with the Criminal Justice System, including possible institutionalization, incarceration, or placement in another residential setting. Programs must be evidence-based programs that have acquired relative consistency in producing positive outcomes with clients.

The Proposer will submit all proposed contracts for specialized services to DYS for approval before contracts are implemented or services are utilized. DYS will approve or reject proposed contracts within 48 hours of receiving the proposed contract. DYS will also work with the successful Proposer to develop contract approval procedures for emergency situations.

All other existing funding sources and resources will be exhausted before services will be funded through this project.

The Proposer's proposal shall meet all requirements of this RFP including the provisions of Section VII, the Subgrant Terms and Provisions.

## G. Management Plan

### 1. Admission and Discharge Procedures

a. Youth may be referred for assessment during the informal or formal probation stage. The initial assessment is to be conducted by DYS counseling staff.

b. The DYS counseling staff will then refer the completed assessment to the Program Manager for review and approval to present to the youth court judge for an order recommending placement in the IACCII.

c. The Program Manager will then contact the Proposer to notify him that a youth has been approved for the program.

d. Upon notification by DYS, the Proposer will conduct further assessments and develop a draft case plan for the youth. This plan will then be sent to the Program Manager and then to the youth court.

e. All youth submitted to the program must comply with the rules and regulations of any placement, or the Proposer must submit a recommendation for gaining compliance.

### 2. Transportation Requirements

Proposer shall provide transportation to and from residential and day programs a youth is placed in while under their supervision. They must maintain vehicle liability insurance.

### 3. Records

A case record must be maintained for each client in the IACCII. Progress notes and other daily documentation must be completed for every contact or service provided to a program client. Notes will reflect progress or lack of progress related to problem statements and defined goals in the treatment plan. Notes must be dated, signed, and kept in chronological order. Program staff must review treatment plans no less than every four weeks and this must be reflected in a "monthly progress note" in the client case file.

4. **Interviewing and Hiring Program Staff**

Those individuals being considered for employment in the IACCII must undergo a criminal background investigation as part of the interview process.

5. **Fire and Natural Disaster Plan**

Fire drills must be conducted at least quarterly. There must be documentation of staff participation, time and efficiency of evacuation, and general performance of the drill. Disaster drills must be conducted annually and the same documentation must be provided as with fire drills.

Staff must be trained in the use of alarm systems, notification of authorities, and use of emergency equipment. This training should also be documented. Escape routes and procedures must be specified and posted at highly visible locations.

6. **Fiscal and Programmatic Compliance**

a. The subgrantee must comply with all fiscal and programmatic reporting as required by MDHS Subgrantee Manual. MDHS is also requiring that the subgrantee submit a budget which meets the agency's standard for a **Modified Zero-Based Budget showing justification for all costs** (See Exhibit C).

b. A Modified Zero Based Budget (MZBB) is a financial management strategy intended to achieve a more cost effective delivery of public services. Planning and budgeting techniques endeavor to redirect effort and funds from lower priority new programs to higher priority current programs, improve efficiency and effectiveness and reduce spending. This concept matches spending levels with services to be performed. A Modified ZBB starts at a base that is higher than zero. An appropriate starting point for a budget proposal would be 80 or 85 percent of the current spending levels. An important element of this budgeting procedure is that it forces prioritization of programs and activities. When this strategy is practiced, it allows us to make decisions about programs when funding levels are reduced.

c. The Proposer must comply with all fiscal and programmatic reporting as required by the MDHS Proposer/Contract Manual and submit monthly reporting worksheets by the 10th calendar day of the following month. All programmatic reporting required shall be submitted to MDHS by the 10th calendar day of the following month. The IACCII "Enrollment Termination Notification Form" must be submitted to MDHS/DYS office upon enrollment and termination of participants.

d. The Proposer must meet at the request of MDHS to review the Proposer's

performance under the Subgrant. MDHS may also conduct periodic on-site monitoring and/or auditing of Proposer's performance under the Subgrant. MDHS shall provide the Proposer with written notice of any on-site monitoring and/or auditing visit. Performance evaluation monitoring/reviews will be conducted as determined by MDHS.

e. The findings of all performance evaluation reviews/visits shall be recorded by MDHS and presented, in writing, to the Proposer. Should the Proposer not concur with the findings, the Proposer shall be given an opportunity to submit a written statement to MDHS to that effect. The Proposer's written disagreement shall be considered by MDHS in its final report.

f. MDHS shall use the monthly reports and reviews as described under this Section and such other reviews or reports as may be required by MDHS, federal, and/or state agencies as a measure of the Proposer's performance.

g Further, Proposer shall cooperate fully with any data collection and evaluation activities carried out by MDHS in connection with the services performed under this Subgrant.

h. The Proposer shall submit and receive prior approval of any such sub-contract for outside treatment or organization providing treatment from the DYS program manager. Charges submitted for billing of specific services for treatment must be submitted in a cost break-out report for services provided by the vendor.

**7. Fidelity Bond**

A fidelity bond in the amount equal to twenty-five percent (25%) of the contract amount must be obtained and placed in effect for the duration of the program in which MDHS is providing funds, naming MDHS as the insured.

**8. Administrative Expense**

Proposer shall not report administration expenses in excess of 15% of counseling services.

**9. Work Facility**

The Proposer shall be responsible for the acquisition of suitable space to house its offices and documents relevant to the Subgrant. Such space shall be located in an area that is readily accessible to MDHS, recipients of Subgrant services, and is convenient to public transportation. The space shall comply with the provisions of the American with Disabilities Act (P.L.101 - 336) and all applicable state and local

building codes.

**10. Public Assistance Fraud**

The Proposer shall report/refer any cases of suspected fraud related to the receipt of public assistance to the local Department of Human Services' office or the Division of Youth Services. The Proposer shall not be responsible for determining if action should be taken against the alleged perpetrator.

**11. Licenses and Permits**

Proposer shall obtain all permits, licenses, and registrations to undertake all activities necessary to do business in Mississippi. If it fails to do so, Proposer shall be considered in default of its obligation to MDHS and the State of Mississippi, and the Subgrant shall be terminated.

**12. State Forms**

The Proposer shall use such forms as MDHS may require in the administration and operation of Subgrant.

**13. Service Delivery**

The program will decrease criminal activity among its participants, as well as inspire the adolescents to be more positive and effective individuals. Project Outcomes must demonstrate the following:

a. Reduction of training school and detention center commitment rates.

b. Proven success rate in the decline of recidivism within the targeted youth population.

c. Track the success of the project using statistical data.

**H. Collaborations**

The Proposer must work with local youth courts, school systems, mental health providers, and other state agencies to assist families. The Proposer should also be prepared to work closely with local community-based service providers and the faith-based community.

**I. Detailed Timeline/Work Plan**

Each client must receive supervision and counseling, including monitoring of employment and educational status participation, compliance with set curfews and assigned public service

work, as well as compliance with established program rules and regulations. The Proposer will be responsible for supervising youth under the jurisdiction of the court assigned to them until court supervision is terminated, or until DYS transfers supervision of the youth to another counselor thus removing the Proposer's responsibility for supervising the youth. The duration of programming and intervention provided to each youth will be determined by the youth's individual needs.

**J. Evaluation Tool**

To evaluate progress toward goals and objectives, all program staff who provides services to the adolescents must meet weekly to review client cases. Phase placements shall be evaluated and individual treatment plans must be reviewed and signed by program staff on a monthly basis by program staff. Those involved in the evaluation must include the program coordinator, therapists, and case manager.

MDHS/DYS will evaluate the program in four areas as follows:

1. Reduction of commitment rate by 30%;

2. Decrease positive drug screenings by 5%.

3. Increase the number of adolescents placed back into the regular school setting by 80%.

**K. Performance Measures**

- Clients served each quarter: Determined by Judicial Order.

- The specific target population for this initiative is: Adolescent offenders 10 through 17 years of age who possess high risk of returning or becoming further involved in the criminal justice system.

- All programmatic and fiscal reports should be completed and submitted on a monthly basis and by the 10th of the month.

- Services for sub-contracts are approved by DYS prior to providing services.

- A break-out of all services provided with cost will be submitted to DYS each month on the 10th.

**L. Evidence-Based Practices**

Each IACCII must incorporate evidence-based practices and positive behavioral intervention that includes two (2) or more of the following elements **(Referenced from**

**the 2006 Session-House Bill 199; pages 20 and 21; lines 662-670):**

- academic
- tutoring/literacy
- mentoring
- vocational training
- substance abuse treatment
- family counseling
- anger management

Programs may include, but shall not be limited to:

- after school and weekend programming
- job readiness programs
- home detention programs
- community service conflict resolution programs
- restitution and community service

The following Blueprints Model (Evidence-Based) Programs were selected from a review of over 600 programs. These programs have acquired relative consistency in producing positive outcomes with clients.

**Program Titles**

- Midwestern Prevention Project (MPP).
- Big Brothers Big Sisters of America (BBBS).
- Functional Family Therapy (FFT).
- Life Skills Training (LST).
- Multisystemic Therapy (MST).
- Nurse-Family Partnership (NFP).
- Multidimensional Treatment Foster Care (MTFC).
- Olweus Bullying Prevention Program (BPP).
- Promoting Alternative Thinking Strategies (PATHS).
- The Incredible Years: Parent, Teacher and Child Training Series (IYS).
- Project Towards No Drug Abuse (Project TND).

****To acquire more information on evidence-based program models, go to www.pacificlearning.com.***

## M. Evaluation Tool

To evaluate progress toward goals and objectives, all program staff who provide services to the adolescents must meet weekly to review client cases. Phase placements shall be evaluated and individual treatment plans must be reviewed and signed by program staff on a monthly basis by program staff. Those involved in the evaluation must include the program coordinator, therapists, and case manager.

MDHS/DYS will evaluate the program in three areas as follows:

- Reduction of commitment rate by 30%;
- Decrease positive drug screenings by 5%.

- Increase the number of adolescents placed back into the regular school setting by 80%.

**N. Performance Measures**

- Clients served during funding period: Non-Medicaid and Non-Billed Medicaid.
- Clients served each quarter: Determined by Judicial Order.
- The specific target population for this initiative is: Adolescent offenders 10 through 17 years of age who possess high risk of returning or becoming further involved in the criminal justice system.
- Placements, if appropriate, during funding period: Non- Medicaid and Non-Billed Medicaid clients.
- All equipment should be leased or purchased by December 31, 1007.
- All administrative and programmatic staff should be hired by 15 days within the beginning date of the contract in SFY 2007.
- All programmatic and fiscal reports should be completed and submitted on a monthly basis and by the 10th of the month.

## V. MDHS' RESPONSIBILITIES

**A. Forms and Policies**

MDHS will furnish the Proposer with a prototype of all required or recommended MDHS forms to be used in the administration and operation of the program from which the Proposer shall reproduce sufficient forms for their use.

MDHS will provide the Proposer with program manual and policy updates and changes.

**B. Other Duties**

MDHS will --

- Monitor work performed by the Proposer.
- Provide information on MDHS' requirements relevant to the Subgrant.
- Remit payment to the Proposer in accordance with the terms and conditions of the Subgrant.

- As appropriate, keep Federal and State officials apprized of the Proposer's work under the Subgrant.

- Intervene in any Proposer's operations for cause as determined by MDHS.

## VI. EVALUATION AND AWARD CRITERIA

### A. Overview of Evaluation Methodology

1. During the evaluation process, all information concerning the proposals submitted, including identity and number of Proposers, will remain private and will not be disclosed to anyone whose official duties do not require such knowledge. At any time during the evaluation, MDHS may request a Proposer to provide explicit written clarification of any part of the Proposer's proposal.

2. At its discretion, MDHS may perform an appropriate cost and pricing analysis of a Proposer's proposal.

3. If Subgrants are awarded, the awards will be made to that financially responsible and technically responsive Proposer whose proposal conforms to the conditions and requirements of this RFP, and which is most advantageous to MDHS with price and other factors considered. MDHS will notify the successful Proposer in writing of the award of the Subgrants. MDHS will notify the unsuccessful Proposers in writing that their proposals have not been accepted.

4. The evaluation will be conducted in five phases:

   a. Phase I - Selection of Responsive Proposals
   b. Phase II - Evaluation of Management and Technical Proposal
   c. Phase III - Evaluation of Financial Component
   d. Phase IV - Recommendation of Proposer
   e. Phase V - Award and Notification

### B. Evaluation Committee

1. A committee will be selected to evaluate proposals. Members of the Evaluation Committee will be from pertinent MDHS' programmatic and administrative personnel.

2. Other professional staff and consultants may also assist in the evaluation process.

3. MDHS reserves the right to alter the composition of the Evaluation Committee and their specific responsibilities.

D. **RIGHTS AND REMEDIES UPON TERMINATION OR SUSPENSION.** In the event of termination or suspension as provided in this Section, Proposer shall be entitled to receive just and equitable compensation for unreimbursed obligations or expenses that are reasonably and necessarily incurred in the satisfactory performance, as determined by MDHS, of this Agreement, that were incurred before the effective date of suspension or termination, and that are not in anticipation of termination or suspension. Costs of the Proposer resulting from obligations incurred by the Proposer during a suspension or after termination of this Subgrant are not allowable under this Agreement. MDHS shall not be liable for any further claims of the Proposer. In no case, however, shall said compensation or payment exceed the total amount of this Subgrant. Proposer shall be liable to MDHS for damages sustained by MDHS by virtue of any breach of this Agreement by Proposer, and MDHS may withhold any payments to Proposer for the purpose of set off until such times as the exact amount of damages due to MDHS from Proposer are determined.

In case of termination or suspension as provided hereunder, all property, finished or unfinished documents, data, studies, surveys, drawings, photographs, manuals and reports or other materials prepared by or for the Proposer under this Agreement shall, at the option of MDHS, become the property of MDHS and shall be disposed of according to MDHS' directives.

The rights and remedies of MDHS provided in this Section shall not be exclusive and are in addition to any other rights and remedies provided by law or in equity.

**AGREEMENTS BY PROPOSER**

A. **SUBCONTRACTORS.** It is understood and agreed that the Proposer may enter into agreements or subcontracts with eligible entities (hereinafter sometimes referred to as Proposer's Contractor/Subcontractor) for the provision of the services required under this Agreement. Any and all such agreements or subcontracts shall include all of the terms and conditions of this Agreement. The Proposer, however, shall be fully responsible for the performance of its Contractors/ Subcontractors. Copies of all subcontracts, agreements, and modifications thereto shall be forwarded to MDHS' Division of Youth Services.

B. **LIABILITY OF SUBCONTRACTORS.** Proposer agrees that in any agreement or subcontract for the provision of the services covered by this Agreement, it shall require that the contractor or subcontractor release and hold harmless MDHS from and against all claims, demands, liabilities, suits, damages and costs of every kind and nature whatsoever, including court costs and attorneys' fees, arising out of or caused by the Contractor or Subcontractor and/or its officers, agents, employees, and volunteers in the performance of such services.

**RECORDS AND AUDITS**

A. **MAINTENANCE OF RECORDS.** Proposer shall establish and maintain financial and programmatic records, supporting documents, statistical records and other records as may be necessary to reflect the performances of the provisions of this Agreement.

B. **FISCAL REQUIREMENTS AND AUDIT.** Proposer shall establish such fiscal control and fund accounting procedures, including internal auditing procedures, as may be necessary to assure

the proper disbursal of and accounting for funds in accordance with this Agreement, the Single Audit Act Amendments of 1996 (31 U.S.C. Sections 7501 - 7507) and revised United States Office of Management and Budget (OMB) Circular A-133. The Proposer shall keep, maintain and present to MDHS, as required, necessary and proper vouchers, documentation and such other reports as may be required to support the expenditure of funds pursuant to this Agreement, and the Proposer shall keep and maintain bookkeeping and accounting records and procedures as the same may be established and approved by MDHS. The Proposer's records must be sufficient to allow MDHS to audit and monitor the Proposer's operation of its program and sufficient to permit the preparation of reports required by the Single Audit Act and the statutes authorizing this Subgrant. These records shall be set up in accordance with Generally Accepted Accounting Principles, MDHS' Fiscal Accountability Guidelines, and OMB Cost and Accounting Standards.

C. **INDEPENDENT AUDIT.** Audits shall be made by an independent auditor in accordance with the Single Audit Act Amendments of 1996, revised OMB Circular A-133, and generally accepted government standards covering financial audits.

D. **AUDIT FINDINGS.** Proposer shall receive, reply to and resolve any state and/or federal programmatic, fiscal and administrative exceptions related to this Agreement and/or any of the Proposer's Contractors/Subcontractors.

**RECORD RETENTION AND ACCESS TO RECORDS**

It is specifically understood and agreed that the Proposer shall provide MDHS with readily accessible and full opportunity to conduct program and/or fiscal monitoring and auditing (including through on-site visits to the Proposer's premises) of the Proposer's performance under this Agreement. MDHS, any State agency authorized to audit MDHS, the federal grantor agency, and the Comptroller General of the United States or any of their duly authorized representatives shall have the right of access to any books, documents, papers or other records of the Proposer that are pertinent to the services performed under this Agreement in order to make audit, examination, excerpts and/or transcripts. These records shall be retained for at least three (3) years; however, if any litigation or other legal action, by or on behalf of the State or Federal Government has begun that is not completed at the end of the three (3) year period, or if audit finding, litigation or other legal action has not been resolved at the end of the three (3) year period, the records shall be retained until resolution.

**MONTHLY REPORTING**

Proposer shall furnish MDHS with written monthly reports of costs incurred, which shall contain sufficient data to permit the tracing of funds to a level of expenditures adequate to establish that such funds have been used in compliance with this Agreement. Such reports shall be due ten (10) calendar days after the close of each month, shall be complete for the period covered and shall contain financial details pertinent to the subgrant. Proposer shall review and discuss such reports with MDHS at such time and in such manner as may be deemed appropriate by MDHS.

acknowledged in any advertising, print, brochures, flyers, etc. used to advertise services that the Proposer and/or its Contractors/Subcontractors are providing with said agency's funding.

**OWNERSHIP OF DOCUMENTS AND WORK PRODUCTS**

All documents, notes, programs, books, data bases (and all applications thereof), files, reports, studies, unfinished documents, and/or other material collected or prepared by the Proposer and/or any of its Contractors/Subcontractors in connection with this Agreement shall be owned by MDHS during the term of this Agreement and upon completion or termination of this Agreement. MDHS hereby reserves all rights to all systems, computer programs, data bases and all applications thereof and to any and all information and/or material prepared in connection with this Agreement. The Proposer is prohibited from use of the aforesaid information and/or material without the express prior written approval of MDHS.

**PROPERTY, EQUIPMENT AND SUPPLIES**

Property, equipment and supplies purchased, in whole or in part, with funds provided by MDHS shall be accounted for and disposed of in accordance with MDHS' directives, policies and procedures. Proposer must adequately safeguard all such property and must assure that it is used solely for purposes authorized by this Agreement. Nothing herein, however, shall be construed to authorize the Proposer to purchase equipment with funds provided under this Subgrant unless such is specifically allowed by Section III of this Agreement.

**LIMITATION ON EXPENDITURE OF PROGRAM FUNDS**

Expenses charged against funds granted herein shall not be incurred by the Proposer except during the period of this Agreement as set forth above and may only be incurred and paid only as necessary to the performance of the work and activities set forth in Exhibit A. All expenses obligated for the approved program must be supported by approved signed contracts, bills, or other evidence of liability consistent with MDHS established procurement procedures. Further, funds received under this Agreement and any contract or subcontract hereunder shall be used only to supplement, not supplant or duplicate, the amount of federal, state and/or local funds otherwise expended for services provided by the Proposer or in the Proposer's service area.

**CONFLICT OF INTEREST**

Proposer shall ensure that there exists no direct or indirect conflict of interest in the performance of this Subgrant and/or performance by any of the Proposer's/Subcontractors. Further, Proposer warrants that no part of any federal or state money shall be paid directly or indirectly to an employee or official of MDHS as wages, compensation or gifts in exchange for acting as an officer, agent, employee, subcontractor, or consultant to the Proposer in connection with any work contemplated or pertaining to this Subgrant or Agreement. Proposer shall strictly comply with all conflict of interest provisions or standards of conduct provisions contained in the MDHS Proposer/Contract Manual or any applicable state, federal, or local law, rule, or regulation.

**GOVERNING LAWS AND LEGAL REMEDIES**

This Agreement shall be construed and governed in accordance with the laws of the State of Mississippi. Proposer expressly agrees that under no circumstances shall MDHS be obligated to pay an attorney's fee or the cost of legal action to Proposer.

Any notice required or permitted to be given under this Agreement shall be in writing, personally delivered or sent by certified mail, to the party to whom the notice should be given at the address set forth on the Mississippi Department of Human Services' (MDHS) Subgrant/Contract Signature Sheet or at such address as the party may provide in writing from time to time.

**CERTIFICATIONS OF COMPLIANCE AND ASSURANCES**

This Agreement is also subject to the Standard Assurances, Certifications Regarding Lobbying, Debarment, Suspension and Other Responsibility Matters; and Drug-Free Workplace Requirements, MDHS' Certification Regarding Unresolved Monitoring Findings; Unresolved Audit Findings; and Litigation Occurring Within the Last Three (3) Years; the Certification of Adequate Fidelity Bonding; and the Board Member's Notification of Liability, attached hereto.

# STATE OF MISSISSIPPI
# DEPARTMENT OF HUMAN SERVICES

## REQUEST FOR PROPOSALS

## INDIVIDUALIZED ASSESSMENT AND COMPREHENSIVE COMMUNITY INTERVENTION INITIATIVE (IACCII) PROGRAM

## EXHIBIT A

**Exhibit A includes:**

- **Cover Sheet**

STATE OF MISSISSIPPI
DEPARTMENT OF HUMAN SERVICES

REQUEST FOR PROPOSALS

INDIVIDUALIZED ASSESSMENT AND COMPREHENSIVE COMMUNITY INTERVENTION INITIATIVE (IACCII)

# EXHIBIT B

Exhibit B includes:

- Board Member's Notification of Liability
- Standard Assurances

## MISSISSIPPI DEPARTMENT OF HUMAN SERVICES

## BOARD MEMBER'S NOTIFICATION OF LIABILITY

LIABILITY

MDHS assumes no liability for actions of the Proposer or its employees, agents or representatives under this Subgrant. Proposer agrees to indemnify, defend, save and hold harmless MDHS from and against all claims, liabilities, suits damages and cost of every kind and nature whatsoever, including court cost and attorney's fees, arising out of or caused by Proposer and/or its agents, employees, contractors, or subcontractors, in the performance of this Subgrant. The Proposer acting through its Board of Directors assumes liability in the event the Proposer misuses funds or fails to perform according to the provisions of the Subgrant. The Proposer shall notify each Board member, in writing, within 15 days of receiving the executed Subgrant of this requirement, and the Proposer shall sign a statement to this effect prior to receiving funds under this Subgrant.

I acknowledge and agree to notify all members of the Board of Directors, if applicable, in writing of the assumption by ________________________________ of liability in the event that ________________________________ misuses funds or fails to perform according to the provision of the Subgrant. Further, I will keep a copy of said notification letter as a permanent part of the Subgrant file.

Authorized Official Signature:

Name: ________________________

Organization: ________________________

Date: ________________________

Witness: ________________________

Date: ________________________

**OVERVIEW**

Each Subgrantee and any lower-tier subrecipient must assure that it will comply with the regulations, policies, guidelines, and requirements imposed by the Federal grantor agency and MDHS. The MDHS Subgrantee must also ensure that any lower-tier subgrants it issues through funds received from MDHS will require the lower-tier subrecipient to comply with these same regulations. The assurances listed in this section may not be applicable to a particular project or program, and there may be additional assurances required by certain Federal awarding agencies.

In addition, each subgrantee must certify in writing that it will comply with the following regulations:

- Lobbying
- Suspension and Debarment
- Drug-Free Workplace
- Unresolved Monitoring and Audit Findings
- Fidelity Bond Coverage

**STANDARD ASSURANCES**

The Subgrantee assures that it:

1. has the legal authority to apply for and receive the subgrant; that a resolution, motion, or similar action has been duly adopted or passed as an official act of the subgrantee's governing body, authorizing the subgrant, including all understandings and assurances contained therein, and directing and authorizing the person identified as the official representative of the Subgrantee to act in connection with the subgrant and to provide such additional information as may be required.

2. will give MDHS, the State Auditor's Office, the Federal grantor agency, and the Comptroller General, or any of their authorized representatives, access to and the right to examine all records, books, papers, documents, or items related to the subgrant.

3. will establish and maintain both fiscal and program controls and accounting procedures in accordance with generally accepted accounting principles and Federal grantor agency and MDHS directives; and will keep and maintain such books and records for audit by MDHS, by the Federal grantor agency, by the State Auditor, or by their authorized representatives; and will maintain all such records, books, papers, documents, or items for a period of at least three years from the date of submission of the final reporting worksheet, or, if any litigation, claims, audit, or action has begun before the expiration of the three-year period, will retain all such

items until the completion of the action and resolution of all issues involved or until the end of the regular three-year period, whichever is later.

4. will comply with the Single Audit Act Amendments of 1996.

5. will establish safeguards to prohibit employees from using their positions for a purpose that constitutes, or presents the appearance of, personal or organizational conflict of interest, or personal gain.

6. will comply with all Federal and State statutes relating to discrimination, including, but not limited to:

   Title VI of the Civil Rights Act of 1964, prohibiting discrimination on the basis of race, color, or national origin;

   Title VII of the Civil Rights Act of 1964, relating to non-discrimination in matters of recruitment, hiring, promotion, and other employment practices;

   Title VIII of the Civil Rights Act of 1968, as amended, relating to non-discrimination in the sale, rental, or financing of housing;

   Title IX of the Education Amendments of 1972, as amended, prohibiting discrimination on the basis of sex in federally assisted education programs and activities;

   the Age Discrimination Act of 1975, prohibiting discrimination on the basis of age;

   Section 504 of the Rehabilitation Act of 1973, prohibiting discrimination on the basis of handicaps;

   Subtitle A, Title II of the Americans with Disabilities Act (ADA) (1990);

   the Omnibus Reconciliation Act of 1981, prohibiting discrimination on the basis of race, color, religion, sex, national origin, age, and handicap;

   the Drug Abuse Office and Treatment Act of 1972, as amended, relating to non-discrimination on the basis of drug abuse;

   the Comprehensive Alcohol Abuse and Alcoholism Prevention, Treatment, and Rehabilitation Act of 1970, as amended, relating to non-discrimination on the basis of alcohol abuse or alcoholism; and,

   Act of 1970, as amended, relating to non-discrimination on the basis of alcohol abuse or alcoholism; and,

   Sections 523 and 527 of the Public Health Service Act of 1912, as amended, relating to confidentiality of alcohol and drug abuse patient records; and any other non-discrimination provisions in the specific statute(s) under which these monies will be granted or awarded and the requirements of any other non-discrimination statute(s) which may apply to this subgrant or award.

7. will ensure that buildings and facilities owned, occupied, or financed by the United States government are accessible to and usable by physically handicapped persons in accordance with the Architectural Barriers Act of 1968.

8. will comply with the requirements of the provisions of the Uniform Relocation Assistance and Real Property Acquisition Act of 1970, which provide for fair and equitable treatment of persons displaced or whose property is acquired as a result of Federal and federally assisted programs. These provisions apply to all interests in real property acquired for project purposes regardless of Federal participation in purchases.

9. will comply with the provisions of the Hatch Act, as amended, which limit the political activities of employees whose principal employment activities are funded in whole or in part with Federal funds.

10. will comply, as applicable, with the provisions of the Davis-Bacon Act, the Copeland Act,and the Contract Work Hours and Safety Standards Act, regarding labor standards for federally assisted construction subagreements.

11. will conform with Executive Order (EO) 11246, entitled "Equal Employment Opportunity," as amended by EO 11375, and as supplemented in Department of Labor regulations (41 CFR Part 60) and will incorporate an equal opportunity clause in federally assisted construction contracts and subcontracts.

12. will comply with the minimum wage and maximum hours provisions of the Federal Fair Labor Standards Act.

13. will comply with the Intergovernmental Personnel Act of 1970 relating to prescribed standards for merit systems for programs funded under one of the 19 statutes or regulations specified in Appendix A of OPM's Standards for a Merit System of Personnel Administration.

14. will comply, if applicable, with Section 102(a) of the Flood Disaster Protection Act of 1973, which requires recipients in a special flood hazard area to participate in the program and to purchase flood insurance if the total cost of insurable construction and acquisition is $10,000 or more.

15. will comply with the Lead-Based Paint Poisoning Prevention Act, which prohibits the use of lead-based paint in construction or rehabilitation of residence structures.

16. will assist the Federal grantor agency in assuring compliance with Section 106 of the National Historic Preservation Act of 1966, as amended; EO 11593; and the Archaeological and Historic Preservation Act of 1974.

17. will comply with environmental standards which may be prescribed pursuant to the following: (a) institution of environmental quality control measures under the National Environmental Policy Act of 1969 and EO 11514; (b) notification of violating facilities pursuant to EO 11738; (c) protection of wetlands pursuant to EO 11990; (d) evaluation of flood hazards in flood plains in accordance with EO 11988; (e) assurance of project consistency with the approved State management program developed under the Coastal Zone Management Act of 1972; (f) conformity of Federal actions to State (Clean Air) Implementation Plans under Section 176 of the Clean Air Act of 1955, as amended; (g) protection of underground sources of drinking water under the Safe Drinking Water Act of 1974, as amended; (h) protection of endangered species under the Endangered Species Act of 1973, as amended; (I) Section 6002 of the Resource Conservation and Recovery Act; and (j) the Coastal Barriers Resources Act.

18. will comply with the Wild and Scenic Rivers Act of 1968 related to protecting components or potential components of the national wild and scenic rivers system.

19. will comply with Public Law (PL) 93-348 regarding the protection of human subjects involved in research, development and related activities supported by this subgrant.

20. will comply with the Laboratory Animal Act of 1966 pertaining to the care, handling, and treatment of warm blooded animals held for research, teaching, or other activities supported by this subgrant.

21. will comply with Federal regulations regarding criteria for cost sharing or matching contributions.

22. will assure all funds received shall be used only to supplement services and activities that promote the purposes for which the grant is awarded, and not supplant, unless specifically authorized by the program regulations and the appropriate MDHS Division.

23. will provide certification regarding lobbying to comply with Section 319, PL 101-121 (31 USC 1352).

24. will provide the required certification regarding their exclusion status and that of their principals prior to the award in accordance with EOs 12549 and 12689 Debarment and Suspension.

25. will provide certification to comply with the Drug-Free Workplace Act of 1988.

26. will comply with all applicable requirements of all other Federal and State laws, Executive Orders, regulations, and policies governing the program(s) for which these monies are provided and with the terms and conditions of the Subgrant Agreement.

**STANDARD ASSURANCES AND CERTIFICATIONS**

**III. DRUG FREE WORKPLACE (PROPOSERS OTHER THAN INDIVIDUALS) - Continued**

(f) Taking one of the following actions, within 30 calendar days of receiving notice under subparagraph (d)(2), with respect to any employee who is so convicted --

(1) Taking appropriate personnel action against such an employee, up to and including termination, consistent with the requirement of the Rehabilitation Act of 1973, as amended; or

(2) Requiring such employee to participate satisfactorily in a drug abuse assistance or rehabilitation program approved for such purposed by Federal, State, or local health, law enforcement, or other appropriate agency.

(g) Making a good faith effort to continue to maintain a drug-free workplace through implementation of paragraphs (a), (b), (c), (d), (e), and (f).

The Proposer may insert in the space provided below the site(s) for the performance of work done in connection with the specific subgrant. Check ____ if there are workplaces on file that are not identified here:

Place of Performance (Street address, city, county, state, zip code)

______________________________________________

______________________________________________

**IV. UNRESOLVED MONITORING FINDINGS;**
**UNRESOLVED AUDIT FINDINGS;**
**AND LITIGATION OCCURRING WITHIN THE LAST THREE (3)YEARS**

Identify any unresolved monitoring findings related to any programs that have been received by the Proposer during the last three (3) years and the status of each finding:

______________________________________________

______________________________________________

Identify any unresolved audit findings related to any programs received by the Proposer during the last three (3) years and the status of each finding:

______________________________________________

______________________________________________

Identify any litigation and/or administrative hearings that the Proposer, the Proposer's Senior Management, or Proposer's Directors have been involved in during the last three (3) years, including the outcome or disposition of the case:

______________________________________________

______________________________________________

## REQUIRED CERTIFICATIONS (Continued)

**CERTIFICATION OF ADEQUATE FIDELITY BONDING**

Identify any and all types of bond coverage currently in force. Include the types of bond coverage; the officers or owners and employees covered; the period covered by the bond; and the limits of coverage assigned to each officer, owner, or employee and the total limit of the bond as applicable.

______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________

Proposers/Contractors that have been unable to obtain fidelity bond coverage, describe in detail the efforts made to obtain fidelity bond coverage and the reason coverage has not been obtained.

______________________________________________
______________________________________________
______________________________________________
______________________________________________

As the authorized representative of the Proposer, I hereby certify that the Proposer will comply with the above certifications in items I, II, and III; the information provided items III, IV and V is true and complete to the best of my knowledge, and that the coverage and amounts specified shall be maintained throughout the effective period of the subgrant.

PROPOSER NAME AND ANY OTHER NAMES UNDER WHICH THE PROPOSER HAS DONE BUSINESS:

______________________________________________

______________________________________________

PROPOSER ADDRESS AND ANY OTHER ADDRESSES THE PROPOSER HAS USED:

______________________________________________

______________________________________________

TYPED NAME AND TITLE OF THE PROPOSER'S AUTHORIZED REPRESENTATIVE

______________________________________________

SIGNATURE OF PROPOSER'S AUTHORIZED REPRESENTATIVE AND DATE:

______________________________________________

**EXAMPLE**
**MODIFIED ZERO-BASED BUDGET NARRATIVE**

**PROPOSER NAME**
**IACCII PROGRAM**
**ZERO-BASE BUDGET NARRATIVE**

**ADMINISTRATION** (Must not exceed 15% of grant award.)

Salaries

1 Program Coordinator $0,000 mo. @ 50%= $0,000. mo.
x 7 months = $0,000.

This position handles all functions required to manage grant funds.

1 Payroll Clerk @ 25% of $0,000. annual = $0,000.

This position handles all functions required to meet payroll responsibilities of staff.

Total Salaries $________

Fringe Benefits

FICA @ 7.65% of Gross Salaries ($0,000) = $0,000.

Workmen's Compensation - 3% of Gross Salaries ($0,000) =$000.

Total Fringe Benefits $________

Travel - Not to exceed State Approved Rates.

Staff to attend mandatory programmatic and fiscal training.

000.00 estimated miles @ $.485 per mile = $000.00

In- Service Training $0,000.00

Estimated Meals and Lodging

Total Travel $ ________

Commodities

Office Supplies - Paper, pens, calculator tape, etc. $000.

Estimated monthly $0,000 x 7 mo.'s = 0,000.00

Total Commodities $ ________

Contractual Services

Postage estimated $000.

Rental or Lease

Total Contractual Services $________

Equipment

1 Computer

Total Equipment $________

Indirect Cost - (COPY OF INDIRECT PLAN MUST BE SUBMITTED)

The approved indirect cost plan distributes the office cost (i.e. Executive Director's and staff salaries and fringe benefits, building rental and utilities) based upon the percentage of space occupied by the program's administration. This program's rate is 1 %. This year's office budget is $100,000.

Program share: $100,000 x 1 % = $1,000

Total Indirect Cost $___________

**TOTAL ADMINISTRATION** $___________

Mississippi
Form MDHS-CSSS-1007
Effective 3-01-2005

MISSISSIPPI DEPARTMENT OF HUMAN SERVICES

# COST SUMMARY SUPPORT SHEET

Page _____ of _____ Pages

| 1. Applicant Agency | | | |
|---|---|---|---|
| Subgrant Number | 3. Grant ID<br>SFY 2007 | 4. Beginning<br>December 1, 2007 | 5. Ending<br>June 30, 2008 |
| Activity<br>COUNSELING SERVICES | | | |

| 7. For MDHS Use Only | Line Item | Description of Item and/or Basis for Cost | 10. Budget | | |
|---|---|---|---|---|---|
| | | | Federal | All Other | Total |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | Totals | | | |