IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| J.B., a minor child, by and through his next friend, Addie Ward, on behalf of himself and all others similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | 2:06cv755-MHT |
| WALTER WOOD, in his individual capacity, | ) ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| J.B., a minor child, by and through his next friend, Addie Ward, on behalf of himself and all others similarly situated, | ) ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO. |
| v. | ) ) | 2:06cv908-MHT |
| | ) | (WO) |
| WALTER WOOD, in his individual capacity, | ) ) ) | |
| Defendant. | ) | |

OPINION

Plaintiff J.B., a minor child, brings this lawsuit, by and through his next friend and great-grandmother, against Walter Wood, Director of the Alabama Department of Youth Services (DYS), in his individual capacity, under the Fourteenth Amendment of the Constitution (as enforced through 42 U.S.C. § 1983) and Alabama law. J.B. claims that, when he was detained by court order in a county youth facility pending placement by DYS into a rehabilitative and drug-treatment program, he was denied his right under the due process clause of the Fourteenth Amendment that such placement take place within a reasonable period of time. He also brings common-law claims of negligence and wantonness based on the state-law requirement that DYS "accept all children committed to it within seven days of notice of disposition." 1975 Ala. Code § 12-15-61(c); see also id. § 12-15-71(j). As relief, he seeks compensatory and punitive damages and attorney's fees. Jurisdiction over his federal claim is proper under 28 U.S.C. § 1331 (federal question) and 28

U.S.C. § 1343 (civil rights); jurisdiction over his state-law claims is proper under 28 U.S.C. § 1367 (supplemental jurisdiction).

This case is currently before the court for resolution on the record of the issue of Wood's liability. For the reasons that follow, the court concludes that Wood has qualified immunity from J.B.'s federal claim and that the state-law claims should be dismissed without prejudice.


## I. BACKGROUND

The problems with delayed placement of juveniles by DYS is longstanding and began to receive judicial attention in the 1990s. In 1996, this court issued an order granting preliminary-injunctive relief to a class of juveniles in a suit against James Dupree, the former DYS Director. <u>A.W. v. Dupree</u>, No. 92-H-104-N (M.D. Ala. 1996) (Hobbs, J.).[1] In that order, the court held that

_____

1. J.B.'s Brief in Support of Opposition to Summary Judgment (doc. no. 38), Exhibit 14.

the failure to provide timely evaluations and placement of juveniles taken into DYS custody violated prior consent orders of the court and infringed upon the constitutional rights of plaintiff class members.

Focusing on a state law that requires DYS to "accept all children committed to it within seven days of notice of disposition," 1975 Ala. Code § 12-15-61(c), the court found that there were "scores of juveniles held in detention centers throughout the state awaiting rehabilitative services from [DYS]" and that the court "was concerned that evaluations for these juveniles [were] routinely not initiated within seven days, nor completed within fourteen days, as required by the Interim Consent Order [of August 25, 1994]." Id. at 3. The court recognized that DYS was operating under financial constraints but concluded that this was an inadequate defense to the plaintiffs' claims. The court concluded that the "unreasonable delay in getting [juveniles] evaluated, [and] subsequent unreasonable

4

delay in getting [them] placed in an appropriate program, [led] to unjustifiably prolonged restraints on juvenile's liberty" and was unconstitutional under the Fourteenth Amendment.  Id. at 6.

In October 2001, Wood entered into a settlement agreement with a juvenile, S.S., in which he agreed, without accepting liability, that DYS would accept children committed to its custody in compliance with the seven-day state-law requirement.  Nonetheless, delays in placement of juveniles persisted.

On May 18, 2005, after being adjudicated delinquent for first-degree burglary, J.B., the plaintiff in the present case, was committed to the custody of DYS by order of the Juvenile Court of Montgomery County, Alabama.  Pending J.B.'s transfer to DYS, the state court ordered that he be detained at the Montgomery County Youth Facility.  His detention at the youth facility lasted for 41 days without rehabilitative or drug-treatment services.  On June 28, 2005, he was placed at

the 28-day Autauga High Intensive Treatment (HIT) program, located in Prattville, Alabama. Subsequent to completion of the HIT program, he was placed at the 64-day Bridge program, located in Mobile, Alabama, for drug treatment, where he completed the program and was released.

On April 4, 2006, after being adjudicated delinquent for violation of after-care, J.B. was committed a second time to the custody of DYS by order of the Juvenile Court of Montgomery County. The court specifically noted that he was "committed for inpatient drug treatment" and further directed that he be detained at the Montgomery County Youth Facility pending transfer to DYS. J.B.'s detention at the youth facility on this occasion lasted for 35 days without rehabilitation or drug-treatment services. On May 10, 2006, he was placed at a drug-treatment facility in Mobile.

## II.  FEDERAL CLAIM

J.B. brings his federal claim against Wood in his individual capacity under 42 U.S.C. § 1983.  He claims that Wood caused him to suffer unjustifiable restraint on his liberty and acted with deliberate indifference to his right to placement within a reasonable time in a rehabilitative and drug-treatment program in violation of the Fourteenth Amendment.  Wood responds that he is immune from this federal claim pursuant to the Eleventh Amendment and the doctrine of qualified immunity.

### A.  Eleventh Amendment

Wood argues that J.B.'s federal claim, although brought against him in his individual capacity, is barred by the Eleventh Amendment because the State of Alabama is the real, substantial party in interest.[2]  He contends

---

2.  The Eleventh Amendment states: "The Judicial Power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. Const. Amend. XI.

that, if J.B. is successful on this claim, it would force DYS to conform its conduct to state law.  This argument lacks merit.

It is well settled that so long as a parties seek damages against public officials in their individual capacities, "the Eleventh Amendment does not restrict their ability to sue in federal court."  <u>Hafer v. Melo</u>, 502 U.S. 21, 31 (1991).  The Supreme Court has recognized that "imposing personal liability on state officers may hamper their performance in public duties," <u>id</u>., but "such concerns are properly addressed within the framework of [the Court's] personal immunity jurisprudence."  <u>Id</u>.

In this case, because J.B. seeks only monetary relief from Wood in his individual capacity and because J.B. is bases his claim on federal and not state law, J.B.'s federal claim is not barred under Eleventh Amendment sovereign immunity.

## B. Qualified Immunity

Wood also contends that he is immune from the federal claim pursuant to the doctrine of qualified immunity. The doctrine insulates government employees, sued in their individual capacities, from suit and liability for civil damages for actions taken pursuant to their discretionary authority. Saucier v. Katz, 533 U.S. 194, 200 (2001). In determining whether a public employee is entitled to such immunity, a court must undertake a two-step analysis. Sims v. Metropolitan Dade County, 972 F.2d 1239, 1236 (11th Cir. 1992). First, a court must determine whether the evidence establishes a constitutional violation. Scott v. Harris, 550 U.S. 372, 377 (2007). If the evidence adequately alleges a constitutional violation, the court must then determine whether the defendant's acts or omissions transgressed clearly established federal statutory or constitutional law of which a reasonable person would have known. Hope v. Pelzer, 536 U.S. 730, 737 (2002).

<u>Preclusive Effect of A.W. v. Dupree</u>:  J.B. relies exclusively on the unpublished opinion in <u>A.W. v. Dupree</u> to support his contention that the delay  in his placement into rehabilitative and drug-treatment programs violated his clearly established Fourteenth Amendment constitutional right to substantive due process of which a reasonable person would have known.  He contends that this court's decision in <u>A.W.</u> collaterally estops Wood from relitigating the issue of whether he was deprived of his right to substantive due process as a result of the delay in his placement.  For this reason, J.B. argues, Wood is not entitled to qualified immunity.

As the plaintiff, J.B. can "seek[] to foreclose the defendant from litigating an issue the defendant has previously litigated unsuccessfully in an action with another party." <u>Parklane Hosiery Co., v. Shore</u>, 439 U.S. 322, 326, n.4 (1979).  Four conditions must be met in order for issue preclusion to apply: "(1) the issue at stake must be identical to the one alleged in the prior

litigation; (2) the issue must have been actually litigated in the prior litigation; ... (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that earlier action;" and (4) "the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding." <u>Greenblatt v. Drexel Burnham Lambert, Inc.</u>, 763 F.2d 1352, 1360 (11th Cir. 1985). The party asserting issue preclusion bears the burden of persuasion.

J.B. seeks to have precluded from relitigation the constitutionality, under the Fourteenth Amendment due process clause, of the delay in his placement into a rehabilitation or drug-treatment program. In his briefs to this court, he never addresses, however, how the four conditions for establishing issue preclusion have been met. Instead, he merely attaches the opinion in <u>A.W.</u> The mere attachment of this opinion as support for the

contention that the issue of the constitutionality of the delay in placement is precluded is insufficient. J.B. "bears the burden of showing with clarity and certainty what was determined by the prior judgment." Clark v. Bear Stearns & Co., 966 F.2d 1318, 1321 (9th Cir. 1992). "[I]t is not enough that [he] introduce the decision of the prior court, rather, [he] must introduce a sufficient record of the prior proceeding to enable the trial court to pinpoint the exact issues previously litigated." Id.

In terms of ascertaining the exact issues previously litigated and particularly whether the parties litigated the issue of the constitutionality of the delay in placement of juveniles, the A.W. opinion provides limited clues. The A.W. court addressed a motion for preliminary-injunctive relief filed by a class of juveniles. The opinion describes the juveniles' claim as follows: "The plaintiffs claim that the defendant has, and continues to, violate prior consent orders of this court relating to the provision of evaluations and

services to juveniles committed to the Department of Youth Services." <u>A.W. v. Dupree</u>, No. 92-H-104-N, at 1. The claim, as described in the opinion, does not raise the issue of the constitutionality of the delay in placement. However, the court, after finding that the practices of the department violated prior consent orders, goes on to state "that said practices infringe upon the constitutional rights of plaintiff class members." In elaborating on the reasons why the constitutional rights of the juveniles were infringed, the court never lays out the competing contentions as to the constitutionality of the department's practice. Therefore, it is impossible to assess whether the parties in fact actually litigated the issue.

Even assuming that the <u>A.W.</u> opinion is sufficient to demonstrate that the parties actually litigated the issue of the constitutionality of the delay in placement of juveniles under the due process clause, the court is not convinced that J.B. has shown that this finding was

necessary to the decision.  In order for the court in
<u>A.W.</u> to grant a preliminary injunction, the juveniles had
to show: (1) a substantial likelihood of success on the
claim that DYS continued to violate prior consent orders
relating to the provision of evaluations and services to
juveniles committed to the department; (2) the threat of
irreparable injury if the preliminary injunction were not
granted; (3) such injury outweighed the harm that the
preliminary injunction would cause to the opposing party;
and (4) the preliminary injunction would be in the public
interest.  <u>GSW, Inc. v. Long County</u>, 999 F.2d 1508, 1518
(11th Cir. 1993).  Although the court did address the
constitutionality of the delay in placement in passing,
the resolution of this issue was unnecessary to the
determination of whether the juveniles were entitled to
injunctive relief as a result of the department's
violation of a prior consent order.  If the department
violated a consent order, the court could have granted
the preliminary injunction irrespective of its resolution

of the issue of the constitutionality of the delay in placement. See I.A. Durbin, Inc. v. Jefferson Nat'l Bank, 793 F.2d 1541, 1551 (11th Cir. 1986). Therefore, the prerequisite for applying issue preclusion (that the determination of the issue in the prior litigation have been a critical and necessary part of the judgment in that earlier action) has not been met.

Finally, J.B.'s federal claim is against Wood in his individual capacity; whereas A.W. brought suit against Wood's predecessor, Dupree, in his official capacity. In this case the issue is Wood's own personal conduct and whether he can be held liable for that conduct. That issue simply was not litigated in A.W.

Applicable Constitutional Standard: Given the inapplicability of issue preclusion to this case, this court must, in accordance with the qualified-immunity doctrine, determine whether the evidence in this case establishes a constitutional violation. The court must first address the question of what constitutional

standard applies to the issue of the constitutionality of the delay in placement of a delinquent juvenile in a rehabilitative or drug-treatment program.  J.B. argues, consistent with the opinion in A.W., that the delay in his placement should be addressed under the Fourteenth Amendment due process clause.  He maintains that the delay would violate the due process clause if he can show that it was unreasonable and unjustifiable restraint on his liberty and that Wood was deliberately indifferent to the delay.  See D.W. v. Rogers, 113 F.3d 1214, 1218-19 (11th Cir. 1997) (finding that a juvenile committed a mental health facility had a substantive due process right to treatment); Hale v. Tallapoosa County, 50 F.3d 1579, 1582 n.4 (11th Cir. 1995) (applying the Fourteenth Amendment due process clause to a pretrial detainee). Wood contends that the delay in the placement of J.B. should be addressed as a condition of confinement case under the Eighth Amendment.  In accordance with the Eighth Amendment, such delay would violate J.B.'s

constitutional rights only if he can show that Wood was deliberately indifferent to his objectively serious medical need. See Morales v. Turman, 562 F.2d 993, 998-999 (5th Cir. 1977) (applying the Eighth Amendment deliberate-indifference standard to the denial or delay in the provision of medical-treatment services to juveniles);[3] see also Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1185-92 (11th Cir. 1994) (applying the deliberate-indifference standard to a claim brought by a juvenile detained in a youth detention center), overruled in part by Hope v. Pelzer, 536 U.S. 730 (2002).

However, regardless as to the constitutional amendment deemed applicable, J.B. must show deliberate indifference on Wood's part. See Marsh v. Butler County, 268 F.3d 1014, 1024 n. 5 (11th Cir. 2001) (en banc) ("the standard for providing basic human needs to those

---

3. In Bonner v. Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments"). This he has not shown.

Deliberate-Indifference Standard: The deliberate-indifference standard has two components, "an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind." Sims v. Mashburn, 25 F.3d 980, 983 (11th Cir. 1994).

To meet the objective component in a denial or delay of treatment case, a plaintiff must first demonstrate the existence of an "objectively serious medical need." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). "Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to [a] violation only if those needs are 'serious.'" Hill 40 F.3d at 1186

(quoting <u>Hudson v. McMillian</u>, 503 U.S. 1, 9 (1992)). "[A] 'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." <u>Id</u>. at 1187 (citation omitted). As explained by the Ninth Circuit Court of Appeals, "[a] 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" <u>McGuckin v. Smith</u>, 974 F.2d 1050, 1059 (9th Cir. 1992) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 104 (1976)), <u>overruled on other grounds by</u> <u>WMX Technologies, Inc. v. Miller</u>, 104 F.3d 1133, 1136 (9th Cir. 1997)).

<u>Objectively Serious Medical Needs</u>:  J.B. contends that during the two commitments by the juvenile court he was harmed by Wood's delay in placing him in a rehabilitative or drug-treatment program.  In his first commitment for first-degree burglary, the Juvenile Court

of Montgomery County placed him with DYS with a referral to a Counseling and Psychiatric Service program. Nonetheless, it took approximately 20 days before he was referred by the staffing and placement committee at DYS for placement in a rehabilitative and drug-treatment service program. According to the Screening and Placement Staffing Report, J.B. had a risk assessment score of 11, which was in the high-risk category.[4] His service plan evaluation completed a week after the staffing report determined that he had scored a 52 on the adolescent-alcohol-and-drug-involvement scale, indicating that he was chemically dependent.[5]

Serious drug and alcohol addiction has been found by courts to constitute an objectively serious medical need. See, e.g., Davis v. Carter, 452 F.3d 686, 688, 695 (7th

---

4. Classification Manual, Exhibit 12. Juveniles with a risk-assessment score above ten are considered to be in the high-risk category and are considered to require the type of housing that includes an institutional bed or medium-secure bed.

5. Service Plan Evaluation, Exhibit 17

Cir. 2006) (holding that a drug and alcohol addiction requiring methadone maintenance program was a serious medical need); <u>Lancaster v. Monroe County, Ala.</u>, 116 F.3d 1419, 1425-26 (11th Cir. 1997) (stating that acute alcohol withdrawal that causes seizures to be a serious medical condition and holding that "a jail officer who is aware of but ignores the dangers of acute alcohol withdrawal and waits for a manifest emergency before obtaining medical care is deliberately indifferent to the inmate's constitutional rights"); <u>Morrison v. Washington County, Ala</u>, 700 F.2d 678, 686 (11th Cir. 1983) (holding that a person suffering from acute alcohol-abstinence syndrome to be seriously ill). In particular, drug and alcohol addictions that have been found to constitute an objectively serious medical need are those that result or have the potential to result in serious injury or pain. <u>See, e.g</u>, <u>Davis</u>, 452 F.3d at 688 (death); <u>Lancaster</u>, 116 F.3d at 1425-26 (seizures and death); <u>Morrison</u>, 700 F.2d at 686-87 (death).

Although there is no evidence that J.B. suffered serious injury or pain, the court concludes, in light of the greater vulnerabilities of juveniles to the physical stresses associated with chemical dependency relative to adults, that J.B.'s dependency without treatment had the potential to result in serious injury or pain. The court therefore finds that J'B's level of drug addiction created an objectively serious medical need.

Deliberate Indifference: The subjective component of the standard requires a determination that Wood was deliberately indifferent to J.B.'s chemical dependence and that this deliberate indifference caused the delay in J.B.'s placement into a rehabilitation or drug-treatment program.

Deliberate indifference entails more than mere negligence. Estelle v. Gamble, 429 U.S. 97, 106 (1976). A prison official cannot be found deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety." Farmer v.

22

Brennan, 511 U.S. 825, 837 (1994).  Specifically, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id.  Thus, "deliberate indifference has three requirements: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence."  Farrow v. West, 320 F.3d 1235, 1245 (11th Cir. 2003).

In order to better assess the deliberate indifference claim, it is necessary to address the context of juvenile-placement decisions at the department.  DYS has the authority to make placements of delinquent juveniles without the approval of the committing court.  At DYS, placement decisions are made by the placement and staffing committee and ultimately approved by the director, in this case Wood.  The committee has meetings once a week in which it places juveniles in the appropriate rehabilitative or drug-treatment program.

23

The department has a practice whereby it will not staff a committed juvenile until it has received the necessary information to make the placement decision. This includes the court order, a social summary, risk and needs assessment, school transcripts, social security number, and immunization records. This practice of waiting to receive all the necessary information prior to placement is based on the placement and classification manual, which requires that placement decisions be made that are in the child's best interest.

Delays in placement are caused, in part, by this staffing process. With regards to most juveniles, there is a delay in receiving the necessary information, and, even in cases in which it is received, delays are caused by the fact that staffing takes place only once a week. During this delay, juveniles are held in detention at DYS without receiving credit, notice of when they will be placed, or the necessary rehabilitative or drug-treatment services.

In the case of J.B., he was first committed to the custody of DYS on May 18, 2005.  The service plan indicating his drug dependency was not completed by the Montgomery Area Mental Health Authority until June 17, 2005.  Eleven days after receiving the service plan, he was placed at the 28-day Autauga HIT program.  Subsequent to completion of the HIT program, he was placed at the 64-day "Bridge" program for drug treatment where he completed the program and was released.  Therefore, it took DYS 11 days to place J.B. after being informed of his drug dependency.

J.B. was next committed to the custody of DYS on April 4, 2006.  He has not presented any evidence as to when a service plan was completed after this commitment or any other indicators of when the department determined that he was chemically dependent.  Thirty-five days later, on May 10, 2006, he was placed in a drug-treatment program in Mobile.  There is also no evidence that he received credit for the time served at DYS detention,

notice of when he would be placed, or the necessary rehabilitative or drug-treatment services.

J.B. contends that Wood was deliberately indifferent to his delays in placement without rehabilitation or drug-treatment services. He contends that there is no statutory or regulatory requirement that the staffing committee wait to receive all of the necessary information prior to placing juveniles, such as himself, or that there be only a once-a-week staffing schedule. In addition, he argues that Wood could have pursued alternatives such as sending him home with electronic monitoring or to a group or foster home while he awaited placement into a rehabilitation or drug-treatment program.

J.B.'s deliberate-indifference contention fails because the evidence is insufficient to support the conclusion that Wood had subjective knowledge of the risk posed by J.B.'s drug dependency. As stated, in order to be held liable for deliberate indifference, Wood had to

have subjective knowledge of the risk of harm.  <u>Farmer</u>,

511 U.S. at 841.  Subjective knowledge can be

demonstrated by showing that Wood had actual knowledge or

inferred when a risk is obvious, such as in cases in

which the risk is "longstanding, pervasive, well-

documented, or expressly noted by ... officials in the

past, and the circumstances suggest that the defendant

... being sued had been exposed to information concerning

the risk and thus 'must have known' about it."  <u>Id</u>. at

842.

In this case, there is no evidence that Wood had

actual knowledge.  In his deposition, Wood stated that he

did not personally review J.B.'s file.  He was not a part

of the staffing committee that reviewed J.B.'s case and

therefore did not review J.B.'s screening and placement

report or his service plan evaluation that revealed

J.B.'s drug dependency prior to his placement.  Although

he was the ultimate decision-maker regarding J.B.'s

placement, in this case members of the screening and

placement committee affixed his signature to documents related to the juvenile's placement, without his review.

In addition, while the delay in placement of juveniles is long-standing, pervasive, and well-documented as demonstrated by the history of litigation on this issue, the risk of harm to J.B. as a result of this delay was not so obvious that Wood should be held liable. A delay in placement of an otherwise physically and mentally healthy child does not create a risk of harm. Instead, only when juveniles suffer from objectively serious medical needs does the risk of harm rise to the level of a constitutional violation. J.B. has not presented any evidence of long-standing, pervasive, or well-documented delays in placement of children with objectively serious medical needs. Wood, therefore, did not have subjective knowledge of the risk from the delay in placement of J.B. in a rehabilitation or drug-treatment program.

Even assuming that Wood had subjective knowledge of the risk, the deliberate indifference claim still fails because J.B. has not shown that Wood acted with anything more than mere negligence in his failure to place J.B. in a rehabilitation or drug-treatment program without unreasonable delay.

Wood has successfully argued that a source of the delay in J.B's placement was the lack of bed spaces in the rehabilitation and drug-treatment facilities. This lack of capacity is systemic. Juveniles are placed in detention by committing courts. The intake of juveniles in treatment facilities is then determined by the number of beds available for particular classifications of juveniles compared to the number of commitments in these classifications. Delays occur when there is insufficient capacity in certain classifications at certain times. Wood concedes that occasionally he has been able to reallocate DYS resources to eliminate or minimize, within applicable categories of placement options, wait lists

when they have occurred.  However, there is no evidence that in this instance Wood deliberately failed to eliminate or minimize the wait list for J.B.'s placement in a drug-treatment program.

J.B. contends that Wood deliberately disregarded the risk of harm resulting from his drug dependency by not seeking alternative placement, such as at home with electronic monitoring or in a group or foster home.  He argues that Wood had the authority to send him home with electronic monitoring or to a group or foster home.  The court agrees that Wood had this authority; however, it is not clear that such courses of action would have been in J.B.'s best interest.

J.B.'s service plan evaluation showed that he lived with his grandparents.  While at home, he and his friends used drugs and committed crimes such as breaking and entering and robbery.  In particular, J.B. experimented with alcohol, marijuana, mushrooms, and Xanax pills.  He was a member of the Crips gang and had been expelled from

school for possession of marijuana. A decision by Wood to send J.B. home, even with electronic monitoring, would have placed him at risk of continued drug abuse prior to his placement in a rehabilitation or drug-treatment program. Therefore, the decision of Wood to not pursue home placement as an alternative to detention did not demonstrate deliberate indifference to J.B.'s chemical dependency.

In addition, J.B. has not shown that the alternative options of group-home placement were available at the time of his commitment. In particular, he has not shown that there was space available at particular group homes that could have served as an alternative to his detention at the Montgomery Youth Facility or that Wood was aware of these alternatives. Even assuming that there were places available in group homes, J.B. has not shown Wood was aware that a group home would be better positioned to address the risk of harm associated with his chemical dependency as J.B. awaited placement in a rehabilitation

or drug-treatment program. As a result, the failure of Wood to place J.B. in a group home does not demonstrate deliberate indifference to J.B.'s chemical dependency.

In sum, the delay in placement of J.B. into a rehabilitation or drug-treatment program after his commitments by the court did not amount to a constitutional violation. In the absence of a constitutional violation, Wood is immune from suit on J.B.'s federal claim.[6]

### III. STATE-LAW CLAIMS

J.B. also asserts that Wood was negligent and wanton in breaching his duty to place him within seven days from notice of disposition as required by Alabama law. This court declines to reach the merits of these claims.

A district court has discretion to decline supplemental jurisdiction over a claim when it "has

---

6. In any event, based on the facts before the court, even if Wood did violate J.B.'s constitutional right, the court cannot say that that right was clearly established.

dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Factors to be taken into account include "the values of judicial economy, convenience, fairness, and comity." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988). Courts are strongly encouraged to dismiss state claims when the federal claims have been resolved prior to trial. See id. (concluding that "federal court[s] should decline the exercise of [supplemental] jurisdiction by dismissing the case without prejudice" when the federal law claims have been dismissed prior to trial).

In the case, the court has found against J.B on his federal claim prior to trial. His Alabama state-law claims will be dismissed without prejudice. The period of limitations for filing the state law claims in state court will be tolled "for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." 28 U.S.C. § 1367(d).

*** 

33

For the foregoing reasons, this court concludes that Wood is entitled to qualified immunity on J.B.'s federal claim and that his remaining state-law claims should be dismissed without prejudice.

An appropriate judgment will be entered.

DONE, this the 25th day of March, 2010.

_____/s/ Myron H. Thompson_____
UNITED STATES DISTRICT JUDGE